# United States Court of Appeals
## For the First Circuit

---

Appeal # 25-1158

State of New Jersey, et al.
vs.
(President) Donald Trump, et al.

---

*Pro Se appellants Colleen Connors and Melvin Jones Jr.'s OBJECTION on appeal as to the Plaintiffs' States - appellees' "standing" to sue the defendants… due the the LEGAL ISSUE OF REDRESSABILITY* [in that the plaintiffs/ appellees are the ROOT CAUSE of any harm which they falsely allege].

*Note: that the page count of this document is NOT accurately reflected due to the font being in 33 point font …which is still at times VERY blurry for me {e.g. Melvin Jones Jr.} to see.*

*Pro Se appellant Colleen Connors [and] Melvin*

*Jones Jr.'s  OBJECTION or appeal:*

- *Here, we believe and assert an OBJECTION and/ or standing objection… due to a substantial constitutional and structural, manifest*

*prejudicial  error put against [us] [Colleen Connors and Melvin Jones Jr.] and put against the Defendants in civil case #25-cv-10139... by NOT allowing us to be GRANTED intervenor*

*status in the district court... so that [we] could have THEN asserted the ISSUE of redressability [e.g. at the hearing... which gave rise to the instant appeal and related appeals #25-1200 and*

*#25-117]; simply put*

*....the Democratic "blue*

*state" AG's do NOT*

*have proper standing*

*to sue –  because they*

*are and have CAUSED*

*THEIR OWN HARM.*

*For example:*

# INTRODUCTION

*In the last Term at the United States Supreme Court, standing was the critical question in several major cases: the two challenges to the Biden Administration's first student loan*

forgiveness plan, *Biden v. Nebraska*[1] and *Department of Education v. Brown*,[2] as well as the challenge to the Administration's immigration priorities in *United States v. Texas*[3] and the

*race-discrimination challenge to the Indian Child Welfare Act in Haaland v. Brackeen.[4] Standing has featured heavily in journalistic coverage of the decision in 303 Creative LLC v. Elenis.[5] And standing*

*may have been the reason for the Court's stay of a lower court decision about the legality of the abortion drug mifepristone.[6] The centrality of standing doctrine in contemporary U.S. law has many*

sources. One is procedural fusion, with the consequent loss of law and equity's distinctive formal structures.[7] Another is a gradual shift over the twentieth century: from having public law

*questions answered defensively, when the law was being enforced against someone; to having such questions answered offensively, via suits for injunctions and declaratory judgments. Yet another is the shift*

*beginning in the 1970s toward expansive preenforcement review of agency rules. Still other reasons standing has become more central are doctrinal developments of the 1970s, not all of which have survived on*

*their own: easy implication of statutory causes of action, the shift to enforcing public law rights primarily through injunctions rather than damages, and the growth of structural injunctions. All of these*

developments from the twentieth century put greater pressure on standing doctrine, as courts increasingly came to use it as a filter for the cases to be decided. But one more source is especially important for

*the centrality of standing in the twenty-first century: the role of states as litigants against the federal government.8 There is an institutional side to the story, including a dramatic infusion of resources and*

*expertise into the offices of state solicitors general. And there is a doctrinal side, especially the Supreme Court's decision in Massachusetts v. EPA.*[9] *In that case, a narrow majority of the Court read*

*state standing broadly, saying states were to be given "special solicitude in our standing analysis."10 The consequences have been predictable. In just the last decade and a half, states have come to*

*dominate the public law scene. States — often large coalitions of states, all represented by attorneys general from the opposite political party of the President — now file suits challenging any important action*

*taken by the executive*

*branch.*

*The last decade and a*

*half is not normal.*

*Measured by the*

*yardstick of the first two*

*centuries of constitutional*

*cases, it is not typical for*

*so many of our major*

*public law cases to have names like United States v. Texas and Biden v. Nebraska. The landmark decisions of our history, cases like Dred Scott v. Sandford and Youngstown Sheet & Tube Co. v. Sawyer, have*

*not typically had state plaintiffs. If those cases had been decided in the twenty-first century, they might have been called Massachusetts v. Buchanan and Ohio v. Truman.*

*Although the new state standing has transformed the federal courts and reshaped their relationship to the executive branch, these transformations might prove temporary. This past Term at the*

*Supreme Court saw what seems to be a deliberate turn by the Justices away from expansive conceptions of state standing. But it remains unclear whether the Court grasps the larger purpose of having a*

*doctrine of standing, and whether it internalizes that purpose or treats standing doctrine as a box to be checked.*

## I. BASIC PRINCIPLES

*Over the past fifty years, courts have developed*

*an elaborate doctrine of "standing" to sue. This doctrine sometimes seems rootless, and it is often criticized as highly malleable.[11] In elaborating standing, courts have run through various tests and terms,*

*and even the term "standing" itself emerged only in the middle of the twentieth century.12 But the modern doctrine of standing is only the surface. Beneath it, and other current doctrines of procedure, jurisdiction,*

*and remedies, lie older,*

*more foundational*

*principles.*

*Article III of the*

*Constitution vests the*

*federal judiciary with*

*"judicial Power" to decide*

*an enumerated range of*

*"Cases" and*

*"Controversies."[13] Since the Founding, members of the Supreme Court have insisted that this means that they must act through certain forms — they cannot issue advisory opinions in response to executive*

inquiry,[14] and they cannot opine on disputes when they do not have the power to issue binding relief.[15] Federal courts cannot decide cases without litigants, or without remedies to award.[16]

*In other words, Article III requires the proper parties, seeking proper relief.17 This logic has driven various permutations of justiciability doctrines. It explains why courts would classically reject*

*cases without the real party in interest, or parties of necessary importance.18 It explains why courts would not decide what they called "political questions" — meaning cases where the relief was effectively*

*within the jurisdiction of the political branches and not the courts.*[19] *It explains why courts would not issue judgments against nonconsenting sovereigns — they were not proper parties against*

whom proper relief could be issued.[20]

## A. Standing

This logic of proper parties and proper relief continues to animate standing doctrine, which is now attributed almost

*exclusively to Article III. Today, blackletter standing doctrine requires plaintiffs to show an "injury in fact."*21 *This doctrinal requirement serves many purposes. One is to ensure that the court has the correct*

*plaintiffs before it.*

*Requiring the plaintiff to show injury will frequently operate as a rough proxy that ensures that the plaintiff has a legitimate reason to be in court, distinct from someone*

*requesting an advisory opinion.*

*The injury-in-fact requirement has become more demanding over time — indeed, some would say to the point of absurdity.22 Even if a party has been given a*

*private cause of action by Congress, the Court still demands separate proof of "injury in fact," meaning that sometimes plaintiffs who face a square violation of their statutory rights will still lack standing.*[23] *But even*

*here, the requirement of proper parties and proper relief helps explain the Court's demand. As scholars of standing have explained, some injuries and claims are ones that properly belong to the public.24 Part of the*

*explicit rationale of these*

*cases, as well as their*

*implicit justification, is the*

*concern that Congress*

*might be trying to give to*

*private plaintiffs*

*enforcement powers that*

*are the public's, and thus*

*powers that should be*

*exercised by the executive branch.*25 *Additionally, standing doctrine strongly disfavors so-called "third party standing."*26 *These are cases in which even though the plaintiff does have an injury in fact and*

*it can be redressed by her suit, she is denied standing nonetheless, because she is vindicating rights that more properly belong to somebody else.*27 *The plaintiff can vindicate the rights of others only if she*

*demonstrates a "'close' relationship" to that somebody else, and demonstrates something that is keeping that somebody else from asserting those rights directly.*[28] *This doctrine even more directly*

*evidences the need for proper parties. It says that the blackletter standing test is necessary but not sufficient if there is a more proper party who could bring the case instead.*

*Professor Richard Re has observed a general pattern underpinning many modern standing decisions that he calls the "most interested plaintiff rule."[29] Standing often is "made available on a relative basis,"*

*taking into account "where the particular plaintiff before the court stands as compared" to other potential plaintiffs,[30] with standing often being awarded to "plaintiffs with the greatest stake in*

*obtaining the requested remedy."[31] To take one recent example, in Clapper v. Amnesty International USA,[32] the Court denied standing and concluded its analysis by pointing to other plaintiffs who would*

have "a stronger evidentiary basis for establishing standing than do respondents in the present case."33 To the extent that this is indeed a general pattern in the Court's decisions, once again it points to the

*continuing influence of the fundamental principle of proper parties.*

## B. Remedies

*Remedies are also critical to the proper exercise of the judicial power. Indeed, blackletter*

*standing doctrine requires the plaintiff's injury in fact to be connected to remedies. The injury must be traceable to the defendant, and it must be redressable by the relief that the plaintiff seeks.*[34]

*Hence, "standing is not dispensed in gross,"*[35] *and "'a plaintiff must demonstrate standing' . . . 'for each form of relief'* *that is sought."*[36] *If a plaintiff seeks an injunction, for instance, "case-or-controversy*

*considerations 'obviously shade into those determining whether the complaint states a sound basis for equitable relief.'"*37 *Indeed, it would be no exaggeration to say that one of the most important reasons that*

*plaintiffs must demonstrate their injury in the first place is so that they can demonstrate that they are seeking the proper relief to redress it. Attention to remedies and redressability helps explain some of the*

*classic early twentieth-century standing cases. Consider the 1923 case of Frothingham v. Mellon,*[38] *where the Court rejected a challenge to the Maternity Act*[39] *on the grounds that an individual*

*plaintiff had no standing to sue. The case is often shorthanded as memorializing a rule against "taxpayer standing," but that is something of a misnomer.40 Taxpayers do and have always had*

*standing to challenge the taxes they pay.*[41] *(Think of the property owner who challenged the tax in Hylton v. United States,*[42] *or the manufacturer who challenged the tax in Bailey v. Drexel Furniture Co.*[43]*) Harriet*

*Frothingham's problem was that she had no legal objection to the taxes she paid, only to the way the government subsequently spent the money. And this is a problem, to use modern doctrinal terms, of*

*redressability. If the taxes were lawfully collected from Mrs. Frothingham, once they entered the federal treasury she lost any legal claim to them. And if she were somehow to obtain an injunction against the*

*government's spending under the Maternity Act, that remedy would not benefit her as a taxpayer. The government would not need to refund the money; it could simply spend it on something else.*

*Or consider the next decade's case of Ex parte Levitt,[44] where the Court refused to entertain a lawyer's potentially explosive challenge to the legality of Hugo Black's appointment to the Supreme Court. The*

Court's extremely brief opinion described Levitt as an improper party, which is not obviously correct.[45] The even more fundamental problem sounded in remedies and jurisdiction. Levitt filed a "Petition for an Order to

*Show Cause" without identifying an established cause of action or a basis for equitable relief, and filed it in the Supreme Court as an original matter, even though the Supreme Court could not possibly have original*

*jurisdiction in such a case.[46] To shorthand cases like these as "standing cases" and to reduce them to the problem of injury in fact is to miss something very important about the inquiry.*

*The importance of remedies to standing, and attention to proper relief, is especially evident in equity. The range, power, and flexibility of equitable remedies are a central part of equity's*

*contributions to modern law. As Professor D.E.C. Yale put it, with some modest overstatement, "Equity is essentially a system of remedies."47 Unsurprisingly, equity has tended to require a stronger showing of injury*

*(or of a "grievance," to use language more apt for equity) before it will deal out a stronger remedy.[48] Thus, "in equity it all connects — the broader and deeper the remedy the plaintiff wants, the stronger the*

*plaintiff's story needs to be."[49]*

*Some reasons for this practice are straightforwardly functional. For example, equitable remedies are often more intrusive to the parties,[50]*

*encroaching on liberty interests of private defendants and raising democratic concerns for public defendants. And equitable remedies are often more burdensome to the courts, because they can require*

*supervision and updating over time.51 Another functional reason is an analogy to damages: there is an inherent symmetry between the amount of a plaintiff's injury and the amount of damages the defendant*

*is required to pay.*[52] *But no such symmetry is inherent in equitable remedies like injunctions, specific performance, and constructive trust.*[53] *Equity had to be conscious about whether the plaintiff's grievance*

*was commensurate with the remedy sought, because otherwise a trifle of grievance could be the basis for a remedy that imposed massive costs on the defendant. The connection of the intensity of the plaintiff's*

*grievance to the intensity of the remedy is grounded in equity's role as a secondary system.[54] And while the modern Supreme Court does not always make this explicit,[55] its cases show*

*a pattern of requiring a stronger grievance for a stronger equitable remedy. The cases in which the Court emphasizes the standing-remedy connection are almost always cases about*

*equitable remedies, such as City of Los Angeles v. Lyons,[56] Lewis v. Casey,[57] and Gill v. Whitford.[58] This is true of cases about redressability — which is the place in the Lujan[59] framework that most*

*obviously integrates standing and remedy. And it is not just redressability but standing generally. In Professor Ernie Young's words, "the familiar landmarks of standing doctrine — Data*

*Processing, Warth v. Seldin, Allen v. Wright, Lujan v. Defenders of Wildlife — all involved equitable relief.*"[60] *The stronger remedial medicine of equitable remedies is precisely where almost all the*

development of standing doctrine has been.[61] This pattern points to the continuing influence of the fundamental principle of proper relief.

## C. The Judicial Role

*These doctrines and principles all serve an important separation of powers purpose, which the Court intones so frequently as to mark a cliché. The doctrines of justiciability define "the judiciary's proper role in*

*our system of government."*[62] *"The 'law of Art. III standing is built on a single basic idea — the idea of separation of powers.'"*[63] *Thus, "[r]elaxation of standing requirements is directly related to the expansion*

*of judicial power."64 And so on.65 But why? What do these mantras mean? Is the Court making the tautological point that because standing is a judicial construction of the requirements of Article III, and because*

*the separation of powers comprises Articles I, II, and III of the Constitution, any violation of the doctrine of standing must also be a violation of the separation of powers? If so, the invocation of separation of powers*

*adds nothing but an air of seriousness.*

*Yet there is a deeper connection between standing, remedies, and the judicial role. The judicial role is the conclusive resolution by judges of legal disputes,*

*which in turn are the sorts of disputes that can be conclusively resolved by judges acting as judges. Put less circularly, what judges do is enter judgments ("conclusive resolution") of disputes that involve*

*the rights of parties ("the sorts of disputes that can be conclusively resolved by judges") according to law ("acting as judges"). Doctrines like standing operate to ensure that the federal courts act as courts. Requiring proper*

*parties ensures that it is a judicially cognizable dispute, and requiring proper relief ensures that it is a judicially resolvable dispute. These requirements help to distinguish the court's power to decide*

*particular cases according to law from the legislature's power to make law and the executive's power to enforce it.*

*These doctrines of justiciability also serve practical purposes — but*

*not only (or not particularly) the one that is too-often cited, of ensuring that the issue will be well litigated.*[66] *In important public law cases, the issue is almost always amply litigated by ideologically motivated*

*parties and armies of amici.*

*Instead, the doctrines help protect the right of people to stay out of court. That is, they protect the right to be safe from the lawyers. The Supreme Court has*

called this *"a due regard for the autonomy of those persons likely to be most directly affected by a judicial order."*67 *More concretely, it means that when the proper parties do not want the courts to intervene in their*

*business, they can continue to manage their own affairs without judicial oversight.*[68] *For a stark example, consider the fate of Gary Gilmore, who was executed by the state of Utah in 1977.*[69] *Because Gilmore's*

*execution was the first one after the Supreme Court declared a moratorium on the death penalty in 1972,*[70] *there were fair questions about the legality of his sentence. But Gilmore made a "knowing and*

*intelligent" choice not to challenge it, accepting his fate.71 For the Supreme Court, that was reason enough not to intervene and decide any further legal questions, even a constitutional question on a matter of*

*life and death.*72 *Gary Gilmore's mother, Bessie, sought unsuccessfully to intervene, but the Justices in the majority concluded that she lacked "standing,"*73 *that the Court was "without jurisdiction to entertain*

the 'next friend' application filed by Bessie Gilmore,"[74] and that "[w]ithout a proper litigant before it, this Court is without power to stay the execution."[75] The justiciability doctrines also protect the courts

*from their own snap judgments. A consequence of the classical model of the judicial role is to ensure that the legal issues on the docket of the Supreme Court do not too neatly track the list of*

*political issues at the front of the minds of the public.*76 *Another consequence is to ensure that those issues come before the Court at a deliberate pace. In combination, these consequences provide*

*another level of remove between the kinds of things the courts do and the kinds of things that would have been done by a council of revision.*

*It is worth noting, and is more than incidental, that these practical purposes*

*presuppose that the courts are not infallible. If courts always got things right, always made things better rather than worse, there would be no reason other than resource constraints not to have them decide as many*

*things as possible. And if*

*their time must be*

*rationed, there would be*

*no reason not to give*

*them the cases of the*

*vastest scale and*

*greatest importance first.*

*The doctrines of*

*justiciability that bind the*

*judicial role recognize that this is not so. To ensure order, we sometimes treat judicial decisions as if they are infallible, but we must not confuse that practice with actual perfection.*[77]

*There are important and valid questions about whether all of these principles have been cashed out in exactly the right places. One can certainly quibble with the details of existing doctrine. And one can*

*argue more fundamentally that some of these inquiries should not be in a doctrine called or conceptualized as Article III standing, but instead should be handled by rules about causes of action,*

*equitable jurisdiction, various civil procedure doctrines, and so on.*[78] *In fact, as is often the case, our legal system would be healthier if the answers to many important questions were traced not to the*

*Constitution but to background principles embedded in our legal system,79 where a few words do not have to be strained to do so much. But whatever doctrinal boxes one may choose for the proper-party and*

*proper-relief inquiries, these questions are critical to safeguarding the judicial role. One way or another, federal courts should be deciding only cases between the proper parties that result in proper relief.*

## II. THE MASSACHUSETTS V. EPA ERA AND THE SHIFTING JUDICIAL ROLE

The viability of this model of the judicial role has been challenged for decades. In 1976, Professor Abram Chayes

*wrote about the then-new "public law model" of litigation in which courts served more as law-declaring regulators than as resolvers of specific disputes.*[80] *On this model, a lawsuit:*

*focuses not on the fair implications of private interactions, but on the application of regulatory policy to the situation at hand. The lawsuit does not merely clarify the meaning of the law, remitting the parties to*

*private ordering of their affairs, but itself establishes a regime ordering the future interaction of the parties and of absentees as well, subjecting them to continuing judicial oversight.*81

*But the seemingly ascendant Public Law Model has not been unhesitatingly accepted by the federal courts; some hawkishness on standing and remedies over the past fifty years, among many other*

*things, has marked judicial hesitation.*

*A new variation of the Public Law Model, and a new threat to the traditional model of the judicial role, seemed to emerge after the Supreme Court's 2007*

*decision in Massachusetts v. EPA. In this decision, the Court found that Massachusetts had standing to sue the Environmental Protection Agency for failure to regulate greenhouse gas emissions under the*

*Clean Air Act. Although the injury that the state claimed was a loss of its coastline because of rising sea levels,82 this injury was difficult to trace directly to the EPA's actions, and also difficult to redress by a*

*prohibitory or even a mandatory injunction addressed to the EPA. It was exactly the kind of diffuse injury that would ordinarily not suffice to establish standing. But the Court held in a 5–4 decision that the state*

had standing because states should receive "special solicitude" in the standing analysis.[83] In the years following that decision — what we will call the "Massachusetts v. EPA era" — the number of lawsuits

*brought by state attorneys general challenging actions by the federal government skyrocketed. Now, when a Republican administration does something consequential and controversial, it will*

*almost certainly be sued by a group of Democratic states, and when a Democratic administration does something consequential and controversial, the roles reverse.*[84] *Republican state*

*attorneys general initiated 58 lawsuits against the Obama Administration; Democratic state attorneys general initiated 155 lawsuits against the Trump Administration; and*

*Republican state attorneys general have already initiated 59 lawsuits against the Biden Administration.*[85] *As we will discuss in Part III, this dynamic was on continuing display in the October 2022 Term,*

*which featured major challenges to the Biden Administration's immigration policies and student loan forgiveness. (During the same time, lower courts issued nationwide relief in at least four more suits by*

*states against the Biden*

*Administration, in cases*

*challenging immigration*

*policies,[86] vaccination*

*requirements,[87] and*

*influence on social media*

*platforms.[88])*

*The decision in*

*Massachusetts v. EPA*

*contributed to this dynamic, but it is not the only thing that did, and perhaps not even the most important thing that did. Other causes discussed include the rising sophistication and resources of state*

*solicitors general,*

*ideological polarization in*

*Congress, changes in the*

*preliminary injunction, the*

*rise of the national*

*injunction, and a trend*

*toward major executive*

*actions being taken with*

*only an attenuated claim*

*of legislative authorization. Whatever the precise accumulation of causes, however, Massachusetts v. EPA is a key part of the story because it allowed suits by states that would never have been*

*considered cognizable under previous standing law.*

### A. *Massachusetts v. EPA*

*What is clear about Massachusetts v. EPA is that it reflected a lax judicial attitude toward*

*state standing. What is less clear is the exact basis for Massachusetts's standing to sue. The specific nature of the state's injury — and more importantly the connection between that*

*injury and the remedy the state sought against the EPA — were more speculative than in a typical administrative law suit. Not because climate change is speculative, to be clear, but because the nature of the problem is*

*so global and systemic*

*that it is hard to connect*

*a future hypothetical EPA*

*rulemaking to exact*

*fluctuations in the*

*coastline of the state of*

*Massachusetts.*

*It is true that Congress*

*had provided a statutory*

*cause of action to challenge agency decisions like the one at issue.*89 *The Court described that statutory cause of action as being "of critical importance to the standing inquiry."*90 *But under precedent at*

*the time, and emphatically confirmed since, a statutory cause of action is not completely sufficient to answer the question of standing.*[91]

*To round out the argument for standing,*

*the Court emphasized that states were entitled to special access to the federal courts. "States are not normal litigants for the purposes of invoking federal jurisdiction," the Court wrote.*92 *States had*

*"surrender[ed] certain sovereign prerogatives"* by forming the United States, and could no longer vindicate their interests through war, treaties, or even some exercises of the police power.*93 Thus,*

*concluded the Court:*

*"Given that procedural right [in 42 U.S.C. § 7607(b)(1), discussed above,] and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is*

*entitled to special solicitude in our standing analysis."94 The nature of this "special solicitude" was famously undefined.95 As Chief Justice Roberts's dissent in Massachusetts v. EPA put it: "It is not at*

*all clear how the Court's ‘special solicitude' for Massachusetts plays out in the standing analysis, except as an implicit concession that petitioners cannot establish standing on traditional terms."*96 *Both*

*the majority opinion and later cases suggested that Massachusetts v. EPA could undermine some important aspects of standing doctrine. First, it could undermine the rule against parens patriae lawsuits that*

*dates back to another standing case involving the Bay State, Massachusetts v. Mellon — the companion case to Frothingham. In Massachusetts v. Mellon, the Court refused to hear another lawsuit that*

*challenged the federal spending in the Maternity Act as beyond federal power, but this one was brought by the state of Massachusetts. Among other things Mellon squarely rejected the argument that "the suit*

*may be maintained by the State as the representative of its citizens."*97 *While a state had many powers to regulate and entertain lawsuits in its own courts on its own citizens' behalf, "[i]t cannot be*

*conceded that a State, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof."*98 *A state, one might say, is not the proper party to*

*vindicate the rights of its citizens against the federal government.*

*In a long footnote, Massachusetts v. EPA pushed against Mellon. The Court warned against a "broad reading" of Mellon, and insisted*

*that "there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what Mellon prohibits) and allowing a State to assert its rights under federal*

*law (which it has standing to do)."*99 *Even if this distinction did not formally allow states to reassume the role of parens patriae against the federal government, in practice it seemed to invite the creative*

reconceptualization of such suits.[100]

Second, special solicitude could license a kind of broad economic speculation about the impact of federal policies on states, which might give states power to

*challenge every major administrative action. For instance, in Texas's challenge to the Obama Administration's Deferred Action for Parents of Americans (DAPA) program, the state relied in part on speculation*

*about the financial impact of immigrant populations in Texas.*[101] *The October 2022 Term cases featured such arguments as well, from the states challenging both the Biden Administration's immigration policies and*

*its student loan*

*forgiveness.*

*Taken too far, these*

*arguments could*

*obliterate any demand for*

*proper parties. States*

*encompass enough*

*people, places, and*

*things that any significant*

*administrative policy can be said to affect a state in some way.[102] Call this the state-as-a-super-big-person problem[103] — and think in your mind of the massive human-shaped sovereign on the*

frontispiece of Thomas Hobbes's Leviathan. If anything, given the sheer massiveness of state "persons," the "injury in fact" test would need to be applied to them with special skepticism, not "special solicitude," in

order to establish whether they are the proper parties.[104]

## B. Inattention to Remedies

The pressure to shift the judicial role has come not just from a lax approach to standing, but also from

*inattention to proper relief. Three instances of this inattention are (1) the rapid rise of the national injunction, (2) the shifting and merits-centric understanding of the preliminary injunction,*

*and (3) the one-good-plaintiff rule. The first instance is the dramatic growth of the national injunction.[105] Ordinarily, an injunction regulates the conduct of the defendant vis-à-vis the plaintiff. The primary*

*exception, if it is right to think of it that way, is the class action, but even then the defendant's conduct is regulated vis-à-vis those who are effectively plaintiffs, virtually represented by the "named" plaintiff.*[106]

*In many cases the Supreme Court has expressed this party-specific understanding of what equitable remedies do,107 and it reflects centuries of equity practice.108 By contrast,*

*a national injunction "controls the federal defendant's conduct against everyone"*[109] — *including people who are not parties to the case, and who are not represented by parties in the case.*

*The exact birthday of the national injunction is disputed,110 but what is not in dispute is that it was peripheral and inconsequential until the Massachusetts v. EPA era. Only in 2014 did the national injunction*

*become central to our nation's political life, and especially to judicial interventions in that life. The litany of vices is familiar, and they can be listed here without elaboration: heightened incentives for forum*

*shopping, asymmetrical effects for a win by the plaintiff and a win by the defendant, circumvention of class action rules and United States v. Mendoza,111 a risk of conflicting injunctions, a lack of percolation for*

*major constitutional questions, and rushed decisionmaking by the Supreme Court. All of these consequences drive ever higher the partisan polarization that has American public life in its grip.*

*Standing and remedies are not completely separate, of course.[112] In fact, in Massachusetts v. EPA itself, the Court's laxity about standing was in part a laxity about redressability, that is, about the question of*

*remedies! So too, the growth of state standing and national injunctions may create a multiplier effect.*[113] *It may be easier for judges to justify granting extremely broad relief when they are faced not with an*

*individual plaintiff with an individual injury, but with what is effectively a collective, conceptual plaintiff that is really asserting a public injury. Indeed, some cases might feature a coalition of such collective,*

*conceptual plaintiffs that purport to represent nearly half of the country. Having allowed lawsuits on the basis of broad, nonindividualized "injuries," it seems only natural to grant broad,*

nonindividualized relief to "redress" them.

A second instance of judicial inattention to remedies issues is shown in the decadence of the preliminary injunction. It is standard remedial doctrine that preliminary

*injunctions are supposed to be rare.114 They are not meant to decide the case, but are instead meant to hold things in place — "preserve the status quo" — so a court is able to decide the dispute.115 As such, they*

*are a critical tool in equity's arsenal. They are especially useful in allowing a court to stop a defendant from abusing the legal process by going ahead and taking the irreversible action that will moot or radically*

alter the case — selling the disputed pet, tearing down the disputed house, exporting the disputed Vermeer.

But that is no longer the primary function that preliminary injunctions serve. The emergent goal

*is to prevent any harm to a plaintiff, with a presumption that any violation of a right is inherently irreparable*[116] *— which in public law cases has the effect of making preliminary injunctions almost*

*automatic. What is*

*purportedly a four-factor*

*test for a preliminary*

*injunction is, as the*

*courts increasingly*

*recognize, becoming a*

*one-factor test that*

*depends entirely on what*

*the court thinks of the*

merits.[117] What a district court thinks is also closer to a snap judgment than would be advisable — there is briefing, but there is no trial,[118] and there is usually little or no experience over time with

*the challenged statute, rule, or policy.*

*This shift in preliminary injunction practice interacts with national injunctions and lax state standing. It most obviously overlaps with the rise of the national*

*injunction, since most national injunctions are preliminary. The national injunction degrades judicial decisionmaking, and the shifts in preliminary injunction practice are pushing the courts further toward*

*hasty, relatively fact-free resolution of major questions of public law. The changes in the preliminary injunction also interact with lax state standing. Put together, there is a shift from any real weighing of*

*the equities of the particular injunction to a focus on just the merits — which means our biggest public law cases are presented as pure questions of law, presented by collective, conceptual plaintiffs, with*

*no trial or real-life testing.*

*And then courts are not*

*even deciding these*

*questions, but are simply*

*predicting who would be*

*"likely" to win. Making*

*everything turn on judicial*

*intuition about the merits*

*is especially ill advised in*

*a time of extreme political polarization with the easy forum shopping that comes to a coalition of plaintiff states.*

*A third instance of remedial inattention related to standing doctrine has been the*

*Court's endorsement of the so-called one-good-plaintiff rule in looking for standing.119 When faced with a slew of different appellant parties, many of whom may not be proper parties to the case, the Court*

*likes to say that it needs to find only "one good plaintiff" before it can move on to the merits and ignore the standing of all the other plaintiffs. Viewed as a matter of standing doctrine alone, one can see some logic*

*in this.*[120] *True, if one party has standing, the Court will need to resolve that party's rights. But figuring out whether all, most, or merely one of the parties has standing will be exceptionally important for determining*

*what relief a court should ultimately issue.*[121]

*Of course the Supreme Court's inattention to these remedial issues may be partly explained, even if not justified, by the dynamic created by modern notions of judicial*

*supremacy, reflected in opinions like Cooper v. Aaron.122 In Cooper the Court famously, or notoriously, equated its own judicial opinions with the Constitution itself, suggesting that the Supremacy Clause and*

*the oath requirements of Article VI required all other government officials to swear fealty to Supreme Court opinions.123 If this is taken seriously it can eclipse more nuanced analysis of remedies at*

*the Supreme Court. Why should the Supreme Court worry about the details of the scope of relief if as a practical matter a Supreme Court opinion operates as if it were a national injunction? And if all the*

*plaintiffs truly want is a Supreme Court opinion — whatever the actual remedy — then all they care about is one plaintiff who is good enough to get it.*

But this inattention has had consequences,

*especially when it comes to the lower courts. Even if the Supreme Court believes that the Constitution requires all other officials to equate Supreme Court opinions with the Constitution itself, could it really*

*believe that the same is true of opinions in the District of Hawaii and the Northern District of Texas?*

## C. Institutional Realities

*These doctrinal developments are*

*intertwined with institutional developments. One is the growth and polarization of litigating arms within each state (usually the state solicitor general's office).124 As other scholars have*

recognized, states as litigants against the federal government are flying in the slipstream of Abram Chayes's Public Law Model.125 Another is the lower court judges' increasingly sympathetic attitude toward state

*plaintiffs. This attitude could stem from heightened polarization of lower court judicial appointments.126 Such polarization would in turn be exacerbated by forum shopping, allowing each cadre of plaintiffs to bring*

*their case in front of a more sympathetic judge.*[127]

*This change in attitude could also come from considerations of fairness and symmetry. Even a judge who was hawkish on standing, inclined to*

*think that the Court had erred in letting Massachusetts lever the judicial power against the EPA, might think that having wrongly granted standing to State A, it was only fair to grant it to State B as well.*128 *This*

*is especially true as the partisan control of the executive branch switches, and thus so does the partisan valence of the states inclined to sue it. If blue states get special solicitude, then red states should too.*129

*Similarly, a judge skeptical of national injunctions might think that if a Democratic administration was required to endure them, then a Republican administration should too.*[130]

*Whatever the exact mix of doctrinal details and institutional dynamics that got us to this point, the cumulative effect of the Massachusetts v. EPA era has been*

*stunning. The legal system has been approaching a point of exhaustion and futility, like a high school theater play on the last night of the performance, when everyone knows the lines but is so tired of saying*

*them. As soon as a presidential administration does something that matters, it will be sued immediately by a coalition of states whose attorneys general are of the opposite political party; the plaintiff*

*States will wrap themselves up in "special solicitude" and point to downstream costs they may suffer from the federal policy, which is easy to do because every important federal policy will lead to costs*

*somewhere; and the States will seek a preliminary injunction shutting down the federal policy everywhere. And then, because they sue in a friendly district court and circuit court, and because the preliminary*

*injunction analysis is in essence little more than a judicial prediction of the merits, they will almost certainly get the injunction they seek.*131 *And so we have arrived, for the first time in our national history, at a state*

*of affairs where almost every major presidential act is immediately frozen by a federal district court. This new but now familiar routine puts enormous pressure on our democratic system and on the Supreme Court.*

*Instead of a presumption of legitimacy for action by the political branches,[132] almost every important action they take will be judicially blocked. The Supreme Court is forced to act more quickly, without the percolation*

*advantage of having several circuit courts consider the question.*[133] *And the political branches may even be tempted to authorize major policies as a sheer political gambit, knowing that the courts will quickly*

*enjoin their enforcement, allowing proponents of a policy to score political points against the judiciary without having to accept any of the policy's costs or consequences. This is bad law and bad*

*democracy. It cannot go on forever.*

## III. END OF AN ERA? TWO CHEERS FOR THE SUPREME COURT'S COURSE CORRECTION

*Perhaps the most recent Term proves the truth of*

*Stein's Law: "If something cannot go on forever, it will stop." Although the rise of the Massachusetts v. EPA era seemed inexorable, the October 2022 Term may have marked a turning point. There are*

*two pieces of good news.*
*First, the Court seems to*
*recognize the need for a*
*course correction.*
*Second, the cases from*
*this Term signal at least*
*some understanding that*
*this course correction —*
*for both state and*

*individual plaintiffs — will require attention to remedies. But at the same time, the Court is sometimes too lost among the trees of standing doctrine to see the way out of the woods.*

## A. Narrowing Massachusetts v. EPA

Taken together, the Court's standing decisions from this Term signal a substantial narrowing of state standing. The starting point is the arguments of

*the States. In both Biden v. Nebraska and United States v. Texas, the plaintiff States relied for standing on the kinds of broad interests that were given special solicitude in Massachusetts v. EPA.*[134] *In the States'*

*main brief in United States v. Texas, for example, the table of authorities includes Massachusetts v. EPA, and the pages cited are "passim."[135] The States' arguments were not entirely rejected*

*by the Court. In one case brought by states the Court found standing (Biden v. Nebraska), and in the other it did not (United States v. Texas). And yet in neither case did the Court cite Massachusetts v. EPA*

*favorably. In fact, in neither case did any of the nine Justices cite Massachusetts v. EPA favorably.*[136] *Instead, the opinion that was cited with approval — in opinions joined by six of the Justices — was the*

*Chief Justice's dissent in Massachusetts v. EPA.*[137]

*The absent presence of Massachusetts v. EPA is even more remarkable because its category of "special solicitude" for states would have*

*arguably changed the outcome in one case and provided strong support for the Court's standing holding in another. Yet in neither case did the Court suggest there was any special advantage for*

*states in the standing*

*analysis.*

*Consider first United*

*States v. Texas. In the*

*opinion of the Court,*

*Justice Kavanaugh on*

*the first page completely*

*identified the standing of*

*states with the standing*

*of private citizens. He quoted a case in which the Court held "that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with*

prosecution."138 Then he immediately applied that holding to the States: "Consistent with that fundamental Article III principle, we conclude that the States lack Article III standing to bring this suit."139 As a

*matter of logic, that conclusion — no standing for an individual citizen, ergo no standing for a state — follows only if there is no special solicitude for states. Nor did the Court leave matters there. In two*

*footnotes, the Court directly addressed the fact that the plaintiffs were States. In footnote 3, the Court began: "Also, the plaintiffs here are States." But this did not become the basis for special solicitude, and if*

*anything the Court drew from the identity of the plaintiffs as States the need for special skepticism of standing.*140 *Then, in footnote 6, the Court was even more directly dismissive of*

*Massachusetts v. EPA.*
*First, the Court distanced*
*itself from the citation, by*
*attributing the citation to*
*the plaintiff States.*141
*Second, the Court*
*expressly noted*
*"disagreements that*
*some may have with*

*Massachusetts v. EPA"*
*(presumably including at*
*least one member of the*
*majority).142 Third, and*
*most important for the*
*future, the Court held*
*Massachusetts v. EPA*
*inapplicable because*
*"[t]he issue there involved*

*a challenge to the denial*

*of a statutorily authorized*

*petition for*

*rulemaking,"*143 *a sharp*

*limitation to the scope of*

*the precedent.*

*The other Justices*

*expressed even more*

*explicit skepticism of*

*Massachusetts v. EPA.*

*Justice Gorsuch (joined by Justices Thomas and Barrett) found it "hard not to wonder why the Court says nothing about 'special solicitude' in this case. And it's hard not to think, too, that lower*

*courts should just leave that idea on the shelf in future ones."*144 *Justice Alito's dissent expressed similar surprise, culminating in the question: "[M]ost importantly, has this monumental decision*

been quietly interred?"145

The next week this forecast of quiet abandonment seemed to come true. On June 30, 2023, the Court decided the student loan cases, Biden v. Nebraska and

*Department of Education v. Brown. In the former case, the Court concluded that the state of Missouri did have standing to challenge the Administration's student loan forgiveness plan,146 though two individuals in*

*the latter case did not.*[147]

*Yet despite the Court's conclusion that the one good plaintiff was a State, there was no mention of Massachusetts v. EPA from any quarter. This curious incident of the*

*Court's silence about Massachusetts v. EPA is telling, especially because the case would have reinforced the borderline state-standing claim that the Court accepted in Biden v. Nebraska. It appears that*

*the Chief Justice's dissent in Massachusetts v. EPA is now considered more authoritative than the majority opinion.*

## B. Renewed Attention to Remedies

*Moreover, and especially promising, the decisions*

*from last Term also seemed to recognize that taming the latest onslaught of public litigation will require some attention to redressability and remedies. This recognition is especially*

*apparent in some of the separate opinions in United States v. Texas, and the majority opinion in two other cases: Department of Education v. Brown, the student loan case brought by individual plaintiffs; and*

*Haaland v. Brackeen,*
*where the Court rejected*
*both individual and state*
*challenges to the*
*constitutionality of the*
*Indian Child Welfare Act.*
*Brackeen presented*
*potentially seismic*
*challenges to the*

*constitutional status of federal Indian law, but the Court rejected all of them — some on the merits, some for lack of standing. On the merits, the Court concluded that the statute (and implicitly much of the rest of*

*federal Indian law) was within Congress's Article I powers and did not violate principles of federalism.148 There was an additional challenge on equal protection grounds — which one Justice described as*

*"serious"*[149] *— that also had the potential to upend much of federal Indian law. It was dismissed for lack of standing.*[150]

*In dismissing the equal protection challenge for lack of standing, the*

*Court specifically emphasized the problem of remedies and redressability. The Court was willing to accept that the kind of race discrimination alleged by the challengers counted as an injury.151 But the*

*important point was that their suit was not a suit for redress of that injury. The defendant was the Secretary of the Interior, but she was not the one enforcing the statute: "[E]njoining the federal parties would not remedy*

*the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements."*152 *Thus the proper parties would be the parties in a*

*state-court adoption proceeding, and the proper relief would be a judgment deciding the adoption petition notwithstanding any unconstitutional statute to the contrary.*153

*Brackeen's discussion of redressability built on the recent precedent of California v. Texas,*[154] *in which the Court had dismissed a constitutional challenge to the Affordable Care Act because of similar flaws.*

*The challenged parts of the statute were not enforced by federal officials, and potentially not even enforceable.*155 *This created problems both of traceability and redressability. In an opinion by Justice Breyer,*

*the Court explained the redressability problem in this way: "Remedies . . . ordinarily 'operate with respect to specific parties' . . . [;] they do not simply operate 'on legal rules in the abstract.'"156 And the Court explained*

*that the plaintiffs could not possibly have sought any particular remedy, such as damages or an injunction, against any of the defendants — the executive branch had no power to enforce the law, and Congress was not a*

proper party to the suit either.157 In both Brackeen and California v. Texas, restoring the centrality of remedies specific to the parties was a healthy development that can

*mitigate the new spread of public litigation. Brackeen's discussion went further still, emphasizing the distinction between judgments and opinions in a way that might eventually clear up the*

*Cooper v. Aaron confusion.*158 *The challengers in Brackeen suggested that redressability came from the fact that if the Court were to agree with them, then lower courts would surely follow the*

*Supreme Court's opinion as precedent. In response, writing for the Court, Justice Barrett said that "[r]edressability requires that the court be able to afford relief through the exercise of its power, not through the*

*persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power."159 And she concluded: "It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment,*

*not the opinion, that
demonstrates
redressability. The
individual petitioners can
hope for nothing more
than an opinion, so they
cannot satisfy Article
III."*160

*As a matter of text, history, structure, and legal technicalities, this distinction between judgments and opinions is correct, as well as critical to understanding the judicial power.*161 *But it is not the conception*

*that has always held*

*sway in the past sixty*

*years, and it is still*

*striking to see the*

*Supreme Court saying, in*

*effect: plaintiffs cannot*

*litigate a case merely on*

*the assumption that*

*people will follow*

*Supreme Court opinions as law. And lest one think the distinction between judgments and opinions was entirely a one-off, we also note that the Court's extremely technical mootness discussion in Moore v. Harper,[162] a*

*prominent case from this Term about the meaning of the Elections Clause, also hinged on the formal distinction between opinions and judgments.*[163] *Renewed attention to opinions and judgments is a very*

*promising form of renewed attention to remedies.*

*Attention to remedies was also somewhat apparent in the Court's analysis in Department of Education v. Brown, one of the two student loan*

*cases. Two individuals,*

*Myra Brown and*

*Alexander Taylor,*

*challenged the*

*Administration's student*

*loan relief plan on a*

*somewhat indirect basis.*

*The Court described their*

*claim for relief this way:*

*First, because the HEROES Act does not substantively authorize the Plan, the Department was obligated to follow the typical negotiated-rulemaking and notice-and-comment requirements. Second, if*

*the Department had observed those procedures, respondents might have used those opportunities to convince the Department (1) that proceeding under the HEROES Act is unlawful or otherwise undesirable,*

*and (2) that it should*

*adopt a different*

*loan-forgiveness plan*

*under the HEA instead,*

*one that is more*

*generous to them than*

*the HEROES Act plan*

*that they allege is*

*unlawful. They assert*

*there is at least a chance that this series of events will come to pass now if we vacate the Plan.164 The Court found this argument "strange" and "unusual,"165 and unanimously concluded that it could not support*

*standing. In the Court's view, "the deficiencies of respondents' claim [were] clearest with respect to traceability," because "the Department's decision to give other people relief under a different statutory scheme did not cause*

*respondents not to obtain the benefits they want."166 Yet as the Court recognized, this problem of traceability also sounded in remedies, observing that it had never "accepted that an injury is*

*redressable when the prospect of redress turns on the Government's wholly discretionary decision to create a new regulatory or benefits program."167 The fundamental reason that the plaintiffs' claim was*

*so strange, and ultimately so unavailing, is that eliminating loan relief is not a natural remedy for those who seek expanded loan relief. And then there is Justice Gorsuch's concurrence in United States v. Texas.*

*As discussed above, a majority of five Justices concluded that the states had suffered no cognizable injury from the Biden Administration's enforcement discretion. But Justice Gorsuch's concurrence began:*

*"[R]espectfully, I diagnose the jurisdictional defect differently. The problem here is redressability."*[168] Justice Gorsuch zeroed in on several different remedies problems specific to the

*immigration case, such as the scope of a jurisdictional bar in the Immigration and Nationality Act,[169] the fact that eliminating the enforcement "Guidelines" would still leave the executive branch with the*

*same discretion,*[170] *and the plaintiff States' inattention to the traditional nonmerits considerations in seeking equitable relief.*[171] *We will leave the details of these redressability problems to one side.*

*What is promising is that several Justices on the Court are stressing the importance of such details, and if all courts were to heed them, the inevitable challenges to federal immigration policy would proceed in a more*

*orderly and lawful — a*

*more judicial — fashion.*

*In addition to this, Justice*

*Gorsuch's concurrence*

*also happily gave*

*attention to another*

*important remedial issue:*

*the scope of relief under*

*the Administrative*

*Procedure Act*172 *(APA). In a nutshell the question is whether § 706 of the Act authorizes a remedy of "universal vacatur." In recent decades, numerous federal courts have assumed that the Act authorizes this relief,*

because it instructs a reviewing court to "set aside"[173] unlawful agency action.[174] There have also been recent scholarly voices in support of the conventional practice. For example, Professor

*Ronald Levin has argued that it is best to see the Act as a framework statute, and even though it was not understood at the time of enactment to authorize universal vacatur, that potent remedy has been*

*developed by federal courts as they fill out the details of the congressional framework.175 Nevertheless, as Justice Gorsuch noted, this remedy is looking increasingly shaky. There*

*was no practice of*

*"universal vacatur" before*

*the Act;176 no one at the*

*time of the Act or in the*

*immediately following*

*decades — including*

*Professor Kenneth Culp*

*Davis and Professor*

*Louis Jaffe — seems to*

*have been aware that a new super-remedy was being created;*[177] *and most decisively of all to read "set aside" as a reference to remedies is in direct contravention of the text and structure of the Act, which places the*

*"set aside" reference within a section on the scope of review and has a different section on remedies that directs courts to use traditional remedies such as injunctions.*[178] *Moreover, because there is no*

*traditional legal or equitable remedy of "vacatur" (vacatur being what a reviewing court does to a judgment), there is an acute need for real congressional authorization if the courts are going to apply a new*

*remedy,[179] especially a super-remedy that upends the traditional relationship between the federal courts and the executive branch. Finally, there is an easy explanation for how courts could come to*

*assume there was a vacatur remedy in the Act — review of agency action was often exclusive to the D.C. Circuit, which meant that a circuit precedent that a rule was unlawful had the practical effect of*

vacating it.180 That is much easier to explain than how the Act, right on its face, created a novel remedial superpower that escaped everyone's attention for decades. These points and others are being made now by

an increasing number of scholars.[181]

It is no accident that the renewed attention to remedies is coinciding with new skepticism about vacatur. "Universal vacatur" is a remedial abstraction — it floats

*above the plaintiff and defendant, and with this putative remedy a court is acting directly on a rule or other agency-promulgated legal norm. But this is exactly what California v. Texas and Haaland v.*

*Brackeen* said that courts do not do. Courts redress the plaintiff's injury by giving the plaintiff a remedy against the defendant.182 They may enjoin the enforcement of a statute or rule, but properly speaking the

*injunction runs against those who would enforce the statute or rule; it does not act directly on the legal norm itself.*[183] *Of course this is not to deny that a court's decision has implications that run beyond the parties.*[184]

*The precedents of the Supreme Court control the actions of the lower federal courts, which means that when the Court holds a statute to be unconstitutional or a rule to be unlawful, it may be as good as vacated.*

*(Indeed, this may be even true for the D.C. Circuit when it has exclusive review.) But in certain moments of perspicuity, the Court has wisely insisted on precision about this point: the federal courts give*

*judgments that redress the injuries of parties, and it is only in the performance of that duty — and not as an independent duty, or a distinct cause of action, or a stand-alone remedy — that federal judges will*

*say what the law is and what it isn't.*[185]

*This is not only a point about administrative law. It is emblematic of the broader concerns about standing and remedies — about proper parties and proper relief — that the*

*current moment calls for.*

*The tide of national*

*injunctions over the last*

*decade has put*

*enormous pressure on*

*the standing-remedy*

*nexus, as minimal or*

*even merely probabilistic*

*injuries are made the*

*basis for far-reaching injunctions. But that tide has been ebbing, and across the courts of appeals there have been many critical voices about the national injunction.*186 *In response, there has*

*recently been a marked shift by plaintiffs and courts to rely on "universal vacatur" as the preferred means of controlling how the federal government acts toward nonparties. This is a predictable hydraulic*

*effect, and there will be no fundamental reset of the judicial role if every national injunction gets relabeled "universal vacatur." Attention to proper relief in a sound analysis of standing should result in great*

*skepticism about both of these forms of universal remedy, as judges both off and on the Supreme Court are increasingly noting.*

## C. Continued Confusion

*At the same time, the Court is too distracted by the details of standing doctrine to fully sort out the challenges it faces in these cases.*

*Return to United States v. Texas but in slightly closer focus. While the*

*Court reached the correct result in stopping the lawsuit, and while it sensibly backed away from the "special solicitude" of Massachusetts v. EPA, in other ways the Court's opinion is a mess. The*

*Court relied centrally on an earlier nonenforcement case, Linda R.S. v. Richard D.,*[187] *which was about redressability, but the Court deployed it for a different point — to deny that Texas had sufficient*

injury, or more precisely to deny that Texas's injury was "cognizable,"[188] creating doctrinal confusion. In addition to blending different parts of standing doctrine together, the majority also blended in

*the merits: important parts of the opinion seem to rely on a substantive conclusion that as a matter of statutory or constitutional law, the Administration had lawful enforcement discretion.*189 *And the*

*opinion contains a largely unexplained list of exceptions that are hard to trace to any consistent theory.[190] Several of the Court's exceptions are merits-focused — a catalog of circumstances in which it would not be*

true that the executive branch was lawfully exercising enforcement discretion — which creates further confusion about the basis for the Court's decision.191 The old doctrinal blinders are also apparent in

*Biden v. Nebraska. The Court found its one good plaintiff — the state of Missouri — and thus used the case to announce the unlawfulness of the Administration's student loan relief program,*

*concluding that the Administration had exceeded its statutory authority in multiple respects.192 While we agree with the Court's ultimate disposition of the merits, its treatment of jurisdiction, and*

*especially of remedies, was troubling.*193

*Over the dissent's objection, the Court found standing for the state. At a doctrinal level, the Court's standing analysis was somewhat pedestrian and*

*defensible. The Court eschewed, without comment, the broader and more implausible claims to standing made by the plaintiff states, such as those based on lost tax revenue or so-called*

*"quasi-sovereign" interests.[194] Instead, it adopted the most concrete and modest theory of standing in the case — that the state of Missouri can sue because of harms suffered by the Missouri*

*Higher Education Loan Authority (MOHELA), which the Court treated as "also a harm to Missouri."195 The standing dispute turned on some fairly narrow points. All agreed that MOHELA would*

*have had standing to sue on its own behalf, because it had lost money it otherwise could have collected by servicing the loans,*[196] *so the only remaining question was whether Missouri could sue for*

*that injury instead. The majority said yes, stressing the ways in which MOHELA was a state actor; the dissent said no, stressing the ways in which MOHELA's property and legal personhood were*

*separate from the state.197 In our view the dissent had the better of this argument, and we suspect that the majority's conclusion would have been a great surprise to the Marshall Court, which*

*distinguished the standing of government-created corporations from the government itself — most prominently when discussing the Bank of the United States.198*

*Perhaps the biggest point of disagreement between the majority and the dissent on standing was how to read the Court's precedent in Arkansas v. Texas,*199 *where the state of Arkansas had standing to sue on behalf*

*of the University of Arkansas. The majority believed that the University of Arkansas had a similarly separate legal personhood as MOHELA. It wrote: "[I]n Arkansas, the University of Arkansas could have*

asserted its rights under the contract on its own. . . . We permitted Arkansas to bring an original suit all the same."[200] While we have our doubts about that too, the majority's reading of the case is at least plausible.[201] So

*even if the Court was wrong to find standing, it found standing in the least wrong way.*202 *Of course, if the Court was straining to find standing because of its desire to stop an executive branch*

*overreach,203 that is itself a problem.204 More important than these quibbles, the Court's path to reaching the merits demonstrates inattention to the bigger standing picture. What about the remedial side*

*of the case? The lower court had granted a national injunction pending appeal, which the Solicitor General had also challenged.205 After ruling against the Biden Administration on the merits, thanks to*

*MOHELA, the Court ignored the remedial issue presented by the case below — dismissing the Solicitor General's challenge to the injunction as "moot."*206 *But is the Court really countenancing the*

*possibility that a national injunction can issue against the Administration's student loan forgiveness to forty-three million people, because of the modest standing claim of . . . MOHELA?*[207] *That*

*because one state agency has lost some of its finder's fees, a lower federal court should have halted the entire national program? Why, in the lower courts, would the injuries to MOHELA (and apparently Missouri) not*

*be fully redressed by ordering the United States to pay restitution to MOHELA (or Missouri)?*208

*Perhaps the Court was envisioning that even if the proper relief were narrow (which it*

*neglected to tell the Eighth Circuit), everyone would treat a Supreme Court opinion as if it were a national injunction, thanks to the legacy of Cooper v. Aaron. As a practical matter, Supreme Court decisions often do*

*have this effect, thanks to principles of vertical precedent, comity shown by the executive to another branch, and the general willingness of the public to accept the inevitable. Supreme Court opinions are often*

*treated as de facto national injunctions. But they are not the same thing, and in Brackeen and United States v. Texas just days earlier, the Court had been carefully attentive to these distinctions. In*

*Biden v. Nebraska it apparently could no longer maintain this attention.*

*It would be embarrassing for the Court to favor nationwide relief on the basis of such a flimsy injury. But to reject the*

*relief given below would have required the Court to grapple with the problems of remedies and redressability, which it may not have been ready yet to do. Silence leaves this question, which is so very capable*

*of repetition, for another day.*

## IV. THE ENDURING CHOICE BETWEEN TWO APPROACHES TO STANDING

*We have described the recent past and present of standing. But what is*

*the future? Doctrine is one way to answer this question. Standing requires the proper parties. Standing requires an injury, not a circuitous and indirect injury, but a personal injury — even for a state. Standing*

*requires available remedies that will redress the injury. And so on. If Massachusetts v. EPA and other developments have taken us off track, and if the Court is making a course correction, then maybe we are just back*

*to doctrine as usual. That would be a tidy story with a satisfying ending.*

*Too tidy. In law, doctrinal rules are never enough. The rules are employed and applied by human beings in the setting of human institutions. To be*

*sure, the application of legal rules is hemmed in by the rhetorical practices of legal argument — practices that constrain what is considered, and how it is considered, and by whom it is considered, and when it is*

*considered. But while these practices constrain, they also liberate. Standing sets judges free to be judges, rather than carrying out some other commendable office of the state.*

*And rules and people are still not the full story. Judges employ and apply rules, including rules about standing, with a situation sense about what exactly it is that they are doing. And it is here that standing as a judicial*

*practice is impossible to grasp if it is thought of merely as a collection of rules. Behind the use of these rules lie mindsets. The first way to think about standing is as a body of external constraints. External, that*

*is, in the sense of being external to the judge. Standing doctrine is a series of hurdles. This external concept of standing is roughly similar to an American football metaphor Justice Scalia used for common*

*law judges, as seen through the eyes of a first-year law student: [T]he great judge — the Holmes, the Cardozo — is the man (or woman) who has the intelligence to discern the best rule of law for the case at hand*

*and then the skill to perform the broken-field running through earlier cases that leaves him free to impose that rule: distinguishing one prior case on the left, straight-arming another one on the right,*

*high-stepping away from another precedent about to tackle him from the rear, until (bravo!) he reaches the goal — good law.*209

*On this mindset, principles like standing are external to the judge,*

*just as the opposing players are external to Justice Scalia's runner. The runner wants to get around the opposing players, and once he has done so, he is moving on. Standing is a box the judge has to check*

*before getting on to the*

*interesting and motivating*

*stuff.*

*Judges often talk about*

*standing this way. For*

*example, if a judge wants*

*to know "Can I do this or*

*is there any precedent to*

*stop me?", that suggests*

*an external concept. Indeed, at oral argument in Biden v. Nebraska, Justice Alito pressed the Solicitor General of the United States to admit that there was no "case that presents precisely the issue that's here."210*

*It also fits how judges sometimes seem to act, even when they don't talk about it. Judges sometimes seem "hungry" to get to the merits.211 In fact, that very charge was made by Justice Kagan against*

*the majority in Biden v. Nebraska.*[212]

*A second way of thinking about standing is quite different. It sees the practice of standing not as an external obstacle to the judge, but as something the judge is*

*supposed to internalize.213 You could think of standing as a judicial habit. It is an exercise in "judicial self-governance."214 Standing, in other words, is a judicial virtue, an unwillingness to decide*

*cases, no matter how attractive in achieving justice or preventing injustice, if the proper party is not before the court and a proper remedy is not available to that party. On this view, standing is a judicial kind*

*of fortitude, with a reinforcing alloy of steady patience. In this concept of standing we can think of traditional virtues such as fortitude and patience being adapted to the role morality of the judge. And moral virtues always*

*need to be internalized;*
*they are never just about*
*following the rules.*
*The importance of this*
*way of thinking may be*
*reinforced by the salience*
*of equitable relief in*
*public law cases. A judge*
*who thinks of an*

*injunction as the automatic result of satisfying a four-factor test, who thinks of things like "irreparable injury" and "balancing the equities" as merely hurdles to be gotten over before getting on with the*

*business of correcting what's wrong with the world — such a judge is not doing equity.215 Equity has always required an equitable mindset.216 And as more and more important public law cases involve*

*equitable relief, that may be an additional reason that standing requires an internal mindset.*

*In each concept there is plenty to criticize and to praise.*

*One criticism of the external concept of*

*standing is that it is manipulable.*[217] *If standing doctrine is not the main thing, but a set of threshold obstacles to be gotten over if you can, then we should not be surprised if it is manipulated for a court to*

*reach or avoid reaching the merits. This manipulation critique was recognized by the Supreme Court itself in United States v. Texas: "As this Court's precedents amply demonstrate, Article III*

*standing is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated . . . ."*218 Yet there are also good grounds for the external

*concept of standing. One is that the ultimate aim of a legal system is in fact justice, not standing. Imagine a nation with an enormous court building, as large as the Library of Babel in Borges's short story, with millions of*

*rows of boxes, containing hundreds of millions of complaints, each one sorted with exquisite care into boxes labeled "standing" or "no standing," awaiting a merits determination that will never come. Is this*

*justice? Is this even a substantial step toward justice? Correspondingly, the internal concept of standing can be criticized for its elevation of judicial inaction. The internal concept might lead to a*

*world where all judges are taught at the knee of Alexander Bickel, and they overlearn their lessons. Or to use another image, judges might be like clerks overzealous in finding reasons not to grant a*

*writ of certiorari. But judges exist to do things, to decide cases and grant remedies. The greatest judge is not the judge who can find a way to make sure every one of her cases is dismissed as nonjusticiable.*

*Another way to put this is that the internal concept runs the risk of making standing the main thing. But the internal concept has two great advantages, and we consider these two advantages decisive.*

*First, it aligns with the reason we have standing doctrine in the first place. Standing is not meant to be a filter to ensure that judges get a small enough set of cases that they can give each one proper deliberation. If*

*standing were a solution to overwork, then a court with a small caseload, or a self-chosen caseload, might not even need it. But courts should not just do the right number of things, but the right things. Standing is meant*

*to ensure that we have in place the basic requirements for this social practice of adjudication. Proper parties and proper relief help us have proper courts, that is, courts acting as courts. Without*

*proper parties and proper relief, judges may do all kinds of wonderful things, and what they are doing may be "[m]uch more rational," "but it would not be near so much like a [court]."*[219]

*Second, the internal concept can partially ameliorate the manipulability concern. There is no "non-manipulable, serious version" of standing doctrine.*220 *But external rules that have*

*no claim on the inner morality of a person are always more subject to manipulation. In part this is because the rules themselves offer one line of defense, whereas rules backed by habits or virtues offer two. But it is*

*also because an individual who sees a rule as an external obstacle will be motivated to circumvent it, whereas an individual who internalizes a rule will be motivated to carry it out, even if that means new*

*extensions to new circumstances. It is not an accident that moral teaching for millennia has emphasized the importance of this framing — rules we want to follow should not be framed as external. In the*

*words of the Prophet Jeremiah, the law needs to be written on our hearts.*221

*The Court's rules about state standing are getting better, and it increasingly appears that Massachusetts v. EPA is*

*recognized as a wrong turn that threw the standing jurisprudence of the federal courts into confusion. But good rules about standing222 are not enough. They need to be internalized. They need to be framed by*

*judges not only as hurdles to surmount, but as habits to make one's own. A good court makes good decisions, but it only makes decisions as a court would — and that means giving proper relief to proper parties.*

# CONCLUSION

*"Courts," Judge Jerome Frank once wrote, "do business at retail, not at wholesale."223 That assertion could be met with immediate challenges and qualifications, and Judge*

*Frank anticipated one of them. He continued: "Wholesaling occurs in the stare decisis department, where the courts deliver pronouncements concerning the legal rules. But the facts of*

*individual cases always ultimately divert the courts' business into retail channels."*224 *That Judge Frank's point is still true at all, we think, is in large part due to the idea of standing. Standing requires proper*

*parties and proper relief, and those requirements guide the courts toward retail decisionmaking. As Justice Kagan put it, standing is what makes a court "stay in its lane."225 Yet as courts have come to govern so much of our*

*political life, and as so many of us have come to expect them to do so, standing doctrine and its corresponding view of judicial power will always be under pressure. Unconstrained by such niceties, there is so much*

*more a judge could do!*
*This Term suggests that*
*the Court is trying to*
*nudge the judiciary*
*toward the classical view*
*of the judicial role, or at*
*least toward the circa*
*2005 view of the judicial*
*role, and if so that is a*

*good development. But it will not be the end of the temptation. Constant pressure requires constant vigilance.*

---

*\* Harry Kalven, Jr. Professor of Law,*

*University of Chicago Law School.*

*\*\* John N. Matthews Professor of Law, University of Notre Dame. The authors thank Nick Bagley, Stephanie Barclay, A.J. Bellia, Curt Bradley,*

*Aaron-Andrew Bruhl, Mike Dorf, Jack Goldsmith, Jacob Hamburger, Michael McConnell, Richard Re, and Stephen E. Sachs for helpful comments, and Drew Garden, Will Horvath, and Georgios*

*Sarris for research assistance.*

[https://harvardlawreview.org/print/vol-137/proper-parties-proper-relief/](https://harvardlawreview.org/print/vol-137/proper-parties-proper-relief/)

**Part of standing doctrine:** *Redressability is one of the three key elements required to establish standing to sue in federal court, alongside*

*"injury in fact" and "causation.".*

**Meaning in practice:**

*If a plaintiff seeks a remedy that would not meaningfully alleviate their claimed injury, or if the relief requested depends on actions by a third party not before the court, then the court might find that the issue lacks*

*redressability and dismiss the case.*

**Factors considered:**

*When assessing redressability, courts may consider the nature of the relief sought, the likelihood of the defendant complying with a court order, and whether any potential obstacles could prevent the*

*relief from effectively addressing the injury.*

*Example scenarios where redressability might be an issue:*

**Seeking injunctive relief against a future action that might not occur:** *If a plaintiff seeks to prevent a hypothetical future harm*

*that is not likely to happen, a court may find the issue lacks redressability.*

***Seeking relief that requires action by a third party not in court:*** *If a plaintiff's injury can only be remedied by actions of a party not involved in the lawsuit, the court may find*

*the issue lacks redressability.*

*Here... the plaintiffs states literally OBSTRUCT the immigration authorities from doing their jobs to RID the United States of illegal aliens... both MEN, WOMAN, and CHILDREN – some or most of whom are "secretly"*

*being guided by [first] illegal border crossing "coyote-smugglers", and [second] most and/ or some are being then guided by (as part of the SAME smuggling human tracking illegal alien net-work)... by "corrupt" immigration attorneys and activists who literally "AID"*

*in having the illegal aliens EVADE and HIDE from the United States' immigration authorities [e.g. ICE and Department of Homeland Security]... and worse YET as all of the Democratic - Blue State [open borders and illegal alien – immigration fraud loving] plaintiffs AG*

*states – are SANCTUARY STATES [e.g. sanctuary havens] for the illegal aliens in the first place — which literally is what is and has caused ANY harm which the plaintiffs/ appellees falsely claim…. Then by natural extension…. The issue of REDRESSABILITY is RIPE*

*here… whereby even AFTER a long protracted litigation of the three related appeals and district court case…. There will still be NO meaningful change or harm which can be as matter of LAW [e.g. in reality] addressed by the district court…. Because a favorable*

*ruling as to the plaintiffs will ONLY create MORE harm to the defendants and pro se intervenors such as Colleen Connors and myself [e.g. Melvin Jones Jr.].*

*Respectfully submitted.*

Thank you.

Best,

Date: 2-25-2025

_____

Melvin Jones Jr. disabled

PRO SE appellant

1935 Hosler St.

Flint, Michigan

*48503*

*Email:*

*[jonesjrmel@gmail.com](mailto:jonesjrmel@gmail.com)*

*Google voice to text ph#*

*415-562-5074*

—-

*Date: 2-25-2025*

*Colleen Connors*

——————————————————

*Colleen Connors PRO SE*

*appellant*

*1935 Hosler St.*

*Flint, Michigan*

*48503*

*Email:*

*cmcolleen4@gmail.com*

*Google voice to text ph#*

*408-459-9639*

Journal of Migration and Health 8 (2023) 100199



Contents lists available at ScienceDirect

## Journal of Migration and Health

journal homepage: www.elsevier.com/locate/jmh



# Messaging inclusion with consequence: U.S. sanctuary cities and immigrant wellbeing

Ashley R. Houston [a,b,*], Carmel Salhi [a,c], Alisa K. Lincoln [a,c,d]

[a] Institute for Health Equity and Social Justice Research, Northeastern University, 360 Huntington Avenue, Boston, MA 02115, United States
[b] Department of Counseling, Developmental, and Educational Psychology, Boston College, 140 Commonwealth Avenue, Chestnut Hill, MA 02467, United States
[c] Department of Health Sciences, Northeastern University, 360 Huntington Avenue, Boston, MA 02115, United States
[d] Department of Sociology and Anthropology, Northeastern University, 1135 Tremont St, Boston, MA 02120, United States

## ARTICLE INFO

*Keywords:*
Sanctuary cities
Immigration
Health
Safety
Structural violence
Social movements

## ABSTRACT

In the United States (U.S.), sanctuary cities have increasingly garnered public attention as places dedicated to increasing immigrant safety, inclusion, and health. These cities primarily rely on limiting local police cooperation with federal immigration enforcement to deter immigrant detention and deportation. However, sanctuary policies' inability to extend immigrants' legal rights and their reliance on police as ushers of sanctuary may complicate how these spaces attend to their stated goals. In this paper, we examine how organizational workers conceptualize sanctuary, safety, and immigrant health and wellbeing within sanctuary cities. We draw on interviews with organizational workers in two sanctuary cities: Boston, Massachusetts and Seattle, Washington collected between February and August 2018. Our findings reveal that immigrants continue to face structural barriers to housing, safe employment, education, and healthcare within sanctuary cities with consequences to wellbeing. Workers' definitions of safety draw on interconnected structural exclusion that prevent immigrants from accessing basic needs and fail to account for historically rooted forms of racism and nativism. Organizational workers identified tensions between messages of sanctuary and what local sanctuary policies offer in practice, providing insight into consequences of institutionalizing a grassroots social movement. As organizational workers negotiate these tensions, they must develop everyday sanctuary practices to extend immigrant inclusion, safety, health, and wellbeing.

## 1. Introduction

Popular discussion of sanctuary cities has become more pronounced in the United States (U.S.) following 2016, when the Trump administration proposed an end local jurisdictions' ability to pass sanctuary policies (Lasch et al., 2018; Paik, 2017; Roy, 2019). The Trump administration accused sanctuary cities of violating federal law by attempting to shield undocumented immigrants from deportation (Lasch et al., 2018). In response, cities increasingly proposed and passed sanctuary policies to resist punitive immigration policy and anti-immigrant rhetoric. As more sanctuary cities emerge, scholarship examining sanctuary cities and practices have likewise grown. Much research focuses on how these spaces offer immigrants' protection from federal policy, while others have begun to explore their limitations in addressing immigrants' needs within them (Lasch et al., 2018; Paik, 2017; Roy, 2019; Bauder, 2017; Kaufmann, 2019; Kuge, 2020; Ortiz

et al., 2021). In this paper, we examine how organizational workers conceptualize sanctuary policies in addressing immigrants' safety, needs, and health. In addition, we explore how messages of sanctuary may conflict with workers' understandings of sanctuary in practice.

### 1.1. The growth of sanctuary cities

Immigrant exclusion has been a fundamental feature of U.S. policy since its founding (Daniels, 2004). Under the former Trump administration, policies of immigrant exclusion were significantly reinforced. During his term in office, former President Trump passed 'zero-tolerance' policies on immigration and referred to immigrants as 'invaders' and 'illegal criminal aliens' (Bacon, 2018; Buff, 2019; Domonoske and Gognzales, 2018; Walia, 2021). Government officials threatened to prosecute immigrant parents for entering the U.S. without legal authorization and endangering their children by "smuggling" them into the

* Corresponding author.
  *E-mail address:* ashley.houston@bc.edu (A.R. Houston).

https://doi.org/10.1016/j.jmh.2023.100199
Received 4 May 2023; Received in revised form 11 July 2023; Accepted 20 July 2023
Available online 22 July 2023
2666-6235/© 2023 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

*A.R. Houston et al.*                                                                                                                                    *Journal of Migration and Health 8 (2023) 100199*

country (Buff, 2019). The Department of Homeland Security (DHS) routinely prosecuted asylum seekers as criminals (Buff, 2019). Though the Trump administration offers a recent example, populist approaches to immigration comprise historical and bipartisan foundations of policies targeting immigrants (Paik, 2017; Roy, 2019; Walia, 2021). For example, the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) militarized the U.S. Southern border—making it more deadly and dangerous to cross—and deterred migration by excluding many immigrants from federally-funded benefits, including welfare and health care (Abrego et al., 2017; Espenshade et al., 1997; Hagan et al., 2003; Jones-Correa and de Graauw, 2013; Kerwin, 2018). The IIRIRA also established the 287(g) program that allows local police to partner with federal immigration enforcement agencies, including Immigration Customs Enforcement (ICE) (Kerwin, 2018; Varsanyi et al., 2012). It is this cooperation that sanctuary cities attempt to limit.

Naomi Paik (Paik et al., 2019) emphasizes how the concept of 'sanctuary' conveys a spatial notion of protection and has a historically antagonistic relationship with the state—serving as a reminder that the nation-state does not have exclusive control over what happens within it. Contemporary sanctuary policies and practices originate from grassroots organizing in the 1980s following U.S. involvement in Central America that resulted in the forced displacement of thousands of Central Americans who were later denied asylum claims by the U.S. (Roy, 2019; Bauder, 2017; Paik et al., 2019; Garcia, 2021). In response, faith communities and solidarity organizations mobilized to support asylum seekers while working to expose violent U.S. foreign policy and politicized restrictions on migration and legal recognition (Roy, 2019; Buff, 2019).

The 1980's Sanctuary Movement paved the way for the New Sanctuary Movement, which mobilized following the post-9/11 securitization of the border (Lasch et al., 2018; Bauder, 2017; Buff, 2019). Although no immigration policies have been passed by Congress since the IIRIRA (1996), other "homeland security" laws like the Patriot Act (2001) and the Real ID Act (2005) further deprived non-citizens from accessing social resources (Buff, 2019). Like the original Sanctuary Movement, the New Sanctuary Movement relies on coalitions across religious and solidary organizations (Garcia, 2021) and encourages local jurisdictions to pass sanctuary policies to limit police cooperation with federal immigration enforcement (Lasch et al., 2018; Bauder, 2017). In 2017, at least 600 counties attempted to delimit conditions under which local police collaborate with federal immigration enforcement (Paik, 2017; Wong et al., 2019). As of 2018, there were about 400 subnational jurisdictions with sanctuary policies throughout the U.S., incorporating roughly half of the U.S. population (Kuge, 2020).

### 1.2. Sanctuary in practice

Although sanctuary cities are embedded in popular discussion, there remains no legal definition of a 'sanctuary city' resulting in a gradient of policy protections between different sanctuary or 'welcoming' cities. Typically, these cities are understood as areas that enact local policy to establish noncooperation between police and federal immigration enforcement agencies to foster immigrant safety, inclusion, and health (Lasch et al., 2018; Paik, 2017; Bauder, 2017; Kaufmann, 2019; Ortiz et al., 2021). Lasch and colleagues (Lasch et al., 2018) outline five potential approaches that localities may adopt to be considered a 'sanctuary': (1) barring investigation of civil and criminal immigration violations by local police; (2) limiting compliance with immigration detainers and warrants; (3) refusing ICE access to local jails; (4) limiting local police's disclosure of sensitive information; and (5) restricting local participation in operations with federal immigration enforcement. Localities may adopt any or all of these approaches to be considered a sanctuary city, leading to important contextual differences between them.

While local sanctuary policies operate on a wide gradient, most attempt to help unauthorised immigrants cope with federal immigration

policies (Bauder, 2017). There is some evidence that inclusive state and local immigration climates may be associated with less poverty among immigrants in general and improve healthcare utilization among undocumented immigrants in particular (De Trinidad Young et al., 2018; Marrow, 2012; Potochnick, 2014). Inclusive local policies may help shape federal immigration policies, including increased recognition of the health and health care needs of immigrants (Aboii, 2016). Local policies also help reframe narratives around migration and highlight the injustices of immigration raids (Paik, 2017). However, scholars have also pointed to the limitations of sanctuary cities due to their inability to extend immigrants' legal rights and their reliance on local police, who disproportionately target people of color and may reinforce the racialization of immigrants (Gomberg-Muñoz and Wences, 2021).

### 1.3. Addressing structural oppression

Because most sanctuary cities focus on limiting local police cooperation with federal immigration enforcement, they may fail to address the myriad of ways immigrants are structurally excluded from essential resources. Broad definitions of safety, that incorporate immigrants' material needs in addition to risk of detention and deportation, are particularly relevant given the breadth of scholarship outlining the effects of 'illegality' or 'illegalization'. 'Illegality' can be conceptualized as both a legal and social construct impacting how immigrants are treated within society and their relationship to the state (Garcia, 2021; Menjívar, 2021). 'Illegalization' emphasizes the *processes* by which some immigrants are rendered 'illegal' and in turn operate in spaces of precarity (Bauder, 2014). In the U.S., one's legal status dictates healthcare coverage and social resource access, health risks, vulnerability to violence, and wages in the labor market (Menjívar, 2006; Young et al., 2019). Federal immigration policies reinforce definitions of national belonging that conflate citizenship and racial or ethnic identifications, increasing vulnerability to arrest and social exclusion for those labeled "illegal" or foreign (Menjívar and Abrego, 2012).

Although some sanctuary cities have attempted to limit structural oppression by expanding access to city resources, such as driver's licenses and health insurance (Marrow, 2012; Darling and Bauder, 2019), immigrants continue to face barriers to social and health resources. Understanding how localities address these challenges is necessary. Yet, much research on sanctuary cities has focused on policies and laws hindering deportation and detention by local police's cooperation with immigration enforcement (Lasch et al., 2018; Bauder, 2017; Villazor, 2010). Relatively less is known about their ability to foster immigrant safety and inclusion beyond limiting vulnerability to detention and deportation or how messages of sanctuary cities may complicate their practices on the ground. We identify how organizational workers in two sanctuary cities—Boston, Massachusetts and Seattle, Washington—conceptualize the role of sanctuary policy in addressing immigrant safety, inclusion, and wellbeing. Additionally, we examine how workers negotiate tensions between how sanctuary cities are messaged and how they operate in practice.

## 2. Methods

The data used in this analysis were drawn from a pilot study among immigrant-serving organization workers ($N = 54$) in two sanctuary cities: Boston, Massachusetts ($n = 35$) and Seattle, Washington ($n = 19$). Study sites were chosen through existing connections among the research team. Boston and Seattle are similarly sized with around 700,000 and 745,000 residents respectively (U.S. Census Bureau 2018). About 28% of residents in Boston are foreign-born compared with 20% in Seattle (U.S. Census Bureau 2018). Both cities' governments express politically progressive messages around immigration yet have distinct approaches to sanctuary policymaking (Davis, 2020). For this paper, we review policies enacted prior to August 2018, when data were collected. The 2014 Boston Trust Act (BTA) restricts local police from honoring ICE

*A.R. Houston et al.* *Journal of Migration and Health 8 (2023) 100199*

detainers without a criminal warrant; inquiring about an individual's immigrant status; providing personal information about an individual to immigration authorities; making arrests under ICE warrants; or pre-forming duties of an immigration an officer (Mayors Office 2019). The 2003 Seattle Ordinance 121,063 bars city employees from inquiring about an individual's immigration status unless police believe a felony has been committed or an individual has been previously deported (Woodring, 2019). A 2017 resolution prohibits ICE detainers from being honored without a judicial warrant and specifies that local police cannot operate as immigration officers. Moreover, Seattle has an Inclusive Equity Cabinet to advise the mayor on residents' civil liberties and allocate funds for children and families affected by federal immigration policy (Seattle City Council 2017).

### 2.1. Participants

Participants were eligible if they worked for an immigrant-serving organization and were identified through snowball sampling to ensure inclusion of diverse organizations and account for concern over immigration enforcement. Snowball sampling techniques are appropriate when working with marginalized populations to gain trust and reduce sampling (Harding, 2013). Participants worked in a variety of domains, including health, law, advocacy, activist, faith-based, or governmental organizations. While we did not collect participants' immigration status, some identified themselves as immigrants in interviews.

### 2.2. Data collection

Our semi-structured interview guide explored participants' work responsibilities; conceptualization of safety and sanctuary; experiences with immigrant communities; challenges and facilitators to providing services; concerns among immigrant clients; and the role of sanctuary policies in fostering immigrant safety, inclusion, and wellbeing. Interviews were conducted between February and August 2018, after the Trump administration had accelerated immigration enforcement but prior to proposed public charge inadmissibility policies in October 2018 that would prevent migration or pathways to citizenship for those deemed to be a risk of becoming a "public charge" to the government (Artiga et al., 2019). Participants consented to have their interviews audio recorded. Interviews were transcribed verbatim. Participation was confidential and all interviews were de-identified prior to analysis. This study received full approval from Northeastern University Institutional Review Board.

### 2.3. Analysis

Our analysis techniques were derived from modified grounded theory. Modified grounded theory involves inductive, theoretical coding in conjunction with constant comparative coding to develop theory (Strauss and Corbin, 1994). This approach is well-suited to examine experiences (Creswell, 2007) and power dynamics (Strauss and Corbin, 1994), helping to bridge the gap between theory and empirical research (Harding, 2013; Charmaz and Belgrave, 2007). First, the research team reviewed transcripts line by line, to develop an open coding scheme. Next, in line with axial coding, we reviewed initial codes to identify categories through multiple, iterative steps including memo making. These categories revolved around participants' concerns over economic security, labor and wage discrimination, housing instability, detention, and deportation. Finally, selective coding allowed us to connect these categories around a one core category to illuminate theory underlying these themes. A theoretically focused coding approach allows for examination of relationships between concepts and build greater theoretical sensitivity than earlier coding (Creswell, 2007). Once saturation was met and no new themes emerged, codes were organized into a codebook and applied across the dataset by the first author with input from the other authors. Transcribed interviews were managed,

reviewed, and coded in NVivo (QSR International Pty Ltd 2018).

### 2.4. Theory

In our analysis process, we found that workers' descriptions of structural exclusion in policy and across institutions limits immigrants' access to resources and legal rights. Therefore, we felt selective coding was best informed by and that our results contribute to the structural violence framework. Structural violence (Galtung, 1969) refers to historical and deliberate inequities of power that result in harm over time (Viruell-Fuentes et al., 2012). These inequities shape the distribution of resources that constrain one's health and wellbeing, including access to basic resources like healthcare, food, education, and housing (Galtung, 1969; Lee, 2016). While lack of access to material resources may not result in immediate harm, structural violence explains how this leads to harm over one's life course (Menjívar and Abrego, 2012; Galtung, 1969; Lee, 2016). In the context of migration, structural violence is rooted in daily uncertainties or precarious access to fair wages, food, housing, and health care (Menjívar and Abrego, 2012), often through policy constraints (Holmes, 2013; Konczal and Varga, 2012). Federal and state policies can be considered structural forms of violence because they are rooted and concealed in discriminatory daily practices that reinforce and reproduce inequalities based on (perceived) legal status (Menjívar and Abrego, 2012). Some scholars have named this the "axis of stratification" by legal status (Menjívar, 2006; Young et al., 2019), legal violence (Menjívar and Abrego, 2012), or categorical violence (Castañeda et al., 2016), to describe how immigration policies reinforce definitions of national belonging that conflate citizenship and racial or ethnic identifications, increasing health risks for those deemed "illegal" or foreign (Menjívar and Abrego, 2012). Our findings illuminate indirect pathways through which structural violence harms immigrant health and wellbeing in two sanctuary cities.

### 3. Results

Organizational workers described a gradient in sanctuary policies across the U.S. aimed to expand immigrants' safety, inclusion, and health. This coupled, with an inability to extend immigrants' legal rights, led many participants to identify tensions between how sanctuary cities are messaged and how they are enacted. For example, messages of sanctuary may rely on narrow definitions of "safety" that differ from organizational workers' definitions that include mitigating structural exclusion across institutions (e.g., in housing, employment, legal system, and health care). Furthermore, participants noted that risks of detention, discrimination, and exclusion remain salient concerns. Finally, reliance on local police as enforcers of 'sanctuary' raised additional tensions in messages of safety among immigrant communities targeted by police. Some participants specifically identified ongoing structural discrimination informed by historical, intersecting, and systemic manifestations of racism and nativism. Tensions between how sanctuary cities are messaged and their limitations were conceptualized as unintended consequences of institutionalizing a grassroots social movement into policy. Participants negotiated tensions by identifying, developing, and implementing sanctuary *practices* to address policy limitations.

### 3.1. Defining safety in sanctuary cities

When asked to define 'safety', organizational workers described interrelated structural components in addition to protection from detentions and deportation.

Safety goes beyond being protected from attacks and is more about generally feeling secure in your environment…being able to go to school, being able to access health services, being able to obtain food,

*A.R. Houston et al.*    *Journal of Migration and Health 8 (2023) 100199*

housing without…being harassed by law enforcement. (Boston 11, Activist Organization)

Concerns about their housing…I think people would consider that feeling unsafe, even if it's not a direct threat to their physical safety. (Boston 20, Faith Organization)

Addressing immigrants' material needs and ensuring immigrants are free of discrimination were crucial to increasing immigrant safety. Participants identified increasing gentrification, labor exploitation, and lack of access to basic resources like food, education, and healthcare ran counter to messages of safety within sanctuary cities. Organizational workers noted how access to resources were not necessarily addressed by policies that primarily focus on limiting police cooperation with federal immigration enforcement.

Participants noted that interconnected structural and institutional exclusion was of particular concern for immigrants with precarious or undocumented legal status.

If you don't have a [legal] status, if you don't have a stable job that pays benefits, then getting access to healthcare is really difficult. (Seattle, Advocacy Organization)

However, federal policy and anti-immigrant rhetoric increasingly blurred boundaries between legal status designations. Several participants felt that immigrants—of all legal statuses—remained concerned about safety and access to basic resources.

People's sense of safety in terms of what they're hearing…even though refugees really—by and large…should not feel as threatened by what they're hearing…they don't peel back all the layers of that. So, there's these different incidents that occur and they're very worried…they hear things in the national news and that translates into no one wants me here…Or their family can't come because their family keeps getting delayed in the process with the Muslim ban… they're also reacting to this blanket negative talk about immigrants, about people undocumented, about the border. (Seattle 14, Activist Organization)

Organizational workers' definitions of safety extended beyond deterring detention and deportation to illuminate how messages of sanctuary may conflict with how organizational workers understand sanctuary in practice.

### 3.2. Defining 'Sanctuary': symbolic versus psychological

When asked to define 'sanctuary', some participants distinguished between 'sanctuary' as a historical concept and 'sanctuary' as defined by city government through local policy.

Sanctuary has existed for years—centuries…sanctuary looks like a lot of different things. So, it looks like making sure we help folks have a home, have somewhere to stay, have somewhere to sleep. It looks like the churches taking in folks who know that ICE is going to come for them. (Boston 17, Activist Organization).

Participants identified sanctuary policies' restriction of local police's cooperation with ICE but noted a gradient between different sanctuary localities, making it difficult to offer a singular definition of 'sanctuary'.

There is not a single definition that's applicable to every single city that calls themselves a sanctuary city. (Seattle 3, Advocacy Organization)

Instead, participants often distinguished between progressive and less progressive sanctuary cities.

[Sanctuary policies] include not sharing information with federal immigration enforcement …progressive sanctuary cities go even further to advance immigrants' rights, like creating legal defense funds, or thinking about municipal IDs, or municipal voting…

sanctuary policies can be anything on that spectrum. (Boston 8, Legal Organization)

Progressive sanctuary cities attempt to address structural exclusion across institutions in addition to limiting local police cooperation with federal immigration enforcement, while less progressive cities primarily aimed to restrict police cooperation with federal immigration enforcement.

Defining 'sanctuary' led participants to reflect on how cities enact sanctuary *in practice*. This is where nearly all participants discussed how sanctuary cities fall short in reaching their messaged goals.

Boston was declared a sanctuary city…but I have seen people get deported in Boston. To me, a sanctuary city would be where nobody gets deported, like at a baseline. (Boston 15, Activist)

For example, sanctuary policies that focus on local police's cooperation may not have the intended reach across the city where state police, or other non-city law enforcement, operate.

It [sanctuary policy] only applies to the city police and not to the other, say half a dozen law enforcement jurisdictions that operate within the city. For example, it doesn't apply to port authority; it doesn't apply to King County police…who can operate within the city. And people don't make a distinction…if you pull the average person off of the street and say 'if you ran into a cop in Seattle, who would they be working for?', they could probably list two maybe three jurisdictions, when there are at least half a dozen. Then when you start thinking about the Federal stuff, there's even more, right? (Seattle 1, Faith Organization)

Other participants noted that most sanctuary policies concentrate around urban centers but do not necessarily apply to enforcement outside of the urban center, leaving undocumented immigrants vulnerable to detention and deportation in surrounding areas.

The tensions between how sanctuary cities are messaged and how they function led some organizational workers to reflect on the use of the term 'sanctuary'.

How meaningful…is the sanctuary project? I would say from a psychological in the sense…it's very meaningful. Legalistically, it's trash—it's nothing. (Seattle 11, Advocacy Organization)

Nearly all participants emphasized that sanctuary policies may foster a sense of inclusion, but some added that taking actions toward inclusion through allocating funds or creating programs is equally important.

Any city can make such declaration as a political promise or just trying to brush up their image…you're claiming you're a sanctuary city and then what are you committing to that in terms of funds, programs, and specifics? (Boston 1, Activist Organization)

As a result, some organizational workers described the city's use of the term 'sanctuary' was a political gesture or symbolic if it failed to enact additional policies and practices to mitigate immigrants' structural exclusion.

For some organizational workers, tensions between symbolic sanctuary and sanctuary in practice reflect contradictions between federal and local policy domains.

One very hard reality is that there is no way to guarantee anyone's safety and at the end of the day. Even the best [local] policies cannot…make up for bad policies at the federal level or implementation practices of an administration who's looking to basically deport as many immigrants as possible. (Boston 6, Government Organization)

Participants noted how localities had little ability to regulate federal immigration policy and prevent immigration enforcement from operating within the city.

A.R. Houston et al.

*Journal of Migration and Health 8 (2023) 100199*

Just because there are these…[sanctuary] policies or ordinances in place, it doesn't mean that federal agents and ICE don't get to be present. (Seattle 7, Legal Organization)

Localities' inability to prevent federal immigration enforcement was at odds with how many organizational workers' understood 'safety' and 'sanctuary'.

### 3.3. Messaging sanctuary

Many participants felt that messages of sanctuary offered public support around immigration, while others cautioned that these messages could obscure sanctuary cities' limitations.

[Sanctuary policy] helps alleviate fear, but maybe not in ways that are realistic…it's a false sense of security, but I think it definitely alleviates the fear for sure." (Boston 1, Activist Organization)

Messages of sanctuary may perpetuate a false sense of security among immigrants residing within them who remain vulnerable to the harmful impacts of federal immigration policies and practices.

We don't want to use 'sanctuary' because it's a misleading term because ICE can come into any part of the city…We don't to tell people Seattle is a sanctuary but then have them think 'Oh, great. That means ICE won't get me here and I'll be safe'. And then all of a sudden, ICE comes and gets them. (Seattle 13, Government Organization)

This led some participants to balance wanting immigrants to feel welcome while also understanding on-going risks. Others chose to avoid using the term 'sanctuary' altogether.

As organizational workers negotiated the limits of sanctuary policy in enacting sanctuary practices, many described sanctuary cities help foster discussion around federal immigration policies and practices.

We can't stop necessarily what's happening at the federal level, but we can call attention to it…why should our tax dollars support a profit-making [immigrant detention] enterprise…we can't immediately change that. We can continue to look for the day where that system is changed. (Seattle 10, Faith Organization)

I think the sanctuary is great in terms of changing public opinion…A lot of people who hadn't necessarily thought of immigration before kind of want to jump on that bandwagon. (Boston 16, Advocacy Organization)

Yet, a few participants noted how increasing discussions following the 2016 Presidential election ignored historical policies and practices targeting immigrants.

It's really odd to me that the term [sanctuary] has really just reemerged recently in response to the rhetoric from the current [Trump] administration, given that ICE was created by the Bush administration…I don't remember there being much push back to the created of the Department of Homeland Security and the creation of ICE…when Obama was heavily deporting people. The communities that were targeted—which was predominantly the Latinx community—was pushing back but not really the rest of the country in the way that people want to push back now…the idea of an entire city being a sanctuary knowing the way that local law enforcement and federal law enforcement both operate with really racist and Islamophobic foundations at both levels. (Boston 11, Faith Organization)

For this participant, the influx in adoption of sanctuary policies in response to the Trump administration felt inconsistent with (in)action under previous administrations that likewise targeted immigrants. Moreover, deeming the city a sanctuary without addressing interconnected structural discrimination (e.g., mass incarceration and immigrant detention) felt at odds with the ethics and history of the Sanctuary Movement that these policies sprouted from.

### 3.4. Institutionalizing the sanctuary movement: consequences and actors

Tensions between messages of sanctuary and how they operate on the ground were conceptualized as a result of institutionalizing a grassroots movement into policy. Participants noted the impacts of institutionalization in two ways. First, sanctuary policies focus less on challenging U.S. imperialism and systems of oppression that continue to reproduce immigrants' precarity compared to the Sanctuary Movement. Second, institutionalization shifts the actors involved in providing sanctuary from religious congregations and solidarity organizations to local police, who may further contradict messages of safety.

Those working in advocacy and activist organizations distinguished between narratives of sanctuary adopted by local governments and sanctuary activists, reflecting concern over how 'sanctuary' changes when embedded in the state.

The Sanctuary movement happened in the 80s…we [The U.S.] did not consider the people fleeing the violence there to be refugees. We considered them economic-migrants and therefore, it was harder for them to find [legal] status…That's why so many, predominantly faith groups…started the sanctuary movement, which was harboring people who were in the country unlawfully because our government did not see them as refugees…Nothing that we're doing right now… beside from a couple of faith groups, is anything like that. So, it's very hard to use that same term. (Boston 4, Advocacy Organization)

These participants distinguished "true" sanctuary, which attends to immigrants' material needs, versus symbolic sanctuary, that shifts public perception around immigration by enacting policy.

The more we try to have the state absorb something that for years has been a way to combat the state, then it's not going to mean anything anymore. (Boston 17, Activist Organization)

As local governments and police become the ushers of 'sanctuary', some participants expressed concern that the sanctuary movements' conceptualization of 'sanctuary' and the movements' goals may become increasingly symbolic.

Reliance on police as actors of sanctuary raised challenges for several participants given longstanding practices of racial profiling by the police. Multiple workers described how police disproportionately target Black and non-white individuals, including immigrants who have become increasingly racialized, further contradicting messages of safety in sanctuary cities.

I think a lot of people in Boston, particularly from more privileged communities who are not regularly policed, believe that Boston is a progressive city…I think for communities and Muslim folks who are in low-income neighborhoods, who are Black, who are just generally, are more policed know that local law enforcement are not necessarily to be trusted. (Boston 11, Faith Organization)

Critiques on the reliance of police to enact sanctuary stemmed from mistrust of police in general and specific stories about police collaborating with ICE.

We do believe that there were some deportations as a result [of local police coordination with ICE]. I can't prove that… (Seattle 16, Advocacy Organization)

Widespread mistrust of police created doubt about how sanctuary policies were enforced, which was concerning given that nearly all participants acknowledged that ICE continued operating in each city. Additionally, some described the police presence in public institutions as security could limit immigrants' civic participation and inclusion.

Although all participants voiced frustration over the limitations of sanctuary policy in attending to immigrant safety and enacting sanctuary, their suggestions to address these limitations varied. Some organizational workers described working within the current system by passing additional policies, modeled after other localities or states, that

*A.R. Houston et al.*                                                                 *Journal of Migration and Health 8 (2023) 100199*

attend to a broader definition of safety to mitigate exclusion across institutions. Others advocated for more radical solutions, calling for non-reformist, or reforms that go beyond maintaining the status quo but aim to dismantle structural oppression by abolishing ICE and the police state, or coalition building across groups.

> California is the best example just in terms of healthcare, in terms of in-state tuition for undocumented students…all of these policies have passed in some other states…(Boston 28, Activist Organization)

> The immediate question is about abolishing ICE, right…really getting rid of it, not just kind of replacing it or renaming…Getting rid of this…incredibly militarized police whose sole function is to go in and terrorize these communities. That's the immediate question of safety. (Boston 30, Activist Organization)

In negotiating how to address immigrant safety, many participants distinguished between immediate needs: preventing detention and deportation, increasing access to legal funds and resources, housing, health care, and education—and long-term goals: immigration reform and/or abolition.

### 3.5. Consequences for immigrant health

Similar to participants' broadly definition of safety, many described a broad definition of health, highlighting how structural violence operates through multiple pathways and leads to harm overtime.

> There are numerous issues to deal with…health—mental health is a part of that. But also general health [like] housing, education, legal services. (Boston 2, Legal Organization)

Organizational workers identified how exclusion across institutions within and beyond sanctuary cities added to immigrants' stress leading to range of health problems.

> Our clients have lots of concerns. Their immigration status is often just one of many. Housing, mental health, healthcare, employment, food, education, all the things. (Boston 8, Legal Organization)

> The fact is, the longer someone is here in the US – a person of color – the worse they tend to do mental health wise, physically…everything just seems to go higher and higher…I think part of it is racism and the stress of all that but a lot of it is feeling like there's no one to talk to and that you can't trust anybody. (Boston 19, Health Organization)

Health workers framed the effects of prolonged stress—from anti-immigrant rhetoric, interactions with law enforcement, and barriers to basic resources—as contributing to growing rates of anxiety, depression, and the exacerbation of chronic conditions among their immigrant patients.

Despite increased health risks, several participants acknowledged barriers for immigrants in accessing healthcare within sanctuary cities, creating a negative feedback loop of harm.

> I think that there's really a lot of deep trauma that people have… because people are afraid to even access health services, especially if their immigration status is at risk, people don't have a lot of options to deal with those fears and the trauma of being constantly afraid. (Boston 11, Faith Organization)

By acknowledging this negative feedback loop, participants complicate approaches that focus on police cooperation or expanding immigrants' eligibility without additionally addressing the widespread effects of anti-immigration rhetoric, federal policy, and institutional mistrust.

Some participants critiqued policies or practices that fail to acknowledge how oppression operates systemically.

> It's always challenging because people sometimes have a tendency and especially, I think a lot of the big news networks and…

mainstream media…to kind of treat all of these issues as being separate things…kind of make the immigration struggle look like its own. [It's] only about Latinx people for example, which is not the case…the tactics all the same and it's the same state apparatus that's attacking…I'm like, this is why these issues are connected." (Boston 29, Activist Organization)

Multiple participants described intersecting and overlapping structures that reproduce immigrants' precarious social and legal positions with negative impacts on health. Acknowledging how various institutions perpetuate structural violence offers an opportunity to unite organizations across domains (e.g., labor, health, and legal), rather than a perspective that immigrant "is not my organizations' issue." One participant described historical immigrant and racial U.S. policies to further demonstrate longstanding intersectional oppression.

> As citizenship became a concept, that's where [it] housed this notion of race…Giving citizenship to black slaves was really the point where citizenship became tangible…it matters to the immigrants' rights movement because of the fact that we are people of color and we do face another component, which is imperialism…there wasn't just slavery in the US, it was slavery across the world both because of colonialization and…imperialism…also just recognizing that policy in itself is created to leave out people of color. (Boston 17, Activist Organization)

By invoking the links between citizenship, racism, and imperialism, this participant frames the gaps left by contemporary 'sanctuary' policy in opposition to the Sanctuary Movement, which recognized the need to counter intersectional oppression and U.S. imperialism in sanctuary practice.

The limitations participants identified in sanctuary policies ability to address structural violence and its role in immigrant health, led several workers to claim their own role as actors of sanctuary.

> [The] public health [department] did this thing where they defined their waiting areas as 'private spaces', which allows them to say to ICE, if ICE shows up, that you have to have a warrant to come in. (Seattle 1, Faith Organization)

For health organizations, sanctuary practices facilitate immigrants' safety and include: designating waiting rooms as private spaces, not capturing sensitive information in medical records, limiting police in their organization, and/or offering services or resources to immigrants regardless of legal status.

> We've offered very specific guidance…about what we should write in the charts…And now, we've tried to tell people please don't document immigration status at all on the assumption that those records are subpoena-able. (Boston 12, Health Organization).

While many participants were aware that sanctuary practices remain limited, they conceptualized them as acts of resistance fundamental in addressing immigrant safety, inclusion, and health.

### 3.6. Limitations

There are three important aspects of our study design that inform and circumscribe the interpretation of our results. First, and most importantly, our reliance on snowball sampling techniques likely limited the diversity of experiences and thoughts represented by our participants. While this approach helps mitigate mistrust to support recruitment and data collection, future research may employ alternative sampling strategies to explore how a broader range of organizational workers conceptualize and enact sanctuary. Second, Seattle and Boston are two of many sanctuary cities in the U.S. While our findings provide conceptual insight into sanctuary as a complex process, we are not able to offer analysis of how this process varies between sites. Future research may examine important differences between sub-national contexts to

*A.R. Houston et al.*                                                                                    *Journal of Migration and Health 8 (2023) 100199*

better understand how structural violence operates and is resisted. Third, we focused on organizational workers, who offer unique, front-line perspectives on the messaging and formulation of sanctuary policies. A sample that focuses on immigrants' perspectives may offer additional insights on their impacts not presented here.

## 4. Discussion

Organizational workers in Boston and Seattle conceptualized sanctuary, safety, and health distinct from public messages about sanctuary cities. These distinctions illuminate tensions between how sanctuary is messaged and what it looks like in practice. More specifically, participants described how immigrants continue to face barriers in housing, employment, health care, education, and accessing resources. Persistent institutional exclusion, despite local sanctuary policies, reflect how structural violence operates through an interconnected web conceptualized in Fig. 1. Research exploring the diversity of sanctuary policies has highlighted the role of local factors, including composition of immigrant populations, competition between foreign-born and native born for local resources, local political and partisan dynamics, and activism or social movement organizations within an area shape immigrant policies and practices (Collingwood et al., 2023; de Graauw, 2022). For example, participants occasionally referenced San Francisco, which has passed additional policies of immigrant inclusion, including expanded access to drivers' licenses, workplace protection, inclusion in education, and access to healthcare. De Graauw (2022) explores the role of mayors in addressing immigrant policies to support immigrants in San Francisco throughout federal and local political contexts (de Graauw, 2022). This suggests that examination of the gradient between sanctuary policies are necessary to fully understand their reach and impact.

Organizational workers negotiate the limitations of sanctuary policies by developing practices to mitigate the web of structural violence, becoming everyday actors of sanctuary. As such, organizational workers are essential in envisioning and enacting sanctuary in practice. Participants emphasized the need to address immigrants' material conditions, work across institutions, and acknowledge how historically rooted intersectional and interlocking forms of oppression (e.g., racism and nativism) work in tandem. Broad definitions of safety and health help expand understandings of sanctuary, illustrate ties to the Sanctuary Movement, and offer spaces for organizations to mitigate limitations of policy by adopting sanctuary practices (Houston et al., 2022). In this way, our findings contribute to existing scholarship conceptualizing sanctuary as more than a policy, status, or geographic space but rather a multidimensional set of practices, ethics, and processes (Houston et al.,

2022; Houston, 2019).

Examining sanctuary cities requires understanding their role within federal policy. Sanctuary cities are geographically limited and are not immune to federal immigration enforcement. Rather, they most often rely on restricting local police's collaboration with federal immigration enforcement. This focus limits their ability to address federal immigration practices and other facets of immigrant safety, inclusion, health that remain salient concerns within sanctuary cities. Many of these limitations have been previously identified. Roy (Roy, 2019) argues that sanctuary cities have limited scope, despite being hailed as symbols of resistance and contends that liberal conceptualizations of sanctuary fail to challenge the criminalization of immigrants that remain integral to punitive immigration policy. Bauder (Bauder, 2017) argues that sanctuary cities are not able to address the root of the oppression they seek to counter.

Participants situated the ongoing structural exclusion and discrimination against immigrants as historical, intersecting, and systemic manifestations of racism and nativism. In doing so, participants offer further insight into the limits of sanctuary policy. This is particularly concerning given the increased racialization of immigrants (Viruell-Fuentes et al., 2012; Asad and Clair, 2018; Sáenz and Manges Douglas, 2015). Sanctuary cities' reliance on local police as actors of sanctuary, given longstanding practices of violent policing and racial profiling within immigrant and historically oppressed communities, contradict messages of safety. Organizational workers' concerns over reliance on police are not unjustified. Paik (Paik, 2017) writes that sanctuary policies often leave loopholes for law enforcement to circumvent the protections offered in these spaces. As a result, ICE has continued to meet deportation orders and expectations under the Trump administration (Paik, 2017). In making these connections, participants remind us that immigration enforcement cannot be unlinked from historical practices of racism and nativism that require challenging the carceral state (Viruell-Fuentes et al., 2012; Asad and Clair, 2018; Hunt et al., 2004). As Paik (Paik, 2017) argues, the limits of sanctuary are not only external (e.g., due to federal policy), but also the result of how the liberal sanctuary frameworks legitimize law enforcement, neutralizing the ability to contest the carceral state. Similarly, Kuge (Kuge, 2020) notes that when sanctuary legislation becomes the only strategy for managing productive neoliberal subjects, it fails to challenge systems that contribute to inequities.

Although sanctuary policies cannot extend immigrants' legal rights (Paik, 2017; Kaufmann, 2019), participants note that these policies are useful in disrupting detention and deportation and shifting public narratives around immigration. Paik (2017) argues that sanctuary policies help stabilize immigrants' access to resources and highlight the injustice of raids, arrests, detentions, and deportations. In this way, sanctuary policies have utility as a process toward increasing immigrant safety and wellbeing. Yet, these benefits may not be accurately reflected in their messaging. Rather than liberal sanctuary frameworks that center police, an abolitionist framework may focus on resisting ICE and other oppressive practices that criminalize communities (Paik, 2017). Reducing and preventing detention and deportation is essential to short term goals. But so, too, is understanding the limits of focusing on short term solutions without holding long term goals in perspective. Local policies may offer temporary and geographically bounded protections for immigrants in sanctuary cities. Within these bounds, participants highlight their role as non-state actors of sanctuary practice. Their descriptive understandings of intersectional oppression and structural exclusion emphasize the necessity for intra-organizational collaboration to address immigrants' material needs on the ground. That is, sanctuary policies alone cannot attend to immigrant safety and health without simultaneously advancing immigrant rights, addressing their structural and material needs, and working to dismantle systems of oppression at the root of structural inequities.



**Fig. 1.** Interconnected web of safety and health.

*A.R. Houston et al.*    *Journal of Migration and Health 8 (2023) 100199*

## 5. Conclusion

Our study contributes to a nascent but growing body of scholarship calling for structural analysis of immigrant health, examining interconnected pathways of oppression and its harm. Our findings contribute to research outlining tensions between how sanctuary cities are messaged and how they operate, which may unintentionally promote a false sense of safety among immigrants residing within them (Bauder, 2017). Organizational workers framed these tensions as a result of divergent definitions between state actors, workers, and activists. However, within this tension, workers identify additional practices and policies of resistance that progressive localities may enact to meet short-term and long-term goals. Long-term goals articulated by some participants in our study included working toward dismantling immigration practices and state violence through reform or abolition. Short-term goals identified additional policies that governments could adopt. For example, policies that expand access to drivers' licenses, aid with tuition or education, provide and protect rights for undocumented workers, expand state and local access to social and health resources, including housing assistance and health insurance. Some of these practices have been adopted in cities outside of Boston and Seattle. Organizational practices were also identified, including not capturing documentation status in medical records, avoid using security officers in uniform to prevent misidentification as police or immigration officers, clarifying social resource eligibility information for immigrants, and continuing activism and coalition building to promote immigrant safety, inclusion, and wellbeing across domains.

## 6. Statements and declarations

Our pilot study was funded by the Global Resilience Institute at Northeastern University. The authors declare no conflicts of interest.

### Declaration of Competing Interest

The authors declare the following financial interests/personal relationships which may be considered as potential competing interests:

Alisa K. Lincoln reports financial support was provided by Northeastern University.

### Acknowledgements

We gratefully acknowledge study participants who shared their experiences. Additionally, we acknowledge our colleagues, Amy Farrell, Carlos Cuevas, Berna Turam, Martha Davis, and Elizabeth Ennen for their contributions in data collection.

### References

Lasch, C.N., Chan, L., Eagly, I.V., Haynes, D.F., McCormick, E.M., Stumpf, J.P., 2018. Understanding "Sanctuary Cities". Boston Coll. Law Rev. 59 (5), 1703–1774. lawd igitalcommons.bc.edu/bclr/vol59/iss5/5.

Paik, A.N., 2017. Abolitionist Futures and the US Sanctuary Movement. Race Cl 59 (2), 3–25. https://doi.org/10.1177/0306396817717858.

Roy, A., 2019. The city in the age of Trumpism: from sanctuary to abolition. Environ. Plan. D Soc. Space 37 (5), 761–778. https://doi.org/10.1177/0263775819830969.

Bauder, H., 2017. Sanctuary cities: policies and practices in international perspective. Int. Migr. 55 (2), 174–187. https://doi.org/10.1111/imig.12308.

Kaufmann, D., 2019. Comparing urban citizenship, sanctuary cities, local bureaucratic membership, and regularizations. Public Adm. Rev. 79 (3), 443–446. https://doi.org/10.1111/puar.13029.

Kuge, J., 2020. Countering illiberal geographies through local policy? The political effects of sanctuary cities. Territ. Politics, Gov. 8 (1), 43–59. https://doi.org/10.1080/21622671.2019.1604255.

Ortiz, H., Farrell-Bryan, D., Gutierrez, G., Boen, C., Tam, V., Yun, K., Venkataramani, A. S., Montoya-Williams, D., 2021. A content analysis of US sanctuary immigration policies: implications for research in social determinants of health. Health Aff. Web Exclus. 40 (7), 1145–1153. https://doi.org/10.1377/hlthaff.2021.00097.

Daniels, R., 2004. Guarding the Golden door: American immigration Policy and Immigrants Since 1882. Hill and Wang.

Bacon, D., 2018. Detention Crisis: Trump Defends 'zero-tolerance' Immigration, 18 June. USA Today.

Buff, R.I., 2019. Sanctuary everywhere: some key words, 1945–present. Radic. Hist. Rev. 2019 (135), 14–42. https://doi.org/10.1215/01636545-7607809.

Domonoske, C., Gonzales, R., 2018. What We Know: Family Separation And 'Zero Tolerance' At The Border. National Public Radio. https://www.npr.org/2018/06/19/621065383/what-we-know-family-separation-and-zero-tolerance-at-the-border.

Walia, H., 2021. Border and Rule: Global Migration, Capitalism, and the Rise of Racist Nationalism. Haymarket Books.

Abrego, L., Coleman, M., Martínez, D.E., Menjívar, C., Slack, J., 2017. Making immigrants into criminals: legal processes of criminalization in the post-IIRIRA era. J. Migr. Hum. Secur. 5 (3), 694–715. https://doi.org/10.14240/jmhs.v5i3.105.

Espenshade, T., Baraka, J., Huber, G., 1997. Implications of the 1996 welfare and immigration reform acts for US immigration. Popul. Dev. Rev. 23 (4), 769–801. https://doi.org/10.2307/2137379.

Hagan, J., Rodriguez, N., Capps, R., Kabiri, N., 2003. The effects of recent welfare and immigration reforms on immigrants' access to health care. Int. Migr. Rev. 37 (2), 444–463. https://doi.org/10.1111/j.1747-7379.2003.tb00144.x.

Jones-Correa, M., de Graauw, E., 2013. The illegality trap: the politics of immigration & the lens of illegality. Daedalus 142 (3), 185–198. https://doi.org/10.1162/DAED_a_00227.

Kerwin, D., 2018. From IIRIRA to trump: connecting the dots to the current US immigration policy crisis. J. Migr. Hum. Secur. 6 (3), 192–204. https://doi.org/10.1177/2331502418786718.

Varsanyi, M.W., Lewis, P.G., Provine, D.M., Decker, S., 2012. A multilayered jurisdictional patchwork: immigration federalism in the United States. Law Policy. 34 (2), 138–158. https://doi.org/10.1111/j.1467-9930.2011.00350.x.

Paik, A.N., Ruiz, J., Schreiber, R.M., 2019. Sanctuary's radical networks. Radic. Hist. Rev. 2019 (135), 1–13. https://doi.org/10.1215/01636545-7607797.

Garcia, M.G., 2021. Mobile Sanctuary: latina/o Evangelicals redefining sanctuary and contesting immobility in Fresno, CA. J. Ethn. Migr. Stud. 47 (19), 4515–4533. https://doi.org/10.1080/1369183X.2020.1761780.

Wong, T.K., Shklyan, K., Silva, A., Espino, J., 2019. Fractured Immigration Federalism: How Dissonant Immigration Enforcement Policies Affect Undocumented Immigrants. US Immigration Policy Center, UC San Diego. https://usipc.ucsd.edu/publications/Fractured-Immigration-Federalism.pdf.

De Trinidad Young, M.E., León-Pérez, G., Wells, C.R., Wallace, S.P., 2018. More inclusive states, less poverty among immigrants? An examination of poverty, citizenship stratification, and state immigrant policies. Popul. Res. Policy Rev. 37 (2), 205–228. https://doi.org/10.1007/s11113-018-9459-3.

Marrow, H.B., 2012. The power of local autonomy: expanding health care to unauthorized immigrants in San Francisco. Ethn. Racial. Stud. 35 (1), 72–87. https://doi.org/10.1080/01419870.2011.594168.

Potochnick, S., 2014. How states can reduce the dropout rate for undocumented immigrant youth: the effects of in-state resident tuition policies. Soc. Sci. Res. 45, 18–32. https://doi.org/10.1016/j.ssresearch.2013.12.009.

Aboii, S.M., 2016. Undocumented immigrants and the inclusive health policies of sanctuary cities. Harvard Public Health Rev. 9, 1–10. https://www.jstor.org/stable/48503139.

Gomberg-Muñoz, R., Wences, R., 2021. Fight for the city: policing, sanctuary, and resistance in Chicago. Geogr. Rev. 111 (2), 252–268. https://doi.org/10.1080/00167428.2020.1832423.

Menjívar, C., 2021. The racialization of "illegality". Daedalus 150 (2), 91–105. https://doi.org/10.1162/daed_a_01848.

Bauder, H., 2014. Why we should use the term 'illegalized' refugee or immigrant: a commentary. Int. J. Refugee Law 26 (3), 327–332. https://doi.org/10.1093/ijrl/eeu032.

Menjívar, C., 2006. Liminal legality: Salvadoran and Guatemalan Immigrants' lives in the United States 1. Am. J. Sociol. 111 (4), 999–1037. https://doi.org/10.1086/499509.

Young, M.E.D.T., León-Perez, G., Wells, C.R., Wallace, S.P., 2019. Inclusive state immigrant policies and health insurance among Latino, Asian/Pacific Islander, Black, and White noncitizens in the United States. Ethn. Health 24 (8), 960–972. https://doi.org/10.1080/13557858.2017.1390074.

Menjívar, C., Abrego, L., 2012. Legal Violence: immigration law and the lives of central American immigrants 1. Am. J. Sociol. 117 (5) https://doi.org/10.1086/663575, 000-000.

Darling, J., Bauder, H., 2019. Introduction. Darling, J., Bauder, H. Sanctuary Cities and Urban Struggles: Rescaling Migration, Citizenship, and Rights. Manchester University Press, pp. 1–22.

Villalobos, R.C., 2010. Sanctuary cities" and local citizenship. Fordham Urban Law J. 37 (2), 573.

U.S. Census Bureau (2018) Data reports: population and Housing Unit Estimates https://www.census.gov/acs/www/data/data-tables-and-tools/data-profiles/2018/.

Davis, M.F., 2020. The limits of local sanctuary initiatives for immigrants. Ann. Am. Acad. Pol. Soc. Sci. 690 (1), 100–116. https://doi.org/10.1177/0002716220931423.

Mayors Office (2019) Amendments to 'Boston Trust Act' Announced. https://www.americanbar.org/groups/young_lawyers/publications/tyl/topics/immigration-law/sanctuary-cities-federalisms-local-frontiers/.

Woodring, B., 2019. Sanctuary Cities: federalism's local frontiers. Young Lawyer 24 (1), 10–11. https://www.americanbar.org/groups/young_lawyers/publications/tyl/topics/immigration-law/sanctuary-cities-federalisms-local-frontiers/.

Seattle City Council (2017) Welcoming Cities Resolution. https://www.seattle.gov/council/issues/past-issues/welcoming-cities-resolution#:~:text=A%20RESOLUTION%20affirming%20the%20City%20of%20Seattle%20as%20a%20Welcoming,marital%20status%2C%20parental%20status%2C%20sexual.

A.R. Houston et al.

*Journal of Migration and Health 8 (2023) 100199*

Artiga, S., Garfield, R., Damico, A., 2019. Estimated Impacts of Final Public Charge Inadmissibility Rule on Immigrants and Medicaid Coverage. Estimated Impacts of Final Public Charge Inadmissibility Rule on Immigrants and Medicaid. Kaiser Family Foundation.

Harding, J., 2013. Qualitative Data Analysis from Start to Finish. Sage Publications Ltd.

Strauss, A., Corbin, J., 1994. Grounded theory methodology. Handb. Qual. Res. 17 (1), 273–285.

Creswell, J., 2007. Qualitative Inquire and Research Design: Choosing Among Five Approaches, 2 ed. Sage Publications Ltd.

Charmaz, K., & Belgrave, L.L. (2007). Grounded theory. The Blackwell encyclopedia of sociology.

QSR International Pty Ltd. (2018). NVivo (Version 12). In QSR.

Galtung, J., 1969. Violence, Peace, and Peace Research. J Peace Res. 6 (3), 167–191. http://www.jstor.org/stable/422690.

Viruell-Fuentes, E.A., Miranda, P.Y., Abdulrahim, S., 2012. More than culture: structural racism, intersectionality theory, and immigrant health. Soc. Sci. Med. 75 (12), 2099–2106. https://doi.org/10.1016/j.socscimed.2011.12.037.

Lee, B.X., 2016. Causes and cures VII: structural violence. Aggress Violent Behav. 28, 109–114. https://doi.org/10.1016/j.avb.2016.05.003.

Holmes, S.M., 2013. Fresh fruit, Broken bodies: Migrant Farmworkers in the United States. University of California Press.

Konczal, L., Varga, L., 2012. Structural violence and compassionate compatriots: immigrant health care in South Florida. Ethnic Racial Stud. Healthc. Immigr. Underst. Connect. 35 (1), 88–103. https://doi.org/10.1080/01419870.2011.594169.

Castañeda, H., Holmes, S., Kallius, A., Monterescu, D., 2016. Anthropology and human displacement: mobilities, ex/inclusions and activism. American ethnologist.

Charmaz, K. (2006). Constructing Grounded theory: a Practical Guide Through Qualitative Analysis. Sage Publications.

Collingwood, L., Martinez, G., Oskooii, K.A.R., 2023. Undermining sanctuary? When local and national partisan cues diverge. Urban Aff. Rev. Thousand Oaks Calif. 59 (1), 133–169. https://doi.org/10.1177/1078087421104867.

de Graauw, E., 2022. Mayoral leadership, immigrant sanctuary, and multilevel policy dynamics in San Francisco. Territ. Polit. Gov. 10 (3), 389–406. https://doi.org/10.1080/21622671.2021.1980092.

Houston, A, Da Fonseca, T., Joseph, T., Lincoln, A., 2022. Challenging federal exclusion: immigrant safety, health, and healthcare access in sanctuary cities. Health Place 75 (102811). https://doi.org/10.1016/j.healthplace.2022.102822.

Houston, S., 2019. Conceptualizing sanctuary as a process in the United States. Geogr. Rev. 109 (4), 562–579. https://doi.org/10.1111/gere.12338.

Asad, A.L., Clair, M., 2018. Racialized legal status as a social determinant of health. Soc. Sci. Med. 199, 19–28. https://doi.org/10.1016/j.socscimed.2017.03.010.

Sáenz, R., Manges Douglas, K., 2015. A call for the racialization of immigration studies: on the transition of ethnic immigrants to racialized immigrants. Sociol. Race Ethn. (Thousand Oaks) 1 (1), 166–180. https://doi.org/10.1177/2332649214559287.

Hunt, L.M., Schneider, S., Comer, B., 2004. Should "acculturation" be a variable in health research? A critical review of research on US Hispanics. Soc. Sci. Med. 59 (5), 973–986. https://doi.org/10.1016/j.socscimed.2003.12.009.

# The Consequences of Illegal Immigration for Housing Affordability, Government Budgets, and American Workers

**Prepared Testimony of Steven A. Camarota**
**Director of Research**
**Center for Immigration Studies**

**For**

**U.S. House Oversight and Accountability Committee, Subcommittee on National Security, the Border, and Foreign Affairs**

**Hearing entitled: "The Border Crisis: The Cost of Chaos"**

**Wednesday, September 25, 2024**

*Summary: My testimony will focus on the impact of illegal immigration on housing affordability, public coffers, and American workers. Adding millions of people to the country through immigration drives up the cost of housing and reduces affordability relative to wages in areas of heavy settlement. Fiscally, illegal immigrants are a net drain — they create more in costs than they pay in taxes. This is primarily due to their low average education levels, which results in low average earnings and tax payments. Their lower incomes and education cause a large share to qualify for welfare programs, typically through their U.S.-born children. Illegal immigration also increases the supply of labor impacting the wages and employment of some American workers, often the poorest and least educated. Further, the availability of illegal immigrant workers allows American policymakers to ignore the decades-long increase in the share of working-age less-educated U.S.-born men not in the labor force — neither working nor looking for work. They are not counted as unemployed because they are not actively looking for work. This deterioration is linked to serious social pathologies such as crime, welfare dependency, suicide, and drug overdoses. Finally, illegal immigrants do increase the aggregate size of the U.S. economy, but overall GDP impact is not a measure of their tax contributions or economic benefits to the U.S.-born. Almost all the GDP increase goes to the illegal immigrants themselves in the form of wages.*

## Overall Numbers

- The current surge of illegal immigration is unprecedented. House Judiciary reported last month that 5.6 million illegal aliens have been released into the country since January 2021. There have also been 1.7 million "got-aways" — individuals observed entering illegally but not stopped in FY2021 to FY2023. Visa overstays also hit a record in FY 2022.

- The Center for Immigration Studies preliminarily estimates that the illegal immigrant population grew to 14 million by 2024, up 3.8 million since January 2021, when the president took office. However, the Census Bureau data on which this is based may not fully reflect the recent influx increasing the undercount of illegal immigrants.

## Housing

- Census Bureau data shows that since January of 2021 the number of immigrant-headed households is up 2.4 million, with perhaps 1.4 million of this increase due to illegal immigration.

- Prior research shows that by increasing demand for housing, immigration drives-up costs in areas where immigrants settle. My own analysis indicates that a 5-percentage point increase in the recent immigrant share of a metro area's population is associated with a 12 percent increase in the average U.S.-born household's rent, relative to their income. However, more analysis is needed to fully explore this relationship.

## Fiscal Impact

- The negative fiscal impact of illegal immigrants — taxes paid minus benefits received — is primarily due their modest average education level. Some 69 percent of adult illegal immigrants are estimated to have no education beyond high school, which is double the U.S.-born share. This results in relatively low average incomes and tax payments, along with significant use of welfare.

- Using the National Academies' estimate of immigrants' net fiscal impact by age and education level, we estimate that the lifetime fiscal drain (taxes paid minus benefits received) for each illegal immigrant is about $68,000, although this estimate comes with some caveats.

- We estimate that 59 percent of households headed by illegal immigrants use one or more welfare programs, creating roughly $42 billion in costs. We also estimate that the children of illegal immigrants, who are mostly U.S.-born, cost public schools $68.1 billion.

- Illegal immigrants can receive welfare on behalf of U.S.-born children. Millions also have work authorization (e.g. DACA and asylum applicants), allowing receipt of the EITC. In addition, illegal immigrant children can directly use some programs like WIC.

- High welfare use is not caused by an unwillingness to work. In fact, illegal immigrant-headed households are more likely to have a worker present than U.S.-born households.

- Illegal immigrants do pay some taxes. We estimate they paid nearly $26 billion in income and payroll taxes in 2019.

- Illegal immigrants do add perhaps $321 billion to the nation's GDP, but this is not a measure of their tax contributions or the benefits they create for the U.S.-born. Almost all the increase in economic activity goes to the illegal immigrants themselves in the form of wages.

**Labor Market**

- The notion that illegal immigrants do only the jobs Americans don't want is false. Prior analysis shows that out of 474 civilian occupations as defined by Department of Commerce, only six are majority immigrant (legal and illegal). These six account for 1 percent of the total U.S. workforce.

- There are no occupations in the United States in which a majority of workers are illegal immigrants.

- Though often the focus of the immigration debate, farmworkers comprise less than 1 percent of the entire U.S. labor force and less than 5 percent of all illegal immigrants.

- There is good evidence that immigration reduces wages and employment for some U.S.-born workers, although distinguishing the impact of illegal immigrants is difficult.

- Illegal immigration has to be understood in the context of the extremely troubling decades-long increase in the share of less-educated U.S.-born men not in the labor force, which coincides with the rapid increase in immigration since the 1960s.

- For example, 4 percent of "prime-age" (25 to 54) U.S.-born men with only a high school education or less were not in the labor force in 1960 — neither working nor looking for work. By 2000 it was 13 percent, and in 2024 it is 18 percent.

- Job competition with immigrants, including illegal immigrants, is not the only reason for this decline. However, immigration, including tolerating large-scale illegal immigration, has allowed society to ignore the decline and the accompanying social pathologies such a drug use, crime, suicide and social and political alienation

# Introduction

Congress set limits on legal immigration and has allocated funds to enforce those limits for good reason. Allowing widespread illegal immigration raises profound concerns about a host of issues, from public safety and national security to the rule of law. While these impacts are all important, my testimony will focus on three key areas: housing, fiscal costs, and the labor market. Before exploring these three areas I will first discuss the scale of the ongoing border crisis and resulting dramatic growth in the size of the illegal immigrant population. I use the terms "immigrant" and

"foreign-born" interchangeably throughout this testimony.[1] The foreign-born as defined by the Census Bureau includes all persons who were not U.S. citizens at birth — mainly naturalized citizens, lawful permanent residents, long-term temporary visitors, and illegal immigrants.

## The Current Surge

**Border Encounters and Aliens Released.** From January 2021 to August 2024 there have been 10.4 million "encounters" at all U.S. borders.[2] There have never been this many encounters over such a short period of time, which in the past were referred to as "apprehensions," though there are some differences between the two terms. The number of encounters is suggestive of the scale of the ongoing crisis, but it does not capture the number of new illegal immigrants, as encounters can represent multiple attempts by the same person to enter the country. In addition to encounters, the most recent estimate of the number of illegal immigrants released in to the country over this time comes from the House Judiciary Committee, which reported last month that "In less than four years, the Biden-Harris Administration has released into the United States more than 5.6 million illegal aliens."[3] The decision to release these aliens or fly them in under the CHNV program, represents new additions to the illegal immigrant population. Many of those released are parolees, have pending asylum applications, and/or were released on their own recognizance. Many of these individuals have been given work authorization. However, they are still inadmissible aliens who have not been formally admitted to the U.S. and are subject to deportation under the Immigration and Nationality Act.

**Got-Aways.** In addition to those released into the interior of the country, there are so-called "got-aways," which according to DHS are "the number of subjects who, after making an unlawful entry, are not turned back or apprehended". Prior to Covid-19, the number averaged about 128,000, and it was roughly 137,000 in 2020. In FY2021, DHS reported the number more than doubled to 391,000.[4] DHS has not published any got-away figures newer than 2021. However, media accounts, based on a Freedom of Information Act request, show 606,131 got-aways in FY2022 and 670,674 in FY2023.[5] While some got-aways in FY2021 were in October to December 2020, before President Biden took office, it seems certain that from January of 2021, when President Biden took office, and the end of FY2023 there were 1.6 to 1.7 million got-ways. On an annual basis, the number of got-aways in FY 2022 and 2023 is more than 4 times the average in the Trump administration's first three years before immigration temporarily fell during Covid-19. These figures do not include all who successfully evade the Border Patrol unseen, which may be similar in scale to got-aways, thereby adding many more new illegal immigrants to these totals.

**Visa Overstays.** A significant number of new illegal immigrants, and perhaps a majority before the current border surge, were admitted legally on a temporary visa or under the visa waiver program and then did not leave the country when the time limit expired. DHS for FY 2022 showed 850,000 foreign visitors overstayed in that year. The total overstay rate for 2022 was 3.67 percent, which is more than double the rate of recent years. Of course, not all of these individuals stay long-term, and there is always some number of people who leave the country but whose departure was not properly recorded.[6] For unexplained reasons, the administration has not

released any newer overstay numbers. Still, as best we can tell from 2022, the current level of overstays is higher than before Covid-19, adding further to the illegal population.[7]

**What the Monthly Census Data Shows.** The largest Census Bureau survey that captures the foreign-born population is the American Community Survey (ACS), which is released annually



**Figure 1**
**There is variation in the data, but since President Biden's election, growth in the foreign-born has been unprecedented.**
(in millions)

Source: Public use Current Population Survey (CPS) March 2019 to August 2024.

and reflects the population in July of each year. The most recent ACS available is for 2023, so it is already over a year out of date. Moreover, for reasons that are not entirely clear, the ACS is producing estimates of the foreign born that are significantly lower than other Census Bureau surveys.[8] The monthly Current Population Survey (CPS), which the Census Bureau collects for the Bureau of Labor Statistics, is released shortly after it is collected each month, providing much more up-to-date information than the ACS. Moreover, the CPS shows a significantly larger foreign born in 2022 and 2023 than the ACS, which is more in line with what we know about the scale of new immigration since the border crisis began. The CPS also provides estimates of the immigrant population though August of 2024.



**Figure 2**
**Estimated illegal immigrants Population**
**2021 to 2024**
(in millions)

14
preliminary

12.6
preliminary

11.5

10

www.cis.org

2021        2022        2023        2024

Center for immigration Studies estimates based on public use monthly Current Population Survey Jan, Feb, Mar 2021 to 2024.

Figure 1 shows the results through August of 2024 on the size of the total population. The increase post-Covid since January of 2021 is an astonishing 6.6 million. Given the number released into the country, the got-ways, and the visa overstays discussed above, the growth in the foreign born shown in the figure still seems low. Equally important, the recent growth represents a *net* increase. The number of new arrivals is significantly larger but has been offset by outmigration (including deportations), natural mortality among the existing foreign-born population, and, in the specific case of illegal immigrants, legalizations (e.g., successful asylum applicants or marriage to an American).

**Estimating the Illegal Population.** Our best estimate, based on the CPS, is that the illegal immigrant population in the first three monthly of 2021 was 10 million, which increased to 11.2 million by 2022. We preliminary estimate that by early 2023 it had increased further to 12.6 million and by 2024 it was 14 million in 2024.[9]  It is very unlikely that the illegal population has ever grown this rapidly before.[10]  Unfortunately, not all of the administrative data on legal immigration is available to fully estimate the illegal immigrant population in 2023 and 2024; and, there are other areas of uncertainty about our estimates.[11]  Nonetheless, given the number released by administration, got-aways and visa overstays, the estimate are likely conservative.

# The Impact on Housing

The dramatic increase in immigration in recent years must have implications for the cost of housing. This is especially true because the increase is concentrated in only parts of the country. As already discussed, the total foreign population increased 6.6 million from January of 2021 to August of this year. Further, over this time period the number of immigrant-headed households increased by 2.4 million.[12] This increase in population and households represents a significant increase in demand for housing in many locality. Our prior estimate indicated that some 60 percent of the growth in foreign born came from illegal immigration. Illegal immigration is significantly increasing demand for housing, particularly for rental property. Of households headed by an immigrant who arrived between January 2022 to August 2024, 89.5 percent responded they were renters.[13] Adding very large numbers of people to the country must significantly impact housing prices by driving-up demand for rental properties. In the last two

years there have been numerous stories in the media about the increasing costs of housing. The Census Bureau reports that the increase in rents in 2023 was by far the largest in the past decade.[14] This is certainly consistent with the possibility that immigration, including illegal immigration, has significantly increased housing prices in areas of heavy immigrant settlement.

**Prior Research on Immigration and Housing.** Opinion writers have argued that that the recent surge in immigration is making housing less affordable.[15] There is certainly prior research showing immigration drives up housing costs. In a 2007 study, Albert Saiz found that "An immigration inflow equal to 1% of a city's population is associated with increases in average rents and housing values of about 1%."[16] This suggests that immigration has a very large impact on housing prices in some areas of the country. A 2017 study by Mussa, Nwaogu, and Pozo also found that the influx of immigrants into a metropolitan area drives up rents and housing prices.[17] Studies that have looked for a relationship between immigration and housing prices internationally have also found it. In the immigrant-receiving countries of Australia and Canada, research indicates immigration increases housing prices.[18] Looking across 21 different countries from 2007 to 2014, another study also found evidence that the arrival of immigrants significantly increases housing costs.[19]

**Immigration and Rent Affordability.** Immigration likely impacts the housing market in complex ways. For example, along with driving up demand for housing it can also lower construction costs by reducing wages in the construction industry. On the other hand, it may indirectly impact affordability by reducing wages, making housing relatively more costly. Figure 3 shows a scatter plot of the recent (2010 or later arrival) immigrant share of Metropolitan Statistical Areas (MSAs) in 2022 and the percentage of income households headed by the U.S.-born spend on rent. The analysis



Figure 3
Relationship between percentage of MSA's population comprised of recent immigrants and the share of income U.S.-born households spent on rent in 2022* (top 50 metro areas)

y = 0.37x + 0.13
R² = 0.26
R = .51

www.cis.org

*Recent immigrants defined as having arrived in 2010 or later.
Center for Immigration Studies analysis of 2022 American Community Survey.

shows a strong positive relationship. For each one percentage point increase in the recent immigrant share of a city's population, U.S.-born households spent ***0.37 percentage points more of their income on rent. These results imply that if the recent immigrant share of a metro area's population increased by 5 percentage points, the average household headed by a U.S.-born person in these cities would experience a 12 percent increase in rent, relative to their income.

Of course, this is only a simple correlation and does not include homeowners. Much more detailed analysis would be necessary to confirm this relationship. But these result are consistent with the prior literature and support the idea that immigration in general reduces housing affordability for U.S.-born renters. It is therefore reasonable to assume that the recent influx of immigrants is contributing to the increasing share of Americans struggling to afford housing in many areas of heavy immigrant settlement.

# The Fiscal Impact of Illegal Immigration

Unfortunately, there has not been enough time to estimate all the fiscal effects of the recent influx. Further, state and local governments have not provided much detailed information on the costs of dealing with the recent influx. But based on statements and some publicly available information, we know that many jurisdictions in the U.S. are struggling with the cost of providing services to new illegal immigrants. In addition to the immediate costs of the border surge, there is research on the fiscal impact of immigrants, and even some attempts to measure the specific impact of illegal immigrants on public coffers.

**Current Surge and Costs to Local Communities.** The city of New York reports it has spent or expects to spend $12 billion over the next three years on housing, food, health care, and other services for recently arrived illegal immigrants.[20] In order to come up with the money to cover these new costs, the city plans to cut the budget by 5 percent across a range of services, including sanitation, public education, and the police department.[21] This is an example of the fiscal drain from illegal immigration causing fewer services or higher taxes for American citizens. The estimated cost of accommodating recently arrived illegal immigrants in Chicago in 2023 were estimated at $361 million.[22] By the end of FY 2023, the District of Columbia expected to have spent $36.4 million on various services for illegal immigrants.[23] Denver mayor Mike Johnston stated that the city will likely spend $180 million in 2024 on the illegal influx – more than triple what it spends on the homeless.[24] A report from the state of Massachusetts in December of last year shows that the state has spent or expects to spend more than $2 billion through FY2025 on shelters and other services for illegal immigrants.[25] Other localities such as El Paso, Los Angeles, and Philadelphia are all struggling to provide services to newly-arrived illegal immigrants.

**The Education Level of Illegal Immigrants.** Educational attainment is a key factor when considering illegal immigrants' effect on public coffers because it determines what type of jobs they typically do and their resulting income. Income matters enormously because it affects both tax payments and eligibility for means-tested government programs. Averaging estimates from the Migration Policy Institute (MPI) and the Center for Migration Studies (CMS) indicates that 43 percent of illegal immigrants have less than a high school diploma, 25 percent have only a high school education, 13 percent have some college, and 18 percent have at least a bachelor's.[26] Based on the citizenship of individuals encountered at the border and Census Bureau data, the new illegal immigrants now settling in the U.S. as a result of the current border crisis also likely have modest levels of education, though we cannot say this for certain.[27]

**The Challenge of Estimating Fiscal Effects.** Calculating the current fiscal impact of immigration requires numerous decisions about how to allocate various costs. Even more challenging are long-term fiscal estimates, which require making assumptions about the state of the economy and government finances well into the future. The results of any analysis will obviously vary depending on the assumptions.

**The National Academies' 2017 Fiscal Study.** One of the largest and most important studies on the fiscal impact of immigrants was a 2017 study by the National Academies of Sciences, Engineering, and Medicine, which projected the lifetime fiscal impact (taxes paid minus services used) of immigrants by education. These estimates are expressed as a net present value (NPV).[28] The Academies' 2017 study does not report separate estimates for illegal and legal immigrants. Rather, it simply estimates tax payments and expenditures on immigrants based mainly on the CPS Annual Social and Economic Supplement, which includes both legal and illegal immigrants. The study's fiscal projections include eight different scenarios, based on different assumptions about things like future spending and tax rates. The 2017 study does not identify which scenario is most likely.

**Net Fiscal Impact of Illegal Immigrants.** We can use the Academies' estimates to get a reasonable idea of the fiscal impact of illegal immigrants. In a 2017 analysis, I averaged the results of the Academies' eight fiscal scenarios to get one estimate for each educational category. I follow the same approach in the table below.[29] It shows these fiscal estimates and takes a weighted average of the education level of illegal immigrants reported by MPI and CMS, adjusts the National Academies' figures for inflation and legality, and produces a lifetime NPV of the average illegal immigrant of negative $68,390 in 2023 dollars.[30]

If we use the CBO's estimate that the ongoing border surge will add 8.7 million people to the country, the vast majority of whom will be here illegally, then it implies a net fiscal drain due to the border surge of $595 billion during the lifetime of these illegal immigrants.[31] A new Manhattan Institute study also concludes that educational attainment is the key to understanding immigrants' fiscal impact. The author of that study finds an even larger negative impact than I estimate, concluding that "the border crisis will cost an estimated $1.15 trillion over the lifetime of the new unlawful immigrants."[32]

Our estimates do come with caveats. First, the Academies' estimates are for all immigrants; though we do include an adjustment to take this issue into account.[33] Further, the long-term fiscal situation for the country has deteriorated significantly since 2012, the base year the Academies

used for its estimate.[34] This means the fiscal impact of those with lower levels of education, as well as the average taxpayer, has become even more negative.

### Lifetime Fiscal Impact of an Illegal Immigrant By Educational Attainment

| | Lifetime fiscal balance immigrant only[a] | Educational attainment of illegal Immigrants[b] | Fiscal impact of illegal immigrants by education (unadjusted) | Adjustment factor for being illegal (reduces services used & tax payments)[c] | Fiscal impact of illegal Immigrants |
|---|---|---|---|---|---|
| Less than HS | -$173,375 | 43.3% | -$75,041 | 0.676 | -$50,743 |
| HS only | -$69,750 | 25.4% | -$17,697 | 0.799 | -$14,135 |
| Some College | $41,000 | 13.2% | $5,405 | 0.893 | $4,825 |
| Bachelor's | $183,000 | 16.3% | $29,862 | 0.220 | $6,582 |
| >Bachelor's | $423,875 | 1.8% | $7,697 | 0.220 | $1,697 |

| | | Unadjusted Costs of Illegal Immigrants | | Adjusted Costs of Illegal Immigrants | |
|---|---|---|---|---|---|
| | | In 2012 Dollars | -$49,774 | In 2012 Dollars | -$51,773 |
| | | In 2023 Dollars | -$66,708 | In 2023 Dollars | -$68,390 |

[a]Based on *The Economic and Fiscal Impact of Immigration*, National Academies Press 2017, Table 8-12.
[b]Averaged educational attainment from the Center for Migration Studies and the Migration Policy Institute.
[c]Based on *The Cost of a Border Wall vs. the Cost of Illegal Immigration* 2017, Center for Immigration Studies.
Figures are for illegal immigrants arriving at all ages. Costs for their U.S.-born children are not included.

**Welfare Programs.** We can understand better why illegal immigrants create significant fiscal costs by looking at the welfare system. In a study published in December of 2023, my colleague Karen Zeigler and I examined welfare use in the 2022 Survey of Income and Program Participation (SIPP). The programs included in our analysis are: Earned Income Tax Credit (EITC); Supplement Security Income (SSI); Temporary Aid to Needy Families (TANF); free and reduced-price school lunch and breakfast (school meals); Women, Infants, and Children (WIC) nutrition program; Supplemental Nutrition Assistance Program (SNAP), also called food stamps; Medicaid; subsidized and public housing.



Figure 4
Welfare use Based on Legal Status of the Household Head

Source: Public use file of the 2022 Survey of Income and Program Participation. Cash includes,TANF, SSI and the EITC. Food Assistance includes Food Stamps, WIC and free and reduced priced lunch/breakfast. www.cis.org

Use of these programs is an important indicator of fiscal impact because not only are the programs themselves costly, those receiving them generally pay little to no federal or state income tax. To identify illegal immigrants in the SIPP, we use the self-reported characteristics of immigrants to assign weighted probabilities to the foreign born that create a representative population of illegal immigrants.[35]

**Welfare Use by Illegal Immigrants.** Figure 4 reports our estimates from our analysis of the 2022 Survey of Income and Program Participation. We estimate that 59.4 percent of illegal immigrant households use one or more welfare programs.

Compared to the U.S.-born, illegal-headed households use every program at statistically higher rates, except for SSI, TANF, and housing. Illegal immigrants have especially high use of cash (mainly the EITC), food programs, and Medicaid.

**How Can Illegal Immigrant Welfare Use Be So High?** The high use of welfare by illegal-immigrant-headed households is due to several factors. First and foremost, more than half of all illegal immigrant households have at least one U.S.-born child on behalf of whom they can receive benefits.[36] Second, many states offer Medicaid directly to illegal immigrants.[37] Third, six states also offer SNAP benefits to illegal immigrants under limited circumstances.[38] Fourth, illegal immigrant children have the same eligibility as citizens for free and subsidized school lunch/breakfast and WIC under federal law.[39] Fifth, several million illegal immigrants have work authorization that provides a Social Security Number and EITC eligibility along with it. This includes those with DACA or TPS, as well as many applicants for asylum, and those granted suspension of deportation, and withholding of removal.[40] All of these factors, coupled with the large share of illegal immigrants with modest levels of education, and their resulting low income, means many qualify for welfare. Finally, there is a large welfare bureaucracy whose job it is to help those eligible for programs navigate the system.

For all of the reasons listed above, the ban on illegal immigrants directly using most welfare programs has only modest effects, and tweaking those restrictions is unlikely to make much difference. If we wish to reduce the cost associated with illegal immigrants' use of means-tested programs, we need to enforce the law and reduce the number of illegal immigrants in the country. If they are allowed to remain, the welfare costs will remain too.

**A Rough Estimate of Welfare Cost.** The SIPP is much better at measuring the share of the population accessing programs than it is at estimating the dollar value of what they receive, and for some programs it does not even report the value of benefits. However, we can estimate the costs created by illegal immigrant households for the eight programs we examined in the welfare study discussed above. Federal expenditures on these programs total $817 billion.[41] States spent an additional $226 billion on Medicaid.[42] Looking at the share of recipients in illegal immigrant households indicates that they account for 4 percent of the cost of the programs listed above. This means illegal immigrants received about $42 billion from these programs in 2021. This is only a rough estimate because we do not have detailed costs for every program by household.[43] Equally important, the SIPP has a significant undercount of illegal immigrants, so the number of illegal immigrant households using welfare is underreported in the survey. This undercount is larger than the undercount in other Census Bureau surveys such as the CPS and ACS.

**Public Education.** Public schooling is one of the areas in which illegal immigration has its largest impact. Based on the 2014 ACS, Pew Research estimated that there are 725,000 illegal immigrants enrolled in public schools and an additional 3.2 million U.S.-born children of illegal immigrants in school.[44] Using the 2019 ACS we attempt to update their estimate and find that there were again about 4 million children of illegal immigrants in the nation's schools. The National Center for Education Statistics reports that in the 2019-20 school year the average expenditure per student was $17,013.[45] Applying the above estimates would mean that illegal immigration cost schools $68.1 billion a year – before the current surge. Put another way, each additional 100,000 students added to schools by the border crisis will cost $1.7 billion each year. This estimate is conservative because it does not include the above-average costs for remedial learning and language services that many children of illegal immigrants require. It also does not

take into account that a large share of illegal immigrants reside in states that spend significantly above the national average on education.

**The Cost of the Uninsured.** Another area where illegal immigrants create significant costs is the nation's health care system, particularly its emergency rooms. As already discussed, illegal immigrant households make extensive use of Medicaid, typically due to their U.S.-born children. In addition to Medicaid, about one-fifth of all those without health insurance in the U.S., before the current border crisis, were illegal immigrants. Migration Policy Institute (MPI) MPI estimated that 53 percent of illegal immigrants in 2019 lacked health insurance – 5.83 million.[46] This equals 22 percent of the total uninsured, though the Census Bureau estimate of the uninsured is not adjusted for undercount in the way that MPI's estimate of illegal is adjusted.[47] Public expenditures (federal, state, and local) on the uninsured total $33.6 billion annually.[48] If illegal immigrants account for about one-fifth of government expenditures on the uninsured, it would equal nearly $7.5 billion a year. However, Medical Expenditure Panel Survey that immigrants in general tend to consume somewhat less health care than the U.S.-born, primarily because they are relatively young. So, expenditures on the uninsured illegal immigrants by taxpayers likely total less than $7 billion each year. On the other hand, this estimate does not include the U.S.-born minor children of illegal immigrants, a significant percentage of whom are also uninsured.

# Effect on the Labor Force

**The Educational Level of Illegal Immigrants.** Like the fiscal impact, educational attainment is also a key factor when considering the impact of illegal immigrants on the labor force because it determines what type of jobs they typically do. As already discussed all prior research indicates that the overwhelming majority of illegal immigrants have modest education levels. Based on the citizenship of individuals encountered at the border and Census Bureau data, it seem likely that new illegal immigrants who arrived during the current surge also have similarly modest levels of education. While some illegal immigrants are well educated, their primary impact on the labor market is to increase the supply of workers with no more than a high school education.

**Illegal Immigrants by Occupation.** Putting aside the extent to which there is undercount in Census Bureau data, there are likely now at least 9 illegal immigrants in the U.S. labor force.[49] Due to their education levels, they are heavily concentrated in lower-wage less-skilled jobs such as construction labor, building cleaning and maintenance, food service and preparation, groundskeeping, retail sales, and food processing. In a 2018 Center for Immigration Studies report, we estimated the illegal share of workers in all 474 occupations as defined by the Department of Commence using Census Bureau data.[50] We found that only six were majority immigrant (legal and illegal). These six occupations account for 1 percent of the total U.S. workforce. Perhaps most important, there are no occupations in the United States in which a majority of workers are illegal immigrants. Even in the two dozen occupations where illegal immigrants are 15 percent or more of the workers, there are still 5.7 million U.S.-born Americans and 2.2 million legal immigrants employed.

| Top Ten Occupations where Illegal Immigrants are the Largest Share | | | | |
|---|---|---|---|---|
| Occupation | Illegal Share | Legal Immigrant Share | Native Share | U.S.-born in Occupation | Illegal Immigrants in Occupation |
| Plasterers & Stucco Masons | 31% | 27% | 42% | 14,707 | 10,832 |
| Graders & Sorters, Agricultural Products | 30% | 32% | 38% | 27,593 | 21,993 |
| Drywall Installers, Ceiling Tile Installers, & Tapers | 28% | 20% | 51% | 80,702 | 44,761 |
| Agricultural Workers, Animal Breeders | 28% | 23% | 49% | 451,512 | 258,484 |
| Pressers, Textile, Garment, & Related Materials | 26% | 22% | 52% | 25,394 | 12,911 |
| Roofers | 24% | 18% | 58% | 139,662 | 56,912 |
| Sewing Machine Operators | 22% | 30% | 48% | 97,777 | 45,908 |
| Painters, Construction & Maintenance | 21% | 21% | 59% | 378,866 | 132,961 |
| Carpet, Floor, & Tile Installers & Finishers | 21% | 19% | 60% | 104,023 | 35,565 |
| Maids & Housekeeping Cleaners | 20% | 29% | 51% | 873,439 | 351,434 |
| Total Labor force | 5% | 12% | 83% | 133,452,383 | 7,655,428 |

| Top Ten Occupations with the Largest Number of Illegal Immigrants | | | | |
|---|---|---|---|---|
| Occupation | Illegal Immigrants in Occupation | Illegal Share | Legal Immigrant Share | U.S.-born Share | U.S.-born in Occupation |
| Maids And Housekeeping Cleaners | 351,434 | 20% | 29% | 51% | 873,439 |
| Cooks | 336,363 | 13% | 16% | 71% | 1,840,832 |
| Construction Laborers | 332,258 | 17% | 18% | 65% | 1,275,355 |
| Agricultural Workers, Animal Breeders | 258,484 | 28% | 23% | 49% | 451,512 |
| Grounds Maintenance Workers | 255,066 | 17% | 17% | 66% | 1,000,518 |
| Janitors And Building Cleaners | 243,608 | 9% | 18% | 73% | 2,012,226 |
| Driver/Sales Workers And Truck Drivers | 191,777 | 5% | 12% | 83% | 3,009,564 |
| Cashiers | 191,306 | 5% | 10% | 85% | 3,319,122 |
| Carpenters | 178,254 | 14% | 14% | 72% | 926,980 |
| Laborers, Freight, Stock, Material Movers | 153,790 | 6% | 9% | 85% | 2,110,123 |
| Total Labor force | 7,655,428 | 5% | 12% | 83% | 133,452,383 |

*There Are No Jobs Americans* , Steven A. Camarota, Jason Richwine, and Karen Zeigler. August 2018. Center for Immigration Studies.

Figures are based on five-year file (2012 to 2016) public use file of the American Community Survey and are not adjusted for undercount.

The notion that illegal immigrants only do jobs Americans don't want is simply false. It is true that most Americans do not face significant job competition from illegal immigrants, because they tend to have more years of schooling or they work in the public sector, where there are relatively few illegal immigrants. But millions of Americans do compete with them for jobs. Those who do face competition from illegal immigrants tend to be employed in low-wage and are among the least educated Americans — U.S-born and legal immigrant.

**Farm Labor.** The need for agricultural labor often dominates the discussion on illegal immigrant workers. Many people mistakenly assume that most illegal immigrants work on farms, but this has not been true for many decades. In fact, only about 1 percent of the entire American labor force is employed in agriculture, so it is impossible for farm workers to account for a large share of all illegal immigrant workers. In the aforementioned 2018 Center for Immigration Studies report by myself and two colleagues, we estimated that just 4 percent of all illegal aliens in the labor force were employed in agriculture. Pew Research estimates a similar percentage.[51] Although illegal immigrants make up a significant share of workers in this small sector, only a tiny share of all illegal immigrants are farm workers. The vast majority who work in the service, construction, and other sectors discussed above are U.S.-born or legal immigrants.

**Evidence that Immigration Reduces Wages.** Despite assertions to the contrary, there is clear evidence that immigration does reduce the wages and employment of some U.S.-born workers, though distinguishing the impact of illegal immigration in particular is difficult. In its 2017 magisterial report, the National Academies of Sciences, Engineering, and Medicine reviewed the research on the effects of immigration on the U.S. labor market and cited numerous academic studies showing negative wage impacts from immigration, particularly on the least educated.[52] A 2019 review of over 50 studies by economist Anthony Edo took a more international perspective and again came to the same conclusion. Edo points out that low-skill immigration tends to make low-skill natives the "losers" and high-skill natives the "winners", with an increase in inequality as one of the consequences.[53] Of course, lower wages for some

Americans can increase economic opportunities for other workers, and it can also increase profits for businesses and lower prices for consumers. But there is no free lunch; these benefits require that some Americans, typically at the bottom of the labor force, lose out.

**Trump Slowdown May Have Helped Workers.** A report by Karen Zeigler and myself last year found that the number of new immigrants (legal and illegal) averaged 1.38 million from 2017 to 2019, compared to 1.62 million in 2015 and 1.75 million in 2016. A part of this falloff seems to have been a reduction in illegal immigration. We further found that this slowdown coincided with a 3.2 percent increase (inflation adjusted) in median weekly wages for U.S.-born workers without a bachelor's, in contrast to slight declines in the prior four years. Labor force participation also increased during the immigration slowdown much more than it did in the years before the Trump administration.[54] A study in *Economic Review* finds something similar. It shows that the downturn in immigration during Trump's presidency coincided with an increase in job offers in areas where immigrants had traditionally been settling relative to lower immigration areas. Further, advertised wages grew substantially more in areas that had become more dependent on immigration than lower immigration areas. This lends support to the idea that the slowdown during the Trump administration helped U.S.-born workers.[55]

**Labor Force Participation.** One of the arguments for immigration, including tolerating illegal immigration, is that the low unemployment rate means there are not enough workers. But this ignores the enormous increase in the share of U.S.-born people who are of working age but not in the labor force. They do not show up as unemployed because they are not actively looking for work. Sometimes this issue is examined as the "the labor force participation rate," which is the share of working-age people either working or looking for work. In the discussion that follows I report the inverse of this number -- that is, the share of working-age people *not* in the labor force.



Figure 5
Comparing prior peaks in the bussines cycle, the increase among working-age (16 to 64) U.S.-born men not in the labor force is most pronounced among the less-educated.

Center for Immigration studies analysis of the 1960, 1970, 1980 and 1990 public use decennial Census, which is collected in April. Figures for 2000, 2019, and 2024 are from the April public use CPS.

www.cis.org

**Deterioration in Work Among the Less Educated.** As already discussed, illegal immigration mainly increases the supply of workers with modest levels of education, and it is precisely such workers who have seen their participation in the labor force deteriorate. Figure 5 shows that for U.S.-born men (16 to 64) without a bachelor's degree, the share not in the labor force increased from 12 percent in 1960 to 20.2 percent in 2000, to 27.9 percent in April 2024.

While the situation may have returned to what it was in 2019 before Covid, it still represents a dramatic change from what it was historically. If we exclude the young and those who might have retired early and focus only on "prime age" men (25 to 54), who are traditionally the most likely to work, we still find a significant deterioration for those without a bachelor's degree. They went from near universal participation — just 4.2 percent were not in the labor force —in 1960 to 10.6 percent in 2000 to 15.2 percent in 2024. U.S.-born women (25 to 64) with no more than a high school diploma have fared better than men, though the share of women not in the labor force rate is still higher in 2024 than in 2000, when female participation peaked. The overall picture is one of very substantial long-term increase in the share of less-educated U.S.-



Figure 6
The growth in the share not in the labor force among "prime-age" (25-54) U.S.-born men at prior peaks in the business cycle is most pronounced for the less educated.

Center for Immigration Studies analysis of the 1960, 1970, 1980 and 1990 public use decennial Census, which is collected in April. Figures for 2000, 2010, 2019 and 2024 are from the April public use CPS.

www.cis.org

born Americans not in the labor force, though women have done better recently. For men without a bachelor's the deterioration is 6 decades long, and the share not in the labor force is at or near historic highs.

**Has Immigration Caused the Decline in Work?** The extent to which immigration reduces the wages of some U.S.-born workers, particularly the less-educated, it undermines the incentive to work. The fall-off in immigration in the first three years of the Trump administration certainly coincided with an increase in labor force participation among workers without a bachelor's degree. A 2019 Center for Immigration Studies analysis of EEOC discrimination cases found numerous instances where immigrants were used to replace U.S-born workers.[56] Other research finds a negative impact on the employment of young U.S.-born workers, while more than one study has found a negative impact on the employment of Black Americans from immigration.[57] However, it seems certain that many factors have contributed to the decline in labor force participation.

Some researchers believe globalization and automation have weakened demand for less-educated labor and caused a long-term decline in wages, making work less attractive.[58] If correct, then tolerating large-scale illegal immigration is highly counterproductive, since it primarily adds less-educated workers. Other researchers point to overly generous welfare and disability programs that undermine work.[59] Some research holds that changing expectations about men as providers, including the decline in marriage, has caused them to value work less.[60] There is also evidence that substance abuse, obesity, and criminal records can be causes *and* effects of the decline in work.[61] Immigration is likely only one of many factors that have increased the share of working-age U.S.-born men not in the labor. But immigration almost certainly has an indirect impact on labor force participation by allowing our society to ignore

this problem.

**Ignoring the Decline in Participation.** The continued arrival of so many immigrant workers, a large share of whom are illegally in the country, allows policymakers to ignore this huge deterioration in participation. After all, why worry about all the American-born people not in the labor force when we can simply bring in ever more immigrants to fill jobs? The extensive list of politicians and business groups currently calling for giving work authorization to illegal immigrants in the last two months is but the latest example of how immigration allows opinion leaders to focus on giving more jobs to immigrants to deal with a tight labor market rather than deal with all of the U.S.- born Americans on the economic sidelines.  Ignoring and relying on immigrant labor seems extremely unwise.  There is strong association between not working and so- called "deaths of despair", including suicide, drug overdose, and destructive levels of alcohol consumption and death from poisoning.[62]  Men not in the labor force also make relatively unattractive marriage partners, so low participation hinders family formation.[63] Additionally, not being employed is associated with social isolation.[64] There are a number of studies showing a link between not working and crime.[65] The increase in U.S.-born men not in the labor force is not only bad for these individuals, it is has significant negative consequences for American society.

### Conclusion

It is perhaps understandable and even laudable that many public figures in this country focus on the plight of illegal immigrants. It is certainly true that many of those who show up at our southern border, or who have been flown into the United States under the CHNV program, face difficult circumstances in their home countries. But seeing illegal immigrants simply as desperate people facing desperation fails to appreciate that they are also rational risk-takers who are responding to the incentives the administration has created. As long as prospective illegal immigrants know there is a very good chance they will be released if they make it here, they will keep coming in large numbers.

Elected leaders are supposed to act in the best interest of the American people. Tolerating widespread illegal immigration, or even encouraging it, has a cascading series of consequences for the American people. It is why public opinion polls show tremendous dissatisfaction with the current situation. Illegal immigration has implications for national security, public safety, and the rule of law. My testimony has focused on housing, public coffers, and the labor market. There is very good reason to believe that in some parts of the country illegal immigration has driven up rents and made housing less affordable relative to wages. Equally important, prior research makes clear that by adding large numbers of people to the country with modest levels of education, illegal immigration creates a net fiscal drain.

There is also little doubt that by dramatically increasing the supply of less-educated labor, illegal immigration reduces wages for some less-educated American workers, especially the poorest and least educated. Perhaps even more important, the availability of so many illegal immigrant workers allow businesses and policymakers to largely ignore the huge increase in the share of working-age Americans not in the labor force, particularly men. There is a near consensus that this deterioration in participation in the labor force contributes to profound social problems including, crime, substance abuse, failure to form families, welfare dependence, social isolation, and an early death. Those who strongly empathize with the desire of people from other countries

to come here need to understand the very real negative impact illegal immigration has on many Americans.

---

[1] The term "immigrant" has a specific meaning in U.S. immigration law, which is all those inspected and admitted as lawful permanent residents (green card holders). In this analysis, we use the term "immigrant" in the non-technical sense to mean all those who were not U.S. citizens at birth.

[2] https://www.cbp.gov/newsroom/stats/nationwide-encounters

[3] *The Consequences of the Biden-Harris Administration's Open-Borders Policies: The Cases of Four Illegal Aliens Who Viciously Attacked a Man on a Chicago Train*. U.S. HOUSE OF REPS., COMM. ON THE JUDICIARY (Aug. 21, 2024). Source: https://judiciary.house.gov/media/press-releases/consequences-biden-harris-administrations-open-borders-policies-cases-four.

[4] See Table 2b in Department of Homeland Security Border Security Metrics Report: 2022. U.S. Department of Homeland Security, July 3, 2023), https://www.dhs.gov/sites/default/files/2023-07/2023_0703_plcy_fiscal_year_2022_border_security_metrics_report_2021_data.pdf

[5] On May 15, 2024 Fox News reported 606,131 got-aways in FY 2022 and 670,674 in 2023. https://www.foxnews.com/politics/new-data-reveals-illegal-immigrants-eluding-border-patrol-spiked-under-biden-surpassing-predecessors

[6] FY 2022 Entry/Exit Overstay Report, June 2022, Department of Homeland Security, https://www.dhs.gov/sites/default/files/2023-07/23_0707_FY22_FY23_CBP_Integrated_Entry_Exit_Overstay_Report.pdf.

[7] For additional discussion about the FY2022 report, see DHS Reports Record Number of Overstays in 2022, Jessica M. Vaughan, Center for Immigration Studies, June 23, 2023. https://cis.org/Vaughan/DHS-Reports-Record-Number-Overstays-2022.

[8] "American Community Survey Shows Record Size and Growth in Foreign-Born Population in 2023," Steven A. Camarota, September 12, 2024, Center for Immigration Studies. https://cis.org/Camarota/American-Community-Survey-Shows-Record-Size-and-Growth-ForeignBorn-Population-2023

[9] "Estimating the Illegal Immigrant Population Using the Current Population Survey," Steven A. Camarota and Karen Zeigler, on March 29, 2022, Center for Immigration Studies, https://cis.org/Report/Estimating-Illegal-Immigrant-Population-Using-Current-Population-Survey

[10] In interpreting this increase, note that our estimate for the first part of 2021 represents a low point. The number of illegal immigrants was higher in 2019 before Covid. But, after 2021 the increase has been extremely large.

[11] The largest uncertainties surrounding these numbers are: First, we do not have all the data available to estimate legal immigration in 2023 and 2024. Second, we do not know how out-migration (emigration) may have changed among the existing legal immigrant population or illegal immigrant population in a post-Covid world, so we use prior patterns. A third area of uncertainty is the lack of a detailed recent literature on the undercount of immigrants generally and illegal immigrants in particular in the monthly CPS. It is unclear how many illegal immigrants are currently being missed by the survey. We had assumed only a 2.3 percent undercount for illegal immigrants in this data. But, given what has happened at the border, this level of undercount seems too low. The scale of the recent surge makes it more difficult for the Census Bureau to capture new arrivals in the survey as well as weight the data correctly to reflect the influx. If the undercount is larger, then the illegal immigrant population would be correspondingly larger. Without undercount adjustment we estimate 10 million in 2021 illegal immigrant in the data, 11.2 million in 2022, 12.3 million in 2023, and 13.7 million in 2024. Our hope is to revise and continually improve this estimate as more information becomes available over time.

[12] These figures come from an analysis of the public use 2024 August Current Population Survey.

[13] These figures come from an analysis of the public use 2024 Annual Social and Economic Supplement of the Current Population Survey (ASEC CPS), reflecting the population in March. The ASEC CPS identifies renters and homeowners.

[14] Cost of Rent and Utilities Rose Faster Than Home Values in 2023, U.S. Census Bureau, September 12, 2024. https://www.census.gov/library/stories/2024/09/acs-rent-burden.html

[15] "The Migrant and Housing Crises are Colliding with Predictable Results," Paul Kupiec, *The Hill,* October 5, 2023. "Fact check: Does immigration increase housing costs?" Sarah Bedford, *Washington Examiner*, May 24, 2023.

[16]Immigration and Housing Rents in American Cities," Albert Saiz, *Journal of Urban Economics*, 2007. https://www.sciencedirect.com/science/article/abs/pii/S009411900600074X

[17]"Immigration and housing: A Spatial Econometric Analysis," Abeba Mussa, Uwaoma G. Nwaogu and Susan Pozo, *Journal of Housing Economics* March 2017. https://www.sciencedirect.com/science/article/abs/pii/S1051137717300025

[18]"How Migration Affects Housing Affordability," John Daley, Brendan Coates, and Trent Wiltshire, *The Conversation,* March 4, 2018, https://theconversation.com/how-migration-affects-housing-affordability-92502. "Immigration is making Canada's housing more expensive. The government was warned 2 years ago," Nojoud Al Mallees, *The Canadian Press* January 11, 2024. https://www.cbc.ca/news/politics/ircc-immigration-housing-canada-1.7080376

[19]"An Assessment of the Immigration Impact on the International Housing Price," Albert Saiz Barbu, T.C, Vuța, M., Străchinaru, A.I. and Cioaca, S.I., 2017.. Amfiteatru Economic, 19(46), pp. 682-695.

[20]"Updating the Costs of NYC's Asylum Seeker Crisis," New York City Web site, https://www.nyc.gov/content/getstuffdone/pages/asylum-seeker-update

[21]"Mayor Eric Adams announces sweeping budget cuts that would drop number of police officers to lowest since 1990s," Marcia Kramer and Natalie Duddridge, CBS News, November 16, 2023. https://www.cbsnews.com/newyork/news/new-york-city-mayor-eric-adams-set-to-announce-sweeping-budget-cuts-in-response-to-asylum-seeker-crisis/.

[22]"Budget Hearings Kick Off with Intense Scrutiny on Costs to Care for Migrants in Chicago," Heather Cherone, WWTW News, October 16, 2023, https://news.wttw.com/2023/10/16/budget-hearings-kick-intense-scrutiny-costs-care-migrants-chicago.

[23]"As migrants continue to arrive in D.C. concerns remain about capacity," Michael Brice-Saddler, *Washington Post,* September 4, 2023, https://www.washingtonpost.com/dc-md-va/2023/09/03/dc-migrants-buses-hotels-update/

[24]"Denver mayor says migrant crisis could cost city $180 million in 2024," Marc Sallinger, *News9,* Jan 2, https://www.9news.com/article/news/local/next/next-with-kyle-clark/denver-mayor-says-migrant-crisis-could-cost-city-180-million-2024/73-7921e159-19cb-4378-9ee7-991092173f8e.

[25]Executive Office For Administration & Finance Commonwealth of Massachusetts Memorandum, August 26, 2024. https://malegislature.gov/Bills/193/SD3396.pdf

[26]The Center for Migration Studies estimates that in 2019, 67 percent had no education beyond high school, 14.5 percent have some college, and 18.5 percent have a bachelor's or more. Center for Migration Studies website, http://data.cmsny.org/. The Migration Policy Institute's estimate based on pooled data from 2015 to 2019 shows that 70 percent have no education beyond high school, 12 percent have some college, and 18 percent have at least a college education. Migration Policy Institute website, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

[27]To estimate the education of those encountered at the border, I use the detailed population shares by country reported at Customs and Border Protection website for border encounters. I combine this with the educational attainment from those same countries of new immigrants (arrived in 2020 through 2023) using a pooled sample of the monthly CPS from January to July 2023. This shows that, for adults encountered at the border, 64 percent had no education beyond high school, 12 percent have some college, and 24 percent have at least a bachelor's. Of course, this approach can provide only limited insight into the possible educational attainment of new illegal immigrants, primarily because we do not have specific data on the subset of those encountered who were released. Equally important, we have no information about the education level of got-aways or those missed by the Border Patrol entirely. We also have not attempted to develop an estimate for the education level of visa over-stayers. (Note: This estimate is only for those identified by country in the CBP data. No country was reported by CBP for about 6-7 percent of encounters. Cubans are also excluded because those paroled into the U.S. can receive permanent residency within one year due to a special provision in the law and therefore do not add to the illegal immigrant population.) Custom and Border Protection web site, https://www.cbp.gov/newsroom/stats/nationwide-encounters.

[28]NPV represents the fiscal balance (taxes paid minus costs) if we had to spend the money today. Costs or benefits in the future are discounted or reduced based on how long from now they occur.

[29]The 2017 NAS estimates by education level can be found in Table 8-12 in Chapter 8 of the report, https://nap.nationalacademies.org/cart/download.cgi?record_id=23550&file=359-494. Averaging the eight scenarios by education (all ages) produces the following results: negative $173,375 for an immigrant with less than a high school education, negative $69,750 for an immigrant with only a high school education, positive $41,000 for an immigrant with some college, positive $183,000 for an immigrant with only a bachelor's.

[30]The combined net fiscal effects by education level in the Academies' study are shown in the first column of the table. We use our 2017 analysis, and we adjust downward the net fiscal cost of less-educated illegal immigrants on

the assumption that they use less in public services than their legal counterparts, but we adjust downward the positive fiscal impact of more educated illegal immigrants based on the assumption that better educated illegal immigrants pay less in taxes than their legal immigrant counterparts because their legal status prevents them from having earnings that reflect their skills. The Cost of a Border Wall vs. the Cost of Illegal Immigration, Center for Immigration Studies February, 2017, https://cis.org/Report/Cost-Border-Wall-vs-Cost-Illegal-Immigration

      The NAS has fiscal estimates for immigrants with a graduate degree, but neither CMS nor MPI have any estimate for illegal immigrants with this education level. Both organizations are only estimating that 18 percent have a bachelor's or more. To address this issue we assume that 10 percent of illegal immigrants with a bachelor's degree have a graduate degree and then apply the NAS study's fiscal impacts estimates by education level.

[31]"Effects of the Immigration Surge on the Federal Budget and the Economy," CBO report, July 23, 2024. www.cbo.gov/system/files/2024-07/60165-Immigration.pdf

[32]"The Lifetime Fiscal Impact of Immigrants," Daniel Di Martino, Manhattan Institute September 2024, https://media4.manhattan-institute.org/wp-content/uploads/the-lifetime-fiscal-impact-of-immigrants.pdf.

[33]An additional caveat about using the NAS fiscal estimate is that they employ the concept of "net present value" (NPV). While commonly used in economics, this approach has the effect of reducing the size of the net fiscal drain that less-educated immigrants create because the costs or benefits in future years are much less relative to more immediate costs. If the NPV concept is not used, the actual net lifetime fiscal drain illegal immigrants create would be much larger than we report here.

[34]The 2015 Congressional Budget Office's long-term fiscal projection indicated that public debt held by the public would equal 104 percent of GDP in 2040. *See The 2015 Long-Term Budget Outlook,* Congressional Budget Office, June 2015, https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/50250-longtermbudgetoutlook-4.pdf. In contrast, the 2023 long term outlook showed it would be roughly 140 percent of GDP. See *The 2023 Long-Term Budget Outlook,* Congressional Budget Office, June 2023, https://www.cbo.gov/system/files/2023-06/59014-LTBO.pdf.

[35]Based on our estimates of illegal immigrants in the monthly CPS, which we have already discussed, we believe the total weighted illegal population in mid-2022 in the monthly CPS is 11.8 million. The SIPP and CPS use similar weighting schemes, but the surveys cover different population universes. We assume that the ratio of illegals in the two surveys is the same as the ratio (.75) of non-citizen post-1980 Hispanics, a population which significantly overlaps with illegal immigrants. We therefore assume 8.85 million illegal immigrants are in the 2022 SIPP. To determine which SIPP respondents are most likely to be illegal aliens, we first exclude immigrant respondents who are almost certainly not illegal aliens — for example, spouses of native-born citizens; veterans; adults who receive direct welfare payments; people who have government jobs; Cubans (because of special rules for that country); immigrants who arrived before 1981, immigrants in certain occupations that require screening and background checks; and likely student visas holders.

      The remaining candidates are weighted to replicate known characteristics of the illegal population by age, gender, continent of origin, certain states of residence, and length of residence in the U.S. as published by the Center for Migration Studies. The resulting illegal population is designed to match CMS on the known characteristics listed above, as well as on education. The total size of the population, however, is controlled to our 8.85 million estimate of illegal immigrants in the 2022 SIPP. For more a detailed discussion of how we estimate illegal immigrants in the data, see "Welfare Use by Immigrants and the U.S.-Born: Comparing program use by foreign- and U.S.-born-headed households," Steven A. Camarota and Karen Zeigler on December, 2023 Center for Immigration Studies, https://cis.org/Report/Welfare-Use-Immigrants-and-USBorn.

[36]This eligibility extends to even housing. The HUD's handbook covering regulations states if at least one member of a family is eligible (e.g., a U.S.-born child), then the family can live in federally subsidized housing, though they may receive pro-rated assistance. New York City has a similar rule for its own housing programs.

[37] See "State-Funded Health Coverage for Immigrants as of July 2023," Kaiser Family Foundation data web site https://www.kff.org/racial-equity-and-health-policy/fact-sheet/state-funded-health-coverage-for-immigrants-as-of-july-2023/

[38]According to the National Immigration Law Center, six states provide SNAP benefits to illegal immigrants even if they do not have U.S.-born children, typically only if they meet certain hardship requirements in addition to having low incomes. https://www.nilc.org/issues/economic-support/state_food/

[39]Food and Nutrition Service, U.S. Department Of Agriculture web site, https://www.fns.usda.gov/non-citizen-communities#:~:text=The%20food%20is%20free%20for,make%20you%20a%20public%20charge

[40]Based on administrative data, we estimated in 2021 that there were roughly 2 million illegal immigrants with work authorization and valid Social Security numbers (SSNs) that allow receipt of the EITC. Since 2021, the administration has further expanded work authorizations to illegal immigrants with the recent influx of asylum applicants. Prior research by the Social Security Administration had also estimated some 700,000 illegal immigrants using stolen SSNs. It is unclear if such individuals would be detected and prevented from receiving the EITC by the IRS. Our methodology for selecting illegal immigrants assumes that only those with citizen children may receive the EITC. Any immigrant who reports receiving the EITC without their being a U.S.-born children is assumed to be a legal immigrant.

[41]"Federal Spending on Benefits and Services for People with Low Income: FY2008-FY2020," Congressional Research Service, December 2021. https://crsreports.congress.gov/product/pdf/R/R46986.

[42]"Medicaid Financing: The Basics," Elizabeth Williams et. al. Kaiser Family Foundation April 2023. https://www.kff.org/medicaid/issue-brief/medicaid-financing-the-basics/

[43]The biggest question mark concerning cost is for Medicaid, which is by far the largest program by expenditure. Immigrants are younger and somewhat healthier than U.S.-born people on Medicaid. Moreover, for illegal immigrant households it is often the case that only the U.S. children are eligible for the program. On the other hand, a large share of Medicaid for illegal immigrants is due to pregnant women, and the average costs of pregnancy and delivery is quite high. An analysis of the Medical Expenditure Panel Survey found that immigrant families enrolled in Medicaid cost 90 percent what U.S.-born households enrolled in Medicaid cost. Of course, whether this is true for illegal immigrants specifically is unclear. "The Cost of Immigrant Medicaid Coverage Under Current Policy," Jason Richwine, October, 2019 Center for Immigration Studies, https://cis.org/Report/Cost-Immigrant-Medicaid-Coverage-Under-Current-Policy.

[44]"Children of unauthorized immigrants represent rising share of K-12 students," Jeffrey S. Passel and D'vera Cohn, Pew Research, 2019, https://www.pewresearch.org/short-reads/2016/11/17/children-of-unauthorized-immigrants-represent-rising-share-of-k-12-students/

[45]National Center for Education Statistics, "Fast Facts," https://nces.ed.gov/fastfacts/display.asp?id=66#:~:text=Total%20expenditures%20for%20public%20elementary,constant%202021%E2%80%9322%20dollars).&text=This%20amounts%20to%20an%20average,fall%20of%20that%20school%20year.

[46]"Profile of the Unauthorized Population: . U.S.," Migration Policy Institute web site, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

[47]"Health Insurance Coverage in the United States: 2019" U.S. Census Bureau September 2020. https://www.census.gov/library/publications/2020/demo/p60-271.html.

[48]"Sources of Payment for Uncompensated Care for the Uninsured," Teresa A. Coughlin, Haley Samuel-Jakubos, and Rachel Garfield, Kaiser Family Foundation, April, 2021. https://www.kff.org/uninsured/issue-brief/sources-of-payment-for-uncompensated-care-for-the-uninsured/

[49]In their estimates CMS shows 71 percent of all illegal immigrants (not just those of working age) are in the labor force. MPI estimated 66 percent (again, not just those of working age) are in the labor force, but it is based on data from 2015 to 2019, when the economy was weaker. Center for Migration Studies website, http://data.cmsny.org/. Migration Policy Institute website, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

[50]"There Are No Jobs Americans Won't Do: A detailed look at immigrants (legal and illegal) and natives across occupations," Steven A. Camarota, Jason Richwine, and Karen Zeigler, August 2018, Center for Immigration Studies, https://cis.org/Report/There-Are-No-Jobs-Americans-Wont-Do.

[51]See Appendix D in Size of U.S. Unauthorized Immigrant Workforce Stable After the Great Recession, Jeffrey S. Passel and D'vera Cohn 2016, Pew Research, https://www.pewresearch.org/hispanic/2016/11/03/appendix-d-detailed- tables/#occupation.

[52] See Table 5-2 in *The Economic and Fiscal Consequences of Immigration*, National Academies of Sciences, Engineering, and Medicine, Francine D. Blau and Christopher Mackie, Eds. National Academies Press, 2017.

[53] Anthony Edo, The Impact of Immigration on the Labor Market. *Journal of Economic Surveys*, Vol. 33 (2019), pp. 922-948. https://onlinelibrary.wiley.com/doi/abs/10.1111/joes.12300.

[54] "Less-Educated U.S.-Born Workers Do Better When Immigration Is Lower: Trends in Median Weekly Earnings for Immigrants and the Native-born, 2012 to 2022", Steven A. Camarota and Karen Zeigler, May 2023, Center for Immigration Studies, https://cis.org/Report/LessEducated-USBorn-Workers-Do-Better-When-Immigration-Lower.

[55]"Do Immigration Restrictions Affect Job Vacancies? Evidence from Online Job Postings", Elior Cohen and Samantha Shampine, Economic Review, Vol. 108 (2023).

[56] "No Americans Need Apply: EEOC lawsuits reveal how employers are eager to replace low-skill native workers with immigrants", Jason Richwine, Center for Immigration Studies, October 2019, https://cis.org/Report/No-Americans-Need-Apply.

[57] "The Impact of Low-Skilled Immigration on the Youth Labor Market", Christopher L. Smith, 2012, *Journal of Labor Economics*, Vol. 30, No. 1 January 2012, pp. 55-89. "The impact of immigration on Unemployment and Earnings among Racial Minorities in the United States", Augustine J. Kposowa, 1995, *Ethnic and Racial Studies*, Volume 18, 1995. "Latino Employment and Black Violence: The Unintended Consequence of U. S. Immigration Policy", Edward S. Shihadeh and Raymond E. Barranco, March 2010, *Social Forces*, Vol. 88, No. 3, https://www.jstor.org/stable/40645896. Immigration and African-American Employment Opportunities: "The Response of Wages, Employment, and Incarceration to Labor Supply Shocks NBER Working Paper No. w12518, George J. Borjas, Jeffrey Grogger and Gordon H. Hanson, Revised Sept. 2022, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=930608.

[58] Nunn, Ryan, and Jana Parsons. "Labor Force Nonparticipation: Trends, causes, and policy solutions." Brookings, (2019). Groshen, Erica L., and Harry J. Holzer. "Labor market trends and outcomes: What has changed since the Great Recession?." *The ANNALS of the American Academy of Political and Social Science* 695.1 (2021): 49-69.

[59] Winship, Scott. "Reconnecting Americans to the benefits of work." United States Congress Joint Economic Committee (2021). Greszler, Rachel. "Social Security Disability Program May Appear "Solvent" but It's a Bad Deal for Workers and a Poor Program for Individuals with Disabilities." Heritage Foundation, (2022).

[60] Eberstadt, Nicholas. *Men without work: America's invisible crisis*. Templeton Foundation Press, 2016.

[61] Henkel, Dieter. "Unemployment and substance use: a review of the literature (1990-2010)." *Current drug abuse reviews* 4.1 (2011): 4-27. Crabtree, Steve. "Obesity linked to long-term unemployment in US." *Gallup*, (2014). Agan, Amanda, and Sonja Starr. "The effect of criminal records on access to employment." *American Economic Review* 107.5 (2017): 560-564.

[62]"The geography of Desperation in America: Labor Force Participation, Mobility, Place, and Well-being" Carol Graham and Sergio Pinto, *Social Science & Medicine,* Feb 2021. https://www.sciencedirect.com/science/article/abs/pii/S0277953620308315?via%3Dihub "Occupation, Employment Status, and "Despair"-Associated Mortality Risk among Working-Aged U.S. Adults," Iliya Gutin, and Robert Hummer 1997-2015, *Preventive Medicine*, August 2020. https://www.sciencedirect.com/science/article/abs/pii/S0091743520301535?via%3Dihub "How Economic Recessions And Unemployment Affect Illegal Drug Use: A Systematic Realist Literature Review," Gera Nagelhout, Karin Hummel, Moniek de Goeij, Hein de Vries, Eileen Kaner and Paul Lemmens, *International Journal of Drug Policy*, June 2017. https://www.sciencedirect.com/science/article/pii/S0955395917300877 "Alcohol Consumption And Labour Market Participation: A Prospective Cohort Study Of Transitions Between Work, Unemployment, Sickness Absence, and Social Benefits," Maja Bæksgaard Jørgensen, Jacob Pedersen, Lau Caspar Thygesen, Cathrine Juel Lau, Anne Illemann Christensen, Ulrik Becker and Janne Tolstrup, *European Journal of Epidemiology,* January 2019. *https://link.springer.com/article/10.1007/s10654-018-0476-7*

[63]"When Work Disappears: Manufacturing Decline And The Falling Marriage-Market Value Of Young Men," David Autor, David Dorn and Gordon Hanson, *NBER Working Paper 23173*, January 2018. http://www.nber.org/papers/w23173

[64]Does unemployment lead to greater levels of loneliness? A Systematic Review," N. Morrish and A. Medina-Lara, *Social Science & Medicine*, October 2021. https://www.sciencedirect.com/science/article/pii/S0277953621006717?via%3Dihub

[65]"Does Unemployment Increase Crime? Evidence from U.S. Data 1974-2000," Ming-Jen Lin, *The Journal of Human Resources,* Spring, 2008. https://www.jstor.org/stable/40057352 "How Do Labor Markets Affect Crime? New Evidence on an Old Puzzle," David Mustard, *IZA Discussion Paper No. 4856,* March 2010. https://docs.iza.org/dp4856.pdf