# United States Court of Appeals
## For the First Circuit

_____

Appeal # 25-1158

State of New Jersey, et al.
vs.
(President) Donald Trump, et al.

_____

**_EMERGENCY - MOTION to AMEND Appellant's pro se APPEAL BRIEF to ADD... new/ additional issues raised on appeal..... As a matter of judicial economy filed by Melvin Jones Jr. - pro se appellant;as set forth herein._**

## *MOTION TO AMEND APPELLANTS PRO SE BRIEF:*

*To add:*

*That the preliminary injunction should be CHANGED to specifically restrict pregnant Hispanic, Mexican and/ or Latino woman from unlawfully*

*crossing either the US southern or US northern border AFTER the 1st month of pregnancy ...as an URGENT matter of health and safety protection of the UN-BORN BABY and to protect the health of BOTH the mom who is "heavy with child in her womb" and the*

*gestational critical formative approx. 9 months during which SO many life long, and permanent birth defects can and do occur... with the rigors of illegal border crossing in the first place;*

*1.) See the attached NIH study which supports the*

*NEW issue which [I] respectfully raise on appeal as an ADDED issue with respect to my pro se appellants brief, and most IMPORTANT...*

*2.)   That the preliminary injunction be changed to state that NO pregnant Hispanic, Mexican, or Latino*

*woman who have utilized the "unlawful services" of a BORDER CROSSING SUGGLER shall be allowed to enter the United  States to give birth... because such is nearly 100% certain to place BOTH the mom to be and unborn baby to CERTAIN DEATH during*

# *the rigors of illegal alien border crossing [for example]*



**U.S.**

## Pregnant woman died trying to cross U.S.-Canada border after smuggler told her to wade through frigid river, prosecutors say

Updated on: February 7, 2025 / 8:23 AM EST / CBS/AP

> " *A man extradited from Canada was arraigned on human smuggling charges Thursday in the case of a 33-year-old pregnant woman found dead in a frigid northern New York river after she illegally crossed the border, according to <u>federal authorities</u>.*
>
> *The body of Ana Vasquez-Flores of Mexico was found in the Great Chazy River just south of the Canadian border on Dec. 14, 2023, two days after her husband told U.S. border agents she had crossed*

*illegally and was lost. Searchers found footprints in the snow leading to the river, where she drowned, according to federal authorities.*

*Vasquez-Flores' death came amid a surge of people crossing into New York and New England from Canada. The incident became an example of the perils migrants face trekking through the wooded and often snowy landscape along the U.S.-Canada border.*

*Jhader Augusto Uribe-Tobar, 36, is accused by federal prosecutors of smuggling Vasquez-Flores into the United States for $2,500 and instructing her to wade through the river in the dark.*

*Uribe-Tobar pleaded not guilty to federal charges of alien smuggling and conspiracy to commit alien smuggling. He was detained pending a trial. Prosecutors say he is a citizen of Colombia and lives in Quebec, Canada.*

U.S.

# *Pregnant woman died trying to cross U.S.-Canada border after smuggler*

## told her to wade through frigid river, prosecutors say

*Updated on: February 7, 2025 / 8:23 AM EST / CBS/AP*

**A man extradited from Canada was arraigned on human smuggling charges Thursday in the case of a 33-year-old pregnant woman found dead in a frigid northern New York river after she illegally crossed the border, according to <u>federal authorities</u>.**

**The body of Ana Vasquez-Flores of Mexico was found in the Great Chazy River just south of the Canadian border**

*on Dec. 14, 2023, two days after her husband told U.S. border agents she had crossed illegally and was lost. Searchers found footprints in the snow leading to the river, where she drowned, according to federal authorities.*

*Vasquez-Flores' death came amid a surge of people crossing into New York and New England from Canada. The incident became an example of the perils migrants face trekking through the wooded and often snowy landscape along the U.S.-Canada border.*

*Jhader Augusto Uribe-Tobar, 36, is accused by federal prosecutors of smuggling Vasquez-Flores into the United States for $2,500 and instructing her to wade through the river in the dark.*

*Uribe-Tobar pleaded not guilty to federal charges of alien smuggling and conspiracy to commit alien smuggling. He was detained pending a trial. Prosecutors say he is a citizen of Colombia and lives in Quebec, Canada.*

*"This tragedy highlights the dangers of illegal migration and how, as alleged, smugglers deliberately put people in harm's way for profit," U.S. Attorney Carla Freedman said in a prepared <u>statement</u>.*

*Illegal crossings have <u>continued to skyrocket</u> with roughly 19,000 people arrested in fiscal year 2024. That is about the same amount as the last 17 years combined. Although, Customs and Border Protection notes that the Swanton Sector has seen a 52-percent reduction in*

*encounters since the height of crossings in June.*

*In 2022, the <u>bodies of four people</u>, including a baby and a teenager, were found in Canada near the U.S. border in what authorities believe was a failed crossing attempt during a freezing blizzard.  Prosecutors say <u>the family of four</u> — 39-year-old Jagdish Patel; his wife, Vaishaliben, who was in her mid-30s; their 11-year-old daughter, Vihangi; and 3-year-old son, Dharmik —*

*died on Jan. 19, 2022, after spending hours wandering in blizzard conditions.*

*Prosecutors said Indian national Harshkumar Ramanlal Patel ran part of a sprawling human smuggling scheme and recruited Steve Shand to shuttle the migrants across the border."*

*https://www.cbsnews.com/news/pregnant-woman-dies-us-canada-border-man-charged/*

- *SEE ALSO THE DOJ "PREPARED STATEMENT AS TO THE FORGOING ISSUE*

*OF PREGNANT ILLEGAL ALIEN MEXICAN WOMAN WHO PAY MONEY TO SMUGGLERS TO DUPE TRICK THE US IMMIGRATION LAWS.*

- *In short, it should be BLANTALY OBVIOUS TO THE DISTRICT COURT THAT ITS PRELIMINARY INJUNCTION AS BROADLY WRITTEN IS LITERALLY*

*PUTTING THE LIVES OF UNBORN CHILDREN IN EXTREME DANGER.... [and] that the Plaintiffs - appellee [blue state greedy democrat AG's] are too "hell bent" on making Donald Trump look bad... because a Black incompetent former VP - Kamala Harris could NOT buy her way into the US presidency with $ 2 billion*

*dollars.... How sad for America indeed.*

- *In short... just look at how horribly the City of Flint {e.g. Mayor Sheldon Neeley} mistreat the elderly and disabled elderly in the City of Flint [e.g. see the attachment affixed hereto... and keep in mind that literally BOTH Mr. Neeley and Michigan Governor*

*Gretchen Whitmer... not too long ago visited the senior center at issue (Hasselbring Senior [recreation Center) ]....Apparently to KICK out the current management ...so that the City of Flint can NOW "STEAL" [extort] the millage funds "mafia style"... as reported in MLIVE online news.  YES - more likely*

*than not... so that they/ the City of Flint can NOW misdirect as millage funds to a MEXICAN ILLEGAL ALIEN CENTER  which teaches pregnant MEXICAN illegal aliens how to EVADE immigration authorities.*

*Respectfully submitted.*

*Thank you.*

*Best,*

*Date: 2-26-2025*

_____

*Melvin Jones Jr. disabled*

*PRO SE appellant*

*1935 Hosler St.*

*Flint, Michigan*

*48503*

*Email: [jonesjrmel@gmail.com](mailto:jonesjrmel@gmail.com)*

*Google voice to text ph#*

*415-562-5074*

*SEE THE ATTACHED EXHIBIT…. on the next pages:*



PRESS RELEASE

# Colombian Smuggler Extradited in Connection with Pregnant Woman's Border-Crossing Death

Thursday, February 6, 2025

**For Immediate Release**

U.S. Attorney's Office, Northern District of New York

PLATTSBURGH, NEW YORK – A Colombian man was extradited from Canada to the United States and arraigned today for charges arising from the drowning of a pregnant woman. The woman, a citizen of Mexico, died in December 2023 while trying to illegally enter the United States by wading across the Great Chazy River in Champlain, New York.

United States Attorney Carla B. Freedman; Special Agent in Charge Erin Keegan of Homeland Security Investigations, Buffalo, New York Field Office; and Chief Patrol Agent Robert N. Garcia of United States Border Patrol, Swanton Sector, made the announcement.

Jhader Augusto Uribe-Tobar, age 36, is a citizen of Colombia who resides in Quebec, Canada.

According to the indictment and an earlier-filed criminal complaint, Uribe-Tobar smuggled a pregnant woman, A.V.-F., from Canada into the Northern District of New York for $2,500, by instructing her to wade through the frigid Great Chazy River in darkness. The smuggling attempt ended in A.V-F.'s death.

United States Attorney Carla Freedman stated: "This tragedy highlights the dangers of illegal migration and how, as alleged, smugglers deliberately put people in harm's way for profit. By

vigorously prosecuting human smuggling networks, we are deterring and reducing the number of dangerous crossings like the one that took the lives of this young woman and her unborn child."

HSI Buffalo Special Agent in Charge Erin Keegan stated: "We will not stand by as lives are tragically lost by the deception of human smugglers profiting off the vulnerability of migrants. HSI Buffalo and our partners vigorously pursue justice for the victims who are exploited and endangered by the people whom they are trusting to move them across borders."

Border Patrol Chief Patrol Agent Robert Garcia stated: "Effective border security enforcement hinges on tangible penalties for criminal actions. The U.S. Border Patrol continues to enforce the laws of the United States, and this prosecution by the U.S. Attorney's Office demonstrates that those who violate the law will be held accountable."

The charges in the complaint and indictment are merely accusations. The defendant is presumed innocent unless and until proven guilty.

On December 7, 2023, A.V-F.'s relative contacted Uribe-Tobar on TikTok where Uribe-Tobar advertised himself as a smuggler.  Uribe-Tobar advised A.V-F.'s relative, "It costs $2500 American, it is worked through Montreal and they are left in the City of Plattsburgh, NY."  A few days later, on December 11, 2023, A.V-F.'s relative sent Uribe-Tobar proof that he had wired $2,500 to Uribe-Tobar.  Shortly after receiving that message, Uribe-Tobar traveled with A.V-F.  to the immediate area of the United States-Canada border.

At approximately 6:21 that evening, Uribe-Tobar told A.V-F.'s relative, "Friend we are at the river crossing."  At 6:22 p.m., Uribe-Tobar told A.V-F.'s relative, "She is crossing friend" to which her relative replied, "I'm very nervous."  At 7:06 p.m., Uribe-Tobar messaged A.V-F's relative, "Bro hello, I think she got wet or turned off her cell phone.  Bro, I told her to hold it while she was crossing."  Uribe-Tobar followed that message with a screenshot of messages he exchanged with A.V-F., which showed that he had sent her three messages at 6:17 p.m. The screenshot indicates that the last message was never read.

Uribe-Tobar and A.V-F's relative continued to exchange messages throughout the night of December 11, 2023.  Uribe-Tobar claimed that he had people searching for A.V-F. and that "I already sent them a pin to see if they see her, I told them what happened and that she is pregnant."

On December 12, 2023, A.V-F.'s relative told a Border Patrol Agent in Champlain that she was supposed to illegally enter the United States on December 11, but that he had not heard from her.  He reported her last known location as the edge of the Great Chazy River in Champlain, and that the smuggler had told A.V-F. the river was wadable.  Multiple law enforcement agencies immediately began to search for A.V-F.  On December 14, 2023, they found A.V-F.'s body in the Great Chazy River.

The charges against Uribe-Tobar carry a minimum term of 3 years and a maximum term of life in prison.  A defendant's sentence is imposed by a judge based on the particular statutes the defendant is charged with violating, the U.S. Sentencing Guidelines and other factors.

At his initial appearance today in Plattsburgh, Uribe-Tobar was ordered detained pending a trial scheduled before Senior United States District Judge David N. Hurd in Utica, New York.

The Department of Homeland Security, Homeland Security Investigations and United States Border Patrol are investigating the case.  Assistant U.S. Attorneys Katherine Kopita and Carling Dunham are prosecuting the case. The Department of Justice's Office of International Affairs assisted in securing the arrest and extradition of Uribe-Tobar.

*Updated February 6, 2025*

**Topics**

**HUMAN SMUGGLING**          **IMMIGRATION**

**Component**

USAO - New York, Northern

# Related Content

**PRESS RELEASE**

## New Jersey Man Sentenced to 3 Years for Alien Smuggling

February 26, 2025

Case: 25-1158          Document: 00118253907          Page: 25          Date Filed: 02/26/2025          Entry ID: 6703051

PRESS RELEASE

## Guatemalan National Sentenced to 14 Months Imprisonment for Illegally Reentering the United States a Year After Deportation

February 19, 2025

---

PRESS RELEASE

## Colombian Man Sentenced to 18 Months for Alien Smuggling

February 14, 2025

---

 **Northern District of New York**

Main Office:

P.O. Box 7198

100 South Clinton Street

Syracuse, NY 13261-7198

Syracuse: 315-448-0672

Fax: 315-448-0689



**Subscribe**

**All Access + the daily online newspaper – Start today for $1**

Advertisement

SUBSCRIBER 🔑

# City wants Genesee County millage funds to keep Flint senior center open

Updated: Feb. 26, 2025, 4:18 p.m. | Published: Feb. 26, 2025, 3:58 p.m.



The outside of Hasselbring Park Senior Community Center is seen on Wednesday, Feb. 26, 2025, in Flint.  Ayrton Breckenridge | MLive.com

    

Journal of Human Rights and Social Work (2022) 7:349–360
https://doi.org/10.1007/s41134-022-00227-y



# Pregnant Migrant Latinas at the US Border: A Reproductive Justice Informed Analysis of ICE Health Service Policy During "Zero-Tolerance"

Marissa McFadden[1] · Christine Marie Velez[2] · Maria Mercedes Ávila[3]

Accepted: 5 August 2022 / Published online: 8 October 2022
© The Author(s), under exclusive licence to Springer Nature Switzerland AG 2022

## Abstract

During the Trump Administration, the Immigration and Customs Enforcement (ICE) Directive (11032.3) revoked the automatic release of pregnant women detained by ICE. This paper presents a policy analysis of the impact of this directive on pregnant Latina migrants. The directive is contextualized as part of the Trump Administration's "zero-tolerance" immigration policy that directed U.S. attorney's offices along the southwest border in April of 2018 to criminally prosecute all cases involving illegal entry with no exceptions. Under this policy, Latin American migrants seeking asylum in the USA faced criminalization, family separation, and detention. Reproductive justice (R.J.) is the guiding conceptual framework for analyzing this policy's impact. Three case studies demonstrate the reproductive and human rights violations impacting pregnant, migrant Latinas seeking to enter the U.S. under "zero-tolerance." This policy did not deter migration from Central and South America and created avoidable harm. Although "zero-tolerance" was rescinded in 2021, the long-term impacts remain unknown. Implications and recommendations for social work practice, policy advocacy, and social work education are provided.

**Keywords** Latinas · Reproductive justice · "Zero tolerance" · Immigration policy

This policy analysis focuses on pregnant, Latinas seeking to migrate to the U.S. who were impacted by the removal of the exemption of detention under ICE Health Service Directive 113.032.3: *Identification and Monitoring of Pregnant Detainees*, one of the directives under the Trump administration's "zero tolerance" immigration policies. We use reproductive justice (RJ) as a framework and lens through which to analyze this policy as it relates specifically to the rights and healthcare needs of pregnant migrant Latinas. An RJ framework helps to illuminate the ways in which this policy was harmful to the physical and mental well-being of Latinas, and how this policy violated human and reproductive rights. Three case examples are presented to that highlight the harmful impact of automatic detention

of migrants and asylum seekers. Our analysis concludes that this policy failed in achieving its stated goals. We also assert that "zero tolerance" policy was xenophobic and discriminatory. It harmed pregnant Latina migrants and asylum seekers and violated their human and reproductive rights. We share the implications of such policies for social work, specifically, social work practice with children and families and social work education. We contend that these policies of forced detention and criminalization of pregnant Latina migrants caused undo harm in a myriad of ways. The structural inequities criminalizing migration in the USA are discussed.

## Background and Context of "Zero-Tolerance"

In 2018, the Trump administration's "zero-tolerance" policy was created with the intention to curtail and control "illegal" border crossings. On April 6, 2018, Attorney General Jeff Sessions stated that:

> The situation at our southwest border is unacceptable. Congress has failed to pass effective legislation that serves the national interest- that closes dangerous loop-

✉ Christine Marie Velez
  cvelez@uvm.edu

1   Lamoille Health Partners, Morrisville, VT, USA

2   Social Work Department, University of Vermont, 85 South Prospect, 443 Waterman, Burlington, VT, USA

3   Department of Pediatrics, University of Vermont, Burlington, VT, USA



holes and fully funds a wall along our southern border. To those who wish to challenge the Trump administration's commitment to public safety, national security, and the rule of law, I warn you: illegally entering this country will not be rewarded but will instead be met with the full prosecutorial powers of the Department of Justice. To the Department's prosecutors, I urge you: promoting and enforcing the rule of law is vital to protecting a nation, its borders and its citizens (Department of Justice [DOJ], 2018).

Then-Attorney General Jeff Sessions suggested that immigration from the US-Mexico border is an urgent national security issue, threatening the safety and well-being of US citizens and legal permanent residents. Sessions, with the support of other Trump administration officials, made it clear that detainment and criminal prosecution were to be the primary approaches to addressing migration from Central and South America.

The sociopolitical context is important to the Trump Administration's enacting of "zero-tolerance." The Trump administration operated under a decidedly anti-immigrant platform that fueled stigmas around the country of origin and skin color (Morey, 2018). "Zero tolerance" aligns with other legislative decisions of the Trump Administration which the Supreme Court upheld, that were specifically focused on issues of immigration, such as what was understood as the "Muslim ban," where travel bans from seven countries, five of which were understood as majority Muslim was a legislative priority (Liptak & Shear, 2018). Similarly, the Trump administration's preoccupation with the construction of a border wall along the U.S.-Mexico border to keep migrants and immigrants out of the USA is consistent with this administration's approach to immigration, migration, and border control. Racist rhetoric about Black and Brown immigrants was employed by the Trump administration to justify enacting "zero tolerance."

In the years leading up to the implementation of "zero tolerance," there was an increase of migrants, specifically migrant families, seeking asylum and/or crossing the U.S.-Mexico border (APHA, 2020; Kandel, 2018). In decades past, the majority of migrants were people traveling alone, often men, and a shift had occurred with more children and youth trying to reach the U.S. in the years leading up to the implementation of "zero-tolerance." Some of these youths have traveled alone, and many have traveled with parents and caretakers (Kandel, 2018; Ohta & Long, 2019). As stated by Attorney General Jeff Sessions above, improved border enforcement at the U.S.-Mexico border was an issue of national security, and as part of the Trump administration, all were committed to increasing criminal immigration enforcement. However, the distinct difference to Trump's "zero-tolerance" approach to addressing unauthorized border crossing is that all people crossing the border without declaring themselves at a formal port of entry were now in criminal violation of US law, which includes children and pregnant people. This is a stark contrast to previous approaches to immigration enforcement that excluded pregnant people and family units from mandatory detention (Messing et al., 2020; Ohta & Long, 2019).

The Trump administration is not the first U.S. presidential administration to implement anti-immigrant legislation; the Obama administration, for example, is responsible for deporting an unprecedented number of immigrants and asylum seekers (Chishti et al., 2017). Although deportations reached a record high during the Obama administration (Chishti et al., 2017), criminal and federal detention of migrants was low as they "were not considered enforcement priorities" (Kandel, 2018, p. 6). The Trump administration implemented a "100% prosecution" policy under the belief that a "zero-tolerance" approach was "necessary to discourage migrants from coming to the United States (U.S.) and submitting fraudulent asylum requests" (Kandel, 2018, p. 1). The family separation that ensued because of "zero tolerance" was justified by the Trump administration with the logic that when parents are placed in jail, they are naturally separated from their children anyway (Kandel, 2018). Crossing the border without formally presenting oneself at an official port of entry or overstaying a visa was considered a criminal offence that would be addressed by the U.S. Immigration and Customs Enforcement (ICE) carceral system.

At the U.S.-Mexico border, Immigration and Customs Enforcement (ICE) operates a Health Service Corps with the mission of "working hard to be the best health care delivery system in detention and correctional care" (ICE, n.d.). Currently, ICE has around 200 facilities where migrants are currently detained in the U.S. (APHA, 2020). Under "zero tolerance" policy, every migrant—including asylum seekers—were automatically detained and placed in the custody of ICE, if entering other than at an official port of entry or overstaying a visa, and criminally prosecuted (EO 13,768).

Given what we know about the stringent nature of "zero tolerance" policy, any Latinx person seeking asylum at the US-Mexico border likely faced federal criminalization, separation, and detention into federal custody. Once in custody, migrants were sent to ICE detention facilities that operated at various sites along the US-Mexico border. These facilities were operated by the US Department of Homeland Security (during the Trump administration this department was run by Kirstjen Nielson) (EO 13,768). These facilities experienced considerable growth in detained persons, accompanied by the rise in use of private prisons for detention, and they operate with inadequate numbers of support staff and medical staff (APHA, 2020; Hampton et al., 2022).

Men, women, and children were all detained and often separated from one another and held in different facilities



Journal of Human Rights and Social Work (2022) 7:349–360

(Hampton et al., 2022). Since children cannot be imprisoned with parents or family members, children were separated from parents and caregivers and separately placed into the federal custody of the US Department of Health and Human Services (Southern Poverty Law Center (SPLC), 2022). This resulted in over 3000 children being separated from their families and often placed hundreds of miles away in detention centers also known as Office of Refugee Resettlement Centers (ORR) (SPLC, 2022). Many children experienced trauma because of this experience, including reported incidents of violence and sexual assault, and severe psychological harm (Physicians for Human Rights (PHR), 2019). The Trump administration was aware that enforcement of this policy would separate children from parents and caregivers (DOJ, 2021).

## ICE Health Service Corps

Since all prisoners within the USA have a constitutional right to healthcare, all people detained under this policy were technically provided healthcare through the ICE Health Service Corps. This care was part of the federally mandated screening process (EO 13,768) for detained children and adults, inclusive of pregnant women. The ICE Health Service Corps has several accrediting bodies including the American Correctional Association (ACA), the National Commission on Correctional Health Care (NCCHC), the National Practitioner Data Bank, ICE Family Residential Standards, and ICE Performance Based National Detention Standards. The ACA is the entity responsible for setting the standards of human dignity and treatment in custody, while the NCCHC writes the actual policy. Both dictate laws and applications of the ICE Health Service Corps and these standards are known as ICE Performance-Based National Detention Standards (PBNDS) (Gutierrez et al., 2020).

## Change to ICE Health Service Corps Directives Under "Zero Tolerance"

There are three major immigration practices that have commenced since immigration law at the US-Mexico border was amended under the Trump administration in 2017 through Executive Order 13,768 *Enhancing Public Safety in the Interior of the United States*. These are family separation, removing the exemption of detention for pregnant migrant women, and the federal criminalization of any migrant Latinx person seeking to cross the US-Mexico border (Executive Order 13,768). In this paper, we focus on pregnant Latina/x women who have been impacted by the removal of the exemption of detention under ICE Health Service Policy 11,032.3 *Identification and Monitoring of*

*Pregnant Detainees*. This policy is largely informed by the performance-based national detention standard (*PBNDS) 4.4 Medical Care (Women)*.

On December 14, 2017, the Trump administration, with the effort led by then-Attorney General Jeff Sessions, issued ICE Directive 11,032.3: *Identification and Monitoring of Pregnant Detainees*. According to ICE, Directive 11,032.3's purpose was to ensure that pregnant detainees "are identified, monitored, tracked, and housed in an appropriate facility to manage their care (EO 11,032.3)." The policy dictates that the Field Office Director (FDO) and Field Medical Coordinator are to be contacted upon detaining a person identified as pregnant. The policy also outlines individual responsibilities of Executive Field Officers (EFOs) such as a 72-hour window to notify facilities that they are housing a detainee who is pregnant, ensuring that detention facilities are aware of their obligations, ensuring that detainees receive appropriate care, and that the facility can provide appropriate medical care, monitoring, and knowledge regarding use of restraints (EO 11,032.3).

Neither this policy nor the PBNDS provides specific information, beyond the types of services offered, regarding what medical care for pregnant migrants should look like. There is a very strong emphasis on surveillance and tracking of the individual in custody, along with a statement of compliance with standards of care set by the National Commission on Correctional Healthcare (NCCHC) (PBNDS 4.4). The procedures and requirements outlined in EO 11,032.3 largely encompass provision of care, determining needs for care, and ensuring that if the needs of a person who is pregnant are above and beyond what the facility can provide, that they will be transferred to a facility that can meet those needs, and there is no definition of what "above and beyond" might mean (EO 11,032.3).

According to Directive 11,032.3, "ICE detention facilities will continue to provide onsite prenatal care and education, as well as remote access to specialists who remain in custody (ICE HSCP 11,032.3)." Additionally, ICE ensures access to comprehensive counseling and assistance, postpartum follow-up, and in certain cases, abortion services (U.S. Immigration and Customs Enforcement, 2011). Per the policy, services are available yet there is an absence of details related to the implementation, expectation, or quality of care of services provided.

Due to the removal of this exemption that previously allowed for pregnant migrant women and asylum seekers to not be held in detention as it is a threat to their health and well-being, pregnant Latina/x migrants and asylum-seekers were disproportionately impacted by being detained by ICE and forced to carry out their pregnancies, and for some, births, while being detained in federal custody. Pregnant migrants lacked proper and timely access to abortion (Messing et al., 2020). Many pregnant women in detention

received subpar prenatal care. This is due to several factors that highlight both systemic challenges and systemic racism within the ICE carceral system. According to the Department of Homeland Security:

> Regardless of how medical care is provided, facilities face challenges recruiting, hiring, and retaining medical staff. Specifically, remote locations, competing opportunities, difficulty offering competitive pay rates, and cumbersome hiring processes adversely affect ICE's ability to attract qualified staff. However, it is difficult to measure medical vacancy rates; facility requirements are fluid, and strategies for ensuring adequate coverage vary widely. In addition, ICE has limited options to impose consequences if contractors do not meet staffing contract terms. Challenges ICE faces in recruiting medical staff require resource-intensive mitigation (Department of Homeland Security Office of Inspector General (DHS OIG), 2021).

While the 2021 report did correlate lack of providers, low quality of care, and negative medical outcomes, it does suggest that a lack of providers may increase the risk of inadequate medical care, but at the time of this evaluation, COVID-19 limited a full assessment and determination of outcomes (DHS OIG, 2021). Contrary to these findings, the American Public Health Association argues that the rapid growth of privately contracted detention facilities has led to numerous human right concerns including but not limited to inadequate medical care, mistreatment, unsanitary conditions, and reports of reproductive violence against women (APHA, 2020). Even if there is not a direct correlation between adequate staffing and quality of care, there is a correlation between quality of care and systemic racism in the form of reproductive violence committed against migrants and asylum seekers who are detained by ICE (APHA, 2020).

Prior to the 2017 amendment, ICE policy dictated that pregnant women were "generally not detained unless their detention was mandatory under the law, or when "extraordinary circumstance" warranted detention (Policy 11,032.2)." Therefore, understanding the "zero tolerance" policy and its subsequent implications helps to understand and to frame the far-reaching impacts of the types of reproductive rights violations for Latina/o/x migrants living in the borderlands diaspora and beyond.

We use a reproductive justice lens to analyze the impact on the reproductive healthcare that Latina/x migrants and asylum seekers were provided while detained in ICE custody. Through this lens, we can explore the human right abuses that occur during this "strategy of reproductive control" (Messing et al., 2020, p. 339). The American Civil Liberties Union, Women's Refugee Commission, and the Washington Office on Latin America have identified how these policies have obstructed the reproductive and human

rights of migrants and asylum seekers in the USA. In particular, the Center for American Progress (CAP) notes numerous reports of miscarriages due to shackling, the hindering of access to abortion, solitary confinement, sexual abuse, and non-consensual gynecological services (APHA, 2020; Ellmann, 2019).

## Reproductive Justice

Using a RJ-informed lens, issues of reproduction that impact any person containing the components of a reproductive system would indicate the binary labeling of female assigned at birth. We acknowledge that not all pregnant and birthing persons identify as their gender assigned at birth. There is other existing research that addresses the ways in which border policies impact people who identify as non-binary, gender non-conforming, transgender, and/or Queer in similar and complicated ways (Fehrenbacher et al., 2020; Hubach et al., 2022; Jones, 2021). However, the case studies used in this policy analysis represent pregnant and birthing persons who are identified as female. Therefore, a policy analysis that addresses the impact on pregnant and birthing persons who do not identify as female is beyond the scope of this paper. We acknowledge that a policy analysis with a specific focus on migrant Latinx pregnant and birthing persons who identify as non-binary, transgender, and/or Queer is an area of study to consider for further research and policy assessment.

Reproductive justice (RJ) at its core is a movement that was started and continues to be led by Women of Color activists. The movement is a response to a mostly white women's movement that often excluded the unique needs of people of color and Queer and trans identifying people (who also have reproductive health needs) (Ross, 2018; SisterSong, 2022). RJ engages with intersection of immigration, citizenship status, and reproductive justice and has been concerned with these issues since the emergence of RJ focused activism (Messing et al., 2020). An RJ-focused critique embraces an intersectionality framework that critiques gender, class, race, and power simultaneously. RJ is an inclusive and right-focused framework that centers:

> The right to have children, the right not to have children, and the right to parent children in safe and healthy environments. In addition, reproductive justice demands sexual autonomy and gender freedom for every human being (Ross & Solinger, 2017, p.9).

Central to this definition of RJ is that any person who desires to reproduce, and/or who does become a parent through whichever means they choose, requires a safe and dignified context for this experience (Ross & Solinger, 2017) which extends beyond the perinatal period. RJ acknowledges



that choice and having options around reproduction are not often available to marginalized groups, which is where RJ and the more traditional abortion frameworks that center "choice" diverge as "isolating abortion from other issues of social justice fail to recognize the environments in which people make reproductive decisions" (Messing et al., 2020, p. 340).

RJ values the many ways in which people can become parents, and that ideally, people can have choice in this process. However one becomes a parent, an RJ framework highlights that all people have the right to parent in safe and healthy environments. Detention centers and federal custody are not considered safe, dignified, or healthy environments (SisterSong, 2022). RJ helps to highlight how Policy *11,032.3 Identification and Monitoring of Pregnant Detainees* denies pregnant Latinx migrant's basic human rights and reproductive rights.

The basic human and reproductive rights that were rescinded under "zero tolerance" reflect the history and systems of policies and practices that rely on discrimination and racism to promote white nationalism within the USA, socially and politically. Although "zero tolerance" was rescinded by the Biden Administration in January of 2021 (Diaz, 2021; DOJ, 2021, p.1), these human right violations have not suddenly disappeared. In fact, "zero tolerance" policies were heavily supported by many people in the USA and continue to be, especially within republican and conservative circles. Given the recent decision by the Supreme Court to overturn Roe v. Wade on June 24, 2022, we must now consider the ways in which the denial of protections to access reproductive healthcare such as abortion (and potentially other means of reproductive healthcare such as contraception) is now justified on a federal level in more than half of states within the USA (Guttmacher Institute, 2022). Therefore, consequences of such policies are compounded by the reversal of legislation that has historically protected rights to reproductive healthcare, such as abortion. We must consider how the reversal of Roe v. Wade will disproportionately impact and cause harm to pregnant Latina migrants and asylum seekers who are still being detained by ICE at the US-Mexico border. An RJ-focused lens demands the acknowledgement of an accurate historical account that informs the present and the future (Ross, 2018; Ross & Solinger, 2017).

As such, an RJ-focused application also recognizes that the US political and social structures were created to protect and serve white individuals and communities and always have had at its core, anti-immigrant sentiments. At its inception, RJ activists have always conceptualized immigration as a central RJ issue (Messing et al., 2020), which undoubtedly concerns family separation, detention of pregnant women, and access to reproductive health care while detained (National Women's Law Center (NWLC), 2017). As social workers, we do not believe that migration and immigration

are crimes. In fact, the USA became a settler colonial nation because white Europeans migrated and immigrated. The disparate application of migration as a crime for Black and Brown bodies but not so for whites is discriminatory and harmful.

This paper analyzes the ways in which "zero-tolerance" policy criminalizes migration when it concerns the movement of Black and Brown bodies, as well as how health policy was weaponized to exert power and control over those bodies. We are particularly concerned about the impact of stereotypical tropes about Latina/x sex and sexuality related to fertility and reproduction, and the impact on the reproductive health and well-being of Latinas/xs and their families (Chavez, 2011). We assert that an RJ-focused framework helps to highlight the ways in which policy 11,032.3 is shaped by and tied to the xenophobic fear that Latinx people "over reproduce" and threaten the demographic standing of the USA (Chavez, 2011).

## Statistics on Migration in 2018

Evidently, we see an increase in the numbers of pregnant migrants in custody because removing the exemption of detention did not deter women, children, and families from migrating to the USA, as many were fleeing violence in their home countries and were seeking financial opportunities (Isaacson & Hite, 2018). By August of 2018, a mere 4 months after the implementation of "zero tolerance" apprehension totals showed a 38% increase from the previous month, with 45.7% of all migrants who were apprehended reported to be children or family members (Isaacson & Hite, 2018). Therefore, removing the exemption not only increased the number of migrants who were pregnant and detained, but it also increased risk for an already incredibly vulnerable population with an insufficiently staffed carceral system. Under "zero tolerance," ICE detained pregnant people 2098 times in 2018, a 52% increase relative to 2016. The length of detention also increased, with 13% of detentions of pregnant people lasting more than 30 days (APHA, 2020).

## Case Studies Concerning Pregnant Migrants

When analyzing the policy and standards that impact pregnant migrants who have been detained in ICE custody, there is a necessity to understand the current social problems of racism xenophobia and mass incarceration in the USA. It is imperative to understand the ways in which the violation of human rights of pregnant Latina migrants is a direct reflection and outcome of that problem. For this reason, this analysis is grounded in three case studies, all from 2018, which report on the experiences of pregnant Latina migrants who



were detained at the US border because of the "zero tolerance" policy after the removal of the exemption of detention for pregnant women. These cases are evidence of reproductive abuses and human right violations that occurred under the "zero tolerance" policy, even though long-term impacts remain to be well understood.

In conducting this analysis, an RJ lens will operate to locate, critically analyze, and scrutinize the broader realm of ICE practices within the US Health Service Corps that violate human and reproductive rights (the same agency responsible for providing healthcare to all detained individuals in the USA, jails and prison systems) (Department of Homeland Security, 2021). Two of the case studies presented here come directly from the American Civil Liberties Union [ACLU] and the third is from the Washington Post; all three demonstrate that pregnant migrant Latina detainees were provided with suboptimal and inadequate healthcare while in custody, and we assert their reproductive rights were violated.

It is important to ground this topic in the framework of human rights. International human right bodies such as the International Covenant on Economic, Social and Cultural Rights (ISESCR), and Convention on the Elimination of All Forms of Discrimination Against Women (CEDAW) have played a substantial role in codifying women's sexual and reproductive health as a matter that intersects in multiple ways with the right to life, the right to be free from torture, the right to health, the right to privacy, the right to education, and the prohibition of discrimination (United Nations, 1948). The United Nations also outlines the obligations of, and examples by which, states have obligations to respect, protect, and fulfill rights related to women's sexual and reproductive health (United Nations, 1948).

We frame these case studies in the context of data on reproductive healthcare services that was reported by ICE to the United States Government Accountability Office (GAO) in 2018. According to this report, services such as ordering consultation, pregnant patient seen by an OBGYN within 30 days, prescribed prenatal vitamins, ordering of proper diet, screenings for sexually transmitted infections, and offering Hepatitis B vaccination all went unreported—GAO regarded that any data left blank was unreported and considered to be non-compliant. Services such as scheduling of OBGYN appointments, documentation of consultation in a timely manner, documentation of prenatal education, medical record reviews, and ordering appropriate labs ranged between 75 and 80% compliance in 2018 (GAO, 2020). This data points to some of these issues faced by pregnant migrant Latinas concerning reproductive rights while in the custody of ICE.

In specific case-by-case findings from 2015 to 2019, the inspection found compliance deficiencies in the areas of at least one detained person not receiving health appraisal within 48 h of arrival and therefore was also not afforded access to specialized care and obstetric evaluation, lack of access to a mental health assessment after miscarriage while in custody, lack of documentation regarding outcome of and completion of pregnancy tests, and lack of documentation regarding miscarriage at a previous facility, and the use-of-force policy did not include pregnant detainees nor did it address special precautions regarding use of restraints (GAO, 2020). Furthermore, the GAO reports that many of these instances of compliance violation occurred at private immigration detention facilities that were not staffed with ICE Health Service Corps members (GAO, 2020). This again raises the issue of the problematic use of privatized carceral systems to house-detained migrants, and the ways in which it leaves migrants vulnerable to obstruction of their reproductive rights.

## Case Study #1: Jane Doe vs. Trump Administration

In September 2017 a young migrant woman crossed into the United States and discovered that she was pregnant soon after. While in ICE Custody, this woman expressed that she wanted to access an abortion, but the Trump Administration did not approve this. That panel included Judge Brett Kavanaugh. Jane Doe, a pregnant 17-year-old unaccompanied immigrant minor, was effectively held hostage by the government to stop her from accessing abortion. The Trump administration ordered the private shelter where she was staying to prevent her from going to any abortion-related appointments. While the court battle raged, the government's obstructionism pushed Doe further along in her pregnancy against her will. She always remained resolute in her decision to terminate her pregnancy. Yet day after day, she was forced to sit in the shelter, waiting to hear whether she would be able to have an abortion or whether she would be forced to carry the pregnancy to term. An emergency order from a lower court allowing Doe to have the abortion was secured, but the government appealed. Over a vigorous dissent by Judge Patricia Millett, Judge Kavanaugh wrote a decision that allowed the government to further obstruct Jane's abortion. By the time of Judge Kavanaugh's ruling, the Trump administration had already delayed Doe's abortion by almost a month. The decision allowed the government to continue to obstruct her abortion while the government looked for a sponsor for Jane, which they had been unsuccessful in finding for the prior month and a half. As Judge Millett put it, there was no "reason to think that a sponsor" could be found in "short order." As a result, Judge Kavanaugh's order would force Doe to delay her abortion for "multiple more weeks." Because fur-



ther delay was clearly unacceptable, the full court of appeals was asked to review the case. It did so, and reversed Judge Kavanaugh's decision, ordering the government to allow Doe to have an abortion without further delay (Amiri, 2018, The American Civil Liberties Union [ACLU]).

Under policy 11,032.3, medical care for women falls to the 2008 *PBNDS 4.4* "Medical Care" (U.S. Immigration and Customs Enforcement, 2011). According to the purpose and scope of this PBNDS, "the detention standard ensures that female detainees in U.S. Immigration and Customs Enforcement (ICE) custody have access to appropriate and necessary medical health care." Additionally, when policy 11,032.3 was enacted, it was stated in the PBNDS that "a pregnant detainee in custody shall have access to pregnancy services including routine or specialized prenatal care, pregnancy testing, comprehensive counseling and assistance postpartum follow-up, lactation services and in some cases abortion services" (U.S. Immigration and Customs Enforcement, 2011, p.324). RJ illuminates how in practice this standard was not enacted and in fact healthcare was denied, because timely access to abortion would be seen as a procedure that was both appropriate and necessary for this woman (Ross & Solinger, 2017).

For the case *Jane Doe v. Trump Administration*, Jane Doe was (1) nearly denied an abortion and (2) held up in a month-long process of fighting for an abortion for so long, that she nearly missed the window for which it would have been safe for her body, and legal for her to access an abortion, which means she was forced to endure an unwanted pregnancy for a certain amount of time. This case study is a direct example of reproductive violence in that prior to 2020, it was standard practice for ICE to deny abortions to minors who are in custody (APHA, 2020). Even after a prohibition was placed on preventing access to abortion care, state laws often restricted access in the form of mandatory waiting periods and gestational age limits (APHA, 2020). In 2022, with the reversal of Roe v. Wade, pregnant migrants and asylum seekers will face even greater limitations on timely access to abortion, considering that much of the US border with Mexico coincides with states such as Arizona and Texas that have already or will soon place severe restrictions on abortion if not eliminating access completely (Jiménez, 2022).

There was no indication in this story that this person was being held in ICE custody for other than that she was seeking asylum in the USA and fleeing violent family members. Under the policy that superseded 11,032.3, also known as 11,032.2: *Identification and Monitoring of Pregnant Detainees*, Jane Doe, as a pregnant woman, would not have necessarily been detained in ICE custody for arriving at the border and seeking asylum. Under previous policy,

the detention of a pregnant migrant was mandatory under the law, only when "extraordinary circumstance" (such as having committed a criminal offense) warranted detention (ICE Directive 11,032.2).

Not only was Jane Doe criminalized and detained at the border, but Jane Doe was also held hostage by the Trump administration when she sought out an abortion. This administrative decision and migrant experience ultimately highlight what Ross and Solinger (2017) have already stated as a means for imperial power and control:

> No matter what kinds of regulations the government, the church, the family, or other authorities created, girls and women have always done what they could do to shape their own reproductive lives. These assertions have particular meaning for the lived experiences of women of color, whose reproductive capacity has constituted both a key engine for white power and wealth historically and a touchstone for those who want to distinguish the "value" of women's reproductive bodies by race. These perspectives make clear that women of color have been targeted in distinctive, brutal ways across U.S. history (Ross & Solinger, 2017, p. 87).

It becomes clear that the ICE Health Service Corps did not have the sole autonomy to help this woman in her decision to get an abortion. Instead, the Trump administration, with the support of the US supreme court, detained this woman and withheld necessary medical care, until an appeal emergency order by the ACLU allowed for an appeal that ordered the government to allow Jane Doe to access abortion.

The Trump administration was in direct violation of the sexual and reproductive rights of Jane Doe in two ways. The first being when the supreme court was accessed as a third party to delay the authorization of Jane Doe's access to services (in this case, an abortion); the second was an attempt to deny access to abortion, as a service that only women require (Ellmann, 2019). The third was a direct violation of CEDAW (article 16) by obstructing her rights to "freely and reasonably" make decisions about her pregnancy (CEDAW, Article 16). These violations specifically reflect the failure of PBNDS 4.4 to protect a detained migrant's right to determine and consent to their reproductive healthcare as well as failure to prevent the psychological harm that would accompany carrying an unwanted pregnancy. Within the RJ framework, these failures are a direct confirmation of how systemic racism and inequality shapes power dynamics in terms of decision-making, access, and dignity around all aspects of reproductive rights and freedoms and access to healthcare (APHA, 2020). The failure of ICE HSC to protect migrants with healthcare policy and performance standards is evidence that showcases how this impacts those who are



most vulnerable to systems of oppression and state violence (APHA, 2020).

## Case Study #2: 23-Year-Old Asylum Seeker Requires Prenatal Care

A 23-year-old asylum seeker was detained at a U.S. port of entry when she was 12 weeks pregnant. She was held in ICE custody for three months and transferred between facilities six times. One transfer between New Mexico and Texas took 23 hours and landed her in the hospital for exhaustion and dehydration. She experienced nausea, vomiting, weakness, headaches, and abdominal pain during her detention and did not receive sufficient prenatal vitamins or adequate medical attention (López, 2018, The American Civil Liberties Union (ACLU)).

This case study highlights several violations of human and reproductive rights. Under policy 11,032.3 and PBNDS 4.4, this woman was transferred to different facilities in different states, six times. According to the report, there is a correlation between these transfers and the hospitalization for dehydration and exhaustion, reifying the argument that immigration detention is dangerous for maternal health (Ellmann, 2019). While in ICE custody, this woman (1) did not "receive routine, age appropriate gynecological and obstetrical health care," (2) did not "receive age- appropriate assessments and preventative women's health services, as medically appropriate, and (3) did not "have access to pregnancy services including routine or specialized prenatal care" (U.S. Immigration and Customs Enforcement, 2011, p. 323). All of which are standards of care within PBNDS 4.4 from a human right perspective, if the US government is making the claim that it is necessary to take thousands of Latina/o/x migrants into custody, it should also be held responsible for assuming the responsibility of providing adequate healthcare to those individuals.

The Committee on Economic, Social and Cultural Rights (CESCR) affirms health as a fundamental human right, and entitlement, to the highest attainable standard of health that reflects a life with dignity (United Nations Human Rights Office of the High Commissioner (OHCHR), n.d.). Regarding maternal health, CESCR affirms the health of pregnant and parenting persons to be a core obligation, of which the state has "immediate obligation to take deliberate, concrete, and targeted steps towards fulfilling the right to health in the context of pregnancy and childbirth" (OHCHR, n.d.). The right to maternal and reproductive health also includes access to pre-natal care, which this person was denied, and thus was not provided with a safe and dignified context in which to be fertile, reproduce, or become a parent (Ross & Solinger, 2017).

## Case Study #3: Pregnancy Ends in Stillbirth

A 24-year-old woman went into premature labor and delivered a stillborn baby while she was in custody at an Immigration and Customs Enforcement detention center in South Texas last week, officials said. The woman, a migrant from Honduras whose identity the agency withheld, was arrested near Hidalgo, Tex., on Feb. 18, 2018. She was six months pregnant at the time. Four days later, she went into labor and delivered a premature and unresponsive baby boy. Local doctors pronounced the newborn dead soon after. In a statement, officials said the Department of Homeland Security, which oversees ICE and U.S. Customs and Border Protection, doesn't count stillbirths as in-custody deaths; rather, they're recorded in their own category, along with miscarriages. An ICE spokesman said stillbirths are very rare, but the announcement drew swift public condemnation from advocates and migrant rights groups (Thebault, 2019, The Washington Post).

Had this woman been transferred to a hospital with prenatal and perinatal services, this woman and her premature infant may have received the immediate medical attention they required, instead of being forced to give birth within the confines of an ICE health facility that was likely understaffed and not equipped to medically intervene in the instance of premature birth. It is possible that the outcome of this case was related to the conditions that this woman experienced while in ICE custody and the care received through the ICE Health Services Corps.

Media reporting confirmed that (1) the woman gave birth prematurely; (2) premature birth ended in a stillbirth, and (3) the government denied responsibility of this outcome (Thebault, 2019). As demonstrated within the previous case study, adequate prenatal care and a birth environment where women have access to medical intervention are not only appropriate, but also a codified human right. Despite this, it appears unlikely that there is a routine practice of preventive health services provided while in ICE custody and therefore demonstrates a failure to provide adequate reproductive healthcare to a migrant person in ICE custody.

Each case study demonstrates several violent themes such as delayed care and treatment, the denial of care and treatment, the violation of the right to healthcare, and the lack of protections for migrants requiring healthcare access while detained. HRW (2013) identify the following as violations to the human right to reproductive healthcare: inaccurate information about available services, barriers to clinic access, lack of interpreters, invasion of privacy, and violations of consent for medications and procedures.

In framing the failures of ICE HSC throughout each case study, it is essential to understand that these human



right violations are common-place and point to a larger systemic failure which can be attributed to a culture of white supremacy that functions to justify and facilitate state-sanctioned violence against pregnant migrant Latinas, and Latinx migrants in general. Furthermore, the ICE medical context does not provide a safe emotional space to process through these distinctly migrant, Latina/o/x Brown and Black–embodied experiences, which points to more avoidable emotional harm and physical trauma, in the form of structural violence.

## Implications for Social Work

### Implications for Social Work Practice and Policy Advocacy with Immigrants and Their Families

Alongside the human and reproductive right abuses of this policy, it did not actually meet its intended goals of curtailing immigration or keeping Americans safe (Morey, 2018). "Zero tolerance" and the removal policy was extremely expensive especially compared with alternative options such as community-based detention programs (which monitor families seeking asylum and supports their compliance with judicial processes) (Kandel, 2018). Congress in fact did not allot special funding for "zero tolerance" and one major critique is that it diverted funds away from monitoring actual criminal activity, which ultimately left the US-Mexico border more unsafe that previously so (Kandel, 2018). From a financial analysis alone, this policy was unsuccessful, and it has done little to nothing to curb migration at the US-Mexico border, which was stated by Jeff Sessions as the intended goal. As social workers, although we feel strongly against any criminalization of migrants, this is a much more human right alternative to automatic federal detention and can increase the likelihood that people can seek healthcare.

Interdisciplinary and interprofessional collaboration should be emphasized in practice based on the premise that human beings are global citizens, and there should be freedom of movement for all people, those fleeing economic hardships, climate change, violence, and war. Social workers are well positioned to partner with other professionals to provide support to immigrants, migrants, refugees, and asylum seekers. Many social work academics and practitioners carry much expertise already in a human right–based approaches to practice with migrant communities. The Declaration of Human Rights clearly states that every human being has the right to choose autonomy, dignity, and community, and to access basic needs required to live (United Nations, 1948). To support efforts that in many places have already been underway for some time is to advocate for policies that support healthcare for all people, especially the most vulnerable. As we are currently living in a time where

access to safe and legal abortions is being criminalized and banned in many states within the USA, it has become illegal and extremely challenging for many people to access abortion in states that are largely conservative (Jiménez, 2022). Prior to the over-turn of Roe v. Wade, it is evident that the administration took advantage of the opportunity to deny this right to migrants and asylum seekers as some of the most vulnerable and disenfranchised people. Even with our own National Association of Social Workers (NASW) moving to denounce the Trump administration's policies formally (NASW, 2019), pregnant migrants and asylum-seekers will continue to disproportionately face the denial of essential reproductive healthcare and services when they are detained in federal custody.

Unfortunately, what is being reported demonstrates that thousands of women are forced to go without essential reproductive healthcare and services while in ICE custody. Therefore, not only is policy 11,032.3 in violation of the reproductive rights of pregnant Latina migrants, but Executive Order 1378 is in violation of the reproductive rights of all detained Latinx migrants. These policies have major implications for migrant and immigrant healthcare. This is especially the case in a world where climate change will force migration, and in considering the numerous humanitarian crises occurring globally and on nearly every continent.

We also hope that this analysis underscores the utility of a specific RJ-informed praxis in social work. RJ offers social workers a digestible framework through which to address intersectionality-informed RJ approaches in their practice with children, youth, and families. Social workers in any setting should actively support efforts for families to remain intact whenever possible, especially in the context of trauma work and utilizing trauma-informed approaches (Kopels, 2018), because RJ emphasizes and acknowledges trauma work from systems perspectives that underscore the interconnectedness and relational aspect of supporting healing and resilience against reproductive injustice and human right violations. Pregnant and parenting Black and Brown bodies are not disposable; they matter and reflect resilience, resistance, and healing which is an inherent component of the Latina experience that often goes overlooked (Kiehne & Androff, 2021).

Social work is a values and ethics–based profession that aspires for social justice for all people and supports the health and well-being of communities and families. Reproductive-related policies and healthcare access are central to supporting families and communities. It is likely that those directly impacted by "zero tolerance," directly, will have to manage mental health challenges, and social workers are currently and will continue to provide services to this population, and an analysis could inform mental health promotion efforts for refugees, migrants, immigrants, asylum seekers, and new Americans. Considering also that many Latinx



migrants like other groups who are forced to migrate are 2SLGBTQIA + individuals who are feeling gender-based violence, a central concern for the RJ movement, many social workers are likely to support the many people harmed by "zero tolerance" in the USA and other discriminatory policies in other countries and localities.

## Implications for Social Work Education

This policy analysis is useful and important for teaching content related to immigration policy, migrant, and immigrant healthcare, as well as human right violations. It is important to frame for social work students that these policies represent and perpetuate a violent legacy of the white colonial regime—wherein the activity, and in this case, migration and reproduction of Latina/o/x bodies are of concern to the American government (Manian, 2020; Sirkin et al., 2021). The Trump administration's removal of the exemption of detention under ICE Health Service Policy 113,032.3 functioned to violate the reproductive rights and bodies of women—and did so in ways that arguably supported the administration's agenda and concerns regarding migration into the USA via the US-Mexico border.

It is the onus of social work students and practitioners to question, examine, and critique any way in which modern legislation functions as a mechanism to impose imperial power and control onto racialized and migrating bodies. It is a matter of social work pedagogy to call attention to this matter as well as to frame it historically, in the social work classroom. The three case studies offered in this paper are important examples of the nuanced and complex issue that is the detention of pregnant migrants and asylum seekers for doing nothing other than simply migrating.

This policy analysis also has potential to reach social work students who might be interested in these specific policy issues concerning Latino/a/x migration and reproductive justice but may be geographically located far away from the US-Mexico border. It also functions to call attention to a matter that one may not know much about depending on their location. More broadly, this policy analysis, in conjunction with others like it, may be used to think critically about and address past, present, and future policies that are written to exert power, control, and violence via human right violations over other racialized and migrating bodies.

Finally, the reproductive and racial justice issues noted here in this analysis hold implications for all populations that social workers work with. With migration increasingly occurring throughout the world due to ever-present conflict and persecution, climate change, and poverty (Kandel, 2018), social workers must consider and understand that similar policies have been written and will continue to be implemented by regimes and are situated in colonialism, power, and control

of those in power. If we, as social workers assert that migration is a basic human freedom, we must also be aware of the modern-day policies that criminalize migration and jeopardize the health and well-being of vulnerable, marginalized, and displaced persons and families (Kopels, 2018).

## Conclusions

Alongside a broad range of human right violations listed here, criminalization and detention of migrants from Central and South America did not yield the results that the Trump administration hoped for and did little to deter migration (Sirkin et al., 2021). This is because this inhumane policy never once addressed the structural issues (inclusive of climate change and violence) that create situations where adults, children, youth, and families must seek asylum in USA. The enforcement of "zero tolerance" and the subsequent human right violations that accompanied it only reinforced a climate of discrimination and xenophobia and questions "whether the U.S. is abiding by human rights and refugee related international protocols" (Kandel, 2018, p. 16).

Lastly, we end by acknowledging and appreciating the extremely hard work of frontline social work practitioners, activists, and educators who have been sounding the alarm about reproductive injustices and Latina/o/x communities for what feels like forever. A policy such as "zero tolerance" is inconsistent with the social work code of ethics, and we acknowledge the distress and secondary trauma that comes from engaging in this work and bearing witness to human right abuses such as the ones mentioned here (Byers & Shapiro, 2019). More women are in federal custody than ever before and the number of girls and women seeking asylum is growing (HRW, 2013). The criminalization of migration is a means to justify the implementation of racist and xenophobic legislation that criminalizes migration and violates basic human rights (Monico et al., 2019). Understanding the impact of "zero tolerance" informs how social work moves forward in supporting migrants and immigrants, especially Black and Brown immigrants who are challenged with racist and xenophobic policies, often times from wealthy and "developed" nations like the USA.

## Declarations

**Conflict of Interest**  The authors declare no competing interests.

## References

American Public Health Association. (2020, October 24). *A call to investigate and prevent further violations of sexual and reproductive health and rights in immigration detention centers*. https://www.apha.org/policies-and-advocacy/



public-health-policy-statements/policy-database/2021/01/13/a-call-to-investigate-immigration-detention-centers

Amiri, B. (2018, July 18). Brett Kavanaugh's one abortion case. *The American Civil Liberties Union (ACLU))*. https://www.aclu.org/blog/reproductive-freedom/abortion/brett-kavanaughs-one-abortion-case

Byers, D. S., & Shapiro, J. R. (2019). Renewing the ethics of care for social work under the Trump administration. *Social Work, 64*(2), 175–180.

Chavez, L. R. (2011). Latina sexuality, reproduction, and fertility as threats to a nation. In R.D. & J.F. Editor (2nd Eds.), *The Latino Condition* (pp. 531–541). New York University Press.

Chishti, M., Pierce, S., & Bolter, J. (2017, Jan 26). *The Obama record on deportations: Deporter in chief or not?* https://www.migrationpolicy.org/article/obama-record-deportations-deporter-chief-or-not

Department of Homeland Security Office of Inspector General. (2021, 29 October). *Many factors hinder ICE's ability to maintain adequate medical staffing at detention facilities.* https://www.oig.dhs.gov/sites/default/files/assets/2021-11/OIG-22-03-Oct21.pdf

Department of Justice. (2018, April 6). Attorney general announces zero tolerance policy for criminal illegal entry. https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry

Department of Justice. (2021, January 13). *DOJ OIG releases report on the Department of Justice's planning and implementation of its zero-tolerance policy and its coordination with the Departments of Homeland Security and Health and Human Services.* Office of the Inspector General. https://oig.justice.gov/sites/default/files/2021-01/2021-01-14.pdf

Diaz, J. (2021, January 27). *Justice department rescinds Trump's 'zero tolerance' immigration policy.* National Public Radio. NPR.org.

Ellmann, N. (2019, 21 October). Women's health and right in immigration detention. Center for American Progress (CAP). https://www.americanprogress.org/article/womens-health-rights-immigration-detention/

Fehrenbacher, A. E., Musto, J., Hoefinger, H., Mai, N., Macioti, P. G., Giametta, C., & Bennachie, C. (2020). Transgender people and human trafficking: Intersectional exclusion of transgender migrants and people of color from anti-trafficking protection in the United States. *Journal of Human Trafficking, 6*(1), 182–194.

Gutierrez, A. M., Hofstetter, J. D., Dishner, E. L., Chiao, E., Rai, D., & McGuire, A. L. (2020). A right to privacy and confidentiality: Ethical medical care for patients in United States immigration detention. *Journal of Law, Medicine & Ethics, 48*(1), 161–168.

Guttmacher Institute. (2022). *Roe v. Wade overturned: Our latest resources.* https://www.guttmacher.org/abortion-rights-supreme-court#

Hampton, K., Mishori, R., Griffin, M., Hillier, C., Pirrotta, E., & Wang, N. E. (2022). Clinicians' perceptions of the health status of formerly detained immigrants. *BMC Public Health, 22*(1), 1–11.

Hubach, R. D., Zipfel, R., Muñoz, F. A., Brongiel, I., Narvarte, A., & Servin, A. E. (2022). Barriers to sexual and reproductive care among cisgender, heterosexual and LGBTQIA+ adolescents in the border region: Provider and adolescent perspectives. *Reproductive Health, 19*(1), 1–11.

Human Rights Watch (HRW). (2013, May 22). *Turning migrants into criminals: The harmful impact of US border prosecutions.* https://www.hrw.org/report/2013/05/22/turning-migrants-criminals/harmful-impact-us-border-prosecutions#

Immigration and Customs Enforcement (ICE). (n.d.). ICE health service corps focused on the best patient outcomes. https://www.ice.gov/features/health-service-corps

Isaacson, A., & Hite, A. (2018, September 13). August border statistics show that Trump's policies are not deterring migration. *Washington Office on Latin America (WOLA).* https://www.wola.org/analysis/august-border-statistics-show-trumps-policies-not-deterring-migration/

Jiménez, J. (2022, 4 May). What is a trigger law? And which states have them? *The New York Times.* https://www.nytimes.com/2022/05/04/us/abortion-trigger-laws.html

Jones, A. (2021). 'People need to know we exist!': An exploratory study of the labour experiences of transmasculine and non-binary sex workers and implications for harm reduction. *Culture, health & sexuality*, 1–15.

Kandel, W. (2018). The Trump administration's "zero tolerance" immigration and enforcement policy. *Congressional Research Service*, 1–20.

Kiehne, E., & Androff, D. K. (2021). Advancing integration: The social work response to restrictionist US immigration policies. *Journal of Poverty, 25*(2), 119–137.

Kopels, J. D. (2018). Family separation, zero tolerance, and advocacy. *School Social Work Journal, 43*(1), IX–XIV.

Liptak, A., & Shear, M. D. (2018, June 26). *Trump's travel ban is upheld by the supreme court.* The New York Times. https://www.nytimes.com/2018/06/26/us/politics/supreme-court-trump-travel-ban.html

López, V. (2018, May 3). Working to uncover how ICE treats pregnant women. *American Civil Liberties Union (ACLU).* https://www.aclu.org/blog/immigrants-rights/immigrants-rights-and-detention/working-uncover-how-ice-treats-pregnant-women

Manian, M. (2020). Immigration detention and coerced sterilization: History tragically repeats itself. *American Civil Liberties Union.* https://www.aclu.org/news/immigrants-rights/immigration-detention-and-coerced-sterilization-history-tragically-repeats-itself

Messing, A. J., Fabi, R. E., & Rosen, J. D. (2020). Reproductive injustice at the US border. *American Journal of Public Health, 110*(3), 339–344.

Monico, C., Rotabi, K., Vissing, Y., & Lee, J. (2019). Forced child-family separations in the Southwestern US border under the "zero-tolerance" policy: The adverse impact on well-being of migrant children (part 2). *Journal of Human Rights and Social Work, 4*(3), 180–191.

Morey, B. N. (2018). Mechanisms by which anti-immigrant stigma exacerbates racial/ethnic health disparities. *American Journal of Public Health, 108*(4), 460–463.

National Association of Social Workers. (2019, July 15). *NASW condemns Trump administration's nationwide removal raids on immigrant families.* https://www.socialworkers.org/News/News-Releases/ID/1973/NASW-Condemns-

National Women's Law Center (NWLC). (2017, A). *Immigrant rights and reproductive justice: How harsh immigration policies harm immigrant health.* https://nwlc.org/wp-content/uploads/2017/04/Immigrant-Rights-and-Reproductive-Justice.pdf

Ohta, R., & Long, C. (2019). How should health professionals and policy makers respond to substandard care of detained immigrants? *AMA Journal of Ethics, 21*(1), 113–118.

Physicians for Human Rights (PHR). (2019, September 4). *U.S. government confirms migrant children experienced severe mental health issues following "family separation".* https://phr.org/news/u-s-government-confirms-migrant-children-experienced-severe-mental-health-issues-following-family-separation/

Ross, L. J. (2018). Reproductive justice as intersectional feminist activism. *Souls Journal, 19*(13), 159–180.

Ross, L. J., & Solinger, R. (2017). *Reproductive justice: An introduction.* University of California Press.

Sirkin, S., Hampton, K., & Mishori, R. (2021). Health professionals, human rights violations at the US-Mexico border, and holocaust legacy. *AMA Journal of Ethics, 23*(1), 38–45.

SisterSong. (2022). Reproductive justice. Sistersong: Women of color reproductive justice collective. https://www.sistersong.net/reproductive-justice

Southern Poverty Law Center (SPLC). (2022, March 23). *Family separation-a timeline.* https://www.splcenter.org/news/2022/03/23/family-separation-timeline



Thebault, R. (2019, February 25). A 24 year old Honudran woman's pregnancy ended in a stillbirth at an ICE detention center. *The Washington Post*. https://www.washingtonpost.com/nation/2019/02/26/year-old-honduran-womans-pregnancy-ended-stillbirth-an-ice-detention-center/

United Nations. (1948). *Universal declaration of human rights*. https://www.un.org/en/about-us/universal-declaration-of-human-rights

United Nations Human Rights Office of the High Commissioner. (n.d.). Sexual and reproductive health and rights. https://www.ohchr.org/en/node/3447/sexual-and-reproductive-health-and-rights

U.S. Government Accountability Office. (2020, March 24). *Immigration detention: Care of pregnant women in DHS facilities*. https://www.gao.gov/products/gao-20-330

U.S. Immigration and Customs Enforcement. (2011). *4.4 medical care (women)*. Performance Based National Detention Standards. https://www.ice.gov/doclib/detention-standards/2011/4-4.pdf

**Publisher's Note** Springer Nature remains neutral with regard to juridictional claims in published maps and institutional affiliations.

Springer Nature or its licensor holds exclusive rights to this article under a publishing agreement with the author(s) or other rightsholder(s); author self-archiving of the accepted manuscript version of this article is solely governed by the terms of such publishing agreement and applicable law.

