# United States Court of Appeals
## For the First Circuit

---

Appeal # 25-1158

State of New Jersey, et al.
vs.
(President) Donald Trump, et al.

---

**2nd EMERGENCY - _MOTION to AMEND Appellant's pro se APPEAL BRIEF to ADD... new/ additional issues raised on appeal_..... The the State of Michigan/ City of Flint murders its children and has a horrific history of**

*neglect and mistreatment of the children in the State of Michigan (e.g. whereby MI AG - Dana Nessel, Flint Chief Terrance Green, Flint City Council "leadership" [e.g. Candice Mushatt and Ladell Lewis], and Genesee County Sheriff - Chris Swanson, and Michigan Governor Gretchen Whitmer has ALL apparently and ARE covering it up ]) filed by Melvin Jones Jr. - pro se appellant - intervenor.*

*continued on the NEXT page*

# 2nd - MOTION TO AMEND APPELLANTS PRO SE BRIEF:

**To add:**

**That the preliminary injunction should be CHANGED to specifically restrict:**



- *Preganant migrant and/ or pregnant illegal alien woman from ANY and ALL countries ...be it via tourism birth immigration fraud, illegal border crossing immigration fraud, or "mail order bride/ marriage" immigration fraud from having [her]*

*newborn baby to be considered [a] lawful U.S. citizen... until the appropriate U.S. immigration authorities determine [e.g. with a 6 month window to do so... PRIOR TO ISSUANCE OF A U.S BIRTH CERTIFICATE {but allowing immediately appropriate*

*medical care and attention to the newborn baby at issue}]... to determine which State and County is most SAFE for the birth mother [e.g. unlawful migrant] and her NEW BORN BABY ...which is to say.... that States and Cities such as the State of Michigan*

*and City of Flint should be EXCLUDED from receiving and/ or having any such {new born baby …born to an illegal alien and/ or undocumented migrant} to remain in the State of Michigan in general …due to the State of Michigan's horrific history of its*

*leaders [e.g. such as Michigan AG - Dana Nessel and Flint Mayor Sheldon Neeley]... literally covering of wrongful deaths/ murder of little Black African American children and covering up [e.g. and hiding from the district court as to civil case*

*#25-cv-10139]... the State of Michigan's conscious shocking abuse of its children in MANY cities:*

* *SEE the Detroit Free Press News Article affixed hereto,*

* *And SEE ALSO ...[a] recent decision issued by the 6th Circuit Court of Appeals... against the*

*City of Flint/ City of Flint Mayor Sheldon Neeley [re: civil case Barton v. Neeley] #23-2089.*

*Simply put, the aforementioned are NEW issues which [I] wish to raise on appeal... whereby the preliminary injunction which the district court*

*issued... which gave rise to my/ our [Colleen Connors and my {e.g. Melvin Jones Jr's} instant appeal is MUCH TOO board and vague as written... and as such .... It BLINKS LEGAL REALITY that "blue Democratic States" and cities such as the State of Michigan and City of Flint*

*are an IMMINENT DANGER to the health and safety of ANY newborn baby ...whether a natural born U.S. citizen [or] a new born baby born of a mother who is an undocumented migrant/ illegal alien... regardless of what country the birth mother is from.*

*Respectfully submitted.*

*Thank you.*

*Best,*

*Date: 2-27-2025*

_____

*Melvin Jones Jr. disabled*

*PRO SE appellant*

*1935 Hosler St.*

*Flint, Michigan*

*48503*

*Email: jonesjrmel@gmail.com*

*Google voice to text ph#*

*415-562-5074*

*SEE THE ATTACHED EXHIBIT…. on the next pages:*

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0201p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

RAYMOND C. BARTON,

*Plaintiff-Appellee,*

*v.*

SHELDON NEELEY,

*Defendant-Appellant.*

┐
│
│
├ No. 23-2089
│
│
┘

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-10051—Nancy G. Edmunds, District Judge.

Argued: July 23, 2024

Decided and Filed: August 27, 2024

Before: GILMAN, GRIFFIN, and MATHIS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Chelsea S. Down, THE WILLIAMS FIRM, P.C., Grand Blanc, Michigan, for Appellant. Stacey L. Heinonen, ARNOLD E. REED & ASSOCIATES, P.C., Southfield Michigan, for Appellee. **ON BRIEF:** Chelsea S. Down, Kendall B. Williams, THE WILLIAMS FIRM, P.C., Grand Blanc, Michigan, for Appellant. Stacey L. Heinonen, Arnold E. Reed, ARNOLD E. REED & ASSOCIATES, P.C., Southfield Michigan, for Appellee.

———————————

## OPINION

———————————

GRIFFIN, Circuit Judge.

Two young African American boys died after two City of Flint firefighters failed to properly sweep a burning house. Then-City Fire Chief, plaintiff Raymond Barton, tried to

discharge the firefighters for gross misconduct, but Flint's Mayor, defendant Sheldon Neeley, intervened and allegedly covered up the firefighters' malfeasance to advance his support from the firefighters' union in an upcoming election. When Chief Barton refused Mayor Neeley's directives to cover up the malfeasance, Neeley fired Barton. In this lawsuit, Barton claims that his termination constitutes retaliation in violation of his First Amendment rights. The district court denied Neeley's motion to dismiss on qualified-immunity grounds, spurring this interlocutory appeal. Because Barton plausibly pleaded a violation of his First Amendment rights, and it is clearly established that public employees cannot be compelled to make false, politically motivated statements on matters of public concern in response to threats of retaliation, we affirm the district court's denial of qualified immunity to Neeley.

I.

The following facts are alleged in the operative complaint, which we accept as true for purposes of the motion to dismiss. *Mynatt v. United States*, 45 F.4th 889, 893 (6th Cir. 2022).

In May 2022, six Flint firefighters responded to a house fire and were informed that residents likely were still in the home. Two of those firefighters, Daniel Sniegocki and Michael Zlotek, entered the home to search for the residents. Sniegocki and Zlotek claimed that they thoroughly searched all the rooms on the second floor using infrared equipment and thermal-imaging cameras, and they subsequently declared the home "all clear." A few minutes later, however, other firefighters entered the home and immediately found two African American boys, visible to the naked eye, lying on the floor in a second-floor bedroom. The boys eventually died from the fire.

Barton, who was the City's Fire Chief at that time, concluded that Sniegocki and Zlotek lied about their search efforts—potentially due to racial animus. He noted that the boys were African American while Sniegocki and Zlotek are Caucasian, the boys were readily observable, and Sniegocki and Zlotek refused to cooperate with the investigation. So Barton recommended to the city council and city officials, including Mayor Neeley, that Sniegocki and Zlotek be suspended without pay pending a final investigation and that they be discharged at the conclusion of that investigation.

Neeley disagreed.  He instructed Barton to change the recommendation by "alter[ing] official reports to disguise the firefighters' misconduct, suspend[ing] the firefighters with pay, and drop[ping] his recommendation that they be discharged."  Politics allegedly motivated Neeley's orders to Barton:  Neeley was running for re-election and needed the support of the firefighters' union, which he did not believe he would get if Barton terminated Sniegocki and Zlotek's employment.  Barton refused, telling Neeley that, as Fire Chief, he had a duty to be truthful to the public, and "in his personal capacity, [he] was unwilling to make false statements or profess professional judgments that he did not actually hold."  Specifically, Barton alleges that he was "unwilling to participate in a cover-up of firefighter misconduct that was likely motivated by racism."

So Neeley acted on his own, "unilaterally and surreptitiously chang[ing] [Barton's] official recommendation."  Neeley also "instructed Chief Barton to make a public announcement saying that he initiated the change and agreed with it."  Again, Barton refused Neeley's demands and "reminded Mayor Neeley [that] he would not make false statements."  At a subsequent city council meeting, Barton "explained that he had not changed his recommendation and that he wanted to discharge Sniegocki and Zlotek from the fire department."

Meanwhile, Neeley was re-elected as Mayor.  Nine days later, he allegedly "called Chief Barton into his office and told Chief Barton to resign as fire chief or be fired because Chief Barton had refused to serve Mayor Neeley's personal interests by participating in the cover-up of the firefighters' misconduct."  Barton refused, so Neeley terminated Barton's employment.

Barton contends in this lawsuit, brought under 42 U.S.C. § 1983, that his firing constitutes retaliation in violation of the First Amendment.  Neeley moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing in relevant part that Barton failed to plausibly plead this claim, and alternatively, that he was entitled to qualified immunity. The district court denied Neeley's motion, and Neeley timely filed a notice of interlocutory appeal.

II.

We review de novo a district court's denial of a motion to dismiss based on qualified immunity. *Anders v. Cuevas*, 984 F.3d 1166, 1174–75 (6th Cir. 2021). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 562 (6th Cir. 2011) (explaining that in qualified-immunity appeals, "[w]e apply the ordinary standard used in reviewing motions to dismiss, accepting well-pled factual allegations as true"). "A claim is plausible on its face" if the pleaded "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Notably, "a well-pleaded complaint may [survive a motion to dismiss] even if . . . recovery [seems] very remote and unlikely." *Stratton v. Portfolio Recovery Assocs. LLC*, 770 F.3d 443, 447 (6th Cir. 2014) (internal quotation marks omitted). When considering a motion to dismiss, we must accept as true all factual allegations in the complaint, *see Napolitano*, 648 F.3d at 369, and must read the complaint's allegations "as a whole," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011).

III.

A.

The sole issue on appeal is whether Mayor Neeley is entitled to qualified immunity at the pleadings stage. Qualified immunity is an affirmative defense that protects public officials, in certain circumstances, from liability for civil damages when they violate a person's constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). We ask two questions to determine whether a public official is entitled to qualified immunity: (1) whether the facts alleged support a violation of the plaintiff's constitutional rights, and (2) if they do, whether that

right was clearly established at the time of the defendant's alleged misconduct.  *Id.* at 232; *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578–79 (6th Cir. 2022).  If the public-official defendant did not violate a constitutional right, or if he did but the right was not clearly established at the time of the violation, then the defendant is entitled to qualified immunity.  *See Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).  It is "generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity."  *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019) (citation omitted).  This case is no exception.

### B.

Beginning with prong one of the qualified-immunity analysis, we hold that Barton plausibly alleged that he engaged in conduct protected by the First Amendment and that Neeley retaliated against him for doing so.[1]

### 1.

As a public employee, Barton receives limited First Amendment protections.  "[G]overnment offices could not function if every employment decision became a constitutional matter," *Connick v. Myers*, 461 U.S. 138, 143 (1983), so a public employee's First Amendment rights are narrower than those of "the citizenry at large," *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017).  Nevertheless, "citizens do not surrender their First Amendment rights by accepting public employment."  *Lane v. Franks*, 573 U.S. 228, 231 (2014).  Therefore, "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."  *Connick*, 461 U.S. at 142.  As such, despite these narrower rights, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

---

[1]A plaintiff alleging a § 1983 claim must prove two elements:  "First, a plaintiff must allege that a defendant acted under color of state law.  Second, a plaintiff must allege that the defendant's conduct deprived the plaintiff of rights secured under federal law."  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012).  Neeley does not contest that he acted under color of state law, so we must decide only whether Barton sufficiently alleged that Neeley deprived him of a federal right.

Keeping these principles in mind, a public employee's speech is constitutionally protected only if it passes a three-part test. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012). Barton must show: (1) he spoke as a private citizen rather than pursuant to his official duties; (2) his speech involved a matter of public concern; and (3) his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Mayhew*, 856 F.3d at 462 (citation omitted); *Handy-Clay*, 695 F.3d at 540. On appeal, Neeley contests only whether Barton plausibly alleged that he spoke in his private, and not his official, capacity.

Public employees' statements made "pursuant to their official duties," rather than in their capacities as private citizens, are not protected by the First Amendment and therefore are subject to "employer discipline." *Garcetti*, 547 U.S. at 421. But a public employee's speech that "simply relates to public employment or concerns information learned in the course of public employment" may be protected. *Lane*, 573 U.S. at 239. "[T]he question of whether a statement was spoken as a public employee or as a private citizen for First Amendment purposes [is] 'a practical one,' requiring a fact-specific inquiry into the 'duties an employee actually is expected to perform.'" *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010) (quoting *Garcetti*, 547 U.S. at 424–25). In conducting this inquiry, we look to the "content and context" of the statement, *id.* at 348, consulting several non-exhaustive factors, including "the speech's impetus; its setting; its audience; and its general subject matter," *Mayhew*, 856 F.3d at 464. We have also considered whether the speech was made within or outside the "ordinary chain of command." *Fox*, 605 F.3d at 349–50. In sum, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240.

2.

To determine whether Barton spoke in his private or public capacity, we must first determine exactly what speech is at issue. We first focus on Barton's speech at the city council meeting. The complaint alleges that "Barton addressed the meeting and explained that he had

not changed his recommendation and that he wanted to discharge Sniegocki and Zlotek from the fire department." It further provides his reasoning behind these statements: "Barton believed that an honest response to the[] citizen complaints [at the meeting] was necessary to maintain public confidence in the fire department," especially given "the history of racism by City officials." The complaint does not plead that Barton vocalized these concerns at the city council meeting—indeed, it characterizes them as "belie[fs]."

Based on the audience, setting, and subject matter, Barton's reporting on the potential discipline of firefighters during a city council meeting was an official duty of the Fire Chief. After all, Flint's City Charter and Code of Ordinances empowers the Fire Chief to oversee the fire department, including its employees. *See* Flint City Charter § 4-203(F) (2018) (providing that a duty of the head of the fire department is "supervision and discipline" of employees); City of Flint Code of Ordinances § 19-21 (2012) (providing that the Fire Chief has "direct and immediate control and management of the Fire Department").[2] Thus, Barton's speech at the city council meeting, which addressed the incident with Sniegocki and Zlotek and the resulting report, was not speech that Barton made as a private citizen, so it cannot give rise to a First Amendment retaliation claim.

Barton resists this conclusion, claiming that he explained why he would not alter his recommendation and that such explanations were private speech. We disagree for two reasons. First, even accepting the factual allegations in the complaint as true, Barton does not plead that he publicly voiced his rationale—i.e., the alleged racial issues underlying the firefighters' misconduct and the Mayor's cover-up scheme—for why he wanted to discipline Sniegocki and Zlotek. Rather, he separately alleges what he "explained" (that he wanted to discipline Sniegocki and Zlotek) versus what he "believed" (that he should be honest with the public in light of city officials' history of racism). *See Believe*, Black's Law Dictionary (12th ed. 2024) (defining "believe" as "[t]o feel certain about the truth of . . . [t]o think or suppose"). Second,

---

[2]When reviewing rulings on motions to dismiss brought under Rule 12(b)(6), we may consider and take judicial notice of matters of public record, as well as items appearing in the record of the case. *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023). We consider these public records because they are readily available on the City of Flint's website and are contained in the district court's record. *See* Flint City Charter (2018), *available at* https://www.cityofflint.com/wp-content/uploads/2022/12/Flint-Charter-Searchable.pdf. And in any event, Barton does not contest Neeley's reliance on these documents.

even if Barton had sufficiently pleaded that he expressly stated these thoughts, he was still addressing the public in his capacity as Fire Chief regarding the discipline of his subordinate firefighters. So Barton's statements at the city council meeting are not protected speech, and the district court erred by concluding otherwise.

3.

However, Barton's speech at the city council meeting is not the only speech at issue in this case. Barton's relevant speech also included (1) his refusal to change his report on his own, and (2) his refusal to make a public announcement saying that he initiated and agreed with the changed report. Indeed, Barton pleads that these *refusals* ultimately led to the termination of his employment. It is well established that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). After reviewing the content and context of this refusal-to-speak conduct, *Fox*, 605 F.3d at 348, we conclude that Barton sufficiently alleged that his unwillingness to lie in order to further Neeley's political campaign was not within the scope of his official duties, *see Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (explaining that the "exception to First Amendment protection"—speech made pursuant to one's official duties—"must be read narrowly").

The Fire Chief serves "the Mayor, City Council[,] and the citizens of the City of Flint" with the administration and management of the fire department. Barton did not refuse to change his report as part of that overarching task (for instance, as part of a disagreement with an official policy of Flint). Instead, he refused to issue a false report that he believed had an underlying racial animus to help Neeley's mayoral re-election bid; plainly, his command as Fire Chief does not include aiding an official in an election campaign. Such refusals fall outside the scope of Barton's ordinary duties and are therefore protected by the First Amendment. *See Jackler v. Byrne*, 658 F.3d 225, 240 (2d Cir. 2011) (holding that "[a public employee] had a strong First Amendment interest in refusing to make a report that was dishonest").

Neeley disagrees, arguing that Barton's "refrain from engaging in speech that owed its existence to his official job duties . . . is not protected speech." But that argument ignores the context of and reasoning behind Barton's refusals to speak. That Barton learned of Neeley's

demands to speak strictly because of Barton's public employment is not dispositive.  *See Lane*, 573 U.S. at 240.  The "critical question" is whether Barton's official duties included taking actions that furthered Neeley's reelection efforts.  *See id.*  At most, Barton's refusals of Neeley's threats "merely concern[ed]" his duties as Fire Chief, which is not enough to constitute public speech.  *See id.*; *Boulton*, 795 F.3d at 534; *Jackler*, 658 F.3d at 241 ("In the context of the demands [by a superior] that [a public employee] retract his truthful statements and make statements that were false, we conclude that his refusals to accede to those demands constituted speech activity that was significantly different from the mere filing of his initial [r]eport.").

In sum, Barton was (refraining from) speaking in his capacity as a private citizen when he declined to help Neeley win re-election and cover up racism within the fire department, which he alleges caused his termination as Fire Chief.  So we affirm the district court's holding that Barton plausibly alleged a violation of his constitutional rights.  *See Handy-Clay*, 695 F.3d at 538 ("We may affirm the district court's determination on any grounds, including grounds not relied upon by the district court." (internal quotation marks omitted)).

## C.

Turning to the second prong of the qualified-immunity analysis, we hold that it is clearly established that public employees cannot be compelled to make false statements on matters of public concern in response to threats of retaliation.  Neeley is therefore not entitled to qualified immunity in this procedural posture.

In determining whether a right is clearly established, we look to the law of the Supreme Court, then this circuit, and then other circuits.  *Cahoo v. SAS Analytics, Inc.*, 912 F.3d 887, 898 (6th Cir. 2019).  "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* (internal quotation marks and brackets omitted).  Although clearly established law cannot be defined "at a high level of generality," *Godawa v. Byrd*, 798 F.3d 457, 467 (6th Cir. 2015) (citation omitted), a case with near-identical facts need not exist for a right to be clearly established, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam).  Indeed, "an official can be on notice that his conduct violates established law even in novel factual situations."  *Cahoo*, 912 F.3d at 898

(citation omitted); *see also District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) ("Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." (citation omitted)).   "[T]he *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).   Given these principles, "[t]he relevant inquiry is 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"   *Id.* at 610 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Any reasonable citizen, let alone a publicly elected official, would know that threatening a government employee to make false statements on a matter of public concern—rooted in the official's own personal campaign interest and that would have covered up public employees' discriminatory conduct—or face a loss of employment would violate multiple clearly established First Amendment principles.   First, "it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983." *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997).   And this right extends to public employees.   *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) ("The First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern.").   Second, as previously highlighted, the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all."   *Wooley*, 430 U.S. at 714.   Again, this right protects public employees.   *See Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (holding that a public university violated a professor's First Amendment rights by compelling him to use students' preferred pronouns); *cf. Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 884–86 (2018) (holding that compelling public employees to subsidize a union "violates [their] free speech rights . . . by compelling them to subsidize private speech on matters of substantial public concern").   In sum, because "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment," public employees cannot be compelled to speak, and in turn, they cannot be retaliated against when they choose not to speak on matters of public concern.   *Lane*, 573 U.S. at 235.

Given these clearly established principles, we hold that Neeley compelled Barton to take a position on a matter of public concern with which Barton disagreed: he demanded that Barton "make a public announcement saying that he initiated [Neeley's] change [in the report] and agreed with it" or else be fired for "refus[ing] to serve Mayor Neeley's personal interests by participating in the cover-up of the firefighters' misconduct." And when Barton refused, Neeley fired Barton, unconstitutionally retaliating against him. *See Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 715–19 (6th Cir. 2001) (explaining that eliciting a public employee's spoken disagreement with the employer's policy, and thereafter terminating him, violated multiple First Amendment rights—including the rights to be free from retaliation and compelled speech—because "the conduct that led to [the plaintiff's] firing was his unwillingness to agree fully with the policy. . . [and] this mental dissent could be interpreted as protected by the First Amendment"). The Supreme Court and this circuit have found, several times, that when public employees were fired or disciplined for speaking on matters of public concern related to their employment, their First Amendment rights were violated (or they at least pleaded such a violation). *E.g., Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 574 (1968); *Lane*, 573 U.S. at 236 (collecting cases); *Mayhew*, 856 F.3d at 466; *Handy-Clay*, 695 F.3d at 544–45. Therefore, the facts alleged here plausibly demonstrate a violation of First Amendment retaliation and compelled-speech principles, which were clearly established at the time of Barton's discharge from employment.

*Jackler*, another First Amendment retaliation case, is illustrative. 658 F.3d at 225. It involved a municipality's firing of a police officer for refusing orders from superiors to alter his police report detailing his colleague's excessive use of force against a civilian. *Id.* at 229. The Second Circuit concluded that the officer "had a strong First Amendment interest in refusing to make a report that was dishonest" because "a citizen has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false." *Id.* at 240–41. And his "refusals to accede to" his superiors' demands were "significantly different from the mere filing of his initial [r]eport," so his *refusals* were private, protected speech, rather than speech made pursuant to his official police duties. *Id.* Therefore, the court denied qualified immunity because it was "clearly established that the First Amendment protect[s] a citizen's decision both as to what to say and

what not to say, and that it protect[s] a government employee, including a police officer, speaking as a citizen on a matter of public concern, against retaliation for that speech except where the government's interest in the agency's proper functioning outweighed the employee's First Amendment right." *Id.* at 243 (relying on *Pickering*, 391 U.S. at 563, *Waters v. Churchill*, 511 U.S. 661 (1994), *Rankin v. McPherson*, 483 U.S. 378 (1987), and *Connick*, 461 U.S. at 138). Barton's claim here is of a piece.

In sum, considering the relevant, clearly established law from the Supreme Court, Sixth Circuit, and other circuits, *Cahoo*, 912 F.3d at 898, Barton's right not to speak on a matter of public concern in response to threats of retaliation was clearly established at the time of his firing. Neeley is not entitled to qualified immunity at the pleadings stage of these proceedings.

IV.

For these reasons, we affirm the district court's denial of Neeley's motion to dismiss based on qualified immunity.

2/25/25, 1:21 PM    Eastern District of Virginia | MS-13 member sentenced to life in prison for murders in Virginia and Massachusetts | United States D…



PRESS RELEASE

# MS-13 member sentenced to life in prison for murders in Virginia and Massachusetts

Thursday, January 30, 2025

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Virginia

ALEXANDRIA, Va. – A Salvadoran national and member of the Uniones Locos Salvatrucha (ULS) clique of the violent Mara Salvatrucha 13 (MS-13) gang was sentenced today to six concurrent life prison sentences and additional terms of years following his conviction on charges relating to his participation in the gang's criminal enterprise, including six murders and additional murder conspiracies.

According to court documents, on Aug. 25, 2018, Elmer De Jesus Alas Candray, aka German Alexander Ramirez Lopez, Buky, and Desquiciado, 27, met other MS-13 members in New Bedford, Massachusetts, to murder an associate of MS-13's Directos Locos Salvatrucha clique, identified in court records as K.A.C. MS-13 leadership in El Salvador had approved the murder because they believed K.A.C. had betrayed MS-13. That evening, they met K.A.C. at the residence of an MS-13 member in New Bedford. After the group ate dinner together, they beat and strangled K.A.C. to death. The conspirators then dismembered K.A.C.'s body, placed his remains in trash bags, and buried the remains in a wooded area near New Bedford. Alas Candray and other conspirators were promoted in the MS-13 ranks for their participation in the murder.

In June 2019, Alas Candray and others conspired to murder individuals who frequently gathered to drink in a wooded area in the clique's perceived territory in Reston. On June 23, 2019, Alas Candray and other members and associates armed themselves with a 9mm firearm, a .45 caliber firearm, and two machetes and traveled to the Hunters Woods area of Reston. The group murdered an individual, identified as J.L.G.M., shooting him and slashing him with a machete.

On Sept. 17, 2020, Alas Candray and others devised a plan to lure a young woman, identified as I.J.P.G., to Colts Neck Road in Reston under false pretenses and kill her because they believed she was associated with a rival gang and had disparaged MS-13 on social media. A co-conspirator exchanged messages with I.J.P.G. via Snapchat, pretending to be a member of MS-13's rival gang. He and another co-conspirator later picked up I.J.P.G. and drove her to Colts Neck Road, where Alas Candray and another MS-13 member were waiting for them. The four co-conspirators killed I.J.P.G. by taking turns shooting her, primarily in the face.

In March 2021, MS-13 members and associates conspired to murder an individual, identified as S.A.T.L., because they believed he was a member of a rival gang. On March 11, 2021, Alas Candray and other MS-13 members and associates, surveilled S.A.T.L. in Fairfax County and waited for an opportunity to murder him. Alas Candray and his co-conspirators went to an apartment complex on Winterthur Court in Reston where Alas Candray fatally shot S.A.T.L.

On May 30, 2022, Alas Candray and co-conspirators travelled to the Lerner Springs at Reston Apartment Homes and joined others on a footpath behind the complex to patrol the clique's perceived territory. Shortly thereafter, the conspirators encountered an individual, identified as R.A.P.S., on the footpath. Alas Candray and others murdered R.A.P.S. by kicking him and dropping a large rock on his head as he lay on the footpath.

On June 18, 2022, Alas Candray and a co-conspirator picked up an individual, identified as F.R.A.R., from Reston and drove him to Seneca Regional Park in Fairfax County. Alas Candray, and his co-conspirators believed that F.R.A.R. had disrespected MS-13 and violated its rules. After arriving at a pre-selected location in the park, Alas Candray and several co-conspirators murdered F.R.A.R. by beating him with a baseball bat and stabbing him. They then dismembered F.R.A.R.'s body and buried F.R.A.R.'s remains in a clandestine grave.

On Aug. 17, 2022, Alas Candray instructed a relative to relay a message to other ULS members and associates. Using coded language, Alas Candray instructed a co-conspirator to get rid of ammunition, warned ULS members and associates that law enforcement had pictures of them, and advised them to move. The relative relayed the message the following day.

The jury convicted Alas Candray of conspiracy to participate in a racketeering enterprise, five counts of conspiracy to commit murder in aid of racketeering, five counts of murder in aid of racketeering, and three counts of use of a firearm during a crime of violence causing death.

2/26/25, 1:20 PM    Eastern District of Virginia | MS-13 member sentenced to life in prison for murders in Virginia and Massachusetts | United States D...

Erik S. Siebert, U.S. Attorney for the Eastern District of Virginia; Sean Ryan, Special Agent in Charge of the FBI Washington Field Office's Criminal and Cyber Division; and Kevin Davis, Fairfax County Chief of Police, made the announcement after sentencing by U.S. District Judge Michael S. Nachmanoff.

Assistant U.S. Attorneys John Blanchard, Megan Braun, and Natasha Smalky prosecuted the case.

This effort is part of an Organized Crime Drug Enforcement Task Forces (OCDETF) operation. OCDETF identifies, disrupts, and dismantles the highest-level criminal organizations that threaten the United States using a prosecutor-led, intelligence-driven, multi-agency approach. Additional information about the OCDETF Program can be found at https://www.justice.gov/OCDETF.

A copy of this press release is located on the website of the U.S. Attorney's Office for the Eastern District of Virginia. Related court documents and information are located on the website of the District Court for the Eastern District of Virginia or on PACER by searching for Case No. 1:22-cr-1789.

## Contact

Press Officer
USAVAE.Press@usdoj.gov

*Updated February 7, 2025*

## Topic

**VIOLENT CRIME**

## Components

Federal Bureau of Investigation (FBI)  |  USAO - Virginia, Eastern

# Related Content

PRESS RELEASE

## Three Newport News men sentenced to life in prison for a series of six robberies and five murders

Ronzel Monte Dixie, Kwaimain Shy'de Redmon, and Meko Montez Brown Jr., of Newport News, were sentenced to life in prison after they were convicted by a federal jury on charges relating...

February 26, 2025

PRESS RELEASE

## MS-13 member sentenced to 50 years in prison for his participation in three murders

Salvadoran national and MS-13 member Henry Leonel Barrera Ayala was sentenced today to 50 years in prison for conspiracy relating to three murders.

February 13, 2025

PRESS RELEASE

## Hampton man convicted on mail theft and firearm charges

Jamal Ashton Shields, 33, of Hampton, was convicted by a federal jury today of conspiracy, mail theft, and illegal receipt of a firearm by a person under indictment.

February 7, 2025

✉ **Eastern District of Virginia**

Justin W. Williams United States Attorney's Building

2100 Jamieson Ave

Alexandria, VA 22314

Email USAO-EDVA

📞 Alexandria: 703-299-3700

# Detroit Free Press

# Freezing deaths, living in squalor and shocking murder: Are Michigan's children OK?

**Lily Altavena**, **Kristi Tanner**, **Nushrat Rahman**, **Christine MacDonald**, **Tresa Baldas** and **Gina Kaufman**
Detroit Free Press
Published 6:05 a.m. ET Feb. 24, 2025 | **Updated 12:57 p.m. ET Feb. 24, 2025**

**Key Points**

- Amid a series of tragedies befalling children in Michigan, advocates and policymakers are asking how state and local social safety nets allowed these tragedies to happen.

- Data shows the number of unhoused children last year reached the greatest number in a decade, according to a Detroit Free Press analysis.

- More than 150,000 school-age children in the state are unaccounted for in enrollment data, according to another Free Press analysis of state education and U.S. census data.

In Pontiac, children lived alone for years, police say, sleeping atop pizza boxes surrounded by a sea of garbage and feces instead of soft mattresses and sturdy bedframes.

In Detroit, two children perished after spending the night in a casino parking garage in frigid temperatures, without the insulated walls of a home around them to keep them warm.

And in the Upper Peninsula, police say a child slept in a closet he also used as a bathroom, rather than in a bedroom to call his own, nestled under a plush blanket and pillow cradling his head.

Michigan's most vulnerable children are not OK.

And advocates, educators, policymakers and experts are asking how numerous state and local social safety nets allowed a cascading slew of tragedies to occur — with children slipping through the cracks — over just a few months. And they wonder, how much more calamity could be taking place that hasn't made headlines.

Case 2:25 158          Document: 00118252876          Page: 33          Date Filed: 02/27/2025          Entry ID: 6703086

"Children in general aren't a priority in our country and in the state sometimes," said Peri Stone-Palmquist, co-executive director of the Ypsilanti-based Student Advocacy Center of Michigan. Some people and organizations do prioritize children, but as a society, she said, "If they really were a priority, we wouldn't allow a family to be sleeping in a parking garage in Michigan winter. We wouldn't stand for that."

Families on the brink of crisis shouldn't be isolated, experts say. There should be resources to help. People to intervene. Authorities to investigate. But in case after case over the past several months, advocates said, all the mechanisms that exist to help children in trouble seemingly never materialized to help, at least enough to avoid tragedy.

A school district never got verification that children who were allegedly abandoned by their mother for four years in squalor showed up to a new school that had requested records, according to police. Detroit's homeless response team didn't deem a family's tenuous living situation as an emergency, months before two children died in their van in a casino parking garage on an especially cold night. Children's Protective Services closed a case, citing no evidence of neglect, just six months before a Detroit mother allegedly murdered her 9-year-old son, burying him in a shallow grave, according to WXYZ.

"It's obvious we've failed these children. ... The news stories are proof of that," said state Rep. Luke Meerman, a Republican representing Coopersville who is chairing a Michigan House oversight subcommittee on child welfare. "This is not acceptable for this to be happening to kids."

Data and experts suggest these are not isolated cases and far more children are suffering than reported. The number of unhoused children last year, sheltered and unsheltered, reached the greatest number in a decade, according to a Detroit Free Press analysis. More than 150,000 school-age children in the state are unaccounted for in enrollment data, according to another Free Press analysis of state education and U.S. census data. And Michigan's child welfare agency has been under federal oversight for more than 15 years.

"For every kid that makes it into the newspaper, there are hundreds, probably thousands of children out there who are just by the grace of God, not dying or being seriously injured," said Frank Vandervort, a law professor with the Child Advocacy Law Clinic at the University of Michigan.

In the case of Na'Ziyah Harris, a 13-year-old who went missing in Detroit last January now presumed dead — a criminal case is ongoing — the teen's great-aunt told the Detroit Free Press in September that it didn't have to be this way. Agencies like CPS could have helped.

"There were multiple opportunities to save her life," she said.

## CPS under scrutiny for more than a decade

Police believe 9-year-old Zemar King was killed in October but his body wasn't discovered until early January when a landlord found his backyard grave. Authorities accuse his mom of killing him, binding his hands and feet, digging a hole and burying his body before fleeing to Georgia.

Six months before Zemar was found, WXYZ-TV (Channel 7) reports, the boy told Children's Protective Services that his mother choked him, beat him with a belt and wanted to kill him. The two were interviewed by CPS after the mom came to the emergency room of a hospital, reporting she was anxious and depressed, according to CPS documents.

The boy told CPS about being beaten by his mom, that he had not been to school in more than a year and doesn't always have food to eat. The state agency closed the case, according to internal records obtained by WXYZ, finding "no preponderance of evidence of physical neglect." A spokesperson for the agency declined to comment on the WXYZ report.

Vandervort said CPS, which falls under the umbrella of the Michigan Department of Health and Human Services, has long prioritized keeping families together, which sometimes runs afoul of what Vandervort said the law states the agency should do: Keep children safe.

"When CPS is involved in a case, child safety is the paramount consideration," he said. "That's what the law says, and they just ignore that. The Michigan Department of Human Services has ignored that for decades."

The agency has been under federal scrutiny for more than 15 years, after a lawsuit alleged the state's child welfare program was not protecting children in foster care. Reports from the federal monitor found that investigators sometimes fell short in completing investigations in a timely manner. The agency has touted progress in improving how it investigates child abuse allegations despite a July 2024 state auditor general's report that found the child

welfare program, which disagreed with many of the auditor's findings, still needed to improve.

Erin Stover, a spokesperson for the Michigan Department of Health and Human Services, wrote in an email response on behalf of the department to questions about the recent tragic stories of children harmed that Children's Protective Services is "one part of Michigan's safety net for children" and the department investigated approximately 74,000 reports of child abuse and neglect last year.

"It is always difficult and challenging — and at times heartbreaking — for our staff when they see children in situations that are not necessarily ideal," she wrote. "The state of Michigan's goal is to keep families together and we work with families to make sure they have the resources that they need to achieve that goal."

Meerman, the state lawmaker, said solutions are still needed, but finding them is not an easy path.

"To be completely honest with you, I do struggle with solutions," he said. "We definitely need to see what's gone wrong here via our oversight committee."

## Students missing from school

In Pontiac this month, sheriff's deputies rescued three children from what officials have described as an "unimaginable" case of abuse and neglect: Three siblings were found living alone in squalor for four years — the result of a mother who allegedly abandoned them.

By the time the children were rescued, authorities said, their hair was matted, their clothing and bodies were covered in feces, and their toenails were so long that they struggled to walk. And when they were taken to the hospital to be evaluated, they noted, the children struggled to flush a toilet or brush their teeth because they hadn't done so in so long. The children had gone virtually undetected for years, not even venturing outside to go to school.

Oakland County Sheriff Michael Bouchard attributed their failure to attend school to a gap in state school code, which does not require school officials to ensure students fully enroll in a new school when transferring from an old one. He also said the students dropped off from schools' radar during the chaos of the coronavirus pandemic.

School closures due to the pandemic have long ended and still many students haven't returned and state public school enrollment continues to decline. In the 2024-25 school year, enrollment is down by about 5.4% from the 2019-20 school year, according to state figures. Not all of those students are missing — Michigan birth rates have long been on the decline, and some students went to private school, contributing to lower enrollment figures. Some may also be homeschooled, but those families are not required to register any information in the state.

Still, the data suggests some kids are not fully accounted for. Using an estimation method developed by researchers at Michigan State University and data from state and federal sources, a Free Press analysis found as many as 150,000 children could be homeschooled children or simply unaccounted for in Michigan enrollment data for the 2023-24 school year. The same analysis a decade ago estimated 100,000 unaccounted-for children.

Bob Wheaton, spokesman for the Michigan Department of Education, wrote in an email statement that lawmakers need to focus on creating a policy that would help the state account for all children so none fly under the radar.

"Counting every child — including children who are homeschooled — would help us understand how many children are not enrolled in any educational environment," he wrote. "If children aren't registered in public schools, private schools, parochial schools, or homeschools, authorities could look into why that is the case."

That is not a new proposal, but one debated for years in Michigan. Any attempts to track children outside of public school have come under fire from the state's homeschool community. Israel Wayne, vice president of the Michigan Christian Homeschool Network, wrote in an email that the organization believes the state's child abuse laws are adequate.

And another nagging problem exacerbated by the pandemic: Students enrolled in school don't show up enough, which creates academic problems but also raises questions about child welfare. About 30% of Michigan students were chronically absent in the 2023-24 school year, according to state data. If students aren't showing up regularly, educators might not notice patterns in behavior that point to abuse or neglect. And getting students back to school takes hard work, often home visits, which costs money schools don't have to spend, said Stone-Palmquist, of the Student Advocacy Center.

"It's really hard work, really intense work, to go out to people's homes and be like, 'What's going on?' " she said. "Whether that's transportation barriers, or a parent doesn't have child care ... or there's mental health issues or substance abuse issues. There's all sorts of reasons, and are often not easy to address."

## Shortages of key school staff members

But advocates also say even once students are in schools, it's not guaranteed that staff members could identify students in trouble amid a shortage of counselors and social workers. Michigan has the second-worst ratio of students to counselors in the nation, according to the most recent data from the 2023-24 school year from the American School Counselor Association.

In the year since Na'Ziyah Harris disappeared, Jarvis Butts, 42, was charged with her murder and sexual assault. In a case winding its way through court, prosecutors allege Butts killed Na'Ziyah, whose body is still missing, after discovering she was pregnant with his child.

A substitute teacher from J.E. Clark Preparatory Academy, which Na'Ziyah attended, testified in court last month that on the day Na'Ziyah went missing, she was "acting very unusual." She said the teen laid on the floor and said she needed to go see the counselor. The substitute said she asked the security guard to send the counselor to her room if she came in. She testified that she never saw "the counselor because she never came up to see us. I guess she wasn't in the building that day."

Chrystal Wilson, a spokeswoman for Detroit Public Schools Community District, wrote in a text message that she did not have the details of the incident. She wrote that "drawing a connection to the school not providing a counselor and the child being abducted is a bit of a stretch."

Heather Martinez, chief executive officer of Boldli, a youth services organization based in Detroit, called school social workers the "key" to identifying kids in distress, and they are in a position to help with issues like homelessness, food insecurity and neglect.

"Our teachers are overwhelmed, our administrators are overwhelmed," she said. "The social workers are the ones that have the ties to the community resources. They're hopefully the

ones that know what's there in that specific community that can help families better than anybody else."

Organizations like Martinez's try to bridge some of those gaps with more opportunities for kids and parents to engage in school- or education-related activities, including parent education programs and after-school tutoring for kids, which goes beyond enriching kids academically. Martinez said when a student lost their mom last year, it was the adults in after-school programming who helped the student and their dad with desperately needed resources.

## A 'crisis' in Detroit's homeless system

Darnell Currie Jr. was a football player. He was 9 years old. A'millah Currie loved "Bluey." She was only 2. On Thursday, their loved ones said goodbye to the two children, the "heart and soul of their family" who "shared an unbreakable bond." They were unhoused when they apparently froze to death in a van.

A mother and her four children, along with their grandmother and her child, were living in the vehicle, Detroit police said. They were parked on the ninth floor of a downtown Detroit casino garage when their car stopped running in the middle of the night.  On Feb. 10, Darnell Jr. and A'millah stopped breathing. The Wayne County Medical Examiner's Office has not confirmed an official cause of death and said the investigation could take several months.

The circumstances prompted Mayor Mike Duggan to direct the city and its housing department to investigate the homeless response system. The mother called the city's homeless response team at least three times, most recently in November, and reportedly reached out to multiple shelters only to be told they were full.

"A homeless person needs a quick answer. They're in an emergency," said Chad Audi, president and CEO of the Detroit Rescue Mission Ministries.

New data, as well as changes made a year ago to the city's system of receiving calls for help and referring people to shelters, offers insight into the challenged system. The vast majority of those who made contact with the Coordinated Assessment Model, or CAM, which directs people facing homelessness to shelter and other housing resources in Detroit, Hamtramck and Highland Park, were put on a waiting list to be placed in a shelter.

Among those who received a referral, families spent the most amount of time — 133 days on average as of December — on a list waiting to be placed in a shelter. Single women were on the waitlist for about three months, according to CAM's latest quarterly report.

The length of time is a reflection of a number of factors, including availability of resources, such as housing subsidies, and need, said Tasha Gray, executive director of the Homeless Action Network of Detroit (HAND), one of three nonprofits that manages CAM. On top of that, pandemic-era protections and financial aid have largely expired, and is "leading to a crisis that the homeless system alone cannot resolve."

"More people are staying in shelters longer because they are not able to bounce back as quickly," Gray said in an email. "Also, resources like housing choice vouchers, which supported some households in moving out of shelters and gaining stability, are drying up."

From 2023 to 2024, children faced the largest increase in homelessness across the country and locally, the number of children experiencing homelessness last year — sheltered and unsheltered — reached the greatest number in a decade, according to a Free Press analysis of HAND data.

A total of 464 children were unhoused, or 27% of the people counted during a one-night count in January 2024 of people who were facing homelessness in Detroit, Hamtramck and Highland Park. While the number of adults, 18 years and older, experiencing homelessness has declined by 42% since 2015, the number of unhoused children increased by 5% during the same time.

Desiree Jennings, CEO of The Children's Center, a Detroit-based center that helps families with behavioral health needs, said traumatic events can often be the impetus for a larger crisis. For example, the flooding in southwest Detroit this month could be the exact kind of event to displace families and exacerbate lingering issues. Intervening when those crises occur is crucial, she said.

"Those families are now in a situation where they have unprecedented needs," she said. "Now is the time as a community to wrap our arms around the crisis situations that are happening in our city."

2/26/25, 6:42 AM                    Michigan children falling through cracks in state, local safety nets

## A community responsibility

On Jan. 9, exactly one year from the day Na'Ziyah disappeared, 36th District Judge Aliyah Sabree paused during a court hearing for the girl's suspected killer to list all the ways the authority figures around the 13-year-old — who grins in a selfie taken in a classroom the day she vanished in glasses, her hair wrapped in two buns — failed to shield Na'Ziyah from harm and, ultimately, death.

"From what I have heard over the last four days … several people failed her," she said. "I don't know where her mother is. I don't know anything other than that she (Na'Ziyah) was forced to live at a home where she was not protected or given the adequate attention or love. I don't know where her father is. I don't have any mention of him in her life. …

"There's no mention of CPS, but I wonder what their involvement was over the years because this was not just a one-year thing. … As a community, we should look at this case as a prime example of how much work we have to do when it comes to protecting our children and especially our Black girls."

At one point in her remarks, Sabree summed up her disappointment in all the ways the 13-year-old's circumstances had been overlooked: "I don't know who else failed Na'Ziyah, but the community did."

*Free Press staff writer Andrea Sahouri contributed to this article. Contact Lily Altavena: laltavena@freepress.com*