# United States Court of Appeals
## For the First Circuit

———————

Appeal # 25-1158

State of New Jersey, et al.
vs.
(President) Donald Trump, et al.

————————————

**_4th EMERGENCY -  MOTION to AMEND Appellant's pro se APPEAL BRIEF to ADD... new/ additional issues raised on appeal....._   That MS-13 mothers and fathers pose an imminent danger to CHILDREN ...especially in California.**

# _Pro Se/ appellant {Melvin Jones Jr.'s} and Colleen Connors' 4th MOTION TO AMEND (our) APPELLANTS PRO SE BRIEF:_

**_To add:_**

**_That the preliminary injunction should be CHANGED to specifically restrict:_**

- *That the State of California should have been specifically listed on/ in the district court's preliminary injunction as a state which is EXCLUDED from being allowed to be a state which ANY illegal alien/ undocumented migrant… birth mother [and] her*

*new born baby can reside... due MS-13 gang members who are BOTH woman and men... pose an imminent danger to the safety and health of [their] new-born baby... because MS-13 terror gang members literally TORTURE CHILDREN; and the State of California*

*{but NOT limited to said state}.... is literally INFESTED with MS-13 terror gang members... all up and down the state of California:*

- *"California MS-13 member accused of 10-year-old's torture and murder is in US illegally:"*

- *By Michael Ruiz*

*Published January 19, 2023*

**Fox News**



**Video**

**Warning: This story includes graphic allegations of violence against children**

## *EXCLUSIVE: A suspected*

## *MS-13 gang member set to go*

## *on trial next week for the horrific*

*2018 slaying of his California girlfriend's 10-year-old son is a native of El Salvador and living in the U.S. illegally, according to a law enforcement source.*

- *<u>Kareem Ernesto Leiva</u>, 37, and his American girlfriend Heather Maxine Barron, 33, are both charged with murder and torture in the death of her son, Anthony Avalos, as well as child abuse against two other children in the home, court records show.*

- *Prosecutors allege the boy had been beaten, starved, forced to kneel on rice, force-fed, whipped and more in a home where he was allegedly subjected to "extreme physical pain and suffering."*

- *CALIFORNIA SEEKS DEATH PENALTY IN ALLEGED TORTURE KILLING OF ANTHONY AVALOS*



- 

- ***<u>Kareem Leiva, an illegal immigrant from El Salvador, is accused of the torture and murder of 10-year-old California boy Anthony Avalos, right. (Al Seib/Los Angeles Times via</u>***

*__Getty Images, David Barron via AP)__*

- *__While in jail, Leiva allegedly shanked another inmate, according to court documents, and was accused of domestic violence against females in both 2010 and 2013.__*

- *__His brother, Mauricio Leiva, is another alleged MS-13 member who was indicted in a federal racketeering case against a__*

*deadly drug ring in 2016, court documents show.*

- *Leiva and Barron's murder trial in Los Angeles is scheduled to begin next week. Jonathan Hatami, who rose to prominence as the lead prosecutor in the Gabriel Fernandez trial, and Saeed Teymouri are assigned to the case.*

- *Leiva's defense attorney, Dan Chambers, did not immediately*

***respond to a message seeking***

***comment.***



● 

● ***This undated photo provided by David Barron shows Anthony Avalos. Los***

***Angeles County prosecutors have charged his mother and her boyfriend with murder***
***and torture. (David Barron via AP)***

● ***Prosecutors previously alleged***

***that Barron and Leiva whipped***

***the child, poured hot sauce on***

*his face and hung him upside down. He had been tortured "for almost two weeks, up until paramedics responded to [the] residence and found Anthony's lifeless body," court documents allege.*

- *Anthony and his siblings also suffered other forms of abuse, including being burned with a curling iron or locked in their rooms for hours.*

- **_On June 20, 2018, just weeks after the end of Anthony's fourth-grade school year, Barron called 911 to report her son was unconscious, according to the documents._**

- **_Police arrived and found the boy not breathing and covered in bruises and abrasions. He also had circular burn marks on his stomach. After he was transported to a hospital,_**

***doctors noted he appeared "severely malnourished and dehydrated."***



● ***Heather Maxine Barron, who was indicted for the torture and murder of her 10-year-old son***

*Anthony Avalos in Lancaster, walks into court for a pretrial hearing Feb. 27, 2018, in Los Angeles Criminal Court. (Irfan Khan/Los Angeles Times via Getty Images)*

- *MOTHER'S BOYFRIEND ARRESTED IN DEATH OF 10-YEAR-OLD BOY WHO COMPLAINED ABOUT ABUSE*

- *He was pronounced dead the following morning.*

- ***The Los Angeles County Medical Examiner-Coroner ruled Anthony's death a homicide and identified multiple causes of death: subdural, subarachnoid and intraparenchymal cerebral hemorrhages due to blunt-force head trauma.***



- 

- *Anthony Avalos in an undated family photo. (Facebook)*

- *Court documents allege he was held up by his feet and dropped on his head repeatedly, punished with wrestling moves,*

*forced to fight other children in the house, thrown into furniture, beaten in the face with a ping-pong paddle, slammed to the floor and given rug burn.*

- *The day before the 911 call, Anthony was unable to walk or eat, according to authorities. But Leiva and Barron allegedly left him unconscious for hours.*



● 

● *Kareem Ernesto Leiva at a*

*pre-trial hearing in Los Angeles*

*Criminal Court Feb. 27, 2018, in*

*Los Angeles. Leiva and his*

*girlfriend Heather Maxine Barron*

*were indicted for the murder and*

*torture of her 10-year-old son*

*Anthony Avalos in Lancaster. (Irfan Khan/Los Angeles Times via Getty Images)*

- *"The final death blows came that evening when Leiva slammed Anthony on his head multiple times," prosecutors allege. "Barron did not call the police until the next morning. Leiva purposefully fled the residence with his children before authorities arrived."*

- *Authorities had received reports for years of alleged child abuse, according to court filings. Even before Barron began dating Leiva, another adult male acquaintance of hers was accused of sexually assaulting her son when he was just 5 years old.*

- *Despite many interactions with county child services, authorities determined investigations into numerous prior child abuse allegations were "inconclusive."*



- 

- *Booking photos showing accused child killers Kareem Leiva and Heather Barron. (Los Angeles Sheriff)*

- *Barron was able to keep custody of her seven children,*

*three of whom she shared with Leiva, who fathered another five kids with three other women. According to authorities, he was especially abusive to his non-biological children, and allegedly admitted to shoving Anthony's younger brother so hard into a chair he needed three staples to close a gash in his scalp.*

- *FOX Los Angeles reported in October that the Los Angeles*

*County Board of Supervisors approved a $32 million settlement with the rest of Anthony's family, which sued, alleging social workers on the case failed to properly handle the accusations. Members include the boy's father as well as maternal aunts and uncles who are expected to testify against Barron at trial.*



- ***Heather Barron appeared for a hearing in a Lancaster courtroom with boyfriend Kareem Ernesto Leiva, both charged with the torture and murder of Barron's 10-year-old son, Anthony Avalos, Aug. 3,***

*2018. (Al Seib/Los Angeles Times via Getty Images)*

● *The former Los Angeles district attorney, Jackie Lacey, had intended to seek the death penalty in the case, but current DA George Gascon, who has publicly opposed such punishment for years, reversed course after taking office.*

● *source:*

URL
https://www.foxnews.com/us/california-ms-13-member-accused-10-year-olds-torture-murder-us-illegally

*Respectfully submitted.*

*Thank you.*

*(continued on the NEXT page).....*

*Best,*

*Date: 2-27-2025*

*_____*

*Melvin Jones Jr. disabled*

*PRO SE appellant*

*1935 Hosler St.*

*Flint, Michigan*

*48503*

*Email: jonesjrmel@gmail.com*

*Google voice to text ph#
415-562-5074*

*SEE THE ATTACHED
EXHIBIT…. on the
next pages:*

 U.S. Customs and
Border Protection

U.S. Customs and Border Protection

## Archived Content

In an effort to keep CBP.gov current, the archive contains content from a previous administration or is otherwise outdated.

# San Diego Sector Border Patrol agents arrest MS-13 gang member

**Release Date:** Wed, 11/27/2024

**CHULA VISTA, Calif.** — Friday morning, U.S. Border Patrol agents assigned to the Chula Vista Border Patrol Station arrested a man identified as a member of the Mara Salvatrucha (MS-13) gang entering the U.S. illegally.

On November 22, 2024, at approximately 3:15 a.m., agents encountered a group of individuals after they entered the U.S. illegally. The individuals were arrested and transported to a nearby Border Patrol Station for enrollment into removal proceedings.

At the station, it was discovered that one man provided false biographical information including making a false claim to Mexican citizenship. Checks revealed the man was a 32-year-old citizen of El Salvador and that he is a member of the MS-13 gang.

"I applaud our San Diego Sector Border Patrol agents for their diligence and dedication to protecting our country," said Chief Patrol Agent Patricia McGurk-Daniel. "Preventing dangerous people from entering our communities is our pledge to America."

The man is being held in custody of the Department of Homeland Security pending expedited removal to El Salvador.

In fiscal year 2024, San Diego Sector Border Patrol apprehended 26 known gang members, representing a 62.5% increase from the previous fiscal year.

To prevent the illicit smuggling of humans, drugs, and other contraband, the U.S. Border Patrol maintains a high level of vigilance on corridors of egress away from our Nation's borders.  To report suspicious activity to the U.S. Border Patrol, contact San Diego Sector

at (619) 498-9900.

---

*U.S. Customs and Border Protection (CBP) is America's frontline: the nation's largest law enforcement organization and the world's first unified border management agency. The 65,000+ men and women of CBP protect America on the ground, in the air, and on the seas. We facilitate safe, lawful travel and trade and ensure our country's economic prosperity. We enhance the nation's security through innovation, intelligence, collaboration, and trust.*

**Last Modified: Jan 27, 2025**





## Social Media Directory

View a complete list of local and regional CBP social media accounts.

**View the Directory**

Case 25-1158        Document: 00118253247        Page: 35        Date Filed: 02/27/2025        Entry ID: 6703240



El Salvador        El Salvador

# MS13

by *InSight Crime*
28 Feb 2024



The Mara Salvatrucha, or MS13, is perhaps the most notorious street gang in the Western Hemisphere. While it has its origins in the poor, refugee-laden neighborhoods of 1980s Los Angeles, the gang's reach now spans from Central America to Europe.

A predatory criminal organization, the MS13 lives mostly from extortion. But the gang's resilience owes to its strong social bonds, which are created and strengthened via acts of violence mostly directed at their rivals and one another.

Their activities have helped make the Northern Triangle — Guatemala, El Salvador, and Honduras — one of the most violent places in the world outside a warzone. The US Department of the Treasury categorizes the group as a "transnational criminal organization," the first such designation for a US street gang, though the MS13's criminal proceeds do not even approach those of their counterparts on that list.

Manage consent

The US government has also **charged** over a dozen MS13 leaders in El Salvador with terrorism, marking an unprecedented escalation in the country's fight against international street gangs. The gang has suffered a near fatal blow in its spiritual home, El Salvador, following a **historic security crackdown** implemented by the administration of President Nayib Bukele that has seen around **two thirds** of its broader membership thrown in jail.

# History

The MS13 was founded in the poor, marginalized neighborhoods of Los Angeles in the 1980s. As a result of the civil wars wracking El Salvador, Guatemala and Nicaragua, refugees flooded northward. Many of them wound up in California, living among the mostly Mexican neighborhoods of East and Central Los Angeles, as well as the San Fernando Valley.

While the Mexican gangs reigned in the local underworld, the war-hardened immigrants quickly organized themselves into competing groups, the strongest of which was called the Mara Salvatrucha Stoners or MSS.

The origins of the name are still disputed, but "mara" is a Central American term for gang. "Salva" refers to El Salvador. "Trucha" is a slang term for "clever" or "sharp."

Salvatruchas was also the name given to the locals who fought against William Walker, an ambitious businessman and proponent of slavery from the United States who tried to subdue various parts of Central America with a small army in the 1850s. Walker, after a brief stint as the self-proclaimed president of Nicaragua, was overrun and executed by Honduran locals.

For their part, the Stoners were composed of refugees from El Salvador in the Pico Union neighborhood who spent most of their time listening to heavy metal music, drinking and smoking. With time, the gang evolved, shedding their original Stoner name and image: The MSS became the MS.

The gang's rivals took note. Conflict between the MS and the 18th Street, or Barrio 18, was particularly fierce in and around Los Angeles. The fighting put the gang on the radar of officials, who began to jail them in large numbers in the late 1980s and early 1990s.

Inside prison, the MS was forced to bow to another master, the Mexican Mafia, or "la eMe," for short, whose power extended from the jails to the streets. The Mafia's umbrella, known as the "Sureños,"

included many prominent gangs and stretched into much of the southwest of the United States and Mexico.

The MS13's subservience afforded the gang more protection in the streets and in prison. In return, the MS provided hitmen and paid the Mafia regular quotas from their criminal proceeds. It also added the number 13, the position M occupies in the alphabet, to their name. Thus, the MS became the MS13.

By the mid-1990s, partly as a way to deal with the gangs and partly as a product of the get-tough immigration push toward the end of the presidency of Bill Clinton, the US government began a program of deportation of foreign-born residents convicted of a wide range of crimes. This enhanced deportation policy vastly increased the number of gang members being sent home to El Salvador, Honduras, Guatemala, and elsewhere.

According to one estimate, 20,000 criminals returned to Central America between 2000 and 2004. The trend continued over time: US immigration authorities **removed** nearly 6,000 suspected gang members in 2018 alone – around 1,300 of them from the MS13.

Central American governments, some of the poorest and most ineffective in the Western Hemisphere, were not capable of dealing with the criminal influx, nor were they properly forewarned by US authorities.

The convicts, who often had only the scarcest connection to their countries of birth, had little chance of integrating into legitimate society, and they often turned to gang life. In this way, the decision to use immigration policy as an anti-gang tool helped spawn the virulent growth of the gang in Honduras, El Salvador and Guatemala.

The MS13's principal activities vary a great deal from one region to another. In Central America, where the gang's reach and size (relative to overall proportions) is largest, the MS13's operations are more diversified. This includes extortion and controlling the neighborhood petty drug market.

Their crimes, **such as extorting bus companies**, are arguably more disruptive on a daily basis to more people than any other criminal activity in the region. In the United States, the MS13 focuses on local drug sales and "protecting" urban turf to extort small businesses and underground bars.

There is some evidence the gang has been involved in other, more sophisticated transnational criminal activities, most notably international drug and human trafficking rings. But the gang's role in these

activities appears to be largely in a support rather than a leading role.

What's more, in the more than a dozen international drug trafficking cases tracked by InSight Crime, the gang members worked with networks outside of the MS13 structure, most notably the Mexican Mafia's networks. In all instances, the drug trafficking was in very small quantities compared to other international criminal groups.

Throughout its existence, various governments' attempts to reduce the threat posed by the MS13 have instead had the reverse effect of spreading the threat posed by the gang. Perhaps the most obvious example is the aforementioned policy of deporting foreign nationals committed of crimes in the United States.

But Central American governments have also contributed: the "**mano dura**," or "iron fist" policies, which jailed youths based on appearance and association as well criminal activities, became the norm following their implementation by Salvadoran President Francisco Flores in the late 1990s. As a result, El Salvador, Honduras, and Guatemala saw their prison populations overflow with members of the MS13 and other gangs.

Because the brittle prison systems in each of those nations were unprepared for the sudden influx of thousands of violent and organized gang members, violence rose sharply inside jails. In response, authorities **separated the gangs**, but this opened up space for them to reorganize.

In prison, for example, they were given freedom and safety not possible on the outside. They frequently had access to cellular phones, computers and television. As a result, the MS13's Central American branches could rebuild their organizational structures from inside prison walls, as well as **expand their capacity** to carry out crimes such as car theft, extortion and petty drug dealing.

The gang is now in its second generation. Youth enter as they often see it as a viable alternative to a life with minimal employment or education opportunities. Entry is often violent, sometimes including a "13-second" beatdown.

Older members seeking to break free find internal rules they might have created keeping many of them from separating. The gang, for example, penalizes desertion with a death sentence. Even if they can break free of their membership, their tattoos have often branded them for life.

In El Salvador, MS13 members saw something of a reprieve from their usual violent lifestyle when their leaders and their Barrio 18 rivals agreed to a nationwide "truce" brokered through community groups and the Church and facilitated by the government in March 2012. The apparent ceasefire was followed by a tremendous drop in El Salvador's homicide rate that many hoped would signal a major shift in citizen security in the country.

However, some critics of the truce feared it dangerously heightened the profile of the street gangs, and provided them with the resources necessary to exert greater influence on government institutions. The United States was also reluctant to endorse the gang truce, instead increasing pressure on the MS13.

In addition to designating the gang as a transnational criminal organization in fall 2012, the United States imposed economic sanctions on six MS13 leaders by adding them to its Specially Designated Nationals List in June 2013.

Concerns over the truce were further fueled by reports of rising extortion and **disappearances** during the truce period, as well as the discovery of mass graves. Additionally, homicides began rising again in mid-2013 as the truce **unraveled**, and continued to rise throughout 2014 and early 2015.

By 2016 and in the midst of record levels of violence, the government launched a series of "**extraordinary measures**" to aggressively crack down on the MS13 and the country's other gangs.

The MS13 soon found itself locked in what **resembles a low-intensity war** with government security forces, with the gangs **sustaining the bulk** of casualties. The gang has also had to deal with the emergence of **anti-gang death squads** composed largely of members of the military and police.

Violence has since cooled significantly, with homicides **plummeting to historic lows** in 2019 and 2020 amid allegations of a renewed entente between the MS13 and the government of Nayib Bukele. Multiple state officials told InSight Crime there was an **informal pact** between parts of the government and the gangs, which broadly speaking sees the gangs lower the murder rate in exchange for better prison conditions.

Evidence of the alleged pact had surfaced largely thanks to local press, with the El Faro media group publishing **prison logs**, **surveillance photographs**, intercepted phone calls and other materials documenting a series of meetings between top state officials and leaders of the MS13. However, the Bukele government has repeatedly denied the existence of any gang pact.

The MS13 also boosted its political capital in El Salvador following the onset of the **coronavirus pandemic**, in early 2020, reportedly leveraging its vast territorial control and prior relationship with the state to impose curfews, enforce mask-mandates, and run government-financed relief programs in cash-strapped communities where the government has minimal presence.

The gang's domestic exploits may also have helped weather persistent pressure from US prosecutors, who in 2020 began targeting top MS13 leaders in El Salvador with **terrorism charges** and requesting extraditions. With the **extraditions having largely been blocked** by El Salvador's Supreme Court, there has been speculation as to whether MS13 members are being protected as part of the alleged unofficial pact with the government.

The gang's fortunes have since taken a nosedive. The informal pact with the Bukele administration appeared to unravel following a **bloody gang massacre** in March 2022 that claimed 87 lives. The government responded by launching a **ferocious crackdown** against the gangs, **enacting emergency powers** to make sweeping arrests that tore through gang ranks.

The speed and scale of the ongoing crackdown, dubbed the ***régimen de excepción***, or state of emergency, appears to have taken the MS13 by surprise. Unlike previous crackdowns, the gang **failed to mount** a coordinated response. Instead, a sizable chunk of its membership wound up in jail, was forced into hiding, or fled the country. The gang has been **neutralized** in El Salvador, at least for now, though its structure remains intact in other Central and North American countries.

# Leadership

On paper, the MS13 has a hierarchy, a language, and a code of conduct. In reality, the gang is loosely organized, with cells across Central America, Mexico, and the United States, but without any single recognized leader.

The leaders are known as "corredores," or "runners," and "palabreros," loosely translated as "those who have the word." These leaders control what are known as "cliques," the cells that operate in specific territories.

These cliques have their own leaders and hierarchies. Most cliques have a "primera palabra" and "segunda palabra," in reference to first and second-in-command. Some cliques are transnational; some fight with others and have more violent reputations. Some cliques control smaller cliques in a given region. They also have treasurers and other small functionary positions. The MS13 also has programs,

under which it groups numerous cliques. At its most potent, the MS13 leadership **can control** the actions of these cliques from afar.

# Geography

Numbers vary, but the US Southern Command says there are as many as 70,000 gang members in the Northern Triangle. The proliferation of gangs has accompanied a rise in murder rates.

Of these gangs, the MS13 is the largest in the region. Central American immigration to other parts of the United States, such as New York City and the Washington, DC area, helped foster the spread of the MS13 within the United States as well. The gang has also begun to appear in parts of Europe, most notably Spain and Italy.

In El Salvador alone, the MS13 has over **30,000 fully-fledged members**, known as *homeboys*, though most are now in jail, according to police intelligence reports obtained by InSight Crime. Those who arrested appear to have gone underground or scattered to nearby countries, particularly Mexico, Guatemala, and the United States.

Some top Salvadoran MS13 leaders are thought to be **seeking refuge** in Mexico, where the gang operates its so-called Mexico Program. The Mexico Program was formed by exiled Salvadoran gang members who entered the human smuggling and drug trades, according to an InSight Crime **investigation**.

# Allies and Enemies

The MS13 is enemies with the Barrio 18, another street gang with an extensive presence in Central America, Mexico and the United States. In recent years, the gang has sought to expand its political connections.

Video evidence surfaced in 2016 showing that **the gang had secretly negotiated** with leaders of El Salvador's governing party, the Farabundo Martí National Liberation Front (Frente Farabundo Martí para la Liberación Nacional – FMLN), offering them political support in exchange for economic benefits.

Negotiations with the Bukele government may have reinforced the MS13's political ties – at least one MS13 leader wanted by US authorities was reportedly **escorted out of El Salvador** by a top official in

late 2021. But dialogue with the Bukele administration appears to have collapsed following the most recent crackdown.

# Prospects

Mass arrests in El Salvador, starting in early 2022, have **eviscerated** the MS13's street-level membership. As a result, the gang has lost control of strategic territories it once relied on to make money through extortion and drug peddling. In its weakened state, it seems unlikely the gang will **stage a comeback** any time soon.

Outside El Salvador, the MS13's ranks remain intact. The gang remains a significant threat to citizen security in urban hubs in Honduras and Guatemala, also maintaining a presence in a number of US cities.

© 2025 InSight Crime

Powered by Newspack



Homeland
Security
Investigations

U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# HSI San Francisco Locks Away MS-13 Gang Members for Over 20 Years in Prison for Racketeering Conspiracy, Conspiracy to Commit Murder

**Release Date:** January 6, 2025

**SAN JOSE** — Erick Escalante-Torres and Jose Noe Ramirez-Avelar, members of the La Mara Salvatrucha gang (better known as MS-13) based in Santa Cruz, were sentenced today to 27 years and 11 months in prison and 22 years in prison, respectively, for racketeering conspiracy, conspiracy to commit murder in aid of racketeering, and other crimes. The sentences were handed down by the Honorable Edward J. Davila, U.S. District Judge, following the defendants' convictions by guilty plea.



"This case illustrates the direct threat transnational gang activity is to our communities and the indiscriminate and needless devastation it brings to innocent families," said Homeland Security Investigations (HSI) San Francisco Special Agent Charge Tatum King. "HSI San Francisco will aggressively pursue individuals engaged in this criminal activity and ensure they face the consequences for their actions. HSI San Francisco appreciates the dedicated work of its special agents together with the U.S. Attorney's Office and the Santa Cruz Police Department in bringing these individuals to justice."

Escalante-Torres, 29, also known as "Deceptico" or "Problematico," and Ramirez-Avelar, 34, also known as "Chepito" or "Sparky," were both actively involved in the MS-13 enterprise in Northern California from approximately 2015 to 2017. According to their plea agreements, MS-13 members and associates earn promotions and prestige by committing criminal activities benefitting the gang, including by engaging in violent crimes such as murder and attempted murder of rival gang members.

Case 2:25-mj-01158    Document 00118353247    Page: 44    Date Filed: 02/27/2025    Entry ID: 6703240

2/27/25, 12:35 PM    MS-13 Gang Members Sentenced to Over 20 Years in Prison for Racketeering Conspiracy, Conspiracy to Commit Murder | Home...

In the summer of 2016, Escalante-Torres, Ramirez-Avelar, and others began planning to murder a man they believed to be associated with the rival 18th Street gang. Once the gang received approval for the killing from higher-up gang leaders in El Salvador, the group began surveilling the victim's movements and plotting different ways to kill him. According to court documents, they decided to kill the victim late at night when he would routinely walk to a nearby taqueria to escort home his fiancée who worked the late shift. On Sept. 22, 2016, they executed their plan, fatally shooting the victim on his way to pick up his fiancée. The victim was not actually affiliated with the rival gang.

Both defendants were also involved in other gang shootings. In May and June 2016, Escalante-Torres and Ramirez-Avelar helped destroy the evidence from a murder committed by another Northern California MS-13 clique. In July 2016, Escalante-Torres and others drove into rival gang territory and, after spotting suspected rival gang members, Escalante-Torres fired two shots, hitting one victim in the leg.

"Defendants engaged in murder and other violent crimes to carry out the goals of MS-13, a transnational criminal organization. Their ruthless actions threatened public safety in Santa Cruz," said United States Attorney Ismail J. Ramsey. "With these sentences, we are sending a strong message to gang members that these crimes will be fully investigated and prosecuted, and justice will be served."

Both defendants pleaded guilty on Aug. 19, 2024, to one count of racketeering conspiracy, one count of conspiracy to commit murder in aid of racketeering, and one count of using a firearm in furtherance of a crime of violence resulting in death. Escalante-Torres also pleaded guilty to one count of attempted murder in aid of racketeering and one count of discharge of a firearm in furtherance of a crime of violence.

Judge Davila also sentenced each defendant to a five-year term of supervised release in addition to the terms of imprisonment. Escalante-Torres has been in federal custody since 2018, and Ramirez-Avelar has been in federal custody since 2017. Both defendants began serving their sentences today. In addition to Escalante-Torres and Ramirez-Avelar, 10 other members of the Santa Cruz clique have been convicted and sentenced for their involvement in criminal activity as members of the gang.

Assistant United States Attorneys George Hageman and Aseem Padukone are prosecuting this case with the assistance of Mimi Lam. The prosecution is the result of a years-long investigation by HSI and the Santa Cruz Police Department.

## Topics

LAW ENFORCEMENT (/TOPICS/LAW-ENFORCEMENT)

## Keywords

HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)

LAW ENFORCEMENT PARTNERSHIP (/KEYWORDS/LAW-ENFORCEMENT-PARTNERSHIP)    MS-13 (/KEYWORDS/MS-13)

TRANSNATIONAL CRIME (/KEYWORDS/TRANSNATIONAL-CRIME)

TRANSNATIONAL CRIMINAL ORGANIZATION (TCO) (/KEYWORDS/TRANSNATIONAL-CRIMINAL-ORGANIZATION-TCO)

Last Updated: 02/05/2025



**PRESS RELEASE**

# Ten MS-13 Members and Associates Indicted for Gang-Related Murders and Racketeering

Thursday, July 27, 2023

**For Immediate Release**

U.S. Attorney's Office, Eastern District of California

FRESNO, Calif. — A seven-count superseding indictment was unsealed today, charging 10 MS-13 members and associates with a RICO conspiracy and murder in aid of racketeering, U.S. Attorney Phillip A. Talbert announced.

"When reports surfaced that MS-13 had established a presence in the City of Mendota in the Central Valley, a multi-agency investigation was launched," U.S. Attorney Talbert said. "Today's announcement is a direct result of the arrests in 2018 of 25 individuals on federal and state charges in connection with their Mara Salvatrucha (MS-13) gang activities. One of the highest priorities of my office and of the federal law enforcement agencies we work with is to partner with the police departments, sheriffs' offices, and district attorneys in our district to reduce violent crime."

According to court documents, the following defendants named in the indictment are alleged members and associates of Mara Salvatrucha (MS-13), a violent criminal street gang: Martin Alfredo Leiva-Leiva, 43, of Richmond; Juan Carlos Urias-Torres, 34, of Stockton; Angel Antonio Diaz-Morales, 32, of Salinas; Jose Rene Barrera-Martinez, 34, of Mendota; Luis Fausino Diaz-Pineda, 28, of Mendota; Angel Antonio Castro-Alfaro, 29, of Mendota; Jose Joaquin Amaya-Orellana, 31, of Mendota; Julio Cesar Recinos-Sorto, 28, of Leesburg, Virginia; Jose Armando

Torres-Garcia, 27, of El Salvador; and Jose Santos Hernandez-Otero, 29, of El Salvador. The criminal organization's members and associates engage in acts of violence, including acts involving murder, extortion, kidnapping, assault, and other crimes often with the purpose of intimidating rival gang members, victims of extortion, and members of the community, and to protect their "turf" and fellow gang members.

## MS-13

According to court documents, MS-13 (Mara Salvatrucha) was formed in Los Angeles in the mid 1980s by Salvadoran immigrants and is known for committing brutal acts of violence against rival gang members and nongang members. MS-13 in Los Angeles is beholden to the Mexican Mafia, which is a criminal organization that united Hispanic gang members under a single alliance operating within the California state prison system, the streets and suburbs of large cities throughout Southern California, and elsewhere.

MS-13 has a self-imposed code of conduct to enforce and maintain compliance among its members. MS-13 also adopts and enforces the Mexican Mafia's rules. MS-13 has zero tolerance for members and associates who cooperate with law enforcement. Once MS-13 has evidence that someone has cooperated with law enforcement, MS-13 issues a "green light" as to that person, which is an order that if any MS-13 member sees the person who is allegedly or actually cooperating with law enforcement, that person is to be killed on sight. MS-13 members also engage in acts of violence against innocent citizens and rival gang members in their territory.

Participation in violent acts increases the respect accorded to members who commit violent acts. Additionally, commission of violent acts by MS-13 members enhances the gang's overall reputation for violence in the community, resulting in the intimidation of citizens in MS-13's territory.

## MS-13 in Fresno County

Since 2015, there are more than 14 homicides alleged to be related to MS-13 in Mendota. These homicides are alleged to be related to MS-13 for a variety of reasons that include: the locations where the homicide victims were recovered (in and around Mendota), the association between the homicide victims and known MS-13 gang members, and the cause of death or condition the homicide victims have been found, including gruesome attacks caused by machetes, a weapon commonly used by MS-13 gang members.

The MS-13 subsets operating in Mendota have a direct connection to, and originate from, MS-13 from Los Angeles. Investigators allege that the individuals charged in the indictment were associated with a Mara Salvatrucha subset in Mendota known as Vatos Locos Salvatruchos (VLS).

2/26/25, 2:35 PM 158 Document 001:18253247 Page: 47 Date Filed: 03/27/2025 Entry ID: 6703240

Eastern District of California | Ten MS-13 Members and Associates Indicted for Gang-Related Murders and Racketeering | United …

### Murder of an adult male on Jan. 26, 2016

Leiva-Leiva and Diaz-Morales are charged with the murder of an adult male on Jan. 26, 2016, in San Benito County for the purpose of gaining entrance and maintaining and increasing position in MS-13.

### Murder of an adult female on July 13, 2016

Leiva-Leiva and Urias-Torres are charged with the murder in Fresno County of an adult female that occurred on July 13, 2016, for the purpose of gaining entrance and maintaining and increasing position in MS-13.

### Murder of an adult female and an adult male on Oct. 30, 2016

Leiva-Leiva, Hernandez-Otero, Torres-Garcia, Amaya-Orellana, and Recinos-Sorto are charged with murdering an adult female and an adult male on Oct. 30, 2016, in Fresno County for the purpose of gaining entrance and maintaining and increasing position in MS-13.

### Murder of an adult male in January 2017

Leiva-Leiva, Barrera-Martinez, Diaz-Pineda, and Angel Antonio Castro-Alfaro are charged with the January 2017 murder of an adult male in Fresno County for the purpose of gaining entrance and maintaining and increasing position in MS-13.

### Murder of an adult female on Dec. 13, 2017

Leiva-Leiva and Urias-Torres are charged with the murder of an adult female on Dec. 13, 2017, for the purpose of gaining entrance and maintaining and increasing position in MS-13.

"MS-13 gang members prey upon the communities they live in, committing the most heinous, violent acts against their victims. The streets of the Central Valley and surrounding communities are safer when criminal gang members are arrested and held to account for their crimes," said HSI San Francisco Special Agent in Charge Tatum King. "I'm proud of HSI's exhaustive investigative work, together with the Federal Bureau of Investigation, the Fresno County Sheriff's Office, the California Highway Patrol, the California Department of Justice, and the US Attorney's Office in the Eastern District of California, in bringing these subjects to justice."

"The FBI is deeply committed to leveraging all of its assets, both foreign and domestic, in collaboration with our local, state, and federal partners to disrupt and dismantle criminal organizations that threaten the communities we serve. Every family deserves to live in a community free of fear and gang violence," said Special Agent in Charge Sean Ragan of the FBI Sacramento Field Office. "We also need the public to come forward with information to help us all in that mission. Never suffer in silence; law enforcement can and will help ensure justice for victims and safer communities for all."

This case is the product of an investigation by the Federal Bureau of Investigation and Homeland Security Investigations, in partnership with the Fresno County Sheriff's Office, the

Multi-Agency Gang Enforcement Consortium (MAGEC), and the Fresno County District Attorney's Office with assistance from the Mendota Police Department, the San Benito County Sheriff's Office, the Los Angeles Police Department Robbery, Homicide Division and the Los Angeles County Sheriff's Office. The U.S. Department of Justice's Organized Crime and Gang Section (OCGS), the Office of Enforcement Operations (OEO), and the Office of International Affairs (OIA) also assisted. Assistant U.S. Attorneys Kimberly A. Sanchez and Justin J. Gilio and Special Assistant U.S. Attorney Robert Veneman-Hughes are prosecuting the case.

If convicted, the defendants face a mandatory minimum sentence of life in prison and a maximum statutory penalty of death. Any sentence, however, would be determined at the discretion of the court after consideration of any applicable statutory factors and the Federal Sentencing Guidelines, which take into account a number of variables. The charges are only allegations; the defendants are presumed innocent until and unless proven guilty beyond a reasonable doubt.

This effort is part of an Organized Crime Drug Enforcement Task Forces (OCDETF) operation. OCDETF identifies, disrupts, and dismantles the highest-level criminal organizations that threaten the United States using a prosecutor-led, intelligence-driven, multi-agency approach. Additional information about the OCDETF Program can be found at www.justice.gov/OCDETF.

This case is part of Project Safe Neighborhoods (PSN), a program bringing together all levels of law enforcement and the communities they serve to reduce violent crime and gun violence, and to make our neighborhoods safer for everyone. On May 26, 2021, the U.S. Department of Justice launched a violent crime reduction strategy strengthening PSN based on these core principles: fostering trust and legitimacy in our communities, supporting community-based organizations that help prevent violence from occurring in the first place, setting focused and strategic enforcement priorities, and measuring the results.

Anyone with information on murders committed in the Mendota area 2014-2018, please call the Fresno County Sheriff's Office Homicide Unit at 559-600-3111.

leiva-leiva_superseding_indictment.pdf

*Updated July 27, 2023*

**Topic**

Case 2:25-r-1158        Document 001182539247        Page: 49        Date Filed: 03/27/2025        Entry ID: 6703240

| VIOLENT CRIME

**Component**

[USAO - California, Eastern](#)

# Related Content

---

PRESS RELEASE

## Three Aryan Brotherhood Prison Gang Members Convicted of Rico Conspiracy and Murder in Aid of Racketeering

Following a four-week trial before U.S. District Judge Jennifer L. Thurston, three members of the Aryan Brotherhood prison gang were found guilty of racketeering activity that included murder, drug trafficking...

February 18, 2025

---

PRESS RELEASE

## Marysville Man Charged With Assaulting U.S. Postal Worker

Edgar Castro, 40, of Marysville, was arrested today, charged by complaint with assaulting a federal employee.

February 11, 2025

---

PRESS RELEASE

Case 25-1158    Document 00118253947    Page: 50    Date Filed: 02/27/2025    Entry ID: 6703240

## Two Indicted for Kidnapping Mother and Child, Transporting Them from Fresno to Mexico Against Their Will

A federal grand jury returned a three-count indictment today against Rosa Ventura, 34, of Fresno, and Claudia Gonzales, 38, of Fresno, charging them with conspiracy to kidnap, kidnapping, and kidnapping...

January 30, 2025

 **Eastern District of California:**

Sacramento Main Office

501 I Street, Suite 10-100

Sacramento, CA. 95814

Email USAO-EDCA

Telephone: (916) 554-2700

Fax Line: (916) 554-2900

 An official website of the United States government

🏛 **Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

🔒 **Secure .gov websites use HTTPS**
A **lock** (🔒) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

⊕ En Español   🗋 Contact Us   ⚭ Quick Links

 **U.S. Immigration and Customs Enforcement**

Search

Call 1-866-DHS-2-ICE     Report Crime

ICE    NEWSROOM

FEBRUARY 16, 2012 • SAN FRANCISCO, CA • TRANSNATIONAL GANGS

# San Francisco MS-13 gang leader sentenced to life in prison

*Defendant is seventh Bay Area MS-13 member to receive life sentence in Operation Devil Horns*

SAN FRANCISCO – A Bay Area leader of La Mara Salvatrucha, or MS-13, was sentenced to life in federal prison Wednesday on racketeering-related charges arising from Operation Devil Horns, a long-term probe led by U.S. Immigration and Customs Enforcement's Homeland Security Investigations.

Danilo Velasquez, aka "Triste," appeared in federal court Wednesday in San Francisco before U.S. District Judge William H. Alsup. At sentencing, Judge Alsup described the defendant as a "vicious murderer."

Velasquez belonged to a clique of MS-13 which claimed part of the Mission District of San Francisco. Velasquez joined the "20th Street" clique in 2004. Since its inception, MS-13 members have warred with rival gang members and sought to extort payments from other criminals in its territory. When the federal government indicted the majority of the 20th Street clique members on Oct. 22, 2008, Velasquez assumed leadership on the streets. The evidence presented at trial showed how Velasquez, with others, conspired to commit a variety of crimes to further the goals of the gang, including attacking and killing rival gang members and others who defied or challenged MS-13.

Case 1:25-cv-00158    Document: 00118253247    Page: 52    Date Filed: 02/27/2025    Entry ID: 6703240

During Velasquez's trial, the government presented evidence of multiple murders committed by MS-13 members in 2008. Several of the victims were not involved in gangs or any illegal activity, including a 14-year-old, but were mistaken to be rival gang members by MS-13 members.

The evidence at trial showed that on Feb. 19, 2009, Velasquez and fellow gang members Luis Herrera, aka "Killer" and Jaime Balam, aka "Tweety," went looking to kill rival gang members in the Bay Area. In the Excelsior District, they spotted a car of young Latino professionals – two were college graduates of UC Berkeley, one a law student at UC Hastings, one a bank employee and another a student at City College in San Francisco. According to evidence presented at trial, these victims were targeted because some of the men wore baseball caps in colors associated with rival gang members. None of the victims were gang members themselves.

Velasquez, Herrera and Balam followed the victims' car into Daly City, Calif., boxed the car in at a red light, whereupon Velasquez and Balam flanked the victims' car carrying semi-automatic handguns and began shooting. By the time they finished firing, they had severely wounded two of the passengers and murdered a third passenger, Moises Frias Jr. Frias suffered nine gunshot wounds, including several to the head. He died en route to the hospital.

Herrera pleaded guilty mid-trial to seven racketeering-related counts, including use of a firearm causing the death of Frias. As part of his plea, Herrera admitted that he was part of the MS-13 hunting party that followed the victims' car and murdered Frias. Herrera was sentenced Jan. 24, to 35 years in prison. Balam remains a fugitive.

Velasquez's trial was the second of three consecutive federal trials of members of the 20th Street clique of MS-13. Six of Velasquez's fellow MS-13 gang members were convicted in August 2011 after a five-month trial that involved more than 150 witnesses. The six gang members – Marvin Carcamo, aka "Psycho;" Angel Noel Guevara, aka "Peloncito;" Erick Lopez, aka "Spooky;" Moris Flores, aka "Slow Pain;" Jonathan Cruz-Ramirez, aka "Soldado;" and Luis Herrera's brother Guillermo Herrera, aka "Sparky" – were each sentenced to life in prison in December 2011.

Thursday, a federal jury convicted the sole defendant in the third trial, Manuel Franco, aka "Dreamer," on one count of violent crime in aid of racketeering conspiracy.

The cases were prosecuted by Assistant U.S. Attorneys Wilson Leung, Wil Frentzen, Derek Owens, Andrew Scoble and David Hall of the Organized Crime Strike Force of the U.S. Attorney's Office for the Northern District of California, and Trial Attorney Theryn G. Gibbons of the Criminal Division's Organized Crime and Gang Section. In addition to HSI, the San Francisco and Daly City police departments figured prominently in these investigations.

Updated: 11/18/2024

MEDIA INQUIRIES

For media inquiries about ICE activities, operations, or policies, contact the ICE Office of Public Affairs at ICEMedia@ice.dhs.gov.

About Us                          Immigration Enforcement

Combating Transnational Crime              Newsroom

    



### ICE Contact Center

Report suspicious activity: 1-866-DHS-2-ICE

2/27/25, 12:53 PM    San Francisco MS-13 gang leader sentenced to life in prison | ICE



ICE.gov

**An official website of the U.S. Department of Homeland Security**

**National Terrorism Advisory System**

| | | |
|---|---|---|
| About ICE | Archive | The White House |
| Accessibility | No FEAR Act Data | DHS Components |
| FOIA Requests | Site Links | USA.gov |
| Privacy Policy | Performance Reports | |
| DHS.gov | Inspector General | |



**PRESS RELEASE**

# Federal Grand Jury Indicts 23 MS-13 Members and Associates for Alleged Widespread Methamphetamine Trafficking

Tuesday, November 14, 2023

**For Immediate Release**

U.S. Attorney's Office, Central District of California

*LOS ANGELES* – Federal and local law enforcement officials this morning announced the unsealing of a federal grand jury indictment charging 23 members and associates of the Mara Salvatrucha-13 (MS-13) transnational street gang who allegedly trafficked pound quantities of methamphetamine and illegally possessed ammunition found in a "ghost gun."

Today's takedown resulted in the arrests of 17 MS-13 members and associates who are expected to be arraigned on the 36-count indictment this afternoon in United States District Court in downtown Los Angeles. Four of the federal defendants were already in state custody, and authorities continue to search for two defendants named in the indictment.

As part of this morning's takedown, law enforcement seized multiple pounds of suspected methamphetamine, fentanyl and cocaine. Authorities this morning also seized nine firearms and approximately $94,000 in cash – with about $50,000 seized from one residence.

"MS-13, one of the largest and most violent gangs in North America, perpetuates a cycle of violence and destruction, the victims of which are most often immigrants from Central America

and Mexico and other Latinos," said United States Attorney Martin Estrada. "The widespread methamphetamine trafficking conspiracy we have charged reveals that drug-trafficking is the primary method MS-13 uses to finance its modus operandi of murder and mayhem."

"MS-13 members, allegedly at the direction of an incarcerated Mexican Mafia member, were able to wreak havoc on communities in Los Angeles," said Donald Alway, the Assistant Director of the FBI's Los Angeles Field Office. "This case is just the latest joint operation targeting MS-13's transnational criminal enterprise as we continue to make an impact on their ability to intimidate and threaten law abiding citizens in and around Los Angeles."

"The Los Angeles Police Department appreciates the partnership, commitment and dedication from our partner law enforcement agencies," said Los Angeles Police Chief Michel Moore. "These arrests will have a meaningful and lasting impact on crime in Los Angeles by taking the leadership and the most violent of these gang members off the street."

"These street gangs use the sales of illicit drugs to further their criminal enterprise and victimize our communities," said Los Angeles County Sheriff Robert Luna. "Through our collaboration with our federal and local law enforcement partners, the Los Angeles County Sheriff's Department was able to assist in the takedown of several violent MS-13 gang members and associates that use fear and intimidation to threaten public safety."

"Transnational street tangs that prey on our communities with drugs and violence will always be a priority of HSI and their partners," said Homeland Security Investigations Special Agent in Charge Eddy Wang. "This collaborative takedown shows the resolve of the law enforcement community to make our streets safer."

Mara Salvatrucha was formed in Los Angeles in the mid-1980s, and the street gang is now comprised of tens of thousands of individuals in at least 10 states and several Central American countries, notably El Salvador. In the mid-1990s, Mara Salvatrucha became associated with the Mexican Mafia and added the number 13 to its name ("M" is the 13th letter of the Spanish and English alphabets).

This case focuses on MS-13 in Los Angeles and its efforts to traffic methamphetamine in their "territory." The indictment returned November 8 and unsealed today alleges that an imprisoned MS-13 member who also was a member of the Mexican Mafia controlled MS-13 Los Angeles by imposing a rule on all the gang's Los Angeles-area cliques that required them to buy methamphetamine from Herlyn Barrientos, 46, a.k.a. "Doctorazo," of Huntington Park, and others. Once the various cliques redistributed the methamphetamine, some profits from that distribution flowed to the imprisoned MS-13 member.

During the period of July 2021 to August 2023, the MS-13 inmate allegedly first designated Pavel Hurtado, 36, a.k.a. "Temper," of Oxnard, and, later, Eli Grijalva, 34, a.k.a. "Skinny," of South Los Angeles, to be the overall shot caller for MS-13 Los Angeles. In this role, Hurtado and

Grijalva – the indictment's top two defendants – allegedly oversaw MS-13's drug trafficking activities and communicated with the MS-13 inmate to coordinate drug trafficking activities for the gang.

MS-13 members used violence and intimidation to control narcotics trafficking in territories controlled by the gang and narcotics sales comprised most of the revenue generated by MS-13. To sell narcotics within MS-13's territory, one must either be an MS-13 member, an associate, or otherwise have permission from – and pay extortionate rent payments to – MS-13.

Each MS-13 member and associate, along with wholesale narcotics suppliers and street drug dealers, would receive authorization from the shot callers to sell drugs within individual clique territories, and in return, would be required to pay a portion of the drug proceeds, known as a "tax," to his or her respective MS-13 shot caller for the areas in which narcotics were trafficked.

Agustín Aquino-Martínez, 46, a.k.a. "Chino," of Lancaster, allegedly acted as treasurer for MS-13 Los Angeles, coordinated the collection of the drug proceeds and "taxes" from each MS-13 Los Angeles clique and was responsible for forwarding those profits and taxes to the MS-13 inmate.

The indictment charges all 23 defendants with one count of conspiracy to possess with intent to distribute and distribute methamphetamine. Thirty-four of the indictment's 36 counts charge individual MS-13 members and associates – including Hurtado, Grijalva and Barrientos – with distribution of methamphetamine. One of the indictment's counts accuses an individual gang member of being a felon unlawfully possessing ammunition inside a "ghost gun."

*An indictment contains allegations that a defendant has committed a crime. Every defendant is presumed to be innocent until and unless proven guilty in court.*

If convicted, each defendant charged with conspiracy to distribute methamphetamine would face a statutory maximum sentence of life in federal prison. The distribution of methamphetamine count is punishable by a statutory maximum of life in federal prison. The illegal possession of ammunition count carries a statutory maximum sentence of 10 years in federal prison.

The FBI's Los Angeles Metropolitan Task Force on Violent Gangs is investigating this matter. This task force is comprised of the FBI, the Los Angeles Police Department, the Los Angeles County Sheriff's Department, and Homeland Security Investigations. IRS Criminal Investigation and the California Department of Corrections and Rehabilitation provided substantial assistance.

Assistant United States Attorneys Shawn T. Andrews of the Terrorism and Export Crimes Section and Hava Mirell of the Violent and Organized Crime Section are prosecuting this case.

This case is part of an Organized Crime Drug Enforcement Task Forces (OCDETF) operation. OCDETF identifies, disrupts and dismantles the highest-level criminal organizations that threaten the United States using a prosecutor-led, intelligence-driven, multi-agency approach. Additional information about the OCDETF program can be found at https://www.justice.gov/OCDETF.

**Contact**

Ciaran McEvoy

Public Information Officer

ciaran.mcevoy@usdoj.gov

(213) 894-4465

*Updated November 14, 2023*

**Topics**

| **DRUG TRAFFICKING** | **VIOLENT CRIME** |

**Component**

USAO - California, Central

Press Release Number: 23-246

# Related Content

PRESS RELEASE

### Russian National Charged in Federal Criminal Complaint Alleging He Bit and Injured Deportation Officer Who Arrested Him

A Russian national was charged today in a federal criminal complaint alleging he bit and injured an immigration officer who had detained and arrested him on Tuesday in downtown

Los...

February 26, 2025

---

**PRESS RELEASE**

## Two Men and Woman Charged in Grand Jury Indictment Alleging Armed Robbery Spree of a Dozen Southern California Businesses

A federal grand jury has returned a 12-count superseding indictment charging two San Fernando Valley residents and one Long Beach resident with committing armed robberies of smoke shops, donut shops...

February 20, 2025

---

**PRESS RELEASE**

## Former Newport Beach Doctor Pleads Guilty to Possession of Hundreds of Images and Video of Child Sexual Abuse Material

A former Newport Beach gynecologist pleaded guilty today to federal criminal charges for possessing child sexual abuse material (CSAM) across multiple personally owned devices.

February 19, 2025

---



### Central District of California

312 N. Spring St. Suite 1200
Los Angeles, CA 90012

Phone: (213) 894-2400
Fax: (213) 894-0141

2/27/25, 12:53 PM    ICE Homeland Security Investigations arrests get MS-13 gang members 27-year, 30-year sentences | ICE

 An official website of the United States government

## Official websites use .gov
A **.gov** website belongs to an official government organization in the United States.

## Secure .gov websites use HTTPS
A **lock** (🔒) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 En Español    📄 Contact Us    🔗 Quick Links


U.S. Immigration and Customs Enforcement

Search

**Call** 1-866-DHS-2-ICE    Report Crime

ICE    NEWSROOM

## Archived Content
In an effort to keep ICE.gov current, the archive contains content from a previous administration or is otherwise outdated. This information is archived and not reflective of current practice.

JULY 1, 2020 • SANTA CRUZ, CA • TRANSNATIONAL GANGS

# ICE Homeland Security Investigations arrests get MS-13 gang members 27-year, 30-year sentences

SAN FRANCISCO, Calif. – U.S. Immigration and Customs Enforcement's (ICE) Homeland Security Investigations (HSI) arrests in Santa Cruz, California, resulted in MS-13 gang members receiving a 30-year prison sentence and a 27-year sentence.

"Homeland Security Investigations will continue our work to eradicate MS-13 criminal gang members trying to operate in California or anywhere else in America," said HSI San Francisco (NorCal) Special Agent in Charge Tatum King. "We appreciate the critically important work our partners at the Santa Cruz Police Department undertook to stop the victimization of community members by MS-13. HSI will continue to stand united with our local, state and federal law enforcement partners in our ongoing efforts to protect our communities."

The transnational street gang La Mara Salvatrucha, also known as MS-13, has local chapters, or cliques, throughout the world, including El Salvador, Honduras, Mexico, and the United States. MS-13 members and associates engage in crimes such as murder, narcotics trafficking, extortion, and obstruction of justice. MS-13 members enforce gang rules and protect gang territory with violence, including murder. The Santa Cruz Salvatrucha Locos (SCSL) is an MS-13 clique that operates in and around Santa Cruz, California.

On June 18, 2020, MS-13 gang member Alexander Martinez-Flores, a.k.a. "Pocar," was sentenced in the Northern District of California to 30 years of incarceration for using a firearm to cause murder, conspiracy to commit murder and extortion, and racketeering conspiracy. Martinez, 29, is a citizen of El Salvador.

Martinez, who was living in Santa Cruz, was a member of the SCSL clique of the MS-13 gang from at least January 2013 to February 2017, and the first-in-command from about February to August 2014. Martinez and SCSL members engaged in violence, drug trafficking and extortion. Martinez coordinated with MS-13 members in El Salvador and other places to carry out the directives of the gang's leadership in and around Santa Cruz. Martinez directed how SCSL money was maintained and spent.

Along with other gang members, Martinez patrolled SCSL's claimed gang territory in Santa Cruz with firearms and knives and assaulted, stabbed, threatened or shot rival gang members to maintain control over this "turf." Martinez hunted for rivals to kill on multiple occasions.

Martinez admitted that he was one of the shooters in a murder committed by SCSL gang members and that in April 2016 the gang discussed seeking approval from El Salvador to kill a suspected rival gang member. The murder was approved, and Martinez was one of the gang members tasked with killing the victim. On Sept. 22, 2016, the victim was shot and killed, and Martinez was one of the shooters. He then celebrated the murder with other MS-13 members.

According to a plea agreement, Martinez had a role in supporting SCSL's extortion and drug trafficking activities. On one occasion in July 2016, Martinez-Flores collected an extortion payment, the "monthly fee due to SCSL," from a local drug dealer.

On June 29, Tomas Rivera, a.k.a. "Jonas Portillo Escobar," a.k.a. "Profugo," a.k.a. "Caballo," was sentenced to 27 years in prison for conspiring to engage in racketeering, extortion by force, and murder in aid of racketeering in connection with his role as a

leader of the local Santa Cruz-based MS-13 gang clique.

Rivera, 27, of El Salvador, arrived in Santa Cruz in April of 2016, where he quickly stepped in as second in command of the SCSL clique of the MS-13 gang. Rivera admitted he played a key role in a murder committed by SCSL gang members. Specifically, Rivera admitted that in April 2016 he discussed seeking approval from El Salvador to kill a suspected rival gang member. The murder was committed by Martinez-Flores and other SCSL members Sept. 22, 2016, and Rivera collected the murder weapons. Rivera, Martinez and other SCSL members then celebrated the murder. At an October 2016 SCSL meeting, Rivera took charge of organizing the day-to-day efforts of SCSL members to kill additional rivals. Rivera also had a role in burning clothing and a car involved in another murder by MS-13 members.

From April 2016 through January 2017, Rivera and SCSL members engaged in drug trafficking and extortion. Rivera coordinated with MS-13 members in El Salvador and other places to carry out the directives of the gang's leadership in and around Santa Cruz. Rivera acknowledged he pushed for strict adherence to MS-13 rules, including the rule that required all people who wanted to join the gang to commit a murder to qualify for membership.

Additionally, Rivera had a role in patrolling the area over which SCSL gang members asserted their control. Rivera admitted in the plea agreement that on one occasion he and other SCSL members assaulted a suspected rival gang member they found in their territory. On another occasion, Rivera and other MS-13 members were in a car, when they spotted people they suspected of being rival gang members. One of the MS-13 members shot at and attempted to kill a member of the group.

The U.S. Attorney's Office Organized Crime Strike Force prosecuted the cases. These sentencings are the results of a joint HSI San Jose and Santa Cruz Police Department investigation into MS-13 criminal street gang members operating in the greater Santa Cruz, California area.

"The Santa Cruz Police are grateful to HSI for assistance in investigating and convicting very violent members of the Mara Salvatrucha gang. It will make our community safer," said Santa Cruz Chief of Police Andrew Mills.

U.S. District Court Judge Edward J. Davila handed down the sentences. Judge Davila also sentenced the defendants to a 5-year period of supervised release.

2/7/25, 12:23 PM    ICE: Homeland Security Investigations arrests get MS-13 gang members 27-year, 30-year sentences, ICE

Eight of the other charged defendants have already pleaded guilty for their roles in the SCSL and MS-13 criminal enterprise.

In fiscal year 2019, HSI agents made nearly 4,000 arrests of transnational gang members; of those, more than 300 were tied to MS-13.

Individuals across the world can report suspicious criminal activity to the HSI Tip Line 24 hours a day, seven days a week. Highly trained specialists take reports from both the public and law enforcement agencies on more than 400 laws enforced by HSI. Contact the toll-free tip line at 1-866-DHS-2-ICE or by completing its online tip form at https://www.ice.gov/webform/hsi-tip-form. Both are staffed around the clock. From outside the U.S. and Canada, callers should dial 802-872-6199. Hearing impaired users can call TTY 802-872-6196.

Electronic court filings and further procedural and docket information are available at https://ecf.cand.uscourts.gov/cgi-bin/login.pl.

Updated: 01/24/2025

## MEDIA INQUIRIES

For media inquiries about ICE activities, operations, or policies, contact the ICE Office of Public Affairs at ICEMedia@ice.dhs.gov.

**About Us**                                    **Immigration Enforcement**

**Combating Transnational Crime**                **Newsroom**







**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE

2/27/25, 12:35 PM    ICE: Homeland Security Investigations arrests get MS-13 gang members 27-year, 30-year sentences | ICE



ICE.gov

**An official website of the U.S. Department of Homeland Security**

About ICE

Accessibility

FOIA Requests

Privacy Policy

DHS.gov

Archive

No FEAR Act Data

Site Links

Performance Reports

Inspector General

The White House

DHS Components

USA.gov

**National Terrorism Advisory System**

2/7/25, 2:03 PM                    California MS-13 member accused of 10-year-old's torture and murder is in US illegally: source



🖨 Print    ✖ Close

# California MS-13 member accused of 10-year-old's torture and murder is in US illegally: source

By Michael Ruiz

Published January 19, 2023

Fox News

***Warning: This story includes graphic allegations of violence against children***

**EXCLUSIVE:** A suspected MS-13 gang member set to go on trial next week for the horrific 2018 slaying of his California girlfriend's 10-year-old son is a native of El Salvador and living in the U.S. illegally, according to a law enforcement source.

Kareem Ernesto Leiva, 37, and his American girlfriend Heather Maxine Barron, 33, are both charged with murder and torture in the death of her son, Anthony Avalos, as well as child abuse against two other children in the home, court records show.

Prosecutors allege the boy had been beaten, starved, forced to kneel on rice, force-fed, whipped and more in a home where he was allegedly subjected to "extreme physical pain and suffering."

**CALIFORNIA SEEKS DEATH PENALTY IN ALLEGED TORTURE KILLING OF ANTHONY AVALOS**



Kareem Leiva, an illegal immigrant from El Salvador, is accused of the torture and murder of 10-year-old California boy Anthony Avalos, right. (Al Seib/Los Angeles Times via Getty Images, David Barron via AP)

While in jail, Leiva allegedly shanked another inmate, according to court documents, and was accused of domestic violence against females in both 2010 and 2013.

His brother, Mauricio Leiva, is another alleged MS-13 member who was indicted in a federal racketeering case against a deadly drug ring in 2016, court documents show.

Leiva and Barron's murder trial in Los Angeles is scheduled to begin next week. Jonathan Hatami, who rose to prominence as the lead prosecutor in the Gabriel Fernandez trial, and Saeed Teymouri are assigned to the case.

Leiva's defense attorney, Dan Chambers, did not immediately respond to a message seeking comment.



This undated photo provided by David Barron shows Anthony Avalos. Los Angeles County prosecutors have charged his mother and her boyfriend with murder and torture. (David Barron via AP)

Prosecutors previously alleged that Barron and Leiva whipped the child, poured hot sauce on his face and hung him upside down. He had been tortured "for almost two weeks, up until paramedics responded to [the] residence and found Anthony's

2/27/2025, 1:08 PM    California MS-13 member accused of 10-year-old's torture and murder is an US illegally: Source

lifeless body," court documents allege.

Anthony and his siblings also suffered other forms of abuse, including being burned with a curling iron or locked in their rooms for hours.

On June 20, 2018, just weeks after the end of Anthony's fourth-grade school year, Barron called 911 to report her son was unconscious, according to the documents.

Police arrived and found the boy not breathing and covered in bruises and abrasions. He also had circular burn marks on his stomach. After he was transported to a hospital, doctors noted he appeared "severely malnourished and dehydrated."



Heather Maxine Barron, who was indicted for the torture and murder of her 10-year-old son Anthony Avalos in Lancaster, walks into court for a pretrial hearing Feb. 27, 2018, in Los Angeles Criminal Court. (Irfan Khan/Los Angeles Times via Getty Images)

**MOTHER'S BOYFRIEND ARRESTED IN DEATH OF 10-YEAR-OLD BOY WHO COMPLAINED ABOUT ABUSE**

He was pronounced dead the following morning.

The Los Angeles County Medical Examiner-Coroner ruled Anthony's death a homicide and identified multiple causes of death: subdural, subarachnoid and intraparenchymal cerebral hemorrhages due to blunt-force head trauma.



Anthony Avalos in an undated family photo. (Facebook)

Court documents allege he was held up by his feet and dropped on his head repeatedly, punished with wrestling moves, forced to fight other children in the house, thrown into furniture, beaten in the face with a ping-pong paddle, slammed to the floor and given rug burn.

The day before the 911 call, Anthony was unable to walk or eat, according to authorities. But Leiva and Barron allegedly left him unconscious for hours.



Kareem Ernesto Leiva at a pre-trial hearing in Los Angeles Criminal Court Feb. 27, 2018, in Los Angeles. Leiva and his girlfriend Heather Maxine Barron were indicted for the murder and torture of her 10-year-old son Anthony Avalos in Lancaster. (Irfan Khan/Los Angeles Times via Getty Images)

"The final death blows came that evening when Leiva slammed Anthony on his head multiple times," prosecutors allege. "Barron

did not call the police until the next morning. Leiva purposefully fled the residence with his children before authorities arrived."

Authorities had received reports for years of alleged child abuse, according to court filings. Even before Barron began dating Leiva, another adult male acquaintance of hers was accused of sexually assaulting her son when he was just 5 years old.

Despite many interactions with county child services, authorities determined investigations into numerous prior child abuse allegations were "inconclusive."



Booking photos showing accused child killers Kareem Leiva and Heather Barron. (Los Angeles Sheriff)

Barron was able to keep custody of her seven children, three of whom she shared with Leiva, who fathered another five kids with three other women. According to authorities, he was especially abusive to his non-biological children, and allegedly admitted to shoving Anthony's younger brother so hard into a chair he needed three staples to close a gash in his scalp.

FOX Los Angeles reported in October that the Los Angeles County Board of Supervisors approved a $32 million settlement with the rest of Anthony's family, which sued, alleging social workers on the case failed to properly handle the accusations. Members include the boy's father as well as maternal aunts and uncles who are expected to testify against Barron at trial.



Heather Barron appeared for a hearing in a Lancaster courtroom with boyfriend Kareem Ernesto Leiva, both charged with the torture and murder of Barron's 10-year-old son, Anthony Avalos, Aug. 3, 2018. (Al Seib/Los Angeles Times via Getty Images)

**CLICK HERE TO GET THE FOX NEWS APP**

The former Los Angeles district attorney, Jackie Lacey, had intended to seek the death penalty in the case, but current DA George Gascon, who has publicly opposed such punishment for years, reversed course after taking office.

 Print    Close

**URL**

https://www.foxnews.com/us/california-ms-13-member-accused-10-year-olds-torture-murder-us-illegally

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

Log In    Watch TV

**Recommended**



07:53 **Liberal filmmaker Michael Moore criticizes Trump's…**



03:20 **Parents continuing fight after federal court dismisses…**



02:48 **Bezos reining in Washington Post opinion page from…**



05:16 **NYPD chief bl… blue state's 're… door' system f…**

TRUE CRIME

# California MS-13 member accused of 10-year-old's torture and murder is in US illegally: source

Kareem Leiva, an accused child killer expected to go to trial next week, is also an illegal immigrant, according to a law enforcement source

By **Michael Ruiz** · **Fox News**

Published January 19, 2023 2:00am EST



**Tim Ward slams George Gascon for new immigration policy: 'Creating a vacuum' for criminals to exploit**

Tulare County District Attorney Tim Ward joined 'Fox & Friends First' to discuss Gascon's new policy and Illinois ending cash bail statewide.

*Warning: This story includes graphic allegations of violence against children*

**EXCLUSIVE:** A suspected MS-13 gang member set to go on trial next week for the horrific 2018 slaying of his California girlfriend's 10-year-old son is a native of El Salvador and living in the U.S. illegally, according to a law enforcement source.

Kareem Ernesto Leiva, 37, and his American girlfriend Heather Maxine Barron, 33, are both charged with murder and torture in the death of her son, Anthony Avalos, as well as child abuse against two other children in the home, court records show.

Prosecutors allege the boy had been beaten, starved, forced to kneel on rice, force-fed, whipped and more in a home where he was allegedly subjected to "extreme physical pain and suffering."

**CALIFORNIA SEEKS DEATH PENALTY IN ALLEGED TORTURE KILLING OF ANTHONY AVALOS**



Kareem Leiva, an illegal immigrant from El Salvador, is accused of the torture and murder of 10-year-old California boy Anthony Avalos, right. (Al Seib/Los Angeles Times via Getty Images, David Barron via AP)

While in jail, Leiva allegedly shanked another inmate, according to court documents, and was accused of domestic violence against females in both 2010 and 2013.

His brother, Mauricio Leiva, is another alleged MS-13 member who was indicted in a federal racketeering case against a deadly drug ring in 2016, court documents show.





## Stories

Home · News · Stories · 2008 · January · MS-13 Threat Assessment

### The MS-13 Threat
#### A National Assessment

01/14/08



They perpetrate violence—from assaults to homicides, using firearms, machetes, or blunt objects—to intimidate rival gangs, law enforcement, and the general public. They often target middle and high school students for recruitment. And they form tenuous alliances...and sometimes vicious rivalries...with other criminal groups, depending on their needs at the time.

**Who are they?** Members of Mara Salvatrucha, better known as MS-13, who are mostly Salvadoran nationals or first generation Salvadoran-Americans, but also Hondurans, Guatemalans, Mexicans, and other Central and South American immigrants. And according to our recent national threat assessment of this growing, mobile street gang, they could be operating in your community...now or in the near future.

Based on information from our own investigations, from our state and local law enforcement partners, and from community organizations, we've concluded that while the threat posed by MS-13 to the U.S. as a whole is at the "medium" level, membership in parts of the country is so concentrated that we've labeled the threat level there "high."

Here are some other highlights from our threat assessment:

**MS-13 operates in at least 42 states and the District of Columbia and has about 6,000-10,000 members nationwide.** Currently, the threat is highest in the western and northeastern parts of the country, which coincides with elevated Salvadoran immigrant populations in those areas. In the southeast and central regions, the current threat is moderate to low, but recently, we've seen an influx of MS-13 members into the southeast, causing an increase in violent crimes there.

**MS-13 members engage in a wide range of criminal activity,** including drug distribution, murder, rape, prostitution, robbery, home invasions, immigration offenses, kidnapping, carjackings/auto thefts, and vandalism. Most of these crimes, you'll notice, have one thing in common—they are exceedingly violent. And while most of the violence is directed toward other MS-13 members or rival street gangs, innocent citizens often get caught in the crossfire.

**MS-13 is expanding its membership at a "moderate" rate** through recruitment and migration. Some MS-13 members move to get jobs or to be near family members—currently, the southeast and the northeast are seeing the largest increases in membership. MS-13 often recruits new members by glorifying the gang lifestyle (often on the Internet, complete with pictures and videos) and by absorbing smaller gangs.

Speaking of employment, MS-13 members typically work for legitimate businesses by presenting false documentation. They primarily pick employers that don't scrutinize employment documents, especially in the construction, restaurant, delivery service, and landscaping industries.

**Right now, MS-13 has no official national leadership structure.** MS-13 originated in Los Angeles, but when members migrated eastward, they began forming cliques that for the most part operated independently. These cliques, though, often maintain regular contact with members in other regions to coordinate recruitment/criminal activities and to prevent conflicts. We do believe that Los Angeles gang members have an elevated status among their MS-13 counterparts across the country, a system of respect that could potentially evolve into a more organized national leadership structure.

One final word about MS-13: the FBI, through its MS-13 National Joint Task Force and field investigations, remains committed to working with our local, state, national, and international partners to disrupt and dismantle this violent gang.

Note: the assessment is law enforcement sensitive and is not publicly available.

**For More Information**

- **Going Global on MS-13**
- **MS-13 Up Close**
- **FBI Violent Gangs Website**

### Story Index

By Date

**By Subject**
- Art Theft
- Civil Rights
- Counterterrorism
- Crimes Against Children
- Criminal Justice Information Services
- Cyber Crimes
- Director/FBI Leadership
- Field Cases
- Foreign Counterintelligence
- General
- History
- Intelligence
- International
- Lab/Operational Technology
- Linguist/Translation Program
- Major Thefts/Violent Crime
- Organized Crime/Drugs
- Partnerships
- Public/Community Outreach
- Public Corruption
- Recruiting/Diversity
- Responding to Your Concerns
- Technology
- Training
- White-Collar Crime

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

https://archives.fbi.gov/archives/news/stories/2008/january/ms13_011408                                                          1/2



# MS-13 in the United States and Federal Law Enforcement Efforts

Updated August 20, 2018

**Congressional Research Service**

https://crsreports.congress.gov

R45292

# Summary

The Mara Salvatrucha (MS-13) is a violent criminal gang operating both in the United States and abroad—namely Central America. MS-13 was formed on the streets of Los Angeles, CA, in the 1980s by refugees who were fleeing civil conflict in El Salvador. It became a transnational gang as MS-13 members who were deported from the United States to Central America helped establish gang ties and spread U.S. gang culture abroad.

In the United States, MS-13's structure largely consists of loosely organized cells, or "cliques," that each control specific territory. While some have suggested that the size of MS-13 has grown in the United States, since at least 2005 law enforcement officials have consistently cited its membership to be around 10,000. Domestically, MS-13 has been involved in local crimes including extortion, drug distribution, prostitution, robbery, and murder, as well as transnational illicit activity such as drug trafficking and human smuggling and trafficking. The gang is known for its particularly violent criminality, which has been demonstrated in a reported uptick in violent homicides attributed to MS-13 in certain locales.

Countering gang crime has often been the purview of state and local law enforcement. However, given that gang activity is not constrained by jurisdictional boundaries, and that local law enforcement agencies may not have the capacity to investigate complex gang crimes, federal law enforcement has had a long-standing interest in countering gangs, including MS-13. One element in determining the appropriate federal policy responses to tackle threats posed by MS-13 may be to have a clear conceptualization of the gang. Researchers and criminal justice system authorities have primarily described MS-13 as a criminal gang or a transnational criminal organization (TCO)—concepts that have some overlap in structure, motivation, and criminality. Whether MS-13 demonstrates elements that are uniquely gang or TCO may help inform the federal policy response to its illegal activities.

Another challenge in countering the danger posed by MS-13 is understanding the scope of the threat. Key questions focus on the validity of existing estimates and whether the gang is growing in number or in territory. Thus, policymakers may question how officials define and determine gang membership. While there is no centralized database to track gang membership, a number of agencies maintain datasets that contain gang-related information. Policymakers may also question how this information is shared and utilized.

Oversight bodies such as the Department of Justice's Office of the Inspector General (DOJ OIG) and the Government Accountability Office (GAO) have recommended means by which federal law enforcement could enhance its enforcement efforts against violent criminal gangs such as MS-13, and policymakers may take interest in whether some of these recommendations are still relevant.

There is also a current debate about the relationship between gangs such as MS-13 and unaccompanied alien children (UAC) arriving in the United States. Some have suggested that MS-13's presence in Central America could continue to drive unauthorized migration into the United States by those seeking to escape the gang and its violence. There are also concerns that MS-13 may exploit the U.S. Southwest border by bringing young gang members from Central America to the United States as UAC or may recruit some of the vulnerable UAC to join the gang's ranks once in the United States. Policymakers may seek more data from officials in order to understand the nuances of these potential relationships between MS-13 and UAC.

# Contents

Birth and Evolution of MS-13 ............................................................................................................ 1

Shifting Structure, Size, and Criminality? ......................................................................................... 2

    Organizational Structure ............................................................................................................. 2

    Membership Estimates ................................................................................................................ 2

    Criminal Activities ...................................................................................................................... 3

Federal Domestic Enforcement Efforts ............................................................................................. 4

Conceptualizing MS-13 for a Policy Response .................................................................................. 6

    Federal Definitions ..................................................................................................................... 7

        Gangs ..................................................................................................................................... 7

        Transnational Organized Crime .............................................................................................. 8

    Variances in Conceptualizing MS-13 ......................................................................................... 9

        MS-13: Gang or TCO—Does It Matter? ............................................................................ 10

Evolving Issues for Domestic Gang Enforcement .......................................................................... 12

    Tracking MS-13 membership .................................................................................................... 12

    Oversight of Federal Law Enforcement Coordination ............................................................. 13

    Immigration and Unaccompanied Minors ................................................................................ 14

Going Forward ................................................................................................................................. 15

## Tables

Table 1. Gangs and Transnational Organized Crime: Identifying Elements ..................................... 9

## Contacts

Author Information .......................................................................................................................... 15

The Mara Salvatrucha (MS-13) is a violent criminal gang operating both in the United States and abroad—namely Central America. U.S.-based members have committed both local and transnational crimes ranging from extortion, homicide, and drug distribution to human and drug trafficking. The gang has a reputation for committing particularly violent crimes, which has generated attention from law enforcement, policymakers, and the public.

This report provides a brief background on MS-13 with a focus on its structure and criminal activities in the United States. It highlights U.S. law enforcement initiatives and other federal resources used to counter the gang's illicit activities. It discusses how the gang is conceptualized by the federal government and how this conceptualization may drive specific policy responses to the gang's activities. The report also provides an overview of selected domestic policy issues Congress may examine as part of its efforts to counter MS-13.

# Birth and Evolution of MS-13

MS-13 was born on the streets of Los Angeles, CA. It was formed in the 1980s by refugees who were fleeing civil conflict in El Salvador. When these Salvadoran nationals moved into the Los Angeles area, some youth coalesced to form MS-13, in part for protection from existing Latino gangs, such as the 18th Street gang, as well as for a way to connect with other Salvadorans.[1] By the 1990s, MS-13 had reached the East Coast, particularly Washington, DC, and Long Island, NY.[2] Historically, MS-13 members were mostly Salvadoran nationals or first-generation Salvadoran-Americans, but the group has expanded to include other Central and South American immigrants. MS-13 has largely focused on creating an identity and community, though members do engage in activities that generate revenue for the gang.

MS-13 became a transnational gang as members who were deported from the United States to Central America established gang ties there.[3] Legislation enacted in the mid-1990s increased the number of foreign nationals subject to detention and removal from the United States.[4] From 2001 to 2010, nearly 130,000 foreign nationals were deported to Central America because of a criminal conviction, primarily to the Northern Triangle countries of El Salvador, Guatemala, and Honduras.[5] The exact number of these deportees who were gang members is unknown, as is the number of deported gang members who were affiliated with MS-13. However, some of these deportees helped to establish MS-13 gang ties in their home countries (where gangs were already present) and assisted in the spread of U.S. gang culture in Central America.[6]

---

[1] James C. Howell and John P. Moore, *History of Street Gangs in the United States*, Bureau of Justice Assistance and Office of Juvenile Justice and Delinquency Prevention, National Gang Center Bulletin No. 4, May 2010; InSight Crime and American University, Center for Latin American & Latino Studies, *MS13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction*, 2018.

[2] InSight Crime and American University, Center for Latin American & Latino Studies, *MS13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction*, 2018.

[3] For more information on MS-13 in Central America, see CRS Report RL34112, *Gangs in Central America*.

[4] The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA, P.L. 104-208,) of 1996, among other things, expanded the definition of "aggravated felonies" for which convicted individuals would be subject to deportation. It also put greater constraints on relief from removal.

[5] Department of Homeland Security, Office of Immigration Statistics, *2010 Yearbook of Immigration Statistics*, January 2011, Table 38.

[6] InSight Crime and American University, Center for Latin American & Latino Studies, *MS13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction*, 2018.

# Shifting Structure, Size, and Criminality?

In recent years, law enforcement, the media, and policymakers have shown interest in MS-13 and its violent criminal activities.[7] High-profile incidents of violent behavior committed by gang members have raised questions about whether this reflects a developing organizational structure, increasing size, or changing criminality.

## Organizational Structure

In the United States, MS-13's organizational structure largely consists of loosely organized cells, or "cliques." These cliques vary in size and in the number that may exist in a particular locale, but each clique typically has ties to a particular territory. Researchers have noted that this territory serves two purposes: (1) it contributes to a clique's sense of neighborhood and community, and serves as a place where they can recruit, and (2) it is an area where the gang generates money from illicit activities such as extortion or charging "rent" on local businesses.[8]

In some areas of the country, MS-13 cliques are more organized, and several operate as part of a larger "program." In some instances, in "places where the MS13 is very organized, such as Los Angeles and El Salvador," there may be an additional organizational layer where programs answer to a ruling council.[9] Generally, the U.S. MS-13 structure of relatively diffuse cliques differs from the gang's more organized structure in El Salvador.

Some have suggested that MS-13 may try to consolidate its power structure to exert more direction over the U.S. cliques; this has been attempted unsuccessfully at various times, and the extent to which such control may take hold has been debated.[10] In some instances, leaders in El Salvador, including prison-based leaders, have tried to exert more direction over activities of U.S. programs and cliques; however, researchers have indicated that leadership in El Salvador may have little or no direction over activities of the powerful MS-13 programs and cliques in the United States.[11]

## Membership Estimates

While some have suggested that the size of MS-13 has grown in the United States,[12] since at least 2005 the FBI has consistently estimated the domestic size of the gang to be around 10,000

---

[7] See, for example, U.S. Congress, House Committee on Homeland Security, Subcommittee on Counterterrorism and Intelligence, *Combating Gang Violence on Long Island: Shutting Down the MS-13 Pipeline*, 115th Cong., 1st sess., June 20, 2017; and Department of Justice, "Attorney General Sessions Delivers Remarks on the Administration's Efforts to Combat MS-13 and Carry Out its Immigration Priorities," press release, December 12, 2017.

[8] InSight Crime and American University, Center for Latin American & Latino Studies, *MS13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction*, 2018.

[9] Ibid., p. 32.

[10] Steven Dudley and Hector Silva Avalos, *MS13: Hierarchy vs. Federation*, InSight Crime, February 14, 2018. See also Del Quentin Wilber, "MS-13, Violent and Unruly, Is Trying to Organize—Can It?," *The Wall Street Journal*, August 19, 2018.

[11] Ibid.

[12] In April, 2017, for example, Attorney General Sessions stated that "MS-13 now has more than 10,000 members in at least 40 states in this country—up significantly from just a few years ago." See Department of Justice, *Remarks by Attorney General Jeff Sessions at Meeting of the Attorney General's Organized Crime Council and OCDETF Executive Committee*, April 18, 2017.

members.[13] Of note, it appears that federal law enforcement may be moving away from generating regular estimates of gang membership in the United States, both in aggregate and for specific gangs. For instance, after 2009 the National Gang Threat Assessments ceased including MS-13 membership estimations.[14] As of June 2018, the FBI had removed from its website the reference to the total estimated number of gang members in the United States.[15]

## Criminal Activities

In the United States, MS-13 gang members have been involved in local crimes including extortion, drug distribution, prostitution, robbery, and murder, as well as in more transnational illicit activity such as drug trafficking and human smuggling and trafficking.[16] While some of the illegal activities help support the gang's criminal finances, others facilitate the maintenance of territory as well as gang brand and unity.

MS-13 has a reputation for particularly violent criminal activity. Some experts see this violence as serving both internal and external purposes. Internally, violence may help recruit—it serves a brand-identifying purpose—in addition to providing discipline and cohesion. Externally, it can help establish territory as well as social and political control.[17]

---

[13] For example, in a 2005 report, the FBI estimated MS-13 membership to be 8,000-10,000; see Federal Bureau of Investigation, *How We're Ganging Up on MS-13: And What You Can Do To Help*, July 13, 2015. An April 2006 FBI news story on MS-13 estimated U.S. membership to be 10,000; see Federal Bureau of Investigation, *A Close-Up of MS-13, FBI Executive Visits El Salvador*, April 19, 2006. A 2008 FBI threat assessment placed MS-13 membership between 6,000-10,000 individuals; see Federal Bureau of Investigation, *The MS-13 Threat: A National Assessment*, January 14, 2008. The 2009 National Gang Threat Assessment estimated MS-13 membership at 8,000-10,000 individuals in the United States; see National Gang Intelligence Center, *National Gang Threat Assessment 2009*, January 2009. In addition, a 2009 FBI news story noted that domestic MS-13 membership was 10,000 individuals; see Federal Bureau of Investigation, *A Courageous Victim: Taking a Stand Against MS-13*, May 1, 2009. FBI congressional testimony in 2017 reiterated the estimation of 10,000 MS-13 gang members in the United States; see U.S. Congress, House Committee on Homeland Security, Subcommittee on Counterterrorism and Intelligence, *Combating Gang Violence on Long Island: Shutting Down the MS-13 Pipeline*, 115th Cong., 1st sess., June 20, 2017. Estimates of the total number of MS-13 members internationally has varied. Some estimates place this total at 50,000-70,000. See Steven Dudley and Hector Silva Avalos, *MS13 in the Americas: Major Findings*, InSight Crime, February 16, 2018. The United Nations Office on Drugs and Crime (UNODC) estimated in 2012 that there were about 24,000 MS-13 members in the Golden Triangle of Central America. See UNODC, *Transnational Organized Crime in Central America and the Caribbean: A Threat Assessment*, September 2012.

[14] It is unclear why the National Gang Intelligence Center (NGIC) ceased reporting these numbers. There had been critiques of how the NGIC derived membership estimates, citing, for instance, that states contributing data on gang membership may rely on differing definitions of what constitutes a gang. See, for example, U.S. Government Accountability Office, *Better Coordination and Performance Measurement Would Help Clarify Roles of Federal Agencies and Strengthen Assessment of Efforts*, GAO-09-708, July 24, 2009; and U.S. Department of Justice, Office of the Inspector General, *A Review of the Department's Anti-Gang Intelligence and Coordination Centers*, November 2009.

[15] The FBI notes that there are about "33,000 violent street gangs, motorcycle gangs, and prison gangs ... criminally active in the U.S. and Puerto Rico today." See Federal Bureau of Investigation, *What We Investigate: Gangs*, https://www.fbi.gov/investigate/violent-crime/gangs. Previously (as recently as May 2018), the FBI noted that these 33,000 violent street gangs had about 1.4 million members in the United States. As of June 2018, however, the FBI had removed the reference to 1.4 million members.

[16] Federal Bureau of Investigation, *The MS-13 Threat: A National Assessment*, January 14, 2008. See also InSight Crime and American University, Center for Latin American & Latino Studies, *MS13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction*, 2018.

[17] InSight Crime and American University, Center for Latin American & Latino Studies, *MS13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction*, 2018.

In recent years, this violence has been demonstrated in a reported wave of violent homicides and other criminality attributed to MS-13 in certain locales. For example, authorities have been investigating a spate of killings and other violent activities on Long Island, NY, attributed to MS-13. In May 2017 testimony before the Senate Judiciary Committee, the Suffolk County (NY) police commissioner estimated that since 2016, 38% of murders in the county were attributable to MS-13.[18] In a series of five superseding indictments, federal prosecutors with the Eastern District of New York have indicted two dozen MS-13 members with crimes including at least 15 murders, as well as assaults, arson, and drug distribution.[19] The series of indictments includes charges in the high-profile killings of teenagers Nisa Mickens and Kayla Cuevas.[20]

Illustrating a potential increase in MS-13 activity in the Washington, DC, metro area, some suburban jurisdictions have seen an increase in the number of MS-13 members in their county jails. As of February 2018, the Montgomery County, MD, jail reported a 20% increase in the MS-13 population over the previous year. During that same time, the number of MS-13 members in jail increased by 32% in the Prince William County, VA, jail and doubled in the Fairfax County, VA, jail.[21]

# Federal Domestic Enforcement Efforts

Countering gang crime is generally the purview of state and local law enforcement. However, given that gang activity is not constrained by jurisdictional boundaries, and that local law enforcement agencies may not have the capacity to investigate complex gang crimes, federal law enforcement has had a long-standing interest in contending with gangs, including MS-13. There is no single federal agency charged with investigating crimes committed by gangs, and federal resources for confronting this threat are allocated across several departments and agencies including the FBI, Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and U.S. Immigration and Customs Enforcement (ICE), among others. As the FBI and ICE are often seen as having leading roles in federal gang enforcement efforts, this section largely focuses on their activities.[22]

Within the Department of Justice (DOJ), the FBI is charged with investigating violent gangs and runs a number of anti-gang initiatives. One of the primary tools the FBI uses to counter the gang

---

[18] Testimony by Timothy D. Sini, Police Commissioner, Suffolk County, NY, before U.S. Congress, Senate Committee on Homeland Security and Governmental Affairs, *Border Insecurity: The Rise of MS-13 and Other Transnational Criminal Organizations*, 115th Cong., 1st sess., May 24, 2017. It is unknown, however, the proportion of murders attributable to MS-13 prior to 2016.

[19] Department of Justice, U.S. Attorney's Office, Eastern District of New York, "Two Dozen Ms-13 Gang Members Indicted on Federal Racketeering Charges," press release, June 7, 2018.

[20] Liz Robbins, "Mother of Long Island Gang Victim Invited to the State of the Union," *The New York Times*, January 28, 2018.

[21] Michael Miller, "'Vying for Control': How MS-13 Uses Violence and Extortion in America's Jails," *The Washington Post*, February 4, 2018. While these jailhouse population data may illustrate a significant increase in MS-13 related activity, they could also reflect a law enforcement *focus* on targeting MS-13 in those jurisdictions rather than an actual increase in MS-13 criminality. The data are not clear on whether they reflect single snapshots in time or whether they account for the flow of the MS-13 affiliated inmates in and out of the jails. Nor do they illustrate the actual MS-13 or relative total jail population numbers. (One exception is that the Fairfax County jail noted an increase in MS-13 membership from about 20 to about 40.) For these reasons, and others, analysts cannot assess whether these data truly reflect changes in MS-13 criminality in specific jurisdictions.

[22] In addition to federal enforcement initiatives, the federal government also provides grants to state and local law enforcement to help address gang threats—broadly, not specific to MS-13—in those jurisdictions. However, a discussion of these grants is outside the scope of this report.

threat is Violent Gang Safe Streets Task Forces, which focus on countering violent gangs and violent crimes. The FBI established the Safe Streets Violent Crime Initiative in 1992 and, through this program, administers Violent Gang Safe Streets Task Forces across the United States.[23] These gang task forces include federal, state, and local law enforcement officers that investigate crimes ranging from racketeering to drug conspiracy and firearms violations.[24]

In addition to domestic law enforcement initiatives to counter violent gangs such as MS-13, the FBI has transnational policing partnerships. In 2004, the FBI launched an MS-13 National Gang Task Force (NGTF) to coordinate federal, state, and local investigations of MS-13. This has since evolved into the Transnational Anti-Gang Task Force (TAG) initiative that targets transnational gang threats—with a current focus on MS-13 and the 18th Street gang. The FBI has established TAG task forces, comprised of FBI agents and vetted local officers, in El Salvador, Guatemala, and Honduras. In addition to being operational task forces, these TAGs facilitate intelligence and information sharing. The TAG initiative also includes the Central American Law Enforcement Exchange (CALEE) program, which helps train local law enforcement in the United States and Central America on gang-related issues and techniques for countering the gang threats.[25]

Work of the TAG units can be seen in a number of investigations. For example, in September 2017, through Operation Regional Shield, over 3,800 gang members—from MS-13 and the 18th Street gang—in the United States, El Salvador, Guatemala, and Honduras were charged with crimes including murder, arson, racketeering, and conspiracy to distribute marijuana; the FBI's TAG units were involved with the investigations in Central America.[26] In the United States, over 70 individuals were charged, including 17 MS-13 members who were alleged to have committed murder and other crimes on Long Island, NY.[27]

The FBI, through the direction of Congress, established the National Gang Intelligence Center (NGIC) in 2005.[28] The NGIC was established to coordinate intelligence information from federal, state, and local policing agencies.[29] It supports law enforcement investigations by providing strategic and tactical analysis of intelligence. Agencies contributing to the NGIC share gang information and resources to identify and respond to the greatest gang threats.

Within the Department of Homeland Security (DHS), ICE Homeland Security Investigations (HSI) has a National Gang Unit (NGU) that works to deter and disrupt domestic gang operations—specifically those of transnational criminal gangs, prison gangs, and outlaw

---

[23] Federal Bureau of Investigation, *FY2019 Authorization and Budget Request to Congress*, February 2018. The FBI administers at least 169 such task forces.

[24] Ibid. See also, testimony by Stephen Richardson, Federal Bureau of Investigation, before U.S. Congress, House Committee on Homeland Security, Subcommittee on Counterterrorism and Intelligence, *Combating Transnational Gangs Through Information Sharing*, 115th Cong., 2nd sess., January 18, 2018.

[25] For more information on the Violent Gang Safe Streets Task Forces, see https://www.fbi.gov/investigate/violent-crime/gangs/violent-gang-task-forces.

[26] Department of Justice, "3,800 Gang Members Charged in Operation Spanning United States and Central America," press release, September 29, 2017.

[27] Department of Justice, "MS-13 Gang Members Indicted In New York For Murder Of Four Young Men In Park And Killing Of Rival At Deli," press release, July 19, 2017.

[28] For more information on the NGIC, see https://www.fbi.gov/investigate/violent-crime/gangs/ngic and 34 U.S.C. §41507. The NGIC was established by P.L. 109-162.

[29] The NGIC has federal representation from agencies across the federal government, including the FBI, DEA, ATF, U.S. Marshals Service, Department of Defense, and U.S. Customs and Border Protection. It disseminates information to (as well as that received from) the broader law enforcement community and has a web-based information center to facilitate this sharing.

motorcycle gangs (OMGs). The NGU also "identifies and develops intelligence on gang membership, associations, activities, and international networks."[30]

One ongoing HSI gang initiative is known as Operation Community Shield, which ICE launched in 2005 to disrupt and dismantle transnational criminal gangs. ICE HSI reports that in FY2017 it arrested 796 MS-13 gang members and associates (up from 434 in FY2016) through this program.[31] To put these 796 MS-13 arrests in the context of other gang-related arrests, during the same time, "HSI made 4,818 criminal arrests related to gang activity and 892 administrative arrests[32] as a result of gang investigations. Additionally, [ICE Enforcement and Removal Operations] administratively arrested 5,225 gang members and associates" in FY2017.[33]

Operation Community Shield has included a number of operations that specifically target MS-13.

Through Operation Raging Bull, ICE and its domestic and international law enforcement partners arrested 267 MS-13 members and associates from September through November 2017.[34] Of the 267 arrests, 214 were in the United States; of those, 93 suspects were arrested for criminal violations—such as murder, robbery, and drug possession and trafficking—and 121 were arrested for administrative immigration violations (e.g., unlawful presence).

Elsewhere, federal law enforcement initiatives that are generally not focused on countering gangs could potentially be leveraged to address certain gang threats, such as those posed by MS-13. For instance, led by the DEA, the Organized Crime Drug Enforcement Task Force (OCDETF) program targets major drug trafficking, money laundering, and transnational criminal organizations.[35] Attorney General Sessions has directed the OCDETF program to make countering MS-13 a priority.[36] However, some have suggested that investigating MS-13 may not truly be an OCDETF priority because the gang is more involved in small-scale drug distribution rather than the larger distribution that is traditionally the target of OCDETF investigations.[37]

# Conceptualizing MS-13 for a Policy Response

One challenge in determining the appropriate policy responses to tackle threats posed by MS-13 is developing a clear conceptualization of the gang. There is a range of law enforcement tools and other resources that the federal government could leverage to counter the illicit activities of MS-13. Having a clear conceptualization of MS-13 may help to determine the most appropriate and effective tools and resources to counter their criminal activity. Researchers and authorities have

---

[30] For more information on the National Gang Unit, see https://www.ice.gov/national-gang-unit.

[31] Department of Homeland Security, "DHS Announces Progress in Enforcing Immigration Laws, Protecting Americans," press release, December 5, 2017.

[32] ICE describes an administrative arrest as "the arrest of an alien for a civil violation of the immigration laws, which is subsequently adjudicated by an immigration judge or through other administrative processes." See U.S. Immigration and Customs Enforcement, *Fiscal Year 2017 ICE Enforcement and Removal Operations Report*, https://www.ice.gov/removal-statistics/2017#tab1.

[33] Department of Homeland Security, "DHS Announces Progress in Enforcing Immigration Laws, Protecting Americans," press release, December 5, 2017.

[34] Immigration and Customs Enforcement, *ICE's 'Operation Raging Bull' Nets 267 MS-13 Arrests*, https://www.ice.gov/features/raging-bull.

[35] For more information, see Department of Justice, Organized Crime Drug Enforcement Task Forces, *FY2019 Interagency Crime and Drug Enforcement Congressional Submission*. Federal participants in OCDETF come from the Departments of Justice, Homeland Security, State, Treasury, Labor, and the U.S. Postal Service.

[36] Department of Justice, "Attorney General Jeff Sessions Gives Key Department of Justice Task Force New Tools to Dismantle MS-13," press release, October 23, 2017.

[37] Hector Silva Avalos, *US Toughens Rhetoric, Declares MS13 'Priority' Target*, InSight Crime, October 24, 2018.

primarily described MS-13 as either a criminal street gang or a transnational criminal organization (TCO); however, policy discussions of the gang often blur these lines.

# Federal Definitions

The federal government has offered descriptions of gangs and transnational criminal organizations that may help facilitate both the conceptualization of MS-13 and policy responses to the gang's criminality. These concepts are working definitions to describe criminal phenomena that sometimes overlap in structure, motivation, and criminality.

## Gangs

DOJ describes a gang as

> (1) an association of three or more individuals; (2) whose members collectively identify themselves by adopting a group identity which they use to create an atmosphere of fear or intimidation frequently by employing one or more of the following: a common name, slogan, identifying sign, symbol, tattoo or other physical marking, style or color of clothing, hairstyle, hand sign or graffiti; (3) the association's purpose, in part, is to engage in criminal activity and the association uses violence or intimidation to further its criminal objectives; (4) its members engage in criminal activity, or acts of juvenile delinquency that if committed by an adult would be crimes; (5) with the intent to enhance or preserve the association's power, reputation, or economic resources; (6) the association may also possess some of the following characteristics: (a) the members employ rules for joining and operating within the association; (b) the members meet on a recurring basis; (c) the association provides physical protection of its members from other criminals and gangs; (d) the association seeks to exercise control over a particular location or region, or it may simply defend its perceived interests against rivals; or (e) the association has an identifiable structure; (7) this definition is not intended to include traditional organized crime groups such as La Cosa Nostra, groups that fall within the Department's definition of "international organized crime," drug trafficking organizations or terrorist organizations.[38]

DOJ has described MS-13 as an example of a prominent criminal street gang operating in the United States.[39]

In addition to DOJ's definition of a gang, 18 U.S.C. §521 defines a "criminal street gang" as an ongoing group, club, organization, or association of 5 or more persons" with three elements:

- One of its primary purposes is committing crimes including (1) a federal felony involving a controlled substance for which the penalty is at least five years imprisonment, (2) a violent federal felony that uses or attempts to use force, or (3) a conspiracy to commit one of these felonies.

- In the past five years, its members have engaged in a continuing series of these felony crimes.

- Its activities affect interstate or foreign commerce.

---

[38] Department of Justice, *About Violent Gangs*, May 28, 2015.

[39] Department of Justice, *Criminal Street Gangs*, May 12, 2015.

## Transnational Organized Crime

In July 2011, the Obama Administration released the *Strategy to Combat Transnational Organized Crime: Addressing Converging Threats to National Security* (strategy).[40] The strategy provides the federal government's first broad conceptualization of transnational organized crime (TOC), highlighting it as a national security concern. It notes the following:

> Transnational organized crime refers to those self-perpetuating associations of individuals who operate transnationally for the purpose of obtaining power, influence, monetary and/or commercial gains, wholly or in part by illegal means, while protecting their activities through a pattern of corruption and/or violence, or while protecting their illegal activities through a transnational organizational structure and the exploitation of transnational commerce or communication mechanisms. There is no single structure under which transnational organized criminals operate; they vary from hierarchies to clans, networks, and cells, and may evolve to other structures. The crimes they commit also vary. Transnational organized criminals act conspiratorially in their criminal activities and possess certain characteristics which may include, but are not limited to:
>
> > In at least part of their activities they commit violence or other acts which are likely to intimidate, or make actual or implicit threats to do so;
> >
> > They exploit differences between countries to further their objectives, enriching their organization, expanding its power, and/or avoiding detection/apprehension;
> >
> > They attempt to gain influence in government, politics, and commerce through corrupt as well as legitimate means;
> >
> > They have economic gain as their primary goal, not only from patently illegal activities but also from investment in legitimate businesses; and
> >
> > They attempt to insulate both their leadership and membership from detection, sanction, and/or prosecution through their organizational structure.[41]

The strategy noted that TOC networks include transnational gangs. Pursuant to Executive Order 13581,[42] which accompanied the 2011 strategy, the Department of the Treasury can sanction listed transnational criminal organizations.[43] In 2012, the Treasury Department designated MS-13 as a significant transnational criminal organization, noting the gang's "involvement in serious transnational criminal activities, including drug trafficking, kidnapping, human smuggling, sex trafficking, murder, assassinations, racketeering, blackmail, extortion, and immigration offenses."[44] More recently, Executive Order 13773, issued in February 2017, directed federal law enforcement to strengthen efforts to combat transnational criminal organizations, including criminal gangs. This indicates that federal enforcement efforts aimed at TOC may also target various forms of criminal gangs, including street gangs.[45]

---

[40] The White House, *Strategy To Combat Transnational Organized Crime: Addressing Converging Threats to National Security*, July 2011.

[41] The White House, *Strategy To Combat Transnational Organized Crime: Addressing Converging Threats to National Security*, July 2011, p. ii. This definition originally appeared in Department of Justice, *Overview of the Law Enforcement Strategy to Combat International Organized Crime*, April 2008, p. 2.

[42] Executive Order 13581, "Blocking Property of Transnational Criminal Organizations," 3 C.F.R. § 13581.

[43] Entities originally designated as TCOs as part of Executive Order 13581 were The Brothers' Circle, Camorra, Yakuza, and Los Zetas.

[44] Department of the Treasury, "Treasury Sanctions Latin American Criminal Organization," press release, October 11, 2012.

[45] Executive Order 13773, "Enforcing Federal Law With Respect to Transnational Criminal Organizations and Preventing International Trafficking," 82 *Federal Register* 10691, February 9, 2017.

**Table 1** provides some highlights of these definitions of gangs and TOC.

### Table 1. Gangs and Transnational Organized Crime: Identifying Elements

| | Gangs | Transnational Organized Crime |
|---|---|---|
| Structure | • No singular, defining structure<br>• May have an identifiable structure, include rules for joining and ongoing membership, or hold regular meetings<br>• May provide members protection from rivals, and control and defend particular territory and/or interests | • Self-perpetuating organizations with no singular, defining structure<br>• Protect activities with corruption and/or violence or through a transnational organizational structure to exploit transnational commerce or communications<br>• Insulate leadership and members from detection, sanction, and/or prosecution through their organizational structure |
| Criminality | • Engage in criminal activity, including with violence or intimidation | • Engage in criminal activity, including with violence or intimidation |
| Motivations | • Enhance or preserve the group's power, reputation, or economic resources<br>• Maintain a collective group identity and create an atmosphere of fear or intimidation | • Obtain power, influence, monetary and/or commercial gains (**economic gain is the top priority**)<br>• May attempt to gain influence in government, politics, and commerce |

**Source:** Department of Justice, *About Violent Gangs*, May 28, 2015. The White House, *Strategy To Combat Transnational Organized Crime: Addressing Converging Threats to National Security*, July 2011.

**Notes:** DOJ's definition of gangs also states that they are distinct from traditional organized crime groups, transnational organized crime groups, drug trafficking organizations, or terrorist organizations, though it does not provide more detail on this distinction.

## Variances in Conceptualizing MS-13

There can be overlap in the criminal activities of TCOs and gangs, which can make distinguishing the two difficult. For example, drug distribution is often a source of income for both TCOs and gangs. As noted by the DEA, "[a]lthough gangs are involved in all avenues of criminal activity, the major source of income for most street gangs remains the trafficking of illegal drugs."[46] While TCOs are more involved in wholesale-level drug distribution, gangs are more often involved in retail-level distribution; alliances between the two facilitate product movement. MS-13 has mostly been involved in local drug peddling, and these retail-level drug sales are the "most important revenue stream for the gang."[47] Cliques have developed relationships with transnational drug trafficking organizations to facilitate the flow of drugs within the United States. MS-13's

---

[46] Drug Enforcement Administration, *2017 National Drug Threat Assessment*, October 2017, p 17.

[47] InSight Crime and American University, Center for Latin American & Latino Studies, *MS13 in the Americas: How the World's Most Notorious Gang Defies Logic, Resists Destruction*, 2018, p. 41.

involvement in criminal activity similar to that of TCOs—such as drug distribution—is one factor that may lead to uncertainty in conceptualizing the gang.

Further blurring the lines between gangs and TCOs is the fact that both may have similar motivations. As DOJ notes, a gang's purpose is, in part, to engage in criminal activity "with the intent to enhance or preserve the association's power, reputation, or economic resources."[48] Similarly, as the 2011 strategy notes, TCOs operate for the "purpose of obtaining power, influence, monetary and/or commercial gains" and economic gain is their primary goal.[49] As noted, MS-13 has engaged in various forms of violent criminal behavior; however, the gang has focused more on establishing and maintaining identity, community, and turf than on generating money.

These definitional issues have contributed to inconsistencies in the conceptualization of MS-13, both within the federal government and among researchers. While the gang has been officially designated by the Treasury Department as a significant transnational criminal organization, federal investigative agencies such as the FBI, DEA, and ICE vary on whether they investigate MS-13 under programs targeting violent gangs or those targeting TCOs.[50] In addition, some researchers argue that MS-13 has evolved into a "fully functional transnational criminal organization,"[51] citing the gang's expansion into drug production and trafficking in Central America. Others disagree with this categorization. These dissents generally relate to MS-13's structure and criminal capacity. For instance, some contend that "while the group may play a peripheral role in international crimes such as drug trafficking, at its heart it remain[s] a loose-knit network of street gangs."[52] In addition, those contending that MS-13 has not risen to the level of a TCO note that the gang has not been able to establish a consistent role in international drug distribution, in part because it has been more focused on developing identity, camaraderie, and turf than on creating profit.[53]

## MS-13: Gang or TCO—Does It Matter?

Given the difficulties of clearly distinguishing between gangs and TCOs with existing definitions, policymakers may question whether drawing a distinction and placing MS-13 into just one of these categories is necessary or important for developing policies and strategies to counter the gang.

---

[48] Department of Justice, *About Violent Gangs*, May 28, 2015.

[49] The White House, *Strategy To Combat Transnational Organized Crime: Addressing Converging Threats to National Security*, July 2011, p. ii.

[50] The FBI generally targets MS-13 under its violent crime and gangs program; see, for example, Federal Bureau of Investigation, *Gangs*, https://www.fbi.gov/investigate/violent-crime/gangs. In addition, the DEA's National Drug Threat Assessment distinguishes transnational organized crime from gangs and identifies MS-13 as a national gang; see Drug Enforcement Administration, *2017 National Drug Threat Assessment*, October 2017. And, while some ICE cases targeting MS-13 are initiated from the National Gang Unit, ICE established the Transnational Organized Crime Initiative in June 2017 focused on countering MS-13 and other transnational gang activity; see U.S. Immigration and Customs Enforcement, "Joint Operation Nets 24 Transnational Gang Members, 475 Total Arrests under Operation Matador," press release, March 29, 2018.

[51] Douglas Farah and Kathryn Babineau, *The Rapid Evolution of the MS 13 in El Salvador and Honduras from Gang to Tier-One Threat to Central America and U.S. Security Interests*, National Defense University, Perry Center Occasional Paper, March 2018, p. 5. Notably, this assessment is based largely on MS-13 activities and structure in Central America.

[52] James Bargent, *US Treasury Adds MS-13 Leaders to Economic Sanctions List*, InSight Crime, June 6, 2013.

[53] Steven Dudley, "MS-13 Is a Street Gang, Not a Drug Cartel—And the Difference Matters," *The Conversation*, March 20, 2018.

In some ways, it may not matter whether the federal government classifies MS-13 as a TCO, a gang, or a hybrid of the two. One argument for why it doesn't matter is that federal law enforcement often divides investigations by criminal violation rather than by actor. Being a gang member in and of itself is not a crime (nor is being a member of a TCO). However, engaging in illicit activities on behalf of or in association with a gang or TCO *is* a crime. As such, members of MS-13 will generally be investigated and prosecuted for crimes committed, not for affiliation.

Another factor in why it may not matter whether MS-13 is consistently categorized as a gang or TCO is that, as noted, the federal government does not have definitions that clearly distinguish criminal gangs from TCOs. There are hazy lines. Categorizing MS-13 as one or the other may demand a more precise distinction between gangs and TCOs—something that may or may not be possible, necessary, or desirable. Because of the differences between each criminal organization—gang or TCO—it may be more important to understand a criminal entity rather than to label it. For instance, the NGIC notes that among the spectrum of gangs, "[u]nderstanding the specific mentality of each gang type is integral to disruption and dismantlement."[54]

While there are arguments for not strictly categorizing MS-13 as either a TCO or a criminal street gang, there are some policy-focused arguments for doing so. One such discussion involves how federal resources are oriented toward countering TCOs and gangs. Domestic resources aimed at thwarting TCOs are largely enforcement-based.[55] However, there is a mix of enforcement and prevention resources allocated to thwarting gangs.[56] For example, enforcement resources for domestic efforts to counter TCOs include funding for federal law enforcement agency investigation and prosecution priorities, interagency enforcement activities such as the OCDETF program, and Treasury Department efforts to implement sanctions against TCOs. Resources to counter gangs include not only federal investigations, prosecutions, and interagency enforcement activities, but include grants that support prevention and suppression activities like the violent gang and gun crime reduction program[57] and the juvenile justice grants for gang and youth violence education, prevention, and intervention.[58] Following from this, different conceptualizations of a gang—in this case MS-13—implicate different resources available. If officials view MS-13 as a TCO, law enforcement initiatives may be the chief means to counter MS-13. However, if MS-13 is viewed as a criminal street gang, this may open up a range of federal resources, both law enforcement and prevention resources.[59]

Defining MS-13 as a criminal street gang or a TCO may also affect federal investigations and prosecutions of gang members. For instance, 18 U.S.C. §521 provides a penalty enhancement on certain convictions if a defendant is found to be a member of a criminal street gang. There is a no similar enhancement for members of a TCO. However, authorities are not constrained by which criminal statues they can prosecute members of gangs or TCOs.

---

[54] National Gang Intelligence Center, *National Gang Report 2015*, p. 8.

[55] Some international support is allocated to assisting foreign nations counter TOC, but a discussion of this is outside the scope of this report.

[56] Based on CRS review of the Consolidated Appropriations Act, 2018 (P.L. 115-141), and the accompanying Committee Print.

[57] The Violent Gang and Gun Crime Reduction grants are supported by the Byrne Memorial Justice Assistance Grants (JAG) program. For more information about the JAG program, see CRS In Focus IF10691, *The Edward Byrne Memorial Justice Assistance Grant (JAG) Program*.

[58] For more information on juvenile justice grant programs to reduce gang and youth violence, among other things, see CRS Report RL33947, *Juvenile Justice: Legislative History and Current Legislative Issues*.

[59] See, for example, Jonathan Blitzer, "Former Gang Members Offer Advice on How to Combat MS-13," *The New Yorker*, January 30, 2018.

# Evolving Issues for Domestic Gang Enforcement

## Tracking MS-13 membership

In countering the danger posed by MS-13, a foundational challenge is understanding the scope of the threat. Key questions focus on whether the gang is growing in number or in territory. Debate over the number of MS-13 members in the United States raises a question about how U.S. officials determine these numbers. In the past, the NGIC has produced estimates of the number of gangs and the membership numbers.[60] For instance, in 2011 it estimated that there were "approximately 1.4 million active street, prison, and OMG gang members comprising more than 33,000 gangs in the United States."[61] However, since 2011 the National Gang Report has not made estimates on the number of gangs and gang members in the United States. It is unclear whether the federal government is tracking these data in another manner.

In this context, some have wondered whether federal law enforcement should maintain a centralized database on gang membership/affiliation that could provide counts of gang membership across the country. A number of federal entities collect related information on gangs; however, federal agencies do not appear to maintain databases that *exclusively* collect information on gangs. Some databases used by the FBI and ICE, for example, contain information on gang membership, but the databases are not limited to gangs and gang membership. A few examples are discussed below.

**Federal Bureau of Investigation.** The FBI has noted that "[t]he databases of each component agency are available to the NGIC, as are other gang-related databases, permitting centralized access to information."[62] The FBI's website notes that the NGIC shares "timely and accurate information." However, it is unclear whether law enforcement officials from the component agencies who are assigned to the NGIC have automatic access to each agency database or what the procedures may be to access gang-related data. Policymakers may examine the merits of various forms of gang-related intelligence and information sharing—be it through a centralized database or access to various sources of information.

In addition to the NGIC's information sharing efforts, law enforcement agencies may be able to obtain certain gang-related information through the FBI's National Crime Information Center (NCIC). Law enforcement agencies nationwide can query and submit information to the NCIC database, which contains 21 files—7 property files and 14 persons files.[63] One of these files is a gang file, containing information on violent gangs and their members. In looking at gang information sharing, policymakers may have questions about how gang intelligence information is collected, the completeness of the gang file, how data may be removed from the file, how often law enforcement partners query the file, and how the information is used.

---

[60] National Gang Intelligence Center, *National Gang Report 2015*. This report relies on information from the National Alliance of Gang Investigators' Associations and the FBI Safe Streets and Gang Unit.

[61] National Gang Intelligence Center, *2011 National Gang Threat Assessment: Emerging Trends.*

[62] Federal Bureau of Investigation, "Statement Before the Senate Judiciary Committee," press release, September 16, 2009.

[63] The property files contain records of stolen articles, boats, guns, license plates, parts, securities, and vehicles. The persons files are Supervised Release, National Sex Offender Registry, Foreign Fugitive, Immigration Violator, Missing Person, Protection Order, Unidentified Person, Protective Interest, Gang, Known or Appropriately Suspected Terrorist, Wanted Person, Identity Theft, Violent Person, and National Instant Criminal Background Check System (NICS) Denied Transaction. See https://www.fbi.gov/services/cjis/ncic.

**U.S. Immigration and Customs Enforcement.** DHS maintains at least two databases in which gang-related information may be stored and accessed. One is the Investigative Case Management (ICM) system, which "serves as the core law enforcement case management tool primarily used by [HSI] special agents and personnel supporting the HSI mission.... Additionally, ICE Enforcement and Removal Operations (ERO) personnel use ICM to manage immigration cases that are presented for criminal prosecution ... and will also use ICM to query the system for information that supports its civil immigration enforcement cases."[64] Agents can link records and documents associated with particular cases, and ICM has a field to notate an individual's gang membership/affiliation and role within the gang.[65]

A second system is the Enforcement Integrated Database (EID), which contains "information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations" primarily conducted by ICE and U.S. Customs and Border Protection (CBP).[66] It has records created, modified, and accessed through several software applications including the EID Arrest Guide for Law Enforcement (EAGLE), used by ICE. EAGLE allows officers to process biometric and biographic information of arrested persons, and it contains specific information fields to notate an individual's gang membership and role.[67] Policymakers may be interested in how the information in these databases may be used by ICE and other law enforcement partners.

## Oversight of Federal Law Enforcement Coordination

There are a number of federal enforcement initiatives, task forces, and centers to counter violent gangs such as MS-13 that are coordinated efforts. Reviews from oversight bodies such as DOJ's Office of the Inspector General (DOJ OIG) and the Government Accountability Office (GAO) have critiqued areas in which these efforts could be improved.

When the NGIC was established to coordinate intelligence information from federal, state, and local policing agencies, P.L. 109-162 directed that it create a database that would "collect, analyze, and disseminate gang activity information" from participating agencies. In DOJ OIG's November 2009 review of DOJ's anti-gang intelligence and coordination centers (including NGIC), it concluded that the NGIC had not created a gang information database, as had been directed by Congress pursuant to P.L. 109-162.[68] It also noted that the "NGIC is perceived as predominately an FBI organization, and it has not developed the capability to effectively share gang intelligence and information with other law enforcement organizations."[69] There has not been a subsequent report that speaks to whether these criticisms still hold true, and it is unclear whether there is a centralized database at the NGIC that contains information on gang members and associates.

---

[64] Department of Homeland Security, *Privacy Impact Assessment for ICE Investigative Case Management*, June 16, 2016, p. 2.

[65] Information provided to CRS by ICE on March 8, 2017.

[66] Department of Homeland Security, *Privacy Impact Assessment Update for the Enforcement Integrated Database (EID)*, April 8, 2014, p. 2.

[67] Information provided to CRS by ICE on March 17, 2017.

[68] U.S. Department of Justice, Office of the Inspector General, *A Review of the Department's Anti-Gang Intelligence and Coordination Centers*, November 2009, p. iii.

[69] Ibid.

A July 2009 GAO report reviewed, among other things, the roles of DOJ and DHS in countering gangs—including their collaborative efforts, and the departments' assessments of these efforts.[70] While DOJ and DHS implemented the majority of GAO's recommendations that resulted from this report, one was left outstanding. GAO recommended that DOJ "develop a department wide, strategic-level performance measure for the department's anti-gang efforts."[71] However, DOJ informed GAO in 2014 that it ultimately could not develop such a department-wide measure because of the differences in the missions and functions of its component agencies.[72]

Policymakers may look into whether or how federal agencies such as DOJ and DHS have changed their approaches and roles in coordinated efforts to counter violent gangs such as MS-13 in response to these critiques.[73]

## Immigration and Unaccompanied Minors

The relationship between transnational gangs such as MS-13 and unaccompanied alien children (UAC) arriving in the United States has received interest from researchers, policymakers, Administration officials, and the public alike.[74] Some observers have suggested that MS-13's evolution in Central America—including challenging government legitimacy, committing crimes with impunity, and expanding into more sectors of the global criminal economy—could continue to drive unauthorized migration into the United States by those seeking to escape the gang and its violence.[75] For instance, in 2013 the United Nations High Commission for Refugees interviewed over 400 UAC from all over the world on factors surrounding their displacement to the United States. Of the 104 UAC from El Salvador, 63% reported that they had experienced or been threatened with gang-related violence.[76] More recently, a number of reports suggest that the increased flow of Central American families seeking asylum at and between U.S. ports of entry at the U.S.-Mexico border stems in part from gang violence.[77] In addition, there have been concerns that MS-13 may exploit the U.S. Southwest border in order to bring gang members from Central America to the United States as UAC or may recruit some of the vulnerable UAC to join the gang's ranks once in the United States.

Understanding the nuances of these potential relationships between MS-13 and UAC can be particularly challenging. For instance, CBP data indicate that in FY2017 it apprehended 310,531 individuals not lawfully present in the United States. Of those, 228 were identified as affiliated with MS-13. (This number was down from 437 MS-13 affiliated individuals apprehended in

---

[70] U.S. Government Accountability Office, *Better Coordination and Performance Measurement Would Help Clarify Roles of Federal Agencies and Strengthen Assessment of Efforts*, GAO-09-708, July 24, 2009.

[71] Ibid., p. 48.

[72] U.S. Government Accountability Office, Better Coordination and Performance Measurement Would Help Clarify Roles of Federal Agencies and Strengthen Assessment of Efforts, GAO-09-708, July 24, 2009, https://www.gao.gov/products/GAO-09-708#summary_recommend.

[73] There have been congressional requests for updated assessments of federal efforts to counter gang activity in specific criminal domains such as drugs. See, for example, Office of U.S. Senator Bill Cassidy, "Cassidy Calls for Review of Federal Anti-Gang Strategy to Combat Opioid Epidemic," press release, April 6, 2018.

[74] For more information on the issue of UACs, see CRS Report R43599, *Unaccompanied Alien Children: An Overview*.

[75] Douglas Farah and Kathryn Babineau, *The Rapid Evolution of the MS 13 in El Salvador and Honduras from Gang to Tier-One Threat to Central America and U.S. Security Interests*, National Defense University, Perry Center Occasional Paper, March 2018, p. 28.

[76] U.N. High Commissioner for Refugees (UNHCR), *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*, March 2014, p. 32.

[77] See, for example, Sofía Martínez, "Today's Migrant Flow is Different," *The Atlantic*, June 26, 2018.

FY2014,[78] the year in which the number of UAC apprehended at the Southwest border reached a peak.) CBP data also indicate that in FY2017 it apprehended 41,435 UAC along the U.S. Southwest border.[79] However, publicly available CBP data do not reflect whether any of these UAC were affiliated with MS-13 at the time that they arrived in the United States. When CBP has provided data regarding UAC gang affiliation, they have only been estimates that are not based on *confirmed* gang membership. For instance, CBP indicated in June 2017 congressional testimony that since October 2012 there had been about 5,000 individuals apprehended with "confirmed or suspected gang affiliations" and that 159 (3%) of these were UAC. Of these 159 UAC with gang affiliations, "approximately 56 UACs were suspected or confirmed to be affiliated with MS-13."[80]

Additionally, even if an MS-13 member arrested in the United States is confirmed to have originally arrived in the country as a UAC, it may be difficult to determine whether he or she arrived as a gang member or was recruited once in the United States. Moreover, it remains unclear the extent to which immigrant youth in the United States join MS-13 on their own for a sense of community or brotherhood or whether they are coerced to join to avoid the consequences of being unaffiliated in a gang environment.

In their oversight of federal efforts to counter gang activity, policymakers may be interested in exploring how officials are determining and classifying UAC gang membership and affiliation as well as how this information is tracked.

# Going Forward

As policymakers debate the best path to tackle threats posed by MS-13, a key challenge is developing a clear conceptualization of the gang, including potential changes in its organizational structure, size, and criminality. This conceptualization may help in understanding the scope of the threat and identify the resources available to counter it. Policymakers may then be poised to evaluate law enforcement's tools and techniques to gather and share gang-related information, conduct anti-gang enforcement initiatives, and respond to evolving threats posed by MS-13 and its affiliates.

## Author Information

Kristin Finklea
Specialist in Domestic Security

---

[78] U.S. Customs and Border Protection, *CBP Enforcement Statistics 2018*. Of note, in the first eight months of FY2018, CBP reported 275 MS-13 apprehensions—more than either the entire FY2016 or FY2017.

[79] U.S. Customs and Border Protection, *U.S. Border Patrol Southwest Border Apprehensions by Sector FY2017*. In the first eight months of FY2018, CBP reported 32,372 apprehensions of UAC along the Southwest border.

[80] Department of Homeland Security, *Written testimony of CBP U.S. Border Patrol Acting Chief of Carla Provost for a Senate Committee on the Judiciary hearing titled "The MS-13 Problem: Investigating Gang Membership As Well As Its Nexus to Illegal Immigration, and Assessing Federal Efforts to End the Threat"*, June 21, 2017.

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.



**U.S. Department of Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# HSI-Led Investigation Secures 7-Year Prison Sentence of MS-13 Gang Member for Racketeering Conspiracy, Conspiracy to Commit Murder and Related Gun Charge

**Release Date:** January 8, 2025

**SAN JOSE** — Elmer Hernandez-Leiva, a member of the Santa Cruz Salvatrucha Locos — an MS-13 gang based in Santa Cruz, California — was sentenced on Dec. 12 in the United States District Court, Northern District of California.



The sentencing is the result of a years-long investigation by HSI San Francisco and the San Jose and Santa Cruz Police Departments into "MS-13" criminal street gang members operating in the greater Santa Cruz, California area.

"The sentencing of this MS-13 gang member marks a victory in the ongoing battle against criminal gang activity in the greater Santa Cruz, California area," said Homeland Security Investigations (HSI) San Francisco Special Agent in Charge Tatum King. "It underscores the critical collaboration between HSI and local law enforcement and our shared dedication to public safety. I greatly appreciate the contribution and tenacity of the San Jose and Santa Cruz Police Departments in bringing a successful sentencing in this case."

The sentence handed down includes time served (89 months and 14 days) plus 180 days for racketeering, conspiracy to commit murder and aid of racketeering, possessing a firearm in furtherance of a crime and possession of a firearm by a prohibited person.

Hernandez-Leiva, also known as "Kanana", is a citizen and national of El Salvador.

## Topics

[LAW ENFORCEMENT (/TOPICS/LAW-ENFORCEMENT)](/topics/law-enforcement)

**Keywords**

HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)

LAW ENFORCEMENT PARTNERSHIP (/KEYWORDS/LAW-ENFORCEMENT-PARTNERSHIP)    MS-13 (/KEYWORDS/MS-13)

TRANSNATIONAL CRIME (/KEYWORDS/TRANSNATIONAL-CRIME)

TRANSNATIONAL CRIMINAL ORGANIZATION (TCO) (/KEYWORDS/TRANSNATIONAL-CRIMINAL-ORGANIZATION-TCO)

Last Updated: 02/05/2025

# She graduated from high school with honors but can't read or write. Now she's suing

By Sabrina Clay and Danny Freeman, CNN

🕐 8 minute read · Updated 10:41 AM EST, Thu February 27, 2025

**She's attending college but can't read or write. Now she's suing her high school ...**

03:58

**(CNN) —** Aleysha Ortiz is 19 years old and dreams of one day writing stories and maybe even a book. That may sound like a reasonable aspiration for a teenager recently out of high school, but for Aleysha it will be much harder.

Despite graduating last June from Hartford Public High School in Hartford, Connecticut, and earning a scholarship to college, Aleysha is illiterate. She says she cannot read or write.

Many high school seniors feel proud and excited in the days before graduation. But Aleysha tells CNN she felt scared.

She graduated with honors, which usually means a student has demonstrated academic excellence.

2/27/25, 1:28 PM                    Connecticut high school graduate alleges she can't read or write in lawsuit | CNN

But after 12 years of attending public schools in Hartford, Aleysha testified at a May 2024 city council meeting that she could not read or write. Suddenly, she says, school officials seemed concerned about awarding her a diploma.

Two days before graduation, she says, school district officials told her she could defer accepting the diploma in exchange for intensive services. Aleysha didn't listen.

"I decided, they (the school) had 12 years," she says. "Now it's my time."

Aleysha is now suing the Hartford Board of Education and the City of Hartford for negligence, as well as her special education case manager, Tilda Santiago, for negligent infliction of emotional distress.

The board's chairperson, Jennifer Hockenhull, declined to comment on the lawsuit.

So did Jonathan Harding, chief legal officer for the City of Hartford, who told CNN, "I generally do not publicly remark on ongoing litigation." CNN reached out to Santiago through her attorney but did not receive a response.

In a statement to CNN, Hartford Public Schools said, "While Hartford Public Schools cannot comment on pending litigation, we remain deeply committed to meeting the full range of needs our students bring with them when they enter our schools — and helping them reach their full potential."

But one educator says Aleysha's story doesn't surprise him.

Jesse Turner, who runs the Literacy Center at Central Connecticut State University, says the quality of special education in public schools often varies according to zip code and demographics.

A 2019 report from EdBuild, which promotes equity in public schools, found majority non-White school districts in the US get $23 billion less than districts that mostly serve White students. Minority enrollment in Hartford's public schools was at about 90% during the 2020-2021 and 2021-2022 school years.

"America should be asking a question: Do we really care about our children — all of our children?" Turner asks.





Hartford Public High School. In a statement, the school district said, "we remain deeply committed to meeting the full range of needs our students bring with them when they enter our schools — and helping them reach their full potential." CNN

## She struggled as a 'bad child' in school

Aleysha was born in Puerto Rico, where even as a toddler she says she showed evidence of learning deficits.

Her mother, Carmen Cruz, says she knew early on that her daughter needed help.

"I saw that she had a specific problem she had to deal with," Cruz says in an interview with CNN that was translated from Spanish.

When Aleysha was 5 years old Cruz moved her family to Connecticut, believing Aleysha would receive better services for her learning difficulties.

But her struggles in school continued.

In first grade Aleysha "had difficulty with letter, sound and number recognition," according to her lawsuit. And because her learning disabilities were not addressed, Aleysha began acting out in class.

"I was the bad child," Aleysha says.

By the time Aleysha reached the 6th grade, she says in the lawsuit, evaluations showed she was reading at a kindergarten or first-grade level.

High school was no better. In her sophomore year at Hartford Public High School, Tilda Santiago became Aleysha's special education teacher and case manager. The lawsuit alleges Santiago subjected Aleysha "to repeated bullying and harassment," including stalking her on school grounds

2/27/25, 2:28 PM    Connecticut high school graduate alleges she can't read or write in lawsuit | CNN

subjected Aleysha "to repeated bullying and harassment," including stalking her on school grounds. The suit also alleges Santiago belittled Aleysha in front of teachers and other students and mocked her learning disabilities.

Aleysha says she reported the behavior to school officials and Santiago was eventually removed as her case manager "because of the dysfunctional relationship" between them, according to the lawsuit.

Aleysha also says her mother advocated on her behalf and urged the principal and other school officials to do a better job of addressing her daughter's disabilities. A mother of four, Cruz doesn't speak English and says she didn't go to school beyond the eighth grade.

"I didn't know English very well, I didn't know the rules of the schools. There were a lot of things that they would tell me, and I let myself go by what the teachers would tell me because I didn't understand anything."

By the 11th grade, when Aleysha reported she still "could barely hold a pencil," she began speaking up for herself. She says she knew if she were ever going to fulfill her dreams of becoming a writer or leading a normal life, she needed to learn how to read and write.

In her senior year some teachers suggested Aleysha get tested for dyslexia, a learning disability that makes reading difficult because of an inability to recognize sounds and how they relate to letters and words.

Also, during her senior year, Aleysha made a surprising announcement: She'd been accepted at the University of Connecticut and planned to attend in the fall.

Just one month before graduation, Aleysha says she finally began receiving the additional testing she had been asking for. The evaluations were not completed until the last day of high school, the lawsuit states. The testing revealed Aleysha still "required explicitly taught phonics, fluency and reading comprehension."

Phonics is typically first taught in kindergarten.

Aleysha had previously been diagnosed with attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), unspecified anxiety disorder and unspecified communication disorder. The new testing also revealed she has dyslexia as well.

## 'I just see words everywhere… with no meaning'

Last fall Aleysha enrolled at the University of Connecticut as a full-time student, taking two classes. She wants to study public policy.

So, how did Aleysha become a college student who can't read or write? The same way she got through high school, she says: By relying on apps that translate text to speech and speech to text.

She used the technology to fill out her college application, including writing an essay. She also got help from other people on navigating the process and received several financial grants and scholarships to pay for UConn.

The apps gave "me a voice that I never thought I had," she says.



Aleysha shows CNN's Danny Freeman how she uses her laptop to transcribe audio for her school assignments. CNN

Aleysha says her teachers mostly just passed her from one grade to the next in elementary and middle school. But by the time she reached high school she'd figured out how to use the technology to fulfill her assignments.

When most teenagers were hanging out at the mall, going to school events or going on dates, Aleysha says she was spending 4 to 5 hours a night doing homework.

Aleysha says she'd record all of her classes on her cell phone, then later replay everything her teachers said. She used her laptop's voice-to-text tool to search the definition of each word, then turned that text into audio she could understand. Once she grasped the assignment, she'd speak the answer, turn it into text and then cut and paste the words into her homework.

answer, turn it into text and then cut and paste the words into her homework.

Because of her limited vocabulary and speech impediment, the translation was not always accurate or grammatically correct, she says. But using the technology helped raise her grades from Cs and Ds to As and Bs, she adds.

She said she would start her homework as soon as she got home from school and finish each night at 1 or 2 a.m. before getting up at 6 a.m. to take the bus back to school.

June 25, 2023 at 8:41 PM

# The unsaid

Today May 2 I just got out of school and got in
the bus next to  a friend she invited me to hang
out Friday but I told her I don't know because I
may have to do  classwork and she laughed
and she said you always do work she asked
me what class I had today I told her I have
Spanich she said that's a easy class for you
because you know Spanish but I told her that I
speak Spanish but it's hard for me to write
every Spanish because I don't know how to
write Spanish and then she say oh yeah that's
true yeah she told me if I read more English
and write more English I told her yeah but little
does she know is that I also don't know how to
write in English that's why I never had time to
do anything because

2/27/25, 1:25 PM    Connecticut high school graduate alleges she can't read or write in lawsuit | CNN

One of Aleysha's diary entries, produced with talk-to-text technology. Courtesy Aleysha Ortiz

Aleysha demonstrated for CNN how she uses the app. She chose a passage from a book, took an image of it on her phone and then played the phone audio reading the passage aloud to her.

When asked if she could read the passage from the book, Aleysha told CNN, "It's impossible. I just see these words everywhere… with no meaning."

Aleysha says college has been very difficult. UConn is providing academic support, but she hasn't attended classes since February 1. She says she took some time off to get mental health treatment but plans to return soon.

## She wants to hold school officials accountable

Aleysha's lawsuit comes as President Donald Trump is taking steps to get rid of the federal Department of Education, saying he wants "to stop the abuse of your taxpayer dollars to indoctrinate America's youth."

The proposed move would gut the agency staff and leave the funding and education of students to states and local municipalities.



2/27/25, 1:25 PM    Connecticut high school graduate alleges she can't read in wide in lawsuit | CNN

Aleysha is a freshman at the University of Connecticut's Hartford campus. Courtesy Aleysha Ortiz

Turner, the Connecticut educator, says shutting down the DOE is a bad idea. He argues that if you put the responsibility of funding children's education in the hands of each state, not all states will do the right thing.

"How do I protect the special education children? Who do I go to?" he says. Turner adds that the DOE is where schools, students and parents go to lodge a complaint, because "they have to investigate."

Aleysha says she is taking legal action because school leaders "don't know what they're doing and don't care," adding that she wants them to be held accountable for what she says she experienced. She is also seeking compensatory damages.

Cruz, Aleysha's mother, tells CNN she is speaking out now about her daughter "so other people in my position don't have to go through the same thing."

As she looks back on her 12 years in the Hartford public school system, Aleysha says she feels sad that she wasn't taught to read and write. She also says she will continue to speak out, because she believes her city schools can do better.

"I'm a very passionate person and I like to learn," she says. "People took (away) that opportunity for me to learn, and now I'm in college and I wanna take advantage of that. Because this is my education."

**MORE FROM CNN**


A kindergartner's hopes for beating cancer are tied to federal grants now on the chopping ...


Mississippi city drops lawsuit over newspaper editorial that judge ordered removed