# United States Court of Appeals
## For the First Circuit
_____

No. 25-1158

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE;
STATE OF MARYLAND; DANA NESSEL, Attorney General; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF
WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US
DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State;
US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as
Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and
Human Services; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their
official capacity as Acting Commissioner of Social Security; UNITED STATES,

Defendants.

--------------------------------------------------------------------------

MELVIN JONES, JR.; COLLEEN CONNORS,

Interested Parties - Appellants.
_____

*Interested Party - Appellants' Jones and Connors'
emergency motion [to] Amend (ADD) clarifying {NEW}
issues on APPEAL that 1st Circuit Appeals Court EN
BANC {MS-13} removal determination #19-1620 would
be TODAY a different determination due to the
INFESTATION of MS-13 throughout the United States:*

# _Emergency Motion to AMEND our Appellants pro se Appeal Brief which [is] already tendered on 2-19-2025:_

**1.)** [We] Colleen Connors and Melvin Jones Jr. - pro se Appellants- [parties with a significant interest in the outcome of district court case #25-cv-10139]... wish to

*AMEND our appellants brief to ADD that...*

*1st Circuit Appeals Court EN BANC {MS-13} removal determination #19-1620 would be TODAY a different determination due to the INFESTATION of MS-13 throughout the United States; which is to say [such is a tale as "old" as time…. with respectful to unlawful border crossings at the southern and northern U.S. borders….*

*Which is that [of course it is WIDELY KNOWN throughout the entire world] that IF/ WHEN an illegal migrant/ alien asserts FEAR of being removed from the United States and RETURNED to their home country…. then the asylum protection laws of the united states automatically "COME INTO PLAY" {e.g.. which is a good gig for ANY and ALL*

*pregnant illegal alien WOMEN seeking to enter the United States to TAKE ADVANTAGE of the "GOLD MINE" of incredible benefits which awaits said pregnant illegal alien women [e.g. the MOST PRECIOUS OF WHICH IS THAT OF THE UNITED STATES' [moth to the flame - unconditional birthright citizenship ….and the district courts [e.g. in #25-cv-10139]] overly broad*

*preliminary injunction which should have set forth at least a few restrictions pertaining to known transnational terrorist gangs which have NOW infected the United States… such that there is as a matter of law and/ or FACT ….no reasonable basis to infer that a pregnant illegal alien who has LIED about her fear of her home country due to MS -13 or TdA {and/ or} actually has direct or*

*indirect "ties" to either MS-13 or Tda or any other terror gang from other countries… which NOW infect many of the Plaintiff AG's states in the first place}} should be allowed {WITHOUT AT LEAST A 6 month "freeze on issuance of a United State Birth Certificate… but immediately allowing for medical care for the newborn NON-US citizen undocumented migrant}… so*

*that the appropriate US immigration authorities can thoroughly determine IF immediate removal proceedings MUST happen as to illegal alien mother and [HER NEW BORN] undocumented migrant newborn baby.*

*2.)   [for example]:*

*"On October 1, 2018, Diaz Ortiz filed an application for asylum, withholding of removal, and CAT*

*protection, basing his request on multiple grounds, including persecution because of his evangelical Christian religion. He also reported that an aunt had been murdered in 2011 by members of MS-13, and he feared that the gang would kill him as well if he returned to El Salvador. In a subsequently filed affidavit, Diaz Ortiz stated*

*that, while he was living in El Salvador, MS-13 had threatened his life "on multiple occasions" because he was a practicing evangelical Christian. He said he repeatedly refused the gang's demands that he join MS-13, but gang members continued to follow him and issue threats. In 2015, the gang physically attacked him*

*and warned "that they would kill [him] and [his] family if [he] did not stop saying [he] was a Christian and living and preaching against the gang way of life." Diaz Ortiz explained that, because he would not give up his evangelical Christian beliefs, he and his parents decided he should leave El Salvador and "seek the safety and protection of [his] aunt*

and uncle" in the United States. (see attached).

Respectfully submitted.
Thank you.
Best,

Date: 3-3-2025

_____

Melvin Jones Jr. disabled

PRO SE appellant

1935 Hosler St.

Flint, Michigan

48503

Email: jonesjrmel@gmail.com

Google voice to text ph#

415-562-5074

—

Date: 3-3-2025

_____

Colleen Connors

PRO SE appellant

1935 Hosler St.

*Flint, Michigan*

*48503*

*Email:*

*cmcolleen4@gmail.com*

*Google voice to text ph#*

*(use email)*

\* See the
attached
Exhibit )

# United States Court of Appeals
## For the First Circuit

No. 19-1620

CRISTIAN JOSUE DIAZ ORTIZ,

Petitioner,

v.

MERRICK B. GARLAND,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Howard, Chief Judge,
Lynch, Lipez, Thompson, Kayatta,
Barron, and Gelpí, Circuit Judges.

Kristin M. Beale, with whom Ellen A. Scordino and DLA Piper LLP were on brief, for petitioner.

Benjamin Mark Moss, Senior Litigation Counsel, Office of Immigration Litigation, with whom Brian M. Boynton, Acting Assistant Attorney General, Civil Division, and John W. Blakeley, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

Sameer Ahmed, with whom Philip L. Torrey and the Crimmigration Clinic/Harvard Immigration and Refugee Clinical Program were on brief, for amici curiae Constitutional and Immigration Law Professors.

Kirsten V. Mayer, Ezra D. Geggel, and Ropes & Gray LLP on brief for amicus curiae Political Asylum/Immigration Representation Project.

_____

Opinion En Banc

January 10, 2022

LIPEZ, **Circuit Judge**.  Cristian Josue Diaz Ortiz, a
native of El Salvador, seeks review of a decision by the Board of
Immigration Appeals ("BIA") affirming the denial of his claims for
asylum, withholding of removal, and protection under the United
Nations Convention Against Torture ("CAT").  The Immigration
Judge's ("IJ") rejection of Diaz Ortiz's petition for relief rested
on an adverse credibility determination that primarily drew its
support from a "Gang Assessment Database."  Flaws in that database,
including its reliance on an erratic point system built on
unsubstantiated inferences, compel us to conclude that the
credibility judgment -- and, in turn, the rejection of Diaz Ortiz's
request for relief -- is not supported by substantial evidence.
Accordingly, we grant the petition for review and remand for new
immigration proceedings.

                                I.

**A. Factual Background**

        In July 2015, when he was sixteen, Diaz Ortiz  entered
the United States at the Texas border.  Immigration officials
quickly arrested him, initiated removal proceedings, and released
him into the custody of his uncle, who lived in East Boston.  Three
years later, on August 20, 2018, Diaz Ortiz and two others were
arrested in East Boston by agents of Homeland Security
Investigations ("HSI") and Enforcement and Removal Operations
("ERO") as part of an operation to arrest members of the notorious

Mara Salvatrucha ("MS-13") gang, a dangerous criminal organization known for committing violent crimes in the United States and Central America. See United States v. Pérez-Vásquez, 6 F.4th 180, 187-89 (1st Cir. 2021) (describing the operation and criminal activities of MS-13).[1] Although he had no prior arrests and had not been observed participating in any gang activity, Diaz Ortiz was thereafter detained by Immigration and Customs Enforcement ("ICE"). See 8 U.S.C. § 1226(a) (providing that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States").[2]

On October 1, 2018, Diaz Ortiz filed an application for asylum, withholding of removal, and CAT protection, basing his request on multiple grounds, including persecution because of his evangelical Christian religion. He also reported that an aunt had been murdered in 2011 by members of MS-13, and he feared that the

---

[1] ERO and HSI are both branches of Immigration and Customs Enforcement ("ICE"). Who We Are, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice (last updated July 6, 2021). "ERO manages all aspects of the immigration enforcement process" and specifically "target[s] public safety threats," including "gang members," for "identification and arrest." Id. HSI investigates "transnational crime," including "transnational gang activity." Id.

[2] Diaz Ortiz unsuccessfully sought release from custody while proceedings were ongoing, see Diaz Ortiz v. Smith, 384 F. Supp. 3d 140, 144 (D. Mass. 2019), and he later was denied a stay of removal pending resolution of his petition for review. According to his original brief to this court, he was deported to El Salvador on July 9, 2019.

gang would kill him as well if he returned to El Salvador.  In a subsequently filed affidavit, Diaz Ortiz stated that, while he was living in El Salvador, MS-13 had threatened his life "on multiple occasions" because he was a practicing evangelical Christian.  He said he repeatedly refused the gang's demands that he join MS-13, but gang members continued to follow him and issue threats.  In 2015, the gang physically attacked him and warned "that they would kill [him] and [his] family if [he] did not stop saying [he] was a Christian and living and preaching against the gang way of life."  Diaz Ortiz explained that, because he would not give up his evangelical Christian beliefs, he and his parents decided he should leave El Salvador and "seek the safety and protection of [his] aunt and uncle" in the United States.

In elaborating on his Christian practice in El Salvador, Diaz Ortiz stated in the affidavit that he had attended church with his family three to four times a week, and he became a youth leader in the church at the age of thirteen.  The family sometimes hosted vigils and prayer sessions in their home.  Diaz Ortiz also reported that his family owns a store that sells religious items, including Bibles, crosses, and Christian music.  In Boston, he only occasionally went to church with his aunt, noting that it was difficult to find the time to go because he was in school during the day and working at night.  However, he would often read the

Bible, and he spoke with his mother "almost every day and [they] always prayed together and would sometimes sing hymns."

Among the other supporting documents submitted by Diaz Ortiz were affidavits from his mother and his pastor in El Salvador, and a letter from the instructor of the Army Junior Reserve Officers' Training Corps ("JROTC") at East Boston High School describing Diaz Ortiz as "an excellent student and also a leader." Diaz Ortiz also submitted an expert declaration describing gang violence in El Salvador and confirming that gangs target evangelical Christians, particularly visible youth leaders such as Diaz Ortiz.

## B. Diaz Ortiz's Testimony at the Merits Hearing

On December 4, 2018, an IJ presided over a hearing in which Diaz Ortiz testified with the help of an interpreter. His testimony reiterated much of the information that he had reported in his affidavit, sometimes with slight variation or elaboration. Diaz Ortiz stated, inter alia, that: (1) he is an evangelical Christian who regularly attended church in El Salvador and served as a youth leader; (2) he worked at his family's store, where religious items were sold; (3) MS-13 gang members often approached him on his way to school to ask him to join the gang, which he repeatedly refused to do; (4) on one occasion in 2015, gang members beat him with a baseball bat, stole his phone and bicycle, and threatened to kill him if he did not give up his Christian beliefs

and join the gang. Diaz Ortiz also testified that a person cannot be both an evangelical Christian and a member of MS-13, that he would not join a gang, and that he was opposed to gangs because of his faith.

With respect to his religious practice in the United States, Diaz Ortiz testified that, since arriving in Boston, he had attended church only "a few times" because, not knowing anyone, he "felt alone." Instead, he prayed at home and, during daily video calls, his mother would read Bible verses to him. He recounted that, while living in his aunt and uncle's home, he had been helping care for a cousin with special needs. He attended school for tenth and eleventh grades, and he participated in the school's JROTC program until he took a part-time job to cover his personal expenses.

## C. The IJ's Questioning

During the hearing, the IJ questioned Diaz Ortiz on two subjects that the IJ later referenced in finding that Diaz Ortiz was not credible. The first inquiry focused on his family's store:

> **IJ:** Mr. Diaz, the photographs that you were presented earlier, are those photographs of your store on the street?
> **Diaz Ortiz:** Yes, of course, that's my mother and father's store.
> **IJ:** My question is, are those pictures of the store that you said was yours in El Salvador?
> **Diaz Ortiz:** Yes, they are, yes.
> **IJ:** Are you in any of these pictures?
> **Diaz Ortiz:** No.
> **IJ:** When were these pictures taken?

- 7 -

> **Diaz Ortiz:** Well, this was sent by my mother
> as evidence from my country.
>
> . . .
>
> **IJ:** So, these are pictures of the store that
> belongs to your mother and your father,
> correct?  It's not a picture of . . .
> **Diaz Ortiz:** Yes, yes, they are.
> **IJ:** . . . a store that belongs to you,
> correct?
> **Diaz Ortiz:** No, not, not to me.  It's the
> family's, it belongs to the family.

The IJ then directed Diaz Ortiz's counsel to continue her

questioning.

The second inquiry occurred after Diaz Ortiz's counsel

completed her questioning.  The IJ briefly asked Diaz Ortiz about

his admitted use of marijuana, and the following exchange then

occurred:

> **IJ:** What is your method of transportation,
> meaning how do you get from one place to the
> other?
> **Diaz Ortiz:** What do you mean, what do you mean?
> I don't understand the question.
> **IJ:** When you, when you travel in your
> community, what transportation do you use?
> **Diaz Ortiz:** Train.
> **IJ:** Always?
> **Diaz Ortiz:** Yes.  Well, when I lived in, in my
> house where I lived in, in East Boston, I
> didn't because it was close, but when I lived
> in Boston, I, I had to use the train.
> **IJ:** Do you have a car?
> **Diaz Ortiz:** No.
> **IJ:** So, you never traveled anywhere except by
> train, correct?
> **Diaz Ortiz:** Yes, yes, only in train.

At that point, the government began its cross-examination. After other questioning, the government attorney referred to an encounter between Diaz Ortiz and the police on August 1, 2018, in which officers seized a chain with a padlock that Diaz Ortiz was carrying in his backpack. The questioning then proceeded as follows:

> **Government:** And you told the officer that it was a chain and lock that you use for your bicycle.
> **Diaz Ortiz:** Yes, several times they stopped me.
> **Government:** And why would you tell the officers --
> **IJ:** . . . The question is not whether they stopped you on various occasions, the question is whether you told the officer that you had the bicycle and the padlock -- that you had the chain and the lock for your bicycle, that's the question.
> **Diaz Ortiz:** I told them that I had . . . that because I changed it. . . .
> . . .
> **Government:** Why did you tell the police that you had the chain and the padlock for a bicycle, yet you told the Court today that you only traveled around by train?
> **Diaz Ortiz's Attorney ("Attorney"):** Objection, mischaracterizes the testimony.
> **IJ:** Overruled, it's not misstating the testimony.
> **IJ to Diaz Ortiz:** Go ahead.
> **Diaz Ortiz:** Well, when I lived in East Boston, of course, I had the bicycle there to go around and, and do things around there, but when I lived in Boston and I took the train, I couldn't bring the bike anymore.
> . . .
> **IJ to Diaz Ortiz:** Do you remember that I specifically asked you whether you used any other means of transportation, yes or no?

> **Diaz Ortiz:** Oh, yes, yes, I remember when you said that.
> **IJ:** And you told the Court that you did not use any other means of transportation other than a train? Is that correct?
> **Diaz Ortiz:** [Not translated].
> **IJ:** No, I didn't ask for a reason why.
> **Diaz Ortiz:** Yes, you said that, but --
> **IJ:** I'm just asking you what you told the Court.
> **IJ to Government:** Next question.

Government counsel then turned to a different subject.

In her redirect examination, Diaz Ortiz's attorney returned to the bike lock incident:

> **Attorney:** . . . [C]ounsel asked you about a time that you were found with the . . . bike lock, do you remember that?
> **Diaz Ortiz:** Yes, I remember that.
> **Attorney:** And why did you carry a bike lock?
> **Diaz Ortiz:** Well, that time, a friend of mine had asked to borrow my bike because he had messed up his bike, and the chain that he had, he told me to change it, it was a chain that had numbers, a lock that had numbers, and he said to take mine off and use this one. So, I took his own, the one that had the numbers, that's what I was going to use.
> **Attorney:** Were there other times that the police had also stopped you and, and seen you with the bike lock?
> **Diaz Ortiz:** Yes, several times when I had my bike with me, and they saw me with my backpack, and they asked did I have anything inside, and I said, yes, of course, I have my bike chain. And I showed it to them, and then I -- they looked and then they put it back, and that was the only -- only that one time that I didn't have my bike with me that they asked me, but I explained the reason why.

The hearing also included expert testimony given via telephone by Dr. Harry E. Vanden, a professor of Latin American and International Studies, who explained that MS-13 targets evangelical Christians who proselytize in neighborhoods the gang wants to control because it views them as competitors. He noted that the gang would be aware of Diaz Ortiz and his family because of their visible proselytizing activities, including door-to-door visits to neighbors.

**D. The Gang Package**

Over objection from Diaz Ortiz's counsel, the government introduced a package of Gang Assessment Database documents as rebuttal evidence during its cross-examination. The package included a memorandum by Special Agent Sean Connolly of the Department of Homeland Security ("DHS") describing Diaz Ortiz as a "verified" MS-13 gang member based on a collection of law enforcement field reports drawn from the database.[3] Diaz Ortiz's attorney argued that the gang package was "not reliable and [was] fundamentally unfair," asserting that the field reports contained mistakes and inconsistencies. Counsel also referred to testimony given at Diaz Ortiz's bond hearing by criminal justice professor and former Boston Police Officer Thomas Nolan, who criticized the

---

[3] We shall refer to the gang-related documents, i.e., the memorandum and its supporting documents, collectively as the "gang package."

methodology used and conclusions reached in the gang package.[4]  The IJ overruled Diaz Ortiz's objection to the gang package without explanation.

Because the gang package is central to our decision in this case, we describe its contents below in some detail and then similarly review Professor Nolan's critique of those materials.

### 1. The Contents of the Gang Package

The gang package opens with Agent Connolly's memo, with the subject line: "Verified MS-13 Gang Affiliation of Cristian Josue DIAZ ORTIZ aka Christian DIAZ-ORTIZ."  The memo goes on to state the following:

> On August 20, 2018, Cristian Josue DIAZ ORTIZ was arrested with two other MS-13 gang members by Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI) as part of an MS-13 gang arrest operation in East Boston, Massachusetts.
>
> Homeland Security Investigations Boston Intelligence has determined Cristian Josue DIAZ ORTIZ to be a Risk to Public Safety as a VERIFIED and ACTIVE member of the MS-13 gang in the Boston metro area.
>
> The Mara Salvatrucha (MS-13) gang is a large transnational criminal organization with thousands of members and associates throughout the United States.  The MS-13 gang is among the most violent transnational street gangs in the United States, specializing in crimes of violence including murder, attempted murder, violent armed assaults, firearms offenses, weapons related crimes, drug distribution,

---

[4]  Professor Nolan also prepared an affidavit that was submitted as an exhibit to Diaz Ortiz's Prehearing Statement.

intimidation and robbery.  In Massachusetts MS-13 operates in a number of communities including: Boston, Chelsea, East Boston, Somerville, Everett, Revere, Lynn and Nantucket.

1.    Cristian Josue DIAZ ORTIZ has been verified as an MS-13 gang member by the Boston Police Department (BPD)/Boston Regional Intelligence Center (BRIC). (See the attached BPD/BRIC MS-13 Gang Member Verification: "CHRISTIAN DIAZ-ORTIZ".)

2.    Cristian Josue DIAZ ORTIZ has documented associations with MS-13 gang members by the Boston Police Department and Boston School Police Department (BSPD).  (See the attached BPD & BSPD incident/field interview reports and gang intelligence bulletins.)

3.    Cristian Josue DIAZ ORTIZ has been documented carrying common MS-13 gang related weapons[5] by the Boston Police Department. (See the attached BPD incident/field interview reports.)

4.    Cristian Josue DIAZ ORTIZ has been documented frequenting areas notorious for MS-13 gang activity by the Boston Police Department.  These areas are 104 Bennington St. and the East Boston Airport Park/Stadium in East Boston, Massachusetts which are both known for MS-13 gang activity including recent firearms arrests and a homicide.  (See the attached BPD incident/field interview reports and MS-13 gang intelligence bulletins.)

Although this memorandum was written by a federal agent,

DHS was merely the final link in a chain of reporting that began

with police officers in Boston conducting stops called "field

---

[5] The only "documented" reference to a "weapon[]" is a report that Diaz Ortiz possessed the bicycle chain and padlock when he was questioned by police on August 1, 2018.  See infra.

- 13 -

interrogation observations" -- FIOs for short.  FIOs are "interaction[s] in which a police officer identifies an individual and finds out that person's business for being in a particular area." Commonwealth v. Warren, 58 N.E.3d 333, 337 n.5 (Mass. 2016) (quoting Commonwealth v. Lyles, 905 N.E.2d 1106, 1108 n.6 (Mass. 2009)).  These "consensual encounters" are considered "constitutionally insignificant, and a police officer may initiate such an encounter without any information indicating that the individual has been or is presently engaged in criminal activity." Commonwealth v. Narcisse, 927 N.E.2d 439, 443 (Mass. 2010).[6]  The

---

[6] The Boston Police Department ("BPD") rule that governs reports on FIOs states that it was "developed to assist officers in ensuring that intelligence and information is gathered only on persons suspected of engaging in criminal activity or persons associating with those suspected of criminal activity."  Boston Police Dep't Rules & Procedures, Rule 323, Field Interaction/Observation/Encounter Report (FIOE Report), sec. 1 (July 2015) (hereinafter "Rule 323"), https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/t/56a2569205caa7ee9f29e6a2/1453479570208/rule323.pdf; see also id. at sec. 2 ("The FIOE Report is a mechanism to allow the Department to document and accumulate up-to-date information concerning known criminals and their associates . . . ." (emphasis added)).  However, the rule also allows an officer to document an "observation" or "a voluntary encounter," without reasonable suspicion.  Id. at secs. 4.3, 4.4.  An "observation" may be documented only "where the information collected serves a legitimate intelligence purpose," id. at sec. 4.3, and an "encounter" may be documented only if the officer has "a legitimate intelligence purpose for the encounter," id. at sec. 4.4.  A "legitimate intelligence purpose" includes observing, or speaking to, "[a]n individual known to be associated with a gang."  Id. at sec. 4.3; see also id. at sec. 4.4.

At least since 2011, the BPD has labeled these interactions as FIOEs -- "Field Interaction/Observation/Encounter[s]" -- but it

officer then documents the FIO.[7]  At the time of Diaz Ortiz's immigration hearing, if the subject of an FIO was verified as a gang member or associate, the "name and supporting documentation" would be forwarded to the Boston Regional Intelligence Center ("BRIC") for entry into Boston's Gang Assessment Database.  See Boston Police Dep't Rules & Procedures, Rule 335, Gang Assessment Database 4 (Mar. 23, 2017) (hereinafter "Rule 335 (2017)"), https://www.ca1.uscourts.gov/sites/ca1/files/citations/rule335%2 B%28gang%2Bdatabase%29.pdf.[8]  BRIC, which maintains the database,

---

also continues to use the FIO acronym.  See Rule 323 (using the FIOE label); Boston Police Dep't, Boston Police Commissioner Announces Field Interrogation and Observation (FIO) Study Results (Oct. 8, 2014), https://bpdnews.com/news/2014/10/8/boston-police-commissioner-announces-field-interrogation-and-observation-fio-study-results?rq=fio%20dATA (noting "Significant Changes to Department FIO Rule in 2011," including that "[t]he new FIO Rule adds an encounter to the list of documentable interactions, to ensure that those interactions that do not rise to a Terry Stop are properly documented").

[7] The FIOs involving Diaz Ortiz are documented in various ways.  Some FIOs are documented in actual police reports ("Field Interview Reports," as the BPD titles them), while others are described only in "gang intelligence bulletins," single-page documents that look like PowerPoint slides and have slide numbers. Each bulletin consists of a one-sentence description of an FIO, along with photos of the individuals who are the subject of the bulletin captioned with their names, addresses, and birth dates.

[8] In June 2021, the BPD amended Rule 335 to exclude the use of FIO reports "as the sole verification criteria for any individual."  Boston Police Dep't Rules & Procedures, Rule 335, Gang Assessment Database, sec. 5 (June 8, 2021) (hereinafter "Rule 335 (2021)"), https://static1.squarespace.com/static/5086f19ce4b0ad16ff15598d/ t/60c008de38813c6f9ecda1f9/1623197918488/ACFrOgB2rFeSFgLdZEW8mws 9eunEbgjaWMwzU5UJnIMONIeFfoVLprGEvsHWcfTYpaI4hoI30Ioacz7pDChr_r4

"is a unit of the Boston Police Department that gathers and investigates information in an effort to reduce violence in Boston." Sarah Betancourt, Boston center's gang database lists 3,853 people, CommonWealth (Mar. 9, 2021), https://commonwealthmagazine.org/criminal-justice/boston-centers-gang-database-lists-3853-people/.[9] DHS and other agencies have been able to access the intelligence stored in the database. See id.[10]

---

LIBNaBY0RnDvKYv4BH-1fuE_FV0q6FmD6J07iocJKdM9B95o1TG8BvW6GTi9o.pdf. The recent changes obviously may play no role in our assessment of the BIA's and IJ's decisions, but we describe the amendments where relevant to our discussion. In referring to Rule 335, we will indicate whether it is the 2017 version applicable to Diaz Ortiz's original proceedings or the amended 2021 rule. One further note: the 2017 version was not divided into sections, and we therefore refer to its page numbers. The amended version contains section numbers.

[9] The government did not provide the IJ with information about this chain of reporting when it submitted the gang package at Diaz Ortiz's merits hearing, and we have therefore drawn this background from publicly available sources.

[10] The amended rule states that "[t]he database is only used for valid law enforcement purposes." Rule 335 (2021), sec. 3; see also id. at sec. 6 ("Authorized users must have a legitimate law enforcement purpose for accessing the Gang Assessment Database."); id. at sec. 8 (stating that "[a]uthorized [u]sers may access the Gang Assessment Database when there is a legitimate law enforcement purpose for doing so, such as an ongoing investigation or in support of a prosecution"). The older version of the rule stated that officers needed "a legitimate law enforcement purpose" to access the database, but it did not place the same limit on "authorized user[s]." Rule 335 (2017), at 3. Given the recency of the amendments to the rule, the record in this case contains no information about whether the changes have affected DHS's access to the database.

- 16 -

The BPD uses a point system to verify suspected gang members, and different types of conduct are assigned different point values.  See Rule 335 (2017), at 2-3.  For example, the Department's non-exhaustive list of triggering conduct includes having a gang-related tattoo and participating in gang publications, each worth eight points.  Id. at 3.  Also on the list is "Contact with Known Gang Member/Associate (FIO)," which is worth "2 points per interaction."  Id.  At the time of Diaz Ortiz's hearing, a person who accrued six points was labeled a gang associate, and a person who accrued ten points was deemed a gang member.  Id.[11]

BRIC generates a "Gang Member VERIFICATION Report" for individuals who have been entered into the database.  Diaz Ortiz's report identifies him as a primary, active, and "[v]erified" member of MS-13 and indicates that he has accrued "21 points."  All twenty-one points resulted from his contacts with "known" gang members or associates.  The Gang Member Verification Report shows that sixteen of the points were assigned for eight instances of "Contact with Known Gang Members/Associates."  The remaining five points were assigned for one incident, described in a Boston School

_____

[11] The 2021 version of the rule does not distinguish between gang "associates" and "members," and it specifies that a gang associate is "[a]ny person . . . that has been verified using the Point-Based Verification System defined by this Rule and has obtained at least ten (10) points."  Rule 335 (2021), sec. 4.2.

Police "Intelligence Report," that is listed under "Information Developed During Investigation and/or Surveillance." The corresponding report, however, simply documents that Diaz Ortiz was seen with young men who were suspected MS-13 members.

Thus, Diaz Ortiz was assigned points for nine FIOs. There are sixteen reports and bulletins involving Diaz Ortiz in the Gang Assessment Database, but some FIOs are accompanied by both a police report and a gang intelligence bulletin. There is also one Boston School Police report in the database for which Diaz Ortiz was not assigned any points.[12]

The nine encounters for which Diaz Ortiz was assigned points are the following:

-— <u>March 8, 2017</u> (2 points[13]): Diaz Ortiz was smoking marijuana in an alleyway with another Hispanic teenager.[14] Diaz Ortiz also had a small amount of marijuana on his person, a civil

_____

[12] That report, detailing events that occurred on September 14, 2017, states that Diaz Ortiz was in the East Boston Stadium with "a group of known MS-13 members" who were approached by a Hispanic male who identified himself as Eric Quevedo. According to the report, as Quevedo was leaving the area, "he got into a verbal confrontation with [another individual] who made reference to the fact that QUEVEDO was an MS-13 member."

[13] This police report does not designate Diaz Ortiz's companion as an "MS-13 Gang Member," as later reports do, but Diaz Ortiz was nevertheless assigned points for the FIO.

[14] The Field Interview Reports identify the individuals with whom Diaz Ortiz associated as Hispanic. All references to individuals' ethnicities are drawn from the law enforcement documents being described.

offense in Massachusetts.  See Mass. Gen. Laws ch. 94C, § 32L (effective July 28, 2017).[15]

-— September 13, 2017 (2 points):  Diaz Ortiz was smoking marijuana on the front steps of a building with another Hispanic teenager, who is identified in the police report as a "known MS-13 gang member."

-— November 28, 2017 (5 points):  Boston School Police officers saw a student wearing a "full face mask" and spoke with the student, whom they identified as a member of MS-13.  That student then walked up to a group of other teenage boys, including Diaz Ortiz, and "met with" them.

-— April 3, 2018 (2 points):  Diaz Ortiz and another Hispanic teenager were found skipping school and smoking marijuana in a park.  The police report states that the two teenagers were "known to the officer as verified MS-13 gang members"[16] and had a "history of carrying weapons," but none of the prior reports in the gang package mention Diaz Ortiz carrying a weapon.  The officer

---

[15] At that time, possession of one ounce or less of marijuana was a civil offense.  See Mass. Gen. Laws ch. 94C, § 32L (effective Dec. 4, 2008 to July 27, 2017).  The triggering amount increased to two ounces or less on July 28, 2017.  See Mass. Gen. Laws ch. 94C, § 32L (effective July 28, 2017).

[16] Prior to this FIO, Diaz Ortiz had only accrued nine points -- enough to be considered a gang "associate" using the BPD's point system under the 2017 version of the BPD's Rule 335, but not a gang "member," as the police report represents.  See Rule 335 (2017), at 3.

did a pat frisk of the two teens and found an aluminum baseball bat in the right pant leg of Diaz Ortiz's companion, which the officer confiscated.  The teens were warned about smoking marijuana in a park and released.

-— <u>May 28, 2018</u> (2 points):  Diaz Ortiz was "loitering" with three other Hispanic teenagers whom the officer conducting the FIO "knew" to be MS-13 members.

-— <u>June 1, 2018</u> (4 points assigned for two FIOs):  (1) Diaz Ortiz was seen with a group of teenagers in front of a building where one member of the group lived, which officers noted was "a known hangout and address" for MS-13 members; and (2) Diaz Ortiz was stopped with two other teenagers, one of whom officers believed had a warrant out for his arrest, but when the officers ran their names there were no outstanding warrants.

-— <u>June 21, 2018</u> (2 points):  Diaz Ortiz was sitting on the track benches of the East Boston Stadium after hours with four other teenagers, three of whom were "verified" MS-13 "associates." Officers told them to leave.  A notation on the report made by HSI Special Agent Connolly observes that the East Boston Stadium is "notorious for MS-13 gang activity."

-— <u>August 1, 2018</u> (2 points):  Officers stopped Diaz Ortiz and two other Hispanic teenagers as they were walking out of a park.  Diaz Ortiz was carrying a backpack and told the officers that he had a metal chain with a padlock in it that he used for

his bicycle.  A notation made by Special Agent Connolly on a gang intelligence bulletin about the encounter asserts that "MS-13 gang members commonly carry large metal chains with locks to be used [i]n gang related assaults."[17]  The officers confiscated the chain and released the three teenagers.  Nothing in the gang package suggests that Diaz Ortiz ever used the bike chain and lock as a weapon.

### 2.  The Expert Critique of the Gang Package

As noted above, Diaz Ortiz submitted an affidavit from Professor Nolan, a former Boston police officer, in advance of his merits hearing.  Nolan spent twenty-seven years as an officer in the BPD and nine as a lieutenant.  Since leaving the Department, he has taught criminal justice courses at six colleges and universities and written an academic book on policing issues, see Thomas Nolan, Perilous Policing: Criminal Justice in Marginalized Communities (2019), as well as numerous articles and essays on the subject.  Nolan concluded that Diaz Ortiz "should not have been listed as a verified gang member" in the BRIC Gang Assessment Database because the "intelligence" about Diaz Ortiz does not comply with federal regulations governing shared criminal

---

[17] The notation does not attribute that assertion to any source, although the record contains a January 2016 newspaper article on MS-13 stating that one gang leader told members to "dress down and carry a bicycle chain with a lock for a weapon, instead of a gun or a knife."

intelligence databases in the Code of Federal Regulations. <u>See</u> <u>generally</u> 28 C.F.R. Part 23. The regulations are implicated, Nolan explains, because the Gang Assessment Database "is an interjurisdictional shared database that [is] accessible to other agencies."

Part 23 of the Code's Title 28 was originally adopted in 1980 to ensure that the operation of criminal intelligence systems was not undertaken "in violation of the privacy and constitutional rights of individuals," Criminal Intelligence Systems Operating Policies, 45 Fed. Reg. 40,156, 40,156 (June 13, 1980), a purpose that has remained unchanged, <u>see</u> 28 C.F.R. § 23.1. The regulations provide that entities that operate "interjurisdictional intelligence system[s]," <u>see</u> <u>id.</u> § 23.3(b)(5), like BRIC, "shall collect and maintain criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity," <u>id.</u> § 23.20(a).

Nolan emphasizes that Diaz Ortiz faced no criminal charges for any of the incidents documented in the Boston gang database and that "there was no direct relation between these encounters and any reasonable suspicion of [Diaz Ortiz's] involvement in criminal activity." Thus, Nolan concludes, the

information about Diaz Ortiz "should not be contained within the database" and is "not reliable."

In addition to his pre-hearing submission of Professor Nolan's affidavit, Diaz Ortiz submitted a supplemental brief after the hearing that focused specifically on the gang package and reiterated his contention that its contents were unreliable and, hence, an improper basis for concluding that Diaz Ortiz was a gang member or involved in gang activities. Diaz Ortiz's brief described the point system used by the BPD and argued that it "can criminalize normal teenage behaviors such as associating with others of the same ethnicity." And he included in his brief a two-and-a-half-page chart detailing the inconsistencies throughout the gang package -- for example, he flagged that the April 3, 2018, police report mentions his "history of carrying weapons" but that no prior entries describe him carrying weapons. Diaz Ortiz therefore asked the IJ not to consider the gang package or, if the IJ did consider it, to give it "minimal weight" in analyzing his application for relief.

## II.

### A. The IJ's Decision

The IJ began his assessment of the record with the "threshold" determination that Diaz Ortiz was not credible, initially attributing that finding to inconsistencies in his testimony and "the lack of corroboration." The IJ gave limited

weight to the supporting affidavits from Diaz Ortiz's family members and noted a shift he perceived in Diaz Ortiz's testimony concerning his family's store: "At first during his testimony, he stated that he owned a store that sold Christian paraphernalia. However, he later revisited this fact and stated that the store actually belonged to his family."  Although the IJ was "persuaded that [Diaz Ortiz's] family may have been evangelical Christians," "such does not necessarily indicate that [Diaz Ortiz] is an evangelical Christian."

Then, without addressing Diaz Ortiz's arguments about the unreliability of the gang package, the IJ went on to find that Diaz Ortiz was "not credible pertaining to his gang membership," remarking that Diaz Ortiz "alleges that he is not an MS-13 gang member, despite the plethora of evidence found within" the gang package.  The IJ specifically stated that he was "unpersuaded" by Diaz Ortiz's explanation for the chain and padlock seized from him on August 1, 2018.  Elaborating, the IJ stated: "Upon questioning by the Court, [Diaz Ortiz] stated that he uses the train for transportation and did not make any mention of the bicycle."

The IJ continued by explaining that,

> [t]roublingly, the Respondent stated that a Christian cannot be a member of MS-13; however, the evidence indicates that he likely is a MS-13 member.  Given the significant evidence that the Respondent is a MS-13 gang member, the Court casts great doubt on whether

> the Respondent is actually an evangelical
> Christian.

Relying on that doubt, the IJ concluded that Diaz Ortiz had not met his burden to prove statutory eligibility for asylum and did not consider whether the evidence would have entitled Diaz Ortiz to relief if he were credible. With respect to Diaz Ortiz's claim that he had experienced past persecution in El Salvador, the IJ explained that, "based on the Court's adverse credibility determination, the Court is unable to find that these events actually occurred as described." The IJ likewise found that Diaz Ortiz's lack of credibility undermined his assertion that his life would be threatened on account of a protected ground if he returned to El Salvador.[18] The IJ also found that Diaz Ortiz did not merit a favorable exercise of discretion because of his gang membership,[19] and that he did not qualify for withholding of removal or relief under the Convention Against Torture.

---

[18] Diaz Ortiz originally asserted persecution based on his political opinion and membership in a particular social group, as well as on his religion. He has since focused on his identity as an evangelical Christian and his "related affiliations as a Salvadoran evangelical youth leader and a Salvadoran evangelical who proselytizes."

[19] In explaining why he would deny relief as a matter of discretion even if Diaz Ortiz were eligible for asylum, the IJ said the following:

> DHS has filed numerous documents stating that
> [Diaz Ortiz] is affiliated with a gang or a
> member of such. He has been stopped by the
> police several times, and on at least one

**B. The BIA's Decision**

In his appeal to the BIA, Diaz Ortiz argued that the IJ violated his due process rights by relying on the gang package to conclude that he was not credible on the question of his gang membership.  The BIA, however, found no clear error in the IJ's adverse credibility determination, noting that it was "based on inconsistencies between [Diaz Ortiz's] testimony and the documentary evidence."  The BIA pointed to Diaz Ortiz's testimony that he had never joined a gang and that a Christian could not be in a gang, contrasting that assertion with the evidence in the gang package, including that he was a "'VERIFIED and ACTIVE member of the MS-13 gang in the Boston metro area'" and that he had been "'documented carrying common MS-13 gang related weapons,' including 'large metal chains with locks . . . used in gang related assaults.'"

The BIA acknowledged Diaz Ortiz's explanations for the evidence cited by the IJ -- including that he had the lock and chain for his bike -- but observed that the IJ "did not find these explanations to be reasonable."  Apparently to demonstrate that

occasion, he was found with a lock and chain, a weapon frequently used by local gang members.  His gang affiliations are also well-documented by law enforcement agencies.  Because gang affiliation is an incredibly dangerous factor, the Court finds that it is a serious negative inequity that is not offset by [Diaz Ortiz]'s positive equities.

the IJ's view was supportable, the BIA then turned to the specific encounters between Diaz Ortiz and law enforcement officers that were described in the police reports in the gang package and from which Diaz Ortiz's gang affiliation purportedly could be inferred. The BIA noted that Diaz Ortiz "had multiple contacts with law enforcement when he associated with known gang members in areas frequented by the gang, and [he] admitted that he previously testified that he 'did not use any other means of transportation other than a train' in Boston."

The BIA dispatched in a lengthy footnote Diaz Ortiz's argument that it was fundamentally unfair, and thus a due process violation, for the IJ to rely on the gang package to find him not credible. Specifically, the BIA rejected as "not borne out by the record" Diaz Ortiz's assertion of inconsistencies in the gang package. Rather, the BIA stated, the reports "consistently indicate that the respondent associated with known MS-13 gang members in areas of Boston frequented by the gang and carried gang-related weapons."

The BIA noted Professor Nolan's critique of the gang package, including his assertion that the reports about Diaz Ortiz in the gang database violate federal regulations because the database does not identify information giving "rise to a reasonable suspicion that the respondent participated in criminal activity." In response, without identifying any criminal activity by Diaz

Ortiz, the BIA observed that "the professor does not explain why the respondent's associations with known MS-13 gang members in areas frequented by the gang, along with the fact that gang-related weapons were found on his person, do not give rise to a reasonable suspicion." The BIA did not address Nolan's critique that the "known MS-13 members" with whom Diaz Ortiz was seen associating might themselves have been identified as such based on the same problematic foundation. Further sidestepping the contention that Diaz Ortiz's inclusion in the gang database was inconsistent with federal law, the BIA deemed "[s]ignificant[]" that "counsel has not presented evidence that the respondent has been removed from the Boston police's database because his inclusion was unlawful."

The BIA expressly noted that it did not rely on the IJ's finding that Diaz Ortiz testified inconsistently about the ownership of his family's store. The BIA also stated in a footnote that, even if Diaz Ortiz's explanations for the inconsistencies found by the IJ were plausible, "the Immigration Judge's findings are also plausible in light of the record as a whole, and thus they are not clearly erroneous."

## C. Petition for Review to the First Circuit

On review of the BIA's decision, the panel was divided. The majority rejected Diaz Ortiz's contention that the IJ's adverse credibility determination was not supported by substantial evidence. See Diaz Ortiz v. Barr, 959 F.3d 10, 11-12 (1st Cir.

2020).  The dissent asserted that the agency's reliance on the "seriously flawed" gang package undermined the credibility finding and resulted in a due process violation that required new proceedings.  Id. at 19.  That disagreement became the focus of Diaz Ortiz's request for rehearing en banc.

We granted that request, vacated the panel decisions, and now reconsider Diaz Ortiz's petition for review.  He again asserts that the IJ's and BIA's reliance on the gang database denied him due process and that the IJ's adverse credibility finding is not supported by substantial evidence.  He further asserts that the record demonstrates that he is eligible for immigration relief, and that -- at a minimum -- he is entitled to a new hearing.

### III.

**A. Legal Principles**

Where, as here, the agency's denial of relief rests on both the IJ's conclusions and the BIA's further justifications for the IJ's findings, we review both administrative decisions.  See Zhakira v. Barr, 977 F.3d 60, 66 (1st Cir. 2020).  "We assess the agency's legal determinations de novo and its 'factual findings under the deferential substantial evidence standard, meaning that we will not disturb such findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  Id. (quoting Ramírez-Pérez v. Barr, 934

F.3d 47, 50 (1st Cir. 2019)) (additional internal quotation marks omitted).

An adverse credibility determination is a factual finding subject to the substantial evidence standard. See Cuesta-Rojas v. Garland, 991 F.3d 266, 270-71 (1st Cir. 2021). In evaluating an asylum-seeker's credibility, the IJ may take inconsistencies into account "without regard to whether [they] . . . go[] to the heart of the applicant's claim," 8 U.S.C. § 1158(b)(1)(B)(iii), so long as the resulting adverse credibility determination is "sustainable" based on the record as a whole, Cuesta-Rojas, 991 F.3d at 270. We are obliged to "uphold credibility findings if 'the IJ has given reasoned consideration to the evidence and has provided a cogent explanation for his finding.'" Huang v. Holder, 620 F.3d 33, 37 (1st Cir. 2010) (quoting Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 5 (1st Cir. 2008)); see also Cuesta-Rojas, 991 F.3d at 270-71.

Asylum relief requires proof that the petitioner is "unable or unwilling" to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see also Zhakira, 977 F.3d at 66. Withholding of removal requires the applicant to show a higher likelihood of future persecution. See Avelar Gonzalez v. Whitaker, 908 F.3d 820, 828 & n.3 (1st Cir.

- 30 -

2018); 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b)(2).  To prevail on his CAT claim, Diaz Ortiz would need "to show by a preponderance of the evidence that, if returned to El Salvador, 'he would be subject to torture by or with the acquiescence of a government official.'" Perez-Trujillo v. Garland, 3 F.4th 10, 18 (1st Cir. 2021) (quoting Aldana-Ramos v. Holder, 757 F.3d 9, 19 (1st Cir. 2014)) (additional internal quotation marks omitted); see also 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1).

The IJ did not consider whether Diaz Ortiz's testimony and his supporting evidence would have satisfied these standards for relief if he had found Diaz Ortiz credible.  Rather, as recounted above, the IJ identified inconsistencies between Diaz Ortiz's testimony and other evidence in the record -- primarily, that contained in the gang package -- as the basis for discrediting Diaz Ortiz's professed adherence to evangelical Christianity and finding that he was a member of MS-13.  The BIA likewise cited the evidence of Diaz Ortiz's gang association as support for the IJ's factual findings.

Diaz Ortiz argues that the gang package is so flawed that it should not have been considered at all in the IJ's and BIA's assessment of his claims for immigration relief.  He contends both that the gang package's overarching conclusion that he is a gang member -- based on the point system -- is wrong and that the underlying reports that he associated with gang members are

themselves not reliable evidence that he did so.  Accordingly, he asserts, the record fails to support the IJ's credibility finding with substantial evidence.  We thus begin by examining Diaz Ortiz's challenge to the agency's reliance on the gang package.

## B. The Reliability of the Gang Package

Unmistakably, the IJ and BIA both gave the gang package substantial weight in finding Diaz Ortiz not credible.  However, it is important to distinguish between two materially different types of content in the package: (1) the police reports detailing specific encounters with Diaz Ortiz, and (2) the gang "evidence" drawn from those reports, using the BPD's point system and other non-percipient information.  That distinction is significant in evaluating the IJ's credibility determination.

In affirming that determination, the BIA "consider[ed] the totality of the circumstances," recounting the evidence and Diaz Ortiz's responses as follows:

> The respondent was . . . confronted with documents from Homeland Security Investigations and the Boston Police Department indicating that he is a "VERIFIED and ACTIVE member of the MS-13 gang in the Boston metro area."  These documents reflect that the respondent has "documented associations with MS-13 members" and "frequent[ed] areas notorious for MS-13 gang activity."  Finally, they state that the respondent "has been documented carrying common MS-13 gang related weapons," including "large metal chains with locks . . . used in gang related assaults."

> When pressed, the respondent explained that he was not a gang member, and he did not know that the people he associated with were gang members or that the areas they spent time in together were frequented by the gang. He also explained that the lock and chain found on his person were for his bike. The Immigration Judge did not find these explanations to be reasonable. The respondent had multiple contacts with law enforcement when he associated with known gang members in areas frequented by the gang, and the respondent admitted that he previously testified that he "did not use any other means of transportation other than a train" in Boston.

(citations omitted) (alteration and omission in original). Because the BIA affirmed the IJ's decision based on the "totality of the circumstances," we understand the BIA to have relied on both the police reports themselves and the "gang evidence" derived from the use of the point system. Consequently, if any aspect of this evidence is unreliable, the stated evidentiary basis for the agency's decision would be undermined. Here, it turns out, the agency's reliance on the challenged evidence is problematic for the reasons we now explain.

We previously have rejected a challenge to the agency's use of law enforcement reports similar to the FIOs, noting that "[n]othing in the record compels us to find that the police and other government reports were so obviously unreliable as to render the agency's reliance on them an abuse of the agency's wide discretion." Miranda-Bojorquez v. Barr, 937 F.3d 1, 7 (1st Cir.

2019); see also Arias-Minaya v. Holder, 779 F.3d 49, 54 (1st Cir. 2015) ("[I]t is settled beyond hope of contradiction that . . . immigration courts may consider police reports even when they rest largely on hearsay."). We recognized that limits on the use of such materials exist, but we observed that "those limits are generally satisfied as long as the trier first determines that the report is reliable and that its use would not be fundamentally unfair." Arias-Minaya, 779 F.3d at 54 (emphasis added).

Diaz Ortiz contends that, unlike in the cases cited above,[20] no such threshold determination of reliability was made here despite the compelling evidence to the contrary that he provided. He particularly targets the portion of the gang package that concluded that he was a member of MS-13. In other words, this objection does not attack the government's use of the police

---

[20] In Arias-Minaya, the IJ had observed that "the petitioner had offered no reason to doubt either the reliability of the police report or the truth of the facts set forth therein." 779 F.3d at 51. We also noted that "the IJ determined (and the BIA confirmed) that the police report was reliable and probative of the petitioner's character." Id. at 54.

Similarly, in Miranda-Bojorquez, we observed that, "not only did the IJ find the reports reliable and that their use would not be fundamentally unfair, but he also gave Miranda an opportunity to rebut their reliability." 937 F.3d at 7. As previously noted, we also stated that "[n]othing in the record compels us to find that the police and other government reports were so obviously unreliable as to render the agency's reliance on them an abuse of the agency's wide discretion." Id.

officers' firsthand accounts of their encounters with him.[21]
Rather, he objects to the way those reports are used in the
database, and he faults the IJ and BIA for uncritically accepting
the conclusion that he is a gang member despite the abundant
evidence he submitted of the faulty underpinnings for that
conclusion.

The record amply justifies Diaz Ortiz's critique of the
agency's deference to the gang package. Despite his assertion
that the law enforcement reports in the database -- the building
blocks for identifying Diaz Ortiz as a "verified" member of MS-13
-- do not support that classification, neither the IJ nor BIA
considered whether the interactions documented by the FIOs, and
the points assigned to those encounters, were reliable indicators
of gang affiliation. See, e.g., Vasquez v. Rackauckas, 734 F.3d
1025, 1046 (9th Cir. 2013) (noting that "the lack of objective
criteria" for assessing whether an individual is an active gang
member, inter alia, "presents a considerable risk of error" and
requires "careful factfinding").

If the IJ and BIA had performed even a cursory assessment
of reliability, they would have discovered a lack of evidence to

---

[21] That is not to say that Diaz Ortiz agrees that the FIOs are
entirely accurate. As noted above, his post-hearing brief to the
IJ identified numerous inaccuracies in the police reports,
including an unsubstantiated statement that he had a "history of
carrying weapons." However, he does not contest most of the
percipient details of the reported encounters.

substantiate the gang package's classification of Diaz Ortiz as a member of MS-13. Most significantly, the record contains no explanation of the basis for the point system employed by the BPD. The record is silent on how the Department determined what point values should attach to what conduct, or what point threshold is reasonable to reliably establish gang membership.

That silence is so consequential because, during the period relevant to this case, the list of "items or activities" that could lead to "verification for entry into the Gang Assessment Database" was shockingly wide-ranging. Rule 335 (2017), at 2. It included "Prior Validation by a Law Enforcement Agency" (nine points), "Documented Association (BPD Incident Report)" (four points), and the open-ended "Information Not Covered by Other Selection Criteria" (one point). Id. at 3.[22] The 2017 form for submitting FIO reports to the database states that a "Documented Association" includes virtually any interaction with someone identified as a gang member: "[w]alking, eating, recreating, communicating, or otherwise associating with confirmed gang

---

[22] Among other changes, the 2021 revised rule does not include the open-ended entry in the list of items, and the rule now specifies that validation by another law enforcement agency is limited to agencies whose validation process is "at least as rigorous as that used by the Boston Police Department." Rule 335 (2021), sec. 5. Also, the rule now provides that reports submitted for verification "must be manually reviewed by a BRIC analyst and supervisor to determine compliance" with the rule before they are entered into the database. Id. at sec. 7.

members or associates." <u>See</u> Rule 335 (2017), at 6.  "Contact with Known Gang Members/Associates (FIO)" -- the category used for nearly all of Diaz Ortiz's point accumulation -- includes "[v]isiting, corresponding, or engaging in financial transactions with gang members or associate[s]." <u>Id.</u>

Scholarly critiques of gang databases that employ similar point systems have recognized that they cast too wide a net. <u>See</u>, <u>e.g.</u>, Kevin Lapp, <u>Databasing Delinquency</u>, 67 Hastings L.J. 195, 210 (2015) ("The broad criteria for inclusion in gang databases, and the discretion afforded to law enforcement in deciding whom to include, make it difficult for young people living in gang-heavy communities to avoid qualifying criteria."); K. Babe Howell, <u>Fear Itself: The Impact of Allegations of Gang Affiliation on Pre-Trial Detention</u>, 23 St. Thomas L. Rev. 620, 649 (2011) (remarking that "[t]he criteria for inclusion in gang databases are almost entirely unrelated to criminal conduct or even to active participation in gang activities" and create "the potential for false positives"); Joshua D. Wright, <u>The Constitutional Failure of Gang Databases</u>, 2 Stan. J. C.R. & C.L. 115, 125 (2005) ("The subjective criteria used to document gang members . . . reinforce the suspicion that databases, even if properly managed and administered, are excessively over inclusive and overstate minority participation rates.").

Moreover, the point system was applied to Diaz Ortiz in a haphazard manner.  He was assigned points for most, but not all, of his documented interactions with purported MS-13 members.  When he was assigned points, he was not always assigned the same number per interaction.  Although he was assigned two points for "contact" with alleged gang members or associates on most occasions, he was assigned five points for the "Intelligence Report" submitted by the Boston School Police that describes an encounter that appears no different from the other "contacts."  Only two items in the Rule 335 list carry five points: "Information from Reliable, Confidential Informant" and "Information Developed During Investigation and/or Surveillance."  See Rule 335 (2017), at 3. We thus cannot accept the BIA's implicit conclusion that the gang package's points-driven identification of Diaz-Ortiz as a "VERIFIED and ACTIVE" member of MS-13 was reliable.

The FIOs describing Diaz Ortiz's contacts with law enforcement that were contained in the gang package were themselves similarly unreliable.  Consequently, even if the BIA had relied exclusively on the material in the FIOs -- rather than also relying on the points-based conclusion that Diaz Ortiz himself was a gang member -- we would still have reason to fault the BIA's affirmance of the IJ's credibility determination.  For example, several of the FIOs specifically state that the individuals with whom Diaz Ortiz was interacting were deemed "verified MS-13 gang members"

because the BRIC database classified them as such, presumably utilizing the flawed point system we have described. As Professor Nolan points out in his affidavit, "it is unclear from the information provided by the Gang Assessment Database how any other named individuals were verified as members of MS-13. Given the problems with [Diaz Ortiz's] inclusion as a 'verified member,' it is possible that these individuals also should not have been included."

The entry for November 28, 2017 -- the report from a Boston school officer -- illustrates several of these issues. The gist of the entry is that two officers made "casual conversation" with a student in a "full face mask" whom they identified as a member of MS-13, and they then saw the student walk over to a group of teenage boys that included Diaz Ortiz. The report identifies no improper conduct by any of the students; it does not say that the mask bore gang colors or symbols;[23] it does not indicate that the masked student spoke directly to Diaz Ortiz. Nor does the report explain the basis for identifying the student as an MS-13 member other than to say that the BRIC labeled the student as a "verified" member. Therefore, we at most can infer from this paltry set of facts that Diaz Ortiz was standing near an individual

---

[23] In his en banc supplemental brief, Diaz Ortiz states, though without citation to the record, that the face mask was "an 'animal hoodie' that was popular attire for students attending the high school at that time."

who was identified as an MS-13 member by the BRIC, with the only
basis for that identification the possible use of the same
problematic point system that identified Diaz Ortiz as a member.
Yet, Diaz Ortiz received five points merely because that student
decided to walk over and join a group that included him.[24]

Other FIOs in the gang package, including encounters on
June 1 and June 21, 2018, are flawed for the same reason.  They
say that the individuals with whom Diaz Ortiz was found were gang
members in part because the BRIC database "verified" them as such.
We have no reason to believe that the BRIC labeled these
individuals as gang members on any basis other than an application
of the flawed point system.  For the reasons we have already
explained, an identification of an individual based on the point
system alone, without additional information to bolster the
credibility of its conclusion, is not reliable.  Therefore, the
BIA could not have properly affirmed the IJ's credibility
determination on the ground that Diaz Ortiz was associating with

---

[24] A news story published in March 2021 reported that,
according to the BPD, school resource officers no longer
communicate with BRIC or federal immigration authorities.  See
Sarah Betancourt, Boston center's gang database lists 3,853
people, CommonWealth (Mar. 9, 2021), https://commonwealth
magazine.org/criminal-justice/boston-centers-gang-database-
lists-3853-people/.

gang members and, for that reason, was not believable in asserting that he is a devout Christian opposed to gangs.[25]

In addition, there is a patent disconnect between Diaz Ortiz's conduct as described in the database and any threatening, "gang-like" activities.  None of the reports support an inference that he had participated in criminal activity at all,[26] let alone the kinds of violent crimes for which MS-13 is infamous.[27]  Indeed, absent the unsubstantiated statements that those with whom he associated were gang members, the FIOs show no more than a teenager engaged in quintessential teenage behavior -- hanging out with friends and classmates.  These social encounters occurred in unremarkable neighborhood locations for this peer group: at a park, at school, in front of one teenager's home, on the benches in an empty stadium.  The record lacks any evidence as to why assigning

---

[25] In his testimony before the IJ, Diaz Ortiz did not explicitly deny that the other individuals with whom he was found to be associating were gang members.  Rather, he stated that he was not aware that such was the case.  However, Diaz Ortiz was not obliged to prove that those individuals were not gang members.  It was the government's obligation to demonstrate that they were MS-13 associates through the gang package or other evidence.

[26] As previously noted, possession of a small amount of marijuana was a civil offense in Massachusetts, see supra note 15, and the officers who observed Diaz Ortiz using marijuana took no action against him.

[27] Presumably, the arrest of Diaz Ortiz by ERO and HSI in August 2018 was based solely on his supposed status as a gang member, not criminal activity, as no criminal conduct is noted anywhere in the DHS memorandum reporting the arrest.

points for those interactions was a reliable means of determining gang membership.  Certainly, the fact that the young men were all Hispanic does not permit an inference that any, or all, of them were gang members.  See generally Jeffrey Fagan, et al., Final Report: An Analysis of Race and Ethnicity Patterns in Boston Police Department Field Interrogation, Observation, Frisk, and/or Search Reports 20 (2015), https://s3.amazonaws.com/s3.documentcloud.org/documents/2158964/full-boston-police-analysis-on-race-and-ethnicity.pdf (reporting "racially disparate treatment of minority persons in BPD FIO activity").

In rejecting Diaz Ortiz's due process challenge, the BIA ignored the problems with the government's evidence and discredited Professor Nolan's views because Diaz Ortiz had "associated with known MS-13 gang members" in areas frequented by gang members and "carried gang-related weapons," i.e., the bicycle chain and lock.[28]  In other words, while acknowledging that Nolan had raised serious doubts about the gang database's reliability, the BIA responded to those concerns in circular fashion -- relying on the questionable data about Diaz Ortiz's peers to deflect the criticism of the questionable data about Diaz Ortiz.

_____

[28] As recounted above, the database contains no information that Diaz Ortiz possessed "weapons," aside from the reference to the single occasion that he was reported to have the chain and lock.

The government argues that the IJ and BIA could find Diaz Ortiz's claim to be an evangelical Christian not credible based on his undisputed "bad" behaviors: trespassing at the East Boston Stadium, smoking marijuana, skipping school, and associating with a peer who had a baseball bat concealed in his pants leg.[29]  But even if such a finding would be supportable -- an assessment we need not make -- that is not the finding that was made here.  The IJ and the BIA expressly invoked the conclusion drawn in the database that Diaz Ortiz was a member of MS-13, and their view of the evidence was necessarily colored by the assumption that gang members or associates were involved in each observed interaction.  Indeed, none of these non-violent behaviors would even be fodder for entry into the Gang Assessment Database without that assumption.

The government emphasizes in its en banc briefing, and it reiterated at oral argument, that "[a]t least seven different police officers on at least six different occasions indicated that they knew various individuals -- Diaz Ortiz and people he associated with -- to be gang members."  Although the government describes these as "statements of personal knowledge," there is little in the record to support this claim.  None of the FIOs,

---

[29] The government also points to Diaz Ortiz's possession of the bike lock without his bicycle in its catalogue of "bad" behaviors.  As we explain below, this categorization rests on tenuous assumptions grounded in the problematic gang package.

with the exception of the one concerning the September 14, 2017 encounter that garnered no points in the BRIC, see supra note 12,[30] provide any specific facts supporting the assertion that the individuals identified were MS-13 gang members. Most state that the officers identified the individuals as gang members or that the officer knew them to be such, but they do not specify whether that belief stemmed from the point system or from personal knowledge.

Moreover, no officer testified at Diaz Ortiz's immigration hearing or submitted an affidavit or sworn statement articulating what that personal knowledge, if it existed, might have been. Accordingly, the record fails to show personal knowledge for the officers' statements that Diaz Ortiz was with gang members such that those statements could properly cast doubt on the veracity of his testimony. Diaz Ortiz testified that he did not know that he had been socializing with anyone associated with a gang, and the government's assertion that he must have known is based solely on the information in the database that is unreliable for the reasons we have discussed. The record simply leaves unanswered whether any of Diaz Ortiz's neighborhood and school friends were in fact gang members or associates.

_____

[30] Neither the IJ nor BIA specifically referred to this encounter in their decisions.

As noted above, and apparently in response to critiques like those submitted by Diaz Ortiz in this case, the BPD has acknowledged that FIOs, on their own, do not provide an adequate foundation for verifying individuals as gang associates. See supra note 8 (describing the elimination of FIOs "as the sole verification criteria for any individual," Rule 335 (2021), sec. 5). Tellingly, also as described above, the FIO reports about Diaz Ortiz in the BRIC database should not have been included at all, regardless of the significance attributed to them. The federal regulations cited above plainly prohibit entities like BRIC from collecting "criminal intelligence information" about an individual unless "there is reasonable suspicion that the individual is involved in criminal conduct or activity." 28 C.F.R. § 23.20(a) (emphasis added). Simply associating with people who may be engaged in criminal activity is not enough.

We are not suggesting that the federal regulations governing criminal intelligence information establish an exclusionary rule applicable to immigration proceedings. Nor are we saying that IJs are entirely precluded from admitting into evidence, and considering, information contained in police reports such as those in the BRIC Gang Assessment Database.[31] Rather, the

---

[31] We reiterate, however, that we do not know the circumstances in which the BPD's revised Rule 335 contemplates DHS access to the BRIC database.

IJ's and BIA's primary error in this case was their embrace of the flimsy -- indeed, arguably nonexistent -- link between the FIOs, with their assigned point values for largely unexceptional teen behaviors, and the conclusion that Diaz Ortiz is a gang member. The BPD's failure to comply with the federal regulations meant to prevent "violation of the privacy and constitutional rights of individuals" was simply one of multiple signals that the contents of the gang package do not reliably establish its conclusion of gang affiliation. Criminal Intelligence Systems Operating Policies, 45 Fed. Reg. 40,156, 40,156 (June 13, 1980).

In rejecting Professor Nolan's opinion about the unreliability of the gang database information, the BIA found it significant that Diaz Ortiz's counsel had not presented evidence that Diaz Ortiz's name had been "removed from the Boston police's database because his inclusion was unlawful." However, there is typically no notice provided to individuals of their inclusion in the database or a specified procedure to object.[32] See Yawu Miller, Are there really 160 gangs in Boston?, Bay State Banner (July 30, 2019),                                  https://www.baystatebanner.com/

---

[32] By contrast, California and Nevada, among other jurisdictions, require local law enforcement agencies to notify individuals whose names are included in their gang databases of the process through which they can contest that designation. See Cal. Penal Code § 186.34(c)(1)-(2); Nev. Rev. Stat. Ann. § 179A.500(1)(a).

2019/07/30/are-there-really-160-gangs-in-boston/.[33]   Recognizing

the lack of any such procedure, the government suggested on appeal

that Diaz Ortiz could have brought a civil rights lawsuit under 42

U.S.C. § 1983 to have his name removed from the database.  Putting

aside the unrealistic assumptions that a slow and costly civil

action is feasible for a respondent in immigration proceedings and

that -- even if successful -- a judgment would have issued in time

to make a difference in these removal proceedings, it defies logic

to suggest that Diaz Ortiz's failure to pursue that course enhances

the reliability of the information in the database.

In sum, the record clearly shows that the IJ and the BIA

credited the gang package's "verification" of Diaz Ortiz as a gang

member in finding him not credible.  However, the BRIC database

does not contain "reasonable, substantial, and probative evidence"

of gang membership or association, and the government provided no

other evidence to substantiate the inferences and conclusions

drawn from the police reports via the BRIC point system.  Zhakira,

977 F.3d at 66 (quoting Ramírez-Pérez, 934 F.3d at 50) (internal

quotation marks omitted).  Put differently, the government's

---

[33] According to a news report in March 2021, BRIC's director
stated that an individual seeking to have his name removed from
the database would need to write a letter to the Boston Police
Department's legal advisor, which would trigger an assessment by
the Department and BRIC.  See Sarah Betancourt, Boston center's
gang database lists 3,853 people, CommonWealth (Mar. 9, 2021),
https://commonwealth          magazine.org/criminal-justice/boston-
centers-gang-database-lists-3853-people/.

evidence was simply not "of a 'kind and quality' that a reasonable factfinder could find sufficient" to support labeling Diaz Ortiz a gang member and, for that reason, to reject on credibility grounds his claim to religious persecution. Garland v. Ming Dai, 141 S. Ct. 1669, 1677 (2021) (quoting Dir., Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 279 (1994)).

**C.  Mode of Transportation Testimony**

The government maintains that the IJ's credibility determination did not rest solely on the gang database and Diaz Ortiz's gang status.  It points out that the IJ also identified an inconsistency in Diaz Ortiz's testimony concerning his use of a bicycle as a means of travel, and that the BIA supported the IJ's view of that testimony.  Hence, we must consider whether such an inconsistency provides an independent ground for the IJ's adverse credibility determination.[34]

---

[34] The IJ also identified a discrepancy in Diaz Ortiz's testimony concerning the ownership of his family's store.  However, the BIA did not endorse the IJ's view of that testimony, evidently recognizing -- correctly -- that it provides no support for the adverse credibility determination.  The IJ plainly misinterpreted Diaz Ortiz's initial statements about the store, inexplicably construing that testimony to suggest that Diaz Ortiz -- a teenager when he left El Salvador -- had claimed he was the owner, rather than his parents.  Specifically, after the IJ asked Diaz Ortiz if he had worked in El Salvador, he answered that he "worked with [his] parents" and that the work was "selling clothes in the street."  In response to a question from his attorney, he explained that "we did have a store . . . on the street . . . and we would sell Bibles and Christian belts and clothing."

The IJ saw a contradiction in Diaz Ortiz's testimony on how he traveled around Boston. In cross-examination, the DHS attorney asked Diaz Ortiz to explain why he told police on August 1, 2018, that he was carrying a chain and padlock for his bicycle given that, earlier in the immigration hearing, he had told the IJ that he traveled only by train. As recounted above, Diaz Ortiz responded that he used a bicycle when he lived in East Boston, but he took the train when he lived in Boston.

Plainly, the IJ's initial probing about Diaz Ortiz's transportation, which occurred at the end of Diaz Ortiz's direct testimony, was not about his travel per se. Rather, that questioning is only reasonably understood as a between-the-lines inquiry into Diaz Ortiz's gang affiliation, triggered by the notation on the August 1, 2018, police report that "MS-13 gang members commonly carry large metal chains with locks to be used [i]n gang related assaults." On that day, Diaz Ortiz did not have his bicycle with him, and the IJ unsurprisingly wanted an explanation for why he nonetheless was carrying the lock.

Our deferential review of agency fact-finding might ordinarily keep us from second-guessing the IJ's assessment that Diaz Ortiz's explanation for carrying the bike lock that day, given during his redirect examination, was unpersuasive. See supra Section III.A. But the IJ juxtaposed that assessment with his finding that Diaz Ortiz was "not credible pertaining to his gang

membership," citing "the plethora of evidence found within [the gang package]."  In other words, as described below, the record demonstrates that the IJ rejected Diaz Ortiz's innocent explanation for his possession of the bike lock because of "the significant evidence that Respondent is a MS-13 gang member."  In turn, the BIA relied on the gang database to uphold the IJ's adverse credibility finding.

A careful review of the exchange between Diaz Ortiz and the IJ that gave rise to the government's cross-examination about his possession of the bike lock reveals, at most, imprecision in Diaz Ortiz's statements about his mode of transportation.  His assertion that he used "only" the train was part of an exchange in which the IJ pressed him on whether he "[a]lways" did so.  In responding, Diaz Ortiz initially said, "Yes," but then continued to explain that, when he lived in East Boston, "I didn't because it was close."  The IJ then asked Diaz Ortiz if he had a car.  Diaz Ortiz replied that he did not, and the IJ then asked again, "So, you never traveled anywhere except by train, correct?"  His answer, "Yes, yes, only in train" -- and not by car -- was thus given in the context of his earlier explanation that he did not need the train in East Boston.  Later, when the government in cross-examination inquired about the bike lock in his backpack, he explained that, when he lived in East Boston, he had the bicycle "to go around and . . . do things around there."

It is important to keep in mind that Diaz Ortiz required the assistance of an interpreter at the hearing. His answers to the questions from the IJ and DHS attorney suggest that he may not have viewed bicycling around East Boston to "do things around there" as "travel" equivalent to the use of a car or the train. Strikingly, despite the language barrier and Diaz Ortiz's evident willingness to answer the questions posed to him, the IJ manifested impatience and, indeed, hostility toward Diaz Ortiz throughout the questioning about his mode of transportation.

Most notably, during the cross-examination, the IJ cut off what appears to be an attempt by Diaz Ortiz to explain the discrepancy the IJ had raised. When pressed a second time to confirm that he previously said that he traveled only by train ("And you told the Court that you did not use any other means of transportation other than a train? Is that correct?"), Diaz Ortiz said something to the government's attorney that is reported as "[Not Translated]" in the transcript. The IJ then said to Diaz Ortiz: "No, I didn't ask for a reason why." Diaz Ortiz again attempted to reply, saying, "Yes, you said that but--." In response, the IJ said, "I'm just asking you what you told the Court," and then immediately said to the government: "Next question."

Diaz Ortiz's testimony about the bike lock and chain was not inherently unbelievable. He was living in East Boston when he

was found with them, and he testified that officers had asked him on other occasions -- when he did have his bicycle -- if he had anything in his backpack: "I said, yes, of course, I have my bike chain. And I showed it to them, and . . . they looked and then they put it back . . . ." Even if one could plausibly see a variation in Diaz Ortiz's testimony on his mode of transit, the difference was minor when viewed in context and, hence, insufficient on its own to support the adverse credibility determination. See 8 U.S.C. § 1158(b)(1)(B)(iii) (stating that the IJ may consider inconsistencies that do not go "to the heart of the applicant's claim," but also must consider "the totality of the circumstances, and all relevant factors").

Inescapably, then, given the agency's emphasis on the gang package and Diaz Ortiz's supposed gang affiliation, we cannot isolate the "bike lock" rationale as a standalone basis for the IJ's credibility finding. Indeed, it is undeniable that Agent Connolly's notation about MS-13's use of bicycle chains -- the prompt for the IJ's travel inquiry -- was an attempt to attach sinister meaning to Diaz Ortiz's possession of the bike lock. The IJ acted on that cue -- reflected in both the content and manner of his questioning -- and then expressly relied on the depiction of Diaz Ortiz as a gang member in evaluating his responses.[35]

---

[35] The IJ's hostile attitude toward Diaz Ortiz, fueled by the gang database, may also account for the absurd interpretation of

Hence, because the IJ's view of Diaz Ortiz's testimony about his use of a bicycle and bike lock was anchored in the database's "verification" of his gang status, the sustainability of that view necessarily turns on whether the "plethora of evidence" in the gang package has a supportable foundation.  And, as we have explained, it does not.

Finally, we note that, even if the IJ's assessment of the mode-of-transportation evidence had not been influenced by the gang package, we would need to remand the case to the agency for reconsideration of the adverse credibility determination.  In making and affirming the credibility finding, the IJ and BIA impermissibly relied on the identification of Diaz Ortiz as a "verified" gang member as part of "the totality of the circumstances."  Hence, we do not know if the IJ would have found Diaz Ortiz not credible based solely on his mode-of-transportation testimony.  It would be the IJ's role, not ours, to assess Diaz Ortiz's credibility on that basis.  See Securities Exchange Comm'n v. Chenery, 318 U.S. 80, 88 (1943) (noting that "a judicial judgment cannot be made to do service for an administrative judgment"); id. at 95 ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."); see

---

Diaz Ortiz's testimony about his family's store.  See supra note 34.

also, e.g., Rivera v. Ashcroft, 394 F.3d 37, 40 (1st Cir. 2005) (remanding to the BIA because "the agency action . . . cannot be sustained on the stated grounds").

Accordingly, neither the agency's adverse credibility determination nor its denial of Diaz Ortiz's claims was supported by substantial evidence, and Diaz Ortiz is entitled to reconsideration of his claims for relief.

**IV.**

In holding that the IJ's credibility finding and the resulting denial of relief are not supported by substantial evidence, we wish to make clear that we are not necessarily prohibiting all use on remand of the police reports contained in the gang package. Those reports include uncontested percipient facts. Nonetheless, the agency must ensure that all evidence cited in support of its decision "is reliable and that its use would not be fundamentally unfair." Arias-Minaya, 779 F.3d at 54.

Given our conclusion that this case must be remanded under the substantial evidence standard of review, we need not, and therefore do not, reach Diaz-Ortiz's constitutional due process claim. See Marasco & Nesselbush, LLP v. Collins, 6 F.4th 150, 178 (1st Cir. 2021) (describing the principle of constitutional avoidance). However, we do not minimize the importance of the fairness concerns raised by Diaz Ortiz and amici with respect to the law enforcement practices that led to his

classification as a member of MS-13. The Boston Police Department's amended Gang Assessment Database Rule reflects recognition of those concerns. The amended rule, which discounts the significance of FIOs and provides other safeguards, should diminish the potential for criminalizing ordinary behaviors of minority youth without hampering law enforcement efforts to monitor and control violent gangs.

Nonetheless, in this case, unsupported characterizations of such behaviors permeated the record before the IJ. We previously have recognized the risk that fresh credibility findings may be affected by prior exposure to a petitioner's case. See, e.g., Jabri v. Holder, 675 F.3d 20, 26 (1st Cir. 2012). The case before us again presents such a scenario. Thus, on remand, "although assignments are within the agency's discretion, given the prior credibility determination, confidence would be enhanced if the matter were assigned to a different IJ." Id.

The petition for review is granted, the order of the BIA is vacated, and the matter is remanded to the BIA for proceedings consistent with this opinion.

-DISSENTING OPINION FOLLOWS-

LYNCH, **Circuit Judge, with whom HOWARD, Chief Judge, joins, dissenting**.  We dissent because, in our view, the majority violates binding statutory, Supreme Court, and First Circuit law, and also because the majority's unprecedented alteration of the law will have unfortunate consequences going well beyond this case. The majority erroneously vacates a well-supported lack of credibility finding by the Immigration Judge ("IJ") as to the religious persecution asylum claim by Cristian Josue Diaz Ortiz if he were removed after his illegal entry into the United States. This finding was based on the IJ's observations of Diaz Ortiz's testimony and admissions, including his admitted failure to attend his church in the United States and his own volunteered statement that, based on his religious belief, he would, of course, not associate with MS-13.  But Diaz-Ortiz was found with gang members and in possession of a favored MS-13 weapon, and he had admitted he had numerous associations with individuals linked by police with MS-13 (as set forth in an admissible gang database), although Diaz Ortiz claimed, not credibly, not to know of their MS-13 affiliation.  The IJ supportably rejected Diaz Ortiz's attempted explanation of the inconsistency between the "innocent" explanation of why he was found with a gang weapon while in the company of gang members and an earlier admission he had made.  The lack of credibility finding was upheld by the Board of Immigration Appeals ("BIA") in a reasoned decision.  This court is required by

binding law to deny the petition.  See Garland v. Dai, 141 S. Ct. 1669, 1677 (2021).

I.

We incorporate our prior majority opinion, vacated by the en banc court, for a longer discussion of the case.  See Diaz Ortiz v. Barr, 959 F.3d 10 (1st Cir. 2020).  In addition, we add these points.

We start with the binding statutes and Supreme Court and First Circuit precedents.  The majority's decision arrogated to itself a function which by congressional command belongs to the immigration agencies.  See 8 U.S.C. § 1158(b)(1)(B)(iii) (assigning to the trier of fact -- i.e. the immigration judge -- credibility determinations); see also Cuatzo v. Lynch, 796 F.3d 153, 156 (1st Cir. 2015) ("Immigration judges have broad discretion over the conduct of immigration court proceedings.").

As the Supreme Court recently has explained,

> Congress has carefully circumscribed judicial review of [IJ and] BIA decisions. When it comes to questions of fact -- such as [an adverse credibility determination] -- the [Immigration and Nationality Act] provides that a reviewing court must accept "administrative findings" as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."

Dai, 141 S. Ct. at 1677 (emphases added) (quoting 8 U.S.C. § 1252(b)(4)(B)). "This is a 'highly deferential' standard" that precludes reviewing courts from making independent credibility determinations. Id. at 1677–78 (quoting Nasrallah v. Barr, 140 S. Ct. 1683, 1692 (2020)). Instead, it permits only the deferential review by courts of the agency's credibility determinations. Id. at 1678 ("The only question for judges reviewing the [IJ or] BIA's factual determinations is whether any reasonable adjudicator could have found as the agency did." (emphasis in original)). That is because "[t]he IJ -- who actually observes the witness -- is best positioned to assess the applicant's credibility in the first instance." Id. at 1678.

The majority violates the firm rules that special deference is given to adverse credibility determinations made by immigration judges and that we must deny the petition for review of the denial of an application for immigration relief if any reasonable adjudicator could find that substantial evidence supports the agency's decision. See Silva v. Gonzales, 463 F.3d 68, 72 (1st Cir. 2006) ("We must uphold the BIA's decision 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" (quoting 8 U.S.C. § 1252(b)(4)(B))). In the course of doing so, the majority also violates the law that the rules of evidence do not apply in immigration proceedings and that reliability determinations are to be made by the immigration

agencies.  See Yongo v. I.N.S., 355 F.3d 27, 30 (1st Cir. 2004);
see also Miranda-Bojorquez v. Barr, 937 F.3d 1, 7 (1st Cir. 2019)
("[S]ince the rules of evidence do not apply in immigration
proceedings, the evidentiary standards deployed by immigration
judges 'are generally more lax.'" (quoting Cabas v. Barr, 928 F.3d
177, 184 (1st Cir. 2019)).

## II.

The majority tries unsuccessfully to justify its
reasoning by resorting to the principle of constitutional
avoidance.  That is error.  See Jennings v. Rodriguez, 138 S. Ct.
830, 842-43 (2018) (plurality opinion) (holding the court erred in
invoking the canon of constitutional avoidance when interpreting
an unambiguous immigration statute); see also Rodriguez v.
Robbins, 715 F.3d 1127, 1140 (9th Cir. 2013) ("[I]f the statute
does not raise constitutional concerns, then there is no basis for
employing the canon of constitutional avoidance.").

The majority focuses on the fact that the IJ -- not bound
by the rules of evidence -- did not exclude the gang database
evidence (which the majority terms the "gang package") offered to
rebut Diaz Ortiz's own testimony.  The ruling denying exclusion of
the gang database is not even colorably a due process violation.
First, the gang package included a collection of, inter alia, law
enforcement field reports of the type commonly considered by
immigration courts.  See Miranda-Bojorquez, 937 F.3d at 7; see

also Arias-Minaya v. Holder, 779 F.3d 49, 54 (1st Cir. 2015) ("[I]t is settled beyond hope of contradiction that . . . immigration courts may consider police reports even when they rest largely on hearsay.").

Second, Diaz Ortiz was given an opportunity to review those materials; admit, deny, or otherwise explain their content; and introduce an expert's affidavit to challenge their reliability. See Miranda-Bojorquez, 937 F.3d at 7 (rejecting a due process argument over the admission of police reports in immigration court in part because the IJ gave the petitioner an opportunity to rebut their reliability); see also Davis v. Lynch, 802 F.3d 168, 177 (1st Cir. 2015) ("An immigration petitioner's right to due process entails, at its core, the right to notice of the nature of the charges and a meaningful opportunity to be heard." (quotation marks and citation omitted)).  With that opportunity, Diaz Ortiz did not argue that the events documented in the package did not occur.  Nor did he ask that the officers who summarized the data or who made the observations be called to testify or be made available for cross-examination.  This petition for review does not state even a colorable due process claim and the canon of avoidance is improperly invoked.

## III.

In order to achieve the result it wants, the majority substitutes its own opinion for that of the agency and

mischaracterizes what the IJ and the BIA actually held as to the adverse credibility finding.[36]  A reasonable adjudicator easily could find, as the IJ did and the BIA affirmed, that Diaz Ortiz was not credible because of inconsistencies in his testimony and contradiction of his testimony through other evidence.

The record makes absolutely clear that the adverse credibility finding did not rest primarily on the information in the gang database, but rested on Diaz Ortiz's admissions, inconsistencies, and not credible testimony.

When the IJ asked Diaz Ortiz what his method of transportation in Boston was, Diaz Ortiz responded that he took the train.  When the IJ asked, "Always?", Diaz Ortiz stated: "Yes. Well, when I lived in, in my house where I lived in, in East Boston, I didn't because it was close, but when I lived in Boston, I, I had to use the train."  The IJ clarified again: "So, you never

---

[36]    The majority focuses primarily on the point system contained in the gang database, but that focus is misplaced. Neither the IJ nor the BIA mention the point system in their respective decisions, or the high number of points assigned to Diaz Ortiz.  Rather, the agency cites the uncontested evidence that Diaz Ortiz was found carrying a bike chain and padlock -- a gang-related weapon -- and was often seen associating with gang members and hanging around gang headquarters.  An independent news article corroborated that chains and padlocks are used as gang weapons.  Further, Diaz Ortiz never denied that the individuals with whom he associated were gang related, and his expert, Professor Thomas Nolan, has opined only that it is merely "possible" (as opposed to, e.g., more likely than not) that those individuals were mislabeled in the gang package as gang members and associates.

traveled anywhere except by train, correct?" Diaz Ortiz confirmed: "Yes, yes, only in train." Not once during that dialogue did Diaz Ortiz tell the IJ that he traveled by bicycle.

Later in the hearing, the government asked Diaz Ortiz about the occasion on which the police found a metal chain and padlock -- a gang-related weapon -- on him while he was with two gang members, and he told the officers the items were for a bike that he was not currently using. The government asked: "Why did you tell the police that you had the chain and the padlock for a bicycle, yet you told the Court today that you only traveled around by train?" Diaz Ortiz responded: "Well, when I lived in East Boston, of course, I had the bicycle there to go around and, and do things around there, but when I lived in Boston and I took the train, I couldn't bring the bike anymore."

The IJ justifiably rejected that explanation. That the IJ's "initial probing" into Diaz Ortiz's transportation was inspired by information in the gang package is irrelevant. Diaz Ortiz's testimony was plainly inconsistent and provided a specific reason warranting a finding that Diaz Ortiz testified untruthfully as to the reason he carried a favored MS-13 weapon. See Zaruma-Guaman v. Wilkinson, 988 F.3d 1, 6 (1st Cir. 2021).

Further supporting that finding is Diaz Ortiz's explanation as to why he was found carrying the bike chain and padlock, but no bicycle. On top of the inconsistencies just

described, Diaz Ortiz's response hardly had to be accepted as credible or satisfactory. He merely stated: "Well that time, a, a friend of mine had asked to borrow my bike because he had messed up his bike, and the chain that he had, he told me to change it, it was a chain that had numbers, a lock that had numbers, and he said to take mine off and use this one. So, I took his own, the one that had the numbers, that's what I was going to use." The IJ did not find the explanation credible. And nothing in the record would compel the IJ to accept the petitioner's lies.[37] See Zaruma-Guaman, 988 F.3d at 8 ("[I]t is the purview of the IJ, within wide limits, to accept or reject an explanation for demonstrated testimonial inconsistencies.").[38]

---

[37] The conclusion that the bike chain and padlock was a gang-related weapon is supported by a news article the IJ plainly was entitled to consider. See Allison Manning & Susan Zalkind, How Violent Street Gang MS-13 Operates in Massachusetts, Boston.com (Jan. 29, 2016), https://www.boston.com/news/local-news/2016/01/29/how-violent-street-gang-ms-13-operates-in-massachusetts.

[38] The majority's attempt to preclude the use of a common law enforcement tool in cases such as this one will have a bad effect. See Dep't of Justice, Fifty-Six MS-13 Members Indicted (Jan. 29, 2016), https://www.justice.gov/usao-ma/pr/fifty-six-ms-13-members-indicted (noting that MS-13 is known to "actively recruit[] prospective members . . . inside local high schools from communities with significant immigrant populations from Central America"); see also United States v. Pérez-Vásquez, 6 F.4th 180, 186-87 (1st Cir. 2021) (explaining that prospective gang members must commit a violent crime and then be "jumped" to become a full member); United States v. Sandoval, 6 F.4th 63, 74 (1st Cir. 2021) (similar); United States v. López, 957 F.3d 302, 304-05 (1st Cir. 2020); United States v. Leoner-Aguirre, 939 F.3d 310, 313-14 (1st Cir. 2019).

IV.

We regret the majority has reached this conclusion and

dissent.

**-DISSENTING OPINION FOLLOWS-**

**GELPÍ**, **Circuit Judge**, **dissenting**.  The administrative record convinces me that the decision of the Board of Immigration Appeals affirming the Immigration Judge (IJ) is supported by substantial evidence.  Moreover, the IJ's credibility and evidentiary determinations are to be given deference.  In this instance, the petitioner was represented by counsel and afforded the opportunity to challenge the evidence presented by the government, as well as to present his own evidence.  As such, I would affirm the administrative ruling below.  I write separately, however, to express my concern.

I am cognizant, as the majority points out, that the Boston Police Department's gang database is susceptible to promote the disparate treatment of minorities.  I am also troubled that it lacks a mechanism to notify those included in the database or allow challenges to the information therein.  However, remanding this matter to the administrative agency for further proceedings is not the proper means to address such paramount concerns.  Affirming the decision of the agency below would in no way preclude future challenges to the gang database in the appropriate state or federal judicial forum.