# United States Court of Appeals
## For the First Circuit
_____

No. 25-1158

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; DANA NESSEL, Attorney General; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in their official capacity as President of the United States; US DEPARTMENT OF STATE; MARCO RUBIO, in their official capacity as Secretary of State; US DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of Homeland Security; US DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of Health and Human Services; US SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in their official capacity as Acting Commissioner of Social Security; UNITED STATES,

Defendants.

--------------------------------------------------------------------------

MELVIN JONES, JR.; COLLEEN CONNORS,

Interested Parties - Appellants.

_____

*Colleen Connors and Melvin Jones Jr.'s RESPONSE and OBJECTION to the appellee - plaintiffs AG motion to stay briefing and ANY renewed motion thereof (and)..... Interested Party - Appellants' Jones and Connors' emergency motion [to] Amend (ADD) clarifying {NEW} issues on APPEAL that [we] BOTH*

*have significant interest (joindering) the defense of President Donald  Trump, et al… as to the birth right EO as issue in district court civil case #25-cv-10139 (and)...Colleen Connors and Melvin Jones Jr.'s RESPONSE and OBJECTION to the appellee - plaintiffs AG motion to stay briefing and ANY renewed motion  thereof:*

# *Emergency Motion to AMEND our Appellants pro se Appeal Brief which [is] already tendered on 2-19-2025 [and] Colleen Connors and Melvin Jones Jr.'s RESPONSE and OBJECTION to the appellee - plaintiffs AG motion to stay briefing and ANY renewed motion  thereof:*

*1.) Interested Party - Appellants' Jones and Connors' emergency motion [to] Amend (ADD) clarifying {NEW} issues on APPEAL that [we] BOTH have significant interest (joindering) the defense of President Donald Trump, et al... as to the birth right EO at issue in district court civil case #25-cv-10139; ...and at*

*issue in the instant appeal and related appeals { #25-1170 and #25-1200 }....which is to say  there [are] MANY birthright U.S. Supreme Court cases issued well AFTER the 14th Amendment was enacted into law... and give GREATER guidance and support to our {e.g. Colleen Connors and Melvin Jones Jr.'s}*

_requested AMENDMENTS to our already filed pro se appellants brief  [which CAN be provided by us in the form of a newly filed SUPPLEMENTED AMENDMENT upon the appeals court issuing a briefing schedule in the instant appeal... which for the sake of judicial economy SHOULD be nearly the SAME briefing schedule as is or will be_

_set in the TWO (2) related appeals referenced above]_.    _Simply put, here... the interested parties/ appellants Jones Jr., and Connors have very significant interests as joindered or intervenor interested parties to the district court case which gave rise to our appeal... in that the TIME IS RIPE for the First Circuit Court of Appeals to (via de novo_

*appellate review) determine [if] the district court has committed prejudicial - manifest constitutional error in dealing with us... and [IF]... the district courts preliminary injunction causes us both {e.g. Colleen Connors and Melvin Jones Jr.} irreparable harm [which we raise on appeal that such does and the district*

*court did]... and then as a natural matter of law - [we] NOW must, repeat must be GRANTED, at least, the status of JOINDERED INTERESTED PARTIES via reverse and remand to the district court... with instructions... to SET [forth] a more detailed and less "non restrictive" preliminary injunction" consistent with the "evolution of*

*citizenship and/ or birth right citizenship law" set forth below [and] with the appellate review construct that the district court [e.g. due to the RUSHED manner in which the plaintiff AG states brought their civil case in the first place]…. did NOT even address the issue [e.g. COMPLETELY IGNORED THE LAW AS TO JOINDER as to us in its*

*unclear and three-fold TEXT only ruling] which gave rise to our instant appeal... which the district court LACKS the discretion to do.... Albeit the constitutional prejudicial error aforementioned ....was INVITED by the appellees/ AG democratic plaintiff states.... So then it should come as NO surprise that they [e.g. instead of the*

*normal due process and constitutional course of appellate review here as to our constitutional and procedural rights].... they/ the appellees simply want an EASY WIN... so that MS -13 and TdA transnational terrorist gangs [e.g. pregnant women, and men] can continue to over-run and infest the United States with rampant illegal*

*border crossings and/ or tourism birth immigration fraud [e.g. which WAS NOT and HAS NOT been fully considered as such may or may NOT even be connected to nor relate to the 14th Amended [e.g. on all fours] via a fully briefed appeal [e.g. as to #25-1158]:*

**2.)** **8 FAM 102.3-4  citizenship by birth outside the united states to Citizen Father**

**Under Section 1993 of Revised Statutes (Weedin v. chin bow)**

- *(CT:CITZ-37; 06-08-2020)*

- *In Weedin v. Chin Bow, 274 U.S. 657 (1927), the Court construed § 1993 of the Revised Statutes as prohibiting a father from transmitting citizenship by descent to*

*a child born outside the United States unless he had been a resident of the United States prior to or at the time of the child's birth.*

*"The United States contends that the proviso of section 1993, 'but the rights of citizenship shall not descend to children whose fathers never resided in the United States,' must be construed to mean that only the children whose fathers have resided in the United States before their birth become citizens under the section.  It is claimed for the respondent that the residence of the father at any time in the United States before his death entitles his son whenever born to citizenship.  These conflicting claims make the issue to be decided."*

*\*\*\*\**

*"We think the words, 'the right of citizenship shall not descend to persons whose fathers have never been resident in the United States,' are equivalent to saying that fathers may not have the power of transmitting by descent the right of citizenship until they shall become residents in the United States. The other view is that the words, 'have never been resident in the United States,' have reference to the whole life of the father until his death, and therefore that grandchildren of native-born citizens, even after they, having been born abroad, have lived abroad to middle age and without residing at all in the United States, will become citizens, if their fathers born abroad and living until old age abroad shall adopt a residence in the United States just before death. We are thus to have two generations of citizens who have been born abroad, lived abroad, the first coming to old age, and the second to maturity, and bringing up of a family without any relation to the United States at all until the father shall in his last days adopt a new residence.  We do not think that such a construction accords with the probable attitude of Congress at the time of the adoption of this proviso into the statute."*

● ***8 FAM 102.3-5  Citizenship OF Child***

***Born Abroad in wedlock to Citizen Mother***

*and Non-Citizen Father Under Section 1993 of Revised statutes (Montana v. Kennedy)*

- *(CT:CITZ-120; 01-27-2025)*

- *a. Montana v. Kennedy, 366 U.S. 308 (1961), concerns the ability of a U.S. citizen mother to transmit citizenship to a child born abroad in*

*wedlock to a non-U.S. citizen father. The Court ruled that § 1993 only permitted U.S. citizen fathers who had lived in the United States to transmit citizenship and that a seemingly contradictory statute did*

*not alter that rule.  (In 1994, INA section 301(h) was enacted to allow U.S. citizen mothers who had resided in the United States prior to May 24, 1934 to transmit citizenship.)*

- *b. The petitioner, whose mother was a native-born United States citizen and whose father was a citizen of Italy, was born in Italy in 1906 while his parents were temporarily residing there, and entered the*

*United States with his mother later the same year. After that, he continuously resided in the United States and was never naturalized. His claim of U.S. citizenship was based primarily upon § 2172 of*

*the Revised Statutes, which granted citizenship to children born abroad to a citizen parent, without reference to sex.*

- *c.  The Court held that at time of petitioner's birth in Italy in 1906, the § 1993 requirement that*

*the father be the source of inherited citizenship status for foreign-born children applied, and therefore such statute did not afford citizenship to petitioner, even though his mother was a*

# native-born United States citizen.

"In 1874 Congress re-enacted two statutes which seem to defy complete reconciliation.  R.S. § 2172 . . . provided that 'children of persons who now are, or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens thereof.  R.S. § 1993 . . . provided that 'All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.'  Since R.S. § 2172 spoke broadly of children of citizen 'persons'—perhaps citizen mothers as well as citizen fathers—while R.S. § 1993 spoke only of children of citizen 'fathers' (and even then embraced only citizen fathers who had been United States residents), there is a conflict in the apparent reach of the simultaneously re-enacted provisions.

Whatever may have been the reason for the 1874 re-enactment of the Act of 1802, as R.S. § 2172, we find nothing in that action which suggests a purpose to reverse the structure of inherited citizenship that Congress created in 1855 and recognized and reaffirmed until 1934.  On this basis and in the light of our precedents, we hold that at the time of petitioner's birth in 1906, R.S. § 1993 provided the sole source of inherited citizenship status for foreign-born children of American parents.  That statute cannot avail this petitioner, who is the foreign-born child of an alien father."

- **8 FAM 102.3-6  constitutionality of Differing Standards For Acquisition Of Citizenship under the Immigration and Nationality Act**

- *(CT:CITZ-120; 01-27-2025)*

- *a. In Afroyim v. Rusk, (1967), the Court held:*

> *"that the Fourteenth Amendment was designed to, and does, protect every citizen of this nation against a congressional, forcible destruction of his citizenship, whatever his creed, color, or race."*

- *b. In Miller v. Albright, 523 U.S. 420 (1998), the*

*Court faced a challenge to 8 U.S.C. § 1409 (INA § 309), which prescribed different residency requirements and legitimation requirements for acquisition of citizenship by children born abroad*

*to unmarried U.S. citizen fathers as opposed to unmarried U.S. citizen mothers.  Six justices agreed to uphold the statute, but on three different grounds, leading to no majority opinion.  Justice Stevens*

*wrote that the statute was constitutional because the differences were based on biological differences and because the different classes' qualifications served valid governmental interests of ensuring that*

*the child actually shared a relationship with a citizen parent. Justice O'Connor found that the petitioner, the daughter of an unmarried U.S. citizen father, did not have standing as the alleged discrimination*

*was suffered by the father, not the daughter. Justice Scalia noted that the petitioner had not met the statutory requirement for citizenship, and even if the requirement was unconstitutional, the*

*Court had no power to grant citizenship beyond that provided for by the Constitution or by statute.*

- *c.  In Nguyen v. INS, 533 U.S. 53 (2001), the Court revisited the constitutionality of INA*

*Section 309 and its differing requirements based on the sex of the unmarried citizen parent. The question before the Court was whether the requirement that an unmarried citizen father legitimate his child is*

*consistent with the constitutional guarantee of equal protection.  The Court affirmed the judgment of the Court of Appeals and upheld the distinction, holding that statute does not discriminate on the basis*

*of sex by requiring a citizen father—but not a citizen mother—to take steps to establish his connection (through legitimation, adjudication, or acknowledgment) to a child born out of wedlock*

*outside the United States before he can transmit U.S. citizenship to the child. The Court found that applying different physical-presence requirements to unwed citizen mothers and fathers was substantially*

*related to the important government interests in minimizing the risk of statelessness of foreign-born children and in "assuring a link between an unwed citizen father, and this country, to" the child.*

- *d. In Flores-Villar v. United States, 131 S. Ct. 2312 (2011), an equally divided Court issued a one-sentence decision affirming the judgment by the Ninth Circuit Court of Appeals.  The Ninth Circuit had*

*rejected an Equal Protection Clause challenge to the differing physical-presence requirements of two former sections of the INA, 8 U.S.C. §§ 1401(a)(7) and 1409. Today, these*

*requirements are encompassed in INA Sections 301(g) and 309. The question under consideration was whether Congress's decision to impose a shorter physical-presence*

*requirement (one continuous year) on unwed citizen mothers of foreign-born children than on other citizen parents of foreign-born children violates the Fifth Amendment's guarantee of equal protection.  The*

*Ninth Circuit found that the differing standards advanced the important government interests articulated in Nguyen. As an affirmance resulting from a divided court, the Supreme Court's decision has no*

precedential value.  See

Neil v. Biggers, 409 U.S.

188, 192 (1972).

- e. In Sessions v.

Morales-Santana, 582

U.S. _____, 137 S. Ct.

1678 (2017), the Court

ruled that, for purposes

of transmission of

*citizenship to a child born abroad out of wedlock to a U.S. citizen and an alien, five years of physical presence before the child's birth, at least two of which occur after the parent reaches age 14, are required,*

*regardless of the sex of the U.S. citizen parent. The Court's decision strikes down the one-year continuous physical presence criterion in INA 309(c) for transmission of citizenship to children*

*born abroad out of wedlock to U.S. citizen mothers when the other parent is an alien, and in its place imposes the five/two year requirement that U.S. citizen fathers must satisfy, pursuant to*

*current INA 309(a) and*

*301(g):*

- *(1)  The case, brought*

*by a child born out of*

*wedlock to a U.S. citizen*

*father and alien mother,*

*presented an equal*

*protection challenge to*

*the different periods of*

*prior physical presence in the United States required under the 1958 version of the INA for transmitting U.S. citizenship at birth to a child born abroad out of wedlock to a U.S. citizen father compared with a*

*U.S. citizen mother. Although the required periods of prior physical presence have changed since 1958, they remained different for fathers and mothers; and*

- *(2)  By its terms, the Court's decision is to be*

*applied prospectively, with the controlling factor being the applicant's date of birth. If the applicant was born abroad out of wedlock to one citizen and one alien parent on or after June 12, 2017, then the*

*Morales-Santana decision applies to INA 309(c) cases.  If the applicant was born between November 14, 1986 and June 11, 2017, and the claim is under INA 309(c), then the current*

*language of INA 309(c) would apply.*

- **8 FAM 102.3-7  Insular Cases**

- *(CT:CITZ-37; 06-08-2020)*

- *a. In the first decade of the 20th century, in a series of court cases often called the "Insular Cases", the Supreme*

*Court developed the rationale that, absent specific Congressional legislation or treaty provisions:*

- *(1)  The Constitution has only limited applicability to U.S. territories; and*

- *(2) Inhabitants of territories acquired by the United States acquire U.S. nationality-but not U.S. citizenship.*

- *b. The Court ruled that:*

- *(1) Alaska and Hawaii were incorporated territories (Rasmussen v.*

*U.S., 197 U.S. 516 (1905); Hawaii v. Mankichi, 190 U.S. 197 (1903); but*

"The Court concluded that art. III of the treaty regarding Alaska allowed its inhabitants all the rights, advantages and immunities of citizens of the United States as an incorporated territory.  The Court then determined that U.S. Constitution Amendment VI was applicable to Alaska."

- *(2)  Puerto Rico and the Philippines, although they had become U.S. territory, were not part*

*of the United States*

*because Congress had*

*not yet enacted laws*

*incorporating them into*

*the United States or*

*making the Constitution*

*fully applicable to them*

*(Downes v. Bidwell, 182*

*U.S. 244 (1901); Dorr v.*

# U.S., 195 U.S. 138 (1904)).

> "The Court affirmed and held that Puerto Rico was a territory appurtenant belonging to the United States, but not a part of the United States within the revenue clauses of the U.S. Constitution."

- ## c.  In Downes, the Court stated that:

> The liberality of Congress in legislating the Constitution into all our contiguous territory has undoubtedly fostered the impression that it went there by its own force, but there is nothing in the Constitution itself, and little in the interpretation put upon it, to confirm that impression

- ## d. In Gonzales v. Williams, 192 U.S. 1 (1904), the Supreme

*Court The Court held that citizens of Puerto Rico were not aliens even though they had not been granted full U.S. citizenship by act of Congress.  The Court referred to its earlier finding that:*

> The nationality of the inhabitants of territory acquired by conquest or cession becomes that of the government under whose dominion they pass, subject to the right of election on their part to retain their former nationality by removal or otherwise, as may be provided." *(Boyd v. Nebraska ex rel Thayer, 143 U.S. 135 (1892))*

- **8 FAM 102.3-8  Constitutionality of Statutory Conditions Subsequent For Retention of Citizenship Acquired by Birth AbroaD (Rogers v. Bellei)**

- *(CT:CITZ-57; 06-07-2021)*

- *a. In Rogers v. Bellei, 401 U.S. 815 (1971) the court upheld the*

*constitutionality of the retention provisions of former section 301(b) of the Immigration and Nationality Act.*

- *b. The court found that:*

Congress has the power to impose the condition subsequent of residence in this country on appellee, who does not come within the Fourteenth Amendment's definition of citizens as those 'born or naturalized in the United States,' and its imposition is not unreasonable, arbitrary, or unlawful.

- *c.  In Rogers v. Bellei, however, the court held*

*that the constitutional definition of citizenship in the 14th Amendment does not include persons who acquired citizenship by birth abroad to a citizen parent. This definition was:*

"one restricted to the combination of three factors, each and all significant: birth in the United States, naturalization in the United States, and subjection to the jurisdiction of the United States."

- *d. The court held:*

*"The plan thus adopted by Congress with respect to a person of this classification was to bestow citizenship at birth but to take it away upon the person's failure to comply with a post-age-14 and pre-age-28 residential requirement.  It is deprival of citizenship, once bestowed, that is under attack here."*

\*\*\*\*

*"Of initial significance . . . is the Fourteenth Amendment's opening sentence:  "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  The central fact, in our weighing of the plaintiff's claim to continuing and therefore current United States citizenship, is that he was born abroad.  He was not born in the United States.  He was not naturalized in the United States.  And he has not been subject to the jurisdiction of the United States.  All this being so, it seems indisputable that the first sentence of the Fourteenth Amendment has no application to plaintiff Bellei.  He simply is not a Fourteenth-Amendment-first-sentence citizen . . . .  The plaintiff's claim thus must center in the statutory power of Congress and in the appropriate exercise of that power within the restrictions of any pertinent constitutional provisions other than the Fourteenth Amendment's first sentence."*

\*\*\*\*

*"A contrary holding would convert what is congressional generosity into something unanticipated and obviously undesired by the Congress.  Our National Legislature indulged the foreign-born child with presumptive citizenship, subject to subsequent satisfaction of a*

*reasonable residence requirement, rather than to deny him citizenship outright, as concededly it had the power to do, and relegate the child, if he desired American citizenship, to the more arduous requirements of the usual naturalization process.  The plaintiff here would force the Congress to choose between unconditional conferment of United States citizenship at birth and deferment of citizenship until a condition precedent is fulfilled.  We are not convinced that the Constitution requires so rigid a choice.  If it does, the congressional response seems obvious.*

*. . . Neither are we persuaded that a condition subsequent in this area impresses one with 'second-class citizenship.'  That cliche is too handy and too easy, and, like most cliches, can be misleading.  That the condition subsequent may be beneficial is apparent in the light of the conceded fact that citizenship to this plaintiff was fully deniable.  The proper emphasis is on what the statute permits him to gain from the possible starting point of non-citizenship, not on what he claims to lose from the possible starting point of full citizenship to which he has no constitutional right in the first place.  His citizenship, while it lasts, although conditional, is not 'second-class.'"*

- *e. The court summarized:*

*"the statutory pattern, therefore, developed and expanded from (a) one, established in 1790 and enduring through the Revised Statutes and until 1934, where citizenship was specifically denied to the child born abroad of a father who never resided in the United States; to (b), in 1907, a governmental protection condition for the child born of an American citizen father and residing abroad, dependent upon a declaration of intent and the oath of allegiance at majority; to (c), in 1934, a condition, for the child born abroad of one United States citizen parent and one alien parent, of five years' continuous residence in the United States before age 18 and the oath of allegiance within six months after majority; to (d), in 1940, a condition, for that child, of five years' residence here, not necessarily continuous, between ages 13 and 21; to (e), in 1952, a condition, for that child, of five years' continuous residence here, with allowance, between ages 14 and 28. Thus, in summary, it may be said fairly that, for the most part, each successive statute, as applied to a foreign-born child of one United States citizen parent, moved in a direction of leniency for the child."*

- ## *8 FAM 102.3-9  Decisions Regarding the Philippines*

- *(CT:CITZ-35; 05-15-2020)*

- *a. Dorr v. U.S., 195 U.S. 138 (1904):  The Philippine Islands were never incorporated into the United States, and the Constitution of the United States thus never*

*was fully applicable to them:*

> *"If the treaty-making power could incorporate territory into the United States without congressional action, it is apparent that the treaty with Spain, ceding the Philippines to the United States [30 Stat. at L. 1759], carefully refrained from so doing; for it is expressly provided that (article 9): 'The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.' In this language it is clear that it was the intention of the framers of the treaty to reserve to Congress, so far as it could be constitutionally done, a free hand in dealing with these newly-acquired possessions…."*
>
> *"The legislation upon the subject shows that not only has Congress hitherto refrained from incorporating the Philippines into the United States, but in the act of 1902, providing for temporary civil government (32 Stat. at L. 691, chap. 1369), there is express provision that § 1891 of the Revised Statutes of 1878 shall not apply to the Philippine Islands.  This is the section giving force and effect to the Constitution and laws of the United States, not locally inapplicable, within all the organized territories, and every territory thereafter organized, as elsewhere within the United States."*

- *b. Toyota v. United States, 268 U.S. 402*

*(1925,) assumed that Filipinos may become citizens by naturalization by bringing themselves within the narrow provisions of an act of Congress applicable to them.  "The seventh subdivision of § 4, of the*

*Act of May 9, 1918 (40 Stat. 542), permits "any native-born Filipino" or "any alien, or any Porto Rican not a citizen of the United States" belonging respectively to the classes there described, on presentation of the*

*required declaration of intention, to petition for naturalization without proof of 5 years' residence within the United States; and the act permits "any alien" serving in the forces of the United States" during*

*the time this country is engaged in the present war" to file his petition for naturalization without making the preliminary declaration of intention and without proof of 5 years' residence in the United States."*

- *c.  Rabang v. Boyd, 353 U.S. 427 (1957):  During the period of American dominion over the Philippine Islands, between April 11, 1899 and July 4, 1946, large number of Filipinos were non-citizen U.S.*

nationals. Their non-citizen U.S. nationality automatically was terminated upon the grant of independence July 4, 1946. This applied even to Filipinos who were residing in the United States on July 4,

*1946.   Application for habeas corpus and declaratory relief from order of deportation. The Court of Appeals for the Ninth Circuit, 234 F.2d 904, affirmed a judgment denying the application, and*

*petitioner brought certiorari. The Supreme Court, Mr. Justice Brennan, held that person born in the Philippine Islands, who thereby was a national of the United States, became an alien on grant*

*of independence to Philippines, regardless of permanent residence in the continental United States on that date, and was deportable on conviction of Federal narcotics offense. Affirmed.  Mr. Justice*

*Douglas dissented.  Upon the proclamation of Philippine independence on July 4, 1946, 8 s 14 of the Philippine Independence Act of 1934 became operative. Section 14 provided:*

*"Upon the final and complete withdrawal of American sovereignty over the Philippine Islands the immigration laws of the United States (including all the provisions thereof relating to persons ineligible to citizenship) shall apply to*

*persons who were born in the Philippine Islands to the same extent as in the case of other foreign countries."  (48 Stat. 464)*

- *d. In the matter of U.S. Immigration and Naturalization Service v. Hibi, 414 U.S. 5; 94 S. Ct. 19, (October 23, 1973) the U.S. Supreme Court held that neither failure to fully publicize rights which Congress*

*accorded under*

*Nationality Act of 1940*

*nor failure to have*

*stationed in Philippine*

*Islands during all of time*

*such rights were*

*available an authorized*

*naturalization*

*representative gave rise*

*to estoppel against the government.  Mr. Justice Douglas, with whom Mr. Justice Brennan and Mr. Justice Marshall concurred, dissented and filed opinion.*

- *e. On July 17, 1988, INS v. Pangilinan, 486*

*U.S. 875 (1988) the U.S. Supreme Court, held that: the court lacked power to confer citizenship in violation of limitations imposed by Congress in exercise of its exclusive constitutional authority*

*over naturalization, and revocation of vice consul's naturalization authority did not deprive Filipino nationals of their rights under the due process clause of the Fifth Amendment and under its equal*

*protection component.*

*The Supreme Court ruled*

*that the courts could not*

*order redress to*

*Philippine veterans,*

*many of whom had sued*

*repeatedly over the*

*years, saying they were*

*deprived of their right to*

*claim the benefit Congress had promised in the expired law. Only Congress could set the terms and conditions of naturalization, the court said.*

- **8 FAM 102.3-10  Constitutionality of Marriage Laws (United States v. Windsor, Obergefell v. Hodges)**

- *(CT:CITZ-37; 06-08-2020)*

- *a. In United States v. Windsor, 570 U.S. 744 (2013), the Court held that the federal Defense of Marriage Act, which defined marriage for federal purposes as the*

*union of one man and one woman:*

*…is unconstitutional as a deprivation of the liberty of persons by the Fifth Amendment of the Constitution.*

- *b. In Obergefell v. Hodges, 576 U.S. ____ (2015), the Court held that all states, the District of Columbia, and U.S. territories were*

*required to perform and recognize the marriages of same sex couples on the same terms and conditions as opposite-sex couples. Specifically:*

*The Court, in this decision, holds same-sex couples may exercise the fundamental right to marry in all States. It follows that the Court also must hold—and it now does hold—that there is no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character.*

- **8 FAM 102.3-11  Constitutionality of Diplomatic Recognition**

- *(CT:CITZ-37; 06-08-2020)*

- *In Zivotofsky v. Kerry, 576 U.S. 1 (2015), the court held that the President of the United States has the exclusive power to recognize (or*

*not recognize) foreign*

*nations:*

> *To allow Congress to control the President's communication in the context of a formal recognition determination is to allow Congress to exercise that exclusive power itself.  As a result, the statute is unconstitutional.*
>
> *\* \* \**
>
> *In holding § 214(d) invalid the Court does not question the substantial powers of Congress over foreign affairs in general or passports in particular.  This case is confined solely to the exclusive power of the President to control recognition determinations, including formal statements by the Executive Branch acknowledging the legitimacy of a state or government and its territorial bounds.  Congress cannot command the President to contradict an earlier recognition determination in the issuance of passports.*

*Respectfully submitted.*

Thank you.

Best,

Date: 3-5-2025

_____

Melvin Jones Jr. disabled

PRO SE appellant (interested party)

1935 Hosler St.

Flint, Michigan

48503

Email: jonesjrmel@gmail.com

Google voice to text ph#

415-562-5074

March 5th, 2025

/ S /

_____

Colleen Connors - appellant
(interested party)
1935 Hosler St. Flint,
Michigan 48503
Email:
cmcolleen4@gmail.com
Google voice to text ph#
408- 459 - 9635