Case 3:25-1158    Document: 0011-8256858    Page: 1    Date Filed: 03/09/2025    Entry ID: 6705194

**The New York Times**

https://www.nytimes.com/2024/03/15/business/tesla-discrimination-lawsuit-settlement.html

# *Tesla Settles Discrimination Suit With Former Factory Worker*

The carmaker and energy company settled with a Black man who had worked at its California factory and had won a $3 million judgment against the company.

 **By Jack Ewing**

March 15, 2024

Tesla and a former employee have agreed to settle a closely watched lawsuit that cast a harsh light on the carmaker's treatment of Black workers.

Lawyers for Tesla and for Owen Diaz, who worked at the company's factory in Fremont, Calif., did not disclose the terms of the settlement in a legal filing on Friday. "The parties have reached an amicable resolution of their disputes," Lawrence A. Organ, a lawyer for Mr. Diaz, said in an email, adding that he could not comment further.

Last year, a jury in federal court in San Francisco awarded Mr. Diaz $3.2 million after he presented evidence that he had been subject to repeated harassment by supervisors at Tesla's factory, including being addressed with a racial slur more than 30 times. A supervisor drew a racist caricature near his work station, according to testimony in the case.

Tesla did little to discipline the supervisors or address pervasive racism at the factory, the jury found.

Mr. Diaz appealed, saying that $3.2 million was insufficient compensation for the psychological damage he suffered, including loss of sleep, depression and damaged relations with his wife and son. Mr. Diaz's lawyers also argued that the award was

Case: 25-1158	Document: 00118256858	Page: 2	Date Filed: 03/09/2025	Entry ID: 6705194

not sufficient to punish Tesla for failing to stop the harassment.

It was the second trial in the case. In the first, in 2021, jurors awarded Mr. Diaz $137 million, but a judge ruled that the amount was excessive. The second trial last year dealt solely with the amount Mr. Diaz should receive in damages.

In a decision last year, Judge William H. Orrick of U.S. District Court said, "Tesla's conduct was reprehensible and repeated, and it failed to take responsibility or change its ways during Diaz's time at the company." But he ruled that $3.2 million was adequate compensation. Mr. Diaz's appeal of that ruling was pending when he and Tesla agreed to settle.

In court filings, Tesla lawyers denied that the company had failed to respond to the harassment. "Tesla had clear official policies barring racially discriminatory harassment and did not condone, permit, allow or tolerate such conduct," Tesla lawyers wrote last year. They did not respond to a request for comment Friday.

**Jack Ewing** writes about the auto industry with an emphasis on electric vehicles. More about Jack Ewing

---

A version of this article appears in print on , Section B, Page 4 of the New York edition with the headline: Tesla and Former Employee Settle Discrimination Suit

Case: 25-1158        Document: 00118256858        Page: 3        Date Filed: 03/09/2025        Entry ID: 6705194

Canada    USA

Fossil Fuels



About    Contact    Eco-Anxiety    Climate Glossary        Search...

Cities & Communities        Electric Vehicles

Heat & Power        Community Climate Finance

SUBSCRIBE

# 'Tesla Wouldn't Be Tesla' if Not for 2010 Economic Stimulus Loan

June 14, 2020    Reading time: 3 minutes





Harani0403/WikimediaCommons

**12**

SHARES

As governments craft post-pandemic economic stimulus plans that will either drive a green recovery or reinforce the polluting industries that need to be hastened into retirement, Bloomberg Green is out with a timely reminder that "Tesla wouldn't be Tesla" if not for the boost it received from the 2010 economic stimulus in the United States.

"About a month after Barack Obama won the presidency, a cash-strapped Elon Musk made it clear that Tesla Inc.—then a boutique maker of a $109,000 sports car—would have to delay the rollout of a less expensive electric sedan unless it got government support," Bloomberg recalls. "It was the middle of what was then the worst American financial collapse since the Great Depression, and the markets had just taken too much of a beating."

"We can't move forward with that without a major amount of capital," Musk said in December 2008.

At the time, Obama's team was laying plans to direct a portion of its US$800-billion economic recovery package to green industries, and Tesla's share of the pie came out at $465 million. The company built its Fremont, California manufacturing plant, began selling shares, repaid its federal loan ahead of schedule, mainstreamed the electric vehicle, "and now employs about 20,000 people in the Bay Area alone," Bloomberg says. "It has the second-largest market capitalization of any automaker worldwide."

Looking back, the officials who ran the U.S. Department of Energy's Loan Programs Office—a technology commercialization shop connected to both Tesla and a less successful solar venture, Solyndra—have some advice for the architects of this year's economic stimulus in the U.S. While economic stimulus isn't the LPO's only function, it "really has a chance to shine when the larger credit markets just aren't there," said former director Mark McCall.

"Part of the public relations challenge the office faces is that it operates like a typical project finance bank but has the ambitions of a venture capital firm," Bloomberg writes. "It takes technology risks that commercial banks usually shun."

Yet in spite of the avalanche of negative publicity the Solyndra investment produced, the news agency says that loan was one of the office's few unsuccessful efforts. (And the talk at the time was that Solyndra only failed because it didn't anticipate how quickly the rest of the solar market would mature, leaving it too little time to commercialize its own innovative design approach.)

And now, "there's not a major car manufacturer in the world without at least one electric vehicle in its lineup, and some are converting their entire fleet to EVs," said Jonathan Silver, who headed the Loan Programs Office in the early years of Obama's presidency and helped negotiate its deal with Tesla. "We did really put industries on the map."

Bloomberg says the LPO hasn't taken on very many new projects since 2011, but still has more than $40 billion available for loans and loan guarantees, including $10.9 set aside for advanced nuclear and $8.5 billion for advanced fossil projects. And various would-be advisors see "plenty of ripe targets" for that money: Bloomberg cites carbon capture and sequestration, energy storage, and electric and hydrogen vehicle technologies, all of which could also be advanced by setting up an infrastructure bank to support a broad array of projects.

"This is the moment in time to use an infrastructure bank to not only create infrastructure jobs writ large, but direct them in ways that provide long-term benefits to the country, like clean and renewable power," Silver told the news agency.

in **Carbon Pricing**, **Community Climate Finance**, **Electric Vehicles**, **United States**

## Related Posts

Case 25-1158     Document 01-8256858     Page 6     Date Filed: 03/09/2025     Entry ID: 6705194

**The New York Times**    https://www.nytimes.com/2018/11/30/business/tesla-factory-racism.html

# Menial Tasks, Slurs and Swastikas: Many Black Workers at Tesla Say They Faced Racism

African-American workers have reported threats, humiliation and barriers to promotion at the plant. The automaker says there is no pattern of bias.

**By Lauren Hepler**

Nov. 30, 2018

FREMONT, Calif. — Owen Diaz had seen swastikas in the bathrooms at Tesla's electric-car plant, and he had tried to ignore racist taunts around the factory.

"You hear, 'Hey, boy, come here,' 'N-i-g-g-e-r,' you know, all this," said Mr. Diaz, who is African-American. Then, a few hours into his shift running the elevators, he noticed a drawing on a bale of cardboard. It had an oversize mouth, big eyes and a bone stuck in the patch of hair scribbled over a long face, with "Booo" written underneath.

On that winter night in the factory, when, he said, a supervisor admitted drawing the figure as a joke, Mr. Diaz had had enough. He typed a complaint to a Tesla manager on his phone. "Racist effigy & drawing" was the subject.

"When you really just look at it, you ask yourself at some point, 'Where is my line?'" said Mr. Diaz, 50, who worked at the factory as a contractor for 11 months before he quit in May 2016.

It is a line that others say they reached, too.

Interviews, internal communications and sworn legal statements filed by more than two dozen current or former Tesla employees and contractors describe a wide range of concerns among some African-American workers at the factory in Fremont, including threats by co-workers, demeaning assignments and barriers to

3/9/25, 9:27 AM                  Mental Tasks, Slurs and Swastikas: Many Black Workers at Tesla Say They Faced Racism - The New York Times

Case 25-1158     Document 00118256858     Page 7     Date Filed 03/09/2025     Entry ID 6705194

advancement. Three lawsuits by former workers accusing Tesla of failing to curb racial discrimination and harassment have been filed since early last year, including one by Mr. Diaz awaiting trial.

Tesla rejects the workplace portrait painted in the complaints as inaccurate, saying there is no evidence to support "a pattern of discrimination and harassment." It is not the only automaker to face allegations of racism in recent years, and it acknowledges that "in a company the size of a small city, there will at times be claims of bad behavior," real or false. But it said there was no indication that the factory had an unusual rate of complaints.



The Model 3 assembly line. "In a company the size of a small city," Tesla said, "there will at times be claims of bad behavior," real or false.  Justin Kaneps for The New York Times

"We strive to provide a respectful work environment for all employees and do our best to prevent bad conduct," the company said. African-American employees at various levels of authority, made available by Tesla, said their own experiences had been positive.

Crystal Spates, a production manager overseeing 500 people building the Model 3, said racial slurs were not tolerated at the factory. "I have never heard, myself, anyone use that terminology," said Ms. Spates, 30, who is African-American and joined Tesla two years ago.

Mr. Diaz, like Tesla itself, likened the plant to a small city — one in which experiences can vary, he said. "You know, you can have something that happens in one part of the city that doesn't happen in another part," he said. But when his son encountered racial slurs and caricatures in a different part of the factory, Mr. Diaz concluded that the issue was not an isolated one.

One suit accusing Tesla of racial discrimination and harassment, filed last November in California Superior Court, seeks class-action status. The lawyers involved — Lawrence A. Organ and Bryan Schwartz, whose practices focus on workplace rights — say they have identified dozens of potential plaintiffs. Each lawyer has won multimillion-dollar judgments in other harassment or discrimination cases against major employers. Tesla is seeking to move the case into arbitration, which would require workers to bring individual lawsuits rather than a joint claim.

The state's Department of Fair Employment and Housing says it has issued 10 "right to sue" letters — a precondition for a discrimination lawsuit — to employees complaining of racial bias at the Fremont plant. Dozens of other complaints against Tesla are pending, but the agency would not say how many involved race.

In an email to employees last year, which the company later released in response to one of the lawsuits, Elon Musk, Tesla's chief executive, warned against "being a huge jerk" to members of "a historically less represented group." At the same time, he wrote, "if someone is a jerk to you, but sincerely apologizes, it is important to be thick-skinned and accept that apology."

Case 25-1158          Document 00118356858          Page: 0          Date Filed: 03/09/2025          Entry ID: 6705194

But by many accounts, the issues at the Tesla factory go beyond the need for a thick skin.

## High Hopes

When employees and contractors are counted together, there are more than 15,000 workers at the Fremont factory, but it is not clear how many are African-Americans. The company says more than two-thirds of the production leads — those directing work in different areas of the factory — are nonwhite. But it would not specify the share of jobs held by African-Americans, who have long been underrepresented in other Silicon Valley workplaces.

In any case, some African-American workers who expected to help build a future for the company and themselves, like Teshawna Stewart, say the reality proved to be a slap in the face.

Before starting at Tesla last year, Ms. Stewart, 25, sorted and packed orders at a nearby Amazon warehouse.



Teshawna Stewart was assigned to the Model 3 assembly
line, but before production began, she said, she was
frequently assigned to menial tasks while workers of other
races did work like sorting components.  Anastasiia Sapon for
The New York Times

The job she landed installing taillights at the Tesla factory paid several dollars an hour more. But she discovered a downside when she was assigned to "the brick," the production area for Model 3 sedans.

During several weeks when the Model 3 production line was not yet operating, Ms. Stewart said, she was frequently assigned to menial tasks, while workers of other races did work like sorting components.

In a sworn statement for a lawsuit, she said that when she had complained about "African-American employees being required to get down on our hands and knees and scrub the floor," a human resources representative told her that she was "making up stories."

Tesla said Ms. Stewart "did not raise these types of claims during her employment." Ms. Spates, the production manager, said assembly workers were expected to handle other tasks if production was interrupted, but "nothing in terms of 'get on your hands and knees.'" She does not recall working with Ms. Stewart.

In May, Ms. Stewart was fired for "job abandonment," she said, after her team was assigned to a job in San Francisco for the day to help prepare cars for shipment to China. Tesla said she had been fired because she failed to return to the factory and had been given written warnings about her attendance. She said she had returned with the other workers, who were not African-American, and was the only one fired.

Like Ms. Stewart, Nigel Jones arrived at Tesla with high hopes. He was fresh out of the Army when he started as a temporary battery technician at Tesla in September 2015. Mr. Jones, now 26, quickly found the kind of rapid professional mobility often out of reach without a college degree. In about 22 months, he went from being an $18-an-hour contractor to making $85,000 a year as a mobile-equipment supervisor.

3/6/25, 8:27 AM    Menial Tasks, Slurs and Swastikas: Many Black Workers at Tesla Say They Faced Racism - The New York Times

Then, on a busy afternoon in January during the ramp-up of Model 3 production, Mr. Jones said, he stopped to help two other African-American workers set up a water cart. A new manager questioned the group, and after Mr. Jones assured him that he had everything "under control," the manager turned and muttered a vulgar racial epithet within 10 feet of the group, Mr. Jones recalled. His recollection was affirmed by a current employee who said he had witnessed it; he asked not to be identified.

Though he tried to "let that go," Mr. Jones soon put a post on Facebook about growing tired of "subtle racial discrimination" at work. His mother said Mr. Jones had also told her about the incident two to three weeks later, shortly before he was fired.



Nigel Jones, an Army veteran, started at Tesla as a temporary battery technician. He later put a post on Facebook complaining of "subtle racial discrimination" at work. Anastasiia Sapon for The New York Times

Tesla said Mr. Jones had been "reprimanded numerous times for attendance and safety violations" and given a "final written warning" before being fired for attendance problems.

---

 Behind the Journalism

**Our business coverage.** Times journalists are not allowed to have any direct financial stake in companies they cover.

Here's more on our standards and practices.

---

Mr. Jones denied having had attendance problems, attributing that account to the manager with whom he tangled. He looks back with regret that the prospect of a bright future didn't pan out.

"Tesla, it is a cool company," Mr. Jones said. "You sit there and you're like, 'This can't be happening here.'"

## A Settlement Offer

DeWitt Lambert, an African-American electrician, was not quite 40 when he left home in Mobile, Ala., in 2012 and drove to California in search of a job. Tesla hired him in June 2015 as a production associate, mostly installing seatbelts.

Soon, he said, he encountered co-workers mocking his Southern drawl. He started to wear headphones to drown them out, but when the occasional taunts turned to frequent racial slurs, he said, they were hard to ignore.

The company granted his request to change stations, but his tormentors started lingering near his new spot, he told officials, and he worried that they "are going to do something to me."

Between June 2016 and February 2017, Mr. Lambert sent at least a dozen text messages, emails, photos and videos to human resources, copies show.

The evidence sent by Mr. Lambert included a 58-second cellphone video, punctuated by repeated racial slurs, in which an unidentified narrator walking the factory floor says it's "DeWitt's" phone and threatens to "cut you up … so everybody can have a piece of you, nigger." He said it had been recorded by co-workers who took his phone and meant it as a threat.



After DeWitt Lambert was moved to a different station at the factory after enduring racial slurs, but tormentors followed him, he said. His case against Tesla is in arbitration.  Edmund D. Fountain for The New York Times

Feeling that he had a potential civil rights claim, he consulted a lawyer about legal options, and filed a complaint with the state fair-employment agency.

Tesla's general counsel, Todd Maron, wrote in March 2017 with an offer to settle.

"We are willing to pay Mr. Lambert $100,000, but only if we are to resolve this matter before there is media attention," Mr. Maron wrote in an email provided by Mr. Lambert's lawyer.

Attached was a four-page document outlining information the company had collected to undermine Mr. Lambert's claims. "Our C.E.O., Elon Musk, has reviewed this case personally and notwithstanding everything that's in the attached document, he is sorry that this case did not get escalated much sooner and he agrees that change is needed," the email stated.

Mr. Lambert, who declined the settlement offer in favor of a chance to take the claim to trial and argue for higher damages, was put on paid administrative leave.

In June, after Tesla succeeded in moving the case to arbitration, Mr. Lambert received a letter terminating his employment, saying the company had discovered acts "inconsistent with Tesla's values." Tesla said Mr. Lambert himself had been involved in "instigating use of the 'N-word.'" He conceded that he had used the epithet at times, but only with other African-Americans.

After Tesla moved to bring the case to a close, an arbitrator issued a preliminary ruling saying it merited fuller consideration.

"I feel like everything was taken away from me," said Mr. Lambert, who is living at his mother's house back in Alabama. "I got everything snatched from up under me since I complained about it."

## 'Not Tesla Material'

DeWayne Jones, 52, was a commercial truck driver in 2012 when he learned that Tesla was hiring. He was familiar with the factory, having worked there from 1992 to 1995, when it was the production site of a joint venture by General Motors and Toyota called Nummi.

Within about 90 days after starting at Tesla as a contract production associate, he became a full-time employee and saw his pay steadily climb from $17 to $21 an hour.



DeWayne Jones said a Tesla official had told him that "people like you" didn't move up to lead positions. The company denied any inequity in its career development practices.  Ryan Christopher Jones for The New York Times

Mr. Jones (no relation to Nigel Jones) said he had then started to notice that black workers weren't being promoted. In one case, he said, a manufacturing official told him that "people like you" didn't move up to lead positions. He also reported that he had heard a supervisor say of black employees that "there's too many of them in there, they are not Tesla material," and that he had been at a meeting where a supervisor, gesturing toward African-American workers, remarked that "monkeys work outside."

Tesla said there was no record of a formal complaint from Mr. Jones about racial insults.

The company also denied that there was any inequity in its career development practices. "You do a great job, you make your way here," said the company's head of diversity and inclusion, Felicia Mayo, who is African-American. After a year at the company, she was recently made a vice president.

Clarence Johnson, who came to Tesla four and a half years ago as a forklift driver and now tests equipment on a safety team — his second promotion — said his experience reflected opportunity.

While he said he could not speak for others, he added, "I'm an African-American male, and I didn't have any of those roadblocks."

Like Ms. Spates, he said supervisors would not tolerate racial slurs — though he said the use of a racial epithet "where it's two people referring to one another as friends" was common.

For Mr. Jones, the route was not up but out. He said his children and a psychologist he had started seeing persuaded him to go back to truck driving.

"Everybody has a breaking point," he said. "I'm able to breathe now."

## A Son's Parallel Path

If Nummi represented the auto industry's past, Owen Diaz was sure that Tesla was the future.

But that was before the racist effigy on the cardboard bale, and the slurs and offensive graffiti that came earlier. He said he had ultimately found the environment so degrading that he struggled to get out of bed for work.

As for the graffiti, Tesla said that Mr. Diaz brought "a single drawing to the attention of his supervisor" and that it "was promptly and thoroughly investigated." It said a contractor involved had been given a warning and suspended without pay.

Case: 25-1158        Document: 00118256858        Page: 17        Date Filed: 03/09/2025        Entry ID: 6705194



Demetric Diaz, who was a contractor at Tesla, said he had seen bathroom graffiti that included a racial slur. After he complained to his staffing firm, he said, he was let go.  Ryan Christopher Jones for The New York Times

Despite what he said he had experienced, Mr. Diaz was eager to give his youngest son, Demetric, a chance at the company's pay and stock options. So he recruited him as a fellow contractor in 2015, working in a different production area.

The first weeks were fine for Demetric, now 23. But he started to notice incidents that disturbed him.

"I started telling him like, 'Hey, well, I seen this, Dad,'" Demetric said. "When I was in the bathroom," he said, he saw vulgar graffiti that included a racial slur.

The younger Mr. Diaz complained to his staffing firm and then to a Tesla supervisor about racial abuse, protesting that the supervisor was "calling me an N-word every day," according to a lawsuit. The suit says that within days, he was given a written warning of misconduct and was shortly out of a job. Tesla said he had been let go after repeated warnings about failing to wear protective clothing.

Case: 25-1158          Document: 00118256858          Page: 18          Date Filed: 03/09/2025          Entry ID: 6705194

His father hung on for a few more months. Then he quit.

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: At Tesla, Allegations Of Racism

3/3/25, 6:27 AM    Tesla hit with new lawsuit alleging racial abuse against Black workers

TECH NEWS

# Tesla hit with new lawsuit alleging racial abuse against Black workers

The automaker is facing at least 10 lawsuits alleging widespread race discrimination or sexual harassment, including one by a California civil rights agency.



— A huge logo greets workers heading to the assembly line at Tesla Motors, on Feb. 19, 2015, in Fremont, Calif. Michael Macor / San Francisco Chronicle via Getty Images file

July 1, 2022, 7:50 AM EDT

**By Reuters**

Fifteen Black former or current employees at Tesla filed a lawsuit against the electric car maker on Thursday, alleging they were subjected to racial abuse and harassment at its factories.

The workers said they were subjected to offensive racist comments and behavior by colleagues, managers, and human resources employees on a regular basis, according to the lawsuit filed in a California state court.

ADVERTISING



The harassment, which occurred mostly at Tesla's Fremont, California factory, included using the terms "nigger", "slavery" or "plantation" or making sexual comments such as "likes booty," the lawsuit said, adding that the automaker's "standard operating procedures include blatant, open and unmitigated race discrimination".

Some of the plaintiffs were assigned to the most physically demanding posts in Tesla or passed over for promotion, according to the lawsuit.

3/8/25, 8:27 AM                    Tesla hit with new lawsuit alleging racial abuse against Black workers

**2021: Federal court orders Tesla to pay $137 million to former Black employee over racism**

03:38



It said that Montieco Justice, a production associate at Tesla's Fremont factory, was immediately demoted upon returning to Tesla after taking an authorized leave of absence as a result contracting COVID-19.

Tesla did not immediately respond to a Reuters request for comment.

The automaker is facing at least 10 lawsuits alleging widespread race discrimination or sexual harassment, including one by a California civil rights agency.

It previously has denied wrongdoing and says it has policies in place to prevent and address workplace misconduct.

On Monday, a federal judge in California ordered a new trial on the damages Tesla owes to a Black former factory worker who accused the company of race discrimination, after he turned down a $15 million award.

This month, a Tesla shareholder filed a lawsuit accusing CEO Elon Musk and the company's board of directors of neglecting worker complaints and fostering a toxic workplace culture.

3/0/25, 8:27 AM                                    Tesla hit with new lawsuit alleging racial abuse against Black workers


Reuters

Reuters

**FILED**
Superior Court of California
County of Alameda
05/17/2024
Chad Finke , Executive Officer / Clerk of the Court
By: _Nicole Hall_ Deputy
N. Hall

1

2

3

4

5

6            SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                IN AND FOR THE COUNTY OF ALAMEDA

8

9    MARCUS VAUGHN, et al,                   No. RG17-882082

10       Plaintiffs/Petitioners,           ORDER GRANTING IN PART MOTION OF
                                           PLAINTIFFS FOR CLASS
11       v.                                CERTIFICATION.

12   TESLA, INC, et al,                    Hearing Date:   April 15, 2024
                                           Time:   9:30 AM
13       Defendants/Respondents.           Dept.:   21

14                                         TRIAL DATE: OCTOBER 14, 2024

15

16

17        The Motion of plaintiffs for class certification came on for hearing on March 1, 2024, and

18   April 15, 2024, in Department 21 of this Court, the Honorable Noël Wise presiding.  Counsel

19   appeared on behalf of plaintiffs and on behalf of defendant.  After consideration of the points and

20   authorities and the evidence, as well as the oral argument of counsel, IT IS ORDERED: The

21   Motion of plaintiffs for class certification is GRANTED IN PART.

22   ///

23   ///

24   ///

25

26

1

## SUMMARY

The court finds that class certification is appropriate for fact-finding on particular common fact issues.  (CRC 3.765(b) ["When appropriate, an action may be maintained as a class action limited to particular issues"].)  The common particular fact issues are:

1. Was there a pattern or practice of pervasive race harassment at the Tesla factory?  [If yes, identify the time period or periods by month/year, then go to #2]

2. For each of the time periods identified in response to #1, did Tesla know or should have known of the pattern or practice of pervasive race harassment at the factory?  [If yes, for any time period, then go to #3]

3. If Tesla knew or should have known that there was a pattern or practice of pervasive race harassment at the factory for a time period in which you answered "yes" in question #2, did Tesla fail to take immediate and appropriate corrective action? (Govt Code 12940(j)(1).)

The court is not certifying a class of Tesla workers to pursue a class claim for individual liability or damages.  Each Tesla worker who wants to recover damages must file a separate lawsuit.  Class certification on particular common fact issues is, however, superior to the repeated re-litigation of the common fact issues in what may be hundreds of individual cases. The classwide findings will establish common facts that the members of the class or Tesla may then use in individual cases, avoiding the time, expense, inefficiency, and potentially inconsistent results of repeated litigation of those common fact issues. This will permit the court to expedite the trials in the individual actions.  (Evid Code 352 [cumulative evidence].)

After the fact-finding is concluded regarding the particular common fact issues, and Tesla workers have filed individual cases, the court will oversee the cases utilizing case management that resembles a coordinated proceeding.  If hundreds of Tesla workers had filed individual cases in Alameda and other counties, then the court or the parties might have sought the creation of a coordinated proceeding as a mechanism to manage those cases.  (CCP 404; CRC 3.501 et seq.)  That did not happen.  Instead, plaintiffs filed this class action, and hundreds of Tesla workers have apparently delayed filing individual cases in reliance on the possibility that this class action might be a more effective and efficient procedural vehicle to resolve their claims.  This order clarifies that each individual Tesla worker must file an individual case, but also certifies a class for determining common particular fact issues so that the Tesla workers and Tesla itself (as well as the court) will receive some of the efficiency benefits of a coordinated proceeding.

The court finds that class certification is also appropriate for injunctive relief.  (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 689-696 [directing trial court to order certification for injunctive relief].)  There can be a class trial on the issue of "If Tesla currently knows or should have known of that there was, or is, pervasive race harassment at the factory, is Tesla currently taking immediate and appropriate corrective action." (Govt Code 12940(j)(1)).

Class certification on injunctive relief is superior to individuals seeking injunctive relief because the class representatives and the class counsel will be responsible for seeking relief for the benefit of the class as a whole.  A class trial on injunctive relief will ensure that Tesla is not subjected to potentially inconsistent injunctions in separate individual cases.  Class certification on injunctive relief is superior to the Civil Rights Department ("CRD")'s parallel case because the class case is significantly more developed.  In addition, Tesla alleges that the CRD failed to

comply with its pre-filing responsibilities.  If Tesla is correct, then the CRD's case might be narrowed or dismissed before it reaches the merits.  Class certification on injunctive relief is also superior to the Equal Employment Opportunity Commission ("EEOC")'s parallel case because the class case is significantly more developed.

Class certification on injunctive relief is conditioned on plaintiffs timely amending their complaint to include a plaintiff who is typical and adequate.  The current plaintiffs do not include a person who is currently employed at Tesla.

OVERVIEW OF PURPOSE OF CLASS ACTION PROCEDURE

Class certification is a procedural device for managing the claims of numerous allegedly injured persons.  A motion for class certification does not concern the merits.  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 437-444.)

Class actions are creatures of equity.  (*Estrada v. Royalty Carpet Mills, Inc.* (2024) 15 Cal.5th 582, 611; *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1084.)  "'The class suit was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the subject of litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable." (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, fn 14 [quoting *Hansberry v. Lee* (1940) 311 U.S. 32, 41-42].)

The class mechanism should be used when "substantial benefits accrue both to the litigants and the courts."  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.)  A class action is a procedural mechanism for the resolution of numerous claims in a single lawsuit with all the attendant savings of time and energy for the parties and the court.  "[T]he class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.)  "If a class suit is not permitted …, a multiplicity of legal actions dealing with identical basic issues will be

1  required in order to permit recovery by each [plaintiff]. The result would be multiple burdens

2  upon the plaintiffs, the defendant and the court." (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695,

3  714-715.)

4      A class action must be "superior to alternate means for a fair and efficient adjudication of

5  the litigation." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal. 4th 319, 332.)  In

6  determining whether a class is appropriate, "[t]he relevant comparison lies between the costs and

7  benefits of adjudicating plaintiffs' claims in a class action and the costs and benefits of

8  proceeding by numerous separate actions—*not* between the complexity of a class suit that must

9  accommodate some individualized inquiries and the absence of any remedial proceeding

10  whatsoever." (*Sav-on*, 34 Cal.4th at 339 fn 10.)

11      Therefore, the court must consider all the other tools available for the effective and

12  efficient judicial management of the claims that would be asserted and resolved in a class action.

13  This complex department has the court's authority to manage cases generally (CCP 128(a)(3)), to

14  manage complex cases specifically (CRC 3.400; Std. Jud. Admin. Standard 3.10), to manage

15  related cases (CRC 3.300), to join multiple plaintiffs in a single case (CCP 378), to consolidate

16  cases for pretrial or trial purposes (CCP 1048, CRC 3.350), to manage the claims of numerous

17  persons using the class action mechanism (CCP 384), and to manage the claims of numerous

18  persons as a coordinated proceeding (CCP 404; CRC 3.501.  (See generally *Volkswagen of*

19  *America, Inc. v. Superior Court* (2001) 94 Cal.App.4th 695, 704-705 [complex]; *McGhan*

20  *Medical Corp. v. Superior Court* (1992) 11 Cal.App.4th 804, 805 [coordination].)

21

22                    <u>OVERVIEW OF RELATED CASES</u>

23      As noted above, a class action must be "superior to alternate means for a fair and efficient

24  adjudication of the litigation." (*Sav-on*, 34 Cal.4th at 332.)  This is a situation where the

25  "alternate means" are actual and current alternatives and not theoretical possibilities.  The court

26  does not consider the motion for class certification in a vacuum.

This trial court is managing three related categories of cases that concern allegations of race or sex harassment against Tesla.[1]  Each category is focused on race harassment at the Fremont factory, but the CRD case includes statewide claims, and the individual cases include sex harassment, disability accommodation, and other claims.  The court's goal is to manage the claims effectively, efficiently, and to avoid inconsistent orders.  (CRC 3.400; Std Jud Admin 3.10; *Volkswagen of America, Inc. v. Superior Court* (2001) 94 Cal.App.4th 695, 704-705.)

Category 1 is this putative class action.  *Vaughn v. Tesla*, RG17882082, was filed on November 13, 2017, and alleges claims for race harassment at the Tesla Fremont manufacturing factory.  The temporal scope of the putative class action is from November 9, 2016, through the present.  The case has taken two trips to the court of appeal.  (*Vaughn v. Tesla, Inc.* (2019) 2019 WL 2181391 [arbitration re plaintiff Vaughn]; *Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208 [arbitration re plaintiffs Chatman and Hall/public injunction].)

Category 2 is a law enforcement action.  *Civil Rights Department v. Tesla*, 22CV006830, was filed on February 9, 2022, by the Civil Rights Department, which is part of the Business, Consumer Services and Housing Agency of the State of California. (Govt Code 12804.)  The law enforcement action alleges claims for race harassment and discrimination at the Tesla Fremont manufacturing factory and throughout California.[2]  The case concerns claims that arise from June 18, 2018, through the present.  (*Dept. of Fair Employment and Housing v. Tesla, Inc.* (Superior Court 2022) 2022 WL 17549760 at *5.)

---

[1] Plaintiffs assert claims for both race harassment and race discrimination, but at oral argument clarified that the claims for discrimination were for discriminatory treatment that has the effect of harassment and not discrimination in the sense of being paid less than similarly situated employees or being denied promotions.  In the class action, the court will refer to both claims collectively as claims for "harassment."

[2] On September 28, 2023, the EEOC filed a parallel federal EEOC law enforcement action. (*EEOC v Tesla, Inc.*, Case No. 4:23-cv-04984.)  (Evid Code 452(d) [judicial notice of court records in *EEOC v. Tesla*].)  The court invited the EEOC to offer its thoughts on the interrelationship of the various cases.  (Order of 4/8/24, Issue #12 and footnote 1.)  The EEOC declined the opportunity to submit an amicus brief.  (EEOC letter filed 4/12/24.)

Category 3 is approximately 15 cases brought by individual plaintiffs. The individual cases allege claims for race or sex harassment and discrimination at the Tesla Fremont factory and potentially elsewhere in California. In January 2024 the court reassigned all the identified individual plaintiff cases to Judge Wise in Dept 21 to obtain the efficiencies of consistent case management and avoid inconsistent orders. (CRC 3.300 [related cases].) Counsel for plaintiffs asserts that if the claims of Tesla workers are not managed as a class, then over 200 Tesla workers will file individual cases. (pltf supp brief filed 2/29/24 at 1:6 ["hundreds or thousands of repetitive individual actions"] and at 2:7:7-8 ["hundreds or even thousands of others would later file claims"]; pltf supp brief filed 3/15/24 at 5:11-15 [suggesting 500 cases might be filed]; pltf second supp brief filed 4/12/24 at 1:24 ["thousands" of separate lawsuits; TR on 4/15/24 at 12:7.) Tesla has opined that it expects the number of individual cases that Tesla workers actually file to be much smaller.

The three categories of cases are interrelated. The management of one category affects the management of the others. Each of the three categories of cases asserts that individual persons were subject to harassment and that those persons should recover damages. Similarly, each of the three categories concern the issue of whether there was a pattern or practice of race harassment, whether Tesla knew or should have known of that race harassment, and whether Tesla failed to take immediate and appropriate corrective action. (Govt Code 12940(j)(1) and (k)).

The class action could arguably address both pattern or practice and individual claims in a single action using the two-phase approach described in *Teamsters v. United States* (1977) 431 U.S. 324, and *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 35-37. The CRD and EEOC law enforcement actions could likewise address both types of claims in a single action using the same two-phase approach.[3] The individual cases focus on the actions that affected the

---

[3] The CRD states that in the law enforcement case it will ask the court to follow the *Teamsters* model and have a two-phase trial. (CRD brief filed 3/15/24 at 5:10-12.)

individual plaintiffs, but in each case the plaintiff could present evidence of a pattern or practice of failing to prevent or address race discrimination and harassment as evidence of Tesla's motive, intent, or knowledge. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 109-118.) Thus, the court is not considering the abstract issue of whether a class action is a mechanism that would be superior to hypothetical alternatives but the immediate real-life issue of whether class treatment of claims or particular fact issues would be superior to the alternatives.

## PROCEDURAL BACKGROUND

The Second Amended Complaint filed July 7, 2021, in this class action asserts claims for Race-Based Discrimination in Violation of the Fair Employment and Housing Act ("FEHA") (Govt Code 12940(a), Race-Based Harassment in Violation of FEHA (Govt Code 12940(j)(1)) and Failure to Prevent Discrimination and Harassment in Violation of FEHA (Govt Code 12940(k)) at Tesla's production factory in Fremont, California.   Plaintiffs assert that because Tesla failed to comply with the FEHA, the members of the class were exposed to harassment as a result of their race and suffered emotional distress damages.

## FACTUAL BACKGROUND

TESLA POLICIES

Tesla had common written policies.  Since May 2010, Tesla has had a written Code of Business Conduct and Ethics. (Hart Dec filed 10/16/23, Exh A).   Since October 2011, Tesla has had a written Anti-Harassment and Discrimination Policy (Hart Dec Exh B.)   In December 2016, Tesla revised its written Anti-Harassment and Discrimination Policy (Hart Dec Exh C.)  In December 2017, Tesla revised its written Code of Business Conduct and Ethics. (Hart Dec, Exh D).  In July 2018, Tesla issued its Policy Against Discrimination & Harassment in the Workplace

(Hart Dec Exh E), which Tesla revised in November 2018 (Hart Dec Exh F), and again in March 2021 (Hart Dec Exh G). These are common, formal written policies.

Tiffany Hart, Senior ER (Employee Relations) Partner at Tesla testified that the use of the n-word has been prohibited at the Tesla Fremont factory since at least 2010. (Hart Depo [Helland Dec filed 12/22/23, Exh G] at 80, 87-89, 99-100.)[4]

Tesla also had "policies" that were not formal. For example, on May 31, 2017, Tesla CEO Elon Musk sent an email to all employees. (Hart Depo at 155-156.) Musk's email included a prior April 21, 2013, email when he wrote: "Tesla has a strict no a* policy"[5] and then stated:

> Part of not being a huge jerk is considering how someone might feel who is part of an historically less represented group. They have endured difficulties that someone born or raised in a more privileged situation did not. This doesn't mean that there is a different standard of performance or that you can't give critical feedback. You should – doing anything else would be an insult to the hard work it took to get there – but don't ever intentionally allow someone to feel excluded, uncomfortable or unfairly treated. Sometimes these things happen unintentionally, in which case you should apologize.

> In fairness, if someone is a jerk to you, but sincerely apologizes, it is important to be thick-skinned and accept that apology. If you are part of a less represented group, you don't get a free pass on being a jerk yourself. We have had a few cases at Tesla where someone in a less represented group was actually given a job or promoted over more qualified highly represented candidates and then decided to sue Tesla for millions of dollars because they felt they weren't promoted enough. That is obviously not cool.

(Organ Dec. filed 6/5/23, Exh. 2.)

---

[4] The n-word is highly charged, provocative, and, depending on the circumstances, abhorrent. The court recognizes that witnesses and counsel are reluctant to use the complete word because they are uncomfortable saying it and do not want to cause offense. (*People v. Ware* (2022) 14 Cal.5th 151 fn 1; *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1116; *Monteiro v. Tempe Union High School Dist.* (9th Cir. 1998) 158 F.3d 1022, 1030, fn. 12.)
[5] Neither Musk's April 21, 2013 email, nor his May 31, 2017 email, explicitly states what a "a strict no a* policy," means, but the reference speaks for itself.

In February 2020 (Evid Code 452), Tesla issued its Anti-Handbook Handbook.  (Organ Dec. filed 6/5/23, Exh. 1.)  The Anti-Handbook Handbook states: "If you do something stupid, depending on the circumstances you may be coached and given another chance or may be asked to leave.  …here are some examples of stupid things people do …Harassing or bullying others."

TESLA PROCEDURES

Tesla had common procedures for training managerial and non-managerial employees. From 2015 through the present Tesla had a procedure under which it trained workers on anti-harassment and anti-discrimination.  (Hart Dec. para 19.)  From 2015 through the present Tesla required training regarding discrimination and harassment.  (Hart Dec. para 20-21.) These are common procedures.

In approximately 2017, Tesla launched a graffiti remediation program.  Under this program, if someone reported graffiti to HR, then HR was supposed to conduct an investigation and partner with security to determine who created the graffiti and when they did it. If HR could not determine who created the graffiti, then HR was supposed to reach out to the supervisors or managers of the impacted area to remind them to watch for violations.  (Hart Dec. filed 10/16 at para 25.) (Hart Depo at 169-171.) This procedure is common to the class.

EMPLOYEE COMPLAINTS

In 2017, "Tesla created a centralized internal tracking system to document complaints and investigations."  (Hart Dec filed 10/16 at para 24.)  This is common evidence of who made what formal complaints.

Plaintiffs provided declarations from 240 witnesses who stated that they observed harassment at the Tesla Fremont factory; some complained about it.[6] Of the 240 declarations submitted by plaintiffs, all stated that they heard the n-word at the Tesla Fremont factory (Sadat Dec, para 3; Helland Reply Dec filed 12/22/23, para 2, Exh A), 112 stated that they complained to a supervisor, lead, manager or HR about harassment, and 16 made written complaints. (Cardozo Dec. filed 10/16/23 para 7.) The number of declarations demonstrates that the sample is sufficiently large. (*Duran*, 59 Cal.4th at 42 [sample must be sufficiently large].)[7] The selection by plaintiffs' counsel of which declarations to present to the court suggest that the sample was not random. (*Duran*, 59 Cal.4th at 43-45 [sample must be random].)

In opposing this motion, Tesla provided declarations from 228 witnesses who generally stated that they did not observe harassment at the Tesla Fremont factory or that if they observed it then Tesla took "immediate and appropriate corrective action." Of the 228 declarations submitted by Tesla, 99 heard the n-word at the Tesla Fremont factory. (Helland Supp Dec filed 12/22/23, para 2, Exh A.) Of the defendant declarations, several workers state they made complaints, and several supervisors or managers state that they received complaints. (E.g. Robert Brown, Philip Buchannan.) Like the declarations submitted by plaintiffs, the number of declarations demonstrates that the sample is sufficiently large but the selection by defendant's counsel suggests that the sample was not random. (*Duran*, 59 Cal.4th at 42-45.)

---

[6] The parties disagree on whether there are 236 or 240 declarations. The specific number is not material to the court's analysis.

[7] *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 38-49, explains that presentation of a representative sample of witnesses is an appropriate way to present evidence. The sample must be of an appropriate size and must be random so that the trier of fact can make reasonable inferences and extrapolate from the sample to the population as a whole. A non-representative sample has the risk of misleading the jury. A representative sample avoids the undue consumption of time that would result if all percipient witnesses testified. (Evid Code 352.)

In opposing this motion, Tesla reviewed the declarations filed by plaintiffs and prepared a table that provides information on (1) "Did the declarant allege that he or she complained to a supervisor, lead, manager, or HR about harassment or discrimination? and (2) "Did the declarant allege that he or she made a written complaint to a supervisor, lead, manager, or HR about harassment or discrimination?" (Cardozo Dec. filed 10/16/23, Exh D, Right hand column.)  The table indicates that many of the declarants made complaints but that few made formal written complaints.

Like plaintiffs' underlying declarations, this table is a summary of anecdotal information and suffers from the same deficiencies as the underlying declarations themselves.  Without some assurance that the declarations are representative of the experiences of the workers at the Tesla Fremont factory, a jury could not reasonably extrapolate from the evidence presented to the class as a whole. (*Duran*, 59 Cal.4th at 39; *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1433 fn 2.)  The declarations and the table summarizing the declarations are common evidence of who made what complaints, but the evidence is of diminished value because it is anecdotal.


TESLA RESPONSE TO EMPLOYEE COMPLAINTS

In 2017, "Tesla created a centralized internal tracking system to document complaints and investigations." (Hart Dec filed 10/16/23 at para 24)  Plaintiffs state they will rely on information in this database to demonstrate that Tesla was aware of complaints about race harassment and how (if at all) Tesla responded to the complaints.  (Pltf trial plan at 3:18-19, 11:6.)  Tesla indicates that it will rely on the existence of the database, and the information within it, to demonstrate that it took complaints seriously and that Tesla responded appropriately to complaints. (Oppo at 12:13-14.)  Tesla's "centralized internal tracking system" is common

evidence that would be directly relevant to whether Tesla had a pattern or practice of failing to respond to complaints of race harassment.

Tiffany Hart, Senior ER (Employee Relations) Partner at Tesla testified about Tesla's response to complaints. Hart testified that when she was an HR business partner, she did twenty investigations per year and that since becoming a Senior ER Partner in June 2022, she has done an average of eight per month. (Hart Depo [Helland Dec filed 12/22/23, Exh G] at 27.) Hart did about fifteen investigations at the Fremont factory. (Hart Depo at 28.)

The court has reviewed the declarations provided by plaintiffs and by Tesla and they indicate that when workers complained, different things happened on different occasions. Declarations submitted by plaintiffs suggest that Tesla failed to take "immediate and appropriate corrective action." (Govt Code 12940(j)(1).) Plaintiff declarant Adrianna Leaks states that she complained to a supervisor, the supervisor was terminated, and there was no change in the racist behaviors. (Leaks para 11, 12.) Plaintiff declarant Albert Blakes asserts he complained to HR, and there was no change in the racist behaviors. (Blakes, para 12.) Plaintiff declarant Alvin Patterson states he complained to leads and supervisors, and they denied that racism was a factor in promotions. Alvin Patterson also contends that he complained about his supervisor to his supervisor, was referred to HR, then received more harassment from his supervisor, and was then warned by HR about his own workplace conduct. (Patterson para 9, 14.) Tatiana Smith testified that she was subject to race harassment, she complained verbally to her supervisor, and her supervisor advised her to not go to HR. On Tatiana Smith's last day of work, she states she sent an email to HR describing the race harassment and HR never responded to her email. (Tatiana Smith Dec at 8, 9, 10, Exh A.) Marcus Vaughn testified that when he reported that someone said "These niggas is lazy and they're hella slow" that the person taking

the complaint "just kind of like giggled and laughed and then just, you know, told me to not worry about it, and that's where we left it at, to not worry about it and that everything would be okay, I guess." (Vaughn Depo at 150-151.) Perry Wiley testified that he was the subject of racist incidents, and made complaints to his supervisor twice. Perry Wiley asserts he was threatened with retaliation the first time he complained and was retaliated against the second time. (Perry Wiley at para 9, 18.) Many declarants stated that they did not report things to Human Resources because they thought that if managers or supervisors were harassing, that Human Resources already knew about it, and Human Resources had already demonstrated Tesla would not take appropriate action.

Declarations submitted by Tesla suggest that if Tesla was informed about racist incidents, it took "immediate and appropriate corrective action" (Govt Code 12940(j)(1).) Tesla Declarant Robert Brown is a supervisor and states that he has counseled workers who use the term "nigga," that in 2017 or 2018 he observed an incident involving the term and reported it to HR, and that in 2019 he counseled his team that music with the word was not appropriate for the workplace. (Brown Dec, para 13-16.) Tesla Declarant Philip Buchannan is a supervisor and states that an employee reported to HR that a coworker called him monkey, that HR promptly investigated, and that Tesla terminated the employee who used the inappropriate language. (Buchannan Dec, para 13) Tesla Declarant Jeremiah Clark states "I personally have seen graffiti using racial slurs. When I see it, I see that it is removed quickly by the building facilities team." (Clark Dec., para 21.) Tesla Declarant Macey Harrison states: "On a few occasions I have heard the "N" word stated during an argument. And the employees who were arguing were counseled that having a public altercation was not acceptable, nor was using the "N" word." (Harrison Dec, para 19.)

Like the declarations and summary table about whether workers complained, the declarations about whether and how Tesla responded are a statistically significant number of witnesses who are arguably non-representative. The court gives the declarations diminished weight other than to demonstrate that there is a substantial number of witnesses with highly relevant and probative information, and that the parties could create a *Duran* compliant sample of witness who could testify in a manageable class trial.

It is important to further explain why the court finds the over 500 declarations submitted by plaintiffs and by Tesla to be of diminished value at this point in the litigation. In a regular, single plaintiff case, the claim concerns what happened to a specific individual and counsel has the discretion to select which witnesses to present to make that showing. In a class action, however, the trier of fact's focus is often on whether there was a policy, pattern, or practice that applied to the class as a whole.

Supervisors, leads, managers, and persons with similar responsibilities can often testify regarding their experience as to a policy, pattern, or practice at the relevant facility or in the relevant department, division, or work area. (E.g. Hart dec filed 10/16/23; Hart Depo [Helland Dec filed 12/22/23, Exh G].) Non-managerial employees can typically testify only about their individual experiences. Based on the declarations the parties have already filed, there will likely be a bell curve of individual experiences at the Tesla factory, and the bell curve might be weighted to one side or the other. If there is testimony from non-managerial individuals, then the court or jury must hear from a representative sample of sufficient size. Without that requirement, the trier of fact will hear from "disgruntled employees" selected by counsel for plaintiffs and "happy campers" selected by counsel for defendant, each of which might be

witnesses from the extremes of the bell curve.[8]  If counsel selects their witnesses, then the trier of fact will have no meaningful information about the shape of the bell curve and thus no reliable information about the alleged pattern or practice.  As a result, the trier of fact cannot reliably extrapolate from the evidence presented to the class as a whole.  (*Duran*, 59 Cal.4th at 39; *Dunbar,* 141 Cal.App.4th at 1433 fn 2.)

The issue on class certification is not whether the alleged pattern or practice exists, but whether plaintiffs can present the claim with common evidence.  Tesla's formal written policies, informal written policies, common procedures for training managerial and non-managerial employees, graffiti remediation program, and "centralized internal tracking system" are common evidence.  The declarations submitted by plaintiffs and by Tesla about Tesla's response to complaints appear to be statistically significant in number, but they are of diminished value because there is no assurance they are a representative sample.

### COURT DISCRETION IN CLASS CERTIFICATION

The California Supreme Court has provided guidance to trial courts regarding class action management.  "[T]he trial court has an obligation to consider the use of ... innovative procedural tools proposed by a party to certify a manageable class."  (*Sav-on*, 34 Cal.4th at 339.)

Plaintiffs seek to certify a class to pursue FEHA claims, to prove a pattern and practice, to prove injury to individual members of the class, and to obtain damages and injunctive relief.

---

[8] Employers on occasion suggest that witnesses offered by plaintiffs are not credible because they are merely "disgruntled employees."  In return, plaintiffs suggest that witnesses offered by an employer are not credible because they are current employees who are "happy campers."  (*Transnational Management Systems, LLC v. Pegasus Elite Aviation, Inc.* (Cal. Superior (2021) 2021 WL 7707368 at *24 [disgruntled employees]; *Corinthian Intern. Wage and Hour Cases* (Cal. Superior 2019) 2019 WL 13463508 fn 5 [happy campers].)

The court has the option of the *Teamsters* two-phase trial. (Moving at 17-18.) Plaintiffs also suggest the court could certify a class for common particular issues. (Moving at 18-19.) The court has this option. (CRC 3.765(b).) Plaintiffs also suggest that the court could certify a class for the limited remedy of injunctive and declaratory relief. (Moving at 18-19.) The court also has this option. (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 689-696.)

The court considered the alternatives and requested supplemental briefing on those options. Before turning to the traditional class certification analysis, the court will generally summarize its class certification and trial structure options.

MODEL A.  SINGLE TRIAL TO RESOLVE LIABILITY, DAMAGES, AND INJUNCTIVE RELIEF.

The first model involves a class that is certified to pursue defined claims where liability and damages are resolved in a single trial and result in a single judgment. This is the most common model.

At the class trial the trier of fact determines both the defendant's liability and the aggregate damages owed to the class. The defendant does not assert individual defenses and affirmative defenses against each individual member of the class, but it can demonstrate that it would prevail against a percentage of the class and that would be taken into account in determining the amount of damages.[9] "The allocation of the total sum of damages among the

---

[9] *Duran* states "any procedure to determine the defendant's liability to the class must still permit the defendant to introduce its own evidence, both to challenge the plaintiffs' showing *and to reduce overall damages*" and also "[i]f trial proceeds with a statistical model of proof, a defendant … must be given a chance to impeach that model *or otherwise show that its liability is reduced* because some plaintiffs were properly classified as exempt." (59 Cal.4th at 37-38 [emphasis added].)

17

individual class members is an internal accounting question that does not directly concern the defendant." (*In re Cipro Cases I & II* (2004) 121 Cal. App. 4th 402, 417.)

In a previous court this court described this one-phase model and compared it to the *Teamsters* two-phase model. (*Vaughn v. Tesla, Inc* (Cal. Superior 2021) 2021 WL 2182408 at *11-12.) The court later referred the parties to *Bennett v. Regents* (2005) 133 Cal.App.4th 347 and its holding that this model was not appropriate where the members of the class seek aggregate emotional distress damages. The case law is consistent that this model is generally not appropriate even if there is allegedly widespread harassment and numerous persons have claims for harassment. (*Howard v. Cook County Sheriff's Office* (7th Cir. 2021) 989 F.3d 587, 600-605.) Plaintiffs do not propose this model. The court does not address this option further.


MODEL B.  TWO-PHASE TRIAL (*TEAMSTERS*).

The second model (*Teamsters*) involves a two-phase trial where the trial is bifurcated into phases. (*Int'l Bhd. of Teamsters v. United States* (1977) 431 U.S. 324.) The court's tentative decision (filed on February 27, 2024) at pp 10:9-16:5 identified and discussed this model.

In the first *Teamsters* phase, a jury typically determines whether the workplace was a hostile workplace environment. If the defendant prevails in Phase I, then judgment is entered in favor of the defendant against all members of the class because the defendant has demonstrated on a classwide basis that there was not a hostile work environment. If the plaintiffs prevail in Phase I, the case moves to Phase II hearings (or trials) on individualized issues where the burden of proof is flipped and the defendant has the burden of demonstrating that it is not liable to each member of the class, and the defendant can assert its individual affirmative defenses against each individual member of the class.

The United States Supreme Court set out this model in *Int'l Bhd. of Teamsters v. United States* (1977) 431 U.S. 324, 360-361, and more recently referred to this model with approval in *Wal-Mart v. Dukes* (2011) 564 U.S. 338, 367. (See also *Serrano v. Cintas Corp.* (6th Cir., 2012)

699 F.3d 884, 893; *Thiessen v. GE Capital Corp.* (10th Cir. 2001) 267 F.3d 1095; *Allison v. Citgo Petroleum Corp.* (5th Cir. 1998) 151 F.3d 402, 409.)  The California Supreme Court has recognized this model as appropriate in certain circumstances. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 35-37.)[10]

The *Teamsters* model is generally appropriate when at Phase I the trier of fact can determine whether a common official policy was lawful, and at Phase II the individual hearings can focus on whether the common unlawful policy caused damage to the members of the class. The *Teamsters* model is less appropriate when the issue is whether there was an unlawful pattern or practice rather than whether there was an unlawful official policy.  (*O'Hailpin v. Hawaiian Airlines Inc.* (D.Hi., 2023) 2023 WL 8600498 at *7.)

Following a Phase I trial on common issues, the *Teamsters* model anticipates individual Phase II hearings.   Plaintiffs in this case recognize that the Phase II hearings would need to be jury trials.  "A trial procedure that had individual hearings on the amount of damages would result in what amounts to a series of individual trials on damages, thus arguably destroying much of the superiority of the class procedure." (*Vaughn v. Tesla, Inc* (Cal. Superior 2021) 2021 WL 2182408 at 11.)  In *McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 456, the court of appeal raised the same issue of whether a procedure where "class members could submit claims by answering a questionnaire, and any dispute could be resolved in "streamlined trials" … would be materially superior to individual trials."

Federal trial courts that have considered the *Teamsters* model on claims for harassment have held that it must be modified to take into account the inherently individual nature of claims for harassment.  *EEOC v. Mitsubishi Motors* (C.D. Ill. 1998) 990 F.Supp. 1059, 1077, states: "The *Teamsters* presumption of liability, however, does not work at the individual relief phase of a sexual harassment case. … Shifting a burden of proof does not work in a pattern or practice

---

[10] A decade earlier, the Court of Appeal suggested that the model would be appropriate in certain circumstances. (*Alch v. Super. Ct.* (2004) 122 Cal.App.4th 339, 378-80.)

1    action for sexual harassment, because individual relief for sexual harassment, even if the

2    harassment for which a plaintiff recovers is based on a pattern or practice of tolerance by an

3    employer, still requires a plaintiff to prove that she was subjectively harmed by the harassing

4    conduct." *E.E.O.C. v. International Profit Associates, Inc.* (N.D. Ill., 2007) 2007 WL 3120069,

5    at *15 states: "the *Teamsters* framework cannot be applied in a straightforward fashion to a

6    hostile work environment case." *O'Hailpin v. Hawaiian Airlines Inc.* (D.Hi., 2023) 2023 WL

7    8600498 at *7 states "in addressing pattern and practice claims based on a hostile work

8    environment—where liability depends on a showing that an individual claimant's work

9    environment is both objectively and subjectively hostile—district courts have acknowledged the

10   awkward fit of the *Teamsters* framework."

11       If the court were to grant certification under the *Teamsters* model and were to manage the

12   claims of an estimated 100 to 300 members of the class who submitted claims in this class

13   action, then, following a Phase I trial on common issues, there would be the need for 100 to 300

14   Phase II jury trials in this class action.  The case would cease to be a typical class action where

15   the class functions as a collective whole and would become a case where 100 to 300 individual

16   Tesla workers prosecuted their claims in a single case.  The joinder of perhaps hundreds of

17   plaintiffs in a single case might be permissible because the claims of the Tesla workers arise "out

18   of the same transaction, occurrence, or series of transactions or occurrences" (CCP 378), but the

19   joinder of so many different plaintiffs who were allegedly harassed by different persons at

20   different times or locations might not be "in the interests of justice" (CCP 379.5).  (See *In re*

21   *Ranitidine Cases* (Superior Court 2021) 2021 WL 9749384 [discussing joinder of more than 50

22   plaintiffs in single case].)

23       Plaintiffs argue that the *Teamsters* model of managing all the claims of all of the

24   individual Tesla workers in a single case is superior because requiring each Tesla worker to file a

25   separate case "would be a recipe for chaos and injustice" and "impose serious financial and

26   logistical burdens on the class."  (pltf second supp brief filed 4/12/24 at 2:23 and 14:20.)

Plaintiffs state that "if the Court does not certify a class for both common and individual phases, every putative class member would have the legal right to file a separate lawsuit, at any time within the remaining limitations period (and thus likely on varying timelines), with counsel of their choice, in any court (state or federal) with jurisdiction as to which venue is proper, with separate C.C.P. §170.6 rights, etc." (pltf second supp brief filed 4/12/24 at 3:26-4:3.)

There is nothing inherently unusual about requiring each person who alleges an injury to file a separate case and prove their claims. The class mechanism is the exception to the standard litigation procedure that injured persons file their own cases. The issue on class certification is whether that mechanism can be used to generate efficiencies for the court and the parties, which would result in savings of court time, witness time, litigation costs, and attorneys' fees, while at the same time ensuring that the parties are afforded their rights, including the rights to select counsel of their choice, to file CCP 170.6 challenges, and to have jury trials.

This court's tentative decision (filed on February 27, 2024) contains a more detailed discussion of the *Teamsters* model. The court finds that class certification with the *Teamsters* mechanism in this case is not a "superior alternative." The court does not address this option further.

Tesla argued that there should be no class certification of any type, but that certification for the resolution of common particular fact issues and certification for purposes of injunctive relief "are less problematic than" the *Teamsters* model because the parts of those models "that would follow the proposed common trial [are] subject to well-defined rules of civil procedure and abundant California case law." (Tesla brief filed 2/29/24 at p10:27-11:7.)  The court turns to those models.

///
///
///
///

MODEL C.  TRIAL ON PARTICULAR ISSUES, WITH SEPARATE CASES FOR DAMAGES.

The third model is certification of particular issues for class adjudication, and then separate individual cases by persons who want to pursue individual cases. The court's tentative decision (filed on February 27, 2024) at pp 16:7-19:15 identified and discussed this model. Certification of particular issues is expressly permissible under California law.  (CRC 3.765(b) ["When appropriate, an action may be maintained as a class action limited to particular issues"].) In *Sarun v. Dignity Health* (2019) 41 Cal.App.5th 1119, 1136-1137, the Court of Appeal reversed a trial court order denying class certification in its entirety and remanded with instructions to certify a class on particular issues.  *Sarun*, 41 Cal.App.5th at 1136-1137, states that although "answering the open-price-term question would not fully resolve class members' ultimate liability to Dignity Health [there is] utility in deciding this threshold issue. … settling this issue could significantly expedite final determination of any outstanding billing disputes." *Sarun*, 41 Cal.App.5th at 1137, later states: "requiring class members to individually pursue the contract interpretation question, aside from its potential economic infeasibility, would create an unacceptable risk of inconsistent outcomes."

In *Hefczyc v. Rady Children's Hospital-San Diego* (2017) 17 Cal.App.5th 518, 545, the Court of Appeal affirmed the trial court's denial of single-issue class certification on the facts of that case.  *Hefczyc*, 17 Cal.App.5th at 545, states: "That inquiry presents individualized and complicated issues unique to each class member, each of whom received different bills based on different services. Accordingly, the single issue that Hefczyc has identified is not appropriate for class certification."

In *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal. 4th 319, 339-340, the Supreme Court stated that trial courts have substantial discretion in evaluating whether to certify a class and in devising innovative procedures to manage class actions to obtain the benefits of the class action mechanism while protecting the rights of the parties.  Pursuant to *Sav-On Drug*

*Stores*, this court views particular issue certification as one of several options that it should properly consider when managing a class action for certification.

Certification of particular issues is also expressly permissible under Federal law. (FRCP 23(c)(4) ["When appropriate, an action may be brought or maintained as a class action with respect to particular issues"].) Addressing single issue certification, *Mejdrech v. Met-Coil Sys. Corp.* (7th Cir. 2003) 319 F.3d 910, 911, states, "If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings."

Particular issue certification under FRCP 23(c)(4) has been used in federal courts in various circumstances. In *Hernandez v. Motor Vessel Skyward* (S.D. Fla. 1973) 61 F.R.D. 558, 561, over 600 passengers fell sick on an ocean cruise and the court granted class certification on the single issue of "Whether the defendants were negligent in preparing either the drinking water or food that was available for consumption by the passengers." In *In re Honda Am. Motor Co. Dealership Rels. Litig.* (D. Md. 1997) 979 F. Supp. 365, plaintiffs alleged a conspiracy in violation of RICO and the Court certified a class for the limited purpose of determining whether the conspiracy existed, with damages to be decided in subsequent individual actions. In *In re Chiang* (3rd Cir. 2004) 385 F.3d 256, 267, the court approved class certification on two issues related to whether a business practice discriminated unlawfully but left other issues for individual determination.

A variant of particular issue certification is to certify a common fact issue or issues for class treatment and to postpone the issues of individual causation and damages for resolution in other proceedings in the same case. In *In re Deepwater Horizon* (5th Cir. 2014) 739 F.3d 790, 815-816 , the court certified a class on common issues such as "BP's involvement in the well design, explosion, discharge of oil, and cleanup efforts" while deferring issues of individual

23

1  causation and damages to later proceedings in the same case. In *Butler v. Sears, Roebuck and*

2  *Co.* (7th Cir., 2013) 727 F.3d 796, 801-802, the court affirmed certification of a class on the

3  common issue of "whether the Sears washing machine was defective" and remanded for the trial

4  court to consider to consider the "Complications [that] arise from the design changes and from

5  separate state warranty laws, but can be handled by the creation of subclasses." In *Dawson v.*

6  *Great Lakes Educational Loan Services, Inc.* (W.D. Wis. 2018) 327 F.R.D. 637, 648-649, the

7  court approved class certification on the common issue of liability where it was alleged that

8  defendants fraudulently and negligently inflated the amount owed on student loans while leaving

9  issues of causation and damages for later proceedings in that case.

10       Particular issue certification must be tailored to the facts of each case to ensure there are

11  significant benefits to the parties and the court. The court should certify particular issues for

12  class treatment only if they can be cleanly separated from other issues so that a jury deciding

13  individual issues will not need to revisit the issues that were decided on a class basis. "[T]he

14  judge must not divide issues between separate trials in such a way that the same issue is

15  reexamined by different juries." (*In re Rhone-Poulenc Rorer Inc.* (7th Cir. 1995) 51 F.3d 1293,

16  1303.) (See also *Mejdrech,* 319 F.3d at 911.) In the colorful language of *In re Rhone-Poulenc,*

17  51 F.3d at 1302, the court "must carve at the joint." (See also *Rink v. Cheminova, Inc.* (M.D. Fla

18  2001) 203 F.R.D. 648, 652 [rejecting particular issue certification because "even if a jury

19  answered this question in the plaintiffs' favor, any subsequent mini-trial involving the issue of

20  whether the delivery of the defective product caused injury and damage to a particular plaintiff

21  would necessarily have to involve all of the facts and circumstances surrounding the delivery of

22  the product"].)

23       When there is particular issue certification of a common issue in a mass tort, there is the

24  legitimate concern that there might be undue risk of error when there are enormous consequences

25  [that] turn on the correct resolution of a complex factual question" and it might be preferable to

26  have the issue decided repeatedly in multiple trials and "letting a consensus emerge from several

1   trials." (*Mejdrech*, 319 F.3d at 912.) (See also *In re Rhone-Poulenc*, 51 F.3d at 1299, 1304

2   [noting risk of entrusting significant issue to a single jury].)  That risk is mitigated because "The

3   individual class members will still have to prove the fact and extent of their individual injuries.

4   The need for such proof will act as a backstop to the class-wide determinations." (*Mejdrech*, 319

5   F.3d at 912.)

6       On the facts of this case, certification of a class is appropriate to determine the common

7   particular fact issues of whether there was a pattern or practice of pervasive harassment during a

8   particular time frame, whether Tesla knew of the pervasive harassment, and whether Tesla failed

9   to take immediate and appropriate corrective action.  The jury's verdict will function as a class

10  wide resolution of the common particular issues.  The members of the class can then elect

11  whether to pursue their claims for damages in individual civil cases.  This is consistent with

12  Tesla's argument that the claims for damages should be asserted in individual civil cases.  (Oppo

13  at 35-36.)

14      This model is similar to, but different from, the *Teamsters* two-phase trial.  It is similar

15  because the court and the parties will have the benefit of a single resolution of the common

16  particular issues, and then the individual workers will prosecute their individual claims in jury

17  trials.  It will be different because instead of the claims being resolved in a single case, the claims

18  of the individuals will be presented in separately filed cases that will then be resolved in jury

19  trials.  The court will grant class certification for resolution of common particular fact issues

20  under this model.

21      The court orders that the equitable tolling effect of this putative class action ends ten days

22  after notice is given to the class of the limited issues class certification.  (*In re Honda Am. Motor*

23  *Co. Dealership Rels. Litig.* (D. Md. 1997) 979 F. Supp. 365, 371 and fn5.)  The parties should

24  anticipate that any case alleging race harassment at the Tesla Fremont factory will likely be

25  related and assigned to a single judge for management as related cases.  (CRC 3.300.)  It may

26

1  also be appropriate for the court to manage the cases as a coordinated proceeding. (CCP 404 et

2  seq; CRC 3.501 et seq.)

3

4  MODEL D.  TRIAL LIMITED TO SEEKING INJUNCTIVE RELIEF

5       The fourth model involves a single trial but with the remedy limited to injunctive relief.

6  The court's tentative decision (filed on February 27, 2024) at pp 19:17-22:15 identified and

7  discussed this model.  California law and federal law take different analytical approaches on this

8  issue.

9       California has a single standard for class certification under CCP 382.  The development

10  of class certification law has been guided by equity. (*Estrada v. Royalty Carpet Mills, Inc.*

11  (2024) 15 Cal.5th 582, 611.) (See also *Hefczyc v. Rady Children's Hospital-San Diego* (2017) 17

12  Cal.App.5th 518, 528.)

13       Federal law, in contrast, has different requirements for different types of claims. All class

14  actions must meet the general set of requirements in FRCP 23(a).  Claims for "final injunctive

15  relief or corresponding declaratory relief" must meet the requirements of FRCP 23(b)(2).  Claims

16  for damages and other monetary relief must meet the requirements of FRCP 23(b)(3).

17       No California Court of Appeal has held that the federal FRCP 23(b)(2) standard can, or

18  must, be used in California. "No California authority supports the contention that

19  ascertainability, predominance and superiority are not required when a proposed class action

20  would be certified under Federal Rules of Civil Procedure, rule 23(b)(1)(A) or (b)(2) (28 U.S.C.)

21  if it were proceeding in federal court." (*Hefczyc v. Rady Children's Hospital-San Diego* (2017)

22  17 Cal.App.5th 518, 533.) (See also *Kendall v. Scripps Health* (2017) 16 Cal.App.5th 553, 577-

23  578; *Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676,

24  691 fn 12.)  This trial court must follow the Court of Appeal decisions. (*Auto Equity Sales, Inc.*

25  *v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.)

26

A plaintiff in a California court can, however, define the claims and elect to seek declaratory and injunctive relief rather than damages and thereby focus the class certification analysis on policies and procedures, and alleged systemwide violations, rather than on the effects of those alleged systemwide violations on the individual member of the class. *Hefczyc* states, "California courts have never adopted Rule 23 as 'a procedural strait jacket.' To the contrary, trial courts [are] urged to exercise pragmatism and flexibility in dealing with class actions." (*Hefczyc,* 17 Cal.App.5th at 531.)

In *Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, the Court of Appeal reversed the trial's denial of class certification and directed the trial court to certify the class.  In *Capitol People* the plaintiffs sought only declaratory and injunctive relief. (155 Cal.App.4th at 686.)   The trial court denied class certification.  The Court of Appeal found that the trial court failed to focus on the allegedly unlawful systemwide policies and practices and the theory of recovery in the commonality inquiry. (155 Cal.App.4th at 693.)  The Court of Appeal held that the trial court had turned pattern and practice "upside down" by improperly focusing on the individualized effects of the alleged practice to determine whether there was a pattern rather than the common evidence that could be presented to demonstrate the existence of an alleged common practice or policy.  (155 Cal.App.4th at 696.) The Court of Appeal held that the trial court failed to differentiate between classwide injunctive relief and the existing statutory fair hearing procedure that adjudicates *individual* claims and grievances (155 Cal.App.4th at 701-702).

*Capitol People* is noteworthy because it reversed a trial court decision and directed the trial court to certify the class.  *Hefczyc v. Rady Children's Hospital-San Diego* (2017) 17 Cal.App.5th 518, and *Kendall v. Scripps Health* (2017) 16 Cal.App.5th 553, provide less guidance because the appellate court affirmed trial court orders that denied class certification. Rather than standing for the proposition that a trial court must reach a particular conclusion, the court reads *Hefczyc* and *Kendall* collectively for the more modest proposition that trial courts are

vested with discretion in evaluating whether to grant or deny class certification and that the Court of Appeal will affirm if there is no abuse of discretion. (*Kaldenbach v. Mutual of Omaha Mutual Life Ins. Co.* (2009) 178 Cal.App.4th 830, 844 ["Any valid pertinent reason stated will be sufficient to uphold the order."]; *Cohen v. DirecTV* (2009) 178 Cal.App.4th 966, 981 ["because the trial court stated at least one valid reason for denying the motion for class certification, we decline to reverse the trial court's order."].)

In *Carter v. City of Los Angeles* (2014) 224 Cal.App.4[th] 808, the court discussed class certification in the context of whether it was appropriate to approve a class settlement. In that context, the court quoted *Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. 338, 362-363, for the proposition that "When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident." (*Carter*, 224 Cal.App.4[th] at 824.)

In this case, certification of a class for injunctive relief will ensure that class counsel has a fiduciary duty not just to the named plaintiffs but also to all the persons who might be affected by an injunction. (*Allen v. Int'l Truck & Engine Corp.* (7th Cir. 2004) 358 F.3d 469, 471.) As a matter of law, any plaintiff could seek a public injunction to prevent harassment. (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 227-232.) Certification of a class for injunctive relief will also ensure that if the jury finds the alleged pattern or practice, and if a court finds that an injunction is appropriate, then there will be a single directive court order, and Tesla will not be subject to inconsistent injunctions. If the situation at Tesla changes, then the parties in the class case can seek to modify the injunction accordingly. (CCP 533.)

On the facts of this case, certification of a class to assert the claims alleged by plaintiffs in the Second Amended Complaint, and to seek the limited remedy of injunctive relief, is appropriate. If there is currently pervasive harassment at the Fremont factory, and Tesla knows or should know of that harassment, and Tesla has a pattern or practice of failing to take

immediate and appropriate corrective action, then these findings will affect all Black/African-American persons currently at the Tesla Fremont factory.   Under these circumstances, a class wide injunction would be appropriate to compel Tesla to take appropriate action prospectively. The court will grant class certification under this model.

MODEL E – NO CLASS CERTIFICATION, FOLLOWED BY SEPARATE INDIVIDUAL ACTIONS

The fifth model is the denial of the motion for class certification in its entirety.

If the court denied class certification, then the members of the putative class would need to file individual actions, which may number in the hundreds.  If the court followed its usual procedure and distributed the cases randomly to be managed in different civil departments, then there would be duplicative discovery, multiple hearings in multiple departments with no coordinated schedule, and potentially inconsistent orders, all of which would be inefficient and a burden on the parties and the court.  If the court managed the cases in a single department as related cases in the same manner as a coordinated proceeding, then the court could obtain some of the benefits of a class action or coordinated proceeding.  (CRC 3.300; CCP 404; CRC 3.501 et seq.)

If the court denied class certification the court would need to address certain common and recurring fact issues in each and every trial – specifically, whether in the relevant time frame Tesla's motive, intent, or knowledge could be established by evidence that Tesla knew or should have known of pervasive race harassment and whether it took immediate and appropriate corrective action.  (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 109-118.)  While counsel for plaintiffs suggests hundreds of cases might be filed, Tesla argues that perhaps 50 or fewer cases

will actually be filed.  Even if Tesla is correct, juries would need to hear evidence on the common fact issues many times.

If the court denied class certification, then each member of the putative class who is currently a worker at Tesla could arguably seek a public injunction.  (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 227-232)  The individual plaintiffs would not be in privity with each other, so the court would arguably need to address certain common and recurring fact issues related to Tesla's current practices in each and every trial.  The parties would then face the possibility of inconsistent injunctive relief as different plaintiffs may seek different outcomes based on different evidence.  If Tesla were found liable in even a small number of the cases that are tried, different trial judges will craft different injunctions as appropriate to the evidence that is presented in each case.

The court finds that denial of class certification and permitting individual plaintiffs to file individual cases seeking damages and injunctive relief is not a "superior alternative."  The court does not address this option further.


EFFECT OF *WAL-MART V. DUKES.*

Tesla argues that *Wal-Mart v. Dukes* (2011) 564 U.S. 338, changed the class certification landscape.  *Wal-Mart* addressed "whether the certification of the plaintiff class was consistent with Federal Rules of Civil Procedure 23(a) and (b)(2)."  (564 U.S. at 342.)  Of significance, FRCP 23(b)(2) concerns class actions for injunctive relief and FRCP 23(b)(3) concerns class actions for monetary relief.

Regarding FRCP 23(a)(2) and the requirement that "there are questions of law or fact common to the class," the Supreme Court held that on the issue of liability there must be a "common contention … of such a nature that it is capable of classwide resolution—which means

that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." (*Wal-Mart*, 564 US at 350.)   Class certification must consider "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." (*Wal-Mart*, 564 US at 350.)

Regarding damages, the Supreme Court held that a court may not certify a class under FRCP 23(b)(2) where "the monetary relief is not incidental to the injunctive or declaratory relief." (564 U.S. at 360.)   Assuming that the class could seek damages in a FRCP 23(b)(2) class, the Court held that the lower court erred in its plan that a special master would have hearings with a sample set of the class members: the percentage of claims determined to be valid would then be applied to the entire remaining class; and the number of (presumptively) valid claims would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery—without further individualized proceedings. (*Wal-Mart*, 564 US at 367.)   The Supreme Court indicated that even where there is a finding of an unlawful pattern or practice the defendant is still "entitled to litigate its statutory defenses to individual claims." (*Wal-Mart*, 564 US at 367.)

As a matter of procedure, *Wal-Mart* is a federal case about "whether the certification of the plaintiff class was consistent with Federal Rules of Civil Procedure 23(a) and (b)(2)." (564 U.S. at 342.)   California's statute authorizing class certification is CCP 382, and the development of class certification law has been guided by equity. (*Estrada v. Royalty Carpet Mills, Inc.* (2024) 15 Cal.5th 582, 611.)   *Walmart* did not address California class action standards.

As a matter of substance, *Wal-Mart*'s analysis of the commonality requirement under FRCP 23(a) is consistent with established California law in holding that common issues of law or fact must predominate, and that the class mechanism should be used when "substantial benefits accrue both to the litigants and the courts." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.)   Further, *Wal-Mart*'s analysis of the availability of damages under FRCP 23(b)(2) is immaterial because the plaintiffs in this case are clearly seeking damages.   Plaintiffs proposed

the *Teamsters* model with jury trials for individual claims so Tesla would have the opportunity for a jury trial with each member of the class. Under the particular issues model, Tesla will similarly have the opportunity for a jury trial with each member of the class.


## STANDARD FOR CLASS CERTIFICATION

The court will grant the motion for class certification for both (1) the determination of common particular fact issues and (2) injunctive relief. The court will consider them separately because in evaluating class certification, the court considers the causes of action alleged and the plaintiffs' theory of recovery. (*Brinker*, 53 Cal.4th at 1024; *Capitol People First*, 155 Cal.App.at 690, 695-696.) For each, the court considers the established factors of numerosity, ascertainability, predominance of common questions, typicality, adequacy of representation, and superiority. (*Brinker*, 53 Cal.4th at 1021.)


## CLASS CERTIFICATION FOR PARTICULAR FACT ISSUES


PARTICULAR ISSUE CERTIFICATION – NUMEROSITY

The statutory touchstone for numerosity is whether there are so many class members that "it is impracticable to bring them all before the court." (CCP 382.) Although "[n]o set number is required as a matter of law for the maintenance of a class action," classes of more than 30 to 40 class members generally satisfy the numerosity requirement because at that point, joinder is not practical. (*Hendershot v. Ready to Roll Transportation, Inc.* (2014) 228 Cal.App.4th 1213, 1222; *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934.)

Plaintiffs assert the proposed class of members within the relevant time period through mid-2021 is approximately 5,977 persons at the Fremont factory who self-identified as Black/African-American. (Moving at fn 25 and fn 26.) The parties have submitted the

declarations of over 500 Tesla workers who experienced or observed what could be described as race harassment.

Tesla Senior HR Partner Hart stated that in her declaration that "In 2016, Tesla employed more than 6,000 workers at the Fremont factory. By 2022, Tesla employed more than 22,000 workers at the Fremont factory. … , 11 % identify as Black or African American." (Hart Dec filed 10/16/23 at para 3, 6)   Assuming an unrealistic zero turnover and an average of 14,000 workers, there were approximately 1,540 Tesla workers between 2016 and 2022 who identified as Black or African American.

Plaintiffs have presented evidence demonstrative the proposed class is numerous.


PARTICULAR ISSUE CERTIFICATION – ASCERTAINABILITY

Ascertainability requires a class that is defined "in terms of objective characteristics and common transactional facts" that make "the ultimate identification of class members possible when that identification becomes necessary."  (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 961, 967, 974.) For purposes of ascertainability, the parties and the court do not need to identify by name the persons in the proposed class or any potential subclass. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695.)  "If necessary to preserve the case as a class action, a court may redefine the class to reduce or eliminate an ascertainability or manageability problem." (*Sarun v. Dignity Health* (2019) 41 Cal.App.5th 1119, 1137-1138; *Cohen v. DIRECTV* (2009) 178 Cal.App.4th 966, 979.)  The trial courts can also consider and create subclasses. (*Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 376-377.)

Plaintiffs seek to certify a class defined as: "Black/African-Americans who were employed on the production floor at the Tesla factory in Fremont at any time from November 9, 2016 to the final disposition of this action, who were not subject to an arbitration agreement for all relief sought for the entire period of their employment at Tesla." (Moving at 2:5-7.)

1    The court has two concerns regarding plaintiffs' proposed definition of the class. First,

2    plaintiffs' proposed class definition has no fixed end date. For purposes of the particular fact

3    issues class, the court defines the end date of the class as the date this order is filed. Second, the

4    court is troubled by defining a class of "Black/African-Americans" without more information or

5    clarification.

6         For purposes of the particular issues class, the court defines the class as the persons at the

7    Fremont factory who self-identified to the parties as Black/African-American. (*Sarun,* 41

8    Cal.App.5th at 1137-1138 [court may redefine a class].) As of the last briefing, plaintiffs

9    identified approximately 5,977 persons at the Fremont factory who, as of mid-2021, self-

10   identified as Black/African-American. (Pltf opening filed 6/5/23 at p5, fn 25 and fn 26.)

11        The court ORDERS that the parties meet and confer (using a process similar or identical

12   to the process described in the Order of June 5, 2020), to identify persons who worked at the

13   Tesla Fremont Factory through the date of this order and who self-identify as Black/African-

14   American and to provide a composite list of these individuals to the court promptly.[11] If the

15   parties cannot reach an agreement, then the court ORDERS that plaintiffs may file a motion on

16   shortened time and the court will hear the motion at the next regularly scheduled case

17   management conference and hearing date. The court will then define the common particular fact

18   issues class as the persons who self-identify to the parties as Black/African-American and who

19   are on the resulting composite list.

20   ///

21   ///

22   ///

23

24

---

25        [11] The order of June 5, 2020, concerned an interrogatory that asked Tesla to "Please
     identify all black individuals who worked at the Tesla Factory during the statutory period." The
26   court limited the response to persons who self-identified as Black in the EEOC-1 Forms or in a
     response to a *Belaire-West* notice. (*Vaughn v. Tesla, Inc.* (2020) 2020 WL 7223000 at *2.)

1  PARTICULAR ISSUE CERTIFICATION – LAW ON PREDOMINANCE IN CONTEXT OF A

2  PATTERN OR PRACTICE

3     Plaintiff's burden on moving for class certification is not merely to show that some

4  common issues exist, but, rather, to place substantial evidence in the record that common issues

5  predominate.  (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal. 4th 1096, 1108.)  The

6  determination of how much commonality is enough to warrant use of the class mechanism

7  requires a fact specific evaluation of the claims, the common evidence, and the anticipated

8  conduct of the trial.

9     In a claim alleging an unlawful pattern or practice, the issue for determination at trial is

10 whether there was the alleged pattern or practice and not whether or how it affected any specific

11 individual.  *Duran*, 59 Cal.5[th] at 36, states: "In a pattern and practice case, the employer's

12 actions must be examined in the aggregate to determine whether the employer is liable to any

13 particular plaintiff for discrimination." *Sav-On,* 34 Cal. 4th 319, addresses the issue of a policy,

14 pattern or practice in several places, stating, "[p]redominance is a comparative concept," (34 Cal.

15 4th at 334), that the community of interest requirement does not mandate that class members'

16 claims be uniform or identical, (34 Cal.4[th] at 338), and that the "logic of predominance" does not

17 require a plaintiff to prove that a defendant's policy was "either right as to all members of the

18 class or wrong as to all members of the class" (34 Cal. 4th at 338).  *Williams v. Superior*

19 *Court* (2013) 221 Cal.App.4th 1353, 1370, states: "An unlawful practice may create

20 commonality even if the practice affects class members differently."

21    When a class claim concerns an aggregate practice, the plaintiffs are not required to

22 prove that every member of the proposed class was exposed to the allegedly wrongful practice,

23 or the practice was uniformly unlawful as to all members of the class.  *Bell v. Farmers Inc.*

24 *Exchange* (2004) 115 Cal.App.4[th] 715, 744, holds that class certification is appropriate even if

25 some individual members of the class cannot, or do not, prove that they were damaged.  (See

26 also *Hofer v. Southwest Airlines Co* (Superior Court 2022) 2022 WL 1296952 at *6 [discussion

of "practice"]; *Naranjo v. General Nutrition Corp.* (Cal Superior 2018) 2018 WL 8058761 at *6-7 [discussion of "practice" and suggestion that it requires a plaintiff to prove a "standard operating procedure"].)  The corollary suggests that on issues where the defendant has the burden, such as showing that it took "immediate and appropriate corrective action," the defendant is presumably required to show that it had a pattern or practice of taking immediate and appropriate corrective action and not that it always took immediate and appropriate corrective action.

The class certification inquiry of whether common issues predominate and permit a plaintiff to represent a class is different from the merits inquiry of whether at trial the class can prove the alleged unlawful pattern or practice.  The class certification hurdle requires that a plaintiff establish that common issues predominate, not that the plaintiff can prove the defendant had an unlawful pattern or practice on the merits.  (*Linder*, 23 Cal.4th at 437-444.)  The court can therefore grant a motion for class certification because common issues predominate, and a defendant can prevail at trial if the class cannot prove the alleged unlawful pattern or practice.

PARTICULAR ISSUE CERTIFICATION – PREDOMINANCE IN THIS CASE

In this case, the court finds common issues of fact will predominate on certain common particular fact issues. (CRC 3.765(b) ["When appropriate, an action may be maintained as a class action limited to particular issues"].)  The common particular fact issues[12] are:

1. Was there a pattern or practice of pervasive race harassment at the Tesla factory?  [If yes, identify the time period or periods by month/year, then go to #2]

---

[12] The court identifies the common particular fact issues for purposes of this order on class certification.  The court may modify the specific text of the issues, including to take into account burden of proof, factual or legal concerns, or to clarify the verdict form.

2. For each of the time periods identified in response to #1, did Tesla know or should have known of the pattern or practice of pervasive race harassment at the factory?  [If yes, for any time period, then go to #3]

3. If Tesla knew or should have known that there was a pattern or practice of pervasive race harassment at the factory for a time period in which you answered "yes" in question #2, did Tesla fail to take immediate and appropriate corrective action? (Govt Code 12940(j)(1).)

The first common fact issue is whether there was a pattern or practice of pervasive race harassment at the Tesla factory during a specific time frame or time frames as found by the jury. The existence of "harassment" is central to the claim of any member of the class.  (Govt Code 12940(j)(1).)  "Pervasive race harassment" is defined by case law.  (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283 [pervasive harassment is "a concerted pattern of harassment of a repeated, routine, or a generalized nature"].)  (See also *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 940.)  The determination would be whether there was a "pattern or practice" regarding the class; the court discussed the nature of "pattern or practice" above.  The individual or subjective experience of any given worker is not relevant because whether there was a pattern or practice of pervasive race harassment will be "assessed from the perspective of a reasonable person belonging to [same protected class as] the plaintiff [class]."  (*Cornell*, 18 Cal.App.5th at 940.)[13]

_____

[13] If an individual Tesa worker files a separate action seeking damages, then in that action the worker will need to prove (among other things) that they were subjected to race harassment at the Tesla Fremont factory, the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, and that the worker subjectively perceived the work environment to be hostile.  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462; *Galvan v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 549, 564.)  (See also CACI 2521A.)

The parties can present common evidence so the jury can determine this fact issue on a common basis. Common evidence will include reports of graffiti to the graffiti remediation program (Hart Dec para 25) and reports of harassment to the "centralized internal tracking system" (Hart Dec para 24). Common evidence may include testimony from HR staff, managers, leads, and supervisors about reports of harassment that they received from workers and whether they observed or experienced harassment. Common evidence may include testimony from workers about whether they observed or experienced harassment. At trial the parties and the court will need to address how to ensure that testimony from workers is from a statistically significant number of randomly selected witnesses. (*Duran*, supra.)

The second common fact issue is whether, for each of the time periods identified in response to common issue one, Tesla knew or should have known of the pattern or practice of pervasive race harassment at the factory. (Govt Code 12940(j)(1).) Whether Tesla management knew or should have known about any pattern or practice of pervasive harassment at the Fremont factory is central to whether Tesla's subsequent action or inaction is probative evidence of Tesla's motive, intent, or knowledge. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 109-118 [me-too evidence]; *Johnson v. United Cerebral Palsy/Spastic Children's Foundation of Los Angeles and Ventura Counties* (2009) 173 Cal.App.4th 740, 763-767 [same].)

Tesla argues that this not a common issue because individuals have knowledge and because "Motive, intent or knowledge are concepts usually applied to an individual's state of mind." (Tesla Supp Brief filed 4/12/24 at 3:18-26.) It is well established that corporations act through their agents and that notice to a corporate agent can be notice to a corporation. (*Moore v. Phillips* (1959) 176 Cal.App.3d 702, 709.) For purposes of punitive damages, advance notice to a corporation is notice to "an officer, director, or managing agent." (Civil Code 3294(b).) A

corporation can have a motive or intent based on the motives or intent of the corporation's employees. "California corporations can form intent, be reckless and commit acts through their agents." (*Granite Construction Co. v. Superior Court* (1983) 149 Cal.App.3d 465, 472.) (See also *Cruz v. Homebase* (2000) 83 Cal.App.4th 160, 167 [corporate intent in context of punitive damages].)

The parties can present common evidence so the jury can determine, on a common basis, whether Tesla knew or should have known of the pattern or practice of pervasive race harassment at the factory. This evidence will likely focus on what was observed by or reported to Tesla's supervisors, leads, managers, and HR through informal and formal lines of communication.

The third common fact issue is, if Tesla knew or should have known that there was a pattern or practice of pervasive race harassment at the factory for a time period identified by the jury, did Tesla fail to take immediate and appropriate corrective action. (Govt Code 12940(j)(1).) Tesla's action or inaction after it was aware of a pattern or practice of pervasive harassment is probative evidence of Tesla's motive, intent, or knowledge. (*Panjota*, supra; *Johnson*, supra.)

Common evidence will likely focus on Tesla's response and reaction when it knew or should have known about a pattern or practice of pervasive race harassment at the Tesla factory. Tesla's formal written policies, informal written policies, common procedures for training managerial and non-managerial employees, graffiti remediation program, and "centralized internal tracking system" are common evidence. The declarations submitted by plaintiffs and by Tesla regarding Tesla's response to complaints appear to be a statistically significant number of declarations, but, as noted above, there is no assurance those declarations reflect a representative sample.

PARTICULAR ISSUE CERTIFICATION – PREDOMINANCE - ARBITRATION AGREEMENTS

The court finds common issues of fact will NOT predominate on the issue of whether any member of the class must arbitrate some or all of their claims. Tesla may raise issues regarding arbitration when Tesla workers file civil actions.

Tesla has stated: "Tesla would agree that the filing of this action tolled the time for individuals to file any non-arbitrable administrative charges with DFEH and to file complaints with the court." (Tesla Supp Brief filed 2/29/24 at 9:15-17.) Tesla then states that it does not agree that claims that are subject to arbitration are within the scope of such tolling. (Tesla Supp Brief filed 2/29/24 at 9:17-21.)

The court expressly does not address or decide whether this formerly putative and now certified class action has the effect of tolling the statute of limitations for any claims that Tesla workers seek or are compelled to pursue in arbitration. The statute of limitations is an affirmative defense that Tesla would need to assert in any arbitration; if Tesla asserts that affirmative defense, then the Tesla worker could assert tolling, and the arbitrator would need to resolve that issue. The court should not, and will not, decide substantive issues at class certification, including substantive issues that must be presented to an arbitrator. (*Linder,* 23 Cal.4th at 437-444.)


PARTICULAR ISSUE CERTIFICATION – PREDOMINANCE - STATUS AS EMPLOYEE OF TESLA

The court finds common issues of fact might predominate on the issue of whether any individual class member was an "employee" of Tesla under the FEHA, but the court will not certify this issue for class treatment for the reasons set forth below.

The law is that the FEHA makes it unlawful for an employer to harass or retaliate against an employee, but that to be entitled to relief for allegations of harassment and retaliation, a

FEHA claimant must first demonstrate an employment relationship with his or her alleged

employer. (*Jimenez v. U.S. Cont'l Mktg.* (2019) 41 Cal.App.5th 189, 196.) The relationship need

not be direct, and a worker can prove an employment relationship through proof of the

employer's exercise of direction and control over the employee. (*Jiminez*, 41 Cal.App.5th at 197.)

The evidence is that the members of the putative class were formally employed by many

different staffing agencies while assigned to work at Tesla, and worked in many different

locations in the Fremont factory under various supervisors and managers. The evidence

indicates that after every staffing agency assigned a worker to work at the Tesla factory, Tesla

consistently exercised direction and control over the worker.

Tesla appears to acknowledge that class certification would be appropriate on this issue

but does not concede the issue on the merits. That noted, this issue is unrelated to the central

common fact issues of whether there was pervasive harassment, whether Tesla knew of that

harassment, and whether Tesla had a practice of failing to address that harassment. Furthermore,

it appears that presentation of the relevant evidence on this issue in any individual trial would

likely be brief (perhaps no more than 15-30 minutes) and could be tailored to whether Tesla

exercised direction and control over the specific worker who was asserting the claim. The court

will not certify this issue for class treatment in the interest of having a manageable trial on

common particular issues.


TYPICALITY - PARTICULAR ISSUE CERTIFICATION

"The typicality requirement's purpose " 'is to assure that the interest of the named

representative aligns with the interests of the class. … Typicality refers to the nature of the claim

or defense of the class representative, and not to the specific facts from which it arose or the

relief sought. … The test of typicality is whether other members have the same or similar injury,

whether the action is based on conduct which is not unique to the named plaintiffs, and whether

other class members have been injured by the same course of conduct. … A class representative

who does not have a claim against the defendants cannot satisfy the typicality requirement's "
(*Martinez v. Joe's Crab Shack Holdings* (2014) 231 Cal.App.4th 362, 375.) (See also *Medrazo
v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 99; *Daniels v. Centennial Group, Inc.*
(1993) 16 Cal. App. 4th 467, 473.)

Plaintiff Marcus Vaughn is typical of the members of the class for purposes of seeking
retrospective relief. Vaughn worked at the Tesla Fremont factory from April 23, 2017, through
October 31, 2017. During that time, Vaughn worked entirely through the staffing agency
Balance Staffing. Vaughn alleged he observed race harassment and graffiti, complained in
writing to HR, was not interviewed by HR, and is not aware if Tesla ever investigated his
complaint. (Vaughn Dec.)

Plaintiff Monica Chatman is typical of the members of the class for purposes of seeking
retrospective relief. Chatman worked at the Tesla Fremont factory from November 16, 2016,
through September 11, 2019. Chatman initially worked through the staffing agency West Valley
Staffing and became a direct Tesla employee on August 2, 2017. Chatman alleges she observed
race harassment and graffiti, complained to HR in 2018, and is not aware if Tesla ever
investigated her complaint. (Chatman Dec.)

Plaintiff Titus McCaleb is typical of the members of the class for purposes of seeking
retrospective relief. McCaleb worked at the Tesla Fremont factory from October 2016 through
June 2017. McCaleb worked through the staffing agency West Valley Staffing. McCaleb
alleged he observed race harassment, complained to his leads and supervisors, and they took no
action to stop harassment. McCaleb stated he saw racial graffiti on the bathroom walls and
written on employee announcements and elsewhere in the factory, and stated that Tesla did not
appear to be removing or addressing it in any meaningful way. (McCaleb Dec.)

Plaintiff Evie Hall has dismissed her claims.

///

///

ADEQUACY- PARTICULAR ISSUE CERTIFICATION

The responsibilities of a class representative fall into three categories: (1) to have no interests adverse to the class; (2) to protect the interests of the class, and (3) to select and monitor competent class counsel. (*J. P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 212 [no adverse interests]; *McGhee v. Bank of America* (1976) 60 Cal.App.3d 442, 450 ["whether the plaintiff's attorney is qualified to conduct the proposed litigation"]; *Sharp v. Next Entertainment, Inc.* (2008) 163 Cal.App.4th 410, 432 ["vigorously and tenaciously protecting the class members' interests"].)  (See also *Wershba v. Apple Computer* (2001) 91 Cal. App. 4th 224, 238.)

The court finds that Marcus Vaughn, Monica Chatman, and Titus McCaleb have no interests adverse to the class.  Tesla does not dispute this point.  The court finds that Marcus Vaughn, Monica Chatman, and Titus McCaleb are adequately motivated to protect the interests of the class and to prosecute the claims of the class both for retrospective relief in the form of damages and in the form of prospective injunctive relief.  The court finds that Marcus Vaughn, Monica Chatman, and Titus McCaleb have retained competent counsel.

The court finds that class counsel does not have a conflict with the members of the class regarding whether claims are resolved in court or in arbitration because the class specifically excludes claims that are subject to an arbitration agreement.  This is also not an issue in this case because the members of the class who decide to prosecute individual claims against Tesla may choose class counsel or any other counsel to represent them in the individual cases.

DETERRING WRONGDOING AND ALTERNATIVE PROCEDURES - PARTICULAR ISSUE CERTIFICATION

The trial courts have "the obligation to consider "the role of the class action in deterring and redressing wrongdoing." (*Linder*, 23 Cal.4th at 445-446.) "The problems which arise in the management of a class action involving numerous small claims do not justify a judicial policy

that would permit the defendant to retain the benefits of its wrongful conduct and to continue that conduct with impunity." (*Linder,* 23 Cal.4th at 446.) "[T]ermination of a defendant's alleged wrongdoing is a factor to be considered." (*Blue Chip*, 18 Cal.3d at 386.)

On the facts of this case, there are significant incentives for individual persons to file civil actions to recover damages suffered from the alleged harassment. Looking at the law, the FEHA states that a prevailing plaintiff can recover damages, plus attorneys' fees and costs. (Govt Code 12965(c)(6).) The fee shifting provision in the FEHA is designed to encourage the filing of meritorious civil actions. (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 114.) During oral argument, counsel for the putative class stated to the court that if the court were to deny class certification, then counsel expected to file a significant number of individual cases alleging harassment based on the facts that are presented in the putative class action. This suggests that class counsel believes there is sufficient incentive for individuals to file meritorious individual cases.

As part of evaluating whether it was superior to manage the claims as a class or as individual actions, the court asked Tesla to state on the record whether it agrees that the filing of this putative class action tolled the time for the members of the putative class to file administrative charges with the DFEH and to file complaints with the court. (*Morris v. AGFA* (2006) 144 Cal.App.4th 1452, 1464 [trial court asked if defendants would assert the statute of limitations as a defense in Texas before finding that Texas was a "suitable alternative forum" for the claims].) Telsa stated that it agrees that the filing of this class action tolled the statute of limitations for Tesla workers to file administrative claims with the DFEH and to file lawsuits in court. (Tesla supp brief filed 2/29/24 at 9:14-10:2.) This is a part of the superiority analysis because it ensures that Tesla workers have an adequate remedy. Tesla workers who delayed filing individual cases because they thought that their claims would be resolved in this class action are not prejudiced by their decisions to defer filing individual cases. (*Bernuy v. Bridge Property Management Co.* (2023) 89 Cal.App.5th 1174, 1187-1192 [tolling factors]; *Hildebrandt*

*v. Staples the Office Superstore, LLC* (2020) 58 Cal.App.5th 128 [tolling factors].)   The tolling will end ten days after notice is given to the class of the limited issues class certification.  (*In re Honda Am. Motor Co. Dealership Rels. Litig.* (D. Md. 1997) 979 F. Supp. 365, 371 ["I am ruling that the tolling period ceases only after I have rendered my decision to certify the class solely as to liability issues and *not* to certify it as to damages issues"].)

This class action is not the only civil case in which a plaintiff is alleging there is harassment at the Tesla Fremont factory and seeking damages.  The court can deny class certification if a class action would be duplicative of another case that is pursuing the same relief.  (*Caro v. Procter & Gamble Co.* (1993) 18 Cal. App. 4th 644, 660 [class certification denied in part because defendant had already entered into consent decrees with public law enforcement entities].)  The CRD has filed and is pursuing a parallel law enforcement action. The EEOC has filed a similar action.

It is unclear as of the date of this order whether the CRD will be able to pursue the same relief that is the subject of the particular issues class.  Tesla is asserting that the CRD case must be dismissed entirely, or narrowed significantly, because the CRD failed to comply with the CRD's pre-filing responsibilities.  The CRD's claims are also subject to a different statute of limitations.  Given the current uncertainty about whether the CRD case will proceed on the merits, the court cannot find that the putative class action is redundant of the CRD's law enforcement action.  The EEOC case was not filed until September 28, 2023, so the court cannot find that the putative class action is redundant of the EEOC's relatively new law enforcement action.

MANAGEABILITY/TRIAL PLAN FOR CLASS TRIAL - PARTICULAR ISSUE CERTIFICATION

The trial court is ultimately required to manage any class trial so that the trial provides due process to both the absent class members and to the defendant.  (*Kight v. CashCall* (2014)

231 CalApp.4th 112, 127.)  When a plaintiff files a motion for class certification, then "It is not sufficient … simply to mention a procedural tool; the party seeking class certification must explain how the procedure will effectively manage the issues in question." (*Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1432-1433.)

The court is confident that the court and the parties can manage a trial where the jury will make findings on the common particular fact issues. The court has defined the fact issues that the jury will decide.  The common evidence is Tesla's formal written policies, informal written policies, common procedures for training managerial and non-managerial employees, graffiti remediation program, and "centralized internal tracking system."  In addition, plaintiffs and Tesla may present (1) the testimony of a *Duran* compliant sample of workers, supervisors, leads, and managers about the existence of the alleged pattern or practice of race harassment; (2) the testimony of workers, supervisors, leads, managers, and Human Resources personnel about whether Tesla knew of the alleged harassment; and (3) the testimony of workers, supervisors, leads, managers, and Human Resources personnel about whether Tesla took immediate and appropriate action.

The court must address the issue that the findings on the common particular fact issues may be different for different time frames.  The approximately 500 declarations in support of and in opposition to this motion suggest that over a period of approximately eight years Tesla workers in the Fremont factory heard the n-word and otherwise experienced conditions that might reasonably be characterized as race harassment.  It is unclear whether Tesla was aware at all times or became aware of the alleged pervasive race harassment at a certain time; whether Tesla changed the number of HR personnel responsible for responding to complaints of race harassment at a certain time; whether Tesla changed how seriously it took complaints of race harassment at a certain time; etc.

There are two different ways the court can permit the jury to make findings on the common particular fact issues for different time frames.  First, the court could now, or closer to

1  trial, order the creation of subclasses for the purpose of permitting the jury to make factual

2  findings about particular time frames. (CRC 3.764(a)((3) [court may amend or modify an order

3  certifying a class].) (See also *Vasquez v. Superior Court* (1971 4 Cal.3d 800, 821; *Lazar v. Hertz*

4  (1983) 143 Cal.App.3d 128, 144.) Second, the court could at trial provide the jury with a

5  special verdict form and require the jury to make fact findings on the time frames when Tesla did

6  (or did not) have pervasive race harassment at the factory, was (or was not) aware of any such

7  harassment, and did (or did not) take immediate and appropriate action.

8  The court is currently inclined to provide the jury with a special verdict form. "[A]

9  special verdict is that by which the jury find the facts only, leaving the judgment to the Court."

10  (CCP 624.) (See also *Rodriguez v. Parivar, Inc.* (2022) 83 Cal.App.5th 739, 750-751 [discussing

11  special verdict forms].) As applied in this case, the jury will be required to consider the evidence

12  and to make findings of fact that include whether there was a pattern or practice of pervasive

13  race harassment at the Tesla factory, and if so, defining the relevant time periods when the

14  pattern or practice of pervasive race harassment occurred. The jury will then need to determine

15  whether Tesla knew, or should have known of the harassment, and if it did, whether Tesla took

16  immediate and appropriate corrective action during the time periods identified by the jury.

17  Plaintiffs may argue that the allegedly unlawful pattern and practice was consistent

18  throughout the class period. (TR on 4/15/24 at 28-34.) Plaintiff's April 12, 2024 brief at p 10

19  argued that there is no evidence that Tesla's policies changed, but then states: "In principle,

20  Plaintiffs would not object if the Court later determined in response to a compelling evidentiary

21  showing that there is a need for subclasses based on particular time periods (or that the jury

22  should have the option for time-period differentiation on the verdict form." Similarly, Tesla may

23  argue that it followed its written polices at all times and there was no unlawful pattern and

24  practice at any time during the class period. Tesla's April 12, 2024 brief at p 8 argued that the

25  court "must break the class into periods of time of no more than 1 year" because "Tesla's

26

1  policies and systems, the individuals who worked there, arbitration and staffing agency

2  agreements, and everything else continuously changed."

3       The jury should have the ability to find that the allegedly unlawful pattern and practice

4  existed for some, but not all, portions of the class period.  Furthermore, as a matter of due

5  process, Tesla should have the opportunity to minimize the effect of a potential adverse

6  judgment by arguing that any alleged unlawful action or inaction was confined to a limited time

7  frame.  (*Duran v. U.S. Bank National Assn* (2014) 59 Cal.4th 1, 37-38 [defendant must be

8  permitted to make showing to reduce overall damages].)

9       As explained above, the court is currently inclined to find that the superior approach is to

10  leave the issue of defining the time periods to the jury.  The parties suggested periods of one or

11  two years. (Stip filed 4/22/24.)  The court finds that time periods of January through December

12  are arbitrary regarding the start and end dates.  As part of the motion for class certification, the

13  court on April 15, 2024, asked the parties to meet and confer on what time periods and/or

14  intervals should be submitted to the jury to make its findings.   Plaintiffs stated, "that the jury

15  will be best positioned to identify the time periods" whereas Tesla stated, "Tesla believes it

16  needs to be addressed on a year-by-year basis."   (Filing on 4/22/24.)  Currently, the parties have

17  been unable to agree to relevant time periods for the jury to consider.

18       The court is wary about independently setting the relevant time frames because the

19  setting of the time frames is intertwined with factual findings about what Tesla knew, when it

20  knew it, and when, if ever, Tesla changed how it addressed reports of race harassment.  (*Linder*,

21  23 Cal.4th at 437-444 [court should not decide merits at class certification].)[14]

22

23       [14] The record at class certification suggests dates such as (1) the date in 2017 when Tesla
24  implemented its graffiti program; (2) the date in 2017 when Tesla implemented its "centralized
    internal tracking system"; (3) the May 31, 2017, date that Elon Musk, Tesla's CEO, distributed
25  an email reminding employees of the "no a* policy"; (4) the date on February 2020 when Tesla
    distributed the anti-handbook handbook; (5) any date or dates that Tesla hired additional
26  members of Human Resources to investigate complaints of harassment or, conversely, decided to
    not expand the investigative capacity of Human Resources; etc.

The court acknowledges that with a special verdict there is "the possibility of a defective or incomplete special verdict, or possibly no verdict at all." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285.)   The court is persuaded that the jury can determine the relevant dates and time periods, if any, that are appropriate for answering the questions in the verdict form; juries regularly make discrete factual findings in special verdict forms and the court has no reason to think that the jury will be unable to do so here.

Further, the special verdict in the class trial on the common particular fact issues is not intended to result in a judgement in the sense of a "final determination of the rights of the parties in an action." (Civil Code 577.)  Rather, the special verdict is intended to result in factual findings on common issues that can be used as evidence in subsequent cases.  In *Sarun,* 41 Cal.App.5th at 1136-1137, the court referred to the anticipated judgement on common fact issues as a "declaratory judgement" while anticipating subsequent individual claims to resolve the individual issues.

MANAGEABILITY/TRIAL PLAN FOR ANTICIPATED INDIVIDUAL CASES - PARTICULAR ISSUE CERTIFICATION

The class judgment on the common particular issues is only the beginning of the process of managing the potential claims that are implicit in the over 500 declarations describing what is alleged to be race harassment at Tesla's Fremont factory.  The trial on common particular fact issues will not result in a money judgment in favor of any member of the class.  The members of the class will need to file separate individual lawsuits against Tesla if they want to pursue claims for race harassment.

The court intends to manage the separate lawsuits in the manner of related cases (CRC 3.300) or a coordinated proceeding (CCP 404 et seq; CRC 3.501 et seq.).  Specifically, the following aspects of case management will permit the court to manage the claims efficiently with benefits for both the parties and the court:

1. The statutes of limitation for pre-filing charges and for filing lawsuits were tolled as of November 13, 2016, for all the claims not subject to arbitration. Defendant has agreed that this is the law. (TR from 3/1/24 at 95:11-22)

2. The cases will proceed in a single department to limit the possibility of inconsistent orders. (Tesla Supp Brief 4/12/24 at 1:4-12; Pltf Supp Brief 4/12/24 at 4:6-17.)

3. The court can order the use of standardized discovery.

4. The court's orders on common issues in the related cases will serve as guidance to all the related cases in the manner of orders in a coordinated proceeding. (Tesla Supp Brief 4/12/24 at 1:4-12; Pltf Supp Brief 4/12/24 at 4:6-17.)

5. There can be a common repository for all discovery so that all parties have access to the discovery that was produced in each of the cases. (*Raymond Handling Concepts Corp. v. Superior Court* (1995) 39 Cal.App.4th 584, 589.)

6. When it is time for trial, the court can order that members of the class have individual trials or may group the plaintiffs as might be appropriate for trial. (CCP 1048.)

At trial, each Tesla worker who is seeking damages must prove that they personally experienced severe or pervasive conduct. (CACI 2521A; *Caldera v. Department of Corrections and Rehabilitation* (2018) 25 Cal.App.5th 31, 38.) (See also *Howard*, 989 F.3d at 600-605.) If plaintiffs prove in the class trial that during the relevant time period there was a pattern or practice of race harassment, that Tesla know of the harassment, and that Tesla failed to take appropriate action, then an individual Tesla worker must still prove that they personally experienced harassment. Stated otherwise, Tesla may present and argue that although there was a finding of the pattern or practice in the Fremont factory generally, that this particular individual plaintiff did not suffer harassment. Conversely, if Tesla proves in the class trial that there was no pattern or practice of race harassment or that Tesla took appropriate action, then an individual

Tesla worker could still prove that they personally experienced harassment. (See also TR on 4/15/24 at 36:14-37:11 [comments of court] and 46:16-25 [comments of Tesla].) The result of the trial on common particular fact issues would be a finding of fact or facts that would have the same effect as a declaratory judgment. (*Sarun v. Dignity Health* (2019) 41 Cal.App.5[th] 1119, 1136-1137 [referring to result of particular issue certification as a "declaratory judgment"].)

In any lawsuit by an individual Tesla worker who is a member of the class seeking damages, the judgment from the trial on the common particular fact issues could be offered as evidence of Tesla's motive, intent, or knowledge (Evid Code 1101(b) but could not be offered as evidence of Tesla's character (Evid Code 1101(a)). (*Panjota v. Anton* (2011) 198 Cal.App.4[th] 87, 109-122.) Members of the class and/or Tesla could present the judgment on the common facts to the jury as evidence in the same manner that parties can use a stipulation about facts. (CACI 106 ["the attorneys for both sides can agree that certain facts are true. This agreement is called a "stipulation." No other proof is needed and you must accept those facts as true in this trial."].)

The court in this class certification order does not decide what evidence trial judges should admit or exclude in the anticipated individual cases. The court does grant certification for the common particular fact issues with the expectation that resolution of those fact issues on a common basis will permit trial judges to manage the trials more efficiently because a jury will have already decided certain common fact issues.

## CLASS CERTIFICATION FOR INJUNCTIVE RELIEF

NUMEROSITY – CLASS FOR INJUNCTIVE RELIEF

The number of people who currently work at the Fremont factory and have self-identified as Black/African-American can be reasonably estimated at over 500 workers. Tesla Senior HR Partner Hart stated that in her declaration that "By 2022, Tesla employed more than 22,000

workers at the Fremont factory. ... , 11 % identify as Black or African American." (Hart Dec filed 10/16/23 at para 3, 6)  Assuming an unrealistic zero turnover and an average of 14,000 workers, there were approximately 1,540 Tesla workers between 2016 and 2022 who identified as Black or African American.  This is numerous.

ASCERTAINABILITY– CLASS FOR INJUNCTIVE RELIEF

Plaintiff seeks to certify a plaintiff class defined as: "Black/African-Americans who were employed on the production floor at the Tesla factory in Fremont at any time from November 9, 2016 to the final disposition of this action, who were not subject to an arbitration agreement for all relief sought for the entire period of their employment at Tesla." (Moving at 2:5-7.)

Plaintiffs' proposed class definition has no fixed end date.  For purposes of an injunctive relief only class, there is no need for a temporal scope because the class is seeking only prospective relief. (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 684-685 [injunctive relief class defined without temporal scope].)

The definition of the proposed class is less significant for purposes of the proposed injunctive relief class, because any injunction would have a common effect on all persons.  The court orders that the class for injunctive relief is defined as: "All persons who self-identify as Black/African-American, who were employed on the production floor at the Tesla factory in Fremont at any time from November 9, 2016 through entry of judgment in this action, who were not subject to an arbitration agreement for all relief sought for the entire period of their employment at Tesla."

PREDOMINANCE – CLASS FOR INJUNCTIVE RELIEF

The court finds common issues of fact will predominate on a claim for injunctive relief.  The court can certify a class for the limited purpose of seeking injunctive relief. (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676.)

Common evidence will likely include much of the same evidence relevant to whether there was a pattern or practice of pervasive race harassment at the Tesla factory, but the evidence will be focused on Tesla's action or inaction in the recent past because the claim for injunctive relief will concern whether the court should award prospective relief.

TYPICALITY – CLASS FOR INJUNCTIVE RELIEF

None of the named plaintiffs have worked at Tesla since Chatman stopped working on September 11, 2019. This raises the issue of whether the named plaintiffs are typical of the members of the class for purposes of seeking injunctive relief.

The law is clear that "Where a petitioner seeks declaratory or injunctive relief, it is insufficient that he has been injured in the past; "he must instead show a very significant possibility of future harm in order to have standing." (*Coral Construction, Inc. v. City and County of San Francisco* (2004) 116 Cal.App.4th 6, 17.) The law is also clear that if a class representative lacks standing to seek injunctive relief, then the class representative is not typical of the members of the class who are able to seek injunctive relief for purposes of seeking injunctive relief. (*Estrada v. FedEx Ground Package Sys., Inc.* (2007) 154 Cal.App.4th 1, 17 [plaintiff "lacked standing to pursue his claims for prospective equitable relief" because, inter alia, "his relationship with FedEx ended before this lawsuit"]; *Price v. Starbucks Corp.* (2011) 192 Cal.App.4th 1136, 1142 fn. 5 [similar].) The trial court must follow this case law. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) The court finds that none of the named plaintiffs has individual standing to seek injunctive relief, and therefore, the named plaintiffs are not typical of the members of the class for purposes of seeking injunctive relief.

The court set out its concerns with this result in the tentative decision filed on February 27, 2024 at pp 42-44. (*City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 55-56 [trial court may set out its concerns].) While plaintiffs make a reasonable

argument that it is peculiar to require workers to remain at a job where they are subject to harassment so that they have standing to stop the alleged harassment, current employment is nevertheless necessary to have standing to seek injunctive relief.  (Plaintiff filing on 3/15/24 at 10-12.)

Plaintiffs may file a motion to amend the complaint to add a plaintiff(s) who is a current Tesla employee, and a motion to establish that the new plaintiff(s) is an adequate and typical class representative(s) to seek injunctive relief.  (*Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1308; *Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 99.)  Plaintiffs may file those motions concurrently so that the issue of whether any new plaintiff(s) is an adequate class representative for purposes of seeking injunctive relief is decided promptly.  Plaintiffs must make any proposed new class representative available for deposition immediately after filing a motion to establish that the new plaintiff(s) is an adequate and typical class representative(s).  Plaintiffs may file those motions at any time but not later than 30 days from the date of this order.

ADEQUACY– CLASS FOR INJUNCTIVE RELIEF

The court does not address whether Marcus Vaughn, Monica Chatman, and Titus McCaleb are adequate class representatives for seeking injunctive relief.  As noted, they are not typical of the class for purposes of seeking injunctive relief. Plaintiffs must amend the complaint to add plaintiffs who might be typical and adequate.

DETERRING WRONGDOING AND ALTERNATIVE PROCEDURES – CLASS FOR INJUNCTIVE RELIEF

There are several procedural vehicles to obtain an injunction to address the alleged pattern or practice of race harassment.

Lawsuits by individual current Tesla workers are potential vehicles for injunctive relief. Any individual plaintiff currently employed at Tesla could seek a public injunction. (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 227-232)  That would, however result in the possibility of inconsistent injunctions in individual cases.

This class action is also a potential vehicle for injunctive relief.  A class action for injunctive relief is superior to individual lawsuits because class counsel have a fiduciary duty to the entire class and not just to their individual clients. (*Allen v. Int'l Truck & Engine Corp.* (7th Cir. 2004) 358 F.3d 469, 471.)  Addressing the benefits of a class action for injunctive relief, the court in *Capitol People First,* 155 Cal.App.4th at 702 states: "without class treatment there could be multiple actions that would burden the litigants and the courts with cumulative and excessive expenses, discovery efforts and evidence."

The CRD's law enforcement action is another a potential vehicle for injunctive relief. (See Court order dated 4/8/24 at Issue #10.)  "[I]n the area of employment discrimination, the Legislature has allowed both for affected employees to enforce the law …, and for an administrative agency—the Department of Fair Employment and Housing—to do so as well. That structure promotes robust enforcement."  (*DFEH v. Cisco Systems, Inc.* (2022) 82 Cal.App.5th 93, 100.)  (See also (See Gov. Code 12920.5, 12965.)  The CRD can "independently seek non-monetary preventative remedies" to address a failure "to take all reasonable steps necessary to prevent discrimination and harassment from occurring" "whether or not the Department prevails on an underlying claim of discrimination, harassment, or retaliation." (2 CCR 11023(a)(3); Govt Code 12940(k).)

The CRD's action is broader than the class action in that it seeks recovery for Tesla workers throughout California (not just the Fremont factory) and is not limited by individual workers' arbitration agreements.  The CRD's action is also narrower than the class action in that the CRD's case is limited to recovery for workers after June 18, 2018.  (CRD brief filed 4/12/24 at 5-6.)  As discussed previously in this order, the CRD case might never reach the merits due to

Tesla's affirmative defense that the CRD failed in whole or in part to comply with its pre-filing requirements. Tesla asserts "This inevitably will result in substantial evisceration if not elimination of the CRD's action before any injunctive relief trial." (Tesla brief filed 4/12/24 at 9.)[15]

The EEOC's law enforcement action is yet another potential vehicle for injunctive relief. (See Court order dated 4/8/24 at Issue #12.) The EEOC has the ability to assert claims on behalf of individuals under section 706 of the Civil Rights Act of 1964, which permits the EEOC to file actions on behalf of persons claiming to be aggrieved (42 U.S.C. 2000e-5(b)) and section 707 of the Civil Rights Act of 1964, which permits the EEOC to file law enforcement actions (42 U.S.C. 2000e-6(a)). There are, however, "possible differences between the public and private interests involved." (*EEOC v. General Tel. Co. of Northwest, Inc.* (9th Cir. 1979) 599 F.2d 322, 333.) The EEOC case was filed on September 28, 2023, and appears to still be in the pleading stage.

The court finds that at this point in time, this class action is the superior procedural vehicle for seeking injunctive relief related to the alleged race harassment at the Fremont factory.

MANAGEABILITY/TRIAL PLAN– CLASS FOR INJUNCTIVE RELIEF

The court is confident that the court and the parties can manage a trial on injunctive relief. Common evidence will likely include much of the same evidence relevant to whether there was a pattern or practice of pervasive race harassment at the Tesla factory, but the evidence will be focused on alleged harassment in recent years, and Tesla's recent and current action, or

---

[15] This is not a situation where a law enforcement action has already proceeded to conclusion and a class action for injunctive relief would be duplicative. (Compare *Caro v. Procter & Gamble Co.* (1993) 18 Cal. App. 4th 644, 660 [class certification denied in part because defendant had already entered in to consent decrees with public law enforcement entities].)

inaction, in taking immediate and appropriate corrective action when informed of race harassment.

CONCLUSION AND FURTHER PROCEEDINGS

The motion of plaintiffs for class certification is GRANTED IN PART.

The court ORDERS that the motion for class certification regarding common particular fact issues is GRANTED. (CRC 3.765(b); *Sarun*, supra.) The common particular fact issues are identified above. The class will be defined as the persons on the list (to be developed by the parties) who worked at the Tesla Fremont factory from November 9, 2016, through the date of this order and have self-identified as Black/African-American. Following the class trial on the common particular fact issues, the members of the class may prosecute their individual claims for damages, and they and Tesla may offer the judgment on the common particular fact issues from the class trial as evidence in the individual trials.

The court ORDERS that the motion for class certification regarding injunctive relief is CONDITIONALLY GRANTED. The class for injunctive relief is dependent on plaintiffs adding a plaintiff or plaintiffs to the complaint and plaintiffs demonstrating that that the new plaintiff(s) meet the requirements of typicality and adequacy. The court does not require a complete re-briefing of a motion for class certification on a claim for injunctive relief. Plaintiffs may file those motions at any time, but not later than 30 days from the date of this order. Following the class trial, the court will order injunctive relief if appropriate.

The court further ORDERS that the parties meet and confer about class notice to the members of the common particular fact issues class, including the content of the class notice, the means of distribution, and the cost. (CRC 3.766.) The court is inclined to find that plaintiffs are required to provide class notice, and the opportunity to opt-out, to the persons who would be bound by the class findings on the common particular fact issues, because those findings may affect their individual claims for damages. The court ORDERS that the class notice on the

common particular fact issues must state that the tolling effect of the class action will end ten days after notice is given to the class pursuant to this order. (*In re Honda Am. Motor Co. Dealership Rels. Litig.* (D. Md. 1997) 979 F. Supp. 365, 371 and fn5.) The court ORDERS that the class notice on the common particular fact issues must clearly inform the members of the class that they will need to file separate lawsuits if they want to pursue a claim against Tesla for damages.

The court is inclined to find that class notice is appropriate, even if not required, to the members of the injunctive relief class. Class notice is appropriate because the class trial on injunctive relief might affect those persons. Class notice is not required because any injunctive relief would by definition apply to Tesla and all Tesla workers. (*Capitol People First,* 155 Cal.App.4th at 700 [observing "the trial court was particularly concerned with the reality that interveners could not opt out because the relief sought was systemwide injunctive relief which, if provided, everyone would have to live with"].)

If the parties are unable to stipulate on class notice for either or both classes, then the court ORDERS that plaintiffs may file a motion for approval of a plan of class notice and have it heard at the next regularly scheduled case management conference and hearing date. The court will be inclined to grant any reasonable request to shorten time so that the notice can be distributed to the members of the class promptly.

Regarding case management, the court sets the class trial on the common particular fact issues and injunctive relief for October 14, 2024. The court will, by separate order in the CRD law enforcement case, continue the trial in that case now set for that date. The court has determined that although it is permissible to consolidate a private class action lawsuit with a

public law enforcement lawsuit[16], for the reasons addressed in this order the court does not do so in this instance. [17]

EVIDENCE

The Court has considered all the declarations submitted, as well as the attached exhibits. The Court's consideration of the evidence is limited to the motion for certification and should not be construed as an indication of admissibility in future motions or at trial.

Dated: May 17, 2024

Noël Wise
Judge of the Superior Court

---

[16] (*Serrano v. Cintas Corp.* (6th Cir., 2012) 699 F.3d 884, 890 fn 1 [EEOC intervened in class action]; *E.E.O.C. v. Von Maur, Inc.* (S.D. Iowa, 2006) 237 F.R.D. 195 [EEOC and private plaintiff cases consolidated for pre-trial purposes]; *Estate of Ward v. Von Maur, Inc.* (S.D. Iowa, 2008) 2008 WL 11336227 [EEOC and private plaintiff cases consolidated for trial].)

[17] The class plaintiffs, the CRD, and Tesla have each argued in various contexts that private parties and public law enforcement have different interests, that the results in one case might not have claim or issue preclusion in the other case, and that a consolidated trial would be hampered by uncertainty about whether the communications between the lawyers for the class and for the CRD are joint communications for a common interest (*Meza v. H. Muehlstein & Co.* (2009)176 Cal. App. 4th 969, 981-983; *OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 887-891).

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>05/17/2024<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _Nicole Hall_ Deputy<br>N. Hall |
| PLAINTIFF/PETITIONER:<br>Marcus Vaughn  et al | |
| DEFENDANT/RESPONDENT:<br>Tesla, Inc. et al | |
| **CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER:<br>RG17882082 |

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the Order Granting in Part Motion of Plaintiffs for Class Certification entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.


Bryan Schwartz
BRYAN SCHWARTZ LAW
bryan@bryanschwartzlaw.com

Cimone Nunley
California Civil Rights Law Group
cimone@civilrightsca.com


Jane Beasley Mackie
Bryan Schwartz Law, P.C.
jane@bryanschwartzlaw.com

Jasjit Mundh
NICHOLS KASTER, LLP
jmundh@nka.com


Jennifer Abby Reisch
Bryan Schwartz Law, P.C.
jennifer@bryanschwartzlaw.com

Lawrence A. Organ
California Civil Rights Law Group
larry@civilrightsca.com


Marqui Jennifer Hood
California Civil Rights Law Group
marqui@civilrightsca.com

Matthew C. Helland
NICHOLS KASTER, LLP
helland@nka.com


Victoria Rose Ellis
victoria.ellis@calcivilrights.ca.gov
Chad Finke, Executive Officer / Clerk of the Court


Dated: 05/17/2024                    By:

_Nicole Hall_

N. Hall, Deputy Clerk

| SHORT TITLE: Vaughn  VS Tesla, Inc. | CASE NUMBER: RG17882082 |
|---|---|

Raymond A Cardozo
Reed Smith LLP
rcardozo@reedsmith.com

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>05/17/2024<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _Nicole Hall_ Deputy<br>N. Hall |
| PLAINTIFF/PETITIONER:<br>Marcus Vaughn et al | |
| DEFENDANT/RESPONDENT:<br>Tesla, Inc. et al | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>RG17882082 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Alexander L. Conti
Conti Law
23 Corporate Plaza Drive
Suite 150
Newport Beach, CA 92660-

Michael A Gregg
Littler Mendelson, P. C.
18565 Jamboree Road, Suite 800
Irvine, CA 92612-

Michael S. Kun
Epstein Becker & Green, P.C.
1925 Century Park East
Suite 500
Los Angeles, CA 90067-2506

Chad Finke, Executive Officer / Clerk of the Court

Dated: 05/17/2024                    By:

_Nicole Hall_

N. Hall, Deputy Clerk

**CERTIFICATE OF MAILING**

No. A-_____

# In the Supreme Court of the United States

George Jarvis Austin,

*Petitioner*

v.

Tesla, et. al.

*Respondent*

On Appeal from the United States Ninth Circuit **No. # 21 - 15151** & District Court
for the Northern District of California
No.3:20:00800
Hon. District Judge Chen

## APPLICATION FOR 60 DAY EXTENSION (approx. 3/13/23)

George Jarvis Austin, Self Represented

2107 Montauban Ct., Stockton, CA

209.915.6304,

gaustin07@berkeley.edu

*Petitioner in Supreme Court, Pro Se*



RECEIVED
NOV - 7 2022
OFFICE OF THE CLERK
SUPREME COURT, U.S.

## APPLICATION FOR EXTENSION OF TIME TO FILE PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT (SELF REPRESENTED)

To the Court, Chief Justice Roberts, and Justice Kagan (Ninth Circuit)

In accord with Supreme Court Rule 13 Mr. George Jarvis Austin, self represented Petitioner, applies with "good cause," for a 60 day extension to file Petition on Writ of Certiorari.  Final Judgment was entered on 10/13/22, after Motion for Reconsideration.  Previously Petition for Rehearing (En Banc) by Mr. Austin was denied on 9/29/22 with Writ apparently due approximately 1/13/23 (90 days after Judgment entered).  Mr. Austin is still recovering from severe injuries causing physical disability both in the workplace at Tesla, and a separate car accident creating strains on every part of life, study (Straight A's, and A+'s last nine semesters), healing process and employment (working more than full time while representing himself) creating need for more time (*as physical injury causing temporary disability is creating additional challenges, and constraints, with caseload responsibilities similar to that of a corporate law firm associate, but done Pro Se (self represented) without the structural supports of research departments,*

*information tech, paralegals, legal secretaries, nor a law degree, nor law*

*license, or corporate law expenditure accounts).*









3



## RULES COMMITTEE

### RESOLUTION
By
President pro Tempore of the Senate Darrell Steinberg
RELATIVE TO COMMENDING

# George Austin

WHEREAS, George Austin was selected from a highly competitive group of outstanding college and university graduates from California and throughout the nation, and was appointed a 2012-2013 California Senate Fellow; and

WHEREAS, George Austin, from Stockton, graduated from the University of California, Berkeley, with a Bachelor of Arts degree in Sociology; and

WHEREAS, Through his service in the Senate Committee on Governance and Finance, George Austin had the unique opportunity of acquiring a deeper understanding of the legislative process and public policy formation, while also providing assistance to Senate Members, legislative committees, and their constituencies; and

WHEREAS, The California Senate Fellows program, established in 1973 and sponsored jointly by the Senate and California State University, Sacramento, enables 18 individuals to become full-time Senate staff members in the State Capitol for 11 months and receive six units of university graduate credit; and

WHEREAS, As a result of his outstanding service as a Senate Fellow, George Austin is better equipped to provide valuable leadership and contributions to educational institutions; local, regional, state, and federal governments; and professional, business, and community endeavors in the State of California and the nation; now, therefore, be it

RESOLVED BY THE SENATE RULES COMMITTEE, That George Austin, a 2013-2013 California Senate Fellow, be commended for his exemplary service on behalf of the Members of the Senate, and extended best wishes for every success in his future endeavors.

Senate Rules Committee Resolution No. 24 adopted this 12th day of August, 2013

CHAIR
Senatoris Est Civitatis

Libertatem Tueri •

4



**Checkr**

Report completed on Apr 3, 2022 9:48 PM UTC

Consumer Report for
**George Jarvis Austin**

Requestor Company

Status
Clear

California Candidates/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.

Sólo para los Candidatos/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.



**Report Information**

Clear

First name
George

Middle name
Jarvis

Last name
Austin

Date of birth
XX/XX/XXXX

Phone number
(308) 915 8304

Zip code
95210

Email
gaustin07@berkeley.edu

Social Security Number
XXX-XX-





Mr. Austin seeks Cert., and 60 day extension, as the decision was in blatant disregard for a. the Supreme Court's *Kasten* FLSA anti-retaliation controlling standard (*adverse action within days of escalating Mr. Austin's good faith documented formal complaints, in an entry level role outside of his responsibility to monitor, to HR and higher level management for unpaid overtime wage correction in a publicly documented hostile, and retaliatory work environment, especially toward Black men*), as well as b. controlling Ninth Circuit precedent including *Landers* FLSA unpaid, or late, overtime standard (*multiple weeks of unpaid, or late, overtime documented and complained about*).  See Kasten v. Saint-Gobain Performance Plastics, 563 U.S. 1 (2011) See also Landers v. Quality Communications, Inc., 771 F.3d 638 (9th Cir. 2014) See also e.g. (publicly documented retaliatory, hostile work environment, particularly for Black men):

https://www.cnbc.com/2022/07/25/tesla-is-under-scrutiny-by-the-eeoc-10q-reveals.html; www.sec.gov /Archives/edgar/data/1318605/000095017022012936/tsla-20220630.htm (Tesla said in its second-quarter filing that the U.S. Equal Employment Opportunity Commission cause finding "closely parallels" complaints put forth in a lawsuit by California's civil rights agency, the Department of Fair Employment and Housing. Tesla's first U.S. vehicle assembly plant is based in Fremont, California....In February, that state agency revealed that it had engaged in a three-year investigation of Tesla, received hundreds of complaints from Black workers there and found evidence that the company routinely engaged in racist discrimination that harmed these workers....Among other things, the DFEH alleges that Tesla has kept Black workers in California in lower-level roles at the company even if they had the skills and experience for promotions or more senior roles; assigned Black workers more physically demanding, dangerous and dirty work in their facilities; and retaliated

against Black workers who complained formally about what they endured, including racist slurs used by managers in the workplace.)

https://teslamotorsclub.com/tmc/threads/diversity-harrassment-issues-at-tesla.102005/ (Black Workers Say Racism Is Rampant Inside Tesla. Now California Is Suing. - Horrific allegations of racism prompt California lawsuit against Tesla)

https://www.civilrightsca.com/protocol-tesla-discrimination-lawsuits/ (Ex-workers Say Tesla is Still Racist, ...100-plus sworn statements from a class-action lawsuit and public records obtained by Protocol.

https://www.google.com/amp/s/www.theverge.com/platform/amp/2021/8/5/22611725/tesla-paid -1-million-black-former-employee-racist-slur (Tesla reportedly paid $1 million to former employee who said supervisors called him a racist slur; Melvin Berry said the **company failed to act** when supervisors called him the N-word then retaliated - Berry is not the first worker to allege racism at Tesla's Fremont plant)

https://www.latimes.com/business/autos/la-fi-hy-tesla-racism-lawsuit-20171115-story.html (Marcus Vaughn ... alleges that supervisors and co-workers called him the N-word, but his **written complaint to human resources about it was not investigated**....standard operating procedure at the Tesla factory is pre-civil rights era race discrimination," the lawsuit says. "Race harassment has continued at the Tesla factory, and became more widespread, because despite their knowledge of the harassment, defendants have done nothing that could be reasonably expected to stop it."  Vaughn's legal action is the third lawsuit filed this year by [B]lack workers alleging that racial slurs were used against them and that the company ignored their complaints.)

https://www.google.com/amp/s/www.cbsnews.com/amp/news/tesla-million-melvin-berry-fremo nt-california-n-word-racial-discrimination/ (Former Tesla employee who said supervisors called him the N-word awarded $1 million ... complaint alleging he was called the N-word while working in the electric automaker's factory in California. Melvin Berry was hired by Tesla as a materials handler in 2015, but quit only 17 months later after being harassed on the job, ... KKK signs and swastikas The Berry case is one of three racial discrimination lawsuits filed by former employees against Tesla since 2017.  In a class-action lawsuit representing more than 100 employees ... Another Black employee said in court documents that he had been called the N-word about 100 times and saw KKK signs and swastikas spray-painted on bathroom stalls.  In a third lawsuit, two former Tesla employees, a Black father and son, Owen Diaz and Demetric Di-az, also said they were subject to "severe and pervasive racial harassment" while working at the Fremont factory...[and won]. *See e.g.* www.npr.org/2021/10/05/ 1043336212/tesla-racial-discrimination-lawsuit ; www.businessinsider.com/tesla-racial-abuse-lawsuit-payout-owen-diaz -2022-6?amp)

https://www.bloomberg.com/news/articles/2020-09-09/tesla-is-under-pressure-to-end-arbitrati on-for-racism-claims (Tesla has faced multiple allegations of racial discrimination and harassment at its factory in Fremont, California,"..In recent years, Tesla has faced high profile allegations of racial discrimination at its Fremont plant, where roughly 10,000 people work. In late 2017, a Black worker, Marcus Vaughn, filed a lawsuit saying the plant was a "hotbed of racist behavior."...In 2018, Owen Diaz and his son Demetric filed suit as well, alleging a pattern of racial harassment and hostility. Demetric dropped his suit voluntarily, but Owen's case is slated for trial before a U.S. district court judge in San Francisco in October. The company said in an emailed statement to Bloomberg at the time that it takes discrimination and harassment of all forms "extremely seriously" and has a dedicated team

focused on investigating and addressing workplace concerns. All three men were contract workers, so they never signed arbitration agreements.)

https://www.reuters.com/article/us-tesla-lawsuit-racism-idUSKBN1YZ18E (Tesla must have known about the harassment and "ratified" it, even if only lower level workers were directly involved.")

https://www.claimsjournal.com/news/national/2020/09/09/299249.htm (Since 2014, workers have filed 145 complaints with California's Department of Fair Employment and Housing alleging discrimination at Tesla on the basis of race, age, gender, disability, medical leave, pregnancy, sexual orientation, and national origin, according to a synopsis provided by the agency after a California Public Records Act request. This May, three separate people alleged they were forced to quit because of their race. .....)

https://capitalandmain.com/tesla-workers-file-charges-with-national-labor-board-as-battle-with-elon-musk-intensifies-0419 (Tesla Workers File Charges With National Labor Board as Battle With Elon Musk Intensifies...Workers at Tesla's Fremont, California electric car factory have filed a complaint with the National Labor Relations Board, accusing Elon Musk's company of illegal surveillance, coercion, intimidation and prevention of worker communications..... Workers at Tesla's Fremont, California electric car factory have filed a unfair labor practice charge with the National Labor Relations Board (NLRB), accusing the company of illegal surveillance, coercion, intimidation and prevention of worker communications.)

https://www.google.com/amp/s/www.nytimes.com/2018/11/30/business/tesla-factory-racism.amp.html (Owen Diaz, right, and his son, Demetric, said they had heard racial slurs directed toward them while working at the Tesla factory in Fremont, Calif. Owen Diaz, right, and his son, Demetric, said they had heard racial slurs directed toward them while working at the Tesla factory in Fremont, Calif.Credit...Ryan Christopher Jones for The New York Times Menial Tasks, Slurs and Swastikas: Many Black Workers at Tesla Say They Faced Racism African-American workers have reported threats, humiliation and barriers to promotion at the plant. .... Owen Diaz had seen swastikas in the bathrooms at Tesla's electric-car plant, and he had tried to ignore racist taunts around the factory.  "You hear, 'Hey, boy, come here,' 'N-i-g-g-e-r,' you know, all this," said Mr. Diaz, who is African-American. Then, a few hours into his shift running the elevators, he noticed a drawing on a bale of cardboard. It had an oversize mouth, big eyes and a bone stuck in the patch of hair scribbled over a long face, with "Booo" written underneath....On that winter night in the factory, when, he said, a supervisor admitted drawing the figure as a joke, Mr. Diaz had had enough. He typed a complaint to a Tesla manager on his phone. "Racist effigy & drawing" was the subject."When you really just look at it, you ask yourself at some point, 'Where is my line?'" said Mr. Diaz, 50, who worked at the factory as a contractor ....Interviews, internal communications and sworn legal statements filed by more than two dozen current or former Tesla employees and contractors describe a wide range of concerns among some African-American workers at the factory in Fremont, including threats by co-workers, demeaning assignments and barriers to advancement. Three lawsuits by former workers accusing Tesla of failing to curb racial discrimination and harassment have been filed ...The state's Department of Fair Employment and Housing says it has issued 10 "right to sue" letters ...— to employees complaining of racial bias at the Fremont plant. Dozens of other complaints against Tesla are pending, but the agency would not say how many involved race.")

https://www.industryweek.com/leadership/article/22024555/teslas-a-hotbed-for-racist-behavior-worker-claims-in-suit (Tesla's a Hotbed for Racist Behavior, Worker Claims in Suit - The

employee says he's one of more than 100 African-American Tesla workers affected and is seeking permission from a judge to sue on behalf of the group....Tesla Inc.'s production floor is a "hotbed for racist behavior," an African-American employee claimed in a lawsuit in which he alleged black workers at the electric carmaker suffer severe and pervasive harassment. The employee says he's one of more than 100 African-American Tesla workers affected and is seeking permission from a judge to sue on behalf of the group. He's seeking unspecified general and punitive monetary damages as well as an order for Tesla to implement policies to prevent and correct harassment...."Although Tesla stands out as a groundbreaking company at the forefront of the electric car revolution, its standard operating procedure at the Tesla factory is pre-Civil Rights era race discrimination," the employee said in the complaint, filed Monday in California's Alameda County Superior Court..... The lawsuit was filed on behalf of Marcus Vaughn, who worked in the Fremont factory from April 23 to Oct. 31. Vaughn alleged that employees and supervisors regularly used the "N word" around him and other black colleagues. Vaughn said he complained in writing to human resources and Musk.....Larry Organ, an attorney at the California Civil Rights Law Group, said that Vaughn reached out to him after the law firm sued Tesla on behalf of other African American employees who complained about racial harassment this year. A Tesla assembly line worker sued in March, claiming the company did little to stop coworkers from harassing him.)
https://www.google.com/amp/s/www.businessinsider.com/tesla-workers-testimonies-recall-raci sm-being-called-n-word-slurs-2021-7%3famp (A Tesla factory worker said he was called the N-word '100 times' by coworkers, according to a sworn testimony....Former Tesla workers routinely used racial slurs against Black employees, according to sworn testimonies obtained by Protocol.  Aaron Craven, a Black worker at Tesla's Fremont factory, said in a sworn statement he had been called the N-word "approximately 100 times," and saw KKK signs and swastika graffitied in bathroom stalls. Workers submitted 103 declarations in March 2021 as part 2017 lawsuit suing Tesla for racial harassment.  "I was directly called n----- and n---- approximately 100 times at the Fremont factory," Craven said a sworn statement reviewed by Protocol. "I heard the terms n----- and n---- used over 100 times by coworkers, and by my lead Auggie, in the Tesla factory."Additionally, ex-contractor Aaron Minor stated he heard Tesla employees refer to the Fremont factory as a plantation and Black people as "cotton workers," Protocol reported.....Two separate lawsuits filed against Tesla in 2017 alleged racial harassment and discrimination at the Fremont plant. Former Tesla worker DeWitt Lambert said coworkers regularly called him the N-word and made sexually explicit comments.  In 2019, Black and Latino workers at a Tesla factory in Buffalo, New York, filed discrimination complaints with the US Equal Employment Opportunity Commission (EEOC) and the New York Division of Human Rights. The six former workers said they heard racial slurs and racist comments at the factory.)
https://www.protocol.com/workplace/tesla-fremont-racism-discrimination (Racist graffiti, 'plantation' jokes and 100 potential lawsuits: Ex-workers say Tesla is still racist...The N-word, demeaning jokes and retaliation on the basis of race are all common at Tesla, according to 100-plus sworn statements from a class-action lawsuit and public records obtained by Protocol....When Aaron Craven clocked in to work every day at the Tesla Fremont factory, he knew he might hear or be called the N-word. When he walked into the bathroom stalls, he knew he might see graffiti of "KKK" or a swastika.  "I was directly called n----- and n---- approximately 100 times at the Fremont factory," Craven said in a sworn statement. "I heard the terms n----- and n---- used over 100 times by co-workers, and by my lead Auggie, in the Tesla factory.  Former Tesla workers also called ex-contractor Aaron

Minor "n-----," and Minor, too, found swastikas in the bathroom. Minor heard the factory called "the Plantation" and its Black employees "cotton workers." "My understanding is that people refer to the Tesla factory as the Plantation and call employees cotton workers because Tesla treats its Black employees like slaves," he wrote in a sworn statement. These sworn statements and 103 other declarations sworn under penalty of perjury comprise a 500-page exhibit filed in March 2021 as part of a 2017 lawsuit that alleges Tesla discriminates against Black people and has allowed a racially hostile work environment to fester in its factories. The lawsuit's allegations against the company are not unique:....Race-based complaints about Tesla are on average more common than the proportion of race-based complaints state-wide; while about 10% of all cases requesting right to sue were filed on the basis of race with the DFEH in 2020 (and less than that in previous years), more than 30% of the Tesla cases from 2018 to 2021 are based on allegations of racial discrimination.")

https://www.google.com/amp/s/www.latimes.com/business/technology/story/2021-08-05/ex-tesla-employee-called-racial-slur-wins-rare-1-million-reward%3f_amp=true (Ex-Tesla employee called a racial slur wins rare $1-million reward ... a Black former employee who won a ruling after alleging that supervisors called him the "N-word" ..... Tesla Inc. has paid more than $1 million to a Black former employee who won a ruling that the company failed to stop his supervisors from calling him the "N-word" at the electric-car maker's Northern California plant. The rare discrimination award by an arbitrator to Melvin Berry, which followed a closed-door proceeding, caps years of complaints from Black workers that Tesla turned a blind eye to the commonplace use of racial slurs on the assembly line and was slow to clean up graffiti with swastikas and other hate symbols scrawled in common areas. It ends a years-long and emotionally grueling fight launched by Berry, who was hired by the company as a materials handler in 2015 and quit less than 18 months later.....Arbitration typically keeps disputes between employees and companies secret, but court filings reveal that the arbitrator found Berry's allegations more credible than Tesla's denials, though she called it a "difficult" case after hearing from witnesses on both sides. Berry claimed that when he confronted a supervisor for calling him the "N-word," he was forced to work longer hours and push a heavier cart...."I hope the world knows that an arbitrator found Tesla treats its employees like this," Berry, 47, told Bloomberg News in a phone interview Wednesday. He ..said he's now taking time off to focus on his mental health as he still hasn't "gotten over the healing process.".....," arbitrator Elaine Rushing said in her May 12 ruling, which hasn't been previously reported. Rushing, a former judge in Sonoma County Superior Court for almost two decades..... Rushing "was clearly troubled by the facts, culture at the company and the tone of the defense.".....After his supervisors turned against him, Berry alleged, he suffered from sleepless nights, panic attacks, depression and anxiety, prompting him to seek help from a psychologist for the first time, according to the ruling. He broke down during the arbitration proceeding as he recalled how he "became quiet and cried a lot" and "questioned his sanity," Rushing wrote......."This is a case of a 23-year-old White man with only a high-school education supervising a 43-year-old African-American man with a college degree, a classic invitation for serious resentment," she wrote.......In 2020, 31 complaints were filed with California's Department of Fair Employment and Housing alleging discrimination at Tesla on the basis of race, age, gender expression, disability and pregnancy, according to data obtained from public records. The state agency issued right-to-sue letters in a majority of the cases; a handful were closed with insufficient evidence. In July, Valerie Workman, Tesla's vice president of people, posted on the company's blog to remind employees about the use of slurs and epithets as they prepared to return to offices.")

\\

https://www.google.com/amp/s/mobile.reuters.com/article/amp/idUSKBN1YZ18E (A federal judge rejected Tesla Inc's effort to dismiss claims by two former workers that the California electric car factory where they worked was a hotbed of racial hostility, clearing the way for a possible trial....In a decision on Monday, U.S. District Judge William Orrick in San Francisco found open questions over whether Owen Diaz and his son Demetric Di-az faced "severe and pervasive racial harassment" in 2015 and 2016 at Tesla's factory in suburban Fremont, which employs more than 10,000 people. The plaintiffs, who are black, said they were subjected to repeated racial epithets dozens of times, as well as racist cartoons, and that supervisors engaged in or did little to stop the racism....Orrick said Diaz could pursue claims that Tesla allowed and did not take reasonable steps to stop racial harassment.)
https://www.google.com/amp/s/futurism.com/tesla-pays-racial-slur/amp (TESLA PAYS FORMER EMPLOYEE $1 MILLION FOR CALLING HIM HORRIFIC RACIAL SLUR... "I HOPE THE WORLD KNOWS THAT AN ARBITRATOR FOUND TESLA TREATS ITS EMPLOYEES LIKE THIS." A former Tesla employee named Melvin Berry was awarded over $1 million in an arbitration hearing earlier this year after he filed complaints about racist harassment at work — including his direct supervisor calling him the N-word and then punishing him with longer hours of harder work for speaking out about it. ...Toxic Culture.....Arbitrator Elaine Rushing decided that the evidence that Berry — who quit after 18 months and dealt with panic attacks, depression, and anxiety as a result — was harassed was clear....."Racial discrimination awards are rare and it seems this was especially hard-fought," employment lawyer Cliff Palefsky, who wasn't involved in the case, told Bloomberg News. Rushing, he added, "was clearly troubled by the facts, culture at the company, and the tone of the defense.")

Whereas Mr. Austin's, (*a Black man in a publicly documented retaliatory, hostile work environment*), plead facts are far above *Landers* articulated standards where he specified multiple weeks of unpaid overtime (versus at least one week standard in *Landers)* and made formal complaints about this issue (*management/supervisors admitted willfully unpaid or late, after complaints*) for multiple weeks leading to adverse Employer actions, and where (although not required by *Landers),* he provided independently verified approximate minimum amount of unpaid overtime by State of California Auditor (after State

12

Auditors auditing the company and their wage information three times and calling Mr. Austin personally to apologize for delay). This application is being filed 10 days prior to the due date (and in fact it is more than 60 days before the due date for Petition for Writ of Cert), and Mr. Austin is attaching copies of opinions. See attached. To be extra-cautious on the date in January (approx. 1/13/23) the Petition for Writ of Cert. is due Mr. Austin motioned for clarification per the Ninth Circuit Court's accounting system as to the exact date (to ensure on the same page.) Have not received an answer, yet.

Jurisdiction is proper per 28 U.S.C. § 1254 and Supreme Court Rules 10(a)(c). ((a) a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals (and the controlling precedent itself ruled upon i.e. *Landers*) on the same important matter; and has ... has so far departed from the accepted and usual course of judicial proceedings, or sanctioned such a departure by a lower court, as to call for an exercise of this Court's supervisory power; ...(c)... a United States court of appeals has decided an important question of federal law ... in a way that conflicts with (and directly contradicts *Kasten*) relevant (and controlling) decisions of this

Court.)  Because the Ninth Circuit's court of appeals blatant disregard of Supreme Court & the Ninth Circuit's own controlling precedent on the related issues of FLSA anti-retaliation, and pay (willful) violations the following questions are ripe for Writ of Certiorari:

1. Under *Kasten* was adverse action by Joint Employer Tesla retaliation when only days (*within week*) after escalated good faith reporting FLSA overtime wage violations to HR Officer after multiple formal reports to management (by Mr. Austin)?  Was admitted adverse action even more blatantly retaliatory in violation of FLSA's anti-retaliation statute when management admitted willful non, or late, payment, with a. type of complaints (formal vs. informal), b. timing (within week), c. lack of process (no investigation of, or response to, Mr. Austin's complaints) all strongly suggesting pretext, and retaliatory animus (*especially when employed in entry level, whose role was not to monitor nor correct these company issues, who reported internally up the latter including to direct supervisors, head of department, and HR manager (up to Elon Musk directly); especially when employers feedback and reviews were excellent toward him*)?

١٤

2. Under Ninth Circuit's *Landers (at least one week of uncompensated overtime),* and this Court's *Tyson (uncompensated overtime), and Perez (non-exempt entry level role)* was joint employer Tesla's admitted (willful) non, or late, payment of several weeks of plead owed, complained about, but unpaid, or late, overtime (*for which Tesla admitted they retaliated days after Mr. Austin made formal good faith complaints*) an FLSA overtime pay violation? Was the violation(s) especially egregious, or blatant when rooted in independently verifiable facts as supervisor, and management, admitted they had not paid several weeks of overtime when Mr. Austin escalated complaints to HR and upper managment about labor code FLSA overtime wage violations (*especially as State of California's Auditing Department confirmed the substance, and provided specific amount of Tesla's violations independently verified approximate minimum amount of unpaid overtime by State of California Auditor (after State Auditors auditing the company and their wage information three times and calling Mr. Austin personally to apologize for delay before making*

*benefit payments after a car accident when unable to work <u>at all</u>*

*for approximately a year due to severity of injury).*

WHEREFORE, the Court should grant Petitioner, Mr. George Jarvis

Austin a 60-day extension of time to file petition for a writ of certiorari

(moving deadline from 1/13/23 to 3/13/23).


October 27, 2022             Respectfully submitted,

                             *[s] George Jarvis Austin*

                             *Self-Represented*

                             2107 Montauban Ct., Stockton, CA

                             209.915.6304, gaustin07@berkeley.edu
                             *Petitioner in Supreme Court, Pro Se*

**NOT FOR PUBLICATION**

# FILED

UNITED STATES COURT OF APPEALS

JUN 28 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

GEORGE JARVIS AUSTIN,

               Plaintiff-Appellant,

    v.

TESLA, INC.; et al.,

               Defendants-Appellees.

No. 21-15151

D.C. No. 3:20-cv-00800-EMC

MEMORANDUM[*]

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Submitted June 15, 2022[**]

Before:    SILVERMAN, WATFORD, and FORREST, Circuit Judges.

    George Jarvis Austin appeals pro se from the district court's judgment

dismissing his action alleging federal and state law violations stemming from his

employment termination.  We have jurisdiction under 28 U.S.C. § 1291.  We

review de novo a dismissal under Federal Rule of Civil Procedure 12(b)(6).  *Hebbe*

---

    [*]     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

    [**]     The panel unanimously concludes this case is suitable for decision
without oral argument.  *See* Fed. R. App. P. 34(a)(2).

*v. Pliler*, 627 F.3d 338, 341 (9th Cir. 2010).  We affirm.

The district court properly dismissed Austin's action because Austin failed to allege facts sufficient to state a wage theft or retaliation claim under the Fair Labor Standards Act ("FLSA").  *See Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 645 (9th Cir. 2015) ("[A] plaintiff asserting a violation of the FLSA overtime provisions must allege that she worked more than forty hours in a given workweek without being compensated for the hours worked in excess of forty during that week"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)).

The district court did not abuse its discretion in denying Austin leave to amend because amendment would have been futile.  *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) (setting forth standard of review and stating that leave to amend may be denied where amendment would be futile); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) ("[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad." (internal quotation marks omitted)).

We do not consider matters not specifically and distinctly raised and argued in the opening brief, or arguments and allegations raised for the first time on appeal. *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009).

All pending motions and requests are denied.

**AFFIRMED.**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 29 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| GEORGE JARVIS AUSTIN, | No. 21-15151 |
| Plaintiff-Appellant, | |
| | D.C. No. 3:20-cv-00800-EMC |
| v. | Northern District of California, San Francisco |
| TESLA, INC., Organization; et al., | |
| | ORDER |
| Defendants-Appellees. | |

Before:     SILVERMAN, WATFORD, and FORREST, Circuit Judges.

The panel has voted to deny the petition for panel rehearing.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 35.

Austin's petition for panel rehearing and petition for rehearing en banc (Docket Entry No. 50) are denied.

No further filings will be entertained in this closed case.