IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.

*Corrected:  Emergency Motion by pro se appellants' Colleen Connors and Melvin Jones Jr. to DISMISS WITH PREJUDICE our appeal… as we ENTIRELY WITHDRAW our appeal.*

_(corrected notice of withdrawal of our pro se appeal) and request for dismissal of our pro se appeal with prejudice... in its entirety;_

_Introduction:_
_I am reliably informed and  believe in information... [it] has_

come to me {e.g. disabled pro se appellant - Melvin Jones Jr.} that President Donald Trump... [is and/ or may be asked to PARDON - the police officer who killed and murdered in "cold blood" a black dude {e.g. ex-police officer DEREK CHAUVIN whom

*is a white police officer and [whom] I believe acted (committed deliberate and intentional murder while in his police officers uniform of a BLACK MAN... on the primarily and/ or SOLE basis of race animus against Blacks) ... [and] due to the systemic "culture" of*

accepted and encouraged police brutality and murder of Black people in general within the United States... which includes that of the State of Michigan [e.g. Michigan Attorney General Dana Nessel... whom I believe has "ducked" meaningful prevention

*and/ or investigation of police harassment against blacks and/ or police harassment against the disabled in the State of Michigan ( which SADLY INCLUDES what appears to be the COVER UP of the Flint Mayor Sheldon Neeley and two-white*

*firefighters' wrongful death/ murder of BLACK children which is NOW a civil action titled BARTON v. NEELEY)] }... all of which literally makes me sick to my stomach.*

*And, after further discussion[s] with*

*Colleen Connors (e.g. co-appellant who is also [for certain tasks... such as driving me to my medical appointments, but not limited to such... also my "informal/ lay-caregiver" (yes - since the year 2016, shortly after a horrendous slip and fall on a large sheet of ice... near downtown*

*Detroit, Michigan - my cardiac medical conditions worsened quickly and I developed the medical-need to use a prescribed walker both inside and outside of my home…. plus BOTH my legs and my back/ spine seriously worsened as to their function and pain….*

*whereby {praise Jesus, I do NOT take any sort of prescribed pain medication for such - because I am/ have been VERY blessed with super good doctors})].... so, after further discussions with Colleen — after [we] both became aware of a recent ruling against*

*president Donald Trump... which literally likened him/ Mr. Trump to acting like [a] "KING" or "DICTATOR" ... as to President Donald Trump's EXECUTIVE ORDERS and/ or EXECUTIVE ACTIONS... which [I], disabled appellant Melvin Jones Jr.,  infer are **<u>not</u>** within*

*the IMMUNE protected lawful presidential functions... which in an unrelated ruling — the U.S. Supreme Court set forth the* <mark>*generally a US president enjoys absolute immunity for LAWFULLY INTENDED ACTIONS within her/ his CONGRESSIONALLY CONFERRED POWERS...*</mark>

*whereby acting like a dictator or a king is certainly NOT allowed by ANY law within the United States for a President*.... And, so the court at issue ruled that as to President Trump: *{    A President who touts an image of himself as a "king" or a "dictator,"5 perhaps as his vision of*

*effective leadership, fundamentally misapprehends the role under Article II of the U.S. Constitution. In our constitutional order, the President is tasked to be a conscientious custodian of the law, albeit an energetic one, to take care of effectuating his*

*enumerated duties, including the laws enacted by the Congress and as interpreted by the Judiciary. U.S. CONST. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed* ...").
See:
[ Wilcox vs. Trump civil case #25-334 (BAH)  ]};

*and given that BOTH the defendants and plaintiffs' in "birthright citizenship civil case" #25-cv-10139... Literally DO NOT want [us] in "their precious" litigation... we NOW are FULLY inclined to AGREE that ....here - this a GREAT time and place {juncture in and as to*

*our appeal}... to MOVE THE APPEALS COURT TO TERMINATE and DISMISS OUR PRO SE APPEAL.... Immediately and forthwith ....whereby we WITHDRAW our notice of appeal and WITHDRAW with prejudice our tendered pro se appeals brief, and withdraw with*

*prejudice [ALL] of our other pending motions related to our appeal... except the instant motion for DISMISSAL WITH PREJUDICE of our appeal.... With a specific NOTATION ....that [we] NOW fully agree with the Honorable District courts PRELIMINARY INJUNCTION..... and any*

*eventual permanent injunction issued which is consistent with the preliminary injunction already issued.*

## *Conclusion:*

*We pro se appellants Melvin Jones Jr. and Colleen Connors... withdraw in its entirety our pro se appeal*

[and].... motion the Honorable 1st Circuit Court of Appeals for an IMMEDIATE and SUA SPONTE DISMISSAL WITH PREJUDICE OF OUR INSTANT APPEAL #25-1158.

See also the attached supporting document of which [we] speak.

*Thank you.*

*Best,*

*Date: 3-7-2025*

_____

*Melvin Jones Jr. disabled*

*PRO SE appellant (interested party)*

*1935 Hosler St.*

*Flint, Michigan 48503*

*Email: jonesjrmel@gmail.com*

*Google voice to text ph#*

*415-562-5074*

*–*

*Date: March 7th, 2025*

*_____*

*Colleen Connors - appellant*
*(interested party)*
*1935 Hosler St.*
*Flint, Michigan 48503*
*Email:*
*cmcolleen4@gmail.com*
*Google voice to text ph#*
*408-459-9635*

Case: 25-1158    Document: 00118256900    Page: 23    Date Filed: 03/07/2025    Entry ID: 6705834

**US news**

# Court rules Trump's firing of labor board official illegal, saying president is not a king

### Judge orders reinstatement of Gwynne Wilcox to National Labor Relations Board after her removal by US president



📷 Gwynne Wilcox. Photograph: National Labor Relations Board

**Michael Sainato**

Thu 6 Mar 2025 16.19 EST

A federal court ruled that Donald Trump's abrupt firing of a former senior official at the top US labor watchdog was illegal, and ordered that she be reinstated.

Gwynne Wilcox was the first member of the National Labor Relations Board to be removed by a US president since the board's inception in 1935.

The framers of the US constitution "made clear that no one in our system of government was meant to be king - the President included - and not just in name only", the judge Beryl A Howell, wrote in the ruling.

Howell presided over the hearing held on Wednesday on a motion for summary judgment in the District of Columbia. "The President does not have the authority to terminate members of the National Labor Relations Board at will, and his attempt to fire plaintiff from her position on the Board was a blatant violation of the law," she wrote.

"A president who touts an image of himself as a 'king' or a 'dictator,' perhaps as his vision of effective leadership, fundamentally misapprehends the role under Article II of the US Constitution," wrote Howell.

Article II of the US Constitution outlines the executive powers and responsibilities of the president. Howell continued, "in our constitutional order, the president is tasked to be a conscientious custodian of the law, albeit an energetic one, to take care of effectuating his enumerated duties, including the laws enacted by the Congress and as interpreted by the Judiciary".

Wilcox filed the lawsuit early last month, alleging her removal was a "blatant violation" of the National Labor Relations Act, which stipulates that members of the board can only be removed for negligence or misconduct. Her removal left the board with only two members, lacking the quorum of at least three members required to rule on cases.

"I'm ready to get back to work," said Wilcox after the hearing in a speech outside the courthouse today. "It's not just about me, but I'm glad to be the face of this fight."

Her attorney, Deepak Gupta, noted this was the beginning of a long fight.

Wilcox was confirmed by the Senate in September 2023, and set to serve until August 2028. She sought a declaratory judgment ruling her removal unlawful and an injunction to permit her to complete her appointed term.

The White House has defended her removal, and that of the NLRB general counsel, claiming that "these were far-left appointees with radical records of upending longstanding labor law, and they have no place as senior appointees in the Trump administration".

During the hearing, Howell noted that in court, the Trump administration claimed the law prohibiting removal of board members was unconstitutional. Similar arguments have been made in recent lawsuits against the NLRB by SpaceX, Amazon and other employers in response to labor law enforcement actions pursued against the corporations.

Howell explained the US supreme court precedent of Humphrey's Executor, a 1935 case in which the court ruled that a commissioner of the Federal Trade Commission had been unlawfully removed by Franklin Delano Roosevelt.

Former NLRB chairs and labor leaders criticized the removal of Wilcox, claiming it violated that precedent set by the supreme court, undermined the independence of the NLRB and in effect halted federal labor law enforcement in the US.

The AFL-CIO, the largest federation of labor unions in the US, held a rally in support of Wilcox outside the courthouse during Wednesday's hearing.

"A week after taking office, President Trump effectively shut down the National Labor Relations Board (NLRB) and jeopardized the NLRB's independence by illegally firing Wilcox, the first Black woman to serve on the Board," said the AFL-CIO.

## Why you can rely on the Guardian not to bow to Trump – or anyone

I hope you appreciated this article. Before you move on, I wanted to ask whether you could support the Guardian's journalism as we face the unprecedented challenges of covering the second Trump administration.

As Trump himself observed: "The first term, everybody was fighting me. In this term, everybody wants to be my friend."

He's not entirely wrong. All around us, media organizations have begun to capitulate. First, two news outlets pulled election endorsements at the behest of their billionaire owners. Next, prominent reporters bent the knee at Mar-a-Lago. And then a major network – ABC News – rolled over in response to Trump's legal challenges and agreed to a $16m million settlement in his favor.

The Guardian is clear: we have no interest in being Donald Trump's – or any politician's – friend. Our allegiance as independent journalists is not to those in

3/6/25, 6:05 PM                    Trump rules Trump's illegal labor board action illegal, saying president is now abusing US news | The Guardian

power but to the public. Whatever happens in the coming months and years, you can rely on the Guardian never to bow down to power, nor back down from truth.

How are we able to stand firm in the face of intimidation and threats? As journalists say: follow the money. The Guardian has neither a self-interested billionaire owner nor profit-seeking corporate henchmen pressuring us to appease the rich and powerful. We are funded by our readers and owned by the Scott Trust – whose only financial obligation is to preserve our journalistic mission in perpetuity.

What's more, we make our fearless, fiercely independent journalism free to all, with no paywall – so that everyone in the US can have access to responsible, fact-based news.

**With the new administration boasting about its desire to punish journalists, and Trump and his allies already pursuing lawsuits against newspapers whose stories they don't like, it has never been more urgent, or more perilous, to pursue fair, accurate reporting. Can you support the Guardian today?**

**We value whatever you can spare, but a recurring contribution makes the most impact, enabling greater investment in our most crucial, fearless journalism. As our thanks to you, we can offer you some great benefits – including seeing far fewer fundraising messages like this. We've made it very quick to set up, so we hope you'll consider it. Thank you.**



**Betsy Reed**
*Editor, Guardian US*

---

○ Support $5/month

---

Recommended

◉ **Support $15/month**

Unlock **All-access digital** benefits:

- ✔ Unlimited access to the Guardian app
- ✔ Unlimited access to our new Feast App
- ✔ Ad-free reading on all your devices
- ✔ Exclusive newsletter for supporters, sent every week from the Guardian newsroom
- ✔ Far fewer asks for support

---

○ Support once from just $1

---

**Continue** →     **Remind me in April**    VISA  mastercard  AMERICAN EXPRESS  PayPal

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,

         Plaintiff,

         v.

DONALD J. TRUMP, *in his official capacity as President of the United States*

and

MARVIN E. KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*,

         Defendants.

Civil Action No. 25-334 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Scholars have long debated the degree to which the Framers intended to consolidate executive power in the President.  The "unitary executive theory"—the theory, in its purest form, that, under our tri-partite constitutional framework, executive power lodges in a single individual, the President, who may thus exercise complete control over all executive branch subordinates without interference by Congress—has been lauded by some as the hallmark of an energetic, politically accountable government, while rebuked by others as "anti-American," a "myth," and "invented history."[1]  Both sides of the debate raise valid concerns, but this is no

---

[1]    *Compare, e.g.*, Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* (2008), Saikrishna B. Prakash, *Imperial from the Beginning: The Constitution of the Original Executive* (2015), *and* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 597 (1994); *with, e.g.*, Allen Shoenberger, *The Unitary Executive Theory is Plainly Wrong and Anti-American: "Presidents are Not Kings*," 85 Alb. L. Rev. 837, 837 (2022), Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129 (2022), *and* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 4 (1994) ("Any faithful reader of history must conclude that the unitary executive . . . is just myth."); Cass R. Sunstein, *This Theory is Behind Trump's Power Grab*, N.Y. Times (Feb. 26, 2025), https://www.nytimes.com/2025/02/26/opinion/trump-roberts-unitary-executive-theory.html; *see*

mere academic exercise.[2]  The outcome of this debate has profound consequences for how we Americans are governed.  On the one hand, democratic principles militate against a "headless fourth branch"[3] made up of politically unaccountable, independent government entities that might become agents of corrupt factions or private interest groups instead of the voting public. Additionally, at least theoretically, empowering a President with absolute control over how the Executive branch operates, including the power to "clean house" of federal employees, would promote efficient implementation of presidential policies and campaign promises that are responsive to the national electorate.  On the other hand, the advantages of impartial, expert-driven decision-making and congressional checks on executive authority favor some agency independence from political changes in presidential administrations, with the concomitant benefits of stability, reliability, and moderation in government actions.  No matter where these pros and cons may lead, the crucial question here is, what does the U.S. Constitution allow?

To start, the Framers made clear that no one in our system of government was meant to be king—the President included—and not just in name only.  *See* U.S. CONST. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States.").  Indeed, the very structure of the Constitution was designed to ensure no one branch of government had absolute power, despite

---

*also* Julian Davis Mortenson, *The Executive Power Clause*, 168 U. PA. L. REV. 1269, 1334 (2020) (describing "the exercise of executive power" as "fully subordinate to instructions by its legislative principal" at the founding).

[2]    The academy has provided various formulations of the "unitary executive" theory.  *See, e.g.*, Steven G. Calabresi & Kevin H. Rhodes*, The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 HARV. L. REV. 1153, 1158 (1992) ("Unitary executive theorists claim that all federal officers exercising executive power must be subject to the direct control of the President."); Lessig & Sunstein, *supra*, at 2 ("Many think that under our constitutional system, the President must have the authority to control all government officials who implement the laws."); Chabot, *supra*, at 129 (2022) (describing the "unitary executive" theory as the idea that the Constitution gave the President "plenary removal power" affording him "'exclusive control over subordinates' exercise of executive power").

[3]    Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 578 (1974) (quoting The President's Comm. on Admin. Mgmt., Administrative Management in the Government of the United States 30 (1937)).

the perceived inefficiencies, inevitable delays, and seemingly anti-democratic consequences that may flow from the checks and balances foundational to our constitutional system of governance.

The Constitution provides guideposts to govern inter-branch relations but does not fully delineate the contours of the executive power or the degree to which the other two branches may place checks on the President's execution of the laws. As pertinent here, the Constitution does not, even once, mention "removal" of executive branch officers. The only process to end federal service provided in the Constitution is impeachment, applicable to limited offices (like judges and the President) after a burdensome political process. *See, e.g.*, *id.* art. II, § 4 (impeachment of President); *id.* art. III, § 1 (impeachment of federal judges). This constitutional silence on removal perplexed the First Congress, bedeviled a President shortly thereafter and a second President after the Civil War during Reconstruction (leading to condemnation of the former and impeachment proceedings against the latter), and has beset jurists and scholars in our modern era. *See infra* Part III.A.3.b.[4]

Yet, in assessing separation of powers, the Constitution itself is not the only available guide. Historical practice and a body of case law are, respectively, instructive and binding. *See infra* Part III.A.1; *e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation of powers cases this Court has often 'put significant weight upon historical practice.'" (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014))). Both make clear that textual

---

[4]    In 1834, President Andrew Jackson fired two Secretaries of the Treasury when each refused his order to remove U.S. funds from the Second National Bank, which Jackson viewed as having "resist[ed] his reelection in part with bank funds," and these removal actions triggered a congressional condemnation resolution for an abuse of power. *See* Lessig & Sunstein, *supra* n.1, at 78-80. Jackson's replacement as Secretary at Treasury, Roger Taney, did as ordered and was later appointed Chief Justice. *Id.* at 79. The resolution condemning President Jackson was ultimately expunged, in 1837, but not without significant debate and Jackson's reputational decline. *See id.* at 81-83.
       Over thirty years later, in 1867, President Andrew Johnson's removal of the Secretary of War in defiance of a congressional statute led to his impeachment and near conviction. Richard Murphy, 32 FED. PRAC. & PROC. JUD. REV. § 8128 (2d ed.) (2024).

silence regarding removal does not confer absolute authority on a President to willy-nilly override a congressional judgment that expertise and insulation from direct presidential control take priority when a federal officer is tasked with carrying out certain adjudicative or administrative functions. As Justice Louis Brandeis eloquently opined, "[c]hecks and balances were established in order that this should be 'a government of laws and not of men,'" observing further that the separation of powers was not adopted "to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 292-93 (1926) (Brandeis, J., dissenting).

A President who touts an image of himself as a "king" or a "dictator,"[5] perhaps as his vision of effective leadership, fundamentally misapprehends the role under Article II of the U.S. Constitution. In our constitutional order, the President is tasked to be a conscientious custodian of the law, albeit an energetic one, to take care of effectuating his enumerated duties, including the laws enacted by the Congress and as interpreted by the Judiciary. U.S. CONST. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed . . . ."). At issue in this case, is the President's insistence that he has authority to fire whomever he wants within the Executive branch, overriding any congressionally mandated law in his way. *See* Letter from Sarah Harris, Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain

---

[5]    *See* @WhiteHouse, X (Feb. 19, 2025, 1:58 PM), https://perma.cc/V9Y2-SWRD ("LONG LIVE THE KING!"); WSJ News, *Trump Says He Won't Be a Dictator "Except for Day One" if Re-Elected*, YOUTUBE (DEC. 6, 2023), https://www.youtube.com/watch?v=dQkrWL7YuGk; *see also* @realDonaldTrump, X (Feb. 15, 2025, 1:32 PM), https://perma.cc/S5GR-BXF5 ("He who saves his Country does not violate any Law."). Some of defendants' supporting amici also draw analogies to the British monarchy; Tennessee has described the tradition of the British king's "'prerogative power to remove' executive officers 'at will,'" which "carried into the United States." Tennessee's Amicus Br. at 5-6 (quoting Michael W. Connell, *The President Who Would Not Be King* 162 (2020)). In a democracy created to repudiate that very regime, that analogy has little purchase.

Principal Officers of the United States ("Letter from Acting SG") (Feb. 12, 2025), https://perma.cc/D67G-FKK4 (describing the Trump administration's view of the removal power).  Luckily, the Framers, anticipating such a power grab, vested in Article III, not Article II, the power to interpret the law, including resolving conflicts about congressional checks on presidential authority.  The President's interpretation of the scope of his constitutional power—or, more aptly, his *aspiration*—is flat wrong.

The President does not have the authority to terminate members of the National Labor Relations Board at will, and his attempt to fire plaintiff from her position on the Board was a blatant violation of the law.  Defendants concede that removal of plaintiff as a Board Member violates the terms of the applicable statute, *see* Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:12-13, and because this statute is a valid exercise of congressional power, the President's excuse for his illegal act cannot be sustained.

## I.    BACKGROUND

The statutory and procedural background relevant to resolving this dispute is summarized below.

### A.    *Statutory Background*

The National Labor Relations Board ("NLRB") was established ninety years ago by Congress in the National Labor Relations Act ("NLRA") in response to a long and violent struggle for workers' rights.  *See generally*, J. Warren Madden, *Origin and Early Years of the National Labor Relations Act*, 18 HASTINGS L.J. 571 (1967); Arnold Ordman, *Fifty Years of the NLRA*: *An Overview*, 88 W. VA. L. REV. 15, 15-16 (1985).  Congress sought to protect industrial peace and stability in labor relations and thus created a board to resolve efficiently labor disputes and protect the rights of employees to "self-organization, to form, join, or assist labor organizations [and] to bargain collectively through representatives of their own choosing."  29

U.S.C. §157; *see also id.* § 151; *Crey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271 (1964) (describing these goals); *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362 (1949) (same).

The NLRB is a "bifurcated agency" consisting, on one side, of a five-member, quasi-judicial "Board" that adjudicates appeals of labor disputes from administrative law judges ("ALJs"), and on the other, of a General Counsel ("GC") and several Regional Directors who prosecute unfair labor practices and enforce labor law and policy. *See* NLRB, *Who We Are*, https://perma.cc/9RLA-FSYL; 29 U.S.C. §§ 153(a), (d), 160; *Starbucks v. McKinney*, 602 U.S. 339, 357 (2024) (Jackson, J., concurring in part and dissenting in part). The two sides operate independently, with the GC independent of the Board's control. *NLRB v. United Food & Com. Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 117-18 (1987) (describing how the Labor Management Relations Act of 1947 amended the NLRA to separate the prosecutorial and adjudicatory functions between the Board and General Counsel).

The NLRB generally addresses labor disputes as follows: Upon the filing of a "charge" by an employer, employee, or labor union, a team working under the Regional Director will investigate and decide whether to pursue the allegation as a formal complaint. *See* NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V.[6] If the parties do not settle and the Director formally pursues the complaint, the Director will issue notice of a hearing before an ALJ. *Id.*; 29 U.S.C. § 160(b); 29 C.F.R. § 101.10; *Starbucks*, 602 U.S. at 342-43.[7] If necessary, after issuance of a complaint, the Board may seek temporary injunctive relief in federal district court while the dispute is pending at the NLRB. 29 U.S.C. § 160(j); *Starbucks*, 602 U.S. at 342. The

---

[6]    The initial request made by the employee, union, or employer is referred to as a "charge"; only the Director issues a "complaint." NLRB, *What We Do*, https://perma.cc/CU82-KU4V.

[7]    If the parties do formally settle after issuance of a complaint, Board approval is required. *NLRB*, 484 U.S. at 120.

ALJ then gathers evidence and presents "a proposed report, together with a recommended order to the Board." 29 U.S.C. § 160(c). That order will become the order of the Board unless the parties file "exceptions." *Id.*; 29 C.F.R. §§ 101.11-.12. If the parties file exceptions requesting the Board's review, the Board will consider the ALJ's recommendation, gather additional facts as necessary, and issue a decision. 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. The Board may craft relief, such as a cease-and-desist order to halt unfair labor practices or an order requiring reinstatement of terminated employees. 29 U.S.C. § 160(c). These orders, however, are not independently enforceable; the Board must seek enforcement in a federal court of appeals (and may appoint attorneys to do so). *Id.* §§ 154, 160(e); *In re NLRB*, 304 U.S. 486, 495 (1938) (noting compliance with a Board order is not obligatory until entered as a decree by a court). Aside from adjudicating disputes, the Board may also conduct and certify the outcome of union elections, 29 U.S.C. § 159, and promulgate rules and regulations to carry out its statutory duties, *id.* § 156.

Although both the Board members and the GC are appointed by the President with "advice and consent" from the Senate, *id.* §§ 153(a), (d), only the Board is protected from removal at-will by the President, who is authorized to remove a Board member "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause," *id.* § 153(a). Such restrictions were intentional; much like many other multimember entities, the Board was designed to be an independent panel of experts that could impartially adjudicate disputes. *See* 29 U.S.C. § 153(a); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 CORNELL L. REV. 76, 770-71 (2013) (describing the NLRB as a classic example of an agency designed to be independent). Board members serve staggered five-year terms, and the President is authorized to designate one board member as Chairman. 29 U.S.C.

§ 153(a).  In practice, the Board is partisan-balanced based on longstanding norms, though such a balance is not statutorily mandated.  *See* Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 COLUM. L. REV. 9, 54-55 (2018).

### B.    *Factual Background*

As set out in plaintiff's complaint and statement of material facts, and undisputed by defendants, plaintiff Gwynne Wilcox was nominated by President Biden and confirmed by the U.S. Senate to a second five-year term as member of the NLRB in September 2023.  Pl.'s Mot. for Expedited Summ. J. ("Pl.'s Mot."), Statement of Material Facts ("Pl.'s SMF") ¶ 2, ECF No. 10-1; Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J., Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 2, ECF No. 23-2.  She was designated Chair of the Board in December 2024.  Complaint ¶ 12, ECF No. 1.

Shortly after taking office, President Trump moved Marvin Kaplan, a then-sitting Board member and a defendant in this case, into the position of Chair, replacing plaintiff.  *Id*. ¶ 13.  President Trump then, on January 27, 2025, terminated plaintiff from her position on the Board via an email sent shortly before 11:00 PM, by the Deputy Director of the White House Presidential Personnel Office.  Pl.'s Decl., Ex. A, ECF No. 10-4; Pl.'s SMF ¶ 3; Defs.' SUMF ¶ 3.  The termination was not preceded by "notice and hearing," nor was any "neglect of duty or malfeasance" identified, despite the explicit restrictions to removal of a Board member in the NLRA.  Pl.'s Decl. ¶¶ 3-4; Pl.'s SMF ¶¶ 4-5; Defs.' SUMF ¶ 5 (regarding lack of notice and hearing); Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:10-17.  The email instead cited only political motivations—that plaintiff does not share the objectives of the President's administration—and asserted, in a footnote, that the restriction on the President's removal authority is unconstitutional as "inconsistent with the vesting of the executive Power in the President."  Pl.'s Decl. ¶ 3; Ex. A.

The NLRB's Director of Administration, who reports directly to Mr. Kaplan, began the termination process, cutting off plaintiff's access to her accounts and instructing her to clean out her office.  Pl.'s Decl. ¶¶ 5-6.  The Board already had two vacancies, and now, without plaintiff, it is reduced to only two sitting members—one short of the three-member quorum required to operate.  Compl. ¶ 18; 29 U.S.C. § 153(b).  Removal of plaintiff has thus stymied the functioning of the Board.

Plaintiff filed the instant suit, challenging her removal and requesting injunctive relief against Mr. Kaplan so that she may resume her congressionally mandated role.  *See* Compl. ¶¶ 21-22.  Recognizing that this case involves a pure question of law, plaintiff moved for expedited summary judgment, on February 10, 2025, Pl.'s Mot., ECF No. 10, and defendants responded with a cross-motion for summary judgment, with briefing completed on a condensed schedule.  *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 23; Pl.'s Opp'n to Defs.' Cross-Mot. and Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 27; Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 30.  Interested parties also weighed in as amici.[8]  Following a hearing, held on March 5, 2025, the parties' cross-motions for summary judgement are ready for resolution.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is only "'material' if a dispute over it might affect the outcome of a suit under the

---

[8]    Amici include: the Constitutional Accountability Center ("CAC") and a cohort of nineteen states and the District of Columbia, led by Minnesota, writing in support of plaintiff, *see* CAC's Amicus Br., ECF No. 15; Nineteen States & D.C.'s Amicus Br., ECF No. 31; and Tennessee and a cohort of twenty states, led by Florida, writing in support of defendants, *see* Tennessee's Amicus Br., ECF No. 18; Twenty States' Amicus Br., ECF No. 26.

governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (quoting *Anderson*, 477 U.S. at 248).

A plaintiff "seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## III.    DISCUSSION

In the ninety years since the NLRB's founding, the President has never removed a member of the Board.  Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem.") at 4, ECF No. 10-2.  His attempt to do so here is blatantly illegal, and his constitutional arguments to excuse this illegal act are contrary to Supreme Court precedent and over a century of practice.  For the reasons explained below, plaintiff's motion is granted.  Plaintiff's termination from the Board was unlawful, and Mr. Kaplan and his subordinates are ordered to permit plaintiff to carry out all of her duties as a rightful, presidentially-appointed, Senate-confirmed member of the Board.

### A.    *Humphrey's Executor* and its Progeny are Binding on this Court.

The Board is a paradigmatic example of a multimember group of experts who lead an independent federal office.  Since the early days of the founding of this country, Congress, the President, and the Supreme Court all understood that Congress could craft executive offices with some independence, as a check on presidential authority.  That understanding has not changed

10

over the 150-year history of independent, multimember commissions, nor over the 90-year history of the NLRB.  The Supreme Court recognized this history and tradition in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), in upholding removal protections for such boards or commissions, and this precedent remains not only binding law, but also a well-reasoned reflection of the balance of power between the political branches sanctioned by the Constitution.

> **1.     *Removal Restrictions on Board Members are Well-Grounded in History and Binding Precedent.***

As a textual matter, the Constitution is silent as to removals.  *See In re Hennen*, 38 U.S. 230, 258 (1839).  Consequently, though Article II grants the President authority over some appointments—with advice and consent of the Senate—and vests in him the "executive power," Article II contains no express authority from which to infer an absolute removal power.  *Compare* U.S. CONST. art. II, § 1, cl. 1 (vesting clause), *and id.*, § 2, cl. 2 (appointments clause); *to id.* art. I, § 8, cl. 18 (clause granting *Congress* the authority "to make all laws" "necessary and proper" for carrying out its powers and "all other Powers vested . . . in the Government").  The Supreme Court has held that a general power to remove executive officers can be inferred from Article II, *see Myers,* 272 U.S. at 163-64, yet the contours of that removal power and the extent to which Congress may impose constraints are nowhere clearly laid out.

The courts in such cases must therefore turn to established precedent—judicial decisions as well as general practice and tradition.  The Supreme Court has repeatedly recognized that "'traditional ways of conducting government . . . give meaning' to the Constitution."  *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (alteration in original) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).  Thus, "[i]n separation-of-powers cases this Court has often 'put significant weight upon historical practice.'"

*Zivotofsky*, 576 U.S. at 23 (quoting *Noel Canning*, 573 U.S. at 524).  Even when the validity of a particular power is in question, the Court will, "in determining the . . . existence of [that] power," give weight to "the usage itself," *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915), and "hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached," *Noel Canning*, 573 U.S. at 526.  Justice Frankfurter in his seminal concurring opinion in *Youngstown* declared that "systematic, unbroken" practice could even "be treated as a gloss on 'executive Power' vested in the President."  343 U.S. at 610-11.

Not only are the removal protections on members of the independent, multimember boards like the NLRB supported by over a century of unbroken practice, but they have also been expressly upheld in clear Supreme Court precedent.  Since 1887, Congress has created multiple independent offices led by panels whose members are appointed by the President but removable only for cause.  *See, e.g.*, Interstate Commerce Act, Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379, 383 (1887) (creating the Interstate Commerce Commission, with restrictions on officers' removal except for "inefficiency, neglect of duty, or malfeasance"); Federal Reserve Act, Pub. L. No. 63-64, ch. 6, § 10, 38 Stat. 251, 260-61 (1913) (creating the Federal Reserve Board, whose members are removable only "for cause").  In 1914, Congress established the Federal Trade Commission ("FTC") with an "inefficiency, neglect of duty, or malfeasance in office" removal restriction for its five commissioners.  FTC Act, Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717, 717-18 (1914).

The Supreme Court explicitly upheld removal restrictions for such boards when considering removal protections for the commissioners of the FTC in *Humphrey's Executor* in 1935, while also recognizing the President's general authority over removal of executive branch

officials.  The Court noted that commissioners of the FTC, "like the Interstate Commerce Commission" "are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'"  *Id.* at 624 (quoting *Ill. Cent. R.R. Co. v. Interstate Com. Comm'n*, 206 U.S. 441, 454 (1907)).  Congress, having the power to create such expert commissions with quasi-legislative and quasi-judicial authority, must also have, "as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal for except for cause in the meantime."  *Id.* at 629.

Two months later, with the guidance supplied in *Humphrey's Executor* and following the model of the FTC as endorsed by the Supreme Court there, Congress established the National Labor Relations Board.  *See* Madden, *supra*, at 572-73; *Yapp USA Auto. Sys., Inc. v. NLRB*, --F. Supp. 3d--, No. 24-cv-12173, 2024 WL 4119058, at *5 (E.D. Mich. Sep. 9, 2024).  Both entities—the FTC and NLRB—have five-member leadership boards with staggered terms of several years, minimizing instability and allowing for expertise to accrue.  *See* 29 U.S.C. § 153(a); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020).  Both were intended to exercise impartial judgment.  *See* Datla & Revesz, *supra*, at 770-71 (describing independence of the NLRB); *Seila L.*, 591 U.S. at 215-16 (describing the FTC as "designed to be 'non-partisan' and 'to act with entire impartiality'" (quoting *Humphrey's Ex'r*, 295 U.S. at 624)).  The Board, like the FTC, is "predominately quasi judicial and quasi legislative" in nature, with the primary responsibility of impartially reviewing decisions made by ALJs.  *Humphrey's Ex'r*, 292 U.S. at 624; *see* 29 U.S.C. § 160.  In fact, the Board does not prosecute labor cases nor enforce its rulings.  The side of the NLRB managed by the General Counsel—who is removable at-will by the President—carries out those more "executive" powers.  *See* 29 U.S.C. § 153(d) (describing the General Counsel's "final authority, on behalf of the Board" over "the

investigation of charges and issuance of complaints . . . and . . . the prosecution of such complaints before the Board"). As plaintiff correctly states, the Board closely resembles the FTC and is thus "squarely at the heart of the rule adopted in *Humphrey's Executor*." Pl.'s Mem. at 9.

Numerous other offices have followed the mold of the NLRB and FTC with multimember independent leadership boards protected from at-will removal by the President. *See* Pl.'s Mem. at 7 n.2 (listing, *e.g.*, the Merit Systems Protection Board, 5 U.S.C. § 1202(d); the Federal Labor Relations Authority, 5 U.S.C. § 7104(b); and the Federal Energy Regulatory Commission, 42 U.S.C. § 7171(b)(1)). "Since the Supreme Court's decision in *Humphrey's Executor*, the constitutionality of independent [multimember] agencies, whose officials possess some degree of removal protection that insulates them from unlimited and instantaneous political control, has been uncontroversial." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 760 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025); *see also The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional" issues of separation of powers.).[9]

Recent consideration of the constitutionality of the removal protections for NLRB members have accordingly upheld those constraints on presidential removal authority under *Humphrey's Executor*. *See, e.g.*, *Overstreet v. Lucid USA Inc.*, No. 24-cv-1356, 2024 WL 5200484, at *10 (D. Ariz. Dec. 23, 2024); *Company v. NLRB*, No. 24-cv-3277, 2024 WL

---

[9]    Defendants protest the reliance on history and tradition because independent multimember commissions date back only to the late 1880s. Defs.' Reply at 4-5. "[S]uch a practice comes far too late to provide reliable evidence of the original public meaning of Article II or the Constitution's separation of powers," in defendants' view. Defs.' Reply at 4-5. That in no way invalidates the significance of longstanding tradition, however, which is probative "[e]ven when the nature of or longevity of [the] practice is subject to dispute, and even when that practice began after the founding era." *Noel Canning*, 573 U.S. at 525; *see id.* at 528-29 (relying on a post- Civil War practice of intra-recess appointments); CAC's Amicus Br. at 11, ECF No. 15 (making this point).

5004534, at *6 (W.D. Mo. Nov. 27, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No.

24-cv-445, 2024 WL 4594709, at *7 (W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*,

No. 24-cv-2717, 2024 WL 4188068, at *9 (N.D. Ill. Sep. 13, 2024); *YAPP USA Automotive Sys.*,

2024 WL 4119058, at *7.  Courts have also recently upheld restrictions on removal under

*Humphrey's Executor* for other multimember boards, such as the Consumer Product Safety

Commission ("CPSC").  *See, e.g.*, *Leachco*, 103 F.4th at 761-62; *Consumers' Rsch. v. CPSC*, 91

F.4th 342, 352 (5th Cir. 2024); *United States v. SunSetter Prods. LP*, No. 23-cv-10744, 2024 WL

1116062, at *4 (D. Mass. Mar. 14, 2024).  The same has been true for the FTC.  *See, e.g.*,

*Illumina, Inc. v. FTC*, 88 F.4th 1036, 1046-47 (5th Cir. 2023); *Meta Platforms, Inc. v. FTC*, 723

F. Supp. 3d 64, 87 (D.D.C. 2024).  A court in this district has also upheld removal protections for

the Merit Systems Protection Board.  *See Harris v. Bessent*, No. 25-cv-412 (RC), 2025 WL

679303, at *7 (D.D.C. Mar. 4, 2025).  The 150-year history and tradition of multimember boards

or commissions and 90-year precedent from the Supreme Court approving of removal

protections for their officers dictates the same outcome for the NLRB here.

### 2.  *Defendants' Argument that* **Humphrey's Executor** *Does Not Control Fails.*

Discounting this robust history, defendants posit that the President's removal power is

fundamentally "unrestricted" and that only two, narrow "exceptions" have been recognized: one

for "inferior officers with narrowly defined duties," as established in *Morrison v. Olson*, 487

U.S. 654 (1988), and the other for "multimember bod[ies] of experts, balanced along partisan

lines, that performed legislative and judicial functions and [do not] exercise any executive

power," as established in *Humphrey's Executor*.  Defs.' Opp'n at 5-6 (second passage quoting

*Seila L.*, 591 U.S. at 216).  According to defendants, neither exception applies to the Board.  *Id.*

at 6.  Putting aside to address later whether congressional authority to constrain the President's

15

removal authority is characterized fairly by defendants as a narrow "exception" to the rule of "unrestricted" removal power, *see infra* Part III.A.3.b, *Humphrey's Executor* plainly controls.

Defendants emphasize that *Humphrey's Executor* understood the FTC at the time not to exercise any "executive power," which was key to its "exception," and that the NLRB today clearly "wield[s] substantial executive power." Defs.' Opp'n at 6-8 (relying on *Seila L.*, 591 U.S. at 216 n.2, 218); *see also* Defs.' Reply at 3. They do not, however, meaningfully distinguish between the authority of the FTC in 1935, as recognized in *Humphrey's Executor*, and the authority of the NLRB today. The FTC in 1935 had powers mimicking those of both the Board and the NLRB's GC. The FTC had broad powers of investigation and could issue a complaint and hold a hearing for potential unfair methods of competition. *See Humphrey's Ex'r*, 295 U.S. at 620, 621; *see also* 15 U.S.C. § 49 (authorizing the FTC's subpoena power). The FTC, upon finding a violation, could issue a cease-and-desist order and then go to the Court of Appeals for enforcement. *Humphrey's Ex'r*, 295 U.S. at 620-21; *see also* FTC Act, ch. 311, § 5, 38 Stat. at 719-20. The party subject to the order could also appeal to that court. *Humphrey's Ex'r*, 295 U.S. at 621. Further, the FTC could issue rules and regulations regarding unfair and deceptive acts. *See* FTC Act, § 6, 38 Stat. at 722; Hon. R. E. Freer, Member of the FTC, Remarks on the FTC, its Powers and Duties at 2 (1940), https://www.ftc.gov/system/files/documents/public_statements/676771/19400827_freer_remarks _._rational_association_of_credit_jewelers.pdf.

The NLRB's collective authority, though comparable, *see supra* Part I.A (describing the NLRB's GC's authority to investigate and pursue enforcement against unfair labor practices and the Board's adjudicatory authority and power to issue unenforceable cease-and-desist orders), is, if anything, less extensive than that of the FTC. The NLRB hardly engages in rulemaking (other

16

than to establish its own procedures), instead relying on adjudications for the setting of precedential guidance. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("The [NLRB], uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking."). Moreover, the aspects of the NLRB's authority most executive in nature—prosecutorial authority to investigate and bring civil enforcement actions—are tasks assigned to the GC instead of the Board itself. *See* 29 U.S.C. § 153(d).[10]

Even though the Supreme Court of 1935 may have not referred to these classic administrative powers as "executive" and the Supreme Court today would, *see, e.g.*, *Seila Law*, 591 U.S. at 216 n.2, the substantive nature of authority granted to these two independent government entities does not significantly differ. If the Supreme Court has determined that removal restrictions on officers exercising substantially the same authority do not impermissibly intrude upon presidential authority, *Humphrey's Executor* cannot be read to allow a different outcome here. That is especially true considering that the Supreme Court, in its next major decision addressing removal protections for executive branch officers, rejected the notion that the permissibility of "'good cause'-type restriction[s] . . . turn[s] on whether or not th[e] official"

---

[10]    Defendants suggest that because the NLRB makes "significant decisions shaping the rights and obligations of Americans" and "set[ting] federal labor policy," the "constitutional calculus" is different, and the *Humphrey's Executor* "exception" cannot apply. Defs.' Reply at 3, 5; Motions H'rg (Mar. 5, 2025), Rough Tr. at 54:1-7 (citing *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990) ("[T]he NLRB has the primary responsibility for developing and applying national labor policy.")). Defendants do not, however, explain how applying federal law in individual adjudications establishes "federal labor policy" any more than the rulemaking and adjudications of the FTC in *Humphrey's Executor* do, nor do they explain why subsequent caselaw—*see supra* Part III.A.3.a—should be read as putting such a gloss on the holding of *Humphrey's*. Plaintiff contributed little to the debate about the scope of the NLRB's powers that may be considered "executive," simply tying its authorities closely to the FTC in 1935, despite the NLRB's bifurcated structure, resulting in a more cabined exercise of any executive authority by the Board itself. *See* Pl.'s Reply at 3-5; *see also* Motions H'rg (Mar. 5, 2025), Tr. at 23:5-13 (plaintiff's counsel stating, "answering the question about exactly what 'executive' means and what those terms 'quasi-legislative' and 'quasijudicial' mean, it's not the easiest thing in the world. I think, for purposes of this motion that's before you, I think what matters is that . . . *Humphrey's Executor* is binding.").

is classified as "purely executive" or exercising quasi-legislative or quasi-judicial functions. *See Morrison*, 487 U.S. at 689.[11]

Defendants make a final, superficial distinction between the NLRB and the FTC to argue that the precedent of *Humphrey's Executor* should not apply. Defs.' Opp'n at 10. The NLRB, they note, has stricter removal protections because its members cannot be removed for "inefficiency," whereas FTC members can. *Id.* In both *Consumers' Research*, 91 F.4th at 346, 355-56, and *Leachco*, 103 F.4th at 761-63, however, courts of appeals upheld removal protections that did not include an exception for "inefficiency." "Inefficiency" does not differ in substance from "neglect of duty," so omitting "inefficiency" as a grounds for removal cannot be a dispositive difference in the President's ability to exercise his Article II powers over the NLRB. *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1, 8, 69 (2021) (explaining

---

[11] Defendants' argument about the exercise of "executive power" is ultimately tautological and leaves *Humphrey's Executor* completely devoid of force. They reason that because the NLRB is housed within the executive branch, the Board inherently exercises "executive power." Defs.' Opp'n at 7 (citing *Seila L.*, 591 U.S. at 216 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013))). Reading *Humphrey's Executor* to allow removal protections only for offices that do not exercise "executive power," defendants then conclude that the NLRB does not fit within *Humphrey's Executor*. The necessary implication of such reasoning is that *no board or commission placed with the executive branch* could, as a constitutional matter, be legally subject to removal protections duly enacted by Congress. Yet, defendants dodge that extraordinary result and contradictorily suggest that removal protections on the Federal Reserve Board are acceptable because that Board does not exercise an "executive function." Defs.' Reply at 5; *see also* Motions H'rg (Mar. 5, 2025), Rough Tr. at 59-60 (defense counsel declining to discuss Federal Reserve Board or the Federal Open Market Committee or why these entities should be treated differently than the NLRB as to presidential removal power).

Recognizing that the exercise of "executive power" could not be dispositive, the Fifth Circuit in *Consumers' Research* agreed with the plaintiffs there that the CPSC "wields substantial executive power" but still held that the CPSC was constitutional under *Humphrey's Executor*. 91 F.4th at 353-55 ("Having concluded that the Commission exercises substantial executive power (in the modern sense), we must next consider whether that characteristic—standing alone—removes the Commission from the *Humphrey's* exception. We conclude that it does not . . . ."). The Fifth Circuit examined the other factors in *Seila Law* to conclude that the removal protections for CPSC members were constitutionally sound: The CPSC does not have a novel structure or present a historically unprecedented situation; the CPSC does not have a single director but rather a multimember board; and the CPSC does not have any of the other features that concerned the Court in *Seila Law*, such as the receipt of funds outside the appropriation process or the inability of the President to influence the office's leadership through the appointment power. *See id.*

Regardless whether the NLRB exercises "substantial executive power," "executive power," or "quasi-legislative and quasi-judicial power," the NLRB does not sufficiently differ from the FTC to warrant a departure from *Humphrey's Executor*.

that the absence of "inefficiency" as a ground for removal does not unconstitutionally interfere with the President's authority). Defendants offer no reason to suggest otherwise. The NLRB fits well within the scope of *Humphrey's Executor*.

### 3.     Defendants' Argument that Humphrey's Executor *Has Been "Repudiated" and is No Longer Good Law Is Not Persuasive.*

Fundamentally, the position of defendants and their supporting state amici urging this Court not to apply *Humphrey's Executor* stems from a reading of the Supreme Court's subsequent case law as "repudiat[ing]" the precedent. Defs.' Opp'n at 9 (quoting *Seila L.*, 591 U.S. at 239 (Thomas, J., concurring in part)); Tennessee's Amicus Br. at 7-10, ECF No. 18 (arguing forcefully that *Humphrey's Executor* was wrongly decided and has been "narrowed . . . nearly out of existence"); Twenty States' Amicus Br. at 3-8, ECF No. 26. Defendants therefore argue that *Humphrey's Executor* must be read extremely narrowly, despite that "whatever little remains" is binding on this Court. Defs.' Opp'n at 8 n.2. To the contrary, an unbroken line of cases since *Humphrey's Executor* has reinforced the constitutionality of removal restrictions on multimember expert boards, and the pre-*Humphrey's Executor* history demonstrates that this decision was well-grounded in accepted principles of checks and balances.

### a.     Post-**Humphrey's Executor** *Case Law Reinforces its Central Holding.*

In every case following *Humphrey's Executor*, the Supreme Court has preserved the constitutionality of removal protections on independent, multimember boards and commissions. Shortly following *Humphrey's Executor*, in *Wiener v. United States*, 357 U.S. 349 (1958), the Court held that the Constitution did not grant the President authority to remove members of the multimember War Claims Commission "for no reason other than that he preferred to have on that Commission men of his own choosing." *Id.* at 355-56. Thirty years later, in *Morrison*, the Court again recognized the exception to the President's removal power for officers with

adjudicatory powers, but further explained that the permissibility of removal restrictions did not turn on whether the officers' functions were "quasi-legislative and quasi-judicial," as opposed to executive in nature, instead looking to the degree to which they impeded the President's ability to execute the laws.  *See* 487 U.S. at 691-93 (upholding removal protections for independent counsel contained in the Ethics in Government Act).

Then, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), the Court reiterated its holding in *Humphrey's Executor* that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause" and declined to reexamine that precedent.  *Id.* at 483 (striking down double for-cause removal protections); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 686 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (describing the defendants as attempting to compare the office's removal protections to that of "the FCC, the FTC, and the NLRB," which were understood to be "permissible under the Supreme Court's 1935 decision in *Humphrey's Executor*").

Most recently, in *Seila Law*, the Supreme Court likewise declined to "revisit [its] prior decisions allowing certain limitations on the President's removal power."  591 U.S. at 204. While defendants make much of dicta in this decision, such as that the FTC's powers would now be considered executive, Defs.' Opp'n at 9; *see also* Tennessee's Amicus Br. at 9, *Seila Law* made key distinctions between single-head offices and multimember boards or commissions that reinforce why placing restrictions on removal of leaders of the latter is not problematic under our Constitution, *see* 591 U.S. at 224-26.  Despite restrictions on removal, the President can exercise more control over a multimember board through his *appointment power* as vacancies arise, and with staggered terms, some Board vacancies arise during each administration.  *See id.* at 225.

20

Those new appointees can restrain the Board member the President might otherwise prefer to remove, and no President will be "saddled" with a single "holdover Director from a competing political party who is dead set *against*" his agenda. *Id.* at 225 (emphasis in original). That is particularly the case here, where President Trump could exercise near total control over the NLRB by appointing two members of his choosing to the Board to join Mr. Kaplan, whom the President appointed during his first term and recently elevated to Chairman, creating a majority of Trump appointees, and by appointing a General Counsel of his choice. *See* NLRB, *Members of the NLRB Since 1935*, https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935 (last visited Mar. 5, 2025); 29 U.S.C. § 153(d) (allowing the General Counsel to be removed at will).[12]

Moreover, the multimember structure prevents the public from being subject to decisions made unilaterally by an unelected official, who could become captured by private interests. The distribution of power among several individuals on the Board "avoids concentrating power in the hands of any single individual." *Seila L.*, 591 U.S. at 222-23. Lastly, unlike single-head offices, entities led by multimember boards have a robust basis—more than even a "foothold"—in "history [and] tradition." *Id.* at 222. For these reasons, when the Court ultimately invalidated the removal restrictions on the CFPB's director as a *single* head of the bureau, Chief Justice Roberts expressly suggested that "converting the CFPB into a multimember agency" would solve "the problem." *Id.* at 237.[13]

---

[12]    Instead, by bringing the Board to a complete halt, the President has foreclosed his own ability to see his Board appointees effectuate his agenda and has frozen the functioning of an important government office.

[13]    The Supreme Court's most recent removal protections case, *Collins v. Yellen*, 594 U.S. 220 (2021), was likewise about an office led by a single director, and the Court there reaffirmed it "did 'not revisit [its] prior decisions allowing certain limitations on the President's removal power'" in *Seila Law*. *Id.* at 250-51 (quoting *Seila L.*, 591 U.S. at 204).

Finally, two months ago, the Supreme Court denied certiorari in *Leachco*, where the Tenth Circuit upheld removal protections for commissioners on the Consumer Product Safety Commission under *Humphrey's Executor*—once again, declining to revisit that precedent. *See* 103 F.4th 748 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025).

> **b.    *Presidential Removal Power Has Never Been Viewed as Unrestricted.***

Defendants and their supporting states' amici go even further in suggesting that not only has *Humphrey's Executor* been repudiated over time but the opinion was also wrong at the time it was decided. Defs.' Opp'n at 8 n.2, 9; Tennessee's Amicus Br. at 7; *see* Twenty States' Amicus Br. at 6-7. Defendants read *Humphrey's* predecessor, *Myers v. United States*, 272 U.S. 52 (1926), as formalizing the President's "unrestricted removal power," which ultimately derives from the "vesting" clause in Article II establishing a "unitary" executive. Defs.' Reply at 1-2 (first passage quoting *Seila L.*, 591 U.S. at 215); Motions H'rg (Mar. 5, 2025), Rough Tr. at 30:22-31:4 (plaintiff's counsel describing *Myers* as a "building block" in the unitary executive theory). They are again misguided. While the *Myers* Court made clear that the President has a general removal power for executive officials, defendants' myopic focus on this case loses sight of the limitations in its holding, a point driven home in *Humphrey's Executor* decided less than a decade later. Nothing in the Constitution or the historical development of the removal power has suggested the President's removal power is absolute. In fact, the history upon which *Myers* relies and the immediately following Supreme Court decisions undercut any view that Congress, when exercising its constitutional authority to shape executive offices, is completely barred from conditioning the President's exercise of his removal authority.

In *Myers*, Chief Justice Taft—the only person to have served both as the President and a Justice of the Supreme Court—recounted and relied on the history of the Decision of 1789, a

congressional debate about the President's removal powers during the First Congress, to declare unconstitutional a statute requiring the "advice and consent of the Senate" for both appointment *and* removal of federal postmasters. *See* 272 U.S. at 107, 111-36, 176-77.[14]  The First Congress had created the first three executive departments, the Departments of Foreign Affairs, War, and Treasury, and after much debate, ultimately granted plenary removal power to the President over the Secretary of Foreign Affairs and crafted that agency to be an arm of the President.  *Id.* at 145; *see also* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 25-29 (1994).  The First Congress did not make clear whether that decision—to grant the President plenary removal authority over the Secretary of Foreign Affairs—derived from the Constitution or rather was granted by Congress's own prerogative.  *See Myers*, 272 U.S. at 285 n.75 (Brandeis, J., dissenting); Lessig & Sunstein, 94 COLUM. L. REV. at 26-28; *Seila L.*, 591 U.S. at 271 (Kagan, J., dissenting in part and concurring in part) ("The summer of 1789 thus ended without resolution of the critical question: Was the removal power 'beyond the reach of congressional regulation'?" (quoting Saikrishna Prakash, *New Light on the Decision of 1789*, 91 CORNELL L. REV. 1021, 1072 (2006))).  Some clarity in the First Congress's view may be gleaned, however, by the disparate approach that the Congress took with respect to the Department of the Treasury.  Seeing the Treasury as a department less intrinsically tied to core executive powers enumerated in Article II like that over foreign policy, Congress gave far more direction to the structure of that department, specifying in detail its offices and functions and granting independence from unfettered presidential removal power to the Comptroller.  *See* Lessig & Sunstein, *supra*, at 27-28.  In short, the executive branch was not treated as strictly

---

[14]    The statute regarding removal of the postmasters read: "Postmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or suspended according to law." *Myers*, 272 U.S. at 107.

unitary, but rather as a branch with units of varying degrees of independence and generally subject to congressional direction through checks and balances—including on its personnel. *See* John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 HARV. L. REV. 1939, 1964 n.135 (2011).

Chief Justice Taft in *Myers* cherry-picked only one portion of that 1789 story by highlighting what the First Congress did with the Department of Foreign Affairs. *See* 272 U.S. at 113-36; *Seila L.*, 591 U.S. at 277 (Kagan, J., dissenting in part and concurring in part) (describing how scholars have "rejected Taft's one-sided history"). Despite the structure of the Post Office far more closely resembling the Treasury Department of 1789 than the Department of Foreign Affairs, Chief Justice Taft ignored the actual nuances reflected in the Decision of 1789 as to congressional power to condition the President's removal power reflected in the treatment of the new Treasury Department and instead read this history "through executive-colored glasses" to support "his strong preconceptions" as former President "about presidential removal power," to reach the conclusion that a regional postmaster could not be subject to removal protections. Robert Post, *Tension in the Unitary Executive: How Taft Constructed the Epochal Opinion of* Myers v. United States, 45 J. SUP. CT. HIST. 167, 172 & n.56 (2020) (first passage quoting Hayden Smith to William H. Taft (Sep. 1, 1925) (Taft Papers)); *Myers*, 272 U.S. at 176; Lessig & Sunstein, *supra*, at 25-30.[15] Dicta in the lengthy *Myers* majority opinion made broad pronouncements about the importance of the presidential removal power that were both contradictory and inapposite: While Chief Justice Taft promoted the benefits of recognizing vast

---

[15] Notably, Chief Justice Taft reached this conclusion over three dissents, including from Justices Holmes and Brandeis. *Myers*, 272 U.S. at 178-295. Justice Brandeis, in particular, espoused a view of checks and balances that emphasized the interdependence of the executive and legislative branches, vindicated in Justice Jackson's concurring opinion in *Youngstown*, 343 U.S. at 634. *See Myers*, 272 U.S. at 240-95.

presidential removal authority on one hand, he recognized that Congress could legislate around appointment and removal of principal officers, in some circumstances, and inferior officers, refusing to threaten protections for the civil service, on the other.  *Id.* at 127, 134-35, 161-62, 183, 186 ("[T]here may be duties of a quasi judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President cannot in a particular case properly influence or control. . . . [Moreover,] [the appointments clause] give[s] to Congress the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them.").[16]

Only nine years later, in *Humphrey's Executor*, the Supreme Court—consisting of six of the same justices who participated in the *Myers* decision (*i.e.,* Justices Sutherland, Van Devanter, Brandeis, Stone, McReynolds, and Butler)—unanimously retreated, denouncing the idea of "illimitable" removal authority and disavowing *Myers'* abundant dicta.  *Morrison*, 487 U.S. at 687 ("In *Humphrey's Executor*, we found it 'plain' that the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." (quoting 292 U.S. at 629)).  Justice Sutherland, who authored *Humphrey's* despite joining the majority opinion in *Myers*, limited *Myers* to "the narrow point" that "the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress" and wrote that other "expressions . . . are beyond the point involved and therefore do not come within the rule of stare decisis.  In so far as they are out of harmony with the views here set forth, these expressions are disapproved."  *Humphrey's Ex'r*, 292 U.S. at 626-27.

---

[16]     The bold position taken by the current administration, *see* Exec. Order No. 14215, 90 Fed. Reg. 10447 (2025), that the President has supreme control over *all* of his subordinates threatens to upend limits on the removal power over *inferior* officers, expressly acknowledged in *Myers*.

*Humphrey's Executor*, consistent with the dissents in *Myers*, did not foreclose that the President may have total authority over removal of some officials (like "high political officers," *Myers*, 272 U.S. at 241 (Brandeis, J., dissenting)), but it made clear that his removal authority may certainly be limited by Congress in other circumstances.[17]  *Humphrey's Ex'r*, 292 U.S. at 629-32.

The takeaway from *Myers* is therefore discrete and uncontroversial: While Congress may structure executive branch offices via statute and legislate about the roles of executive branch officers, including standards for their removal, Congress cannot reserve for itself an active role in the removal decision.  The problem in *Myers* was that the statute required Senate advice and consent to remove postmasters and that encroached on the presidential power of removal.  272 U.S. at 107.  It cannot be gainsaid that the President has the power of removal of executive branch officers.  When Congress has statutorily provided a for-cause removal requirement, this means that the President has the authority to determine whether the for-cause requirement

---

[17]     Justice Brandeis's dissent in *Myers* was not so broad as to authorize Congress to restrict presidential authority over removal of anyone in the executive branch.  *See Myers*, 272 U.S. at 240-42 (Brandise, J., dissenting). Rather, he focused on the fact that the postmaster was an *inferior officer*, very unlike that of the Secretary of Foreign Affairs, and the mischief that would result if the majority decision were read to endorse absolute presidential removal authority for all officials.  *Id.* at 241, 247, 257 ("Power to remove, as well as to suspend, a high political officer, might conceivably be deemed indispensable to democratic government and, hence, inherent in the President. But power to remove an inferior administrative officer appointed for a fixed term cannot conceivably be deemed an essential of government."); *see also id.* at 181-82, 187, 193 (McReynolds, dissenting) (resisting *Myers'* overbroad dicta suggesting that *all* executive officers must serve at the pleasure of the President).  In the dissenters' views, a functional analysis into an office's role and responsibilities—like that in *Humphrey's Executor*—was necessary, but only for principal officers.

In the face of the current administration's push for a more absolutist presidential removal power, history provides significant cautions: Protections for inferior federal officers came about to counter the extensive "spoils system" that characterized the executive branch in the early 1800s—particularly during the presidency of Andrew Jackson, whose controversial legacy is due in part to his association with widespread corruption.  *See Myers*, 272 U.S. at 276-83 (McReynolds, J., dissenting); *id.* at 272 U.S. at 250-52 (Brandeis, J., dissenting).  Congress having a hand in executive appointments and removal was seen as an antidote to corruption.  Such provisions set the stage for the development of the modern civil service system.  *See id.*; Katherine Shaw, *Partisanship Creep*, 118 Nw. Univ. L. Rev. 1563, 1573 & n. 48 ("[A] few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, the foundation of modern civil service." (quoting *Elrod v. Burns*, 427 U.S. 347, 354 (1976))).

prescribed by Congress has been met.  As the Supreme Court has since repeatedly articulated, "the essence" of "*Myers* was the judgment that the Constitution prevents Congress from draw[ing] to itself the" power to remove.  *Morrison*, 487 U.S. at 686 (citing *Bowsher v. Synar*, 478 U.S. 714 (1986), for that interpretation).  That holding is completely compatible with *Humphrey's Executor*.  Little more can be gleaned from the unreliable historical retelling and prolix *Myers* majority opinion.[18]

    In short, neither the Founding-era history nor *Myers* can carry the heavy weight that the current President has thrust upon it.  *See* Letter from Acting SG ("In *Myers* . . ., the Supreme Court recognized that Article II of the Constitution gives the President an 'unrestricted' power of 'removing executive officers.'").  Neither supports the view that the President's removal power is "illimitable."  Whatever the benefits of unrestricted removal authority under certain circumstances, "[t]he Framers did not constitutionalize presidential control over all that is now considered 'executive'; they did not believe that the President must have plenary power over all we now think of as administration," Lessig & Sunstein, *supra*, at 118, and neither did the early twentieth century Supreme Court.

---

[18]    At the motions hearing, defense counsel argued that this interpretation of both *Myers* and *Humphrey's Executor* had been rejected by the Supreme Court in *Seila Law*, 591 U.S. at 228.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 62:1-17.  That is not so.  In *Seila Law*, amicus had distilled the Court's precedent as follows:

> *Humphrey's Executor* and *Morrison* establish a general rule that Congress may impose "modest" restrictions on the President's removal power, with only two limited exceptions. . . . Congress may not reserve a role *for itself* in individual removal decisions (as it attempted to do in *Myers* and *Bowsher*). And it may not eliminate the President's removal power altogether (as it effectively did in *Free Enterprise Fund*). Outside those two situations, amicus argues, Congress is generally free to constrain the President's removal power.

*Seila L.*, 591 U.S. at 228 (emphasis in original) (internal citations omitted).  Rather than reject that reconciliation of *Myers* and *Humphrey's Executor*, the Court simply restated the principle, uncontroverted in either precedent, that "the President's removal power is the rule, not the exception," *id.*, and then declined to revisit these precedents or to "elevate [*Humphrey's Executor*] into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority," *id.*  In other words, the Supreme Court neither constrained *Humphrey's Executor* by expanding *Myers* beyond its holding nor endorsed an expansion of *Humphrey's Executor* itself.  In short, *Seila Law*, on this matter, had frankly little to add.

The holding in *Humphrey's Executor*, that Congress could create boards or commissions with elements of independence from the President, was therefore not at all a "fiction" or an aberration, as defendants have supposed.  Defs.' Opp'n at 9.[19]  *Humphrey's Executor*, and thus NLRB Board members' removal protections, are consistent with the text and historical understandings of Article II, as well as the Supreme Court's most recent pronouncements.  That Congress can exert a check on the President by imposing for-cause restrictions on the removal of leaders of multimember boards or commissions is a stalwart principle in our separation of powers jurisprudence.

### c.       Humphrey's Executor *Remains Binding.*

In any case, *Humphrey's Executor* remains binding on this Court, as defendants rightly acknowledge.  *See* Defs.' Opp'n at 8 n.2; *Illumina*, 88 F.4th at 1047 ("[T]he question of whether . . . *Humphrey's Executor* [is] no longer binding" is for the Supreme Court alone to answer.).  As the Supreme Court has made clear, "[i]f a precedent . . . has direct application in a case, yet appears to rely on reasons rejected in some other line of decisions," the lower courts should still "leav[e] to the [Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This court is charged with following case law that directly controls a particular issue, 'leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" (alterations in original) (quoting *Mallory v. Norfolk S. Ry. Co.*,

---

[19]       Nor can *Humphrey's Executor* be fairly described as an "exception[]" to the general rule of presidential removal authority.  *Contra Seila L.*, 591 U.S. at 198.  As explained, a careful reading of the history and the scope of the dispute in *Myers* confirms that *Humphrey's Executor* was not some exception to an otherwise absolute presidential removal power previously established in *Myers.*  To the extent *Myers* extolled such an absolute presidential removal power in overbroad dicta, it was in short order rejected by a unanimous Supreme Court.  *Myers* simply established that the President alone may exercise removal authority over principal officers, and *Humphrey's Executor* explained that Congress can set standards, without conferring the exercise of that power to itself, to cabin the President's singular exercise of that authority in the circumstances presented.

600 U.S. 122, 136 (2023))); *Meta Platforms*, 723 F. Supp. 3d at 87 ("It is certainly not this Court's place to deem a long-standing Supreme Court precedent obsolete . . . and thus no longer binding." (internal quotation marks and citation omitted)).  This Court would be bound to conclude that plaintiff's termination was unlawful even were the conclusion reached—and this Court adamantly has not—that *Humphrey's Executor* was, by today's measure, ill-reasoned or wrongly decided.

### B.     Plaintiff is Entitled to Permanent Declaratory and Injunctive Relief.

For all of these reasons, plaintiff prevails on the merits and is therefore entitled to a declaratory ruling that she was unlawfully terminated from her position as a member of the Board.  Defendants concede as much.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 71:23-72:1 (defense counsel stating, "We are not fighting this requested declaratory judgment.").

Plaintiff further requests injunctive relief against Mr. Kaplan, ordering him to allow plaintiff to carry out all of her duties.  Compl. at 7.  To demonstrate that injunctive relief is warranted, a plaintiff must show that (1) she has suffered an irreparable injury, (2) remedies available at law are inadequate to compensate, (3) a remedy in equity is warranted considering the balance of the hardships to each party, and (4) the public interest is not disserved.  *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006).  Notwithstanding plaintiff's success on the merits, defendants contest her entitlement to injunctive relief.  Defs.' Opp'n at 10.

#### 1.     *Plaintiff's Irreparable Harm and Inadequate Remedies at Law*

Plaintiff is suffering irreparable harm that cannot be repaired in the absence of an injunction.[20]  Courts have recognized as irreparable harms the "unlawful removal from office by the President" and "the obviously disruptive effect" that such removal has on the organization's

---

[20]     These two factors are often considered together.  *See, e.g.*, *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ), 2025 WL 665041, at *32 (D.D.C. Mar. 1, 2025).

functioning. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at * 5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983). In *Berry*, terminated members of the Civil Rights Commission challenged President Reagan's decision to remove them. *Id.* at *1. The Commission was "left without a quorum," and the court recognized as an irreparable injury both the commission's inability to "fulfill its mandate" and the individuals' inability to serve "Congress in the furtherance of civil rights." *Id.* at *5. Likewise here, plaintiff has been deprived of a presidentially appointed and congressionally confirmed position of high importance, and both she and, by consequence, the NLRB have been deprived of the ability to carry out their congressional mandate in protecting labor rights—which cannot be retroactively cured by monetary damages. *See id.*; *Dellinger v. Bessent*, No. 25-cv-385 (ABJ), 2025 WL 471022, at *11-13 (D.D.C. Feb. 12, 2025) ("[T]he loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief."); *Harris v. Bessent*, --F. Supp.3d--, No. 25-cv-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18, 2025) ("By vindicating [her] right to occupy th[at] office, th[is] plaintiff[] act[s] as much in [her] own interests as those of [her] agenc[y's]. . . . Striking at the independence of these officials accrues harm to their offices, as well.").[21]

Furthermore, plaintiff and the NLRB suffer an injury due to the loss of the office's independence. As an entity entrusted with making impartial decisions about sensitive labor

---

[21] Defendants argue that because President Trump could restore the NLRB's quorum by appointing members to fill the vacant seats, the harm here is not irreparable. Defs.' Opp'n at 14. While filling the open seats would halt the ongoing harm and prevent future harm, restoration of the NLRB's quorum would not do anything to *repair* the past harm—the backlog of cases, the months employers and employees have spent waiting for adjudications, the practical ramifications felt across the country (from workers' rights violations to workplace unrest) of labor disputes left unresolved, delayed union recognition, and so forth. The possibility that the NLRB could once again operate may be one difference between this case and the situation of the Civil Rights Commission in *Berry*, where the Commission was set to expire before it could fulfill its statutory mandate, *see* 1983 WL 538, at *5, but that possibility does not make the harm here somehow reparable. The NLRB's statutory mandate is not to—at some point in time—operate, contrary to defendants' suggestion, Defs.' Opp'n at 14-15, but rather to have an ongoing, efficient administration of the country's labor laws.

disputes, the NLRB's character and perception as neutral and expert-driven is damaged by plaintiff's unlawful removal.  *See Humphrey's Ex'r*, 295 U.S. at 630 ("[The] coercive influence [of the removal power] threatens the independence of a commission."); *Harris*, 2025 WL 679303, at *13 ("[T]he MSPB's independence would evaporate if the President could terminate its members without cause, even if a court could later order them reinstated.").  Money likewise cannot make up for that kind of intangible and reputational harm.

Defendants argue that, regardless of the injury, plaintiff's requested remedy—reinstatement to her position—is one the Court cannot grant.  Defs.' Opp'n at 11.  Not only have all previous cases sought back pay instead of reinstatement, defendants point out, but also reinstatement is not a remedy historically available at equity, which constrains the relief available to the Court today.  *Id.* at 12 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).  Plaintiff counters, however, that she does not request the remedy of "reappointment" and does not need to be reinstated: She requests only a declaration that the President lacked authority to remove her—making the termination email void *ab initio*—and injunctive relief to enable her to carry out her position as before.  *See* Pl.'s Reply at 9.

Defendants do not challenge the Court's ability to afford declaratory relief, but they do challenge an injunction running against the executive branch, even against the President's subordinates, to permit plaintiff to carry out her duties.  Defs.' Opp'n at 11, 13.  They contend that such relief would effectively "compel[]" the President "to retain the services of a principal officer whom he no longer believes should be entrusted with the exercise of executive power."  Defs.' Opp'n at 11; *see also* Defs.' Reply at 7-8.  At most, however, this argument simply restates defendants' position on the merits, because, as a general matter, courts undoubtedly have authority to constrain unlawful presidential action by enjoining the President's subordinates.

31

*See, e.g.*, *Youngstown*, 343 U.S. at 582, 589 (holding a presidential act unconstitutional and affirming the district court judgment which restrained Secretary of Commerce); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.' *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment). Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.' *Soucie v. David*, 448 F.2d 1067, 1072 n. 12 (D.C. Cir. 1971)." (alterations in original)); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) (noting that a court "can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order").

Moreover, the D.C. Circuit has held such relief is appropriate in this type of employment context: A court may, by targeting a President's subordinates, "reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment" that would require injunctive relief against the President himself. *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (holding that the plaintiff's injury was therefore redressable); *cf. Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (holding that plaintiff's claim was redressable because injunctive relief against inferior officials, who could *de facto* reinstate plaintiff by allowing him to exercise the privileges of his office, would remedy plaintiff's harm); *see also Harris*, 2025 WL 679303, at *10-12 (holding that the court can order such relief to remedy an unlawful termination and relying on *Swan* and *Severino*); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ),

2025 WL 665041, at *29-31 (D.D.C. Mar. 1, 2025) (same).  The Court therefore has the

authority to issue both the declaratory and injunctive remedies that plaintiff seeks.[22]

## 2. *Balance of the Equities and the Public Interest*

The balance of the equities and the public interest also favor injunctive relief here.  *See*

*Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, where the government is a party, "[t]hese

two factors merge").  The public has an interest in efficient and peaceful resolution of labor

conflicts, and the Board's functioning is crucial to that goal.  In 2024, the NLRB received 20,000

to 30,000 unfair labor practice charges, and the Board reviewed 144 unfair labor practice cases

---

[22]    Defendants' arguments that plaintiff may not be "reinstated" or "reappointed" because reinstatement was not a remedy originally available at equity are not only inconsequential because relief need not be fashioned in that form, as described above, but they are also flawed.  Defendants' argument ultimately boils down to a technical distinction: Historically, requests for reinstatement were styled as writs of mandamus or *quo warranto* before courts of law instead of requests for injunctions before courts of equity, as defendants' cited cases reflect.  Defs.' Opp'n at 12; Twenty States' Amicus Br. at 3; *see In re Sawyer*, 124 U.S. 200, 212 (1888) (noting that while a court of equity does not have "jurisdiction over the appointment and removal of public officers, . . . the courts of law, . . . either by certiorari, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*" do); *White v. Berry*, 171 U.S. 366, 377 (1898) (same).  After the merger of law and equity in the federal courts over eighty years ago, however, that distinction makes no difference and does not render improper the injunctive relief plaintiff requests.

Unsurprisingly, many courts have, therefore, reinstated federal employees to their positions or prevented their removals from taking effect.  *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) ("[P]etitioner is entitled to the reinstatement which he seeks."); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that plaintiff was "entitled to reinstatement"); *Paroczay v. Hodges*, 219 F. Supp. 89, 94 (D.D.C. 1963) (holding that, because plaintiff "was never legally separated," the court "will therefore order plaintiff's reinstatement"); *Berry*, 1983 WL 538, at *6 (enjoining removal of members of the U.S. Commission on Civil Rights); *cf. Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (acknowledging that "[u]se of the court's injunctive power" may be appropriate in certain cases regarding discharge of employees).  The other cases cited by defendants for the principle that reinstatement is not available as equitable relief, Defs.' Opp'n at 12, involve the unique situation of federal courts presiding over questions about state officers' entitlement to their positions, which is wholly inapplicable here.  *See Baker v. Carr*, 369 U.S. 186, 231 (1962) (citing cases about "enjoin[ing] a state proceeding to remove a public officer"); *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 489-90 (1924) (holding that the district court did not have "jurisdiction over the appointment and removal of state officers"); *Harkrader v. Wadley*, 172 U.S. 148, 165-70 (1898) (declining to enjoin a state criminal proceeding); *see also* Twenty States' Amicus Br. at 16-17 (making the inapposite argument that imposing a remedy of reinstatement of state officers invades state sovereignty).

In any case, the D.C. Circuit has "note[d] that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty."  *Swan*, 100 F.3d at 976 n.1.  Indeed, plaintiff made a last-minute request in her Notice of Supplemental Authority, ECF No. 33 at 4, for a writ of mandamus in the alternative.  A writ of mandamus requires that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *Id.* at 4 n.1 (alteration accepted) (quoting *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted)).  Accordingly, if injunctive relief were not available here because of adherence to the historical dividing lines of law and equity, a writ of mandamus would likely be available, and the effective relief provided to plaintiff would be the same.  *See Harris*, 2025 WL 679303, at *11.

and 115 election certification cases. *See* Nineteen States & D.C.'s Br. at 7, ECF No. 31 (citing NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V; NLRB, *Board Decisions Issued*, https:www.nlrb.gov/reports/agency-performance/board-decisions-issued (last visited Feb. 24, 2025)). Without a functioning NLRB, unfair labor practices go unchallenged, union elections go unrecognized, and pending labor disputes go unreviewed. *See* Pl.'s Mem. at 12 (providing one example where Whole Foods has refused to recognize a union election because it claims the NLRB lacks the authority to certify it); Pl.'s Reply at 12 (citing an additional example where CVS has refused to recognize a majority elected union). Incentives to comply with national labor law may be severely undercut if no agency is available for enforcement. Employees, employers, and bargaining units all suffer as a result. The public also has an interest in the protection of duly enacted, constitutional laws—like the NLRA—from encroachment from other branches. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))). Reinstating plaintiff would allow the NLRB to reach a quorum, thereby allowing the Board to carry out the important work in promoting labor stability, adjudicating labor disputes, and protecting workers' rights, without inflicting any measurable harm on defendants.[23]

Defendants protest that the President will indeed experience harm—by virtue of retaining "a principal officer whom the President no longer believes should be entrusted with the exercise of executive power," resulting in the executive branch "slip[ping] from the Executive's control, and thus from that of the people." Defs.' Opp'n at 15 (second passage quoting *Free Enter. Fund*,

---

[23] As plaintiff's supporting state amici point out, a less partisan Board, insulated from at-will removal, is less likely to whipsaw the public by taking completely disparate approaches every four years, which has concomitant public benefits in greater stability and predictability in administration of the law. *See* Nineteen States & D.C. Br. at 9 n.21.

561 U.S. at 499).  Yet, President Trump can exercise control over the NLRB by appointing two members of his choosing to the vacant seats and appointing a General Counsel who will adopt his enforcement priorities; he simply has chosen not to do so.  In any case, whether the public will benefit more from the balance Congress has struck in preserving some independence from political whims in the administration of our national labor laws or from complete executive control goes to the core of the constitutional question underlying the merits—and thus the answer is dictated by binding precedent.

Finally, defendants predict their ultimate success before the Supreme Court, warning that if plaintiff is allowed to resume her duties on the Board now, any NLRB decisions in the meantime may be voidable, and "the NLRB will be under a heavy cloud of illegitimacy."  Defs.' Reply at 9; *see also* Defs.' Opp'n at 16; Twenty States' Amicus Br. at 16 (suggesting that "reinstatement hampers effective governance" by causing "intra-office 'chaos'" and questions about the fitness of the official).  The possibility of future changes in the law is not enough, however, to permit an unlawful termination and the halting of all Board activity in the meantime. Plaintiff's wrongful termination has caused "chaos" enough and shall not be allowed to stand based on defendants' self-serving speculation.

## IV.  CONCLUSION

The President seems intent on pushing the bounds of his office and exercising his power in a manner violative of clear statutory law to test how much the courts will accept the notion of a presidency that is supreme.  Defendants cite in their briefing *Trump v. United States*, 603 U.S. 593, 608-09 (2024) (granting the President absolute and presumptive immunity from criminal liability for "official acts"), to argue that the removal power is "conclusive and preclusive," with the result that the President need not be subject to criminal *or civil* legislative constraints.  Defs.'

Reply at 7.  The courts are now again forced to determine how much encroachment on the legislature our Constitution can bear and face a slippery slope toward endorsing a presidency that is untouchable by the law.  The President has given no sufficient reason to accept that path here.

*Humphrey's Executor* and its progeny control the outcome of this case and require that plaintiff be permitted to continue her role as Board member of the NLRB and her termination declared unlawful and void.  The Constitution and caselaw are clear in allowing Congress to limit the President's removal power and in allowing the courts to enjoin the executive branch from unlawful action.  Defendants' hyperbolic characterization that legislative and judicial checks on executive authority, as invoked by plaintiff, present "extraordinary intrusion[s] on the executive branch," Defs.' Opp'n at 1, is both incorrect and troubling.  Under our constitutional system, such checks, by design, guard against executive overreach and the risk such overreach would pose of autocracy.  *See Myers*, 272 U.S. at 293 (Brandeis, J., dissenting).  An American President is not a king—not even an "elected" one[24]—and his power to remove federal officers and honest civil servants like plaintiff is not absolute, but may be constrained in appropriate circumstances, as are present here.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 6, 2025

**BERYL A. HOWELL**
United States District Judge

---

[24]     Motions H'rg (Mar. 5, 2025), Rough Tr. at 43:9 (plaintiff's counsel highlighting the constitutional role of other branches in checking President's authority).

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.



==Additional reason that appeal #25-1158 must be dismissed with prejudice; which is the Plaintiffs' (failure)/ NON JOINDER of ELON MUSK as a defendant in district court case # 25-1158:==

_Which is to say;_
_The Plaintiff [democratic AG states] have wrongly failed to JOINDER an indispensable party ELON MUSK….._ {e.g. MUSK is behind the EO at issue — [as to the "redefining" BIRTHRIGHT CITIZENSHIP IN THE UNITED STATES] and ELON MUSK {MUSK} …has a history of ACTIVELY

*ENCOURAGING RAMPANT RACISM AND [a] CULTURE OF RAMPANT ABUSE OF HIS EMPLOYEES {e.g. Black African Americans... and by extension (ALSO) Hispanic/ Mexican employees additionally}; similarly (e.g. SEE OUR CORRECTED - MOTION TO DISMISS AND EXHIBITS HERETO)... current*

*defendant [President Donald Trump, et al.... through and at the direction of ELON MUSK's [DOGE DEPARTMENT]] have a DOCUMENTED HISTORY OF INTENTION ABUSE and TRAUMA BEING PUT AGAINST THE current FEDERAL EMPLOYEE WORKFORCE {e.g. which appears to be "LASER FOCUSED" upon/*

*against that of Democratic-Black African American "senior" Federal Employees} and ...ALONG WITH US EPA (current ADMINISTRATOR - LEE ZELDIN, and ELON MUSK, the defendants President Donald Trump, et al... in district Court Case #25-1158) ...are colluding {to further destroy cohesiveness in America...*

*with plans to FIRE for NO REASON thousands of federal employees at the US EPA and US EPA Title VI department.... which is also designed to SHIELD the US EPA from liability in the and as to the Flint Water Crisis.... to (by using silly slogans such as) "MAKE AMERICA GREAT AGAIN"... but in reality the TRUMP goal is to be ....*

*"MAKING AMERICA MORE HATEFUL AGAIN"…. with and by putting forth "DICTATOR and KING" fiat — Executive Orders [EO's]…. which at the end of the day… are ALL rooted in one thing — and that is MAKING PRESIDENT DONALD TRUMP "A DICTATOR AGAIN"…. so that Jan. 6th…. can NOW come into*

FULL expanded aperture of [him/ Mr. Donald Trump] NEVER having to "give up power of being the president" by INSTALLING himself as the Dictator that Mr. Donald Trump is …. with (e.g. one unconstitutional) Executive Order at a time…. In the HOPES…. THAT his "BUDDIES" at the US SUPREME COURT

...will "do him a solid" [a]nd actually UPHOLD the current "birthright citizenship Executive Order which is at issue in (our/ my) instant appeal #25-1158.

And, so here — an INDISPENSABLE PARTY who has NOT been properly brought "into/ under" the

*JURISDICTION of the District Court via civil case #25-1158... [is for sure] ...that of the #1, and/ or #2 or #3 guy in charge at the President Donald Trump white-house... [and] that is: ELON MUSK.*

*Thank you.*
*(continued on the NEXT page)*

*Best,*

*Date: 3-10-2025*

_____

*Melvin Jones Jr. disabled*
*PRO SE appellant (interested party)*
*1935 Hosler St.*
*Flint, Michigan 48503*
*Email: jonesjrmel@gmail.com*
*Google voice to text ph#*
*415-562-5074*

*–*

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

---

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.

**AFFIDAVIT IN SUPPORT OF MOTION TO DISMISS APPEAL 25-1158  - Pro Se - Interested Party  {disabled} proposed intervenor MELVIN JONES JR.**

## _AFFIDAVIT_:

_I, Melvin Jones Jr., hereby declare that I am over 18 years of age, and I have either read, typed, or listened to the attached supporting exhibits which ARE part of my instant affidavit in support of the pending CORRECTED motion to dismiss pro se appeal #25-1158._

_And, as a matter of "economy" for my serious vision impairments and my episodic very blurry vision… I have to refer to and incorporate said attached exhibits INTO my affidavit here… whereby on reliable information, believe, or observation, and/ or personal knowledge, and/ or_

recollection and/ or understanding which I [NOW] have…. I do further declare and attest to the following;

- The title of my instant affidavit CAN BE EASILY called "**_back to the future_**"... whereby NOW (e.g. as a political stunt of the ELON MUSK, and DONALD TRUMP {REPUBLICAN} white house administration).... Is attempting to WHITE-WASH and rewrite history regarding WHO [e.g. what political party] is TRULY responsible for millions of undocumented migrants from ALL over the world literally taking unlawful advantage of the intentionally broken and open

*border policy which has plagued the United States since the late 1970's; which is that of REPUBLICAN initiated AMNESTY for illegal aliens which was VERY well a certain means by which the REPUBLICAN PARTY was able to be such a dominant force in the WHITE HOUSE …such as former U.S. president RONALD REGAN.*

*For example,* *As the nation's attention turns back to the fractured debate over immigration, it might be helpful to remember that in 1986, Ronald Reagan signed a sweeping*

*immigration reform bill into law. It was sold as a crackdown: There would be tighter security at the Mexican border, and employers would face strict penalties for hiring undocumented workers.*

*But the bill also made any immigrant who'd entered the country before 1982 eligible for amnesty -- a word not usually associated with the father of modern conservatism.   In his renewed push for an immigration overhaul this week, President Obama called for Republican support for a bill to*

address the growing population of illegal immigrants in the country. This time, however, Republicans know better than to tread near the politically toxic A-word. **_Part of this aversion is due to what is widely seen as the failure of Reagan's 1986 Immigration Reform and Control Act. However, one of the lead authors of the bill says that unlike most immigration reform efforts of the past 20 years, amnesty wasn't the pitfall._**

**_"We used the word 'legalization,' " former_**

*Wyoming Sen. Alan K. Simpson tells NPR's Guy Raz. "And everybody fell asleep lightly for a while, and we were able to do legalization."*

*The law granted amnesty to nearly 3 million illegal immigrants, yet was largely considered unsuccessful because the strict sanctions on employers were stripped out of the bill for passage.*

*Simpson says the amnesty provision actually saved the act from being a total loss. "It's not perfect, but 2.9 million people came forward. If you can bring*

*one person out of an exploited relationship, that's good enough for me."*

## Reagan And Amnesty

*Nowadays, conservative commentators like Glenn Beck and Rush Limbaugh often invoke the former president as a champion of the conservative agenda. Sean Hannity of Fox News even has a regular segment called "What Would Reagan Do?"*

*Simpson, however, sees a different person in the president he called a "dear friend."*

==Reagan "knew that it was not right for people to be abused," Simpson says. "Anybody who's here illegally is going to be abused in some way, either financially [or] physically. They have no rights.=="

*Source:*

https://www.npr.org/2010/07/04/128303672/a-reagan-legacy-amnesty-for-illegal-immigrants

//
For the reasons stated herein and for the reasons stated in the attached exhibits affixed hereto [and] for the reasons

*set forth in the approx. 8 Citations of Supplemental Authorities in appeal #25-1158 filed by the appellants [e.g. Melvin Jones Jr. and/or Colleen Connors]…. I believe that my instant affidavit further supports that the currently pending CORRECTED motion to dismiss appeal #25-1158 with prejudice should be granted by the 1st Circuit Court of*

*Appeals... immediately and forthwith.*

*I, Melvin Jones Jr., do swear and affirm, and attest that the foregoing statements made by me in my affidavit are true and correct... to the best of my knowledge, information, belief, understanding, recollection, and/ or personal knowledge per 28 USC S. 1747 under*

penalty of perjury my
attestation is made herein.


Thank you.


Best,
Date: 3-9-2025
_____
Melvin Jones Jr. disabled
PRO SE appellant (interested
party)
1935 Hosler St.
Flint, Michigan 48503

Email: *jonesjrmel@gmail.com*

Google voice to text ph#

415-562-5074

–

# SEE  THE ATTACHED EXHIBITS AFFIXED HERETO ON THE NEXT PAGE[s].....



Play Live Radio

MY PLAYLIST

                                                            DONATE

---

**HISTORY**

# A Reagan Legacy: Amnesty For Illegal Immigrants

JULY 4, 2010 · 2:12 PM ET

HEARD ON ALL THINGS CONSIDERED

By NPR Staff

**11-Minute Listen**                    PLAYLIST    TRANSCRIPT



"I believe in the idea of amnesty for those who have put down roots and lived here, even though sometime back they may have entered illegally," Ronald Reagan said in 1984.

*Hulton Archive/Getty Images*

As the nation's attention turns back to the fractured debate over immigration, it might be helpful to remember that in 1986, Ronald Reagan signed a sweeping immigration reform bill into law. It was sold as a crackdown: There would be tighter security at the Mexican border, and employers would face strict penalties for hiring undocumented workers.

But the bill also made any immigrant who'd entered the country before 1982 eligible for amnesty -- a word not usually associated with the father of modern conservatism.

In his renewed push for an immigration overhaul this week, President Obama called for Republican support for a bill to address the growing population of illegal immigrants in the country. This time, however, Republicans know better than to tread near the politically toxic A-word.

Part of this aversion is due to what is widely seen as the failure of Reagan's 1986 Immigration Reform and Control Act. However, one of the lead authors of the bill says that unlike most immigration reform efforts of the past 20 years, amnesty wasn't the pitfall.

"We used the word 'legalization,' " former Wyoming Sen. Alan K. Simpson tells NPR's Guy Raz. "And everybody fell asleep lightly for a while, and we were able to do legalization."

The law granted amnesty to nearly 3 million illegal immigrants, yet was largely considered unsuccessful because the strict sanctions on employers were stripped out of the bill for passage.

Simpson says the amnesty provision actually saved the act from being a total loss. "It's not perfect, but 2.9 million people came forward. If you can bring one person out of an exploited relationship, that's good enough for me."

## Reagan And Amnesty

Nowadays, conservative commentators like Glenn Beck and Rush Limbaugh often invoke the former president as a champion of the conservative agenda. Sean Hannity of Fox News even has a regular segment called "What Would Reagan Do?"

Simpson, however, sees a different person in the president he called a "dear friend."

Reagan "knew that it was not right for people to be abused," Simpson says. "Anybody who's here illegally is going to be abused in some way, either financially [or] physically. They have no rights."

Peter Robinson, a former Reagan speechwriter, agrees. "It was in Ronald Reagan's bones -- it was part of his understanding of America -- that the country was fundamentally open to those who wanted to join us here."

Reagan said as much himself in a televised debate with Democratic presidential nominee Walter Mondale in 1984.

"I believe in the idea of amnesty for those who have put down roots and lived here, even though sometime back they may have entered illegally," he said.

### Now, Amnesty Is Out; Border Security Is In

More than 20 years later, the Republican Party has changed its tune. President Obama's call for bipartisanship on the immigration issue was answered by Senate Republican Leader Mitch McConnell. A bipartisan effort would be possible, he said, if Obama "would take amnesty off the table and make a real commitment to border and interior security."

But Simpson, a fellow Republican who served in the Senate with McConnell from 1986 to 1997, says calling for tighter borders is a tried-and-true tactic of politicians unwilling to confront the realities of a growing illegal population.

"That's always the palliative that makes people feel good," he says. "You just say, 'Well, we're still dinkin' around with immigration, so since we can't seem to get anything done and our constituents are raising hell -- how do we get re-elected?' Well, you just put some more money into the border."

Robinson says Reagan's own diaries show the president found the idea of a militantly staffed border fence difficult to take. In a private meeting with then-President Jose Lopez Portillo of Mexico in 1979, Reagan wrote that he hoped to discuss how the United States and Mexico could make the border "something other than the location for a fence."

### Fix It Before You Overhaul It

These days, Republicans are also calling for existing laws to be toughened up, which Reagan would have agreed with, Robinson says. In fact, Robinson says, he would have been so upset at the federal government's failure to make good on the 1986 reform that he would have demanded for that law to be fixed first before instituting a new overhaul.

"He, too, would have been right there in saying, 'Fix the borders first.' " Where he would have differed, Robinson says, is his welcoming attitude toward immigrants.

"He was a Californian," Robinson says. "You couldn't live in California ... without encountering over and over and over again good, hard-working, decent people -- clearly recent arrivals from Mexico."

That the U.S. failed to regain control of the border -- making the 1986 law's amnesty provision an incentive for others to come to America illegally -- would have infuriated Reagan, Robinson says.

"But I think he would have felt taking those 3 million people and making them Americans was a success."

 Gmail

MEL JONES JR <jonesjrmel@gmail.com>

## Attached is the most recent/last email sent to you and me from Hayley Cormack at the US EPA Title VI department, which was received on February 11, 2025.
1 message

**Colleen Connors** <cmcolleen4@gmail.com>                                                                Sun, Mar 9, 2025 at 7:21 AM
To: Deborah Greenspan <deborah.greenspan@blankrome.com>, Zeldin.Lee@epa.gov, mobrien@irli.org, chajec@irli.org,
gcanaan@irli.org, gwv@dcglaw.com, tmccotter@boydengray.com, daniel.epstein@aflegal.com, "jon@publicrightsproject.org"
<jon@publicrightsproject.org>, serviceS3@michigan.gov, giovanatiN@michigan.gov, Stacey.Metro@ag.ny.gov,
Annabelle.Wilmott@doj.ca.gov, Lorraine.Lopez@doj.ca.gov, Delbert.Tran@doj.ca.gov, zoe.levine@ag.ny.gov,
Irina.Trasovan@doj.ca.gov, "denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "nicole.hill@dc.gov"
<nicole.hill@dc.gov>, "robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "gerard.cedrone@mass.gov"
<gerard.cedrone@mass.gov>, "brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>, jgrayson@nmdoj.gov,
molly.alarcon@sfcityatty.org, "david.louk@sfcityatty.org" <david.louk@sfcityatty.org>, shannon.stevenson@coag.gov,
ksadeck@riag.ri.gov, jared.b.cohen@mass.gov, john.keller@ag.state.mn.us, johnsonkarpg@doj.state.wi.us,
julio.thompson@vermont.gov, dmosteller@ncdoj.gov, "jeremy.feigenbaum@njoag.gov" <Jeremy.feigenbaum@njoag.gov>,
shankar.duraiswamy@njoag.gov, Viviana.hanley@njoag.gov, shefali.saxena@law.njoag.gov, Elizabeth.walsh@law.njoag.gov,
HStern@ag.nv.gov, akirschner@oag.state.md.us, Janelle.Medeiros@ct.gov, PolicyOffice@epa.gov, EIS-Filing@epa.gov,
education@epa.gov, NEPAssisthelp@epa.gov, NEPA@epa.gov, eric.wessan@ag.iowa.gov, matt.rice@ag.tn.gov,
nlindzen@corpfraudlaw.com, yuri.s.fuchs@usdoj.gov, sara.eisenberg@sfcityatty.org, "cc: MEL JONES JR"
<jonesjrmel@gmail.com>, Colleen Connors <CMColleen4@gmail.com>, "Marissa.Malouff@doj.ca.gov"
<Marissa.Malouff@doj.ca.gov>, "vanessa.kassab@delaware.gov" <vanessa.kassab@delaware.gov>,
"kaliko.d.fernandes_hawaii_gov" <kaliko.d.fernandes@hawaii.gov>, "harrist19@michigan.gov" <harrist19@michigan.gov>,
"eng.connie@epa.gov" <eng.connie@epa.gov>, "egle-nondiscriminationCC@michigan.gov" <egle-
nondiscriminationCC@michigan.gov>, "Cormack, Hayley" <Cormack.Hayley@epa.gov>, "EGLE-
Accessibility@michigan.gov" <EGLE-Accessibility@michigan.gov>, "Faltin, Todd (he/they)" <Faltin.Todd@epa.gov>,
"Oviedo, Luis" <oviedo.luis@epa.gov>, "MacMillan-Sanchez, Ariel (she/her/hers)" <MacmillanSanchez.Ariel@epa.gov>,
"Johnson, Johanna (she/her/hers)" <Johnson.Johahna@epa.gov>, "Mason, Trinita" <Mason.Trinita@epa.gov>, "Moore,
Tammy" <moore.tammy@epa.gov>, "Walts, Alan (he/him/his)" <walts.alan@epa.gov>, "Risley, David"
<Risley.David@epa.gov>, "tmlewis@cityofflint" <tmlewis@cityofflint.com>, "cmcgehee@pittlawpc.com"
<cmcgehee@pittlawpc.com>, "eric.a.rey@usdoj.gov" <eric.a.rey@usdoj.gov>, "Jason.T.Cohen@usdoj.gov"
<Jason.T.Cohen@usdoj.gov>, "OIG_Hotline@epa.gov" <OIG_Hotline@epa.gov>, Corey <cstern@levylaw.com>, Patrick
Lanciotti <PLanciotti@napolilaw.com>, "dpettway@cityofflint.com" <dpettway@cityofflint.com>, "saneeley@cityofflint.com"
<saneeley@cityofflint.com>, "mbard@cityofflint.com" <mbard@cityofflint.com>, "michelle.t.domingue.II@usdoj.gov"
<michelle.t.domingue.II@usdoj.gov>, "Kaplan, Robert (he/him/his)" <kaplan.robert@epa.gov>, Mel jones jr
<meljonesjr@gmail.com>, "marianne.f.kies@usdoj.gov" <marianne.f.kies@usdoj.gov>, "daniel.c.eagles@usdoj.gov"
<daniel.c.eagles@usdoj.gov>, "kuhlr@michigan.gov" <kuhlr@michigan.gov>, "gambilln@michigan.gov"
<gambilln@michigan.gov>, "MitosinkaA@michigan.gov" <MitosinkaA@michigan.gov>, gaiello@mayerbrown.com"
<gaiello@mayerbrown.com>, "jkuptz@cityofflint.com" <jkuptz@cityofflint.com>, "dfaraci@campbell-trial-lawyers.com"
<dfaraci@campbell-trial-lawyers.com>, "alin@eisnerlaw.com" <alin@eisnerlaw.com>, "ccmushatt@cityofflint.com"
<ccmushatt@cityofflint.com>, "heidy.gonzalez@usdoj.gov" <heidy.gonzalez@usdoj.gov>, AG attorney as to MI COC civil
case #23-000115-MZ <bettenhausenm@michigan.gov>, robinsonr11 <robinsonr11@michigan.gov>, Justus Brown
<jubrown@cityofflint.com>, Kameshia Ar-Rahmaan <kar-rahmaan@cityofflint.com>, Davina Donahue
<ddonahue@cityofflint.com>, City of Flint Clerk's Office <cityclerk@cityofflint.com>, Davina Donahue
<CouncilPublicComment@cityofflint.com>, "trachelleyoung@gmail.com" <trachelleyoung@gmail.com>, Ladel Lewis
<llewis@cityofflint.com>, Judy Priestley <jpriestley@cityofflint.com>, Tonya Burns <tburns@cityofflint.com>, Mark Cuker
<mark@cukerlaw.com>, "michael.l.williams@usdoj.gov" <michael.l.williams@usdoj.gov>, "molsen@mayerbrown.com"
<molsen@mayerbrown.com>, "jcampbell@campbell-trial-lawyers.com" <jcampbell@campbell-trial-lawyers.com>, "mnguyen-
dang@mayerbrown.com" <mnguyen-dang@mayerbrown.com>, "pnapoli_napolilaw.com" <pnapoli@napolilaw.com>, Renee
Auten <rauten@thelandbank.org>, Jennifer Riggs <jriggs@thelandbank.org>, Jeremy Maltz <jeremy@lehotskykeller.com>,
"hammoudf1@michigan.gov" <HammoudF1@michigan.gov>, Michigan Attorney General <miag@michigan.gov>,
"dweyre@mcalpinepc.com" <dweyre@mcalpinepc.com>, "g@mayerbrown.com" <g@mayerbrown.com>,
"ljiang@susmangodfrey.com" <ljiang@susmangodfrey.com>, mpitt <mpitt@pittlawpc.com>, Hunter Shkolnik
<hunter@napolilaw.com>, "arosenman@mayerbrown.com" <arosenman@mayerbrown.com>, Theodore Leopold
<tleopold@cohenmilstein.com>, Emmy Levens <elevens@cohenmilstein.com>, Flint Mayor <mayor@cityofflint.com>,
"frank.bednarz@hlli.org" <frank.bednarz@hlli.org>, "ted.frank@hlli.org" <ted.frank@hlli.org>, Diane

3/4/25, 2:24 AM    Gmail - Colleen, this is the most recent/last email sent to you and me from Hayley Cormack at the US EPA Title VI department, which was...

<russell.diane@epa.gov>, Amanda Trujillo <atrujillo@cityofflint.com>, "King-Piepenbrok, Pier (AG)"
<KingP1@michigan.gov>, "jonhoma@sinasdramis.com" <jonhoma@sinasdramis.com>, "val@vlwlegal.com"
<val@vlwlegal.com>, "sdg@miller.law" <sdg@miller.law>, "sparadise@eisnerlaw.com" <sparadise@eisnerlaw.com>,
"echeverria.marietta@epa.gov" <echeverria.marietta@epa.gov>, "thompkins.anita@epa.gov" <thompkins.anita@epa.gov>,
"burneson.eric@epa.gov" <burneson.eric@epa.gov>, "travers.david@epa.gov" <travers.david@epa.gov>,
"waters.tom@epa.gov" <waters.tom@epa.gov>, "davis.angela@epa.gov" <davis.angela@epa.gov>,
franklmcnamara@gmail.com, mriordan@publicinterestlegal.org, eric.hamilton@usdoj.gov, "ryan@mclanelaw.com"
<ryan@mclanelaw.com>

DATE: March 9, 2025

Mel,

Attached is the most recent/last email sent to you and me from Hayley Cormack at the US EPA Title VI department, which was received on February 11, 2025.

By the way, my family surname is Gonzalez (with a "z", which indicates roots in Spain). Also, my ancestors were US citizens.

- Colleen

---

📄 **Gmail - Follow-up to questions on website accessibility.pdf**
59K

Gmail - Follow-up to questions on website accessibility    9/9/25, 7:05 AM

 Gmail

Colleen Connors <cmcolleen4@gmail.com>

---

## Follow-up to questions on website accessibility

---

**Cormack, Hayley** <Cormack.Hayley@epa.gov>                    Tue, Feb 11, 2025 at 10:25 AM
To: "jonesjrmel@gmail.com" <jonesjrmel@gmail.com>, Colleen Connors <cmcolleen4@gmail.com>
Cc: "Geisler, Isabel" <Geisler.Isabel@epa.gov>, "Mason, Trinita" <Mason.Trinita@epa.gov>, "Faltin, Todd" <Faltin.Todd@epa.gov>

Good morning, Mr. Jones and Ms. Connors.

I hope that you are well. Mr. Jones, thank you for your responses to our questions. We would appreciate your responses to a few more questions that we have. You are not obligated to answer these questions, but we think that your responses to these questions will help us better understand the nature of the issues you have raised with respect to EGLE's website.

1. I understand that you have said that the content of EGLE's website gets cut off when you zoom into the website and that there is no horizontal scrollbar to view the entire webpage. To fully understand your experience with EGLE's website, it would be helpful for us to understand the specific webpages on EGLE's website that you are having difficulty accessing. Can you provide links to the specific webpages on EGLE's website that contain content that you could not access?

2. For each webpage that you cannot access, can you please confirm the specific reason that you cannot access the content of the webpage (e.g. that the content gets cut off and there is no horizontal scrollbar or that the content of the

webpage is not readable by a screen reader)?

3. You mentioned that you have used an "ADA capable computer," that had a large screen and other features. You also mentioned that the EGLE website was "still quirky," when you viewed the EGLE website on the "ADA capable computer." Can you explain what you meant by the EGLE website being "quirky?"

4. You also mentioned that you use Google Chrome on a Chromebook to access the internet. Chromebooks have a built-in screen reader called ChromeVox which may help people with visual impairments to more easily understand text on websites by reading aloud the text on the screen. Have you tried using ChromeVox to read aloud the text on EGLE's website?

Additionally, we may be reaching out to you to request a second meeting to follow up on your responses to our questions and to discuss the status of your complaint.

Thank you,
Hayley

Hayley Cormack (she/her)

Program Analyst **|** Office of External Civil Rights Compliance (OECRC)

U.S. Environmental Protection Agency **|** Office of Environmental

Justice and External Civil Rights

Office: (202) 250-8851 **|** Cormack.Hayley@epa.gov

3/9/25, 2:22 AM Gmail - Email Service on March 9th, 2025.... Re: # 25-1158.... Tesla Settles Discrimination Suit With Former Factory Worker [ ( CITA...

 Gmail

**MEL JONES JR** <jonesjrmel@gmail.com>

## Email Service on March 9th, 2025.... Re: # 25-1158.... Tesla Settles Discrimination Suit With Former Factory Worker [ ( CITATION of supplemental authorities pursuant to Fed. R. App. P. 28(j) filed by Appellants Colleen Connors and Melvin Jones, Jr.. Served on 03/08/2025. )

1 message

**MEL JONES JR** <jonesjrmel@gmail.com>                                                   Sun, Mar 9, 2025 at 6:32 AM
To: Deborah Greenspan <deborah.greenspan@blankrome.com>, Zeldin.Lee@epa.gov, mobrien@irli.org, chajec@irli.org, gcanaan@irli.org, gww@dcglaw.com, tmccotter@boydengray.com, daniel.epstein@aflegal.com, "jon@publicrightsproject.org" <jon@publicrightsproject.org>, serviceS3@michigan.gov, giovanatiN@michigan.gov, Stacey.Metro@ag.ny.gov, Annabelle.Wilmott@doj.ca.gov, Lorraine.Lopez@doj.ca.gov, Delbert.Tran@doj.ca.gov, zoe.levine@ag.ny.gov, Irina.Trasovan@doj.ca.gov, "denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>, "robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>, "brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>, jgrayson@nmdoj.gov, molly.alarcon@sfcityatty.org, "david.louk@sfcityatty.org" <david.louk@sfcityatty.org>, shannon.stevenson@coag.gov, ksadeck@riag.ri.gov, jared.b.cohen@mass.gov, john.keller@ag.state.mn.us, johnsonkarpg@doj.state.wi.us, julio.thompson@vermont.gov, dmosteller@ncdoj.gov, "jeremy.feigenbaum@njoag.gov" <Jeremy.feigenbaum@njoag.gov>, shankar.duraiswamy@njoag.gov, Viviana.hanley@njoag.gov, shefali.saxena@law.njoag.gov, Elizabeth.walsh@law.njoag.gov, HStern@ag.nv.gov, akirschner@oag.state.md.us, Janelle.Medeiros@ct.gov, PolicyOffice@epa.gov, EIS-Filing@epa.gov, education@epa.gov, NEPAssisthelp@epa.gov, NEPA@epa.gov, eric.wessan@ag.iowa.gov, matt.rice@ag.tn.gov, nlindzen@corpfraudlaw.com, yuri.s.fuchs@usdoj.gov, sara.eisenberg@sfcityatty.org
Cc: MEL JONES JR <jonesjrmel@gmail.com>, Colleen Connors <CMColleen4@gmail.com>, "Marissa.Malouff@doj.ca.gov" <Marissa.Malouff@doj.ca.gov>, "vanessa.kassab@delaware.gov" <vanessa.kassab@delaware.gov>, "kaliko.d.fernandes_hawaii_gov" <kaliko.d.fernandes@hawaii.gov>, "jeremy.feigenbaum@njoag.gov" <jeremy.feigenbaum@njoag.gov>, "harrist19@michigan.gov" <harrist19@michigan.gov>, "eng.connie@epa.gov" <eng.connie@epa.gov>, "egle-nondiscriminationCC@michigan.gov" <egle-nondiscriminationCC@michigan.gov>, "Cormack, Hayley" <Cormack.Hayley@epa.gov>, "EGLE-Accessibility@michigan.gov" <EGLE-Accessibility@michigan.gov>, "Faltin, Todd (he/they)" <Faltin.Todd@epa.gov>, "Oviedo, Luis" <oviedo.luis@epa.gov>, "MacMillan-Sanchez, Ariel (she/her/hers)" <MacMillanSanchez.Ariel@epa.gov>, "Johnson, Johahna (she/her/hers)" <Johnson.Johahna@epa.gov>, "Mason, Trinita" <Mason.Trinita@epa.gov>, "Moore, Tammy" <moore.tammy@epa.gov>, "Walts, Alan (he/him/his)" <walts.alan@epa.gov>, Deborah Greenspan <deborah.greenspan@blankrome.com>, "Risley, David" <Risley.David@epa.gov>, "tmlewis@cityofflint.com" <tmlewis@cityofflint.com>, "cmcgehee@pittlawpc.com" <cmcgehee@pittlawpc.com>, "eric.a.rey@usdoj.gov" <eric.a.rey@usdoj.gov>, "Jason.T.Cohen@usdoj.gov" <Jason.T.Cohen@usdoj.gov>, "OIG_Hotline@epa.gov" <OIG_Hotline@epa.gov>, Corey <cstern@levylaw.com>, Patrick Lanciotti <PLanciotti@napolilaw.com>, "dpettway@cityofflint.com" <dpettway@cityofflint.com>, "saneeley@cityofflint.com" <saneeley@cityofflint.com>, "mbard@cityofflint.com" <mbard@cityofflint.com>, "michelle.t.domingue.II@usdoj.gov" <michelle.t.domingue.II@usdoj.gov>, "Kaplan, Robert (he/him/his)" <kaplan.robert@epa.gov>, Mel jones jr <meljonesjr@gmail.com>, "marianne.f.kies@usdoj.gov" <marianne.f.kies@usdoj.gov>, "daniel.c.eagles@usdoj.gov" <daniel.c.eagles@usdoj.gov>, "kuhlr@michigan.gov" <kuhlr@michigan.gov>, "gambilln@michigan.gov" <gambilln@michigan.gov>, "MitosinkaA@michigan.gov" <MitosinkaA@michigan.gov>, "gaiello@mayerbrown.com" <gaiello@mayerbrown.com>, "jkuptz@cityofflint.com" <jkuptz@cityofflint.com>, "dfaraci@campbell-trial-lawyers.com" <dfaraci@campbell-trial-lawyers.com>, "alin@eisnerlaw.com" <alin@eisnerlaw.com>, "ccmushatt@cityofflint.com" <ccmushatt@cityofflint.com>, "heidy.gonzalez@usdoj.gov" <heidy.gonzalez@usdoj.gov>, AG attorney as to MI COC civil case #23-000115-MZ <bettenhausenm@michigan.gov>, robinsonr11 <robinsonr11@michigan.gov>, Justus Brown <jubrown@cityofflint.com>, Kameshia Ar-Rahmaan <kar-rahmaan@cityofflint.com>, Davina Donahue <ddonahue@cityofflint.com>, City of Flint Clerk's Office <cityclerk@cityofflint.com>, Davina Donahue <CouncilPublicComment@cityofflint.com>, "trachelleyoung@gmail.com" <trachelleyoung@gmail.com>, Ladel Lewis <llewis@cityofflint.com>, Judy Priestley <jpriestley@cityofflint.com>, Tonya Burns <tburns@cityofflint.com>, Mark Cuker <mark@cukerlaw.com>, "michael.l.williams@usdoj.gov" <michael.l.williams@usdoj.gov>, "molsen@mayerbrown.com" <molsen@mayerbrown.com>, "jcampbell@campbell-trial-lawyers.com" <jcampbell@campbell-trial-lawyers.com>, "mnguyen-dang@mayerbrown.com" <mnguyen-dang@mayerbrown.com>, "pnapoli_napolilaw.com" <pnapoli@napolilaw.com>, Renee Auten <rauten@thelandbank.org>, Jennifer Riggs <jriggs@thelandbank.org>, Jeremy Maltz <jeremy@lehotskykeller.com>, "HammoudF1@michigan.gov" <HammoudF1@michigan.gov>, Michigan Attorney General <miag@michigan.gov>, "dweyre@mcalpinepc.com" <dweyre@mcalpinepc.com>, "g@mayerbrown.com" <g@mayerbrown.com>,

"ljiang@susmangodfrey.com" <ljiang@susmangodfrey.com>, mpitt <mpitt@pittlawpc.com>, Hunter Shkolnik <hunter@napolilaw.com>, "arosenman@mayerbrown.com" <arosenman@mayerbrown.com>, Theodore Leopold <tleopold@cohenmilstein.com>, Emmy Levens <elevens@cohenmilstein.com>, Flint Mayor <mayor@cityofflint.com>, "frank.bednarz@hlli.org" <frank.bednarz@hlli.org>, "ted.frank@hlli.org" <ted.frank@hlli.org>, Diane <russell.diane@epa.gov>, Amanda Trujillo <atrujillo@cityofflint.com>, "King-Piepenbrok, Pier (AG)" <KingP1@michigan.gov>, "jonhoma@sinasdramis.com" <jonhoma@sinasdramis.com>, "val@vlwlegal.com" <val@vlwlegal.com>, "sdg@miller.law" <sdg@miller.law>, "sparadise@eisnerlaw.com" <sparadise@eisnerlaw.com>, "echeverria.marietta@epa.gov" <echeverria.marietta@epa.gov>, "thompkins.anita@epa.gov" <thompkins.anita@epa.gov>, "burneson.eric@epa.gov" <burneson.eric@epa.gov>, "travers.david@epa.gov" <travers.david@epa.gov>, "waters.tom@epa.gov" <waters.tom@epa.gov>, "davis.angela@epa.gov" <davis.angela@epa.gov>, "robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>, "denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>, "david.louk@sfcityatty.org" <david.louk@sfcityatty.org>, nlindzen@corpfraudlaw.com, franklmcnamara@gmail.com, mriordan@publicinterestlegal.org, eric.hamilton@usdoj.gov, "ryan@mclanelaw.com" <ryan@mclanelaw.com>, Zeldin.Lee@epa.gov, zoe.levine@ag.ny.gov
Bcc: UrbanForestNewYork@gmail.com, Mel jones jr <meljonesjr@gmail.com>

# [[ **Email Service on March 9th, 2025…** ]]…. *CITATION of supplemental authorities pursuant to Fed. R. App. P. 28(j) filed by Appellants Colleen Connors and Melvin Jones, Jr.. Served on 03/09/2025:*

 Tesla Settles Discrimination Suit With Former Fa…

# Good morning to ALL….

# <u>**Please see the attached VERY important document**</u>:

*Tesla Settles Discrimination Suit With Former Factory Worker*
*(SEE ATTACHED [* <u>Tesla and a former employee have agreed to settle a closely watched lawsuit that cast a harsh light on the carmaker's treatment of Black workers. Lawyers for Tesla and for Owen Diaz, who worked at the company's factory in Fremont, Calif., did not disclose the terms of the settlement in a legal filing on Friday. "The parties have reached an amicable resolution of their disputes," Lawrence</u>

_A. Organ, a lawyer for Mr. Diaz, said in an email, adding that he could not comment further. Last year, a jury in federal court in San Francisco awarded Mr. Diaz $3.2 million after he presented evidence that he had been subject to repeated harassment by supervisors at Tesla's factory, including being addressed with a racial slur more than 30 times. A supervisor drew a racist caricature near his work station, according to testimony in the case. ])_.... WOW !!!

And to think that ELON MUSK is 2nd or 3rd in command in the WHITE HOUSE {e.g. in current President Donald Trump's administration}.
 Which by the way --- has (I believe more likely than not wrongly interfered [e.g. ELON MUSK, DONALD TRUMP and LEE ZELDIN] ...YES - have interfered with my ongoing US EPA TITLE VI "investigation" pertaining to the MI EGLE/ State of Michigan and City of Flint; and such was DONE in an effort to [I believe HIDE and COVER-UP]... conceal the US EPA's culpability and LIABILITY as it relates to the ONGOING Flint Water Crisis FTCA lawsuit pending in FWC district court case #16-cv-10444.... whereby literally a few weeks ago [Colleen Connors and [me]/ disabled Melvin Jones Jr.] received an EMAIL

from (former -we believe) US EPA TITLE VI employee HAYLEY CORMACK which requested another ZOOM meeting with at a bare minimum Colleen Connors {e.g. I am reliably informed by Colleen of said email ...which I did NOT open nor did I read it}.... out of FEAR that the NUMEROUS and APPARENTLY "DICTATOR"/ KING issued Executive Orders issued by President Donald Trump as related to the Federal Employee workforce in general and specifically to the US EPA... would somehow ...then allow Donald Trump, ELON MUSK, and LEE ZELDIN ....to deploy "JACK BOOTED GOVERNMENT THUGS" to snatch Colleen and [I] up... due to Colleen's [family name]/ grandparents had the surname of GAZALEZ [e.g. from SPAIN].... AND YES - Colleen Connors is an AMERICAN CITIZEN ...and [of course]... I, Melvin Jones Jr., am ALSO a U.S. Citizen.

Further... although I believe that the current ICE/ DHS immigration raids may be honorable... [I] am very concerned at the MIXED message which the defendants actions [e.g. motion to change the CASE CAPTION in appeal #25-1158]...

*actually says about the TRUE MOTIVE {e.g. media stunts for VOTES}... which I now believe such REALLY may be.... and HOW VERY sad for concerned United States Citizens such as Colleen Connors and me/ disabled Melvin Jones Jr.*

*YEP - so, within less than 3 months of the President Donald Trump presidency... there is ALREADY more of the SAME... whereby NOW it is the REPUBLICANS who will IN REALITY do NOTHING meaningful about MS-13, and TdA and the horrifically BROKEN immigration system in the United States.*

*Well.... NO WONDER how it is... that VP Kamala Harris NEVER visited the US southern border for approx. 3 1/2 years of her being the VP under former US president Joe Biden 😂😂😂.*

**And... BEFORE 12 noon on March 10th, 2-25... I fully intend to FILE an AFFIDAVIT in support of our CORRECTED MOTION {e.g. Colleens'**

**_and my} corrected motion to DISMISS the instant appeal #25-1158._**

**SEE THE ATTACHED DOCUMENT.**

*Best,*



*/s/*

*Melvin Jones Jr.. - disabled PRO SE appellant*

*1935 Hosler St.*

*Flint, Michigan*

*48503*

*Email: jonesjrmel@gmail.com*

*Google voice to text ph# 415-562-5074*

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

               Plaintiffs-Appellees,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

               Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

               Interested Parties–Appellants.

## MOTION TO AMEND CAPTION

The federal government defendants are currently listed as "Defendants" in the caption but should be listed as "Defendants-Appellees."  The government respectfully requests the caption be amended so that the federal government defendants may file a motion seeking summary affirmance of the appeal from the denial of the motion to intervene and dismissal for lack of jurisdiction of the nonparties' appeal from the preliminary injunction.  The Plaintiffs-Appellees do not oppose this motion to amend the caption.

1.  Defendants have an interest in whether other parties intervene in their litigation.  As a result, defendants are defendants-appellees in appeals from the denial of a motion to intervene.  *See, e.g.*, *In re Efron*, 746 F.3d 30 (1st Cir. 2014); *R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1 (1st Cir. 2009); *T-Mobile Ne. LLC v. Town of Barnstable*, 969 F.3d 33 (1st Cir. 2020); *Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197 (1st Cir. 1998).

2.  Because the defendants are not listed as appellees, they are currently unable to file a motion in the CM/ECF system.  The clerk's office has advised that defendants must file a motion to correct their designation.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request the Court amend the caption to designate defendants as defendants-appellees.

Respectfully submitted,

SHARON SWINGLE

*s/ Derek Weiss*

DEREK WEISS
*Attorneys, Appellate Staff*
*Civil Division, Room 7325*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

March 2025

2

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Federal Rules of Appellate Procedure 27(d)(2)(E) and 32(a)(5)-(6) because it has been prepared in 14-point Garamond, a proportionally spaced font. I further certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 220 words, according to the count of Microsoft Word.

*s/ Derek Weiss*
Derek Weiss

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that on March 6, 2025, I caused the foregoing motion to be served on appellants Melvin Jones Jr. and Colleen Connors by U.S. mail pursuant to Federal Rule of Appellate Procedure 25(c)(1)(B) to the following address:

Melvin Jones Jr. and Colleen Connors
1935 Hosler Street
Flint, MI 48503-4415

*s/ Derek Weiss*
Derek Weiss



**REVOLT**

# Racists proudly run rampant on Twitter after Elon Musk buys app — see their tweets

**Angel Saunders**
Fri, October 28, 2022 at 12:21 PM EDT

3 min read





Twitter

Yesterday (Oct. 27), it was announced that tech billionaire Elon Musk now owns Twitter. His first order of business was to fire several top executives, including

one who banned Former President Donald Trump for years worth of hate speech and derogatory comments.

Entertainment News    Gene Hackman cause of death    Jenna Elfman in 'Dark Winds'    Best streaming d

riddance. MAKE TWITTER FUN AGAIN" and an American flag emoji. An easily recognizable nod to Trump's "Make America Great Again" motto. Now, racists are coming together to celebrate in the vilest way possible.



## y!entertainment

Sign in

BREAKING: Elon Musk has fired Vijaya Gadde, head of legal policy, trust & safety, who made the decision to permanently suspend Donald Trump.

**Benny Johnson** ✔
@bennyjohnson · **Follow**

Good riddance.

MAKE TWITTER FUN AGAIN 🇺🇸

10:37 PM · Oct 27, 2022                                      ⓘ

♥ **15.8K**      💬 **Reply**      🔗 **Copy link**

**Read 238 replies**

One user said, "I'm already seeing a disturbing amount of vile content ever since Elon bought Twitter. People gleefully tweeting the N-word, the f- word for gay [people], the k-word for Jews and a ton of anti-trans rhetoric. Free speech though, amiright? I'm disgusted," another posted.

ADVERTISEMENT

Others basked in the ability to offend targeted groups of individuals.

"BREAKING: Elon Musk said you can say 'n**ger' on Twitter and in real life," one user wrote. "I'm SO happy I can say how much I hate n**gers and Jews now. Thanks, @elonmusk for once again using your incredible wisdom to make the

3/10/25, 3:40 AM     Racists proudly run rampant on Twitter after Elon Musk buys app — see their tweets

world a better place!" another posted online. There was one person who admitted, "Since Elon Musk made Twitter [a] free speech haven, I'll say this: F**K N**GERS. FULL STOP."

Another even made a poll to see who was hated the most. "Thanks, @elonmusk what do y'all hate more?" The poll included three options: N**gers, Jews and kebabs. Musk celebrated by tweeting, "Let the good times roll." Without condemning the racist and offensive language, he later posted, "Twitter will be forming a content moderation council with widely diverse viewpoints. No major content decisions or account reinstatements will happen before that council convenes."

See related tweets below.



⚠
Not found

FUCK NIGGERS AND FUCK THE JEWS pic.twitter.com/I76vXEtU1Q

— 🌻🌲Eldian🌲🌻 (@frogfella13) October 28, 2022

3/10/25, 3:40 AM                          Racists proudly run rampant on Twitter after Elon Musk buys app — see their tweets



Jews everywhere will be so appreciative of this disrespect.

12:13 PM · Oct 28, 2022                                                            ⓘ

♥ 8        💬 Reply        🔗 Copy link

Read 6 replies

ADVERTISEMENT

ⓘ
Not found

ELON MUSK LET ME SAY NIGGER pic.twitter.com/NRECPp89x4

— Gök (@DrainGangTurkey) October 28, 2022

ⓘ
Not found

Unforgivable. Elon must have similar views. Scary to us Jews

https://t.co/SwZEirHGoh

— DrLJRose 🌈Wellness Ed🇺🇦 (@idesigncourses) October 28, 2022

3/10/25, 3:40 AM                    Racists proudly run rampant on Twitter after Elon Musk buys app — see their tweets



Not found

---

Twitter. People gleefully tweeting the n-word, the f-word for gay ppl, the k-word for Jews and a ton of anti-trans rhetoric. Free speech though amiright? I'm disgusted.

— Darth BonBon 🍬 (@darthbonn) October 28, 2022



Not found

Thanks @elonmusk what do yall hate more? #nigger #jew #kebab

— Sergej Petrosian (@JerePetrosian) October 28, 2022

ADVERTISEMENT



Not found

He would have tweeted nigger today pic.twitter.com/HWzbSe8szK

— Synth 🌞 (@CoolGuySynth) October 28, 2022



Not found

3/10/25, 3:40 AM                    Racists proudly run rampant on Twitter after Elon Musk buys app — see their tweets

Changed my user name.

Thanks @elonmusk

28, 2022

⊙
Not found

I'm SO happy I can say how much I hate niggers and Jews now. Thanks @elonmusk for once again using your incredible wisdom to make the world a better place!

— FreeSpeechAbsolutist4525 (@freespeechpwnz) October 28, 2022



•voice of the ungay
@bigotryexpert · **Follow**

X

BREAKING: Elon musk said you can say nigger on twitter and in real life

11:13 AM · Oct 28, 2022                                    ⓘ

♥ 4        💬 Reply        🔗 Copy link

Read 7 replies

ADVERTISEMENT

⊙
Not found

Since Elon Musk made Twitter free speech haven, I'll say this:

FUCK NIGGERS.

FULL STOP



Not found

"Elon musk is going to bring back all our accounts, and he's going to let us say 'nigger' and 'faggot' trust me he's literally our guy"
pic.twitter.com/6SC6pIaSsm

— Whllperx 🇲🇽💸🤑🧤 (@ElonIsAFag) October 28, 2022



Not found

Be quiet nigger https://t.co/I16sS0WBgM

— nick (@BigNick696) October 28, 2022

Terms and Privacy Policy      Privacy Dashboard      About Our Ads

## Solve the daily Crossword

35,898 people played the daily Crossword recently. Can you solve it faster than others?



**Crossword**

Play on Yahoo