IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.

ELON MUSK, LEE ZELDIN,
Donald J. Trump in their official
Capacity as Federal Employees
and Mr. Trump, in his official
capacity as President of the
United States, et al. - APPELLEES

_Amended Notice: (of amended notice of appeal on March 15th 2025) filed by appellants Colleen Connors and Melvin Jones Jr._

## _Amended Notice: (of amended notice of appeal on March 15th 2025) filed by appellants Colleen Connors and Melvin Jones Jr._

1.)    SEE THE ATTACHED CONTINUATION OF OUR ….Amended Notice: (of

*amended notice of appeal on March 15th 2025) filed by appellants Colleen Connors and Melvin Jones Jr..... which continues on the NEXT/ following pages;*

*Respectfully Submitted.*

*Thank you.*

*15th, of March 2025*

_Colleen Connors_

_____

*Colleen Connors PRO SE*
*appellant (interested party)*
*1935 Hosler St.*
*Flint, Michigan 48503*
*Email:*
*cmcolleen4@gmail.com*


*—-*

*March 15th, 2025*

_____

*/Melvin Jones Jr./ disabled PRO SE appellant (interested party)*

*1935 Hosler St.*

*Flint, Michigan 48503*

*Email: jonesjrmel@gmail.com*

*Google voice to text ph# 415-562-5074*

*{see the exhibit on the next page[s]}*

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.

*Supplemental Response*

ELON MUSK, LEE ZELDIN,
Donald J. Trump in their official
Capacity as Federal Employees
and Mr. Trump, in his official
capacity as President of the
United States, et al. - APPELLEES



*Notification: of Appellants Connors and Jones Jr.'s
INTENT to file a response in the US Supreme Court
regarding MUSK, RUMP, ZELDIN, et al., application:*

*NOTIFICATION [and] request that ANY objections thereto be filed via ECF Pacer (e.g. served electronically to pro se appellants Colleen Connors and [me], disabled appellant, Melvin Jones Jr.)... on or before March 18th, 2025 at 5pm eastern standard time):*

*—*

*Notification: of Appellants Conors and Jones Jr.'s INTENT to file a response in the US Supreme Court regarding TRUMPS {e.g. ELON MUSK's, PRESIDENT DONALD TRUMP, LEE ZELDIN, et al.s} application therein AS SPECIFICALLY RELATING TO U.S. DISTRICT COURT CASE #25-cv-10139:*

*Here, our/ interested parties appellants' RESPONSE TO*

*SAID US SUPREME COURT APPLICATION WILL BE ON ACCOUNT OF:*

*1.)    What NOW [is/ appears to be] president Donald Trump's DICTATOR/ THUG LOVING/ UNCONSTITUTIONAL ATTEMPT VIA THREATS OF {what we believe… given ELON MUSK's TESLA COMPANY ENCOURAGING*

*EMPLOYEES TO "KILL BLACK PEOPLE" and Donald Trump's March 14th, 2025 HITLER-STYLE threat filled hate-rant against LITIGANT-OPPONENTS in the instant appeal #25-1158 and civil case #25-cv-10139 ...at the OFFICES OF THE US DEPARTMENT OF JUSTICE}.... We believe that such is specifically*

*meant to "CHILL" our 1st Amendment FREE SPEECH RIGHTS... which (for example) the 4th circuit court of appeals in an PUBLISHED opinion "recently" has stated is [e.g. such type of government misconduct is non-constitutional];*

*2.) We are NOW VERY concerned that President Donald Trump has literally "in an indirect and*

*arguably very direct manner"... threatened to have [a] JEWISH woman (Colleen Connors) and [a] disabled Black African American guy {e.g. Melvin Jones Jr.,}... KILLED just for simply asserting our First (1st) Amendment Constitutional Rights in civil case #25-cv-10139 by filing a NOTICE OF APPEAL [and] in 1st circuit*

court of appeals - appeal #25-1158,

3.)    We... also respectfully believe that the US SUPREME COURT SHOULD NOT "PIECEMEAL" what is NO DOUBT one of the MOST important and consequential 14th amendment cases {e.g. the Birthright Citizenship EO at issue NATIONALLY at the appeals court level... which is NOW RIPE to be

*FULLY decided in the US SUPREME COURT}... as a matter of significant judicial economy within the Federal Judiciary, tremendous financial economy as to [ALL] States within the United States;*

*4.)    And... as a matter of SAFETY for those who oppose the ELON MUSK, Donald Trump, et al,... Executive Order as to*

*birthright citizenship {e.g. such as the concerned individuals [the likes of (us) pro se appellants - concerned parties Colleen Connors ]}... and what also appears to be the Democratic - AG plaintiffs' states attorneys-generals as a whole [YES - a sad day for America indeed]. Respectfully Submitted.*

*Thank you.*

15th, of March 2025

_____

Colleen Connors PRO SE
appellant (interested party)
1935 Hosler St.
Flint, Michigan 48503
Email:
cmcolleen4@gmail.com

—-

March 15th, 2025

_____

*/Melvin Jones Jr./ disabled*
*PRO SE appellant (interested*
*party)*
*1935 Hosler St.*
*Flint, Michigan 48503*
*Email: jonesjrmel@gmail.com*
*Google voice to text ph#*
*415-562-5074*

==[SEE THE ATTACHED==
==EXHIBITS WHICH WE==

*INTEND UP ALSO PRESENTING TO THE US SUPREME COURT IN OUR HOPEFUL TO BE ACCEPTED RESPONSE.....]*

*{see the exhibit on the next page[s]}*

L A W F A R E

**Courts & Litigation**  **Foreign Relations & International Law**

# Immigration Is Not Invasion

**Ilya Somin**

Monday, March 25, 2024, 8:00 AM

*Texas's argument equating the two goes against the text and original meaning of the Constitution, and would set a dangerous precedent if courts accept it.*

In two important cases currently before the U.S. Court of Appeals for the Fifth Circuit, the state of Texas has advanced the argument that illegal migration and drug smuggling qualify as an "invasion" authorizing the state to "engage in war" in response, under Article I of the Constitution. So far, federal courts have uniformly rejected such claims. But if they were to accept them, drastic consequences would follow. Border-state governments would be empowered to attack neighboring countries, even without congressional authorization. And the federal government would have the power to suspend the writ of habeas corpus—thereby detaining people without due process—almost anytime it wants. In addition to these practical considerations, Texas's "invasion" argument is at odds with the text and original meaning of the Constitution.

In *United States v. Abbott* the federal government is suing Texas for installing floating buoy barriers in the Rio Grande to block migration and drug smuggling, thereby creating safety hazards and possibly impeding navigation. (I have authored an amicus brief in *United States v. Abbott* on behalf of myself and the Cato Institute.) The Biden administration claims this violates the Rivers and Harbors Act of 1899, which bars "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States." In *United States v. Texas*, the state is defending the legality of S.B. 4, a new state law that criminalizes unauthorized migration, expands state law enforcement officials' powers to detain undocumented migrants, and gives Texas state courts the authority to order removal of migrants convicted under the law. The federal government claims S.B. 4 is preempted by federal law and that it infringes on federal authority over immigration.

In both cases, Texas argues the federal government's interpretation of the relevant statutes is wrong. But, more importantly, the state also contends that the Invasion Clause of Article I of the Constitution gives it the power to install buoys in the river

border it shares with Mexico and to enforce S.B. 4 even if federal statutes forbid such actions. Article I, Section 10, Clause 3, of the Constitution states that "[n]o state shall, without the Consent of Congress, ... engage in war, unless actually invaded, or in such imminent Danger as will not admit of delay." Texas claims illegal migration and drug smuggling qualify as "invasion" and that, therefore, the Constitution gives the state the power to take military action in response in defiance of federal statutes, and even in the absence of congressional authorization for war.

So far, courts have uniformly rejected this argument. In *United States v. Abbott*, federal District Judge David Alan Ezra (a Reagan appointee) wrote a strong opinion repudiating Texas's "breathtaking" claim of authority. His ruling was affirmed by a three-judge panel of the U.S. Court of Appeals for the Fifth Circuit but is now up for en banc review before the full Fifth Circuit.

In the S.B. 4 case, which was also litigated before Judge Ezra, he wrote the most thorough judicial opinion on the definition of "invasion" in all of American history. As he explains, the idea that illegal migration qualifies as invasion flies in the face of the text, history, and original meaning of the Constitution. The case is now on appeal to the Fifth Circuit. The Supreme Court recently allowed S.B. 4 to go into effect by refusing to lift an administrative stay that had been blocking the district court injunction against the law. But, within hours, the Fifth Circuit lifted the stay, thereby ensuring that S.B. 4—for now—cannot be enforced, as appellate review proceeds.

Previously, three federal appellate court rulings—all decided in the 1990s—also rejected the kind of argument advanced by Texas, holding that only an armed attack, not mere illegal migration, qualifies as "invasion." Many courts have also held that the definition of "invasion" is a "political question" not subject to judicial review.

### The Text and Original Meaning of "Invasion"

The constitutional text undermines the idea that "invasion" includes illegal migration and smuggling. The Invasion Clause relied on by Texas allows states to "engage in war" in response. That suggests an "invasion" must be the kind of organized assault that would normally justify full-scale war in response, including sending troops to attack and occupy the country from which the invasion originated. Illegal migration and smuggling do not qualify as such under international law, either today or at the time of the founding of the United States.

The Guarantee Clause of Article IV of the Constitution states that the federal government must protect the states "against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." Here, invasion is paired with "domestic Violence"—which in

18th century usage refers to uprisings against the state government, not the modern use of the term to denote violence in family and intimate relationships. Under the long-standing doctrine of *noscitur a sociis*, "a word may be known by the company it keeps." Here, it makes little sense to assume that "invasion" includes nonviolent actions, when it is coupled with "domestic Violence."

The original meaning reinforces the text. As legal scholar Frank Bowman <u>notes</u>, "[T]hroughout the Constitutional Convention and the state ratification debates that followed, delegates and commentators used the term 'invasion' over and over" in ways that, with rare exceptions for "metaphorical" uses, "invariably refer… to a hostile armed incursion into or against the territory of the states or the nation."

In his <u>*Report of 1800*</u>, James Madison, one of the leading framers of the Constitution, responded to claims that the Guarantee Clause authorized the notorious Alien and Sedition Acts of 1798 by emphasizing that "[i]nvasion is an operation of war," and thus the Clause does not authorize restrictions on immigration. The same logic applies to the use of "invasion" in Article I. Efforts to use other statements by Madison to support Texas's position ignore the one time he specifically addressed the meaning of "invasion" and <u>misinterpret those other statements</u>, to boot.

There is some founding-era evidence suggesting that a relatively small invasion might have been enough to trigger the Invasion Clause. But a small invasion must still be an armed attack. Moreover, the possibility that a small invasion is sufficient for a state to qualify as "actually invaded" further undercuts Texas's argument. If illegal migration or drug smuggling are invasions triggering the power to engage in war in response, and even a small invasion qualifies, that suggests that even small-scale illegal migration or smuggling would be sufficient to enable a state to wage war without congressional authorization. Such an absurd implication goes well beyond the ordinary meaning of the terms and certainly was not expected by anyone at the time of the founding.

Defenders of Texas's position cite founding-era dictionaries that included metaphorical secondary definitions of "invasion," as in the case of an "invasion" by a disease or an "invasion" of rights by an incursion. But there is no evidence the original understanding of the invasion provisions of the Constitution included such secondary meanings. As the district court noted in the S.B. 4 case, in interpreting terms in statutes and the Constitution, words must be given their "natural or normal meaning, not the broadest possible meaning." In context, the natural meaning here is an organized armed attack on the United States.

In addition, as Justice Antonin Scalia emphasized in his opinion for the Court in <u>*District of Columbia v. Heller*</u> (2008), a major Second Amendment case, courts must prefer ordinary meaning over "secret or technical meanings that would not

have been known to ordinary citizens in the founding generation." In the context of Article I and Article IV, where "invasion" and "actually invaded" are used to denote actions that would justify engaging in war, or pose threats comparable to those of "domestic Violence," ordinary citizens would not assume that mere unauthorized migration or smuggling qualify as invasions allowing such drastic responses.

It is also important to recognize that an "invasion" does not exist merely because some small percentage of immigrants and drug smugglers are armed. In any large group of people, there will almost always be a few who may carry weapons. Such a situation does not constitute an "invasion" unless they are actually engaged in a significant organized assault on the United States, as opposed to merely carrying arms for self-defense or in order to engage in ordinary criminal activity.

### Dangerous Implications

If Texas prevails on its "invasion" argument, it would have dangerous implications that go far beyond allowing the state to place water buoys in the Rio Grande, or adopt measures like S.B. 4.

If border states can "engage in war" in response to illegal migration or drug smuggling, they would have the authority to attack neighboring nations at virtually any time. Ever since the federal government enacted significant restrictions on migration across the southern border in the early twentieth century (later expanded to include most migrants from Latin America), unlawful migration and cross-border drug smuggling has occurred virtually every year (though there was relatively little illegal migration during the Great Depression). If such activity qualifies as an invasion, Texas and other border states would be empowered to wage war in response, virtually any time they want. As the district court noted in the water buoy case, "Under this logic, once Texas decides, in its sole discretion, that it has been invaded, it is subject to no oversight of its 'chosen means of waging war.'"

 Prominent conservative legal scholar John Yoo, a border hawk, warns that Texas's argument would allow states to "attack drug-cartel members not only across the border but all the way back to their hideouts," thereby triggering large-scale hostilities with Mexico. "Preventing states from provoking such conflicts," he writes, "was the very purpose of Article I, Section 10's bar on state war-making."

Concerns about such escalation are more than just theoretical. Over the past year, the idea of turning the "war on drugs" into a real war by invading Mexico has become increasingly popular in GOP circles, advanced by a variety of prominent politicians, including Donald Trump. The risk of conflict becomes greater if a state like Texas can initiate it on its own, without federal authorization.

In addition to giving states the power to start wars without congressional authorization, Texas's argument would give the federal government the power to suspend the writ of habeas corpus almost any time it wants, thereby enabling detention of suspects without trial or filing charges. The Suspension Clause of the Constitution states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or *Invasion* the public Safety may require it" (emphasis added). If illegal migration and drug smuggling qualify as "invasion" for purposes of triggering state and federal authority to resist invasion under the Invasion Clause of Article I and the Guarantee Clause of Article IV, they surely also qualify as such under the Suspension Clause. And there is significant illegal migration and smuggling of contraband goods going on at virtually all times.

The danger of creating unlimited power to suspend the writ of habeas corpus is exacerbated further if a small "invasion" is enough to trigger the Suspension Clause. If illegal migration and drug smuggling qualify as "invasion" and even a small invasion is sufficient to trigger relevant constitutional provisions, then even small amounts of illegal migration and smuggling would be enough to authorize suspension of the writ.

The Suspension Clause says that even when there is an ongoing "Rebellion or Invasion," the writ may be suspended only if "the public Safety may require it." But this is not much of a constraint, as the clause permits suspension even if public safety only "may" require it. Certainty is not necessary. Particularly in border states, including Texas, it is almost always possible to argue that "public safety" may be promoted by suspension.

The suspension power is not limited to recent immigrants, but applies to U.S. citizens, as well. Historically, suspension has been used against citizens, as was the case during the Civil War. In 2022, 89 percent of people convicted of fentanyl trafficking were U.S. citizens. If illegal migration and drug smuggling qualify as an "invasion" triggering the Suspension Clause, citizens might well be among those detained without charges. Suspension also need not be limited to border states. Undocumented immigrants and drug traffickers can and do make their way to interior states, as well.

British violations of the writ were major grievances of the American colonists before and during the American Revolution. If the original meaning of the Constitution allowed suspension any time illegal migration or cross-border smuggling occurs, that issue would surely have been raised at the Constitutional Convention and in the ratification debates.

The Fifth Circuit or the Supreme Court could, as some other courts have done, hold that the definition of "invasion" is a "political question" that courts are not permitted to resolve. Such a ruling would be dubious. The definition of "invasion" is no more "political" than that of many other words in the Constitution that courts

routinely interpret, such as those that determine the relative scope of federal and state power over economic regulation, international trade, and much else. But if judges do rule that the meaning of "invasion" is a political question, they should also hold—as Judge Ezra did in the water buoy and S.B. 4 cases—that such a ruling does not mean Texas can use a declaration of "invasion" as a way to get around federal statutes and empower the state to wage war against foreign nations without congressional authorization.

Legal issues aside, the drumbeat of rhetoric equating drug smuggling and immigration and invasion also has dangerous political implications. An invasion is the kind of thing to which governments usually respond with overwhelming force. The more people assume immigration and drug smuggling are equivalent to an invasion, the greater the likelihood there will be political pressure for such draconian measures as killing migrants, family separation (which Trump may seek to revive if he returns to power), and the idea of invading Mexico to fight the war on drugs more effectively. At the very least, "invasion" rhetoric moves the Overton Window on such proposals in the wrong direction.

Court decisions may not be able to have much impact on these political dynamics. But judicial rejection of Texas's "invasion" argument can at least forestall the danger of letting border states initiate war anytime they want, and giving the federal government a nearly unlimited power to suspend the writ of habeas corpus.

---------------------------------------------------------------------------------

**Ilya Somin**

**Read More**

Ilya Somin is Professor of Law at George Mason University, B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute, and author of Free to Move: Foot Voting, Migration and Political Freedom.

}

# Originalism and Birthright Citizenship

MICHAEL D. RAMSEY*

*The first sentence of the Fourteenth Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." This language raises two substantial questions of scope. First, what does it mean to be born "in" the United States? Does that include birth in U.S. overseas possessions, territories, bases, or places under temporary U.S. occupation? Second, what does it mean to be born "subject to the jurisdiction" of the United States? Does that include persons born in the United States to parents who are only temporary visitors or parents not lawfully present in the United States?*

*The original meaning of the Citizenship Clause's text indicates a broad scope for constitutional birthright citizenship as to both places and persons. At the time of enactment, places subject to permanent U.S. sovereign authority were considered "in" the United States without regard to whether they were territorially contiguous or culturally integrated into the U.S. political system. In mid-nineteenth-century terminology, persons born within U.S. territory were "subject to [its] jurisdiction" unless excluded legally by international rules of immunity or practically by military or political realities.*

*But these originalist solutions in turn raise a challenge for originalism as a theory of modern constitutional interpretation. There is little evidence that the Amendment's enactors considered or could have foreseen the modern implications of either question. The United States had no material overseas possessions when the Amendment was drafted and ratified. Restrictive federal immigration laws did not materially take hold in the United States until the late nineteenth century. Application of the Citizenship Clause thus requires originalism to confront the role (or lack thereof) of intent in modern originalist theory. Most modern originalists claim to be bound by the original meaning of the text rather than the original intent of the enactors. But in the case of the Citizenship Clause, the text's resolution of key questions of its scope appears to be accidental. The Citizenship Clause presses originalism to explain why original meaning should be binding in modern law when it does not reflect the enactors' policy choices. As the Article discusses, explanations are*

* Hugh and Hazel Darling Foundation Professor of Law, University of San Diego School of Law. © 2020, Michael D. Ramsey. Thanks to Larry Alexander, Allan Erbsen, Andrew Hyman, Matthew Ing, Andrew Kent, Thomas H. Lee, Catherine Powell, Lisa Ramsey, Michael Rappaport, John Vlahoplus, and participants at Fordham Law School's Faculty Colloquium for helpful comments, and to Jessica Bade and Ellen Atkinson for research assistance.

Electronic copy available at: https://ssrn.com/abstract=3681119

*available, but they may take originalism away from some of its apparent common ground.*

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   407

I.   BACKGROUND: U.S. CITIZENSHIP IN HISTORICAL CONTEXT . . . . . . . . . . . .   410

   A.   CITIZENSHIP IN THE ORIGINAL CONSTITUTION AND AFTERWARDS . . .   410

   B.   CITIZENSHIP, THE CIVIL WAR, AND AFTERWARDS . . . . . . . . . . . . . . .   416

   C.   MODERN CHALLENGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   421

II.  THE ORIGINAL MEANING OF THE CITIZENSHIP CLAUSE . . . . . . . . . . . . . .   424

   A.   "BORN . . . IN THE UNITED STATES" . . . . . . . . . . . . . . . . . . . . . . . . . . .   425

      1.   Pre-enactment Meaning: What Was "in" the United States in the Nineteenth Century? . . . . . . . . . . . . . . . . . .   426

      2.   The Drafting History and the Territorial Scope of the Citizenship Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   427

      3.   Pre-enactment Usage: What Was Not "in" the United States? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   429

      4.   Post-enactment History: The *Insular Cases* . . . . . . . . . . .   432

      5.   Modern Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   435

   B.   "SUBJECT TO THE JURISDICTION THEREOF" . . . . . . . . . . . . . . . . . . . . .   436

      1.   Pre-enactment Meaning: Who Was "Subject to [U.S.] Jurisdiction" in the Mid-Nineteenth Century? . . . . . . . . .   437

      2.   The Drafting History and "Jurisdiction" in the Citizenship Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   441

         *a.   Maintaining Prior Exceptions: Diplomats* . . . . . . . .   441

         *b.   Maintaining Prior Exceptions: Native Americans* . .   442

         *c.   Categories Not Excluded: Children of Aliens* . . . . .   445

         *d.   The Citizenship Clause and the 1866 Civil Rights Act*   451

      3.   Post-ratification Interpretations . . . . . . . . . . . . . . . . . . . .   454

      4.   Modern Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   458

Electronic copy available at: https://ssrn.com/abstract=3681119

III. ORIGINALISM AND THE ORIGINAL MEANING OF THE CITIZENSHIP CLAUSE    461

    A.   THE CONSTITUTION'S ACCIDENTAL CITIZENSHIP RULES . . . . . . . . . .    462

    B.   ORIGINALISM AND ACCIDENTAL OUTCOMES. . . . . . . . . . . . . . . . . . .    467

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    471

## INTRODUCTION

The first sentence of the Fourteenth Amendment declares: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."[1] This language raises two substantial questions of scope. First, what does it mean to be born "in" the United States? Does that include birth in U.S. overseas possessions, territories, bases, or places under temporary U.S. occupation? Second, what does it mean to be born "subject to the jurisdiction" of the United States? Does that include persons born in the United States to parents who are only temporary visitors or parents not lawfully present in the United States?

Modern law curiously gives a narrow answer to the first question and a broad answer to the second. Birth "in" the United States, for constitutional purposes, means only birth in one of the states or an "incorporated" territory such as the District of Columbia. It excludes U.S. overseas territories such as Puerto Rico and American Samoa, whose inhabitants are not constitutional citizens (people born in Puerto Rico have birthright citizenship by statute while those born in American Samoa do not).[2] But long-standing practice broadly recognizes constitutional citizenship for almost all persons born "in" the United States in this narrow sense, including children of temporary visitors and undocumented migrants.[3]

Both propositions have come into recent dispute. Cases brought by natives of American Samoa have challenged the Citizenship Clause's geographic scope, with (so far) inconsistent results,[4] and the American Samoans' claim has received substantial academic support.[5] The constitutional citizenship of U.S.-

---

1. U.S. CONST. amend. XIV, § 1.

2. *See* Tuaua v. United States, 788 F.3d 300, 307–08 (D.C. Cir. 2015) (discussing citizenship status of persons born in "unincorporated" U.S. territories); SAM ERMAN, ALMOST CITIZENS: PUERTO RICO, THE U.S. CONSTITUTION, AND EMPIRE 122–43 (2019) (discussing Puerto Ricans' failure to obtain constitutional citizenship and the 1917 legislation giving them statutory citizenship).

3. U.S. DEP'T OF STATE, 8 FOREIGN AFFAIRS MANUAL § 301.1-1(d) (2018) ("All children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth . . . ."); Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 AKRON L. REV. 719, 721–23 (2012) (discussing modern practice).

4. *Compare Tuaua*, 788 F.3d at 302–06 (rejecting U.S. citizenship claims of persons born in American Samoa), *with* Fitisemanu v. United States, 426 F. Supp. 3d 1155, 1196–97 (D. Utah 2019) (finding that persons born in American Samoa are entitled to constitutional citizenship), *appeal filed*, No. 20-4017 (10th Cir. Feb. 11, 2020).

5. *See, e.g.*, Brief of Citizenship Scholars as *Amici Curiae* in Support of Plaintiffs-Appellees and Affirmance at 31, *Fitisemanu*, No. 20-4017 (10th Cir. May 12, 2020) (supporting American Samoans'

Electronic copy available at: https://ssrn.com/abstract=3681119

born persons whose parents are neither U.S. citizens nor lawful permanent residents has likewise been sharply disputed, including recently by the President of the United States.[6] Like the campaign to expand the Clause's geographic scope, the campaign to narrow the Clause's application has received notable academic support.[7]

Originalism, increasingly a prominent approach to constitutional interpretation,[8] appears to provide answers to both questions. As described below, the Amendment's text, given its public meaning at the time of enactment, directed a relatively broad scope for constitutional birthright citizenship as to both places and persons. At the time of enactment, places subject to permanent U.S. sovereign authority were considered "in" the United States without regard to whether they were territorially contiguous or culturally integrated into the U.S. political system. The idea of territory formally possessed by, but not fully within, the United States for constitutional purposes was an atextual and ahistorical concept the Supreme Court created over thirty years after the Amendment's ratification. Similarly, in mid-nineteenth-century terminology, persons born within U.S. territory were "subject to [U.S.] jurisdiction" unless excluded legally by national or international law concepts of jurisdiction or practically by military or political realities; it seems apparent that this meaning was adopted in the Fourteenth Amendment.

But these originalist solutions raise a puzzle for originalism as a theory of modern constitutional interpretation. Although application of the text's original meaning to core modern questions of constitutional citizenship seems relatively

---

claim to constitutional citizenship); ERMAN, *supra* note 2, at 8–26 (arguing that the Fourteenth Amendment extended citizenship to natives of island territories such as Puerto Rico); Rose Cuison Villazor, *Problematizing the Protection of Culture and the* Insular Cases, 131 HARV. L. REV. F. 127, 130–31, 134–36 (2018) (describing the American Samoa citizenship litigation); John Vlahoplus, *Other Lands and Other Skies: Birthright Citizenship and Self-Government in Unincorporated Territories*, 27 WM. & MARY BILL RTS. J. 401, 401–02 (2018) (criticizing the *Tuaua* decision).

6. *See* Patrick J. Lyons, *Trump Wants to Abolish Birthright Citizenship. Can He Do That?*, N.Y. TIMES (Aug. 23, 2019), https://www.nytimes.com/2019/08/22/us/birthright-citizenship-14th-amendment-trump.html; *Trump Says He Is Seriously Looking at Ending Birthright Citizenship*, REUTERS (Aug. 21, 2019, 12:43 PM), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-he-is-seriously-looking-at-ending-birthright-citizenship-idUSKCN1VB21B [https://perma.cc/A87U-DKLV]. As discussed in Section I.C, the President has suggested making the change by executive order rather than by legislation.

7. For challenges to a broad view of birthright citizenship in academic and political commentary, see generally PETER H. SCHUCK & ROGERS M. SMITH, CITIZENSHIP WITHOUT CONSENT: ILLEGAL ALIENS IN THE AMERICAN BILL (1985); Patrick J. Charles, *Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law*, 51 WASHBURN L.J. 211 (2012); John C. Eastman, *Born in the U.S.A.? Rethinking Birthright Citizenship in the Wake of 9/11*, 12 TEX. REV. L. & POL. 167 (2007); and William Ty Mayton, *Birthright Citizenship and the Civic Minimum*, 22 GEO. IMMIGR. L.J. 221 (2008). For academic defenses, see generally GERALD L. NEUMAN, STRANGERS TO THE CONSTITUTION: IMMIGRANTS, BORDERS, AND FOUNDATIONAL LAW 165–87 (1996); Garrett Epps, *The Citizenship Clause: A "Legislative History*," 60 AM. U. L. REV. 331 (2010); James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 GREEN BAG 367 (2006); Ing, *supra* note 3, at 725–68; Gerard N. Magliocca, *Indians and Invaders: The Citizenship Clause and Illegal Aliens*, 10 U. PA. J. CONST. L. 499 (2008).

8. *See generally* ILAN WURMAN, A DEBT AGAINST THE LIVING: AN INTRODUCTION TO ORIGINALISM (2017) (outlining the history and basic principles of originalism).

Electronic copy available at: https://ssrn.com/abstract=3681119

straightforward, there is little evidence that the Amendment's enactors considered or foresaw the resolution of either question regarding the Clause's scope. As to the consequences of birth in overseas possessions, the United States had no material overseas possessions when the Amendment was drafted and ratified. The assumption had generally been and remained as of the 1860s that U.S. territories (apart from the constitutionally unique District of Columbia) would be settled by people from the existing states and would become states themselves.[9] Acquisition of imperial possessions—raising the question of what counted as "in" the United States for citizenship purposes—did not begin until the Spanish–American War.[10]

Similarly, restrictive federal immigration laws did not materially take hold in the United States until the late nineteenth century. The U.S. federal government long claimed some power to exclude aliens (at least enemy aliens), and immigration restrictions existed throughout the nineteenth century at the state level.[11] It was possible in theory for persons to be born in the United States to parents not lawfully present, but there is little evidence that anyone recognized the issue in the 1860s, much less that the Amendment's enactors thought they had resolved it by the Citizenship Clause.

Application of the Citizenship Clause thus requires originalism to confront the role (or lack thereof) of intent in modern originalist theory. Most modern originalists claim to be bound by the original meaning of the text rather than the original intent of the enactors.[12] But in the Citizenship Clause, the text's resolution of these key modern questions of its scope appears to be accidental. Application of the original meaning to these questions would not resolve core modern policy issues in accordance with the enactors' design—because such resolution was not part of the original design other than by accident. The Citizenship Clause presses originalism to explain why original meaning should be binding in modern law when it does not reflect policy choices of the enactors.[13] As this Article discusses, explanations are available, but they may take originalist approaches away from some of their apparent common ground.

The Article proceeds in three parts. Part I reviews the development of U.S. citizenship law in the eighteenth and nineteenth centuries and introduces the questions of the Citizenship Clause's scope. Part II argues that the Clause's original

---

9. *See* ERMAN, *supra* note 2, at 12.

10. *See id.* at 8–26; GARY LAWSON & GUY SEIDMAN, THE CONSTITUTION OF EMPIRE: TERRITORIAL EXPANSION AND AMERICAN LEGAL HISTORY 103–28 (2004).

11. *See* NEUMAN, *supra* note 7, at 19–20.

12. *See generally* WURMAN, *supra* note 8, at 11–24 (discussing the evolution of originalist theories); John O. McGinnis & Michael B. Rappaport, *Unifying Original Intent and Original Public Meaning*, 113 NW. U. L. REV. 1371 (2019) (discussing principles of modern originalism). For approaches focused on original intent, see, for example, Larry Alexander, *Originalism, The Why and the What*, 82 FORDHAM L. REV. 539 (2013) and Richard S. Kay, *Original Intention and Public Meaning in Constitutional Interpretation*, 103 NW. U. L. REV. 703 (2009).

13. *See* Cristina M. Rodríguez, *The Citizenship Clause, Original Meaning, and the Egalitarian Unity of the Fourteenth Amendment*, 11 U. PA. J. CONST. L. 1363, 1364–65 (2009).

Electronic copy available at: https://ssrn.com/abstract=3681119

public meaning indicates a broad scope, both as to places "in" the United States and persons "subject to [its] jurisdiction." Part III illustrates the enactors' inability to foresee key policy questions of constitutional citizenship and considers the implications of these conclusions for theories of originalism.

<h2 style="text-align:center">I. BACKGROUND: U.S. CITIZENSHIP IN HISTORICAL CONTEXT</h2>

This Section provides an overview of legal developments relating to the definition and scope of U.S. citizenship, as well as key modern controversies. As it recounts, the Constitution adopted in 1789 alluded to but did not define U.S. citizenship, leaving its articulation to state and federal statutes and common law.[14] Particularly as a result of the uncertain citizenship status of freed slaves after the Civil War, Congress adopted first a statute (the Civil Rights Act of 1866) and then the Fourteenth Amendment (ratified in 1868) declaring that, with some exclusions, persons born in the United States are U.S. citizens.[15] These provisions confirmed the citizenship of the freed slaves, but subsequent developments raised issues about the inclusion of other groups that persist to modern times. Specifically, as this Section describes, doubts arose about the citizenship of persons born in U.S. overseas territories and of persons born in the United States to noncitizen parents.

<h3 style="text-align:center">A. CITIZENSHIP IN THE ORIGINAL CONSTITUTION AND AFTERWARDS</h3>

The original Constitution was curiously unsystematic regarding citizenship. Its text assumed (without expressly declaring) that there was a concept of citizenship, both citizenship of the United States and citizenship of the individual states. As to U.S. citizenship, the three eligibility clauses (for the House, the Senate, and the presidency) referred to the length of time one must be a "Citizen of the United States" to hold the different offices.[16] Article I, Section 2 made it seven years for the House, and Article I, Section 3 made it nine years for the Senate; for the presidency, Article II, Section 1 provided that only "a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution" was eligible.[17] Article I, Section 8 also gave Congress power to "establish an uniform Rule of Naturalization."[18] Naturalization was then understood as power to confer citizenship legislatively;[19] as a power of the national Congress, this clause presumably granted the power to create U.S. citizenship by statute (though the Constitution did not say so in so many words).

---

14. *Cf.* U.S. CONST. art. I, §§ 2–3; *id.* art. II, § 1; *id.* art. III, § 2; *id.* art. IV, § 2.

15. *See id.* amend. XIV, § 1; Civil Rights Act of 1866, ch. 31, 14 Stat. 27. For a chronological summary of the enactment of the Act and the Amendment, see David P. Currie, *The Reconstruction Congress*, 75 U. CHI. L. REV. 383, 394–407 (2008).

16. U.S. CONST. art. I, § 2, cl. 2 (House); *id.* art. I, § 3, cl. 3 (Senate); *id.* art. II, § 1, cl. 5 (President).

17. *Id.* art. I, §§ 2–3; *id.* art. II, §1; *see* Michael D. Ramsey, *The Original Meaning of "Natural Born*," 20 U. PA. J. CONST. L. 199, 234–40 (2017) (discussing the presidential eligibility clause).

18. U.S. CONST. art. I, § 8, cl. 4.

19. *See* Ramsey, *supra* note 17, at 236 (discussing the original scope of Congress's naturalization power).

Electronic copy available at: https://ssrn.com/abstract=3681119

Article III, meanwhile, contained several references to citizens of individual states:

> The judicial Power shall extend . . . to Controversies . . . between a State and Citizens of another State;—between Citizens of different states;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.[20]

Likewise, the Comity Clause of Article IV provided that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[21] Although perhaps one could read these references to "Citizens" to mean U.S. citizens resident in a particular state, they seem better understood to envision a distinct concept of state citizenship.[22]

These provisions exhaust the original Constitution's treatment of citizenship, and they left substantial questions. Apart from naturalization, how did one become a citizen of the United States? To what extent did state citizenship differ from U.S. citizenship? What limits, if any, existed on states' ability to define state citizenship? As discussed below, these questions became sharply disputed in the early- to mid-nineteenth century.

Initially, however, development of citizenship law went fairly smoothly, though it remained somewhat undertheorized. Congress, pursuant to its naturalization power, enacted the first national naturalization statute in 1790,[23] and a federal statutory law of naturalization remained part of U.S. law, with various repeals, replacements, and amendments, through the time of the Fourteenth Amendment. Though U.S. statutory naturalization law thus varied in details over time, during this period it remained consistent in basic principles: (1) children born abroad of U.S.-citizen parents were (subject to some limitations) U.S. citizens at birth; (2) aliens born abroad could become U.S. citizens through a process that involved maintaining U.S. residence for a period of time and taking formal allegiance to the United States; and (3) persons born in the United States, regardless of the circumstances of their parents, were not covered by the federal citizenship statutes.[24]

---

20. U.S. CONST. art. III, § 2, cl. 1.

21. *Id*. art. IV, § 2.

22. *See* JAMES H. KETTNER, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608–1870, at 255–61 (1978) (discussing historical interpretations of Article IV).

23. Act of Mar. 26, 1790, ch. 3, 1 Stat. 103.

24. *See* KETTNER, *supra* note 22, at 236–46 (discussing the development of U.S. naturalization law in this period). For most of the nineteenth century, the basic outlines of naturalization were set by the Naturalization Act of 1802 with various modifications. *Id*. at 246 n.92; *see* Act of Apr. 14, 1802, ch. 28, 7 Stat. 153.

The 1802 Act had two ambiguities relating to foreign-born children of U.S. citizens. First, it was not clear whether it required both parents, either parent, or just the father to be a U.S. citizen. Second, it arguably did not apply to children whose parents were born after 1802, because it applied only to "children of persons who are now, or have been citizens of the United States." 1802 Act § 4; *see* Ludlam v. Ludlam, 31 Barb. 486, 490–91 (N.Y. Gen. Term 1860), *aff'd*, 26 N.Y. 356 (1863) (assuming that the

Electronic copy available at: https://ssrn.com/abstract=3681119

Without comprehensive federal law in the Constitution or federal statutes, citizenship law (apart from naturalization) remained, as it was before 1789, a combination of state statutes and common law. Many states had citizenship statutes dating from the pre-Constitution period, but (like the post-1789 federal laws) they were typically not comprehensive.[25] As a result, citizenship law was often common law. In particular, courts invoked a common law of citizenship to answer two early questions.

The first of these questions was how to treat persons born during the Revolution in areas under British occupation and persons born in the American colonies before the Revolution who had not fully supported the revolutionary side. For example, *Gardner v. Ward* concerned the citizenship of a person born in Massachusetts prior to 1775 who lived outside the American colonies during the war and returned in the 1780s.[26] *Inglis v. Trustees of the Sailor's Snug Harbour* similarly addressed the citizenship of a person born in the colonies prior to 1783, but who had lived in New York City during the British occupation and departed for England when the British withdrew.[27] These cases generated a range of technical answers whose significance diminished as the nineteenth century progressed and the Revolution became more distant. They are important, however, in revealing a common law baseline that persons born within a nation's territory were citizens (or subjects) of that nation—with some limitations, and with some uncertainty as to the effect of the change in sovereignty accompanying U.S. independence.[28]

A second question was the citizenship status of persons born in the United States to noncitizen parents. In theory, there were two main ways one could approach this question. One, associated with European writers and European practice, was that citizenship derived from one's parents (typically one's father). Under this view, called *jus sanguinis*, children of aliens born in a foreign country

---

1802 Act did not apply to a foreign-born child whose U.S.-citizen father was born after 1802). The 1855 Naturalization Act resolved both ambiguities by providing that the child's father had to be a U.S. citizen and that there were no limitations on when the father was a citizen. *See* Act of Feb. 10, 1855, ch. 71, § 1, 10 Stat. 604.

25. *See, e.g.*, Lynch v. Clarke, 1 Sand. Ch. 583, 648, 665–68 (N.Y. Ch. 1844) (discussing various colonial and state statutes); Barzizas v. Hopkins, 23 Va. (2 Rand.) 276, 280–85 (1824) (discussing and applying Virginia's citizenship statutes); *see also* KETTNER, *supra* note 22, at 213–24 (discussing state citizenship laws).

26. 2 Mass. (1 Tyng) 244, 253 (1805) (holding that the claimant was entitled to U.S. citizenship).

27. 28 U.S. (3 Pet.) 99, 120, 126–27 (1830) (holding that the claimant was not entitled to U.S. citizenship). For similar cases, see, for example, Shanks v. Dupont, 28 U.S. (3 Pet.) 242 (1830); Dawson's Lessee v. Godfrey, 8 U.S. (4 Cranch) 321 (1808); McIlvaine v. Coxe's Lessee, 8 U.S. (4 Cranch) 209 (1808).

28. Thus, in *Gardner*, for example, the baseline assumption was that persons born in Massachusetts prior to the Revolution were British subjects and then became U.S. citizens upon U.S. independence. The difficult question was whether Gardner's physical absence and failure to support the Revolution created an exception; the court held it did not. *See* 2 Mass. (1 Tyng) at 245, 253; *see also* KETTNER, *supra* note 22, at 173–209 (discussing these cases); Bernadette Meyler, *The Gestation of Birthright Citizenship, 1868–1898 States' Rights, the Law of Nations, and Mutual Consent*, 15 GEO. IMMIGR. L.J. 519, 528–30 (2001) (emphasizing these cases as associating citizenship with birth within sovereign territory).

Electronic copy available at: https://ssrn.com/abstract=3681119

would not be citizens or subjects of that country (unless naturalized).[29] English law and practice were sharply to the contrary, however. Birth in England made a person an English subject regardless of the parents' circumstances. Blackstone explained:

> The first and most obvious division of the people is into aliens and natural-born subjects. Natural-born subjects are such as are born within the dominions of the crown of England, that is, within the ligeance, or as it is generally called, the allegiance of the king; and aliens, such as are born out of it. Allegiance is the tie, or *ligamen*, which binds the subject to the king, in return for that protection which the king affords the subject. The thing itself, or substantial part of it, is founded in reason and the nature of government; the name and the form are derived to us from our Gothic ancestors.[30]

Blackstone's account continued, "[n]atural allegiance is such as is due from all men born within the king's dominions immediately upon their birth. For, immediately upon their birth, they are under the king's protection. . . . Natural allegiance is therefore a debt of gratitude."[31] It followed that the parents' status as subjects or aliens was irrelevant to the child's status: "The children of aliens, born here in England, are, generally speaking, natural-born subjects, and entitled to all the privileges of such."[32]

After independence, there was general (though not universal) agreement among U.S. courts and commentators that the English idea of subjectship by birth within the nation's territory (*jus soli*) became the citizenship law of the United States. As discussed, this idea formed the baseline in cases such as *Gardner* and

---

29. *See, e.g.*, EMER DE VATTEL, LE DROIT DES GENS OU, PRINCIPES DE LA LOI NATURELLE: APPLIQUÉS À LA CONDUITE & AUX AFFAIRES DES NATIONS & DES SOUVERAINS [THE LAW OF NATIONS, OR, PRINCIPLES OF THE LAW OF NATURE: APPLIED TO THE CONDUCT AND AFFAIRS OF NATIONS AND SOVEREIGNS] bk. I, ch. XIX, § 212 (trans., 1797) (1758); *see also* Ramsey, *supra* note 17, at 224–26 (discussing Vattel).

30. 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 354–55 (Oxford, Clarendon Press 1765).

31. *Id*. at 357 (footnote omitted).

32. *Id*. at 361–62. In stating this rule, Blackstone followed principles described by Edward Coke more than a century earlier in *Calvin's Case*:

> Concerning the local obedience it is observable, that as there is a local protection on the King's part, so there is a . . . local ligeance of the subject's part. . . . [L]ocal obedience being but momentary and uncertain, is yet strong enough to make a natural subject, for if he hath issue here, that issue is . . . a natural born subject. . . .

[1608] 77 Eng. Rep. 377, 384; 7 Co. Rep. 1 a, 6 b; *see* KETTNER, *supra* note 22, at 17–28 (discussing *Calvin's Case*); Meyler, *supra* note 28, at 528–29 (same); Vlahoplus, *supra* note 5, at 404–07 (same). The rule likely long predates Coke. *See* Lynch v. Clarke, 1 Sand. Ch. 583, 639 (N.Y. Ch. 1844) ("It is an indisputable proposition" that "[b]y the common law, all persons born within the ligeance of the crown of England, were natural born subjects, without reference to the *status* or condition of their parents. . . . This was settled law in the time of Littleton, who died in 1482. And its uniformity through the intervening centuries, may be seen by reference to the authorities, which I will cite without further comment." (citation omitted)).

Electronic copy available at: https://ssrn.com/abstract=3681119

*Inglis* in assessing the effects of U.S. independence on citizenship. Shortly after the Constitution's ratification, James Madison observed:

> It is an established maxim that birth is a criterion of allegiance. Birth, however, derives its force sometimes from place, and sometimes from parentage; but, in general, place is the most certain criterion; it is what applies in the United States. . . .[33]

Importantly, the U.S. baseline was commonly stated in Blackstonian terms as turning on the place of birth irrespective of the citizenship status of the parents. William Rawle wrote in 1829:

> Therefore every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution. . . . Under our Constitution the question is settled by its express language, and when we are informed that, excepting those who were citizens, (however the capacity was acquired,) at the time the Constitution was adopted, no person is eligible to the office of president unless he is a natural born citizen, the principle that the place of birth creates the relative quality is established as to us.[34]

Similar statements can be found, for example, in works by Zephaniah Swift (1795)[35] and James Kent (1827).[36]

Nineteenth-century court opinions were generally to the same effect. In *Inglis*, Justice Story (in dissent, but consistent with the majority on this point) followed Blackstone, writing:

---

33. M. ST. CLAIR CLARKE & DAVID A. HALL, CASES OF CONTESTED ELECTIONS IN CONGRESS, FROM THE YEAR 1789 TO 1834, INCLUSIVE 33 (Washington, Gales & Seaton 1834) (remarks made during the first session of the first Congress in 1789). The context was a debate over William Smith's eligibility to serve in Congress, which turned upon whether and when he had become a U.S. citizen. *See id.*

For a possible contrary view, see DAVID RAMSAY, A DISSERTATION ON THE MANNER OF ACQUIRING THE CHARACTER AND PRIVILEGES OF A CITIZEN OF THE UNITED STATES 6 (n.p. 1789) (appearing to adopt a *jus sanguinis* view of citizenship); Ramsey, *supra* note 17, at 227–28 n.96 (discussing Founding-Era views of *jus sanguinis* citizenship).

34. WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 86 (Portage Publications, Inc. 2d ed. 2011) (1829).

35. 1 ZEPHANIAH SWIFT, A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 163, 167 (Windham, John Byrne 1795) (describing "natural born subjects" as those "born within the state" and later specifically saying that the children of aliens "born in this state" are natural born subjects); *id.* at 164–65 (explaining the *jus soli* rule as based on allegiance to the territorial sovereign at birth in return for protection, closely tracking Blackstone).

36. 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 33, 43 (New York, O. Halsted 1827) [hereinafter 2 KENT (6th ed.)] (distinguishing between "natives" and "aliens," and concluding that "[n]atives are all persons born within the jurisdiction of the United States" while an "alien is a person born out of the jurisdiction of the United States"). A later edition added in a footnote: "This is the rule of the common law, without any regard or reference to the political condition or allegiance of their parents, with the exception of the children of ambassadors, who are in theory born within the allegiance of the foreign power they represent." 2 *id.* at 38 n.a (6th ed. 1848) (citing *Calvin's Case*, [1608] 77 Eng. Rep. 377, 384; 7 Co. Rep. 1 a, 6 b).

Electronic copy available at: https://ssrn.com/abstract=3681119

Two things usually concur to create citizenship; first, birth locally within the
dominions of the sovereign; and secondly, birth within the protection and obe-
dience, or in other words, within the ligeance of the sovereign. That is, the
party must be born within a place where the sovereign is at the time in full pos-
session and exercise of his power, and the party must also at his birth derive
protection from, and consequently owe obedience or allegiance to the sover-
eign, as such, de facto.[37]

Earlier, in *McCreery's Lessee v. Somerville*, Story (writing for the Court)
observed without discussion that the U.S.-born daughters of an Irish citizen were
"native born citizens of the United States."[38] Somewhat later, in *Lynch v. Clarke*,
a New York state case, the court concluded:

[B]y the law of the United States, every person born within the dominions and
allegiance of the United States, whatever were the situation of his parents, is a
natural born citizen. . . . I am bound to say that the general understanding of
the legal profession, and the universal impression of the public mind, so far as
I have had the opportunity of knowing it, that the birth in this country does of
itself constitute citizenship.[39]

---

37. 28 U.S. (3 Pet.) 99, 155 (1830) (Story, J., dissenting). Story disagreed on the outcome of the case
on other grounds, but his general statement of citizenship rules was not contested. *Accord* Kilham v.
Ward, 2 Mass. (1 Tyng) 236, 264–65 (1806) (opinion of Sewall, J.) ("The doctrine of the common law
is, that every man born within its jurisdiction is a subject of the sovereign of the country where he is born
. . . ."); State v. Manuel, 20 N.C. (3 & 4 Dev. & Bat.) 144, 151 (1838) ("[A]ll free persons born within
the State are born citizens of the State."); Barzizas v. Hopkins, 23 Va. (2 Rand.) 276, 278 (1824) ("The
place of birth, it is true, in general, determines the allegiance."). In his *Commentaries*, Story repeated the
rule that "[p]ersons, who are born in a country, are generally deemed citizens and subjects of that
country" but added that the rule should perhaps not apply to children of temporary visitors. JOSEPH
STORY, COMMENTARIES ON THE CONFLICT OF LAWS, FOREIGN AND DOMESTIC, IN REGARD TO
CONTRACTS, RIGHTS, AND REMEDIES, AND ESPECIALLY IN REGARD TO MARRIAGES, DIVORCES, WILLS,
SUCCESSIONS, AND JUDGMENTS § 48, at 48 (Boston, Hilliard, Gray & Co. 1834); *see also* Hardy v. De
Leon, 5 Tex. 211, 237 (1849) (quoting Story's *Commentaries*). This general rule was also reflected in
state statutes; for example, the Virginia citizenship statute of 1783 provided that "all free persons born
within the territory of this Commonwealth . . . shall be deemed citizens of this Commonwealth."
*Barzizas*, 23 Va. (2 Rand.) at 282–83 (quoting this statute).

38. 22 U.S. 354, 354 (1824).

39. 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844); *see* 2 KENT (6th ed.), *supra* note 36, at 49 n.a (favorably
citing and discussing *Lynch*). The issue in *Lynch* was whether persons born in the United States to
noncitizen parents who were only temporary visitors were U.S. citizens; the court answered in the
affirmative. *See* Leake v. Gilchrist, 13 N.C. (2 Dev.) 73, 75–76 (1829) (argument of counsel) (noting
that citizenship arose from birth in the United States even as to "accidental" birth of a person whose
parents "belong to another country"); KETTNER, *supra* note 22, at 287 ("Americans [in the early
nineteenth century] merely continued to assume that 'birth within the allegiance' conferred the status [of
citizenship] and its accompanying rights."). *But see Hardy*, 5 Tex. at 237 (observing that, although Story
"d[id] not undertake to assert that in the present state of public law such a qualification [as to temporary
visitors] is universally established, its propriety does not appear to have been questioned; and its
adoption in the present case seems to be fully sanctioned by law and demanded by every consideration
of humanity and justice"); STORY, *supra* note 37 (expressing doubts about the rule later adopted in
*Lynch* as to temporary visitors). In *Ludlam v. Ludlam*, the New York courts held—in considerable
tension with *Lynch*—that by common law the foreign-born child of a U.S. citizen temporarily residing
overseas was a U.S. citizen. 31 Barb. 486, 500 (N.Y. Gen. Term 1860), *aff'd*, 26 N.Y. 356 (1863).

Electronic copy available at: https://ssrn.com/abstract=3681119

Despite these broad statements identifying U.S. citizenship with birth within U.S. territory, there were some evident exceptions. First, it was generally understood that slaves were not citizens, because the condition of slavery was in its nature inconsistent with citizenship.[40] Second, tribal Native Americans were not considered citizens even though born in U.S. territory because they owed immediate allegiance to their respective tribes. James Kent held in *Goodell v. Jackson*: "Though born within our territorial limits, the Indians are considered as born under the dominion of their tribes. . . . They belong, by birth, to their own tribes, and these tribes are placed under our protection and dependent upon us; but still we recognize them as national communities."[41] Third, following long-standing exceptions recognized by English law, U.S.-born persons without even temporary obligations to U.S. law, such as children of foreign diplomats or foreign military forces, were excluded from citizenship.[42]

Thus, the early nineteenth century appeared to develop a general consensus on U.S. citizenship. Persons born outside the United States were treated according to the federal naturalization law. Persons born in the United States were citizens under common law (and sometimes state statutes), with exceptions for those born to slaves, tribal Native Americans, diplomats, and foreign military personnel (and with some uncertainty at the margins).[43]

### B. CITIZENSHIP, THE CIVIL WAR, AND AFTERWARDS

The early-century consensus was sharply upset, however, by the developing issue of the citizenship of free persons of African descent, which itself became part of the broader sectional conflict over slavery. Initially many Northern states—and even some Southern states—recognized such persons as citizens (though often with greatly reduced rights).[44] But as the slave economy expanded and sectional disputes heightened, Southern states increasingly did not want to treat free Blacks as citizens—and in particular they did not want to treat free Blacks from other states as entitled to Article IV's privileges-and-immunities protection.[45] Whether states could refuse such protections depended on a range of issues, including whether citizenship was a matter of state or federal law. The debate was theoretically complex and need not be fully examined here;

---

40. *See* KETTNER, *supra* note 22, at 300–01.

41. 20 Johns. Ch. 693, 712 (N.Y. Ch. 1823) (emphasis omitted); *see also* KETTNER, *supra* note 22, at 294–95 (discussing the exclusion of Native American tribes from citizenship during this period). Some tribes were granted citizenship by treaty or statute, but this was uncommon. *Id.* at 296–97.

42. *See Inglis*, 28 U.S. (3 Pet.) at 155 (Story, J., dissenting) (noting these exceptions); 2 KENT (6th ed.), *supra* note 36, at 39 (noting exceptions for foreign diplomats).

43. For example, despite the holding in *Lynch*, it seems fair to say that the issue of temporary visitors remained somewhat unsettled in the mid-nineteenth century. *See supra* note 39 (discussing post-*Lynch* cases); *see also* Mayton, *supra* note 7, at 225–40 (finding uncertainty in pre-Civil War citizenship law, and noting that *Lynch* was the only case directly confronting the issue of temporary visitors).

44. *See, e.g.*, Commonwealth v. Aves, 35 Mass. (18 Pick.) 193, 209 (1836); State v. Manuel, 20 N.C. (3 & 4 Dev. & Bat.) 144, 150–51 (1838); Fisher's Negroes v. Dabbs, 14 Tenn. (6 Yer.) 119, 126 (1834); *see also* KETTNER, *supra* note 22, at 316–17 (discussing cases).

45. *See* KETTNER, *supra* note 22, at 311–24.

Electronic copy available at: https://ssrn.com/abstract=3681119

most significantly, it reached its greatest prominence in the Supreme Court's decision in *Dred Scott v. Sandford*, with Chief Justice Taney concluding that, as a constitutional matter, persons of African descent could not be citizens.[46] Taney's conclusion became an immediate flashpoint; Justices McLean and Curtis ridiculed it in dissent,[47] and the emerging Republican Party directly renounced it.[48]

After the Civil War and the Thirteenth Amendment, it became critical to address the citizenship status of the newly freed slaves. The first federal Civil Rights Act, passed in April 1866 over President Johnson's veto, provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States."[49] But Taney's conclusion in *Dred Scott* that persons of African descent could not be citizens made the Civil Rights Act constitutionally dubious as applied to freed slaves. Recognizing this problem, Congress added what became the first sentence of the Fourteenth Amendment (drafted in 1866, ratified in 1868), using similar though somewhat distinct language: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."[50]

It is common ground, and has been since their enactment, that the Act and the Amendment made citizens of the freed slaves and overruled *Dred Scott* as applied to persons of African ancestry generally.[51] The Amendment also, by its plain language, nationalized the idea of citizenship: state citizenship was linked directly to national citizenship, and states would not have power to deny state citizenship to national citizens living within the state.[52]

But because the Amendment's description of national citizenship was qualified in two respects, it opened two new debates that remain active today. By its text,

---

46. 60 U.S. (19 How.) 393, 404–05 (1857). Taney argued, implausibly but consistent with common Southern views on the matter, that the Framers of the Constitution intended that no persons of African descent could be citizens. *Id.*; *see also* Amy v. Smith, 11 Ky. (1 Litt.) 326, 332–33 (1822) (similarly holding that persons of African descent could not be citizens). Although the multiple opinions in *Dred Scott* are difficult to assess, it appears that only two other Justices concurred in this part of Taney's opinion. *See* 60 U.S. (19 How.) at 404–05.

47. *See* 60 U.S. (19 How.) at 531 (McLean, J., dissenting); *id.* at 582–83 (Curtis, J., dissenting). Justice Curtis restated the common view of *jus soli* citizenship: "Undoubtedly, as has already been said, it is a principle of public law, recognised by the Constitution itself, that birth on the soil of a country both creates the duties and confers the rights of citizenship." *Id.* at 578. He also showed at length that, in the Founding Era, there was no exception to this rule for free persons of African descent in a substantial number of states, *id.* at 572–76, while acknowledging that states had the power to alter the common law rule (including as to free persons of African descent) by statute, *id.* at 579.

48. *See, e.g.*, Abraham Lincoln, Speech on the Dred Scott Decision (June 26, 1857) (transcript available at https://teachingamericanhistory.org/library/document/speech-on-the-dred-scott-decision [https://perma.cc/EMY2-CYCW]).

49. Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27; *see* Currie, *supra* note 15, at 394–99 (discussing enactment of the Act).

50. U.S. CONST. amend. XIV, § 1. The Amendment's drafting history is discussed in greater detail in Section II.B.2, *infra*.

51. *See, e.g.*, Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 73 (1873) (discussing the Citizenship Clause's purpose to overrule *Dred Scott*).

52. *See* U.S. CONST. amend. XIV.

Electronic copy available at: https://ssrn.com/abstract=3681119

to be a constitutional citizen a person must be born or naturalized (1) "in the United States" and (2) "subject to [U.S.] jurisdiction."[53] As to naturalization, these requirements seem straightforward: naturalization procedures occur in U.S. territory and naturalized persons expressly accept U.S. jurisdiction over them. It does not seem likely that there would be any category of purportedly naturalized U.S. citizens not naturalized in the United States or not subject to its jurisdiction. For potential born citizens, the issues may be more difficult.

First, what did it mean to be born "in the United States"? For most births this would be clear, but not for all. Are U.S. overseas territories and possessions, bases, areas subject to disputed sovereignty, or under U.S. leases or temporary occupation "in" the United States?[54] Second, what was meant by "subject to the jurisdiction" of the United States? This text appears to create a category of persons born in the United States but *not* subject to U.S. jurisdiction.

For the most part, in the immediate post-ratification period the first issue was not contested. Contiguous territories were understood as part of the United States and ultimately destined for statehood. The United States lacked material overseas possessions or territories. The only material permanent noncontiguous U.S. territory of the time was Alaska (purchased in 1867), but the acquisition treaty acknowledged Alaskans' U.S. citizenship; Alaska's indigenous population was excluded from citizenship by the same theory that excluded tribal Native Americans in the contiguous states and territories, and in any event the non-Native population was extremely small and not expected to grow.[55] Although the United States contemplated further acquisitions,[56] none was completed for thirty years after the Amendment.

The Spanish–American War (1898) changed the picture entirely. As a direct consequence, the United States acquired Puerto Rico, Guam, and the Philippines; the nation's sudden global outlook encouraged other acquisitions including Hawaii (1898), American Samoa (1900), and the U.S. Virgin Islands (1917). These acquisitions raised broader constitutional issues—not

---

53. *Id.*

54. *See* Allan Erbsen, *Constitutional Spaces*, 95 MINN. L. REV. 1168, 1188–97 (2011) (discussing the ambiguity of places "in" the United States).

55. On the status of Alaska after acquisition, see LAWSON & SEIDMAN, *supra* note 10, at 105–08. Pursuant to congressional authorization, the United States in the nineteenth century also took possession of various uninhabitable "guano" islands. *See* Jones v. United States, 137 U.S. 202, 209–12 (1890) (discussing and upholding this authorization). *See also* Erbsen, *supra* note 54, at 1226–27 n.220 (discussing this authorization); *id.* at 1229 n.226 (discussing the 1857 acquisition of the remote Howland Island under this authorization). It does not appear that any permanent settlement was imagined on these islands.

56. President Grant pushed strongly for acquisition of the Dominican Republic, even signing a treaty to that effect, but the Senate refused its consent. *See* RON CHERNOW, GRANT 691–99, 719–20 (2017). As Professor Erman recounts, in congressional debates and other commentary of this period, it was broadly assumed that birthright citizenship would apply to new acquisitions. An argument against further acquisitions—particularly associated with congressmen and commentators from the South—was that acquisitions would substantially increase the number of nonwhite citizens. *See* ERMAN, *supra* note 2, at 12–13 (discussing post-Amendment assumptions).

Electronic copy available at: https://ssrn.com/abstract=3681119

just the citizenship of their inhabitants but the Constitution's application within their territory.[57]

In the post-war *Insular Cases*, the Supreme Court developed a compromise. "Unincorporated" territories, it said, were not fully subject to the Constitution, while "incorporated" territories were fully subject to it. Which territories were and were not "incorporated" was a matter for Congress. Thus, territories not incorporated by Congress were not fully part of the United States for constitutional purposes.[58] Though the *Insular Cases* did not directly address the question of citizenship,[59] Congress and the Executive Branch treated the outcome as indicating that persons born in unincorporated territories were not constitutional citizens, while over time, Congress extended birthright citizenship to most of these areas by statute.[60] But the understanding remained that the Constitution did not require U.S. citizenship for persons born in unincorporated territories. And curiously, Congress failed to extend statutory birthright citizenship to persons born in American Samoa, who are to this day designated "U.S. nationals" but not U.S. citizens (unless they go through the statutory naturalization process as adults).[61]

In contrast to this narrow view of who was born "in" the United States for constitutional purposes, law and practice settled on a broad view of who was born "subject to the jurisdiction" of the United States. That resolution was initially in some doubt. Just five years after ratification of the Fourteenth Amendment, the Supreme Court appeared to take a restrictive view in the *Slaughter-House Cases*, observing (in an aside) that "[t]he phrase, 'subject to its jurisdiction' was intended to exclude from [the Clause's] operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States."[62] But a decade later, the Court (again in an aside) suggested a broader

---

57. LAWSON & SEIDMAN, *supra* note 10, at 108–18.

58. *See* ERMAN, *supra* note 2, at 53–55, 85–87; LAWSON & SEIDMAN, *supra* note 10, at 194–97. The principal cases were *De Lima v. Bidwell*, 182 U.S. 1 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901); *Dooley v. United States*, 183 U.S. 151 (1901); *Gonzales v. Williams*, 192 U.S. 1 (1904); and *Dorr v. United States*, 195 U.S. 138 (1904). Depending on how one counts, there were as many as twenty such cases. *See infra* Section II.A.4 (discussing these cases in greater detail).

59. In *Gonzales*, in which the parties directly raised the issue of Puerto Ricans' citizenship status, the Court held only that natives of Puerto Rico were not "aliens" under the relevant federal statute and expressly declined to reach the constitutional citizenship issue. 192 U.S. at 12; *see* ERMAN, *supra* note 2, at 87 (noting that the Court "found it more profitable to evade classification of the citizenship status of Puerto Ricans").

60. *See* 8 U.S.C. § 1406 (2018) (granting U.S. citizenship to persons born in the U.S. Virgin Islands); *id.* § 1407 (granting U.S. citizenship to persons born in Guam); Jones–Shafroth Act, Pub. L. No. 64-368, § 5, 39 Stat. 951, 953 (1917) (granting U.S. citizenship to persons born in Puerto Rico); ERMAN, *supra* note 2 (discussing the status of Puerto Rico after the *Insular Cases*).

61. *See* Nationality Act of 1940, Pub. L. No. 76-853 § 204, 54 Stat. 1137, 1139 (designating American Samoans as noncitizen "nationals" of the United States); Fitisemanu v. United States, 426 F. Supp. 3d 1155, 1170–74 (D. Utah 2019) (discussing status of American Samoans), *appeal filed*, No. 20-4017 (10th Cir. Feb. 11, 2020).

62. 83 U.S. (16 Wall.) 36, 73 (1873). As discussed in Section II.B.3, the issue in the *Slaughter-House Cases* had nothing to do with the "subject to the jurisdiction" language, and there was no dispute about the citizenship status of the claimants.

Electronic copy available at: https://ssrn.com/abstract=3681119

view in *Elk v. Wilkins*.[63] *Elk* principally confirmed the pre-Amendment rule that tribal Native Americans lacked birthright citizenship under the Amendment, but in the course of its discussion, the Court observed that such Native Americans were no more subject to the jurisdiction of the United States than "the children born within the United States, of ambassadors or other public ministers of foreign nations"[64] (thus arguably implying that other U.S.-born children of aliens were U.S. citizens).[65] Ultimately the Court faced the issue directly in *United States v. Wong Kim Ark* in 1898, holding that the U.S.-born child of lawful Chinese resident immigrants was born "subject to the jurisdiction" of the United States and thus was a U.S. citizen under the Fourteenth Amendment.[66]

Meanwhile the U.S. Executive Branch had moved somewhat in the opposite direction. In an early post-ratification opinion, Secretary of State Hamilton Fish (in the Grant Administration) concluded that even children of temporary visitors were born citizens under the Amendment.[67] But later administrations backed off that conclusion,[68] and in the 1890s, the McKinley Administration argued— including in the *Wong Kim Ark* case—that U.S.-born children of Chinese immigrants were not citizens.[69] After the Supreme Court rejected the latter conclusion in *Wong Kim Ark*, the Executive Branch reverted to a broad view of the Clause, concluding that the Clause conveyed citizenship not only to children of permanent residents but also to children of temporary visitors and (when the issue emerged)

---

63. 112 U.S. 94 (1884).

64. *Id.* at 102.

65. As with the *Slaughter-House Cases*, the Court in *Elk* was not called upon to resolve the meaning of the "subject to the jurisdiction" language. The parties agreed that persons born into tribes lacked constitutional citizenship at birth; the question was whether a member of a tribe could become a U.S. citizen by renouncing his tribe and integrating into the larger society. *Id.* at 98. The Court held that tribal members could not subsequently become citizens other than through naturalization. *Id.* at 109.

66. 169 U.S. 649, 704–05 (1898). Chief Justice Fuller, joined by Justice Harlan, dissented. *Id.* at 705.

67. *See id.* at 689–90 ("The Fourteenth Amendment [Citizenship Clause] . . . is simply an affirmance of the common law of England and of this country, so far as it asserts the status of citizenship to be fixed by the place of nativity, irrespective of parentage. The qualification 'and subject to the jurisdiction thereof,' was probably intended to exclude the children of foreign ministers, and of other persons who may be within our territory with rights of extraterritoriality." (quoting Statement from Hamilton Fish, U.S. Sec'y of State, to George Perkins Marsh, Am. Minister to It. (May 19, 1871), *in* 2 A DIGEST OF THE INTERNATIONAL LAW OF THE UNITED STATES TAKEN FROM DOCUMENTS ISSUED BY PRESIDENTS AND SECRETARIES OF STATES 394, 394 (Francis Wharton ed., Gov't Printing Office 1887))); *accord* OPINIONS OF THE PRINCIPAL OFFICERS OF THE EXECUTIVE DEPARTMENTS, AND OTHER PAPERS RELATING TO EXPATRIATION, NATURALIZATION, AND CHANGE OF ALLEGIANCE 18 (Washington, Gov't Printing Office 1873) ("The child born of alien parents in the United States is held to be a citizen thereof . . . ." (opinion of Secretary of State Fish)). *But see* Charles, *supra* note 7, at 231–45 (finding early Executive Branch views more ambiguous).

68. *See Wong Kim Ark*, 169 U.S. at 719 (Fuller, C.J., dissenting) (noting opinions of Secretaries of State Frelinghuysen and Bayard); Charles, *supra* note 7, at 231–45 (discussing Executive Branch views); Mayton, *supra* note 7, at 247 (same).

69. *Wong Kim Ark*, 169 U.S. at 649–50. The Executive Branch view had some support in commentary. *See generally* Meyler, *supra* note 28 (discussing competing post-Amendment views).

Electronic copy available at: https://ssrn.com/abstract=3681119

to children of persons not lawfully present in the United States.[70]

### C. MODERN CHALLENGES

Though both the narrow view of "in the United States" and the broad view of "subject to [U.S.] jurisdiction" remained largely uncontested for many years, they have recently been challenged. As noted, the first issue is immediately relevant only to persons born in American Samoa because Congress over time extended statutory birthright citizenship to persons born in other overseas territories (apart from the Philippines, which gained independence after World War II). In the 2000s, a campaign began to declare American Samoans constitutionally entitled to U.S. citizenship; in 2015, the D.C. Circuit held—principally on the basis of the *Insular Cases*—that American Samoa is not "in" the United States for purposes of the Citizenship Clause.[71] Then in 2019, a Utah District Court rejected the D.C. Circuit's conclusion and held the Samoans entitled to U.S. citizenship under the Fourteenth Amendment (the litigation remains ongoing).[72] The Samoans' claim has been supported by some academic writing, both specifically on the citizenship question[73] and more broadly as attacks on the underlying theory of the *Insular Cases*.[74] And the broader implications of the *Insular Cases* have been challenged in other litigation regarding the constitutional status of Puerto Rico.[75]

Modern arguments for a narrower scope of "subject to [U.S.] jurisdiction" began with the 1985 book by Peter Schuck and Rogers Smith, *Citizenship Without Consent*.[76] Adopting what they called a "consensual" position, Schuck

---

70. *See* U.S. DEP'T OF STATE, *supra* note 3 ("All children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth . . . ."); Ing, *supra* note 3 (discussing modern practice).

71. Tuaua v. United States, 788 F.3d 300, 310 (D.C. Cir. 2015). As a textual matter, the court found the phrase "in the United States" to be ambiguous. *Id*. at 303. The court also found it persuasive that the government of American Samoa opposed U.S. citizenship. *Id*. at 309–10 (finding it "anomalous to impose citizenship over the objections of the American Samoan people themselves, as expressed through their democratically elected representatives").

72. Fitisemanu v. United States, 426 F. Supp. 3d 1155, 1196 (D. Utah 2019), *appeal filed*, No. 20-4017 (10th Cir. Feb. 11, 2020). The court found that the *Insular Cases* did not control the outcome; instead it based its conclusion on *Wong Kim Ark* and that case's reliance on the traditional common law of *jus soli* citizenship. *See id*. In the court's view, that common law encompassed citizenship for all persons born within U.S. sovereign territory, regardless of its status as incorporated or unincorporated.

73. ERMAN, *supra* note 2, at 8–13 (arguing for a broad scope of the Citizenship Clause to include birth in all U.S. territories).

74. *See* LAWSON & SEIDMAN, *supra* note 10, at 197 (concluding that "[t]he doctrine of 'territorial incorporation' that emerged from *The Insular Cases* is transparently an invention designed to facilitate the felt needs of a particular moment in American history"); *id*. at 196 (describing "a torrent of academic criticism of *The Insular Cases*"). Lawson and Seidman specifically found the *Insular Cases* indefensible as a matter of the Constitution's original meaning. *See id*. at 196–97.

75. *See* Adriel I. Cepeda Derieux, *The Supreme Court Has a Chance to Bring Constitutional Equality to Puerto Rico*, SLATE (Oct. 10, 2019, 3:28 PM), https://slate.com/news-and-politics/2019/10/puerto-rico-constitutional-rights-supreme-court.html (discussing the recent U.S. Supreme Court case *Financial Oversight & Management Board for Puerto Rico v. Aurelius Investment LLC*, 140 S. Ct. 1649 (2020), which raised the question whether the Appointments Clause applies to Puerto Rican-related entities).

76. SCHUCK & SMITH, *supra* note 7.

Electronic copy available at: https://ssrn.com/abstract=3681119

and Smith argued that the Citizenship Clause should be read to extend citizenship only to U.S.-born children of parents who (if not themselves citizens) had become part of the U.S. political community as lawful permanent residents.[77] Their term "consensual" invoked the proposition that the sovereign should consent to the person's integration into U.S. society by admission of the parents as lawful permanent residents. Thus, while accepting the result in *Wong Kim Ark*, their view excluded from citizenship both children of temporary visitors and children of persons not lawfully resident.[78]

Schuck and Smith were not entirely clear whether they intended their account as a claim about the Clause's original meaning or as an argument for a reinterpretation of the Clause in light of modern conditions. More recent academic commentary has, however, cast the argument specifically in terms of the Clause's original meaning and intent, contending that the "consensualist" view of citizenship was adopted by the Clause's enactors and is reflected in the text's requirement of birth "subject to the jurisdiction" of the United States.[79] Indeed, some academic authorities would go further. Professor John Eastman, for example, has expressly argued that *Wong Kim Ark* was wrongly decided:

> Justice Gray [in *Wong Kim Ark*] appears not to have appreciated the distinction between partial, territorial jurisdiction, which subjects all who are present within the territory of a sovereign to the jurisdiction of its laws, and complete, political jurisdiction, which additionally requires allegiance to the sovereign. . . .
>
> . . .
>
> . . . Justice Gray simply failed to appreciate . . . that there is a difference between territorial jurisdiction and the more complete, allegiance-obliging jurisdiction that the Fourteenth Amendment codified.[80]

Thus, Professor Eastman argues that the extent of constitutional citizenship should be restored to what the "drafters [of the Fourteenth Amendment] actually intended, that only a complete jurisdiction, of the kind that brings with it a total and exclusive allegiance, is sufficient to qualify for the grant of citizenship to which the people of the United States actually consented."[81]

Versions of this argument have been adopted by political leaders and persist to the present. Various bills have been introduced without success in Congress over the course of recent decades to narrow or eliminate birthright citizenship for U.S.-born children of temporary visitors or of persons not

---

77. *See generally id.*

78. *Id.* at 85, 117–19.

79. *See generally, e.g.*, Eastman, *supra* note 7 (elaborating on this point); Mayton, *supra* note 7 (same). *But see* Ing, *supra* note 3, at 749–67 (critiquing this view).

80. Eastman, *supra* note 7, at 175–76.

81. *Id.* at 178.

Electronic copy available at: https://ssrn.com/abstract=3681119

lawfully present.[82] Most recently, President Trump called (unofficially) for a narrow view of birthright citizenship.[83] Trump, moreover, suggested altering the rule by executive order rather than going through Congress;[84] presumably the approach would be to direct the relevant agency to reinterpret current U.S. citizenship law.[85] Former Trump advisor Michael Anton elaborated the argument for the narrow view of constitutional citizenship in the *Washington Post* and at greater length in the *Claremont Review of Books*;[86] the position has been advocated by prominent policy organizations such as the Heritage Foundation[87] and in leading political commentary.[88]

Both the Samoans' argument and the President's argument rest to a substantial extent on claims about the original meaning of the Fourteenth Amendment. A central point of the first argument is that the Constitution's original meaning contains no distinction between incorporated and unincorporated territories[89]—a distinction invented by the Supreme Court over thirty years later in the *Insular Cases*. At the time of the Amendment, the Samoans argued, all U.S. territories were "in" the United States. Similarly, the argument for restricting constitutional citizenship to the children of citizens and lawful permanent residents rests on claims about the text's original meaning and the enactors' understandings and intentions—specifically, the intended meaning of the phrase "subject to the jurisdiction" of the United States. Anton, for example, labeled his arguments

---

82. *See generally* Legislation Denying Citizenship at Birth to Certain Children Born in the U.S., 19 Op. O.L.C. 340 (1995) (statement of Walter Dellinger, Assistant Attorney Gen.) (discussing proposals in the 1990s).

83. Lyons, *supra* note 6; *Trump Says He Is Seriously Looking at Ending Birthright Citizenship*, *supra* note 6.

84. Jonathan Swan & Stef W. Kight, *Exclusive: Trump Targeting Birthright Citizenship with Executive Order*, AXIOS (Oct. 30, 2018), https://www.axios.com/trump-birthright-citizenship-executive-order-0cf4285a-16c6-48f2-a933-bd71fd72ea82.html [https://perma.cc/GP25-JMSC].

85. The Immigration and Nationality Act repeats the language of the Citizenship Clause without elaboration. *See* 8 U.S.C. § 1401(a) (2018). The long-standing Executive Branch interpretation is that this language includes U.S.-born children of temporary visitors and of parents not lawfully present. *See* U.S. DEP'T OF STATE, *supra* note 3.

86. *See* Michael Anton, *Birthright Citizenship: A Response to My Critics*, CLAREMONT REV. BOOKS (July 22, 2018), https://claremontreviewofbooks.com/digital/birthright-citizenship-a-response-to-my-critics [hereinafter Anton, *Response*]; Michael Anton, *Citizenship Shouldn't Be a Birthright*, WASH. POST (July 18, 2018), https://www.washingtonpost.com/opinions/citizenship-shouldnt-be-a-birthright/2018/07/18/7d0e2998-8912-11e8-85ae-511bc1146b0b_story.html.

87. *See* Amy Swearer & Hans A. von Spakovsky, *9 Things to Know About Birthright Citizenship*, THE HERITAGE FOUND. (Oct. 31, 2018), https://www.heritage.org/immigration/commentary/9-things-know-about-birthright-citizenship [https://perma.cc/WP7Q-ES8M] (arguing that "[u]niversal birthright citizenship is a misinterpretation of the 14th Amendment . . . and is inconsistent with the intent of the amendment's framers" and that "[t]he president has the constitutional authority to direct executive agencies to act in accordance with the original meaning of the Citizenship Clause, and to direct agencies to issue passports, Social Security numbers, etc., only to those whose status as citizens is clear under the current law").

88. *See, e.g.*, Edward J. Erler, *Trump's Critics Are Wrong About the 14th Amendment and Birthright Citizenship*, NAT'L REV. (Aug. 19, 2015, 8:00 AM), https://www.nationalreview.com/2015/08/birthright-citizenship-not-mandated-by-constitution [https://perma.cc/6EVR-N6M3] (arguing that "'subject to the jurisdiction' . . . means owing exclusive political allegiance to the U.S").

89. *Cf*. U.S. CONST. amend. XIV, § 1.

Electronic copy available at: https://ssrn.com/abstract=3681119

"originalist" and relied heavily on the Amendment's drafting debates.[90] However, though the debate over the scope of birthright citizenship has been wide-ranging and largely framed in originalist terms, there is no comprehensive account of the Clause's original meaning. The next Part turns to developing such an account.

## II. THE ORIGINAL MEANING OF THE CITIZENSHIP CLAUSE

This Part addresses the original meaning of the two contested parts of the Citizenship Clause: "born . . . in the United States" and "subject to the jurisdiction thereof." It concludes that in both cases the original meaning is relatively clear. Birth "in" the United States meant birth in territory under permanent U.S. sovereign authority, without regard to the extent to which that territory was geographically, politically, or culturally integrated within the United States. Birth "subject to the jurisdiction" of the United States meant birth to parents who were neither legally nor practically exempt from U.S. sovereign authority. That is, in terms of modern debates, it concludes that in each case the broader view of the Clause accords with the original meaning.

A brief comment should be made here about methodology. This Article adopts an "original public meaning" approach, asking what the Constitution's text meant when it was adopted.[91] In this sense, it departs somewhat from previous scholarship on the Citizenship Clause, which has focused more upon the drafters'

---

90. *See* Anton, *Response*, *supra* note 86 (invoking statements by Senators Jacob Howard, Lyman Trumbull and Reverdy Johnson, among others, in the Amendment's drafting debates); *see also, e.g.*, Erler, *supra* note 88 (invoking drafters of the Fourteenth Amendment); Swearer & von Spakovsky, *supra* note 87 (invoking the "original meaning of the Citizenship Clause"). Counterarguments as well have focused principally on originalist and textualist claims. *See, e.g.*, Garrett Epps, *The Citizenship Clause Means What It Says*, ATLANTIC (Oct. 30, 2018), https://www.nationalreview.com/2015/08/birthright-citizenship-not-mandated-by-constitution (responding to Anton).

91. Originalist methodology takes a variety of approaches, and a definitive account is beyond the scope of this Article. For further discussion, see Vasan Kesavan & Michael Stokes Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 GEO. L.J. 1113, 1127–34 (2003) (describing methodology of "original meaning textualism"); Gregory E. Maggs, *A Critical Guide to Using the Legislative History of the Fourteenth Amendment to Determine the Amendment's Original Meaning*, 49 CONN. L. REV. 1069, 1108–12 (2017) (discussing original meaning specifically in the context of interpreting the Fourteenth Amendment); and *id*. at 1108 (describing original public meaning as "the meaning that a reasonable person would have attached to the words of the Amendment when the Amendment became effective"); and see also WURMAN, *supra* note 8, at 11–24 (discussing the evolution of originalist approaches). For a more complete statement of my own approach, see Michael D. Ramsey, *Missouri v. Holland and Historical Textualism*, 73 MO. L. REV. 969, 970–77 (2008). As I outlined there:

[H]istorical textualism is fundamentally focused on finding the most plausible meaning of the actual words and phrases [of the Constitution]. It is not sufficient, in this formulation, to say merely that one's interpretative approach "starts with the text": the question is wholly conceived as asking what the text (that is, its words and phrases) meant. More important than starting with the text (although that is of course the right starting point) is *ending with the text*. That is, in a historical textualist approach, the conclusion should be rendered as: phrase "X" has meaning "Y." As described below, quite a few things beyond the document's actual words and phrases may contribute to that conclusion, but the conclusion should always be brought back to a particular clause or set of clauses.

*Id*. at 971–72.

Electronic copy available at: https://ssrn.com/abstract=3681119

objectives, intents, and expectations. To an original meaning approach, the drafters' subjective intentions are not decisive, although the drafters' commentary may be relevant to the question of textual meaning.[92] The touchstone of the inquiry, however, is the historical meaning of the text, and accordingly that is the focus of this Article.

In conducting this inquiry, the ensuing discussion addresses three distinct time periods. The first is the period prior to the drafting and enactment of the constitutional language. In many respects, this may be the most probative period. The meaning and usage of relevant words and phrases before the drafting period, particularly in legal and political commentary, establishes the linguistic background from which the constitutional language arose. This earlier period also reflects background assumptions that provided context for the subsequent drafting and enactment.[93] The second period is the immediate time of drafting and ratification. As noted, this period is examined not to establish the subjective intent or policy objectives of any particular person or body but rather to evaluate what specific meaning educated and engaged speakers of the period gave to the relevant language.[94] Finally, the discussion examines post-ratification legal and political commentary, again with the objective of evaluating specifically the meaning of the relevant language at the time of enactment.[95]

This Part does not imply any conclusion about how the Clause should be interpreted in modern law. That question is taken up from an originalist perspective in Part III below.

### A. "BORN . . . IN THE UNITED STATES"

This Section begins with the question of what it meant to be born "in the United States." As discussed above, current law holds that birth in outlying U.S.

---

92. *See* Maggs, *supra* note 91, at 1110 (noting that, in an original public meaning analysis, the Fourteenth Amendment's legislative history "provide[s] what has been called 'publicly available context of constitutional communication'" and thus "show[s] how people in 1866 talked about the subjects covered by the Fourteenth Amendment" (quoting Lawrence B. Solum, *Originalism and the Unwritten Constitution*, 2013 U. ILL. L. REV. 1935, 1939)); *see also* Kesavan & Paulsen, *supra* note 91, at 1148–64 (discussing the relevance of comments in the drafting process of the original Constitution). As I have described earlier, this approach

> focuses upon the meaning of words and phrases, and thus is interested in direct evidence of how those words and phrases were actually used, or indirect evidence of how the historical sources seemed to assume they would be used. In contrast, general statements of goals, values or expectations, especially where not tied to any specific language, seem much less probative. Drafting, ratifying and post-ratification history are not ends in themselves, but only evidence of what a particular phrase may have meant.

Ramsey, *supra* note 91, at 975.

93. *See* Ramsey, *supra* note 91, at 974–75 (expanding on these points).

94. *Id*. at 975.

95. *See id*. (expressing reasons for caution in using post-ratification sources). In addition, the ensuing discussion focuses particularly on meaning in political and legal discourse. *See generally* John O. McGinnis & Michael B. Rappaport, *The Constitution and the Language of the Law*, 59 WM. & MARY L. REV. 1321 (2018) (justifying such a focus on the basis of the Constitution's status as a legal document employing a distinctive legal language).

Electronic copy available at: https://ssrn.com/abstract=3681119

territories does not come within this constitutional phrase (so that persons born in U.S. outlying territories depend on statutory grants of citizenship or—in the case of American Samoa—are not citizens at all). That result is difficult to square with the Citizenship Clause's original meaning.

1. Pre-enactment Meaning: What Was "in" the United States in the Nineteenth Century?

One might say, from the Clause's literal language, that "in the United States" meant only "in" one of the component states whose union forms "the United States"—that is, that territories were not fully "in" the United States until they were "admitted . . . into this Union" as states pursuant to the Constitution's Article IV.[96] This narrow reading, however, is contrary both to the way the phrase "in the United States" was used in pre-Amendment nineteenth-century legal discourse and to the goals and history of the Amendment.

Courts and other nineteenth-century authorities commonly referred to U.S. territories as "in" the United States. *Loughborough v. Blake*,[97] for example, concerned Congress's power to impose taxes in the District of Columbia. In affirming Congress's power, Chief Justice Marshall observed: "[The United States] is the name given to our great republic, which is composed of States and territories. The district of Columbia, or the territory west of the Missouri, is not less within the United States, than Maryland or Pennsylvania."[98]

Marshall's view—that territories were "within" the United States—was adopted with regard to territories acquired in the mid-nineteenth century. In *Cross v. Harrison*, the Court considered the validity of U.S. tariffs on goods imported into California after Mexico ceded California to the United States in 1848 and before California became a state in 1850.[99] Neither the Court nor the U.S. Executive Branch doubted that California was part of the United States after the cession, such that U.S. goods brought there were not subject to U.S. tariffs but foreign goods potentially were.[100]

---

96. U.S. CONST. art. IV, § 3. *See* Erbsen, *supra* note 54, at 1186–88 (noting this possible ambiguity). This approach would seem to have the odd result that the District of Columbia would not be "in" the United States, but perhaps that difficulty could be overcome by the Constitution's express provision for creating the District from land ceded by existing states. *See* U.S. CONST. art. I, § 8, cl. 17.

97. 18 U.S. (5 Wheat.) 317 (1820).

98. *Id*. at 319; *see also* Am. Ins. Co. v. Canter, 26 U.S. (1 Pet.) 511, 542 (1828) (Marshall, C.J.) ("The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed."). *Canter* concluded that the Florida territory, upon acquisition from Spain, became part of the United States subject to Congress's power to make rules for the territories. *Canter*, 26 U.S. (1 Pet.) at 540; *see* U.S. CONST. art. IV, § 3, cl. 2. The opinion also found that Congress's Article IV power included power to create territorial courts outside Article III, *Canter*, 26 U.S. (1 Pet.) at 546, a conclusion open to doubt on originalist grounds, *see* LAWSON & SEIDMAN, *supra* note 10, at 146–49.

99. 57 U.S. (16 How.) 164 (1853).

100. *See id*. at 197 ("By the ratifications of the treaty [of Guadalupe Hidalgo], California became a part of the United States . . . ."); *id*. (concluding that the provision of U.S. tariff laws that "ships coming from foreign ports into the United States were not to be permitted to land any part of their cargoes in any

Electronic copy available at: https://ssrn.com/abstract=3681119

Moreover, specifically as a matter of citizenship law, courts and commentators recognized that birth in U.S. territories constituted birth in the United States. As discussed in Section I.A., the U.S. nineteenth-century common law generally followed the British idea of *jus soli* that birth within sovereign territory established subjectship (in Britain) or citizenship (in the United States).[101] It followed from the *jus soli* principle that persons born in U.S. territories were U.S. citizens under common law only if the territories were "in" the United States. Pre-Amendment common law and commentary held that they were.[102] Notably, at no point in the pre-Civil War period did Congress make any provision for the citizenship of persons born or residing in the territories, even though Congress provided that persons born abroad to parents who were U.S. citizens at birth.[103] Presumably Congress assumed that persons born in the territories were U.S. citizens under common law and so a statutory provision was unnecessary; had there been doubt on the issue, there would have been considerable pressure to resolve it by statute, as was done for children of U.S. citizens born abroad.

## 2. The Drafting History and the Territorial Scope of the Citizenship Clause

Although the issue of territorial scope did not arise directly in the debates over Section 1 of the Fourteenth Amendment, participants in the debates appeared to assume an expansive territorial scope, consistent with earlier legal authorities. Michigan Senator Jacob Howard introduced what became the Citizenship Clause as an amendment to the existing draft on May 29, 1866,[104] with the Senate

---

other than in a port of delivery" applied to non-U.S. goods imported into California). The U.S. Executive Branch took a similar view. *See id*. at 185 (quoting Letter from James Buchanan, U.S. Sec'y of State, to William Voorhees (Oct. 7, 1848)) (concluding that California was "within the territory of the United States" and therefore no duties could be imposed in California on products of the rest of the United States, or vice versa, as a result of the Constitution's Uniform Duties Clause).

The difficult question in *Cross* was whether the U.S. military governor of California had authority to impose tariffs on non-U.S. goods after the end of the war and prior to authorization of a territorial government by Congress, *see id*. at 198, a conclusion that has been sharply questioned, *see* LAWSON & SEIDMAN, *supra* note 10, at 152–82. But that issue did not turn on any claim that California was not part of the United States.

101. *See supra* Part I.A.

102. *E.g*., Picquet v. Swan, 19 F. Cas. 609, 616 (C.C.D. Mass. 1828) (No. 11,134) (Story, J.) ("A citizen of one of our territories is a citizen of the United States . . . ."); Lynch v. Clarke, 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844) ("[E]very person born within the dominions and allegiance of the United States . . . is a natural born citizen."); RAWLE, *supra* note 34 ("[E]very person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution . . . ."); *see also* Corp. of New-Orleans v. Winter, 14 U.S. (1 Wheat.) 91, 94–95 (1816) (assuming that a resident of the Mississippi territory was a "citizen"); Hepburn v. Ellzey, 6 U.S. (2 Cranch) 445, 453 (1805) (assuming that residents of the District of Columbia were "citizens"); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1688, at 566 (Boston, Hilliard, Gray & Co. 1833) (discussing *Hepburn* and *Winter*). For an engaging discussion of citizenship issues that arose from the competing U.S. and U.K. claims to the Oregon territory between 1818 and 1846, see Vlahoplus, *supra* note 5, at 412–23.

103. *See, e.g*., Act of Apr. 14, 1802, ch. 28, 7 Stat. 153; Act of Mar. 26, 1790, ch. 3, 1 Stat. 103; *see also* KETTNER, *supra* note 22, at 236–46 (discussing eighteenth- and nineteenth-century naturalization statutes).

104. CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866). The original draft of Section 1 of the Amendment began by guaranteeing the "privileges or immunities of citizens of the United States"

Electronic copy available at: https://ssrn.com/abstract=3681119

debating it on May 30.[105] Most of the Senate debate focused on whether Howard's proposal excluded tribal Native Americans on reservations or on the western frontier.[106] Senators wanted them excluded from citizenship (consistent with prior practice). Howard thought his language accomplished the exclusion, but Wisconsin Senator James Doolittle disagreed and moved to add clarifying language.[107]

Debate over Doolittle's motion addressed whether tribes were excluded by Howard's "subject to the jurisdiction" requirement. Doolittle himself argued that Howard's language would cover "Indians of the Territories" as well as tribes within states, specifically referencing Colorado (then a territory).[108] Illinois Senator Lyman Trumbull, defending Howard's language, observed that "the first section [of the proposed amendment] refers to persons everywhere, whether in the States or in the Territories or in the District of Columbia" but argued the tribes were not subject to U.S. jurisdiction.[109] Trumbull gave the specific example of the Navajo Tribe (located in territories that later became Arizona, New Mexico,

---

without a definition of "citizens." *See id.* at 2765. Senator Benjamin Wade objected that the meaning of citizen might be contested and proposed instead to "strike out the word 'citizen,' and require the States to give equal rights and protection of person and property to all persons born in the United States or naturalized under the laws thereof." *Id.* at 2768–69. Howard undertook to address Wade's concern with an amendment to the draft that clarified the meaning of "citizen," adopting Wade's language in part. *See id.* at 2890.

105. *Id.* at 2890–97 (debate and final vote adopting Howard's proposal). On the relevance of drafting history to original meaning analysis, see *supra* note 92. On the use of the *Congressional Globe* as an authority, see Maggs, *supra* note 91, at 1075 (describing it as an "accurate and reliable source," and noting that it was "widely available almost immediately after every debate" and that "[t]he debates over the Fourteenth Amendment were therefore neither secret nor difficult for interested outsiders to follow"). Discussion of congressional debates over the Citizenship Clause necessarily focuses on the Senate. As noted, the Clause was introduced in the Senate as an amendment to the House draft; the House subsequently acceded to the Senate amendments with little comment on the Citizenship Clause. *See* CONG. GLOBE, 39th Cong., 1st Sess. 3144–49 (1866) (House debate on Senate amendments); *id.* at 3148 (remarks of Representative Stevens) (describing the Citizenship Clause, without further meaningful elaboration, as "an excellent amendment, long needed to settle conflicting decisions between the several States and the United States").

106. *See* CONG. GLOBE, 39th Cong., 1st Sess. 2890–97 (1866).

107. *Id.* at 2890.

108. *Id.* at 2892.

109. *Id.* at 2894. Trumbull contrasted Section 1 of the proposal with Section 2 (addressing representation in Congress), which he said "refers to no persons except those in the States of the Union." *Id.* He continued:

> We have had in the country, and have to-day, a large region of country within the territorial limits of the United States, unorganized, over which we do not pretend to exercise any civil or criminal jurisdiction, where wild tribes of Indians roam at pleasure, subject to their own laws and regulations, and we do not pretend to interfere with them.

*Id.* Trumbull argued that these "wild Indians" in the unorganized territories were excluded from birthright citizenship because they were not subject to U.S. jurisdiction—but for that point to matter, he necessarily assumed that unorganized territories were "in" the United States. *See id.* Howard, the drafter of the relevant language, agreed with Trumbull that tribes were excluded by the "subject to the jurisdiction" language without addressing the territorial scope. *Id.* at 2895.

Electronic copy available at: https://ssrn.com/abstract=3681119

and Utah).[110] All Senators who spoke seemed to assume that the Howard proposal encompassed the territories (including unorganized frontier territories); their disagreement was whether the "subject to the jurisdiction" language excluded Native tribes within those territories.[111]

Moreover, given the purpose of the Citizenship Clause, there is no reason to suppose that its drafters would have used language that excluded territories. The central purpose, all agree, was to overturn *Dred Scott*'s citizenship holding and confirm U.S. citizenship for freed slaves and other persons of African descent.[112] It would make no sense to exclude such persons from this protection because they happened to be born in the territories (and the drafters would have been particularly cognizant of freed slaves in the territories as the *Dred Scott* case itself involved the status of a slave who had been taken into the western territories).

3. Pre-enactment Usage: What Was Not "in" the United States?

Thus, it seems clear that U.S. territories were ordinarily considered "in" the United States in the nineteenth century, including during the drafting of the Fourteenth Amendment. Might it have been the case, though, that some areas under U.S. authority were nonetheless considered outside the United States, so that even if most territories were "in" the United States, some were not? Indeed, the compound nature of the Amendment's Citizenship Clause indicates that some places were "subject to the jurisdiction" of the United States yet not "in" the United States; otherwise, the Amendment could simply have granted citizenship to persons born subject to U.S. jurisdiction.[113] If being under U.S. jurisdiction was not sufficient, what was the test for calling a territory "in" the United States?

---

110. *Id*. at 2893. This debate retraced the Senate's debate earlier in the year over the Citizenship Clause of the 1866 Civil Rights Act. Senator Trumbull proposed that the Act's Clause read: "All persons born in the United States, and not subject to any foreign power, are hereby declared to be citizens of the United States. . . ." *Id*. at 498. This set off debate as to whether Native Americans were excluded, prompting the Senate to add the additional language "excluding Indians not taxed." *Id*. at 569. As with the debate over the Amendment, the debate over the Act assumed that Native Americans—including those in the territories—were "born in the United States," with the question being whether they were excluded by subsequent restrictions. *See id*. at 498–504, 522–30, 569–78.

111. After debate, the Senate voted against Doolittle's motion (apparently satisfied that Howard's language excluded the tribes without needing further adjustment) and then approved Howard's proposal without further discussion. *See id*. at 2897.

Though ratification materials do not address the Amendment's scope systematically, speakers likewise assumed a broad territorial scope. For example, Schuyler Colfax, the Speaker of the House of Representatives, in an 1866 speech explaining the Amendment, observed that it "declares that every person—every man, every woman, every child, born under our flag or naturalized under our laws, shall have a birthright in this land of ours." Hon. Schuyler Colfax, Speaker, House of Representatives, "My Policy" Reviewed: Necessity of the Constitutional Amendment, Speech at Indianapolis (Aug. 7, 1866), *in The Questions of the Hour*, CIN. COM., Aug. 8, 1866, http://www.tifis.org/sources/Colfax.jpg [https://perma.cc/CU25-ASYV].

112. *See, e.g*., Maggs, *supra* note 91, at 1083–84, 1087.

113. Reinforcing this point, the Thirteenth Amendment forbids slavery "within the United States, *or* any place subject to their jurisdiction." U.S. CONST. amend. XIII, § 1 (emphasis added). The Eighteenth Amendment (prohibiting "intoxicating liquors") had a similar reference to places "within" the United States and (in addition) "all territory subject to the jurisdiction thereof." *Id*. amend. XVIII, § 1 (repealed 1933). *See* Erbsen, *supra* note 54, at 1221–24 (discussing the reach of these Amendments).

Electronic copy available at: https://ssrn.com/abstract=3681119

The Supreme Court considered this issue directly in the mid-nineteenth century case *Fleming v. Page*,[114] with important implications for the Citizenship Clause. *Fleming*, like *Cross*, was a tariff case. It concerned the Mexican city of Tampico, which the U.S. military occupied during the Mexican War; the question was whether owners of goods shipped from Tampico to New York during the occupation had to pay U.S. tariffs upon landing the goods in New York.[115] The importers argued not, because (they said) Tampico was "in" the United States during the military occupation and thus tariffs on foreign products did not apply.[116] The Court thought otherwise. The Court acknowledged that Tampico at the time was "subject to the sovereignty and dominion of the United States" under international law.[117] But it further concluded that, as a matter of U.S. law, Tampico was not part of the United States because the occupation was temporary and there had not been a formal cession or annexation.[118] The Court strongly implied, however, that if there were a formal annexation or cession, Tampico would become part of the United States, at least for constitutional purposes. Chief Justice Taney's opinion is worth quoting at length on this point:

> The United States, it is true, may extend its boundaries by conquest or treaty . . . . But this can be done only by the treaty-making power or the legislative authority, and is not a part of the power conferred upon the President by the declaration of war. . . . [H]is conquests do not enlarge the boundaries of this Union, nor extend the operation of our institutions and laws beyond the limits before assigned to them by the legislative power.

> It is true, that, when Tampico had been captured, and the State of Tamaulipas subjugated, other nations were bound to regard the country, while our possession continued, as the territory of the United States, and to respect it as such. . . . As regarded all other nations, it was a part of the United States, and belonged to them as exclusively as the territory included in our established boundaries.

> But yet it was not a part of this Union. For every nation which acquires territory by treaty or conquest holds it according to its own institutions and laws. And the relation in which the port of Tampico stood to the United States while it was occupied by their arms did not depend upon the laws of nations, but upon our own Constitution and acts of Congress. The power of the President under which Tampico and the State of Tamaulipas were conquered and held in subjection was simply that of a military commander prosecuting a war waged against a public enemy by the authority of his government. And the country from which these goods were imported was invaded and subdued, and occupied as the territory of a foreign hostile nation, as a portion of Mexico, and was held in possession in order to distress and harass the enemy. While it was

---

114. 50 U.S. (9 How.) 603 (1850).
115. *Id.* at 605.
116. *Id.* at 606.
117. *Id.* at 614.
118. *Id.* at 616.

Electronic copy available at: https://ssrn.com/abstract=3681119

occupied by our troops, they were in an enemy's country, and not in their own; the inhabitants were still foreigners and enemies, and owed to the United States nothing more than the submission and obedience, sometimes called temporary allegiance, which is due from a conquered enemy, when he surrenders to a force which he is unable to resist. But the boundaries of the United States, as they existed when war was declared against Mexico, were not extended by the conquest; nor could they be regulated by the varying incidents of war, and be enlarged or diminished as the armies on either side advanced or retreated. They remained unchanged. And every place which was out of the limits of the United States, as previously established by the political authorities of the government, was still foreign; nor did our laws extend over it. Tampico was, therefore, a foreign port when this shipment was made.[119]

Crucially, *Fleming* did not turn on the fact that Tampico was not contiguous territory or that it was culturally or politically distinct from the United States (or that it had not been admitted as a state). Taney's central point was that no treaty or annexation had "enlarge[d] the boundaries of this Union." The strong implication was that if Tampico had been annexed by treaty or legislation it would, by that act, have become part of the United States. (This is consistent with what the Court said in *Cross* four years later about California.)[120] *Fleming* thus marks a clear boundary as to when a territory comes within the United States.

It is true that the United States did not then have any material noncontiguous territories (until the purchase of Alaska in 1867), so early legal and political commentary does not directly say that geographically remote territories are "in" the United States, for citizenship purposes or otherwise.[121] However, British law did face this question, and there was no doubt about its resolution. Under the British law of subjectship, all persons born in the monarch's dominions were British subjects, including those born in areas outside the British Isles and indeed including areas (such as the parts of India under direct British sovereign control) that had populations not of British descent.[122] As descendants of the colonists in British North America, nineteenth-century Americans were familiar with this doctrine;

---

119. *Id.* at 614–16. In a separate holding, the Court also found that even if Tampico had been within the United States for constitutional purposes, it was not within the United States for purposes of the tariff laws because Congress had not established U.S. customs there. *Id.* at 616–17.

120. *See* Cross v. Harrison, 57 U.S. (16 How.) 164, 197 (1853) (stating that California became part of the United States as a result of cession by treaty).

121. Presumably no one supposed that people born in Tampico (or elsewhere in Mexico) during U.S. military occupation were born "in" the United States for citizenship purposes, but that was because of the temporary occupation rule described in *Fleming*. In contrast, it appears to have been assumed that Alaska residents were "in" the United States upon formal acquisition of the territory. The treaty of acquisition with Russia provided that inhabitants of Alaska "shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States." LAWSON & SEIDMAN, *supra* note 10, at 106 (quoting Treaty Concerning the Cession of the Russian Possessions in North America by his Majesty the Emperor of all the Russias to the United States of America, Russ.-U.S., art. III, Mar. 30, 1867, 15 Stat. 539, 542).

122. *See* H. S. Q. HENRIQUES, THE LAW OF ALIENS AND NATURALIZATION: INCLUDING THE TEXT OF THE ALIENS ACT, 1905, at 29–31 (1906); Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case *(1608)*, 9 YALE J.L. & HUMAN. 73, 86–87 (1997).

Electronic copy available at: https://ssrn.com/abstract=3681119

under it, their colonist ancestors were British subjects at birth despite being born in outlying British territories.[123]

As a result, when the Amendment was adopted, common legal discourse understood a person to be born "in" the United States if that person was born in territory subject to permanent U.S. sovereignty. As *Fleming* explained, places under temporary U.S. occupation would not be considered "in" the United States even though they were under U.S. control (and thus subject to temporary U.S. jurisdiction), but once the United States asserted permanent sovereignty by treaty or legislation, the boundaries of the United States were (as *Fleming* said) thereby extended to include the new territory.

4. Post-enactment History: The *Insular Cases*

As discussed, the constitutional status of noncontiguous U.S. territories arose in the aftermath of the Spanish–American War in the series of Supreme Court decisions collectively known as the *Insular Cases*, in which the Court created the idea of "unincorporated" territories not fully within the United States for all constitutional purposes.[124] In modern law, these decisions have been taken to indicate that outlying territories are not "in" the United States for purposes of the Citizenship Clause,[125] although the Supreme Court never adopted this specific proposition. More significantly for the present discussion, however, the *Insular Cases* strongly suggest that the Citizenship Clause's original meaning did not direct this result—because the Court's rationale did not rest on a textual or historical distinction among types of territories. Rather, the multiple and somewhat incoherent opinions in the *Insular Cases* indicate that the constitutional text was clear but the Justices for policy reasons were uncomfortable with its implications.

The Court started out well enough in *De Lima v. Bidwell*, in which a narrow majority found (relying on *Fleming* and *Cross*) that Puerto Rico after the U.S. acquisition was "domestic" rather than "foreign" territory for tariff purposes.[126] In the majority's view, the key was that Spain had formally ceded Puerto Rico to the United States: "[B]y the ratification of the treaty of Paris the island became territory of the United States."[127]

---

123. *See* Inglis v. Trs. of the Sailor's Snug Harbour, 28 U.S. (3 Pet.) 99, 120 (1830) ("It is universally admitted, both in the English courts and in those of our own country, that all persons born within the colonies of North America, whilst subject to the crown of Great Britain, were natural born British subjects . . . .").

124. *See supra* note 58 and accompanying text.

125. *See* Tuaua v. United States, 788 F.3d 300, 303, 306 (D.C. Cir. 2015). *But see* Fitisemanu v. United States, 426 F. Supp. 3d 1155, 1196–97 (D. Utah 2019) (rejecting that analysis), *appeal filed*, No. 20-4017 (10th Cir. Feb. 11, 2020).

126. De Lima v. Bidwell, 182 U.S. 1 (1901).

127. *Id.* at 196; *see also id.* at 182–86 (relying heavily on *Cross* and *Fleming*). The dissent argued that, despite the cession, Puerto Rico should be regarded as "foreign" specifically for tariff purposes until Congress directly addressed the matter. *See id.* at 200–19 (McKenna, J., dissenting). The dissent's position seems flatly contrary to both executive and judicial assumptions regarding California after the Mexican War, as reflected in *Cross*, although it drew support from the Court's alternative holding in *Fleming*. *See supra* note 119. In any event, however, the dissent did not deny that, for general purposes, Puerto Rico was part of the United States after the cession. *See De Lima*, 182 U.S. at 201–02.

Electronic copy available at: https://ssrn.com/abstract=3681119

Congress dealt with the specific matter of tariffs in the Foraker Act in 1900, which established statutory duties on goods brought to the U.S. mainland from Puerto Rico.[128] The problem, though, was the Constitution's Uniformity Clause, which requires that "all Duties, Imposts and Excises shall be uniform throughout the United States."[129] In *Downes v. Bidwell*, importers argued that the Foraker Act violated this Clause by imposing duties on Puerto Rican goods that did not apply to goods from elsewhere in the United States (again, consistent with what both the Court and the Executive Branch had assumed regarding California in *Cross*).[130]

*De Lima* should have resolved *Downes*: if Puerto Rico was U.S. territory after the cession, it would seem obviously to be a part of the United States for purposes of the Uniformity Clause (and four of the five Justices from the *De Lima* majority reached that conclusion). But *Downes* was much more than a tariff case, as one commentary explains:

> [T]hese cases were generally understood to be a broad referendum on the freedom of Congress to deal with the island territories in ways at least facially prohibited by the Constitution. More specifically, the larger question lurking in the background was whether all the provisions in the Bill of Rights concerning civil and criminal procedure had to be fully extended to territories populated, in the pointed and revealing words of Justice Henry Brown, "by alien races, differing from us in religion, customs, laws, methods of taxation and modes of thought."[131]

The Justices in the *Downes* majority openly acknowledged their policy-driven concerns over potential U.S. citizenship for island natives; although that issue was not directly presented in *Downes*, the Justices knew it would follow from a holding that insular territories such as Puerto Rico—and by implication the Philippines—were part of the United States for constitutional purposes. Justice Brown observed:

> [T]he consequences [of extending the Constitution to the insular territories] will be extremely serious. Indeed, it is doubtful if Congress would ever assent to the annexation of territory upon the condition that its inhabitants, however foreign they may be to our habits, traditions and modes of life, shall become at once citizens of the United States.[132]

Similarly, Justice Edward White wrote that the power of annexation "could not be practically exercised if the result would be to endow the [territory's] inhabitants with citizenship of the United States" and objected to the "immediate

---

128. Ch. 191, 31 Stat. 77 (1900).
129. U.S. CONST. art. I, § 8, cl. 1.
130. *See* 182 U.S. 247–49 (1901).
131. LAWSON & SEIDMAN, *supra* note 10, at 195 (quoting *Downes*, 182 U.S. at 287).
132. *Downes*, 182 U.S. at 279–80.

Electronic copy available at: https://ssrn.com/abstract=3681119

bestowal of citizenship on those absolutely unfit to receive it" as members of "an uncivilized race."[133]

Brown (who delivered the opinion of the Court in *De Lima*) switched his vote in *Downes*, joining the four *De Lima* dissenters to conclude that Congress could establish a special tariff status for Puerto Rico. But what would be the theory? The five-Justice majority produced three opinions. Of them, Justice White's concurrence provided the ultimate solution. According to White, some U.S. territories are "incorporated" into the United States and some are not; incorporated territories receive the full benefit of the Constitution and unincorporated territories do not.[134] Notably, White (and later the Court) did not wholly exclude island territories from the Constitution; "fundamental" constitutional rights would still apply there.[135] But the Constitution would not fully apply there, and the Court would establish the extent to which it did or did not apply.

These doctrinal innovations allowed the Court to finesse the question of the citizenship of persons born in Puerto Rico. Unlike prior acquisition treaties, the treaty with Spain did not address the citizenship of people in the ceded territories. The issue came to the Court in *Gonzales v. Williams*,[136] but the Justices declined to decide it, holding in an obvious evasion that the Puerto Rican claimant had a right to enter the U.S. mainland because she was in any event not an alien within the meaning of the applicable statute.[137]

The policy-driven evasiveness of the *Insular Cases* respecting Puerto Rico and the Philippines contrasts sharply with the Court's forthright treatment of Cuba, in which the Court confidently applied the doctrine of *Fleming*.[138] Spain also formally surrendered Cuba after the war, but unlike Puerto Rico and the Philippines, Cuba was never formally annexed by the United States. Rather, it was held under U.S. military jurisdiction pending its independence, which it

---

133. *Id.* at 306 (White, J., concurring). As Professor Erman explains, the overriding concern was more the Philippines than Puerto Rico. *See* ERMAN, *supra* note 2, at 54–55.

134. *See Downes*, 182 U.S. at 288, 305–06, 343–44 (White, J., concurring). Brown, writing only for himself, argued that the Constitution applied to the territories "only when and so far as Congress shall so direct." *Id.* at 279 (opinion of Brown, J.). A majority of the Court adopted White's idea in *Dorr v. United States*, rejecting the full application of the bill of rights—especially jury trial—in the island territories but retaining the idea that "fundamental" constitutional rights did apply there. *See* 195 U.S. 138, 147–49 (1904).

135. *Dorr*, 195 U.S. at 147–49; *Downes*, 182 U.S. at 288 (White, J., concurring).

136. 192 U.S. 1 (1904).

137. *See id.* at 15; *see also id.* at 12 ("We are not required to discuss . . . the contention of Gonzales' counsel that the cession of Porto Rico accomplished the naturalization of its people."). The implications of the *Insular Cases* for the modern law of citizenship as a matter of precedent seem murky. The Court expressly reserved the question of insular citizenship in *Gonzales* and did not return to it. *See id.* at 12. But *Gonzales* confirmed that Puerto Rico, and presumably the other insular territories, were part of the United States for some constitutional purposes, and the doctrine of incorporation (however dubious as an original matter) holds that fundamental constitutional rights extend to the unincorporated island territories. *See Dorr*, 195 U.S. at 148–49. Citizenship might seem like one of those fundamental rights. *But see* Tuaua v. United States, 788 F.3d 300, 303–08 (D.C. Cir. 2015) (relying on the *Insular Cases* to reject claims of constitutional citizenship by American Samoans, specifically finding citizenship not to be a fundamental right).

138. *See* Fleming v. Page, 50 U.S. (9 How.) 603, 614–16 (1850).

Electronic copy available at: https://ssrn.com/abstract=3681119

obtained in 1902.[139] In the interim, the question was whether Cuba was "in" the United States. Under *Fleming*, it plainly was not because it had not been formally annexed—and the Court duly (and unanimously) so held.[140]

For an original meaning assessment, the central attribute of the *Insular Cases* is their non-originalist analysis, founded on the ahistorical judicially invented doctrine of incorporation. Justice Harlan, dissenting in *Downes*, wrote: "I am constrained to say that this idea of 'incorporation' has some occult meaning which my mind does not apprehend. It is enveloped in some mystery which I am unable to unravel."[141] A modern assessment concludes:

> [T]here is nothing in the Constitution that even intimates that express constitutional limitations on national power apply differently to different territories once that territory is properly acquired. Nor is there anything in the Constitution that marks out certain categories of rights or powers as more or less "fundamental" than others. . . . The doctrine of "territorial incorporation" that emerged from *The Insular Cases* is transparently an invention designed to facilitate the felt needs of a particular moment in American history.[142]

Had there been a clear textual or historical understanding that geographically or culturally distant territories were not "in" the United States, the Court presumably would have invoked it. The Court's failure to do so—and its reliance instead on half measures and race-based policy arguments—indicates the lack of textual and historical foundation for its conclusions. Thus, despite their results, the *Insular Cases* confirm the textual and historical analysis set forth above. Under the Fourteenth Amendment's original meaning, territories formally acquired by the United States were "in" the United States for citizenship purposes; the Justices in the majority were unable to develop textual and historical arguments for a contrary position.

5. Modern Applications

In sum, at the time of its enactment the Citizenship Clause's phrase "born . . . in the United States" most likely referred to birth in territory under permanent U.S. sovereignty. The distinction between incorporated and unincorporated territory was a subsequent policy-driven judicial invention that lacked foundation in original materials. Rather, the key distinction at the time of the Amendment's enactment was the one identified in the mid-century decisions in *Fleming* and *Cross*: formal cession or annexation, as opposed to temporary occupation.

---

139. *See* Andrew Kent, Boumediene, Munaf*, and the Supreme Court's Misreading of the Insular Cases*, 97 IOWA L. REV. 101, 152, 154 (2011) (discussing the status of post-war Cuba).

140. *See* Neely v. Henkel, 180 U.S. 109, 119 (1901) (unanimously finding that Cuba was not "a part of the territory of the United States," with Justice Harlan, who had dissented sharply in *Downes*, writing for the Court); *see* Kent, *supra* note 139, at 148–50 (discussing *Neely*).

141. 182 U.S. 244, 391 (1901) (Harlan, J., dissenting).

142. LAWSON & SEIDMAN, *supra* note 10, at 196–97; *see also* ERMAN, *supra* note 2, at 47–66 (highlighting racial overtones in the *Insular Cases*).

Electronic copy available at: https://ssrn.com/abstract=3681119

That conclusion would not resolve all difficult issues of application. It is not entirely clear how this meaning would apply to territories annexed with the understanding that they would eventually receive independence (such as the Philippines) or to places under long-term or indefinite lease or occupation by the United States, such as Guantánamo Bay or the Panama Canal Zone.[143] But the original meaning would apply the Citizenship Clause to persons born in Puerto Rico, Guam, American Samoa, and the U.S. Virgin Islands—all of which are under permanent U.S. sovereignty pursuant to formal acquisitions and thus are "in the United States" under the original meaning of the Fourteenth Amendment.

### B. "SUBJECT TO THE JURISDICTION THEREOF"

This Section turns to the second requirement of the Fourteenth Amendment's Citizenship Clause. By its text, the Clause requires that, in addition to being born "in the United States," a person must (presumably at birth)[144] be "subject to the jurisdiction thereof" to qualify for constitutional citizenship. The core question for this Section, therefore, is what categories of persons were understood as in the United States but not subject to its jurisdiction.[145] As with the previous Section, this Section begins with the meaning of the key phrase "subject to the jurisdiction" in the period prior to drafting and enactment of the Amendment. It next examines how that meaning fits with the debates and commentary in the enactment period and the immediate post-enactment period. Finally, it applies the Clause's original meaning to modern controversies.

---

143. In the 1903 Hay–Bunau–Varilla Treaty, Panama granted to the United States "in perpetuity the use, occupation and control" of the canal and land immediately on each side of the canal. Convention Between the United States and the Republic of Panama for the Construction of a Ship Canal to Connect the Waters of the Atlantic and Pacific Oceans, Pan.-U.S., art. II, Nov. 18, 1903, 33 Stat. 2234. In a 1903 agreement with Cuba, the United States acquired a lease over the Guantánamo Bay facility that allowed the United States to "exercise complete jurisdiction and control over and within said areas" while also "recogniz[ing] the continuance of the ultimate sovereignty of the Republic of Cuba over the above described areas." Agreement Between the United States of America and the Republic of Cuba for the Lease (Subject to Terms to be Agreed Upon by the Two Governments) to the United States of Lands in Cuba for Coaling and Naval Stations, Cuba-U.S., art. III, Feb. 23, 1903, T.S. No. 428; *see also* Erbsen, *supra* note 54, at 1194 (questioning whether "embassies, military bases on foreign soil, U.S.-flagged ships, and the exclusive economic zone that extends 200 miles from the U.S. coast" are "in" the United States for constitutional purposes).

144. The timing issue was central to *Elk v. Wilkins*, in which a person born in the United States but not subject to U.S. jurisdiction at birth (because he was born a member of a tribe) claimed he could obtain U.S. citizenship by submitting to U.S. jurisdiction as an adult. The Court rejected that claim (over Justice Harlan's dissent). 112 U.S. 94, 109 (1884). This Article assumes without more discussion that the Court's conclusion was correct as a matter of the Clause's original meaning.

145. As indicated above, *supra* note 91 and accompanying text, this Article addresses the original meaning of the text in the legal and political context in which it was adopted. The drafters' understanding is a supplemental, not a primary, aspect of this inquiry. Accordingly, the appropriate starting point is the meaning of the relevant phrase in pre-Amendment discourse.

Electronic copy available at: https://ssrn.com/abstract=3681119

1. Pre-enactment Meaning: Who Was "Subject to [U.S.] Jurisdiction" in the Mid-Nineteenth Century?

The most common meaning of "jurisdiction" is associated with courts, meaning a court's power over a case or a litigant.[146] That meaning fits poorly with the Citizenship Clause, which invokes the jurisdiction of the United States. The Clause's language instead invokes the idea that, in addition to "jurisdiction to adjudicate" (the familiar jurisdiction of courts), nations have jurisdiction (meaning authority) to prescribe and enforce laws—legislative and executive jurisdiction.[147] This idea of legislative and executive jurisdiction—a nation's jurisdiction—comes from pre-Amendment international law and was also found in ordinary dictionaries of the time. According to the 1865 edition of Webster's dictionary, jurisdiction as applied to nations meant the "[p]ower of governing or legislating," "the power or right of exercising authority," the "limit within which power may be exercised," or "extent of power or authority."[148] Thus, while the term "jurisdiction" was often associated with a court's power over a litigant or an issue, more broadly it encompassed a lawmaker's power to prescribe rules for a person or territory (legislative jurisdiction) and an executive's power to enforce rules against a person or within a territory (executive jurisdiction).

The dictionary definition reflects the nineteenth-century international law of sovereignty, which (like modern international law) used "jurisdiction" to mean the scope of a sovereign's authority. The leading U.S. international law writer of the pre-Civil War period, Henry Wheaton, directly used "jurisdiction" in this way: he equated a nation's "sovereign power of municipal legislation . . . within its territory" to its "territorial jurisdiction."[149] He added that ships on the high seas "are subject to the jurisdiction of the state to which they belong" (meaning they are subject to that state's sovereign authority)[150] and noted (in an exception

---

146. *See, e.g.*, Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738, 819–20 (1824) (discussing jurisdiction of federal courts); 1 JOHN BOUVIER, A LAW DICTIONARY 683 (Philadelphia, George W. Childs 11th ed. 1862) (defining "jurisdiction" as "[a] power constitutionally conferred upon a judge or magistrate, to take cognizance of, and decide causes according to law, and to carry his sentence into execution"); *see also* Ing, *supra* note 3, at 725–29 (discussing judicial jurisdiction).

147. *See* SEAN D. MURPHY, PRINCIPLES OF INTERNATIONAL LAW 319–22, 335–38 (3d ed. 2018) (discussing jurisdiction to prescribe, adjudicate, and enforce in international law).

148. NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 732 (Chauncey A. Goodrich & Noah Porter eds., Springfield, G. & C. Merriam 1865); *see also* Ing, *supra* note 3, at 726–29 (reviewing sources and finding a "consistent antebellum equation of 'jurisdiction' with 'sovereign authority'"). This use is found in the Fourteenth Amendment's Equal Protection Clause, U.S. CONST. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."), and as noted above, in the Thirteenth and Eighteenth Amendments, *id.* amend. XIII, § 1 (slavery shall not exist in "any place subject to [U.S.] jurisdiction"); *id.* amend. XVIII, § 1 (banning sales of alcohol within "all territory subject to [U.S.] jurisdiction") (repealed 1933). On modern usage in this sense, see Ho, *supra* note 7, at 368–69 (noting usage meaning "subject to U.S. sovereign authority and laws").

149. HENRY WHEATON, ELEMENTS OF INTERNATIONAL LAW: WITH A SKETCH OF THE HISTORY OF THE SCIENCE 100 (Philadelphia, Carey, Lea & Blanchard 1836). On Wheaton's influence, see generally ELIZABETH FEASTER BAKER, HENRY WHEATON, 1785-1848 (1937).

150. WHEATON, *supra* note 149, at 107.

Electronic copy available at: https://ssrn.com/abstract=3681119

explored below) that ambassadors resident in a foreign country are "exempt from the local jurisdiction."[151] Thus in Wheaton's terms, "subject to the jurisdiction" of the United States meant under U.S. sovereign authority.

In nineteenth-century international law, a nation's sovereign authority was closely linked to territory. A sovereign had almost complete authority over (almost) every person and thing within its territory, but authority over almost nothing outside its territory except the actions of its own citizens.[152] The idea of territorial "jurisdiction" (meaning territorial authority) is set forth most clearly in the early nineteenth-century Supreme Court case *Schooner Exchange v. McFaddon*,[153] in which Chief Justice Marshall explained foreign sovereign immunity. Marshall began: "The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. . . . All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself."[154] But, he continued, "all sovereigns have consented to a relaxation in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers."[155] Although Marshall went on to discuss exceptions to territorial jurisdiction, he noted that the exceptions did not encompass foreign private citizens traveling or residing in a nation:

> When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country. Nor can the foreign sovereign have any motive for wishing such exemption. His subjects thus passing into foreign countries, are not employed by him, nor are they engaged in national pursuits. Consequently there are powerful motives for not exempting persons of this description from the jurisdiction of the country in which they are found, and no one motive for requiring it.[156]

---

151. *Id*. at 106.

152. *See id*. at 100–08; *accord* VATTEL, *supra* note 29, bk. II, ch. VII, § 84, at 166 ("The sovereignty united to the domain establishes the jurisdiction of the nation in her territories, or the country that belongs to her. It is her province, or that of her sovereign, to exercise justice in all the places under her jurisdiction, to take cognisance of the crimes committed, and the differences that arise in the country."); *see also* STORY, *supra* note 37, § 539, at 450 (approvingly quoting this passage from Vattel). As discussed in Section II.A.3, a nation might have temporary jurisdiction over occupied territory without that territory being formally "in" the nation. *See* Fleming v. Page, 50 U.S. (9 How.) 603, 614–16 (1850).

153. 11 U.S. (7 Cranch) 116 (1812). The issue in *Schooner Exchange* was whether a French warship in a U.S. port came within one of the exceptions. *Id*. at 122.

154. *Id*. at 136. Marshall overstated slightly here because territorial jurisdiction was not "exclusive" as to aliens present in U.S. territory; as discussed below, a nation retained authority over its citizens or subjects abroad. *See infra* note 165.

155. 11 U.S. (7 Cranch) at 136.

156. *Id*. at 144; *accord* STORY, *supra* note 37, §§ 541–42, at 452–53 (noting a sovereign's authority over temporary visitors); VATTEL, *supra* note 29, bk. II, ch. VIII, §§ 99, 101, at 171–72 (same, and concluding that "foreigners who pass through or sojourn in a country, either on business, or merely as

Electronic copy available at: https://ssrn.com/abstract=3681119

The equation of "jurisdiction" with "sovereign authority" in this passage is unmistakable—amounting to the unsurprising proposition that visitors to a country ordinarily must obey that country's laws and courts while within its territory.

Marshall identified three exceptions to territorial sovereignty: foreign rulers themselves and their property, foreign diplomats, and foreign military forces.[157] These, he said, even when coming within the sovereign's territory, are not "within the jurisdiction of the sovereign" and thus are immune from local laws and local adjudication.[158] In the particular case, he concluded that a French warship had such an immunity from U.S. jurisdiction.[159]

Wheaton's widely read international law treatise discussed ambassadors' immunities in similar terms, specifically using the phrase "subject to jurisdiction."[160] Ambassadors and their families and staff were, Wheaton said, "entitled to an entire exemption from the local jurisdiction."[161] But this exemption itself had exceptions, including: if the ambassador "is a citizen or subject of the country to which he is sent . . . he remains still subject to its jurisdiction," and if the ambassador "is at the same time in the service of the power who receives him as a minister . . . he continues still subject to the local jurisdiction."[162] Thus Wheaton used "subject to the jurisdiction" of a nation to mean not having immunity from that nation's "power of governing or legislating" (as Webster's dictionary defined "jurisdiction")[163] in the same way Marshall used "amenable to" jurisdiction in *Schooner Exchange*.[164]

---

travellers" are "subject to the laws" of that country because "[t]he sovereignty is the right to command the whole country; and the laws are not simply confined to regulating the conduct of the citizens towards each other, but also determine what is to be observed by all orders of people throughout the whole extent of the state").

157. *Schooner Exch.*, 11 U.S. (7 Cranch) at 137–40.

158. *Id.* at 138. Marshall noted an exception that certain crimes might "forfeit the privileges annexed to [the ambassador's] character" and make him "amenable to the local jurisdiction." *Id.* at 139.

159. *Id.* at 145–46.

160. *See* WHEATON, *supra* note 149, at 177.

161. *Id.* at 176; *see also id.* at 178 (stating that embassy secretaries have an "exemption from the local jurisdiction"); *id.* at 179 (stating that ambassadors' families have an "exemption from the local laws and jurisdiction"); *id.* (stating that personal effects of the ambassador "are entirely exempt from the local jurisdiction . . . but any other real property, or immoveables, of which he may be possessed within the foreign territory, is subject to its laws and jurisdiction"). The influential eighteenth-century international law authority Vattel wrote in similar terms. Diplomatic personnel, he stated, "must be independent of the sovereign authority and of the jurisdiction of the country, both in civil and criminal matters," and thus their service as diplomatic agents should not "subject them to a foreign authority." VATTEL, *supra* note 29, bk. IV, ch. VII, § 92, at 471; *see also id.* bk. IV, ch. VIII, § 110, at 488 (denying that an ambassador is "subject, in civil cases, to the jurisdiction of the country where he resides"); *id.* bk. IV, ch. VIII, § 113, at 491 (considering "what circumstances [an ambassador's] property may be subjected to, and by what others it may be exempted from, the jurisdiction of a country"); *id.* bk. IV, ch. VIII, § 115, at 493 (concluding that an ambassador's immoveable property is "subject to the jurisdiction of the state in which it lies" because no immunity for it should be recognized).

162. WHEATON, *supra* note 149, at 177; *see also id.* at 181 (concluding that unlike ambassadors, consuls lack diplomatic immunity and thus "are subject to the local law in the same manner with other foreign residents owing a temporary allegiance to the state").

163. *See supra* notes 149–52 and accompanying text.

164. *See supra* notes 154–56 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=3681119

Based on widely read authorities such as Webster's dictionary, Wheaton's *Elements of International Law*, and Marshall's *Schooner Exchange* opinion, we can conclude that "subject to the jurisdiction [of the United States]" had a clear meaning and scope in nineteenth-century language. It meant within the United States' power of "governing or legislating"; and it included all persons in U.S. territory (because ordinarily territorial jurisdiction was "absolute"), except those with diplomatic and other legal immunities (most notably ambassadors and their families and staff) and foreign military forces.

Importantly, as discussed in Section II.A, in nineteenth-century terms some persons and territory could be subject to U.S. jurisdiction and yet not be "in" the United States. Although there are loose statements in nineteenth-century sources that a nation's jurisdiction could not extend beyond its territory, jurisdiction over citizens abroad was well established.[165] Further, and importantly for the Citizenship Clause, territory might be controlled temporarily by the United States, as in an armed occupation, and yet not be "in" the United States; that territory would thus be (temporarily) subject to U.S. jurisdiction although not part of the United States. As previously described, the Court noted this situation with respect to the Mexican port of Tampico in *Fleming*.[166] Thus, "in the United States" and "subject to its jurisdiction" described two substantially overlapping but distinct categories.

As a final textual point, it does not appear that there were competing definitions of "subject to the jurisdiction" in the pre-Amendment period. Prior scholarship has discussed at length competing ideas of citizenship (of which there were many),[167] but the central question in assessing the Citizenship Clause's original textual meaning is not pre-Amendment abstract conceptions of citizenship; it is the pre-Amendment meaning of the key constitutional phrase. On that point it does not appear that there was any dispute on basic principles (although, as reflected for example in *Schooner Exchange*, there might be disputes on particular applications).[168]

---

165. *See, e.g.*, The Apollon, 22 U.S. (9 Wheat.) 362, 370 (1824) (opinion of Story, J.) ("The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens."); STORY, *supra* note 37, § 540, at 451 ("[N]ations generally assert a claim to regulate the rights, duties, obligations, and acts of their own citizens, wherever they may be domiciled."); WHEATON, *supra* note 149, at 100–01. As noted, Wheaton also said that a nation's jurisdiction extended to its ships on the high seas. *Id.* at 107.

166. *See supra* Section II.A.3.

167. *See, e.g.*, SCHUCK & SMITH, *supra* note 7, at 25–48; Edward J. Erler, *From Subjects to Citizens: The Social Compact Origins of American Citizenship*, *in* THE AMERICAN FOUNDING AND THE SOCIAL COMPACT 163, 163–97 (Ronald J. Pestritto & Thomas G. West eds., 2003); Mayton, *supra* note 7, at 225–28.

168. It is true that there were different sources of a nation's jurisdiction. Citizens/subjects were subject to their nation's permanent jurisdiction wherever they went, including outside sovereign territory. In some accounts, this connection could not be renounced by the individual without the sovereign's consent. In contrast, noncitizen visitors or residents were subject to temporary jurisdiction arising from presence in sovereign territory, which persisted only so long as that presence continued. *See, e.g.*, Schooner Exch. v. McFaddon, 11 U.S. (7 Cranch) 116, 144 (1812) (discussing visitors' "temporary and local allegiance"). Some modern authorities contend that the Citizenship Clause refers

Electronic copy available at: https://ssrn.com/abstract=3681119

2. The Drafting History and "Jurisdiction" in the Citizenship Clause

We should now consider how the ordinary pre-Amendment meaning of "subject to the jurisdiction" fits with the Citizenship Clause's context, purposes, and drafting history.[169] The starting point, as before, is that the Clause's central purpose was to guarantee constitutional citizenship to freed slaves and other U.S.-born persons of African descent. That purpose, however, would be achieved by the Clause's opening phrase "born . . . in the United States."[170] The "subject to the jurisdiction" language, in the Amendment's structure, was a restriction on the general rule of *jus soli* citizenship adopted by the phrase "born . . . in the United States." The question then is: of those born "in" the United States, whom did the Amendment seek to exclude from citizenship?

*a. Maintaining Prior Exceptions: Diplomats*

A bedrock principle of *jus soli* citizenship was that it did not grant citizenship to children of diplomats and their families and staff. Long-standing English law was clear on this point: children of foreign diplomatic households born in England were not English subjects, and correspondingly children of English diplomats born abroad were English subjects (despite the common law rule that foreign-born children of subjects were aliens).[171] As discussed in Section I.A., pre-Amendment U.S. sources commonly referred to this exception.[172]

We may readily conclude that one purpose of the "subject to the jurisdiction" exclusion was to align the Citizenship Clause with the existing common law of citizenship regarding diplomats.[173] Diplomats and their dependents might be "in"

---

only to the former, not the latter. *See, e.g.*, Eastman, *supra* note 7, at 175–78; Mayton, *supra* note 7, at 225. But the pre-enactment meaning does not suggest that limitation. As discussed, authorities such as Marshall and Wheaton used the phrase "subject to" (or "amenable to") jurisdiction to mean both kinds of sovereign authority. *See supra* notes 149–65 and accompanying text.

169. On the role of the Amendment's legislative history in original meaning analysis, see *supra* notes 91–92.

170. It is likely that some freed slaves were not born in the United States. Congress prohibited the slave trade in 1808. Act of Mar. 2, 1807, ch. 22, 2 Stat. 426 (effective Jan. 1, 1808). Some elderly former slaves in 1868 might have been brought to the United States prior to that date. Moreover, some illegal slave imports continued after 1808. *See* NEUMAN, *supra* note 7, at 178–79. However, there is no record that these possibilities were discussed in the debates; the Amendment's drafters and ratifiers appeared to assume former slaves were all born in the United States, or at least that there would be no practical way to show otherwise.

171. 1 BLACKSTONE, *supra* note 30, at 361–62; HENRIQUES, *supra* note 122, at 29–30.

172. *See supra* Section I.A; *see, e.g.*, Inglis v. Trs. of the Sailor's Snug Harbour, 28 U.S. (3 Pet.) 99, 155 (1830) (Story, J., dissenting) ("So the children of an ambassador are held to be subjects of the prince whom he represents, although born under the actual protection and in the dominions of a foreign prince."); Lynch v. Clarke, 1 Sand. Ch. 583, 658 (N.Y. Ch. 1844) (noting exception as to citizenship of "the children of ambassadors, (who are deemed to be born within the allegiance of the sovereign represented,)"); 2 KENT (6th ed.), *supra* note 36, at 49.

173. As noted, the original drafter of the Clause, Senator Howard, said he understood the Clause as "declaratory of what I regard as the law of the land already." CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866).

Electronic copy available at: https://ssrn.com/abstract=3681119

the United States,[174] but as Marshall explained in *Schooner Exchange*, they were not under U.S. sovereign authority—that is, they were not subject to U.S. jurisdiction. Thus, the Clause's exclusion of persons not "subject to [U.S.] jurisdiction" kept in place the exclusion from citizenship of U.S-born children of foreign diplomatic personnel. Drafting evidence confirms that this was, in part, the point of the "subject to the jurisdiction" requirement, as Senators directly mentioned diplomatic families as being excluded by it.[175]

It is worth noting, moreover, that the categorical exclusion from citizenship of children born under diplomatic immunity was not insubstantial. By the mid-nineteenth century, a number of countries had diplomatic missions to the United States. And the nineteenth-century diplomatic immunity extended not just to ambassadors themselves, but also to their staff and servants,[176] who might also have families with them. Thus, it was quite likely that there would be children of this description born in the United States but not subject to U.S. jurisdiction.[177]

### b. Maintaining Prior Exceptions: Native Americans

Although not self-evident, the Citizenship Clause's drafting history and other surrounding circumstances show that the "subject to the jurisdiction" phrase had another important purpose: to exclude from citizenship most members of Native American tribes. As discussed, in pre-Amendment law most Native Americans within the United States were not U.S. citizens.[178] When Senator Howard first proposed the Amendment's Citizenship Clause, Senator Doolittle objected that it would change this status (because tribal members were born "in the United States"); Doolittle moved to add an additional textual exclusion of "Indians not taxed."[179] This objection set off an extended debate in which the Clause's

---

174. Foreign diplomats were sometimes said by a legal fiction not to be "in" the host country, even when they physically were. *See* WHEATON, *supra* note 149, at 176. But, because their children would be literally "born . . . in the United States," it would have been unwise for the drafters to rely on a legal fiction to exclude them. *See* CONG. GLOBE, 39th Cong., 1st Sess. 2769 (1866) (remarks of Sen. Wade) (acknowledging that his earlier proposal extending rights to persons "born in the United States" without the jurisdiction requirement might include children of ambassadors).

175. *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866) (remarks of Sen. Howard) (observing that the proposed language would not include persons "who belong to the families of embassadors or foreign ministers accredited to the Government of the United States"); *id.* at 2897 (remarks of Sen. Williams) (noting that the "child of an embassador" is not fully subject to U.S. jurisdiction and thus would be excluded from citizenship by the Clause); *see also* Ing, *supra* note 3, at 739 nn.107–09 (collecting comments).

176. WHEATON, *supra* note 149, at 176.

177. In keeping with *Schooner Exchange*, the "subject to the jurisdiction" requirement would also exclude children of foreign sovereigns and of parents in foreign armies, although these categories seem not to have been of much practical concern. *See Inglis*, 28 U.S. (3 Pet.) at 156 (Story, J., dissenting) ("Thus the children of enemies, born in a place within the dominions of another sovereign, then occupied by them by conquest, are still aliens.").

178. KETTNER, *supra* note 22, at 293–300; *see supra* note 41 and accompanying text.

179. CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866). As explained below, the "Indians not taxed" language came from the 1866 Civil Rights Act and ultimately from Article I, Section 2 of the Constitution (excluding such persons from enumeration for purposes of representation in Congress). This language excluded both the reservation tribes, who were not taxed by treaty, and the frontier tribes,

defenders pointed to the "subject to the jurisdiction" requirement as excluding most Native Americans.[180]

The exclusion rested on two grounds. Many tribes at the time had treaties with the United States that confirmed a degree of self-government and independence from U.S. interference in internal tribal matters. These tribes thus were (or could be described as) not fully subject to U.S. jurisdiction, because in many matters it was the tribe, not the U.S. government, that had prescriptive and law enforcement authority.[181] They would be subject to U.S. jurisdiction if Congress chose to override the treaties and legislate on internal tribal matters[182]—but in 1866 the treaty relationship was the governing law as between the tribes and the U.S. government. As discussed in Section I.A. above, in pre-Amendment nineteenth-century law, tribal members' exclusion from citizenship was explained in exactly this way: "They are not our subjects, born within the purview of the law, because they

---

who were not taxed as a practical matter because they were beyond U.S. authority. The Fourteenth Amendment carried over the exclusion of "Indians not taxed" as to representation, but not as to citizenship. *See* U.S. CONST. amend. XIV, §§ 1–2.

180. CONG. GLOBE, 39th Cong., 1st Sess. 2890–97 (1866); *supra* Section II.A.

181. *See* 1 FRANCIS PAUL PRUCHA, THE GREAT FATHER: THE UNITED STATES GOVERNMENT AND THE AMERICAN INDIANS 107–08 (1984) ("The sovereignty of an Indian tribe, no matter how it might be circumscribed in other respects, was certainly considered to extend to the punishment of its own members. Up to the mid-nineteenth century, indeed, there were no laws or treaty provisions that limited the powers of self-government of the tribes with respect to internal affairs."); *see also* Ing, *supra* note 3, at 730–35 (noting the connection between the quasi-sovereign status of the tribes and their exclusion from citizenship under the Fourteenth Amendment); Magliocca, *supra* note 7, at 520–21 (same). The tribes' partial exclusion from U.S. jurisdiction was frequently and expressly confirmed in treaties. *See, e.g.*, Treaty Between the United States of America and the Creek Nation of Indians, Creek Nation-U.S., art. X, June 14, 1866, 14 Stat. 785 (affirming Creek Nation's self-government, including that congressional legislation "shall not in any manner interfere with or annul their present tribal organization, rights, laws, privileges, and customs"). In contrast, U.S. law governed tribal members in external matters, particularly as to offenses committed against U.S. citizens. *See* 1 PRUCHA, *supra*, at 102–07.

This relationship persisted after adoption of the Fourteenth Amendment while coming under pressure for legislative reform. *See* 2 PRUCHA, *supra*, at 676–81; *see also Ex parte* Crow Dog, 109 U.S. 556, 572 (1883) (holding that the United States lacked jurisdiction to punish a member of the Sioux Tribe for murder of another tribal member); *id.* ("[S]emi-independent tribes whom our government has always recognized as exempt from our laws, whether within or without the limits of an organized State or Territory, and, in regard to their domestic government, left to their own rules and traditions, in whom we have recognized the capacity to make treaties, and with whom the governments, State and national, deal, with a few exceptions only, in their national or tribal character, and not as individuals." (quoting United States v. Joseph, 94 U.S. 614, 617 (1876))). And the "semi-independent" status of the tribes was used—consistent with the understanding of the Amendment's drafters—to continue to deny U.S. citizenship to tribal members in the post-Ratification period. *See* 2 PRUCHA, *supra*, at 683 (describing an 1870 Senate report to this effect).

182. Congress shifted to a primarily statutory rather than treaty-based regime for tribal relations beginning in 1871, when it prohibited further treaties with the tribes. *See* 1 PRUCHA, *supra* note 181, at 531–32. Beginning in the 1880s, Congress extended U.S. law to certain internal tribal matters, including crimes of one tribal member against another. *See* Act of Mar. 3, 1885, ch. 341, § 9, 23 Stat. 362, 385; *see also* United States v. Kagama, 118 U.S. 375, 383–85 (1886) (upholding Congress's power to enact this legislation). The new approach ultimately led to statutory recognition of all U.S.-born Native Americans as citizens. *See* 2 PRUCHA, *supra* note 181, at 686 n.66.

Electronic copy available at: https://ssrn.com/abstract=3681119

are not born in obedience to us. They belong, by birth, to their own tribes, and these tribes are placed under our protection and dependent on us . . . ."[183]

In addition, some tribes or other Native groups were, as a practical matter, beyond U.S. authority because they lived in unsettled and largely uncharted areas in the West. As a technical legal matter, they might be considered subject to U.S. jurisdiction (because no treaty excluded it), but the United States was unable to exercise that jurisdiction other than by force of arms. The situation of these tribes had a rough analogue in the international law of jurisdiction: occupying armies. It was common ground that hostile armies were not subject to U.S. jurisdiction when within U.S. territory as a result of their practical condition as beyond U.S. civil authority.[184] Thus the Amendment's legal background already contained the idea that tribes and other unassimilated Native Americans were not (fully) "subject to the jurisdiction" of the United States for citizenship purposes.

Proponents of the Citizenship Clause specifically linked the exclusion of tribal members from citizenship with the Clause's jurisdiction requirement on these grounds, and opposed Doolittle's motion as redundant.[185] Doolittle's motion was eventually defeated, presumably for this reason.[186]

In sum, in addition to adopting the long-standing common law exclusion of children of diplomats, the "subject to the jurisdiction" language was widely understood to adopt the (somewhat more dubious but also long-standing) exclusion of tribal and unassimilated Native Americans. As with the exclusion of children of diplomats, that understanding followed directly from pre-Amendment legal discourse, which explained the tribes' exclusion from citizenship in terms of their exclusion from ordinary U.S. jurisdiction.[187]

---

183. Goodell v. Jackson, 20 Johns. Ch. 693, 712 (N.Y. Ch. 1823); *see also* KETTNER, *supra* note 22, at 294–95 (discussing the pre-Amendment legal justifications for excluding Native Americans from citizenship).

184. *See* Inglis v. Trs. of the Sailor's Snug Harbour, 28 U.S. (3 Pet.) 99, 156 (1830) (Story, J., dissenting) (noting that "the children of enemies, born in a place within the dominions of another sovereign, then occupied by them by conquest, are still aliens"); Magliocca, *supra* note 7, at 502 (tracing this rule to *Calvin's Case*, and concluding that "[t]his exception [for birth under hostile occupation] was widely accepted here [in the United States] when the Fourteenth Amendment was ratified").

185. *E.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 2893 (1866) (remarks of Sen. Trumbull) ("Does the Government of the United States pretend to take jurisdiction of murders and robberies and other crimes committed by one Indian upon another? . . . [T]hey are not subject to our jurisdiction."); *id*. at 2895 (remarks of Sen. Howard) ("[A]n Indian belonging to a tribe, although born within the limits of a State" is not "subject to this full and complete jurisdiction [of the United States]" because that person "is subject for crimes committed against the laws or usages of the tribe to the tribe itself, and not to any foreign or other tribunal."); *id*. at 2897 (remarks of Sen. Williams) (equating persons subject to tribal authority to diplomats, neither of whom were "fully and completely subject to the jurisdiction of the United States"); *see also* Epps, *supra* note 7, at 357–59 (discussing this part of the drafting history); Ing, *supra* note 3, at 732–33 (same).

186. *See* CONG. GLOBE, 39th Cong., 1st Sess. 2897 (1866).

187. The claim that tribal Native Americans were not subject to U.S. jurisdiction in 1866 seems odd to modern ears because the tribes—especially the reservation tribes—were under ultimate U.S. sovereign authority. This was exactly Doolittle's point. *See id*. at 2892–93 (remarks of Sen. Doolittle); *id*. at 2897 (remarks of Sen. Williams, in agreement). But the Senate majority, led by Howard and Trumbull, saw the matter differently: in their view, although the United States had authority over the

Electronic copy available at: https://ssrn.com/abstract=3681119

*c. Categories Not Excluded: Children of Aliens*

Consistent with the ordinary meaning of "subject to the jurisdiction," the drafting history indicates two substantial categories of persons excluded from constitutional citizenship, despite being born "in" the United States: children of diplomatic households and of tribal or unassimilated Native Americans. Original meaning and drafting history further indicate an important category of persons the text appears not to have excluded: U.S.-born children of aliens. In particular, the drafting debates focused on the U.S.-born children of Chinese immigrants on the West Coast—the issue that eventually reached the Supreme Court in *Wong Kim Ark* in 1898.

Spurred by the Gold Rush and the transcontinental railroad, Chinese immigration in the West accelerated in the mid-nineteenth century and was becoming an issue in the 1860s. (It became a much greater issue soon afterward.)[188] Modern commentators on the Citizenship Clause emphasize the drafting debates in exploring this issue, with one side contending that the drafters understood the Clause to extend citizenship to U.S.-born children of aliens[189] and the other side arguing that such children were excluded by the Clause's "subject to the jurisdiction" language, similar to the Native tribes.[190] Although undoubtedly important, the drafting debates should be neither the starting point nor the touchstone of the inquiry into original meaning. Two points are of greater significance.

First, the prevailing pre-Amendment common law view was that, as a general matter, U.S.-born children of aliens were U.S. citizens at birth. As recounted above, that was the view of leading commentators such as Story, Rawle, and Kent; it was the view of leading judicial decisions, including *Lynch v. Clarke*; and (as the court in *Lynch* discussed) it was a general assumption in practice.[191] That this approach existed in common law does not prove the Fourteenth Amendment adopted it. But its existence makes it plausible that the Amendment adopted it, if (as Howard stated) the Amendment sought largely to

---

tribes as entities, it typically did not claim ordinary jurisdiction over individual tribal members (at least as to internal government). *See, e.g., id.* at 2893. Thus, the United States did not exercise "full and complete" jurisdiction over the individual members, which was sufficient to put the individual members outside the scope of the Citizenship Clause. *See supra* note 185.

188. Efforts to curtail Chinese immigration began at the state level, especially in California, and first reached the Supreme Court in 1875. *See* Chy Lung v. Freeman, 92 U.S. 275, 276, 281 (1875) (holding that state exclusions infringed the federal foreign relations power). Beginning in the 1880s, the federal government began sharply limiting Chinese immigration through treaties and legislation, which the Court generally upheld. *See* Duncan B. Hollis, *Treaties in the Supreme Court, 1861–1900, in* INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 55, 68–69 (David L. Sloss et al. eds., 2011); Thomas H. Lee & David L. Sloss, *International Law as an Interpretive Tool in the Supreme Court, 1861–1900, in* INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE, *supra*, at 124, 154–55.

189. *E.g.*, Epps, *supra* note 7, at 333, 339; Ing, *supra* note 3, at 735–36.

190. *See, e.g.*, Charles, *supra* note 7, at 227–28 (quoting Senators Howard, Trumbull, and Johnson in the debates); Anton, *Response, supra* note 86 (same). For further discussion, see *infra* text accompanying notes 207–20.

191. *See supra* Section I.A.

Electronic copy available at: https://ssrn.com/abstract=3681119

constitutionalize existing practice.[192]

Second, as a textual matter, it is hard to understand how U.S.-born children of aliens could be not "subject to the jurisdiction" of the United States. As discussed, the prevailing understanding of national jurisdiction—as explained by Wheaton and Marshall—was primarily territorial. With narrow exceptions such as those for ambassadors, a sovereign's jurisdiction extended to all persons in sovereign territory. That jurisdiction plainly included aliens, who, it was said, owed a "temporary allegiance" to the territorial sovereign while present in that sovereign's territory.[193] Put in practical terms, aliens in the United States were bound by the ordinary laws, enforcement power, and judicial orders of U.S. authorities to the same extent as citizens.

The exception for ambassadors and their families and staff illustrates the point. Foreign diplomatic personnel were not "subject to the jurisdiction" of the United States (that is, they were not governed by ordinary U.S. sovereign authority despite being in U.S. territory) because they had diplomatic immunity under international law.[194] This immunity arose not because they were aliens but because they were aliens *and* ambassadors. Had they merely been alien visitors or immigrants, they would not have had this immunity and they would come within U.S. sovereign authority ("jurisdiction") while in U.S. territory, as Marshall explained in *Schooner Exchange*.[195]

It is true that aliens (and typically their U.S.-born children) also owed allegiance to a foreign sovereign even while in the United States. As discussed, international law recognized the authority of sovereigns to govern activities of their citizens/subjects abroad. Moreover, many nations claimed the allegiance of foreign-born children of their citizens/subjects, either because the nation followed the European rule of *jus sanguinis* or because (like Britain) the nation had special statutory rules for subjects' foreign-born children.[196] Thus, U.S.-born children of nondiplomat aliens were not subject to the *exclusive* jurisdiction of the United States; they were subject to overlapping jurisdiction to the extent they were citizens/subjects of one sovereign in the territory of another.[197] But the Citizenship Clause's text does not require one to be subject to *exclusive* U.S. jurisdiction to claim U.S. citizenship.[198]

---

192. The drafting debates indicate that congressmen generally recognized the pre-Amendment common law rule as including as citizens the U.S.-born children of aliens. *See* Ing, *supra* note 3, at 737 n.101. Representative Lawrence of Ohio, for example, cited *Lynch* for the proposition that "children born here are citizens without any regard to the political condition or allegiance of their parents." *Id*. (quoting CONG. GLOBE, 39th Cong., 1st Sess. 1832 (1866) (statement of Rep. Lawrence)).

193. *See supra* Section I.A.

194. *See supra* notes 157–64 and accompanying text.

195. *See* 11 U.S. (7 Cranch) 116, 144 (1812).

196. *See* Ramsey, *supra* note 17, at 213–26.

197. This was not uncommon. For example, as the enactors surely recognized, children born in Britain to U.S.-citizen parents would be both British subjects (under Britain's strict *jus soli* subjectship law) and U.S. citizens under U.S. naturalization laws (which since 1790 gave U.S. citizenship to U.S. citizens' foreign-born children).

198. *Cf.* U.S. CONST. amend. XIV, § 1. *But see* Eastman, *supra* note 7, at 170–78 (arguing that the Clause should be read to require exclusive U.S. jurisdiction, relying in part on the drafters' treatment of

Electronic copy available at: https://ssrn.com/abstract=3681119

Modern proponents of a narrow reading of the Citizenship Clause argue that the debates reflect an understanding of "jurisdiction" referring only to persons born to U.S. citizens (and perhaps to lawful resident aliens). But before turning to the drafting history, we should conclude that: (1) the text strongly indicates that the U.S.-born children of aliens (other than diplomatic personnel) were made U.S. citizens by the Clause because they were "subject to [U.S.] jurisdiction"; and (2) this reading is plausible because it adopts the prevailing common law view of U.S. citizenship prior to the Amendment. Evidence from the drafting history must be especially strong to overcome this textual conclusion. As described below, that evidence is at most ambiguous—though in fact it seems to favor the position indicated by the text's ordinary meaning.

The question of U.S.-born children of immigrants (especially Chinese immigrants) arose directly in the Amendment's drafting debates. As discussed, after Senator Howard proposed adding the language that became the Citizenship Clause, Senator Doolittle moved to add further language expressly excluding "Indians not taxed."[199] Technically, the debate proceeded on Doolittle's motion, but Pennsylvania Senator Cowan interjected a long speech questioning the broader wisdom of Howard's proposal.[200] Specifically, he asked (rhetorically, it seems) about its extension of U.S. citizenship to the children of Chinese immigrants and to "Gypsies" (whom he described as wandering bands that did not respect the local laws or customs).[201] California Senator Conness responded specifically on the issue of the U.S.-born children of Chinese immigrants, acknowledging that Howard's proposal would make them U.S. citizens and arguing in favor of that result.[202]

Although we should not overread the drafting history, this exchange strongly indicates the Senators' general understanding of the Clause. Cowan asked if "the child of the Chinese immigrant in California [is] a citizen" under the proposed clause (and argued sharply, in overtly racial terms, against the wisdom of such as result).[203] Conness responded:

> The proposition before us . . . relates simply in that respect to the children begotten of Chinese parents in California, and it is proposed to declare that they shall be citizens. We have declared that by law; now it is proposed to

---

Native Americans). As discussed, with respect to the Native American tribes the drafters and other commentary emphasized that they were not subject to *complete* U.S. jurisdiction (or, put another way, they were only partially subject to U.S. jurisdiction), and thus were excluded from citizenship. *See supra* Section II.B.2.b. Nondiplomat aliens, however, were not subject to only partial jurisdiction in this way. They were subject to complete U.S. jurisdiction while in U.S. territory. *See* Epps, *supra* note 7, at 364–66, 369–70 (discussing this distinction).

199. CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866); *see supra* notes 107–11 and accompanying text.

200. *See* CONG. GLOBE, 39th Cong., 1st Sess. 2890–91 (1866).

201. *See id.*

202. *Id.* at 2891–92.

203. *Id.* at 2890–91.

Electronic copy available at: https://ssrn.com/abstract=3681119

incorporate the same provision in the fundamental instrument of the nation. I am in favor of doing so.[204]

No Senator was recorded disagreeing with Conness's view of the Clause's effect, including Howard, who had proposed the language.[205] No change was proposed or adopted to indicate a narrower application, and the Senate voted to approve Howard's language shortly afterward. It is hard to read this result other than as confirming Conness's (and Cowan's) understanding.[206]

Three statements in the debates are commonly raised to the contrary. First, Senator Howard, in proposing the Clause, stated that it "will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons."[207] This statement, though, seems only to describe the well-understood exclusion of children of persons with diplomatic immunity: "foreigners, [that is,] aliens, who belong to the families of embassadors."[208] Some commentators instead read Howard's statement to exclude "persons born in the United States who are foreigners, aliens, [or] who belong to the families of embassadors."[209] However, that reading is redundant (and ungrammatical): if Howard meant to exclude all children of aliens, he would not have needed to add the reference to families of ambassadors. The only reason to refer to families of ambassadors would be if the children of aliens were covered by the Clause *unless* they were part of diplomatic families.[210]

---

204. *Id*. at 2891; *see also* Epps, *supra* note 7, at 356–57 (discussing this exchange); Ing, *supra* note 3, at 737 & n.98 (same).

205. *See* United States v. Wong Kim Ark, 169 U.S. 649, 699 (1898) ("It does not appear to have been suggested, in either House of Congress [during the drafting debates], that children born in the United States of Chinese parents would not come within the terms and effect of the leading sentence of the Fourteenth Amendment."); *see also* Maggs, *supra* note 91, at 1114 (noting that in the context of legislative history "[a] lack of objection may suggest general agreement"). One reason for the minimal debate on the issue may have been that it had already been discussed in connection with the 1866 Civil Rights Act (enacted in early April 1866, just under two months before the debate on the Howard proposal). As discussed below, *infra* Section II.B.2.d, congressmen appeared to understand the Act's similar language as granting citizenship to U.S.-born children of alien immigrants, including Chinese immigrants.

206. In the ratification debates, the Amendment's supporters generally expressed its scope in broad terms. *E.g.*, Colfax, *supra* note 111; *see also* Ing, *supra* note 3, at 743–47 (describing the ratification debates). Specific discussion of the Clause was sparse, although it arose (unsurprisingly) in California, where commentary indicated that the proposed Amendment would make citizens of Chinese immigrants' children. *See* Ing, *supra* note 3, at 746 (noting criticism of the proposed Amendment on this ground and California Senator Conness's response). Perhaps for that reason, California initially failed to ratify the Amendment in the 1860s (ultimately ratifying it in 1959). *See* Alex Vassar, *California's Ratification of the 14th*, ONE VOTER PROJECT (June 29, 2015), https://www.onevoter.org/2015/06/29/14th-amendment [https://perma.cc/RRP5-FKTL].

207. CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866).

208. *Id*.

209. *E.g.*, Mayton, *supra* note 7, at 24; *accord* Anton, *Response*, *supra* note 86.

210. *See* Epps, *supra* note 7, at 355 n.92. U.S. citizens employed by foreign diplomatic missions did not have diplomatic immunity, so read this way Howard's statement is not redundant. Only foreigners—

Electronic copy available at: https://ssrn.com/abstract=3681119

As noted, Howard did not object when Conness subsequently said that Howard's proposal included U.S.-born children of alien Chinese immigrants.[211] And Howard also stated that the Citizenship Clause constitutionalized existing law;[212] as discussed, pre-Amendment common law generally extended citizenship to U.S.-born children of aliens (other than children of foreign diplomats).

Second, in the argument over the Clause's application to Native Americans, Senator Trumbull stated: "What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else."[213] This language can be read to exclude aliens' U.S.-born children (who often would also owe allegiance to the country of their parents' nationality). But Trumbull likely spoke imprecisely, meaning instead (as he also said repeatedly) those over whom the United States did not have "complete" jurisdiction, as the full context of his comment indicates:

> The provision is, that "all persons born in the United States, and subject to the jurisdiction thereof, are citizens." That means "subject to the complete jurisdiction thereof." Now, does the Senator from Wisconsin [Doolittle] pretend to say that the Navajoe Indians are subject to the complete jurisdiction of the United States? What do we mean by "subject to the jurisdiction of the United States?" Not owing allegiance to anybody else.
>
> . . .
>
> . . . It is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens . . . .[214]

Howard, speaking shortly afterward, stated:

> I concur entirely with the honorable Senator from Illinois [Trumbull], in holding that the word "jurisdiction," as here employed, ought to be construed so as to imply a full and complete jurisdiction on the part of the United States. . . . Certainly, gentlemen cannot contend that an Indian belonging to a tribe, although born within the limits of a State, is subject

---

that is, aliens—could claim diplomatic immunity. *See* WHEATON, *supra* note 149, at 176–77. Howard's statement was wrong in one respect, as he quickly acknowledged: his proposal excluded children of tribal Native Americans as well as children of diplomats. *See* CONG. GLOBE, 39th Cong., 1st Sess. 2895 (1866).

211. *See supra* text accompanying notes 202–06.

212. *See* CONG. GLOBE, 39th Cong., 1st Sess. 2896 (1866).

213. *See id.* at 2893; *see also* Anton, *Response*, *supra* note 86 (relying on this quote). Trumbull later said to similar effect: "[Indians] are not subject to our jurisdiction in the sense of owing allegiance solely to the United States." CONG. GLOBE, 39th Cong., 1st Sess. 2894 (1866). Trumbull's point, in response to Doolittle's motion, was that tribal Native Americans were already excluded from constitutional citizenship by Howard's proposal.

214. CONG. GLOBE, 39th Cong., 1st Sess. 2893 (1866). Trumbull argued at length that the tribes were substantially outside U.S. jurisdiction and excluded by Howard's language. *See id.*

Electronic copy available at: https://ssrn.com/abstract=3681119

to this full and complete jurisdiction.[215]

This is consistent with the way others, including Senators Trumbull and Howard, used the phrase as it related to the tribes: the requirement as they understood it was that persons be *fully* subject to U.S. jurisdiction (which tribal members were not).[216] In any event, here and in related passages Trumbull was discussing the application of the Citizenship Clause to the Native tribes and was not directly considering the children of aliens. Like Howard, Trumbull did not object when Conness stated that the Clause included the U.S.-born children of aliens, and as discussed below, Trumbull thought that the related provisions of the 1866 Civil Rights Act gave U.S.-born children of aliens U.S. citizenship.[217]

Third, Maryland Senator Reverdy Johnson stated: "Now, all this amendment provides is, that all persons born in the United States and not subject to some foreign Power—for that, no doubt, is the meaning of the committee who have brought the matter before us—shall be considered as citizens of the United States."[218] This statement seems to exclude (most) U.S.-born children of aliens, who would often be subject to the "foreign power" of their parents' nationality. But Johnson went on to explain a few sentences later that the Clause recognized citizenship based on "birth within the territory of the United States, born of parents who at the time were subject to the authority of the United States."[219] Nondiplomat aliens in U.S. territory were plainly "subject to the authority of the United States."[220] Johnson nowhere specifically stated that U.S.-born children of aliens were excluded from the Clause, and like Howard and Trumbull, he did not

---

215. *Id.* at 2895. Howard added (in defense of his own language):

The Indian who is still connected by his tribal relation with the government of his tribe is subject for crimes committed against the laws or usages of the tribe to the tribe itself, and not to any foreign or other tribunal. . . . The United States courts have no power to punish an Indian who is connected with a tribe for a crime committed by him upon another member of the same tribe.

*Id.* This relationship is not analogous to nondiplomat aliens within U.S. territory, who as discussed above were indisputably subject to U.S. jurisdiction in such circumstances. *See supra* notes 152–56 and accompanying text.

216. *See* Epps, *supra* note 7, at 358–60. It is important to distinguish between exclusive jurisdiction and "full and complete" jurisdiction. The United States lacked "full and complete" jurisdiction over the tribes, as Trumbull and Howard understood it, because U.S. laws did not extend in all respects to them. The United States did not have exclusive jurisdiction over nondiplomat aliens within U.S. territory, but it did have "full and complete jurisdiction" over them in the sense Howard and Trumbull used the phrase because those aliens did not have any immunity from U.S. sovereign authority. *But see* Anton, *Response*, *supra* note 86 (appearing to equate "complete" and "exclusive" jurisdiction).

217. *See infra* Section II.B.2.d.

218. CONG. GLOBE, 39th Cong., 1st Sess. 2893 (1866); *see* Anton, *Response*, *supra* note 86 (relying on this quote). As discussed in Section II.B.2.d, Johnson, in the first quoted sentence, repeated the language of the 1866 Civil Rights Act, which he may have understood in a broader sense than its literal language may suggest. *See* Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 ("[A]ll persons born in the United States and not subject to any foreign power . . . are hereby declared to be citizens of the United States.").

219. CONG. GLOBE, 39th Cong., 1st Sess. 2893 (1866).

220. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3681119

object to Senator Conness's statement that they were included. Thus, it is at most unclear what Johnson had in mind.

In sum, the leading quotes from the drafting debate that are mentioned in support of a narrow view of the Clause are at best ambiguous. Particularly when taken with drafting and ratifying commentary extending the Clause to aliens' U.S.-born children,[221] they seem insufficient to overcome the Clause's apparent textual meaning.

### d. The Citizenship Clause and the 1866 Civil Rights Act

It is also appropriate to consider the relationship between the Citizenship Clause and its statutory predecessor in the 1866 Civil Rights Act. As described above, the Act was passed (over President Johnson's veto) in the spring of 1866 by the same Congress that drafted the Citizenship Clause roughly a month later.[222] The Act had a Citizenship Clause with terms similar to but distinct from the Amendment: "[A]ll persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States."[223]

Modern proponents of a narrow reading of the Citizenship Clause argue that the Act appears to exclude from citizenship not only Native tribes ("Indians not taxed")[224] and diplomats but also all (or at least most) U.S.-born children of aliens. Even apart from diplomatic families, most U.S.-born children of aliens would be "subject to a foreign power" in the sense that their parents' home nation would likely claim them as citizens/subjects—either by the rule of *jus sanguinis* or (as with the United States and Britain) by statutory exceptions to *jus soli*—and make them subject to that nation's extraterritorial authority. As a result, those U.S.-born children would be excluded from U.S. citizenship under the Act. And the Amendment, it is said, should be read in the same way.[225]

---

221. *See supra* notes 201–06 and accompanying text (discussing exchange between Senators Conness and Cowan).

222. Senator Trumbull introduced the Act in the Senate on January 5, 1866; it passed the Senate on February 2 and the House on March 13. *See* CONG. GLOBE, 39th Cong., 1st Sess. 129 (1866) (introduction of Act); *id*. at 606–07 (passage in the Senate); *id*. at 1367 (passage in the House). President Johnson vetoed it, but the veto was overridden on April 6 (in the Senate) and April 9 (in the House). *Id.* at 1679 (veto message); *id*. at 1809 (Senate override); *id*. at 1861 (House override); *see also* Currie, *supra* note 15, at 394–99 (recounting this chronology).

223. Civil Rights Act of 1866 § 1. The initial draft of the Act had no definition of citizenship; Senator Trumbull first proposed to add a clause addressed only to the citizenship of persons of African descent. CONG. GLOBE, 39th Cong., 1st Sess. 474 (1866). After various objections, Trumbull modified it first to declare citizenship for "[a]ll persons born in the United States and not subject to any foreign power," *id*. at 498, and later to exclude "Indians not taxed." *Id*. at 569; *see* Epps, *supra* note 7, at 350 (discussing the evolution of the proposed language).

224. "Indians not taxed" were those in tribes governed by treaty arrangements (which generally precluded U.S. taxes on tribal members) or those on the unsettled frontier, who were not taxed for obvious practical reasons. *See* CONG. GLOBE, 1st. Sess., 569–78 (1866) (recording debates on this provision).

225. *See, e.g.,* Charles, *supra* note 7, at 223–25; Eastman, *supra* note 7, at 171–72.

Electronic copy available at: https://ssrn.com/abstract=3681119

It might be that the Amendment narrowed the Act's exclusion such that U.S.-born children of aliens had birthright citizenship under the Amendment even though they did not have it under the Act.[226] Indeed, ordinarily one might think that differences in language should convey different meanings. However, in the case of the Citizenship Clause, the Amendment's drafters (who were also the Act's drafters) said that the Amendment constitutionalized the Act's citizenship provisions, indicating that although the words differed they should be read to the same effect.[227] This view seems natural with respect to Native tribes and foreign diplomatic personnel but is puzzling for the children of nondiplomat aliens, for whom arguably the two clauses point in different directions. A narrow reading of the Amendment would produce parallel meanings and resolve this difficulty. Specifically, adding the word "exclusive" to the Amendment's Citizenship Clause so that it requires birth "subject to the *exclusive* jurisdiction" of the United States would align the Clause with the Act's literal text ("not subject to any foreign power")[228] and explain the drafters' common claim that the two meant the same thing.

But this approach faces daunting objections. First, it is not clear why the Senators' claim that the clauses meant the same thing should be decisive. The Senators may have been wrong about the Act's meaning. Perhaps its text inadvertently did not include the U.S.-born children of aliens, but the Senators thought it did (or that it should have); perhaps, then, in subsequently discussing the Amendment they either did not see the difference between the two or sought to cover it up (because the narrative of the Amendment's supporters was that it merely constitutionalized the Act).[229] The touchstone of the present inquiry is the original meaning of the Amendment, not what some Senators thought (or said they thought) about its relationship to a prior Act.

Second, as discussed, a narrow reading of the Amendment is strongly contrary to both its language and the interpretation Senators gave it. U.S.-born children of nondiplomat aliens are subject to U.S. jurisdiction in the ordinary sense of being subject to U.S. law, U.S. law enforcement, and U.S. courts (so long as they are present in the United States). A narrow reading depends on adding the word "exclusive," which does not appear in the Amendment. Moreover, Senate debate on the Amendment's Citizenship Clause strongly indicates a broad assumption

---

226. *See* Epps, *supra* note 7, at 350–51 (noting that one should not assume the Act and the Clause had parallel meanings).

227. Howard, for example, said upon introducing the Amendment's language that it was "declaratory of what I regard as the law of the land already," which would include the previously enacted Civil Rights Act. CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866). He later expressly described the Amendment as constitutionalizing the Act with regard to citizenship. *Id.* at 2896; *see* Ing, *supra* note 3, at 736 & n.97 (collecting additional quotations).

228. Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27.

229. Trumbull, the author of the Act's Citizenship Clause, admitted difficulty in finding the right language to express his intent and proposed or considered various formulations before settling on the one ultimately adopted. *See* CONG. GLOBE, 39th Cong., 1st Sess. 572 (1866). We can presume that Howard, author of the Amendment's Citizenship Clause, was not fully satisfied with Trumbull's version and thus used different language in the Amendment, but it is hard to discern exactly why Howard did so.

Electronic copy available at: https://ssrn.com/abstract=3681119

that the Clause would make citizens of the children of alien immigrants such as the Chinese on the West Coast[230]—indicating that whatever Senators said about the Act, they did not take a narrow view of the Amendment.

Third, even if one accepts a need to align the Act and the Amendment, it is not clear that it should be done by reading the Amendment narrowly. To the contrary, it appears that the Act's drafters understood it, like the Amendment, to include U.S.-born children of aliens. Senator Trumbull introduced what became the Act's Citizenship Clause (with the "not subject to any foreign power" language), leading to the following exchange:

> Mr. COWAN. I will ask whether [Trumbull's proposal] will not have the effect of naturalizing the children of Chinese and Gypsies born in this country?
>
> Mr. TRUMBULL. Undoubtedly.[231]

Cowan then argued at length (in expressly racist terms) against adopting Trumbull's proposed language.[232] Trumbull repeated his understanding later in the debate:

> I have already said that in my opinion birth entitles a person to citizenship, that every free-born person in this land is, by virtue of being born here, a citizen of the United States, and that the bill now under consideration is but declaratory of what the law now is; but, inasmuch as some persons deny this, I thought it advisable to declare it in terms in the statute itself.[233]

No one was recorded disputing the effect of Trumbull's proposal; the question the Senators debated was whether it was a good idea.[234] Thus it appears that when

---

230. *See supra* Section II.B.2.c; *see also* Ing, *supra* note 3, at 737 & nn.98–101 (recounting congressional debate).

231. CONG. GLOBE, 39th Cong., 1st Sess. 498 (1866).

232. *See id.* at 498–99. Cowan and Trumbull disagreed on whether existing law extended U.S. citizenship to the U.S.-born children of Chinese immigrants, *see id.* at 498, but they agreed on the effect of Trumbull's proposed clause while disagreeing on its wisdom. Cowan acknowledged (when pressed by Trumbull) that preexisting law extended U.S. citizenship to U.S.-born children of European immigrants, but he thought nonwhite immigrants were (or at least should be) treated differently, a point Trumbull denied. *See id.*

233. *Id.* at 600.

234. *See* Ho, *supra* note 7, at 373 ("[P]roponents and opponents of birthright citizenship alike consistently interpreted the Act . . . to cover the children of aliens."). In addition to the Cowan–Trumbull exchange, Senator Morrill, for example, observed that "the grand principle of both nature and nations, both of law and politics, [is] that birth gives citizenship of itself . . . . [B]irth by its inherent energy and force gives citizenship." CONG. GLOBE, 39th Cong., 1st Sess. 570 (1866) (discussing the Act). In the subsequent Cowan–Conness exchange regarding the constitutional citizenship of U.S.-born children of Chinese immigrants, Senator Conness observed: "We have declared that by law" (presumably meaning in the Civil Rights Act). CONG. GLOBE, 39th Cong., 1st Sess. 2891 (1866); *see supra* note 204 and accompanying text. Comments in the House of Representatives on the Act's citizenship provision similarly indicated that it included the U.S.-born children of aliens. *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 1262 (1866) (remarks of Representative Broomall); *id.* at 1266 (remarks of Representative Raymond).

Electronic copy available at: https://ssrn.com/abstract=3681119

Senators said that the Amendment had the same effect as the Act, they took a broad view of the Act (rather than a narrow view of the Amendment). They may have been wrong about what the Act actually meant, but that does not affect the analysis of the Amendment. The key is that Senators said the Amendment meant the same as *what they thought the Act meant*—and they thought the Act conveyed citizenship on the U.S.-born children of aliens.[235] President Johnson shared that understanding as well. His veto message objected, among other things, that the Act "comprehends the Chinese of the Pacific States, Indians subject to taxation, the people called Gypsies, as well as the entire race designated as blacks. . . . Every individual of those races, born in the United States, is by the bill made a citizen of the United States."[236]

In any event, the 1866 Civil Rights Act does not seem sufficient to overcome the textual meaning of the Citizenship Clause. No account of the Act is entirely free from difficulties; thus it does not point conclusively to an alternate meaning of the Amendment.

### 3. Post-ratification Interpretations

The apparent clarity of the Citizenship Clause's text is somewhat undercut by what happened after ratification. The scope of the "subject to the jurisdiction" exception remained unsettled until the Supreme Court's decision thirty years later in *United States v. Wong Kim Ark*.[237] First, as discussed, the Court initially took a narrow view of the Clause in the *Slaughter-House Cases* in 1873;[238] second, the

---

235. Trumbull observed that his goal was "to make citizens of everybody born in the United States who owe allegiance to the United States" with the exception that "[w]e cannot make a citizen of the child of a foreign minister who is temporarily residing here." CONG. GLOBE, 39th Cong., 1st Sess. 572 (1866). He added that he had considered drafting the Clause to read "[t]hat all persons born in the United States and owing allegiance thereto are hereby declared to be citizens," but he decided against it because "upon investigation it was found that a sort of allegiance was due to the country from persons temporarily resident in it whom we would have no right to make citizens." *Id*. The "sort of allegiance" invoked here is probably the limited duty of persons with diplomatic immunity not to take actions threatening to the security of the nation. *See* WHEATEL, *supra* note 149, at 177; *see also* VATTEL, *supra* note 29, bk. IV, ch. VII, § 97, at 476 (discussing the standard of conduct for diplomats in foreign nations). Taken with his earlier statements, it seems likely that Trumbull intended the "not subject to any foreign power" language simply to reflect the long-standing exception to birth citizenship for children of diplomats. *See* CONG. GLOBE, 39th Cong., 1st Sess. 572 (1866).

236. CONG. GLOBE, 39th Cong., 1st Sess. 1679 (1866).

237. 169 U.S. 649 (1898).

238. *See* 83 U.S. (16 Wall.) 36, 73 (1873); *supra* Section I.B. In a subsequent series of lectures published posthumously, Justice Miller, the author of the majority opinion, took a more ambiguous view:

> If a stranger or traveller passing through or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction.

SAMUEL FREEMAN MILLER, LECTURES ON THE CONSTITUTION OF THE UNITED STATES 279 (New York, Banks & Brothers 1891). This is a much narrower view of the exception than Miller expressed in the *Slaughter House Cases* (it would appear, for example, not to exclude from citizenship the U.S.-born children of alien permanent residents). But it remains unclear what Miller meant by a stranger "who claims to owe no allegiance to our Government": as discussed, temporary visitors (other than diplomats)

Executive Branch, after initially taking a broad view of the Clause, reverted to a narrow view in the 1880s and 1890s and argued in the *Wong Kim Ark* case that U.S.-born children of legal permanent residents were not citizens under the Clause;[239] and third, as Bernadette Meyler has shown, post-ratification commentary took a range of views of the Clause, some insisting on narrow interpretations of its scope.[240]

As to the Court, a complete account favors the broader view of the Clause. In the *Slaughter-House Cases*, the majority observed (in dicta, because the case did not involve the Clause) that the Clause's purpose was to confirm citizenship to persons of African descent and added: "The phrase, 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States."[241] That view would exclude aliens' U.S.-born children contrary to the textual argument developed above.

But shortly after the *Slaughter-House Cases*, the Court retreated. In *Minor v. Happersett* in 1874, it observed that the scope of birthright citizenship remained uncertain (apart from U.S.-born children of U.S. citizens, whom it thought were obviously citizens).[242] Then in *Elk v. Wilkins* in 1884, the Court appeared to link the "subject to the jurisdiction" exception only to Native tribes and diplomats, not to U.S.-born children of aliens generally:

> [Tribal members], although in a geographical sense born in the United States, are no more "born in the United States and subject to the jurisdiction thereof," within the meaning of the first section of the Fourteenth Amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations.[243]

---

owed temporary allegiance while in U.S. territory. *See supra* Section II.B.1. Miller may have simply been mistaken on this point.

239. *See* 169 U.S. at 649–50; *id*. at 719 (Fuller, C.J., dissenting).

240. *See* Meyler, *supra* note 28, at 532–59 (discussing post-ratification arguments); *see also* Charles, *supra* note 7, at 232–38 (emphasizing disagreements on this point in the post-ratification era).

241. 83 U.S. (16 Wall.) at 73. The issue was whether New Orleans's slaughterhouse monopoly violated the Amendment's Privileges or Immunities Clause. *Id*. at 43.

242. 88 U.S. (21 Wall.) 162, 167–68 (1874). The issue was whether a woman born in the United States had a right to vote. *Id*. at 165. The Court held that she was undoubtedly a citizen by birth, because her parents were also citizens, but citizenship did not convey voting rights. *Id*. at 170–71.

243. 112 U.S. 94, 102 (1884). Of course, the Court's list of categories excluded by the phrase "subject to the jurisdiction" was not necessarily exclusive (and was dicta in any event). But the contrast with the *Slaughter-House Cases* is notable at least in suggesting that the Court was no longer sure whether the Citizenship Clause excluded U.S.-born children of aliens. Significantly, Justice Gray wrote both *Elk* and *Wong Kim Ark* but had not been on the Court for the *Slaughter-House Cases*.

The *Elk* Court—echoing discussion of the tribes in the drafting debates—emphasized that the Citizenship Clause required "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction." *Id*. Some modern commentators have found this statement supportive of a narrow view of the Clause, but it is not. As discussed, the "completely subject" understanding encompassed persons subject to territorial jurisdiction, who were completely subject to U.S. jurisdiction while in the United States (apart from diplomatic personnel, who were not). *See supra* note 214 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=3681119

Finally, in *Wong Kim Ark*, the Court, over a dissent, found that the Clause gave constitutional citizenship to Chinese immigrants' U.S.-born children.[244]

Ordinarily, one might favor the earlier judicial interpretation as the best indicator of original meaning. But the *Slaughter-House* opinion gave no foundation for its view of the Citizenship Clause. In particular, it did not explain how the "subject to the jurisdiction" language supported its suggestion.[245] As noted, the comment was an aside—the case in no way turned on the meaning of the Citizenship Clause. And later cases did not regard it as conclusive.[246]

The opinions in *Wong Kim Ark*, though more remote from ratification, seem more suggestive of the Clause's original meaning. Justice Gray, for the majority, directly made the textual and historical argument described above that U.S.-born children were (with exceptions for diplomats and Native tribes) subject to U.S. jurisdiction in the sense of being under U.S. sovereign authority irrespective of the nationality of their parents; that this reading constitutionalized the prior *jus soli* common law inherited from Britain; and that the drafting history and subsequent interpretations confirmed the Clause's application to U.S.-born children of Chinese immigrants.[247]

In contrast, Chief Justice Fuller's dissent is difficult to follow and failed to base its conclusions in text and historical meaning. In particular, Fuller did not adequately explain the historical meaning of "subject to the jurisdiction" and did not explain in what sense aliens' U.S.-born children were not subject to U.S. jurisdiction. Moreover, Fuller apparently would have recognized birthright citizenship for U.S.-born children of European immigrants but not of other races—a distinction that is extraordinarily difficult to draw from the Amendment's text and background.[248] Despite wide-ranging discussion early in his dissent, at the end Fuller principally invoked the need to give Congress and the treaty-makers

---

244. 169 U.S. 649, 704–05 (1898).

245. *See* 83 U.S. (16 Wall.) at 73.

246. *See, e.g.*, *Wong Kim Ark*, 169 U.S. at 678 (describing the comment in the *Slaughter-House Cases* as "unsupported by any argument, or by any reference to authorities; and . . . not formulated with the same care and exactness, as if the case before the court had called for an exact definition of the phrase").

247. *See id.* at 655–705. Specifically, as to aliens being "subject to [U.S.] jurisdiction," Justice Gray wrote:

> It can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides. . . . [I]t is well known that, by the public law, an alien, or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may be punished for treason, or other crimes, as a native-born subject might be, unless his case is varied by some treaty stipulations.

*Id.* at 693–94 (internal quotations omitted). The majority also invoked the Senate drafting debates, specifically the Cowan–Conness exchange on the U.S.-born children of Chinese immigrants, "as contemporaneous opinions . . . upon the legal meaning of the words [of the Amendment] themselves." *Id.* at 699.

248. *See id.* at 731–32 (Fuller, C.J., dissenting).

Electronic copy available at: https://ssrn.com/abstract=3681119

flexibility in regulating Chinese immigration.[249] Ultimately, he seemed to rest on current policy and practical implications rather than original meaning.

As to the Executive Branch, as discussed above, its initial reading of the Clause under President Grant was a broad one, encompassing the U.S.-born children of aliens; when that position shifted, it did so without a full explanation.[250] Moreover, the Executive Branch's position initially rested on strong textual foundations; it shifted to a narrower view, perhaps as anti-immigrant (and especially anti-Chinese) sentiment arose in the 1880s and 1890s.[251] Thus, although the executive was not consistent in reading the Clause, its views tend to support the broader view of the original meaning.

Finally, without surveying the whole range of post-ratification commentary, one can say that commentary taking a narrow view of citizenship had the same flaw as the *Slaughter-House Cases* majority and the *Wong Kim Ark* dissent. None of it adequately explains how the "subject to the jurisdiction" requirement produces a narrow scope for the Clause (apart from the well-accepted exceptions for diplomats and Native tribes).[252]

---

249. *See id.* at 729–32. Fuller emphasized the treaties and statutes limiting Chinese immigration and restricting the ability of Chinese immigrants to become naturalized citizens, arguing:

> I insist that it cannot be maintained that this Government is unable through the action of the President, concurred in by the Senate, to make a treaty with a foreign government providing that the subjects of that government, although allowed to enter the United States, shall not be made citizens thereof, and that their children shall not become such citizens by reason of being born therein.
>
> A treaty couched in those precise terms would not be incompatible with the Fourteenth Amendment, unless it be held that that amendment has abridged the treaty-making power.

*Id.* at 729. However, the core question was whether the Fourteenth Amendment, given its original meaning, did "abridge the treaty-making power" to this extent, and Fuller offered no reason to think it did not, aside from his desire to protect the political branches' anti-Chinese policies. *Id.*

250. *See supra* note 67 and accompanying text (describing opinions of Secretary of State Hamilton Fish in the Grant Administration).

251. Rising anti-Chinese sentiment was particularly reflected in the so-called Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58 (repealed 1943), which banned Chinese immigration for ten years, and the Geary Act of 1892, ch. 60, 27 Stat. 25 (repealed 1943), which extended the exclusion. President Hayes had previously negotiated a treaty with China removing earlier agreements not to restrict immigration. *See* Treaty Between the United States and China, Concerning Immigration, China-U.S., Nov. 17, 1880, 22 Stat. 826 (known as the Angell Treaty); *see also* Fong Yue Ting v. United States, 149 U.S. 698, 717–18 (1893) (discussing these developments).

252. *See* Meyler, *supra* note 28, at 532–59 (discussing leading post-ratification arguments). Professor Eastman points in particular to the statement in Thomas Cooley's constitutional law treatise that "subject to the jurisdiction" in the Fourteenth Amendment "meant that full and complete jurisdiction to which citizens generally are subject, and not any qualified and partial jurisdiction, such as may consist with allegiance to some other government." THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 243 (Boston, Little, Brown & Co. 1880); *see* Eastman, *supra* note 7, at 174 (relying on this quote as disproving constitutional citizenship for the U.S.-born children of aliens). Cooley's statement in context is ambiguous, however; he went on to discuss Native American tribes (and, in the third edition, children of foreign sovereigns and ambassadors, children born on foreign ships, and children born under hostile occupation) as being excluded by the "subject to the jurisdiction" requirement; he did not mention other potentially excluded categories, such as children of aliens. *See* COOLEY, *supra*; THOMAS M. COOLEY & ANDREW C. MCLAUGHLIN, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 270 (Boston, Little,

Electronic copy available at: https://ssrn.com/abstract=3681119

In sum, the Amendment did not conclusively resolve the debate over citizenship. But, on the whole, the post-ratification history tends to confirm the broad original meaning of the Clause advanced above. Advocates for a narrower view of the Clause were unable to rest their claims firmly on text or history. In particular, commentary advancing the narrow view did not explain *why* the Amendment's text failed to grant birthright citizenship: it did not give a plausible meaning of "subject to the jurisdiction" that excluded aliens' (or just non-European aliens') U.S.-born children.[253] (Commentators did say that "subject to the jurisdiction" meant "subject to *exclusive* jurisdiction"—but that does not explain the text; it adds a word that is not there.) This suggests that the broad view, as a matter of original meaning, is the correct one.

### 4. Modern Applications

The foregoing discussion confirms that the Citizenship Clause applies to the two principal categories of persons whose status modern debates have questioned: U.S.-born children of temporary visitors and U.S.-born children of persons not lawfully present in the United States. It is true that the Court in *Wong Kim Ark*, which considered the citizenship of a U.S-born child of lawful permanent residents, did not directly face or resolve these questions.[254] It is also true that extending constitutional citizenship to U.S.-born children of temporary visitors and U.S.-born children of persons not lawfully present in the United States raises policy issues that do not apply, or do not apply to the same extent, to constitutional citizenship for U.S.-born children of U.S. citizens or lawful permanent residents.[255] And it also may be true, as discussed below,[256] that the

---

Brown, & Co. 3d ed. 1898). The categories Cooley specifically mentioned were not analogous to U.S.-born children of aliens in this respect, so it is not clear what Cooley thought of the latter. In any event, what Cooley—a respected but fallible authority—thought years after ratification is not definitive.

253.  One argument advanced for reading the Clause narrowly is that in the nineteenth century there was a long-standing view of citizenship, associated with European scholars and European practice, incompatible with granting it on merely the accident of birth. Vattel, who thought citizenship should turn mostly on parents' ancestry rather than birthplace, is just one example. *See Wong Kim Ark*, 169 U.S. at 708–09, 731 (Fuller, C.J., dissenting) (discussing Vattel); Lynch v. Clarke, 1 Sand. Ch. 583, 601–02 (N.Y. Ch. 1844) (argument of complainant's counsel) (same). But this argument shows only that the Amendment's drafters *might* have picked citizenship criteria other than mere birth within U.S. territory and under U.S. sovereign authority, not that they did so. Vattel and related writers represented one approach to citizenship, but there was an equal, if not stronger, tradition favoring citizenship by birth: the long-standing English rule, adopted by prominent U.S. courts and commentators, as a matter of common law in the early nineteenth century. *See supra* Section I.A. Moreover, nothing ties the narrower view of citizenship to the Amendment's text: there were competing pre-1866 views of citizenship, but there were no competing pre-1866 views of what it meant to be "subject to the jurisdiction" of the United States.

254.  *See* 169 U.S. at 693 (referring to the Amendment's application to "children here born of resident aliens"); *id.* at 705 (ruling that the claimant was a U.S. citizen because he was born in the United States of parents with a "permanent domicil and residence in the United States"). *See generally* John C. Eastman, *The Significance of "Domicile" in* Wong Kim Ark, 22 CHAP. L. REV. 301 (2019) (arguing that *Wong Kim Ark* should be read only to establish constitutional citizenship for the children of lawful permanent residents).

255.  *See* SCHUCK & SMITH, *supra* note 7, at 36–48 (discussing these policy issues).

256.  *See infra* Section III.A.

Electronic copy available at: https://ssrn.com/abstract=3681119

Amendment's enactors did not consider those policy questions because those questions were not clearly presented at the time of enactment. However, for an analysis based purely on the Clause's original meaning, these considerations should not matter. The question is simply whether the Amendment's language, given the meaning it had at enactment, includes the disputed categories.

Posed in this way, the question seems easily answered. The only material issue is whether persons in those categories are born "subject to the jurisdiction" of the United States as that phrase was understood at the time of enactment. The analysis developed above shows that they are. The U.S. jurisdiction (in the sense of sovereign power) extended to all persons within U.S. territory, with exceptions only for (1) diplomats, foreign sovereigns, and foreign armies, who were exempt from ordinary U.S. jurisdiction under international law; (2) members of Native tribes excluded from ordinary U.S. jurisdiction by treaties; and (3) members of tribes or unorganized bands on the frontier, who were not under U.S. authority as a practical matter. That is, persons not subject to U.S. jurisdiction were those to whom U.S. sovereign authority did not extend, as a legal or practical matter.

The U.S.-born children of temporary visitors or parents not lawfully present fit within none of these exceptions, and they are not materially analogous to any historical exception. As to temporary visitors, Chief Justice Marshall in *Schooner Exchange* specifically identified temporary visitors as "amenable to" U.S. jurisdiction under international law's rule of territorial sovereignty.[257] Moreover, as a practical matter U.S. lawmaking and enforcement authority is applied to temporary visitors in the United States in the same manner as to resident aliens. The point of diplomats' exemption from U.S. jurisdiction is that diplomats are *not* treated like ordinary temporary visitors in terms of submission to U.S. sovereign authority.[258]

The same considerations apply to persons not lawfully present. Like temporary visitors, they are governed by U.S. sovereign authority as a matter of territorial jurisdiction. Nothing in international law suggests any exemption from U.S. jurisdiction—they can be punished for crimes and otherwise placed under U.S. lawmaking and law enforcement authority. (They also might be deported, but that does not make them any less subject to U.S. jurisdiction.)[259] Although distinct from U.S. citizens and noncitizen permanent residents in various respects, they are not distinct for purposes of U.S. sovereign authority while within U.S. territory.

Counterarguments depend either on adding words to the Clause's text or interpreting the text to mean something it did not mean in the nineteenth century. One

---

257. 11 U.S. (7 Cranch) 116, 144 (1812).

258. *See* WHEATON, *supra* note 149, at 176–77.

259. Perhaps unlawful bands of marauders in frontier areas might be regarded as akin to "wild Indians" and beyond U.S. jurisdiction as a practical matter. However, the modern condition of persons not lawfully present in the United States is not analogous. Typically, they act (or attempt to act) as ordinary members of U.S. society, under the same laws and law enforcement as U.S. citizens as a legal and practical matter. *See* Magliocca, *supra* note 7, at 522–26 (considering and rejecting this analogy).

Electronic copy available at: https://ssrn.com/abstract=3681119

might say that U.S.-born children of aliens who are not permanent residents are not subject to the *exclusive* jurisdiction of the United States (because, at least typically, they would also be subject to the jurisdiction of the country of their parents' nationality).[260] As noted above, there is little basis for adding the word "exclusive" to the Citizenship Clause. Moreover, the children of resident aliens are (like the children of nonresident or unlawfully present aliens) often not subject to the *exclusive* jurisdiction of the United States (for the same reasons—they are typically also subject to the jurisdiction of their parents' home countries, at least to some extent). An argument resting on the supposed need for exclusive U.S. jurisdiction must reject *Wong Kim Ark* and contend that no children of aliens have constitutional citizenship—an unlikely outcome for reasons discussed in prior Sections.[261]

A second approach, developed initially by Peter Schuck and Rogers Smith in *Citizenship Without Consent*, argues that citizenship rests on mutual consent of the individual and the sovereign.[262] This view has roots in the nineteenth-century debate over renunciation of citizenship (or subjectship): the British view was that a subject could not renounce subjectship unilaterally, a view that was initially accepted but increasingly rejected in the United States. It also looks to natural law writers such as John Locke and Jean-Jacques Burlamaqui, who emphasized the idea of citizenship by mutual consent.[263] Schuck and Smith argued that, if citizenship depends on consent, only those whom the sovereign admits to the political polity could be citizens.[264] Schuck and Smith's point was principally to exclude from birthright citizenship the children of persons not lawfully present in the United States; their position would accept the citizenship of lawful permanent residents (as in *Wong Kim Ark*).[265]

But Schuck and Smith, like others, offered no plausible explanation of the original meaning of "subject to the jurisdiction" of the United States. In nineteenth-century terms, children of lawful residents and children of persons not lawfully present would be "subject to the jurisdiction" of the United States in exactly the same way. That is, they are subject to U.S. territorial jurisdiction while in the United States (while also likely subject to extraterritorial jurisdiction of their parents' home country). Indeed, it is not clear that Schuck and Smith were even making an argument about original meaning, rather than an argument about the meaning the Clause should have in modern times. Their claim may be better understood to be that (1) the Amendment's enactors did not think about U.S.-

---

260. *See* Anton, *Response*, *supra* note 86 (relying on the supposed need for exclusive jurisdiction).

261. *See supra* Sections II.B.1–3. Some advocates of a narrow view of birthright citizenship do argue that even children of alien lawful permanent residents are not entitled to birthright citizenship. *See, e.g.*, Eastman, *supra* note 7, at 174–78.

262. SCHUCK & SMITH, *supra* note 7.

263. *See id.* at 42–48.

264. *Id.* at 86. For discussion and response, see NEUMAN, *supra* note 7, at 166–80.

265. *See* SCHUCK & SMITH, *supra* note 7, at 78–79, 118. Schuck and Smith also argued that children of temporary visitors lack sovereign consent (even if admitted lawfully) because they are not admitted into the nation's political polity in the same sense that lawful permanent residents are. *Id.* at 118.

Electronic copy available at: https://ssrn.com/abstract=3681119

born children of people unlawfully present in the United States; and (2) if the enactors had thought about such persons, they would have adopted different language, because of the enactors' views of consensual citizenship.[266] This claim, however, is based not on the text's original meaning but rather on the hypothetical intent of the enactors.[267]

With an original meaning approach, we need not (at this stage) resolve debate over Schuck and Smith's suggested modern reinterpretation. What matters here is what the words meant, not what unexpressed ideas the enactors may have had (or would have had if they had understood the issue). Even if the enactors had an idea of citizenship based only on mutual consent, they did not choose language that incorporated this idea. For an original meaning analysis, that is all we need to know.

### III. ORIGINALISM AND THE ORIGINAL MEANING OF THE CITIZENSHIP CLAUSE

This Part turns to the implications of the conclusions set forth above for originalism and modern law. At the risk of some oversimplification, originalism is the view (perhaps better described as a category of views) that the Constitution's original meaning, where it can be fairly discerned, should bind modern governmental actors (known as the "constraint principle").[268] As described in the preceding Part, the Citizenship Clause's original meaning can be identified in two respects central to modern disputes: the geographical scope of birth "in" the United States and persons excluded by the phrase "subject to the jurisdiction" of the United States. Specifically, the original meaning indicates that persons born in U.S. overseas territories are born "in" the United States and that U.S.-born children of persons not lawfully present in the United States are born "subject to the jurisdiction" of the United States.[269] Originalism's "constraint principle" would seem to require modern governmental actors to recognize U.S. citizenship of persons in these categories.

---

266. *See id.* at 95 (noting that the issue of unlawful entry was not fully understood in 1868 because the nation lacked restrictive immigration laws).

267. Schuck and Smith are unclear on this point. Elsewhere they suggest that "subject to the jurisdiction" did (or perhaps could) incorporate their idea of consensual citizenship, although they do not explain how it could do so consistent with its ordinary meaning. *See id.* at 86. *But see* NEUMAN, *supra* note 7, at 169 (criticizing this claim).

268. Lawrence B. Solum, The Constraint Principle: Original Meaning and Constitutional Practice 2 (Apr. 3, 2019) (unpublished manuscript) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2940215 [https://perma.cc/DPC8-6NEW]) [hereinafter Solum, Constraint Principle] ("Originalism is a family of constitutional theories, almost all of which agree that the original meaning of the constitutional text should constrain constitutional practice." (emphasis omitted)). Professor Solum finds that originalist theories share a second core principle he calls the "fixation thesis"—that constitutional text has a fixed meaning at the time of its enactment. Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1, 1 (2015). The present discussion assumes the fixation thesis principle without elaboration. The discussion also leaves aside issues involving the relationship between originalism and precedent. For a discussion of this relationship, see generally John O. McGinnis & Michael B. Rappaport, *Reconciling Originalism and Precedent*, 103 NW. U. L. REV. 803 (2009).

269. *See supra* Part II.

Electronic copy available at: https://ssrn.com/abstract=3681119

This originalist outcome may, however, seem peculiar. The Citizenship Clause's enactors likely did not understand that their constitutional language would resolve either question. Neither question was at the forefront—or even in the background—of nineteenth-century debates over citizenship. The originalist resolution is therefore in some sense accidental: the enactors could have chosen other language to accomplish their goals that might have resolved these modern debates differently (or left them unresolved). Nonetheless, modern originalist approaches founded on the constraint principle would appear to insist that the constitutional language be enforced today with its original meaning, even if that leads to entirely accidental results.[270]

The broader question, then, is why that should be so. What justifications for originalism explain enforcing outcomes that enactors of a provision did not contemplate? This Part takes up that challenge.

### A.  THE CONSTITUTION'S ACCIDENTAL CITIZENSHIP RULES

Originalism is often explained as enforcing policy choices of a law's enactors, as reflected in the text. The puzzle of the Citizenship Clause is that, in the situations discussed here, the text does not reflect policy choices of the Clause's enactors. Rather, it involves subsequently arising policy questions that are resolved by the fortuity of the language chosen. In particular, it involves constraints placed upon current political actors arising from the accident of the language chosen rather than the enactors' decision to impose such constraints.

During the Fourteenth Amendment's drafting and ratification, the United States had no material overseas territories. The territories it had previously acquired had been, for the most part, lightly populated (apart from Native tribes), and the inhabitants had been designated U.S. citizens in the treaties of acquisition (again leaving aside Native peoples, who were excluded from citizenship by the same principle applied to Native tribes in the original United States).[271] That approach also applied to Alaska, the first material noncontiguous U.S. territory, which was acquired in 1867 after the Amendment was drafted and during its

---

270. *See* Solum, *Constraint Principle*, *supra* note 268, at 16–25. An exception, discussed below, is some version of original intent. This Article is more addressed to forms of original meaning originalism, which have become more common among modern academics and judges. *See* WURMAN, *supra* note 8, at 11–24 (discussing the evolution of originalist theories).

Because the Citizenship Clause's application to modern debates is both clear and unexpected, the discussion avoids two important controversies within modern originalism. The first is the use of constitutional construction as a method of resolving vague or ambiguous texts. *See generally* KEITH E. WHITTINGTON, CONSTITUTIONAL CONSTRUCTION: DIVIDED POWERS AND CONSTITUTIONAL MEANING (1999); John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751 (2009); Lawrence B. Solum, *Originalism and Constitutional Construction*, 82 FORDHAM L. REV. 453 (2013). The second is the relevance (or irrelevance) of "original expected applications"—that is, the effects people in the enactment era expected the enactment to have. *See* Lawrence B. Solum, *What Is Originalism? The Evolution of Contemporary Originalist Theory*, *in* THE CHALLENGE OF ORIGINALISM: THEORIES OF CONSTITUTIONAL INTERPRETATION 12, 24–25 (Grant Huscroft & Bradley W. Miller eds., 2011) (discussing this issue). As to the second controversy, there were no original expected applications on the key issues here because the issues were not foreseen.

271. *See* LAWSON & SEIDMAN, *supra* note 10, at 86–102 (discussing pre-Civil War acquisitions).

Electronic copy available at: https://ssrn.com/abstract=3681119

ratification campaign and which, in any event, had a tiny population that was not expected to grow.[272]

It is true that, in the early and mid-nineteenth century, the United States had contemplated acquiring overseas territories. In particular, expansionist forces had eyed Cuba, then a Spanish territory, as a target. But they assumed Cuba, or other acquisitions, would become states through the Article IV process—like Texas, Louisiana, and Florida. Indeed, that was a central point of the project: before the Civil War, acquisitions were favored by Southern interests to increase the number of slave states represented in Congress.[273] The idea of overseas acquisitions did not fully abate with the South's defeat. For example, shortly after the Amendment's adoption, President Grant pushed for annexation of Santo Domingo (now the Dominican Republic).[274] But again, the assumption was that Santo Domingo would become a state (Grant liked the idea in part because he thought its voters would favor the Republican Party).[275] The idea of imperial possessions—places, as the Supreme Court described in the *Insular Cases*, owned by but not fully within the United States—was not part of pre- or post-Civil War thinking.[276]

Thus, the Amendment's enactors likely did not think they were resolving the issue of citizenship in imperial possessions because it was not an issue at the time. Nonetheless, as described above, they picked language that happened to resolve it because, at the time, the phrase "in" the United States included territories under the permanent sovereignty of the United States, without distinctions.[277]

The same can be said of including as citizens U.S.-born children of persons not lawfully present in the United States. Citizenship of such persons was not an issue at the time of enactment. Materially restrictive federal immigration law did not begin until the 1880s.[278] It is true that some aliens were excludable under existing federal law, specifically the Alien Enemies Act, which allowed exclusion of nationals of countries at war with the United States.[279] States also typically

---

272. *See id.* at 105–08 (discussing Alaska). As discussed, the United States had previously acquired a number of uninhabited "guano islands." *See supra* note 55.

273. *See* SAMUEL FLAGG BEMIS, A DIPLOMATIC HISTORY OF THE UNITED STATES 313–19 (5th ed. 1965) (discussing U.S. efforts to acquire Cuba before the Civil War).

274. *See* CHERNOW, *supra* note 56, at 691.

275. *See id.* at 691–99, 719. Similarly, opposition to Grant's project, especially from Southern Democrats, focused on the negative (from their perspective) prospect of extending citizenship to nonwhites. *See* ERMAN, *supra* note 2, at 8–26.

276. *See* ERMAN, *supra* note 2, at 8–26; *supra* Section II.A.4. *But see* Vlahoplus, *supra* note 5, at 420–22 (showing in connection with discussions on the status of the Oregon territory that some congressmen considered holding distant territories as colonies, reservations for nonwhites, or military or commercial bases rather than states).

277. *See* Fleming v. Page, 50 U.S. (9 How.) 603, 614–16 (1850); *supra* Section II.A. One might argue, though, that the concept of imperial possessions of other powers, especially Britain, was well understood at the time, and thus the Amendment adopted the expansive British approach to subjectship.

278. *See, e.g.*, Fong Yue Ting v. United States, 149 U.S. 698, 714–20 (1893) (discussing and upholding anti-Chinese immigration laws); Chae Chan Ping v. United States, 130 U.S. 581, 589, 611 (1889) (same).

279. *See* Act of July 6, 1798, ch. 66, 1 Stat. 577; NEUMAN, *supra* note 7, at 40–41. The federal government also briefly regulated aliens in the controversial Alien Friends Act, which was passed in 1798 and expired in 1800. *See* Act of June 25, 1798, ch. 58, 1 Stat. 566; NEUMAN, *supra* note 7, at 40–

Electronic copy available at: https://ssrn.com/abstract=3681119

excluded certain classes of persons, such as vagrants and sometimes free persons of African descent.[280] But the Alien Enemies Act does not appear to have been invoked broadly to exclude aliens; exclusion from a state was not the same as exclusion from the United States, and in any event, the question of excluded persons' U.S.-born children appears to have been entirely hypothetical at most.[281]

In this respect, the category of U.S.-born children of persons not lawfully present is distinct from another modern debated category: U.S.-born children of temporary visitors. The issue of temporary visitors was well understood in the nineteenth century. Although international travel was nowhere near its modern volume, it was not negligible. Chief Justice Marshall specifically referred to jurisdiction over temporary visitors in *Schooner Exchange*, and the citizenship of a temporary visitor's U.S.-born child was the immediate question in the mid-century New York case *Lynch v. Clarke*—which itself was cited in the Citizenship Clause's drafting debates.[282] When the enactors picked the phrase "subject to the jurisdiction," they can be understood to have deliberately resolved the question of temporary visitors' U.S.-born children. Those visitors and their children were part of the existing citizenship debate, and they were undoubtedly subject to U.S. jurisdiction in the meaning of that phrase at the time, as Marshall indicated directly in *Schooner Exchange*.[283] Enforcing the phrase's original meaning in modern law regarding these children enforces the enactors' deliberate policy choice.

The phrase "subject to the jurisdiction" equally includes the U.S.-born children of persons not lawfully present. But in contrast, we cannot conclude that enforcing the phrase's original meaning in modern law regarding those children enforces a policy choice of the enactors. As Professor Cristina Rodríguez asks:

---

41; *see also* John Vlahoplus, *Apportionment, Allegiance, and Birthright Citizenship*, BRIT. J. AM. LEGAL STUD. (forthcoming) (manuscript at 3–5) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3727525) (discussing other early immigration restrictions).

280. *See* NEUMAN, *supra* note 7, at 20–43.

281. *See id.* at 41–43, 176–77. *Compare* SCHUCK & SMITH, *supra* note 7, at 95 (concluding, with some overstatement, that "no illegal aliens existed at [the] time [of the Fourteenth Amendment], or indeed for some time thereafter"), *with* NEUMAN, *supra* note 7, 176–80 (disputing this argument). Professor Neuman argues that the category of persons not lawfully present in the United States was actually larger because it included slaves brought into the United States illegally after the slave trade's prohibition in 1808. NEUMAN, *supra* note 7, at 178–79. Such persons undoubtedly existed, but their relevance is doubtful. First, they were brought involuntarily and so are not analogous to modern undocumented immigrants. Their illegality pertained to their status as slaves, not to their presence in the United States. Second, the Clause's drafters seem deliberately to have ignored them. The Clause's central purpose, as everyone understood, was to ensure that freed slaves were citizens. Yet the Clause plainly did not give citizenship to slaves brought into the United States illegally after 1808, because they were not born in the United States. No one addressed or attempted to resolve this problem. It seems that the drafters chose to treat all former slaves as born in the United States (a reasonable practical solution as it would have been difficult to distinguish the categories in practice).

282. *See* CONG. GLOBE, 39th Cong., 1st Sess. 1832 (1866) (statement of Rep. Lawrence) (quoting *Lynch* for the proposition that "children born here are citizens without any regard to the political condition or allegiance of their parents"); *see also id.* at 2769 (statement of Senator Fessenden) (specifically raising the question of the citizenship of children of temporary visitors).

283. *See* 11 U.S. (7 Cranch) 116, 144 (1812); *supra* notes 153–56 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=3681119

> [H]ow do we treat the original meaning of a constitutional provision when the source of constitutional debate today stems from a set of facts that could only have been perceived dimly, if they were considered at all, at the time the provision was drafted and ratified (whether the Clause extends to children of unauthorized immigrants—a category of persons that did not exist in 1868)?[284]

The Citizenship Clause is distinct from several related situations that are sometimes thought to be problematic for originalism but in fact are not. One is when the original meaning does not address a contentious modern issue because that issue was not recognized at the time of enactment. Some versions of constitutional interpretation might suggest that we attempt to resolve the issue as the enactors would have, had they thought about it. The argument in this situation is that the text does not go as far in constraining modern governmental actors as the Framers would have wanted it to, had they understood modern conditions.[285] But, even apart from the extreme practical difficulty of this approach, it does not seem required by or consistent with originalism's constraint principle. If a text's original meaning does not address an issue, the correct conclusion (from an originalist perspective) is that the issue is left to the political process. The Citizenship Clause is different because its original meaning *does* address and resolve the key issues by requiring the political branches to recognize certain categories of people as U.S. citizens. The challenge is not that the language fails to resolve the issue; the challenge is that the language resolves the issue accidentally.

The puzzle of the Citizenship Clause is also distinct from the issue of general language adopted in response to a specific problem. Justice Scalia and Bryan Garner described that issue as follows:

> Some think that when courts confront generally worded provisions, they should infer exceptions for situations that the drafters never contemplated and did not intend their general language to resolve. These people want courts to approach general words differently from how they approach words that are narrow and specific. Traditional principles of interpretation reject this distinction because the presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions. It is true that literal meaning is more readily discernible when the provisions are concrete and specific than when they are abstract and general, and one is right to hesitate and ponder before deciding that a specific factual situation falls

---

284. Rodríguez, *supra* note 13.

285. An arguable example is thermal imaging for purposes of law enforcement. The Constitution does not appear to restrict police observation of private property from public streets. That policy choice does not address highly intrusive methods of observation, such as thermal imaging, of which the enactors were unaware. In *Kyllo v. United States*, Justice Scalia, writing for the Court, nonetheless found constitutional protection against thermal imaging under the Fourth Amendment. 533 U.S. 27, 40 (2001). But arguably the better originalist view is that the Constitution did not address the issue and so left it to the political branches. *See* Michael D. Ramsey, *Beyond the Text: Justice Scalia's Originalism in Practice*, 92 NOTRE DAME L. REV. 1945, 1963–64 (2017) (discussing *Kyllo*).

Electronic copy available at: https://ssrn.com/abstract=3681119

within the coverage of a general provision. But in the end, general words are general words, and they must be given general effect.[286]

On first reading, this "general-terms canon"[287] seems to encompass the Citizenship Clause, which—though motivated by the condition of the freed slaves—was written in general terms. Closer attention reveals that there are actually two distinct situations, one more difficult than the other.

All the examples Scalia and Garner give of the general-terms canon are ones in which the general application was understandable to and foreseeable by the enactors. As one illustration, they argue that, under the general-terms canon, the term "persons" in the Fourteenth Amendment's Equal Protection Clause applies to all persons, not just to persons of African ancestry or to men.[288] Similarly, they approve of a case holding that the phrase "any property, including money" in a forfeiture statute meant real as well as personal property.[289] These examples seem correct (even self-evident). But they are unlike the Citizenship Clause because they involve issues known to and foreseeable by the enactors. Whether all persons should be given equal protection, or whether forfeitable property should include real property, would have been part of ordinary legal discourse at the time of enactment. One may be unable to prove the enactors thought about the specific consequences of their general language as to these situations, but ordinary usage would extend to them. Thus, the explanation Scalia and Garner suggest—that choosing general language indicates a choice to generally resolve questions without considering them individually—makes sense and allows us to say that we are resolving matters in accord with the enactors' choices. In the case of the Citizenship Clause, however, the general language is asked to cover situations unlike anything generally understood or foreseeable at the time of enactment. Scalia and Garner's opening discussion seems to include such extensions as well, but their supporting discussion does not appear to recognize the distinction or justify the further extension.[290]

The Citizenship Clause also differs from the application of original meaning to changed technology. For example, one might question the First Amendment's application to speech over the Internet or the Second Amendment's application to modern firearms. Originalists, including Justice Scalia, have dismissed such objections with an explanation similar to the justifications for the general-terms canon.[291] Enactors know that technology will change, and they do not suppose

---

286. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101, 103 (2012).

287. *Id*.

288. *Id*. at 101–02.

289. *Id*. at 103 (citing United States v. S. Half of Lot 7 & Lot 8, 910 F.2d 488 (8th Cir. 1990) (en banc)).

290. *See id*. at 101–02.

291. *See* District of Columbia v. Heller, 554 U.S. 570, 582 (2008) (rejecting arguments "bordering on the frivolous" that arms not in existence in the eighteenth century are not protected by the Second Amendment).

Electronic copy available at: https://ssrn.com/abstract=3681119

that their enactments will lose relevance as a result of that change. The general principle that the enactment reflects remains applicable and appropriate. Resolving the issues presented by the new technology is not accidental. It follows from the general language adopted (as in the ordinary application of the general-terms canon). The Citizenship Clause, in contrast, entails a new factual issue whose resolution is a fortuity of the language selected.[292]

### B. ORIGINALISM AND ACCIDENTAL OUTCOMES

We can now turn to the central question of this Part, which is how originalism justifies adherence to the constraint principle where the rule provided by the Constitution's text does not reflect a policy choice (explicit or implicit) of the enactors. To be clear, these are situations—as with the Citizenship Clause—in which the text's original meaning constrains the political branches even though the constraint in question was neither understood by the enactors nor foreseeable by the people of the enactment era; that is, the constraint is an accidental result of language selected for other reasons.

Several common justifications for originalism seem unhelpful here. Although perhaps less common in modern academic writing, a frequent claim in political commentary is that modern law should respect the wisdom of the Framers. A more sophisticated version invokes the framework in which the Constitution was adopted. For example, John McGinnis and Michael Rappaport argue that the supermajority process required to adopt constitutional provisions tends to produce good results.[293] A related idea is that adopting or amending the Constitution occurs in an atmosphere in which people undertake unusually thoughtful reflection on long-term goals and structures, in contrast to ordinary short-term political thinking.[294]

Though somewhat distinct, these approaches share a common feature: they suppose that adherence to original public meaning produces (on balance) desirable substantive outcomes due to the way the text was adopted as law. Invoking the constraint principle against the policy preferences of modern political actors is justified by the results. But this justification seems inadequate in situations where the enactors did not choose the constraint that is now applied. In the case of the Citizenship Clause, for example, it seems likely that the enactors did not understand the policy questions involving birth in overseas territories or birth to persons not lawfully present in the United States. Invoking the constraint principle to resolve these policy questions (instead of leaving them to the political branches) is difficult to justify on the basis of the enactors' wisdom or the

---

292. As discussed in the next Section, however, the line between these categories may not always be clear. For example, it is not clear that the general-terms canon adequately resolves the development of previously unimaginable paradigm-shifting technology.

293. *See* JOHN O. MCGINNIS & MICHAEL B. RAPPAPORT, ORIGINALISM AND THE GOOD CONSTITUTION 33 (2013); John O. McGinnis & Michael B. Rappaport, *Our Supermajoritarian Constitution*, 80 TEX. L. REV. 703, 710 (2002).

294. *See generally* 1 BRUCE ACKERMAN, WE THE PEOPLE: FOUNDATIONS (1991).

Electronic copy available at: https://ssrn.com/abstract=3681119

enactment's structural advantages. The text's resolution of the policy questions arises from fortuity, not choice.

A second family of justifications for originalism is rooted in popular sovereignty. Regardless of the desirability of the enactors' choices, those choices should (it is said) be honored because they were made through a democratic process encompassing the people's will. Professor Michael McConnell argues that "[t]he people's representatives have a right to govern, so long as they do not transgress limits on their authority that are fairly traceable to the constitutional precommitments of the people themselves, as reflected directly through text and history, or indirectly through long-standing practice and precedent."[295] Or as Professor Ilan Wurman puts it:

> "We the People" enacted the Constitution in a public act of ratification, and because the Constitution is thus clothed with the consent of the governed, we must continue to adhere to it today. We may, of course, always call for another constitutional convention or pursue the amendment process to enact constitutional change. Until the Constitution is changed in one of those two ways . . . we owe it our obedience because "We the People" consented to it.[296]

Again, though, it is not clear why modern political actors should be bound to outcomes not deliberately chosen by "We the People" at the time of enactment. Professor McConnell refers to "constitutional precommitments of the people," but presumably he means *deliberate* constitutional precommitments of the people rather than inadvertent and accidental ones.[297] At least for purposes of this discussion, however, we are proceeding on the understanding that "We the People" in adopting the Fourteenth Amendment did not foresee (and could not have foreseen) that they were adopting any substantive resolution of key modern debates over the Citizenship Clause's scope (namely its extension to insular territories and U.S-born children of undocumented immigrants). "We the People" adopted text that, given its original meaning, would resolve those debates, but that outcome is a fortuity of the language chosen, not a deliberate constitutional precommitment.

That being so, it is not clear why modern opponents of broad readings of the Citizenship Clause have become mired in detailed examination of the Amendment's drafting debates. Why is their argument not that original meaning originalism's constraint principle should apply only to situations in which the

---

295. Michael W. McConnell, *The Importance of Humility in Judicial Review: A Comment on Ronald Dworkin's "Moral Reading" of the Constitution*, 65 FORDHAM L. REV. 1269, 1291 (1997); *see also, e.g.*, ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 38 (1997) (making similar arguments).

296. WURMAN, *supra* note 8, at 59. For a defense of popular sovereignty justifications for originalism, see KEITH E. WHITTINGTON, CONSTITUTIONAL INTERPRETATION: TEXTUAL MEANING, ORIGINAL INTENT, AND JUDICIAL REVIEW 110–60 (1999).

297. *See* McConnell, *supra* note 295.

Electronic copy available at: https://ssrn.com/abstract=3681119

enactors made a deliberate policy choice?[298] One might say that the best originalist way to effectuate the Framers' enactment is to apply it to constrain the political branches only in the paradigm situations the enactors understood and confronted.[299] Thus, in the case of the Citizenship Clause, one might say that it should be read to have guaranteed citizenship only to the paradigm categories of freed slaves, children of U.S. citizens, and (probably) U.S.-born children of lawful permanent residents, while leaving further extensions or nonextensions to the political branches. And why should that argument not be persuasive?[300]

We may identify at least two related reasons why it is not. The first is modern originalism's core commitment to rule of law values—specifically (in the case of a written document) to the rule of written law. Professor Solum discusses this commitment at length in justifying the constraint principle.[301] Rule of law values such as stability, objectivity, and predictability are served by following the text's original meaning even if that meaning constrains modern political actors in ways not foreseeable by the enactors.[302]

Originalism's rule of law commitment also arises from formalistic understandings of what the law is. This commitment underlies Justice Scalia's pioneering

---

298. As noted, Professors Schuck and Smith seemed to rely centrally on the novelty of undocumented immigration as a modern issue in support of reinterpreting the Citizenship Clause. *See* SCHUCK & SMITH, *supra* note 7, at 95. But, perhaps reflecting modern originalism's shift to original meaning analysis, more recent arguments for narrowly reading the Citizenship Clause strongly focus on historical understandings of the text. *See, e.g.*, Eastman, *supra* note 7, at 170–78 (focusing on the history of the Citizenship Clause); Mayton, *supra* note 7, at 240–53 (same); Anton, *Response*, *supra* note 86 (same).

299. This position might be especially attractive to approaches that combine originalism with a strong element of judicial restraint or deference to the political branches. *See generally, e.g.*, J. HARVIE WILKINSON, III, COSMIC CONSTITUTIONAL THEORY: WHY AMERICANS ARE LOSING THEIR INALIENABLE RIGHT TO SELF-GOVERNANCE (2012).

300. The argument might be persuasive to the earlier version of originalism focused on original intent rather than original public meaning. Robert Bork, for example, argued that we should "take from the [Constitution] rather specific values that text or history show the framers actually to have intended and which are capable of being translated into principled rules." Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 IND. L.J. 1, 17 (1971). Although this intent-based version of originalism retains modern adherents, *see, e.g.*, Alexander, *supra* note 12; Kay, *supra* note 12, it has been widely supplanted by the idea of original textual meaning. As a result, the present discussion focuses on the Clause's challenges under the original meaning approach.

It is also not clear that original intentions originalism solves the challenge of the Citizenship Clause. Typically, original intentions are deployed to resolve ambiguities. But the Citizenship Clause is not ambiguous (as to the central points made above), and its drafters apparently intended it to have the meaning that it had at the time. The problem is that they did not understand how their intended meaning would resolve a future policy debate that they did not anticipate. In these circumstances, it is not clear that a lack of intent would overcome unambiguous language.

A competing answer might be that we can discern a broader principle of egalitarianism or inclusivity in the Amendment that should lead us to broad readings of the Citizenship Clause. *See* Epps, *supra* note 7, at 389–90; Rodríguez, *supra* note 13, at 1365. These arguments are likewise incompatible with the methodology of original meaning originalism.

301. *See* Solum, Constraint Principle, *supra* note 268, at 54–72. Notably, Professor Solum puts little weight on consequentialist or popular sovereignty justifications. *See id.* at 81–82.

302. *See* WURMAN, *supra* note 8, at 37 (identifying "[p]redictability, fairness, consistency, and stability" as values that are "served by treating the meaning of the words as authoritative").

Electronic copy available at: https://ssrn.com/abstract=3681119

shift from original intentions to original meaning. The law, he insisted, is what was enacted—namely, the text, not the intentions.[303] A formalist conception of law requires that the text be applied to the full extent of its meaning even if that goes beyond (or not as far as) the enactors' design.[304]

Originalism's commitment to formalism and the rule of law is not incompatible with commitments to the wisdom of the Framers, the structure of the enactment process, or the idea of popular sovereignty. In many—perhaps most—cases, the justifications will run in parallel. Commitment to the text's original meaning does commonly validate these other justifications because the text is (usually) the best evidence of the enactors' understandings. But as the Citizenship Clause indicates, original meaning and the enactors' design will sometimes diverge. At that point, rule of law considerations appear to dominate and justify public meaning originalism's adherence to the text without exception.

An important practical concern reinforces categorical adherence to original meaning in these situations. To this point, we have assumed that it is possible to clearly separate the situations in which the enactors deliberately resolved a modern policy choice and the situations in which they resolved it only accidentally. For example, it seems reasonably likely that the Citizenship Clause's enactors understood the issue of U.S.-born children of temporary visitors and deliberately resolved it (albeit through general language) but that they could not foresee (and therefore did not deliberately resolve) the issue of U.S.-born children of persons not lawfully present. But even these situations may not be so easily characterized. The enactors may not have fully appreciated the issue of U.S.-born children of temporary visitors (although such children undoubtedly existed at the time), and some authorities argue that the enactors did understand (or could have understood) the question of U.S.-born children of persons not lawfully present.[305] The Citizenship Clause's application to U.S. overseas territories may be even harder to categorize. This Article's preceding discussion argues that the idea of "unincorporated" possessions was not understood, and therefore not deliberately resolved, by the enactors.[306] But Professor Sam Erman, a leading authority in this field, can be read as arguing that the idea was at least implicitly understood and rejected by the enactors.[307]

Moving beyond the Citizenship Clause, the categorization difficulties become even more apparent. What if the enactors deliberately chose to constrain the political branches in a certain way, but new policy considerations, not present at the time of enactment, arise to suggest that the policy decision has additional dimensions the enactors could not foresee? For example, assume that the original

---

303. *See* Antonin Scalia, Original Meaning, Speech Before the Attorney General's Conference on Economic Liberties (June 14, 1986), *in* SCALIA SPEAKS: REFLECTIONS ON LAW, FAITH, AND LIFE WELL LIVED 180, 184–85 (Christopher J. Scalia & Edward Whelan eds., 2017).

304. *See id.*; *see also* Kesavan & Paulsen, *supra* note 91, at 1127–33 (discussing the primacy of text in modern originalist theory).

305. NEUMAN, *supra* note 7, at 176–80; Vlahoplus, *supra* note 283.

306. *See supra* Section II.A.

307. *See* ERMAN, *supra* note 2, at 8–26.

Electronic copy available at: https://ssrn.com/abstract=3681119

meaning of Congress's power to declare war constrains the President from initiating military hostilities without Congress's approval.[308] But perhaps aspects of military conflict (or of Congress) have changed so that the same policy questions are not presented today as they were in the eighteenth century. One might say the enactors did not make a deliberate choice to constrain the President as to military situations unlike anything they could foresee and therefore that the Constitution leaves the question of presidential war power to the political branches and the political process.

Pursuing such inquiries necessarily injects considerable uncertainty and subjectivity into the interpretive process. Originalism applied with such qualifications may come to resemble non-originalism and may cease to provide any dependable constraint on judges or the political branches. Originalism's commitment to rule of law values will sharply oppose such moves as undermining objectivity, stability, and predictability; originalism's formalism will insist that the solution is the (relatively) concrete rule of original textual meaning, irrespective of whether that meaning reflects a deliberate policy choice of the enactors.

Again, this approach is compatible with other justifications for originalism. Those who rest originalism on the Framers' wisdom may believe that, on balance, the best way to effectuate the Framers' wisdom is to apply the Framers' text categorically, even to situations in which it may appear that the Framers did not make a deliberate policy choice. The alternative is case-by-case evaluation of the text's compatibility with the Framers' choices, which, in addition to being unstable and unpredictable, may—due to institutional limitations and bias—not deliver superior results. Thus, other justifications for originalism may combine with and complement originalism's formalism, rather than stand as an alternative to it. But as the Citizenship Clause indicates, formalism is originalism's core.

CONCLUSION

This Article seeks to make three contributions to the debate over constitutional citizenship. First, it provides an original meaning account of the disputed parts of the Fourteenth Amendment's Citizenship Clause. The Clause may seem unclear as to its geographic scope (what counts as "born . . . in the United States") and its jurisdictional exclusion (which persons, though born in the United States, are not born "subject to the jurisdiction thereof").[309] An original meaning approach, focused in particular on the meaning of these phrases prior to the Amendment's enactment, provides a clear resolution. Places were considered "in" the United States if they were under formal permanent U.S. sovereignty; this understanding did not, however, extend to places under temporary or conditional occupation.[310] Persons were "subject to the jurisdiction" of the United States if they were within U.S. territory, with exceptions for those legally or practically excluded from U.S.

---

308. *See* Michael D. Ramsey, *Textualism and War Powers*, 69 U. CHI. L. REV. 1543, 1545–46 (2002) (making this argument).

309. *See* U.S. CONST. amend. XIV, § 1.

310. *See supra* Section II.A.

Electronic copy available at: https://ssrn.com/abstract=3681119

sovereign authority—most notably, diplomatic personnel, who were exempt from local territorial jurisdiction under international law, and Native American tribes, who were (partially) exempted from U.S. jurisdiction by treaties or practicalities.[311]

The Citizenship Clause's history and purpose confirm its textual meaning. Its central purpose was, of course, to overrule *Dred Scott* and confirm U.S. citizenship for the recently freed slaves and other Americans of African ancestry. But its drafters deliberately wrote in general terms to provide, as House Speaker Colfax said during the ratification process, "that every person—every man, every woman, every child—born under our flag, or nationalized under our laws, shall have a birthright in this land of ours."[312] They saw themselves continuing the common law of *jus soli* citizenship that prevailed before the Amendment (and confirming it to people of African descent)—hence the common observation that the Clause constitutionalized existing law. And when they discussed exceptions to the broad rule, they focused on the two well-established ones in pre-Amendment law: diplomatic personnel and unassimilated Native Americans.[313] In contrast, when opponents of the proposed clause objected that it would confirm citizenship for U.S.-born children of Chinese immigrants, supporters did not dispute that reading, which was consistent with the pre-enactment common law view that aliens' U.S.-born children were U.S. citizens without regard to the status of their parents.[314]

Leading counterarguments rely on debatable excerpts from the drafting debates, philosophical arguments about the nature of citizenship, and policy-based arguments about the difficulties arising from broad interpretations of the Clause. But these arguments neither provide an alternate account of the Clause's textual meaning nor call the most evident textual meaning into substantial doubt. In an original meaning approach, they do not appear sufficient to overcome the apparent textual meaning, either as to the geographic scope of the Clause or as to its jurisdictional exclusion.

This Article's second point is that the Clause's original meaning provides a definite solution to contested modern issues. As to geographic scope, the original meaning indicates that the Clause extends to birth in U.S. overseas territories (if they are under U.S. permanent sovereignty), contrary to the conclusion of recent litigation.[315] As to the jurisdictional exclusion, the original meaning indicates that the Clause does not exclude U.S.-born children of temporary visitors or of persons not lawfully present in the United States.[316] In the nineteenth-century

---

311. *See supra* Section II.B. As discussed, foreign sovereigns and foreign armies were also exempt from local jurisdiction as a matter of international law, and Native Americans on the frontier, even if not part of treaty arrangements, were as a practical matter beyond U.S. jurisdiction. *See supra* Section II.B.

312. Colfax, *supra* note 111.

313. *See supra* Sections II.B.2.a–b.

314. *See supra* Section II.B.2.c.

315. *Supra* Section II.A; *see also* Tuaua v. United States, 788 F.3d 300, 310 (D.C. Cir. 2015) (rejecting U.S. citizenship claims of persons born in American Samoa).

316. *Supra* Section II.B.

Electronic copy available at: https://ssrn.com/abstract=3681119

meaning, these persons were "subject to the jurisdiction" of the United States as a result of their presence in U.S. territory, and they do not fall within (nor are they analogous to) excluded categories recognized at the time of enactment. Some modern commentary has argued that original meaning analysis cannot provide definite answers to contested modern questions.[317] The Citizenship Clause thus appears to provide a counterexample.

It may be true that the policy implications of broad readings of the Citizenship Clause have changed substantially since ratification—a point emphasized by the Supreme Court in the *Insular Cases* with respect to overseas territories and by modern commentators with respect to U.S.-born children of persons not lawfully present in the United States. It is likely also true that the enactors of the Citizenship Clause did not directly consider either of these matters; the United States had no material overseas possessions at the time the Amendment was drafted, and restrictive federal immigration law did not as a material matter arise for several decades afterward. Original meaning analysis, however, does not regard these points as relevant. The decisive inquiry is the original meaning of the text and the application of that meaning to the modern issues—not the consequences of that application.

That conclusion leads to the Article's final point. Original meaning analysis seems to call for application of the text's original meaning even in situations in which the enactors did not foresee (and could not foresee) that their text would be decisive.[318] "Accidental outcomes" of original rules raise a substantial challenge in justifying the adoption of original meaning as the modern constitutional rule.[319] Some justifications for original meaning—particularly those resting on the enactors' wisdom or authority—seem to fit poorly with enforcing such accidental outcomes. This Article concludes that originalism's willingness to enforce accidental outcomes rests on formalist rule of law values of stability, foreseeability, and objectivity.

---

317. *E.g.*, ERIC J. SEGALL, ORIGINALISM AS FAITH 141–55 (2018).

318. *Supra* Part III.

319. To be clear, asking how original meaning would resolve a modern debate and asking whether original meaning is the best way to resolve modern debates are separate questions. *See* WURMAN, *supra* note 8, at 5 (noting this distinction).

Electronic copy available at: https://ssrn.com/abstract=3681119

# Birthright Citizenship and Undocumented Immigrants

by Ilya Somin

*November 25, 2024*

The incoming Trump administration may be preparing to deny citizenship rights to children of undocumented immigrants born in the United States. That's according to recent reporting, a statement on Nov. 11 by a presidential transition member helping develop the new administration's plans for the Justice Department, and a "Day One" video made by President-elect Trump during the campaign (incoming border czar Tom Homan also supports ending birthright citizenship). According to the *New York Times*, "the team plans to stop issuing citizenship-affirming documents, like passports and Social Security cards, to infants born on domestic soil to undocumented migrant parents in a bid to end birthright citizenship."

Such policies would be a blatant violation of the Fourteenth Amendment, both the text and the original meaning. Section 1 of the Amendment grants citizenship to anyone "born … in the United States and subject to the jurisdiction thereof." There is no exception for children of illegal migrants. There is broad agreement on that point among most constitutional law scholars, across the ideological and methodological spectrum.

That broad consensus is backed by longstanding Supreme Court precedent, going back to *United States v. Wong Kim Ark* (1898). As the Court explained in that case:

> The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications… of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes.

While *Wong Kim Ark* involved children of legal immigrants, the logic of the Court's holding is not limited to that scenario. It applies to children of undocumented immigrants, as well, and indeed to all children born on U.S. soil, other than those of foreign diplomats, soldiers of invading armies, and (at the time) certain members of Indian tribes. It is also backed by the original meaning of the Fourteenth Amendment. For example, Senator Jacob Howard, one of the key drafters of the amendment, stated that eligibility for birthright citizenship "will not, of course, include [children of] persons in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, *but will include every other class of persons*" (emphasis added). As others have pointed out, even the opponents of the citizenship clause understood its clear meaning. The purpose of the Citizenship Clause of Section 1 was to overturn the notorious holding of *Dred Scott v. Sanford*, where the Court had ruled that Black Americans could not be citizens. But the text goes beyond that context and prevents the federal government from denying citizenship to any children born in the United States, with a few narrow exceptions, none of which cover children of undocumented immigrants. Conservative originalist legal scholar Michael Ramsey provides an excellent overview of the text and original meaning in a 2020 *Georgetown Law Journal* article.

Section 1 does have one qualification. It restricts birthright citizenship to those children born in the United States who are "subject to the jurisdiction thereof." Some have argued that this exception excludes children of undocumented immigrants. But undocumented immigrants are obviously subject to U.S. jurisdiction in that they are subject to the authority of American law and can be sanctioned for violating it. In that obvious respect, they are different from foreign diplomats, who are exempt from such jurisdiction by virtue of having diplomatic immunity.

Undocumented immigrants do not, of course, have all the legal rights of citizens; some have argued that means they are not "subject" to U.S. jurisdiction. But that argument makes little sense. If lacking some of the rights possessed by citizens created an exemption from birthright citizenship, it would essentially gut the Citizenship Clause of Section 1. That theory would enable Congress to deny citizenship even to children of legal immigrants who are not yet citizens themselves. After all, they too lack some of the rights of citizens; for example, they do not get to vote or serve on juries.

If the Citizenship Clause covers only children of people who have the full rights of citizens, that would undermine the central purpose of the Clause, which was to reverse *Dred Scott*'s notorious holding that Black people – even those who were not slaves – could not be citizens of the United States. In [his infamous opinion in *Dred Scott*](), Chief Justice Roger Taney concluded that Black Americans could not be citizens in part precisely because they were denied various legal rights. As Taney pointed out, in most states free Blacks could not vote, could not serve on juries, and were barred from serving in the militia (including under the 1792 federal Militia Act, which limited militia service to white men). If such logic is applied to the Citizenship Clause, Congress or a state government could have prevented newly freed slaves and their children from becoming citizens simply by declaring that they were not entitled to vote, could not serve on juries, could not be members of the militia, and so on.

Judge James Ho, a Trump appointee to the U.S. Court of Appeals for the Fifth Circuit, has recently suggested a different potential rationale for excluding children of undocumented immigrants from birthright citizenship. In [a 2015 article](), Ho rightly argued that, under the original meaning of the Fourteenth Amendment, "[b]irthright citizenship [is]… protected no less for children of undocumented persons than for descendants of *Mayflower* passengers." In a 2006 [law journal article]() that discussed the original meaning at length, he also correctly observed:

> There is broad agreement … among most constitutional law scholars, across the ideological and methodological spectrum.

> The clause thus covers the vast majority of lawful and unlawful aliens. Of course, the jurisdictional requirement of the Citizenship Clause must do something – and it does. It excludes those persons who, for some reason, are immune from, and thus not required to obey, U.S. law. Most notably, foreign diplomats and enemy soldiers – as agents of a foreign sovereign – are not subject to U.S. law.

In a [recent interview](), however, he stated that "birthright citizenship obviously doesn't apply in case of war or invasion. No one to my knowledge has ever argued that the children of invading aliens are entitled to birthright citizenship. And I can't imagine what the legal argument for that would be."

The significance of this distinction depends on what qualifies as an "invasion." If it requires an organized armed attack on the United States, then virtually no children of undocumented immigrants today qualify as children of "invaders." But in a recent concurring opinion in a Fifth Circuit case, Judge Ho has suggested that illegal migration, as such, may qualify as an "invasion" under Article I, Section 10, Clause 3 of the Constitution, which states that "[n]o state shall, without the Consent of Congress, … engage in war, unless actually invaded, or in such imminent Danger as will not admit of delay." If he would apply that same definition of "invasion" to the Citizenship Clause, then citizenship could indeed be denied to children of undocumented immigrants.

Elsewhere I have explained why illegal migration, as such, does not qualify as "invasion" under Article I, Section 10, Clause 3, and other provisions of the original Constitution. The idea is contrary to the text and original meaning of the Constitution. As James Madison put it, "invasion is an operation of war." If courts were to equate illegal migration with invasion, that conclusion would have dire consequences, including allowing states to initiate war with foreign countries without congressional authorization, and giving the federal government nearly unlimited authority to suspend the writ of habeas corpus, and thereby detain people (including U.S. citizens) without charges (the Constitution allows suspension of the writ in times of "Rebellion or Invasion").

Michael Ramsey offers an additional reason to reject this equation in the case of the Citizenship Clause:

> The citizenship clause of the Fourteenth Amendment does not say anything directly about invasion. It gives constitutional citizenship to all persons "born … in the United States and subject to the jurisdiction thereof." The invasion issue arises from a longstanding rule in English law holding that invading armies were an exception to the general rule that people born in English territory were English subjects, because English sovereign authority could not operate in areas held by a hostile force. Thus the U.S. constitutional rule, derived for the English rule, would also not seem to apply to hostile armies within U.S. territory. That is, a person born under the control of a hostile army in U.S. territory was "born … In the United States" but not, as a practical matter, "subject to the jurisdiction thereof.…"

Applied to the situation of illegal immigration, it follows that the question is not whether the current situation at the southern border is an "invasion" within the meaning of Article I, Section 10.... The citizenship question is whether the children of persons present in the United States illegally are "subject to the jurisdiction" of the United States.

In this respect, children of persons present in the United States illegally are different from persons born subject to the control of a hostile army. The United States can and does exercise jurisdiction over the former, while it cannot, as a practical matter, exercise jurisdiction over the latter. And under the text of the Fourteenth Amendment, that is a critical difference.

Ramsey is right. Even if illegal immigration does somehow qualify as an "invasion" under Article I of the original Constitution, that would not justify denying birthright citizenship to children of undocumented immigrants.

Like concluding that illegal migration is "invasion," denying birthright citizenship to children of undocumented immigrants could have dire real-world consequences. It would make subject to deportation hundreds of thousands of children who have no home other than the United States. Deporting them would cause grave harm to these innocent people (who had no hand in breaking immigration law), and also damage our economy and society, which would lose those children's valuable contributions.

I have some normative reservations about birthright citizenship. Ideally, I would prefer access to citizenship, residency, and work rights to be less dependent on circumstances of birth. But Trump's apparent plan to deny citizenship to children of undocumented immigrants would exacerbate the flaws of the system, rather than alleviate them. And, even aside from normative considerations, it is clearly unconstitutional. If the new administration goes through with this proposal whether by executive action or legislation, courts should and most likely would strike it down.

*A few parts of this article are adapted from material previously published at the Volokh Conspiracy blog, hosted by Reason.*

*IMAGE: Text of the 14th amendment (Creative commons via Barkan Research)*

## About the Author(s)

### Ilya Somin

Ilya Somin (Bluesky - LinkedIn - X) is Professor of Law at George Mason University, B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute, and author of Free to Move: Foot Voting, Migration and Political Freedom.



**MONEY**

**Tesla**    Add Topic

# 'Kill Black people': Elon Musk's Tesla sued for racial abuse at electric vehicle plant



**Jessica Guynn**
USA TODAY

Published 3:51 p.m. ET Sept. 28, 2023 | **Updated 3:55 p.m. ET Sept. 28, 2023**

The Equal Employment Opportunity Commission is suing Elon Musk's electric vehicle maker Tesla for a pervasive pattern of racial abuse at one of its manufacturing plants and for retaliating against Black employees who complained about the stereotyping, hostility and slurs.

According to the lawsuit filed in federal court in Oakland Thursday, Black employees at Tesla's Fremont, California facility were routinely subjected to graffiti, swastikas, threats such as "'kill black people," and nooses on desks and other equipment, in bathroom stalls, in elevators and on new vehicles on the production line since 2015, the EEOC alleged.

Black employees described racist imagery as "frequent," "constant," "a regular thing," and occurring "too many times to count," the lawsuit alleged.

Employees who objected to the racial hostility were terminated, transferred or had their job duties changed, according to the lawsuit.

"Despite having actual or constructive knowledge of racial harassment and misconduct, Tesla failed and refused to take steps to address the behavior. Tesla failed to investigate complaints of racial misconduct. Tesla failed to adopt policies

or practices to ensure that its temporary workforce did not perpetrate racial harassment at the Fremont Factory," the EEOC lawsuit charged.

**Need a break?** Play the USA TODAY Daily Crossword Puzzle.

Tesla did not immediately respond to a request for comment.

The EEOC, which is charged with protecting the civil rights of Americans in the workplace, said it investigated Tesla after Chair Charlotte Burrows filed a commissioner's charge alleging that Tesla violated Title VII of the Civil Rights Act of 1964 by subjecting Black employees to an unlawful hostile work environment and retaliating against employees for opposing harassment.

Tesla revealed in April 2022 that it was being investigated by the EEOC.

A separate lawsuit brought by California's civil rights agency also accuses the company of ignoring pervasive racism against Black workers in Fremont and in other facilities.

In April, a federal jury in San Francisco ordered Tesla to pay about $3.2 million to a Black former employee after he won a racial harassment lawsuit. The award was far less than the $15 million he rejected when he asked for a new trial last year.

**Breaking** Senate votes to avert a government shutdown

# Donald Trump becomes 1st US president tried and convicted of crimes

Trump was charged with 34 counts of falsifying business records in New York.

By **Peter Charalambous** and **Ivan Pereira**
Video by **Jessie DiMartino**
May 30, 2024, 11:00 PM

   


Watch 24/7

**TRENDING**   Streaming News 24/7   NBCU Local Impact Grants   Pope Francis   St. Patrick's Da...

DONALD TRUMP

# President-elect Donald Trump is a convicted felon. Here are the rights he is set to lose

Donald Trump's no-penalty conviction in his New York hush money case makes him the first president with a felony conviction, with some of his rights impacted by the conviction

Published January 10, 2025 • Updated on January 10, 2025 at 11:13 pm

Log in or create a free profile to save articles



Donald Trump officially became a convicted felon with just 10 days before his inauguration. The judge in his hush money case sentenced the president-elect to an "unconditional discharge." NBC New York's Chris Glorioso reports.

President-elect Donald Trump doesn't have to go to jail, pay a fine or perform community service as a result of his [New York hush money conviction.](#) A judge ended the case Friday with a sentence of an [unconditional discharge](#), closing the case with no punishment.

But unless the conviction for falsifying business records is someday overturned, Trump will have felonies on his criminal record, which will affect some of his rights.

Here are some of the potential impacts and some things that won't change:

**Watch NBC 4 free wherever you are**

WATCH HERE

## Can Trump still vote?

Trump is registered to vote in Florida and he will be able to vote there.

**Get Tri-state area news delivered to your inbox with NBC New York's News Headlines newsletter.**

SIGN UP

Florida does bars people convicted of felonies from voting, but restores their right to vote after they have completed their sentence. People convicted of murder or a sex offense lose their right to vote permanently unless their rights are restored by a clemency board.

For people convicted of felonies in other states — like Trump — Florida only makes a person ineligible to vote if they lost their voting rights in the state where they were convicted. New York doesn't let a person convicted of a felony vote while they are incarcerated, but restores voting rights once that person is released.

**News**



**2 HOURS AGO**

'What should I do?': Mahmoud Khalil's wife captures arrest on video



**1 HOUR AGO**

Watch live as a new astronaut crew takes off for the space station

## Can Trump own a gun?

No. Under federal law, people convicted of felonies are not allowed to possess firearms.

## Does Trump have to give a DNA sample?

By law, every person convicted of a felony in New York must provide a DNA sample for the state's crime databank.

Samples are collected after sentencing, typically when a defendant reports to probation, jail or prison. Samples can also be taken by a court or police official.

It's a noninvasive process involving a swab along the inside of the cheek. State police analyze the cells and genetic material, creating a profile that is then entered into the databank.

There, technology takes over, performing automatic searches and comparing profiles of people convicted of crimes with profiles of DNA collected at crime scenes. Matches can be used to identify a suspect in an unsolved crime.

New York's databank contains profiles for more than 720,000 offenders and is connected to the FBI's Combined DNA Index System.

## Can Trump hold office with a felony conviction?

There is nothing in federal law that prevents a person from becoming president because they have been convicted of a crime. State laws vary on whether a person with a criminal record can run for state and local offices. Some require a pardon or expungement to run for office. There are no such limits to run for federal office.

## Can Trump travel outside the U.S.?

Yes. As president, Trump will have a diplomatic passport enabling him to travel to foreign countries for official business and can also keep a regular, or tourist passport. People sentenced to incarceration or probation can have their passports denied or revoked, but that isn't the case with Trump.

Some countries restrict or reserve the right to prohibit visits from people with felony convictions, including Canada, the United Kingdom and Israel.



A judge can sentence a defendant to unconditional discharge. What does that mean and how often is it used?

## Will this take away business opportunities?

Trump's felony conviction could bar him from holding liquor licenses, but that doesn't necessarily mean his golf courses and hotels will have to stop serving booze.

In New Jersey, for example, where Trump owns three golf courses, state law prohibits anyone who has been convicted of a crime "involving moral turpitude," from holding a liquor license.

But Trump's company has said his properties are all owned through corporate entities, and that he is not officer or director of any entity that holds any liquor licenses.

Trump's conviction could also bar him from reentering the casino business, if he wanted, because people with criminal records are typically unable to obtain gaming licenses. Trump once owned three casinos in Atlantic City, New Jersey, but no longer does.

## Can Trump get a pardon?

Only New York's governor has the power to pardon Trump for this conviction. Trump's case was tried in state court and involved violations of state law. Presidential pardons only apply to federal crimes.

It seems unlikely that Gov. Kathy Hochul, a Democrat, would pardon Trump. Asked last month if she would consider pardoning Trump, she didn't say yes or no, but noted that the pardon process requires several elements, including "remorse."

Trump says he did nothing wrong and has described the case against him as a "hoax" perpetrated by Democrats.

"No one will be treated any better, or any worse, by me when I make those life altering decisions as we're looking at petitions that are coming in throughout the year," Hochul said. "So, no one gets extra favors, no one gets treated worse."

This article tagged under:

**DONALD TRUMP** • **NEW YORK** • **POLITICS**



English

NEWS • PRESS RELEASES

# D.A. Bragg Announces 34-Count Felony Trial Conviction of Donald J. Trump

**Our Work** ›

**News** ⌄

MEDIA COVERAGE

PRESS RELEASES

NEWSLETTERS

DATA ›

REMARKS ›

VIDEO

**Victim Resources** ›

**Careers** ›

**About the** ›

MAY 30, 2024

*Jury Finds the Defendant Guilty of 34 Counts of Falsifying Business Records*

Manhattan District Attorney Alvin L. Bragg, Jr. today announced the all-count trial conviction of DONALD J. TRUMP, 77, for falsifying New York business records in order to conceal his illegal scheme to corrupt the 2016 election. TRUMP was convicted by a New York State Supreme Court jury of 34 counts of Falsifying Business Records in the First Degree. He is expected to be sentenced on July 11.

"Donald Trump is guilty of repeatedly and fraudulently falsifying business records in a scheme to conceal damaging information from American voters during the 2016 presidential election. Over the course of the past several weeks, a jury of 12 every day New Yorkers was presented with overwhelming evidence — including invoices, checks, bank statements, audio recordings, phone logs, text messages, and direct testimony from 22 witnesses — that proved beyond a reasonable doubt that Mr. Trump illegally falsified 34 New York business records. Mr. Trump went to illegal lengths to lie repeatedly in order to protect himself and his campaign. In Manhattan, we follow the facts without fear or favor and have a solemn responsibility to ensure equal justice under the law regardless of the background, wealth or power of the accused. The integrity of our judicial system depends on upholding that principle," said **District Attorney Alvin Bragg.**

reCAPTCHA
Privacy • Terms

Case 2:51-1588    Document 00132599983    Page 100    Date Filed 03/17/0085    Entry ID 6708887
D.A. Bragg Announces 34-Count Felony Trial Conviction of Donald J. Trump | Manhattan District Attorney's Office



**Office**

**Contact Us**

SEARCH 🔍

As proven at trial, TRUMP engaged in a scheme to corrupt the 2016 presidential election and went to extraordinary and illegal lengths to hide this conduct from the American voters and public, illegally causing dozens of false entries to be made in New York business records of his Manhattan-based company to conceal attempts to violate state election law.

The genesis of the scheme was a 2015 meeting at Trump Tower where an agreement was hatched between TRUMP, his former attorney Michael Cohen, and David Pecker, the CEO of American Media Inc. ("AMI"). TRUMP, David Pecker and Michael Cohen agreed that AMI would prevent damaging information about TRUMP from becoming public. AMI, which owned the National Enquirer, purchased stories as part of a "catch and kill" strategy in order to protect TRUMP.





In one instance, American Media Inc. paid $30,000 to a former Trump Tower doorman, who claimed to have a story about a child TRUMP had out of wedlock.

In a second instance, AMI paid $150,000 to a woman who alleged she had a sexual relationship with TRUMP.

In the weeks before the election, a video from the TV show Access Hollywood became public in which TRUMP was recorded on a hot mic saying in part, "You know, I'm automatically attracted to beautiful women, I just start kissing them, it's like a magnet, just kiss, I don't even wait, when you are a star they let you do it, you can do anything, grab them by the p****, you can do anything."

The following day, the Editor-in-Chief of the National Enquirer informed Michael Cohen that the adult-film actress Stormy Daniels was planning to come forward about a sexual encounter she had with TRUMP.

Cohen and TRUMP, knowing how devasting Daniels' story would be to the campaign, agreed to buy her story to defraud the voting public and prevent them from learning the information before Election Day. Cohen, with the approval of TRUMP, set up a shell company called Essential Consultants, LLC and wired $130,000 to Keith Davidson, the attorney for Stormy Daniels. Cohen

used false information and records to disguise the true nature of the shell company. Phone records shown at trial and testimony from witnesses proved that TRUMP was in the loop every step of the way.

After winning the election, TRUMP reimbursed Cohen through a series of monthly checks, first from the Donald J. Trump Revocable Trust – created in New York to hold the Trump Organization's assets during TRUMP's presidency – and later from TRUMP's bank account. In total, 11 checks were issued for a phony purpose. Each check was processed by the Trump Organization and illegally disguised as a payment for legal services rendered pursuant to a non-existent retainer agreement. In total, 34 false entries were made in New York business records to conceal the initial covert $130,000 payment. Cohen was paid $420,000 in total so he would be made whole on the payment, which was being disguised as income and therefore would be taxed.







HOURLY NEWS
LISTEN LIVE
MY PLAYLIST

  

DONATE

POLITICS

# Former President Trump is found guilty in historic New York criminal case

UPDATED MAY 30, 2024 · 7:34 PM ET

By Ximena Bustillo, Andrea Bernstein



Former President Donald Trump appears for his hush money trial at Manhattan Criminal Court on Thursday, before a jury of New Yorkers convicted him on 34 felony counts.

*Steven Hirsch/Pool/Getty Images*

*For live updates about the verdict,* follow NPR's live blog.

NEW YORK — Former President Donald Trump has been found guilty of 34 counts of falsifying business records to influence the outcome of the 2016 presidential election, a historic verdict as Trump, the presumptive Republican presidential nominee, campaigns again for the White House.

This is the first time a former or sitting U.S. president has been convicted of criminal charges.

On Thursday, 12 New York jurors said they unanimously agreed that Trump falsified business records to conceal a $130,000 hush money payment to adult-film star Stormy Daniels to influence the 2016 contest.

Sponsor Message

The decision came after about a day and a half of deliberations.



**POLITICS**
**4 takeaways from the historic felony conviction of Donald Trump**

As the verdicts were read, Trump remained silent and still. But the former president spoke to reporters outside the courtroom, calling the trial a "rigged, disgraceful trial" and saying that the "real verdict" will be rendered on Election Day.

Trump's legal team signaled it would appeal the conviction.

New York Judge Juan Merchan set sentencing for July 11 — just four days before the start of the Republican National Convention. Trump faces a maximum sentence of four years in prison, but as a first-time, white-collar offender, no prison time is necessary, and he could receive probation instead.

# The 34 felony counts in Trump's hush money trial



Invoices for legal services

*Guilty on 11 of 11 charges*

Checks paid for legal services

*Guilty on 11 of 11 charges*

Ledger entries for legal expenses

*Guilty on 12 of 12 charges*

*Source: New York State Unified Court System*

The jury heard from 22 witnesses during about four weeks of testimony in Manhattan's criminal court. Jurors also weighed other evidence — mostly documents like phone records, invoices and checks to Michael Cohen, Trump's once loyal "fixer," who paid Daniels to keep her story of an alleged affair with the former president quiet.

The facts of the payments and invoices labeled as legal services were not in dispute. What prosecutors needed to prove was that Trump falsified the records in order to further another crime — in this case, violating the New York election law that makes it a crime for "any two or more persons [to] conspire to promote or prevent the election of any person to a public office by unlawful means." The jurors were able to choose whether those unlawful means were violating the Federal Election Campaign Act, falsifying tax returns or falsifying other business records.

Trump's defense focused intently on the credibility of Cohen and argued that influencing an election is not illegal.

The verdict came more than a year after a grand jury indicted Trump on March 30, 2023, marking the first time a former or sitting president faced criminal charges.

Republicans dismissed the indictment as an overreach of power by Democratic District Attorney Alvin Bragg, who had brought the charges. On Thursday, following the conviction, Republican elected officials quickly rallied around Trump again.

At a news conference Thursday evening, Bragg said: "While this defendant may be unlike any other in American history, we arrived at this trial — and ultimately today at this verdict — in the same manner as every other case that comes through the courtroom doors: by following the facts and the law, and doing so without fear or favor."

## What the jury heard

In August 2015, two months after Trump announced his 2016 presidential bid, David Pecker, then the publisher of the *National Enquirer* tabloid, met with Trump and Cohen at Trump Tower, according to testimony from Pecker and Cohen.

At that meeting, Pecker testified, it was agreed that he would be the "eyes and ears" of the Trump campaign. His job was to look out for negative stories from women that he could "take off the marketplace" by buying up the rights to the stories but never publishing them.

The plan, as Pecker outlined it, was that he would suppress these stories and at the same time publish negative stories about Trump's opponents. Some of these stories, Pecker said, were sent to Trump and Cohen for approval prior to publication.

Over the next year, Pecker said, he carried out this role. His testimony was corroborated by Keith Davidson, an attorney who represented both Daniels and former *Playboy* model Karen McDougal. In about June 2016, McDougal considered

going public with her story of a yearlong affair with Trump. But Pecker bought the rights to that story, with the expectation that he would be reimbursed by Trump. That never happened.

In early October 2016, according to the testimony of former Trump communications aide Hope Hicks, the campaign was rocked by the release of the *Access Hollywood* tape, where Trump could be heard boasting, "When you're a star, they let you do it. You can do anything. Grab 'em by the p****."

The next day, according to Pecker, Cohen and Davidson, Daniels threatened to go public with accusations that she'd had a sexual encounter with Trump in 2006 in a Lake Tahoe hotel suite during a celebrity golf tournament.

In her testimony, Daniels said there was a "power imbalance" when, after leaving the suite's restroom, she found Trump on the hotel bed in his underwear. That's when, Daniels said, they had sex.

She testified that Trump had dangled a possible role on his TV show *The Celebrity Apprentice*. This detail — that the sex wasn't entirely wanted — caused the defense to request a mistrial, which was denied. It also provided a motive for Trump to suppress the story. Prosecutors said, "Trump knew what happened in that hotel room" and didn't want it to come out. The adult-film actor's testimony also included intimate details of her alleged sexual encounter, some of which Judge Merchan agreed with the defense were not necessary.

Donald Trump found guilty in hush money case : NPR

As October 2016 drew to a close, Cohen testified, he frantically opened bank accounts and tried to come up with a way to pay the $130,000 to keep Daniels quiet. But Trump, Cohen said, wanted to delay the payment until after the election, with the idea that after the election, it wouldn't matter whether Daniels was paid.

This point, that Trump was making the payment to influence the election by keeping women voters on board, was corroborated by a number of other witnesses. Hicks testified that Trump, by then in the White House, told her that it was better the story came out in 2018, rather than 2016.

Cohen ultimately wired the money himself to Daniels, with the understanding, he said, that he would be repaid by Trump. Cohen testified to a number of conversations with Trump, backed up by phone records, including on the day he wired the payments. But the defense rattled Cohen on cross-examination when it presented evidence that one of the calls that Cohen had said was made through Trump's bodyguard, Keith Schiller, was instead with Schiller about threats from a 14-year-old prankster.

Still, the heart of the case rested on the testimony of what happened after the election, when the records were falsified, in particular the handwritten notes and documents from the Trump Organization's former comptroller, Jeff McConney.

McConney authenticated a key record: the bank statement showing Cohen's wire transfer. That record included handwritten notes from Cohen and Trump's former

chief financial officer, Allen Weisselberg, describing the $130,000 payment that would be "grossed up" to cover Cohen's taxes. That sum, combined with another reimbursement and a bonus, for a total of $420,000, was paid out over 12 months at a rate of $35,000 per month.

The payments would be described as pursuant to a "legal retainer." (Weisselberg, who is serving jail time for perjury in Trump's civil fraud trial, did not testify.)

On the stand, Cohen described a repayment scheme that formed the basis of the 34 counts of falsified business records: 11 falsified invoices, 12 falsified ledger entries and 11 checks falsely recording the repayment as legal "retainers." Nine of the checks were signed by Trump himself.

Cohen said he and Weisselberg met and discussed the agreement with Trump shortly before he left for Washington, on or about Jan. 17, 2020. Cohen said Trump approved the deal, saying at the end of the meeting that "it was going to be one heck of a ride" in Washington. Cohen said he and Trump discussed the arrangement again, in early February, in the Oval Office. Photos and White House records corroborated that the two met in the Oval Office at the time.

The defense presented just two witnesses, including Robert Costello, an attorney who wanted to represent Cohen after Cohen's home and office were searched by the FBI in 2018. Costello had been put on the stand to refute Cohen's claim that Costello was pressuring Cohen to stay on Trump's "team." But Costello's emails showed that Trump was deciding which of Cohen's lawyers he wanted to pay and

that Costello was concerned about not giving "the appearance that we are following instructions from [Rudy] Giuliani or the president," referring to the former New York City mayor who was Trump's lawyer at the time.

---



POLITICS
**Trump verdict would likely move only a small number of votes, poll finds**

## How this conviction could affect the 2024 election

Trump has continually blasted any criminal charges he faces as "election interference" affecting his 2024 presidential campaign.

The hush money case likely is the only one of Trump's four ongoing criminal cases that will be heard ahead of Election Day in November, since federal trials in Washington, D.C., and Florida, as well as a state case in Georgia, are in various stages of delays.

This decision in New York is likely to have rippling effects as Trump campaigns as the presumptive Republican presidential nominee. For now, the other 54 criminal charges he faces have not turned off potential voters, and among some Republicans, the cases have bolstered support for him. However, a conviction may not play well with independent and swing voters.

The latest NPR/PBS NewsHour/Marist poll, from May, showed that 17% of voters surveyed said they would be less likely to vote for Trump if he were convicted, while 15% said they would be more likely to vote for him. And 67% of registered voters nationally said it makes no difference to their vote if Trump is found guilty in his hush money trial.

Ian Sams, spokesperson for the White House counsel's office, said in a statement: "We respect the rule of law, and have no additional comment."

President Biden's campaign, however, had a longer statement. "In New York today, we saw that no one is above the law," said spokesperson Michael Tyler. "There is still only one way to keep Donald Trump out of the Oval Office: at the ballot box. Convicted felon or not, Trump will be the Republican nominee for president."

---



## Can't keep up? We've got you.

Let the NPR Politics newsletter keep you up to speed and break it all down in one email.

| Email address | SUBSCRIBE |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR



**Trump calls his opponents 'scum' and lawbreakers in bellicose speech at Justice Department**

For more than an hour, he delivered an insult-laden speech that shattered the traditional notion of DOJ independence.

By **IRIE SENTNER** and **JOSH GERSTEIN**
03/14/2025 04:41 PM EDT
Updated: 03/14/2025 06:42 PM EDT

  

President Donald Trump on Friday walked into the Department of Justice and labeled his courtroom opponents "scum," judges "corrupt" and the prosecutors who investigated him "deranged."

With the DOJ logo directly behind him, Trump called his political opponents lawbreakers and said others should be sent to prison.

Advertisement

"I                                                                                                      1
a

While condemning officials who directed the military's withdrawal from
Afghanistan and repeating his false claims about the 2020 election being
stolen, Trump said: "The people who did this to us should go to jail."

In remarks that were by turns dark, exultant and pugnacious, Trump vowed to
remake the Justice Department and retaliate against his enemies, some of
whom he called "thugs."

It was, even by Trump's standards, a stunning show of disregard for decades of
tradition observed by his predecessors, who worried about politicizing or
appearing to exert too much control over the nation's most powerful law
enforcement agency. Trump, instead, called himself the "chief law enforcement
officer in our country" and accused the DOJ's prior leadership of doing
"everything within their power to prevent" him from becoming the president.

Trump charged the DOJ with spying on his campaign, raiding his home,
persecuting his "family, staff and supporters," launching "one hoax and
disinformation campaign after the other" and breaking the law "on a colossal
scale," making clear the glee he has taken in undermining the department's
typical independence and wielding it to achieve the White House's objectives.

Advertisement

"First, we must be honest about the lies and the abuses that have occurred
within these walls," Trump said. "Unfortunately in recent years, a corrupt
group of hacks and radicals within the ranks of the American government
obliterated the trust and goodwill built up over generations. They weaponized
the vast powers of our intelligence and law enforcement agencies to try and
thwart the will of the American people."

Those days, Trump said, "are over, and they are never going to come back. He
added that he would demand "full and complete accountability for the wrongs
and abuses that have occurred."

While any presidential visit to the Justice Department is a rarity, Trump repeatedly breached other norms in his remarks as he slammed former officials, unleashed attacks on private attorneys, and touted his vote tallies in last year's election.

"It's a campaign by the same scum you've been dealing with for years," Trump said of the lawyers and officials who have targeted him. "We will expel the rogue actors and corrupt forces from our government. … We will restore the scales of justice in our country."

The president sought to recast his fraught history with the department — most notably the two federal criminal cases he faced last year, one on charges of conspiring to overturn the results of the 2020 presidential election and the other for refusing to return a hoard of classified documents after he left office in 2021. Trump also bragged about revoking the security clearance of "deranged Jack Smith," the special counsel who indicted him in those cases. (Smith and the Justice Department abandoned both cases after Trump won reelection last year.).

Advertisement

Trump boasted about pardoning hundreds of "political prisoners who have been grossly mistreated," referring to the people convicted in connection with the pro-Trump mob that stormed the Capitol on Jan. 6, 2021. And he said "there was no better day" than when he fired James Comey, the president's first-term FBI director who investigated the 2016 Trump campaign's ties to Russia.

"What they've ripped down is incalculable," Trump said of the department's leaders under the Biden administration.

📣 Want more POLITICO? Download our mobile app to save stories, get notifications and more. In iOS or Android.

Trump critics said his decision to come to the Justice Department to deliver such strident attacks was the real source of damage to the department's traditions and its morale.

Trump calls his opponents "scum" and lawbreakers in address at Justice Department - POLITICO

"No president has ever given a speech at the Department of Justice like that, where he railed against his political foes and summoned up an agenda for totally political, partisan prosecution," Rep. Jamie Raskin (D-Md.) said. "It was an absolute desecration of the culture and history of the Department of Justice."

Raskin also ridiculed Trump's description of those charged in the Capitol riot as political prisoners. "He called the insurrectionists today political prisoners, like Aleksandr Solzhenitsyn or Nelson Mandela. What a joke," the lawmaker said.

Advertisement

Trump also used his visit to offer an effusive tribute to U.S. District Judge Aileen Cannon, who issued a ruling that tossed out the classified documents case against him. Prosecutors were appealing that decision when Trump prevailed at the polls last November.

"The case against me was bullshit and she correctly dismissed it," he said.

Noting that he had appointed her but did not know her personally, Trump praised Cannon as "brilliant" and credited her for standing her ground under withering criticism from the media and legal pundits. "She was very courageous and it only made her angry," the president said. "They were hitting her so hard it was hard to watch. ... She was the absolute model of what a judge should be."

And he said the Supreme Court's six conservative justices are treated "unbelievably badly" by Democrats opposing Trump's agenda.

Attorney General Pam Bondi introduced Trump by pledging that she and others at the department are fully engaged in his mission.

"We will never stop fighting for him and for our country," she said.

Before the president arrived, the audience heard from two other prominent Trump appointees at DOJ: Deputy Attorney General Todd Blanche and FBI Director Kash Patel. Both did their best to fire up the crowd by declaring that DOJ is heeding Trump's call to get tough on criminals and undocumented immigrants.

Advertisement

Despite Trump's repeated and bitter denunciations of his critics, at times Friday he appeared to say that he does not intend to instruct his appointees how to target his opponents but instead plans to trust them to use their judgment to achieve his goals.

"I don't do it. They do it," the president said, adding later that he might not return to the department again during his presidency.

Toward the end of his speech, Trump quoted an unlikely source.

"Etched onto the walls of this building are the words English philosopher John Locke said: 'Where law ends, tyranny begins,'" Trump said. "And I see that."

*CORRECTION: An earlier version of this report misidentified the people whom Trump said should go to prison.*

**FILED UNDER:** JUSTICE DEPARTMENT, DONALD TRUMP, PAM BONDI, LEGAL, TODD BLANCHE

## West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

EMAIL

Your Email

EMPLOYER

Employer

JOB TITLE

Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

Advertisement

SPONSORED CONTENT



Watch 24/7

TRENDING   Streaming News 24/7   NBCU Local Impact Grants   Pope Francis   St. Patrick's Da...

**DONALD TRUMP**

# President-elect Donald Trump is a convicted felon. Here are the rights he is set to lose

Donald Trump's no-penalty conviction in his New York hush money case makes him the first president with a felony conviction, with some of his rights impacted by the conviction

Published January 10, 2025 • Updated on January 10, 2025 at 11:13 pm

Log in or create a free profile to save articles



Donald Trump officially became a convicted felon with just 10 days before his inauguration. The judge in his hush money case sentenced the president-elect to an "unconditional discharge." NBC New York's Chris Glorioso reports.

President-elect Donald Trump doesn't have to go to jail, pay a fine or perform community service as a result of his New York hush money conviction. A judge ended the case Friday with a sentence of an unconditional discharge, closing the case with no punishment.

But unless the conviction for falsifying business records is someday overturned, Trump will have felonies on his criminal record, which will affect some of his rights.

Here are some of the potential impacts and some things that won't change:

**Watch NBC 4 free wherever you are**

WATCH HERE

## Can Trump still vote?

Trump is registered to vote in Florida and he will be able to vote there.

**Get Tri-state area news delivered to your inbox with NBC New York's News Headlines newsletter.**

SIGN UP

Florida does bars people convicted of felonies from voting, but restores their right to vote after they have completed their sentence. People convicted of murder or a sex offense lose their right to vote permanently unless their rights are restored by a clemency board.

For people convicted of felonies in other states — like Trump — Florida only makes a person ineligible to vote if they lost their voting rights in the state where they were convicted. New York doesn't let a person convicted of a felony vote while they are incarcerated, but restores voting rights once that person is released.

**News**

Case 25-1158    Document: 00118259910    Page: 127    Date Filed: 03/15/2025    Entry ID: 6706883



**2 HOURS AGO**

'What should I do?': Mahmoud Khalil's wife captures arrest on video



**1 HOUR AGO**

Watch live as a new astronaut crew takes off for the space station

## Can Trump own a gun?

No. Under federal law, people convicted of felonies are not allowed to possess firearms.

## Does Trump have to give a DNA sample?

By law, every person convicted of a felony in New York must provide a DNA sample for the state's crime databank.

Samples are collected after sentencing, typically when a defendant reports to probation, jail or prison. Samples can also be taken by a court or police official.

It's a noninvasive process involving a swab along the inside of the cheek. State police analyze the cells and genetic material, creating a profile that is then entered into the databank.

There, technology takes over, performing automatic searches and comparing profiles of people convicted of crimes with profiles of DNA collected at crime scenes. Matches can be used to identify a suspect in an unsolved crime.

New York's databank contains profiles for more than 720,000 offenders and is connected to the FBI's Combined DNA Index System.

## Can Trump hold office with a felony conviction?

3/14/25, 7:22 PM    What rights does Trump lose now that he's a convicted felon? – NBC New York

There is nothing in federal law that prevents a person from becoming president because they have been convicted of a crime. State laws vary on whether a person with a criminal record can run for state and local offices. Some require a pardon or expungement to run for office. There are no such limits to run for federal office.

## Can Trump travel outside the U.S.?

Yes. As president, Trump will have a diplomatic passport enabling him to travel to foreign countries for official business and can also keep a regular, or tourist passport. People sentenced to incarceration or probation can have their passports denied or revoked, but that isn't the case with Trump.

Some countries restrict or reserve the right to prohibit visits from people with felony convictions, including Canada, the United Kingdom and Israel.



A judge can sentence a defendant to unconditional discharge. What does that mean and how often is it used?

## Will this take away business opportunities?

Trump's felony conviction could bar him from holding liquor licenses, but that doesn't necessarily mean his golf courses and hotels will have to stop serving booze.

In New Jersey, for example, where Trump owns three golf courses, state law prohibits anyone who has been convicted of a crime "involving moral turpitude," from holding a liquor license.

But Trump's company has said his properties are all owned through corporate entities, and that he is not officer or director of any entity that holds any liquor licenses.

Trump's conviction could also bar him from reentering the casino business, if he wanted, because people with criminal records are typically unable to obtain gaming licenses. Trump once owned three casinos in Atlantic City, New Jersey, but no longer does.

## Can Trump get a pardon?

Only New York's governor has the power to pardon Trump for this conviction. Trump's case was tried in state court and involved violations of state law. Presidential pardons only apply to federal crimes.

It seems unlikely that Gov. Kathy Hochul, a Democrat, would pardon Trump. Asked last month if she would consider pardoning Trump, she didn't say yes or no, but noted that the pardon process requires several elements, including "remorse."

Trump says he did nothing wrong and has described the case against him as a "hoax" perpetrated by Democrats.

"No one will be treated any better, or any worse, by me when I make those life altering decisions as we're looking at petitions that are coming in throughout the year," Hochul said. "So, no one gets extra favors, no one gets treated worse."

This article tagged under:

**DONALD TRUMP** • **NEW YORK** • **POLITICS**

**Breaking** Senate votes to avert a government shutdown

# Donald Trump becomes 1st US president tried and convicted of crimes

Trump was charged with 34 counts of falsifying business records in New York.

By **Peter Charalambous** and **Ivan Pereira**
Video by **Jessie DiMartino**
May 30, 2024, 11:00 PM

   

3/4/25, 7:23 PM    Donald Trump is found guilty in hush money case : NPR



WAMU 88.5
On Air Now
MY PLAYLIST

  

DONATE

## POLITICS

# Former President Trump is found guilty in historic New York criminal case

UPDATED MAY 30, 2024 · 7:34 PM ET

By Ximena Bustillo, Andrea Bernstein



Former President Donald Trump appears for his hush money trial at Manhattan Criminal Court on Thursday, before a jury of New Yorkers convicted him on 34 felony counts.

*Steven Hirsch/Pool/Getty Images*

*For live updates about the verdict,* follow NPR's live blog.

NEW YORK — Former President Donald Trump has been found guilty of 34 counts of falsifying business records to influence the outcome of the 2016 presidential election, a historic verdict as Trump, the presumptive Republican presidential nominee, campaigns again for the White House.

This is the first time a former or sitting U.S. president has been convicted of criminal charges.

On Thursday, 12 New York jurors said they unanimously agreed that Trump falsified business records to conceal a $130,000 hush money payment to adult-film star Stormy Daniels to influence the 2016 contest.

Sponsor Message

The decision came after about a day and a half of deliberations.



**POLITICS**

**4 takeaways from the historic felony conviction of Donald Trump**

As the verdicts were read, Trump remained silent and still. But the former president spoke to reporters outside the courtroom, calling the trial a "rigged, disgraceful trial" and saying that the "real verdict" will be rendered on Election Day.

Trump's legal team signaled it would appeal the conviction.

New York Judge Juan Merchan set sentencing for July 11 — just four days before the start of the Republican National Convention. Trump faces a maximum sentence of four years in prison, but as a first-time, white-collar offender, no prison time is necessary, and he could receive probation instead.

## The 34 felony counts in Trump's hush money trial



**Invoices for legal services**

*Guilty on 11 of 11 charges*

**Checks paid for legal services**

*Guilty on 11 of 11 charges*

**Ledger entries for legal expenses**

*Guilty on 12 of 12 charges*

Source: *New York State Unified Court System*

The jury heard from 22 witnesses during about four weeks of testimony in Manhattan's criminal court. Jurors also weighed other evidence — mostly documents like phone records, invoices and checks to Michael Cohen, Trump's once loyal "fixer," who paid Daniels to keep her story of an alleged affair with the former president quiet.

The facts of the payments and invoices labeled as legal services were not in dispute. What prosecutors needed to prove was that Trump falsified the records in order to further another crime — in this case, violating the New York election law that makes it a crime for "any two or more persons [to] conspire to promote or prevent the election of any person to a public office by unlawful means." The jurors were able to choose whether those unlawful means were violating the Federal Election Campaign Act, falsifying tax returns or falsifying other business records.

Trump's defense focused intently on the credibility of Cohen and argued that influencing an election is not illegal.

The verdict came more than a year after a grand jury indicted Trump on March 30, 2023, marking the first time a former or sitting president faced criminal charges.

Republicans dismissed the indictment as an overreach of power by Democratic District Attorney Alvin Bragg, who had brought the charges. On Thursday, following the conviction, Republican elected officials quickly rallied around Trump again.

At a news conference Thursday evening, Bragg said: "While this defendant may be unlike any other in American history, we arrived at this trial — and ultimately today at this verdict — in the same manner as every other case that comes through the courtroom doors: by following the facts and the law, and doing so without fear or favor."

## What the jury heard

In August 2015, two months after Trump announced his 2016 presidential bid, David Pecker, then the publisher of the *National Enquirer* tabloid, met with Trump and Cohen at Trump Tower, according to testimony from Pecker and Cohen.

At that meeting, Pecker testified, it was agreed that he would be the "eyes and ears" of the Trump campaign. His job was to look out for negative stories from women that he could "take off the marketplace" by buying up the rights to the stories but never publishing them.

The plan, as Pecker outlined it, was that he would suppress these stories and at the same time publish negative stories about Trump's opponents. Some of these stories, Pecker said, were sent to Trump and Cohen for approval prior to publication.

Over the next year, Pecker said, he carried out this role. His testimony was corroborated by Keith Davidson, an attorney who represented both Daniels and former *Playboy* model Karen McDougal. In about June 2016, McDougal considered

going public with her story of a yearlong affair with Trump. But Pecker bought the rights to that story, with the expectation that he would be reimbursed by Trump. That never happened.

In early October 2016, according to the testimony of former Trump communications aide Hope Hicks, the campaign was rocked by the release of the *Access Hollywood* tape, where Trump could be heard boasting, "When you're a star, they let you do it. You can do anything. Grab 'em by the p****."

The next day, according to Pecker, Cohen and Davidson, Daniels threatened to go public with accusations that she'd had a sexual encounter with Trump in 2006 in a Lake Tahoe hotel suite during a celebrity golf tournament.

In her testimony, Daniels said there was a "power imbalance" when, after leaving the suite's restroom, she found Trump on the hotel bed in his underwear. That's when, Daniels said, they had sex.

She testified that Trump had dangled a possible role on his TV show *The Celebrity Apprentice*. This detail — that the sex wasn't entirely wanted — caused the defense to request a mistrial, which was denied. It also provided a motive for Trump to suppress the story. Prosecutors said, "Trump knew what happened in that hotel room" and didn't want it to come out. The adult-film actor's testimony also included intimate details of her alleged sexual encounter, some of which Judge Merchan agreed with the defense were not necessary.

3/12/25, 7:25 PM    Donald Trump is found guilty in hush money case | NPR

As October 2016 drew to a close, Cohen testified, he frantically opened bank accounts and tried to come up with a way to pay the $130,000 to keep Daniels quiet. But Trump, Cohen said, wanted to delay the payment until after the election, with the idea that after the election, it wouldn't matter whether Daniels was paid.

This point, that Trump was making the payment to influence the election by keeping women voters on board, was corroborated by a number of other witnesses. Hicks testified that Trump, by then in the White House, told her that it was better the story came out in 2018, rather than 2016.

Cohen ultimately wired the money himself to Daniels, with the understanding, he said, that he would be repaid by Trump. Cohen testified to a number of conversations with Trump, backed up by phone records, including on the day he wired the payments. But the defense rattled Cohen on cross-examination when it presented evidence that one of the calls that Cohen had said was made through Trump's bodyguard, Keith Schiller, was instead with Schiller about threats from a 14-year-old prankster.

Still, the heart of the case rested on the testimony of what happened after the election, when the records were falsified, in particular the handwritten notes and documents from the Trump Organization's former comptroller, Jeff McConney.

McConney authenticated a key record: the bank statement showing Cohen's wire transfer. That record included handwritten notes from Cohen and Trump's former

chief financial officer, Allen Weisselberg, describing the $130,000 payment that would be "grossed up" to cover Cohen's taxes. That sum, combined with another reimbursement and a bonus, for a total of $420,000, was paid out over 12 months at a rate of $35,000 per month.

The payments would be described as pursuant to a "legal retainer." (Weisselberg, who is serving jail time for perjury in Trump's civil fraud trial, did not testify.)

On the stand, Cohen described a repayment scheme that formed the basis of the 34 counts of falsified business records: 11 falsified invoices, 12 falsified ledger entries and 11 checks falsely recording the repayment as legal "retainers." Nine of the checks were signed by Trump himself.

Cohen said he and Weisselberg met and discussed the agreement with Trump shortly before he left for Washington, on or about Jan. 17, 2020. Cohen said Trump approved the deal, saying at the end of the meeting that "it was going to be one heck of a ride" in Washington. Cohen said he and Trump discussed the arrangement again, in early February, in the Oval Office. Photos and White House records corroborated that the two met in the Oval Office at the time.

The defense presented just two witnesses, including Robert Costello, an attorney who wanted to represent Cohen after Cohen's home and office were searched by the FBI in 2018. Costello had been put on the stand to refute Cohen's claim that Costello was pressuring Cohen to stay on Trump's "team." But Costello's emails showed that Trump was deciding which of Cohen's lawyers he wanted to pay and

that Costello was concerned about not giving "the appearance that we are following instructions from [Rudy] Giuliani or the president," referring to the former New York City mayor who was Trump's lawyer at the time.

---



POLITICS

**Trump verdict would likely move only a small number of votes, poll finds**

## How this conviction could affect the 2024 election

Trump has continually blasted any criminal charges he faces as "election interference" affecting his 2024 presidential campaign.

The hush money case likely is the only one of Trump's four ongoing criminal cases that will be heard ahead of Election Day in November, since federal trials in Washington, D.C., and Florida, as well as a state case in Georgia, are in various stages of delays.

This decision in New York is likely to have rippling effects as Trump campaigns as the presumptive Republican presidential nominee. For now, the other 54 criminal charges he faces have not turned off potential voters, and among some Republicans, the cases have bolstered support for him. However, a conviction may not play well with independent and swing voters.

The latest NPR/PBS NewsHour/Marist poll, from May, showed that 17% of voters surveyed said they would be less likely to vote for Trump if he were convicted, while 15% said they would be more likely to vote for him. And 67% of registered voters nationally said it makes no difference to their vote if Trump is found guilty in his hush money trial.

Ian Sams, spokesperson for the White House counsel's office, said in a statement: "We respect the rule of law, and have no additional comment."

President Biden's campaign, however, had a longer statement. "In New York today, we saw that no one is above the law," said spokesperson Michael Tyler. "There is still only one way to keep Donald Trump out of the Oval Office: at the ballot box. Convicted felon or not, Trump will be the Republican nominee for president."



## Can't keep up? We've got you.

Let the NPR Politics newsletter keep you up to speed and break it all down in one email.

| Email address | SUBSCRIBE |

<u>See more subscription options</u>

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR



**Trump calls his opponents 'scum' and lawbreakers in bellicose speech at Justice Department**

For more than an hour, he delivered an insult-laden speech that shattered the traditional notion of DOJ independence.

By **IRIE SENTNER** and **JOSH GERSTEIN**
03/14/2025 04:41 PM EDT
Updated: 03/14/2025 06:42 PM EDT

   

President Donald Trump on Friday walked into the Department of Justice and labeled his courtroom opponents "scum," judges "corrupt" and the prosecutors who investigated him "deranged."

With the DOJ logo directly behind him, Trump called his political opponents lawbreakers and said others should be sent to prison.

Advertisement

"I                                                                                                                          ï
a

While condemning officials who directed the military's withdrawal from
Afghanistan and repeating his false claims about the 2020 election being
stolen, Trump said: "The people who did this to us should go to jail."

In remarks that were by turns dark, exultant and pugnacious, Trump vowed to
remake the Justice Department and retaliate against his enemies, some of
whom he called "thugs."

It was, even by Trump's standards, a stunning show of disregard for decades of
tradition observed by his predecessors, who worried about politicizing or
appearing to exert too much control over the nation's most powerful law
enforcement agency. Trump, instead, called himself the "chief law enforcement
officer in our country" and accused the DOJ's prior leadership of doing
"everything within their power to prevent" him from becoming the president.

Trump charged the DOJ with spying on his campaign, raiding his home,
persecuting his "family, staff and supporters," launching "one hoax and
disinformation campaign after the other" and breaking the law "on a colossal
scale," making clear the glee he has taken in undermining the department's
typical independence and wielding it to achieve the White House's objectives.

Advertisement

"First, we must be honest about the lies and the abuses that have occurred
within these walls," Trump said. "Unfortunately in recent years, a corrupt
group of hacks and radicals within the ranks of the American government
obliterated the trust and goodwill built up over generations. They weaponized
the vast powers of our intelligence and law enforcement agencies to try and
thwart the will of the American people."

Those days, Trump said, "are over, and they are never going to come back. He
added that he would demand "full and complete accountability for the wrongs
and abuses that have occurred."

While any presidential visit to the Justice Department is a rarity, Trump repeatedly breached other norms in his remarks as he slammed former officials, unleashed attacks on private attorneys, and touted his vote tallies in last year's election.

"It's a campaign by the same scum you've been dealing with for years," Trump said of the lawyers and officials who have targeted him. "We will expel the rogue actors and corrupt forces from our government. ... We will restore the scales of justice in our country."

The president sought to recast his fraught history with the department — most notably the two federal criminal cases he faced last year, one on charges of conspiring to overturn the results of the 2020 presidential election and the other for refusing to return a hoard of classified documents after he left office in 2021. Trump also bragged about revoking the security clearance of "deranged Jack Smith," the special counsel who indicted him in those cases. (Smith and the Justice Department abandoned both cases after Trump won reelection last year.).

Advertisement

Trump boasted about pardoning hundreds of "political prisoners who have been grossly mistreated," referring to the people convicted in connection with the pro-Trump mob that stormed the Capitol on Jan. 6, 2021. And he said "there was no better day" than when he fired James Comey, the president's first-term FBI director who investigated the 2016 Trump campaign's ties to Russia.

"What they've ripped down is incalculable," Trump said of the department's leaders under the Biden administration.

📣 Want more POLITICO? Download our mobile app to save stories, get notifications and more. In iOS or Android.

Trump critics said his decision to come to the Justice Department to deliver such strident attacks was the real source of damage to the department's traditions and its morale.

3/14/25, 7:25 PM                    Trump calls his opponents 'scum' as he lawmakers in his core speech at Justice Department - POLITICO

"No president has ever given a speech at the Department of Justice like that, where he railed against his political foes and summoned up an agenda for totally political, partisan prosecution," Rep. Jamie Raskin (D-Md.) said. "It was an absolute desecration of the culture and history of the Department of Justice."

Raskin also ridiculed Trump's description of those charged in the Capitol riot as political prisoners. "He called the insurrectionists today political prisoners, like Aleksandr Solzhenitsyn or Nelson Mandela. What a joke," the lawmaker said.

Advertisement

Trump also used his visit to offer an effusive tribute to U.S. District Judge Aileen Cannon, who issued a ruling that tossed out the classified documents case against him. Prosecutors were appealing that decision when Trump prevailed at the polls last November.

"The case against me was bullshit and she correctly dismissed it," he said.

Noting that he had appointed her but did not know her personally, Trump praised Cannon as "brilliant" and credited her for standing her ground under withering criticism from the media and legal pundits. "She was very courageous and it only made her angry," the president said. "They were hitting her so hard it was hard to watch. ... She was the absolute model of what a judge should be."

And he said the Supreme Court's six conservative justices are treated "unbelievably badly" by Democrats opposing Trump's agenda.

Attorney General Pam Bondi introduced Trump by pledging that she and others at the department are fully engaged in his mission.

"We will never stop fighting for him and for our country," she said.

Before the president arrived, the audience heard from two other prominent Trump appointees at DOJ: Deputy Attorney General Todd Blanche and FBI Director Kash Patel. Both did their best to fire up the crowd by declaring that DOJ is heeding Trump's call to get tough on criminals and undocumented immigrants.

Advertisement

Despite Trump's repeated and bitter denunciations of his critics, at times Friday he appeared to say that he does not intend to instruct his appointees how to target his opponents but instead plans to trust them to use their judgment to achieve his goals.

"I don't do it. They do it," the president said, adding later that he might not return to the department again during his presidency.

Toward the end of his speech, Trump quoted an unlikely source.

"Etched onto the walls of this building are the words English philosopher John Locke said: 'Where law ends, tyranny begins,'" Trump said. "And I see that."

*CORRECTION: An earlier version of this report misidentified the people whom Trump said should go to prison.*

**FILED UNDER:** JUSTICE DEPARTMENT, DONALD TRUMP, PAM BONDI, LEGAL, TODD BLANCHE

## West Wing Playbook: Remaking Government
Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

**JOB TITLE**

Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

Advertisement

SPONSORED CONTENT

Certiorari granted by Supreme Court, March 4, 2024
Vacated and remanded by Supreme Court, March 4, 2024

## PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2061**

———————

SPEECH FIRST, INC.,

       Plaintiff – Appellant,

  v.

TIMOTHY SANDS, in his individual capacity and official capacity as President of Virginia Polytechnic Institute and State University,

       Defendant – Appellee.

------------------------------

SOUTHEASTERN LEGAL FOUNDATION; LIBERTY JUSTICE CENTER; CATO INSTITUTE; AMERICAN COUNCIL OF TRUSTEES AND ALUMNI; FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION; ALLIANCE DEFENDING FREEDOM,

       Amici Supporting Appellant.

———————

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Michael F. Urbanski, Chief District Judge. (7:21-cv-00203-MFU)

———————

Argued: October 25, 2022                      Decided: May 31, 2023

———————

Before WILKINSON and DIAZ, Circuit Judges, and MOTZ, Senior Circuit Judge.

———————

Affirmed by published opinion. Senior Judge Motz wrote the opinion, in which Judge Diaz joined. Judge Wilkinson wrote a dissenting opinion.

———————

**ARGUED:** James Hasson, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Appellant.   William H. Hurd, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Richmond, Virginia, for Appellee.  **ON BRIEF:** J. Michael Connolly, Cameron T. Norris, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Appellant.   Matthew B. Kirsner, Richmond, Virginia, Michael McAuliffe Miller, Renee Mattei Myers, Harrisburg, Pennsylvania, Jessica A. Glajch, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Washington, D.C., for Appellee.   Celia Howard O'Leary, Kimberly S. Hermann, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, for Amicus Southeastern Legal Foundation.   Ilya Shapiro, Thomas A. Berry, CATO INSTITUTE, Washington, D.C.; Reilly Stephens, Daniel Suhr, Jeffrey Jennings, LIBERTY JUSTICE CENTER, Chicago, Illinois, for Amici Liberty Justice Center, Cato Institute, and American Council of Trustees and Alumni.   Darpana M. Sheth, Ronald London, Jeffrey D. Zeman, FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Philadelphia, Pennsylvania, for Amicus Foundation for Individual Rights in Education.   Gordon D. Todd, Mackenzie J. Siebert, Robert M. Smith, SIDLEY AUSTIN LLP, Washington, D.C.; John J. Bursch, Cody S. Barnett, ALLIANCE DEFENDING FREEDOM, Washington, D.C., for Amicus Alliance Defending Freedom.

———————

DIANA GRIBBON MOTZ, Senior Circuit Judge:

Speech First, Inc., which identifies itself as a national organization committed to protecting the rights of college students, initiated this action against Timothy Sands, the President of the Virginia Polytechnic Institute and State University (Virginia Tech or the University).  Speech First asserts that two Virginia Tech policies — the Bias Intervention and Response Team Policy (the Bias Policy) and the Informational Activities Policy — violate the First Amendment rights of its student members who attend Virginia Tech.  Just four days after filing suit, Speech First asked the district court to preliminarily enjoin both policies.  In a comprehensive, 53-page opinion, based on numerous findings of fact, the court refused to do so.  The district court held that Speech First (1) lacked standing to challenge the Bias Policy because its members had suffered no injury in fact, and (2) failed to demonstrate a likelihood of success on the merits as to the Informational Activities Policy because the record was, at that time, inadequate as to that policy.  Speech First now appeals.  For the reasons that follow, we affirm.

## I.

The district court's express findings, and uncontradicted record evidence, establish the facts recounted here.  Speech First does not challenge any of these facts.

The Bias Policy defines bias incidents as "expressions against a person or group because of the person's or group's age, color, disability, gender (including pregnancy), gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law."  *Speech First, Inc. v. Sands*, No. 21-00203, 2021 WL 4315459, at *8 (W.D. Va. Sept.

3

22, 2021).  Virginia Tech concluded that such incidents are detrimental to the University community and accordingly established a Bias Policy that allows members of the University community to report incidents of bias that occur at Virginia Tech.

Complaining persons may choose to identify themselves by name, or they can file a report anonymously.  *Id.* at *9.  To make students feel comfortable reporting bias incidents, Virginia Tech has publicized the Bias Policy through a "See something? Say something!" campaign.  The University accepts bias reports filed through various online platforms.

Once submitted, all reported bias incidents go to a panel of university administrators known as the Bias Intervention and Response Team (the BIRT).  *Id.* at *8.  The BIRT includes representatives from the Fraternity and Sorority Life Office, the Services for Students with Disabilities Office, the Virginia Tech Police Department, and the Housing and Residence Life Office. The district court expressly found that the "BIRT lacks any authority to discipline or otherwise punish students for anything." *Id.* at *10.  None of the BIRT's interactions with students — whether a complaining student or a responding student — ever appear on a student's academic transcript or disciplinary record.[1]  Rather, as Dean Hughes explained in his written declaration, all BIRT-related records and

---

[1] The BIRT is overseen by Virginia Tech's Dean of Students Office.  The Dean of Students, Dr. Byron Hughes, declared in writing that his office has "no role in student discipline," but exists instead to "offer advising, care, and support to students."  It is the Student Conduct Office that "administers the Student Code of Conduct, which is 'the exclusive process by which students are adjudicated to be in violation of University policy and sanctioned for any such violations.'"  *Sands*, 2021 WL 4315459, at *9.  Speech First does not seek to enjoin any portion of the Student Code of Conduct or the operations of the Student Conduct Office.

correspondence are kept separately within the Dean of Students Office's case management system.

The BIRT meets weekly and reviews any newly submitted bias incident reports. At the outset of its review, the BIRT considers whether each bias incident report involves First Amendment-protected speech. Some complaints are dismissed outright because they do. In fact, the district court identified only two occasions when the BIRT referred protected speech to the Student Conduct Office and, in both cases, the Student Conduct Office concluded that the speech was constitutionally protected and so did not sanction the accused students. *Id.*

Virginia Tech believes that some complaints that do not violate the law or the Student Code of Conduct may nonetheless present an educational opportunity. In such cases, the BIRT sends a letter to both the complaining student and the responding student that *invites* them to take part in a voluntary conversation facilitated by an administrator in the Dean of Students Office.[2] Attendance at these meetings is entirely *voluntary*; if a student ignores the message or refuses to meet with the Dean of Students Office, the district

---

[2] The BIRT also refers some "localized" bias incidents to non-punitive campus entities. For instance, "a complaint alleging an incident of bias between two roommates may be referred to Housing and Residence Life to address." The BIRT takes a different approach to incidents involving speech that independently may violate the law or the Student Code of Conduct. The record reflects that the BIRT refers complaints "alleging criminal activity . . . to the Virginia Tech Police Department" and complaints "describing an incident that may violate the Student Code . . . to the Student Conduct Office." But the record also demonstrates that the BIRT does not have any "special authority to refer cases." Indeed, the district court found that any member of the university community (for example, students, faculty, or administrators) can report any incident directly to the Student Conduct Office or the Virginia Tech Police Department without ever involving the BIRT. *See Sands*, 2021 WL 4315459, at *12.

5

court found that "no further action is taken, and the student faces no consequences of any kind." *Id.*

The second policy Speech First seeks to enjoin, the Informational Activities Policy, provides:

> Informational activity is defined as the distribution of literature and/or petitioning for signatures where no fee is involved nor donations or contributions sought.  Informational activities may be permitted if they are sponsored by a university-affiliated organization.  Such activities require prior approval by the designated university scheduling office and are subject to university policies and the reasonable guidelines of the authorizing official.

In simple terms, the Informational Activities Policy regulates leafletting and the solicitation of signatures on campus.

The district court found that this policy requires students to make reservations with the Student Engagement and Campus Life Office (the Campus Life Office) to leaflet and solicit signatures at designated locations throughout campus. *Id.* at *22.  The Campus Life Office awards such reservations for free, in the order they are received. *Id.*  Students seeking to engage in informational activities must be "sponsored" by one of the university's 750+ registered student organizations (RSOs).  A student is not required to *belong* to an RSO as a member to leaflet on campus.  Virginia Tech Br. at 14 & n.8.  The student must simply secure the sponsorship of any existing RSO. *Id.*  "RSOs may sponsor informational activities unrelated to their official purpose." *Id.* at 14 n.8.  For instance, "[t]he Chess Club could sponsor leaflets criticizing the government's immigration policies; the Cave Club could sponsor leaflets supporting those policies." *Id.*

Speech First, however, is not an RSO at Virginia Tech.  Its members do not want to become an RSO (or seek an existing RSO's sponsorship) but "want to independently distribute literature about conservative ideas and collect signatures for petitions that support conservative causes."[3]  *Sands*, 2021 WL 4315459, at *23.  They assertedly refrain from doing so out of fear that they "will be punished for engaging in 'informational activities' without [prior approval and] the sponsorship of a 'university-affiliated organization.'"  *Id.*; Speech First Opening Br. at 13.

As noted above, Speech First has not and does not challenge any of these facts.  But Speech First asserts that these facts establish that the Bias Policy caused its members to "censor their speech" and that the Informational Activities Policy is an impermissible prior restraint and speaker-based restriction, and therefore both policies violate the First Amendment.  Speech First Opening Br. at 11–13.  For this reason, Speech First maintains that the district court abused its discretion in refusing to preliminarily enjoin both policies.

## II.

We therefore must determine whether the court did, in fact, abuse its discretion in denying Speech First's motion for a preliminary injunction.  *See Di Biase v. SPX Corp.*,

---

[3] In the district court, Speech First submitted anonymous declarations so stating on behalf of three of its student members (identified as Students A, B, and C).  Because none of those students still attend Virginia Tech, the University moved to dismiss this action as moot and Speech First moved to supplement the appellate record with affidavits from four additional students (identified as Students D, E, F, and G) who assert identical injuries and are currently enrolled at Virginia Tech.  We denied the University's motion to dismiss and granted Speech First's motion to supplement.  We thus consider the declarations of Students D–G as part of the record on appeal.  *See* ECF No. 76; Fed. R. App. P. 10(e); Loc. R. 10(d).

872 F.3d 224, 229 (4th Cir. 2017).  In making this determination, we examine the district court's factual findings for clear error and consider its legal conclusions *de novo*.  *Id.*; *see also dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023).  When a party moves for a preliminary injunction, as Speech First did, it invites the district court to act as the finder of fact on a limited record.  *See* Fed. R. Civ. P. 52(a); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 274 (4th Cir. 2002).  The moving party also bears the burden of demonstrating that it is likely to succeed on the merits.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

When reviewing the denial of a preliminary injunction, an appellate court must credit the district court's factual findings unless clearly erroneous.[4]  *Scotts Co.*, 315 F.3d at 274; *see also dmarcian, Inc.*, 60 F.4th at 138.  Such deference is appropriate because district courts enjoy a comparative "advantage in hearing and 'weighing' evidence." *United States v. Shea*, 989 F.3d 271, 277 (4th Cir. 2021).  Thus, unless, in denying a preliminary injunction request, the district court "rest[ed] its decision on a clearly erroneous finding of a material fact, or misapprehend[ed] the law with respect to underlying issues in litigation," we defer to its judgment.  *Leaders of a Beautiful Struggle*

---

[4] Of course, if instead the district court had granted a motion by Virginia Tech to dismiss Speech First's complaint, we would have a very different obligation — namely, we would be bound to construe the complaint's factual allegations most favorably to plaintiff Speech First.  As Judge Quattlebaum recently explained in *Menders v. Loudoun County School Board*, 65 F.4th 157, 160 (4th Cir. 2023), "in reviewing an order granting a motion to dismiss, we accept the . . . facts from the amended complaint and the incorporated exhibits as true and draw all reasonable inferences from them in favor of the [plaintiffs]."  *See also Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (noting that "important differences exist between the two standards").

*v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc) (quoting *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019), *as amended* (Oct. 31, 2019)).[5]

The record before us shows that the district court took seriously its factfinding responsibility.  The court considered hundreds of pages of exhibits, sworn declarations from Virginia Tech students and administrators, various campus policies and internal campus documents, and screenshots taken from Virginia Tech's website.  Speech First itself submitted much of this evidence.  The district court also provided the parties an opportunity for a lengthy oral argument on the preliminary injunction motion.  After considering the totality of the record before it, the court issued a thorough opinion setting forth its factual findings and legal conclusions.  We turn now to review of that opinion and the substance of Speech First's challenge.

---

[5] As the dissent recognizes, Speech First mounts facial (rather than as-applied) challenges to the policies here.  *See* Dis. Op. at 36; *see also* Speech First Opening Br. at 17, 33.  The dissent concedes, as it must, that "facial challenges are disfavored."  Dis. Op. at 36 (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  Indeed, in *United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012) (Wilkinson, J.), this court rejected a First Amendment facial challenge, cautioning that such challenges rely on speculation, risk premature judicial interpretation of government actions, and run counter to principles of judicial restraint.  So it is here.

III.

Speech First initially contends that the district court erred in concluding that it lacks standing to challenge the Bias Policy on behalf of its student members.[6] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that "standing is an essential and unchanging part of the case-or-controversy requirement of Article III").  Without standing to sue, Speech First cannot show that it is likely to succeed on the merits.  "To establish standing, a plaintiff must show: (1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Wikimedia Found. v. NSA*, 857 F.3d 193, 207 (4th Cir. 2017).  The district court held that Speech First's members had suffered no injury in fact, and thus Speech First lacked standing, because the Bias Policy does not proscribe any constitutionally protected activity.[7]  Indeed, the court concluded the Bias Policy does not proscribe "anything at all." *Sands*, 2021 WL 4315459, at *10.

A.

Speech First grounds its challenge in the First Amendment, which protects free speech and expression.  *See* U.S. Const. amend. I ("Congress shall make no

---

[6] As a membership organization, Speech First has standing as a representative of its members if its members would have standing to sue in their own right. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183–84 (4th Cir. 2013).

[7] We recently explained in another school speech case that "[t]he limitation of federal court jurisdiction to actual cases or controversies is a bedrock principle fundamental to our judiciary's role in our system of government . . . [and] '[o]ne element of the case-or-controversy requirement is that [plaintiffs] . . . must establish that they have standing to sue.'" *Menders*, 65 F.4th at 162 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

law . . . abridging the freedom of speech . . . .").  It "prohibits the state from interfering with the expression of unpopular, indeed offensive, views." *Nat'l Socialist White People's Party v. Ringers*, 473 F.2d 1010, 1016 (4th Cir. 1973) (en banc).  And of course, "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972).

Direct prohibitions of speech and expression naturally invite constitutional scrutiny. For instance, as we explained in *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011), "[a]t the most basic level, the denial of a permit to engage in expressive activity altogether constitutes a First Amendment injury."  Here, Speech First does not contend that the Bias Policy established an outright ban on speech.  But speech need not be banned outright to trigger First Amendment protections.  Individuals suffer a concrete injury even when the state has simply "chilled" the right to engage in free speech and expression.  *See, e.g.*, *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013).  That is what Speech First maintains the University did here in instituting the Bias Policy.

A First Amendment claim premised on chilling speech, like this one, is cognizable only when the asserted chill "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *see also Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).  "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 13–14.  Such allegations, standing alone, cannot demonstrate an injury in fact.  *See Benham*, 635 F.3d at 135.  Thus, Speech First has standing to lodge this challenge to the Bias Policy

only if its members' asserted self-censorship is objectively reasonable. *See id.*; *Laird*, 408 U.S. at 13–14.

Speech First advances two interrelated arguments as to why its members acted in an objectively reasonable manner in assertedly self-censoring. First, it maintains that the University has used implicit threats to deter unfavored speech. Speech First Opening Br. at 24. Second, Speech First argues that Virginia Tech has imposed a burdensome administrative regime that would cause an objectively reasonable student to refrain from engaging in politically charged speech. *Id.* We consider each argument in turn.

1.

As to its initial contention, Speech First asserts that "the entire point of the BIRT is to implicitly threaten students with discipline if they say something 'biased.'" *Id.* The district court rejected this contention, expressly finding that the "BIRT lacks any authority to discipline or otherwise punish students for anything." *Sands*, 2021 WL 4315459, at *10.

We recently explained why this factual finding is critical in considering another student speech challenge to a university policy. *See Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). There, we pointed out that a "credible threat of enforcement" is the *sine qua non* of a speech chilling claim. *Id.* Accordingly, a putative plaintiff suffers no cognizable injury if she lacks an "objectively good reason for refraining from speaking and 'self-censoring' instead." *Id.*

The district court found that the BIRT's interaction with students is limited to offering an optional "educational opportunity for better understanding protected speech and the role of tolerance in the campus community." *Sands*, 2021 WL 4315459, at *8, *10.

12

The court further found that the Bias Policy does "not proscribe anything at all," or require anything of anyone. *Id.* at *10. In fact, the Bias Policy espouses tolerance for competing views, assuring that "[a]ll community members," including those accused of perpetrating bias, "will be treated with respect, consideration, concern, and care." *Id.* at *9. Some bias incidents *do not* involve protected speech and "may be adjudicated through the student conduct process." *Id.* But the district court found that Virginia Tech does not and cannot adjudicate matters involving protected speech. *Id.* at *9, *12.

Speech First attempts to liken the Bias Policy to the coercive tactics found unconstitutional in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). There, the Court held that "informal sanctions," including "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," were sufficient to confer a First Amendment injury. *Id.* at 67, 71–72. In *Bantam Books*, a state entity known as the "Commission to Encourage Morality in Youth" sent to book and magazine publishers "notices, phrased virtually as orders," urging them to stop publishing disfavored materials. *Id.* at 59–63, 68. Those notices included language thanking each publisher "for his 'cooperation' with the Commission" and reminding each that the Commission was mandated "to recommend to the Attorney General prosecution of purveyors of obscenity." *Id.* at 62. The Commission also circulated to local police departments lists of objectionable publications, and local police officers commonly paid personal visits to offending publishers "to learn what action [the publisher] had taken" in response to the Commission's notice. *Id.* at 63. The Court held the Commission's activities unconstitutional because their purpose and effect were to deter disfavored speech. *Id.* at 67, 71–72.

13

The BIRT shares little common ground with the *Bantam Books* Commission and the Commission's attempt to suppress publications it deemed objectionable. The *Bantam Books* Commission, unlike the BIRT, wielded great coercive authority. The Commission sent police officers to pay personal visits to disfavored publishers. *Id.* at 63. And it issued written orders to those publishers it sought to threaten, reminding them that the Commission had an obligation to recommend *criminal prosecution* for "purveyors of obscenity." *Id.* at 62. One publisher had received "at least 35 such notices at the time [the] suit was brought."[8] *Id.* at 61. And critically, the trial court in *Bantam Books* "found as a fact" that "compliance with the Commission's directives was not voluntary." *Id.* at 68.

Here, the district court found as a fact that the BIRT does not mandate involuntary compliance or anything of the sort. Rather, the court found as a fact that "[a]ll that [the] BIRT has the authority to do is to 'invite' students to participate in a 'voluntary conversation' about the alleged bias or refer reports elsewhere." *Sands*, 2021 WL 4315459, at *10. The record establishes that the BIRT does not even extend an invitation for a voluntary conversation in response to every complaint it receives. Rather, the BIRT often dismisses complaints because they involve constitutionally protected activity.

---

[8] Speech First seems to suggest that the University's "See something? Say something!" posters serve the same purpose as the orders and circulated lists in *Bantam Books*. The comparison is unpersuasive. In its posters, the University does not threaten or forbid anything. Indeed, Virginia Tech's posters, unlike the *Bantam Books* Commission's threats, are directed not to those who utter constitutional speech but to those who may complain about it. Thus, the University promotes its bias reporting mechanism not to chill its students' speech but instead to encourage civility. The University's posters do not state, or even suggest, that disciplinary sanctions will be imposed on anyone because of their speech.

14

The district court expressly found that even when the BIRT does extend an invitation to meet, there is "no evidence that students feel obligated to come to these voluntary meetings" with the Dean of Students. *Id.* at *12. None of Speech First's student members have offered any evidence that they (or their peers) feel pressured to attend the meetings.[9] For these reasons, the district court found that the BIRT neither imposes discipline nor suggests in any way that it can impose discipline. Thus, Speech First's reliance on *Bantam Books* fails.[10]

Speech First further argues that Virginia Tech students are threatened by the BIRT's special "referral power." But in truth, the BIRT's ability to refer matters is neither special nor much of a power. As to it being "special," the district court found that the "BIRT may report a Student Code violation *just like any other member of the Virginia Tech*

---

[9] The dissent conceals this lack of evidence with fiery rhetoric and more than a dozen hypothetical questions. Neither provide a sound basis for rejecting the district court's explicit findings of fact. Indeed, our friend in dissent has explained that the disfavored nature of facial challenges (like the one at hand) cannot be overcome by "hypotheticals . . . conjure[d] up" for support. *See Chappell*, 691 F.3d at 393.

[10] The remaining cases on which Speech First relies offer it even less support. The Second Circuit's opinions in *Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992) and *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), concerned high-ranking government officials who threatened to use their expansive authority to punish the speakers. By contrast, here the district court found that the BIRT is administered by a university department — the Dean of Students Office — that, unlike the government officials in those cases or even the Student Conduct Office at Virginia Tech, has no enforcement authority and "no role in student discipline." *Sands*, 2021 WL 4315459, at *9. For this reason, the district court found that the bias incident reporting process is entirely separate from a student's academic and disciplinary records. *See id.* at *10. The asserted threat here is also distinct from the one presented in *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015). Unlike the local sheriff in that case, Speech First does not contend that the BIRT accuses anyone of facilitating odious criminal acts, or that it sends students anything like "cease and desist" letters printed on official law enforcement letterhead.

*community*." *Id.* (emphasis added). As to the "power" of the BIRT referral, unlike any other member of the university community, who could report *any* conduct, the Bias Policy permits the BIRT *only* to refer conduct that is not constitutionally protected and that independently may violate the Student Code of Conduct or the law. In short, because the Bias Policy has specifically disclaimed the ability to adjudicate matters involving protected speech, the policy is far from a "thinly veiled threat[] to institute criminal [or other disciplinary] proceedings," like that in *Bantam Books*. 372 U.S. at 68.

Speech First also did not offer any evidence that BIRT referrals occur with any frequency, or that they are more likely to result in discipline than referrals from other members of the University community. In fact, the only example of a BIRT referral to which Speech First points ended with the referred student receiving no sanctions. *Compare* Speech First Opening Br. at 26 *with Sands*, 2021 WL 4315459, at *10. Moreover, when the BIRT refers an incident to another University entity, that other entity also must determine whether the respondent's conduct is constitutionally protected. The district court found that this process "shows that if one part of the university makes a mistake, the university as a whole will ensure that protected speech remains protected." *Sands*, 2021 WL 4315459, at *12.

In light of the above facts, the district court did not clearly err in finding that the "BIRT lacks any authority to discipline or otherwise punish students for anything." *Id.* at *10. We recently held in *Abbott* that a plaintiff asserting First Amendment chill cannot prevail unless it demonstrates that a challenged policy conveys a "credible threat of enforcement." 900 F.3d at 176. We must follow that holding here, and it requires rejection

of Speech First's argument.  Accordingly, as the district court found, Speech First's student members have failed to allege that they have sustained an injury in fact.

2.

We consider next Speech First's alternative argument that Virginia Tech, through the BIRT, has created an elaborate bureaucratic regime that burdens the exercise of free speech.  Speech First essentially maintains that the BIRT process itself is a form of punishment.

Again guided by our recent decision in *Abbott*, we cannot agree.  There, Ross Abbott, a student at the University of South Carolina, received a university official's approval to host a "Free Speech Event" involving displays of offensive words and symbols, evidently in an attempt to "draw attention to the various threats to free speech on [college] campuses." *Id.* at 164–65.  Immediately thereafter, a different university official informed Abbott that the university had received complaints about Abbott's event and therefore ordered Abbott to "arrange an appointment to fully discuss the charges as alleged." *Id.* at 165.  Abbott was also told "not [to] contact the named complainant, or discuss the complaints with any member of the University community." *Id.*  The university warned him that "[i]f the matter could not be resolved otherwise," the university would investigate him formally. *Id.*  Abbott, like Speech First, asserted that the university's actions would cause a reasonable student to self-censor. *Id.* at 169.  Abbott mounted both an as-applied challenge and a facial challenge; the discussion in *Abbott* of the latter is instructive here.

Speech First's legal theory in support of its facial challenge to Virginia Tech's Bias Policy is largely the same as the theory advanced by Abbott to challenge the University of

17

South Carolina's policy. *See id.* at 178. Like Abbott, Speech First contends that the challenged policy creates a process that is so administratively burdensome in and of itself that it creates a First Amendment injury. We rejected Abbott's argument and, for the same reasons, we reject Speech First's similar argument.

In *Abbott*, echoing the Supreme Court's discussion in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), we acknowledged that some administrative processes may be so onerous as to amount to a sanction, and thus may be sufficient to confer First Amendment standing. 900 F.3d at 178. We cited as examples a "'significantly intrusive' FBI field investigation into a plaintiff's political beliefs and personal life," as well as a federal agency's "extraordinarily intrusive and chilling" eight-month-long investigation "into certain plaintiffs' protected speech and beliefs." *Id.* at 179 (citing *Clark v. Library of Congress*, 750 F.2d 89, 92–95 (D.C. Cir. 1984); *White v. Lee*, 227 F.3d 1214, 1228, 1237–38, 1242 (9th Cir. 2000)). But we emphasized that a "threatened administrative inquiry will not be treated as an ongoing First Amendment injury sufficient to confer standing unless the administrative process itself imposes some significant burden, independent of any ultimate sanction." *Id.* at 179.

Applying this standard in *Abbott*, we explained:

Even an objectively reasonable "threat" that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of "enforcement" or as the kind of "extraordinarily intrusive" process that might make self-censorship an objectively reasonable response.

18

*Id.* The Seventh Circuit, in rejecting another challenge by Speech First to a university bias policy, expressly relied on this "useful guidance" in *Abbott* to hold that "[i]t follows that if a mandatory meeting does not demonstrate a credible threat of enforcement, neither does an invitation to an optional one." *Speech First v. Killeen*, 968 F.3d 628, 640–41 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020). Such is the case here. Indeed, although *Abbott* provided only "guidance" for the Seventh Circuit, here *Abbott* controls.

For these reasons, we cannot accept Speech First's argument that the BIRT process is so burdensome that an objectively reasonable student would self-censor to avoid encountering it.

### 3.

Both of Speech First's theories as to why the Bias Policy violates the First Amendment — i.e., that the Bias Policy chills speech through implicit threats and that the BIRT resolution process is burdensome enough to itself chill speech — suffer from the same fundamental problem: Speech First has not shown that the Bias Policy credibly threatens injury to the organization's members. And for this reason, Speech First's members have not demonstrated the injury in fact necessary to establish standing.

To bring a speech chilling claim, a plaintiff must at least show that it has "suffered an injury or threat of injury that is 'credible,' not 'imaginary or speculative.'" *Cooksey*, 721 F.3d at 235 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (holding that respondents could not establish injury by relying on a "speculative chain of possibilities").

19

It is undisputed that the Bias Policy itself does not set forth or contemplate sanctions and that the BIRT has no power to impose any sanctions. Nor is there any evidence that the BIRT makes threats suggesting that it can punish students.

Speech First offers only speculation in support of its argument that it has suffered an injury in fact. Because the district court's factual findings make clear that no record evidence establishes any such injury, the organization has failed to establish an injury in fact and so lacks standing to challenge the Bias Policy.

## B.

We recognize that Speech First has brought similar challenges against universities located in the Fifth, Sixth, Seventh, and Eleventh Circuits. *See Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020), *as revised* (Oct. 30, 2020); *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); *Killeen,* 968 F.3d at 628; *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022).

In each of these cases, Speech First sought a preliminary injunction. And, in each, the district court denied Speech First's motion for lack of standing. *See Speech First, Inc. v. Fenves*, 384 F. Supp. 3d 732, 743 (W.D. Tex. 2019) (finding that the record was "without any evidence of a credible threat of enforcement"); *Speech First, Inc. v. Schlissel*, 333 F. Supp. 3d 700, 713 (E.D. Mich. 2018) (finding that "[t]he evidence in the present matter . . . reflects no threats—direct, subtle, or implied"); *Speech First, Inc. v. Killeen*, No. 19-03142, slip op. at 31 (C.D. Ill. Sept. 17, 2019) (finding that "being reported [to the bias response team] . . . results in essentially no consequences"); *Speech First, Inc. v. Cartwright*, No. 21-313, 2021 WL 3399829, at \*5 (M.D. Fla. July 29, 2021) (finding that

20

Speech First presented no evidence that the university policy "compels student involvement"). Speech First subsequently noted an appeal from each judgment.

The Seventh Circuit affirmed. That court followed what we believe to be the only appropriate approach: it based "its standing analysis around a series of factual findings by the district court." *See Killeen*, 968 F.3d at 649 (Brennan, J., concurring in part and dissenting in part). After examining those findings and concluding that none were clearly erroneous, the Seventh Circuit upheld the district court's judgment denying a preliminary injunction to Speech First, as we do here. *Id.* at 639, 647 (majority opinion).

The other appellate courts vacated and remanded, but only after seemingly ignoring the factual findings of the respective district courts. The Fifth and Sixth Circuits never even mentioned the applicable standard for reviewing facts found by a district court. Neither court seemed to acknowledge the deference due those findings. Accordingly, Judge White, dissenting from the Sixth Circuit's decision, noted that the majority had reversed the district court's ruling on standing despite "not identify[ing] any clear error in that district court's factual findings." *Schlissel*, 939 F.3d at 773 (White, J., dissenting). The Eleventh Circuit, for its part, apparently relied on its own factual finding: "that the average college student would be intimidated, and quite possibly silenced, by the policy." *Cartwright*, 32 F.4th at 1124. Not only did the district court in *Cartwright* make no such finding, its decision suggests the opposite is true. *See Cartwright*, 2021 WL 3399829, at *5.

Like our colleagues in the Seventh Circuit, and Judge White on the Sixth Circuit, we believe that the district court's factual findings must serve as the starting point for our

analysis.  Here, Speech First has failed to demonstrate that a single one of the district court's numerous findings of fact is clearly erroneous.  And those findings more than adequately support the court's legal conclusion that Speech First's student members have not demonstrated an injury in fact.  Therefore, Speech First is without standing to challenge the Bias Policy.

C.

Our country rightfully places great value on the freedom of speech, and any statute or regulation implicating speech receives close scrutiny.  Freedom of speech, after all, is expressly protected in the very first of the original amendments to our Constitution.  But the First Amendment does not stand in the way of modest efforts to encourage civility on college campuses.

The Supreme Court has explained that governmental entities may engage in speech in order to "'promote a program' or 'espouse a policy.'"  *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1587 (2022) (quoting *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015)).  As the Second Circuit explained in *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003), "[w]hat matters is the distinction between attempts to convince and attempts to coerce."  *See also Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (explaining that the First Amendment permits "government expression" but forbids government "intimidation").

Although Virginia Tech clearly would prefer that its students engage in respectful discourse, the district court found no evidence that the University sought to pursue this goal through intimidation or threats.  In fact, the court found no evidence that the Bias Policy

22

has imposed or threatened to impose any discipline on anyone. Virginia Tech's Bias Policy therefore falls within the bounds of acceptable government speech.

Moreover, in considering Speech First's challenge, we are also mindful of the fact that colleges and universities occupy a special place in our society. They expose students to a wide range of topics that they might otherwise overlook, as well as to persons whose backgrounds and life experiences are far distant from their own. And, for many students, college life is all-encompassing; college campuses are where students reside, work, form bonds with classmates, and refine their worldviews.

It is vital, therefore, that "[t]eachers and students . . . remain free to inquire, to study and to evaluate, to gain new maturity and understanding," and to engage in robust debate about current events. *Whitehill v. Elkins*, 389 U.S. 54, 60 (1967) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)). The Constitution, however, does not require us to ignore that universities have not always been places where such open dialogue is accepted from everyone. With this history in mind, many universities — Virginia Tech among them — find it equally vital to communicate that their campuses are places welcoming to all students, whatever those students' backgrounds and whatever their political, social, or religious views.[11] Just as universities may legitimately strive to promote intellectual curiosity, so too they may legitimately strive to promote civility and a sense of belonging among the student body.

---

[11] Indeed, federal antidiscrimination statutes *obligate* universities to ensure that student-on-student harassment does not bar students' access to educational opportunities and benefits. *See, e.g.*, *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).

That is what Virginia Tech's Bias Policy seeks to achieve. Rather than show indifference for the role that harmful stereotypes and discriminatory tropes play in all facets of society, *see, e.g.*, *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 413 (4th Cir. 2022) (Motz, J., concurring in the judgment), the University here has devised a way to educate its student body about both "protected speech and the role of tolerance in the campus community." *Sands*, 2021 WL 4315459, at *8. This is precisely the type of government speech that the First Amendment permits. *See Walker*, 576 U.S. at 207–08.

## IV.

We turn to Speech First's challenge to Virginia Tech's Informational Activities Policy. The district court held that Speech First did have "standing to pursue its challenge" to this policy because its student members' "intended conduct [was] arguably proscribed by the policy."[12] *Sands*, 2021 WL 4315459, at *22–23. But the court further held that the record, as to this policy, was too incomplete for it to forecast whether Speech First was likely to prevail on the merits. *Id.* at *24.

The court reasoned that even if the Informational Activities Policy does restrict Speech First's members' ability to leaflet and solicit signatures on campus, the policy may ultimately be a "reasonable time, place, and manner restriction[]" that is permitted under

---

[12] We are unconvinced by Virginia Tech's argument that Speech First lacks standing to challenge the Informational Activities Policy. It is uncontroverted that the policy bars Speech First's members from distributing literature unless they first place a reservation through the Campus Life Office and secure the sponsorship of an RSO. And, unlike *Gilles v. Torgersen*, 71 F.3d 497, 500–01 (4th Cir. 1995), on which the University relies, the University has not effectively exempted Speech First from these requirements. Accordingly, the policy's limitation on speech and expression, even if ultimately constitutionally permissible, is at least sufficient to confer standing.

the First Amendment.  *See id.* at *23.   Speech First contends that the district court committed reversible error in concluding that it needed "a more developed record" to determine whether the Informational Activities Policy is constitutional.   Speech First Opening Br. at 32–33; *see also Sands*, 2021 WL 4315459, at *24.   Thus, notwithstanding the district court's holding, Speech First asks us to enjoin the Informational Activities Policy at this early stage in the litigation.

Speech First maintains that the present record requires a finding that the Informational Activities Policy is unlawful both as an impermissible prior restraint on speech and as an impermissible speaker-based regulation.

Speech First rests much of its prior restraint argument on our opinion in *Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schools*, 457 F.3d 376 (4th Cir. 2006), which Speech First asserts is "directly on point" and required the district court to enjoin the Informational Activities Policy as facially unconstitutional — thus precluding the need for further factual development.  *See* Speech First Opening Br. at 33–34; Speech First Reply Br. at 13–14.  Speech First claims that the Informational Activities Policy does exactly what *Child Evangelism* forbids, i.e., it confers "unbridled discretion" upon school administrators to limit First Amendment activity. Speech First Opening Br. at 32–33.   Given Speech First's heavy reliance on *Child Evangelism*, we set forth the particulars of the case in some detail.

That case concerned a public school district that permitted outside organizations to use the schools' take-home flyer forum to distribute flyers for elementary school students to take home to their parents.  *Child Evangelism*, 757 F.3d at 378–79.   The Child

25

Evangelism Fellowship (CEF), which hosted faith-centered "Good News Club" meetings, sought to advertise its activities through that take-home flyer forum. *Id.* The school district's "policy governing access to the take-home flyer forum" conferred on the school district "broad discretion over flyer distribution." *Id.* CEF, invoking the First Amendment, sought an injunction that would require the school district to grant CEF access to the take-home flyer forum. *Id.* at 380. When the district court refused to do so, we reversed, holding that the school district policy did "not provide adequate protection for viewpoint neutrality" because it left the school district with "unfettered discretion . . . to control access to the take-home flyer forum." *Id.* at 378.

According to Speech First, like the take-home flyer policy in *Child Evangelism*, Virginia Tech's Informational Activities Policy confers "unbridled discretion" on the University that can be used to disallow speech. Speech First Opening Br. at 32. But the district court made explicit findings to the contrary.[13] The court explained that, upon receipt of an informational activities request, the Campus Life Office "merely confirms the location is available and then approves [the request]." *Sands*, 2021 WL 4315459, at *22. Thus, the court found that the Informational Activities Policy is nothing more than a "reservation system to which all student organizations have access." *Id.* Accordingly, the

---

[13] Speech First maintains that the district court's findings are irrelevant because *Child Evangelism* focused only on "the plain language of the [take-home flyer] policy." Speech First Opening Br. at 33 (quoting *Child Evangelism*, 457 F.3d at 387). This contention eliminates the context of the quoted phrase and misreads our holding in *Child Evangelism*. When we discussed "the policy" in *Child Evangelism*, we considered both the written policy and the factual record as to the policy's implementation. *Id.* at 379, 387 n.7, 388. The district court here did not err in engaging in the same analysis.

district court found, as a matter of fact, that the Informational Activities Policy does not confer any discretion on the University. *Id.*

Alternatively, Speech First argues that the Informational Activities Policy is still an unconstitutional prior restraint even if it is only a time, place, and manner restriction. *See* Speech First Opening Br. at 34–35. This is so, according to Speech First, because the University has not adequately explained the need for such a policy in the first place. *See id.*

But we have repeatedly stressed that injunctive relief is an extraordinary remedy and that it is the *plaintiff's* burden to demonstrate entitlement to such relief. *See, e.g.*, *Leaders of a Beautiful Struggle*, 2 F.4th at 339; *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020). At this stage of the proceedings, it is Speech First that must demonstrate that it is likely to succeed in its challenge to the Informational Activities Policy — a tough hurdle to overcome, to be sure. *See Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 355 (Wilkinson, J., dissenting) ("[P]reliminary injunctions should not be casually awarded . . . .").

This burden is made more difficult here because, as the district court found, the University has offered evidence that it has limited physical space, and that implementing a reservation system "ensures fair and equitable access" to its finite resources. *Sands*, 2021 WL 4315459, at *22; *see also Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (observing that universities possess "authority to impose reasonable regulations" compatible with their educational mission). The district court found that, in contrast, Speech First failed to

27

produce any evidence suggesting that Virginia Tech's stated rationale was unsupported, unreasonable, or a subterfuge. *See Sands*, 2021 WL 4315459, at *24. Given the state of the record, we can hardly fault the district court for refusing to issue an injunction.

Speech First separately maintains that the Informational Activities Policy is an unconstitutional speaker-based regulation, and that no further factual development is necessary to determine the policy's unconstitutionality. *See* Speech First Opening Br. at 35–37. But Speech First's speaker-based challenge is plagued by the same misunderstanding of the preliminary injunction burden as its prior restraint challenge. Again, Speech First bears the burden of demonstrating it is likely to prevail on the merits, and once more falls short.

The Informational Activities Policy requires students to secure the sponsorship of an RSO before they can distribute leaflets on campus. According to Speech First, "[t]his is a classic speaker-based restriction," and so constitutionally forbidden. *See id.* at 36. Speech First suggests that the RSO preference embedded in Virginia Tech's Informational Activities Policy is no different than the one found unconstitutional by the Eighth Circuit in *Turning Point USA at Arkansas State University v. Rhodes*, 973 F.3d 868 (8th Cir. 2020). *See* Speech First Opening Br. at 36. Not so.

In *Turning Point*, the Eighth Circuit considered an Arkansas State University policy that permitted tabling in the patio area outside of the student union, but only for "registered student organizations and University departments." 973 F.3d at 873. The university's sole rationale for imposing this restriction was that it wanted the union patio to exist as a "comfortable, living-room atmosphere." *Id.* at 879. Because there was "no rational

relationship" between the university's nonspecific justification and the restriction it imposed, the Eighth Circuit held that the policy was unconstitutional. *Id.*

Virginia Tech, by contrast, has not relied on an amorphous desire to make its campus more "comfortable." Rather, the University maintains, and the district court expressly found, that the University relies on physical capacity concerns and only restricts informational activities "to official organizations so that Virginia Tech's limited physical resources can be used for the benefit of the most students." *Sands*, 2021 WL 4315459, at *22. This explanation may, or may not, be a "good reason[] for distinguishing between registered student organizations and other members of the university community." *Turning Point USA*, 973 F.3d at 879. It is simply too early to tell because, as the district court also found, the record lacks "information about the demands on reservable spaces by RSOs and the availability of alternatives for students who are not members of RSOs." *Sands*, 2021 WL 4315459, at *24. Such information would appear vital to the fact-intensive inquiry inherent in determining whether the Informational Activities Policy fits within the contours of the First Amendment. Given the inadequacy of the record evidence pertinent to the Informal Activities Policy, we cannot second guess the district court's considered judgment.

"[A]n undeveloped record not only makes it harder for a plaintiff to meet [its] burden of proof, it also cautions against an appellate court setting aside the district court's exercise of its discretion." *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc); *see also Bowe v. Bd. of Election Comm'rs of City of Chicago*, 614 F.2d 1147, 1153 (7th Cir. 1980). Once this case is returned to the district court, and after further factual

development has taken place, it will be for that court to determine in the first instance whether the Informational Activities Policy complies with the First Amendment. Without a developed record, the district court did not err, let alone clearly err, in determining that Speech First has not yet shown that it is likely to succeed on the merits. *See Di Biase*, 872 F.3d at 230. We accordingly affirm its present refusal to enjoin the Informational Activities Policy.

V.

"[S]ecuring reversal of a denial of preliminary relief is an uphill battle for any movant." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 250 (4th Cir. 2014) (Motz, J., dissenting); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 357 (Wilkinson, J., dissenting); *Sierra Club v. Georgia Power Co.*, 180 F.3d 1309, 1310 (11th Cir. 1999); *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1405 (9th Cir. 1991). This is so because "the ultimate decision to grant the preliminary injunction" is confined to the district court's discretion. *See League of Women Voters*, 769 F.3d at 250 (Motz, J., dissenting) (citing *Miller v. Mitchell*, 598 F.3d 139, 145 (3d Cir. 2010)). "Indeed, because the law places a thumb on the scale against the issuance of preliminary injunctions, our deference should be even greater when the district court *denies* a preliminary injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 357 (Wilkinson, J., dissenting) (emphasis in original).

In this case, though, none of these considerations seem to matter to the dissent. Throughout its lengthy exposition, the dissent disregards the district court's findings of fact

and replaces them with its own conjecture.[14]  Though there are many examples, a few suffice to make the point.

While the dissent proclaims that "[c]ollege students hoping to stay on the administration's good side will not view the [BIRT's] 'invitation' as voluntary," the district court found as a fact that there was "no evidence that students feel obligated to come to these voluntary meetings."  *Compare* Dis. Op. at 48 *with Sands*, 2021 WL 4315459, at *12; *see also Killeen*, 968 F.3d at 643 (observing that the majority of students contacted by the University of Illinois' bias response team declined the invitation to meet).  While the dissent contends that Virginia Tech students have good reason to fear "significant reputational harm" from the BIRT, the district court found as a fact that nothing about the BIRT process would ever appear on a student's academic transcript or disciplinary record. *Compare* Dis. Op. at 51 *with Sands*, 2021 WL 4315459, at *10.  While the dissent discounts Virginia Tech's affirmative efforts to protect free speech as mere "promises and assurances," the district court found as a fact that even "if one part of the university makes a mistake [about protected speech], the university as a whole will ensure that protected speech remains protected."  *Compare* Dis. Op. at 45 *with Sands*, 2021 WL 4315459, at *12.  And while the dissent complains that the Informational Activities Policy provides "no discernable standards by which to evaluate tabling requests," the district court found

---

[14] Sometimes, when the district court's findings of fact prove too inconvenient, the dissent resorts to mischaracterizing them as "claims" by the majority.  *See, e.g.*, Dis. Op. at 47, 53.

31

as a fact that the policy is nothing more than "a reservation system." *Compare* Dis. Op. at 61 *with Sands*, 2021 WL 4315459, at *22.

Moreover, rather than deferring to the district court's prudent decision to wait for a fuller record before deciding whether to enjoin the Informational Activities Policy, the dissent shrugs off the court's entirely proper decision to delay ruling on the question pending development of the factual record as a trivial focus on "narrow details." *See* Dis. Op. at 54.

Most telling is what the dissent does not do: it does not meaningfully recognize the procedural posture of this case, it does not apply the proper deferential standard of review to the district court's many findings of fact, and it does not even attempt to adhere to our holdings in *Abbott*. The dissent instead concocts a novel standard of review for preliminary injunctions in which an appellate court can conjure up subjective fear and then treat it as objective fact, view the record in the light least favorable to the non-movant, and strip district courts of their discretion to determine whether a factual record is sufficiently developed. The dissent's misguided journey produces a dramatic read, but it comes nowhere close to offering a basis for upending the district court's careful exercise of its discretion.

For all these reasons, the judgment of the district court is

*AFFIRMED.*

32

Certiorari granted by Supreme Court, March 4, 2024
Vacated and remanded by Supreme Court, March 4, 2024

WILKINSON, Circuit Judge, dissenting:

Consider a 19-year-old sophomore at Virginia Tech sitting in a favorite class, one involving the role that race, ethnicity, and gender play in contemporary American politics. During a lively class discussion, an interesting but controversial topic comes up. She considers raising her hand to add her thoughts to this fascinating debate, but she hesitates.

She remembers hearing about the University's Bias Intervention and Response Team, which Virginia Tech established to "eliminate acts of bias" through "immediate direct or indirect responses to bias-related incidents." She cannot recall how "bias incident" was defined but thinks it was something about "expressions against a person" in a protected class. She knows that biased speech can be reported anonymously online. In fact, Virginia Tech "encourages" students "to make a report" if they "hear or see something that feels like a bias incident" even if they are "unsure." She vaguely remembers that those reported for bias will be invited to a meeting with the Dean of Students or referred to another University office. Students are told the meetings are voluntary, but word travels quickly on college campuses, and she does not want to be "that girl who got reported." She cannot recollect whether those who get accused of bias get in trouble with the University, but she knows the Dean of Students keeps a file of all complaints.

She thought she had an insightful comment to add to the discussion, but it might not be worth risking an encounter with the bias response team, especially because the team comprises representatives from the offices of Inclusion and Diversity, Student Conduct, the Dean of Students, and the Virginia Tech Police Department.

Faced with these circumstances, what would a reasonable student do? Speak up and risk an anonymous report? Or keep her head down, sit silently, and avoid the potential fallout? A student in this situation will almost always choose the latter. And this is how Virginia Tech objectively chills speech.

The First Amendment should prevent this danger. The Supreme Court has underscored "in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). When pressure and intimidation lurk behind the state's policy such that a reasonable individual "is chilled from exercising her right to free expression" and instead chooses "self-censorship," the steadfast protections of the First Amendment should be summoned into action. *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011).

My friends in the majority claim any fears about chilling are the product of the "dissent's misguided journey," Majority Op. at 32, which I suspect was not intended as a compliment. Odysseys aside, the stark reality of the record is that programs like the Bias Intervention and Response Team (BIRT) are being used in the service of discouraging that open inquiry from which education draws its very meaning and sustenance.

Virginia Tech's Bias Intervention and Response Team is not the benign little system the majority imagines. It is intimidating to the extent that a student of "ordinary firmness" would be deterred from exercising her First Amendment rights. *Benham*, 635 F.3d at 135. Chilling effects of even well-intended government policies present "an evil of constitutional proportions" for the government has an obligation to promote free speech,

34

and at the very least, not to discourage it. Leslie Kendrick, *Speech, Intent, and the Chilling Effect*, 54 Wm. & Mary L. Rev. 1633, 1655 (2013).

The majority today ignores the plight of the college sophomore, declaring instead that Speech First fails to show that BIRT objectively chills speech. Due to Virginia Tech's perfunctory promise to uphold the First Amendment and its proffered assurance that BIRT cannot directly punish students, the majority concludes that no reasonable student would be dissuaded from exercising her free speech rights. This conclusion neglects real-world consequences. The reality is that Virginia Tech has constructed a complex apparatus for policing and reporting whatever administrators may deem "biased speech." The intricate program has a straightforward effect: students self-censor, fearing the consequences of a report to BIRT and thinking that speech is no longer worth the trouble.

How did it ever come to this—that such a fine and distinguished university would institute a policy with such incipient inquisitional overtones, one that turns its campus into a surveillance state? The First Amendment guarantees to everyone not just passive access to but active participation in the marketplace of ideas. Today, the majority breaks that promise to a segment of society who needs it most—college students.

The damage done to the First Amendment is not confined to BIRT. It is compounded by the University's Informational Activities Policy. The whole is even worse than the sum of its parts. The University has somehow managed to offend virtually every cardinal principle of First Amendment law. The First Amendment comes in dead last by its reckoning. The Amendment exists at the sufferance of a bureaucracy dedicated to eliminating "bias." To say that campus life has lost its way severely understates the distance

35

from productive dialogue that once nurtured the capacity of young minds for critical thought. Slowly the critical now succumbs to the conventional. How sad. I would remand this case with directions to the district court to enjoin this ill-conceived experiment in its entirety, thereby allowing the University a new start, one which returns the fresh air of free speech to its rightful place in campus life.

## I.

The majority claims that this litigation comes to us in a premature posture. It argues that the record is devoid of the injury needed to possess standing and is undeveloped as to the application of the Informational Activities Policy. *See* Majority Op. at 32. The majority asks that we kick this whole case down the road. What we have before us, however, is wholly sufficient to resolve this matter here and now. The grant or denial of a preliminary injunction is an appealable order. It is so for a reason. Where the appellants as here have a strong case of ultimate success on the merits, they deserve preliminary injunctive relief and will suffer irreparable harm if it is not awarded. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This is especially so in connection with the First Amendment. That Amendment and those invoking its protections should not be placed at the sufferance of extended rounds of litigation. In this sense, the Amendment functions like an immunity. The longer its beneficiaries languish in litigation, the more its value and meaning is lost. *See Mitchell v. Forsyth*, 472 U.S. 511, 525–29 (1985).

I am aware that this is a facial challenge to BIRT. I am further aware that facial challenges are disfavored. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); *United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012). The majority

says the plaintiffs lack standing. Virginia Tech suggests that, even if Speech First has standing, we ought to hold off any ruling until we receive evidence as to BIRT's application.

I would reject this course of action. In the First Amendment context, facial challenges are appropriate where a "substantial number" of the applications of an "impermissibly overbroad" policy are "unconstitutional[] judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted). The depressive effect of this policy is so evident from its face that we do not need to wait for one deprivation of protected speech after another to occur. I doubt we shall ever know just how many deprivations there are, for the simple reason that self-censorship seldom comes into view. The prohibitive effect on speech will follow from this policy as surely as the night follows the day. *See City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 797 (1984) (explaining that policies are "unconstitutional on their face" when "any attempt to enforce" such policies "would create an unacceptable risk of the suppression of ideas"); *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965 n.13 (1984) (collecting cases).

Reviewing the very terms of this scheme should persuade anyone that a regime this inimical to campus free speech cannot be permitted to stand. The educative effect that colleges should ideally have upon the exercise of basic civil liberty is set at naught by the University's view that speech freedom no longer belongs first and foremost to individual Americans but to the collective and authoritative hand of the state that would suppress them.

The majority would insulate this flawed system from challenge by holding that Speech First lacks standing to bring suit. Plaintiffs must typically suffer an injury in fact to establish standing. In the First Amendment context, however, plaintiffs may "refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship," thus establishing a "chilling effect on their free expression that is objectively reasonable." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (internal quotation marks omitted). The majority makes much of the statement in *Abbott* that it is critical that there be "a credible threat of enforcement" for a policy to objectively chill speech. *Id.* Because BIRT does not directly punish students for speech, the majority concludes there is no credible threat and therefore no chilling effect.

If we confine "credible threat of enforcement" to direct punishment by BIRT, we leave out the policies that stop short of formal penalties but nonetheless exact a heavy toll. What formal penalties is the majority waiting for? A reprimand? Probation? A suspension? An expulsion? If BIRT does not formally impose the particular penalty, its referrals to other offices nonetheless set the process in motion. Of course Speech First has standing. It has shown that the policy at issue causes students to self-censor for fear of being reported, thus effecting an objective chill on speech. The majority talks about such consequences as being wholly fanciful and theoretical. How can it know? Thoughts that are formulated in the mind but never escape the lips still detract from the store of First Amendment expression.

When a challenged policy "risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (internal quotation marks omitted). Should

constitutionally questionable policies escape judicial scrutiny due to overly stringent standing analysis, "[s]ociety as a whole then would be the loser." *Joseph H. Munson*, 467 U.S. at 956. Speech First has shown a variety of ways in which BIRT will take action against protected speech, thus demonstrating a credible threat of enforcement.

Let's examine some of these.

## A.

BIRT's own self-description lays bare Virginia Tech's persistent efforts to impose a bureaucratic superstructure that dampens speech. Because the majority glosses over the policy's practical consequences, it is important to lay it out from beginning to end exactly as it is presented to students. Once the full policy is exposed, stripped of fig-leaf assurances, its oppressive nature has nowhere to hide.

### 1.

The very terms of BIRT betray its chilling effect. Virginia Tech proclaims BIRT's purpose in the most practiced bureaucratese, saying a lot while saying nothing. Unpacking its meaning is no small task. BIRT was created to "eliminate acts of bias" through "immediate direct or indirect responses to bias-related incidents." J.A. 369. The University claims to need this policy because "[b]ias-related incidents often represent a conflict of competing and opposing values," and conventional solutions "will rarely go far enough to do the adaptive work needed to resolve[] gaps between values, beliefs, and behavior." *Id.* The "Bias Intervention and Response Team" is thus meant to be "both proactive and responsive" in addressing the "challenges presented in a community where inclusion and

dissent exist in a way that often results in marginalization, isolation, and loneliness." J.A. 368.

How dense will all this get? The composition of BIRT seems further designed to intimidate any student brave enough to utter controversial thoughts. To achieve its goals, BIRT consists of "a representative from" the office of the "Dean of Students," "Office for Equity and Accessibility, Office for Inclusion and Diversity, Student Conduct, [and the] Virginia Tech Police Department." J.A. 370. Other "representatives from offices may be called upon to participate with BIRT due to the nature of an incident." *Id.* These representatives are supposed to "compile a report for the community that offers a narrative about[] . . . shift[ing] our culture towards a more positive and pluralistic society." *Id.*

A reasonable student reading BIRT's purpose is left with the ominous impression that BIRT was created to "proactive[ly]" address problems caused by "dissent[ing]" "values" and "beliefs," whatever they may happen to be. BIRT will "resolve[] gaps between values, beliefs, and behavior" whenever the supposed gaps appear because typical solutions "will rarely go far enough." To achieve its goal of eliminating bias, BIRT enlists a cast of unnamed but high-ranking University officials and police.

This garbled declaration reads like a mission statement of a committee dedicated to rooting out dissent. A student whose views fail to align with campus orthodoxy would think twice before speaking under such a menacing regime. The majority says that "what matters is the distinction between attempts to convince and attempts to coerce." Majority Op. at 22 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003)). When the stated goal of the bias response team is to "eliminate" bias, we are faced not with a gentle effort to

40

convince students to be unbiased but with a systematic effort to coercively drive out views that strike administrators the wrong way. Telling students "You should stop saying biased things or else we might need to reeducate you" is no benevolent attempt at persuasion. Moreover, as soon as students see that the bias response team includes members of the Office of Student Conduct and Virginia Tech Police Department, they will adjust their behavior to avoid getting reported. Their parents might be displeased and their future prospects compromised if they had a run-in with disciplinary officials and local law enforcement. Better to just keep quiet.

2.

The plain language of its policy makes BIRT even more troubling. Virginia Tech provides a vague but expansive definition of "bias." Students are told that "bias incidents" are "expressions against a person or group because of the person's or group's age, color, disability, gender (including pregnancy), gender identity, gender expression, genetic information, national origin, political affiliation, race, religion, sexual orientation, veteran status, or any other basis protected by law." J.A. 333.

With a definition this loose and rambling, almost anything could be framed as a bias incident. Indeed, the number of bias reports nearly doubled from 2017 to 2018. *Speech First, Inc. v. Sands*, No. 7:21-CV-00203, 2021 WL 4315459, at *10 (W.D. Va. Sept. 22, 2021). This trend either shows Virginia Tech's community is growing more biased—an odd result given the University's efforts to "eliminate" such problems—or it reveals that members of the community are increasingly exploiting the policy's uncertain language. This trend will give rise to another—as reports increase, speech decreases.

41

Worse yet, the explicit language of the policy shows that BIRT invades the realm of protected speech. It defines a "bias incident" as "expressions," and lists examples such as "words or actions that contradict the spirit of the Principles of Community," "jokes that are demeaning to a particular group of people," and "posting flyers that contain demeaning language or images." *Id.* at *8. Additionally, BIRT's preset list of nineteen potential bias offenses includes "Comment in Class or Assignment," "Comment in Person," "Comment in Writing or on Internet," "Comment via Email/Text," "Comment via Phone/Voicemail," and "Written Slur." J.A. 149.

The students in this case, through their submitted declarations, explained that they "enrolled in the University because [they] wanted to learn in a challenging environment where students and faculty are free to engage in lively, fearless debate and deliberation." Pl.'s Mot. to Supplement R. (Student Decl.) 8, 12, 16, 20, ECF No. 67. Yet they are told that words contradicting the spirit of the community's principles can be reported as biased speech. Such an "overly broad" policy "creates a 'danger zone' within which protected expression may be inhibited." *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965). The plain language alerts students that even their comments in class and online are constantly and subjectively parsed for bias.

In effect, the prolix text of the policy permits students to report speech for no other reason than they were offended by what was said. In fact, the district court recounted a few such reports of bias, including the following:

> [1] a report that the words "Saudi Arabia" were written on a whiteboard outside of a student's dorm room, alleging bias based on "national or ethnic origin;" [2] a report that a student in a University residence hall overheard

42

several male students privately "talking crap about the women who were 'playing' in a snowball fight," calling them not "athletic," which the complainant reported as discrimination based on "gender;" and [3] a report that a student told a joke that included "Caitlyn Jenner's deadname" during a classroom lecture, which was reported as discrimination on the basis of gender identity.

*Sands*, 2021 WL 4315459, at *10 (internal citations omitted).

These examples illustrate how students can report speech as biased based on nothing more than its obvious poor taste or the fact that some listener took offense. But offensive speech can seldom be isolated with precision. Speech exists in an environment in which the useful and insightful are often commingled with the outrageous and profane. But the "fact that society may find speech offensive is not a sufficient reason for suppressing it." *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978). To the contrary, "if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Id.*

Despite the "bedrock principle underlying the First Amendment" that the state may not silence "the expression of an idea simply because society finds the idea itself offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989), BIRT's sweeping and vague language enables students to report anything the most sensitive are offended by. The students in this case fear that because the "definition of 'bias' is so broad and vague," they are "confident that someone will find [their] speech to be 'biased.'" Student Decl. 9, 13, 17, 21. Those offended can take steps to avoid future exposure or, better still, engage the speaker with their well-founded disapproval. The cure for distasteful speech is tasteful dialogue, not the conversion of an illustrious campus into a First Amendment dead zone.

43

3.

The BIRT policy goes from bad to worse. Virginia Tech establishes a regime of comprehensive surveillance. The University enthusiastically encourages its students to report a bias incident even if they are "unsure" that an incident qualifies as biased. J.A. 200. As a "student, if you hear or see something that feels like a bias incident, statement, or expression, we encourage you to make a report. In short, if you see something, say something!" *Id.* Where students are urged to report on one another, mutual suspicions fester, as any society bereft of basic freedoms can attest. Anyone at Virginia Tech can submit reports of bias anonymously on Virginia Tech's website through an online reporting tool, called the Bias Incident Reporting Form. *Sands*, 2021 WL 4315459, at *9. Surveillance is total and constant: Undergraduate and professional students "can be referred for bias-related behavior" from "admission to commencement." J.A. 372. And "bias-related incidents can occur on or off campus, including on social media and other digital platforms." *Sands*, 2021 WL 4315459, at *9.

BIRT's eye is nothing short of ubiquitous. In the classroom, on social media, and off campus, Virginia Tech encourages its students to keep watch for any biased speech. By extending its sphere of surveillance off campus, Virginia Tech stretches well beyond the boundaries of acceptable regulation. Courts "must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021). Speech First's student members wish to "engage in open and robust intellectual debate with [their] fellow students" about controversial topics "in the classroom, in other

areas of campus, [and] online." *See, e.g.*, Student Decl. 9. But they are "reluctant to openly express" their opinions because they know that their classmates can anonymously report them on campus or off, creating an oppressive atmosphere of scrutiny from which there is no reprieve. *Id.* In short, students stay silent because they can be reported anytime, anywhere. It is "clear that the average college student would be intimidated, and quite possibly silenced, by the [University's] policy." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022).

### B.

The majority believes all this evidence cannot show a chilling effect because Virginia Tech soothes its students' fears through numerous promises and assurances. First, Virginia Tech emphasizes that BIRT itself does not have any authority to punish students and only refers reports to other offices. Second, when someone is accused of bias, Virginia Tech claims the most likely course of action is that the Dean of Students will invite the accused to a voluntary meeting. Third, students have nothing to fear because how could anyone even suggest that the bias response team would ever penalize constitutionally protected speech.

All these placations miss the mark. Virginia Tech's claims do not change the fact that a reasonable student, considering the policy and accompanying repercussions as a whole, would hardly regard the regime in a kindly, avuncular light.

### 1.

Let's take the matter of BIRT referrals first. Even if BIRT cannot formally punish students and only refers cases to other offices, it gets the ball rolling. A referral to other

45

offices by definition carries its own administrative imprimatur. BIRT admits that it refers cases to offices such as the Office of the Dean of Students, Fraternity and Sorority Life, Student Conduct, Equity and Accessibility, Housing and Residence Life, and Title IX. J.A. 360. Indeed, after a student reported that inappropriate words had been written on a hallway whiteboard, BIRT reviewed the incident and "notified VTPD" and Title IX. J.A. 172. The district court found that "BIRT has referred protected speech to" the Office of Student Conduct "at least twice since 2017." *Sands*, 2021 WL 4315459, at \*10.

So once a complaint is shipped to one of these other entities, reasonable students could fear that they will be subject to that office's disciplinary authority. Even if students believe that BIRT itself cannot punish them (a big "if"), that hardly dispels their fears of getting in trouble with another office. Indeed, the students below said that they are "afraid that Dean of Students Office will keep a record on [them], share the allegations with others at the university, call [them] in for meetings, or refer the allegations to the Office of Student Conduct, the Office of Equity and Accessibility, or the Virginia Tech Police Department." Student Decl. 9, 13, 17, 21.

Consider the scenario in which an eavesdropper anonymously reports a student for gender bias. Even if the accused student thinks that BIRT cannot punish him, he may fear that BIRT will refer him to the office of Title IX which may well be hostile to the student's point of view. Then will he not worry that the office of Title IX may discipline him for his alleged bias? It matters not that BIRT cannot dole out punishment if it can simply refer the case to another office that can. Being reported to BIRT may be only the first step. Who knows what awaits? Uncertainty itself can cause students to fall silent rather than speak up.

46

2.

Virginia Tech also claims that, where BIRT or the Dean of Students directly responds, all that will happen is the Dean will "invite" the accused student to a "voluntary conversation." *Sands*, 2021 WL 4315459, at *10. An invitation is commonly thought of as something one looks forward to. So what sort of invitation is this?

The majority claims that Speech First's members have not offered "evidence that they (or their peers) feel pressured to attend the meetings." Majority Op. at 15. It emphasizes that "the district court found as a fact that there was 'no evidence that students feel obligated to come to these voluntary meetings.'" *Id.* at 31 (quoting *Sands*, 2021 WL 4315459, at *12).

Does the majority really believe this invite is no different from students inviting one another to drop by down the hall for a Friday night pizza? No! This is an invitation from the Dean to the student to come to the Dean's office, not for tea or coffee, but for the express purpose of discussing the student's speech. There is an imbalance here. Dean versus student. State versus the individual. This is precisely the sort of imbalance that the First Amendment has historically refused to tolerate. Why should we ever do so here?

Speech First students not surprisingly explained that they are "afraid" that the Dean will keep a record on them or share the allegations with others at the University. *See, e.g.*, Student Decl. 17, 21. While the majority claims that no trace of the meeting will "appear on a student's academic transcript or disciplinary record," Majority Op. at 31, there is no dispute that a record of the meeting will be kept on permanent file within the Dean of Students Office's case management system, *see id.* at 4–5; J.A. 372. College students

47

hoping to stay on the administration's good side will not view the "invitation" as voluntary or as something to which one may simply send "regrets." With the invitation comes pressure to attend the meeting; better to avoid the whole darn thing by keeping one's mouth shut.

As the Eleventh Circuit recognized, "the students targeted here are . . . teenagers and young adults who, it stands to reason, are more likely to be cowed by subtle coercion." *Cartwright*, 32 F.4th at 1123. In multiple areas of law, the Supreme Court has expressed concern with state coercion of young people, as they are more susceptible to threats and intimidation. *See id.* at 1123–24. Simply telling students the meeting is "voluntary" will do little or nothing to put anyone at ease.

Additionally, "the very name" Bias Intervention and Response Team "suggests that the accused student's actions have been prejudged to be biased." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019). A reasonable student could certainly reach this conclusion given the policy's use of terminology such as "victim," "bystander," "perpetrator," "targeted," and "accused." J.A. 369–70. As such, the name and language of BIRT "intimates that failure to" attend the meeting with the Dean may result in a type of default judgment against the student. *Schlissel*, 939 F.3d at 765. If a student fears the accusations will be taken as true unless he contests them, he would not skip the meeting and risk exposure to "far-reaching consequences, including reputational harm or administrative action." *Id.* If he does skip the meeting, it may well be out of apprehension as to what even worse possibilities await him there.

48

What's more, although Virginia Tech claims a voluntary meeting on the carpet with the Dean is the only response from the school, the policy communicated to students warns otherwise. Virginia Tech touts numerous "interventions for addressing" bias, such as "[a]dvocacy for community members impacted by mistreatment," reporting "a narrative about acts of bias-related behavior" to the community, and further educating the "campus to ensure that bias-incident reporting systems are publicized." J.A. 372. The University also cautions students that "BIRT can consider an array of responses to include: temporary or permanent changes to on-campus housing" or "a community alert" about the incident "from the police department." J.A. 368. Reasonable students could thus conclude that a report to BIRT will result in more than a "voluntary meeting." Despite the Dean's assurances, the reasonable student would likely keep quiet rather than gamble with the repercussions.

3.

When accused of chilling constitutionally protected speech, Virginia Tech's response is, "trust us, BIRT will uphold free speech." Despite devoting much time and many resources to BIRT and proclaiming a goal of eliminating bias, Virginia Tech declares it will administer this policy with a dispassionate hand.

Why should this be comforting? What is protected speech to one may seem unprotected to another. The First Amendment is not to be so casually consigned to the eye of the beholder. It is true that Virginia Tech's written policy affirms its commitment to free speech by saying, "BIRT will examine and review each complaint through the lens of free and protected speech." J.A. 370. But this nebulous assurance offers cold comfort. The very

49

next sentence warns that "[s]ome bias-related incidents may violate the Student Code of Conduct and may be adjudicated through the student conduct process." *Id.* This is reinforced by the fact that BIRT has referred protected speech regarding undocumented immigration to the Office of Student Conduct before. *See Sands*, 2021 WL 4315459, at *10. Furthermore, although "Virginia Tech cannot adjudicate matters that are deemed protected speech," it tells students that "[b]ehavior that is discriminatory or otherwise hurtful to members of the community is addressed through educational interventions." J.A. 370. The next paragraph reminds students that "[r]egardless of whether incidents violate policy or are insensitive, it is crucial that response occurs in a timely and consistent manner." *Id.*

Students are also warned that if BIRT believes bias exists, "[i]nterventions of either an educational or restorative nature will . . . be conducted by the office closest to the students," and the "case will be logged in the [Dean of Students Office's] case management system." J.A. 372. If BIRT finds no bias, however, the case is still logged, indicating that even reports of non-biased, protected speech are kept on file. *Id.*

Through these terms, the University communicates to students that it will intervene even in instances of protected speech. On the one hand, the administration promises that BIRT does not punish protected speech, but then on the other, it tells students that protected, but controversial speech will be subject to the University's reeducation efforts. The reasonable student hears a vague promise to protect free speech followed by BIRT doubling down on the "crucial" need for responding "in a timely and consistent manner"

to bias with "educational interventions," a creative euphemism for disruptive measures meant to stop the student from engaging in heterodox speech again.

The fact that the University keeps a file of all complaints makes dealing with BIRT all the more discomforting. There is no point in keeping something on file if it will never be used for anything. A young college student would be concerned that a filed report may affect her standing with the University in some way. Even assuming the University keeps the student's name confidential, that protection is not ironclad. If word gets out—either through an announcement about the bias incident or through the old-fashioned rumor mill—the student could face significant reputational harm. Such news being spread to the school could have "dramatic effects such as currying disfavor with a professor, or impacting future job prospects." *Schlissel*, 939 F.3d at 765.

Similarly, it damages a student's reputation if her classmates know that she had to undergo an "educational or restorative" intervention, implying that the student is either ignorant or in need of moral restoration. "Because reputational damage can impair a student's prospects for academic and professional success, objectively reasonable students may be expected to behave in ways that mitigate their exposure to any allegation that might trigger a bias investigation." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 652 (7th Cir. 2020) (Brennan, J., concurring). The briefest study of the McCarthy era teaches that even baseless accusations can be enough to ruin someone's good name.

Though stopping short of formal discipline, the collateral consequences of being reported to BIRT create a system where "process is punishment." Keeping complaints on record, subjecting students to "educational interventions," and possibly referring students

to another office is punishment enough. If a city were to announce that it will respond to accusations of unpopular speech with an "educational intervention" or "moral restoration" team, we would not let its constitutional violations off the hook simply because the team disclaimed its obvious authority to punish and promised always to respect the First Amendment. It does not save a policy from constitutional scrutiny for the state to say that its interventions are benign and nonpunitive. The "possibility the Government could have imposed more draconian limitations on speech never has justified a lesser abridgment." *Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 809 (1996) (Kennedy, J., concurring in part).

Virginia Tech cannot paper over the prohibitive tenor of BIRT with promises to be on its best behavior. The First Amendment "does not leave us at the mercy of *noblesse oblige*" and does not condone an unconstitutional system "merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). In other words, the First Amendment entertains no "pinky promise" exception to chilling speech.

Given the admission that the University will respond to, record, and attempt to correct constitutionally protected speech, the undisputed facts show that a reasonable student is "chilled from exercising her right to free expression" and would instead choose "self-censorship." *Benham*, 635 F.3d at 135. BIRT presents a credible threat of enforcement because even assuming a credulous student believes that BIRT cannot punish, he is still likely to self-censor to avoid at least the procedural consequences and at most the reputational harms that inhere in every sinew of this oppressive system.

52

In sum, Virginia Tech's bias response policy chills speech by fostering an atmosphere of anonymous, constant surveillance from, as we have noted, "admission to commencement." With its vague definition of "bias," any joke or off-hand remark or controversial comment can be contorted into a "bias incident." This environment objectively targets the freedom of speech. The only question is whether we give Virginia Tech a license to censor because its policies come with gilded assurances. The majority claims that "even 'if one part of the university makes a mistake about protected speech, the university as a whole will ensure that protected speech remains protected.'" Majority Op. at 31 (quoting *Sands*, 2021 WL 4315459, at *12). What scant solace to know that the bureaucracy may correct its infractions at some point or the other down the road. Why not design a system that heads off First Amendment violations before they occur? The majority believes the University deserves a pass. But state authority is often suppressive before it is wielded. Every day these policies stand, someone somewhere is driven to silence.

## II.

The problems free speech faces on Virginia Tech's campus unfortunately do not end there. The majority also affirms the district court's decision declining to enjoin Virginia Tech's Informational Activities Policy. This policy governs the "distribution of literature and/or petitioning for signatures," J.A. 225, and limits these activities to "specified tabling locations," J.A. 420. Per the policy, students may engage in these forms of speech "if they are sponsored by a university affiliated organization" and receive "prior approval by the designated university scheduling office." J.A. 225. Despite acknowledging that the policy "clearly proscribe[s]" speech, the district court concluded that it did not have enough

information to determine whether the challenged policy is an acceptable time, place, and manner restriction on speech. *Sands*, 2021 WL 4315459, at *23–24.

In assessing the Informational Activities Policy, both the district court and the majority focused on narrow details, asking questions such as how many tables are available and how often are they reserved. *See id.* at *24; Majority Op. at 29. This attention to particulars neglects the policy's broader consequences. To be clear, the policy forbids students from passing out flyers or collecting signatures *anywhere on campus* except at designated tabling locations that one must reserve ahead of time. To do so, the student must belong to a registered student organization or be sponsored by one. There is plenty in the record as it now stands to enjoin this policy as an unreasonable restraint on speech.

A.

The district court committed reversible error by failing to conduct the appropriate legal analysis of the Informational Activities Policy. The majority acknowledges that we review the district court's "legal conclusions *de novo*." Majority Op. at 8. Yet the majority does no such thing, deferring wholly to the district court's views of the law. Looking anew at the legal standard and undisputed facts, a few things are clear. First, the tabling locations identified by the policy are limited public forums and thus restrictions on their use must be reasonable. Second, because the policy proscribes certain types of fundamental speech anywhere on campus except for where allowed by the University and only when given prior approval, the policy is an unreasonable constraint on speech.

54

1.

Determining what kind of forum is at issue is essential to our First Amendment analysis "because the extent to which the Government may limit access" depends on "the nature of the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). The district court, for its part, did not even attempt to analyze the forum.

Not deciding which type of forum was at issue was error. This is a legal question that our circuit has already answered. A public university "campus is a limited public forum." *American Civil Liberties Union v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005). This makes sense. A university campus, "at least for its students, possesses many of the characteristics of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). For example, universities are replete with walkways and thoroughfares, features that are similar to traditional public forums. These areas are generally available to students even if they are inaccessible to the public. It is therefore evident that Virginia Tech's campus is at least a limited public forum.

Virginia Tech's tabling locations under the policy are also limited public forums. The "government creates a designated [or limited] public forum when it purposefully makes property generally available to a class of speakers." *Warren v. Fairfax Cnty.*, 196 F.3d 186, 193 (4th Cir. 1999) (internal quotation marks omitted). Here the tables have been made generally available to students through the school's official policy.

The policy at issue delineates a group of speakers who may use the forum—*i.e.*, sponsored individuals—from a group of speakers who may not—*i.e.*, non-sponsored individuals. Such a policy that allows certain people to speak while disallowing others must

55

be "viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Id.* at 194. Put differently, the "touchstone for evaluating" the policy's regulations "is whether they are reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 (1983).

Courts assess reasonableness by looking at, *inter alia,* whether "substantial alternative channels . . . remain open" despite the policy. *Perry*, 460 U.S. at 54; *see also Ball v. City of Lincoln, Nebraska*, 870 F.3d 722, 737 (8th Cir. 2017); *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1281 (11th Cir. 2003). Courts also ask whether "the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803; *see also Turning Point USA at Arkansas State University v. Rhodes*, 973 F.3d 868, 875–77 (8th Cir. 2020). Last, courts should account for university administrators' expertise in creating educational policies. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. Of the L. v. Martinez*, 561 U.S. 661, 686 (2010); *see also Rhodes*, 973 F.3d at 877. Even the most cursory consideration of these factors reveals Virginia Tech's policy is unreasonable.

### 2.

First, Virginia Tech's policy does not keep open substantial alternative channels for the distribution of pamphlets and the collection of signatures. Students who are not part of a registered student organization or sponsored by one are completely banned from engaging in signature collection or pamphlet distribution anywhere on campus. Moreover, even students who are members of a student organization are banned from distributing pamphlets or collecting signatures unless they have reserved a table through the University.

It is not an exaggeration to say that Virginia Tech's policy leaves no alternative channels for students who wish to exercise their rights to collect signatures and distribute literature.

Virginia Tech argues that a plethora of alternative avenues for speech remain open to students, ranging from the wide array of electronic media to old-fashioned bulletin boards. This does not suffice. The framers of our Constitution would be shocked to think that petitioning and leafletting would be subject to prior state approval. We should not accept the University's invitation to downplay the importance of these two core mediums of free speech. Imagine Samuel Adams or Thomas Paine beseeching the state at some table for permission to pamphleteer. They would hardly abide such a prior restraint.

Handing out leaflets "is the essence of First Amendment expression" and no "form of speech is entitled to greater constitutional protection." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). Leafleting and pamphleteering often allow communication face to face. And the pamphleteer may well feel his speech has greater resonance away from a state-sanctioned table. "For the Revolutionary generation . . . the pamphlet had peculiar virtues as a medium of communication," for it "allowed one to do things that were not possible in any other form." *McCullen v. Coakley*, 573 U.S. 464, 489 n.5 (2014) (quoting Bernard Bailyn, *The Ideological Origins of the American Revolution* 2 (1967)). The importance of petitioning likewise cannot be understated as it is expressly protected by the First Amendment alongside the freedom of speech.

Second, when considering the purpose served by the forum, we must remember, as the majority notes, "colleges and universities occupy a special place in our society." Majority Op. at 23. These educational institutions have historically been places for the free

exchange of speech in the "marketplace of ideas." *Healy v. James*, 408 U.S. 169, 180 (1972). Thus, when examining a restriction on informational activities like the one at issue here, we are not dealing with a restriction on the distribution of literature on a busy downtown street or even in a public park; we are dealing with a ban on advocacy and information in one of America's most important free speech communities. Virginia Tech's restriction on speech does not reasonably match the purposes served by a college campus. The proposed activity at issue involves students passing out leaflets or collecting signatures. And the nature of the forum here is overwhelmingly consistent with promoting a free flow of information. The distribution of pamphlets, the collection of signatures, and the advocacy and debate that accompany those two are perfectly aligned with a college's mission of intellectual growth.

Finally, Virginia Tech argues that we should defer to its expertise. Yet none of the University's proffered justifications for the policy have anything to do with education; they all deal with the orderly administration of campus property. The University's expertise is limited to education, not constitutional law. Courts are "the final arbiter of the question whether a public university has exceeded constitutional constraints, and we owe no deference to universities when we consider that question." *Martinez*, 561 U.S. at 686. Moreover, even if we agreed with Virginia Tech on this point, deference to administrators alone would not overcome the lack of alternative channels of speech and the inconsistency between the policy and the forum.

3.

Considering these factors illuminates the unreasonableness of Virginia Tech's Informational Activities Policy. The University attempts to justify the policy with a handful of feeble reasons. I find none of them compelling.

Virginia Tech claims that this policy is necessary to ensure that access to the limited tabling locations is "fair and equitable." J.A. 420. We should not reward such artificial scarcity. If Virginia Tech did not completely ban informational activities from its entire campus except at designated tables, then there would be no scarcity of possible locations. We should not shift the focus away from the sheer sweep of the policy to mundane questions about table reservations and locations. To do so would impose artificial limits on our review. Our job is to assess the constitutionality of the policy and its effects on campus as a whole, not simply to diagnose the procedures of the table-reservation policy asserted by the state. A university cannot severely restrict speech—and here Virginia Tech enforces a broad ban on leafleting and signature gathering on campus—and then hide behind the ostensible fairness of its limited reservation system. Virginia Tech cannot manufacture scarcity and then use that as a justification for banning speech.

The University also claims its system is necessary to ensure that student groups have access to "high-traffic areas of Campus without impeding student movement (for example, by blocking the exits to busy classrooms) or invading student living spaces (for example, soliciting door to door in residence halls)." J.A. 420. Again, the policy makes little sense in addressing this concern. A policy against pamphleteering in front of classroom exits or

soliciting in residence halls would accomplish the intended goal. Such concerns do not reasonably justify a ban on every walkway and open-air venue on the entire campus.

Similarly, Virginia Tech claims that it is "reasonable to prefer those students who, by forming an organization, have shown some likelihood of structure and continuity in their contribution to the marketplace of ideas." Response Br. at 46. But this reasoning flips the First Amendment on its head. The First Amendment is not needed to protect speech that is popular enough to attract a group; it exists to safeguard an individual's speech that is so "unpopular or distasteful" that other groups will not sponsor it. *Denver Area Educ. Telecommunications Consortium*, 518 U.S. at 785 (Kennedy, J., concurring).

B.

Speech First's likelihood of success on the merits is further bolstered because the Informational Activities Policy constitutes an unconstitutional *prior* restraint on speech. A prior restraint exists when a regulation gives "public officials the power to deny use of a forum in advance of actual expression." *Se. Promotions, Ltd. V. Conrad*, 420 U.S. 546, 553 (1975). "Any prior restraint on expression comes" with a "'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

In the context of public schools and universities, we have acknowledged that prior restraints are only permissible if they are viewpoint neutral, reasonable, and limit government discretion. *See Mote*, 423 F.3d at 446; *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 46 (10th Cir. 2013). Thus, to "pass constitutional muster," a viewpoint-neutral preapproval system "must contain adequate standards to guide the official's decision." *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 372 (4th Cir. 2012)

(internal quotation marks omitted). In other words, a policy cannot give officials unbridled discretion. *See, e.g., Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310–11 (11th Cir. 2003); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572–73 (7th Cir. 2001); *Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir. 2001); *Summum v. Callaghan*, 130 F.3d 906, 919 (10th Cir. 1997). A policy that grants too much ex-ante discretion to a university official cannot survive constitutional scrutiny.

Virginia Tech's policy states that requests to distribute pamphlets and collect signatures "require prior approval by the designated university scheduling office and are subject to university policies and the reasonable guidelines of the authorizing official." J.A. 225. What's more, requests are reviewed by considering "overall campus safety and security, any special circumstances relating to university activities, and the impact such activity may have on the university." J.A. 223. If there are fuzzier or more opaque standards than these, they do not come readily to mind.

The majority denies there is any discretion involved in this policy by saying that it is "nothing more" than a reservation system. Majority Op. at 26. On its face, however, the policy places unreviewable discretion in the hands of university administrators with no discernable standards by which to evaluate tabling requests. The only limitations placed on the University come in the form of vague language referencing unspecified "reasonable guidelines" and the equally unspecified "impact such activity may have on the university." Rather than provide clarity and limit discretion, these additional factors only give administrators more subjective and unverifiable ways to deny a request.

For example, if a student requests to hand out pamphlets promoting a disfavored cause, the school could say his request has been denied due to "university policies." Such a terse rejection would prevent the student from engaging in speech and would be unreviewable. The "absence of express standards renders it difficult to differentiate between a legitimate denial of access and an illegitimate abuse of censorial power." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006) (internal quotation marks omitted). Indeed, among "the dangers posed by unbridled discretion" is the censor's "ability to hide unconstitutional viewpoint discrimination." *Id.* The policy's express terms establish a prior restraint that gives an administrator unchecked discretion, funneling all requests to distribute literature or collect signatures through some black box of government preapproval.

It is important to view the BIRT and Informational Activities policies in tandem. The Informational Activities Policy intensifies the chilling effect of BIRT. The two policies in one sense are disparate but in another sense are of the same piece, for both angle toward an identical end goal: You cannot speak on campus without Virginia Tech's approval. I regret the majority's failure to consider the effect of the BIRT policy and the leafletting prior restraint together. The policies chill speech by channeling student expression into a process that must be approved by the state—either on the front end when trying to distribute pamphlets, or on the back end when a student is reported for bias. Virginia Tech effectively creates "a University-controlled clearinghouse for speech [that] can deter students from speaking out." *Killeen*, 968 F.3d at 652 (Brennan, J., concurring).

62

III.

Making matters worse, today's decision splits from three of our sister circuits. Given the dangers that bias response bureaucracies pose to free expression, it is no wonder that the Fifth, Sixth, and Eleventh Circuits have held that these policies objectively chill speech.

The majority's divergence from our colleagues on the Sixth Circuit is especially troubling because the record shows that Virginia Tech's policy is even worse than the one at issue at the University of Michigan. The bias response policy there defined a "bias incident" as "*conduct* that discriminates, stereotypes, excludes, harasses or harms anyone in our community based on their identity." *Schlissel*, 939 F.3d at 762 (emphasis added). Virginia Tech's policy here does not even feign such a limitation; it explicitly defines a "bias incident" as "*expressions*." J.A. 333 (emphasis added). Even though Michigan was attempting to proscribe conduct and not speech, the Sixth Circuit nonetheless held that Michigan's policy objectively chilled student expression. *Schlissel*, 939 F.3d at 765.

The Eleventh Circuit considered a university bias response team that ostensibly could not punish students but could only refer them to other university actors. The court held that "the district court erred in focusing so singularly on the . . . power to punish." *Cartwright*, 32 F.4th at 1122. While "[p]unishment is no doubt relevant to the objective-chill analysis, and may well be sufficient to prove the requisite chill . . . analogous precedent makes clear that it is not decisive and, in any event, is not uniformly necessary." *Id.* The question, our colleagues determined, was a simple one with a simple answer: Would "the average college-aged student . . . be intimidated—and thereby chilled from exercising her free-speech rights—by subjection to the bias-related-incidents policy?" The

answer was yes. *Id.* at 1124. Given the option of a narrow focus on the power of punishment or a broader examination of the policy's consequences, our sister circuit wisely chose the latter. I cannot say the same about the decision today.

Likewise, the Fifth Circuit held that a bias-response team that did not engage in investigations or punishment still objectively chilled speech given the team's ability to refer students to other offices. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 333 (5th Cir. 2020). And like Virginia Tech here, the University of Texas there also stressed its commitment to the freedom of speech, stating that it "expressly protect[s] and encourage[s]" free speech. *Id.* The Fifth Circuit nonetheless found that these "paeans" to the First Amendment did not "detract[] from the likelihood that the University's policies" chill protected speech. *Id.* at 333–34. All three cases closely resemble ours, yet their legal analysis strives to protect First Amendment rights where ours stumbles.[1]

The majority wishes away the circuit conflict by declaring that three of our sister circuits either "ignor[ed] the factual findings of the respective district courts" or made up their "own factual finding." Majority Op. at 21. I would give our fine colleagues on the Fifth, Sixth, and Eleventh Circuits more credit. If the majority wishes to disagree with them, it at least owes it to them and the law more generally to engage with their reasoning at a higher level. Our sister circuits did not ignore pertinent facts or make stuff up. They

---

[1] The majority is wrong to say the Seventh Circuit reached a different result. The students in that case provided only a "bareboned declaration," which did not indicate whether they intended to engage in speech that would invoke the consequences of the bias response policy. *Killeen*, 968 F.3d at 644. As we have made clear, that evidentiary deficiency is emphatically absent here given the plainly professed expressive intentions of the students. *See, e.g.*, Student Decl. 8, 12, 20.

sized up an important issue of constitutional law and put forth a thoughtful analysis of it. One need only check the above opinions themselves to confirm this conclusion.

The majority's decision today is all the more unfortunate because this is no mere theoretical disagreement. This circuit split creates a patchwork of First Amendment jurisprudence for schools across the country. On the vitally important issue of free speech on college campuses, we should avoid the needless creation of circuit splits, which results in students in Michigan, Florida, and Texas being protected from unconstitutional policies while students in Virginia remain exposed.

IV.

Viewpoint discrimination is arguably the cardinal First Amendment sin, but that is exactly where the BIRT policy leads. When anyone can be anonymously reported for an offense vaguely defined as a "bias incident," one must abandon common sense to think that *all* students will feel an equal effect. The truth is that those who believe their views are the least popular will be the first to clam up. No student who knows his speech will rouse applause will hesitate to make his voice heard. But the student who wishes to dissent will shrink from the stage. Because of this lopsided effect, BIRT commits the First Amendment's original sin, an "egregious" transgression from which the "government must abstain." *Rosenberger v. Rector & Visitors of Univ. of Va*, 515 U.S. 819, 829 (1995).

A.

It is a "core postulate of free speech law" that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). When a government policy, even inadvertently, amplifies the speech

of one viewpoint while chilling the speech of another, that policy destabilizes the foundation of the First Amendment, which "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Taxpayers for Vincent*, 466 U.S. at 804.

The Supreme Court has admonished us to beware of policies that may become viewpoint discriminatory in application. The Court found that a law forbidding registration of "immoral or scandalous" trademarks had criteria so broad and vague that the government was rejecting trademarks merely because they were "offensive to many Americans." *Iancu*, 139 S. Ct. at 2301. The Court concluded that "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Id.* Although the government insisted that it would only interpret "immoral or scandalous" in a non-viewpoint-discriminatory way, the Court held that "we cannot accept the Government's proposal, because the statute says something markedly different." *Id.* The Court thus struck down the provision because it resulted in "viewpoint-discriminatory application." *Id.* at 2300.

## B.

Virginia Tech provides a similarly broad definition of "bias" that will predictably lead to students reporting "ideas that offend" while permitting ideas that please. We know the students involved in this case wish to "speak passionately" about topics such as affirmative action, Black Lives Matter, and abortion, but they refrain from doing so out of fear of being reported. Student Decl. 7–20.

One need not be a mystic to anticipate BIRT's foreseeable effects: Students holding conservative or otherwise heterodox views on controversial topics are more likely to be reported for bias. Indeed, "anonymous reports carr[y] particular overtones of intimidation to students whose views are 'outside the mainstream.'" *Fenves*, 979 F.3d at 338. It takes courage to express unpopular or "incorrect" views, even under the very best of circumstances. Pile BIRT on top of all this, and students with pro-life, anti-affirmative action, restrictive immigration views and traditional religious beliefs have been made conspicuous targets. Sometimes, people at the University do not even try to hide their hostility toward conservative students who hold dissenting values. When students filed this current lawsuit, a Virginia Tech tenured professor took to Twitter to publicly call the students "conservative shitbags" who were "suing the school because they're bigots." J.A. 274.

It is beyond wrong to place these students in the crosshairs. It was beyond wrong in the civil rights era to make those courageous voices for racial equality subject to vilification or worse. It was beyond wrong to make American pacifists in times of war feel beyond the pale of civil discourse. The First Amendment does not permit the fevers of majority passions to deny the minority its say.

Per Virginia Tech's own data, only one in five students feel comfortable expressing ideas in class that are "probably only held by a minority of people." *Sands*, 2021 WL 4315459, at *2. Furthermore, the Foundation for Individual Rights and Expression (FIRE) observed in its 2017 report that bias response policies "risk becoming tools . . . for imposing some form of political or intellectual orthodoxy" on campus. J.A. 246. Professors

themselves have remarked that bias response policies "result in a troubling silence" where students are "afraid to speak their minds" because their peers can "leverage bias reporting policies to shut down unpopular or minority viewpoints." J.A. 264.

The more distasteful public authority finds someone's views, the more it should seek to protect the speaker's right to express them. BIRT runs in exactly the opposite direction. BIRT thus blesses state-sanctioned silencing of minority views, allowing "the majority [to] draw[] a formidable circle around thought," where inside "those limits, the writer is free; but unhappiness awaits him if he dares to leave them" for he is then exposed to "persecutions every day." Alexis de Tocqueville, *Democracy in America* 244 (Harvey C. Mansfield & Delba Whitney ed. & trans., U. Chi. Press 2000) (1835). Like in *Iancu*, the policy here favors one group over another based solely on viewpoint, distinguishing between "those inducing societal nods of approval and those provoking offense and condemnation." 139 S. Ct. at 2300.

Sometimes, of course, the majority view is right. Sometimes the conventional wisdom is sound. Sometimes the "politically correct" is indeed correct. But it must prove its worth through testing, not complacency. Through dialogue, not suppression. The "[f]reedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). Yet in "both concept and design," BIRT's "efforts to encourage students to anonymously" report their classmates for an endless litany of ill-defined offenses "subvert free and open inquiry and invite fears of political favoritism." Keith E. Whittington, *Free Speech and the Diverse University*, 87 Fordham L. Rev. 2453, 2466

68

(2019). Viewpoint discrimination merits clear eyes, not blind ones, for in situations like this and *Iancu*, it can be *de facto* as well as *de jure*.

## V.

The majority says the "First Amendment does not stand in the way of modest efforts to encourage civility on college campuses," Majority Op. at 22, and that Virginia Tech "has devised a way to educate its student body about" the role that "harmful stereotypes and discriminatory tropes play in all facets of society," *id.* at 24. All well and good. But while everyone agrees that promoting civility and discouraging discrimination is a good thing, the majority's vague invocation of civility has no limiting principle.

If, in the name of fostering civility and eliminating stereotypes, the state is allowed to take action against individuals that includes keeping a record of one's wrongspeak, then the stalwart protections of the First Amendment will slowly but inevitably recede. Any speech that is controversial can reflexively be labeled uncivil or discriminatory. Where would the majority draw the line between tolerable speech and the intolerable? The civil and the uncivil? Or the harmful and the helpful? Why should the state be in the business of drawing such lines at all? A public university cannot unfurl some omnipresent banner of civility to silence its students.

The sweet, innocent little system the majority envisions wishes merrily away the suppressive cards in the state's exclusive hand. This has it all backwards. Universities should be the first to embrace the "well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist.*, 141 S. Ct. at

2046. Virginia Tech flips the adage on its head, encouraging students to respond, "I disapprove of what you say, and I'm going to report you for it."

Speech at universities is distinct. It attempts to probe conventional thought rather than confirm it. At its worst, it can be petty and banal. But at its best, academic discourse can rise above the sort of pablum one might hear at a political convention or the repetition of pat, dogmatic lines that often pass for serious discussion. At a time when Americans increasingly sort themselves through soundbites and talking points, speech at a university should counter these trends and embrace the cross-pollination of ideas from diverse viewpoints. It is no coincidence that ancient Athens introduced both dialogue to theater and democracy to the world around the same time—dialogue gives rise to democratic engagement because political truth emerges most fully from the conflict of different points of view. Unfortunately, Virginia Tech's policies restrict the role that speech can play in our democracy at the very time the unique capacities of university speech are needed most. Its bias response team sounds less like a catalyst for dialogue and more like some Ministry of Truth.

Of course there are reasonable time, place, and manner restrictions on speech that administrators can establish, *see Perry*, 460 U.S. at 45–46, such as protecting the privacy of dorms and the orderly progression of classes. Encouraging dialogue does not mean countenancing disruption. The heckler has no right to veto the speech that others come to hear. And the University may obviously take protective measures to stem violent misconduct against students, as occurred so tragically at Virginia Tech itself in the depraved killing of so many good and fine people on April 16, 2007. When speech

threatens to verge into violent misconduct, University officials remain free to act in the best interest of those for whom any community would naturally seek to care.

It is not too much, however, to expect University administrators to appreciate the difference between expressive speech and violent action. This distinction is basic not only to the First Amendment, but to the way in which our society is run and governed. That basic separation must prevail in the campus environment. It is, I recognize, difficult to understand when campus dialogue will lead to mutual respect and appreciation on the one hand or when it may result in heated tempers on the other. It is not, however, for government to steer the consequences of pure speech, lest the line between free and repressive societies be lost.

For all its faults, higher education is not some expensive bauble that has outlived its usefulness. It remains essential to the transmission of the upper reaches of learning to upcoming generations, to the nation's innovation and growth, and to the ability of students to appreciate the past even as they anticipate the future. Universities and monasteries kept alive the fickle light of learning in the Middle Ages. It is not naïve to think universities today can illuminate a better way. America depends mightily on its great universities, of which Virginia Tech is surely one. What we have before us in this case is unworthy of it.

I respectfully dissent. I would reverse and remand this case with directions that the district court enjoin the BIRT and Informational Activities policies at issue. If they are the future of our nation's universities, we shall all share in the loss.