

**MEL JONES JR <jonesjrmel@gmail.com>**

---

## #25-1158 [and] #25-cv-10139.... urgent email to [appellees - plaintiffs AG States New Jersey and Michigan/ Dana Nessel]... LOOK very closely at the Elon Musk, Lee Zeldin, Donald Trump US Supreme Court Application... the "CASE LAW and ARGUMENT ARE WEAK"... and are CODE for "HELP" from their Republican Buddies on the US Supreme Court !!!

1 message

---

**MEL JONES JR <jonesjrmel@gmail.com>**                                Sat, Mar 15, 2025 at 10:52 PM
To: MEL JONES JR <jonesjrmel@gmail.com>, Deborah Greenspan <deborah.greenspan@blankrome.com>,
derek.l.weiss@usdoj.gov, Zeldin.Lee@epa.gov, mobrien@irli.org, chajec@irli.org, gcanaan@irli.org, gwv@dcglaw.com,
tmccotter@boydengray.com, daniel.epstein@aflegal.org, "jon@publicrightsproject.org" <jon@publicrightsproject.org>,
serviceS3@michigan.gov, giovanatiN@michigan.gov, Stacey.Metro@ag.ny.gov, Annabelle.Wilmott@doj.ca.gov,
Lorraine.Lopez@doj.ca.gov, Delbert.Tran@doj.ca.gov, zoe.levine@ag.ny.gov, Irina.Trasovan@doj.ca.gov,
"denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>, "robert.c.merritt@usdoj.gov"
<robert.c.merritt@usdoj.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>, "brad.rosenberg@usdoj.gov"
<brad.rosenberg@usdoj.gov>, jgrayson@nmdoj.gov, molly.alarcon@sfcityatty.org, "david.louk@sfcityatty.org"
<david.louk@sfcityatty.org>, shannon.stevenson@coag.gov, ksadeck@riag.ri.gov, jared.b.cohen@mass.gov,
john.keller@ag.state.mn.us, johnsonkarpg@doj.state.wi.us, julio.thompson@vermont.gov, dmosteller@ncdoj.gov,
"jeremy.feigenbaum@njoag.gov" <Jeremy.feigenbaum@njoag.gov>, shankar.duraiswamy@njoag.gov, Viviana.hanley@njoag.gov,
shefali.saxena@law.njoag.gov, Elizabeth.walsh@law.njoag.gov, HStern@ag.nv.gov, akirschner@oag.state.md.us,
Janelle.Medeiros@ct.gov, PolicyOffice@epa.gov, EIS-Filing@epa.gov, education@epa.gov, NEPAssisthelp@epa.gov,
NEPA@epa.gov, eric.wessan@ag.iowa.gov, matt.rice@ag.tn.gov, nlindzen@corpfraudlaw.com, yuri.s.fuchs@usdoj.gov,
sara.eisenberg@sfcityatty.org
Cc: Colleen Connors <CMColleen4@gmail.com>, MEL JONES JR <jonesjrmel@gmail.com>, "Marissa.Malouff@doj.ca.gov"
<Marissa.Malouff@doj.ca.gov>, "vanessa.kassab@delaware.gov" <vanessa.kassab@delaware.gov>,
"kaliko.d.fernandes_hawaii_gov" <kaliko.d.fernandes@hawaii.gov>, "jeremy.feigenbaum@njoag.gov"
<jeremy.feigenbaum@njoag.gov>, "harrist19@michigan.gov" <harrist19@michigan.gov>, "eng.connie@epa.gov"
<eng.connie@epa.gov>, "egle-nondiscriminationCC@michigan.gov" <egle-nondiscriminationCC@michigan.gov>, "Cormack,
Hayley" <Cormack.Hayley@epa.gov>, "EGLE-Accessibility@michigan.gov" <EGLE-Accessibility@michigan.gov>, "Faltin, Todd
(he/they)" <Faltin.Todd@epa.gov>, "Oviedo, Luis" <oviedo.luis@epa.gov>, "MacMillan-Sanchez, Ariel (she/her/hers)"
<MacMillanSanchez.Ariel@epa.gov>, "Johnson, Johanna (she/her/hers)" <Johnson.Johanna@epa.gov>, "Mason, Trinita"
<Mason.Trinita@epa.gov>, "Moore, Tammy" <moore.tammy@epa.gov>, "Walts, Alan (he/him/his)" <walts.alan@epa.gov>,
Deborah Greenspan <deborah.greenspan@blankrome.com>, "Risley, David" <Risley.David@epa.gov>, "tmlewis@cityofflint.com"
<tmlewis@cityofflint.com>, "cmcgehee@pittlawpc.com" <cmcgehee@pittlawpc.com>, "eric.a.rey@usdoj.gov"
<eric.a.rey@usdoj.gov>, "Jason.T.Cohen@usdoj.gov" <Jason.T.Cohen@usdoj.gov>, "OIG_Hotline@epa.gov"
<OIG_Hotline@epa.gov>, Corey <cstern@levylaw.com>, Patrick Lanciotti <PLanciotti@napollilaw.com>,
"dpettway@cityofflint.com" <dpettway@cityofflint.com>, "saneeley@cityofflint.com" <saneeley@cityofflint.com>,
"mbard@cityofflint.com" <mbard@cityofflint.com>, "michelle.t.domingue.II@usdoj.gov" <michelle.t.domingue.II@usdoj.gov>,
"Kaplan, Robert (he/him/his)" <kaplan.robert@epa.gov>, Mel jones jr <meljonesjr@gmail.com>, "marianne.f.kies@usdoj.gov"
<marianne.f.kies@usdoj.gov>, "daniel.c.eagles@usdoj.gov" <daniel.c.eagles@usdoj.gov>, "kuhlr@michigan.gov"
<kuhlr@michigan.gov>, "gambilln@michigan.gov" <gambilln@michigan.gov>, "MitosinkaA@michigan.gov"
<MitosinkaA@michigan.gov>, "gaiello@mayerbrown.com" <gaiello@mayerbrown.com>, "jkuptz@cityofflint.com"
<jkuptz@cityofflint.com>, "dfaraci@campbell-trial-lawyers.com" <dfaraci@campbell-trial-lawyers.com>, "alin@eisnerlaw.com"
<alin@eisnerlaw.com>, "ccmushatt@cityofflint.com" <ccmushatt@cityofflint.com>, "heidy.gonzalez@usdoj.gov"
<heidy.gonzalez@usdoj.gov>, AG attorney as to MI COC civil case #23-000115-MZ <bettenhausenm@michigan.gov>,
robinsonr11 <robinsonr11@michigan.gov>, Justus Brown <jubrown@cityofflint.com>, Kameshia Ar-Rahmaan <kar-
rahmaan@cityofflint.com>, Davina Donahue <ddonahue@cityofflint.com>, City of Flint Clerk's Office
<cityclerk@cityofflint.com>, Davina Donahue <CouncilPublicComment@cityofflint.com>, "trachelleyoung@gmail.com"
<trachelleyoung@gmail.com>, Ladel Lewis <llewis@cityofflint.com>, Judy Priestley <jpriestley@cityofflint.com>, Tonya Burns
<tburns@cityofflint.com>, Mark Cuker <mark@cukerlaw.com>, "michael.l.williams@usdoj.gov" <michael.l.williams@usdoj.gov>,
"molsen@mayerbrown.com" <molsen@mayerbrown.com>, "jcampbell@campbell-trial-lawyers.com" <jcampbell@campbell-trial-
lawyers.com>, "mnguyen-dang@mayerbrown.com" <mnguyen-dang@mayerbrown.com>, "pnapoli_napolilaw.com"
<pnapoli@napolilaw.com>, Renee Auten <rauten@thelandbank.org>, Jennifer Riggs <jriggs@thelandbank.org>, Jeremy Maltz
<jeremy@lehotskykeller.com>, "hammoudf1@michigan.gov" <HammoudF1@michigan.gov>, Michigan Attorney General
<miag@michigan.gov>, "dweyre@mcalpinepc.com" <dweyre@mcalpinepc.com>, "g@mayerbrown.com"

3/15/25, 6:55 PM    Gmail - #25-1158 [and] #25-cv-10139.... urgent email to [appellees - plaintiffs AG States New Jersey and Michigan/ Dana Nessel]....

Case: 25-1158    Document: 00418259831    Page: 2    Date Filed: 03/15/2025    Entry ID: 6706897

<g@mayerbrown.com>, "ljiang@susmangodfrey.com" <ljiang@susmangodfrey.com>, mpitt <mpitt@pittlawpc.com>, Hunter Shkolnik <hunter@napolilaw.com>, "arosenman@mayerbrown.com" <arosenman@mayerbrown.com>, Theodore Leopold <tleopold@cohenmilstein.com>, Emmy Levens <elevens@cohenmilstein.com>, Flint Mayor <mayor@cityofflint.com>, "frank.bednarz@hlli.org" <frank.bednarz@hlli.org>, "ted.frank@hlli.org" <ted.frank@hlli.org>, Diane <russell.diane@epa.gov>, Amanda Trujillo <atrujillo@cityofflint.com>, "King-Piepenbrok, Pier (AG)" <KingP1@michigan.gov>, "jonhoma@sinasdramis.com" <jonhoma@sinasdramis.com>, "val@vlwlegal.com" <val@vlwlegal.com>, "sdg@miller.law" <sdg@miller.law>, "sparadise@eisnerlaw.com" <sparadise@eisnerlaw.com>, "echeverria.marietta@epa.gov" <echeverria.marietta@epa.gov>, "thompkins.anita@epa.gov" <thompkins.anita@epa.gov>, "burneson.eric@epa.gov" <burneson.eric@epa.gov>, "travers.david@epa.gov" <travers.david@epa.gov>, "waters.tom@epa.gov" <waters.tom@epa.gov>, "davis.angela@epa.gov" <davis.angela@epa.gov>, "robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>, "denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>, "david.louk@sfcityatty.org" <david.louk@sfcityatty.org>, nlindzen@corpfraudlaw.com, franklmcnamara@gmail.com, mriordan@publicinterestlegal.org, eric.hamilton@usdoj.gov, "ryan@mclanelaw.com" <ryan@mclanelaw.com>, Zeldin.Lee@epa.gov, zoe.levine@ag.ny.gov
Bcc: UrbanForestNewYork@gmail.com, Mel jones jr <meljonesjr@gmail.com>

## *March 15th, 2025*

## *#25-1158 [and] #25-cv-10139....*

*RE:  urgent email to [appellees - plaintiffs AG States New Jersey and Michigan/ Dana Nessel]... LOOK very closely at the Elon Musk, Lee Zeldin, Donald Trump US Supreme Court Application... the "CASE LAW and ARGUMENT ARE WEAK"... and are CODE for "HELP" from their Republican Buddies on the US Supreme Court.*

*Good evening,*
*This "letter" is an [u]rgent email to [appellees - plaintiffs AG States New Jersey and Michigan/ Dana Nessel]... LOOK very closely at the Elon Musk, Lee Zeldin, Donald Trump US Supreme Court Application... the "CASE LAW and ARGUMENT ARE*

WEAK"... and are CODE for "HELP" from their Republican Buddies on the US Supreme Court. Please take notice [for example]... the quoted passage/ argument immediately below from the TRUMP, et al... US supreme court application... which is to say --- aside from being "CUTE" and a CATCHY MAGA SLOGAN... is when viewed carefully as HOLLOW as the RACIST HOT MESS THAT THE ELON MUSK (TESLA) WORK ENVIRONMENT IS... which is to say ...WHO {e.g. what ethnicity, county of origin, and/ or ACTUAL immigration status} is the EO at issue targeted at ???   You see... that is the "ultimate fact" which MUST be answered by Elon Musk and Donald Trump.... because make NO mistake they know ....but are just NOT telling the US Supreme Court ...nor are  they telling the general public of the United States [e.g. such as Melvin Jones Jr., and [I]].   And, the TRUMP team is hiding that critical information ...to MAKE AND ARGUMENT ABOUT LACK OF STANDING.... here, they must [and] will FAIL.  Here, Melvin Jones Jr., has informed me... that [he] believes that the Executive Order [EO] at issue is "ROOTED" in race animus against BLACKS at the end of the day.... looking very carefully at Elon Musk's history (e.g. TESLA)...

*and president Donald Trump's first presidency as to issues with "white-supremists" and outright violence against Black Folks who attended his [first] presidential rallies.... oh, how soon and fast the American public forgets !!!   See the quoted screen caption below:*

Government-by-universal-injunction has persisted long enough, and has reached a fever pitch in recent weeks.   It is long past time to restore district courts to their "proper—and properly limited—role * * * in a democratic society." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975).

o.... wait, wait --- not so fast;... because Warth v. Seldin held something all together different... which is [this]:

*Held: Whether the rules of standing are considered as aspects of the constitutional requirement that a plaintiff must make out a "case or controversy" within the meaning of Art. III, or, apart from such requirement, as prudential limitations on the courts' role in resolving disputes involving "generalized grievances" or third parties' legal rights or interests, none of the petitioners has met the threshold requirement of such rules that to have standing a complainant must clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the*

3/15/25, 6:55 PM    Gmail - 25-1658 (and) 25-1263.1 urgent email to appellees plaintiffs AG States New Jersey and Michigan Dana Nessel/....

Case: 25-1158    Document: 00118259831    Page: 5    Date Filed: 03/15/2025    Entry ID: 6706897

*exercise of the court's remedial powers. Pp. 422 U. S. 498-518.*

Page 422 U. S. 491

*(a) As to petitioner Rochester residents who assert standing as persons of low or moderate income and, coincidentally, as members of minority racial or ethnic groups, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and these petitioners' alleged injury. A plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that such practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Here, these petitioners rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief. Pp. 422 U. S. 502-508. Warth v. Seldin, 422 U.S. 490 (1975)*

*Thank you.*
*/s/*
*Colleen Connors [on behalf of Melvin Jones Jr.]*

---

**2 attachments**

**Warth v. Seldin _ 422 U.S. 490 (1975) _ Justia U.S. Supreme Court Center.pdf**
92K

**trumps us SUPREME court application.pdf**
372K



Case: 25-1158    Document: 00118259931    Pages: 7    Date Filed: 03/15/2025    Entry ID: 6706897



# Warth v. Seldin, 422 U.S. 490 (1975)

Overview     Opinions     Materials

**Argued:**           **Decided:**
March 17, 1975        June 25, 1975

**Syllabus**

## U.S. Supreme Court

**Warth v. Seldin, 422 U.S. 490 (1975)**

**Warth v. Seldin**

**No. 73-2024**

**Argued March 17, 1975**

**Decided June 25, 1975**

**422 U.S. 490**

*Syllabus*

This action for declaratory and injunctive relief and damages was brought by certain of the petitioners against respondent town of Penfield (a suburb of Rochester, N.Y.), and respondent members of Penfield's Zoning, Planning, and Town Boards, claiming that the town's zoning ordinance, by its terms and as enforced, effectively excluded persons of low and moderate income from living in the town, in violation of petitioners' constitutional rights and of 42 U.S.C. §§ 1981, 1982, and 1983. Petitioners consist of both the original plaintiffs -- (1) Metro-Act of Rochester, a not-for-profit corporation among whose purposes is fostering action to alleviate the housing shortage for low and moderate income persons in the Rochester area; (2) several individual Rochester taxpayers; and (3) several Rochester area residents with low or moderate incomes who are also members of minority racial or ethnic groups -- and Rochester Home Builders Association (Home Builders), embracing a number of residential construction firms in the Rochester area, which unsuccessfully sought to intervene as a party plaintiff, and the Housing Council in the Monroe County Area (Housing Council), a not-for-profit corporation consisting of a number of organizations interested in housing problems, which was unsuccessfully sought to be added as a party plaintiff. The District Court dismissed the complaint on the ground, *inter alia,* that petitioners lacked standing to prosecute the action, and the Court of Appeals affirmed.

*Held:* Whether the rules of standing are considered as aspects of the constitutional requirement that a plaintiff must make out a "case or controversy" within the meaning of Art. III, or, apart from such requirement, as prudential limitations on the courts' role in resolving disputes involving "generalized grievances" or third parties' legal rights or interests, none of the petitioners has met the threshold requirement of such rules that to have standing a complainant must clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. Pp. 422 U. S. 498-518.

Page 422 U. S. 491

(a) As to petitioner Rochester residents who assert standing as persons of low or moderate income and, coincidentally, as members of minority racial or ethnic groups, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and these petitioners' alleged injury. A plaintiff who seeks

to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that such practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Here, these petitioners rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief. Pp. 422 U. S. 502-508.

(b) With respect to petitioners who assert standing on the basis of their status as Rochester taxpayers, claiming that they are suffering economic injury through increased taxes resulting from Penfield's zoning practices having forced Rochester to provide more tax-abated low or moderate cost housing than it otherwise would have done, the line of causation between Penfield's actions and such injury is not apparent. But even assuming that these petitioners could establish that the zoning practices harm them, the basis of their claim is that the practices violate the constitutional and statutory rights of third parties -- persons of low and moderate income who allegedly are excluded from Penfield. Hence, their claim falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. Pp. 422 U. S. 508-510.

(c) Petitioner Metro-Act's claims to standing as a Rochester taxpayer and on behalf of its members who are Rochester taxpayers or persons of low or moderate income are precluded for the reasons applying to the denial of standing to the individual petitioner Rochester taxpayers and persons of low and moderate income. In addition, with respect to Metro-Act's claim to standing because 9% of its membership is composed of Penfield residents, prudential considerations strongly counsel against according such residents or Metro-Act standing where the complaint is that they have been harmed indirectly by the exclusion of others, thus attempting, in the absence of a showing of any exception allowing such a claim, to raise the putative rights of third parties. *Trafficante v. Metropolitan Life Ins.,* 409 U. S. 205, distinguished. Pp. 422 U. S. 512-514.

Page 422 U. S. 492

(d) Petitioner Home Builders, which alleges no monetary injury to itself, has no standing to claim damages on behalf of its members, since whatever injury may have been suffered is peculiar to the individual member concerned, thus requiring individualized proof of both the fact and extent of injury and individual awards. Nor does Home Builders have standing to claim prospective relief absent any allegation of facts sufficient to show the existence of any injury to members of sufficient immediacy and ripeness to warrant judicial intervention. Pp. 422 U. S. 514-516.

(e) Petitioner Housing Council has no standing where the complaint and record do not indicate that any of its members, with one exception, has made any effort involving Penfield, has taken any steps toward building there, or had any dealings with respondents. With respect to the one exception, this petitioner averred no basis for inferring that an earlier controversy between it and respondents remained a live, concrete dispute. Pp. 422 U. S. 516-517.

495 F.2d 1187, affirmed.

POWELL, J., delivered the opinion of the Court, in which BURGER, C.J., and STEWART, BLACKMUN, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post,* p. 422 U. S. 518. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post,* p. 422 U. S. 519.

Page 422 U. S. 493

**Read More**

## Opinions

### Opinions & Dissents

Hear Opinion Announcement - June 25, 1975

No. 24A

# In the Supreme Court of the United States

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

CASA, INC., ET AL.

———————

**APPLICATION FOR A PARTIAL STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

———————

SARAH M. HARRIS
  *Acting Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

## TABLE OF CONTENTS

Statement ................................................................................................ 4

    A.   Legal background ................................................................. 4

    B.   *Trump* v. *State of Washington* ...................................... 10

    C.   *Trump* v. *CASA, Inc.* ..................................................... 12

    D.   *Trump* v. *State of New Jersey* ..................................... 13

Argument ............................................................................................. 15

    A.   The universal injunctions improperly grant relief to non-parties ....... 15

    B.   The district courts' injunctions improperly grant relief to States........ 28

    C.   The district courts' injunctions improperly prevent the Executive Branch from developing implementation guidance .............................. 32

    D.   The equities favor a stay ................................................... 35

Conclusion ........................................................................................... 39

### PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Donald J. Trump, President of the United States; Marco Rubio, Secretary of State; Pamela Jo Bondi, Attorney General; Kristi Noem, Secretary of Homeland Security; Leland Dudek, Acting Commissioner of Social Security; Kika Scott, Senior Official Performing the Duties of Director, U.S. Citizenship and Immigration Services; and the United States of America.

Respondents (plaintiffs-appellees below) are CASA, Inc.; Asylum Seeker Advocacy Project, Inc; and Maribel, Juana, Trinidad Garcia, Monica, and Liza, individually and as next friends to their future children.

### RELATED PROCEEDINGS

United States District Court (W.D. Wash.):

> *State of Washington* v. *Trump*, No. 25-cv-127 (Feb. 6, 2025)
>
> *Franco Aleman* v. *Trump*, No. 25-cv-163 (Jan. 27, 2025)

United States Court of Appeals (9th Cir.):

> *State of Washington* v. *Trump*, No. 25-807 (Feb. 19, 2025)
>
> *State of Washington* v. *Trump*, No. 25-674 (pending)

United States District Court (D. Md.):

> *CASA, Inc.* v. *Trump*, No. 25-cv-201 (Feb. 18, 2025)

United States Court of Appeals (4th Cir.):

> *CASA, Inc.* v. *Trump*, No. 25-1153 (Feb. 28, 2025)

United States District Court (D. Mass.):

> *State of New Jersey* v. *Trump*, No. 25-cv-10139 (Feb. 6, 2025)

United States Court of Appeals (1st Cir.):

> *State of New Jersey* v. *Trump*, No. 25-1158 (pending)

iii

*State of New Jersey* v. *Trump*, No. 25-1170 (Mar. 11, 2025)

*State of New Jersey* v. *Trump*, No. 25-1200 (pending)

United States Supreme Court:

*Trump* v. *State of Washington*, No. 24A__ (pending)

*Trump* v. *State of New Jersey*, No. 24A__ (pending)

# In the Supreme Court of the United States

---

No. 24A

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANTS

*v.*

CASA, INC., ET AL.

---

**APPLICATION FOR A PARTIAL STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

---

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Acting Solicitor General—on behalf of Donald J. Trump, President of the United States, et al.—respectfully applies for a partial stay of the nationwide preliminary injunction issued by the U.S. District Court for the District of Maryland (App., *infra*, 57a-59a) pending the consideration and disposition of the government's appeal to the United States Courts of Appeals for the Fourth Circuit and pending any further review in this Court. The government is simultaneously filing similar applications in cases arising from the Western District of Washington and District of Massachusetts. From the following paragraph onward, all three applications are identical.

These cases—which involve challenges to the President's January 20, 2025 Executive Order concerning birthright citizenship—raise important constitutional questions with major ramifications for securing the border. But at this stage, the government comes to this Court with a "modest" request: while the parties litigate weighty merits questions, the Court should "restrict the scope" of multiple preliminary injunctions that "purpor[t] to cover every person * * * in the country," limiting those in-

(1)

junctions to parties actually within the courts' power.  App., *infra*, 71a-72a (Nie-meyer, J., dissenting).  Three district courts in Maryland, Massachusetts, and Washington have issued overlapping nationwide injunctions at the behest of 22 States, two organizations, and seven individuals.  Those universal injunctions prohibit a Day 1 Executive Order from being enforced anywhere in the country, as to "hundreds of thousands" of unspecified individuals who are "not before the court nor identified by the court."  *Ibid.*  And these overlapping injunctions prohibit federal agencies from even developing guidance about how they would implement the Order.  Yet three courts of appeals refused to limit that sweeping interim relief to the parties actually before the courts.  See *id.* at 18a, 65a-70a, 111a-142a.

This is hardly the first time that individual district judges have entered injunctions to "govern  * * *  the whole Nation from their courtrooms."  *Labrador* v. *Poe*, 144 S. Ct. 921, 926 (2024) (Gorsuch, J., concurring).  Such universal injunctions, though "a relatively new phenomenon," have become ubiquitous, posing "a question of great significance that has been in need of the Court's attention for some time."  *Id.* at 925-926.  The reasons are familiar:  universal injunctions are "legally and historically dubious," *Trump* v. *Hawaii*, 585 U.S. 687, 721 (2018) (Thomas, J., concurring), and "patently unworkable," *DHS* v. *New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., joined by Thomas, J., concurring).  Universal injunctions transgress constitutional limits on courts' powers, which extend only to "render[ing] a judgment or decree upon the rights of the litigants."  *United States* v. *Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., joined by Thomas and Barrett, J.J., concurring in the judgment) (citation omitted).  Universal injunctions are also incompatible with "'foundational' limits on equitable jurisdiction."  *Department of State* v. *AIDS Vaccine Advocacy Coalition*, No. 24A831, slip op. 7 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissent-

ing) (citation omitted).  "[N]ationwide injunctions have not been good for the rule of law," *Arizona* v. *Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring), and "ris[k] the perception of the federal courts as an apolitical branch," *CASA de Maryland, Inc.* v. *Trump*, 971 F.3d 220, 261 (4th Cir.) (Wilkinson, J.), reh'g en banc granted, 981 F.3d 311 (2020).  And universal injunctions compromise the Executive Branch's ability to carry out its functions, as administrations of both parties have explained.[1]

Universal injunctions have reached epidemic proportions since the start of the current Administration.  Courts have graduated from universal preliminary injunctions to universal temporary restraining orders, from universal equitable relief to universal monetary remedies, and from governing the whole Nation to governing the whole world.  District courts have issued more universal injunctions and TROs during February 2025 alone than through the first three years of the Biden Administration.  That sharp rise in universal injunctions stops the Executive Branch from performing its constitutional functions before any courts fully examine the merits of those actions, and threatens to swamp this Court's emergency docket.

Even measured against other universal injunctions, those at issue here stand out.  The universal injunctions here extend to all 50 States and to millions of aliens across the country—even though tailored interim relief for the plaintiffs to these suits would fully redress their alleged harms.  The courts granted these universal injunctions to States who plainly lacked standing to raise Citizenship Clause claims—defying the bedrock principle that States (like other litigants) may assert only their own rights, not the rights of third parties.  See, *e.g.*, *Haaland* v. *Brackeen*, 599 U.S. 255,

---

[1] See, *e.g.*, Appl. at 36-38, *McHenry* v. *Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025) (No. 24A653) (Biden Administration); Gov't Br. at 72-76, *Hawaii*, *supra* (No. 17-965) (first Trump Administration).

294-295 (2023).  The courts granted universal injunctions to bar federal agencies from even developing and issuing guidance regarding the implementation of the Citizenship Order—contravening the foundational rule that courts cannot restrain the Executive Branch's internal workings by preventing agencies from formulating or issuing policies in the first place.  And individual district courts layered their universal injunctions on top of each other, creating a "jurisdictionally messy" scenario where the government must run the table over months of litigation in multiple courts of appeals to have any chance of implementing the Order anywhere.  App., *infra*, 73a (Niemeyer, J., dissenting).  As Judge Niemeyer put it, these overlapping nationwide injunctions exemplify the "unseemliness of such a broad extension of judicial power." *Ibid.*  And these particular injunctions also exacerbate the existing circuit split over the permissibility of universal injunctions.  See pp. 25-26, *infra*.

This Court should declare that enough is enough before district courts' burgeoning reliance on universal injunctions becomes further entrenched.  The Court should stay the district courts' preliminary injunctions except as to the individual plaintiffs and the identified members of the organizational plaintiffs (and, if the Court concludes that States are proper litigants, as to individuals who are born or reside in those States).  At a minimum, the Court should stay the injunctions to the extent they prohibit agencies from developing and issuing public guidance regarding the implementation of the Order.  Only this Court's intervention can prevent universal injunctions from becoming universally acceptable.

## STATEMENT

### A.    Legal Background

1.    On January 20, 2025, President Trump issued an Executive Order regarding birthright citizenship.  See *Protecting the Meaning and Value of American*

*Citizenship*, Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) (Citizenship Order or Order). That Order is part of the Administration's broader effort to repair the Nation's immigration system, resolve the border crisis, and address the "significant threats to national security and public safety" posed by illegal immigration. *Protecting the American People Against Invasion* § 1, Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025) (Invasion Order); see, *e.g.*, *Securing Our Borders*, Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025); *Declaring a National Emergency at the Southern Border of the United States*, Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025).

Section 1 of the Order recognizes that the Constitution and the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, confer citizenship upon all persons born in the United States and subject to the jurisdiction thereof. See Citizenship Order § 1. Specifically, the Fourteenth Amendment to the U.S. Constitution provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1. That provision, known as the Citizenship Clause, repudiated *Dred Scott* v. *Sandford*, 19 How. 393 (1857), which infamously misinterpreted the Constitution to deny U.S. citizenship to people of African descent based solely on their race. Congress has reaffirmed the Citizenship Clause in the INA, which provides that "a person born in the United States, and subject to the jurisdiction thereof," is a citizen of the United States. 8 U.S.C. 1401(a).

Section 1 of the Order identifies two circumstances in which a person born in the United States is not subject to its jurisdiction: "(1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that

person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."  Citizenship Order § 1.

Section 2 of the Order directs the Executive Branch (1) not to issue documents recognizing U.S. citizenship to the persons identified in Section 1 and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons.  See Citizenship Order § 2(a).  Section 2 specifies that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," *i.e.*, after February 19.  *Id.* § 2(b).  Section 2 also makes clear that the Order does not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship."  Citizenship Order § 2(c).

Section 3 of the Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order."  Citizenship Order § 3(a).  It also directs the "heads of all executive agencies and departments" to "issue public guidance" within 30 days (*i.e.*, by February 19) "regarding th[e] order's implementation with respect to their operations and activities."  *Id.* § 3(b).

2.  The Order reflects that the Citizenship Clause does not extend citizenship universally to everyone born in the United States.  Rather, the Clause expressly excludes from birthright citizenship persons who are born in the United States but who are not "subject to the jurisdiction thereof."  U.S. Const. Amend. XIV, § 1.  The original

public meaning of the term "jurisdiction" refers "political jurisdiction" (which turns on whether a person owes allegiance to, and is entitled to protection from, the United States), not regulatory jurisdiction (which turns on whether a person must follow U.S. law). *Elk* v. *Wilkins*, 112 U.S. 94, 102 (1884). A person born in the United States is subject to its political jurisdiction only if, under background legal principles as understood at the time of ratification, he owes primary allegiance to the United States rather than to an "alien power." *Id.* at 101-102; see Cong. Globe, 39th Cong., 1st Sess. 572 (1866) (statement of Sen. Trumbull) ("What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means.").

Applying that test, this Court has identified multiple categories of people born in the United States who nonetheless lack a constitutional right to U.S. citizenship. Children of foreign diplomats, children of alien enemies, and children born on foreign public ships in U.S. waters fall in that category because they owe primary allegiance to foreign nations. See *United States* v. *Wong Kim Ark*, 169 U.S. 649, 693 (1898). The Court has also held that children of tribal Indians lack a constitutional right to citizenship because they owe "immediate allegiance to their several tribes." *Elk*, 112 U.S. at 99; see Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 (statutory extension of U.S. citizenship to Indians born in the United States).

A substantial body of historical evidence shows that the children of temporarily present aliens or of illegal aliens similarly are not subject to the political jurisdiction of the United States. Emerich de Vattel, the founding era's leading expert on the law of nations, wrote that citizenship by virtue of birth in a country extends to children of "citizens" or of "perpetual inhabitants," but not to children of foreigners who lack "the right of perpetual residence." Emerich de Vattel, *The Law of Nations* §§ 212-

213, at 101-102 (1797 ed.) (emphasis omitted).  And Justice Story recognized a "rea-

sonable qualification" to birthright citizenship for "the children of parents, who were

*in itinere* in the country, or abiding there for temporary purposes, as for health, or

occasional business."  Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48

(1834).

Members of Congress expressed a similar understanding during debates over

the Fourteenth Amendment and the Civil Rights Act of 1866, ch. 31, 14 Stat. 27,

which served as the Amendment's "initial blueprint," *General Building Contractors

Ass'n* v. *Pennsylvania*, 458 U.S. 375, 389 (1982).  For instance, Senator Lyman Trum-

bull explained in a letter to President Andrew Johnson that birthright citizenship

would extend only to persons "born of parents domiciled in the United States."  Mark

Shawhan, Comment, *The Significance of Parental Domicile in Lyman Trumbull's

Conception of Citizenship*, 119 Yale L.J. 1351, 1352-1353 (2010) (citation omitted).

Another Senator observed that "persons may be born in the United States yet not be

citizens," giving the example of a person who is "born here of parents from abroad

temporarily in this country."  Cong. Globe, 39th Cong., 1st Sess. 2769 (1866).  And a

Representative stated that, under "the general law relating to subjects and citizens

recognized by all nations," birthright citizenship did not extend to "children born on

our soil to temporary sojourners."  *Id.* at 1117.

Post-ratification practice points in the same direction.  The Secretary of State

issued an opinion in 1885 concluding that a child "born of [foreign] subjects, tempo-

rarily in the United States," had "no right of citizenship."  2 *A Digest of the Interna-

tional Law of the United States* § 183, at 397-398 (Francis Wharton ed., 2d ed. 1887).

A state supreme court determined that the jurisdictional element of the Citizenship

Clause excludes "those born in this country of foreign parents who are temporarily

traveling here." *Benny* v. *O'Brien*, 32 A. 696, 698 (N.J. 1895). And legal scholars explained that "[t]he words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States." Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) (citation omitted).

This Court in *Wong Kim Ark* then addressed, as the "question presented" in that case, "whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicil and residence in the United States*, * * * becomes at the time of his birth a citizen of the United States." 169 U.S. at 653 (emphasis added). After analyzing that question, the Court concluded that "[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of *resident* aliens." *Id.* at 693 (emphasis added). The Court then summed up its holding as follows: "[A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicil and residence in the United States*, * * * becomes at the time of his birth a citizen of the United States." *Id.* at 705 (emphasis added).

This Court has since recognized that *Wong Kim Ark* addressed only the children of foreign parents who were "permanently domiciled in the United States." *Kwock Jan Fat* v. *White*, 253 U.S. 454, 457 (1920); see *Chin Bak Kan* v. *United States*, 186 U.S. 193, 200 (1902). The Department of Justice, too, noted that *Wong Kim Ark* "goes no further" than addressing the children of foreigners "domiciled in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* 121 (1910). "[I]t has never been held," the Department continued, "and it is very doubtful whether it will ever be held,

that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." *Id.* at 124.

3.     During the 20th century, however, the Executive Branch adopted the incorrect position that the Citizenship Clause extended birthright citizenship to almost everyone born in the United States—even children of illegal aliens or temporarily present aliens.  See, *e.g.*, *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340 (1995).  That policy of near-universal birthright citizenship has created strong incentives for illegal immigration.  It has led to "birth tourism," the practice by which expecting mothers travel to the United States to give birth and secure U.S. citizenship for their children.  See Minority Staff Report, Comm. on Homeland Sec. & Governmental Affairs, U.S. Senate, *Birth Tourism in the United States* (Dec. 21, 2022).  And it has raised national-security concerns by extending U.S. citizenship to persons who lack meaningful ties to the country.  See, *e.g.*, Amy Swearer, *Subject to the [Complete] Jurisdiction Thereof*, 24 Tex. Rev. L. & Politics 135, 201 (2000) (discussing person who was born in Louisiana to temporarily present aliens from Saudi Arabia, who returned to Saudi Arabia as a toddler, and who joined the Taliban and waged war against the United States).  Immediately upon taking office on January 20, 2025, President Trump accordingly issued the Citizenship Order and directed relevant agencies to start taking steps to change course.

**B.     *Trump* v. *State of Washington***

1.     The first nationwide remedy issued from Washington at the behest of four States and two individuals.  One day after the issuance of the Citizenship Order, the State of Washington and three other States (the *Washington* state respondents) sued the federal government in the U.S. District Court for the Western District of

Washington, claiming that the Citizenship Order violates the Citizenship Clause and the INA. See App., *infra*, 6a. Three individuals filed a separate challenge in the same court. See *id.* at 7a. The court consolidated the cases, see *ibid.*, and one of the individuals withdrew from the litigation, see 25-cv-127 Am. Compl. 1-2 n.2 (W.D. Wash.) (*Washington* Am. Compl.). The remaining two individual plaintiffs (the *Washington* individual respondents) sought to represent a class of "pregnant persons residing in Washington State" and "children residing in Washington State" affected by the Citizenship Order, *id.* ¶ 141, but the court has not acted on their request for class certification.

Three days after the issuance of the Citizenship Order, the district court granted the state respondents a universal temporary restraining order enjoining the government from enforcing or implementing Sections 2(a) and 3 of the Order. See App., *infra*, 1a-4a. At the TRO hearing, the government asked the district court to limit any relief to the parties and to "allow the agencies to continue doing things behind the scenes to prepare to implement [the Citizenship Order] to the extent an injunctive order is lifted at some point." 25-cv-127 1/23/25 D. Ct. H'rg Tr. 18 (W.D. Wash.); see *id.* at 17-18. The court refused, issuing a TRO that extended nationwide and that prevented executive agencies from "implementing" as well as "[e]nforcing" the Order. App., *infra*, 3a.

Two weeks later, the district court granted the state respondents' request "to enjoin the Order's implementation and enforcement on a nationwide basis." App., *infra*, 15a-16a; see *id.* at 16a n.9 (noting that the individual respondents sought "only to enjoin the implementation and enforcement of the Order as it relates to themselves"). The court stated a "geographically limited injunction" would be "ineffective" and "unworkable." App., *infra*, 16a-17a. The court also concluded the state respond-

ents have Article III standing because they face the "loss of federal funds" and must "'navigate the chaos and uncertainty the Order creates,'" but did not address the government's argument that States lack standing to assert the citizenship rights of individuals. *Id.* at 8a (brackets and citation omitted).

2.  The government appealed, moved that the injunction be stayed except as to the individual respondents, and renewed its objection to the part of the injunction prohibiting implementation of the Citizenship Order. See D. Ct. Doc. 122 (Feb. 7, 2025). The district court took no action on the motion.

A motions panel of the Ninth Circuit denied the government a stay pending appeal. See App., *infra*, 18a-24a. In an order joined by two judges, the panel stated that the government had not shown a likelihood of success on the merits. See *id.* at 18a. In a concurring opinion, Judge Forrest expressed no view on the merits but concluded that the government had failed to show that "emergency relief is truly necessary to prevent irreparable harm." *Id.* at 24a.

C.   ***Trump* v. *CASA, Inc.***

1.  The next nationwide order issued from Maryland on behalf of two nonprofit organizations with alien members (the *CASA* organizational respondents) and five individuals (the *CASA* individual respondents). Those plaintiffs filed a separate suit challenging the Citizenship Order in the U.S. District Court for the District of Maryland. See App., *infra*, 25a-26a. That court, too, concluded that a "nationwide injunction is appropriate." App., *infra*, 56a. It determined that "[o]nly a nationwide injunction will provide complete relief to the plaintiffs" because one of the organizational respondents, the Asylum Seeker Advocacy Project, has members "in every state." *Ibid.* The court also stated that, because the Citizenship Order "is a categorical policy," a "nationwide injunction against the categorical policy * * * is appropri-

ate." *Ibid.* Finally, the court stated that nationwide relief "is necessary because the policy concerns citizenship—a national concern that demands a uniform policy." *Ibid.*

2.    The government appealed and moved for a partial stay, but the district court denied that motion. See App., *infra*, 60a-64a. The court first denied the government's request to stay the injunction except as to the five individual respondents and the eleven other members of the organizational respondents who had been named in the complaint. See App., *infra*, 61a-63a. The court also denied the government's request to limit the injunction to the enforcement (rather than the implementation) of the Citizenship Order, stating that "the government has no valid interest in taking internal, preparatory steps to formulate policies and guidance on an unconstitutional Executive Order." *Id.* at 63a.

A divided motions panel of the Fourth Circuit similarly denied relief. See App., *infra*, 66a-70a. The court concluded that "this case falls within the parameters for universal injunctions" "outlined in [Fourth Circuit] precedent," primarily because the case involves a "'categorical policy.'" *Id.* at 68a. The court also concluded that the equities did not favor granting a stay. See *id.* at 68a-70a.

Judge Niemeyer dissented, explaining that he would "grant the government's modest motion, which seeks only to cabin the [injunction's] inappropriate reach." App., *infra*, 72a; see *id.* at 71a-74a. Judge Niemeyer expressed "grave concern" about "national injunctions," highlighted the "unseemliness of such a broad extension of judicial power," and described the preliminary injunction here as "presumptuous and jurisdictionally messy." *Id.* at 73a.

**D.    *Trump* v. *State of New Jersey***

1.    The third nationwide injunction—issued to the State of New Jersey, 17 other States, the District of Columbia, and San Francisco (the *New Jersey* state re-

spondents)—came out of Massachusetts. Those plaintiffs challenged the Citizenship Order in the U.S. District Court for the District of Massachusetts, see App., *infra*, 80a & n.4, which granted a nationwide preliminary injunction against the Order's enforcement and implementation. See *id.* at 75a-105a (opinion); *id.* at 106a-107a (order). The court determined that the state respondents had Article III standing without addressing the government's argument that they could not assert the citizenship rights of third parties. See *id.* at 82a-85a.

The district court acknowledged that nationwide injunctions raise "meaningful concerns about the appropriate scope of a single district judge's equitable powers," but nonetheless concluded that the state plaintiffs were entitled to nationwide relief. App., *infra*, 101a; see *id.* at 101a-104a. The court reasoned that "injunctive relief limited to the State plaintiffs is inadequate" because a pregnant woman living in one State could "give birth across the border" in another State, or because a family might move to the State "after welcoming a new baby." *Id.* at 103a.

In the same opinion addressing the state respondents' suit, the district court addressed a separate suit brought by an individual and two organizations. See App., *infra*, 79a-80a. There, the court granted a preliminary injunction to the individual and the organizations' members, rejecting those plaintiffs' request for universal relief. See *id.* at 102a. That order is not at issue here.

2.    The government appealed and moved for a partial stay. See App., *infra*, 108a. The district court denied the motion, rejecting both the government's request to narrow the injunction to the state respondents and its request to allow the government to take "internal steps" to implement the Citizenship Order. *Id.* at 109a.

The court of appeals similarly denied a stay. The court reasoned, as relevant here, that the state respondents could properly assert individuals' citizenship rights

because the Citizenship Order could be enforced "against the Plaintiff-States." App., *infra*, 131a. The court also refused to narrow the injunction's nationwide scope because the government was unlikely "to succeed in demonstrating * * * that the challenged conduct is lawful." *Id.* at 140a. The court did state, however, that it would not "read the plain terms of the District Court's order to enjoin 'internal operations' that are 'preparatory operations that cannot impose any harm' on the Plaintiff-States." *Id.* at 142a.

## ARGUMENT

This Court has frequently granted complete or partial stays of universal orders issued by district courts. See *McHenry* v. *Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (Jan. 23, 2025); *Garland* v. *Vanderstok*, 144 S. Ct. 44 (2023); *Labrador* v. *Poe*, 144 S. Ct. 921 (2024); *Wolf* v. *Innovation Law Lab*, 140 S. Ct. 1564 (2020); *DHS* v. *New York*, 140 S. Ct. 599 (2020); *Barr* v. *East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019); *Trump* v. *Hawaii*, 583 U.S. 1009 (2017); *Trump* v. *International Refugee Assistance Project*, 582 U.S. 571 (2017) (per curiam). The usual stay factors support granting similar relief here. See *Ohio* v. *EPA*, 603 U.S. 279, 291 (2024) (discussing stay factors); *Does 1-3* v. *Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring) (same). The government is likely to succeed in showing that the district courts' universal preliminary injunctions were overbroad in three ways: They grant relief to non-parties, grant relief to States, and enjoin the internal operations of the Executive Branch. The courts' overbroad injunctions cause irreparable harm to the government. Narrowing the injunctions to their proper scope would not cause any hardship to the only plaintiffs properly before the Court and would be in the public interest.

### A.    The Universal Injunctions Improperly Grant Relief To Non-Parties

1.    As Judge Niemeyer observed, the government's request here is "mod-

est": to "cabin the [injunctions'] inappropriate reach," and thereby avoid overlapping nationwide injunctions that "could have the effect of preempting or at least interfering with the orders" of other courts. App., *infra*, 73a. The district courts should have limited their preliminary injunctions to the parties properly before them: the individual respondents, the identified members of the organizational respondents, and, only if they are proper parties, the state respondents. But see pp. 28-31, *infra* (state respondents lack standing to assert the citizenship rights of individuals).

That modest relief would correct the district courts' massive remedial foul. Nationwide or universal remedies exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system." *Trump* v. *Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); see *Department of State* v. *AIDS Vaccine Advocacy Coalition*, No. 24A831, slip op. 7 (2025) (Alito, J., dissenting); *Poe*, 144 S. Ct. at 923-924 (Gorsuch, J. concurring); *DHS*, 140 S. Ct. at 599-601 (Gorsuch, J., concurring).

Start with the constitutional problem: Article III authorizes federal courts to exercise only "judicial Power," which extends only to "Cases" and "Controversies." U.S. Const. Art. III, § 2, Cl. 1. Under that power, courts can adjudicate "claims of infringement of individual rights," "whether by [the] unlawful action of private persons or by the exertion of unauthorized administrative power." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 577 (1992) (citation omitted). Courts that sustain such claims may grant the challenger appropriate relief—for instance, an injunction preventing the enforcement of a challenged law or policy against that individual—but cannot grant relief to strangers to the litigation. Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423-424 (2021). To reach beyond the lit-

igants and to enjoin the Executive Branch's actions toward third parties "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly [courts] do not possess." *Massachusetts* v. *Mellon*, 262 U.S. 447, 489 (1923).

Universal injunctions also contravene this Court's precedents on Article III standing. "[S]tanding is not dispensed in gross," so plaintiffs must establish standing "for each form of relief that they seek." *Murthy* v. *Missouri*, 603 U.S. 43, 61 (2024) (citations omitted). And a plaintiff's remedy must be "limited to the inadequacy that produced his injury in fact." *Gill* v. *Whitford*, 585 U.S. 48, 66 (2018) (brackets and citation omitted). Even if respondents have standing to seek relief for themselves, but see pp. 28-31, *infra*, they lack standing to seek relief for third parties, as to whom plaintiffs cannot "sufficiently answer the question: 'What's it to you?'" *TransUnion*, 594 U.S. at 423 (citation and internal quotation marks omitted).

Universal injunctions also transgress restrictions on courts' equitable powers. Federal courts sitting in equity must apply "'traditional principles of equity jurisdiction'" and may award only those remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) (citation omitted). Congress may by statute authorize new remedies, but courts may not on their own authority "create remedies previously unknown to equity jurisprudence." *Id.* at 332; see *Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001) (new remedies "must be created by Congress").

American courts of equity traditionally "did not provide relief beyond the parties to the case." *Hawaii*, 585 U.S. at 717 (Thomas, J., concurring). They have instead long followed the "rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano* v.

*Yamasaki*, 442 U.S. 682, 702 (1979).  Unsurprisingly, then, there appear to have been "no national injunctions against federal defendants for the first century and a half of the United States."  Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 428 (2017).

Instead, in a 19th-century case where a lower court issued a universal injunction against the enforcement of a *state* statute, this Court agreed that the challenged statute violated the Constitution, see *Scott* v. *Donald*, 165 U.S. 58, 99-101 (1897), but nonetheless held in a separate opinion that the universal injunction was unlawful and that relief should have been "restricted to the part[y] named as plaintiff," *Scott* v. *Donald*, 165 U.S. 107, 117 (1897).  And in a similar modern-day precedent, this Court agreed that a statute prohibiting federal employees from accepting honoraria violated the First Amendment, but held that the injunction protecting "any Executive Branch employee" was overbroad and had to be "limited to the parties before the Court."  *United States* v. *National Treasury Employees Union*, 513 U.S. 454, 462, 477 (1995).  The Court considered it inappropriate "to provide relief to nonparties when a narrower remedy will fully protect the litigants."  *Id.* at 478.

Universal injunctions also subvert the Article III hierarchy of judicial review.  Ordinarily, the coercive effect of a court's judgment extends only to the case at hand, but the *stare decisis* effect of the court's opinion may extend to other cases, depending on the court's position in the Article III hierarchy.  A district court's opinion has no binding precedential effect at all, even in the same district or on the same judge in a different case.  See *Camreta* v. *Greene*, 563 U.S. 692, 709 n.7 (2011).  A court of appeals' published opinion, in turn, constitutes controlling precedent throughout the relevant circuit, though not in other circuits.  See *Poe*, 144 S. Ct. at 932 (Kavanaugh, J., concurring).  And, of course, this Court's decisions constitute controlling precedent

throughout the Nation.  If this Court were to hold a challenged statute or policy un-constitutional, the government could not "successfully enforce [it] against anyone, party or not, in light of *stare decisis*." *Griffin* v. *HM Florida-ORL, LLC*, 144 S. Ct. 1, 1 (2023) (statement of Kavanaugh, J.).  When district courts grant universal injunc-tions, they upend that system, imbuing the orders of courts of first instance with the type of nationwide effect usually reserved for the precedents of the court of last resort.

Further, universal injunctions "render meaningless rules about joinder and class actions." *United States* v. *Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concur-ring in the judgment).  Take these cases:  The individual plaintiffs in *Washington* sought to represent a class of affected "pregnant persons residing in Washington State" and "children residing in Washington State." *Washington* Am. Compl. ¶ 141.  Yet, instead of asking whether the individual plaintiffs satisfied class-certification requirements, see Fed. R. Civ. P. 23, the district court granted a universal injunction.  The court thereby granted even broader relief than the proposed class could have sought:  the preliminary injunction extends "nationwide," App., *infra*, 17a, not just to affected individuals "residing in Washington State," *Washington* Am. Compl. ¶ 141.

Universal relief "can also sweep up nonparties who may not wish to receive the benefit of the court's decision." *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring in the judgment); see *Arizona* v. *Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., con-curring) ("Nationwide injunctions  * * *  sometimes give States victories they do not want.").  In *Washington*, for example, 18 States filed an amicus brief arguing that the Citizenship Order "is constitutional" and "will reduce States' costs from illegal immi-gration."  25-cv-127 Iowa et al. D. Ct. Amici Br. 2 (W.D. Wash.).  Yet the district courts' injunctions prevent the Order from taking effect even in those 18 States.

Universal injunctions cause significant harm to the government.  They invite

forum shopping; different challengers need not file different challenges in different courts if one challenger who files one suit in one court can secure victory nationwide. See *Poe*, 144 S. Ct. at 927 (Gorsuch, J., concurring). They force the government "to seek immediate relief from one court and then the next, with the finish line in this Court." *Ibid.* They countermand the principle that the government is not subject to non-mutual issue preclusion—*i.e.*, that the government may relitigate an issue against one party even if it has lost that issue against another party in another case. See *United States* v. *Mendoza*, 464 U.S. 154, 162-163 (1984). And they operate asymmetrically, granting relief to strangers everywhere whenever a single plaintiff prevails, but not precluding continued litigation by others if some plaintiffs lose. See *DHS*, 140 S. Ct. at 601 (Gorsuch, J., concurring).

Finally, universal injunctions harm the courts. "By their nature, universal injunctions tend to force judges into making rushed, high-stakes, low-information decisions." *DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring). They exert substantial pressure on this Court's emergency docket, forcing the Court to confront difficult issues without "the airing of competing views" among "multiple judges and multiple circuits." *Ibid.* And they needlessly encourage "[r]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches." *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (citation omitted).[2]

---

[2] Members of this Court have debated whether the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.*, authorizes courts to vacate agency action universally. Compare *Texas*, 599 U.S. at 693-704 (Gorsuch, J., concurring in the judgment), with *Corner Post, Inc.* v. *Board of Governors*, 603 U.S. 799, 826-843 (2024) (Kavanaugh, J., concurring). These cases do not present that distinct question because the President's actions are not reviewable under the APA. See *Franklin* v. *Massachusetts*, 505 U.S. 788, 800-801 (1992). The inapplicability of the APA makes these cases particularly good vehicles for considering whether universal relief comports with Article III and traditional principles of equity. Cf. Stay Opp. at 41, *Texas Top Cop Shop*, *supra* (No.

2.   The district courts here failed to address those concerns, instead resting on precedent-defying rationales that would authorize nationwide injunctions in virtually any case.

a.   **CASA (District of Maryland)**.   Although the Citizenship Order has elicited multiple legal challenges, the District of Maryland (in *CASA*) is the only court to have granted a universal injunction to individuals and organizations.   The *Washington* individual respondents did not even ask for universal relief.   See App., *infra*, 16a n.9.   The District of Massachusetts (in *New Jersey*) denied universal relief to the individual and organizational plaintiffs in a separate suit.   See *id.* at 102a.   And another court withheld nationwide relief from individual and organizational plaintiffs. See *New Hampshire Indonesian Community Support* v. *Trump*, No. 25-cv-38, 2025 WL 457609, at *6 (D.N.H. Feb. 11, 2025).   That alone shows the one-way-ratchet effect when a single district court parts ways with its fellow courts and grants universal relief to plaintiffs who cannot obtain that relief elsewhere.

The *CASA* district court nonetheless deemed universal relief appropriate because the Citizenship Order is "a categorical policy." App., *infra*, 56a.   But Article III and principles of equity require courts to tailor injunctions to the scope of the plaintiff's injury, not to the scope of the defendant's policy.   The *CASA* court's contrary view "lacks a limiting principle and would make nationwide injunctions the rule rather than the exception with respect to all actions of federal agencies." *Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring).

The *CASA* district court also noted that the Constitution empowers Congress to "'establish an uniform Rule of Naturalization'" and stated that citizenship is "a

---

24A653) (arguing that a case was "not a promising vehicle" because the district court's universal injunction was "accompanied by a stay under  * * *  the APA").

national concern that demands a uniform policy." App., *infra*, 56a (quoting U.S. Const. Art. I, § 8, Cl. 4). But this case involves birthright citizenship—not naturalization. And the Naturalization Clause's uniformity requirement concerns Congress's power to pass statutes—not federal courts' power to issue remedies. While our legal system has an important interest in the uniformity of judicial decisions in citizenship cases and elsewhere, the way to achieve uniformity is for this Court to resolve circuit conflicts, not for district courts to issue universal injunctions.

The *CASA* district court also believed that nationwide relief was necessary to provide complete relief to one of the organizational plaintiffs, which has "680,000 members who reside in all 50 U.S. states and several U.S. territories." App., *infra*, 56a (citation and ellipsis omitted). As an initial matter, the court should have focused on the members named in the complaint and should not have granted relief to absent members. See *id.* at 71a-72a (Niemeyer, J., dissenting). Article III confines courts to adjudicating the rights of "the litigants brought before the Court." *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611 (1973). Courts may not grant relief to members who were not identified in the complaint and who did not agree to be bound by the judgment. See *FDA* v. *Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); Appl. at 35-36, *McHenry*, *supra* (No. 24A653). And even if the court could properly enjoin the enforcement of the Order against the organizational respondents' unnamed members, the court had no basis for granting relief to millions more aliens who do not belong to those organizations.

    b.    ***Washington*** **(W.D. Washington) and *New Jersey* (D. Mass.)** Meanwhile, the *Washington* and *New Jersey* district courts deemed universal relief necessary to redress the state respondents' asserted injuries. Both courts reasoned that, during the pendency of this litigation, children covered by the Citizenship Order

would be "born in other [S]tates" but would "travel to the Plaintiff States"; that the federal government would treat those children as aliens ineligible for various federal welfare benefits; and that those children would then seek "medical care and social services" from state respondents instead. App., *infra*, 14a, 16a; accord *id.* at 82a-85a, 103a.

That rationale is deeply flawed. First, state respondents lack standing to challenge the Citizenship Order; they have no entitlement to any relief, never mind nationwide relief. See pp. 28-31, *infra*. Second, plaintiffs seeking preliminary injunctions must show themselves "likely" to suffer irreparable harm. *Starbucks Corp.* v. *McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). State respondents have provided no evidence showing that the above speculative chain of events would likely occur, let alone transpire before final judgment, when the preliminary injunction would be in effect. Further underscoring the need for review, the First and Ninth Circuits saw no issue with this reasoning, see App., *infra*, 18a, 141a-142a, but the Fifth Circuit and Chief Judge Sutton have rejected the notion that a State could justify nationwide relief in an immigration case by speculating that some individuals might cross borders, see *Texas* v. *United States*, 126 F.4th 392, 421 n.49 (5th Cir. 2025); *Arizona*, 40 F.4th at 397-398 (Sutton, C.J., concurring). Third, the courts could have fully redressed state respondents' asserted financial injuries by directing the government not to apply the Citizenship Order in the States that have sued, even to persons who were born elsewhere but who later move to those States. Indeed, they could have redressed those injuries through an even narrower injunction directing the federal government to treat covered children as eligible for purposes of federally funded welfare benefits. Universal relief is substantially "more burdensome * * * than necessary to provide complete relief." *Yamasaki*, 442 U.S. at 702.

The *Washington* district court also stated that geographically limited relief would improperly subject the state respondents to "recordkeeping and administrative burden[s]." App, *infra*, 17a.  But the Citizenship Order does not regulate States, let alone impose such burdens on them.  While States might choose to modify their recordkeeping and administrative practices in response to the Order itself, such choices do not generate the injury in fact needed for standing or the irreparable injury needed for an injunction—much less a justification for universal relief.  See, *e.g.*, *Clapper* v. *Amnesty International USA*, 568 U.S. 398, 418 (2013) (plaintiffs may not seek judicial redress for "self-inflicted injuries").

The *Washington* district court also considered geographically limited relief "unworkable."  App., *infra*, 17a.  But no such workability problems have arisen when courts in other cases, including other immigration-related cases, have limited injunctive relief to specific States.  See, *e.g.*, *Texas*, 126 F.4th at 420-421 (enjoining the enforcement of the Deferred Action for Childhood Arrivals program but limiting that relief "to Texas alone"); *Arizona*, 40 F.4th at 398 (Sutton, C.J., concurring) (describing "'state-by-state'" relief in an immigration case as "feasible").  Indeed, it is the universal injunctions that create unworkability, for they prevent federal agencies from developing guidance implementing the Order.  See p. 32, *infra*.

In *New Jersey*, meanwhile, the First Circuit suggested that the government had forfeited its challenge to the nationwide scope of the injunction.  See App., *infra*, 138a-139a.  That suggestion is patently meritless.  The government objected to the injunction's scope in opposing the state respondents' motion for preliminary relief, in seeking a stay in district court, and again in seeking a stay in the court of appeals.  See *id.* at 101a-104a, 109a, 138a.  The court of appeals also asserted that the government raised additional arguments against nationwide relief beyond those pressed in

district court.  See *id.* at 139a.  But even if that were true, it would not matter.  "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."  *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992).

The First Circuit also found "no authority" for narrowing a universal injunction when the movant fails to show a likelihood of success on the underlying merits.  App., *infra*, 140a.  The Fourth Circuit similarly stated in *CASA* that the government is not entitled to relief from the nationwide scope of the injunction because it has not argued "that it will likely prevail on the merits of the Executive Order itself."  *Id.* at 69a.  In *Poe*, however, this Court granted a partial stay of a universal injunction even though the movant had challenged only the scope of the remedy.  See 144 S. Ct. at 921.  As Justice Gorsuch explained, courts should not penalize parties for seeking "narrower rather than broader relief" or "incentivize parties to seek more sweeping relief in order to enhance their chances of success in this Court."  *Id.* at 925 (Gorsuch, J., concurring).  Relief is warranted not only when lower courts violate "liability principles," but also when they violate "remedial principles."  *Ibid.*

3.    Finally, the underlying issues are certworthy.  See, *e.g.*, *Does 1-3*, 142 S. Ct. at 18 (Barrett, J., concurring) (identifying certworthiness as a pertinent stay factor).  Not only does the propriety of universal injunctions raise profound questions about courts' constitutional and equitable authority.  The lawfulness of universal relief has also generated a circuit conflict.  In recent years, some courts of appeals have reversed universal injunctions issued by district courts, recognizing that such remedies exceed the courts' constitutional and equitable powers.  See, *e.g.*, *Louisiana* v. *Becerra*, 20 F.4th 260, 263-264 (5th Cir. 2021); *L.W.* v. *Skrmetti*, 83 F.4th 460, 489-491 (6th Cir. 2023) (Sutton, C.J.), cert. granted, 144 S. Ct. 2679 (2024); *California* v.

*Azar*, 911 F.3d 558, 582-584 (9th Cir. 2018), cert. denied, 139 S. Ct. 2716 (2019); *Georgia* v. *President*, 46 F.4th 1283, 1303-1308 (11th Cir. 2022). But as the First, Fourth, and Ninth Circuit's denials of stays in these cases illustrate, other courts allow such injunctions to remain in place.

Members of this Court have long recognized the need to settle the lawfulness of universal injunctions. Justice Thomas wrote seven years ago that, "[i]f federal courts continue to issue [universal injunctions], this Court is dutybound to adjudicate their authority to do so." *Hawaii*, 585 U.S. at 721 (Thomas, J., concurring). Five years ago, Justice Gorsuch noted that "the routine issuance of universal injunctions is patently unworkable" and that "this Court must, at some point, confront" "this increasingly widespread practice." *DHS*, 140 S. Ct. at 600-601 (Gorsuch, J., concurring). More recently, Justice Kavanaugh recognized that the lawfulness of universal injunctions is "an important question that could warrant [the Court's] review." *Griffin*, 144 S. Ct. at 2 (statement of Kavanaugh, J.).

That question has become more urgent during the current Administration. According to one count, district courts issued 14 universal injunctions against the federal government through the first three years of President Biden's term. See *District Court Reform: Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1705 (2024). By contrast, courts issued *15* universal injunctions (or temporary restraining orders) against the current Administration in February 2025 alone.[3]

---

[3] See *Pacito* v. *Trump*, No. 25-cv-255, 2025 WL 655075, at *25-*26 (W.D. Wash. Feb. 28, 2025); D. Ct. Minute Order, *AIDS Vaccine Advocacy Coalition* v. *United States Department of State* (D.D.C. Feb. 25, 2025); *National Ass'n of Diversity Officers in Higher Education* v. *Trump*, No. 25-cv-333, 2025 WL 573764, at *29 (D. Md. 2025); *Washington* v. *Trump*, No. 25-cv-244, 2025 WL 509617, at *1-*2 (W.D. Wash. Feb. 14, 2025); *PFLAG, Inc.* v. *Trump*, No. 25-cv-337, 2025 WL 510050, at *23-*24 (D. Md. Feb. 13, 2025); *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400, 2025 WL 485324, at *7 (D.D.C. Feb. 13, 2025); *Doe* v. *Trump*, No. 25-cv-10135, 2025 WL 485070, at *14-*15 (D. Mass. Feb. 13, 2025); *Doctors for*

Underscoring the need for this Court's prompt intervention, universal remedies have escalated in other ways too. Courts have issued not just universal injunctions, but universal TROs. See, *e.g.*, App., *infra*, 1a-4a (universal TRO against enforcement of the Citizenship Order). They have run their writ not just nationwide, but worldwide. See, *e.g.*, *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400, 2025 WL 485324, at *7 (D.D.C. Feb. 13, 2025) (worldwide TRO against foreign-aid pause). And they have awarded not just universal injunctive relief, but de facto universal damages. See D. Ct. Minute Order, *AIDS Vaccine Advocacy Coalition* v. *United States Department of State* (D.D.C. Feb. 25, 2025) (order directing the government to pay out $2 billion, including to non-parties).

As the present cases illustrate, moreover, district courts have been issuing overlapping universal injunctions concerning the same policies. See, *e.g.*, *PFLAG, Inc.* v. *Trump*, No. 25-cv-337, 2025 WL 685124, at *32-*33 (D. Md. Mar. 4, 2025) (nationwide injunction against an Executive Order forbidding the use of federal funds to promote gender ideology); *Washington* v. *Trump*, No. 25-cv-244, 2025 WL 659057, at *28 (W.D. Wash. Feb. 28, 2025) (same). Overlapping universal injunctions are even more problematic than other universal remedies. Such "jurisdictionally messy" orders create a serious risk that different courts will subject the government to conflicting nationwide obligations with respect to the same policy. App., *infra*, 73a (Niemeyer, J., dissenting). Overlapping injunctions also heighten the asymmetric stakes

---

*America* v. *OPM*, No. 25-cv-322, 2025 WL 452707, at *10 (D.D.C. Feb. 11, 2025); D. Ct. Doc. 8, at 1, *Association of American Medical Colleges* v. *NIH*, No. 25-cv-10340 (D. Mass. Feb. 10, 2025); *New York* v. *Trump*, No. 25-cv-1144, 2025 WL 435411, at *1 (S.D.N.Y. Feb. 8, 2025); *American Foreign Service Ass'n* v. *Trump*, No. 25-cv-352, 2025 WL 435415, at *3-*4 (D.D.C. Feb. 7, 2025); *Washington* v. *Trump*, No. 25-cv-127, *6 (W.D. Wash. Feb. 2025); *Doe* v. *McHenry*, No. 25-cv-286, 2025 WL 388218, at *1 (D.D.C. Feb. 4, 2025); *National Council of Nonprofits* v. *OMB*, No. 25-cv-239, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025); *CASA, Inc.* v. *Trump*, No. 25-cv-201 (D. Md. Feb. 2, 2025).

of universal-injunction practice; even if the federal government were to obtain relief from a nationwide injunction in one circuit, it still would need to comply with an overlapping nationwide injunction issued by another court in another circuit.

Government-by-universal-injunction has persisted long enough, and has reached a fever pitch in recent weeks.   It is long past time to restore district courts to their "proper—and properly limited—role * * * in a democratic society."  *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975).

### B.    The District Courts' Injunctions Improperly Grant Relief To States

1.    The *Washington* and *New Jersey* district courts' remedial fouls are all the worse because the state respondents are not entitled to any relief at all, let alone nationwide relief.  To sue in federal court, plaintiffs must not only establish Article III standing—*i.e.*, a judicially cognizable injury that was likely caused by the defendant's challenged action and that judicial relief would likely redress.  See *TransUnion*, 594 U.S. at 423.  Plaintiffs must also assert their own legal rights, not third parties'. See *Warth*, 422 U.S. at 499.  Although we argued below (and continue to believe) that state respondents lack Article III standing, States' lack of third-party standing makes the challenged injunctions particularly egregious.  See *Kowalski* v. *Tesmer*, 543 U.S. 125, 129 (2004) (explaining that courts may address Article III standing and third-party standing in either order).  State respondents simply cannot assert citizenship rights on behalf of individuals, so the district courts should not have granted any relief to them.

In general, a party "must assert his own legal rights" and "cannot rest his claim to relief on the legal rights of third parties."  *Sessions* v. *Morales-Santana*, 582 U.S. 47, 57 (2017) (citation and ellipsis omitted); see *Tyler* v. *Judges of the Court of Registration*, 179 U.S. 405, 407-409 (1900).  "[C]onstitutional rights are personal and may

not be asserted vicariously." *Broadrick*, 413 U.S. at 610. Statutory rights work the same way; unless Congress provides otherwise, a suit must be brought by "the party whose legal right has been affected." *Tyler*, 179 U.S. at 407 (citation omitted).

Thus, States cannot raise individual-rights claims against the United States. "[I]t is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government." *Massachusetts* v. *Mellon*, 262 U.S. 447, 485-486 (1923). Suits where States seek to protect their citizens' rights are, in substance, *parens patriae* actions. See *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 607-608 (1982). But "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Id.* at 610 n.16.

Applying those principles, this Court has repeatedly rejected States' attempts to litigate the rights of their residents. In *South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966), it rejected South Carolina's claim that a federal statute violated the Due Process and Bill of Attainder Clauses because States lack rights of their own under those provisions and lack "standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government." *Id.* at 324. In *Haaland* v. *Brackeen*, 599 U.S. 255 (2023), it rejected Texas's claim that a federal statute violated the Equal Protection Clause because a State "has no equal protection rights of its own" and "cannot assert equal protection claims on behalf of its citizens." *Id.* at 294-295. And in *Murthy* v. *Missouri*, 603 U.S. 43 (2024), it rejected Missouri's claim that the federal government had violated the First Amendment by censoring its citizens' speech because Missouri lacked "third-party standing" to sue for those citizens. *Id.* at 76.

Those precedents "should make the issue open and shut." *Brackeen*, 599 U.S. at 295. State respondents have no rights of their own under the Citizenship Clause

or the INA.  Nor may state respondents assert the citizenship rights of individuals who live in those States.  Still less may they assert (as the universal injunctions suggest) the rights of individuals who live in *other* States throughout the Nation.

Although the government raised that argument in the district courts, the courts did not address it, instead holding only that state respondents had shown Article III standing.  See App., *infra*, 7a-8a, 82a-85a.  But limits on third-party standing are distinct from limits on Article III standing.  See *Alliance for Hippocratic Medicine*, 602 U.S. at 393 n.5.  "[E]ven when the plaintiff has alleged [an Article III] injury," "the plaintiff generally must assert his own legal rights."  *Warth*, 422 U.S. at 499.  In *Kowalski*, for example, this Court held that criminal defense attorneys could not challenge a state statute limiting the appointment of counsel for indigent defendants.  See 543 U.S. at 127.  The Court assumed that the attorneys had alleged a pocketbook injury that satisfied Article III—the statute reduced the number of cases in which they would be appointed and paid—but it nonetheless held that the attorneys could not assert their future clients' Sixth Amendment rights.  See *id.* at 129 & n.2, 134.  So too here, even if state respondents have alleged an Article III injury, they may not litigate the citizenship rights of private individuals.

The First Circuit, for its part, relied primarily on *June Medical Services L.L.C.* v. *Russo*, 591 U.S. 299 (2020), a case in which this Court allowed an abortion provider to assert the putative constitutional rights of its clients in challenging an abortion restriction.  See *id.* at 316-320 (plurality opinion); App., *infra*, 128a-131a.  But this Court has since described *June Medical* as an "abortion cas[e]" that "ignored the Court's third-party standing doctrine."  *Dobbs* v. *Jackson Women's Health Organization*, 597 U.S. 215, 286 (2022); see *id.* at 286 n.61.  Besides, *June Medical* reasoned that a plaintiff may sue if the "enforcement of the challenged restriction *against the*

*litigant* would result in the violation of third parties' rights." 591 U.S. at 318 (plurality opinion) (citation omitted). *June Medical* concluded that the challenged statute fit within that exception because it "regulate[d] [abortion providers'] conduct" and subjected them to "'sanctions' for noncompliance." *Id.* at 319 (citation omitted). The Citizenship Order, by contrast, does not require States to do or refrain from doing anything; much less does it subject States to sanctions.[4]

2.     Again, the underlying issues are certworthy. See *Does 1-3*, 142 S. Ct. at 18 (Barrett, J., concurring).  In recent years, States and their political subdivisions have inundated federal courts with politically charged suits challenging federal policies.  California, for example, "filed 122 lawsuits against the [first] Trump administration, an average of one every two weeks."  Nicole Nixon, *California Attorney General Files Nine Lawsuits In One Day As Trump Leaves Office*, Capital Public Radio (Jan. 19, 2021).  Meanwhile, on President Biden's last day in office, Texas announced "the 106th lawsuit" it had "filed against the Biden Administration."  Press Release, Att'y Gen. of Texas, *Attorney General Ken Paxton Sues Biden During the Administration's Final Hours to Stop Unlawful Ban on Offshore Drilling* (Jan. 20, 2025).  Whether red or blue, States are subject to the same, injunction-limiting rule:  individuals, not States, must bring individual-rights claims.  This Court has repeatedly rejected States' "thinly veiled attempt[s] to circumvent the limits on *parens patriae* standing."  *Murthy*, 603 U.S. at 76 (citation omitted); see *Brackeen*, 599 U.S. at 295 n.11. If, upon further review of the preliminary injunctions here, the courts of appeals

---

[4] This Court has separately recognized a narrow exception to the rule against third-party standing for cases where the plaintiff has "a close relationship" with the holder of the right and the holder of the right faces a "hindrance" to protecting his own interests. *Morales-Santana*, 582 U.S. at 57 (citation omitted).  Given that exception, the government has not disputed that individuals may assert the citizenship rights of their soon-to-be-born children.  But state respondents have not seriously argued that they satisfy the conditions for that exception.

disregarded those limits, their decisions would manifestly warrant review.

### C.   The District Courts' Injunctions Improperly Prevent The Executive Branch From Developing Implementation Guidance

Making the universal injunctions here even more problematic, the injunctions micromanage the internal operations of the Executive Branch.  The injunctions prohibit the Executive Branch not only from enforcing the Citizenship Order, but also from taking internal steps to *implement* it.  See App., *infra*, 17a; *id.* at 58a-59a; *id.* at 107a.  And the injunctions all block Section 3(b) of the Order, which directs executive agencies to "issue public guidance within 30 days  *  *  *  regarding this order's implementation with respect to their operations and activities."  Citizenship Order § 3(b); see App., *infra*, 17a; *id.* at 58a-59a; *id.* at 107a.  Those injunctions thus have prevented executive agencies from developing and issuing public guidance explaining how the Executive Branch would carry out the Citizenship Order once the Order takes effect.  See, *e.g.*, *id.* at 63a (refusing to allow the government to begin taking "internal, preparatory steps to formulate policies and guidance").

Those aspects of the injunctions further exceed the courts' authority under Article III.  "The province of the court is, solely, to decide on the rights of individuals." *Marbury* v. *Madison*, 1 Cranch 137, 170 (1803).  Courts have no power to "intrude into the cabinet," *ibid.*; to act as "continuing monitors of  *  *  *  Executive action," *Laird* v. *Tatum*, 408 U.S. 1, 15 (1972); or to exercise "some amorphous general supervision of the operations of government," *Raines* v. *Byrd*, 521 U.S. 811, 829 (1997) (citation omitted).  Once the Executive Branch develops and issues a policy, a court may, of course, resolve legal challenges to the policy and, if appropriate, enjoin the policy's enforcement against injured parties.  But a court has no power under Article III to superintend the Executive Branch's internal operations by prohibiting agencies

from developing or issuing policies in the first place.

The district courts' injunctions also violate Article II's Opinions Clause, which empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." U.S. Const. Art. II, § 2, Cl. 1. The President exercised that power when he directed the "heads of all executive agencies and departments" to prepare "guidance" regarding the Order's implementation. Citizenship Order § 3(b).

Injunctions against the preparation and publication of guidance, moreover, are unnecessary to redress any harms to respondents—and thus further transgress the rule that injunctions should be "no more burdensome" "than necessary to provide complete relief to the plaintiffs." *Yamasaki*, 442 U.S. at 702. Regardless of whether respondents would be injured by the ultimate enforcement of the Citizenship Order, they certainly would not be injured by preparatory work undertaken within the Executive Branch. Nor would they be injured by agencies' issuance of guidance explaining how they would implement the Order in the event that it took effect.

The *CASA* district court reasoned that "the government has no valid interest in taking internal, preparatory steps to formulate policies and guidance on an unconstitutional Executive Order." App., *infra*, 63a. But a court may not issue an unnecessarily burdensome injunction simply because it believes that the government lacks a "valid interest" in performing the enjoined activity. App., *infra*, 63a. Further, while the district courts held that respondents are *likely* to succeed on the merits of their Citizenship Clause challenges, respondents' success is not guaranteed. The government has a legitimate interest in taking preparatory steps so that it can immediately put the Citizenship Order into effect if and when the courts ultimately uphold it.

The *New Jersey* district court and the First Circuit faulted the government for

not adequately identifying the "'internal steps' [it] wish[ed] to take." App., *infra*, 109a; see *id*. at 142a. But the government expressly asked the district court to "limit its injunction to permit the government to implement the [Citizenship Order] in ways that cause no harm to the plaintiff states, including by * * * formulating relevant policies and guidance." 25-cv-10139 D. Ct. Doc. 158, at 6 (Feb. 19, 2025); see *id*. at 8 ("[T]he injunction causes further harm to the Defendants because * * * [it] prevents the executive branch as a whole from even beginning the process of formulating relevant policies and guidance."). The First Circuit also stated that it would not "read the [*New Jersey* injunction] to enjoin 'internal operations' that are 'preparatory operations that cannot impose any harm' on the Plaintiff-States." App., *infra*, 142a. But the scope of that statement is unclear; the court did not specify, for example, whether the government could publish guidance about how it would implement the Order.

This question too is certworthy. See *Does 1-3*, 142 S. Ct. at 18 (Barrett, J., concurring). Whether a district court may properly enjoin the Executive Branch's development and publication of policies is a weighty separation-of-powers question that warrants this Court's attention. The courts of appeals here have resolved that issue in inconsistent ways: The First Circuit stated that it would not read the *New Jersey* district court's injunction to restrain "internal operations," App., *infra*, 142a, but the Fourth and Ninth Circuit declined to grant relief from corresponding portions of the *CASA* and *Washington* injunctions. In addition, in *Hawaii* v. *Trump*, 859 F.3d 741, vacated on other grounds, 583 U.S. 941 (2017), the Ninth Circuit vacated a preliminary injunction to the extent it restricted "internal government operations and procedures" that "d[id] not burden individuals." *Id*. at 786. "An injunction against a government agency," the court explained, "must be structured to take into account the well-established rule that the government has traditionally been granted the wid-

est latitude in the dispatch of its own internal affairs." *Ibid.* (citation and internal quotation marks omitted). Any decisions affirming the injunctions in these cases would be in significant tension with the Ninth Circuit's decision in *Hawaii*.

Confirming the need for this Court's prompt intervention, the injunctions in these cases form part of a broader trend. Since the start of this Administration, district courts have repeatedly issued orders that superintend the internal operations of the Executive Branch by prohibiting the formulation of new policies. One court recently issued a preliminary injunction barring the implementation of an Executive Order that, among other things, required the Secretary of Homeland Security to submit reports to the President regarding refugee admissions. *Pacito* v. *Trump*, No. 25-cv-255, 2025 WL 655075, at *25 (W.D. Wash. Feb. 28, 2025). Another issued a TRO prohibiting implementation of an Executive Order that, among other things, required the Attorney General and Secretary of Homeland Security to prepare guidance concerning the housing of transgender prisoners. *Doe* v. *McHenry*, No. 25-cv-286, 2025 WL 388218, at *6 (D.D.C. Feb. 4, 2025). Such orders pose a serious threat to the Executive Branch's authority "to address new challenges by enacting new * * * policies" "without undue interference by courts." *CFPB* v. *CFSA*, 601 U.S. 416, 446 (2024) (Jackson, J., concurring).

### D.   The Equities Favor A Stay

1.   To put it mildly, universal injunctions irreparably harm the Executive Branch by preventing a branch of government from carrying out its work. The President holds "the mandate of the people to exercise his executive power." *Myers* v. *United States* 272 U.S. 52, 123 (1926). The Executive Branch exists to carry out his policies. Courts play an important role in adjudicating the lawfulness of those policies in justiciable cases, but they irreparably injure our democratic system when they

forbid the government from effectuating those policies against anyone anywhere in the Nation. See *Doe #1* v. *Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting); cf. *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (brackets and citation omitted).

Aggravating that irreparable harm, the district courts' universal injunctions interfere with internal Executive Branch operations by prohibiting agencies from developing and issuing guidance explaining how the Order would be implemented. This Court should grant stays to correct that "improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers); cf. *Cheney* v. *United States District Court*, 542 U.S. 367, 381 (2004) (extraordinary relief is appropriate to correct lower-court orders that "threaten the separation of powers").

In addition, the district courts' universal injunctions impair the President's efforts to address the crisis at the Nation's southern border. In recent years, the United States has faced "an unprecedented flood of illegal immigration." Invasion Order § 1. "Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States," "in violation of longstanding Federal laws." *Ibid.* "Many of these aliens unlawfully within the United States present significant threats to national security and public safety." *Ibid.* Some have "engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities." *Ibid.* "[T]heir presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels." *Ibid.* The district courts' universal injunctions threaten to perpetuate those problems by holding out a nationwide incentive for ille-

gal immigration: the prospect of American citizenship for the unlawful migrants' children and of derivative immigration benefits for the migrants themselves.

2. On the other side of the ledger, narrowing the scope of the district courts' injunctions would not harm the only plaintiffs properly before the district courts—the individual plaintiffs and the identified members of the organizational plaintiffs. A party-specific injunction would fully redress any injuries that those individuals may face. By contrast, harms to the state respondents and third parties are not pertinent. The traditional stay factors require a court to consider whether "the stay will substantially injure *the other parties*." *Ohio*, 603 U.S. at 291 (emphasis added). State respondents are not proper parties to this proceeding. See pp. 28-31, *supra*. Nor, by definition, are third parties. Accounting for their interests in weighing the equities would contravene the rule that strangers to the litigation are "not the proper object of [a court's] remediation." *Lewis* v. *Casey*, 518 U.S. 343, 358 (1996).

3. Finally, issuing a stay would serve the public interest. The district courts in these cases emphasized that the public has a strong interest in enforcing the Citizenship Clause and in upholding the rule of law. See, *e.g.*, App., *infra*, 15a, 90a, 100a. But universal injunctions thwart the rule of law, and Articles II and III, no less than the Citizenship Clause, form part of the Constitution. Whatever this Court's views of the lawfulness of the Citizenship Order, universal injunctions are plainly inappropriate means of redressing any harms to respondents. The public interest supports "grant[ing] the government's modest [application], which seeks only to cabin the [injunctions'] inappropriate reach." App., *infra*, 72a (Niemeyer, J., dissenting). Moreover, granting stays would simply allow the agencies to resume their work developing and issuing guidance regarding the implementation of the Order—work that never got off the ground because the *Washington* court immediately issued

a nationwide TRO.

Granting relief here would not mean that affected individuals would need to file thousands of separate suits across the country challenging the Order. Affected individuals could instead seek class certification and, if appropriate, seek class-wide preliminary relief. See Fed. R. Civ. P. 23. Indeed, the *Washington* individual respondents sought to follow that procedure here. See p. 11, *supra*. So long as putative class members all have standing, that approach, unlike the issuance of nationwide injunctions, complies with Article III and respects limits on courts' equitable authority. That procedure also avoids the asymmetric stakes of nationwide injunctions: A class judgment binds the whole class, but one plaintiff's loss in seeking nationwide relief does not stop others from trying again.

\* \* \* \* \*

There are "more than 1,000 active and senior district court judges, sitting across 94 judicial districts." *DHS*, 140 S. Ct. at 600-601 (Gorsuch, J., concurring). Years of experience have shown that the Executive Branch cannot properly perform its functions if any judge anywhere can enjoin every presidential action everywhere. The sooner universal injunctions are "eliminated root and branch," "the better." *Arizona*, 40 F.4th at 398 (Sutton, C.J., concurring).

**CONCLUSION**

In *Trump* v. *State of Washington*, this Court should stay the preliminary injunction except as to the two individual respondents—and, if the Court concludes that the state respondents are proper parties, as to individuals who are born or reside in those States.  In *Trump* v. *CASA, Inc.*, the Court should stay the preliminary injunction except as to the five individual respondents and the eleven members of the organizational respondents identified in the complaint.  In *Trump* v. *State of New Jersey*, the Court should stay the preliminary injunction in full—or, if the Court concludes that the state respondents are proper parties, except as to individuals who are born or reside in those States.  At a minimum, this Court should stay all three preliminary injunctions to the extent they prohibit executive agencies from developing and issuing guidance explaining how they would implement the Citizenship Order in the event that it takes effect.

Respectfully submitted.

SARAH M. HARRIS
*Acting Solicitor General*

MARCH 2025