No. 24A

# In the Supreme Court of the United States

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

STATE OF NEW JERSEY, ET AL.

———————

**APPLICATION FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

———————

SARAH M. HARRIS
  *Acting Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## TABLE OF CONTENTS

Statement ............................................................................................. 4

    A.    Legal background ................................................................. 4

    B.    *Trump* v. *State of Washington* ...................................... 10

    C.    *Trump* v. *CASA, Inc.* ..................................................... 12

    D.    *Trump* v. *State of New Jersey* ....................................... 13

Argument ........................................................................................... 15

    A.    The universal injunctions improperly grant relief to non-parties ....... 15

    B.    The district courts' injunctions improperly grant relief to States ........ 28

    C.    The district courts' injunctions improperly prevent the Executive Branch from developing implementation guidance ............................ 32

    D.    The equities favor a stay ................................................... 35

Conclusion ......................................................................................... 39

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Donald J. Trump, President of the United States; U.S. Department of State; Marco Rubio, Secretary of State; U.S. Department of Homeland Security; U.S. Department of Health and Human Services; Robert F. Kennedy, Secretary of Health and Human Services; Kristi Noem, Secretary of Homeland Security; U.S. Social Security Administration; Leland Dudek, Acting Commissioner of Social Security; and the United States of America.

Respondents (plaintiffs-appellees below) are the State of New Jersey; Commonwealth of Massachusetts; State of California; State of Colorado; State of Connecticut; District of Columbia; State of Delaware; State of Hawaii; State of Maine; State of Maryland; State of Minnesota; State of Nevada; State of New Mexico; State of New York; State of North Carolina; State of Rhode Island; State of Vermont; State of Wisconsin; Dana Nessel, Attorney General of Michigan; and City and County of San Francisco. The following individuals were plaintiffs in a case that the district court decided alongside the States' case: O. Doe; Brazilian Worker Center, Inc.; and La Colaborativa.

## RELATED PROCEEDINGS

United States District Court (W.D. Wash.):

*State of Washington* v. *Trump*, No. 25-cv-127 (Feb. 6, 2025)

*Franco Aleman* v. *Trump*, No. 25-cv-163 (Jan. 27, 2025)

United States Court of Appeals (9th Cir.):

*State of Washington* v. *Trump*, No. 25-807 (Feb. 19, 2025)

*State of Washington* v. *Trump*, No. 25-674 (pending)

United States District Court (D. Md.):

    *CASA, Inc.* v. *Trump*, No. 25-cv-201 (Feb. 18, 2025)

United States Court of Appeals (4th Cir.):

    *CASA, Inc.* v. *Trump*, No. 25-1153 (Feb. 28, 2025)

United States District Court (D. Mass.):

    *State of New Jersey* v. *Trump*, No. 25-cv-10139 (Feb. 6, 2025)

United States Court of Appeals (1st Cir.):

    *State of New Jersey* v. *Trump*, No. 25-1158 (pending)

    *State of New Jersey* v. *Trump*, No. 25-1170 (Mar. 11, 2025)

    *State of New Jersey* v. *Trump*, No. 25-1200 (pending)

United States Supreme Court:

    *Trump* v. *State of Washington*, No. 24A__ (pending)

    *Trump* v. *CASA, Inc.*, No. 24A__ (pending)

# In the Supreme Court of the United States

––––––––––

No. 24A

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, APPLICANTS

*v.*

STATE OF NEW JERSEY, ET AL.

––––––––––

**APPLICATION FOR A STAY OF THE INJUNCTION
ISSUED BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

––––––––––

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Acting Solicitor General—on behalf of Donald J. Trump, President of the United States, et al.—respectfully applies for a stay of the nationwide preliminary injunction issued by the U.S. District Court for the District of Massachusetts (App., *infra*, 106a-107a) pending the consideration and disposition of the government's appeal to the United States Courts of Appeals for the First Circuit and pending any further review in this Court. The government is simultaneously filing similar applications in cases arising from the Western District of Washington and District of Maryland. From the following paragraph onward, all three applications are identical.

These cases—which involve challenges to the President's January 20, 2025 Executive Order concerning birthright citizenship—raise important constitutional questions with major ramifications for securing the border. But at this stage, the government comes to this Court with a "modest" request: while the parties litigate weighty merits questions, the Court should "restrict the scope" of multiple preliminary injunctions that "purpor[t] to cover every person  * * *  in the country," limiting those in-

(1)

junctions to parties actually within the courts' power.  App., *infra*, 71a-72a (Niemeyer, J., dissenting).  Three district courts in Maryland, Massachusetts, and Washington have issued overlapping nationwide injunctions at the behest of 22 States, two organizations, and seven individuals.  Those universal injunctions prohibit a Day 1 Executive Order from being enforced anywhere in the country, as to "hundreds of thousands" of unspecified individuals who are "not before the court nor identified by the court."  *Ibid.*  And these overlapping injunctions prohibit federal agencies from even developing guidance about how they would implement the Order.  Yet three courts of appeals refused to limit that sweeping interim relief to the parties actually before the courts.  See *id.* at 18a, 65a-70a, 111a-142a.

This is hardly the first time that individual district judges have entered injunctions to "govern  *  *  *  the whole Nation from their courtrooms." *Labrador* v. *Poe*, 144 S. Ct. 921, 926 (2024) (Gorsuch, J., concurring).  Such universal injunctions, though "a relatively new phenomenon," have become ubiquitous, posing "a question of great significance that has been in need of the Court's attention for some time." *Id.* at 925-926.  The reasons are familiar:  universal injunctions are "legally and historically dubious," *Trump* v. *Hawaii*, 585 U.S. 687, 721 (2018) (Thomas, J., concurring), and "patently unworkable," *DHS* v. *New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., joined by Thomas, J., concurring).  Universal injunctions transgress constitutional limits on courts' powers, which extend only to "render[ing] a judgment or decree upon the rights of the litigants." *United States* v. *Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., joined by Thomas and Barrett, J.J., concurring in the judgment) (citation omitted).  Universal injunctions are also incompatible with "'foundational' limits on equitable jurisdiction." *Department of State* v. *AIDS Vaccine Advocacy Coalition*, No. 24A831, slip op. 7 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissent-

3

ing) (citation omitted). "[N]ationwide injunctions have not been good for the rule of law," *Arizona* v. *Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring), and "ris[k] the perception of the federal courts as an apolitical branch," *CASA de Maryland, Inc.* v. *Trump*, 971 F.3d 220, 261 (4th Cir.) (Wilkinson, J.), reh'g en banc granted, 981 F.3d 311 (2020). And universal injunctions compromise the Executive Branch's ability to carry out its functions, as administrations of both parties have explained.[1]

Universal injunctions have reached epidemic proportions since the start of the current Administration. Courts have graduated from universal preliminary injunctions to universal temporary restraining orders, from universal equitable relief to universal monetary remedies, and from governing the whole Nation to governing the whole world. District courts have issued more universal injunctions and TROs during February 2025 alone than through the first three years of the Biden Administration. That sharp rise in universal injunctions stops the Executive Branch from performing its constitutional functions before any courts fully examine the merits of those actions, and threatens to swamp this Court's emergency docket.

Even measured against other universal injunctions, those at issue here stand out. The universal injunctions here extend to all 50 States and to millions of aliens across the country—even though tailored interim relief for the plaintiffs to these suits would fully redress their alleged harms. The courts granted these universal injunctions to States who plainly lacked standing to raise Citizenship Clause claims—defying the bedrock principle that States (like other litigants) may assert only their own rights, not the rights of third parties. See, *e.g.*, *Haaland* v. *Brackeen*, 599 U.S. 255,

---

[1] See, *e.g.*, Appl. at 36-38, *McHenry* v. *Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (2025) (No. 24A653) (Biden Administration); Gov't Br. at 72-76, *Hawaii, supra* (No. 17-965) (first Trump Administration).

4

294-295 (2023). The courts granted universal injunctions to bar federal agencies from even developing and issuing guidance regarding the implementation of the Citizenship Order—contravening the foundational rule that courts cannot restrain the Executive Branch's internal workings by preventing agencies from formulating or issuing policies in the first place. And individual district courts layered their universal injunctions on top of each other, creating a "jurisdictionally messy" scenario where the government must run the table over months of litigation in multiple courts of appeals to have any chance of implementing the Order anywhere. App., *infra*, 73a (Niemeyer, J., dissenting). As Judge Niemeyer put it, these overlapping nationwide injunctions exemplify the "unseemliness of such a broad extension of judicial power." *Ibid.* And these particular injunctions also exacerbate the existing circuit split over the permissibility of universal injunctions. See pp. 25-26, *infra*.

This Court should declare that enough is enough before district courts' burgeoning reliance on universal injunctions becomes further entrenched. The Court should stay the district courts' preliminary injunctions except as to the individual plaintiffs and the identified members of the organizational plaintiffs (and, if the Court concludes that States are proper litigants, as to individuals who are born or reside in those States). At a minimum, the Court should stay the injunctions to the extent they prohibit agencies from developing and issuing public guidance regarding the implementation of the Order. Only this Court's intervention can prevent universal injunctions from becoming universally acceptable.

## STATEMENT

### A.    Legal Background

1.    On January 20, 2025, President Trump issued an Executive Order regarding birthright citizenship. See *Protecting the Meaning and Value of American*

*Citizenship*, Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) (Citizenship Order or Order).  That Order is part of the Administration's broader effort to repair the Nation's immigration system, resolve the border crisis, and address the "significant threats to national security and public safety" posed by illegal immigration.  *Protecting the American People Against Invasion* § 1, Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025) (Invasion Order); see, *e.g.*, *Securing Our Borders*, Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025); *Declaring a National Emergency at the Southern Border of the United States*, Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025).

Section 1 of the Order recognizes that the Constitution and the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, confer citizenship upon all persons born in the United States and subject to the jurisdiction thereof.  See Citizenship Order § 1.  Specifically, the Fourteenth Amendment to the U.S. Constitution provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1.  That provision, known as the Citizenship Clause, repudiated *Dred Scott* v. *Sandford*, 19 How. 393 (1857), which infamously misinterpreted the Constitution to deny U.S. citizenship to people of African descent based solely on their race.  Congress has reaffirmed the Citizenship Clause in the INA, which provides that "a person born in the United States, and subject to the jurisdiction thereof," is a citizen of the United States.  8 U.S.C. 1401(a).

Section 1 of the Order identifies two circumstances in which a person born in the United States is not subject to its jurisdiction: "(1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that

person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."  Citizenship Order § 1.

Section 2 of the Order directs the Executive Branch (1) not to issue documents recognizing U.S. citizenship to the persons identified in Section 1 and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons.  See Citizenship Order § 2(a).  Section 2 specifies that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," *i.e.*, after February 19.  *Id.* § 2(b).  Section 2 also makes clear that the Order does not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship."  Citizenship Order § 2(c).

Section 3 of the Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order."  Citizenship Order § 3(a).  It also directs the "heads of all executive agencies and departments" to "issue public guidance" within 30 days (*i.e.*, by February 19) "regarding th[e] order's implementation with respect to their operations and activities."  *Id.* § 3(b).

2.  The Order reflects that the Citizenship Clause does not extend citizenship universally to everyone born in the United States.  Rather, the Clause expressly excludes from birthright citizenship persons who are born in the United States but who are not "subject to the jurisdiction thereof."  U.S. Const. Amend. XIV, § 1.  The original

public meaning of the term "jurisdiction" refers "political jurisdiction" (which turns on whether a person owes allegiance to, and is entitled to protection from, the United States), not regulatory jurisdiction (which turns on whether a person must follow U.S. law). *Elk* v. *Wilkins*, 112 U.S. 94, 102 (1884). A person born in the United States is subject to its political jurisdiction only if, under background legal principles as understood at the time of ratification, he owes primary allegiance to the United States rather than to an "alien power." *Id.* at 101-102; see Cong. Globe, 39th Cong., 1st Sess. 572 (1866) (statement of Sen. Trumbull) ("What do we mean by 'subject to the jurisdiction of the United States?' Not owing allegiance to anybody else. That is what it means.").

Applying that test, this Court has identified multiple categories of people born in the United States who nonetheless lack a constitutional right to U.S. citizenship. Children of foreign diplomats, children of alien enemies, and children born on foreign public ships in U.S. waters fall in that category because they owe primary allegiance to foreign nations. See *United States* v. *Wong Kim Ark*, 169 U.S. 649, 693 (1898). The Court has also held that children of tribal Indians lack a constitutional right to citizenship because they owe "immediate allegiance to their several tribes." *Elk*, 112 U.S. at 99; see Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 (statutory extension of U.S. citizenship to Indians born in the United States).

A substantial body of historical evidence shows that the children of temporarily present aliens or of illegal aliens similarly are not subject to the political jurisdiction of the United States. Emerich de Vattel, the founding era's leading expert on the law of nations, wrote that citizenship by virtue of birth in a country extends to children of "citizens" or of "perpetual inhabitants," but not to children of foreigners who lack "the right of perpetual residence." Emerich de Vattel, *The Law of Nations* §§ 212-

213, at 101-102 (1797 ed.) (emphasis omitted).  And Justice Story recognized a "reasonable qualification" to birthright citizenship for "the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business."  Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834).

Members of Congress expressed a similar understanding during debates over the Fourteenth Amendment and the Civil Rights Act of 1866, ch. 31, 14 Stat. 27, which served as the Amendment's "initial blueprint," *General Building Contractors Ass'n* v. *Pennsylvania*, 458 U.S. 375, 389 (1982).  For instance, Senator Lyman Trumbull explained in a letter to President Andrew Johnson that birthright citizenship would extend only to persons "born of parents domiciled in the United States."  Mark Shawhan, Comment, *The Significance of Parental Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351, 1352-1353 (2010) (citation omitted).  Another Senator observed that "persons may be born in the United States yet not be citizens," giving the example of a person who is "born here of parents from abroad temporarily in this country."  Cong. Globe, 39th Cong., 1st Sess. 2769 (1866).  And a Representative stated that, under "the general law relating to subjects and citizens recognized by all nations," birthright citizenship did not extend to "children born on our soil to temporary sojourners."  *Id.* at 1117.

Post-ratification practice points in the same direction.  The Secretary of State issued an opinion in 1885 concluding that a child "born of [foreign] subjects, temporarily in the United States," had "no right of citizenship."  2 *A Digest of the International Law of the United States* § 183, at 397-398 (Francis Wharton ed., 2d ed. 1887).  A state supreme court determined that the jurisdictional element of the Citizenship Clause excludes "those born in this country of foreign parents who are temporarily

traveling here." *Benny* v. *O'Brien*, 32 A. 696, 698 (N.J. 1895). And legal scholars explained that "[t]he words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States." Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) (citation omitted).

This Court in *Wong Kim Ark* then addressed, as the "question presented" in that case, "whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicil and residence in the United States*, * * * becomes at the time of his birth a citizen of the United States." 169 U.S. at 653 (emphasis added). After analyzing that question, the Court concluded that "[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of *resident* aliens." *Id.* at 693 (emphasis added). The Court then summed up its holding as follows: "[A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicil and residence in the United States*, * * * becomes at the time of his birth a citizen of the United States." *Id.* at 705 (emphasis added).

This Court has since recognized that *Wong Kim Ark* addressed only the children of foreign parents who were "permanently domiciled in the United States." *Kwock Jan Fat* v. *White*, 253 U.S. 454, 457 (1920); see *Chin Bak Kan* v. *United States*, 186 U.S. 193, 200 (1902). The Department of Justice, too, noted that *Wong Kim Ark* "goes no further" than addressing the children of foreigners "domiciled in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* 121 (1910). "[I]t has never been held," the Department continued, "and it is very doubtful whether it will ever be held,

that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." *Id.* at 124.

3.    During the 20th century, however, the Executive Branch adopted the incorrect position that the Citizenship Clause extended birthright citizenship to almost everyone born in the United States—even children of illegal aliens or temporarily present aliens.  See, *e.g.*, *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340 (1995).  That policy of near-universal birthright citizenship has created strong incentives for illegal immigration.  It has led to "birth tourism," the practice by which expecting mothers travel to the United States to give birth and secure U.S. citizenship for their children.  See Minority Staff Report, Comm. on Homeland Sec. & Governmental Affairs, U.S. Senate, *Birth Tourism in the United States* (Dec. 21, 2022).  And it has raised national-security concerns by extending U.S. citizenship to persons who lack meaningful ties to the country.  See, *e.g.*, Amy Swearer, *Subject to the [Complete] Jurisdiction Thereof*, 24 Tex. Rev. L. & Politics 135, 201 (2000) (discussing person who was born in Louisiana to temporarily present aliens from Saudi Arabia, who returned to Saudi Arabia as a toddler, and who joined the Taliban and waged war against the United States).  Immediately upon taking office on January 20, 2025, President Trump accordingly issued the Citizenship Order and directed relevant agencies to start taking steps to change course.

**B.    *Trump* v. *State of Washington***

1.    The first nationwide remedy issued from Washington at the behest of four States and two individuals.  One day after the issuance of the Citizenship Order, the State of Washington and three other States (the *Washington* state respondents) sued the federal government in the U.S. District Court for the Western District of

Washington, claiming that the Citizenship Order violates the Citizenship Clause and the INA. See App., *infra*, 6a. Three individuals filed a separate challenge in the same court. See *id.* at 7a. The court consolidated the cases, see *ibid.*, and one of the individuals withdrew from the litigation, see 25-cv-127 Am. Compl. 1-2 n.2 (W.D. Wash.) (*Washington* Am. Compl.). The remaining two individual plaintiffs (the *Washington* individual respondents) sought to represent a class of "pregnant persons residing in Washington State" and "children residing in Washington State" affected by the Citizenship Order, *id.* ¶ 141, but the court has not acted on their request for class certification.

Three days after the issuance of the Citizenship Order, the district court granted the state respondents a universal temporary restraining order enjoining the government from enforcing or implementing Sections 2(a) and 3 of the Order. See App., *infra*, 1a-4a. At the TRO hearing, the government asked the district court to limit any relief to the parties and to "allow the agencies to continue doing things behind the scenes to prepare to implement [the Citizenship Order] to the extent an injunctive order is lifted at some point." 25-cv-127 1/23/25 D. Ct. H'rg Tr. 18 (W.D. Wash.); see *id.* at 17-18. The court refused, issuing a TRO that extended nationwide and that prevented executive agencies from "implementing" as well as "[e]nforcing" the Order. App., *infra*, 3a.

Two weeks later, the district court granted the state respondents' request "to enjoin the Order's implementation and enforcement on a nationwide basis." App., *infra*, 15a-16a; see *id.* at 16a n.9 (noting that the individual respondents sought "only to enjoin the implementation and enforcement of the Order as it relates to themselves"). The court stated a "geographically limited injunction" would be "ineffective" and "unworkable." App., *infra*, 16a-17a. The court also concluded the state respond-

ents have Article III standing because they face the "loss of federal funds" and must "'navigate the chaos and uncertainty the Order creates,'" but did not address the government's argument that States lack standing to assert the citizenship rights of individuals. *Id.* at 8a (brackets and citation omitted).

2.    The government appealed, moved that the injunction be stayed except as to the individual respondents, and renewed its objection to the part of the injunction prohibiting implementation of the Citizenship Order. See D. Ct. Doc. 122 (Feb. 7, 2025). The district court took no action on the motion.

A motions panel of the Ninth Circuit denied the government a stay pending appeal. See App., *infra*, 18a-24a. In an order joined by two judges, the panel stated that the government had not shown a likelihood of success on the merits. See *id.* at 18a. In a concurring opinion, Judge Forrest expressed no view on the merits but concluded that the government had failed to show that "emergency relief is truly necessary to prevent irreparable harm." *Id.* at 24a.

C.    ***Trump* v. *CASA, Inc.***

1.    The next nationwide order issued from Maryland on behalf of two nonprofit organizations with alien members (the *CASA* organizational respondents) and five individuals (the *CASA* individual respondents). Those plaintiffs filed a separate suit challenging the Citizenship Order in the U.S. District Court for the District of Maryland. See App., *infra*, 25a-26a. That court, too, concluded that a "nationwide injunction is appropriate." App., *infra*, 56a. It determined that "[o]nly a nationwide injunction will provide complete relief to the plaintiffs" because one of the organizational respondents, the Asylum Seeker Advocacy Project, has members "in every state." *Ibid.* The court also stated that, because the Citizenship Order "is a categorical policy," a "nationwide injunction against the categorical policy * * * is appropri-

ate." *Ibid.* Finally, the court stated that nationwide relief "is necessary because the policy concerns citizenship—a national concern that demands a uniform policy." *Ibid.*

2.     The government appealed and moved for a partial stay, but the district court denied that motion. See App., *infra*, 60a-64a. The court first denied the government's request to stay the injunction except as to the five individual respondents and the eleven other members of the organizational respondents who had been named in the complaint. See App., *infra*, 61a-63a. The court also denied the government's request to limit the injunction to the enforcement (rather than the implementation) of the Citizenship Order, stating that "the government has no valid interest in taking internal, preparatory steps to formulate policies and guidance on an unconstitutional Executive Order." *Id.* at 63a.

A divided motions panel of the Fourth Circuit similarly denied relief. See App., *infra*, 66a-70a. The court concluded that "this case falls within the parameters for universal injunctions" "outlined in [Fourth Circuit] precedent," primarily because the case involves a "'categorical policy.'" *Id.* at 68a. The court also concluded that the equities did not favor granting a stay. See *id.* at 68a-70a.

Judge Niemeyer dissented, explaining that he would "grant the government's modest motion, which seeks only to cabin the [injunction's] inappropriate reach." App., *infra*, 72a; see *id.* at 71a-74a. Judge Niemeyer expressed "grave concern" about "national injunctions," highlighted the "unseemliness of such a broad extension of judicial power," and described the preliminary injunction here as "presumptuous and jurisdictionally messy." *Id.* at 73a.

### D.     *Trump* v. *State of New Jersey*

1.     The third nationwide injunction—issued to the State of New Jersey, 17 other States, the District of Columbia, and San Francisco (the *New Jersey* state re-

14

spondents)—came out of Massachusetts. Those plaintiffs challenged the Citizenship Order in the U.S. District Court for the District of Massachusetts, see App., *infra*, 80a & n.4, which granted a nationwide preliminary injunction against the Order's enforcement and implementation. See *id.* at 75a-105a (opinion); *id.* at 106a-107a (order). The court determined that the state respondents had Article III standing without addressing the government's argument that they could not assert the citizenship rights of third parties. See *id.* at 82a-85a.

The district court acknowledged that nationwide injunctions raise "meaningful concerns about the appropriate scope of a single district judge's equitable powers," but nonetheless concluded that the state plaintiffs were entitled to nationwide relief. App., *infra*, 101a; see *id.* at 101a-104a. The court reasoned that "injunctive relief limited to the State plaintiffs is inadequate" because a pregnant woman living in one State could "give birth across the border" in another State, or because a family might move to the State "after welcoming a new baby." *Id.* at 103a.

In the same opinion addressing the state respondents' suit, the district court addressed a separate suit brought by an individual and two organizations. See App., *infra*, 79a-80a. There, the court granted a preliminary injunction to the individual and the organizations' members, rejecting those plaintiffs' request for universal relief. See *id.* at 102a. That order is not at issue here.

2. The government appealed and moved for a partial stay. See App., *infra*, 108a. The district court denied the motion, rejecting both the government's request to narrow the injunction to the state respondents and its request to allow the government to take "internal steps" to implement the Citizenship Order. *Id.* at 109a.

The court of appeals similarly denied a stay. The court reasoned, as relevant here, that the state respondents could properly assert individuals' citizenship rights

because the Citizenship Order could be enforced "against the Plaintiff-States." App.,
*infra*, 131a. The court also refused to narrow the injunction's nationwide scope be-
cause the government was unlikely "to succeed in demonstrating * * * that the chal-
lenged conduct is lawful." *Id.* at 140a. The court did state, however, that it would
not "read the plain terms of the District Court's order to enjoin 'internal operations'
that are 'preparatory operations that cannot impose any harm' on the Plaintiff-
States." *Id.* at 142a.

## ARGUMENT

This Court has frequently granted complete or partial stays of universal orders
issued by district courts. See *McHenry* v. *Texas Top Cop Shop, Inc.*, 145 S. Ct. 1 (Jan.
23, 2025); *Garland* v. *Vanderstok*, 144 S. Ct. 44 (2023); *Labrador* v. *Poe*, 144 S. Ct.
921 (2024); *Wolf* v. *Innovation Law Lab*, 140 S. Ct. 1564 (2020); *DHS* v. *New York*,
140 S. Ct. 599 (2020); *Barr* v. *East Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019);
*Trump* v. *Hawaii*, 583 U.S. 1009 (2017); *Trump* v. *International Refugee Assistance
Project*, 582 U.S. 571 (2017) (per curiam). The usual stay factors support granting
similar relief here. See *Ohio* v. *EPA*, 603 U.S. 279, 291 (2024) (discussing stay fac-
tors); *Does 1-3* v. *Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring) (same). The
government is likely to succeed in showing that the district courts' universal prelim-
inary injunctions were overbroad in three ways: They grant relief to non-parties,
grant relief to States, and enjoin the internal operations of the Executive Branch.
The courts' overbroad injunctions cause irreparable harm to the government. Nar-
rowing the injunctions to their proper scope would not cause any hardship to the only
plaintiffs properly before the Court and would be in the public interest.

### A.    The Universal Injunctions Improperly Grant Relief To Non-Parties

1.    As Judge Niemeyer observed, the government's request here is "mod-

est": to "cabin the [injunctions'] inappropriate reach," and thereby avoid overlapping nationwide injunctions that "could have the effect of preempting or at least interfering with the orders" of other courts. App., *infra*, 73a. The district courts should have limited their preliminary injunctions to the parties properly before them: the individual respondents, the identified members of the organizational respondents, and, only if they are proper parties, the state respondents. But see pp. 28-31, *infra* (state respondents lack standing to assert the citizenship rights of individuals).

That modest relief would correct the district courts' massive remedial foul. Nationwide or universal remedies exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system." *Trump* v. *Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); see *Department of State* v. *AIDS Vaccine Advocacy Coalition*, No. 24A831, slip op. 7 (2025) (Alito, J., dissenting); *Poe*, 144 S. Ct. at 923-924 (Gorsuch, J. concurring); *DHS*, 140 S. Ct. at 599-601 (Gorsuch, J., concurring).

Start with the constitutional problem: Article III authorizes federal courts to exercise only "judicial Power," which extends only to "Cases" and "Controversies." U.S. Const. Art. III, § 2, Cl. 1. Under that power, courts can adjudicate "claims of infringement of individual rights," "whether by [the] unlawful action of private persons or by the exertion of unauthorized administrative power." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 577 (1992) (citation omitted). Courts that sustain such claims may grant the challenger appropriate relief—for instance, an injunction preventing the enforcement of a challenged law or policy against that individual—but cannot grant relief to strangers to the litigation. Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423-424 (2021). To reach beyond the lit-

igants and to enjoin the Executive Branch's actions toward third parties "would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly [courts] do not possess." *Massachusetts* v. *Mellon*, 262 U.S. 447, 489 (1923).

Universal injunctions also contravene this Court's precedents on Article III standing. "[S]tanding is not dispensed in gross," so plaintiffs must establish standing "for each form of relief that they seek." *Murthy* v. *Missouri*, 603 U.S. 43, 61 (2024) (citations omitted). And a plaintiff's remedy must be "limited to the inadequacy that produced his injury in fact." *Gill* v. *Whitford*, 585 U.S. 48, 66 (2018) (brackets and citation omitted). Even if respondents have standing to seek relief for themselves, but see pp. 28-31, *infra*, they lack standing to seek relief for third parties, as to whom plaintiffs cannot "sufficiently answer the question: 'What's it to you?'" *TransUnion*, 594 U.S. at 423 (citation and internal quotation marks omitted).

Universal injunctions also transgress restrictions on courts' equitable powers. Federal courts sitting in equity must apply "'traditional principles of equity jurisdiction'" and may award only those remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) (citation omitted). Congress may by statute authorize new remedies, but courts may not on their own authority "create remedies previously unknown to equity jurisprudence." *Id.* at 332; see *Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001) (new remedies "must be created by Congress").

American courts of equity traditionally "did not provide relief beyond the parties to the case." *Hawaii*, 585 U.S. at 717 (Thomas, J., concurring). They have instead long followed the "rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano* v.

*Yamasaki*, 442 U.S. 682, 702 (1979). Unsurprisingly, then, there appear to have been "no national injunctions against federal defendants for the first century and a half of the United States." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 428 (2017).

Instead, in a 19th-century case where a lower court issued a universal injunction against the enforcement of a *state* statute, this Court agreed that the challenged statute violated the Constitution, see *Scott* v. *Donald*, 165 U.S. 58, 99-101 (1897), but nonetheless held in a separate opinion that the universal injunction was unlawful and that relief should have been "restricted to the part[y] named as plaintiff," *Scott* v. *Donald*, 165 U.S. 107, 117 (1897). And in a similar modern-day precedent, this Court agreed that a statute prohibiting federal employees from accepting honoraria violated the First Amendment, but held that the injunction protecting "any Executive Branch employee" was overbroad and had to be "limited to the parties before the Court." *United States* v. *National Treasury Employees Union*, 513 U.S. 454, 462, 477 (1995). The Court considered it inappropriate "to provide relief to nonparties when a narrower remedy will fully protect the litigants." *Id.* at 478.

Universal injunctions also subvert the Article III hierarchy of judicial review. Ordinarily, the coercive effect of a court's judgment extends only to the case at hand, but the *stare decisis* effect of the court's opinion may extend to other cases, depending on the court's position in the Article III hierarchy. A district court's opinion has no binding precedential effect at all, even in the same district or on the same judge in a different case. See *Camreta* v. *Greene*, 563 U.S. 692, 709 n.7 (2011). A court of appeals' published opinion, in turn, constitutes controlling precedent throughout the relevant circuit, though not in other circuits. See *Poe*, 144 S. Ct. at 932 (Kavanaugh, J., concurring). And, of course, this Court's decisions constitute controlling precedent

19

throughout the Nation.  If this Court were to hold a challenged statute or policy unconstitutional, the government could not "successfully enforce [it] against anyone, party or not, in light of *stare decisis*." *Griffin* v. *HM Florida-ORL, LLC*, 144 S. Ct. 1, 1 (2023) (statement of Kavanaugh, J.).  When district courts grant universal injunctions, they upend that system, imbuing the orders of courts of first instance with the type of nationwide effect usually reserved for the precedents of the court of last resort.

Further, universal injunctions "render meaningless rules about joinder and class actions." *United States* v. *Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring in the judgment).  Take these cases:  The individual plaintiffs in *Washington* sought to represent a class of affected "pregnant persons residing in Washington State" and "children residing in Washington State." *Washington* Am. Compl. ¶ 141. Yet, instead of asking whether the individual plaintiffs satisfied class-certification requirements, see Fed. R. Civ. P. 23, the district court granted a universal injunction. The court thereby granted even broader relief than the proposed class could have sought: the preliminary injunction extends "nationwide," App., *infra*, 17a, not just to affected individuals "residing in Washington State," *Washington* Am. Compl. ¶ 141.

Universal relief "can also sweep up nonparties who may not wish to receive the benefit of the court's decision." *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring in the judgment); see *Arizona* v. *Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring) ("Nationwide injunctions  * * *  sometimes give States victories they do not want.").  In *Washington*, for example, 18 States filed an amicus brief arguing that the Citizenship Order "is constitutional" and "will reduce States' costs from illegal immigration."  25-cv-127 Iowa et al. D. Ct. Amici Br. 2 (W.D. Wash.).  Yet the district courts' injunctions prevent the Order from taking effect even in those 18 States.

Universal injunctions cause significant harm to the government.  They invite

forum shopping; different challengers need not file different challenges in different courts if one challenger who files one suit in one court can secure victory nationwide. See *Poe*, 144 S. Ct. at 927 (Gorsuch, J., concurring). They force the government "to seek immediate relief from one court and then the next, with the finish line in this Court." *Ibid.* They countermand the principle that the government is not subject to non-mutual issue preclusion—*i.e.*, that the government may relitigate an issue against one party even if it has lost that issue against another party in another case. See *United States* v. *Mendoza*, 464 U.S. 154, 162-163 (1984). And they operate asymmetrically, granting relief to strangers everywhere whenever a single plaintiff prevails, but not precluding continued litigation by others if some plaintiffs lose. See *DHS*, 140 S. Ct. at 601 (Gorsuch, J., concurring).

Finally, universal injunctions harm the courts. "By their nature, universal injunctions tend to force judges into making rushed, high-stakes, low-information decisions." *DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring). They exert substantial pressure on this Court's emergency docket, forcing the Court to confront difficult issues without "the airing of competing views" among "multiple judges and multiple circuits." *Ibid.* And they needlessly encourage "[r]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches." *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (citation omitted).[2]

---

[2] Members of this Court have debated whether the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.*, authorizes courts to vacate agency action universally. Compare *Texas*, 599 U.S. at 693-704 (Gorsuch, J., concurring in the judgment), with *Corner Post, Inc.* v. *Board of Governors*, 603 U.S. 799, 826-843 (2024) (Kavanaugh, J., concurring). These cases do not present that distinct question because the President's actions are not reviewable under the APA. See *Franklin* v. *Massachusetts*, 505 U.S. 788, 800-801 (1992). The inapplicability of the APA makes these cases particularly good vehicles for considering whether universal relief comports with Article III and traditional principles of equity. Cf. Stay Opp. at 41, *Texas Top Cop Shop*, *supra* (No.

2.    The district courts here failed to address those concerns, instead resting on precedent-defying rationales that would authorize nationwide injunctions in virtually any case.

a.    ***CASA* (District of Maryland)**.  Although the Citizenship Order has elicited multiple legal challenges, the District of Maryland (in *CASA*) is the only court to have granted a universal injunction to individuals and organizations.  The *Washington* individual respondents did not even ask for universal relief.  See App., *infra*, 16a n.9.  The District of Massachusetts (in *New Jersey*) denied universal relief to the individual and organizational plaintiffs in a separate suit.  See *id.* at 102a.  And another court withheld nationwide relief from individual and organizational plaintiffs.  See *New Hampshire Indonesian Community Support* v. *Trump*, No. 25-cv-38, 2025 WL 457609, at *6 (D.N.H. Feb. 11, 2025).  That alone shows the one-way-ratchet effect when a single district court parts ways with its fellow courts and grants universal relief to plaintiffs who cannot obtain that relief elsewhere.

The *CASA* district court nonetheless deemed universal relief appropriate because the Citizenship Order is "a categorical policy." App., *infra*, 56a.  But Article III and principles of equity require courts to tailor injunctions to the scope of the plaintiff's injury, not to the scope of the defendant's policy.  The *CASA* court's contrary view "lacks a limiting principle and would make nationwide injunctions the rule rather than the exception with respect to all actions of federal agencies." *Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring).

The *CASA* district court also noted that the Constitution empowers Congress to "'establish an uniform Rule of Naturalization'" and stated that citizenship is "a

---

24A653) (arguing that a case was "not a promising vehicle" because the district court's universal injunction was "accompanied by a stay under * * * the APA").

national concern that demands a uniform policy." App., *infra*, 56a (quoting U.S. Const. Art. I, § 8, Cl. 4). But this case involves birthright citizenship—not naturalization. And the Naturalization Clause's uniformity requirement concerns Congress's power to pass statutes—not federal courts' power to issue remedies. While our legal system has an important interest in the uniformity of judicial decisions in citizenship cases and elsewhere, the way to achieve uniformity is for this Court to resolve circuit conflicts, not for district courts to issue universal injunctions.

The *CASA* district court also believed that nationwide relief was necessary to provide complete relief to one of the organizational plaintiffs, which has "680,000 members who reside in all 50 U.S. states and several U.S. territories." App., *infra*, 56a (citation and ellipsis omitted). As an initial matter, the court should have focused on the members named in the complaint and should not have granted relief to absent members. See *id.* at 71a-72a (Niemeyer, J., dissenting). Article III confines courts to adjudicating the rights of "the litigants brought before the Court." *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611 (1973). Courts may not grant relief to members who were not identified in the complaint and who did not agree to be bound by the judgment. See *FDA* v. *Alliance for Hippocratic Medicine*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); Appl. at 35-36, *McHenry*, *supra* (No. 24A653). And even if the court could properly enjoin the enforcement of the Order against the organizational respondents' unnamed members, the court had no basis for granting relief to millions more aliens who do not belong to those organizations.

 b. ***Washington*** **(W.D. Washington) and *New Jersey* (D. Mass.)** Meanwhile, the *Washington* and *New Jersey* district courts deemed universal relief necessary to redress the state respondents' asserted injuries. Both courts reasoned that, during the pendency of this litigation, children covered by the Citizenship Order

would be "born in other [S]tates" but would "travel to the Plaintiff States"; that the federal government would treat those children as aliens ineligible for various federal welfare benefits; and that those children would then seek "medical care and social services" from state respondents instead. App., *infra*, 14a, 16a; accord *id.* at 82a-85a, 103a.

That rationale is deeply flawed. First, state respondents lack standing to challenge the Citizenship Order; they have no entitlement to any relief, never mind nationwide relief. See pp. 28-31, *infra*. Second, plaintiffs seeking preliminary injunctions must show themselves "likely" to suffer irreparable harm. *Starbucks Corp.* v. *McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). State respondents have provided no evidence showing that the above speculative chain of events would likely occur, let alone transpire before final judgment, when the preliminary injunction would be in effect. Further underscoring the need for review, the First and Ninth Circuits saw no issue with this reasoning, see App., *infra*, 18a, 141a-142a, but the Fifth Circuit and Chief Judge Sutton have rejected the notion that a State could justify nationwide relief in an immigration case by speculating that some individuals might cross borders, see *Texas* v. *United States*, 126 F.4th 392, 421 n.49 (5th Cir. 2025); *Arizona*, 40 F.4th at 397-398 (Sutton, C.J., concurring). Third, the courts could have fully redressed state respondents' asserted financial injuries by directing the government not to apply the Citizenship Order in the States that have sued, even to persons who were born elsewhere but who later move to those States. Indeed, they could have redressed those injuries through an even narrower injunction directing the federal government to treat covered children as eligible for purposes of federally funded welfare benefits. Universal relief is substantially "more burdensome * * * than necessary to provide complete relief." *Yamasaki*, 442 U.S. at 702.

The *Washington* district court also stated that geographically limited relief would improperly subject the state respondents to "recordkeeping and administrative burden[s]." App, *infra*, 17a.  But the Citizenship Order does not regulate States, let alone impose such burdens on them.  While States might choose to modify their recordkeeping and administrative practices in response to the Order itself, such choices do not generate the injury in fact needed for standing or the irreparable injury needed for an injunction—much less a justification for universal relief.  See, *e.g.*, *Clapper* v. *Amnesty International USA*, 568 U.S. 398, 418 (2013) (plaintiffs may not seek judicial redress for "self-inflicted injuries").

The *Washington* district court also considered geographically limited relief "unworkable." App., *infra*, 17a.  But no such workability problems have arisen when courts in other cases, including other immigration-related cases, have limited injunctive relief to specific States.  See, *e.g.*, *Texas*, 126 F.4th at 420-421 (enjoining the enforcement of the Deferred Action for Childhood Arrivals program but limiting that relief "to Texas alone"); *Arizona*, 40 F.4th at 398 (Sutton, C.J., concurring) (describing "'state-by-state'" relief in an immigration case as "feasible").  Indeed, it is the universal injunctions that create unworkability, for they prevent federal agencies from developing guidance implementing the Order.  See p. 32, *infra*.

In *New Jersey*, meanwhile, the First Circuit suggested that the government had forfeited its challenge to the nationwide scope of the injunction.  See App., *infra*, 138a-139a.  That suggestion is patently meritless.  The government objected to the injunction's scope in opposing the state respondents' motion for preliminary relief, in seeking a stay in district court, and again in seeking a stay in the court of appeals.  See *id.* at 101a-104a, 109a, 138a.  The court of appeals also asserted that the government raised additional arguments against nationwide relief beyond those pressed in

district court.  See *id.* at 139a.  But even if that were true, it would not matter.  "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."  *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992).

The First Circuit also found "no authority" for narrowing a universal injunction when the movant fails to show a likelihood of success on the underlying merits.  App., *infra*, 140a.  The Fourth Circuit similarly stated in *CASA* that the government is not entitled to relief from the nationwide scope of the injunction because it has not argued "that it will likely prevail on the merits of the Executive Order itself."  *Id.* at 69a.  In *Poe*, however, this Court granted a partial stay of a universal injunction even though the movant had challenged only the scope of the remedy.  See 144 S. Ct. at 921.  As Justice Gorsuch explained, courts should not penalize parties for seeking "narrower rather than broader relief" or "incentivize parties to seek more sweeping relief in order to enhance their chances of success in this Court."  *Id.* at 925 (Gorsuch, J., concurring).  Relief is warranted not only when lower courts violate "liability principles," but also when they violate "remedial principles."  *Ibid.*

3.    Finally, the underlying issues are certworthy.  See, *e.g.*, *Does 1-3*, 142 S. Ct. at 18 (Barrett, J., concurring) (identifying certworthiness as a pertinent stay factor).  Not only does the propriety of universal injunctions raise profound questions about courts' constitutional and equitable authority.  The lawfulness of universal relief has also generated a circuit conflict.  In recent years, some courts of appeals have reversed universal injunctions issued by district courts, recognizing that such remedies exceed the courts' constitutional and equitable powers.  See, *e.g.*, *Louisiana* v. *Becerra*, 20 F.4th 260, 263-264 (5th Cir. 2021); *L.W.* v. *Skrmetti*, 83 F.4th 460, 489-491 (6th Cir. 2023) (Sutton, C.J.), cert. granted, 144 S. Ct. 2679 (2024); *California* v.

*Azar*, 911 F.3d 558, 582-584 (9th Cir. 2018), cert. denied, 139 S. Ct. 2716 (2019); *Georgia* v. *President*, 46 F.4th 1283, 1303-1308 (11th Cir. 2022). But as the First, Fourth, and Ninth Circuit's denials of stays in these cases illustrate, other courts allow such injunctions to remain in place.

Members of this Court have long recognized the need to settle the lawfulness of universal injunctions. Justice Thomas wrote seven years ago that, "[i]f federal courts continue to issue [universal injunctions], this Court is dutybound to adjudicate their authority to do so." *Hawaii*, 585 U.S. at 721 (Thomas, J., concurring). Five years ago, Justice Gorsuch noted that "the routine issuance of universal injunctions is patently unworkable" and that "this Court must, at some point, confront" "this increasingly widespread practice." *DHS*, 140 S. Ct. at 600-601 (Gorsuch, J., concurring). More recently, Justice Kavanaugh recognized that the lawfulness of universal injunctions is "an important question that could warrant [the Court's] review." *Griffin*, 144 S. Ct. at 2 (statement of Kavanaugh, J.).

That question has become more urgent during the current Administration. According to one count, district courts issued 14 universal injunctions against the federal government through the first three years of President Biden's term. See *District Court Reform: Nationwide Injunctions*, 137 Harv. L. Rev. 1701, 1705 (2024). By contrast, courts issued *15* universal injunctions (or temporary restraining orders) against the current Administration in February 2025 alone.[3]

---

3   See *Pacito* v. *Trump*, No. 25-cv-255, 2025 WL 655075, at *25-*26 (W.D. Wash. Feb. 28, 2025); D. Ct. Minute Order, *AIDS Vaccine Advocacy Coalition* v. *United States Department of State* (D.D.C. Feb. 25, 2025); *National Ass'n of Diversity Officers in Higher Education* v. *Trump*, No. 25-cv-333, 2025 WL 573764, at *29 (D. Md. 2025); *Washington* v. *Trump*, No. 25-cv-244, 2025 WL 509617, at *1-*2 (W.D. Wash. Feb. 14, 2025); *PFLAG, Inc.* v. *Trump*, No. 25-cv-337, 2025 WL 510050, at *23-*24 (D. Md. Feb. 13, 2025); *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400, 2025 WL 485324, at *7 (D.D.C. Feb. 13, 2025); *Doe* v. *Trump*, No. 25-cv-10135, 2025 WL 485070, at *14-*15 (D. Mass. Feb. 13, 2025); *Doctors for*

Underscoring the need for this Court's prompt intervention, universal reme-dies have escalated in other ways too. Courts have issued not just universal injunc-tions, but universal TROs. See, *e.g.*, App., *infra*, 1a-4a (universal TRO against en-forcement of the Citizenship Order). They have run their writ not just nationwide, but worldwide. See, *e.g.*, *AIDS Vaccine Advocacy Coalition* v. *United States Depart-ment of State*, No. 25-cv-400, 2025 WL 485324, at *7 (D.D.C. Feb. 13, 2025) (world-wide TRO against foreign-aid pause). And they have awarded not just universal in-junctive relief, but de facto universal damages. See D. Ct. Minute Order, *AIDS Vac-cine Advocacy Coalition* v. *United States Department of State* (D.D.C. Feb. 25, 2025) (order directing the government to pay out $2 billion, including to non-parties).

As the present cases illustrate, moreover, district courts have been issuing overlapping universal injunctions concerning the same policies. See, *e.g.*, *PFLAG, Inc.* v. *Trump*, No. 25-cv-337, 2025 WL 685124, at *32-*33 (D. Md. Mar. 4, 2025) (na-tionwide injunction against an Executive Order forbidding the use of federal funds to promote gender ideology); *Washington* v. *Trump*, No. 25-cv-244, 2025 WL 659057, at *28 (W.D. Wash. Feb. 28, 2025) (same). Overlapping universal injunctions are even more problematic than other universal remedies. Such "jurisdictionally messy" or-ders create a serious risk that different courts will subject the government to conflict-ing nationwide obligations with respect to the same policy. App., *infra*, 73a (Nie-meyer, J., dissenting). Overlapping injunctions also heighten the asymmetric stakes

---

*America* v. *OPM*, No. 25-cv-322, 2025 WL 452707, at *10 (D.D.C. Feb. 11, 2025); D. Ct. Doc. 8, at 1, *Association of American Medical Colleges* v. *NIH*, No. 25-cv-10340 (D. Mass. Feb. 10, 2025); *New York* v. *Trump*, No. 25-cv-1144, 2025 WL 435411, at *1 (S.D.N.Y. Feb. 8, 2025); *American Foreign Service Ass'n* v. *Trump*, No. 25-cv-352, 2025 WL 435415, at *3-*4 (D.D.C. Feb. 7, 2025); *Washington* v. *Trump*, No. 25-cv-127, *6 (W.D. Wash. Feb. 2025); *Doe* v. *McHenry*, No. 25-cv-286, 2025 WL 388218, at *1 (D.D.C. Feb. 4, 2025); *National Council of Nonprofits* v. *OMB*, No. 25-cv-239, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025); *CASA, Inc.* v. *Trump*, No. 25-cv-201 (D. Md. Feb. 2, 2025).

of universal-injunction practice; even if the federal government were to obtain relief from a nationwide injunction in one circuit, it still would need to comply with an overlapping nationwide injunction issued by another court in another circuit.

Government-by-universal-injunction has persisted long enough, and has reached a fever pitch in recent weeks.  It is long past time to restore district courts to their "proper—and properly limited—role * * * in a democratic society." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975).

### B.    The District Courts' Injunctions Improperly Grant Relief To States

1.    The *Washington* and *New Jersey* district courts' remedial fouls are all the worse because the state respondents are not entitled to any relief at all, let alone nationwide relief.  To sue in federal court, plaintiffs must not only establish Article III standing—*i.e.*, a judicially cognizable injury that was likely caused by the defendant's challenged action and that judicial relief would likely redress.  See *TransUnion*, 594 U.S. at 423.  Plaintiffs must also assert their own legal rights, not third parties'.  See *Warth*, 422 U.S. at 499.  Although we argued below (and continue to believe) that state respondents lack Article III standing, States' lack of third-party standing makes the challenged injunctions particularly egregious.  See *Kowalski* v. *Tesmer*, 543 U.S. 125, 129 (2004) (explaining that courts may address Article III standing and third-party standing in either order).  State respondents simply cannot assert citizenship rights on behalf of individuals, so the district courts should not have granted any relief to them.

In general, a party "must assert his own legal rights" and "cannot rest his claim to relief on the legal rights of third parties."  *Sessions* v. *Morales-Santana*, 582 U.S. 47, 57 (2017) (citation and ellipsis omitted); see *Tyler* v. *Judges of the Court of Registration*, 179 U.S. 405, 407-409 (1900).  "[C]onstitutional rights are personal and may

not be asserted vicariously." *Broadrick*, 413 U.S. at 610.  Statutory rights work the same way; unless Congress provides otherwise, a suit must be brought by "the party whose legal right has been affected." *Tyler*, 179 U.S. at 407 (citation omitted).

Thus, States cannot raise individual-rights claims against the United States. "[I]t is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government." *Massachusetts* v. *Mellon*, 262 U.S. 447, 485-486 (1923).  Suits where States seek to protect their citizens' rights are, in substance, *parens patriae* actions.  See *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 607-608 (1982).  But "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Id.* at 610 n.16.

Applying those principles, this Court has repeatedly rejected States' attempts to litigate the rights of their residents.  In *South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966), it rejected South Carolina's claim that a federal statute violated the Due Process and Bill of Attainder Clauses because States lack rights of their own under those provisions and lack "standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government." *Id.* at 324.  In *Haaland* v. *Brackeen*, 599 U.S. 255 (2023), it rejected Texas's claim that a federal statute violated the Equal Protection Clause because a State "has no equal protection rights of its own" and "cannot assert equal protection claims on behalf of its citizens." *Id.* at 294-295.  And in *Murthy* v. *Missouri*, 603 U.S. 43 (2024), it rejected Missouri's claim that the federal government had violated the First Amendment by censoring its citizens' speech because Missouri lacked "third-party standing" to sue for those citizens. *Id.* at 76.

Those precedents "should make the issue open and shut." *Brackeen*, 599 U.S. at 295.  State respondents have no rights of their own under the Citizenship Clause

or the INA.  Nor may state respondents assert the citizenship rights of individuals who live in those States.  Still less may they assert (as the universal injunctions suggest) the rights of individuals who live in *other* States throughout the Nation.

Although the government raised that argument in the district courts, the courts did not address it, instead holding only that state respondents had shown Article III standing.  See App., *infra*, 7a-8a, 82a-85a.  But limits on third-party standing are distinct from limits on Article III standing.  See *Alliance for Hippocratic Medicine*, 602 U.S. at 393 n.5.  "[E]ven when the plaintiff has alleged [an Article III] injury," "the plaintiff generally must assert his own legal rights."  *Warth*, 422 U.S. at 499.  In *Kowalski*, for example, this Court held that criminal defense attorneys could not challenge a state statute limiting the appointment of counsel for indigent defendants.  See 543 U.S. at 127.  The Court assumed that the attorneys had alleged a pocketbook injury that satisfied Article III—the statute reduced the number of cases in which they would be appointed and paid—but it nonetheless held that the attorneys could not assert their future clients' Sixth Amendment rights.  See *id.* at 129 & n.2, 134.  So too here, even if state respondents have alleged an Article III injury, they may not litigate the citizenship rights of private individuals.

The First Circuit, for its part, relied primarily on *June Medical Services L.L.C.* v. *Russo*, 591 U.S. 299 (2020), a case in which this Court allowed an abortion provider to assert the putative constitutional rights of its clients in challenging an abortion restriction.  See *id.* at 316-320 (plurality opinion); App., *infra*, 128a-131a.  But this Court has since described *June Medical* as an "abortion cas[e]" that "ignored the Court's third-party standing doctrine."  *Dobbs* v. *Jackson Women's Health Organization*, 597 U.S. 215, 286 (2022); see *id.* at 286 n.61.  Besides, *June Medical* reasoned that a plaintiff may sue if the "enforcement of the challenged restriction *against the*

*litigant* would result in the violation of third parties' rights." 591 U.S. at 318 (plurality opinion) (citation omitted). *June Medical* concluded that the challenged statute fit within that exception because it "regulate[d] [abortion providers'] conduct" and subjected them to "'sanctions' for noncompliance." *Id.* at 319 (citation omitted). The Citizenship Order, by contrast, does not require States to do or refrain from doing anything; much less does it subject States to sanctions.[4]

2.    Again, the underlying issues are certworthy. See *Does 1-3*, 142 S. Ct. at 18 (Barrett, J., concurring). In recent years, States and their political subdivisions have inundated federal courts with politically charged suits challenging federal policies. California, for example, "filed 122 lawsuits against the [first] Trump administration, an average of one every two weeks." Nicole Nixon, *California Attorney General Files Nine Lawsuits In One Day As Trump Leaves Office*, Capital Public Radio (Jan. 19, 2021). Meanwhile, on President Biden's last day in office, Texas announced "the 106th lawsuit" it had "filed against the Biden Administration." Press Release, Att'y Gen. of Texas, *Attorney General Ken Paxton Sues Biden During the Administration's Final Hours to Stop Unlawful Ban on Offshore Drilling* (Jan. 20, 2025). Whether red or blue, States are subject to the same, injunction-limiting rule: individuals, not States, must bring individual-rights claims. This Court has repeatedly rejected States' "thinly veiled attempt[s] to circumvent the limits on *parens patriae* standing." *Murthy*, 603 U.S. at 76 (citation omitted); see *Brackeen*, 599 U.S. at 295 n.11. If, upon further review of the preliminary injunctions here, the courts of appeals

---

[4] This Court has separately recognized a narrow exception to the rule against third-party standing for cases where the plaintiff has "a close relationship" with the holder of the right and the holder of the right faces a "hindrance" to protecting his own interests. *Morales-Santana*, 582 U.S. at 57 (citation omitted). Given that exception, the government has not disputed that individuals may assert the citizenship rights of their soon-to-be-born children. But state respondents have not seriously argued that they satisfy the conditions for that exception.

32

disregarded those limits, their decisions would manifestly warrant review.

### C. The District Courts' Injunctions Improperly Prevent The Executive Branch From Developing Implementation Guidance

Making the universal injunctions here even more problematic, the injunctions micromanage the internal operations of the Executive Branch. The injunctions prohibit the Executive Branch not only from enforcing the Citizenship Order, but also from taking internal steps to *implement* it. See App., *infra*, 17a; *id.* at 58a-59a; *id.* at 107a. And the injunctions all block Section 3(b) of the Order, which directs executive agencies to "issue public guidance within 30 days * * * regarding this order's implementation with respect to their operations and activities." Citizenship Order § 3(b); see App., *infra*, 17a; *id.* at 58a-59a; *id.* at 107a. Those injunctions thus have prevented executive agencies from developing and issuing public guidance explaining how the Executive Branch would carry out the Citizenship Order once the Order takes effect. See, *e.g.*, *id.* at 63a (refusing to allow the government to begin taking "internal, preparatory steps to formulate policies and guidance").

Those aspects of the injunctions further exceed the courts' authority under Article III. "The province of the court is, solely, to decide on the rights of individuals." *Marbury* v. *Madison*, 1 Cranch 137, 170 (1803). Courts have no power to "intrude into the cabinet," *ibid.*; to act as "continuing monitors of * * * Executive action," *Laird* v. *Tatum*, 408 U.S. 1, 15 (1972); or to exercise "some amorphous general supervision of the operations of government," *Raines* v. *Byrd*, 521 U.S. 811, 829 (1997) (citation omitted). Once the Executive Branch develops and issues a policy, a court may, of course, resolve legal challenges to the policy and, if appropriate, enjoin the policy's enforcement against injured parties. But a court has no power under Article III to superintend the Executive Branch's internal operations by prohibiting agencies

from developing or issuing policies in the first place.

The district courts' injunctions also violate Article II's Opinions Clause, which empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." U.S. Const. Art. II, § 2, Cl. 1. The President exercised that power when he directed the "heads of all executive agencies and departments" to prepare "guidance" regarding the Order's implementation. Citizenship Order § 3(b).

Injunctions against the preparation and publication of guidance, moreover, are unnecessary to redress any harms to respondents—and thus further transgress the rule that injunctions should be "no more burdensome" "than necessary to provide complete relief to the plaintiffs." *Yamasaki*, 442 U.S. at 702. Regardless of whether respondents would be injured by the ultimate enforcement of the Citizenship Order, they certainly would not be injured by preparatory work undertaken within the Executive Branch. Nor would they be injured by agencies' issuance of guidance explaining how they would implement the Order in the event that it took effect.

The *CASA* district court reasoned that "the government has no valid interest in taking internal, preparatory steps to formulate policies and guidance on an unconstitutional Executive Order." App., *infra*, 63a. But a court may not issue an unnecessarily burdensome injunction simply because it believes that the government lacks a "valid interest" in performing the enjoined activity. App., *infra*, 63a. Further, while the district courts held that respondents are *likely* to succeed on the merits of their Citizenship Clause challenges, respondents' success is not guaranteed. The government has a legitimate interest in taking preparatory steps so that it can immediately put the Citizenship Order into effect if and when the courts ultimately uphold it.

The *New Jersey* district court and the First Circuit faulted the government for

not adequately identifying the "'internal steps' [it] wish[ed] to take." App., *infra*, 109a; see *id.* at 142a. But the government expressly asked the district court to "limit its injunction to permit the government to implement the [Citizenship Order] in ways that cause no harm to the plaintiff states, including by * * * formulating relevant policies and guidance." 25-cv-10139 D. Ct. Doc. 158, at 6 (Feb. 19, 2025); see *id.* at 8 ("[T]he injunction causes further harm to the Defendants because * * * [it] prevents the executive branch as a whole from even beginning the process of formulating relevant policies and guidance."). The First Circuit also stated that it would not "read the [*New Jersey* injunction] to enjoin 'internal operations' that are 'preparatory operations that cannot impose any harm' on the Plaintiff-States." App., *infra*, 142a. But the scope of that statement is unclear; the court did not specify, for example, whether the government could publish guidance about how it would implement the Order.

This question too is certworthy. See *Does 1-3*, 142 S. Ct. at 18 (Barrett, J., concurring). Whether a district court may properly enjoin the Executive Branch's development and publication of policies is a weighty separation-of-powers question that warrants this Court's attention. The courts of appeals here have resolved that issue in inconsistent ways: The First Circuit stated that it would not read the *New Jersey* district court's injunction to restrain "internal operations," App., *infra*, 142a, but the Fourth and Ninth Circuit declined to grant relief from corresponding portions of the *CASA* and *Washington* injunctions. In addition, in *Hawaii* v. *Trump*, 859 F.3d 741, vacated on other grounds, 583 U.S. 941 (2017), the Ninth Circuit vacated a preliminary injunction to the extent it restricted "internal government operations and procedures" that "d[id] not burden individuals." *Id.* at 786. "An injunction against a government agency," the court explained, "must be structured to take into account the well-established rule that the government has traditionally been granted the wid-

est latitude in the dispatch of its own internal affairs." *Ibid.* (citation and internal quotation marks omitted). Any decisions affirming the injunctions in these cases would be in significant tension with the Ninth Circuit's decision in *Hawaii*.

Confirming the need for this Court's prompt intervention, the injunctions in these cases form part of a broader trend. Since the start of this Administration, district courts have repeatedly issued orders that superintend the internal operations of the Executive Branch by prohibiting the formulation of new policies. One court recently issued a preliminary injunction barring the implementation of an Executive Order that, among other things, required the Secretary of Homeland Security to submit reports to the President regarding refugee admissions. *Pacito* v. *Trump*, No. 25-cv-255, 2025 WL 655075, at *25 (W.D. Wash. Feb. 28, 2025). Another issued a TRO prohibiting implementation of an Executive Order that, among other things, required the Attorney General and Secretary of Homeland Security to prepare guidance concerning the housing of transgender prisoners. *Doe* v. *McHenry*, No. 25-cv-286, 2025 WL 388218, at *6 (D.D.C. Feb. 4, 2025). Such orders pose a serious threat to the Executive Branch's authority "to address new challenges by enacting new * * * policies" "without undue interference by courts." *CFPB* v. *CFSA*, 601 U.S. 416, 446 (2024) (Jackson, J., concurring).

### D.    The Equities Favor A Stay

1.    To put it mildly, universal injunctions irreparably harm the Executive Branch by preventing a branch of government from carrying out its work. The President holds "the mandate of the people to exercise his executive power." *Myers* v. *United States* 272 U.S. 52, 123 (1926). The Executive Branch exists to carry out his policies. Courts play an important role in adjudicating the lawfulness of those policies in justiciable cases, but they irreparably injure our democratic system when they

forbid the government from effectuating those policies against anyone anywhere in the Nation. See *Doe #1* v. *Trump*, 957 F.3d 1050, 1084 (9th Cir. 2020) (Bress, J., dissenting); cf. *Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (brackets and citation omitted).

Aggravating that irreparable harm, the district courts' universal injunctions interfere with internal Executive Branch operations by prohibiting agencies from developing and issuing guidance explaining how the Order would be implemented. This Court should grant stays to correct that "improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers); cf. *Cheney* v. *United States District Court*, 542 U.S. 367, 381 (2004) (extraordinary relief is appropriate to correct lower-court orders that "threaten the separation of powers").

In addition, the district courts' universal injunctions impair the President's efforts to address the crisis at the Nation's southern border. In recent years, the United States has faced "an unprecedented flood of illegal immigration." Invasion Order § 1. "Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States," "in violation of longstanding Federal laws." *Ibid.* "Many of these aliens unlawfully within the United States present significant threats to national security and public safety." *Ibid.* Some have "engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities." *Ibid.* "[T]heir presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels." *Ibid.* The district courts' universal injunctions threaten to perpetuate those problems by holding out a nationwide incentive for ille-

gal immigration: the prospect of American citizenship for the unlawful migrants' children and of derivative immigration benefits for the migrants themselves.

2. On the other side of the ledger, narrowing the scope of the district courts' injunctions would not harm the only plaintiffs properly before the district courts—the individual plaintiffs and the identified members of the organizational plaintiffs. A party-specific injunction would fully redress any injuries that those individuals may face. By contrast, harms to the state respondents and third parties are not pertinent. The traditional stay factors require a court to consider whether "the stay will substantially injure *the other parties*." *Ohio*, 603 U.S. at 291 (emphasis added). State respondents are not proper parties to this proceeding. See pp. 28-31, *supra*. Nor, by definition, are third parties. Accounting for their interests in weighing the equities would contravene the rule that strangers to the litigation are "not the proper object of [a court's] remediation." *Lewis* v. *Casey*, 518 U.S. 343, 358 (1996).

3. Finally, issuing a stay would serve the public interest. The district courts in these cases emphasized that the public has a strong interest in enforcing the Citizenship Clause and in upholding the rule of law. See, *e.g.*, App., *infra*, 15a, 90a, 100a. But universal injunctions thwart the rule of law, and Articles II and III, no less than the Citizenship Clause, form part of the Constitution. Whatever this Court's views of the lawfulness of the Citizenship Order, universal injunctions are plainly inappropriate means of redressing any harms to respondents. The public interest supports "grant[ing] the government's modest [application], which seeks only to cabin the [injunctions'] inappropriate reach." App., *infra*, 72a (Niemeyer, J., dissenting). Moreover, granting stays would simply allow the agencies to resume their work developing and issuing guidance regarding the implementation of the Order—work that never got off the ground because the *Washington* court immediately issued

a nationwide TRO.

Granting relief here would not mean that affected individuals would need to file thousands of separate suits across the country challenging the Order. Affected individuals could instead seek class certification and, if appropriate, seek class-wide preliminary relief. See Fed. R. Civ. P. 23. Indeed, the *Washington* individual respondents sought to follow that procedure here. See p. 11, *supra*. So long as putative class members all have standing, that approach, unlike the issuance of nationwide injunctions, complies with Article III and respects limits on courts' equitable authority. That procedure also avoids the asymmetric stakes of nationwide injunctions: A class judgment binds the whole class, but one plaintiff's loss in seeking nationwide relief does not stop others from trying again.

\* \* \* \* \*

There are "more than 1,000 active and senior district court judges, sitting across 94 judicial districts." *DHS*, 140 S. Ct. at 600-601 (Gorsuch, J., concurring). Years of experience have shown that the Executive Branch cannot properly perform its functions if any judge anywhere can enjoin every presidential action everywhere. The sooner universal injunctions are "eliminated root and branch," "the better." *Arizona*, 40 F.4th at 398 (Sutton, C.J., concurring).

**CONCLUSION**

In *Trump* v. *State of Washington*, this Court should stay the preliminary injunction except as to the two individual respondents—and, if the Court concludes that the state respondents are proper parties, as to individuals who are born or reside in those States. In *Trump* v. *CASA, Inc.*, the Court should stay the preliminary injunction except as to the five individual respondents and the eleven members of the organizational respondents identified in the complaint. In *Trump* v. *State of New Jersey*, the Court should stay the preliminary injunction in full—or, if the Court concludes that the state respondents are proper parties, except as to individuals who are born or reside in those States. At a minimum, this Court should stay all three preliminary injunctions to the extent they prohibit executive agencies from developing and issuing guidance explaining how they would implement the Citizenship Order in the event that it takes effect.

Respectfully submitted.

SARAH M. HARRIS
*Acting Solicitor General*

MARCH 2025

# APPENDIX

## *Trump* v. *State of Washington*

District court order granting temporary restraining order
(W.D. Wash. Jan. 23, 2025) ................................................................1a

District court order granting preliminary injunction
(W.D. Wash. Feb. 6, 2025) ................................................................5a

Court of appeals order denying partial stay
(9th Cir. Feb. 19, 2025) ................................................................18a

## *Trump* v. *CASA, Inc.*

District court memorandum opinion (D. Md. Feb. 5, 2025)................................25a

District court order granting preliminary injunction
(D. Md. Feb. 5, 2025) ................................................................57a

District court order denying partial stay
(D. Md. Feb. 18, 2025) ................................................................60a

Court of appeals order denying partial stay
(4th Cir. Feb. 28, 2025) ................................................................65a

## *Trump* v. *State of New Jersey*

District court memorandum of decision
(D. Mass. Feb. 13, 2025) ................................................................75a

District court order granting preliminary injunction to state
plaintiffs (D. Mass. Feb. 13, 2025) ................................................................106a

District court order denying stay
(D. Mass. Feb. 26, 2025) ................................................................108a

Court of appeals order denying stay
(1st Cir. Mar. 11, 2025) ................................................................111a

THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8 AT SEATTLE

9 STATE OF WASHINGTON, *et al.*,                    CASE NO. C25-0127-JCC

10                              Plaintiffs,          TEMPORARY
                                                     RESTRAINING ORDER
11      v.

12 DONALD TRUMP, *et al.*,

13                              Defendants.

14

15

16                    **I.    INTRODUCTION**

17      This matter comes before the Court on the emergency Motion for a Temporary Restraining

18 Order filed by the States of Washington, Arizona, Illinois, and Oregon (Plaintiff States) (Dkt. No.

19 10). The Plaintiff States challenge an Executive Order issued January 20, 2025, by President

20 Trump, entitled "Protecting the Meaning and Value of American Citizenship." Having considered

21 the motion, Defendants' response, if any, and the argument of the parties, if any, the Court

22 GRANTS the Plaintiff States' emergency motion for a 14-day Temporary Restraining Order

23 effective at 11:00 AM on January 23, 2025. The Court enters the following findings of fact and

24 conclusions of law.

25                    **II.    FINDINGS OF FACTS**

26      1.      Plaintiff States face irreparable injury as a result of the signing and implementation

of the Executive Order. The Order harms the Plaintiff States directly by forcing state agencies to

1    lose federal funding and incur substantial costs to provide essential and legally required medical

2    care and social services to resident children subject to the Order. Plaintiff States' residents are also

3    irreparably harmed by depriving them of their constitutional right to citizenship and all the

4    associated rights and benefits, including: subjecting them to risk of deportation and family

5    separation; depriving them of access to federal funding for medical care and eligibility for basic

6    public benefits that prevent child poverty and promote child health; and impacting their education,

7    employment, and health.

8        2.     These harms are immediate, ongoing, and significant, and cannot be remedied in

9    the ordinary course of litigation.

10       3.     A temporary restraining order against Defendants, as provided below, is necessary

11    until the Court can consider Plaintiff States' forthcoming motion for a preliminary injunction.

12            **III.    CONCLUSIONS OF LAW**

13       1.     The Court has jurisdiction over Defendants and the subject matter of this action.

14       2.     Plaintiffs' efforts to contact Defendants reasonably and substantially complied with

15    the requirements of Federal Rule of Civil Procedure 65(b) and Local Civil Rule 65(b).

16       3.     The Court deems no security bond is required under Rule 65(c).

17       4.     Plaintiffs have standing to bring this suit. Plaintiffs have made a sufficient showing

18    of concrete and imminent economic injury. If Plaintiffs cannot treat birthright citizens as precisely

19    that—citizens—then they will lose out on federal funds for which they are otherwise currently

20    eligible. *Department of Commerce v. New York*, 588 U.S. 752, 767 (2019). That is a sufficiently

21    concrete and imminent injury to satisfy Article III standing. *Id*. Plaintiffs also have standing to

22    challenge the Order because of the new and ongoing operational costs they allege. *City and Cnty.*

23    *of San Francisco v. United States Citizenship and Immigration Servs.*, 944 F.3d 773, 787–88 (9th

24    Cir. 2019).

25       5.     To obtain a temporary restraining order, the Plaintiff States must establish (1) they

26    are likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary

1   relief; (3) the balance of equities tips in the Plaintiffs' favor; and (4) an injunction is in the public

2   interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1).

3         6.     There is a strong likelihood that Plaintiffs will succeed on the merits of their claims

4   that the Executive Order violates the Fourteenth Amendment and Immigration and Nationality

5   Act. *See United States v. Wong Kim Ark*, 169 U.S. 649, 694–99 (1898); *Regan v. King*, 49 F. Supp.

6   222, 223 (N.D. Cal. 1942), *aff'd*, 134 F.2d 413 (9th Cir. 1943), *cert denied*, 319 U.S. 753 (1943);

7   *see also Gee v. United States*, 49 F. 146, 148 (9th Cir. 1892).

8         7.     The Plaintiff States have also shown that they are likely to suffer irreparable harm

9   in the absence of preliminary relief. The Executive Order will directly impact Plaintiff States,

10  immediately increasing unrecoverable costs for providing essential medical care and social

11  services to States's residents and creating substantial administrative burdens for state agencies that

12  are forced to comply with the Order. (*See, e.g.*, Dkt. Nos. 14 at 12; 15 at 9; 25 at 5; 26 at 4, 6.)

13  Moreover, the Plaintiff States will suffer immediate repercussions of the Order's mandates as

14  described in its enforcement Section 3(a), (b).

15        8.     The balance of equities tips toward the Plaintiff States and the public interest

16  strongly weighs in favor of entering temporary relief.

17            **IV.   TEMPORARY RESTRAINING ORDER**

18       Now, therefore, it is hereby ORDERED that:

19        1.     Defendants and all their respective officers, agents, servants, employees and

20  attorneys, and any person in active concert or participation with them who receive actual notice of

21  this order are hereby fully enjoined from the following:

22            a.  Enforcing or implementing Section 2(a) of the Executive Order;

23            b.  Enforcing or implementing Section 3(a) of the Executive Order; or

24            c.  Enforcing or implementing Section 3(b) of the Executive Order.

25        2.     This injunction remains in effect pending further orders from this Court.

26

TEMPORARY RESTRAINING ORDER
C25-0127-JCC
PAGE - 3

4a

1

2 Dated this 11th hour of this 23 day of January 2025.

3

4

5

6

7 John C. Coughenour
UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

TEMPORARY RESTRAINING ORDER
C25-0127-JCC
PAGE - 4

5a

THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
8                                  AT SEATTLE

9  STATE OF WASHINGTON, *et al.*,                CASE NO. C25-0127-JCC

10                       Plaintiffs,             ORDER

11     v.

12  DONALD TRUMP, *et al.*,

13                       Defendants.

14

15

16         This matter comes before the Court on the Plaintiff States' motion for preliminary

17  injunction (Dkt. No. 63) and the Individual Plaintiffs' supplemental motion for the same (Dkt.

18  No. 74). Having thoroughly considered the parties' briefing and the relevant record, and having

19  heard the parties' oral argument, the Court hereby GRANTS the motions for preliminary

20  injunction (Dkt. Nos. 63, 74) for the reasons explained herein.[1]

21

22

23

24  [1] Because this order grants an interlocutory injunction, the Court must make findings of fact and
    conclusions of law. Fed. R. Civ. P. 52(a)(2). The Court therefore makes such findings and
25  conclusions via this order, which serves as a memorandum of the Court's decision. *See* Fed. R.
    Civ. P. 52(a)(1) (the findings of fact and conclusions of law "may appear in an opinion or a
26  memorandum of decision filed by the court"); *see also FTC v. H.N. Singer, Inc.*, 668 F.2d 1107,
    1109 (9th Cir. 1982) (explicit factual findings are unnecessary); *Riverside Publishing Co. v.*
27  *Mercer Publishing LLC*, 2011 WL 3420421, slip op. at 1 (W.D. Wash. 2011) (same).

6a

**I.     BACKGROUND**

On January 20, 2025, President Trump issued an Executive Order ("Order") entitled "Protecting the Meaning and Value of American Citizenship." (Dkt. No. 12-1.) In it, the President stated that "the privilege of United States citizenship does not automatically extend to persons born in the United States." (*Id.* at 3.) Instead, the President explained that birthright citizenship does not apply to two categories of newborns depending on the status of their parents: (1) those born to a mother who is "unlawfully present" in the United States and whose father is not a United States citizen or lawful permanent resident ("LPR") at the time of birth, and (2) those born to a mother whose presence in the United States is "lawful but temporary" and whose father is not a United States citizen or LPR at the time of birth. (*Id.*) The Order then declares it the policy of the United States not to "issue documents recognizing citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to the aforementioned categories of persons. (*Id.*) This policy is effective February 19, 2025. (*See id.* at 4.) Nevertheless, the Order further directs the "heads of all executive departments and agencies" to "issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities." (*Id.*)

On January 21, 2025, the states of Washington, Arizona, Illinois, and Oregon ("Plaintiff States") filed a complaint against the Government seeking declaratory and injunctive relief. (Dkt. No. 1 at 1.) In it, they argued that the Order violates the Citizenship Clause of the Fourteenth Amendment and the Immigration and Nationality Act (INA), 8 U.S.C. § 1401. (*Id.* at 28–29.) The Plaintiff States then moved for a temporary restraining order to enjoin the Order, in its entirety. (Dkt. No. 10 at 30.) The Court granted the motion on January 23, 2025. (Dkt. No. 43.) That same day, the Court set a briefing schedule and preliminary injunction hearing. (Dkt. No.

1  44.) The next day, Delmy Franco Aleman, Cherly Norales Castillo, and Alicia Chavarria Lopez[2]

2  ("Individual Plaintiffs") filed suit, lodging similar arguments and seeking similar relief as the

3  Plaintiff States. (*See* Dkt. No. 56 at 2.) The Court consolidated the Individual Plaintiffs' suit with

4  the present action and provided them an opportunity to submit supplemental briefing regarding

5  the preliminary injunction. (*See id.* at 3.) The Plaintiff States' and the Individual Plaintiffs'

6  respective motions for preliminary injunction are now pending before this Court. (*See* Dkt. Nos.

7  63, 74.)

8  **II.     DISCUSSION**

9      **A.     Threshold Matters**

10      Before reaching the criteria for a preliminary injunction, the Government raises two

11  threshold challenges. First, the Government argues that the Plaintiff States' lack standing to

12  bring this lawsuit. (Dkt. No. 84 at 20–26.) Second, the Government contends that both sets of

13  Plaintiffs have failed to assert valid causes of action. (*Id.* at 28–30.) The Court takes each

14  challenge in turn.

15          1.     <u>Standing</u>

16      Though the Court has already concluded that the Plaintiff States have standing, (*see* Dkt.

17  No. 43 at 2), it reaffirms that conclusion here. To establish Article III standing, a plaintiff must

18  demonstrate that they have suffered a concrete "injury in fact" that is traceable to the defendant

19  and likely redressable by judicial relief. *Washington v. U.S. Food & Drug Administration*, 108

20  F.4th 1163, 1172 (9th Cir. 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

21      Here, the Order subjects the Plaintiff States to direct and immediate economic and

22  administrative harms. (Dkt. No. 63 at 12.) That is, the Order would force the Plaintiff States to

23  disqualify many individuals it currently deems citizens, and such disqualification would result in

24

25  [2] All of whom are pregnant noncitizens living in the United States with due dates more than 30

26  days following the Order. *See* C25-0163-JCC, Dkt. No. 1 at 13–15. In a later-filed amended
consolidated complaint (Dkt. No. 106), the Plaintiffs note that Delmy Franco Aleman has chosen

27  to withdraw from the case. (*Id.* at 3–4 n. 2.)

1  the States' significant loss of federal funds for which they are otherwise eligible. (*See id.* at 13.)

2  It would also impose "significant operational disruptions and administrative burdens within state

3  agencies and state-run-healthcare facilities as they try to navigate the chaos and uncertainty the

4  [Order] creates." (*Id.* at 14; *see also* Dkt. Nos. 14 at 12; 15 at 9; 25 at 5; 26 at 4, 6) (documenting

5  burdens on state agencies). This is more than sufficient to satisfy Article III standing. *See Biden*

6  *v. Nebraska*, --- U.S. ---, 143 S. Ct. 2355, 2365–66 (2023) (Missouri had standing to sue the

7  federal government where federal action cancelling student loans would cost Missouri millions

8  "in fees that it otherwise would have earned under its contract with the Department of

9  Education"); *see also City and Cnty. of San Francisco v. United States Citizenship and*

10  *Immigration Servs.*, 944 F.3d 773, 787–88 (9th Cir. 2019) (states had standing to challenge

11  federal government where federal action would have encouraged aliens to disenroll from public

12  benefits, which would have resulted in a reduction in Medicaid reimbursement payments to the

13  States of about $1.01 billion and increased administrative costs).[3]

14               2.     Cause of Action

15          The Government argues that the Plaintiffs lack a valid cause of action. (Dkt. No. 84 at

16  26–30.) But the Plaintiffs maintain a valid cause of action by nature of the equitable relief they

17  seek in response to the statutory and constitutional violations they allege. Federal courts are

18  courts of equity that are tasked with upholding the rule of law. *Cf. Armstrong v. Exceptional*

19  *Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Indeed, "[t]he ability to sue to enjoin unconstitutional

20  actions by state and federal officers is the creation of courts of equity, and reflects a long history

21  of judicial review of illegal executive action, tracing back to England." *Id.* at 327. "'[I]n a proper

22  case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer.'"

23  _____

24  [3] Finally, though the Government does not challenge standing for the Individual Plaintiffs, (*see generally* Dkt. No 84 at 28), the Court nevertheless confirms that they, too, have standing to

25  bring this lawsuit. They are pregnant noncitizens whose children will be deprived of United States citizenship if the Order goes into effect. (*See* Dkt. Nos. 59 at 2–3, 60 at 2–3, 61 at 2–3)

26  (the Individual Plaintiffs fall into the category of persons for which the Order applies, and their due dates come after the effective date of the Order). As such, their harms are directly traceable

27  to the Order.

ORDER
C25-0127-JCC
PAGE - 4

9a

1    *Id.* (quoting *Carrol v. Safford*, 3 How. 441, 463 (1845)). As such, a party may seek to enjoin acts

2    of a public officer that run counter to statute. *See Sierra Club v. Trump*, 929 F.3d 670, 696 (9th

3    Cir. 2019). Similarly, because a public officer's unconstitutional acts are particularly injurious, a

4    court may provide equitable relief under that principle alone. *See id.* at 694. Different standards

5    apply to suits for damages, of course. *See DeVillier v. Texas*, 601 U.S. 285, 292 (2024). But the

6    Plaintiffs here do not seek damages; they seek declaratory and injunctive relief. (Dkt. No. 106 at

7    42.) Therefore, because they have standing, this Court may review the Order and, if it is illegal

8    under the Constitution or the INA, enjoin its enforcement.[4]

9         **B.    Preliminary Injunction**

10        A preliminary injunction is an extraordinary remedy and is never available as a matter of

11   right. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). Therefore, the burden is on

12   the moving party to establish that (1) it is likely to succeed on the merits, (2) irreparable harm is

13   likely to occur absent preliminary relief, (3) the balance of equities tips in the movant's favor,

14   and (4) an injunction is in the public interest. *Id.* at 20. Moreover, in the Ninth Circuit, a

15   preliminary injunction may be appropriate where the moving party establishes "'serious

16   questions going to the merits' and a balance of hardships that tips sharply towards the

17   plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable harm and

18   that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

19   1135 (9th Cir. 2011).

20

21

22

23

---

24   [4] The Government also argues in its response brief that the President should be dismissed from
     this case as immune from the injunctive relief the Plaintiffs seek. (Dkt. No. 84 at 58) (citing

25   *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)). Such a request, buried in a response
     brief, is procedurally deficient. *See* LCR 7(b)(1); *see also Kujat v. Harbor Freight Tools USA,*

26   *Inc.*, 2010 WL 3463928, slip op. at 2 (E.D. Mich. 2010) (it is "procedurally improper . . . [to]
     raise in a response brief what is essentially a Rule 12(b)(6) motion"); *Cooper Lighting, LLC v.*

27   *Cordelia Lighting, Inc.*, 2018 WL 11350387, slip op. at 5 (N.D. Ga. 2018) (similar holding).

ORDER
C25-0127-JCC
PAGE - 5

10a

1         1.    Success on the Merits

2      The Plaintiffs are likely to succeed on their claim that the Order violates the Citizenship

3 Clause of the Fourteenth Amendment (and, in turn, the INA). Indeed, the Court need only look to

4 its text. The Citizenship Clause is clear: "All persons born or naturalized in the United States,

5 and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein

6 they reside." U.S. Const. amend. XIV, § 1, cl. 1. In other words, any individual who is born in

7 the territorial United States or properly naturalized according to federal procedures is a citizen of

8 this country.

9      The Government, for its part, relies on the provision of the Citizenship Clause that

10 conditions citizenship upon being "subject to the jurisdiction" of the United States. (Dkt. No. 84

11 at 31–36.) That is, the Government argues that "children born in the United States of illegal

12 aliens or temporary visitors" are not "subject to the jurisdiction of the United States," and

13 therefore cannot be considered birthright citizens. (*Id.* at 31.) Its logic proceeds as follows. First,

14 the Government contends that a person is "subject to the jurisdiction" of the United States if that

15 person is born "'in the allegiance and under the protection of the country.'" (*Id.* at 33) (citing

16 *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898)). It then explains that such allegiance

17 and protection exist for a person "only if [they are] not subject to the jurisdiction of a foreign

18 power, and the 'nation' has 'consent[ed]' to [that person] becoming part of its own

19 'jurisdiction.'" (*Id.*) (citing *Elk v. Wilkins*, 112 U.S. 94, 101–02 (1884)). The Government further

20 explains that a person owes "allegiance" to the country in which they are "domiciled," and

21 because a child's domicile "'follow[s] the independent domicile of [their] parent,'" so, too, must

22 a child's "allegiance." (*Id.* at 37) (quoting cases). In turn, the Government reasons that because

23 "[t]emporary visitors and unlawfully present aliens" are not "domiciled" here, their children born

24 on our soil must not owe "allegiance" to this country, and therefore are not "subject to [its]

25 jurisdiction" (as that phrase is contemplated by the Citizenship Clause). (*Id.*) But the

26 Government accords more meaning to the phrase "subject to the jurisdiction" than those words

27 or precedent support.

ORDER
C25-0127-JCC
PAGE - 6

In interpreting the text of the Constitution, courts are "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 544 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). Here, the Government interprets the phrase "subject to the jurisdiction" beyond its normal and ordinary meaning. For one, the Government insinuates that "subject to the jurisdiction" conditions citizenship upon the *exclusive* jurisdiction of the United States. (*See* Dkt. No. 84 at 33) (stating that allegiance exists only if a person is not subject to the jurisdiction of a foreign power). But the text of the phrase requires no such exclusivity; it requires only that the person born in the United States be subject to it. *See* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 446 (2020).

The Government also contends that whether a person born in the territorial United States is "subject to its jurisdiction" ultimately turns on the legal status of the person's parents and their allegiance to and domicile in this country. But the words "allegiance" and "domicile" do not appear in the Citizenship Clause, or anywhere in the Fourteenth Amendment, and nowhere in the text does it refer to a person's parentage. The Clause merely refers to "jurisdiction," and the word "jurisdiction" is commonly understood in this context to be "a geographic area within which political or judicial authority may be exercised." *Jurisdiction*, Black's Law Dictionary (12th ed. 2024); *see also The Schooner Exch. v. McFaddon*, 11 U.S. 116, 136 (1812) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute"). Thus, anyone who answers to the political or judicial authority of the United States is "subject to [its] jurisdiction." That is the plain meaning of the phrase "subject to the jurisdiction," and it unequivocally applies to children born in the territorial United States—regardless of the immigration status of their parents.

The Government's interpretation also contravenes longstanding precedent. Indeed, the Supreme Court addressed the meaning of the phrase "subject to the jurisdiction thereof" in the seminal case *Wong Kim Ark. See generally* 169 U.S. at 649–705. There, the Supreme Court

ORDER
C25-0127-JCC
PAGE - 7

1  concluded that a child born in California to Chinese nationals, nevertheless acquired United

2  States citizenship at birth under the Fourteenth Amendment. *Id.* at 705. To reach that conclusion,

3  the Supreme Court exhaustively canvassed English common law,[5] early American decisions,[6]

4  and citizenship's meaning to the Fourteenth Amendment's drafters.[7] It also clearly explained that

5  the phrase "subject to the jurisdiction thereof" was an extremely narrow qualification that only

6  excepted three specific classes of person: "children of members of the Indian tribes, . . . children

7  born of alien enemies in hostile occupation, and children of diplomatic representatives of a

8  foreign state." *Id.* at 682.[8] And to further emphasize the narrowness of the qualifications imbued

9

10  _____

11  [5] *See, e.g., id.* at 657–58 (citing A.V. Dicey for the proposition that only two types of persons
   born in British dominions were not British: those born to ambassadors and those born to hostile
12  invaders).
   [6] *See, e.g., id.* at 674 (noting that *Lynch v. Clarke*, 1 Sandf. Ch. 583 (1844), "emphatically
13  asserted the citizenship of native-born children of foreign parents").
   [7] *See, e.g., id.* at 698–99. To the extent they are useful, the Senate debates indicate that the
14  Citizenship Clause drafters understood the phrase "subject to the jurisdiction thereof" to apply
   broadly to immigrants and their children. *See* Ramsey, *supra*, at 445–50. Indeed, like the
15  Government here, opponents of the proposed Citizenship Clause worried that it would confer
   citizenship upon children born on U.S. soil to immigrant parents. Cong. Globe, 39th Cong., 1st
16  Sess. 2891 (remarks of Sen. Cowan). Proponents defended the language. *Id.* at 2891 (remarks of
   Sen. Conness), 2893 (Sen. Johnson), 2897 (Sen. Williams). But both sides seemed to agree that
17  the Clause would broadly confer citizenship on these persons. *See* Ramsey, *supra*, at 447–50; *see
   also* James Ho, *Birthright Citizenship, the Fourteenth Amendment, and State Authority*, 42 U.
18  Rich. L. Rev. 969, 972 (2008). The opponents lost and the Fourteenth Amendment was ratified,
   with the Citizenship Clause intact.
19  [8] Of course, this exception for Native American children no longer applies. But at the time, in
20  deciding *Wong Kim Ark*, the Supreme Court also confronted its decision in *Elk*. In doing so, the
   *Wong Kim Ark* court clarified that *Elk*'s holding was limited only to be that "an Indian born a
21  member of one of the Indian tribes . . . was not a citizen of the United States." 169 U.S. at 680.
   Congress has since abrogated *Elk* and expanded citizenship to Native American children via
22  statute. *See* 8 U.S.C. § 1401(b) (1924).
23  To that effect, the Government's reliance on *Elk*, (*see, e.g.,* Dkt. No. 84 at 15–16, 31, 33–38), as
   well as on Senate debates around Native American citizenship generally, (*id.* at 34–35), are
24  simply unfounded. The questions addressed there were more difficult than the question about
   immigrant parents due to the tribes' "peculiar relation to the national government" as
25  independent sovereigns. *Wong Kim Ark*, 169 U.S. at 682; *see also* Garrett Epps, *The Citizenship
26  Clause: A "Legislative History"*, 60 Am. U. L. Rev. 331, 357–72 (2010). As noted in *Wong Kim
   Ark*, those special concerns do not directly speak to the question presented here. *See id.* at 680.
27

13a

in the phrase "subject to the jurisdiction thereof," the Supreme Court explicitly clarified that

"aliens" were "exempt" from the qualifications because:

> When private individuals of one nation spread themselves through another as
> business or caprice may direct, mingling indiscriminately with the inhabitants of
> that other, . . . , it would be obviously inconvenient and dangerous to society, and
> would subject the laws to continual infraction, and the government to degradation,
> if such individuals or merchants did not owe temporary and local allegiance, and
> were not amenable to the jurisdiction of the country.

*Id.* at 685–86. In other words, "aliens" and other individuals who avail themselves of this country

for non-diplomatic purposes—whether lawfully or not—are necessarily "subject to the

jurisdiction" of the United States. So, too, are children born of said "aliens" on United States

territory. To construe the phrase otherwise would be "dangerous to society" and delegitimize this

country's jurisdiction over the persons who inhabit it. *See id.* (citing *The Schooner Exch.*, 11

U.S. at 136). And thus, according to the Court in *Wong Kim Ark*, so long as a child is born in the

territorial United States and does not fall under one of the narrowly tailored exceptions covered

by the phrase "subject to the jurisdiction thereof," that child receives citizenship by birth under

the Fourteenth Amendment. *Id.* at 693.

To the Government's credit, allegiance has at least some importance to citizenship.

Indeed, the Supreme Court acknowledged as much in *Wong Kim Ark*. *See id.* ("The fourteenth

amendment affirms the ancient and fundamental rule of citizenship by birth within the territory,

in the allegiance and under the protection of the country"). But again, the Government relies too

heavily on the *parents'* allegiance, when it ought to focus on the *child's*. In *Wong Kim Ark*, the

Supreme Court emphasized time and again that "[b]irth and allegiance go together." *Id.* at 662;

*see also id.* at 659 ("allegiance by birth is that which arises from being born within the

dominions and under the protection of a particular sovereign"). In other words, so long as a

person is born within a territory, then allegiance to that territory is a foregone conclusion. In turn,

that a child happens to be born to undocumented parents or parents with temporary status is

irrelevant.

ORDER
C25-0127-JCC
PAGE - 9

1    Finally, this Court briefly considers the Government's argument regarding consent. The
2    Government intimates that the phrase "subject to the jurisdiction thereof" requires that the
3    United States "consent" to a person becoming subject to its jurisdiction. (Dkt. No. 84 at 33.) That
4    is, "'[n]o one can become a citizen of a nation without its consent'." (*Id.* at 16) (quoting *Elk*, 112
5    U.S. at 102). And because the United States has not "consented" to the entry of undocumented
6    immigrants, it must follow that the United States has not "consented to making citizens of that
7    person's children." (*Id.*) Once again, the Government seems most preoccupied with the legal
8    status of the parents—so much so that it conflates the position of the child with that of their
9    parents. The fact of the matter is that the United States *has* consented to the citizenship of
10   children born on its territory, through the ratification of the Fourteenth Amendment.

11   Ultimately, the Government's position is unavailing and untenable. It does not have the
12   text or precedent to support its interpretation of the Citizenship Clause. And it rehashes losing
13   arguments from over a century ago. *See, e.g.*, *Wong Kim Ark*, 169 U.S. at 705–32 (Fuller, C.J.,
14   dissenting). Moreover, subsequent precedents have affirmed the exceptionally American grant of
15   citizenship as birthright. *See also Regan v. King*, 49 F. Supp. 222, 223 (N.D. Cal. 1942), *aff'd*,
16   134 F.2d 413 (9th Cir. 1943), *cert denied*, 319 U.S. 753 (1943); *see also Gee v. United States*, 49
17   F. 146, 148 (9th Cir. 1892). We need not till the same ground more than a century later.

18   The Plaintiffs are likely to succeed on the merits.

19              2.    Irreparable Harm

20   The Plaintiff States have also shown that they are likely to suffer irreparable economic
21   harm in the absence of preliminary relief. Economic harm "is irreparable here because the states
22   will not be able to recover money damages." *California v. Azar*, 911 F.3d 558, 581 (9th Cir.
23   2018). The Order will directly impact the Plaintiff States, immediately increasing unrecoverable
24   costs for providing essential medical care and social services to the States's residents and
25   creating substantial administrative costs for state agencies that are forced to comply with the
26   Order. (*See, e.g.*, Dkt. Nos. 14 at 12; 15 at 9; 25 at 5; 26 at 4, 6) (*cf. Ledbetter v. Baldwin*, 479

27

1  U.S. 1309, 1310 (1986) ("the State will suffer irreparable harm . . . [and] will bear the

2  administrative costs of changing its system to comply with the District Court's order")).

3        Likewise, the Individual Plaintiffs have made the requisite showing of irreparable harm.

4  "An alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's*

5  *Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (citing Wright & Miller, 11

6  *Fed. Prac. & Proc.* § 2948 (1973)). The Individual Plaintiffs assert that their unborn children

7  will be denied citizenship and be immediately subject to deportation under the INA, 8 U.S.C.

8  § 1182(a)(6)–(7). (*See, e.g.*, Dkt. Nos. 59 at 3, 60 at 2–3.) This would forcibly separate some of

9  their families. (*See, e.g.*, Dkt. No. 61 at 2–3.) The constitutional infringement and the specter of

10  deportation are sufficiently irreparable for the purposes of a preliminary injunction.

11        Therefore, the Plaintiffs have demonstrated the likelihood of irreparable harm.

12             3.       Balance of Equities and Public Interest

13        Finally, the Court finds that the balance of equities and the public interest strongly weigh

14  in favor of entering a preliminary injunction. These two factors merge when the federal

15  government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). First, constitutional violations

16  weigh heavily in favor of an injunction. *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024).

17  Second, the Government has no legitimate interest in enforcing an Order that is likely

18  unconstitutional and beyond its authority. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d

19  497, 539 (N.D. Cal. 2017). Third, the rule of law is secured by a strong public interest that the

20  laws "enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary*

21  *Covenant v. Trump*, 9 F.3d 742, 779 (9th Cir. 2018) (cleaned up).

22        The balance of equities and the public interest both support the relief sought.

23      **C.**    **Scope of Injunction**

24        The Plaintiff States ask the Court to enjoin the Order's implementation and enforcement

25

26

27

16a

1  on a nationwide basis.[9] (*See* Dkt. No. 63 at 29.) They contend anything less cannot provide

2  complete relief, given the Order's "extraordinary nature," its resulting financial burdens, and the

3  likely "operational chaos" the Order will trigger. (Dkt. Nos. 63 at 29, 105 at 23.) It is axiomatic

4  that injunctive relief must be narrowly tailored. *See, e.g., Nat. Resources Def. Council, Inc. v.*

5  *Winter*, 508 F.3d 885, 886 (9th Cir. 2007). Nevertheless, this "is 'dependent as much on the

6  equities . . . as the substance of the legal issues,' and courts must tailor the scope 'to meet th[ose]

7  exigencies.'" *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (quoting *Azar*, 911 F.3d at

8  584).

9        The extreme nature of the equities, *see supra* Part II.B.3., alone warrants nationwide

10  relief. Moreover, the Court cannot ignore the Supreme Court's discussion regarding President

11  Biden's student loan debt program, as implemented by the Secretary of Education, where

12  according to the Court, the Executive branch "arrogat[ed] to itself power belonging to another

13  [branch]." *Biden*, 143 S. Ct. at 2373. Given the nature of that harm and the scope of that conduct,

14  nationwide relief was warranted. *See id.* at 2376 (reversing the District Court's refusal to issue a

15  nationwide preliminary injunction). The Court fails to see a distinction with the actions at issue

16  here.

17        In addition, as the Plaintiff States note, a geographically limited injunction would be

18  ineffective, as it would not completely relieve them of the Order's financial burden(s). (*See* Dkt.

19  No. 63 at 29.) For example, babies born in other states would travel to the Plaintiff States. Once

20  they do, those persons would be eligible for services and support that, without nationwide relief,

21  need be funded by the Plaintiff States, without federal support (even though that same funding

22  would continue for babies born within the Plaintiff States to parents of comparable immigration

23  status). This is, simply said, perverse and bizarre. As *amicus* 72 State and Local Governments

24

25  [9] The Individual Plaintiffs do not specify the scope of the preliminary injunction they seek. (*See*
*generally* Dkt. No. 74.) However, as the Court has not yet ruled on their motion for preliminary

26  class certification (Dkt. No. 58), the Court must surmise that these plaintiffs seek only to enjoin

27  the implementation and enforcement of the Order as it relates to themselves.

1   point out, it is also unworkable. (*See* Dkt. No. 69-1 at 17.) The recordkeeping and administrative

2   burden from such an arrangement, (*see id.*),[10] also mandates nationwide relief. Nor is it clear

3   what, if any, prejudice the Government would suffer from nationwide relief. In its brief in

4   opposition, it points to none. (*See* Dkt. No. 84 at 57–59.)

5          For all these reasons, the Court finds that relief must be nationwide. Anything less is

6   ineffectual.

7   **III.    CONCLUSION**

8          Citizenship by birth is an unequivocal Constitutional right. It is one of the precious

9   principles that makes the United States the great nation that it is. The President cannot change,

10  limit, or qualify this Constitutional right via an executive order. The Court GRANTS the

11  Plaintiffs' motions for a nationwide preliminary injunction (Dkt. Nos. 63, 74) and ENJOINS

12  enforcement or implementation of the Order on a nationwide basis.

13

14         DATED this 6th day of February 2025.

15

16

17         _____

18         John C. Coughenour
           UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26  ───────────────────
    [10] *Amicus* 18 Opposing States do not suggest, in the alternative, limited relief. (*See generally*
27  Dkt. No. 89-1.) Nor do other opposing *amici*. (*See generally* Dkt. Nos. 80-2, 86-2.)

    ORDER
    C25-0127-JCC
    PAGE - 13

18a

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

# FILED

FEB 19 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF WASHINGTON; et al.,<br><br>    Plaintiffs - Appellees,<br><br>  v.<br><br>DONALD J. TRUMP; et al.,<br><br>    Defendants - Appellants,<br><br>----------------------------------------<br><br>JAMES DANIEL JORDAN; et al.,<br><br>    Amici Curiae. | No. 25-807<br><br>D.C. No.<br>2:25-cv-00127-JCC<br>Western District of Washington,<br>Seattle<br><br>ORDER |

Before: CANBY, M. SMITH, and FORREST, Circuit Judges.
Order by Judges CANBY and M. SMITH; Concurrence by Judge FORREST.

Appellants have not made a "strong showing that [they are] likely to succeed on the merits" of this appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The emergency motion (Docket Entry No. 21) for a partial stay of the district court's February 6, 2025 preliminary injunction is denied.

The existing briefing schedule remains in effect. The clerk will place this case on the calendar for June 2025. *See* 9th Cir. Gen Ord. 3.3(f).

1  Washington et. al. v. Trump, et al., No. 25-807

2  Forrest, C.J., concurring.

3       The Government has presented its motion for a stay pending appeal on an

4  *emergency* basis, asserting that it needs the relief it seeks by February 20. Thus, the

5  first question that we must ask in resolving this motion is whether there is an

6  emergency that requires an immediate answer.

7       Granting relief on an emergency basis is the exception, not the rule. *Cf. Nken*

8  *v. Holder*, 556 U.S. 418, 427 (2009) (noting that a non-emergency stay "is an

9  'intrusion into the ordinary processes of administration and judicial review,' and

10  accordingly 'is not a matter of right, even if irreparable injury might otherwise result

11  to the appellant.'" (citations omitted)); *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921,

12  934–35 (2024) (mem.) (Jackson, J., dissenting from grant of stay) ("Even when an

13  applicant establishes [the] highly unusual line-jumping justification [for a non-

14  emergency stay], we still must weigh the serious dangers of making consequential

15  decisions 'on a short fuse without benefit of full briefing and oral argument.'"

16  (citations omitted)). Neither the Federal Rules of Civil Procedure nor the Federal

17  Rules of Appellate Procedure address what a party must show to warrant immediate

18  equitable relief. *Cf.* Fed. R. Civ. P. 62(g)(1); Fed. R. App. P. 8(a)(2)(D); Fed. R.

19  App. P. 27(c). Nor do the "traditional" stay factors that we analyze when considering

20  whether to grant a stay pending appeal. *See Nken*, 556 U.S. at 425–26. But this

1  court's rules provide some guidance. Ninth Circuit Rule 27-3, which governs

2  emergency motions, provides that "[i]f a movant needs relief within 21 days to avoid

3  irreparable harm, the movant must," among other things, "state the facts showing

4  the existence and nature of the claimed emergency." If the movant fails to

5  demonstrate that irreparable harm will occur immediately, emergency relief is not

6  warranted, and there is no reason to address the merits of the movant's request.

7     Here, the Government has not shown that it is entitled to immediate relief. Its

8  sole basis for seeking emergency action from this court is that "[t]he district court

9  has . . . stymied the implementation of an Executive Branch policy . . . nationwide

10  for almost three weeks." That alone is insufficient. It is routine for both executive

11  and legislative policies to be challenged in court, particularly where a new policy is

12  a significant shift from prior understanding and practice. *E.g.*, *West Virginia v. EPA*,

13  597 U.S. 697 (2022); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591

14  U.S. 1 (2020); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). And just

15  because a district court grants preliminary relief halting a policy advanced by one of

16  the political branches does not in and of itself an emergency make. A controversy,

17  yes. Even an important controversy, yes. An emergency, not necessarily.

18     To constitute an emergency under our Rules, the Government must show that

19  its inability to implement the specific policy at issue creates a serious risk of

20  irreparable harm within 21 days. The Government has not made that showing here.

2

1   Nor do the circumstances themselves demonstrate an obvious emergency where it

2   appears that the exception to birthright citizenship urged by the Government has

3   never been recognized by the judiciary, *see United States v. Wong Kim Ark*, 169 U.S.

4   649, 693 (1898), and where executive-branch interpretations before the challenged

5   executive order was issued were contrary, *see, e.g.,* Walter Dellinger, Assistant

6   Attorney General, Office of Legal Counsel, *Legislation Denying Citizenship at Birth*

7   *to Certain Children Born in the United States*, 19 O.L.C. 340, 340–47 (1995).

8       To be clear, I am saying nothing about the merits of the executive order or

9   how to properly interpret the Fourteenth Amendment. I merely conclude that,

10  whatever the merits of the parties' respective positions on the issues presented, the

11  Government has not shown it is entitled to immediate relief from a motions panel

12  before assignment of the case to a merits panel. That said, the nature of this case and

13  the issues it raises does warrant expedited scheduling for oral argument and

14  assignment to a merits panel. And our general orders expressly permit this option:

15  "In resolving an emergency motion to grant or stay an injunction pending appeal,

16  the motions panel may set an accelerated briefing schedule for the merits of the

17  appeal, order the case on to the next available argument calendar . . . , or order the

18  case on to a specified argument calendar." 9th Cir. General Order 6.4(b).

19      Aside from the legal standard governing emergency relief, three prudential

20  reasons support not addressing the merits of the Government's motion for a stay at

1    this point. First, under our precedent, the decision of a motions panel, even if

2    published, is not binding on the future merits panel. In *East Bay Sanctuary Covenant*

3    *v. Biden*, we held that "[t]he published motions panel order may be binding as

4    precedent for other panels deciding the same issue" at the motions stage, but it is not

5    binding on the merits panel in the same case "because the issues are different" as

6    presented in a motion to stay and in the underlying appeal of a preliminary

7    injunction. 993 F.3d 640, 660 (9th Cir. 2021). A motions panel resolving a motion

8    to stay "is predicting the likelihood of success of the appeal" whereas the "merits

9    panel is deciding the likelihood of success of the actual litigation." *Id.* This is a fine,

10   but important, distinction that has implications for the parties and the court. Because

11   the procedural context informs the questions to be answered, "we do not apply the

12   law of the case doctrine as strictly." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 980

13   n.1 (9th Cir. 2024) (quoting *United States v. Houser*, 804 F.2d 565, 568 (9th Cir.

14   1986), *abrogated on other grounds by Christianson v. Cold Indus. Operating Corp.*,

15   486 U.S. 800 (1988)). Therefore, anything a motions panel says about the merits of

16   any of the issues presented in a motion for stay pending appeal is, on a very practical

17   level, wasted effort.

18       Second, as a motions panel, we are not well-suited to give full and considered

19   attention to merits issues. Take this case. The Government filed its emergency

20   motion for a stay on February 12, requesting a decision by February 20—just over a

1   week later. We ordered a responsive brief from the Plaintiff States by February 18,

2   and an optional reply brief from the Government by February 19—one day before

3   the Government asserts it needs relief. This is not the way reviewing courts normally

4   work. We usually take more time and for good reason: our duty is to "act

5   responsibly," not dole out "justice on the fly." *East Bay Sanctuary Covenant*, 993

6   F.3d at 661 (citation omitted). We must make decisions based on reasoned judgment,

7   not gut reaction. And this requires understanding the facts, the arguments, and the

8   law, and how they fit together. *See TikTok Inc. v. Garland*, 604 U.S. ---, 145 S. Ct.

9   57, 63 (2025) (observing that courts should be particularly cautious in cases heard

10  on an expedited basis); *id.* at 75 (Gorsuch, J., concurring) ("Given just a handful of

11  days after oral argument to issue an opinion, I cannot profess the kind of certainty I

12  would like to have about the arguments and record before us."). Deciding important

13  substantive issues on one week's notice turns our usual decision-making process on

14  its head. We should not undertake this task unless the circumstances dictate that we

15  must. They do not here.

16      Third, and relatedly, quick decision-making risks eroding public confidence.

17  Judges are charged to reach their decisions apart from ideology or political

18  preference. When we decide issues of significant public importance and political

19  controversy hours after we finish reading the final brief, we should not be surprised

20  if the public questions whether we are politicians in disguise. In recent times, nearly

5

24a

1   all judges and lawyers have attended seminar after seminar discussing ways to

2   increase public trust in the legal system. Moving beyond wringing our hands and

3   wishing things were different, one concrete thing we can do is decline to decide (or

4   pre-decide) cases on an emergency basis when there is no emergency warranting a

5   deviation from our normal deliberate practice.

6                             \* \* \* \* \*

7       I do not mean to suggest that emergency relief is never warranted. There are

8   cases where quick action is necessary. But they are rare. There must be a showing

9   that emergency relief is truly necessary to prevent immediate irreparable harm. The

10   Government did not make that showing here, and, therefore, there is no reason for

11   us to say anything about whether the factors governing the grant of a stay pending

12   appeal are satisfied. The Government may seek the relief it wants from the merits

13   panel who will be assigned to preside over this case to final disposition.

14       For these reasons, I concur in denying the Government's emergency motion

15   for reasons different than relied on by the majority.

6

Case: 25-1158    Document: 00118260148    Page: 69    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 65    Filed 02/05/25    Page 1 of 32

25a

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CASA, INC.,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-25-201** |
| **DONALD J. TRUMP,** *et al.*, | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

In 1868, the United States Congress ratified the Fourteenth Amendment to the United States Constitution. The Citizenship Clause of the Fourteenth Amendment states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

U.S. Const. amend. XIV, § 1, cl. 1.

More than 150 years after the Fourteenth Amendment was ratified, the newly-sworn-in President of the United States Donald J. Trump signed an Executive Order called "Protecting the Meaning and Value of American Citizenship." *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) (the "Order" or "Executive Order"). The Executive Order interprets the Citizenship Clause of the Fourteenth Amendment in a manner that the Supreme Court has resoundingly rejected and no court in the country has ever endorsed. If the Order is allowed to take effect, it would deny citizenship by birth to U.S.-born persons whose mothers are in the country unlawfully or temporarily and whose fathers are not citizens or lawful permanent residents at the time of the person's birth.

The day after the Executive Order was issued, CASA, Inc. and Asylum Seeker Advocacy Project, two nonprofit organizations that provide services to immigrants, and five pregnant women

without permanent legal status who expect to give birth in the United States in the coming months filed this lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. The plaintiffs allege that the Executive Order violates the Fourteenth Amendment to the Constitution and the Immigration and Nationality Act. They request a preliminary injunction that enjoins implementation and enforcement of the Executive Order until the merits of their claims are resolved. The government opposes preliminary injunctive relief.

The plaintiffs easily have met the standard for a preliminary injunction. There is a very strong likelihood of success on the merits. The plaintiffs will face irreparable harm without injunctive relief. And the balance of the equities and the public interest strongly weigh in favor of a preliminary injunction. The motion for a preliminary injunction is granted. The defendants are enjoined from implementing and enforcing the Executive Order.

## I.     Background

At noon on January 20, 2025, President Trump took the oath of office of the President of the United States. Later that day, President Trump signed an Executive Order called "Protecting the Meaning and Value of American Citizenship." The Executive Order purports to interpret the clause "subject to the jurisdiction thereof" in the Citizenship Clause of the Fourteenth Amendment. In Section 1 of the Order, titled "Purpose," the Order explains that "[t]he Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof.'" Exec. Order § 1. Section 1 continues:

> Among the categories of individuals born in the United States and not subject to
> the jurisdiction thereof, the privilege of United States citizenship does not

automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*Id.*

Section 2 of the Order establishes the policy of the United States government. *See id.* § 2. Under Section 2, no federal department or agency "shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to a person whose mother was unlawfully present or lawfully present with only temporary status and whose father was neither a United States citizen nor lawful permanent resident at the time of that person's birth. *Id.* § 2(a). The policy applies only to persons who are born in the United States on or after February 19, 2025. *Id.* § 2(b). It does not impact the ability of other people, including children of lawful permanent residents, to get documentation of their American citizenship. *Id.* § 2(c).

Section 3 of the Order discusses enforcement. *Id.* § 3. It instructs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and that their agencies' officers, employees, and agents act in accordance with the Order. *Id.* § 3(a). It also instructs the heads of executive departments and agencies to issue public guidance regarding their implementation of the Order within 30 days of its issuance. *Id.* § 3(b).

On January 21, 2025, the plaintiffs filed this lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department

of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. ECF 1, ¶¶ 50–56. Each individual defendant is sued in their official capacity. *Id.* The plaintiffs claim that the Executive Order violates the Fourteenth Amendment, *id.* ¶¶ 101–08, and the Immigration and Nationality Act ("INA"), *id.* ¶¶ 109–14. They seek declaratory and injunctive relief. *Id.* at 37–38.

The two organizational plaintiffs are CASA, Inc. ("CASA") and Asylum Seeker Advocacy Project ("ASAP"). CASA is a nonprofit organization headquartered in Prince George's County, Maryland. *Id.* ¶ 19. It "is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 175,000 members." *Id.* Its mission "is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities." *Id.* ¶ 20. It helps members apply for public benefits and offers free legal consultations. *Id.* ¶ 22. CASA does not issue formal membership to anyone under the age of 15, though it does provide services to young people and their families. *Id.* ¶ 24. CASA's members include women without lawful status who are pregnant or plan to give birth in the United States. *Id.* ¶ 25. Under the Order, their children born in the United States would no longer be U.S. citizens.

ASAP is a nonprofit organization headquartered in New York, New York. *Id.* ¶ 31. It "is the largest membership-based organization of asylum-seekers in the United States, with over 680,000 members from more than 175 countries who reside in all 50 states and several U.S. territories." *Id.* "ASAP's mission is to help its members—individuals seeking asylum—to build a more welcoming United States." *Id.* ¶ 32. To that end, it provides members with community and legal support. *Id.* ASAP does not extend formal membership to people under the age of 14, but the benefits of ASAP membership may extend to them through their parents' membership. *Id.* ¶ 35.

Most ASAP members have applied for asylum and cannot be deported while their asylum applications are pending. *Id.* ¶ 36. ASAP expects that "[h]undreds or even thousands of [its] members will give birth to children in the United States over the coming weeks and months[.]" *Id.* ¶ 37. Despite being born in the United States, those children would not be U.S. citizens under the Order.

The individual plaintiffs—Maribel, Juana, Trinidad Garcia, Monica, and Liza—are proceeding under pseudonyms.[1] ECF 3. Maribel is a member of CASA. ECF 1, ¶ 45. She is undocumented and has lived in the United States for 18 years. *Id.* She is pregnant and due in July 2025. *Id.* Juana is also a CASA member. *Id.* ¶ 46. She has a pending asylum claim. *Id.* She is two months pregnant. *Id.* Trinidad Garcia is a member of ASAP. *Id.* ¶ 47. She and her partner came to the United States on tourist visas in 2017 and filed affirmative asylum applications. *Id.* They are awaiting their asylum interview. *Id.* Trinidad Garcia is pregnant and due in August 2025. *Id.* She and her partner are citizens of Venezuela. *Id.* Venezuela does not provide consular services in the United States, so she fears that her child would be rendered stateless by the Order. *Id.* Monica is also an ASAP member from Venezuela. *Id.* ¶ 48. She has Temporary Protected Status and has filed an application for asylum. *Id.* She is pregnant and due in August 2025. *Id.* Like Trinidad Garcia, she fears that her child would be rendered stateless by the Order. *Id.* Liza is married to an ASAP member who is seeking asylum. *Id.* ¶ 49. Liza is currently in lawful status on a student visa. *Id.* She is pregnant and due in May 2025. *Id.* She and her husband are Russian citizens who fear

---

[1] The individual plaintiffs have asked to proceed under pseudonyms because they "fear that the U.S. government and members of the public could retaliate against them or their minor children because of their participation in this lawsuit." ECF 3, at 1. The government does not oppose the motion "provided that [p]laintiffs provide the identities of those individuals on request if necessary to permit [it] to fully defend this case." ECF 39, at 1. The motion to proceed under pseudonyms is granted. If the government needs to know the identities of the individual plaintiffs to defend this case, it may file a request for relief from the Court.

Case: 25-1158    Document: 00118260148    Page: 74    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 65    Filed 02/05/25    Page 6 of 32

30a

persecution from the Russian government. *Id.* They are afraid to apply for Russian citizenship for their child and are worried their child will be rendered stateless by the Order.[2]

The plaintiffs filed a motion for a temporary restraining order and preliminary injunction. ECF 2. The government opposed the preliminary injunction. ECF 40. The plaintiffs filed a reply. ECF 46. Three amici filed briefs: a group of local governments and local government officials, ECF 37; the Immigration Reform Law Institute, ECF 63; and the State of Tennessee, ECF 50. The Court heard argument on the motion on February 5, 2025.

## II.    Discussion

The plaintiffs seek a preliminary injunction that enjoins the implementation and enforcement of the Executive Order. The government argues that the plaintiffs do not have a cause of action and that preliminary injunctive relief is unwarranted. The Court finds that the plaintiffs do have a cause of action and that preliminary injuctive relief is warranted.

### A.    Reviewabilty of the Executive Order

As a threshold matter, the Court must decide if the plaintiffs' constitutional claim is subject to judicial review. *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023) ("Before [the court] turn[s] to the merits, [it] must decide whether the plaintiffs' claims are reviewable.").[3]

---

[2] Unless otherwise noted, the "plaintiffs" refers to the individual plaintiffs and members of the organizational plaintiffs who are pregnant.

[3] The Court need not decide whether it may review the plaintiffs' statutory claim because the plaintiffs are entitled to a preliminary injunction on their constitutional claim. The claims are essentially coterminous because the statute mirrors the Citizenship Clause. Although the Court has a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case," *Harmon v. Brucker*, 355 U.S. 579, 581 (1958), the constitutional question presented here is essential to the proper disposition of the issues before the Court.

The plaintiffs claim the Executive Order violates the Fourteenth Amendment's Citizenship Clause. There is no question that the Court may review the constitutionality of the Executive Order and grant injunctive relief. The Supreme Court consistently has "sustain[ed] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *See Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). The Supreme Court has affirmed that "the President's actions may . . . be reviewed for constitutionality." *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also Dalton v. Specter*, 511 U.S. 462, 473–74 (1994). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 815 (Scalia, J., concurring)); *see also id.* at 1326 ("[A]n independent claim of a President's violation of the Constitution would certainly be reviewable."). In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court explained that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. 320, 327 (2015). Pursuant to this authority, the Supreme Court has reviewed constitutional challenges to executive orders. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 795–96 (1985). During President Trump's first term, the Supreme Court decided a constitutional challenge to one of his proclamations. *See Trump v. Hawaii*, 585 U.S. 667, 697–99 (2018) (reaching the merits of an Establishment Clause challenge to a Presidential Proclamation).

The government insists the plaintiffs have an "available and exclusive mechanism to challenge disputes about citizenship under the INA." ECF 40, at 9. According to the government, the plaintiffs must pursue their claims through a declaratory action under 8 U.S.C. § 1503(a) of the INA. Section 1503(a) allows "any person who is within the United States" and who "claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States" to seek declaratory relief after "the final administrative denial of such right or privilege." 8 U.S.C. § 1503(a).

This INA provision does not prevent the plaintiffs from bringing a facial constitutional challenge to the Executive Order. The text of the INA does not indicate that § 1503(a) is the exclusive remedy for challenging the denial of a right to citizenship under the Fourteenth Amendment. The Supreme Court has cautioned against reading a statutory right to judicial review "as an exclusive route to review" when the text neither "expressly" nor "implicitly" limits the Court's jurisdiction. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (statute permitting judicial review of the Securities and Exchange Commission's rules and orders was not the "exclusive route to review" constitutional claims against a government board subject to the Commission's good-cause removal power); *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (concluding federal statutes allowing courts of appeal to review an agency order "d[id] not displace district court jurisdiction over . . . far-reaching constitutional claims"). Indeed, judicial review under the INA is not the exclusive mechanism to challenge policies that deny citizenship. *See, e.g.*, *Tuaua v. United States*, 788 F.3d 300, 302–03 (D.C. Cir. 2015).

Further, the plaintiffs cannot pursue their constitutional challenge to the Executive Order under § 1503(a). The statute provides a cause of action to "any person who is within the United

States" who "claims a right or privilege as a national of the United States." 8 U.S.C. § 1503(a).

The plaintiffs are not seeking "a judgment declaring [their children] to be [] national[s] of the

United States" after the denial of a particular right or privilege, *id.*, such as the denial of a passport,

*see, e.g.*, *Cambranis v. Blinken*, 994 F.3d 457, 465 (5th Cir. 2021) (reviewing challenge under §

1503(a) brought after denial of passport application); *Kiviti v. Pompeo*, 467 F. Supp. 3d 293, 303

(D. Md. 2020) (same). Instead, the plaintiffs seek immediate injunctive relief from the Executive

Order because the Order is facially unconstitutional and denies citizenship to their unborn children.

So the government is incorrect: Section 1503(a) of the INA does not offer the plaintiffs an

exclusive and available remedy for their constitutional challenge to the Executive Order.

The plaintiffs can seek protection from unconstitutional executive action in this Court. As

the Supreme Court has explained:

> "The very essence of civil liberty . . . certainly consists in the right of every
> individual to claim the protection of the laws, whenever he receives an injury. One
> of the first duties of government is to afford that protection." Traditionally,
> therefore, "it is established practice for this Court to sustain the jurisdiction of
> federal courts to issue injunctions to protect rights safeguarded by the Constitution
> and to restrain individual state officers from doing what the 14th Amendment
> forbids the State to do."

*Davis v. Passman*, 442 U.S. 228, 242 (1979) (first quoting *Marbury v. Madison*, 5 U.S. (1 Cranch)

137, 163 (1803); and then quoting *Bell*, 327 U.S. at 684). The Court can review the plaintiffs'

claim that the Executive Order violates the Fourteenth Amendment.

### B.    Motion for Preliminary Injunction

To obtain a preliminary injunction, the plaintiffs must establish four factors: (1) that they

are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary

relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in

the public interest. *See Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The plaintiffs must satisfy all four factors to obtain a preliminary injunction. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The plaintiffs have shown they are entitled to this extraordinary remedy.

### 1. Likelihood of Success

The Citizenship Clause of the Fourteenth Amendment states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. The plaintiffs claim the Executive Order violates the Fourteenth Amendment because the order denies citizenship to persons who are born in the United States and are "subject to the jurisdiction thereof." The President sees it differently. On the President's account, "the categories of individuals born in the United States and not subject to the jurisdiction thereof" include any child (i) whose "mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth" or (ii) whose "mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." Exec. Order § 1. Examples of "lawful but temporary" presence include, "but [are] not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa." *Id.* According to the Executive Order, "the privilege of United States citizenship does not automatically extend to" these U.S.-born children. *Id.*

The President's novel interpretation of the Citizenship Clause contradicts the plain language of the Fourteenth Amendment and conflicts with 125-year-old binding Supreme Court precedent. At the turn of the twentieth century, the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), resolved any debate about the scope of the Citizenship Clause and the meaning of "subject to the jurisdiction thereof." *Wong Kim Ark* forecloses the President's interpretation of the Citizenship Clause.

The case arose when Wong Kim Ark, who was born in San Francisco to parents who were Chinese citizens, traveled to China for a temporary visit and was denied re-entry into the United States "upon the sole ground that he was not a citizen of the United States." *Id.* at 653. Wong Kim Ark insisted he was a U.S. citizen because he was born in California. *Id.* If he was a citizen, the "Chinese Exclusion Acts," which prohibited "persons of the Chinese race, and especially Chinese laborers, from coming into the United States," would not apply to him. *Id.*

The Supreme Court framed "the question presented" like this:

> whether a child born in the United States, of parents of Chinese descent, who at the time of his birth are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the fourteenth amendment of the constitution: 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.'

*Id.*

To answer this question, the Supreme Court began with the text of the Constitution and determined that the "constitution nowhere defines the meaning of these words." *Id.* at 654. It then interpreted the Citizenship Clause "in the light of the common law, the principles and history of which were familiarly known to the framers of the constitution." *Id.* The Court observed that "[t]he language of the constitution . . . could not be understood without reference to [English] common

Case: 25-1158    Document: 00118260148    Page: 80    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 65    Filed 02/05/25    Page 12 of 32

36a

law." *Id.*; *see id.* at 655 ("The interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." (quoting *Smith v. Alabama*, 124 U.S. 465, 478 (1888))).

The Court prefaced its review of English common law as follows:

The fundamental principle of the common law with regard to English nationality was birth within the allegiance—also called 'ligealty,' 'obedience,' 'faith,' or 'power'— of the king. The principle embraced all persons born within the king's allegiance, and subject to his protection. Such allegiance and protection were mutual,—as expressed in the maxim, 'Protectio trahit subjectionem, et subjection protectionem,'—and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; but were predicable of aliens in amity, so long as they were within the kingdom. Children, born in England, of such aliens, were therefore natural-born subjects. But the children, born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the king's dominions, were not natural-born subjects, because not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction, of the king.

*Id.* at 655. That principle, as the Court explained, pervaded English common law cases. *See id.* at 655–58.

After a lengthy discussion of common law cases, the Court concluded:

It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador, or of an alien enemy in a hostile occupation of the place where the child was born.

*Id.* at 658.

The Court found that this "same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established." *Id.* In cases decided after

the Declaration of Independence, courts in the United States "assumed . . . that all persons born in the United States were citizens of the United States." *Id.* (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 119 (1804)). The Court noted that, in *Levy's Lessee v. McCartee*, 31 U.S. (6 Pet.) 102 (1832), Justice Story "treated it as unquestionable that by [the principles of common law] a child born in England of alien parents was a natural-born subject." 169 U.S. at 662. And in *United States v. Rhodes*, Justice Swayne also relied on English common law:

> All persons born in the allegiance of the king are natural-born subjects, and all persons born in the allegiance of the United States are natural-born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as of England. We find no warrant for the opinion that this great principle of common law has ever been changed in the United States. It has always obtained here, with the same vigor, and subject only to the same exceptions, since as before the Revolution.

*Id.* at 662–63 (quoting *United States v. Rhodes*, 27 F. Cas. 785, 790 (C.C.D. Ky. 1866) (Swayne, Cir. J.)). Justice Sewall of the Supreme Court of Massachusetts stated in *Kilham v. Ward*:

> The doctrine of common law is that every man born within its jurisdiction is a subject of the sovereign of the country where he is born; and allegiance is not personal to the sovereign in the extent that it has been contended for; it is due to him in his political capacity of sovereign of the territory where the person owing the allegiance was born.

*Id.* (quoting *Kilham v. Ward*, 2 Mass. (1 Tyng) 236, 264–65 (Mass. 1806)).

After an extensive review of English common law, decisions of courts in the United States, and recent acts of Congress, the Supreme Court concluded: "Here is nothing to countenance the theory that a general rule of citizenship by blood or descent has displaced in this country the fundamental rule of citizenship by birth within its sovereign." *Id.* at 674. The Court concluded that the Fourteenth Amendment and the Civil Rights Act of 1866, enacted two years before the Fourteenth Amendment, "finally put at rest" any "doubt" that before their enactment, "all white persons, at least, born within the sovereignty of the United States, whether children of citizens or

of foreigners, excepting only children of ambassadors and public ministers of a foreign government, were native-born citizens of the United States." *Id.* at 674–75.

With their enactment, the Fourteenth Amendment and the Civil Rights Act of 1866 "reaffirmed in the most explicit and comprehensive terms . . . the fundamental principle of citizenship by birth within the dominion." *Id.* at 675. Enacted first, the Civil Rights Act of 1866 states, in part: "All persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." *Id.* (quoting Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27). Soon after Congress enacted the Civil Rights Act of 1866, the "same congress . . . evidently thinking it unwise, and perhaps unsafe, to leave so important a declaration of rights to depend upon an ordinary act of legislation, which might be repealed by a subsequent congress, framed the fourteenth amendment of the constitution." *Id.* After reciting the text of the Fourteenth Amendment's Citizenship Clause, the Court stated:

> As appears on the face of the amendment, as well as from the history of the times, this was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption.

*Id.* at 676. The "main purpose [of the Citizenship Clause] doubtless was . . . to establish the citizenship of free negroes, which had been denied" in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), and "to put it beyond all doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States, are citizens of the United States." *Id.* The amendment's "opening words, 'All persons born,' are general, not to say universal, restricted only by place and jurisdiction, and not by color or race." *Id.*

The Court then interpreted the clause "subject to the jurisdiction thereof." *Id.* at 676–82. At the time, the only case that had decided the meaning of the clause was *Elk v. Wilkins*, 112 U.S.

94 (1884). *Wong Kim Ark*, 169 U.S. at 680. Justice Gray, the author of *Wong Kim Ark*, authored *Elk* only four years earlier. As Justice Gray stated in *Wong Kim Ark*, the *Elk* Court held that "an Indian born a member of one of the Indian tribes within the United States . . . was not a citizen of the United States, as a person born in the United States, 'and subject to the jurisdiction thereof,' within the meaning of the clause in question." *Id.* The *Wong Kim Ark* Court stated the rationale for the *Elk* holding:

> Indian tribes, being within the territorial limits of the United States were not, strictly speaking, foreign states, but were alien nations, distinct political communities, the members of which owed immediate allegiance to their several tribes, and were not part of the people of the United States . . . Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indian tribes (an alien, though dependent, power), although in a geographical sense born in the United States, are no more "born in the United States, and subject to the jurisdiction thereof," within the meaning of the first section of the fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States of ambassadors or other public ministers of foreign nations.

*Id.* at 681. Justice Gray then explained why *Elk* did not apply to the case at bar: "The decision in *Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not in the diplomatic service of a foreign country." *Id.* at 682.

Having distinguished *Elk* as a unique case that "concerned only members of the Indian tribes within the United States," the *Wong Kim Ark* Court determined that:

> [t]he real object of the fourteenth amendment of the constitution, in qualifying the words 'all persons born in the United States' by the addition 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases—children born of alien enemies of hostile occupation, and children of diplomatic representatives of a foreign state—both of which . . . by the law of England and by our own law, from the time of the first settlement of the English colonies in America, had been recognized exceptions to the fundamental rule of citizenship by birth within the country.

*Id.* at 682.

> Ultimately, the *Wong Kim Ark* Court made these "irresistibl[e] . . . conclusions":

> The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.

*Id.* at 693. Except in rare instances, the Fourteenth Amendment guarantees U.S. citizenship to any child born on U.S. soil. *See id.*

The *Wong Kim Ark* Court then applied these holdings to the facts before it. Recall that Wong Kim Ark was denied re-entry into the United States because it was believed he was not a citizen, and if he was not a citizen, the Chinese Exclusion Acts barred his entry into the United States. *Id.* at 653. The Court determined that no legislation to exclude Chinese citizens could apply to a person "born in the United States of Chinese parents." *Id.* at 694–99. Yet the United States could "exclude" or "expel from the country persons of the Chinese race, born in China, and continuing to be subjects of the emperor, though having acquired a commercial domicile in the United States . . . ." *Id.* at 699. The Supreme Court had upheld the Acts previously based on "the right to exclude or to expel all aliens," *id.*, including "Chinese persons not born in this country'"— a population of people who had "'never been recognized as citizens of the United States, nor authorized to become such under the naturalization laws," *id.* at 702 (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 716 (1893)). The Acts could lawfully exclude someone born in China "who had acquired a commercial domicile in the United States" but "voluntarily left . . . with the

intention of returning." *See id.* at 700 (citing *Lem Moon Sing v. United States*, 158 U.S. 538 (1895)).

The *Wong Kim Ark* Court acknowledged that Congress could deny naturalization to someone born in China. *Id.* But the Fourteenth Amendment "contemplates two sources of citizenship . . . birth and naturalization." *Id.* Congress's "power of naturalization . . . is a power to confer citizenship, not a power to take it away." *Id.* at 703. The Court affirmed that "citizenship by birth is established by the mere fact of birth under the circumstances defined in the constitution." *Id.* at 702. So although "[a] person born out of the jurisdiction of the United States can only become a citizen by being naturalized," "[e]very person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." *Id.*

In the end, the Court answered the initial question presented—"whether a child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, but have a permanent domicile and residence in the United States . . . and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States"—"in the affirmative." *Id.* at 705.

The government does not dispute that *Wong Kim Ark* is binding precedent. Nor does it argue that *Wong Kim Ark* was wrongly decided or should be overturned. Instead, the government claims that, under *Wong Kim Ark*, to be "subject to the jurisdiction" of the United States, a person's parents must, at the time of the person's birth, be lawfully domiciled in the United States, ECF 40, at 14, 24–26, and bear "'direct and immediate allegiance' to this country, unqualified by an allegiance to any other foreign power," *id.* at 4. Nothing in *Wong Kim Ark* remotely supports the government's narrow reading of the decision.

Case: 25-1158    Document: 00118260148    Page: 86    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 65    Filed 02/05/25    Page 18 of 32

42a

To address the government's arguments, the Court first must clarify *Wong Kim Ark*'s holding. *Wong Kim Ark* held that, under the Fourteenth Amendment, "[e]very person born . . . in the United States" is "subject to the jurisdiction thereof" and thus a citizen by birth, *id.* at 702, unless they fall into one of the recognized exceptions to citizenship by birth, *id.* at 693. *See also id.* at 657–58 (describing exceptions to citizenship by birth for children of hostile occupiers or diplomats under English common law); *id.* at 658 ("[T]herefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign state, or of an alien enemy in hostile occupation of the place where the child was born."); *id.* at 682 (finding "subject to the jurisdiction thereof" excludes "by the fewest and fittest words (besides children of members of the Indian tribes . . .), the two classes of cases,—children born of alien enemies of hostile occupation, and children of diplomatic representatives of a foreign state"); *id.* at 693 ("The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . with the exceptions . . . of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and . . . children of members of the Indian tribes owing direct allegiance to their several tribes.").

The government seems to dismiss *Wong Kim Ark*'s holding, and the lengthy analysis that supports it, as dicta. On the government's account, *Wong Kim Ark*'s holding was limited to the specific facts of the case: A person born in the United States whose foreign-born parents were "domiciled" in the United States at the time of his birth is "subject to the jurisdiction of" the United States. ECF 40, at 24–26. *Wong Kim Ark* cannot reasonably be read that narrowly. However, even if not part of the Court's holding, *Wong Kim Ark*'s statements that every person born in the United States is "subject to the jurisdiction thereof" and thus a citizen by birth (with certain exceptions)

certainly are not dicta. "Dictum is a 'statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'" *Payne v. Taslimi*, 998 F.3d 648, 654–55 (4th Cir. 2021) (quoting *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999)). If "a precedent's reasoning" is "necessary to the outcome," it "must be followed." *Id.* at 655.

*Wong Kim Ark*'s statement that the "fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth" with certain recognized exceptions, 169 U.S. at 693, could not "have been deleted without seriously impairing the analytical foundations of the holding," *see Payne*, 998 F.3d at 654. Even a cursory review of the decision reveals that this statement and similar statements were not "peripheral" to the holding. They were central to it. And there can be no question that the Court gave them "full and careful consideration." *See id.* at 655. The Court thoroughly discussed the history of citizenship by birth at English common law, the decisions of U.S. courts applying the common law, and the history and text of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S at 655–82. A more "full and careful consideration" is hard to imagine. And these statements and the Court's reasoning were "necessary to the outcome" of the case. *See Payne*, 998 F.3d at 655. Without them, the Court could not have determined that Wong Kim Ark was a U.S. citizen under the Fourteenth Amendment and not excludable from the country under the Chinese Exclusion Acts. They "must be followed." *Id.*

Even if they were dicta, this Court is not free to ignore them. "[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003)). This Court "is 'bound by Supreme Court

dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *See United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)). Though *Wong Kim Ark* can hardly be considered "recent," the Supreme Court's continual recognition that people born in the United States are citizens by birth confirms that this Court must, at the very least, treat *Wong Kim Ark*'s interpretation of the Fourteenth Amendment "as authoritative." *See Wynne*, 376 F.3d at 298 n.3.

Return to the government's arguments. The government argues that, under *Wong Kim Ark*, a person's parents must, at the time of the person's birth, be lawfully domiciled in the country for the person to be "subject to the jurisdiction" of the United States. ECF 40, at 14, 24–26. The government insists *Wong Kim Ark* imposes a parental domicile requirement for citizenship under the Fourteenth Amendment because the Court mentioned "domicile" or "domiciled" throughout the opinion. True, the Court included in the question presented at the beginning of the opinion, and in the answer at the end of the opinion, that Wong Kim Ark's parents "at the time of his birth" had "a permanent domicile and residence in the United States." *Id.* at 653, 705. Also true, the Court stated: "The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, *domiciled* within the United States." *Id.* at 693 (emphasis added). However, the fact that Wong Kim Ark's parents were domiciled and resided in the United States was not essential to the holding or outcome. And even though the Court described the parents of "children born within the territory of the United States" as "domiciled within the United States," the word "domicile" does not appear in the text of the Fourteenth Amendment. And English common law did not impose a parental domicile requirement. In fact, under English common law and the decisions of United States courts that

followed it, the right to citizenship by birth included children of non-citizen parents not domiciled

in the country. *Wong Kim Ark*, 169 U.S. at 657 (noting the English common law rule that "every

person born within the dominions of the crown" was an English subject—"no matter whether of

English or of foreign parents, and, in the latter case, whether the parents were settled, or merely

temporarily sojourning, in the country"); *Calvin's Case*, 77 Eng. Rep. 377, 384 (1608) ("[L]ocal

obedience being but momentary and uncertain, is yet strong enough to make a natural subject, for

if he hath issue here, that issue is . . . a natural born subject . . . ."); *Lynch v. Clarke*, 1 Sand. Ch.

583, 683 (N.Y. Ch. 1844) (applying English common law and holding plaintiff was an American

citizen because she was born in the United States even though her parents were only temporarily

sojourning in the United States when she was born). These cases were part of the common law that

the Fourteenth Amendment affirmed. *Wong Kim Ark*, 169 U.S. at 693. To be a "person[] born . . .

in the United States" and "subject to the jurisdiction thereof" does not require the person's parents

to be domiciled in the United States at the time of birth.[4]

Next, the government argues that, under *Wong Kim Ark*, a person born in the United States

is "subject to the jurisdiction" of the United States only if he is "born 'in the allegiance and under

the protection of this country,'" ECF 40, at 13 (quoting *Wong Kim Ark*, 169 U.S. at 693), and his

allegiance is "unqualified by 'allegiance to any alien power," *id.* (quoting *Elk*, 112 U.S. at 101–

02). The government misconstrues the language in *Wong Kim Ark*. As the Court explained: "The

fundamental principle of the common law with regard to English nationality was *birth within the*

---

[4] The government cites *Benny v. O'Brien*, which suggested that the Fourteenth Amendment exempted from citizenship "those born in this country of foreign parents who are temporarily traveling here, and children born of persons resident here in the diplomatic service of foreign governments." 32 A. 696, 698 (N.J. Sup. Ct. 1895). *Benny*, a decision from an intermediary New Jersey court that came down before *Wong Kim Ark*, has no precedential value.

*allegiance*—also called 'ligealty,' 'obedience,' 'faith,' or 'power'—*of the king*. The principle embraced all persons *born within the king's allegiance . . . .*" 169 U.S. at 655 (emphasis added). Put differently, "[a]ll persons born in the allegiance of the king are natural-born subjects, and all persons born in the allegiance of the United States are natural-born citizens." *Id.* at 662 (quoting *Rhodes*, 27 F. Cas. at 790). That is to say, "every man born within its jurisdiction is a subject of the sovereign of the country where he is born." *Id.* at 663 (quoting *Kilham*, 2 Mass. at 265). "[A]llegiance is not personal to the sovereign in the extent that it has been contended for; it is due to him in his political capacity of sovereign of the territory where the person owing the allegiance was born." *Id.* (quoting *Kilham*, 2 Mass. at 265). At common law, the only people born within the kingdom without allegiance to the king were children of diplomatic representatives or hostile occupiers. *Id.* at 659–60. That is because they were not entitled to the king's protection under common law. Children of diplomatic representatives were "born under the actual protection and in the dominions of a foreign prince." *Id.* at 660 (quoting *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. 99, 155 (1830) (opinion of Story, J.)). Children of hostile occupiers certainly were not entitled to any protection of the sovereign. *Id.* All this is to say: if a person is born in the United States and does not belong to one of the traditional classes of excepted persons, the person is born "within the allegiance" of the United States and "subject to the jurisdiction" of the United States. *Wong Kim Ark* did not hold, as the government maintains, that a person born in the United States is only "subject to the jurisdiction of" the United States if the person bears exclusive allegiance to the United States at the time of birth.

Contrary to the government's positions, *Wong Kim Ark* did not interpret "subject to the jurisdiction thereof" in the Citizenship Clause of the Fourteenth Amendment to exclude persons

born in the United States whose parents are not domiciled in the United States or persons who hold allegiance to another country.

The Executive Order directly conflicts with *Wong Kim Ark*. Under *Wong Kim Ark*, a person "born in the United States" and "subject to the jurisdiction thereof" encompasses every person born in this country save specific classes of people. The Executive Order purports to expand the classes of people that are not "subject to the jurisdiction thereof" and thus to deny citizenship by birth to people who are entitled to it under the Constitution. The children targeted by the Executive Order do not fit within any of the limited exceptions to citizenship by birth identified in *Wong Kim Ark*. They are not children of ambassadors, children of enemies in the country during a hostile occupation, children born on foreign seas, or children born into Indian tribes.[5] They are children whose citizenship by birth has been recognized in this country since the ratification of the Fourteenth Amendment. When the children described in the Executive Order are born, they will be United States citizens under the Fourteenth Amendment and long-standing Supreme Court

---

[5] On the same day the President issued the Executive Order at issue here, he issued another Executive Order that describes "an unprecedented flood of illegal immigration" in which "millions of illegal aliens" who "present significant threats to national security and public safety" have entered the country illegally. Exec. Order § 1 (quoting Exec. Order No. 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025)). In its briefing, the government suggests that a broad, inclusive reading of the Citizenship Clause's "subject to the jurisdiction thereof" will result in citizenship by birth "to the children of individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile threats." ECF 40, at 21. The government seems to advocate for a broader reading of one of the exceptions to citizenship by birth—"children born of alien enemies in hostile occupation"—to include the children described in the Executive Order. *See id.* (quoting *Wong Kim Ark*, 169 U.S. at 682). The meaning of the clause "subject to the jurisdiction thereof" was explained clearly in *Wong Kim Ark*. It is meant to be expansive. *See Wong Kim Ark*, 169 U.S. at 682. The exception for "children born of alien enemies in hostile occupation" applies during a hostile occupation "of part of the king's dominions." *Id*. A "hostile occupation" entails the "firm possession" of a territory that enables the occupier "to exercise the fullest rights of sovereignty over that place." *United States v. Rice*, 17 U.S. (4 Wheat.) 246, 254 (1819). This exception to citizenship by birth plainly does not apply to the children described in the Executive Order.

Case: 25-1158    Document: 00118260148    Page: 92    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 65    Filed 02/05/25    Page 24 of 32

48a

precedent. The President does not have the authority to strip them of their constitutional right to citizenship by birth.

The government cites no case decided after *Wong Kim Ark* that supports the President's interpretation of the Fourteenth Amendment. And there is none. Instead, the government relies principally on two cases decided before *Wong Kim Ark*: *Elk v. Wilkins*, 112 U.S. 94 (1884), and *The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872). *Elk* and the *The Slaughter-House Cases* are no help to the government. *Wong Kim Ark* discussed both cases at length and distinguished them. *See* 169 U.S. at 676–82. It found that *Elk*'s interpretation of "subject to the jurisdiction thereof" did not apply outside the context of Indian tribes because *Elk* "concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not in the diplomatic service of a foreign country." *Id.* at 682. Thus, *Elk*'s holding is confined to members of Indian tribes. The children identified in the Executive Order are not akin to members of Indian tribes, who, in the nineteenth century, enjoyed a unique political status and quasi-sovereignty.[6] *See Elk*, 112 U.S. at 119–20 (Harlan, J., dissenting) ("[I]t would be obviously inconsistent with the semi-independent character of such a tribe, and with the obedience they are expected to render to their tribal head, that they should be vested with the complete rights—or, on the other, subjected to the full responsibilities—of American citizens."). *Elk* does not apply to this case. Nor do *The Slaughter-House Cases*. The government relies on the following language from *The Slaughter-House Cases*: "The phrase 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states, born within the United States." 83 U.S. at 73. The government argues "subjects of foreign states" includes the children

---

[6] Congress gave members of Indian tribes citizenship by birth in 1924. 8 U.S.C. § 1401(b).

described in the Executive Order. ECF 40, at 18. The problem for the government is that *Wong Kim Ark* repudiated this language from *The Slaughter-House Cases* because it was "wholly aside from the question in judgment, and from the course of reasoning bearing upon that case," and "[i]t was unsupported by any argument, or by any reference to authorities." *Id.* at 678.[7] The government has not identified any case that supports the President's interpretation of the Fourteenth Amendment.

In the 125 years since *Wong Kim Ark*, the Supreme Court has never questioned whether a child born in the United States—whose parents did not have lawful status or were in the country temporarily—was an American citizen. In *United States ex rel. Hintopoulos v. Shaughnessy*, the petitioners, who were married to each other, worked as crew members on foreign ships that came into port in the United States. 353 U.S. 72, 73 (1957). They entered the United States lawfully and remained in the country after their 29-day visas expired. *Id.* at 73. The wife gave birth three months after her permission to stay expired and two months after her husband's permission to stay expired. *Id.* Half a year later, deportation proceedings were instituted against both parents, and they asked to suspend deportation "on the ground of the economic detriment that would befall their minor son in the event they were deported." *Id.* at 74. The Court remarked that their child was, "of course, an

---

[7] The only other cases the government says support its position that parental domicile is necessary to be "subject to the jurisdiction" of the United States are *Chin Bak Kan v. United States*, 186 U.S. 193 (1902), and *Kwock Jan Fat v. White*, 253 U.S. 454 (1920). In *Chin Bak Kan*, the Court stated the ruling in *Wong Kim Ark* and included the fact that Wong Kim Ark's parents "ha[d] a permanent domicil[e] and residence in the United States." 186 U.S. at 200 (quoting *Wong Kim Ark*, 169 U.S. at 649). In *Kwock Jan Fat*, the petitioner claimed to be a U.S. citizen by birth, but a government investigation concluded that he was born in China and entered the United States as a minor. 253 U.S. at 455–56. The parties did not dispute that if the petitioner's parents were who he said they were, he would have been born to them "when they were permanently domiciled in the United States" and would be a U.S. citizen. *Id.* at 457 (citing *Wong Kim Ark*). Both cases reference *Wong Kim Ark* only in passing. Neither case held that a person's parents must be domiciled in the United States for their U.S.-born children to be "subject to the jurisdiction" of the United States.

American citizen by birth." *Id.* at 73; *see also id.* at 79 (Douglas, J., dissenting) ("The citizen is a five-year-old boy who was born here and who, therefore, is entitled to all the rights, privileges, and immunities which the Fourteenth Amendment bestows on every citizen."). Similarly, in *INS v. Errico*, the Supreme Court considered two appeals of deporation orders. 385 U.S. 214, 214 (1966). Both petitioners entered the United States by making fraudulent misrepresentations to immigration officials, and after entry, each had a child in the United States. *Id.* at 215–16. Even though the children's parents had procured entry into the country by fraud, the Court did not question that the children were American citizens by virtue of their birth in the United States. *See id.* (stating first petitioner's child "acquired United States citizenship at birth" and second petitioner's child "became an American citizen at birth"). And in *Hamdi v. Rumsfeld*, the Supreme Court "consider[ed] the legality of the Government's detention of a United States citizen on United States soil as an 'enemy combatant.'" 542 U.S. 507, 509 (2004) (plurality). An amicus brief urged the Court to find that the enemy combatant was not a citizen because his parents were in the United States on temporary visas when he was born. *See* Br. for The Claremont Inst. Ctr. for Constitutional Jurisprudence as Amicus Curiae Supporting Respondents, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (No. 03-6696), 2004 WL 871165. Despite this urging, the Court recognized that the person detained was an American citizen because he was born in the United States. 542 U.S. at 509–10.

In other cases, the Supreme Court never has intimated that the immigration status of parents might affect whether their U.S.-born children are citizens at birth. *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (noting that the undocumented respondent—who had entered the country without permission—"had given birth to a child, who, born in the United States, was a citizen of this country"); *Vance v. Terrazas*, 444 U.S. 252, 255 (1980) ("Appellee . . . was born in this country, the son of a Mexican citizen. He thus acquired at birth both United States and Mexican

citizenship."); *Rogers v. Bellei*, 401 U.S. 815, 828 (1971) (acknowledging that American citizenship law "follows English concepts with an acceptance of the jus soli"); *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958) ("Petitioner was born in Artesia, California, in 1916. By reason of that fact, he was a citizen of the United States, and because of the citizenship of his parents, he was also considered by Japan to be a citizen of that country."); *Kawakita v. United States*, 343 U.S. 717, 720 (1952) (noting that petitioner was born in the United States to Japanese citizen parents and "was thus a citizen of the United States by birth"); *Hirabayashi v. United States*, 320 U.S. 81, 96 (1943) (confirming that people of Japanese descent were citizens because they were "born in the United States"); *Perkins v. Elg*, 307 U.S. 325, 327, 329 (1939) (citing *Wong Kim Ark* and finding that the plaintiff was still an American citizen because of her birth in the United States, even though she had moved abroad as a minor and acquired Swedish citizenship); *Morrison v. California*, 291 U.S. 82, 85 (1934) ("A person of Japanese race is a citizen of the United States if he was born within the United States."); *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927) (discussing *Wong Kim Ark* and noting that a child born in the United States "was nevertheless, under the language of the Fourteenth Amendment, a citizen of the United States by virtue of the jus soli embodied in the amendment"); *Ah How v. United States*, 193 U.S. 65, 65 (1904) (stating petitioners offered evidence that they were born in the United States "and therefore each was a citizen").

The government's only response to these Supreme Court cases: "[I]t is not unusual for the Supreme Court, after fully exploring a legal issue, to reach a conclusion that conflicts with earlier assumptions." ECF 40, at 28. That is no response at all.

The Executive Order flouts the plain language of the Fourteenth Amendment to the United States Constitution, conflicts with binding Supreme Court precedent, and runs counter to our

nation's 250-year history of citizenship by birth. The plaintiffs have shown an extremely strong

likelihood that they will succeed on the merits of their constitutional claim.

## 2.  Irreparable Harm

"Citizenship is a most precious right[,] . . . expressly guaranteed by the Fourteenth

Amendment to the Constitution . . . ." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963);

*see also Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, J., dissenting) ("Citizenship is man's

basic right for it is nothing less than the right to have rights."). The right to American citizenship

is "a right no less precious than life or liberty." *Klapprott v. United States*, 335 U.S. 601, 616

(1949) (Rutledge, J., concurring in result). The "deprivation of a constitutional right, 'for even

minimal periods of time, unquestionably constitutes irreparable injury.'" *Miranda v. Garland*, 34

F.4th 338, 365 (4th Cir. 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *accord Leaders

of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("Because

there is a likely constitutional violation, the irreparable harm factor is satisfied."); *Ross v. Meese*,

818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right . . . constitutes

irreparable harm for purposes of equitable jurisdiction").

Here, the plaintiffs have established a strong likelihood of success of the merits on their

claim that the Executive Order violates the Fourteenth Amendment. The denial of the precious

right to citizenship for any period of time will cause them irreparable harm.

The government argues that any harm is "speculative" because the plaintiffs' children will

have "other routes of obtaining status," such as seeking asylum. ECF 40, at 29. This argument is

callous and wrong. The irreparable harm to the plaintiffs and their unborn children is concrete and

imminent. If the Court does not enjoin enforcement of the Executive Order, children born in the

United States who are subject to the Order immediately will be denied the benefits and rights of

U.S. citizenship. The benefits of citizenship include access to certain government public benefit programs such as health care through the Children's Health Insurance Program and food assistance through the Supplemental Nutrition Assistance Program. *See* ECF 37, at 10. The rights of citizenship include the right to live in the United States lawfully and without fear of deportation. Without an injunction, all U.S.-born children subject to the Executive Order will have no legal status in this country when they are born. Without legal status at birth, children could be placed in removal proceedings and deported. Many of the plaintiffs have pending asylum applications or temporary legal status and are not subject to removal. If the Order goes into effect, their children will be without legal status and may be subject to removal even if they are not. The Order may cause some plaintiffs to be separated from their children. *See Wanrong Lin v. Nielsen*, 377 F. Supp. 3d 556, 564–65 (D. Md. 2019) (finding plaintiff would be irreparably harmed if deported and separated from his wife and children in the United States).

Additionally, some of the children of the plaintiffs will be stateless if the Order goes into effect. *See* ECF 2-5, ¶ 4 (statement of plaintiff Liza that her child would be stateless without American citizenship as she and her husband cannot safely apply for Russian citizenship for their child); ECF 2-7, ¶¶ 7–9 (statement of plaintiff Monica that her child would be stateless without American citizenship because there is no Venezuelan consulate in the United States where she could apply for her child's Venezuelan citizenship). For stateless newborns, their "very existence [will be] at the sufferance of the country in which [they] happen[] to find [themselves]." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

Without an injunction, the plaintiffs will face instability and uncertainty about the citizenship status of their newborn babies, and their children born on U.S. soil will be denied the

Case: 25-1158    Document: 00118260148    Page: 98    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 65    Filed 02/05/25    Page 30 of 32

54a

rights and benefits of U.S. citizenship. The Executive Order, if not enjoined, will cause the plaintiffs and their children grave, irreparable harm.

### 3.  Balance of Equities and Public Interest

The final two factors are the balance of the equities and the public interest. The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda*, 34 F.4th at 365 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). To balance the equities, the Court considers "the relative harms to the applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)). The equities and the public interest weigh very strongly in the plaintiffs' favor.

Today, virtually every baby born on U.S. soil is a U.S. citizen upon birth. That is the law and tradition of our country. That law and tradition will remain the status quo pending the resolution of this case. The government will not be harmed if enforcement of the Executive Order is enjoined. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). And "upholding constitutional rights surely serves the public interest." *Id.* (quoting *Giovani*, 303 F.3d at 521); *accord Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest."). If the Executive Order is not enjoined, local governments will face significant harm. Local governments are responsible for issuing birth certificates, which, under the Order, will no longer automatically prove citizenship. *See* ECF 37,

Case: 25-1158    Document: 00118260148    Page: 99    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 65    Filed 02/05/25    Page 31 of 32

55a

at 14. The Order would require local governments to either change the information provided on
birth certificates or develop an entirely new process to verify citizenship. *Id.* at 15. Additionally,
localities will bear a financial burden if the Order takes effect. Currently, local governments
receive federal funding for foster care expenses and health care for children who "qualif[y]" for
assistance. 8 U.S.C. § 1641(b)–(c). A noncitizen "qualifie[s]" if they are a lawful permanent
resident or have received one of several forms of humanitarian relief, such as asylum or refugee
status. *Id.* People with only temporary legal status, such as student or work visas, or people without
any legal status are generally not considered "qualified" for these programs. *See* 8 U.S.C.
§ 1611(a). If children born in the U.S. are not citizens upon birth, they will not be entitled to federal
benefits, and local governments will bear the financial burden for public services. ECF 37, at 9–
12. These collateral consequences on local municipalities and taxpayers surely do not serve the
public interest.

The balance of the equities and the public interest strongly weigh in favor of a preliminary
injunction that maintains the status quo during litigation.

All four factors weigh in favor of a preliminary injunction.

### 4. Nationwide Injunction

"District courts have broad discretion to craft remedies based on the circumstances of a
case, but likewise must ensure that 'a preliminary injunction is no more burdensome to the
defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS, Inc. v. Trump*, 985
F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020)).
Indeed, "[a] district court may issue a nationwide injunction so long as the court 'mold[s] its decree
to meet the exigencies of the particular case.'" *Id.* (alteration in original) (quoting *Trump v. Int'l
Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

Only a nationwide injunction will provide complete relief to the plaintiffs. ASAP has "over 680,000 members . . . who reside in all 50 U.S. states and several U.S. territories." ECF 1, ¶ 31. ASAP expects that "[h]undreds or even thousands of ASAP members will give birth to children in the United States over the coming weeks and months." *Id.* ¶ 38. Because ASAP's members reside in every state and hundreds of them expect to give birth soon, a nationwide injunction is the only way "to provide complete relief" to them. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Further, "a nationwide injunction may be appropriate when the government relies on a 'categorical policy.'" *See HIAS*, 985 F.3d at 326. The Executive Order is a categorical policy. A nationwide injunction against the categorical policy in the Executive Order is appropriate. It also is necessary because the policy concerns citizenship—a national concern that demands a uniform policy. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (noting that the federal government has "constitutional power to 'establish an *uniform* Rule of Naturalization'" (emphasis added) (quoting U.S. Const. art. 1, § 8, cl. 4)). A nationwide injunction is appropriate and necessary.

### III.    Conclusion

For the foregoing reasons, the motion for a preliminary injunction is granted. The Court enjoins the implementation and enforcement of the January 20, 2025 Executive Order 14160, "Protecting the Meaning and Value of American Citizenship." A separate order follows.

Date: February 5, 2025 _____

Deborah L. Boardman
United States District Judge

57a

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CASA, INC.,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-25-201** |
| **DONALD J. TRUMP,** *et al.*, | * | |
| **Defendants.** | * | |

## ORDER

On January 20, 2025, President Donald J. Trump signed Executive Order 14160, "Protecting the Meaning and Value of American Citizenship" ("Executive Order"). CASA, Inc., Asylum Seeker Advocacy Project, and five individuals proceeding under the pseudonyms Maribel, Juana, Trinidad Garcia, Monica, and Liza filed a lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. The plaintiffs allege that the Executive Order violates the Citizenship Clause of the Fourteenth Amendment to the Constitution and the Immigration and Nationality Act. The plaintiffs moved for a preliminary injunction that enjoins the defendants from implementing and enforcing the Executive Order. Upon consideration of the plaintiffs' motion for a preliminary injunction, the defendants' opposition, the plaintiffs' reply, and the briefs filed by three amici, the Court finds that the plaintiffs have shown they are entitled to a preliminary injunction.

The plaintiffs have established that they are likely to succeed on the merits of their claim that the Executive Order violates the Fourteenth Amendment. The Executive Order contradicts the

plain language of the Citizenship Clause of the Fourteenth Amendment and conflicts with binding Supreme Court precedent, *United States v. Wong Kim Ark*, 169 U.S. 649 (1898).

The plaintiffs also have shown that they will suffer irreparable harm without injunctive relief. The unborn children of the individual plaintiffs and the organizational plaintiffs' members will be denied the rights and privileges of U.S. citizenship. The plaintiffs will face uncertainty about their children's citizenship status, and some of their children may be stateless.

The balance of the equities and the public interest weigh in favor of a preliminary injunction. The government will not be harmed because a preliminary injunction will maintain the status quo. Enjoining implementation and enforcement of the Executive Order during litigation will preserve constitutional rights and prevent administrative and financial burdens on local governments.

For the reasons state above and those stated in the memorandum opinion issued today, it is this 5th day of February, 2025 hereby ORDERED that

1. The plaintiffs' motion for a preliminary injunction and temporary restraining order, ECF 2, is GRANTED in part and DENIED in part as follows:

   a. The motion for a preliminary injunction is GRANTED; and

   b. The motion for a temporary restraining order is DENIED as moot;

2. The Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them are

ENJOINED throughout these United States from implementing and enforcing the

Executive Order until further order of this Court; and

3.      The security requirement is hereby waived because the defendants will not suffer

any costs from the preliminary injunction and imposing a security requirement

would pose a hardship on the plaintiffs. *See* Fed. R. Civ. P. 65(c).


_____

Deborah L. Boardman
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CASA, INC.,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **Civ. No. DLB-25-0201** |
| **DONALD J. TRUMP,** *et al.*, | * | |
| **Defendants.** | * | |

## ORDER

On February 5, 2025, the Court granted a nationwide preliminary injunction enjoining the enforcement and implementation of Executive Order 14160, titled "Protecting the Meaning and Value of American Citizenship" (the "Executive Order"). ECF 66. The defendants appealed the preliminary injunction order to the United States Court of Appeals for the Fourth Circuit. They now move for a partial stay of the order pending appeal, ECF 70. Specifically, they ask the Court to "stay the injunction's nationwide application so the injunction provides relief only to the individual plaintiffs and the members of the organizational plaintiffs who have been identified in Plaintiffs' complaint or preliminary injunction papers." ECF 70-1, at 2. They also ask the Court to enjoin only the enforcement of the Executive Order, not the implementation of it. *Id.* at 7. The plaintiffs oppose the motion. ECF 74. The Court declines to narrow the scope of the preliminary injunction pending appeal. The defendants' motion for a partial stay is denied.

"A request for a stay pending appeal is committed to the exercise of judicial discretion." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (citing *Virginian Ry. v. United States*, 272 U.S. 658, 672 (1926)). Courts consider four factors when determining whether to stay an order pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)

whether issuance of the stay will substantially injure the other parties interested in the proceeding;

and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton*

*v. Braunskill*, 481 U.S. 770, 776 (1987)). Of these factors, "[t]he first two . . . are the most critical."

*Id.* The party seeking the stay bears the burden of showing that the circumstances justify an

exercise of judicial discretion. *Id.* at 433–34.

The defendants are not likely to prevail on their argument that the preliminary injunction

should provide relief only to the individual plaintiffs and the members of the organizational

plaintiffs identified in the complaint and the briefing. The Court issued a nationwide injunction for

two reasons.[1] ECF 65, at 32. Both remain valid. First, the 680,000 members of the Asylum Seeker

Advocacy Project ("ASAP"), a plaintiff organization, reside in all 50 states and several U.S.

territories. Many of those members are pregnant, and their unborn children fall within the scope

of the Executive Order. A nationwide injunction is appropriate to give ASAP's members effective

relief. The fact that similarly situated people who are not members of ASAP also enjoy the benefit

of nationwide injunctive relief is no reason to narrow the scope of the injunction. *See Trump v.*

*Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (declining to stay nationwide injunction

enjoining enforcement of immigration policy "with respect to respondents and those similarly

situated"); *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (affirming nationwide injunction

and noting "the equitable power of district courts, in appropriate cases, to issue nationwide

injunctions extending relief to those who are similarly situated to the litigants"). Second, the Court

found a nationwide injunction was necessary because the Executive Order is a "categorical policy"

---

[1] The plaintiffs asked the Court to characterize the injunction as "universal" rather than "nationwide." ECF 74, at 3 n.1. The Court's order granting a preliminary injunction applies "throughout these United States." ECF 66, at 2–3. The Court's intent is to enjoin enforcement and implementation of the Executive Order throughout the United States. The nationwide injunction in this case is a universal injunction.

Case: 25-1158    Document: 00118260148    Page: 106    Date Filed: 03/17/2025    Entry ID: 6707040
Case 8:25-cv-00201-DLB    Document 76    Filed 02/18/25    Page 3 of 5

62a

that addresses the citizenship status of people born anywhere in the United States. *See* ECF 65, at

32 (quoting *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021)). Were the Court to limit the

injunction to the plaintiffs and the members of the plaintiff organizations, a person's citizenship

status during the pendency of this case would depend on their parents' decision to bring this lawsuit

or their parents' membership in one of two voluntary, private organizations. That would make no

sense.[2] Citizenship rules should be uniform and consistent across the country. Uniformity and

consistency can be ensured only through a nationwide injunction. The Fourth Circuit and other

courts of appeal have approved nationwide (or universal) injunctions when there is a need for a

uniform national policy. *See, e.g.*, *HIAS*, 985 F.3d at 326–27 (affirming nationwide injunction

because plaintiff refugee resettlement organizations resettled refugees "throughout the country"

and a limited injunction would "undermine the very national consistency that the Refugee Act is

designed to protect"); *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (granting

preliminary injunction enjoining enforcement of student loan policy because "an injunction limited

to the plaintiff States, or even more broadly to student loans affecting the States, would be

impractical and would fail to provide complete relief to the plaintiffs" and because suspension of

loan payments and interest was "universal"); *Doe #1*, 957 F.3d at 1069–70 (denying stay of

nationwide injunction because the plaintiff class was nationwide, "a nationwide injunction [was]

necessary to provide the class members with complete relief," and there is a need "for a

'comprehensive and unified' immigration policy" (quoting *Arizona v. United States*, 567 U.S. 387,

---

[2] If the Court limited the injunction as the defendants request, the result also would be impractical. *Cf. Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (granting nationwide preliminary injunction because injunction limited to plaintiff states would be impractical). If the defendants had their way, localities would have to determine whether a newborn's parent is a member of the plaintiff organizations before they issued a birth certificate or granted the child government benefits, and the federal government would have to make the same determination before it issued the child a social security card or passport.

401 (2012))); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."); *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (affirming nationwide injunction enjoining immigration policy because "the immigration laws of the United States should be enforced vigorously and *uniformly*" and "there is a substantial likelihood that a geographically-limited injunction would be ineffective" because beneficiaries of the policy "would be free to move among states" (citation omitted)).

The defendants also ask the Court to enjoin only the enforcement of the Order, not the implementation of it. While this case is on appeal, the defendants apparently want to "tak[e] internal, preparatory steps regarding the EO's application and formulat[e] relevant policies and guidance." ECF 70-1, at 6. This request, too, is denied. The Court has found that the plaintiffs established a strong likelihood of success on the merits of their claim that the Executive Order violates the Fourteenth Amendment to the Constitution. Surely, the government has no valid interest in taking internal, preparatory steps to formulate policies and guidance on an unconstitutional Executive Order.

The defendants have not made a strong showing that they are likely to succeed on their claim that the Court erred by granting a nationwide injunction that enjoins the enforcement and the implementation of the Executive Order.

The defendants also have not shown that they will be irreparably injured without a partial stay. They claim that "any injunction that prevents the President from exercising his core authorities is 'itself an irreparable injury.'" ECF 70-1, at 6–7 (quoting *Doe #1*, 957 F.3d at 1084 (Bress, J., dissenting)). The President certainly has the core authority to issue Executive Orders. But the President has no authority to issue an Executive Order that purports to rewrite the

Case: 25-1158    Document: 00118260148    Page: 108    Date Filed: 03/17/2025    Eptry ID: 6707040
Case 8:25-cv-00201-DLB    Document 76    Filed 02/18/25    Page 5 of 5

64a

Constitution and that ignores 125 years of Supreme Court precedent. The President may not

overrule the Constitution "by executive fiat." *See E. Bay Sanctuary Covenant*, 932 F.3d at 779.

The defendants have not shown that they will be irreparably harmed by a nationwide injunction

that maintains the status quo of citizenship by birth.

The defendants' motion for a partial stay pending appeal, ECF 70, is DENIED.

Date: February 18, 2025

Deborah L. Boardman
United States District Judge

65a

FILED: February 28, 2025

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————

**No. 25-1153**
**(8:25-cv-00201-DLB)**

————————

CASA, INC.; ASYLUM SEEKER ADVOCACY PROJECT, INC.; MARIBEL,
Individually and as next friend to her future child, c/o CASA, Inc.; JUANA,
Individually and as next friend to her future child, c/o CASA, Inc.; TRINIDAD
GARCIA, Individually and as next friend to her future child, c/o Asylum Seeker
Advocacy Project; MONICA, Individually and as next friend to her future child,
c/o Asylum Seeker Advocacy Project; LIZA, Individually and as next friend to her
future child, c/o Institute for Constitutional Advocacy and Protection,

Plaintiffs – Appellees,

v.

DONALD J. TRUMP, In his official capacity as President of the United States, c/o
Attorney General of the United States; SECRETARY OF THE UNITED STATES
DEPARTMENT OF STATE, In their official capacity; ATTORNEY GENERAL
OF THE UNITED STATES, In their official capacity; SECRETARY OF THE
UNITED STATES DEPARTMENT OF HOMELAND SECURITY, In their
official capacity, c/o Office of the General Counsel; DIRECTOR OF UNITED
STATES CITIZENSHIP AND IMMIGRATION SERVICES, In their official
capacity, c/o Office of the Chief Counsel; COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION, In their official capacity, c/o Office of the Chief
Counsel; UNITED STATES OF AMERICA, c/o Attorney General of the United
States,

Defendants – Appellants.

————————

MEMBERS OF CONGRESS; THE STATE OF TENNESSEE; AMERICA'S FUTURE;
CITIZENS UNITED; CONSERVATIVE LEGAL DEFENSE AND EDUCATION
FUND; GUN OWNERS FOUNDATION; GUN OWNERS OF AMERICA, INC.;
LEADERSHIP INSTITUTE; U.S. CONSTITUTIONAL RIGHTS AND LEGAL

DEFENSE FUND

Amici Supporting Appellants.

---

O R D E R

---

The government seeks a partial stay of the district court's February 5, 2025, preliminary injunction in this matter.  As the parties agree, we consider that request under the traditional factors laid out in *Nken v. Holder*, 556 U.S. 418 (2009).  We find that the government has not shown an entitlement to a stay pending appeal and accordingly deny its motion.

Our court has reviewed and approved so-called "universal" or "nationwide" injunctions in the past.  *See Roe v. Dep't of Def.*, 947 F.3d 207, 231–33 (4th Cir. 2020); *HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021).  As we have explained, a district court has "wide discretion" in fashioning the scope of a preliminary injunction, and that discretion includes, in appropriate cases, the entry of "an injunction extending relief to those who are similarly situated to the litigants."  *Roe*, 947 F.3d at 231–32.  The burden is on the government to show that it is likely to prevail in its claim that the district court abused its discretion here, and that the equities favor an atypical "intrusion" into the ordinary judicial process.  *Nken*, 556 U.S. at 427, 433–34.  In our view, the government cannot meet that burden.

We join the Ninth Circuit in finding that the government has not made a "strong showing" that it is "likely to succeed on the merits" of its argument against universal

67a

injunctions.  *See Washington v. Trump*, 2025 WL 553485, at *1 (9th Cir. Feb. 19, 2025) (quoting *Nken*, 556 U.S. at 434) (denying similar stay request).  Our circuit precedent forecloses the government's position that injunctions extending relief to those "similarly situated" to the plaintiffs are "categorically beyond the equitable power of district courts." *Roe*, 947 F.3d at 232; *see also HIAS*, 985 F.3d at 326.  And that precedent is based on our understanding that the Supreme Court, too, has "affirmed the equitable powers of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants."  *Roe*, 947 F.3d at 232 (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam)).

We are of course aware of separate writings by Supreme Court Justices, emphasized by the government, that express concerns about the propriety of universal injunctions and an interest in taking up that question.  But notwithstanding these reservations, the Supreme Court has allowed most universal injunctions to remain in effect during the course of litigation, *see, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 477 (Mem.) (2022), even in cases in which the Court has ultimately reversed on the merits, *see Biden v. Texas*, 12 S. Ct. 926 (Mem.) (2021); *United States v. Texas*, 143 S. Ct. 51 (Mem.) (2022).  No decision of the Supreme Court has superseded our precedent in this area, and we have no reason to think the Court will soon announce a change in course.

We agree with the government that a court must "mold its decree to meet the exigencies of the particular case," and ensure that a preliminary injunction is not "more burdensome to the defendant than necessary" to provide complete relief to the plaintiffs. *See Roe*, 947 F.3d at 231 (internal quotation marks omitted).  But to the extent the

3

68a

government argues that the district court abused its discretion in fashioning this universal injunction, in particular, we think that claim, too, is unlikely to succeed.  As the district court identified, *see CASA, Inc. v. Trump*, No. 25-cv-00201-DLB, 2025 WL 545840, at *1 (D. Md. Feb. 18, 2025), this case falls within the parameters for universal injunctions we have outlined in our precedent:  It enjoins a "categorical policy"; the "facts would not require different relief for others similarly situated" to the plaintiffs; and limiting the injunction would make the citizenship of babies turn on the happenstance of their parents' membership in the plaintiff organizations, causing "inequitable treatment" in an area in which uniformity is needed.  *See HIAS*, 985 F.3d at 326–27; *Roe*, 947 F.3d at 323–33; *see also* U.S. Const. art. I, § 8, cl. 4 (empowering Congress to "establish an uniform Rule of Naturalization").  The district court also carefully explained why an injunction limited to the parties – including organizations with hundreds of thousands of members nationwide – would be unworkable in practice and thus fail to provide complete reliefs to the plaintiffs.  *CASA*, 2025 WL 545840, at *1 & n.2; *see Nebraska v. Biden*, 52 F.4th 1044, 1088 (8th Cir. 2022) (per curiam).  "Crafting a preliminary injunction is an exercise of discretion and judgment," *see Int'l Refugee Assistance Project*, 582 U.S. at 579, and we do not think the government can make the requisite "strong showing," *Nken*, 556 U.S. at 434, that the district court abused its discretion here.

Nor has the government shown that the equities favor the granting of a stay.  For well over a century, the federal government has recognized the birthright citizenship of children born in this country to undocumented or non-permanent immigrants, a practice that was unchallenged until last month.  The government has not shown that it will be

4

USCA4 Appeal: 25-1153    Doc: 29    Filed: 02/28/2025    Pg: 5 of 10

69a

harmed in any meaningful way if it continues to comply, for the pendency of its appeal, with that settled interpretation of the law and consistent executive branch practice. *See Washington*, 2025 WL 553485, at *2 (Forrest, J., concurring) (explaining that there is no "obvious" need for stay relief where "it appears that the exception to birthright citizenship urged by the Government has never been recognized by the judiciary, *see United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1899), and where executive-branch interpretations before the challenged executive order was issued were contrary, *see*, *e.g.*, Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 O.L.C. 340, 340-47 (1995)"). It may sometimes be hard to identify which stays disrupt the status quo and are thus disfavored, *see Labrador v. Poe ex. rel. Poe*, 144 S. Ct. 921, 930 (Mem.) (2024) (Kavanaugh, J., concurring), but the status quo in this case is clear, and adding a bit more time to its century-plus pedigree will not impose any substantial harm on the government.

Second, it is notable that the government is not prepared to argue that it will likely prevail on the merits of the Executive Order itself. We are aware of no case – and the government has not cited one – in which a court has stayed a preliminary injunction of a policy, already found likely unlawful, in which the movant did not argue for the policy's legality. Under these circumstances, especially, we are hesitant to disturb a preliminary injunction that maintains the status quo while the lawfulness of the Executive Order is litigated.

Finally, we agree with the district court that the public interest favors its preliminary injunction. *CASA*, 2025 WL 408636, at *16. It is hard to overstate the confusion and

5

upheaval that will accompany any implementation of the Executive Order. Today, virtually every child born in the United States becomes a citizen at birth – allowing us to prove our citizenship with our birth certificates, which identify our place of birth but not the citizenship status of our parents. The Executive Order will do away with that long-standing practice. Even for children born to two citizen parents, a standard birth certificate will no longer suffice to prove citizenship – not under the Executive Order, and not for any other purpose. Existing administrative systems will fail, states and localities will bear the costs of developing new systems for issuing birth certificates and verifying citizenship, and anxious parents-to-be will be caught in the middle. *See id.*; Br. for Local Gov'ts as Amici Curiae at 10–12, No. 25-cv-00201-DLB, ECF No. 37 (Jan. 29, 2025). The public interest would not be served by courting this chaos while we take up an appeal of an Executive Order that the district court already has found is very likely unconstitutional.

The motion for stay pending appeal is

*DENIED*.

Entered at the direction of Judge Harris with the concurrence of Judge Gregory. Judge Niemeyer dissents from the court's order.

For the Court

/s/ Nwamaka Anowi, Clerk

Case: 25-1153    Doc: 29    Filed: 02/28/2025    Pg: 7 of 10
USCA4 Appeal: 25-1158    Document: 001118260148    Page: 115    Date Filed: 03/17/2025    Entry ID: 6707040

71a

NIEMEYER, Circuit Judge, dissenting:

I respectfully dissent from the majority's order denying the government's motion for a partial stay of the district court's preliminary injunction. The government does not seek a stay with respect to the injunction's provision of relief to the parties in this case. It only seeks to stay the effort by the district court to impose its injunction nationwide to afford relief to persons beyond the District of Maryland. By its terms, the district court's order seeks to apply its injunction for the benefit of hundreds of thousands of individuals "throughout these United States." In effect, therefore, the government simply seeks to cabin the district court's injunction to the parties in the District of Maryland. In this posture, the government does not address the merits of the plaintiffs' case, and I express no view here on the merits.

The majority's order denying the government's motion focuses almost all of its discussion to whether the government has satisfied the criteria for a stay outlined in *Nken v. Holder*, 556 U.S. 418, 426 (2009). That analysis prescribes a look at the merits of the case — even though they have not yet been briefed before us — to assess the government's likelihood of success. But the merits are not before us, even for a quick look. At this stage, the government seeks *only* to restrict the scope of the preliminary injunction, which purports to cover every person and every district court in the country. It states, "This motion does not require the Court to address the merits. For the present, the government asks only that the Court stay the preliminary injunction to the extent it sweeps beyond the

sixteen individuals whose claims are identified in the complaint and whose relief is not contested in this motion."

The President issued Executive Order 14160 construing the Citizenship Clause of the Fourteenth Amendment.  Stated broadly, the Executive Order construes specific limiting language of the Citizenship Clause — which applies the Clause to persons "subject to the jurisdiction" of the United States — to conclude that it does not extend citizenship to children born in the United States of aliens illegally present in the United States or of aliens only temporarily present in the United States.  U.S. Const. amend XIV, § 1.  Whether the Order's interpretation is correct is yet to be briefed in this case and determined.

The plaintiffs in this case commenced this action to challenge the Executive Order's interpretation and claim that they will suffer "irreparable harm" from its implementation that can only be redressed by preliminary and permanent injunctive relief.  The district court granted the plaintiffs' motion for a preliminary injunction, but it provided relief not only to the plaintiffs but also to everyone in the nation similarly situated by categorically enjoining the defendants from implementing and enforcing the Executive Order.  The government has appealed, and the issue now is not whether the district court was correct in entering a preliminary injunction.  Rather, it is whether the court was entitled, in the circumstances of this case, to extend its injunction to apply "throughout these United States" — to persons not before the court nor identified by the court.

I would grant the government's modest motion, which seeks only to cabin the order's inappropriate reach.

73a

The judicial unseemliness of such a broad extension of judicial power is highlighted by the fact that within "these United States" — the coverage of the district court's injunction — at least four cases in other United States District Courts are addressing similar challenges to Executive Order 14160. *See Washington v. Trump*, No. 2:25-cv-00127-JCC, in the Western District of Washington; *New Jersey v. Trump*, No. 1:25-cv-10139-LTS, in the District of Massachusetts; *Bell v. Trump*, No. 1:25-cv-10135-LTS, in the District of Massachusetts; and *New Hampshire Indonesian Community Support v. Trump*, No. 1:25-cv-00038-JL-TSM, in the District of New Hampshire. And there may be others. The judges in these four, however, have all issued injunctions against Executive Order 14160. Thus, the district court's order in this case could have the effect of preempting or at least interfering with the orders in these other districts. It implicates unnecessarily potentially conflicting orders or reasoning, claims preclusion, res judicata, and other similar principles that order the work of different courts. Moreover, the orders in all four of these cases have been or will be appealed to the appropriate court of appeals, which are or will be considering the same issues that are presented to us here. As a matter of order and equity, it is simply presumptuous and jurisdictionally messy for one district court to issue an injunction that covers the jurisdiction of other district courts and courts of appeals, which are considering the same issues. And for good reason, the Supreme Court has demonstrated grave concern generally over district courts' issuing national injunctions, as the government has demonstrated at greater length in its papers. *See e.g.*, *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024) (mem.).

74a

While a broad injunction having de facto national effect might be appropriate in some circumstances, it is not so here, in my view. The specifically identified plaintiffs here claim harm that can only be redressed by injunctive relief, and the other district courts across the country are likewise addressing similar claims of harm.

At bottom, I would grant the partial stay requested, which is modest, and proceed to receive the briefs of the parties on the merits and hear oral argument in furtherance of our role to review the district court's injunction on the merits.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| O. DOE et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 25-10135-LTS |
| | ) | |
| DONALD J. TRUMP et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| STATE OF NEW JERSEY et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 25-10139-LTS |
| | ) | |
| DONALD J. TRUMP et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF DECISION ON MOTIONS FOR PRELIMINARY INJUNCTION

February 13, 2025

SOROKIN, J.

In this pair of lawsuits, two groups of plaintiffs advance similar challenges to the legality of one executive order among many issued by President Donald Trump on January 20, 2025. The executive order is titled "Protecting the Meaning and Value of American Citizenship" ("the EO"). Exec. Order No. 14,160 (Jan. 20, 2025).[1] The EO identifies two "categories of

---

[1] Multiple copies of the EO have been made part of the record before the Court. When referencing submissions filed in Doe et al. v. Trump et al., No. 25-cv-10135, the Court will cite to "Doe, Doc. No. __ at __." For submissions filed in New Jersey et al. v. Trump et al., No. 25-cv-10139, the Court will cite to "New Jersey, Doc. No. __ at __." All such citations use the document and page numbering appearing in the ECF header, except where pinpoint citations

individuals born in the United States" to whom the EO says "the privilege of United States citizenship does not automatically extend," then directs federal departments and agencies to cease issuing or accepting "documents recognizing United States citizenship" for such individuals born after February 19, 2025. <u>Doe</u>, Doc. No. 1-1 §§ 1-3.

Both groups of plaintiffs assert that the EO violates the Citizenship Clause of the Fourteenth Amendment to the United State Constitution, along with other constitutional provisions and federal statutes. Each group seeks a preliminary injunction preventing the EO from taking effect. <u>Doe</u>, Doc. No. 10; <u>New Jersey</u>, Doc. No. 3. The motions are fully briefed and were the subject of a motion hearing.[2]

In opposing the requests for injunctions, the defendants assert an array of arguments, which the Court addresses briefly here and in detail below. For starters, each plaintiff has standing to sue, because the uncontested facts establish each would suffer direct injury from the EO's implementation. The plaintiffs are also likely to succeed on the merits of their claims. In a lengthy 1898 decision, the Supreme Court examined the Citizenship Clause, adopting the interpretation the plaintiffs advance and rejecting the interpretation expressed in the EO. The rule and reasoning from that decision were reiterated and applied in later decisions, adopted by

---

reference enumerated sections or paragraphs within the document. The EO appears at <u>Doe</u>, Doc. No. 1-1, and <u>New Jersey</u>, Doc. No. 1-1.

[2] The Court has accepted amicus curiae briefs from the following groups: a collection of local governments and officials representing seventy-two jurisdictions in twenty-four states; eighteen members of Congress serving on the House Judiciary Committee; the Immigration Reform Law Institute; the State of Iowa along with seventeen other states; the State of Tennessee; and former U.S. Attorney General Edwin Meese III. <u>Doe</u>, Doc. Nos. 32, 38, 40; <u>New Jersey</u>, Doc. Nos. 88, 118, 120, 122, 127, 129. The Court has considered these submissions only insofar as they concern legal issues and positions advanced by the parties. <u>See</u> <u>United States v. Sturm, Ruger & Co.</u>, 84 F.3d 1, 6 (1st Cir. 1996) (explaining "an amicus cannot introduce a new argument into a case"). While several of these briefs were helpful, the submission by the State of Tennessee was especially well written.

Congress as a matter of federal statutory law in 1940, and followed consistently by the Executive Branch for the past 100 years, at least. A single district judge would be bound to apply that settled interpretation, even if a party were to present persuasive arguments that the long-established understanding is erroneous.

The defendants, however, have offered no such arguments here. Their three main contentions are flawed. First, allegiance in the United States arises from the fact of birth. It does not depend on the status of a child's parents, nor must it be exclusive, as the defendants contend. Applying the defendants' view of allegiance would mean children of dual citizens and lawful permanent residents would not be birthright citizens—a result even the defendants do not support. Next, the defendants argue birthright citizenship requires the mutual consent of the person and the Nation. This theory disregards the original purpose of the Fourteenth Amendment: to recognize as birthright citizens the children of enslaved persons who did not enter the country consensually, but were brought to our shores in chains. There is no basis to think the drafters imposed a requirement excluding the very people the Amendment aimed to make citizens. Simply put, the Amendment is the Nation's consent to accept and protect as citizens those born here, subject to the few narrow exceptions recognized at the time of enactment, none of which are at issue here. Finally, the Amendment requires states to recognize birthright citizens as citizens of their state of residence. The text includes no domicile requirement at all.

Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake. In so doing, these interpretations stray from the text of the Citizenship Clause. The Fourteenth Amendment says nothing of the birthright citizen's parents, and efforts

78a

to import such considerations at the time of enactment and when the Supreme Court construed the text were rejected. This Court is likewise bound to reject such theories now.

The plaintiffs have also satisfied the other preliminary-injunction factors. Each plaintiff faces irreparable harm, the defendants face none, and the public interest favors enjoining the EO. Accordingly, the plaintiffs in each case are entitled to an injunction preventing implementation of the EO. The individual and two associations who are plaintiffs in the earlier-filed action will be fully protected by an injunction limited to the individual and the members of the associations. The later-filed case, brought by eighteen states and two cities, requires a broader, nationwide injunction. Applying traditional equity principles, such relief is necessary because the record establishes that the harms these plaintiffs face arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions.

For these reasons, the plaintiffs' motions are ALLOWED. This ruling, explained further below and memorialized in separate Orders issued concurrently with this Memorandum, is based on straightforward application of settled Supreme Court precedent reiterated and reaffirmed in various ways for more than a century by all three branches of the federal government.

I.   BACKGROUND

Within hours of taking office, the President signed the EO, which he describes as "an integral part of [his] broader effort to repair the United States' immigration system and to address the ongoing crises at the southern border." Doe, Doc. No. 22 at 14. The EO, however, does not directly concern immigration; rather, it seeks to define the scope of birthright citizenship in the United States. In the section stating its purpose, the EO acknowledges that the Citizenship Clause and a section of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1401, confer citizenship on any person born in the United States and "subject to the jurisdiction thereof." Doe, Doc. No. 1-1 § 1. The EO goes on to identify two "categories of individuals born

4

79a

in the United States" but "not subject to the jurisdiction thereof," to whom birthright citizenship "does not automatically extend." Id. A child falls within one of the identified categories if, at the time of their birth, their father was neither a citizen nor a lawful permanent resident ("LPR") of the United States, and their mother was 1) "unlawfully present in the United States," or 2) lawfully but temporarily present in the United States "(such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa)." Id.

The second section announces that it is "the policy of the United States that no department or agency" of the federal "government shall issue [or accept] documents recognizing United States citizenship" of children within the identified categories. Id. § 2. The stated policy "shall apply only to persons who are born" after February 19, 2025. Id. The EO expressly does not restrict the ability of U.S.-born children of LPRs to receive or use documents recognizing "their United States citizenship." Id. Next, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with" the EO, and that no one within any identified department "act[s], or forbear[s] from acting, in any manner inconsistent with" the EO. Id. § 3(a). The EO further requires "[t]he heads of all executive departments and agencies" to "issue public guidance" by February 19, 2025, regarding implementation of the EO. Id. § 3(b).

In a complaint filed the day the EO issued, an individual plaintiff and two nonprofit associations challenged its legality and sought equitable relief preventing its implementation. See generally Doe, Doc. No. 1. The individual plaintiff, proceeding under the pseudonym "O. Doe," is "an expectant mother" who is lawfully present in the United States "through Temporary

5

80a

Protected Status" ("TPS").  Id. ¶ 13.  Doe's husband, the father of the child due to be born next

month, is neither a citizen nor LPR of this country.  Id.  The baby will be Doe's second child; her

first, now seven years old, also was born in the United States.  Doe, Doc. No. 11-1 ¶ 3.

Doe's co-plaintiffs are La Colaborativa and the Brazilian Worker Center, two

membership organizations located in eastern Massachusetts who provide immigration-related

assistance, among other services.  Doe, Doc. No. 1 ¶¶ 14-15.  Both organizations have members

who are unlawfully present in the United States, some of whom "are either pregnant or plan to

grow their families in the future."  Id.; see Doe, Doc. No. 11-2 ¶ 4; Doe, Doc. No. 11-3 ¶¶ 8-10.

Though the present record does not conclusively establish where the organizations' members

live, counsel at the motion hearing suggested the Court could view the members as located

"primarily" (though perhaps not exclusively) in Massachusetts.  Mot. Hr'g Tr. at 10, 76.[3]  Doe

and the organizations' members have submitted unrebutted declarations describing the harms

they allege the EO will cause the children it targets, who will be treated as noncitizens lacking

any recognized, lawful immigration status.  See generally Doe, Doc. Nos. 11-1 to -3.

The day after Doe and her co-plaintiffs filed suit, New Jersey and a group of seventeen

other states, along with the District of Columbia and San Francisco (collectively, "the State

plaintiffs"), instituted a separate action also challenging the EO under provisions of the

Constitution and other federal statutes.[4]  New Jersey, Doc. No. 1.  Along with their complaint,

---

[3] The transcript of the February 7, 2025, hearing on the motions appears on both dockets.  Doe, Doc. No. 44; New Jersey, Doc. No. 142.
[4] Besides New Jersey, the plaintiffs in this action are Massachusetts, California, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Michigan (through its Attorney General), Minnesota, Nevada, New Mexico, New York, North Carolina, Rhode Island, Vermont, and Wisconsin.  Venue is proper in the District of Massachusetts because the defendants are all officers or agencies of the United States, and at least one plaintiff in each case resides in Massachusetts.  See 28 U.S.C. § 1391(e)(1)(C).

the State plaintiffs filed a motion for a preliminary injunction supported by a memorandum and more than two dozen exhibits. New Jersey, Doc. Nos. 3, 5, 5-1 to -27. The exhibits include declarations by various representatives of state agencies describing financial and administrative burdens they anticipate will result from the EO. See, e.g., New Jersey, Doc. Nos. 5-2, 5-8, 5-14, 5-18 (describing impacts of EO on federal funding related to state health insurance programs, education, foster care, and hospital-based process for acquiring Social Security numbers at birth).

Both complaints name as defendants the President, the State Department, the Secretary of State, the Social Security Administration, and the Acting Commissioner of Social Security. The State plaintiffs also sued the United States, the Department of Homeland Security, the Secretary of Homeland Security, the Department of Health and Human Services, and the Acting Secretary of Health and Human Services.

On January 23, 2025, the Doe plaintiffs filed their own motion for a preliminary injunction, supporting memorandum, declarations, and other exhibits. Doe, Doc. Nos. 10, 11, 11-1 to -10. After hearing from the parties, the Court deemed the cases related to one another and set a consolidated briefing schedule. New Jersey, Doc. No. 71; Doe, Doc. No. 12. The defendants opposed both motions, challenging the State plaintiffs' standing to sue, arguing no plaintiff has advanced a valid cause of action, and urging that the plaintiffs have not satisfied the test governing preliminary-injunctive relief. See generally Doe, Doc. No. 22. Both sets of plaintiffs replied. Doe, Doc. No. 33; New Jersey, Doc. No. 123. The Court heard argument from all parties on February 7, 2025.

II. DISCUSSION

Before addressing the factors governing requests for injunctive relief, the Court disposes of two preliminary challenges that the defendants suggest foreclose consideration of the merits of the plaintiffs' motions. As the Court will explain, the defendants' opening pair of procedural

82a

challenges, like their substantive arguments opposing the motions, wither in the face of settled and binding Supreme Court precedent.

  A. <u>Threshold Issues</u>

    1. *Standing*

The defendants first argue that the State plaintiffs lack standing to bring the claims alleged in their complaint.  <u>See New Jersey</u>, Doc. No. 92 at 18-22.  They are wrong.

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies'" in which a plaintiff can "demonstrate [a] personal stake." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021).  To establish standing under Article III, a "plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  <u>Biden v. Nebraska</u>, 600 U.S. ---, 143 S. Ct. 2355, 2365 (2023).  This test is satisfied if state- or local-government plaintiffs show that an allegedly unconstitutional executive action will likely trigger a loss of federal funds to which they otherwise would be entitled.  <u>See Dep't of Com. v. New York</u>, 588 U.S. 752, 767 (2019).  Such a showing establishes injury that is "sufficiently concrete and imminent" and "fairly traceable" to the challenged action, thereby satisfying Article III.  <u>Id.</u>

The State plaintiffs easily meet this standard.[5]  Uncontested declarations from officials representing several State plaintiffs articulate various forms of federal funding that will be

---

[5] The defendants direct their standing challenge against the State plaintiffs as a group.  They have not contested the showing made by any individual State plaintiff or subset of State plaintiffs.  Even if the defendants had done so, the result would be the same.  The record before the Court includes sworn declarations establishing standing on the part of at least several State plaintiffs.  No more is required at this juncture.  <u>See Nebraska</u>, 143 S. Ct. at 2365 ("If at least one plaintiff has standing, the suit may proceed."); <u>United States v. Texas</u>, 599 U.S. 670, 709 n.1 (2023) (Alito, J., dissenting) ("In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing.").

83a

diminished as a direct result of the EO.  States receive federal funding to cover portions of

services like health insurance, special education, and foster care in amounts that depend on how

many "eligible" children receive such services.  Citizenship is one component of eligibility for

purposes of these programs.  Pursuant to the EO, fewer children will be recognized as citizens at

birth.  That means the number of persons receiving services who are "eligible" under the

identified federal programs will fall—and, as a direct result, the reimbursements and grants the

State plaintiffs receive for these services will decrease.  The reduction to such funding is a

concrete and imminent injury directly and fairly traceable to the EO, redressable by the

injunctive relief the State plaintiffs seek.

      This is all the Constitution requires.  Two decisions of the Supreme Court, both authored

by Chief Justice Roberts, make the point.  In 2023, the Chief Justice, joined by five other

Justices, explained that Missouri had standing to challenge executive action discharging federal

student loans, where a quasi-state agency stood to lose fees it would have collected for servicing

the forgiven loans.  Nebraska, 143 S. Ct. at 2366.  A few years earlier, the Chief Justice

conveyed the Supreme Court's unanimous conclusion that "at least some" states had standing to

challenge executive action revising the United States census.  New York, 588 U.S. at 767-68.[6]

The proposed changes at issue raised the likelihood that persons without lawful immigration

status would be undercounted, and states faced reductions in federal funds allocated according to

population.  Id.  The State plaintiffs here challenge the EO based on precisely the same sort of

direct financial impacts.  They have identified federal grants and reimbursements to which they

---

[6] Though some Justices parted ways as to other issues in the case, all agreed as to standing.

9

84a

are entitled that will diminish under the EO. As in <u>Nebraska</u> and <u>New York</u>, therefore, the State plaintiffs have Article III standing.[7]

The defendants have neither disputed the State plaintiffs' showing of harm nor materially distinguished the Chief Justice's analysis. Their standing challenge hinges on an attempt to analogize this case to <u>United States v. Texas</u>. There, the Supreme Court held state plaintiffs lacked standing to compel the federal government to pursue more "arrests and prosecutions" for violations of immigration laws. 599 U.S. at 678-79. The analogy is inapt.[8] <u>Texas</u> involved "novel" theories of standing and a "highly unusual" claim that the Executive Branch was not sufficiently vigorous in exercising its prosecutorial discretion. <u>Id.</u> at 681, 684. This case, however, concerns the bounds of citizenship guaranteed by the Constitution—not an

---

[7] The Court does not consider a *parens patriae* theory of standing, because the State plaintiffs are not pursuing it. The State plaintiffs also probably have standing based on their sovereign interests. The Citizenship Clause defines which individuals become birthright citizens not only of the United States, but also of the state in which they reside. U.S. Const. amend. XIV, § 1. States have general sovereign interests in which persons are their citizens. They very likely also have sovereign interests in which persons are U.S. citizens, as state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship. <u>E.g.</u>, N.J. Stat. Ann. § 2B:20-1(c); Mass. Gen. Laws ch. 234A, § 4. The defendants essentially conceded at the motion hearing that the State plaintiffs would have standing under these theories, but suggested the theories were "forfeited," at least "[f]or purposes of deciding [the pending] motion[s]," because they were not advanced in the State plaintiffs' submissions thus far. Mot. Hr'g Tr. at 40, 63. The defendants cited no authority for their forfeiture theory. The plaintiffs generally endorsed the sovereign-interest theories during the hearing. Given the strength of the plaintiffs' showing of direct financial harms, the Court need not resolve whether the State plaintiffs' sovereign interests supply an alternative basis for satisfying Article III.

[8] In fact, the defendants' discussion of <u>Texas</u> in their papers verges on misleading. The language upon which they most heavily rely appears in a footnote quoted in their opposition memorandum and referenced during the motion hearing. <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 18-19 (quoting <u>Texas</u>, 599 U.S. at 680 n.3). Contrary to the defendants' characterization, that footnote is not a "holding," and it does not "foreclose[]" the State plaintiffs' standing in this case. <u>Id.</u> Rather, it acknowledges that "States sometimes have standing to sue . . . an executive agency or officer," and though it warns that "standing can become more attenuated" when based on "indirect effects" of federal action, it stops short of saying such effects could never satisfy Article III. <u>Id.</u> This case, in any event, concerns direct effects.

85a

area typically reserved for executive discretion.  The theory of standing advanced by the State plaintiffs—direct financial harm—is ordinary.[9]  <u>Texas</u> simply does not aid the defendants here.

The defendants have not challenged the standing of Doe or her co-plaintiffs to sue—nor could they.  Doe has plainly established injury, to herself and her unborn child, that is concrete, imminent, traceable to the EO, and redressable by the relief she seeks in this lawsuit.  The same is true of the association plaintiffs, which provide services impacted by the EO and have described one or more members facing the same type of injury as Doe.  <u>See Summers v. Earth Island Inst.</u>, 555 U.S. 488, 498 (2009) (requiring, for associational standing, "specific allegations establishing that at least one identified member had suffered or would suffer harm"); <u>see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.</u>, 517 U.S. 544, 551-53 (1996) (describing test for associational standing).

Accordingly, the defendants' standing challenge fails.  All plaintiffs before the Court have satisfied Article III.

### 2.   *Cause of Action*

Next, the defendants assert the Court must deny the pending motions because no plaintiff has a valid cause of action under the Citizenship Clause or the identified federal statutes.  This is meritless.

As Justice Scalia observed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial

---

[9] The harms the State plaintiffs have identified are not "indirect"—indeed, when specifically asked, the defendants failed to identify any "extra step" separating the loss of funding identified by the State plaintiffs from the EO's direct effects.  Mot. Hr'g Tr. at 37-39.  Nor do they arise, as defendants argue, exclusively from services "the states have *voluntarily* chosen to provide." <u>New Jersey</u>, Doc. No. 92 at 20; <u>see</u> <u>Plyler v. Doe</u>, 457 U.S. 202, 230 (1982) (holding states are required by federal law to provide public education services to all children, regardless of immigration status).

11

review of illegal executive action, tracing back to England." Armstrong v. Exceptional Child
Ctr., Inc., 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has "long held that federal
courts may in some circumstances grant injunctive relief" to prevent "violations of federal law"
planned or committed by "state officers" or "by federal officials." Id. at 326-27. The plaintiffs
here ask the Court to do just that.[10]

Limitations that apply where plaintiffs seek damages, rather than equitable relief, have no
bearing on the claims pending here. See New Jersey, Doc. No. 92 at 24 (citing DeVillier v.
Texas, 601 U.S. 285, 291 (2024)). Nor can the defendants short-circuit this lawsuit by pointing
to a narrow provision of the INA providing an avenue for a "national of the United States" to
challenge discrete denials of rights or privileges. See id. (invoking 8 U.S.C. § 1503(a)). That
statute does not facially create an exclusive remedy for such claims, nor does it offer an adequate
alternative to the claims advanced in these actions—including, but not only, because it is not a
mechanism through which the State plaintiffs can obtain relief. Cf. Rusk v. Cort, 369 U.S. 367,
375 (1962) (considering related provisions of same statute and concluding they were not
exclusive means of asserting rights associated with citizenship).

The defendants' threshold challenges fail under clear Supreme Court precedent. The
plaintiffs assert valid causes of action and have standing to pursue them. The Court, therefore,
turns to the substance of the pending motions.

---

[10] In fact, the Department of Justice is doing precisely what it says the plaintiffs cannot do. The
day before this Court's motion hearing, the United States sued Illinois and various state and local
officials, seeking equitable relief via claims brought directly under the Supremacy Clause. See
Compl., United States v. Illinois, No. 25-cv-1285 (N.D. Ill. Feb. 6, 2025), ECF No. 1; cf. New
Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (discussing equitable doctrine of "judicial
estoppel," which in some circumstances prevents parties that have taken one legal position from
reversing course "simply because [their] interests have changed" (cleaned up)). During the
motion hearing, the State plaintiffs raised this issue, and the defendants offered no response.

B.    <u>Preliminary Injunction Analysis</u>[11]

The familiar standard governs the plaintiffs' requests for interlocutory relief.  To secure

the "extraordinary remedy" provided by preliminary injunctions, each group of plaintiffs "must

establish" that: 1) they are "likely to succeed on the merits," 2) they are "likely to suffer

irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in [their]

favor," and 4) "an injunction is in the public interest."  <u>Winter v. Nat. Def. Res. Council, Inc.</u>,

555 U.S. 7, 20 (2008).

"The first two factors of the traditional standard are the most critical."  <u>Nken v. Holder</u>,

556 U.S. 418, 434 (2009).  Courts consider them in tandem.  <u>See</u> <u>Vaqueria Tres Monjitas, Inc. v.</u>

<u>Irizarry</u>, 587 F.3d 464, 485 (1st Cir. 2009) (noting "irreparable harm is not a rigid" factor, but

rather "a sliding scale, working in conjunction with" the first factor); <u>EEOC v. Astra U.S.A.,</u>

<u>Inc.</u>, 94 F.3d 738, 743 (1st Cir. 1996) ("[W]hen the likelihood of success on the merits is great, a

movant can show somewhat less in the way of irreparable harm and still garner preliminary

injunctive relief.").  The third and fourth factors of the injunction test "merge when the

Government is the opposing party."  <u>Nken</u>, 556 U.S. at 435.

---

[11] The defendants proposed, in a footnote, that the Court proceed now to enter or deny a final,
permanent injunction.  <u>See</u> <u>New Jersey</u>, Doc. No. 92 at 50 n.6.  The plaintiffs expressed no
objection to this proposal during the motion hearing, agreeing that the Court could now enter a
final injunction if it concluded an injunction was warranted.  After consideration, the Court
resolves now only the plaintiffs' original requests for preliminary relief.  The defendants are
correct that the plaintiffs' causes of action "are purely legal," <u>id.</u>, but they are wrong to imply
that facts are immaterial here.  The test for injunctive relief requires the plaintiffs to prove, and
the Court to evaluate, questions of harm that bear on the scope of any permanent relief ultimately
awarded.  Though the defendants have leveled no challenges to the plaintiffs' factual
submissions, the Court has an independent duty to ensure that any relief provided is
appropriately tailored to address the harms established by the parties before it.  <u>Cf.</u> <u>DraftKings</u>
<u>Inc. v. Hermalyn</u>, 118 F.4th 416, 423 (1st Cir. 2024) (noting trial judge is "uniquely placed to
design" injunctive relief that corresponds to "specific harm" proven based on facts found by
judge).  To that end, further factual development may be required before the Court crafts a final
judgment.

Measured against these standards, the plaintiffs' submissions support entry of the injunctions they seek, with only minor adjustments explained below.

1.   *Likelihood of Success*

"The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor: "likelihood of success on the merits." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). This factor weighs strongly in the plaintiffs' favor. The plain language of the Citizenship Clause—as interpreted by the Supreme Court more than a century ago and routinely applied by all branches of government since then—compels a finding that the plaintiffs' challenges to the EO are nearly certain to prevail.

The Citizenship Clause speaks in plain and simple terms. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The words chosen by the drafters and ratified by the states, understood "in their normal and ordinary" way, United States v. Sprague, 282 U.S. 716, 731 (1931), bestow birthright citizenship broadly to persons born in the United States. The text is directed at the person born (or naturalized). It does not mention the person's parents at all, let alone expressly condition its grant of citizenship on any characteristic of the parents. So, at the outset, the EO and its focus on the immigration status of a child's parents find no support in the text.

One phrase in the Citizenship Clause is at the heart of the parties' disagreement. The constitutionality of the EO, and the success of the plaintiffs' claims, turns on the meaning of "subject to the jurisdiction thereof." To understand that phrase, however, this Court need look no further than United States v. Wong Kim Ark, 169 U.S. 649 (1898).[12] In that case, the

---

[12] In a line of cases not directly relevant here, courts have considered whether a person born in an unincorporated territory of the United States—such as American Samoa or, for a time, the

Supreme Court meticulously reviewed the contours of citizenship under English and early

American common law, under the 1866 Civil Rights Act and the Fourteenth Amendment, and as

reflected in legal scholarship and court decisions in the decades leading up to the turn of the

twentieth century.  See generally id. at 653-704.  From these sources, the Supreme Court

concluded that "subject to the jurisdiction thereof" was meant "to exclude, by the fewest and

fittest words," the following categories of persons: "children of members of the Indian tribes,"

"children born of alien enemies in hostile occupation, and children of diplomatic representatives

of a foreign state."[13]  Id. at 682.  As to all other persons, "the fundamental rule of citizenship by

birth within the dominion of the United States, notwithstanding alienage of parents," applied.  Id.

at 689.[14]

Applying this longstanding and "fundamental rule of citizenship," the Supreme Court

held that the petitioner—born in the United States to Chinese-citizen parents, who were living

and working in the United States at the time of the child's birth, but who were prevented by law

from naturalizing and eventually returned to China—was a citizen "by virtue of the

---

Philippines—was born "in the United States" for purposes of the Citizenship Clause.  E.g.,
Tuaua v. United States, 788 F.3d 300, 302 (D.C. Cir. 2015).  That language is not the focus of
the present dispute, nor was it the Supreme Court's focus in Wong Kim Ark.

[13] Neither the EO nor the defendants' brief has suggested that all (or any) persons within the
EO's categories are "children born of alien enemies in hostile occupation," specified which
portions of the country are presently so occupied, or identified which foreign powers or
organizations are the "enemies" presently controlling those areas.  See New Jersey, Doc. No. 92
at 38 (quoting another Executive Order and summarily stating that plaintiffs' view might grant
citizenship to children of "unlawful enemy combatants who enter this country in an effort to
create sleeper cells or other hostile networks").  Accordingly, the Court need not consider this
exception to birthright citizenship.

[14] This rule has been reiterated by the Supreme Court.  See, e.g., Perkins v. Elg, 307 U.S. 325,
329 (1939) (citing Wong Kim Ark majority's "comprehensive review" supporting "decision . . .
that a child born here of alien parentage becomes a citizen of the United States"); Weedin v.
Chin Bow, 274 U.S. 657, 660, 670 (1927) (stating "learned and useful opinion" of Wong Kim
Ark majority "held that . . . one born in the United States, although . . . of a parentage denied
naturalization under the law, was nevertheless . . . a citizen" under Fourteenth Amendment).

90a

[C]onstitution itself." Wong Kim Ark, 169 U.S. at 652-53, 703-05.  This holding followed

"irresistibly" from the extensive analysis the majority articulated.  Id. at 693.  Throughout that

analysis, the availability of birthright citizenship "irrespective of parentage" was repeatedly

emphasized.  E.g., id. at 690.  The duration of the parents' residency in the United States was not

assessed, nor did laws preventing the parents from seeking naturalization influence the Court's

determination of the petitioner's status.  The question was resolved, for purposes of the

Citizenship Clause, by the location of the petitioner's birth, and the inapplicability of the narrow

exceptions to birthright citizenship that had been identified by the Court.  Understood this way—

indeed, the way all branches of government have understood the decision for 125 years—Wong

Kim Ark leaves no room for the defendants' proposed reading of the Citizenship Clause.  Of

course, the defendants can seek to revisit this long-settled rule of law, but that is a matter for the

Supreme Court, not a district judge.

   The defendants accept that this Court is bound by the prior holdings of the Supreme

Court.  See New Jersey, Doc. No. 92 at 44; Mot. Hr'g Tr. at 48.  Nevertheless, they urge the

Court to essentially ignore all but a handful of sentences from Wong Kim Ark, arguing the bulk

of the majority's lengthy opinion is dicta.  See New Jersey, Doc. No. 92 at 44 (urging Wong Kim

Ark resolved only whether Citizenship Clause extended to "children of parents with 'a

permanent domicile and residence in the United States,'" and that "[t]he case should not be read

as doing anything more than answering that question" (quoting 169 U.S. at 653)).  At the motion

hearing, the defendants doubled down on this point, brazenly claiming that "dicta can be

disregarded."  Mot. Hr'g Tr. at 75.  That position reflects a serious misunderstanding at best—

and a conscious flouting at worst—of the judicial process and the rule of law.

16

Lower federal courts are not merely obligated to apply the holdings of Supreme Court decisions; they also "are bound by the Supreme Court's 'considered dicta.'" United Nurses & Allied Prof'ls v. NLRB, 975 F.3d 34, 40 (1st Cir. 2020) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991)). "Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when . . . badges of reliability abound." United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993). If such a statement "bears the earmarks of deliberative thought purposefully expressed," concerns an issue that was "thoroughly debated in the recent past," and "has not been diluted by any subsequent pronouncement" of the Supreme Court, a lower federal court must adhere to it. Id.

To the extent the thorough analysis in Wong Kim Ark of the Fourteenth Amendment's common-law foundations, the purpose and intent of its drafters, and its application during the first thirty years after its ratification can be called "dicta" at all, it is undoubtedly the "considered" and "authoritative" sort that this Court is bound to apply. The sheer detail and length of the discussion by the Court's majority make this plain. Add to that the fact that the opposite view—the one the defendants advance to justify the EO—was rejected by the majority in Wong Kim Ark (in the portions of the decision now labeled "dicta" by the defendants) and endorsed only by the dissent. See 169 U.S. at 705-32. The plaintiffs are not relying on a stray "remark" that lacks "care and exactness," standing "wholly aside from the question in judgment" and "unsupported by any argument, or by any reference to authorities," that might not "control the judgment" of a lower court. 169 U.S. at 678. They are "leaning into" the central reasoning of the Supreme Court in support of its holding. Mot. Hr'g Tr. at 48. The defendants' argument to the contrary invites the Court to commit legal error.

92a

Whether "holding" or "considered dicta," the straightforward rule and limited exceptions identified in Wong Kim Ark and summarized above have been applied repeatedly and without hesitation, including by the Supreme Court and the First Circuit.  For example:

- In Morrison v. California, despite statutes that then rendered Japanese persons "ineligible" for citizenship via naturalization, the Supreme Court stated without qualification: "A person of the Japanese race is a citizen of the United State if he was born within the United States."  291 U.S. 82, 85 (1934).

- In Dos Reis ex rel. Camara v. Nicolls, the First Circuit described a person "born in Massachusetts" as having become "an American citizen, not by gift of Congress, but by force of the constitution," despite his parents' status as foreign nationals "never naturalized in the United States," and despite his own "dual nationality" that led to his "service as a draftee in the Portuguese army."  161 F.2d 860, 861-62 (1st Cir. 1947).

- In Kawakita v. United States, a person "born in this country in 1921 of Japanese parents who were citizens of Japan" was "a citizen of the United States by birth"—a status the person did not lose despite later committing treason by acts of cruelty undertaken while working at a Japanese camp for American prisoners during World War II.  343 U.S. 717, 720 (1952).  See also Nishikawa v. Dulles, 356 U.S. 129, 131 (1958) (finding Japanese military service during World War II was basis for expatriation of U.S.-born citizen of Japanese-citizen parents only if service was voluntary); Hirabayashi v. United States, 320 U.S. 81, 96-97 (1943) (noting, in context of World War II, that tens of thousands of "persons of Japanese descent" living on Pacific coast "are citizens because born in the United States," even though "under many circumstances" they also were citizens of Japan "by Japanese law").

- In United States ex rel. Hintopoulous v. Shaughnessy, all members of the Supreme Court considered a child born to foreigners, both of whom had entered the U.S. with temporary permission but remained after their authorization expired, to be "of course[] an American citizen by birth," despite the parents' "illegal presence."  353 U.S. 72, 73 (1957); see id. at 79 (reflecting dissent's agreement that the child was a citizen).

- In INS v. Errico, two different children "acquired United States citizenship at birth" despite their parents having gained admission to this country by misrepresenting material facts about themselves and thereby evading statutory restrictions on lawful immigration. 385 U.S. 214, 215-16 (1966).

- In INS v. Rios-Pineda, a unanimous Supreme Court viewed a child "born in the United States" as "a citizen of this country," even though the father had entered the country "illegally" on his own and "returned to Mexico . . . under threat of deportation"; both parents had then "paid a professional smuggler . . . to transport them" across the border; and the father, when apprehended again, had failed to depart voluntarily "as promised." 471 U.S. 444, 446 (1985).

18

- In <u>Hamdi v. Rumsfeld</u>, at least six Justices treated the petitioner as a citizen of the United States based on his birth in Louisiana, without even discussing his parents' status (they were present lawfully but temporarily), despite the petitioner's active participation in a foreign terrorist organization.  542 U.S. 507, 510 (2004).[15]

- In <u>Mariko v. Holder</u>, a panel of the First Circuit considered a child "born in the United States" to be "a United State citizen" despite the parents' concession that both of them "were here illegally" and therefore removable.  632 F.3d 1, 3, 8 n.4 (1st Cir. 2011).

- In <u>Hasan v. Holder</u>, a different panel of the First Circuit similarly viewed as "a U.S. citizen" a child born in California to foreign-national parents who had overstayed their nonimmigrant visas.  673 F.3d 26, 28 & n.1 (1st Cir. 2012).

This line of decisions—which is not limited to the cases described above—further undermines the defendants' proposed interpretation.[16]

If that were not enough to find that the plaintiffs are likely to succeed on the merits (and it is), the fact that Congress incorporated the language of the Citizenship Clause into provisions of the INA passed more than forty years after <u>Wong Kim Ark</u> cements the meaning of the disputed phrase and provides the plaintiffs an independent avenue to prevailing here.  In the INA, Congress conferred birthright citizenship via statute on several categories of individuals, the first of which is described using language mirroring the Citizenship Clause.  8 U.S.C.

---

[15] Justice Scalia, joined by Justice Stevens, referred to Hamdi as a "presumed American citizen." 542 U.S. at 554 (Scalia, J., dissenting); <u>see</u> <u>Hamdi v. Rumsfeld</u>, 243 F. Supp. 2d 527, 534 (E.D. Va. 2002) (noting Hamdi had "identified himself as a Saudi citizen who had been born in the United States" when detained and interrogated by the American military).  No justice took up the invitation of one amicus in the case to revisit the meaning of the Citizenship Clause, correct the "erroneous interpretation" adopted in <u>Wong Kim Ark</u>, and conclude Hamdi was not a citizen because his parents, though living in Louisiana lawfully at the time of his birth, had only temporary work visas authorizing their presence in this country.  <u>See</u> Br. Amicus Curiae The Claremont Inst. Ctr. Const. Jurisprudence at 2-3, 5, <u>Hamdi v. Rumsfeld</u>, No. 03-6696, 2004 WL 871165 (U.S. Mar. 29, 2004).

[16] So does the fact that the Supreme Court has cited <u>Wong Kim Ark</u> as an example of how to properly assess the original meaning of language in the Constitution or a federal statute.  <u>See</u> <u>Standard Oil Co. v. United States</u>, 221 U.S. 1, 59 & n.6 (1911); <u>cf.</u> <u>BNSF Ry. Co. v. Loos</u>, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (citing <u>Wong Kim Ark</u> majority opinion as authority reflecting "everyone agrees" that "record of *enacted* changes Congress made" to relevant text "over time" is "textual evidence" that "can sometimes shed light on meaning").

§ 1401(a) (confirming citizenship of "a person born in the United States, and subject to the jurisdiction thereof"). As the plaintiffs point out, this provision was enacted in 1940 and "re-codified" in 1952. See Doe, Doc. No. 33 at 2; see also Doe, Doc. No. 11 at 15 (raising statutory claim and advancing brief but distinct argument about likelihood of success thereunder). Because it uses the same language chosen by the Fourteenth Amendment's drafters—words that had been studied in Wong Kim Ark decades earlier—the statute must be understood to have incorporated the Supreme Court's interpretation of those words. See Bostock v. Clayton Cnty., 590 U.S. 644, 654 (2020) (explaining statute "normally" is interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment").[17]

Here, the fundamental rule conveyed by the Citizenship Clause was clear by the time § 1401 was enacted, and the legislators who chose to include the same phrase the Supreme Court already had examined presumably intended the same words would be accorded the same meaning in both contexts. See Taggart v. Lorenzen, 587 U.S. 554, 560 (2019) (recognizing "longstanding interpretive principle" that if statutory term "is obviously transplanted from another legal source, it brings the old soil with it" (cleaned up)). Thus, the statute supports a related but distinct claim upon which the plaintiffs are likely to succeed.[18]

---

[17] Justice Gorsuch went on to explain why this is so: "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, . . . we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." Bostock, 590 U.S. at 654-55.

[18] The defendants advance no separate challenge to the plaintiffs' statutory claim, choosing to "focus . . . on the constitutional provision" which is "coterminous" with the statute. New Jersey, Doc. No. 92 at 25 n.4. By opting not to address the statute, or the manner in which its enactment necessarily strengthens the plaintiffs' interpretation of the relevant language, the defendants have waived any discrete argument related to the statutory claim for purposes of the pending motions. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (applying "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed augmentation, are deemed waived").

Beyond sidestepping <u>Wong Kim Ark</u>, the defendants urge the Court to read three specific requirements into the phrase "subject to the jurisdiction thereof." The defendants contend these requirements are necessary to ensure adherence to the phrase's original meaning. None of these requirements, however, find support in the text itself or the cases construing and applying it. And, more importantly, each of them, if applied as argued, would prevent the Citizenship Clause from reaching groups of persons to whom even the defendants concede it must apply.

<u>First</u>, the defendants suggest the "jurisdiction" phrase is satisfied only by persons who owe the United States "allegiance" that is "direct," "immediate," "complete," and "unqualified by allegiance to any alien power." <u>New Jersey</u>, Doc. No. 92 at 27-28 (cleaned up). Certainly, allegiance matters. Various sources link the "jurisdiction" phrase and concepts of allegiance, including <u>Wong Kim Ark</u>. <u>See, e.g.</u>, 169 U.S. at 654 (noting English common law provided citizenship to those "born within the king's allegiance, and subject to his protection"). The defendants veer off course, however, by suggesting allegiance must be exclusive, and that it derives from the status of a child's parents. If that were so, then the children of dual citizens or LPRs could not receive birthright citizenship via the Fourteenth Amendment. A dual citizen necessarily bears some allegiance to both the United States and the second nation of which they are a citizen. LPRs, unless and until naturalized, remain foreign nationals who are citizens of other countries bearing some allegiance to their places of origin. This principle would also rule out the petitioner in <u>Wong Kim Ark</u>, whose parents resided for years in the United States but remained "subjects of the emperor of China" (and, indeed, returned to China when their U.S.-born son was a teenager). 169 U.S. at 652-53. The defendants, however, agree that children of dual citizens and LPRs are entitled to birthright citizenship, and that the petitioner in <u>Wong Kim Ark</u> was as well.

96a

These anomalies are avoided by focusing on the allegiance of the child, not the parents. As noted earlier, the Citizenship Clause itself speaks only of the child. A child born in the United States necessarily acquires at birth the sort of allegiance that justified birthright citizenship at the common law. That is, they are born "locally within the dominions of" the United States and immediately "derive protection from" the United States. Id. at 659. A child born here is both entitled to the government's protection and bound to adhere to its laws. This is true regardless of the characteristics of the child's parents, subject only to the narrow exceptions identified in Wong Kim Ark. Allegiance, in this context, means nothing more than that. See id. at 662 ("Birth and allegiance go together."). As James Madison explained:

> It is an established maxim that birth is a criterion of allegiance. Birth however derives its force sometimes from place and sometimes from parentage, but in general place is the most certain criterion; it is what applies in the United States; it will be therefore unnecessary to investigate any other.

Founders Online, Citizenship, Nat'l Archives (May 22, 1789), https://founders.archives.gov /documents/Madison/01-12-02-0115 [https://perma.cc/ZC4B-NS9R]. So, "allegiance" does not mean what the defendants think it means, and their first proposed rule founders.[19]

Next, the defendants seek to graft concepts of social-contract theory onto the "jurisdiction" clause of the Fourteenth Amendment by arguing birthright citizenship requires "mutual consent between person and polity." New Jersey, Doc. No. 92 at 45. The defendants again center their argument on the parents at the expense of the child whose birthright is at stake—perhaps, in part, because infants are incapable of consent in the legal sense. In the

---

[19] To the extent the defendants believe temporary, lawful visitors to this country are people who "do not owe an allegiance to the United States," Mot. Hr'g Tr. at 55, the Supreme Court disagrees, see Wong Kim Ark, 169 U.S. at 685 (quoting Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 144 (1812), and its description of the "temporary and local allegiance" private visitors from other countries owe the United States while passing through or doing business here).

defendants' view, mutual consent is lacking where a person (the parent) has entered the United States without permission to do so, or without permission to remain here permanently. The absence of "mutual consent" in those circumstances means, according to the defendants, that the children of such parents fall beyond the "jurisdiction" of the United States for Fourteenth Amendment purposes.

This argument fares even worse than the first. The Fourteenth Amendment enshrined in the Constitution language ensuring "the fundamental principle of citizenship by birth" in the United States applied regardless of race—including, and especially, to formerly enslaved persons. 169 U.S. at 675; see Afroyim v. Rusk, 387 U.S. 253, 262-63 (1967). The defendants do not (and could not) deny this. Enslaved persons, of course, did not "consent" to come to the United States or to remain here. They were brought here violently, in chains, without their consent. These conditions persisted after their arrival. Against this backdrop, it verges on frivolous to suggest that Congress drafted, debated, and passed a constitutional amendment, thereafter enacted by the states, that imposed a consent requirement necessarily excluding the one group of people the legislators and enactors most specifically intended to protect.

Finally, the defendants seek to transform the use of the term "reside" at the end of the Citizenship Clause into a basis for finding that the "jurisdiction" phrase eliminates any person without a lawful "domicile" in the United States. The defendants contend that persons here with temporary visas retain "domiciles" in their native countries, and persons here without lawful status cannot establish a true "domicile." And so, the argument goes, they cannot "reside" in any state, and they remain outside the "jurisdiction" of the United States for Fourteenth Amendment purposes. This, once again, shifts the focus away from the child and the location of birth to the parents and the status and duration of their presence in this country.

The word "reside" appears in the Citizenship Clause only in the phrase specifying that a person entitled to birthright citizenship becomes a citizen not only of the United States, but also of the state where they live. For example, a state within the former Confederacy (or any other state) could not constitutionally deny state citizenship to the child of a formerly enslaved person who lived and gave birth there. The word "reside" does not inject a "domicile" requirement limiting the reach of the Citizenship Clause as a whole and justifying examination of the immigration status of a child's parents. See New Jersey, Doc. No. 123 at 11-12 (articulating the flaws in this theory). In any event, it is not so clear that "illegal entry into the country would . . . , under traditional criteria, bar a person from obtaining domicile within a State." Plyler, 457 U.S. at 227 n.22.

In sum, the defendants invite the Court to adopt a set of rules that work (except when they don't). None of the principles the defendants advance are sturdy enough to overcome the settled interpretation and longstanding application of the Citizenship Clause described above. Each principle, applied uniformly, would lead to unintended results at odds with the text, meaning, and intent of the Fourteenth Amendment—and, in some instances, with the parameters set out in the EO itself.

For all these reasons, the Court finds the plaintiffs are exceedingly likely to prevail on the merits of their constitutional and statutory claims. This conclusion would allow the plaintiffs to "show somewhat less in the way of irreparable harm." Astra U.S.A., 94 F.3d at 743. That relaxed burden, however, is not essential, as the second factor also favors the plaintiffs strongly.

### 2. *Irreparable Harm*

The plaintiffs have supported their assertions of irreparable harm with numerous declarations detailing the imminent and damaging impacts they anticipate will flow from the EO.

Case: 25-1158  Case 1:25-cv-10139-LTS Document 144  Document: 144  Filed 02/13/25  Page 25 of 31  Date Filed: 07/17/2025  Entry ID: 6707040

99a

See Doe, Doc. Nos. 11-1 to -10; New Jersey, Doc. Nos. 5-2 to -21, -23.[20]  Upon review, the Court accepts and credits those declarations, which the defendants have not disputed or rebutted in any way.  The declarations establish that the State plaintiffs do not stand to lose discrete amounts of one-time funds; they face unpredictable, continuing losses coupled with serious administrative upheaval.  They have established irreparable harm.

As for the Doe plaintiffs, what is at stake is a bedrock constitutional guarantee and all of its attendant privileges.  The loss of birthright citizenship—even if temporary, and later restored at the conclusion of litigation—has cascading effects that would cut across a young child's life (and the life of that child's family), very likely leaving permanent scars.  The record before the Court establishes that children born without a recognized or lawful status face barriers to accessing critical healthcare, among other services, along with the threat of removal to countries they have never lived in and possible family separation.[21]  That is irreparable harm.[22]

---

[20] Not every State plaintiff has submitted its own declarations, but the complaint alleges that all face the same categories of harm.  E.g., New Jersey, Doc. No. 1 ¶ 122.  The record supports that allegation, for example, by reflecting that each official attesting to health-insurance-related impacts describes the same federal programs used the same way and forecasts the loss of the same types of federal reimbursements.  See, e.g., Doc. Nos. 5-2, -6, -11, -12, -16, -19.  At this stage, that is enough to find that all State plaintiffs would suffer irreparable harm absent injunctive relief.  The defendants do not contend otherwise.

[21] Doe, for example, has a pending asylum petition and an older child who is a U.S. citizen by birthright—assuming the defendants do not later reconsider the effective date contained in the EO and opt to apply their reading of the Citizenship Clause retroactively, a possibility they did not definitively rule out during the motion hearing.  Mot. Hr'g Tr. at 45-47.  Her family would be placed at a distressing crossroads if her new baby were to face removal from the country.

[22] The defendants' only responses are to suggest that the plaintiffs wait and see how the EO will be implemented, and hope that Doe's asylum application is granted.  Or, in the worst case, "if any removal action were initiated against the children of any of the private plaintiffs at issue in this case, the [child] subject of the action could assert their claim to citizenship as defense in that proceeding."  New Jersey, Doc. No. 92 at 48.  That answer is not persuasive.  Cf. Texas v. EEOC, 933 F.3d 433, 448 & n.29 (5th Cir. 2019) (stating "it would strain credulity to find that an agency action targeting" conduct the agency has deemed "presumptively unlawful" would not trigger implementation "immediately enough to constitute" nonspeculative injury).

100a

The plaintiffs in both cases have shown they are likely to suffer substantial and irreparable harm in the absence of a preliminary injunction. Thus, the two most important factors strongly favor the plaintiffs.

### 3. *Balance of Harms and Public Interest*

The final merged factors also support the plaintiffs' requests for relief. On the plaintiffs' side of the scales, there is a grave risk of significant and irreparable harm arising from the EO. Children not yet born will be stripped of birthright citizenship constitutionally guaranteed to them, as confirmed by settled law and practice spanning more than a dozen decades. They will be deprived of a "title" that is, as "Justice Brandeis observed, . . . superior to the title of President." Tuaua, 788 F.3d at 301. And that harm will arise from an EO that is unconstitutional on its face—an assessment that has now been echoed by multiple federal courts in different jurisdictions. E.g., Prelim. Inj. Order at 6, N.H. Indonesian Cmty. Support v. Trump, No. 25-cv-38 (D.N.H. Feb. 11, 2025), ECF No. 79.

It is difficult to imagine a government or public interest that could outweigh the harms established by the plaintiffs here. Perhaps that is why the defendants have identified none. Instead, they point only to the Executive Branch's discretion in matters of immigration. New Jersey, Doc. No. 92 at 49. But this case is not about how "to manage the immigration system." Id. It is about the Constitution's guarantee of citizenship by virtue of birth. When this right was enshrined in the Fourteenth Amendment, it was moved firmly beyond the bounds of the "core executive authority" the defendants invoke. Id.; see Afroyim, 387 U.S. at 263 (noting framers of Fourteenth Amendment "wanted to put citizenship beyond the power of any governmental unit to destroy"). The defendants' only argument, therefore, adds nothing to their side of the scales.

Though the government has waived any other arguments on these final factors by not developing them in their opposition memorandum, see Zannino, 895 F.2d at 17, the Court makes

26

two more observations.  First, the government has no legitimate interest in pursuing

unconstitutional agency action; "it is always in the public interest to prevent the violation of a

party's constitutional rights."  Dorce v. Wolf, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (cleaned

up); accord League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).  Second, an

injunction will do no more than maintain a status quo that has been in place for well over a

century.  The defendants have not even attempted to demonstrate how they or the public will be

harmed by continuing, for the duration of this action, to adhere to the interpretation of birthright

citizenship that has been consistently applied by the Executive Branch throughout that time

period—including under this President during his first term in office.

The scales tip decisively toward the plaintiffs.  Because all factors favor entry of

injunctive relief, the Court ends by explaining the appropriate parameters of such relief.

C.    Scope of Injunction

Both sets of plaintiffs ask the Court to universally enjoin the defendants from

implementing the EO.  That is, they seek an order that prevents the defendants from applying the

EO not only to them—to Doe, to members of the plaintiff associations, and to the State

plaintiffs—but at all, to anyone, anywhere.  Orders like those the plaintiffs seek here have

become "increasingly common" over the last twenty years.  Dep't of Homeland Sec. v. New

York, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring in grant of stay); see generally

Developments in the Law—District Court Reform: Nationwide Injunctions, 137 Harv. L. Rev.

1701, 1703-15 (2024) (quantifying rise in such injunctions and examining consequences).  That

trend raises meaningful concerns about the appropriate scope of a single district judge's

equitable powers.  See Trump v. Hawaii, 585 U.S. 667, 713-21 (2018) (Thomas, J., concurring)

(examining reasons to be "skeptical that district courts have the authority to enter universal

injunctions").

Alluding to such concerns, the defendants urge the Court to enter relief that is limited in scope. New Jersey, Doc. No. 92 at 49-50. Though the defendants have not proposed specific terms, two of the limitations they urge merit consideration.[23] First, the defendants argue "the Court should limit any relief to any party before it that is able to establish an entitlement to preliminary injunctive relief." Id. at 50. As explained above, the Court has concluded all plaintiffs are so entitled. But that conclusion does not alone justify relief that is universal in scope. The Court still must confront the general principle that injunctive relief should be tailored to the parties before it. Cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs"). Here, the Court finds this principle leads to different results for the two sets of plaintiffs.

For Doe and the members of the two plaintiff organizations, the record before the Court does not demonstrate that universal relief is necessary to "provide complete relief to," and protect the rights of, those parties. An injunction that prevents the defendants and their agents from implementing and applying the EO against Doe or any member of either plaintiff organization suffices to protect them from harm during the pendency of this lawsuit. The record does not establish how awarding similar relief to other persons or organizations that are not parties to this lawsuit is necessary to provide complete relief to the Doe plaintiffs.

---

[23] The third, which urges the Court to reject any facial challenge to the EO and require "individual as-applied challenges," can be rejected out of hand. The plaintiffs have advanced substantial facial challenges that the Court has deemed likely to succeed. The defendants do not explain how their third proposal, which is supported only by a citation to general language from a criminal case in which injunctive relief was not at issue, has anything to do with the scope of injunctive relief. See New Jersey, Doc. No. 92 at 50.

103a

Different considerations arise as to the State plaintiffs.  They have identified harms that do not hinge on the citizenship status of one child, or even of all children born within their borders.  The harms they have established stem from the EO's impact on the citizenship status— and the ability to discern or verify such status—for any child located or seeking various services within their jurisdiction.  For example, Massachusetts will suffer the identified harms not only if children born and living there are unlawfully denied citizenship, but also if a pregnant woman living in the northeastern part of the Commonwealth gives birth across the border in a nearby New Hampshire hospital, or if a family moves to Massachusetts from Pennsylvania (or any other state that has not joined this lawsuit) after welcoming a new baby.  These examples illustrate why injunctive relief limited to the State plaintiffs is inadequate.  In both, children born in states that are not parties to this lawsuit (such as New Hampshire and Pennsylvania) would theoretically lack birthright citizenship even after returning or moving to—and seeking various services in—a state that is among the plaintiffs here.

That result not only fails in providing complete relief to the State plaintiffs, but also risks creating a new set of constitutional problems.  See Saenz v. Roe, 526 U.S. 489, 500-04 (1999) (identifying as component of "right to travel" protected by Fourteenth Amendment "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State").  For the State plaintiffs, then, universal or nationwide relief is necessary to prevent them from suffering irreparable harm.  Cf. Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579-83 (2017) (narrowing in part but upholding in part injunction that protected nonparties similarly situated to the plaintiffs).

104a

Only one issue remains.  The defendants assert the Court may not enjoin the President.[24]
New Jersey, Doc. No. 92 at 50.  The Doe plaintiffs offer no response to this point, see generally
Doe, Doc. No. 33, but the State plaintiffs disagree in a footnote citing instances where executive
orders have been enjoined, see New Jersey, Doc. No. 123 at 15 n.8.  Assuming without deciding
that this Court is empowered to issue an injunction directly constraining the President's actions
in any set of circumstances, nothing in the record suggests such relief is necessary here.  The
President has signed the EO.  No further action by him is described by the EO or predicted by the
plaintiffs.  Other officers and agencies within the Executive Branch are responsible for
implementing the EO, and it is their conduct that the plaintiffs really seek to restrain.  Thus, for
purposes of the preliminary injunction, the relief will be awarded against all other defendants
besides the President, and against any other officers or agents acting on behalf of the President,
but not against the President himself.[25]

III.    CONCLUSION

"What the Constitution has conferred neither the Congress, nor the Executive, nor the
Judiciary, nor all three in concert, may strip away."  Nishikawa, 356 U.S. at 138 (Black, J.,
concurring).  Here, the Constitution confers birthright citizenship broadly, including to persons
within the categories described in the EO.  Under the plain language of the Citizenship Clause
and the INA provision that later borrowed its wording, and pursuant to binding Supreme Court
precedent, the Court concludes that the plaintiffs' constitutional and statutory challenges to the
EO are likely to prevail, the plaintiffs face serious and irreparable harm in the absence of relief,

---

[24] They also suggest the Court should dismiss the President as a defendant, New Jersey, Doc. No.
92 at 50, but a request like that is properly advanced in a motion (not an opposition brief), after
conferral and in compliance with the Local Rule governing motion practice in this Court.  See
generally L.R. 7.1.
[25] Should circumstances arise that merit reconsideration of this aspect of the injunction, the
plaintiffs may bring them to the Court's attention via an appropriate motion.

105a

the defendants face no cognizable harm from a preliminary injunction, and the public interest is served by preventing the implementation of a facially unconstitutional policy.

Accordingly, the plaintiffs' motions (<u>Doe</u>, Doc. No. 10, and <u>New Jersey</u>, Doc. No. 3) are ALLOWED as described herein.  Separate orders will issue in each case memorializing the preliminary injunctions entered by the Court.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

106a

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                        )
STATE OF NEW JERSEY et al.,             )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )      Civil No. 25-10139-LTS
                                        )
DONALD J. TRUMP et al.,                 )
                                        )
        Defendants.                     )
                                        )
```

<u>PRELIMINARY INJUNCTION</u>

February 13, 2025

SOROKIN, J.

For the reasons set forth in the Memorandum of Decision issued today, Doc. No. 144, the

plaintiffs' motion for preliminary injunction (Doc. No. 3) is ALLOWED.  As explained in the

Memorandum, the plaintiffs have advanced valid causes of action seeking equitable relief, and

they have standing to pursue such claims.  They also have demonstrated that each factor

governing their request for preliminary injunctive relief weighs strongly in their favor.  The

plaintiffs are likely to succeed on the merits of their claims under the Citizenship Clause and 8

U.S.C. § 1401, they are likely to suffer irreparable harm in the absence of relief, the balance of

harms tips overwhelmingly in their favor, and the public interest favors an injunction.

Additionally, the record establishes that universal relief is required in order to provide complete

relief to the eighteen states and two cities that have brought this case.

Accordingly, pursuant to Federal Rule of Civil Procedure 65(a), this Court ORDERS as

follows:

1. The United States Department of State, the Secretary of State, the United States
   Department of Homeland Security, the Secretary of Homeland Security, the United States
   Department of Health and Human Services, the Acting Secretary of Health and Human
   Services, the United States Social Security Administration, the Acting Commissioner of
   Social Security, and all officers, agents, employees, attorneys, and any other persons
   acting in concert with or behalf of any named defendant in this action (including agents,
   employees, and other representatives of President Donald J. Trump), are ENJOINED
   from implementing and enforcing Executive Order No. 14,160, "Protecting the Meaning
   and Value of American Citizenship."

2. No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the
   circumstances of this case, where the plaintiffs seek to vindicate an important
   constitutional and federal statutory right, and the injunction will not expose the
   defendants to financial loss. See da Silva Medeiros v. Martin, 458 F. Supp. 3d 122, 130
   (D.R.I. May 1, 2020) (citing Crowley v. Loc. No. 82, 679 F.2d 978, 1000-01 (1st Cir.
   1982)).

3. This preliminary injunction shall take effect immediately upon the docketing of this
   Order and shall remain in effect until the entry of judgment in this matter, unless this
   Court, the United States Court of Appeals for the First Circuit, or the United States
   Supreme Court order otherwise.

                                        SO ORDERED.


                                         /s/ Leo T. Sorokin
                                        United States District Judge

108a

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
STATE OF NEW JERSEY et al.,         )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )        Civil No. 25-10139-LTS
                                    )
DONALD J. TRUMP et al.,             )
                                    )
        Defendants.                 )
_____     )

ORDER ON MOTION TO STAY PRELIMINARY
INJUNCTION PENDING APPEAL (DOC. NO. 157)

February 26, 2025

SOROKIN, J.

        The defendants have appealed this Court's order preliminarily enjoining implementation
of President Donald Trump's Executive Order redefining birthright citizenship in the United
States.  Doc. No. 154.  They now seek an order staying the preliminary injunction until their
appeal is resolved.  Doc. Nos. 157, 158.  The plaintiffs have opposed the defendants' motion in a
thoughtful and persuasive memorandum.  Doc. No. 160.  Though the Court permitted the
defendants an opportunity to reply, see Doc. No. 159 (setting deadline of February 25, 2025),
they have not done so.  For reasons the Court will briefly explain, the defendants' motion for a
stay (Doc. No. 157) is DENIED.

        The standard applicable to the defendants' request requires consideration of essentially
the same four equitable factors that governed the plaintiffs' original motion.  See Doc. No. 158 at
3 (describing standard); Doc. No. 160 at 3 (same).  As the Court explained in detail in its recent
Memorandum Decision, those factors favor the plaintiffs here.  See generally Doc. No. 144.  And,

109a

as the Court also made clear, this was not a close case. The equitable scale did not tip ever so slightly in the plaintiffs' direction; the four factors favor the plaintiffs lopsidedly. That was so in the preliminary-injunction analysis, where the plaintiffs bore a high burden of persuasion and decisively satisfied it. If the defendants could not succeed in that context, then they certainly cannot prevail now. On the present motion, the burden shifts to the defendants to establish entitlement to the extraordinary relief they seek, and they have endeavored to meet it primarily by repastinating the same facts and legal theories the Court has already considered and rejected.

Challenges to the plaintiffs' standing, the nationwide scope of the injunction, and the evaluation of irreparable injury fail for reasons the Court has already explained and the plaintiffs ably address in their opposition memorandum. See Doc. No. 144 at 8-11, 13, 24-29; Doc. No. 160 at 4-15. The only new issue raised by the defendants concerns the scope of conduct enjoined by the prohibition on "implementation" of the Executive Order. See Doc. No. 158 at 7. The defendants did not address this nuance in their earlier papers, nor is it meaningfully developed in the single paragraph they devote to it now. Id. For example, the defendants have not identified what "internal steps" they wish to take, but are prevented from taking, by the plain terms of the injunction. Thus, the Court cannot evaluate whether such steps would or should be foreclosed and what harms may flow from their temporary prohibition. When asked at the preliminary-injunction hearing about this issue, the defendants' lawyer was "not able to answer questions about implementation." Doc. No. 142 at 61. On this issue, then, the motion to stay is denied both for failure to specify what changes the defendants propose making to the injunction and because, as the plaintiffs point out, the Executive Order itself contemplates "implementation" within a relatively brief, thirty-day period.

110a

      "To say more would be to paint the lily." <u>Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.</u>, 126 F.4th 773, 783 (1st Cir. 2025) (Selya, J.).  The defendants' motion for a stay (Doc. No. 157) is DENIED.

                    SO ORDERED.

                     /s/ Leo T. Sorokin
                   United States District Judge

# United States Court of Appeals
## For the First Circuit

---

No. 25-1170

STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF
MAINE; STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL, on
behalf of the People of Michigan; STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH
CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF
WISCONSIN; CITY AND COUNTY OF SAN FRANCISCO,

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the
United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his
official capacity as Secretary of State; U.S. DEPARTMENT OF
HOMELAND SECURITY; KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity
as Secretary of Health and Human Services; U.S. SOCIAL SECURITY
ADMINISTRATION; LELAND DUDEK, in his official capacity as Acting
Commissioner of Social Security; UNITED STATES OF AMERICA,

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

---

Before

Barron, Chief Judge,
Rikelman and Aframe, Circuit Judges.

---

112a

Yaakov M. Roth, Acting Assistant Attorney General, Eric D. McArthur, Deputy Assistant Attorney General, Mark R. Freeman, Sharon Swingle, Brad Hinshelwood, and Derek Weiss, Attorneys, Appellate Staff, U.S. Department of Justice, on brief for appellants.

Jonathan Skrmetti, Attorney General & Reporter, J. Matthew Rice, Solicitor General, and Whitney D. Hermandorfer, Director of Strategic Litigation, on brief for State of Tennessee, amicus curiae.

R. Trent McCotter, Boyden Gray PLLC, Daniel Z. Epstein, America First Legal Foundation, George W. Vien, Pietro A. Conte, and Donnelly, Conroy & Gelhaar, LLP on brief for Members of Congress, amici curiae.

William J. Olson, Jeremiah L. Morgan, William J. Olson, P.C., Jeffrey C. Tuomala, Rick Boyer, and Integrity Law Firm on brief for America's Future, Gun Owners of America Inc., Gun Owners Foundation, Citizens United, U.S. Constitutional Rights Legal Defense Fund, Leadership Institute, and Conservative Legal Defense and Education Fund, amici curiae.

Judd E. Stone II, Christopher D. Hilton, Ari Cuenin, Cody C. Coll, Stone Hilton PLLC, Daniel Z. Epstein, and America First Legal Foundation on brief for Former National Security Official Joshua Steinman, amicus curiae.

Matthew J. Platkin, Attorney General of New Jersey, Viviana M. Hanley, Deputy Attorney General, Jeremy M. Feigenbaum, Solicitor General, Shankar Duraiswamy, Deputy Solicitor General, Andrea Joy Campbell, Attorney General of Massachusetts, Gerard J. Cedrone, Deputy State Solicitor, Jared B. Cohen, Assistant Attorney General, Rob Bonta, Attorney General of California, Denise Levey, Deputy Attorney General, Michael L. Newman, Senior Assistant Attorney General, Marissa Malouff, Irina Trasovan, Supervising Deputy Attorneys General, Lorraine López, Delbert Tran, Annabelle Wilmott, Deputy Attorneys General, Christopher D. Hu, Deputy Solicitor General, Phil Weiser, Attorney General of Colorado, Shannon Stevenson, Solicitor General, William M. Tong, Attorney General of Connecticut, Janelle Rose Medeiros, Assistant Attorney General, Brian L. Schwalb, Attorney General for the District of Columbia, Caroline S. Van Zile, Solicitor General, Jeremey R. Girton, Assistant Attorney General, Kathleen Jennings, Attorney General of Delaware, Vanessa L. Kassab, Deputy Attorney General, Anne E. Lopez, Attorney General of Hawai'i, Kaliko'onālani D. Fernandes, Solicitor General, Aaron M. Frey, Attorney General of Maine, Thomas A. Knowlton, Assistant Attorney General, Dana Nessel, Attorney General of Michigan, Toni L. Harris, Neil Giovanatti, Stephanie M. Service, Assistant Attorneys General, Anthony G. Brown, Attorney General of Maryland, Adam D. Kirschner, Senior Assistant Attorney General, Keith Ellison,

Attorney General of Minnesota, <u>John C. Keller</u>, Chief Deputy Attorney General, <u>Aaron D. Ford</u>, Attorney General of Nevada, <u>Heidi Parry Stern</u>, Solicitor General, <u>Letitia James</u>, Attorney General of New York, <u>Matthew William Grieco</u>, Senior Assistant Solicitor General, <u>Ester Murdukhayeva</u>, Deputy Solicitor General, <u>Raúl Torrez</u>, Attorney General of New Mexico, <u>James W. Grayson</u>, Chief Deputy Attorney General, <u>Jeff Jackson</u>, Attorney General of North Carolina, <u>Daniel P. Mosteller</u>, Associate Deputy Attorney General, <u>Peter F. Neronha</u>, Attorney General of Rhode Island, <u>Katherine Connolly Sadeck</u>, Solicitor General, <u>Joshua L. Kaul</u>, Attorney General of Wisconsin, <u>Gabe Johnson-Karp</u>, Assistant Attorney General, <u>Charity R. Clark</u>, Attorney General of Vermont, Julio A. Thompson, Co-Director, Civil Rights Unit, <u>David Chiu</u>, City Attorney of San Francisco, and <u>David S. Louk</u>, Deputy City Attorney, on brief for appellees.

───────────────

March 11, 2025

───────────────

114a

**BARRON**, **Chief Judge**.    Defendants-Appellants ("the Government") move for a stay pending appeal of a February 13, 2025 order by the United States District Court for the District of Massachusetts.[1]  The District Court's order granted a "universal" preliminary injunction to eighteen states ("Plaintiff-States"), including Massachusetts,[2] in their suit challenging the enforcement of Executive Order No. 14,160.

Titled "Protecting the Meaning and Value of American Citizenship" ("Executive Order"), Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025), the Executive Order limits, in two circumstances, the persons whom federal officials may recognize as having United States citizenship based on having been born in the United States.  The first circumstance is "when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at

---

[1] The following movants have moved for leave to file an amicus (or amici) curiae brief in support of the Government's motion for a stay pending appeal: the State of Tennessee; 18 Members of Congress who serve on the Committee on the Judiciary of the U.S. House of Representatives; America's Future, Gun Owners of America, Gun Owners Foundation, Citizens United, U.S. Constitutional Rights Legal Defense Fund, Leadership Institute, and Conservative Legal Defense and Education Fund; and Former National Security Official Joshua Steinman.  We grant those motions, and the proposed briefs are accepted as filed.  We have considered the amicus briefs only insofar as they concern legal issues and positions raised by the parties.  See Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 33 n.10 (1st Cir. 2020).

[2] The District of Columbia and the City of San Francisco also are plaintiffs.

115a

the time of said person's birth." Id.  The second circumstance is "when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." Id.

The complaint alleges that the Executive Order violates the Citizenship Clause of the Fourteenth Amendment to the United States Constitution, which provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1.  The complaint also alleges that the Executive Order violates 8 U.S.C. § 1401, which provides that "a person born in the United States, and subject to the jurisdiction thereof" "shall be . . . [a] citizen[] of the United States at birth."  The complaint names as the defendants the President, the Secretary of State, the Secretary of Homeland Security, the Secretary of Health and Human Services, the Commissioner of the Social Security Administration, the corresponding agencies, and the United States of America.

The Plaintiff-States moved for a preliminary injunction on January 21, 2025.  The District Court's order granting the motion enjoined all the officials named as defendants, but not the President, as well as all others "acting in concert with or on

116a

behalf of any named defendant in this action" from "implementing and enforcing" the Executive Order.[3]

We do not address the Government's appeal of the preliminary injunction itself. We address only the Government's stay motion, which asks us to decide whether the District Court's order granting a preliminary injunction should be stayed while this court takes up an interlocutory appeal of that injunction. Based on the arguments that the Government presents in support of the stay motion, we deny it.[4]

I.

A preliminary injunction is an "extraordinary remedy." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To

---

[3] The District Court reasoned that "directly constraining the President's actions" was not necessary to provide relief to the Plaintiff-States, as "[o]ther officers and agencies within the Executive Branch are responsible for implementing the [Executive Order], and it is their conduct that the plaintiffs really seek to restrain."

[4] The District Court also issued a preliminary injunction in the companion case of Doe et al. v. Trump et al., No. 25-cv-10135, which involved only private plaintiffs and organizations. That injunction did not provide relief to "other persons or organizations that are not parties to [that] lawsuit." The Government has appealed that injunction but has not moved for a stay pending appeal of that injunction. We note too that the Ninth Circuit recently denied the Government's motion for a partial stay pending appeal of an order granting a nationwide preliminary injunction to four states in their challenge to the Executive Order. See Washington v. Trump, No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025). The Fourth Circuit did the same in a case brought by private parties. See Casa, Inc. v. Trump, No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025).

117a

obtain this relief, a plaintiff "must establish" that: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." Id. at 20.  In addition, a plaintiff seeking a preliminary injunction "must make a 'clear showing' that [it] is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quoting Winter, 555 U.S. at 22).  A grant of a preliminary injunction is reviewed for abuse of discretion. Ashcroft v. ACLU, 542 U.S. 656, 664 (2004) (citation omitted).

The District Court determined that the Plaintiff-States met their burden of showing that they were likely to succeed in establishing their standing to challenge the Executive Order.  It also determined that the Plaintiff-States showed that they were likely to succeed in establishing that the Executive Order violated the Citizenship Clause of the Fourteenth Amendment and 8 U.S.C. § 1401.  The District Court next determined that the Plaintiff-States showed that they would suffer irreparable harm in the absence of their requested injunction based on the Plaintiff-States' declarations "detailing the imminent and damaging impacts they anticipate will flow from the [Executive Order]."  Finally, the District Court determined that the "[b]alance of [h]arms" and the "[p]ublic [i]nterest" supported the

118a

injunction's issuance because "the [G]overnment has no legitimate interest in pursuing unconstitutional agency action" and "an injunction [would] do no more than maintain a status quo that has been in place for well over a century."[5]  With respect to the "universal" aspect of the preliminary injunction, the District Court explained that such relief was "necessary because the record establishes that the harms these plaintiffs face arise not only from births within their borders, but also when children born elsewhere return or move to one of the plaintiff jurisdictions."

The Government filed a notice of appeal of the District Court's preliminary injunction order on February 19, 2025.  On the same day, it filed a motion in the District Court to stay the preliminary injunction pending appeal.  See Fed. R. App. P. 8(a)(1)(A) ("A party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal.").

The District Court denied the stay motion on February 26, 2025, explaining that "[t]he standard applicable to the defendants' [stay] request requires consideration of essentially the same four equitable factors that governed the plaintiffs' original motion."  The District Court reasoned that

---

[5] The District Court noted that the parties both agree that 8 U.S.C. § 1401 and the Citizenship Clause of the Fourteenth Amendment are "coterminous."  The Government does not seek to distinguish between them in its stay motion to us.

- 8 -

"[i]f the defendants could not succeed in that context, then they certainly cannot prevail now" because "[o]n the [stay] motion, the burden shifts to the defendants to establish entitlement to the extraordinary relief they seek." The Government filed this motion for a stay pending appeal on February 27, 2025. This court set an expedited briefing schedule.

## II.

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right." Nken v. Holder, 556 U.S. 418, 427 (2009) (internal quotation marks omitted). Thus, the party seeking a stay -- here, the Government -- bears the burden of proving that the circumstances justify one. Id. at 433-34. To meet that burden, the Government must: (1) make a "strong showing that [it] is likely to succeed on the merits" in its appeal; (2) show that it "will be irreparably injured absent a stay"; (3) show that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) show that the stay would be in "the public interest." Id. at 434. "The first two factors . . . are the most critical." Id.

In evaluating these factors, we are mindful that "[t]he ability to grant interim relief is . . . a means of ensuring that appellate courts can responsibly fulfill their role in the judicial process." Id. at 427. But we are also aware of the "tight

timeline" for resolving applications for interim relief, which is "not always optimal for orderly judicial decisionmaking." Labrador v. Poe, 144 S. Ct. 921, 930 (2024) (Kavanaugh, J., concurring in the grant of stay). That makes it especially important for us to keep in mind that as the "neutral arbiter of matters the parties present," we "rely on the parties to frame the issues for decision," Greenlaw v. United States, 554 U.S. 237, 243 (2008), given our reluctance to definitively opine on issues for which we have been deprived of "the benefit of vigorous adversarial testing," Abernathy v. Wandes, 713 F.3d 538, 552 (1st Cir. 2013) (citing Hill v. Kemp, 478 F.3d 1236, 1251 (10th Cir. 2007)).

The Government expressly declines to make any developed argument that it is likely to succeed on appeal in showing that the Executive Order is either constitutional or compliant with 8 U.S.C. § 1401. Nor does the Government contest that, for more than a century, persons in the two categories that the Executive Order seeks to prevent from being recognized as United States citizens have been so recognized. Instead, the Government contends that it can make the requisite showing for a stay of the preliminary injunction even without developing an argument to us that the Executive Order is lawful and even though the enforcement of the Executive Order would dramatically break with the Executive Branch's longstanding legal position and thereby disrupt longstanding governmental practices. See, e.g., Legis. Denying

Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340, 340-47 (1995). The Government's chief contention in so arguing is that, as to the first <u>Nken</u> factor, it has made a "strong showing" that the Plaintiff-States likely lack standing both under Article III of the U.S. Constitution, <u>see</u> U.S. Const. art. III, § 2, cl. 1 (providing that the "judicial Power shall extend" to all "Cases" and "Controversies"), and under third-party standing principles. As we will explain, we conclude that, at least given its arguments in its stay motion, the Government has not made a "strong showing" to undermine the Plaintiff-States' standing in either respect. We further conclude that it has not met its burden as to the other <u>Nken</u> factors.

**A.**

In seeking the preliminary injunction, the Plaintiff-States contended, and the District Court agreed, that they were likely to establish that they had Article III standing based on a number of distinct kinds of injuries traceable to the enforcement of the Executive Order. The Plaintiff-States' contentions in this regard included that they likely could show that the enforcement of the Executive Order would "directly" cause the Plaintiff-States the "loss of federal . . . funds" that they otherwise would receive for administering federal programs that provide healthcare, education for special needs youth, child welfare, and the Social Security Administration's Enumeration at

Birth program ("EAB").[6]  The Plaintiff-States relied on both Department of Commerce v. New York, 588 U.S. 752 (2019), and Biden v. Nebraska, 143 S. Ct. 2355 (2023), as support for this contention.

The asserted pocketbook injuries in Department of Commerce and Biden did take the form of a loss of federal funds to which the plaintiff-states in those cases would have been entitled absent the challenged federal governmental action.  See Dep't of Com., 588 U.S. at 766-67; Biden, 143 S. Ct. at 2366.  However, the Government's stay motion to us, like its opposition to the motion for the preliminary injunction, makes no reference to either precedent.  Its stay motion thus does not address how those precedents bear on the Plaintiff-States' Article III standing insofar as their injury-in-fact is premised on the loss of the federal funding itself.

The Government, in its reply to the Plaintiff-States' opposition to the stay motion, finally addresses Biden -- but still not Department of Commerce.  In Biden, one of the plaintiff-states there claimed a fiscal injury based on the loss of loan servicing

---

[6] The EAB program provides a mechanism -- facilitated by states, including Plaintiff-States -- for newborns to apply for Social Security Numbers ("SSNs").  Even though eligible noncitizens (in addition to U.S. citizens) may apply for SSNs, the EAB program is only open to U.S. citizens by birth.  See Soc. Sec. Admin., Pub No. 05-10023, Social Security Numbers for Children (2024), ssa.gov/pubs/EN-05-10023.pdf.  States that administer the EAB program receive a service fee for each SSN issued.

123a

fees that a corporation that it controlled would have received absent the Executive Branch's forgiveness of certain federal student loans.  143 S. Ct. at 2365-66.  The Government contends that Biden only held that this asserted financial injury was "concrete" and incurred by the state and so did not address whether the injury was "too attenuated" to establish standing.  But Biden held not just that the loss of loan servicing "fees that [the state-controlled corporation] otherwise would have earned" was a concrete injury, but also that it "[was] an injury in fact directly traceable to the [challenged government action]."  143 S. Ct. at 2366 (emphasis added).

The Government relies principally in its stay motion on the analysis in a footnote in United States v. Texas, 599 U.S. 670, 680 n.3 (2023), concerning the attenuated nature of the injury there, to contend that the Plaintiff-States likely cannot show a pocketbook injury for purposes of Article III standing.  The plaintiff-states in Texas -- unlike the plaintiffs in Department of Commerce and Biden who successfully established their standing -- did not allege that the challenged federal government action would result in their being denied federal funds to which they otherwise would be entitled.  Id. at 674.  In asserting a pocketbook injury, the plaintiff-states in Texas instead pointed to the additional state funds that they alleged that they would expend in response to the federal government's assertedly unlawful

124a

under-regulation of third parties, which the plaintiff-states contended would cause more undocumented noncitizens to be within their states than otherwise would be the case. Id. at 674-75. Thus, given how different Texas is not only from this case but also from Biden and Department of Commerce, the portion of the standing analysis in Texas on which the Government relies provides no basis for us to conclude that it has made the required "strong showing" to undermine the Plaintiff-States' Article III standing.[7]

The Government does also invoke in its stay motion an out-of-circuit precedent, Washington v. FDA, 108 F.4th 1163 (9th Cir. 2024), for the general proposition that an "indirect" fiscal injury does not constitute an Article III injury. One of the state plaintiffs in Washington claimed economic injury in the form of increased costs to the state's Medicaid system, and the court there determined that the claimed injury "depend[ed] on an attenuated chain of healthcare decisions by independent actors." Id. at 1174; see also id. at 1170-71 (explaining Idaho's contention that the FDA's elimination of an in-person dispensing requirement for a particular medication would lead to increased use of that

---

[7] Texas also emphasized that the challenged under-regulation in that case involved the "Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute," and that "a party 'lacks a judicially cognizable interest in the prosecution . . . of another.'" 599 U.S. at 677 (alteration in original) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973)). No such concern is presented here.

medication, which in turn would lead "more women [to] experience complications that require follow-up care, some of which [will be] borne by Idaho through Medicaid expenditures" (second alteration in original) (internal quotation marks omitted)). In other words, as in Texas, the asserted injury took the form of the additional state funds that the plaintiff-state claimed that it would spend as a result of the federal government's lack of regulation of a third party -- namely, the U.S. Food and Drug Administration's elimination of an in-person dispensing requirement for a medication. See id. at 1174. This precedent thus no more assists the Government's position with respect to the loss-of-federal-funds-based injury at issue here than Texas does.

      The Government separately contends in its stay motion, without reference to either Department of Commerce or Biden, that if the Plaintiff-States' alleged injury from the loss of fees from the Social Security Administration's EAB program sufficed for Article III standing, then states would "equally have standing to challenge any federal action that conceivably lowers the birthrate within their borders." (Emphasis added). But, although "qualifying for less federal funding" is "primarily [a] future injur[y]," it can still be an Article III injury when "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Dep't of Com., 588 U.S. at 767 (emphasis added) (quoting Susan B. Anthony List v. Driehaus, 573

126a

U.S. 149, 158 (2014)).  Yet, the Government does not explain why the loss of the EAB servicing fees differs from the loss of the loan servicing fees in Biden, which loss was held to be an Article III injury.  143 S. Ct. at 2365-66.

The Government more broadly contends in its stay motion that because the Plaintiff-States have "voluntarily chosen to provide certain benefits without regard to the recipient's citizenship," "the costs they incur to do so are self-inflicted costs" that "are not traceable to the Executive Order" and thus "do not confer standing to sue in federal court."  In doing so, the Government appears to contend that the Plaintiff-States have no claimed injuries that are immune from this "self-inflicted costs" objection.  But, insofar as this contention is a reprise of the argument based on Texas and Washington, it fails for the same reasons as that argument fails.  And, in any event, the Government has not explained why -- and so has not made a "strong showing" that -- it is likely to succeed in establishing that the Plaintiff-States' claimed fiscal injury is the result of their "voluntary" choice to spend their own funds insofar as that injury is the loss of federal funds to which they otherwise would be entitled for administering the federal programs at issue.  After all, Biden did not deem the plaintiff-state's loss of the fees for servicing federal student loans to be the result of such a choice by the plaintiff and thus not a basis for its Article III standing.

See 143 S. Ct. at 2365-66.  Nor did <u>Department of Commerce</u> so deem the loss of federal funds there.  588 U.S. at 766-67.

We thus conclude that the Government has failed to make a "strong showing" that the Plaintiff-States likely lack Article III standing.[8]

**B.**

The Government separately contends in its stay motion to us that it can make a "strong showing" that the Plaintiff-States likely cannot satisfy third-party standing requirements even if they have Article III standing.  The Government first relies on

---

[8] In addressing the Plaintiff-States' claim that they likely had Article III standing, the District Court reasoned that the Plaintiff-States "very likely . . . have sovereign interests in which persons are U.S. citizens, as state laws commonly define civic obligations such as jury service using eligibility criteria that include U.S. citizenship."  The Plaintiff-States also allege an Article III injury based on the administrative costs associated with updating their citizenship verification systems.  We need not resolve whether either the Plaintiff-States' sovereign interests or administrative burdens provide alternative bases for their Article III standing, because we conclude that the Government has not made the requisite "strong showing" to undermine the Plaintiff-States' claimed injury from the loss of federal funds. We will have time enough to address the questions concerning those asserted injuries, if necessary, in connection with the appeal of the preliminary injunction itself.  The Government does contend that if such administrative burdens sufficed for Article III standing, then states would have standing to challenge "any change in the federal government's policies . . . [that] would affect eligibility for federal programs."  The Government does not contend, however, that the same concern applies insofar as the Plaintiff-States predicate their Article III standing on the claimed loss of federal funds -- nor is it evident why, in the face of <u>Biden</u> and <u>Department of Commerce</u>, that concern would be well-taken.

128a

Warth v. Seldin, 422 U.S. 490 (1975), and Kowalski v. Tesmer, 543
U.S. 125 (2004), for the proposition that a plaintiff "must assert
his own legal rights and interests," 422 U.S. at 499, and that a
constitutional claim should be brought by the person "at whom the
constitutional protection is aimed," 543 U.S. at 129 (quoting Sec'y
of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955 n.5
(1984)).  It thus contends that the Plaintiff-States may not rely
on either the Citizenship Clause of the Fourteenth Amendment or 8
U.S.C. § 1401 to challenge the Executive Order, as individuals
rather than states hold the right of birthright citizenship that
those provisions guarantee.

      In the proceedings in the District Court, however, the
Government did not mention, cite to, or otherwise address the
portion of Kowalski that recognized that "[i]n several cases, [the
Supreme Court] has allowed standing to litigate the rights of third
parties when enforcement of the challenged restriction against the
litigant would result indirectly in the violation of third parties'
rights." 543 U.S. at 130 (quoting Warth, 422 U.S. at 510).  And
the Government did not do so even though the Supreme Court has
explained after Kowalski that it has "generally permitted
plaintiffs to assert third-party rights in cases" where the
above-mentioned condition in Kowalski is met.  June Med. Servs.
L.L.C. v. Russo, 591 U.S. 299, 318 (2020) (citing Kowalski, 543
U.S. at 130).  Nor does the Government's stay motion address this

possible ground for the Plaintiff-States' securing so-called third-party standing. Instead, the motion merely once again asserts that "[t]he [Plaintiff-States] need to allege fiscal injuries because the Executive Order violates their own rights, not just fiscal injuries resulting from an order which, they allege, unlawfully violates someone else's rights."

For the first time in its reply to the Plaintiff-States' opposition to the stay motion, the Government addresses this aspect of Kowalski. It does so by asserting that what it terms this "exception" to the general rule applies only to "parties facing sanctions, criminal convictions, or civil penalties," and cites Craig v. Boren, 429 U.S. 190, 193 (1976), for this proposition. Even if we were to excuse the belated nature of the contention, see Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief."); June Medical, 591 U.S. at 316-18 (arguments challenging third-party standing may be waived), Craig does not so hold, and the Government does not point to any case that does. In fact, Craig observed that the litigant faced the possibility of "incurring a direct economic injury through the constriction of . . . [the] market," and that "such injuries establish the threshold requirements of" Article III standing. 429 U.S. at 194. Furthermore, the

Government ignores the fact that June Medical, 591 U.S. at 318-19, in recognizing this ground for asserting third-party rights, cited to Barrows v. Jackson, 346 U.S. 249 (1953), in which the Supreme Court allowed a litigant facing a "direct, pocketbook injury" in the form of a civil suit seeking damages for the litigant's alleged breach of a racially restrictive covenant to assert a third party's equal protection rights as a defense against that suit, id. at 251-52, 256. Thus, the Government still fails to explain why limitations on third-party standing bar the Plaintiff-States from relying on the Citizenship Clause and 8 U.S.C. § 1401 to challenge the Executive Order based on the logic that "enforcement of the challenged restriction against [them] would result indirectly in the violation of [the] rights [of those individuals excluded from citizenship by the Executive Order]." June Med. Servs., 591 U.S. at 318 (quoting Kowalski, 543 U.S. at 130).

Indeed, under the Executive Order, to achieve the "[p]urpose" of ensuring that "the privilege of United States citizenship does not automatically extend to persons born in the United States" in certain circumstances described above, "no department or agency of the United States government shall . . . accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" for such persons. 90 Fed. Reg. 8449. Thus, in directly operating as to the Plaintiff-States, and not the

131a

individuals excluded from citizenship, the Executive Order causes the Plaintiff-States to lose federal funds but nonetheless has the indirect effect of preventing the individuals from obtaining federally funded services based on their U.S. citizenship. As a result, the Government in seeking the stay from us, as in its filings in the District Court, simply does not engage with whether the enforcement of the challenged governmental action against the Plaintiff-States would result "indirectly" in the violation of the individuals' rights under the Citizenship Clause and 8 U.S.C § 1401. June Med. Servs., 591 U.S. at 318 (quoting Kowalski, 543 U.S. at 130).

The Government also cites to South Carolina v. Katzenbach, 383 U.S. 301 (1966), Haaland v. Brackeen, 599 U.S. 255 (2023), and Murthy, 603 U.S. 43, for the proposition that states may not "assert[] derivative injuries from the alleged violations of other individuals' rights." But Katzenbach held only that states could not bring parens patriae actions against the federal government, see 383 U.S. at 323-24, which is not a theory of standing on which the Plaintiff-States rely. And while it is true that Brackeen, 599 U.S. at 295 n.11, and Murthy, 603 U.S. at 76, denied the plaintiff-states' assertions of third-party standing in those cases as "thinly veiled attempt[s] to circumvent the limits on parens patriae standing," the Court did so because the plaintiff-states there did not successfully allege a concrete

Article III injury -- which, for reasons explained above, the Government has failed to make a "strong showing" is likely the case here.  Furthermore, in those cases, there was no sense in which enforcement of the challenged governmental action against the plaintiff-states "indirectly" resulted in the violation of the constitutional rights held by individuals.  June Med. Servs., 591 U.S. at 318 (citing Kowalski, 543 U.S. at 130).

Thus, we do not see how the Government has made, through its arguments to us, a "strong showing" that it is likely to prevail in its contention that the Plaintiff-States do not have standing to assert the federal constitutional and statutory rights to United States citizenship of the individuals who would not be recognized as having such citizenship under the Executive Order.[9]

**c.**

The Government's failure to make a "strong showing" to undermine the Plaintiff-States' standing -- and thus as to the first Nken factor -- adversely impacts the arguments that it makes about what it describes as the "remaining" Nken factors.  As to the second and fourth Nken factors -- whether the Government "will

---

[9] We note that the Government does not make any independent argument that the Plaintiff-States either fall outside the "zone of interest" of, or fail to invoke a valid cause of action with respect to, the rights asserted under 8 U.S.C. § 1401 and the Citizenship Clause of the Fourteenth Amendment.  Cf. INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor, 510 U.S. 1301, 1305 (1993) (O' Connor, J., in chambers).

be irreparably injured absent a stay" and whether the stay would be in "the public interest" -- the Government contends that they "merge" when the Government is the party seeking a stay of a preliminary injunction against it.  Nken, 556 U.S. at 435.  The Government contends that is so because any injunction that "prevents the President from carrying out his broad authority over and responsibility for immigration matters" results in irreparable harm to it and thus the public interest.  But the precedent to which the Government cites in support of its argument for satisfying its burden as to these two factors found such an injunction to be "an improper intrusion by a federal court into the workings of a coordinate branch of the Government" only because the Government had shown that the plaintiffs likely "had no standing to seek the order entered by the District Court."  INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor, 510 U.S. 1301, 1305-06 (1993) (O' Connor, J., in chambers).  As we have just explained, the Government has not made a "strong showing" that the Plaintiff-States are likely to fail in establishing their standing.  In addition, as we noted at the outset, the Government has not made any developed argument in support of its stay motion that it is likely to succeed in showing that the Executive Order is lawful.

The Government relatedly argues that the injunction is "especially harmful" because "the challenged Executive Order is an

integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border." Because the Government has not made a "strong showing" that it is likely to succeed in showing either that the lower court had no power to enter an injunction or that the enjoined conduct was lawful, we do not see how this contention can suffice to show that the Government has met its burden as to the irreparable harm and public interest factors any more than the contention just considered could do so.

We note, too, to the extent that we must consider "irreparable injury to the parties or to the public resulting from the premature enforcement of a determination which may later be found to have been wrong" in assessing the public interest, Scripps-Howard Radio v. FCC, 316 U.S. 4, 9 (1942) (emphasis added), we must consider how the interests of the broader public are affected by "premature enforcement" of the determination in the Executive Order regarding who is entitled to be recognized as a U.S. citizen. The risks that this determination may later be deemed wrong are high, given that the Government does not argue to us that the Executive Order likely complies with either federal constitutional or federal statutory law. And, understandably, the Government does not dispute that the public has a substantial interest in ensuring that those entitled to be recognized as U.S. citizens under the criteria on which officials at all levels of

government have long relied are not unlawfully deprived of that recognition. So, as to the first two <u>Nken</u> factors -- which are the most critical ones -- and the fourth <u>Nken</u> factor, the Government has not met its burden.

With respect to the third <u>Nken</u> factor -- whether the "issuance of the stay will substantially injure the other parties interested in the proceeding" -- the Government also bears the burden as the party seeking the stay. <u>See</u> <u>Nken</u>, 556 U.S. at 433-34. To meet it, the Government contends that the Plaintiff-States "have failed to show that any such injuries occurring between now and final judgment would be irreparable." That is so, the Government contends, because the Plaintiff-States have failed to demonstrate that any loss of federal funds "could not be recovered through submission of claims after final judgment or through the administrative procedures applicable to those programs" and "requiring exhaustion of claims through an administrative process that could result in payment of contested claims [does not] constitute irreparable harm."

In its motion for a stay to the District Court, however, the Government did not make this contention, which, we note, also does not address the significant additional burdens that the District Court identified in finding that the Plaintiff-States would suffer irreparable harm in the absence of preliminary injunctive relief to redress their Article III injury. <u>Cf.</u>

136a

Acevedo-García v. Vera-Monroig, 296 F.3d 13, 17-18 (1st Cir. 2002)
(declining to consider arguments raised for first time in this
court in support of stay pending appeal of preliminary injunction).
This waiver aside, we note that the Plaintiff-States asserted
during the preliminary injunction proceedings below that, even
after final judgment in this litigation, they would not be able to
recoup the lost EAB servicing fees if families do not obtain an
SSN at birth through the EAB program, cf. Biden, 143 S. Ct. at
2366, and the Government does not contend otherwise. Furthermore,
with respect to other federal funds that the Plaintiff-States
assert enforcement of the Executive Order would cause them to lose,
the Government does not, in attempting to meet its burden as to
the third Nken factor, explain how the Plaintiff-States could
recoup those funds after final judgment. Nor does the Government
address the Plaintiff-States' assertion that any administrative
proceedings applicable to the recoupment of these funds would be
unable to adjudicate constitutional challenges to the eligibility
criteria for those funds.

    While the Government separately contends with respect to
the third Nken factor that the alleged harms to the
Plaintiff-States will occur "years in the future," it does so for
the first time in its reply to the Plaintiff-States' opposition to
the motion for the stay. See Sparkle Hill, 788 F.3d at 29.
Moreover, the Government does not grapple with declarations

137a

submitted by the Plaintiff-States in the preliminary injunction proceedings that show that the loss of federal funds for healthcare insurance and the loss of fees from the EAB program would occur immediately upon the birth of any newborns who would not be recognized as U.S. citizens if the Executive Order were enforced. Thus, the Government has not shown that it has met its burden with respect to the third Nken factor, insofar as it seeks to meet that burden by challenging the District Court's determination that the Plaintiff-States had established that they would suffer irreparable harm in the absence of their requested relief. We therefore conclude that the Government has failed to meet its burden as to the third Nken factor, just as it has failed to meet its burden with respect to the other Nken factors.

### III.

The Government separately contends that, under the Nken factors, it is at least entitled to a stay pending appeal of the preliminary injunction as to its nationwide application. In opposing the Plaintiff-States' request for a nationwide preliminary injunction, however, the Government made only the broad argument -- not now asserted -- that the District Court lacked the authority to enjoin the Government's conduct toward any nonparties because district courts necessarily lack the power to enjoin nonparties. Then, in seeking a stay as to the nationwide aspect of the injunction in front of the District Court, the

138a

Government did not repeat that categorical contention. It instead argued that a court abuses its discretion when it issues an injunction that is not necessary to provide "complete relief to the plaintiff[s]," and that it is likely to succeed in showing that this injunction was not so necessary because the Plaintiff-States' claimed injuries could be "substantially remedied by an order that provided relief only within their borders." Now, in its application to our court for a stay pending appeal, the Government contends that the preliminary injunction is overbroad because "complete relief" could have been provided by a preliminary injunction that "required the federal defendants to treat the children covered by the Executive Order as eligible for the services the [Plaintiff-States] administer."

The Plaintiff-States argue that the Government did not apprise the District Court of the alternative injunction that it now identifies in its stay motion to us, and, in doing so, they point out that the Government offers no details on "how such an injunction would be designed or enforced." They thus argue that the Government cannot assert the availability of such an injunction now as a reason for granting, in part, the stay motion.

The Government responds that it has consistently lodged the same challenge to the nationwide scope of the injunction throughout the course of this litigation. We cannot agree.

The argument that the Government now presses in its stay motion is obviously not the far more sweeping one advanced in challenging the granting of a nationwide preliminary injunction in the preliminary injunction proceedings themselves.  In requesting a stay in front of the District Court, moreover, the Government contested the District Court's finding that a nationwide preliminary injunction was necessary to provide complete relief to the Plaintiff-States only on the ground that "the remote concern that babies will be born after the effective date of the [Executive Order] but also move into the plaintiff states while this case is pending is too speculative to justify such sweeping relief."  In context, then, its contention at that time that the Plaintiff-States' claimed injuries would be substantially remedied by an order that provided relief "only within their borders" was a contention that the Executive Order not be enforced against the Plaintiff-States as to children born inside their borders but still be enforced against them as to children born outside.  That is different from the contention that it now makes in opposing the nationwide aspect of the injunction, which focuses on which state administers the service -- rather than where the children are born.  Thus, we decline to address the contention.  See Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 680 (1st Cir. 1998) (explaining that "[a]s a general rule, a disappointed litigant cannot surface an objection to a preliminary injunction for the first time in an

appellate venue" because doing so deprives the district court of the opportunity to "consider [the objection] and correct the injunction if necessary, without the need for appeal" (internal quotation marks omitted) (quoting United States v. Zenon, 711 F.2d 476, 478 (1st Cir. 1983))); Acevedo-García, 296 F.3d at 18 (declining to consider arguments raised for first time in this court in support of stay pending appeal of preliminary injunction).

We do note, however, that, waiver aside, the Government cites no authority for the proposition that the first Nken factor weighs in favor of a stay of a preliminary injunction as to its nationwide scope even when the party seeking such a stay makes no "strong showing" that it is likely to succeed in demonstrating either that the challenged conduct is lawful or that the plaintiff lacks standing to bring the challenge. Cf. Biden, 143 S. Ct. at 2376 (denying "as moot" the Government's application to vacate, or at a minimum narrow, the lower court's nationwide injunction pending appeal, in light of its conclusion that the plaintiff-states there had standing to challenge the Government action, see id. at 2365-68, and that the challenged action was unlawful, see id. at 2365-75). And yet, the Government, as we have explained, has not made a strong showing as to either the Executive Order's lawfulness or the Plaintiff-States' lack of standing. Accordingly, the Government has failed to make a "strong showing" that the first Nken factor favors the grant of a stay

pending appeal of the preliminary injunction as to its nationwide application.

The only other Nken factor that the Government addresses in seeking a stay as to the injunction's scope is whether such a stay would be in the public interest. In that regard, it asserts that the public-interest factor weighs against a nationwide preliminary injunction because "nineteen other States filed amicus briefs opposing a preliminary injunction here." According to the Government, the District Court's order "imposes an injunction on those non-party States to which they object."

There is no preliminary injunction, however, against any non-party States, only a preliminary injunction that bars the Government from enforcing the Executive Order against those states (and every other state). Nor does the Government cite any authority for the proposition that a nationwide preliminary injunction is against the public interest whenever nineteen states oppose the entry of the injunction against federal officials -- and so even as to the specific circumstance that we confront here, which involves a proposed change to the long-established means by which the United States has determined who its citizens are. Nken, 556 U.S. at 433 (explaining that because a stay is "an exercise of judicial discretion," "the propriety of its issue is dependent upon the circumstances of the particular case" (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672-73 (1926))). Thus,

142a

the Government has not met its burden under the <u>Nken</u> factors for a stay as to the nationwide scope of the preliminary injunction.

**IV.**

There is one hanging thread.  In challenging the scope of the District Court's preliminary injunction, the Government separately argues that it is overbroad to the extent that it "prevents . . . the Executive Branch as a whole from beginning the process of formulating relevant policies and guidance for implementing the President's Order" because the Plaintiff-States cannot claim any injury from such "internal operations."  But, as the District Court noted, the Government does not identify any such steps that it wishes to take but is enjoined from taking by the District Court's order.  Nor do we read the plain terms of the District Court's order to enjoin "internal operations" that are "preparatory operations that cannot impose any harm" on the Plaintiff-States.

**V.**

For the reasons given above, the motion for a stay pending appeal is <u>denied</u>.  A briefing order shall issue forthwith.