# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**J.G.G.,** *et al.*,

     **Plaintiffs,**

       **v.**                            **Civil Action No. 25-766 (JEB)**

**DONALD J. TRUMP,** *et al.*,

     **Defendants.**

## <u>ORDER</u>

Mere hours before their filing deadline and characterizing the Court's proceedings as "a picayune dispute over the micromanagement of immaterial factfinding," Defendants seek to stay the Court's Order requiring them to produce *in camera* particular information.  <u>See</u> ECF No. 37 (Mot.) at 1.  Although their grounds for such request at first blush are not persuasive, the Court will extend the deadline for one more day.

To begin, the Court seeks this information, not as a "micromanaged and unnecessary judicial fishing expedition[]," <u>id.</u> at 2, but to determine if the Government deliberately flouted its Orders issued on March 15, 2025, and, if so, what the consequences should be.

The Government requests a "stay or delay" in part to "make an orderly but expedited decision as to whether to invoke the state secrets privilege and, if so, as to what information." <u>Id.</u> at 3.  That privilege exists when "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." <u>United States v. Reynolds</u>, 345 U.S. 1, 10 (1953).  When such circumstances exist, courts do not "jeopardize the security which the privilege is meant to protect by insisting upon an examination

of the evidence, even by the judge alone, in chambers." Id.  The privilege "is not to be lightly

invoked." Id. at 7.  To do so, the Government must make a "formal claim of privilege, lodged by

the head of the department which has control over the matter, after actual personal consideration

by that officer." Id. at 7–8.

The Government's Motion is the first time it has suggested that disclosing the

information requested by the Court could amount to the release of state secrets.  To date, in fact,

the Government has made no claim that the information at issue is even classified.  Classification

is generally considered to be less protective than the state-secrets privilege.  See Mohamed v.

Jeppesen Dataplan, Inc., 614 F.3d 1070, 1082 (9th Cir. 2010).  It thus appears to be an

uncommon occurrence for the disclosure of unclassified information to threaten state secrets.

Defendants relatedly maintain that "[e]ven addressing the questions in an *ex parte*

submission would result in an immediate flood of media inquiries and demands for the

information, subjecting the diplomatic relationships at issue to unacceptable uncertainty about

how the Court will address those demands." Mot. at 2.  Defendants make that claim despite their

own extensive promotion of the particulars of the flights.  For example, the Secretary of State has

revealed many operational details of the flights, including the number of people involved in the

flights, many of their identities, the facility to which they were brought, their manner of

treatment, and the time window during which these events occurred.  See Secretary Marco Rubio

(@SecRubio), X (Mar. 16, 2025, 8:39 a.m.), https://x.com/SecRubio/status/190125204351743

2213 (sharing post and video revealing these details).  The Court is therefore unsure at this time

how compliance with its Minute Order would jeopardize state secrets.

The Court will nonetheless grant the Government an additional 24 hours to consider

whether to invoke the state-secrets privilege.  If it does invoke it, this Court is obligated to

"determine whether the circumstances are appropriate for the claim of privilege," <u>Reynolds</u>, 345 U.S. at 8, because "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." <u>Id.</u> at 9–10. As our Circuit has cautioned, the privilege "may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter." <u>Ellsberg v. Mitchell</u>, 709 F.2d 51, 57 (D.C. Cir. 1983).

While the Court will permit this additional time, it is not persuaded by Defendants' next contention that a stay is warranted because the D.C. Circuit may imminently rule on their request to stay the TROs. <u>See</u> Mot. at 4. In support of that assertion, the Government reiterates its arguments that the TROs were lawfully defective. <u>See id.</u> at 4–5. But, as explained above, the Court seeks the factual information at issue in order to determine whether the Government complied with the TROs. Whether those TROs were legally defective or legally sound does not govern the compliance inquiry. As the Supreme Court has made crystal clear, the proper recourse for a party subject to an injunction it believes is legally flawed — and is indeed later shown to be so flawed — is appellate review, not disobedience. As the Court reiterated in <u>Walker v. City of Birmingham</u>, 388 U.S. 307 (1967),

> An injunction duly issuing out of a court of general jurisdiction with equity powers, upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, <u>must be obeyed by them</u>, however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming, but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.

Id. at 314 (emphasis added) (quoting Howat v. Kansas, 258 U.S. 181, 189–90 (1922)). That "rule of law," the Supreme Court explained, "reflects a belief that in the fair administration of justice no man can be judge in his own case," no matter how "exalted his station" or "righteous his motives." Id. at 320–21.

The Government also maintains that "disclosure of the information sought could implicate the affairs of the United States allies." Mot. at 5. But it never explains how *in camera* disclosure to the Court could possibly lead to such a result.

Last, the Government claims that it needs assurances that the Court would not disclose the information to Plaintiffs or the public without the Government's having an opportunity for prior appellate review. Id. at 6. The Court has no problem offering such an assurance.

The Court, accordingly, ORDERS that:

1. Defendants' [37] Motion is GRANTED IN PART and DENIED IN PART; and

2. Defendants shall have until March 20, 2025, at 12:00 p.m. to provide the information discussed in the Minute Order of March 18, 2025, or to invoke the state-secrets doctrine and explain the basis for such invocation.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: March 19, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| J.G.G., *et al.*, | ) | Civil Action No. 1:25-cv-00766 |
|  | ) |  |
| Plaintiffs-Petitioners, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DONALD J. TRUMP, in his official | ) |  |
| capacity as President of the United States, | ) |  |
| *et al.*, | ) |  |
|  | ) |  |
| Defendants-Respondents. | ) |  |
|  | ) |  |

## MOTION TO STAY THE MARCH 18 MINUTE ORDER

What began as a dispute between litigants over the President's authority to protect the national security and manage the foreign relations of the United States pursuant to both a longstanding Congressional authorization and the President's core constitutional authorities has devolved into a picayune dispute over the micromanagement of immaterial factfinding. In a series of orders this Court has requested the Government to provide it details about the movements of aircraft outside of the United States and interactions with foreign nations which have no bearing on any legal issue at stake in the case. The underlying premise of these orders, including the most recent one requiring the production of these facts *ex parte* today at noon, is that the Judicial Branch is superior to the Executive Branch, particularly on non-legal matters involving foreign affairs and national security. The Government disagrees. The two branches are coequal, and the Court's continued intrusions into the prerogatives of the Executive Branch, especially on a non-legal and factually irrelevant matter, should end.

The Court's pending questions relate to a comment by the Court to a Government attorney suggesting, incorrectly, that the attorney had the ability to divert aircraft operating at the

President's direction on an extraterritorial mission to remove members of a designated foreign terrorist organization from the United States in connection with one or more sensitive diplomatic agreements requiring months of negotiation. The comment betrayed a complete misunderstanding of the serious national security, safety, regulatory, and logistical problems presented by a fiat from the Court directed at pilots operating outside the United States and was made without regard to whether any such aircraft could feasibly be diverted or even had enough fuel to safely do so. Further, the Court did not pause the hearing to give the attorney an opportunity to act on the remark, nor did it memorialize the remark in the subsequent minute order.

There is no serious dispute that the Government complied with the minute order, and the pending questions are grave encroachments on core aspects of absolute and unreviewable Executive Branch authority relating to national security, foreign relations, and foreign policy. Even addressing the questions in an *ex parte* submission would result in an immediate flood of media inquiries and demands for the information, subjecting the diplomatic relationships at issue to unacceptable uncertainty about how the Court will address those demands. Worse, the risks created by addressing the Court's pending questions would undermine the Executive Branch's ability to negotiate with foreign sovereigns in the future by subjecting all of the arrangements resulting from any such negotiations—as well as the negotiations themselves—to a serious risk of micromanaged and unnecessary judicial fishing expeditions and potential public disclosure.

Accordingly, Defendants seek a stay of this Court's order today requiring the production of specific information *ex parte* tomorrow in under 24 hours, at noon today. The Government continues to object to the compelled disclosure of the immaterial information sought and believes that the court's actions to date represent grave usurpations of the President's powers under the

Alien Enemies Act ("AEA") and his inherent Article II powers. Subject to that continuing objection, the Government submits that a stay is warranted here for four reasons.

*First*, Defendants are currently evaluating whether to invoke the state secrets privilege as to portions of the information sought by this Court's order. Whether and how to invoke that privilege involves both weighty considerations and specific procedures that are not amenable to the 21-hour turnaround period currently provided by this Court's order.[1] This Court itself raised the possibility that the Government might raise the state secrets privilege as a potential basis for not producing information. *See*, *e.g.*, 3/17/25 Tr. at 9:25-10:18. The Government cannot hastily conduct an evaluation of the invocation of that privilege except in exigent circumstances, and the flightpath of an airplane that landed three days ago is not an exigent circumstance warranting such evaluation.

This Court should therefore stay or delay its order to provide Defendants an opportunity to make an orderly but expedited decision as to whether to invoke the state secrets privilege and, if so, as to what information. Indeed, the Supreme Court has instructed that a "formula of compromise" must be applied to cases in which the state secrets privilege may be raised. *United States v. Reynolds*, 345 U.S. 1, 9 (1953). Further, a "court may [not] automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case," and a court may glean "from all the circumstances of the case" without disclosure, even ex parte, whether

---

[1] *See* Attorney General Memorandum for Heads of Executive Departments and Agencies Heads of Department Components on Supplement to Policies and Procedures Governing Invocation of the State Secrets Privilege (Sept. 30, 2022), https://www.justice.gov/d9/pages/attachments/2022/09/30/supplement_to_policies_and_procedures_governing_invocation_of_the_state_secrets_privilege.pdf (explaining that generally the request to invoke the privilege and requisite declaration(s) "must be provided to the Department of Justice at least 40 calendar days before the date it is anticipated that the privilege must be invoked in litigation," with "final declarations" being submitted at least 15 calendar days before and that the "request, declaration(s), and required Department recommendations must be presented to the Attorney General for decision at least 10 calendar days before the date it is anticipated that the privilege must be invoked in litigation").

compulsion will expose "matters which, in the interest of national security, should not be divulged." *Id*. at 10. A cautious approach, rather than an expedited deadline of less than 24 hours, is warranted to avoid forcing the Government into a Hobson's choice—a hasty and potentially underexamined invocation of the state secrets privilege or the release of sensitive national security and foreign affairs information. To that end, the "formula of compromise" in this case is simple and clear: stay the Court's order until the circuit court has ruled on the Government's pending stay motion.

*Second*, a stay is warranted because a decision by the D.C. Circuit on the Government's request for a stay pending appeal is likely imminent. That court set a highly expedited briefing schedule which will be completed by 5pm tomorrow, and a decision will likely be issued by the end of the week. That decision is expected to provide important guidance as to this Court's authority to review Presidential determinations under the AEA, as well as the scope of judicial review, if any.

As the government has explained in its motion to dissolve the TRO, this case is not even justiciable. *See generally* Doc. 26. In particular, the D.C. Circuit has explicitly characterized the AEA as providing "*[u]nreviewable* power in the President to restrain, and to provide for the removal of, alien enemies in time of war[, which] *is the essence of the Act*." *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946) (emphasis added)). *Citizens Protective League* remains binding authority and underscores why judicial intervention is particularly unwarranted here. *See also Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) ("The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." (emphasis added)). The government also possesses very strong arguments that

Plaintiffs' claims necessarily *and exclusively* sound in habeas—which would incontrovertibly preclude this Court's assertion of jurisdiction. *See* Doc. 26 at 7-11.

Particularly because the Court's inquiries relate only to retrospective and immaterial facts, and not future compliance, there is simply no need for the information at issue before the D.C. Circuit can issue its stay ruling.

Moreover, the Government has already set forth its arguments for why its actions complied with this Court's March 16 minute order, *see* Doc. 24, which do not require reference to any of the information sought to support those arguments. And Plaintiffs have not explained why they need any of the requested information to raise whatever compliance arguments they intend to make either. In short, the Plaintiffs and the Court are seeking information about a past event to which the Government has already spoken and which has no salience to the Plaintiffs' claims. Continuing to beat a dead horse solely for the sake of prying from the Government legally immaterial facts and wholly within a sphere of core functions of the Executive Branch is both purposeless and frustrating to the consideration of the actual legal issues at stake in this case. This consideration also warrants a stay.

*Third*, disclosure of the information sought could implicate the affairs of United States allies and their cooperation with the United States Government in fighting terrorist organizations. Such disclosure would unquestionably create serious repercussions for the Executive Branch's ability to conduct foreign affairs. The prospect of hasty and wholly unnecessary disclosure of this information, which these continued proceedings have made manifest, would have a chilling effect on the willingness of other nations to cooperate with the United States. The Court has no basis to intrude into the conduct of foreign affairs by the Government, and a more deliberative and respectful approach is warranted.

*Fourth*, the government does not currently have any assurance at this time that information provided to the Court on an *ex parte* basis would not subsequently be provided to the Plaintiffs or the general public before the Government could seek appellate review of that further disclosure. Once that secondary disclosure occurred, any opportunity for appellate review would be moot; the damage would be done, and the effect on United States foreign policy could be catastrophic.

Therefore, the Government requests that before the Court mandates disclosure of the information sought by the March 18 order, that the Court commit not to make further disclosures of that information before the Government would have an opportunity to seek expedited appellate review of that further disclosure.

## CONCLUSION

The Court has now spent more time trying to ferret out information about the Government's flight schedules and relations with foreign countries than it did in investigating the facts before certifying the class action in this case. That observation reflects how upside-down this case has become, as digressive micromanagement has outweighed consideration of the case's legal issues. The distraction of the specific facts surrounding the movements of an airplane has derailed this case long enough and should end until the Circuit Court has had a chance to weigh in. The Government respects this Court and has complied with its request to present the Government's position on the legality of the Court's TRO and the Government's compliance with that TRO. The Government now asks the Court to accord it the same respect as a coequal branch by staying its order until the important issues raised by this case are considered by the circuit court. Defendants' request for a stay of this Court's March 18 order should be granted.

Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

CHRISTINA P. GREER
Senior Litigation Counsel

PATRICK GLEN
Senior Litigation Counsel

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; and STATE OF WISCONSIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) ) | C.A. No. 25-cv-39-JJM-PAS |
| DONALD TRUMP, *in his Official Capacity as President of the United States*; U.S. OFFICE OF MANAGEMENT AND BUDGET; MATTHEW J. VAETH, *in his Official Capacity as Acting Director of the U.S. Office of Management and Budget*; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his Official Capacity as Secretary of the Treasury*; PATRICIA COLLINS, *in her Official Capacity as Treasurer of the U.S.*; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY A. FINK, M.D., *in her Official Capacity As Acting Secretary Of Health And Human Services*; U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, *in her Official Capacity as Acting Secretary of Education*; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, *in* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |

| | |
|---|---|
| *his Official Capacity as Acting Administrator of the U.S. Federal Emergency Management Agency*; U.S. DEPARTMENT OF TRANSPORTATION; JUDITH KALETA, *in her Official Capacity as Acting Secretary of Transportation*; U.S. DEPARTMENT OF LABOR; VINCE MICONE, *in his Official Capacity as Acting Secretary of Labor*; U.S. DEPARTMENT OF ENERGY; INGRID KOLB*, in her Official Capacity as Acting Secretary of the U.S. Department of Energy*; U.S. ENVIRONMENTAL PROTECTION AGENCY; JAMES PAYNE, *in his Official Capacity as Acting Administrator of the U.S. Environmental Protection Agency*; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, i*n her Capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF JUSTICE; JAMES R. McHENRY III, *in his Official Capacity as Acting Attorney General of the U.S. Department of Justice*; THE NATIONAL SCIENCE FOUNDATION; and DR. SETHURAMAN PANCHANATHAN, *in his Capacity as Director of the National Science Foundation*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## ORDER

The Plaintiff States' Motion for Enforcement of the Temporary Restraining

Order ("TRO") (ECF No. 66) is GRANTED.

[It is a] basic proposition that ***all orders and judgments of courts must be complied with promptly***. * * * Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect. The orderly and expeditious administration of justice by the courts requires that an order issued by a court with jurisdiction over the subject matter

2

and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.

*Maness v. Meyers*, 419 U.S. 449, 458–59 (1975) (citations and quotations omitted) (emphasis added). The Defendants issued a broad, categorical, all-encompassing directive freezing federal funding. The plain language of the TRO entered in this case prohibits all categorical pauses or freezes in obligations or disbursements based on the OMB Directive or based on the President's 2025 Executive Orders.[1] The Defendants received notice of the TRO, the Order is clear and unambiguous, and there are no impediments to the Defendants' compliance with the Order.

The States have presented evidence in this motion that the Defendants in some cases have continued to improperly freeze federal funds and refused to resume disbursement of appropriated federal funds. *See* Exhibits A-C of the States' motion, (ECF Nos. 66-1, 66-2, and 66-3). The Defendants now plea that they are just trying to root out fraud. *See* ECF No. 70. But the freezes in effect now were a result of the broad categorical order, not a specific finding of possible fraud. The broad categorical and sweeping freeze of federal funds is, as the Court found, likely unconstitutional and has caused and continues to cause irreparable harm to a vast portion of this country. These pauses in funding violate the plain text of the TRO.[2] In response to

---

[1] The Defendants acknowledged that they understood what the TRO required: "Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards or obligations on the basis of the OMB Memo, *or on the basis of the President's recently issued Executive Orders.*" ECF No. 51-1 at 1 (emphasis added).

[2] The Court disagrees with the Defendants' Notice (ECF No. 51), particularly paragraph 2. The Court's TRO is clear and unambiguous in its scope and effect, which is inconsistent with the Defendant's interpretation contained in the Notice. ECF No. 51 at 2.

3

the Defendants' arguments, they can request targeted relief from the TRO from this Court where they can show a specific instance where they are acting in compliance with this Order but otherwise withholding funds due to specific authority.

Therefore, consistent with the United States Constitution, United States statutes, United States Supreme Court precedent, and the TRO, the Defendants are hereby further **ORDERED** as follows:

1.    The Defendants must immediately restore frozen funding during the pendency of the TRO until the Court hears and decides the Preliminary Injunction request.

2.    The Defendants must immediately end any federal funding pause during the pendency of the TRO.

3.    The Defendants must immediately take every step necessary to effectuate the TRO, including clearing any administrative, operational, or technical hurdles to implementation.

4.    The Defendants must comply with the plain text of the TRO not to pause any funds based on pronouncements pausing funding incorporated into the OMB Directive, like Section 7(a) of the *Unleashing* Executive Order, and the OMB *Unleashing* Guidance.  The TRO requirements include any pause or freeze included in the *Unleashing* Guidance.

5.    The Defendants must immediately restore withheld funds, including those federal funds appropriated in the Inflation Reduction Act and the

Infrastructure Improvement and Jobs Act. The directives in OMB M-25-11 are included in the TRO.

6.     The Defendants must resume the funding of institutes and other agencies of the Defendants (for example the National Institute for Health) that are included in the scope of the Court's TRO.

IT IS SO ORDERED.

*/s/John J. McConnell, Jr.*
_____
John J. McConnell, Jr.
Chief Judge
United States District Court for the District of Rhode Island

February 10, 2025

# White House Failed to Comply With Court Order, Judge Rules

The federal judge in Rhode Island said the Trump administration had failed to comply with his order unfreezing billions of dollars in federal grants.

 **By Mattathias Schwartz**
Mattathias Schwartz reports on the federal courts.

Published Feb. 10, 2025   Updated Feb. 12, 2025

A federal judge said on Monday that the White House had defied his order to release billions of dollars in federal grants, marking the first time a judge has expressly declared that the Trump administration is disobeying a judicial mandate.

The ruling by Judge John J. McConnell Jr. in Rhode Island federal court ordered administration officials to comply with what the judge called "the plain text" of a ruling he issued on Jan. 29.

That order, he wrote, was "clear and unambiguous, and there are no impediments to the Defendants' compliance."

Shortly after Monday's ruling, Trump administration lawyers appealed the judge's initial order to the U.S. Court of Appeals for the First Circuit, asking the appellate court to pause Judge McConnell's order to keep federal funds flowing while their case was being considered. The White House responded with more defiance.

"Each executive order will hold up in court because every action of the Trump-Vance administration is completely lawful," said Harrison Fields, a White House spokesman. "Any legal challenge against it is nothing more than an attempt to undermine the will of the American people."

The legal actions on Monday marked a step toward what could evolve quickly into a high-stakes showdown between the executive and judicial branches, a day after Vice President JD Vance claimed in a social media post that "judges aren't allowed to control the executive's legitimate power."

Mr. Fields's statement suggested that the president would ultimately prevail in court, but neither he nor the Justice Department explained what the White House would do in the meantime. It appeared that the administration was trying to win through the legal system's established procedures, even as officials questioned the legitimacy of those procedures from the outside.

To that end, some of Mr. Trump's supporters accused the judges ruling against the president of overstepping their authority.

"Activist judges must stop illegally meddling with the president's Article II powers," wrote Mike Davis, who leads the Article III Project, a conservative advocacy group.

The Democratic attorneys general driving much of the legal pushback pressed their position.

"No administration is above the law," said Rob Bonta, the attorney general of California, in a statement shortly after Monday's order. "The Trump administration must fully comply with the court's order."

Already, more than 40 lawsuits have been filed to challenge Mr. Trump's moves, which have included revoking birthright citizenship and giving Elon Musk's teams access to sensitive Treasury Department payment systems.

Judges have already made preliminary rulings that those two executive actions, the funding freeze and other orders may violate existing statutes. On Monday, federal judges maintained a steady flow of challenges to the president's authority, temporarily blocking the Trump administration from reducing health research grants and maintaining a stay on efforts to coax federal employees to quit.

The question looming over Washington is how Mr. Trump will respond.

3/10/25, 1:26 AM   Judge Rules That Trump Administration Defied Order to Unfreeze Billions in Federal Grants - The New York Times

"It's very rare for a president not to comply with an order," said Victoria Nourse, the director of the Georgetown Law Center on Congress and Democracy, who was formerly Joseph R. Biden Jr.'s general counsel during his years as vice president. "This is part of a pattern where President Trump appears to be asserting authority that he doesn't have."

Judge McConnell had previously ordered the White House to unfreeze federal funds locked up by the White House budget office. A memo from that office had demanded that billions of dollars in grants be held back until they were determined to be in compliance with President Trump's priorities and ideological agenda.

On Friday, 22 Democratic attorneys general went to Judge McConnell to accuse the White House of failing to comply with his earlier order. The Justice Department responded in a filing on Sunday that money for clean energy projects and transportation infrastructure, allocated to states by the Inflation Reduction Act and the bipartisan infrastructure bill, was exempt from the initial order because it had been paused under a different memo.

Judge McConnell's ruling on Monday explicitly rejected that argument.

The judge granted the attorneys general's request for a "motion to enforce" — essentially a nudge. It did not find that the Trump administration was in contempt of court or specify any penalties for failing to comply.

However, the judge was straightforward in his finding that the initial temporary restraining order that he issued Jan. 29 was not being followed.

"These pauses in funding violate the plain text of the T.R.O.," Judge McConnell wrote. That earlier ruling ordered the administration not to "pause, freeze, impede, block, cancel or terminate" money that had already been allocated by Congress to the states to pay for Medicaid, school lunches, low-income housing subsidies and other essential services.

The judge also made clear that White House officials were obligated to comply regardless of how they thought the case might conclude. In his ruling on Monday, Judge McConnell quoted an opinion from a 1975 Supreme Court case noting that

"persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."

Going forward, if the judge finds that the government is still ignoring his initial order, he could order more than a dozen administration officials named in the lawsuit to explain why they should not be held in contempt of court, and then punish them with imprisonment — or, more likely, fines paid by their agencies, according to Adam Winkler, a professor at U.C.L.A School of Law.

"It's unlikely you can put the secretary of an agency in jail," he said, "but you can."

The showdown is part of a broader effort by Mr. Trump's opponents to get congressionally approved funding flowing again. Another order requiring that the disputed funds be released was issued last week by Judge Loren AliKhan of the District of Columbia. That case was filed by a coalition of nonprofits represented by Democracy Forward.

Skye Perryman, Democracy Forward's chief executive, said that if there were to be a standoff between the executive and judicial branches, she hoped that the legislative branch would step in.

"That is really a call to action for Congress," she said. "The judicial branch is not going to be able to stop this unlawful and extreme use of executive power on its own."

The Trump administration has complied with the orders to unfreeze federal grants at least partially, but it is difficult to gauge precisely where funds remain stuck. The states have regained access to portals that allow them to be reimbursed for Medicaid. But David A. Super, a professor at Georgetown Law, said that he had heard directly from a number of groups, both inside and outside of government, that said their funding was still frozen.

"There's no question that the government is not complying, has not even come close to complying, with the order," Mr. Super said. "Even funds that weren't frozen before the order are being frozen now."

Mr. Super said Judge McConnell appeared to be trying to take the matter one step at a time.

"If you or I did this, the judge's clerk would be on the phone saying, 'Bring your toothbrush to the hearing to show cause because you might not be coming home tonight,'" he said. "This is the federal government, so the judge is trying to show restraint — expressing anger and reiterating its order, but not immediately bringing up penalties."

The defiance may go beyond the domestic funding freeze. In another Monday filing, plaintiffs in a different lawsuit said that the Trump administration was still putting employees of the U.S. Agency for International Development on administrative leave, despite a court order requiring them to stop.

Charlie Savage contributed reporting. Seamus Hughes contributed research.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Judge Says Trump Violated Order on Funding

3/19/25, 8:34 AM    Judge Floats Contempt Charges in 'Interesting' Interaction with Trump's DOJ - Newsweek



SUBSCRIBE FOR $1      **Login**

**News** | Donald Trump      DOJ      Judge      Federal      Immigration      Deportation

# Judge Floats Contempt Charges in 'Interesting' Interaction with Trump's DOJ

**Published** Mar 18, 2025 at 1:40 PM EDT




**SUBSCRIBE FOR $1**



By **Sean O'Driscoll**
Senior Crime and Courts Reporter

Newsweek Is A Trust Project Member

FOLLOW

---

News Article          |          7

---

A judge floated the idea of holding the Trump administration in contempt of court for deporting immigrants in defiance of a court order, marking an "interesting" point in the a former prosecutor has said.

## Why It Matters

It is highly unusual for a judge to consider contempt charges based on a presidential order, underscoring the tension between the Trump administration and some federal judges.

It is almost an enormously important issue concerning immigration rights and the government's right to deport.

*Newsweek* sought email comment on Tuesday from the Department of Justice.

3/18/25, 8:34 AM    Judge Floats Contempt Charges in Interesting Interaction with Trump's DOJ - Newsweek

**Newsweek**    SUBSCRIBE FOR $1



U.S. President Donald Trump speaks as he signs executive orders in the Oval Office of the White House on March 06, 2025 in Washington, DC.    **ALEX WONG/GETTY IMAGES**

## What To Know

Trump on Saturday issued an executive order announcing that he would invoke the Alien Enemies Act to expel Venezuelan nationals over age 14 who have alleged ties to the Tren de Aragua criminal gang.

**Newsweek**    SUBSCRIBE FOR $1

on the Trump administration, preventing the deportations and ordering all planes carrying the men to return to the U.S.

When the Trump administration continued with the deportations at the weekend, Boasberg demanded an answer at a hearing on Monday.

In a written submission, the Department of Justice told the judge that his order was "not enforceable" for deportations under the Alien Enemies Act of 1798, which has historically only been invoked in wartime.

Former federal prosecutor, Joyce Vance, wrote in her legal blog, *Civil Discourse*, on Monday that a vexed Boasberg openly considered contempt charges during Monday's hearing.

"Then came an interesting moment, the only time during the hearing where Judge Boasberg actually used the word contempt," she wrote.

It came when Baosberg asked a pointed question to Department of Justice lawyer, Abhishek Kambli, about when the deportations took place to assess if they were a violation of Baosberg's court order.

Vance said Boasberg asked Kambli a question about "when Trump signed the proclamation that allegedly triggered his ability to deport members of the Tren de Aragua gang."

Boasberg framed his question to suggest that "the government was at risk" of contempt proceedings, Vance wrote.

## What People Are Saying

**White House Press Secretary Karoline Leavitt wrote on X**, formerly Twitter, on Saturday that the "written order and the Administration's actions do not conflict."

"A single judge in a single city cannot direct the movements of an aircraft carrying foreign alien terrorists who were physically expelled from U.S. soil," she wrote.

Case 1:25 158    Document: 00118261324    Pages: 26    Date Filed: 03/19/2025    Entry ID: 6707698

**Newsweek**     SUBSCRIBE FOR $1

---

READ MORE

- Donald Trump's deportation move rebuked by legal experts: "Violation"

- Trump demands impeachment of "crooked" judge

- Trump administration argues a judge's verbal order is "not enforceable"

- Judge questions Trump administration over deportation flights: Live Updates

---

**Trump's director of border enforcement, Tom Homan,** [told Fox News on March 17](#) that the administration will continue with its deportation plan, regardless of the opinion of Boasberg or any other federal judge "We're not stopping. I don't care what the judges think, I don't care what the left thinks. We're coming."

Homan, the acting head of Immigration and Customs Enforcement ([ICE](#)) during the first Trump administration, added: "They're not going to stop us," he said. "I wake up every morning loving my job because I work for the greatest president in the history of my life," he said.

## What Happens Next

Boasberg ordered the Department of Justice to submit a written explanation by noon on Tuesday on why it couldn't share more information about the timing of the flights.

He also demanded more information about how many planes took off, where they went, what time they took off, when they landed and how many people were transferred from each plane into the custody of the country in which they landed.

Boasberg may consider further legal action if the Department of Justice does not reply to his questions.



MY PLAYLIST

                                                                           DONATE

---

POLITICS

# Trump ordered to pay $9,000 for violating gag order in criminal hush money trial

APRIL 30, 2024 · 9:49 AM ET

HEARD ON ALL THINGS CONSIDERED

 Ximena Bustillo


Audio will be available later today.

Former President Donald Trump has been held in contempt of court and fined $9,000 for violating a gag order aimed at protecting witnesses and jurors in his Manhattan criminal trial.

Prosecutors in Trump's criminal trial last month asked Judge Juan Merchan to fine him $10,000 — $1,000 each for 10 posts — for violating a gag order and rule Trump in contempt of court. Merchan on Tuesday fined Trump for nine of those posts.

Trump was ordered to pay the money by Friday, May 3, and remove seven offending posts from his Truth Social account, and two posts from his campaign website by 2:15 p.m. on Tuesday.

"It is critically important that Defendant's legitimate free speech rights not be curtailed, that he be able to fully campaign for the office which he seeks and that he be able to respond and defend himself against political attacks," Merchan wrote in his order. "It is of utmost importance to this Court that the Expanded Order not be used as a sword instead of a shield by potential witnesses."

But Merchan also warned Trump that the court "will not tolerate continued willful violations of its lawful orders and that if necessary and appropriate under the

circumstances, it will impose an incarceratory punishment." In other words, the court must "consider whether in some instances, jail may be a necessary punishment."

Last week, prosecutors asked Merchan to hold Trump in contempt for 10 posts made on Trump's Truth Social profile and his official campaign profile about potential witnesses in the case, including former lawyer Michael Cohen and adult film star Stormy Daniels; among those 10 posts was one that echoed Fox News host Jesse Waters' opinion that "undercover liberal activists" were "lying to the judge in order to get on the Trump jury."

On Thursday, Merchan will also hold a hearing regarding four additional posts brought up by the prosecution last week.

Weeks before the trial began, Merchan issued a gag order on Trump that specifically bars him from making or directing others to make public statements about potential jurors, court staff or family members of staff.

Last week, Trump went after Cohen again in the courthouse hallway as he left for the day.

"When are they going to look at all the lies that Cohen did in the last trial?" Trump said. Prosecutors last week argued this statement amounted to another violation and they plan to file another order Tuesday.

Trump fined and held in contempt for violating gag order in criminal trial. : NPR

Trump, the presumptive 2024 GOP presidential nominee, is accused of 34 felony
counts of falsifying business records with the intent to further other crimes ahead
of the 2016 presidential election. Trump has pleaded not guilty to all charges. The
jury has already heard from several witnesses including former National Enquirer
publisher David Pecker, First Republic Bank banker Gary Farro and longtime
Trump executive assistant Rhona Graff.

Trump's lawyer Todd Blanche argued that when Trump took to Truth Social to talk
about the case, he was simply defending himself against attacks from Daniels and
Cohen. But when pressed by Merchan to provide specific examples of those
attacks, Blanche did not provide any. Blanche also tried to argue that prosecutors
did not challenge every single related repost on Trump's social media profile,
which Merchan seemed to dismiss outright.

"You're losing all the credibility with the court," Merchan warned Trump's lawyers
as they debated whether or not Trump was trying to comply with the order.

Trump has challenged the gag order, including a failed attempt to delay the trial
while he fought it. An appeals court judge's decision to keep the gag order in place
came less than a week before jury selection began.

Trump has argued that this order is unconstitutionally limiting his political speech
as he campaigns to be the next president. In the ruling that put the gag order in
place, Merchan rejected Trump's assertion that his statements "constitute core
political speech."

Case 1:25-cv-02158          Document: 001118261324          Page: 30          Date Filed: 03/19/2025          Entry ID: 6707698

The current gag order does not cover Merchan or District Attorney Alvin Bragg. Both have also been a recipient of the former president's ire.

In a series of posts on Truth Social, his social media platform, Trump, without evidence called the gag order "ELECTION INTERFERENCE."

The former president has faced penalties for violating gag orders in his prior New York trials. In the fall he was fined a collective $15,000 for two violations in his civil fraud trial — one instance which resulted in Trump unexpectedly being called up to the witness stand. Both fines were for statements seemingly made about the judge's clerk.

The judge in that case, Arthur Engoron, noted that his chambers had been "inundated with hundreds of harassing and threatening phone calls, voicemails, emails, letters and packages" since beginning the trial.

Trump also faces a gag order in his federal election interference case in Washington, D.C., which limits public statements on prosecutors, court staffers and their family members — if those remarks were designed to interfere with lawyers' or court staff's work on the case.

trump     gag order     truth social     criminal trial     new york     president donald trump     cohen     social media

manhattan criminal

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| J.G.G., *et al.*, | ) | Civil Action No. 1:25-cv-00766 |
|  | ) |  |
| Plaintiffs-Petitioners, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| DONALD J. TRUMP, in his official | ) |  |
| capacity as President of the United States, | ) |  |
| *et al.*, | ) |  |
|  | ) |  |
| Defendants-Respondents. | ) |  |

## <u>MOTION TO STAY THE MARCH 18 MINUTE ORDER</u>

What began as a dispute between litigants over the President's authority to protect the national security and manage the foreign relations of the United States pursuant to both a longstanding Congressional authorization and the President's core constitutional authorities has devolved into a picayune dispute over the micromanagement of immaterial factfinding. In a series of orders this Court has requested the Government to provide it details about the movements of aircraft outside of the United States and interactions with foreign nations which have no bearing on any legal issue at stake in the case. The underlying premise of these orders, including the most recent one requiring the production of these facts *ex parte* today at noon, is that the Judicial Branch is superior to the Executive Branch, particularly on non-legal matters involving foreign affairs and national security. The Government disagrees. The two branches are coequal, and the Court's continued intrusions into the prerogatives of the Executive Branch, especially on a non-legal and factually irrelevant matter, should end.

The Court's pending questions relate to a comment by the Court to a Government attorney suggesting, incorrectly, that the attorney had the ability to divert aircraft operating at the

President's direction on an extraterritorial mission to remove members of a designated foreign terrorist organization from the United States in connection with one or more sensitive diplomatic agreements requiring months of negotiation. The comment betrayed a complete misunderstanding of the serious national security, safety, regulatory, and logistical problems presented by a fiat from the Court directed at pilots operating outside the United States and was made without regard to whether any such aircraft could feasibly be diverted or even had enough fuel to safely do so. Further, the Court did not pause the hearing to give the attorney an opportunity to act on the remark, nor did it memorialize the remark in the subsequent minute order.

There is no serious dispute that the Government complied with the minute order, and the pending questions are grave encroachments on core aspects of absolute and unreviewable Executive Branch authority relating to national security, foreign relations, and foreign policy. Even addressing the questions in an *ex parte* submission would result in an immediate flood of media inquiries and demands for the information, subjecting the diplomatic relationships at issue to unacceptable uncertainty about how the Court will address those demands. Worse, the risks created by addressing the Court's pending questions would undermine the Executive Branch's ability to negotiate with foreign sovereigns in the future by subjecting all of the arrangements resulting from any such negotiations—as well as the negotiations themselves—to a serious risk of micromanaged and unnecessary judicial fishing expeditions and potential public disclosure.

Accordingly, Defendants seek a stay of this Court's order today requiring the production of specific information *ex parte* tomorrow in under 24 hours, at noon today. The Government continues to object to the compelled disclosure of the immaterial information sought and believes that the court's actions to date represent grave usurpations of the President's powers under the

Alien Enemies Act ("AEA") and his inherent Article II powers. Subject to that continuing objection, the Government submits that a stay is warranted here for four reasons.

*First*, Defendants are currently evaluating whether to invoke the state secrets privilege as to portions of the information sought by this Court's order. Whether and how to invoke that privilege involves both weighty considerations and specific procedures that are not amenable to the 21-hour turnaround period currently provided by this Court's order.[1] This Court itself raised the possibility that the Government might raise the state secrets privilege as a potential basis for not producing information. *See*, *e.g.*, 3/17/25 Tr. at 9:25-10:18. The Government cannot hastily conduct an evaluation of the invocation of that privilege except in exigent circumstances, and the flightpath of an airplane that landed three days ago is not an exigent circumstance warranting such evaluation.

This Court should therefore stay or delay its order to provide Defendants an opportunity to make an orderly but expedited decision as to whether to invoke the state secrets privilege and, if so, as to what information. Indeed, the Supreme Court has instructed that a "formula of compromise" must be applied to cases in which the state secrets privilege may be raised. *United States v. Reynolds*, 345 U.S. 1, 9 (1953). Further, a "court may [not] automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case," and a court may glean "from all the circumstances of the case" without disclosure, even ex parte, whether

---

[1] *See* Attorney General Memorandum for Heads of Executive Departments and Agencies Heads of Department Components on Supplement to Policies and Procedures Governing Invocation of the State Secrets Privilege (Sept. 30, 2022), https://www.justice.gov/d9/pages/attachments/2022/09/30/supplement_to_policies_and_procedures_governing_invocation_of_the_state_secrets_privilege.pdf (explaining that generally the request to invoke the privilege and requisite declaration(s) "must be provided to the Department of Justice at least 40 calendar days before the date it is anticipated that the privilege must be invoked in litigation," with "final declarations" being submitted at least 15 calendar days before and that the "request, declaration(s), and required Department recommendations must be presented to the Attorney General for decision at least 10 calendar days before the date it is anticipated that the privilege must be invoked in litigation").

compulsion will expose "matters which, in the interest of national security, should not be divulged." *Id*. at 10. A cautious approach, rather than an expedited deadline of less than 24 hours, is warranted to avoid forcing the Government into a Hobson's choice—a hasty and potentially underexamined invocation of the state secrets privilege or the release of sensitive national security and foreign affairs information. To that end, the "formula of compromise" in this case is simple and clear: stay the Court's order until the circuit court has ruled on the Government's pending stay motion.

*Second*, a stay is warranted because a decision by the D.C. Circuit on the Government's request for a stay pending appeal is likely imminent. That court set a highly expedited briefing schedule which will be completed by 5pm tomorrow, and a decision will likely be issued by the end of the week. That decision is expected to provide important guidance as to this Court's authority to review Presidential determinations under the AEA, as well as the scope of judicial review, if any.

As the government has explained in its motion to dissolve the TRO, this case is not even justiciable. *See generally* Doc. 26. In particular, the D.C. Circuit has explicitly characterized the AEA as providing "*[u]nreviewable* power in the President to restrain, and to provide for the removal of, alien enemies in time of war[, which] *is the essence of the Act*." *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946) (emphasis added)). *Citizens Protective League* remains binding authority and underscores why judicial intervention is particularly unwarranted here. *See also Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) ("The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." (emphasis added)). The government also possesses very strong arguments that

Plaintiffs' claims necessarily *and exclusively* sound in habeas—which would incontrovertibly preclude this Court's assertion of jurisdiction. *See* Doc. 26 at 7-11.

Particularly because the Court's inquiries relate only to retrospective and immaterial facts, and not future compliance, there is simply no need for the information at issue before the D.C. Circuit can issue its stay ruling.

Moreover, the Government has already set forth its arguments for why its actions complied with this Court's March 16 minute order, *see* Doc. 24, which do not require reference to any of the information sought to support those arguments. And Plaintiffs have not explained why they need any of the requested information to raise whatever compliance arguments they intend to make either. In short, the Plaintiffs and the Court are seeking information about a past event to which the Government has already spoken and which has no salience to the Plaintiffs' claims. Continuing to beat a dead horse solely for the sake of prying from the Government legally immaterial facts and wholly within a sphere of core functions of the Executive Branch is both purposeless and frustrating to the consideration of the actual legal issues at stake in this case. This consideration also warrants a stay.

*Third*, disclosure of the information sought could implicate the affairs of United States allies and their cooperation with the United States Government in fighting terrorist organizations. Such disclosure would unquestionably create serious repercussions for the Executive Branch's ability to conduct foreign affairs. The prospect of hasty and wholly unnecessary disclosure of this information, which these continued proceedings have made manifest, would have a chilling effect on the willingness of other nations to cooperate with the United States. The Court has no basis to intrude into the conduct of foreign affairs by the Government, and a more deliberative and respectful approach is warranted.

*Fourth*, the government does not currently have any assurance at this time that information provided to the Court on an *ex parte* basis would not subsequently be provided to the Plaintiffs or the general public before the Government could seek appellate review of that further disclosure. Once that secondary disclosure occurred, any opportunity for appellate review would be moot; the damage would be done, and the effect on United States foreign policy could be catastrophic.

Therefore, the Government requests that before the Court mandates disclosure of the information sought by the March 18 order, that the Court commit not to make further disclosures of that information before the Government would have an opportunity to seek expedited appellate review of that further disclosure.

## CONCLUSION

The Court has now spent more time trying to ferret out information about the Government's flight schedules and relations with foreign countries than it did in investigating the facts before certifying the class action in this case. That observation reflects how upside-down this case has become, as digressive micromanagement has outweighed consideration of the case's legal issues. The distraction of the specific facts surrounding the movements of an airplane has derailed this case long enough and should end until the Circuit Court has had a chance to weigh in. The Government respects this Court and has complied with its request to present the Government's position on the legality of the Court's TRO and the Government's compliance with that TRO. The Government now asks the Court to accord it the same respect as a coequal branch by staying its order until the important issues raised by this case are considered by the circuit court. Defendants' request for a stay of this Court's March 18 order should be granted.

Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

CHRISTINA P. GREER
Senior Litigation Counsel

PATRICK GLEN
Senior Litigation Counsel