UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

                    Plaintiffs,                    Case Number 16-10277

v.                                               Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, MICHAEL A.
FINNEY, JOEL FERGUSON, SYLVESTER
JONES, R. STEVEN BRANCH, and
CITY OF FLINT,

                    Defendants.

_____/

## ORDER GRANTING IN PART STATE DEFENDANTS' MOTION TO TEMPORARILY STAY CITY OF FLINT'S RESTORATION OBLIGATIONS UNDER THE SETTLEMENT AGREEMENT

The City of Flint's failures to live up to several of the promises it made in the March 28, 2017 Settlement Agreement have been well documented. The basic goal of that agreement was to effectuate the replacement of the lead and galvanized service lines that supplied drinking water to a multitude of residential and commercial properties in the City. The Settlement Agreement, which resolved the complaint filed in this case under the Clear Water Act, outlined the several tasks necessary to achieve the ultimate goal, such as identifying the offending infrastructure, contacting residents and obtaining consent to work on their properties, excavating and replacing the service lines, and restoring the property surfaces to their original condition. Deadlines and reporting and record-keeping requirements were put in place to monitor and ensure the timely completion of the work. The State of Michigan, some of whose officials were named as defendants

in the case, agreed to fund the project up to $97 million. The City was responsible for doing the actual work.

Under the original Settlement Agreement terms, the service line replacement work was to be completed by March 28, 2020. That deadline, together with corresponding inspection and reporting deadlines, were modified several times. The City has made considerable, if untimely, progress toward remediating the 31,578 properties identified in the Settlement Agreement. However, in a motion now before the Court to suspend some of those enlarged deadlines, the State defendants represent that approximately 1,901 residences still require restoration. The parties have not agreed on how many properties still require service line replacement under the Settlement Agreement's terms. They estimate that approximately $1.1-1.2 million of the funds committed by the State remain. At an estimated cost of $2,500 per restoration, City officials surmise that completing the remaining work will cost approximately $4,754,000, with additional expenses for project management likely to add to that figure. It does not appear that the City would have the funds or the wherewithal to satisfy its obligations under the Settlement Agreement unless help from outside is found.

Fortunately for the residents of Flint, the State has agreed to provide a lifeline and a way forward. In its motion to stay temporarily some of the City's reporting obligations — which none of the parties oppose — the State has offered to assume responsibility for managing the remaining work and provide the additional funds required. The State is *not* suggesting that the Settlement Agreement be modified further to add requirements that would bind the State defendants. However, at the hearing on the motion on June 25, 2024, the State's attorney assured the Court that the present administration is committed to seeing this project through to completion.

The relief requested by the State parties is slightly vague: they ask the Court to stay temporarily "any work and weekly, monthly, and quarterly reporting obligations that Flint has under the Settlement Agreement (as amended), as well as any orders issued by this Court, solely as to restorations." ECF No. 286, PageID.13403. This request apparently does not extend to the City's obligation to submit the notice, statement, and documents, outlined in Paragraph 7 of the Court's April 2022 Order, which requires the City to notify the settling parties with 14 days of its determination that it has completed all required service line replacements and restorations. *See ibid.*; April 2022 Order, ECF No. 237, PageID.11075. The State defendants add that the parties have agreed that "a goal" of August 1, 2025 is an appropriate target for completing the remaining work, or at least giving an estimate for when that may occur.

Although neither the City nor the plaintiffs oppose the State parties' request for a stay, the plaintiffs' approval is contingent on the State's agreement to provide bimonthly reporting on the restoration efforts. This reporting would include:

> a. An Excel spreadsheet listing all addresses where contractors have completed restoration, including, for each address: (i) the date(s) of restoration; (ii) whether the completed work was soft-surface and/or hard-surface (i.e., asphalt and/or concrete) restoration; and (iii) whether additional restoration work remains required; and

> b. the total amount of monies paid by State Parties for work required under the Agreement relating to excavations, replacements, property restoration, and/or program management. This reporting will also include any reimbursements to the City of Flint described in Paragraph 117.c.iv of ECF No. 147-1.

ECF No. 286, PageID.13400-01. The plaintiffs also ask the State to require its contractor continue to conduct the visual inspection, photo documentation, and door hanger efforts, summarized in the Court's February 24, 2023 order, and to make documentation available upon request. Finally, the plaintiffs ask that the State inform the parties within 14 days of the time it believes it has completed

the restoration work, that it provide documentation of that contention, and that the parties use a meet-and-confer process to resolve disputes. The State parties agree to these requests.

Although there may be a dispute over the number of properties where service lines need to be replaced, all parties agree that the bulk of the remaining work involves the City's obligation to restore properties disturbed by an excavation. The State parties ask the Court to "stay any work and the City's weekly, monthly, and quarterly reporting obligations under the Settlement Agreement, or the Court's Orders, solely as to restorations." ECF No. 286, PageID.13399. This Court's past orders regarding restoration indicate that the defendants presently are required to report:

- Monthly, a list of excavated addresses where the City has a record of a completed restoration, a list of excavated addresses where records indicate restoration is still required, and a list of excavated addresses for which the City has no contemporaneous record of restoration and whether a visual inspection had been conducted of that property. Feb. 2023 Order, ECF No. 258, PageID.11695.

- Monthly, any emails or calls received by the City during the reporting period from residents concerning visual inspections. *Id.* at PageID.11696.

- Monthly, the total funding approved for payment for site restoration work based on weekly contractor reports and invoice processing. March 2019 Order, ECF No. 208, PageID.10348.

- Bi-weekly, updates to the plaintiffs regarding when weather conditions occur that would permit it to resume excavation, replacement, or restoration work after the winter season. Feb. 2023 Order, ECF No. 258, PageID.11689.

- Within three days of re-bidding contracts for remaining restoration work, the date it executes each contract. April 2022 Order, ECF No. 237, PageID.11074.

The Court is not aware of any ongoing weekly or quarterly reporting obligations related to restoration.

As the Court has explained several times in previous orders, a settlement agreement in essence is a contract. *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013). When enforcing a contract, the first objective is to "honor the intent of the parties," *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994), and the prime source of that intent is the plain language of the agreement, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language."). Nonetheless, the Settlement Agreement entered by the parties operates as a consent decree — that is, a "settlement agreement subject to continued judicial policing." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). A consent decree is "a strange hybrid in the law," *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992) (quoting *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981)), in that it is "at once 'a voluntary settlement agreement which could be fully effective without judicial intervention' and 'a final judicial order . . . plac[ing] the power and prestige of the court behind the compromise struck by the parties,'" *ibid.* (quoting *Williams*, 720 F.2d at 920). Consent decrees therefore "may be 'treated as contracts for some purposes but not for others.'" *Ibid.* (quoting *United States v. ITT Cont'l Baking*, 420 U.S. 223, 236 n.10 (1975)).

A court's power to enforce a consent decree includes the "inherent equitable power to modify a consent decree if satisfied that the decree 'has been turned through changing circumstances into an instrument of wrong.'" *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 (6th Cir. 1997) (quoting *United States v. Knote*, 29 F.3d 1297, 1302 (8th Cir. 1994)). The authority to modify such a decree includes the power to suspend its operation.

The parties here all agree that some of the provisions of the Settlement Agreement should be suspended, but those conditions would be temporary and focused on achieving the overarching purpose of the settlement that the parties intended. The State's request for a stay appears calculated to allow it greater freedom to assist the City in completing its outstanding restoration work. The parties all consent to a stay, provided the State makes certain reports discussed above. The relief requested in the motion will advance the better interests of the parties and will be allowed.

Accordingly, it is **ORDERED** that the motion by the State defendants to stay temporarily certain of the City of Flint's restoration obligations under the Settlement Agreement, as modified (ECF No. 286) is **GRANTED IN PART**.

It is further **ORDERED** that:

1. Any obligation that the City has under the settlement agreement or subsequent orders of this Court to conduct and provide weekly, monthly, and quarterly reports on restoration work is stayed until August 1, 2025.

2. The State defendants shall submit to the Court on a quarterly basis until August 1, 2025 a report on the status of their efforts to complete excavations, replacements, and restorations required under the Settlement Agreement.

3. The City of Flint, in consultation with the State defendants, shall submit to the Court and the plaintiffs, **on or before July 10, 2024**, a list of all properties that still have lead or galvanized water service lines, itemized by those properties that are subject to remediation under the Settlement Agreement and those properties known still to have lead service lines but are not subject to remediation under the Settlement Agreement. By that date, the City also shall comply with the final excavation and replacement reporting requirements required by the Order Modifying

Settlement Agreement, *see* ECF No. 237, PageID.11071-73, and the Order Granting Plaintiffs'
Fifth Motion to Enforce Settlement Agreement, *see* ECF No. 258, PageID.11686-87.

4.    The parties shall submit a report to the Court **on or before July 1, 2025** on the
status of the State parties' efforts, and if the excavations, replacement, and restoration work
required under the settlement agreement has not been completed by that date, whether the parties
have been able to agree on a plan to complete that work.

5.    The parties are not required at this time to submit supplementals briefs as required
by this Court's February 24, 2023 Order.  *See* ECF No. 258, PageID.11688.

6.    Beginning on **July 15, 2024**, and on the first and fifteenth day of each month
thereafter under August 1, 2025, the State defendants shall provide to the plaintiffs:

a. An Excel spreadsheet listing all addresses where contractors have completed
restoration, including, for each address: (i) the date(s) of restoration; (ii) whether
the completed work was soft-surface and/or hard-surface (i.e., asphalt and/or
concrete) restoration; and (iii) whether additional restoration work remains
required; and

b. the total amount of monies paid by State Parties for work required under the
Agreement relating to excavations, replacements, property restoration, and/or
program management. This reporting will also include any reimbursements to the
City of Flint described in Paragraph 117.c.iv of ECF No. 147-1.

7.    The State defendants shall require their contractor to continue to conduct the visual
inspection, photo documentation, and door hanger efforts, summarized in the Court's February 24,
2023 order, and to make documentation available on request.

It is further **ORDERED** that the City of Flint shall complete all remaining work required
by the Settlement Agreement **on or before August 1, 2025**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  June 29, 2024

# Exhibit A

Supplemental Declaration of Adeline S. Rolnick

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, et al.,

           Plaintiffs,

      v.

NICK A. KHOURI, et al.,

           Defendants.

_____/

Case No. 16-10277

Hon. David M. Lawson

## SUPPLEMENTAL DECLARATION OF ADELINE S. ROLNICK

I, Adeline S. Rolnick, declare as follows:

1.      I am counsel for Plaintiffs Natural Resources Defense Council

(NRDC), Concerned Pastors for Social Action, and Melissa Mays in this action. I

am a member in good standing of the bars of the State of New York and the

District of Columbia. I am admitted to practice in the Eastern District of Michigan.

This declaration describes the supplemental evidence Plaintiffs move for leave to

file in support of their Motion for Contempt.

2.      On August 8, September 7, and September 27, 2023, I attended

meetings by videoconference attended by Plaintiffs' counsel, the City's counsel,

and City representatives. All three meetings concerned whether the City completed

all service line excavations and replacements required by the Settlement

1

Agreement and the Court's February 24, 2023 Order, ECF No. 258, by August 1, 2023, and the City's progress towards completing that work.

3.      Attached as Exhibit 1 is a true and correct copy of an email sent by Joseph Kuptz, Assistant City Attorney, City of Flint, to Sarah Tallman, NRDC, et al., on November 1, 2023.

4.      Attached as Exhibit 2 is a true and correct copy of a letter sent electronically by Adeline Rolnick, NRDC, to Joseph Kuptz, Assistant City Attorney, City of Flint, et al., on August 7, 2023.

5.      Attached as Exhibit 3 is a true and correct copy of an email sent by Adeline Rolnick, NRDC, to Joseph Kuptz, Assistant City Attorney, City of Flint, and William Kim, City Attorney, City of Flint, on August 23, 2023.

6.      Attached as Exhibit 4 is a true and correct copy of a letter sent electronically by Adeline Rolnick, NRDC, to Joseph Kuptz, Assistant City Attorney, City of Flint, et al., on September 15, 2023.

7.      Attached as Exhibit 5 is a true and correct copy of email correspondence, with addresses redacted, among Adeline Rolnick, NRDC, and Joseph Kuptz, Assistant City Attorney, City of Flint, et al., between October 20 and October 23, 2023.


I declare under penalty of perjury that the foregoing is true and correct.

2

Executed in Washington, D.C. on November 1, 2023.

/s/ Adeline S. Rolnick
Adeline S. Rolnick
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6240
arolnick@nrdc.org

*Counsel for Plaintiffs Concerned
Pastors for Social Action, Melissa
Mays, and Natural Resources Defense
Council, Inc.*

# Exhibit 1

| From: | Joseph Kuptz |
|---|---|
| To: | Tallman, Sarah; Rolnick, Addie; Calero, Melanie; Vandal, Nicole |
| Cc: | William Kim |
| Subject: | Concerned Pastors, et al v City of Flint, et al re: Review of SLE/SLR Addresses |
| Date: | Wednesday, November 1, 2023 11:05:19 AM |
| Attachments: | 2023.10.23 Pls" List of Homes Needing Excavation and or Replacement - Rowe Comments JNK.xlsx |

Sarah and Addie - with Rowe's assistance, I have finished a comprehensive review of the spreadsheet titled "2023.10.23 Pls' List of Homes Needing Excavation and or Replacement.xlsx."

There are a total of 184 addresses among the three tabs on that spreadsheet.

I attach "2023.10.23 Pls' List of Homes Needing Excavation and or Replacement - Rowe Comments JNK.xlsx." Rowe's comments are in column N. My comments are also in column N, but in all capital letters.

My analysis of each tab follows, with a summary at the bottom:

- **Excavation required Tab (106 addresses)**
  - 69 - City asserts complete under terms of SA, because:
    - 44 - all scheduling outreach complete
    - 5 - property demolished, burned, owned by LB, etc.
    - 2 - SLE/SLR currently scheduled
    - 6 - SLE/SLR previously completed
    - 12 - completed with non-SLE/SLR road project
  - 14 - still require full scheduling outreach
  - 23 - still require some scheduling outreach
- **Replacement required Tab (20 addresses)**
  - 12 - City asserts complete under terms of SA, because:
    - 1 - all scheduling outreach complete
    - 9 - property demolished, burned, owned by LB, etc.
    - 2 - SLE/SLR previously completed
  - 6 - still require full scheduling outreach
  - 2 - still require some scheduling outreach
- **Information missing Tab (58 addresses)**
  - 43 - City asserts complete under terms of SA, because:
    - 23 - all scheduling outreach complete
    - 16 - property demolished, burned, owned by LB, etc.
    - 1 - completed with non-SLE/SLR road project
    - 3 - SLE/SLR previously completed
  - 11 - still require full scheduling outreach
  - 4 - still require some scheduling outreach

- **Summary of all Tabs (184 addresses)**
  - **124 - City asserts complete under terms of SA, because**
    - **68 - all scheduling outreach complete**
    - **30 - property demolished, burned, owned by LB, etc.**
    - **2 - SLE/SLR currently scheduled**
    - **11 - SLE/SLR previously completed**
    - **13 - completed with non-SLE/SLR road project**
  - **31 - still require full scheduling outreach**
  - **29  - still require some scheduling outreach**

I would recommend that we set a working meeting for early next week between Plaintiffs and the City so that we can work through any addresses that the City believes are complete but Plaintiffs contend are not.

The City does not consent to Plaintiffs' submission of supplemental materials in support of their Motion for Contempt.

Finally, we are in receipt of the draft stipulation that you provided earlier today. I will review that and respond with any feedback.

Thank-you.


Joe


--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

Exhibit 2

August 7, 2023

VIA EMAIL

Joseph Kuptz
William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
jkuptz@cityofflint.com
wkim@cityofflint.com

> Re:  Meet and Confer in *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Dear Messrs. Kuptz and Kim:

Pursuant to Paragraph 128 of the Settlement Agreement ("Agreement"), Plaintiffs requested a meet and confer to discuss whether the City completed all required excavations and replacements by August 1 and a reasonable and practicable deadline for the City's remaining restoration work.

At the parties' upcoming meeting on August 8, 2023, please be prepared to discuss the following.

## I.   Excavations and Replacements

### A.   August 1 deadline

The City was required to complete all remaining excavations and replacements by August 1, 2023. ECF No. 258 at 13. Please confirm whether the City met the August 1 deadline, including whether the City has completed all required excavations and replacements at homes along major roads and at homes flagged by Michigan's State Historic Preservation Office (SHPO). If the City did not meet this deadline, please be prepared to explain the City's plans for completing the overdue excavation and replacement work as quickly as possible.

The City's reporting to date does not reflect that the City met this deadline. *See* July 26, 2023 Em. fr. A. Rolnick to J. Kuptz, et al. Based on the City's most recent reporting, Plaintiffs understand the City to have remaining excavation and/or replacement obligations to 315 addresses. These addresses are listed in the attached spreadsheet ("2023.08.07 Pls' List of Homes Needing Excavation and or Replacement.xlsx"). These homes fall into the following categories:

1. 181 homes, listed on tab 1 ("Excavation required"), require an excavation because the City reported that a resident consented to an excavation, but has not to date reported an excavation at that address.

1

- Column D ("consent source file") lists the reporting spreadsheet indicating that a resident consented to excavation.

2. 50 homes, listed on tab 2 ("Replacement required"), require replacement of a lead or galvanized service line. For these addresses, the City's reporting indicates that a lead or galvanized service line was found, but the City's reporting to date does not indicate that that service line was replaced.

   - Column D ("SLE/SLR Status Source") lists the reporting spreadsheet listing service line excavation and/or replacement data for each address. Columns E through I contain the reported information on service line composition, excavation date, replacement status, and replacement status date.

   - This tab also includes homes which the City listed as requiring replacement in the file titled "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List." These homes are labeled with a "yes" in Column J.

3. 84 homes, listed on tab 3 ("Information missing"), are addresses where the City reported an excavation, but where the City's reporting to date is missing information on service line composition and/or replacement status. Because of this, the City's reporting to date does not demonstrate (and Plaintiffs cannot verify) that the City has completed required replacements at these addresses.

   - Column D ("Status Source") lists the reporting spreadsheet containing service line excavation and/or replacement data for each address. Columns E through I contain the reported information on service line composition, excavation date, replacement status, and replacement status date.

At tomorrow's meeting, please explain the City's understanding of whether it has work remaining at these homes. In particular, please explain whether the City believes that it does not need to complete an excavation at any of these homes because the resident did not respond to the City's attempts to schedule and/or reschedule the excavation. If this is the case, the City must provide reporting showing that it completed the required outreach. ECF No. 237 ¶ 3.d; ECF No. 258 at 15-16.

### B.     Reporting required by August 15

Please explain the City's plans and timeline for providing the reporting required within 14 days of when the City determines that it has completed service line excavations and replacements. This reporting must demonstrate that the City has fulfilled its excavation and replacement obligations to every address on the 2022 Replacement Eligible Homes List. ECF No. 237 ¶ 3; ECF No. 258 at 15-16.

### C.     Ongoing excavation and replacement work

Plaintiffs understand, based on the City's statements to the press, that the City is continuing to accept consent forms and perform outreach to homes that declined excavation

2

and/or were nonresponsive to outreach. Please explain the City's plans for this continued outreach and excavation work.

## II.    Restoration

### A.    Visual inspection photos

On July 19, Plaintiffs requested sample photos of twenty inspected addresses to confirm the accuracy of the City's visual inspections, and the City shared these photos on July 30. *See* ECF No. 258 at 24; July 19, 2023 Em. fr. M. Calero to J. Kuptz; July 26, 2023 Em. fr. A. Rolnick to J. Kuptz; July 30, 2023 Em. fr. J. Kuptz to A. Rolnick. Plaintiffs have reviewed the photos and have follow-up questions about the City's determinations as to the restoration status of some of these addresses. At the parties' meeting, please be prepared to discuss the City's application of the visual inspection criteria to the following addresses: 2402 Miller Road, 506 Harriet Street, 2029 Aitken Avenue.

### B.    Outstanding visual inspection addresses

On August 1, Plaintiffs requested additional information from the City regarding certain addresses where the City has previously reported an excavation. *See* August 1, 2023 Em. fr. M. Calero to J. Kuptz. First, Plaintiffs shared that they had identified an additional address for which the City had reported an excavation, but had not reported a restoration status. Please confirm in writing the restoration status of this address as soon as possible.

In addition, Plaintiffs requested additional information about the 20 "residual" addresses identified by the City in its July 14 email. *See* July 14, 2023 Em. fr. J. Kuptz to R. Kuhl, et al. Plaintiffs are puzzled as to why the City reported excavations and/or replacements at these addresses if these addresses are currently vacant lots or do not exist. Moreover, Plaintiffs are concerned that these addresses may potentially correspond to another, unreported excavated address that may require restoration. Please explain why the City reported an excavation at these addresses.

### C.    Restoration reporting

Plaintiffs have follow-up questions regarding the City's July restoration reporting. *See* July 30, 2023 Em. fr. J. Kuptz to R. Kuhl, et al. First, please explain what the data in the "Restoration Complete" tab reflects. For example, does this tab reflect all addresses for which the City has a contemporaneous record of completed restoration? Do they include addresses where restoration was completed after a visual inspection?

Second, the call log documenting calls from residents or property owners regarding visual inspections is missing address information for several entries. This does not comply with the Court's February 2023 Order. ECF No. 258 at 25. In addition, the City must provide Plaintiffs with any emails it received during the reporting period from residents concerning the visual inspections. *Id.* Please provide these emails as soon as possible and ensure that, going forward, the address information for every call is logged.

### D. Restoration deadline

Once the City has finished determining the remaining scope of restoration work, it is required to propose a restoration deadline within seven days. ECF No. 258 at 16. It is critical that the parties negotiate a new restoration deadline as soon as possible to ensure the City's timely completion of outstanding restoration work. At the parties' upcoming meeting, Plaintiffs would like to discuss the following questions to inform their understanding of a reasonable and practicable deadline for the remaining restoration work.

1. When does the City propose to complete the remaining restoration work?
2. To confirm, at how many homes has the City fully completed restoration? How many homes still require restoration?
3. When did Lakeshore begin completing restoration at excavated homes?
4. How many field staff/crews are currently completing restoration?
5. How many field staff/crews are working on soft surface restoration? Hard-surface restoration?
6. How many addresses are the City and its contractors restoring per week?
7. When does the City anticipate pausing work due to seasonal conditions?
8. Does the City anticipate facing any supply chain issues related to materials used in property restoration?
9. Who is responsible for maintaining records of this work and producing reporting?
10. When does the City anticipate being finished with restoration of the homes it excavated in 2022 and 2023?
11. Is the City planning to use WIIN funding to cover the costs of this work? Does the City plan to seek a further extension of that funding through next year?
12. When do Lakeshore and Rowe's current contracts expire? Does the City have plans to extend these contracts?
13. Has Lakeshore requested approval of overtime to complete restoration work? What is the status of this request?

Sincerely,

_____

Adeline S. Rolnick

encl: 2023.08.07 Pls' List of Homes Needing Excavation and or Replacement.xlsx

cc (via email):    Sarah Tallman, stallman@nrdc.org; Melanie Calero, mcalero@nrdc.org, Bonsitu Kitaba, bkitaba@aclumich.org; Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov

# Exhibit 3

| | |
|---|---|
| **From:** | Rolnick, Addie |
| **To:** | Joseph Kuptz; William Kim |
| **Cc:** | Kuhl, Richard (AG); Bonsitu Kitaba; Tallman, Sarah; Calero, Melanie; Vandal, Nicole; Wall, Michael |
| **Subject:** | Concerned Pastors v. Khouri |
| **Date:** | Wednesday, August 23, 2023 5:02:00 PM |
| **Attachments:** | 2023.08.23 Pls" List of Inactive Homes Requiring Excavation.xlsx |
| | 2023.08.23 Pls" List of Homes with Incomplete Reporting.xlsx |

Joe and Bill,

Following up on the parties' August 8 meeting, I am writing to provide notice that the City must conduct scheduling outreach, and complete excavations and/or replacements if that outreach is successful, at (1) homes that consented to excavation but do not have a current active water account, and (2) homes for which the City's reporting does not allow Plaintiffs to verify whether a required replacement was completed. These homes are listed in the attached files titled "2023.08.23 Pls.' List of Inactive Homes Requiring Excavation.xlsx" and "2023.08.23 Pls.' List of Homes with Incomplete Reporting.xlsx."

Please let me know if you have any questions. Plaintiffs are available to discuss these matters at the City's convenience.

***The City must complete excavations at eligible homes that have consented to excavation but do not have current active water accounts.*** Based on the City's latest reporting, Plaintiffs understand there to be 72 homes where the resident consented to an excavation but the City has declined to excavate because these homes do not have current active water accounts. These homes are listed in the attached file titled "2023.08.23 Pls' List of Inactive Homes Requiring Excavation.xlsx." **The City must complete an excavation and, if necessary, replacement at these homes, unless the City is unable to schedule or reschedule an excavation after completing the required outreach.** ECF No. 237 ¶ 4, ECF No. 258 at 15-16.

The Agreement, as modified, requires the City to complete specific scheduling outreach to any eligible home that consents to excavation. There is no exception to this requirement for homes that lack an active water account. ECF No. 237 ¶ 4. Once a home consents to excavation, the City may resolve its obligation to that home only if: (i) the City completes and documents an excavation and, if necessary, replacement; (ii) the resident declines an excavation after consenting; (iii) the City is unable to schedule an excavation after completing the post-consent scheduling outreach required by Paragraph 6 of the 2020 Stipulation, ECF No. 217; or (iv) the City is unable to complete a scheduled excavation despite completing the outreach required by the February 2023 Order, ECF No. 258. *See* ECF No. 237 ¶ 4, ECF No. 258 at 15-16. None of these categories permit the City to resolve its obligations to an address that has consented to excavation solely because the home does not have a current active water account.

There is also no practical obstacle to the City completing excavations and/or replacements at homes without current active water accounts. The City's reporting reflects that residents of these homes consented recently, indicating that these homes are currently occupied. While the City is required to complete the required flushing protocol following replacements, ECF No. 147-1 ¶ 34, there is no reason the City cannot temporarily turn on water service to a home where it completes a replacement to complete the flushing protocol and then turn off water service after that protocol has been completed.

**By no later than August 28, 2023, please confirm whether the City will conduct scheduling outreach, and complete excavations and/or replacements if that outreach is successful, at the homes listed in the attached file titled "2023.08.23 Pls.' List of Inactive Homes Requiring**

Excavation.xlsx."

***The City must complete the required scheduling outreach to homes for which the City's reporting is incomplete.*** Based on the City's latest reporting, Plaintiffs understand there to be 100 homes for which the City's reporting either (a) indicates that a lead or galvanized service line was found and not replaced, or (b) where the City reported an excavation, but where the City's reporting to date is missing information on service line composition and/or replacement status such that Plaintiffs cannot verify that the City has completed required replacements at these addresses. These homes are listed in the attached file titled "2023.08.23 Pls.' List of Homes with Incomplete Reporting.xlsx." The City has taken the position that it may resolve its obligations to these addresses by completing the in-person consent attempts required by Paragraph 15 of the 2019 Stipulation, ECF No. 208. However, because residents have already consented to—and the City has already completed— excavations at these addresses, **the City must, at a minimum, complete the scheduling outreach required by Paragraph 6 of the 2020 Stipulation, ECF No. 217.** Specifically, the City must complete at least three in-person scheduling attempts, one of which occurs after 5PM or on a weekend, leave a doorhanger, and call the resident. ECF No. 217 ¶ 6. Alternatively, the City may demonstrate that it has resolved its obligations to these addresses by providing reporting, based on its paper records or Cityworks, showing that the City completed required replacements at these addresses.

**By no later than August 28, 2023, please confirm whether the City will either complete the required scheduling outreach to the homes listed in the attached file titled "2023.08.23 Pls.' List of Homes with Incomplete Reporting.xlsx" or provide documentation of the service line composition and replacement status of these homes.**

Regards,

Addie

ADELINE ROLNICK
*Attorney*
NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

Exhibit 4

September 15, 2023

VIA EMAIL

Joseph Kuptz
William Kim
City of Flint Department of Law
1101 S. Saginaw Street, Third Floor
Flint, MI 48502
jkuptz@cityofflint.com
wkim@cityofflint.com

City of Flint
ATTN: City Administrator Clyde Edwards
City Hall
1101 S. Saginaw Street, First Floor
Flint, MI 48502
cedwards@cityofflint.com

      Re:     Notice of City of Flint's Noncompliance with Settlement Agreement in
              *Concerned Pastors for Social Action v. Khouri*, No. 16-10277 (E.D. Mich.)

Dear Messrs. Kuptz, Kim, and Edwards:

      On August 16, 2023, the City notified Plaintiffs of its determination that the City had
completed all excavations and replacements required by the Settlement Agreement
("Agreement"), as modified. *See* Aug. 16, 2023 Em. fr. J. Kuptz to R. Kuhl, et al. Pursuant to
Paragraph 128 of the Settlement Agreement ("Agreement") and Paragraph 3 of the 2022
Stipulation, ECF No. 237, Plaintiffs provide notice that Plaintiffs do not concur in the City's
written statement that the City completed all excavations and replacements required by the
Agreement.

      The Agreement required the City to complete all required excavations and replacements
by August 1, 2023. ECF No. 258 at 13. Within 14 days of determining that it completed all
excavations and replacements, the City was required to provide documentation supporting its
determination. ECF No. 237 ¶ 3. As Plaintiffs have repeatedly notified the City over the last
seven weeks, and as explained in more detail below, the City's reporting to date, including the
reporting the City provided on August 16, 2023, does not reflect that the City completed all
excavations and replacements required by the Agreement. *See* July 26, 2023 Em. fr. A. Rolnick
to J. Kuptz; Aug. 7, 2023 Ltr. fr. A. Rolnick to J. Kuptz; Aug, 18. Em. fr. A. Rolnick to J. Kuptz;
Aug 23 Em. fr. A. Rolnick to J. Kuptz; Sept. 13 Em. fr. A. Rolnick to J. Kuptz.

## I.    The City's reporting remains incomplete

### A.    The City must provide required reporting on its scheduling outreach

The City must complete an excavation and/or replacement at every eligible home that consented to excavation unless the City is unable to schedule an excavation after completing reasonable outreach efforts. *See* ECF No. 217 ¶¶ 2, 6; ECF No. 237 ¶ 3.d. These efforts must include, at a minimum, (1) three in-person outreach attempts, one of which occurs on a weekend or after 5 p.m.; (2) one telephone call; and (3) a doorhanger left at the address if the first in-person attempt is unsuccessful. ECF No. 217 ¶ 6. The City must provide reporting on these outreach efforts, including documentation confirming that the City left a doorhanger at and placed a phone call to each address. *Id*.

The City's reporting to date fails to document that the City made phone calls and left doorhangers as part of its scheduling outreach; that failure violates the Agreement. Aug. 18 Em. fr. A. Rolnick to J. Kuptz; ECF No. 217 ¶ 6. While the City recently provided, for the first time, a handwritten phone log documenting some scheduling phone calls, *see* Sept. 8, 2023 Em. fr. J. Kuptz to A. Rolnick, that log documents phone calls to only 21 addresses. Sept. 13 Em. fr. A. Rolnick to J. Kuptz. And the City has provided no documentation of leaving doorhangers at homes where the first in-person scheduling attempt was unsuccessful. Without any documentation by the City that it has completed the required scheduling outreach, Plaintiffs cannot agree with the City's assertion, inconsistent with the City's own documentation, that it has done so.

The scheduling outreach reporting the City has provided also shows that the City did not complete all required scheduling outreach. As explained in more detail below and documented in the attached spreadsheet titled "2023.09.15 Pls' List of Homes Needing Excavation and or Replacement.xlsx," the City has not completed required in-person scheduling attempts and or/phone calls at 126 homes where residents consented to excavation.

### B.    The City must complete scheduling outreach to homes that recently consented to excavation, but do not have current active water accounts

Based on the City's latest reporting, Plaintiffs understand there to be 67 homes where the resident consented to an excavation but the City has declined to excavate because these homes do not have current active water accounts. The City must complete an excavation and, if necessary, replacement at these homes, unless the City is unable to schedule or reschedule an excavation after completing the required outreach. ECF No. 237 ¶ 4, ECF No. 258 at 15-16.

The Agreement, as modified, requires the City to complete scheduling outreach to any eligible home that consents to excavation. ECF No. 217 ¶ 6. Once a home consents to excavation, the City may resolve its obligation to that home only if: (i) the City completes and documents an excavation and, if necessary, a replacement; (ii) the resident declines an excavation after consenting; (iii) the City is unable to schedule an excavation after completing the post-consent scheduling outreach required by Paragraph 6 of the 2020 Stipulation, ECF No. 217; or (iv) the City is unable to complete a scheduled excavation despite completing the

2

outreach required by the February 2023 Order. *See* ECF No. 237 ¶ 4, ECF No. 258 at 15-16. None of these categories permit the City to resolve its obligations to an address that has consented to excavation solely because the home does not have a current active water account. ECF No. 237 ¶ 4.

The City has agreed to complete the required scheduling outreach to homes that consented to excavation but do not have a current active water account and to complete excavations and/or replacements at homes where this outreach is successful. *See* Sept. 8, 2023 Em. fr. A. Rolnick to J. Kuptz. The City has not yet provided any reporting of scheduling outreach to or excavations performed at these homes. Until the City provides this reporting, Plaintiffs will not be able to concur that the City has completed all required excavations and replacements.

## C. The City must provide complete reporting on service line composition and replacement status

If the City completes an excavation and/or replacement at an eligible home, the City must provide reporting that documents that (a) the date of excavation; (b) the material(s) of the service line; (c) whether any portion of the service line was replaced; (d) if any portion of the service line was replaced, a description of which portion was replaced; and (e) the date of service line replacement, if applicable. ECF No. 208 ¶ 6.ii; ECF No. 237 ¶ 3(a). As Plaintiffs have repeatedly documented, the City's reporting includes a number of addresses where the City reported an excavation but did not report service line composition and/or replacement status; as a result, the City has not documented, and Plaintiffs cannot agree, that the City has completed required replacements at these addresses. July 26, 2023 Em. fr. A. Rolnick to J. Kuptz; Aug. 7, 2023 Ltr. fr. A. Rolnick to J. Kuptz; Aug 23 Em. fr. A. Rolnick to J. Kuptz. For other addresses, the City's reporting indicates that the City completed an excavation and located a lead or galvanized steel service line, but did not replace that line. *Id.*

The City's reporting to date remains incomplete. The City's most recent reporting contained undefined acronyms and abbreviations that did not shed light on whether the City completed required replacements. S*ee* Sept. 13 Em. fr. A. Rolnick to J. Kuptz. And for some of these addresses, the City now indicates that a replacement was completed prior to 2017, contradicting previous reporting that an excavation after 2017 identified a lead and/or galvanized steel service line. *Id.* The City has not explained why, if the City completed a replacement at these addresses before 2017, a more recent excavation identified an existing lead and/or galvanized steel service line.

The City must provide reporting sufficient to allow Plaintiffs to verify whether all required replacements was occurred. At a minimum, because residents have already consented to—and the City has already completed—excavations at these addresses, the City must complete and document the scheduling outreach required by Paragraph 6 of the 2020 Stipulation, ECF No. 217.

3

## II.    The City must complete additional work at and/or provide additional reporting for 217 homes

Based on the City's reporting to date, Plaintiffs understand the City to have remaining excavation and/or replacement obligations to 217 addresses. These addresses are listed in the attached spreadsheet ("2023.09.15 Pls' List of Homes Needing Excavation and or Replacement.xlsx"). Until the City provides reporting documenting that it has resolved its obligations to these homes, Plaintiffs are unable to concur that the City completed all required excavations and replacements.

These homes fall into the following categories:

1. 133 homes, listed on tab 1 ("Excavation required"), require an excavation because the City reported that a resident consented to an excavation, but has not to date reported an excavation at that address or reported that the City completed the full scheduling outreach required by the 2020 Stipulation. *See* ECF No. 217 ¶ 6.

   - Column D ("consent source file") lists the reporting spreadsheet indicating that a resident consented to excavation.

   - Column E ("City's Comment in "2023.07.25 Pls' List of Homes Req SLE SLR - Rowe Anal. V2.xlsx") and Column F ("City's comment in "2023.08.30 Consent Addresses - LGC Comments") include the additional notes the City shared about these addresses in the listed files.

   - Column G ("Plaintiffs' response") includes Plaintiffs' responses to and questions about the additional information provided by the City. For example, the City's comments for several addresses indicate that a resident responded to scheduling outreach, but that the City has not completed the excavation because the work requires a traffic permit or because there is an obstruction. The City must complete and report excavations at these homes.

   - Column H ("Additional scheduling outreach needed") lists the additional scheduling outreach the City must complete at each home.

2. 21 homes, listed on tab 2 ("Replacement required"), require replacement of a lead or galvanized service line. For these addresses, the City's reporting indicates that a lead or galvanized service line was found, but the City's reporting to date does not indicate that that service line was replaced.

   - Column D ("SLE/SLR Status Source") lists the reporting spreadsheet listing service line excavation and/or replacement data for each address. Columns E through I contain the reported information on service line composition, excavation date, replacement status, and replacement status date.

4

- This tab also includes homes which the City listed as requiring replacement in the file titled "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List." These homes are labeled with a "yes" in Column J.

- Column K ("City's Comment in "2023.07.25 Pls' List of Homes Req SLE SLR - Rowe Anal. V2.xlsx"), Column L ("City's comment in '2023.08.23 Pls' List of Homes with Incomplete Reporting UPDATED.xlsx,' column I"), and Column M ("City's comment in '2023.08.23 Pls' List of Homes with Incomplete Reporting UPDATED.xlsx,' column K) include the additional notes the City shared about these addresses in the listed files and columns.

- Column N ("Plaintiffs' response") includes Plaintiffs' responses to and questions about the additional information provided by the City.

- Column O ("Additional scheduling outreach needed") lists the additional scheduling outreach the City must complete at each home.

3. 60 homes, listed on tab 3 ("Information missing"), are addresses where the City reported an excavation, but where the City's reporting to date is missing information on service line composition and/or replacement status. Because of this, the City's reporting to date does not demonstrate (and Plaintiffs cannot verify) that the City has completed required replacements at these addresses.

- Column D ("Status Source") lists the reporting spreadsheet containing service line excavation and/or replacement data for each address. Columns E through I contain the reported information on service line composition, excavation date, replacement status, and replacement status date.

- Column J ("City's Comment in "2023.07.25 Pls' List of Homes Req SLE SLR - Rowe Anal. V2.xlsx") and Column K ("City's comment in '2023.08.30 Consent Addresses - LGC Comments,' Column H") include the additional notes the City shared about these addresses in the listed files and columns.

- Column L ("Plaintiffs' response") includes Plaintiffs' responses to and questions about the additional information provided by the City.

- Column M ("Additional scheduling outreach needed") lists the additional scheduling outreach the City must complete at each home.

************

In short, the City's reporting has not documented that it completed all required excavations and replacements. If the City has additional documentation demonstrating that it did meet its obligations to the homes identified above, please provide it promptly. Plaintiffs do not wish to engage in unnecessary enforcement motion practice, but we also cannot accept assertions of completion that are inconsistent with the records the City has itself provided.

Plaintiffs request a meet and confer with City officials, including the City Administrator and appropriate officials from the Department of Public Works and ROWE, to discuss these matters. We are available at the following times (all EST):

Tuesday, September 19: 10:00 am – 12:00 pm. 3:30 pm – 5:00 pm
Wednesday, September 20: 3:00 pm – 5:00 pm
Thursday, September 21: 3:30 pm – 5:00 pm
Friday, September 22: 2:30 pm – 5:00 pm
Wednesday, September 27: 11:00 am – 2:00 pm
Thursday, September 28: 3:00 pm – 5:00 pm

Sincerely,

Adeline S. Rolnick

encl: 2023.09.15 Pls' List of Homes Needing Excavation and or Replacement.xlsx

cc (via email):     Sarah Tallman, stallman@nrdc.org; Melanie Calero, mcalero@nrdc.org;
Michael Wall, mwall@nrdc.org; Bonsitu Kitaba, bkitaba@aclumich.org;
Richard Kuhl, kuhlr@michigan.gov; Nate Gambill, gambilln@michigan.gov

6

Exhibit 5

| From: | Rolnick, Addie |
|---|---|
| To: | Joseph Kuptz; William Kim (wkim@cityofflint.com) |
| Cc: | Calero, Melanie; Vandal, Nicole; Bonsitu Kitaba; Richard S. Kuhl (kuhlr@michigan.gov); Tallman, Sarah |
| Subject: | RE: Concerned Pastors - dispute re August 1 deadline |
| Date: | Monday, October 23, 2023 6:29:55 PM |
| Attachments: | 2023.10.23 Pls" List of Homes Needing Excavation and or Replacement.xlsx |

Joe,

Please see the attached spreadsheet titled "2023.10.23 Pls' List of Homes Needing Excavation and or Replacement." This spreadsheet documents Plaintiffs' current understanding of where the City has remaining excavation and replacement obligations, based on the reporting the City has provided to date.

These 184 homes fall into the following categories:

1. 106 homes, listed on tab 1 ("Excavation required"), require an excavation because the City reported that a resident consented to an excavation, but has not to date reported an excavation at that address or reported that the City completed the full scheduling outreach required by the 2020 Stipulation. *See* ECF No. 217 ¶ 6.

    0. Column D ("consent source file") lists the reporting spreadsheet indicating that a resident consented to excavation.

    1. Column E ("City's Comment in "2023.07.25 Pls' List of Homes Req SLE SLR - Rowe Anal. V2.xlsx"), Column F ("City's comment in "2023.08.30 Consent Addresses - LGC Comments"), and Column G (City's comment in "2023.09.15 Pls' List of Homes Needing Excavation and Replacement - Rowe Comments") include the additional notes the City shared about these addresses in the listed files.

    2. Column H ("Plaintiffs' response") includes Plaintiffs' responses to and questions about the additional information provided by the City.

    3. Column I ("Additional scheduling outreach needed") lists the additional scheduling outreach the City must complete at each home. If the City listed "no answer" in the "status update" column in the spreadsheet titled "2023.08.23 Pls' List of Inactive Homes Requiring Excavation – Update 9-27-23," Plaintiffs consider the City to have provided the required documentation of a scheduling phone call.

1. 20 homes, listed on tab 2 ("Replacement required"), require replacement of a lead or galvanized service line. For these addresses, the City's reporting indicates that a lead or galvanized service line was found, but the City's reporting to date does not indicate that that service line was replaced. Please note that Plaintiffs have added two addresses to this tab (█████████ and █████████) because the City reported completing excavations at these addresses in September and identifying both the public and private side lines as lead or galvanized steel, but completing only a partial service line replacement. The City must replace the full service line at these homes.

    0. Column D ("SLE/SLR Status Source") lists the reporting spreadsheet listing service line excavation and/or replacement data for each address. Columns E through I contain the reported information on service line composition, excavation date, replacement status, and replacement status date.

    1. This tab also includes homes which the City listed as requiring replacement in the file titled "2022.01.05 Preliminary SLE-SLR Replacement Eligible Homes List." These homes are labeled with a "yes" in Column J.

    2. Column K ("City's Comment in "2023.07.25 Pls' List of Homes Req SLE SLR - Rowe Anal. V2.xlsx"), Column L ("City's comment in '2023.08.23 Pls' List of Homes with Incomplete Reporting UPDATED.xlsx,' column I") and Column M ("City's comment in '2023.08.23

Pls' List of Homes with Incomplete Reporting UPDATED.xlsx,' column K) include the additional notes the City shared about these addresses in the listed files and columns.

3. Column N ("Plaintiffs' response") includes Plaintiffs' responses to and questions about the additional information provided by the City.

4. Column O ("Additional scheduling outreach needed") lists the additional scheduling outreach the City must complete at each home.

2. 58 homes, listed on tab 3 ("Information missing"), are addresses where the City reported an excavation, but where the City's reporting to date is missing information on service line composition and/or replacement status. Because of this, the City's reporting to date does not demonstrate (and Plaintiffs cannot verify) that the City has completed required replacements at these addresses.

0. Column D ("Status Source") lists the reporting spreadsheet containing service line excavation and/or replacement data for each address. Columns E through I contain the reported information on service line composition, excavation date, replacement status, and replacement status date.

1. Column J ("City's Comment in "2023.07.25 Pls' List of Homes Req SLE SLR - Rowe Anal. V2.xlsx") and Column K ("City's comment in '2023.08.30 Consent Addresses - LGC Comments,' Column H") include the additional notes the City shared about these addresses in the listed files and columns.

2. Column L ("Plaintiffs' response") includes Plaintiffs' responses to and questions about the additional information provided by the City.

3. Column M ("Additional scheduling outreach needed") lists the additional scheduling outreach the City must complete at each home.

Please also see the following responses to the information you provided this afternoon about the homes labeled "remove from list" in the file titled "2023.08.23 Pls' List of Inactive Homes Requiring Excavation – Update 9-27-23."

██████████████ - *cut & plugged 2-16-22*
- As discussed in our September 27 meeting, the City must provide information verifying that cut and plugged homes were demolished after the service lines were cut and capped and that water service has not been reinitiated to this homes.

██████████████ - *Condemned by our Building, Safety & Inspections dept.10/11/22.*
- Please provide information verifying that water service was not reinitiated to this home after it was condemned.

████████████ - *We do not have this in our Utility Billing System any longer and the only building close to that location is boarded up.*
- Is it the City's position that this home is vacant or abandoned? If so, please explain why the City reported this address as consenting to excavation in June 2023.

██████████████ - *became active in August 2023- Our records indicate a 3/4" copper service was installed from main to house 6-23-55.*
- The date of replacement appears to be a typo. Please confirm the correct date of service line replacement.

In addition, the City indicated that ████████████████ was "completed by WTSC" in the file titled "2023.08.23 Pls' List of Inactive Homes Requiring Excavation – Update 9-27-23." Plaintiffs have been unable to locate a record of excavation and/or replacement at that address in the City's reporting to date. Please the required reporting on the service line excavation and replacement status of that address or direct to us to where it is documented in the City's previous reporting.

Regards,

Addie

**ADELINE ROLNICK**
*Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER
NRDC.ORG

---

**From:** Tallman, Sarah <stallman@nrdc.org>
**Sent:** Friday, October 20, 2023 2:24 PM
**To:** Joseph Kuptz <jkuptz@cityofflint.com>; William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>
**Cc:** Rolnick, Addie <ARolnick@nrdc.org>; Calero, Melanie <mcalero@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Richard S. Kuhl (kuhlr@michigan.gov) <kuhlr@michigan.gov>
**Subject:** RE: Concerned Pastors - dispute re August 1 deadline

Joe,

Plaintiffs will provide an updated spreadsheet on Monday reflecting our understanding of where the City has remaining excavation and replacement obligations based on the excavation data the City provided on October 18, as well as the specific scheduling outreach still required at each address.

As explained in Addie's September 29 and October 6 emails, as well as the Notice of Violation sent earlier today, Plaintiffs do not understand what the entries in the "status update" column in the file titled "2023.08.23 Pls' List of Inactive Homes Requiring Excavation - Update 9-27-23.xlsx" mean. Because the City has yet to answer Plaintiffs' basic clarifying questions about that spreadsheet, Plaintiffs have been unable to understand how the information in this spreadsheet may or may not indicate that the City has resolved its excavation and/or replacement obligations as to any of listed homes. I have listed our questions again here for your convenience:

1. What does the "status update" column reflect? For example, where the entry in that column reads "no answer," does that mean the resident did not answer a phone call or was not home at the time of an in-person scheduling attempt?
2. The City notes that several addresses were "completed by WTSC." Please provide complete documentation of the completed excavation and/or replacement at these addresses, including the required information on service line composition and replacement status.
3. What does "remove from the list" mean?

As for the file titled "2023.09.15 Pls' List of Homes Needing Excavation and or Replacement - Rowe Comments.xlsx," this included no new reporting for the vast majority of the homes Plaintiffs

3

identified. It included no new information on the "replacement required" and "information missing" tabs. The file did include some new reporting on in-person scheduling attempts at 14 of the 133 homes Plaintiffs listed on the "excavation required" tab. However, due to the City's ongoing failure to provide documentation of the required scheduling phone calls and doorhangers, this reporting does not show that the City completed all required scheduling outreach at any addresses. Indeed, the notes input by Rowe concede that additional scheduling outreach is required at at least 18 of the homes Plaintiffs identified.

Let me know if you have any questions about the above.

Regards,
Sarah

---

**From:** Joseph Kuptz <jkuptz@cityofflint.com>
**Sent:** Friday, October 20, 2023 12:26 PM
**To:** Tallman, Sarah <stallman@nrdc.org>
**Cc:** William Kim (wkim@cityofflint.com) <wkim@cityofflint.com>; Rolnick, Addie <ARolnick@nrdc.org>; Calero, Melanie <mcalero@nrdc.org>; Vandal, Nicole <nvandal@nrdc.org>; Bonsitu Kitaba <bkitaba@aclumich.org>; Richard S. Kuhl (kuhlr@michigan.gov) <kuhlr@michigan.gov>
**Subject:** Re: Concerned Pastors - dispute re August 1 deadline

Sarah - thank-you for your email. In response to the fourth paragraph, I would note that on September 27th, following our meeting, the City provided two spreadsheets to Plaintiffs:

- 2023.08.23 Pls' List of Inactive Homes Requiring Excavation - Update 9-27-23.xlsx; and
- 2023.09.15 Pls' List of Homes Needing Excavation and or Replacement - Rowe Comments.xlsx

It was the City's understanding that the annotations provided on both of those spreadsheets at least somewhat narrowed the total population of outstanding addresses needing consent outreach, scheduling outreach and/or SLE/SLR.

While I'm in the process of gathering additional information from the City's partners in response to your email, it may be helpful for the City to know which addresses on the "2023.09.15 Pls' List of Homes Needing Excavation and or Replacement - Rowe Comments.xlsx" spreadsheet Plaintiffs contend are still at issue.

Are Plaintiffs able to provide that?

Joe

On Fri, Oct 20, 2023 at 11:38 AM Tallman, Sarah <stallman@nrdc.org> wrote:

Joe and Bill,

The City has yet to respond to Addie's September 28 and October 6 emails or to the voicemails she left for Joe last Wednesday and Bill Tuesday. It is critical that the City provide the outstanding reporting it agreed to provide at the parties' September 27 meeting, as well as answers to the questions in Addie's September 28 email, as soon as possible.

Over two months have passed since the City's deadline to provide reporting showing compliance with the August 1 deadline. To conserve the parties' and the Court's resources, Plaintiffs have diligently attempted to anticipate and resolve issues with the City's noncompliant and incomplete reporting informally, without seeking further judicial relief or intervention. Even before the August 1 deadline, Plaintiffs sent the City a list of 335 addresses where the City's reporting had not yet shown completion of excavation obligations.

But, despite Plaintiffs' repeated emails, letters, and phone calls, as well as three meet and confers, the City has yet to provide required reporting on scheduling outreach and service line composition and replacement status for nearly 200 homes. And the City has conceded that it still has remaining excavation and replacement obligations to many homes—work that the City was required to finish by August 1. With winter weather approaching, the City must make every effort to complete this overdue work as quickly as possible. There is no excuse for the City's failure to complete the required excavation work this fall and provide reporting showing it has done so.

**Please share reporting showing that the City fulfilled its excavation and replacement obligations to the addresses on the file titled, "2023.09.15 Pls' List of Homes Needing Excavation and or Replacement.xlsx" for which the City's October 18 reporting did not show compliance by no later than Friday, October 27.** If the City does not cure this violation by October 27, Plaintiffs intend to seek the Court's involvement to resolve this dispute and ensure the City completes the remaining work without further delay.

If the City believes further discussion concerning the disputed addresses would be productive, Plaintiffs will make themselves available for another meet and confer next week.

In addition, **please confirm that the City will provide all requested information to EGLE in support of a WIIN funding extension request by next Friday (10/27).** Richard informed us that this is what the City told EGLE. The City must prioritize the WIIN extension so as not to leave millions of dollars in federal funding on the table.

Regards,

Sarah

SARAH TALLMAN

*Senior Attorney*

NATURAL RESOURCES DEFENSE COUNCIL
1152 15TH STREET NW, SUITE 300
WASHINGTON, DC 20005
T: (312) 651-7918
stallman@nrdc.org
PRONOUNS: SHE/HER

--
Joseph N. Kuptz, Assistant City Attorney
City of Flint, Department of Law
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
(810) 237-2085

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

                        Plaintiffs,                               Case Number 16-10277

v.                                                        Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, MICHAEL A.
FINNEY, JOEL FERGUSON, SYLVESTER
JONES, R. STEVEN BRANCH, and
CITY OF FLINT,

                        Defendants.

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE
## TO SUBMIT SUPPLEMENTAL EVIDENCE

This matter is before the Court on the plaintiffs' motion for leave to submit supplemental

evidence in support of their motion for contempt. The Court has reviewed the parties' briefs and

finds that the plaintiffs have shown good cause to submit additional evidence. The information,

which concerns the plaintiffs' ongoing efforts to enforce the settlement agreement, is relevant to

the pending motion and was not available until after the close of briefing. Although the defendants

dispute that the proposed supplemental evidence is directly related to the issues raised by the

plaintiffs in their motion for contempt, the Court is satisfied that the information may be relevant

to the appropriateness of potential remedies, and it is appropriate to consider it.

Accordingly, it is **ORDERED** that the plaintiffs' motion for leave to submit supplemental evidence in support of their motion for civil contempt (ECF No. 277) is **GRANTED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: November 17, 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

                           Plaintiffs,                       Case Number 16-10277

v.                                             Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, MICHAEL A.
FINNEY, JOEL FERGUSON, SYLVESTER
JONES, R. STEVEN BRANCH, and
CITY OF FLINT,

                           Defendants.

_____/

## ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR CONTEMPT

On March 28, 2017, the City of Flint entered into a Settlement Agreement, promising, among other things, to replace the water service lines made of lead that furnished water to residences throughout the City. The Settlement Agreement brought to a conclusion, or so it was thought at the time, a lawsuit that was filed under the Clean Water Act to redress the well-documented and widely publicized contamination of the City's water system when the municipality replaced the Detroit Water and Sewerage Department, which drew its water from Lake Huron, with its own Flint-River-based system as the source of the City's drinking water. The Settlement Agreement established deadlines for various phases of the replacement and restoration operation. Those benchmarks included outreach, reporting, and inspection requirement deadlines intended to ensure that Flint residents were notified of their rights to remediation and to permit the plaintiffs to monitor the City's progress remediating the defective water distribution system.

Those deadlines almost immediately were missed, and the plaintiffs thereafter filed motions and stipulations to modify them.

Now, for the sixth time in six years, the plaintiffs seek to enforce the Settlement Agreement, as modified by the several deadline extensions that the Court has granted following the parties' stipulations. The plaintiffs allege that the City continues to miss deadlines for completing promised replacement work, including by failing (1) to complete by March 1, 2023 outreach to all homes eligible for service line replacement; (2) to determine by May 1, 2023 the addresses where the City still needs to complete restoration work; and (3) to provide accurate and complete monthly restoration reports to the plaintiffs. They ask the Court to impose coercive sanctions by holding the City and its mayor, a non-party, in contempt; ordering the City and its mayor to pay a $500 daily fine to the Court until it complies with the Court's last enforcement order; and amending the Settlement Agreement to permit the plaintiffs to recover attorney's fees and costs for future enforcement efforts.

The Court held a hearing on the motion on June 30, 2023 during which the parties presented evidence. The Court also permitted the parties to file supplemental briefs in August and November 2023. Based on the evidence, it is apparent that the City has failed to abide by the Court's orders in several respects, and that it has no good reason for its failures. The City has demonstrated belated compliance since the hearing, but even now, it has not actually replaced all of the lead service lines, which it originally promised to replace by March 28, 2020. The City is in civil contempt of the Court's order.

I. Factual Background

At the time of the June 2023 hearing on the present motion, the City of Flint had continued to miss deadlines for completing the water service line replacement work it promised to do when

- 2 -

it entered into a Settlement Agreement on March 28, 2017. The Agreement is extensive, and the parties and the Court repeatedly have modified it in to ensure the City's compliance and protect the health and safety of Flint residents. As modified, the Agreement required that the City "implement a plan to replace *all* lead and galvanized service lines at Flint residences" to reduce lead contamination in the City's tap water. 4th Enforcement Order, ECF No. 228, PageID.11034. It required the City to conduct outreach to residents to seek their consent to excavate their service lines. The outreach was to be made via a mailing and at least two in-person contacts, one of which must occur after 5:00 p.m. or on a weekend, to all homes that had an active water account when or after the parties entered the Agreement. Mar. 2019 Modification Order, ¶¶ 14-15, ECF No. 208, PageID.10354-55; Settlement Agreement, ¶ 11, ECF No. 147-1, PageID.7365-66. The Agreement also mandates that the City address property damage caused by its service line work to residents' sidewalks, curbs, and driveways. The City must repair any damage by filling the excavation trench, removing debris, ensuring uniform plant cover, and repairing any broken asphalt or concrete. 2022 Modification Order, ¶ 2, ECF No. 237, PageID.11071; 5th Enforcement Order, ECF No. 258, PageID.11694-95. Finally, the City must make monthly status reports to the plaintiffs detailing its outreach and restoration efforts, and it must maintain sufficient records to comply with all reporting requirements. 5th Enforcement Order, ECF No. 258at PageID.11695-96; Mar. 2019 Modification Order, ¶ 6, ECF No. 208, PageID.10348-49.

The City has not fulfilled its obligations under the Agreement as modified. As of the filing date of the plaintiffs' motion, the City had yet to complete outreach, excavations, or restoration; it had made inconsistent reports to the plaintiffs; and it repeatedly had missed deadlines. The City's violations have caused difficulties and, in some cases, hardship to Flint residents, many of whom have waited years for excavations and repairs. *See, e.g.*, Diener decl., ECF No. 260-3,

PageID.11784-85 (attesting that the City did not complete restoration work at declarant's property after replacing the service line in 2019); Hayes decl., ECF No. 260-4, PageID.11787-91 (attesting that the City never replaced declarant's service line after she consented to the replacement in 2020); Perez decl., ECF No. 260-5, PageID.11793-94 (attesting that the City determined that no restoration work was needed at declarant's property, despite the City causing extensive damage to his lawn).  Many also still do not have access to safe tap water.  Because the City has yet to replace all water service lines, residents still are advised by the Environmental Protection Agency and the state of Michigan not to drink tap water unless a special filter has been installed.  May 16, 2023 Scripps Article, ECF No. 260-7, PageID.11850-51.

The Agreement states that its dispute resolution mechanism is the "sole and exclusive mechanism" for resolving disputes and disagreements arising out of the Agreement, and that the Court has jurisdiction to enforce its terms.  Settlement Agreement, ¶¶ 125-26, ECF No. 147-1, PageID.7423.  It also states that no modification may be made to the Agreement absent a "joint stipulation of all of the Parties and a Court order."  *Id.* at ¶ 138, PageID.7426-27.  And it caps the plaintiffs' attorney's fees at $895,000, which have been paid, while specifying that the payment "shall fully and finally release, discharge, and satisfy any claim by Plaintiffs to litigation costs (including attorneys' fees and expert costs) incurred in this Case and incurred in enforcing this Agreement through the Termination Date."  *Id.* at ¶¶ 123-24, PageID.7422-23.  However, the plaintiffs contend that the Agreement's dispute resolution provisions have proved inadequate and its fee provisions are inequitable.  The plaintiffs explain, therefore, that they have filed the instant contempt motion in an effort to coerce the City to comply with the Agreement, as well as to amend certain terms of the Agreement to ensure prompt compliance.

A. Violations of the Court's Order

The plaintiffs have filed five previous motions to enforce the Agreement and to remedy the City's mismanagement of the service line replacement process. The Court granted the most recent motion to enforce on February 24, 2023 and ordered three remedies that are relevant here. *First*, the Court ordered the City to create a detailed written Service Line Replacement Plan describing "the steps the City will take to complete the remaining excavation and replacement work (excluding restoration) required by the Agreement as quickly as practicable, and no later than August 1, 2023." 5th Enforcement Order, ECF No. 258, PageID.11689. The Court directed the City to include a plan for "completing outreach as quickly as practicable and no later than March 1, 2023." *Id.* at PageID.11690. *Second*, the Court ordered the City to compile and provide to the plaintiffs an Excel spreadsheet no later than May 1, 2023 (1) listing all previously excavated addresses on the 2022 Replacement Eligible Homes List; and (2) indicating whether the City has contemporaneous documentation that it completed restoration and the date of restoration, or whether it has completed a visual inspection verifying that

> (a) no asphalt, concrete, or other debris remains; (b) the address has a complete, uniform sidewalk with no gaps or holes, and the sidewalk is uniform in both grade and alignment; (c) the address has a complete, uniform driveway with no gaps or holes, and the driveway is uniform in both grade and alignment; (d) the address has a complete, uniform curb, with no gaps or missing pieces, and the curb has a uniform grade and alignment; (e) the lawn is free of holes or trenches and is of a uniform grade, with no visible depressions; (f) any visible topsoil on the greenbelt or lawn is free of debris and the greenbelt or lawn has a consistent and uniform plant cover; and (g) the water shut-off valve is flush with the surface of the lawn and does not pose a tripping hazard.

*Id.* at PageID.11687; Stip. to Modify, ¶ 16.b, ECF No. 256, PageID.11625-27. The parties agreed that, no later than seven days after submitting this list, the City shall propose a deadline for completing all remaining restoration work required under the Settlement Agreement. 5th Enforcement Order, ECF No. 258, PageID.11687. *Third*, the Court directed the City to make a

- 5 -

monthly report to the plaintiffs with an Excel spreadsheet listing all of the excavated properties where (1) the City completed and documented restoration, including the dates of restoration; (2) the City has not completed restoration and does not need a visual inspection to confirm restoration status; and (3) the City has no record of restoration. *Id.* at PageID.11695-96. For properties lacking records, the Court ordered the City to indicate in the spreadsheet whether it has confirmed via an in-person visual inspection that restoration was completed, or whether a visual inspection still is needed. *Id.* at PageID.11695-96.

The plaintiffs now contend that the City has violated all three terms of the Court's February 24, 2023 order.

### 1. Outreach

In the face of the City's noncompliance, the parties repeatedly have agreed to modify the deadline by which the City is required to complete outreach and replace eligible service lines. In April 2022, the City stipulated to complete all remaining excavations by September 30, 2022. Apr. 2022 Modification Order, ¶ 1, ECF No. 237, PageID.11071. The parties agreed at that time that the City had yet to make outreach to 1,369 homes to seek residents' consent to a service line excavation and replacement. Apr. 2022 Stip. to Modify, ECF No. 236, PageID.11060. The homes included those with active water accounts, and more than 700 addresses with inactive accounts that the City agreed were eligible for service line replacement. Sep. 2021 Emails, ECF No. 260-7, PageID.11888; Dec. 2021 Emails, ECF No. 260-7, PageID.11890.

The City did not complete outreach to the 1,369 homes by September 30, 2022. The plaintiffs moved again to enforce the settlement agreement, and the City stipulated in response to a March 1, 2023 deadline for completing any remaining outreach. 5th Enforcement Order, ECF No. 258, PageID.11690. The City also failed to meet that deadline: On April 28, 2023, it sent the plaintiffs a spreadsheet of all work orders "that still needed some sort of outreach," dated April 23,

2023, that included 673 addresses that "were mistakenly excluded because at one point they did not have active water accounts." Apr. 2023 Emails, ECF No. 260-8, PageID.11979. The City suggested that it had completed outreach to most of these addresses the previous week by doubling the number of outreach teams, which made 237 first and second attempts and 445 final attempts at outreach. *Ibid.* As of May 15, 2023, however, the City had not yet provided a report to the plaintiffs detailing the specific addresses to which it had made such outreach. May 2023 Emails, ECF No. 260-8, PageID.11952-53. Moreover, the City allowed that it still was completing outreach to the addresses on its October and December 2022 outreach lists, indicating that it had yet to make weekend visits to 70 of 423 addresses on the October 2022 list and that it still needed to complete outreach to 28 of 104 addresses on the December 2022 list. Apr. 2023 Emails, ECF No. 260-8, PageID.11979. The City stated that its outreach to the latter set of addresses had resulted in 47 completed service line replacements and five work declinations. *Ibid.*

In April, the City also began making weekly reports to the plaintiffs listing the total number of excavations, service line replacements, and consent outreach attempts made, and well as the total number of excavations and replacements scheduled for the next week and the total number of estimated replacements the City could perform based on the number of parts in its materials inventory. The reports detail the following number of weekly outreach attempts:

| Exhibit | Report Date | Final Consent Attempts | Consents Obtained |
|---------|-------------|------------------------|-------------------|
| 37 | April 12, 2023 | 12 | 3 |
| 38 | April 19, 2023 | 8 | 21 |
| 39 | April 26, 2023 | 445 | 14X (number illegible) |
| 40 | May 3, 2023 | 50 | 10 |
| 43 | May 10, 2023 | 0 | 0 |
| 41 | May 17, 2023 | TK | 20 |
| 42 | May 24, 2023 | N/A | 13 |

*See* Status Reps., ECF No. 260-8, PageID.12020-35. The City indicated in the May 17, 2023 report that "[c]onsent attempt data is undergoing final quality control checks" and that it

"anticipated that final, updated reporting on consent attempts will be available 05/1[ ]/2023." May 17, 2023 Status Rep., ECF No. 260-8, PageID.12029 (date illegible). In the final report, dated May 24, 2023, the City indicated that "[c]onsent attempt work is complete." May 24, 2023 Status Rep., ECF No. 260-8, PageID.12031. Although some of the numbers in the emailed status reports are illegible (certain numbers and digits are missing throughout the plaintiffs' exhibits, which came from the City), the plaintiffs represent that the City's spring outreach attempts resulted in more than 200 property owners consenting to service line checks. Contempt Mot., ECF No. 260, PageID.11744. However, the City's reports suggest that many of those property owners lacked active water accounts, and that no service line evaluations or replacements could be made at these addresses until the owners established active water accounts. *See, e.g.*, Apr. 26, 2023 Status Rep., ECF No. 260-8, PageID.12025.

The plaintiffs asked Noah Attal, a data analyst, to complete a statistical analysis of the outreach data the City attached to its weekly reports. Attal analyzed a spreadsheet dated May 14, 2023 that included outreach attempts through March 20, 2023. Attal decl., ECF No. 266-1, PageID.12725 n.2. His analysis shows that, as of May 20, 2023, the City had not completed outreach to 306 addresses on its October 2022 Scope of Work List. *Id.* at ¶ 13, PageID.12730-31. Attal compiled a list of these addresses and attached it as an exhibit to his affidavit. *See* Outreach Work Remaining as of June 2023, ECF No. 266-1, PageID.12740-46. The list indicates that the City completed some outreach to many of the 306 addresses, but it did not complete its outreach by making the required in-person attempts at the required times or by making the required mailings. *Ibid.*; *see also* Attal decl., ¶ 13, ECF No. 266-1, PageID.12731 (categorizing remaining outreach).

The plaintiffs blame the City's failure to complete its outreach obligations by the March 1, 2023 deadline in part on the City's mismanagement of its contractors, Lakeshore Global Corporation and ROWE Professional Services. According to the plaintiffs, the City explained that it wrongly instructed its contractors not to complete outreach to homes that did not have active water accounts, despite acknowledging that many of those homes were eligible for service line replacement under the terms of the Agreement. May 2023 Violations Notice, ECF No. 260-7, PageID.11923; Mar. 2022 Emails, ECF No. 260-8, PageID.11975. The City also explained that it did not ensure that its contractors had the technological capacity to record the times that it attempted to make outreach, or to differentiate between consent and scheduling attempts, and that the City therefore lacked complete reports of consent attempts performed during the fall of 2022. Mar. 2023 Emails, ECF No. 260-8, PageID.11975-76; Calero decl., ¶ 3, ECF No. 260-2, PageID.11765.

## 2. Restoration

The City acknowledges that it did not meet the May 1, 2023 deadline for determining the scope of its remaining restoration work. Resp., ECF No. 264, PageID.12071. It blames inclement weather and ground cover in early 2023, which it says precluded it from visually observing lawns, roads, sidewalks, and driveways. *Ibid.* Although the City began conducting visual inspections in the fall of 2022, it acknowledges that none of the inspections it completed prior to March 2023 complied with the visual inspection criteria set out in the parties' January 19, 2023 stipulation and in the Court's February 24, 2023 order. Calero decl., ¶ 6, ECF No. 260-2, PageID.11766; Apr. 2023 Meet and Confer Request, ECF No. 260-8, PageID.11948. The City agreed that it would have to redo at least 2,000 non-compliant visual inspections. Apr. 2023 Meet and Confer Request, ECF No. 260-8, PageID.11948. On May 18, 2023, the City also informed the plaintiffs that it had

decided to complete visual inspections at 11,000 additional addresses for which it had only hard-copy records of possible restoration. Calero decl., ¶ 6, ECF No. 260-2, PageID.11766-67.

The City attached spreadsheets to its April and May weekly status reports listing the homes with complete excavations where "no replacement was needed." *See, e.g.*, May 17, 2023 Status Rep., ECF No. 260-8, PageID.12029. The spreadsheets are not in the record. But plaintiffs' counsel states in a declaration that, based on her analysis of the spreadsheets, the City reported (1) 5,452 addresses where it had completed visual inspections as of May 1, 2023; (2) 21,138 addresses where it had completed or still needed to complete a visual inspection between May 2, 2023 and May 10, 2023; and (3) 26,590 addresses where it had completed or still needed to complete a visual inspection as of May 10, 2023. Calero decl., ¶ 19, ECF No. 260-2, PageID.11773; *see also id.* at ¶¶ 15-18, PageID.11771-73 (describing the spreadsheets and data). The City states in its response brief that, as of June 14, 2023, it has completed 26,520 in-person visual inspections of addresses that did not have a contemporaneous record of restoration, leaving about 500 inspections to complete. Resp., ECF No. 264, PageID.12071. It attached no documentation or affidavits in support of that assertion, but it represented that it would complete all remaining inspections and supply compliant reporting to the plaintiffs by June 26, 2023. *Ibid.*

Noah Attal also analyzed the scope of the City's remaining restoration analysis obligations, using data the City provided to the plaintiffs through June 21, 2023. Attal decl., ¶ 15, ECF No. 266-1, PageID.12731-32. Attal found that the City had completed an excavation or replacement at 704 addresses for which it has not reported any restoration status. *Id.* at ¶ 19, PageID.12734. Attal also compiled an anonymized list of these addresses and attached it as an exhibit to his affidavit. *See* Excavated Addresses Missing from June 2023 Restoration Reporting, ECF No. 266-1, PageID.12748.

Mr. Attal also testified at the evidentiary hearing. He explained that he is a master's student in public policy and information science at the University of Michigan and worked as a data analyst at the University of Michigan School of Environment and Sustainability and at Safe Water Engineering, a consulting firm based in Detroit. He stated that he has previous experience analyzing municipal water data in these roles.

Mr. Attal testified that he analyzed whether the June restoration reporting data was comprehensive of all documented service line excavations. To answer this question, he compiled approximately 40 files containing addresses where the City had conducted an excavation. He then uploaded this list to ArcGIS, a software program that allowed him to geocode each address and fix data errors, such as duplicate addresses or misspellings. He used the same process for the City's restoration status data. Finally, he compared the two lists and concluded that there were 704 addresses where the City had a record of a previous excavation but no record of restoration status. Thus, the plaintiffs and public were unable to evaluate for those parcels whether restoration was needed. Mr. Attal admitted that he had not independently determined whether any properties he identified were commercial, vacant, demolished, uninhabitable, or duplexes.

The plaintiffs blame the City's mismanagement of its contractors for its mismanagement of its restoration work. The City told the plaintiffs that it has no staff working on restoration reporting, but instead relies entirely on its contractor, ROWE, which it hired in April 2022 to oversee service line exploration, replacement, and property restoration. Calero decl., ¶ 4, ECF No. 260-2, PageID.11765-66; ROWE Contract, ECF No. 260-8, PageID.11957. However, the City did not inform ROWE of all of its reporting requirements, and ROWE only learned of all of the relevant reporting obligations in March 2023, when the plaintiffs explained to ROWE the

restoration requirements detailed in the Court's February 24, 2023 order.  Mar. 2022 Emails, ECF No. 260-8, PageID.11975; Calero decl., ¶ 4, ECF No. 260-2, PageID.11765-66.

At the hearing, the City presented one witness, Jeff Markstrom, who is the design services manager at ROWE Professional Services Company.  The City contracts with ROWE to oversee service line exploration, replacement, and property restoration.  Mr. Markstrom testified that he oversees ROWE's work and is the liaison between the firm and the City.  He also noted that the City has a contract with the Lakeshore Global Corporation (LGC) to perform service line replacement, restoration, and outreach to residents.  He explained that ROWE staff collaborate with teams in the field to make sure data about each site visit are inputted properly.

Mr. Markstrom testified that restoration status site visits began in the Fall of 2022 and then began again "April-ish," of 2023, at least a month after the March 1, 2023 outreach deadline in the Court's latest order.  Although he was aware of the City's May 1 restoration status deadline, he could not recall when he was informed of it.  He identified two principal justifications for the slow start in the Spring.  First, he explained that city contractors could not be done while winter weather conditions persisted, because snow-covered ground might prevent crews from determining if restoration had been completed.  Second, he testified that ROWE's crews had to wait for the language for the door hanger that was to be used as part of the outreach efforts to be approved.

Mr. Markstrom testified that City officials informed him on May 10 that there were properties his teams had previously visited that needed to be inspected again because the records did not include all the information required by the Court's February 2023 Order.  Initially, these site visits were conducted by two staff members from ROWE, but six to eight two-person teams eventually were participating in the work.  He testified that this staffing increase occurred after

May 1. Mr. Markstrom estimated that crews could conduct approximately 120 to 140 inspections per day.

Mr. Markstrom also explained that he had reviewed approximately ten of the 704 addresses noted in Mr. Attal's report and identified some with inactive water accounts or that were abandoned homes. However, he admitted that restoration could be completed at properties with inactive water accounts.

On July 21, 2023, nearly a month after the hearing, the City filed an affidavit from Mr. Markstrom (ECF No. 274-1) stating that he had reviewed the plaintiffs' list of 704 properties and found:

- 102 addresses where visual inspections had already been completed. Mr. Markstrom noted that addresses in this category were frequently duplexes, had a misspelling, or an improper address type (e.g., DR instead of CT).

- 582 addresses where visual inspections were still required

- 20 addresses that were invalid or were vacant parcels

He stated that the City completed visual inspections of the 582 relevant addresses as of July 7.

### 3. Reporting

As noted above, the City indicated that it would provide a compliant list of all of the properties where it has completed visual restoration inspections by June 26, 2023. The spreadsheets the City provided to the plaintiffs apparently did not comply with the Court's February 24, 2023 order. The City did not provide any spreadsheets to the plaintiffs until May 1, 2023. Calero decl., ¶ 11, ECF No. 260-2, PageID.11769; Mar. 2022 Emails, ECF No. 260-8, PageID.11975-76. And the spreadsheets provided thereafter did not comply with the ordered formatting requirements. According to the plaintiffs, the spreadsheets were missing data for thousands of addresses, did not appear to list any addresses where the City had contemporaneous documentation that restoration is complete, and did not clearly distinguish between addresses

where the City had completed inspections and still needed to complete inspections.  Calero decl.,
¶¶ 11-18, ECF No. 260-2, PageID.11769-73; May 2023 Violations Notice, ECF No. 260-7,
PageID.11923.  The City does not dispute that allegation.  The plaintiffs also say that the City
failed to ensure that ROWE had the technological capability to export restoration data in Excel
format until March 2023 and failed to keep ROWE informed of the City's reporting obligations
pursuant to the Court's orders.  Mar. 2022 Emails, ECF No. 260-8, PageID.11975; Calero decl., ¶
4, ECF No. 260-2, PageID.11765-66.  Mr. Markstrom's hearing testimony confirmed that
allegation as well.

### B.  Mayor Neely

Flint Mayor Sheldon Neeley is not a party to this lawsuit or to the Settlement Agreement.
The plaintiffs did not name him as a defendant because the City was under the governance of a
state emergency manager when they filed their original complaint.  However, the mayor's
authority since has been restored, and the mayor once again serves as the "Chief Executive Officer"
of the City of Flint.  City Charter, ECF No. 260-7, PageID.11836.  As such, he is responsible for
taking "care that the laws shall be enforced," including by making recommendations to the City
Council, *ibid.*, reviewing or vetoing every City Council resolution, *id.* at PageID.11834-35, and
submitting an annual budget, *id.* at PageID.11837.  He also is responsible for appointing the City
Administrator and other executive staff.  *Id.* at PageID.11836.

Mayor Neeley also effectively serves as the chief spokesperson for the City of Flint,
including for its service line replacement efforts.  He provides updates at public meetings about
the status of the City's replacement work and routinely makes comments to the press.  In the fall
of 2022, he committed to "continue the work" of pipe replacement "until the work is done,"
promising that he would "work with anyone who is committed to making that happen" and asking
the "remaining homeowners to give our crews the right of entry so we can fix this once and for

all." Nov. 2022 City Press Release, ECF No. 260-7, PageID.11843.  He has also admitted that "[d]eadlines were set and deadlines were missed," and taken personal responsibility for that fact.  *See* May 2023 Scripps Article, ECF No. 260-7, PageID.11853 ("Some could be attributed to me. . . .").  And he has acknowledged that the City has struggled to pin down what work remains, while nevertheless insisting that the City "will not rush through this process just to say we got it done."  *Id.* at PageID.11852.

<div align="center">C. Proceedings on the Contempt Motion</div>

The plaintiffs notified the City in February, March, April, and May 2023 that it had violated Court's February 24, 2023 enforcement order.  *See* Feb. 2023 Violation Notice, ECF No. 260-8, PageID.12016-17; Mar. 2023 Violation Notice, ECF No. 260-7, PageID.11938; Apr. 2023 Meet and Confer Request, ECF No. 260-8, PageID.11946-48; May 2023 Violation Notice, ECF No. 260-7, PageID.11922-23.  Counsel met and conferred to discuss the violations on May 12 and 18, 2023, but did not come to an agreement to resolve them.  *See* Calero decl., ¶¶ 5-7, ECF No. 260-2, PageID.11766-67.  Accordingly, on May 26, 2023, the plaintiffs filed the instant contempt motion.  *See* ECF No. 260.

The Court held a hearing on the plaintiffs' motion for contempt on June 30, 2023.  At the close of the hearing, the Court ordered both parties to file post-hearing supplemental briefing.  On July 27, the Court ordered the plaintiffs to file a reply brief in light of the City's representation that it had complied with its obligations.

On November 1, 2023, the plaintiffs sought leave to submit supplemental evidence.  The defendants filed a response in opposition on November 14, 2023.  The Court ultimately granted the plaintiffs' request.  ECF No. 279.

The documents most recently submitted by the plaintiffs principally concern the City's failure to meet the Court's August 1, 2023 deadline by which it was to complete all service line

<div align="center">- 15 -</div>

excavations and replacements.  *See* ECF No. 258, PageID.11684.  On August 16, 2023, the City

notified the plaintiffs of its determination that it had completed all excavations and replacements

required by the Settlement Agreement.  ECF No. 277-1, PageID.13096.  However, the plaintiffs

responded that the City had failed to provide adequate documentation to support this determination

and that the documentation that was provided actually undermined the City's position.  Over the

next two months, the parties engaged in detailed correspondence about the scope of the outstanding

work and, as of November 1, 2023, it appears that the remaining dispute centers on the status of

replacement work at 184 addresses.  ECF No. 277-1, PageID.13085.  Of these, the plaintiffs assert

that there are 106 addresses where a resident consented to excavation and there are no records of

that work being completed or full scheduling attempts made and 20 addresses where the City's

records indicate that a lead or galvanized steel pipe was found but contain no record of

replacement.  The remaining 58 are addresses where the City reported an excavation but

information on service line composition or replacement status is lacking.  *Id.* at PageID.13103-04.

For its part, the City asserts that the work at the majority of these addresses is complete under the

terms of the Settlement Agreement.  However, it appears to concede that scheduling outreach

remains to be completed at 60 addresses.  *Id.* at PageID.13085.

## II.  Discussion

### A.  Contempt Finding

The plaintiffs request that the Court impose sanctions to remedy the City's ongoing

violations of the Agreement, as modified by the Court's February 24, 2023 enforcement order.

They argue that they have satisfied their burden by demonstrating that the City has failed to comply

with clearly ordered outreach, restoration, and reporting requirements.  And they contend that the

City cannot show categorically and in detail its inability to comply with the Agreement, because

the City repeatedly took actions at odds with the Agreement, and did so despite the plaintiffs repeatedly informing the City of its outstanding obligations.

The City responds that civil contempt is not warranted because it is not meant to be punitive and should merely coerce future compliance. Such coercion is unnecessary where compliance has been achieved, they insist. First, the defendants contend that there is no remaining dispute that all outreach has been completed to homes on the 2022 Replacement Eligible Homes List as of June 22, 2023. Next, the defendants seek to contextualize the 704 addresses missing restoration reporting, noting that they had completed 26,679 visual inspections as of the date of the hearing. The defendants argue that 582 addresses they concede required inspection represent just over two percent of the total. They maintain that this amount is not indicative of neglect and state that inspections at these addresses are complete as of July 7. Finally, they argue that they have taken all reasonable efforts to comply with the Court's orders. Their argument on this point offers few specifics. Rather, they list the work completed so far and its cost.

One thing is certain: the City did not comply with the latest Court order that detailed the remaining procedures and extended deadlines for compliance. There is another certainty: the "power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *N.L.R.B. v. Cincinnati Bronze, Inc*., 829 F.2d 585, 590-91 (6th Cir. 1987) (quoting *Gompers v. Buck's Stove & Range Co*., 221 U.S. 418, 450 (1911)); *Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."). "Contempt proceedings enforce the message that court orders and judgments are to be complied with in a prompt manner." *Elec. Workers Pension Tr. Fund of Local Union #58, IBEW v. Gary's Elec. Serv. Co*., 340 F.3d 373, 378 (6th Cir. 2003).

"A litigant may be held in contempt if his adversary shows by clear and convincing evidence that he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Cincinnati Bronze*, 829 F.2d at 591 (internal quotation omitted).

"Clear and convincing evidence is a not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Gary's Electric*, 340 F.3d at 379 (citation omitted). But "[o]nce the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is presently unable to comply with the court's order." *Ibid.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). "To meet this production burden in this circuit 'a defendant must show categorically and in detail why he or she is unable to comply with the court's order.'" *Ibid.* (quoting *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996)). A "good faith effort" is insufficient. *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir. 1991). Rather, the contemnor must show that it "took all reasonable steps within [its] power to comply." *Ibid.* (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)).

Contempt "is . . . reserved for those who 'fully understand[]' the meaning of a court order and yet 'choose[] to ignore its mandate.'" *Gascho v. Glob. Fitness Holdings*, LLC, 875 F.3d 795, 800 (6th Cir. 2017) (quoting *Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)). As described above, there is ample evidence that the City's conduct fits that reservation. It is undisputed that the City missed the Court-ordered deadlines for completing outreach to service line replacement eligible homes and for assessing the scope of its remaining restoration work. There is clear and convincing evidence that the City violated definite and specific provisions of the Agreement and February 24, 2023 order.

The City effectively suggests that the plaintiffs' motion should be denied as moot because it has completed the ordered outreach and restoration assessments. However, the "mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge." *Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc*., 793 F.2d 1529, 1535 n.5 (11th Cir. 1986).

Despite remaining questions about whether the City has completed all required outreach, *see* ECF No. 277-1, PageID.13085, it now appears that the City has now complied with many of the items raised in the plaintiffs' contempt motion. The City has complied with the Court's orders by completing all required outreach at 313 addresses of concern to the plaintiffs, *see* Stip., ECF No. 269, PageID.12768, and all required visual inspections, *see* Markstrom Decl., ECF No. 274, PageID.13043. Nevertheless, the City may still be found in contempt for its earlier violations. The City is correct that civil contempt is meant to be remedial and not punitive, *see United States v. Work Wear Corp*., 602 F.2d 110, 115 (6th Cir. 1979), but courts regularly find parties in civil contempt, even when they have complied with a court order after the initiation of contempt proceedings. This is possible because there is a distinction between the finding of contempt and the sanctions for the violation, which may be either coercive or compensatory. *See, e.g.*, *Masco Corp. of Indiana v. Delta Imports LLC*, No. 11-14720, 2013 WL 5816525, at *1-2 (E.D. Mich. Oct. 29, 2023) (finding contempt and awarding attorney's fees in enforcing consent judgment even though defendant had purged itself of the contempt); *Benjamin v. Sielaff*, 752 F. Supp 140, 147-48 (S.D.N.Y. 1990) (analyzing contempt and sanctions separately); *Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F. Supp. 2d 247, 254-55 (D. Conn. 2002) (finding defendant in contempt but imposing no sanctions because of compliance). While a coercive remedy may be inappropriate

after compliance has been achieved, a compensatory remedy may be necessary. *See Masco Corp.*, 2013 WL 5816525, at *2 (awarding compensatory sanctions).

Because the plaintiffs have met their burden of proof, the burden shifts to the City to demonstrate that it is unable to comply with the Court's orders. *Gary's Electric*, 340 F.3d at 379. The City has not made that showing with regard to its outreach, restoration, or reporting obligations. It has not even attempted to demonstrate that it "took all reasonable steps within [its] power to comply with" the Court's February 24, 2023 order, *Gary's Electric*, 340 F.3d at 379 (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)), let alone that it made any effort to marshal resources, assert authority, or "demand the results needed" to comply, *Glover*, 934 F.2d at 708 (quoting *Aspira of New York, Inc. v. Bd. of Educ. of New York*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976)). To the contrary, the City acknowledges that it made significant efforts to comply with the order only after the relevant deadlines has passed. *See* Resp., ECF No. 264, PageID.12070-71; Calero decl., ¶¶ 4-11, ECF No. 260-2, PageID.11765-69; Apr. 2023 Emails, ECF No. 260-8, PageID.11979; May 2023 Emails, ECF No. 260-8, PageID.11952.

The City's two principal justifications for the delay — winter weather and preparations for the doorhanger — are unpersuasive. First, winter weather cannot explain the City's failure to perform outreach to homes eligible for service line replacement by March 1, 2023. Although Mr. Markstrom testified about the difficulties conducting compliant visual inspections and restoration work during winter weather, the City provided no evidence that winter weather actually inhibited outreach activities. And the City conducted at least some outreach in December 2022, suggesting that it was possible to do so in all seasons. *See* Apr. 2023 Emails, ECF No. 260-8, PageID.11979.

Winter weather may partially explain a delay in conducting site visits. Certainly, it is challenging to determine whether a property needs restoration if it is covered in snow. But again,

the City has failed to meet its burden of showing it "took all reasonable steps" to comply. *Gary's Electric*, 340 F.3d at 379. The City provided no evidence about snow cover in Flint during the relevant months. And when site inspections did begin, Mr. Markstrom testified that ROWE did not increase its staffing until May 1, after the Court's deadline. At peak, there were approximately six to eight crews working, who could evaluate 120 to 140 houses a day. Had City officials been ready to proceed at that capacity in early March, the City would have had sufficient time to comply with the Court's May 1 deadline. The City knew how many properties required visual inspections, and it knew how much time it had to complete these inspections, yet it has failed to show why these could not completed by May 1.

Likewise, the delay in approval for doorhanger text does not explain adequately the City's failure to meet its deadlines. The parties agreed to the doorhanger text ahead of schedule. Notice & Stip. ¶¶ 1-4, ECF No. 272, PageID.12910. And doorhangers were not required for the outreach activities. Mr. Markstrom provided no specific explanation about how the doorhanger approval process delayed outreach work. An issue with the printing company might justify a delay, but the City has provided no further evidence and the Court cannot speculate. The defendant must demonstrate "categorically and in detail why he or she is unable to comply with the court's order." *Rolex Watch*, 74 F.3d at 720. This explanation is not sufficiently detailed.

Finally, the City attempts to contextualize its belated compliance, listing its achievements thus far. The City has undoubtedly completed much of what the Settlement Agreement and the Court has required. But that does not excuse its missed deadlines. If the Court's deadlines were unfeasible, the proper path would have been for the City to seek a modification. The City never did that. Instead, deadlines came and went with little note. The defendants did not ultimately complete their required tasks until after the Court's June 2023 hearing. Cases that excuse

noncompliance with court orders on the ground of "substantial compliance" still require the party to have taken "all reasonable steps" to comply. *See, e.g.*, *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989); *Satyam Computer Servs. Ltd. v. Venture Global Eng'g, LLC*, 323 F. App'x 421, 430 (6th Cir. 2009). "Good faith is not a defense to civil contempt," and "diligence alone does not satisfy" a contemnor's burden of production. *Glover*, 934 F.2d at 708 (quoting *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 796-97 (1st Cir. 1982)). Here, it is undisputed that the City "repeatedly ignored the court's orders and acted only after contempt proceedings were threatened." *Ibid.* The Sixth Circuit has found that similarly-belated compliance efforts fell "far short of the required diligence" necessary to establish that a party has taken "all reasonable steps to comply" with a court's order. *Ibid.* In *Glover v. Johnson*, the court of appeals cited approvingly a district court's finding of contempt where public officials "allowed deadlines to pass without advance announcements or volunteered explanations, awaiting complaints by the plaintiffs before even treating with the court concerning delinquencies"; bore "with seeming equanimity long periods of nonperformance, inadequate performance, or outright defiance from key constituents"; and "displayed an evident sense of nonurgency bordering on indifference, contrasting vividly with the spurt of activity on the [heels] of plaintiffs' motion for a finding of contempt." *Ibid.* (quoting *Aspira*, 423 F. Supp. at 654). The same findings are evident in the present case, and the City again appears to have made genuine efforts toward compliance only when the plaintiffs spurred it on by filing their sixth motion to enforce the Agreement. *See, e.g.*, *Concerned Pastors for Soc. Action v. Khouri*, 658 F. Supp. 3d 495, 503-04 (E.D. Mich. 2023) (Lawson, J.); 4th Enforcement Order, ECF No. 228, PageID.11030-42.

The City did not take all reasonable steps within its power to comply with the Court's Order. The City has not met its burden of showing an inability to comply with the Court's orders. The City is in contempt of the Court's clear and unambiguous February 24, 2023 order.

### B. Mayor Neely

The same cannot be said for Mayor Neely. It is true that under "[w]ell settled law," non-party corporate officers may be held in contempt when the corporations they lead fail to comply with federal court orders. *Gascho*, 875 F.3d at 803 (quoting *Gary's Electric*, 340 F.3d at 380). And "because a civil contempt ruling either attempts to coerce compliance or compensate the complainant for losses, it is fully appropriate to impose judicial sanctions on the nonparty corporate officer." *Gary's Electric*, 340 F.3d at 383. Nonetheless, two conditions must be met for a district court to have the authority to hold a non-party officer in contempt. First, the officer must have notice of the Court's order or injunction and its contents. *Gascho*, 875 F.3d at 803 (citing *Gary's Electric*, 340 F.3d at 380). Second, the officer must be "responsible for the corporation's conduct" and have "failed to take appropriate action to ensure performance." *Ibid.* (citing *Gary's Electric*, 340 F.3d at 382); *see also Wilson v. United States*, 221 U.S. 361, 376 (1911) (holding that corporate officers who are "apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty," may be found "no less than the corporation itself . . . guilty of disobedience, and may be punished for contempt.").

As "Chief Executive Officer" of the City of Flint, Mayor Neeley is "subject to the court's order just as the [City] itself was." *Gary's Electric*, 340 F.3d at 382. And the City does not dispute that Mayor Neeley had notice of the Court's February 24, 2023 order and its requirements. However, the plaintiffs have not demonstrated that Mayor Neeley himself failed to take appropriate action to ensure compliance with the extended deadlines. They have not supplied any

evidence that demonstrates that Mayor Neeley himself took any actions that prevented the City from completing its outreach or restoration-assessment obligations, or failed to take any actions within his power to ensure performance.

The parties speculate that Mayor Neeley could have done more to supervise contractors and City staff. But they do not point to anything in the record establishing that Mayor Neeley failed to do either of these things or failed to do them adequately. The plaintiffs' conclusory statements fall far short of the "clear and convincing" evidence required to hold Mayor Neeley in contempt of court. See *Gary's Electric*, 340 F.3d at 382 (applying the clear and convincing evidence standard to a non-party corporate executive); *Consolidation Coal Co. v. Loc. Union No. 1784, United Mine Workers of Am.*, 514 F.2d 763, 766 (6th Cir. 1975) ("[T]he petitioner in a civil contempt proceeding must overcome a heavy burden of proof.").

The plaintiffs have not established a *prima facie* case for holding Mayor Neeley in contempt of court.

## C. Remedy

In its initial response to the contempt motion, the City contended that sanctions would not be necessary or warranted because it would fully comply with the Court's prior orders by the hearing date on the contempt motion. It didn't. In its July 2023 supplemental filing, the City argued that it has taken all reasonable efforts to comply with the Court's orders. But its argument on this point offers few specifics. Rather, it listed the work completed so far and its cost. The City represented that there were only 19 service line excavations remaining as of July 19 and that it anticipated meeting its August 1 deadline to complete service line replacement. ECF No. 274, PageID.13039. It reasoned that because there would be no future acts left to coerce, the relief the plaintiffs seek is moot.

- 24 -

As noted above the Court has the authority to order sanctions for contempts, even after a party has complied with the Court's order, but the plaintiffs' November 2023 filing indicated that the City still had not complied with all the requirements of the Settlement Agreement. The plaintiffs' sought-after remedies are not moot.

A court may impose coercive or compensatory sanctions as a civil contempt remedy. *Gary's Electric*, 340 F.3d at 379 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)); *see also Work Wear Corp.*, 602 F.2d at 115 ("Civil contempt is meant to be remedial and to benefit the complainant either by coercing the defendant to comply with the Court's order via a conditional fine or sentence or by compensating the complainant for any injury caused by the defendant's disobedience."). The plaintiffs have asked the Court to impose a $500 fine for each day that the City has failed to comply with the latest order. A contempt fine "is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'" *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) (quoting *Mine Workers*, 330 U.S. at 303-04). The proposed $500 daily fine is coercive because it is intended to incentivize the City to comply with the order, and it is avoidable by complying with the February 24, 2023 order.

However, considering the City's post-hearing efforts, as belated as they were, a daily fine is no longer appropriate, as the plaintiffs now acknowledge. *See* ECF No. 276, PageID.13049. There also are prudential reasons for declining to impose a daily fine due to the financial condition of the City. "[I]t is necessary in fixing the amount of a coercive fine to consider the defendants' financial resources and consequent burden the fines place on the particular defendants." *United States v. Pro. Air Traffic Controllers Org. (PATCO)*, 525 F. Supp. 820, 822 (E.D. Mich. 1981); *see also Mine Workers*, 330 U.S. at 304 (holding that a "court which has returned a conviction for

contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant"). In light of the City's previous arguments that it lacks sufficient funds to complete the pipeline replacement program, a coercive fine at the present time is not warranted.

The plaintiffs also ask the Court to modify the Settlement Agreement in a way that would allow them to seek attorney's fees if they must seek the Court's assistance in the future to secure compliance. The plaintiffs acknowledge that they agreed to limit attorney's fees when they entered the Settlement Agreement, which precludes them from seeking fees related to enforcement. They argue, however, that if they must bring future enforcement actions, the threat of additional attorney fees would deter the City from continuing to violate the Agreement.

The Settlement Agreement required the "State Parties" to pay $895,000 in litigation costs, which included attorneys' fees and expert expenses. That payment was to "satisfy any claim by Plaintiffs to litigation costs (including attorneys' fees and expert costs) incurred in this Case and incurred in enforcing this Agreement through the Termination Date." Settlement Agreement, ¶¶ 123-24, ECF No. 147-1, PageID.7422-23. The "Termination Date" is defined as the later of the date that the Government Parties completed their obligations under the Health Programs section of the Agreement or one year after all the service lines are replaced. *Id.*, ¶ 2(ee), PageID.7362. The service line replacement deadline under the Agreement was to be January 1, 2020, *id.*, ¶ 20(c), PageID.7370-71. The City failed to meet that deadline, and it was extended to August 1, 2023, *see* ECF No. 258, PageID.11684. The City had not met the extended deadline as of November 2023.

Nonetheless, modifying a Settlement Agreement, especially one that has been approved by the Court, is no small task. The Settlement Agreement entered by the parties in this case operates as a consent decree — that is, a "settlement agreement subject to continued judicial policing." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). A consent decree is "a strange hybrid in the law," *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992) (quoting *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981)), in that it is "at once 'a voluntary settlement agreement which could be fully effective without judicial intervention' and 'a final judicial order . . . plac[ing] the power and prestige of the court behind the compromise struck by the parties,'" *ibid.* (quoting *Williams*, 720 F.2d at 920). Consent decrees therefore "may be 'treated as contracts for some purposes but not for others.'" *Ibid.* (quoting *United States v. ITT Continental Baking*, 420 U.S. 223, 236 n.10 (1975). It follows that a consent decree also "should be construed to preserve the position for which the parties bargained." *Vanguards*, 23 F.3d at 1018 (quoting *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992)).

A court has the inherent power to enforce "to modify a consent decree if satisfied that the decree 'has been turned through changing circumstances into an instrument of wrong.'" *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1146 (6th Cir. 1997) (quoting *United States v. Knote*, 29 F.3d 1297, 1302 (8th Cir. 1994)). This power arises from the "injunctive quality of a consent decree," which "compels the approving court to . . . modify the decree if 'changed circumstances' subvert its intended purpose." *Vanguards*, 23 F.3d at 1018 (quoting *Williams*, 720 F.2d at 920). Even though the City's performance of its obligations under the Settlement Agreement has been woefully dilatory, and the delay in replacing the service lines impacts the health and welfare of the community, it cannot be said that the Agreement has been transformed

thereby into "an instrument of wrong," at least not to the extent that would justify a blanket approval for additional attorney's fees for future enforcement efforts.

However, that does not mean that an award of attorney's fees apart from the Agreement is prohibited as a compensatory sanction for the City's contempt. Although the Court declines to modify the Settlement Agreement to clear the way for future attorney's fee requests, the Court still may fashion some kind of equitable relief for the plaintiffs. "Where a consent decree is violated, the court should fashion equitable relief that is 'designed to make the party whole for his or her loss.'" *Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 533 (6th Cir. 2012) (quoting *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999)). The cost of bringing the violation of the Court February 24, 2023 order "to the attention of the court is part of the damages suffered by" the plaintiffs and typically would warrant "[a]t a minimum" the recovery of "fees and costs." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 959 (9th Cir. 2014). And it is "well recognized" that "[c]ourts have inherent authority to enforce their judicial orders and decrees in cases of civil contempt by assessing attorneys' fees." *Liberis v. Craig*, 845 F.2d 326, 1988 WL 37450, at *5 (6th Cir. 1988) (table); *see also Nicole Gas Prod., Ltd.*, 916 F.3d 566, 579 (6th Cir. 2019) (affirming fee award as sanction for contempt finding); *Inst. of Cetacean Rsch.*, 774 F.3d at 958 ("[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party." (quotation marks omitted)). Thus, the Court may order "equitable relief that is compensatory in nature" by awarding the plaintiffs attorney's fees now, to compensate the plaintiffs for the cost of bringing the instant action. *Shy*, 701 F.3d at 533; *see also Inst. of Cetacean Rsch.*, 774 F.3d at 959. "An award of attorney's fees and expense is among the 'appropriate' equitable remedies for a successful moving party 'in a civil contempt proceeding.'" *Cernelle v. Graminex, L.L.C.*, 539 F. Supp. 3d 728, 738 (E.D. Mich. 2021), *aff'd,* No. 21-1579,

2022 WL 2759867 (6th Cir. July 14, 2022); *see TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983) (citing *Chas. Pfizer & Co. v. Davis-Edwards Pharmacal Corp.*, 385 F.2d 533, 538 (2d Cir. 1967)); *see also McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) ("An award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated.") (citing *Redken Lab., Inc. v. Levin*, 843 F.2d 226 (6th Cir. 1988)).

The plaintiffs have not asked for compensatory attorney's fees in any specific amount. The amount of the award must be "reasonable," generally as measured by the lodestar method. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016). That method calls for multiplying "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Ibid.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

The Court will permit the plaintiffs to submit their requests for reasonable attorney's fees incurred in seeking the enforcement of the February 24, 2023 order.

### III. Conclusion

Nearly seven years after entering the Settlement Agreement, it appears that the City still has not completed the service line replacement program. The evidence presented at the hearing demonstrated that the City had outstanding outreach, restoration assessment, and reporting obligations well after the deadlines imposed by the Court's February 24, 2023 Order. The City has not complied with the Court's order, and it has not met its burden of showing an inability to comply.

Accordingly, it is **ORDERED** that the plaintiffs' motion for contempt (ECF No. 260) is **GRANTED IN PART**.

It is further **ORDERED AND ADJUDGED** that the City of Flint is in **CIVIL CONTEMPT** of the Court's February 24, 2023 order.

It is further **ORDERED** that as a remedy for the City's contempt, the plaintiffs may recover their attorney's fees, costs, and expenses (including expert witness expenses) incurred in bringing its motion for contempt and the ensuing proceedings.

It is further **ORDERED** that the plaintiffs may apply for the award of expenses by filing an appropriate motion with proper documentation of fees, costs, and expenses **on or before April 1, 2024**.

It is further **ORDERED** that the motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  March 12, 2024

# Exhibit A



**Joseph Kuptz <jkuptz@cityofflint.com>**

## RE: Concerned Pastors, et al v City of Flint, et al
1 message

**Rolnick, Addie** <ARolnick@nrdc.org>                                      Fri, Jun 16, 2023 at 2:38 PM
To: Joseph Kuptz <jkuptz@cityofflint.com>
Cc: William Kim <wkim@cityofflint.com>, "Tallman, Sarah" <stallman@nrdc.org>, "Calero, Melanie" <mcalero@nrdc.org>, "Vandal, Nicole" <nvandal@nrdc.org>

Joe,


Plaintiffs do not concur in this request. Our clients will not agree to a virtual-only hearing because they believe a contempt motion is sufficiently important to warrant in-person appearance. Our clients are also concerned that a virtual-only hearing will impair accessibility for members of the public by limiting access to those with internet access and the necessary technological capability.


If the City makes this request to the Court, please represent to the Court that Plaintiffs do not concur in the City's request for a virtual-only hearing because the importance of the issues raised in Plaintiffs' motion warrants an in-person hearing.


Regards,


Addie



**ADELINE ROLNICK**

*Attorney*


**NATURAL RESOURCES DEFENSE COUNCIL**

1152 15TH STREET NW, SUITE 300

WASHINGTON, DC 20005

T 202.513.6240
AROLNICK@NRDC.ORG
PRONOUNS: SHE/HER

NRDC.ORG

**From:** Joseph Kuptz <jkuptz@cityofflint.com>
**Sent:** Friday, June 16, 2023 9:07 AM
**To:** Rolnick, Addie <ARolnick@nrdc.org>; Tallman, Sarah <stallman@nrdc.org>
**Cc:** William Kim <wkim@cityofflint.com>
**Subject:** Concerned Pastors, et al v City of Flint, et al


Addie and Sarah - will Plaintiffs concur in a request by the City and the non-party Mayor to a request to the Court for a virtual-only hearing on Plaintiffs' Motion for Contempt? Given Plaintiffs' pending request to reopen/amend the Settlement Agreement to allow for litigation costs, this will substantially reduce those costs if allowed by the Court.


Please advise as to Plaintiffs' position on this as soon as possible.


Joe


--

Joseph N. Kuptz, Assistant City Attorney

City of Flint, Department of Law

1101 S. Saginaw St., 3rd Floor

Flint, MI 48502

(810) 237-2085

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Concerned Pastors for Social Action, et al.,　　　　　Case No. 16-10277

　　　　Plaintiffs,　　　　　　　　　　　　　　　Hon. David M. Lawson

v.

Nick A. Khouri, et al.,

　　　　Defendants.

_____/

<u>**DEFENDANT CITY OF FLINT'S RESPONSE TO PLAINTIFFS' MOTION FOR**</u>
<u>**ATTORNEYS' FEES, COSTS, AND EXPENSES**</u>

　　　　NOW COMES the Defendant City of Flint and for its response to Plaintiffs' Motion for Attorneys' Fees, Costs and Expenses states as follows:

　　　　Following the issuance on March 12, 2024 of the Order Granting in Part Plaintiff's Motion for Contempt, Plaintiffs filed the instant motion, seeking $51,393.50 in attorneys' fees (representing 178.9 hours), $5,728.25 in expert fees and $5,245.81 in travel costs and out of pocket expenses, for a total of $62,367.56.

　　　　However, for two main reasons this request should be significantly reduced. First, the attorneys' fees sought by Plaintiffs are not justified by the relief actually obtained by them on their motion for contempt. Second, the City made a reasonable request to Plaintiffs that the hearing on Plaintiffs' contempt motion be held remotely. This would have avoided all travel costs entirely. That request was denied by Plaintiffs and thus the costs incurred in travelling should not be reimbursable.

i

Wherefore, for the reasons stated herein and in the attached brief, the City of Flint respectfully requests that this Court significantly reduce the amount requested by Plaintiffs in their motion for attorneys' fees, costs, and expenses.

Respectfully submitted,

Dated: April 29, 2024

/s/ Joseph N. Kuptz
Joseph N. Kuptz (P-68623)
City of Flint Law Department
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
jkuptz@cityofflint.com
P-68623

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Concerned Pastors for Social Action, et al.,          Case No. 16-10277
          Plaintiffs,                                                    Hon. David M. Lawson

v.

Nick A. Khouri, et al.,
          Defendants.
_____/

**BRIEF IN SUPPORT OF DEFENDANT CITY OF FLINT'S RESPONSE TO
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES**

iii

# Table of Contents

Statement of the Issue Presented ....................................................................... v

Table of Authorities ....................................................................................... vi

I.   Introduction ................................................................................................ 1

II.  Standard of Review ..................................................................................... 2

III.  Argument .................................................................................................... 3

    A.    The Amount of Attorneys' Fees Sought by Plaintiffs is Not Reasonable Given the "Level of Success" Achieved From Their Motion for Contempt............................. 3

    B.    The Amount Sought by Plaintiffs for Travel Expenses Could Have Been Avoided Entirely........................................................................................ 5

IV.  Conclusion ................................................................................................. 5

**STATEMENT OF THE ISSUE PRESENTED**

1. What amount of attorneys' fees, costs and expenses should this Court award to Plaintiffs, following the issuance of the Order Granting in Part Plaintiffs' Motion for Contempt?

# TABLE OF AUTHORITIES

**Cases**

*Hensley v Eckherhart*, 461 U.S. 424, 433 (1983) ........................................................... 2

## I.    <u>INTRODUCTION</u>

On May 26, 2023, Plaintiffs filed a Motion for Contempt seeking to hold the City of Flint (the "City") and non-party Mayor Sheldon Neeley (in his official capacity) (the "Mayor") in contempt of court for alleged violations of this Court's previously issued orders (the "Contempt Motion"). The Contempt Motion asserted only that the City had failed to (1) determine, by May 1, 2023, which City homes have remaining property restoration work; (2) provide timely, accurate, and complete monthly restoration reporting, and (3) conduct mail and in-person outreach to residents to attempt to obtain their consent to conduct service line excavations (and where appropriate, replacement).

The Contempt Motion sought from this Court a number of items of relief. Specifically, (1) to hold the City in contempt of court; (2) to hold the Mayor in contempt of court; (3) a prospective daily fine of $500.00 until the City cured the alleged failures cited above; and (4) an order allowing Plaintiffs to seek attorneys' fees and costs for <u>future</u> enforcement of the Settlement Agreement.

A hearing was held on the Contempt Motion on June 30, 2023. After the close of that hearing, Plaintiffs, the City and the Mayor filed their post-hearing briefs as ordered by the Court.

Subsequent to the filing of the post-hearing briefs, this Court entered an Order Directing Plaintiffs to Submit a Reply Brief, stating in part, "[t]he defendants state in their supplemental brief that they have now fully complied with their obligations required of them to date." ECF No. 275, PageID.13045. It further noted, "[b]ecause civil contempt is an enforcement remedy intended to coerce compliance, the Court believes that the defendants' response warrants a reply from the plaintiffs." *Id*.

By August 3, 2023, Plaintiffs admitted in their Post-Hearing Reply Brief that, "Plaintiffs do not presently contest the City of Flint's representation that it has finally, after the evidentiary hearing, completed the work that prompted Plaintiffs' contempt motion." ECF No. 276, Page ID.13049 (footnote 1 omitted).

On March 12, 2024, this Court entered an Order Granting in Part Plaintiffs' Motion for Contempt. Of the four items of relief requested by Plaintiffs, that Order granted only one – a finding that the City was in contempt of court. Notably, the Order denied the other three items of relief requested. However, the Order did allow Plaintiffs to recover their attorneys' fees, costs and expenses incurred in bringing the civil contempt motion, only.

Plaintiffs subsequently filed their Motion for Attorneys' Fees, Costs, and Expenses on April 8, 2024, seeking $51,393.50 for attorneys' fees (representing 178.9 hours)[1], $5,728.25 for expert fees[2] and $5,245.81 for travel and other out of pocket expenses.

## II. <u>STANDARD OF REVIEW</u>

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v Eckherhart*, 461 U.S. 424, 433 (1983). The same court also went on to note "[t]he district court also should exclude from this initial fee calculation hours

---

[1] While the City contests the number of hours for attorneys' fees sought by Plaintiffs as not being reasonable given the circumstances, the City does not contest the hourly rates claimed by Plaintiffs for attorney and paralegal time. Those figures are reasonable given the experience and education of the various professionals.

[2] The City also does not contest the amount sought for expert fees.

that were not 'reasonably expended. Cases may be overstaffed . . . Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary . . . ." *Id.* at 434.

The Court further went on to state:

> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? <u>Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?</u> *Id.* (emphasis added).

### III.   ARGUMENT

**A.   THE AMOUNT OF ATTORNEYS' FEES SOUGHT BY PLAINTIFFS IS NOT REASONABLE GIVEN THE "LEVEL OF SUCCESS" ACHIEVED FROM THEIR MOTION FOR CONTEMPT**

The relief actually obtained by Plaintiffs from their Motion for Contempt does not justify the attorneys' fees that they are seeking.

As noted earlier, the Contempt Motion filed by Plaintiffs asserted only that the City had failed to (1) determine, by May 1, 2023, which City homes have remaining property restoration work; (2) provide timely, accurate, and complete monthly restoration reporting, and (3) conduct mail and in-person outreach to residents to attempt to obtain their consent to conduct service line excavations (and where appropriate, replacement).

Plaintiffs sought four separate items of relief - (1) to hold the City in contempt of court; (2) to hold the Mayor in contempt of court; (3) a prospective daily fine of $500.00

until the City cured the alleged failures cited above; and (4) an order allowing Plaintiffs to seek attorneys' fees and costs for future enforcement of the Settlement Agreement.

Plaintiffs also admit that, by no later than August 3, 2023, the City had cured the violations alleged in their motion. If the purpose of a civil contempt motion is remedial, in that it is designed to coerce a future act, then the purpose of Plaintiffs' May 26, 2023 Contempt Motion had been fulfilled by that date.

Ultimately, of the four items of relief requested by Plaintiffs, only one was granted – the finding of civil contempt by the City.

The City certainly acknowledges that the three items complained of by Plaintiffs in their Motion for Contempt were not completed by the dates originally set by court order. However, the City also points out that work on those items continued, and by August 3, 2023, those items had been completed and the information shared with Plaintiffs, which acknowledged completion.

The City also acknowledges that the hours claimed by Plaintiffs – 178.9 – is a reduction of 574.8 hours from the total hours that Plaintiffs have indicated that they worked on this matter. However, even the 178.9 hours claimed is not justified by the results actually obtained by Plaintiffs.

The City would respectfully request a reduction in the award of attorneys' fees awarded to Plaintiffs, commensurate with the results achieved. Doing so would allow the City to allocate those limited resources to completing service line excavations, replacements and restorations.

**B.** **THE AMOUNT SOUGHT BY PLAINTIFFS FOR TRAVEL EXPENSES COULD HAVE BEEN AVOIDED ENTIRELY**

Plaintiffs seek approximately $3,456.85 for travel costs related to the June 30, 2023 hearing on the motion for contempt. However, on June 16, 2023, counsel for the City attempted to obtain Plaintiffs' concurrence in making a request to this Court to hold the hearing virtually. **Exhibit A**. As counsel for the City noted in that email "this will substantially reduce those costs of [eventually] allowed by the Court." *Id.*

That request was denied by counsel for Plaintiffs, and as a result, the travel costs were incurred.

Had Plaintiffs concurred in this reasonable request, those costs could have been avoided entirely, and thus should not be reimbursable to Plaintiffs.

## IV. CONCLUSION

Wherefore, for the reasons stated, the City of Flint respectfully requests that this Court deny Plaintiffs' motion for attorneys' fees, costs and expenses.

Respectfully submitted,

Dated: April 29, 2024                     /s/ Joseph N. Kuptz
                                          Joseph N. Kuptz (P-68623)
                                          City of Flint Law Department
                                          1101 S. Saginaw St., 3rd Floor
                                          Flint, MI 48502
                                          jkuptz@cityofflint.com
                                          P-68623

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2024, I electronically filed the foregoing pleadings using

the ECF system which will send notification of such filing to the counsels of record.

<div style="margin-left: 50%;">

Respectfully submitted,

</div>

Dated: April 29, 2024

<div style="margin-left: 50%;">

<u>/s/ Joseph N. Kuptz</u>
Joseph N. Kuptz (P-68623)
City of Flint Law Department
1101 S. Saginaw St., 3rd Floor
Flint, MI 48502
jkuptz@cityofflint.com
P-68623

</div>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCERNED PASTORS FOR SOCIAL
ACTION, MELISSA MAYS, AMERICAN
CIVIL LIBERTIES UNION OF MICHIGAN,
and NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

                        Plaintiffs,                      Case Number 16-10277

v.                                              Honorable David M. Lawson

NICK A. KHOURI, FREDERICK HEADEN,
MICHAEL A. TOWNSEND, MICHAEL A.
FINNEY, JOEL FERGUSON, SYLVESTER
JONES, R. STEVEN BRANCH, and
CITY OF FLINT,

                         Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION
## FOR ATTORNEY'S FEES AND EXPENSES

On March 12, 2024, the Court found the City of Flint in civil contempt of court due to its repeated failures to meet deadlines for various phases of the replacement and restoration operation prescribed by a settlement agreement to rid the City of lead service lines in its water delivery system. Although the Court denied much of the relief requested in the plaintiffs' motion for contempt, it permitted the plaintiffs to recover, as a compensatory sanction, the attorney's fees and expenses associated with litigating the contempt motion. The plaintiffs now seek an award of $62,367.56, representing $51,393.50 in attorney's fees and $10,974.06 in costs and expenses. The request is well-documented and represents an amount substantially below the plaintiffs' actual entitlement. None of the City's arguments for a reduction of the award is persuasive. The Court will grant the motion.

<center>I.</center>

The Court issued an order on March 12, 2024 holding the City of Flint in civil contempt of this Court's orders that established extended deadlines for several aspects of its obligation to complete water service line replacement and restoration work that it promised to carry out when it entered into a Settlement Agreement on March 28, 2017. The City had failed to finish its outreach obligation by its March 1, 2023 deadline, it failed to ascertain the scope of its remaining restoration work by its May 1, 2023 deadline, and it failed to provide a compliant list of all the properties where it had completed visual restoration inspections. Each of these tasks was detailed in the Court's February 24, 2023 enforcement order. The Court, however, declined to hold Flint's elected mayor in contempt.

By the time of the contempt ruling, the City represented that it had completed most of the tasks for which it was called out by the plaintiffs, albeit belatedly. Some, though, still were left undone. Nonetheless, the Court determined that coercive sanctions were not useful, although compensatory sanctions were appropriate. *See Elec. Workers Pension Tr. Fund of Loc. Union #58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378-79 (6th Cir. 2003) (stating that a court may impose coercive or compensatory sanctions as a civil contempt remedy) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)); *see also United States v. Work Wear Corp.*, 602 F.2d 110, 115 (6th Cir. 1979) ("Civil contempt is meant to be remedial and to benefit the complainant either by coercing the defendant to comply with the Court's order via a conditional fine or sentence or by compensating the complainant for any injury caused by the defendant's disobedience."). The Court, therefore, ordered that the plaintiffs could recover as a contempt sanction their attorney's fees, costs, and expenses (including expert witness expenses) incurred in bringing their motion for contempt and the ensuing proceedings. The Court permitted the plaintiffs

<center>- 2 -</center>

to apply for that compensation by filing an appropriate motion with proper documentation of fees, costs, and expenses.

The plaintiffs filed their motion seeking attorney's fees and expenses of $62,367.56: $51,393.50 in fees and $10,974.06 in expenses.  Cognizant of the City's financial constraints, they represent that the request excludes more than three quarters of the total time they spent litigating contempt motion.  In total, the plaintiffs seek compensation for 178.9 hours of work by three attorneys and a paralegal.  The plaintiffs attached to their motion detailed billing entries.  *See* ECF No. 282-10, PageID.13296-322.  The fee portion of the request breaks down as follows:

|  | Hours Spent | Hours Sought | Rate | Fee |
|---|---|---|---|---|
| Attorney Melanie Calero | 296.4 | 53.7 | $300 | $16,110 |
| Attorney Adeline Rolnick | 211.2 | 48.7 | $325 | $15,827.50 |
| Paralegal Nicole Vandal | 83.5 | 34.4 | $125 | $4,300 |
| Attorney Sarah Tallman | 132.0 | 42.1 | $360 | $15,156 |
| Attorney Michael Wall | 30.6 | 0.0 | $500 | -- |
| TOTAL | 753.7 | 178.9 |  | $51,393.50 |

The plaintiffs state that they reduced their request in four ways.  First, they limited the request to the time spent by three attorneys (Calero, Rolnick, and Tallman) and a paralegal (Vandal) — excluding entirely the work of other members of the litigation team, including environmental litigator Michael Wall, the plaintiffs' local counsel, and several additional paralegals.  Second, counsel reviewed line-item entries to reduce or eliminate time claimed for 1) internal strategy discussions and meetings, 2) meet-and-confer meetings with more than one attorney present, 3) editing work product and drafting correspondence, 4) consultation with an unnecessary aerial imagery expert, 5) and time spent traveling to the motion hearing.  Third, they applied a 40% reduction to Calero and Rolnick's billing entries to account for work that could have been done more quickly by more experienced attorneys.  Fourth, they applied an across-the-

board 30% reduction to account for their unsuccessful argument that Flint's Mayor should be held in contempt and in light of the City's financial position.

The plaintiffs also seek $10,974.06 in costs and expenses, which include the fees for expert witness Noah Attal and counsel's travel costs for the contempt hearing. Again, the plaintiffs attached to their motion detailed time entries for their expert, disclosing that he worked for 102.65 hours at a $55 hourly rate. ECF No. 282-10, PageID.13324-25. And again, they limited their expense submissions by excluding costs for food and taxis. ECF No. 282, PageID.13188.

The City argues that the plaintiffs' fee request should be reduced substantially for two reasons. First, it suggests that the plaintiffs did not achieve a high degree of success in the contempt proceedings because the Court did not grant all the relief the plaintiffs sought. Second, it maintains that the Court should not award the plaintiffs' expenses for their travel to Michigan for the contempt hearing because the plaintiffs would not agree to hold the hearing virtually.

## II.

Although the fee award in this instance represents a compensatory remedy for civil contempt and does not result from the operation of a fee-shifting statute, the amount of the award nonetheless must be "reasonable." *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016). "An award of attorney's fees and expense is among the 'appropriate' equitable remedies for a successful moving party 'in a civil contempt proceeding.'" *Cernelle v. Graminex, L.L.C.*, 539 F. Supp. 3d 728, 738 (E.D. Mich. 2021) (quoting *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983)), *aff'd*, No. 21-1579, 2022 WL 2759867 (6th Cir. July 14, 2022); *see also McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) ("[A]n award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated.") (citing *Redken Lab., Inc. v. Levin*, 843 F.2d 226 (6th Cir. 1988)).

The reasonableness of a fee award generally is measured by the lodestar method. *Husted*, 831 F.3d at 702. That method calls for multiplying "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Ibid.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

Measured against the amount of work necessary to litigate fully the motion for contempt, the plaintiffs' request for fees, if anything, is substantially less than the amount they are entitled to receive. The first step of computing the lodestar is to examine the "the number of hours reasonably expended on the litigation." *Ibid.* The plaintiffs attached to their motion detailed line-item billing entries, describing 753.7 hours of work spanning the period from the entry of the Court's fifth enforcement order in February 2023 to their supplemental submissions on the contempt motion in November. *See* Ex. 3, ECF No. 282-10, PageID.13296-322. Notably, the plaintiffs only seek compensation for 178.9 of those hours and for fewer of the personnel than participated in the contempt proceeding. This figure is reasonable: the plaintiffs undertook substantial efforts to monitor the City's progress, consult with an expert witness to identify the deficiencies in its reporting, and litigate their motion for contempt through a contested hearing and in post-hearing briefing. As one example of the character of this work, the record of proceedings from the plaintiffs' motion for contempt to the present filings is nearly 2,000 pages in length.

The plaintiffs likely would have been entitled to claim additional time because the rationale for some of the reduction in hours overlaps with the so-called *Johnson* factors courts may use to modify a lodestar award, *see Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (noting that courts should consider, among other things, the skill required to perform the legal service and the experience of an attorney), and the Court's determination of the reasonable hourly rate for the attorneys, which accounts — to an extent — for an attorney's level

of experience.  Of the hours sought by the plaintiffs, however, the City does not point to any inappropriate billing entries, and the Court did not locate any in its review of the records.  The time sought by attorneys Calero (53.7 hours), Rolnick (48.7 hours), Tallman (42.1 hours), and paralegal Vandal (34.4 hours) is appropriate.

Besides the hours requested, the billing rates for each attorney also are well-supported and are in line with the rates charged by local environmental law practitioners.  The plaintiffs seek $300 per hour for Calero, an attorney with four years of experience, $325 for Rolnick, an attorney with five years of experience, and $360 for Tallman, an attorney with eleven years of experience.  ECF No. 282, PageID.13178.  According to the State Bar of Michigan's 2023 Economics of Law Survey Results Summary Report, these rates all are *below* the $413 median rate hourly charged by Michigan attorneys specializing in environmental law.  *See 2023 Economics of Law Survey Results*, State Bar of Michigan, 8 (2023), https://www.michbar.org/file/pmrc/pdfs/-2_2023EOL_SurveyResults.pdf.  And the rates are between the median and 75th percentile range for all attorneys with similar years of legal experience.  *Id.* at 6.  The plaintiffs also attached to their motion declarations from two local practitioners who confirm that the requested rates are at or below Detroit-based market rates for environmental litigators with similar skills and experience levels.  *See* Decl. of Nathan Dupes, ¶¶ 11, ECF No. 282-3, PageID.13196-97; Decl. of Mark Granzotto, ¶¶ 17-22, ECF No. 282-4, PageID.13201-03.  The requested $125 hourly rate for paralegal Nicole Vandal also is in line with Detroit market rates and is reasonable.  *See* Dupes decl. ¶ 13; *see also Krueger v. Experian Info. Sols., Inc.*, No. 19-10581, 2024 WL 497105, at *4 (E.D. Mich. Feb. 8, 2024) (awarding $125 per hour for paralegal work); *Aljahmi v. Ability Recovery Servs., LLC*, No. 17-13772, 2022 WL 891416, at *2 (E.D. Mich. Mar. 25, 2022) (noting that courts in this district have awarded between $125 and $160 per hour for paralegal work).

The City argues that the amount of the fee award proposed by the plaintiffs is excessive because the plaintiffs did not achieve a high degree of success in their contempt motion and that the award should be adjusted accordingly. This argument is misplaced. Although a plaintiff's degree of success sometimes matters when a court evaluates a fee request, *see Hensley*, 461 U.S. at 434 (noting that a court, reviewing a lodestar, should ask whether the "plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award"), it is less appropriate in a civil contempt action where the goal of a sanction is to "compensate the complainant for losses sustained," *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 834 (1994) (quoting *Mine Workers*, 330 U.S. at 303-04); *Alter Domus, LLC v. Winget*, No. 08-13845, 2024 WL 1307812, at *1 (E.D. Mich. Mar. 27, 2024) ("[T]he purpose of the attorney's fee allowance here . . . is not based on any fee-shifting provision but rather is for compensation resulting from [the defendant's] contempt.").

All considered, though, the plaintiffs achieved a high degree of success in the contempt motion. Finding a municipality in contempt is unfortunate, but it is no small achievement. Although the Court did not adopt the plaintiffs' requested sanctions, the Court agreed that the City's violations of the Settlement Agreement amounted to contempt of court and opened the door for equitable relief. *Concerned Pastors for Soc. Action v. Khouri*, --- F. Supp. 3d ---, 2024 WL 1076245, at *13 (E.D. Mich. Mar. 12, 2024). The Court therefore assessed attorney's fees "to compensate the plaintiffs for the cost of bringing the instant action." *Ibid.* Moreover, the plaintiffs' fee request already accounts for the City's "lack of success" contention because the plaintiffs reduced their request by 30% across-the-board to adjust for unsuccessful arguments raised in their motion. The City is not entitled to any further reduction on this basis.

The City's second argument is less persuasive than its first. It contends that it should not be required to pay the plaintiffs' expenses incurred for travel to the contempt hearing because the plaintiffs declined its request to hold the hearing virtually. However, holding an in-person hearing versus a remote hearing was not the plaintiffs' decision to make. Even if the plaintiffs consented to conduct the hearing virtually, the Court would have denied the request. The plaintiffs' travel costs therefore were unavoidable and are properly compensable as part of the contempt sanction. *See Cernelle*, 539 F. Supp. 3d at 744 ("The Court has discretion to order recovery of meal and travel expenses."). The City does not point to any inappropriate expenses associated with the plaintiffs' travel to Michigan, and a review of the relevant records suggests that the plaintiffs conducted an economical trip. *See* Expenses, ECF No. 282-10, PageID.13327.

Finally, the City suggests its resources could be better spent completing service line excavations, replacements, and restorations than paying the plaintiffs' fees, which may be true. But it is beside the point. Of course, the City should be directing its resources to its remediation efforts, but the Court found that the City's contempt entitled the plaintiffs to a remedy. The sanction — although not punitive — serves an important signaling function, forcing the City to uphold its commitment to the plaintiffs as outlined in the Settlement Agreement and to recognize the Court's authority. The City cannot complain that the Court imposed unrealistic obligations. The missed deadlines occasioning the finding of contempt were the City's fault. *Compare* Stipulation, ECF No. 256 *with* Order Granting Fifth Motion to Enforce Settlement Agreement, ECF No. 258. It never sought leave to adjust these dates and only belatedly complied after the plaintiffs instituted contempt proceedings. The City is a large enterprise and maintains taxing authority. It can bear this sanction *and* provide relief to the property-owners who have waited on its compliance for far too long.

More fundamentally, it is inaccurate to frame the sanction so narrowly as a diversion of resources from the City's ongoing remediation efforts. The plaintiffs are owed some credit for spurring the City to fulfill its obligations; they are not merely a drain on its resources. Without their persistent efforts, particularly in the recent contempt proceedings, the remediation still could be languishing. Their work has benefitted Flint residents, and they already have accounted for the City's fiscal realities by submitting a pared back fee request.

<div align="center">III.</div>

The plaintiffs' attorney's fee and expense request is reasonable and warranted as an appropriate contempt sanction.

Accordingly, it is **ORDERED** that the plaintiffs' motion for attorney's fees, costs, and expenses (ECF No. 282) is **GRANTED**.

It is further **ORDERED** that the City of Flint shall pay to the plaintiffs forthwith the sum of $62,367.56.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  June 27, 2024