IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.

ELON MUSK, LEE ZELDIN,
Donald J. Trump in their official
Capacity as Federal Employees
and Mr. Trump, in his official
capacity as President of the
United States, et al. - APPELLEES

_Motion for EXPIDTED ruling on emergency motion
w.r.t. the Donald Trump, Elon Musk, et al... sworn
affidavits in #25-cv-00766_

*March 25th, 2025*

*On or about March 24th, 2025... [both] appellants pro se ...(Colleen Connors) and [Melvin Jones Jr.] became aware of NEW and VERY important filings "in a companion IMMIGRATION CASE AS TO PRESIDENT DONALD TRUMP, et al."... [defendants and appellees in the instant appeal #*

*25-1158]... which are contained in civil lawsuit #25-cv-00766.*

*And.... [although] vision impaired pro se appellant Melvin Jones Jr. HAS NOT read fully the attached pleadings affixed hereto as exhibits and JUDICIAL NOTICE for the 1st circuit appeals court judge or panel; ....pro se appellant Colleen Connors is able to*

*read such; and given that our ORIGINAL motion to intervene in civil case #25-cv-10139 [and] in our instant appeal #25-1158 ...literally COMPLAINS of MS-13 and TdA being VERY worrisome and dangerous TERRORISTS GANGS [e.g. both WOMEN and MEN].... as to birthright citizenship and NON-allegiance to the United States and/ or MS-13's and TdA's NON*

*allegiance to the United States in general.... and TAKEN WITH the attached exhibits TO INCLUDE a recent ruling from Honorable U.S. Judge BOASBERG.....*

*We motion the appeals court to do and for the following::*

*1.)   Depending upon Honorable U.S. Judge BOASBERG's determination and ruling []against president Donald*

*Trump, Elon Musk. et al regarding the attached exhibits pertaining SPECIFICALLY TO THE "AFFIRMATIVE DEFENSE" now proffered in said companion civil case by the defendants-appellees president Donald Trump, et al…. AS TO "STATE SECRETS DOCTRINE" and pending contempt warning issued against president Donald Trump*

*{e.g. as such appears to be standing at this point].....*

*2.)   WE - Colleen Connnors and Melvin Jones Jr. REQUEST that the appeals court for the 1st circuit court of appeals.... Then [of course] RENDER A DECISION in our instant pro se appeal... which is FULLY/ 100% consistent with the Honorable U.S. Judge BOASBERG's soon to be issued {instructive}*

*ruling in civil case #25-cv-00766*

*3.)    Indeed, then [IF] president Donald Trump, et al's…. STATE SECRETS DOCTRINE DEFENSE IS ACCEPTED BY HONORABLE U.S. JUDGE BOASBERG….. Then ….[we] BOTH pro se appellants' will JOIN and AGREE to dismiss our instant appeal WITHOUT PREJUDICE;…. However,*

*4.)   [IF]... in FACT and LAW.... in civil case #25-cv-0076.... Honorable U.S. Judge BOASBERG.... rejects the defendants' president Donald Trump, ELON MUSK, et al's.... Proferring of STATE SECRETS DOCTRINE in civil case #25-cv–00766.... then [INDEED]..... the instant appeal #35-1158 should and MUST be briefed and decided by*

*the 1st circuit appeals court {i.e. NOTWITHSTANDING the/ our anticipated UPCOMMING DIRECT RULING AS TO PRESIDENT DONALD TRUMP'S OWN EMERGENCY APPLICATION TO THE US SUPREME COURT PERTAINING SPECIFICALLY TO THE INSTANT APPEAL*

*#25-1158 and civil case #25-cv-10139};.... Which*

*5.)    We pro se appellants have come to FULLY believe will result in a resounding DEFEAT against the defendants – appellees in our instant pro se appeal by way of a scathing and admonishing ruling from the US SUPREME COURT as to the birthright issue in the United States.... Which*

*[we] believe is the "BEDROCK" of the glue that holds the United States together;*

*6.)    Which is to say... here, we Colleen Connors and Melvin Jones Jr., believe that the REAL ISSUE of LAW and ISSUE OF FACT... for the instant appeals court as to appeal #25-1158... is NOT whether or not the Executive Order as to Birthright Citizenship*

*is unconstitutional [e.g. and FOR SURE it/ [presidential executive order is…. Patently Unconstitutional]…. but,INDEED…. the REAL ISSUE OF LAW and ISSUE OF FACT in the instant pro se appeal ….is WHETHER or NOT…. [a] U.S. president [e.g. and here… the matter is RIPE because of president Donald Trumps unilateral conduct in*

*attempting to change the U.S. Constitution with ONE STROKE OF his PEN…. at the direction of ELON MUSK {e.g. and unelected co-president} [WHOA is that troublesome for sure]…. And, so WAIT A MINUTE… here, because;*

7.)  *Indeed, no U.S. President can [NOR] has the constitutional authority to unilaterally change ANY part of the*

*U.S. Constitution... because to ALLOW such nonsense.... is and does and would then ...relegate the United States to a PUPPET DEMOCRACY — that is NOW [e.g. since January 20th, 2025]... a FIAT DICTATORSHIP.... wherein president Donald Trump and "co-president" for LACK OF A BETTER TERM... [Elon Musk] is/ are NOW self-installed DICTATORS...*

*who can NOW "rule" the United States …by EXECUTIVE ORDERS… and here;*

*8.)    Make NO MISTAKE… both pro se appellants Colleen Connors and Melvin Jones Jr. respectfully OBJECT to Elon Musk and President Donald Trump being dictators in chief…. no matter how COOL the defendants/ appellees*

*assert that the TESLA TRUCK is !!!*

*9.)    Anyway…. [we] pro se appellants Colleen Connors and Melvin Jones Jr…. hope that our instant emergency motion MAKES SENSE to the appeals court Judge or Panel…. And [IF] clarfication is NEEDED by and/ or from us…. Please issue and order which seeks to have us clarify ANY questions*

*and such ...which the 1st circuit appeals court MAY have for us/ pro se appellants Colleen Connors and Melvin Jones Jr.; and please also note;*

10.)  *Disabled pro se appellant Melvin Jones Jr.'s has/ had RECENT back pain and stiffness as to such [e.g. he takes NO prescribed pain medication for his knee, back, and shoulder pain]...*

*and so our response to such MAY be somewhat delayed.*

*Thank you.*
*Respectfully Submitted.*
*Best,*

*Colleen Connors*

*_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _*

*Colleen Connors PRO SE appellant (interested party)*
*1935 Hosler St.*
*Flint, Michigan 48503*

Email:
[cmcolleen4@gmail.com](mailto:cmcolleen4@gmail.com)


Google voice to text ph#
(use email)

_____
/Melvin Jones Jr./ disabled
PRO SE appellant (interested
party)
1935 Hosler St.
Flint, Michigan 48503
Email: [jonesjrmel@gmail.com](mailto:jonesjrmel@gmail.com)

*Google voice to text ph#*
*415-562-5074*

*{see the exhibit on the next page[s]}*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

J.G.G., *et al.*,

        **Plaintiffs,**

          **v.**                          **Civil Action No. 25-766 (JEB)**

DONALD J. TRUMP, *et al.*,

        **Defendants.**

<u>**MEMORANDUM OPINION**</u>

      In the predawn hours of Saturday, March 15, five Venezuelan noncitizens being held in

Texas by the Department of Homeland Security sought emergency relief in this Court.  They

justifiably feared that, in a matter of hours, they might be removed from the country pursuant not

to the Immigration and Nationality Act of 1952, but instead the Alien Enemies Act of 1798, a law

last invoked in the wake of Pearl Harbor as the nation was preparing for a world war.  That Act

authorizes the President to summarily remove "natives, citizens, denizens, or subjects" of a

"hostile nation or government" when there is "declared war" against it or when it has

"perpetrated, attempted, or threatened against the territory of the United States" an "invasion or

predatory incursion."  50 U.S.C. § 21.  The President, Plaintiffs believed, had secretly signed a

Proclamation invoking the Act, and, upon its imminent publication, the Government would begin

immediately removing them without any hearing to ensure that they fell within its scope.

      As expected, later that day the President indeed published a Proclamation announcing

that because Tren de Aragua — a violent, transnational criminal organization based in Venezuela

— had committed an "invasion" or "predatory incursion" upon the United States, the

Government could begin immediately deporting any Venezuelan noncitizens it deemed to be members of Tren de Aragua.  See 90 Fed. Reg. 13033, 13034 (Mar. 14, 2025), § 1.  Plaintiffs are among those so deemed.

But wait, they protest; the Government was mistaken.  Each vehemently denies being a member of Tren de Aragua and thus subject to the Proclamation.  Several in fact claim that they fled Venezuela to escape the predations of the group, and they fear grave consequences if deported solely because of the Government's unchallenged labeling.  Plaintiffs therefore sought a Temporary Restraining Order preventing the Government from deporting them or other Venezuelan noncitizens under the Proclamation without a hearing.

To preserve the status quo until Plaintiffs' claims could be properly adjudicated, the Court issued two Temporary Restraining Orders that together prohibited the Government from relying solely on the Proclamation to remove the named Plaintiffs or any other Venezuelan noncitizens in its custody.  Neither Order required the Government to release a single individual from its custody.  Neither Order prevented the Government from apprehending anyone pursuant to the just-published Proclamation.  And neither Order prevented the Government from deporting anyone — including Plaintiffs — through authorities other than the Proclamation, such as the INA.  Indeed, as the President last month designated Tren de Aragua a Foreign Terrorist Organization, members of the gang are already inadmissible to (and thus deportable from) the United States under the INA.  See 8 U.S.C. § 1182(a)(3)(B).

The Government now moves to vacate the TROs, primarily on the ground that there is not a sufficient likelihood that Plaintiffs will succeed on their legal claims. The President's unprecedented use of the Act outside of the typical wartime context — and Plaintiffs' various challenges to such use — implicates a host of complicated legal issues, including fundamental

and sensitive questions about the often-circumscribed extent of judicial power in matters of foreign policy and national security. Such concerns arise principally in connection with Plaintiffs' contention that any action taken pursuant to the Proclamation is unlawful because, despite the President's determination otherwise, Tren de Aragua is not a "foreign nation or government," and its actions, however heinous, do not amount to an "invasion" or a "predatory incursion."

The Court need not resolve the thorny question of whether the judiciary has the authority to assess this claim in the first place. That is because Plaintiffs are likely to succeed on another equally fundamental theory: before they may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all. As the Government itself concedes, the awesome power granted by the Act may be brought to bear only on those who are, in fact, "alien enemies." And the Supreme Court and this Circuit have long maintained that federal courts are equipped to adjudicate that question when individuals threatened with detention and removal challenge their designation as such. Because the named Plaintiffs dispute that they are members of Tren de Aragua, they may not be deported until a court has been able to decide the merits of their challenge. Nor may any members of the provisionally certified class be removed until <u>they</u> have been given the opportunity to challenge their designations as well. The Motion to Vacate will thus be denied.

## I.    Background

### A.    <u>Statutory Background</u>

It is uncontested that the Alien Enemies Act grants the President broad authority to take certain actions against individuals who are alien enemies. The relevant provision provides, in full:

> Whenever there is a declared war between the United States and any
> foreign nation or government, or any invasion or predatory incursion
> is perpetrated, attempted, or threatened against the territory of the
> United States by any foreign nation or government, and the
> President makes public proclamation of the event, all natives,
> citizens, denizens, or subjects of the hostile nation or government,
> being of the age of fourteen years and upward, who shall be within
> the United States and not actually naturalized, shall be liable to be
> apprehended, restrained, secured, and removed as alien enemies.
> The President is authorized in any such event, by his proclamation
> thereof, or other public act, to direct the conduct to be observed on
> the part of the United States, toward the aliens who become so liable;
> the manner and degree of the restraint to which they shall be subject
> and in what cases, and upon what security their residence shall be
> permitted, and to provide for the removal of those who, not being
> permitted to reside within the United States, refuse or neglect to
> depart therefrom; and to establish any other regulations which are
> found necessary in the premises and for the public safety.

50 U.S.C. § 21.

Enacted in 1798, the Act is the only remaining component of "that ill-famed company known as the Alien and Sedition Acts." United States ex rel. Schlueter v. Watkins, 67 F. Supp. 556, 563 (S.D.N.Y. 1946). Unlike the doomed Alien Friends, Naturalization, and Sedition Acts, however, the Alien Enemies Act never faced serious questions concerning whether it was a constitutional exercise of Congress's war powers. See Citizens Protective League v. Clark, 155 F.2d 290, 293 (D.C. Cir. 1946). As James Madison explained in 1800, "With respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war against any nation, and of course to treat it and all its members as enemies." James Madison, Madison's Report on the Virginia Resolution, 4 Elliot's Debates 546, 554 (1800), https://perma.cc/U57E-L59L. Chief Justice Marshall, describing the Act, similarly emphasized that the President's authority vis-à-vis alien enemies stems from Congressional statute, noting that the law "confers on the president very great discretionary powers respecting [alien enemies]" and "affords a strong implication

4

that he did not possess those powers by virtue of the declaration of war." <u>Brown v. United States</u>, 12 U.S. (8 Cranch) 110, 126 (1814).

D.C. Circuit Judge E. Barrett Prettyman, whose name now adorns our city's federal courthouse, confirmed the validity of the Act in the wake of the Second World War when he declared, "The Alien Enemy Act is constitutional, both as an exercise of power conferred upon the Federal Government and as a grant of power by the Congress to the President." <u>Clark</u>, 155 F.2d at 293. Prior to that seismic conflict, the Act had been invoked only twice, during the War of 1812 and the First World War. During World War II, President Roosevelt used the Act, variously, to apprehend, intern, and remove Japanese, Germans, and Italians residing within the United States. <u>See</u> <u>United States <i>ex rel.</i> Zdunic v. Uhl</u>, 46 F. Supp. 688, 689 (S.D.N.Y. 1942); <u>Masami Sasaki v. Rogers</u>, 185 F. Supp. 191, 192 (D.D.C. 1960); <u>Hohri v. United States</u>, 586 F. Supp. 769, 774 (D.D.C. 1984). While vigorously deploying that power, Roosevelt nonetheless "provide[d] for hearings for arrested alien enemies . . . in order to permit them to present facts in their behalf." <u>Schlueter</u>, 67 F. Supp. at 565 (quotation marks omitted). Alien hearing boards, "composed of from three to six civilian members, served without compensation, heard the alien's evidence and made recommendations which were not binding on the Attorney General." <u>Id.</u>

Following the Second World War, the Alien Enemies Act lay dormant for 75 years.

B.　　<u>Factual and Procedural Background</u>

Until now. In early March, DHS began interrogating Venezuelan migrants in its custody, including Plaintiffs, about gang membership. <u>See</u> ECF No. 44-9 (Karyn Ann Shealy Decl.), ¶¶ 3–4; <u>see also</u> ECF No. 44-12 (Melissa Smyth Decl.), ¶ 11. Even after "vehemently den[ying] any affiliation with a gang, past or present," Plaintiffs say they were moved from detention centers across the country to the El Valle Detention Facility in south Texas. <u>See</u> Shealy Decl.,

¶¶ 4–5; ECF Nos. 44-6 (Austin Thierry Decl.), ¶¶ 5–6; 44-7 (Osvaldo E. Caro-Cruz Decl.), ¶¶ 8–10, 18; 44-8 (Katherine Kim Decl.), ¶ 5. The reason for this transport was unveiled on the night of Friday, March 14, when, in Plaintiffs' telling, they were among over 100 Venezuelan noncitizens who were pulled from their cells and told that they would be deported the next day to an unknown destination. See Shealy Decl., ¶ 7; Kim Decl., ¶ 19; Thierry Decl., ¶ 8.

Plaintiffs' counsel caught wind of these movements, and they came to believe that the President had signed or would imminently sign a Proclamation invoking the Alien Enemies Act. See ECF No. 1 (Compl.), ¶¶ 43–55. They suspected that the Proclamation would declare that Tren de Aragua had committed or attempted an "invasion" or "predatory incursion" such that any member of the group was summarily removable under the Act. See ECF No. 3-2 (TRO Br.) at 1–2, 4–5. Plaintiffs believed that the Proclamation could be published at any moment and, once it was, the Government would begin rapidly removing Venezuelan noncitizens — including Plaintiffs — whom it had determined to be members of Tren de Aragua. See id. at 2.

So, in the wee hours of Saturday morning, Plaintiffs filed this lawsuit and sought a Temporary Restraining Order preventing the Government from deporting them under the Act until their claims could be heard. See ECF No. 3-9 (Proposed TRO Order) at 1–2. In addition to contesting the lawfulness of the Proclamation, Plaintiffs staunchly deny that they are members of Tren de Aragua. See, e.g., Compl., ¶¶ 9–10, 12 (J.G.G., J.A.V., W.G.H.); ECF No. 3-6 (W.G.H. Decl.), ¶ 12; ECF No. 3-8 (J.A.V. Decl.), ¶ 5; Shealy Decl., ¶ 4; ECF No. 44-11 (Grace Carney Decl.), ¶ 3. They therefore feared being whisked away without a chance to challenge the Government's say-so.

From there, events developed rapidly. Shortly after being assigned this case around 8:00 a.m. on March 15, this Court contacted the Government and connected with defense counsel at

9:20 a.m.  By then, the Court had been informed by Plaintiffs that at least one Plaintiff had apparently been put aboard an airplane along with other Venezuelans.  See Shealy Decl., ¶ 8 (removal process began around 7:30 a.m.); ECF No. 44-10 (Stephanie Quintero Decl.), ¶ 3 (removal process began at 7:00 a.m.); Carney Decl., ¶¶ 11–12 (inmates were moved from El Valle at about 10:00 a.m.); Smyth Decl., ¶ 14.  It thus appeared that, although the Government knew of the suit contesting the legality of removals under the Proclamation, it was nonetheless moving forward with its summary-deportation plans.  In light of the "exigent circumstances," and because the Plaintiffs had "satisfied" the "factors governing the issuance of preliminary relief," the Court granted an initial TRO that morning.  See Minute Order of Mar. 15, 9:40 a.m.  That Order, which temporarily prohibited the Government from removing only the five named Plaintiffs, was "to maintain the status quo until a hearing" could take place with Plaintiffs and the Government.  Id.  The Order did not command the Government to release anyone from its custody.  Id.

The Court then set an emergency hearing for 5:00 p.m. the same day to consider Plaintiffs' claim that relief should be broadened to a class of all noncitizens subject to the anticipated Proclamation.  This gave both sides seven hours to investigate the facts and prepare their legal arguments.  See ECF No. 4 (Mot. to Certify Class); Minute Order of Mar. 15, 11:04 a.m.

About an hour before that hearing began, the White House published the Proclamation on its website.  See Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua, White House (Mar. 15, 2025), https://perma.cc/D3GM-5YBM; ECF No. 28-1 (Robert L. Cerna Second Decl.), ¶ 5.  As expected, it targeted Tren de Aragua.  See 90 Fed. Reg. at 13033.  The Proclamation announces that the gang has "infiltrated" the Maduro

government in Venezuela, "including its military and law enforcement apparatus." <u>Id.</u> It

explains that "Venezuelan national and local authorities have ceded ever-greater control over

their territories to transnational criminal organizations" like Tren de Aragua, resulting in "a

hybrid criminal state." <u>Id.</u> It further states that Tren de Aragua "is perpetrating, attempting, and

threatening an invasion or predatory incursion against the territory of the United States,"

including by "undertaking hostile actions and conducting irregular warfare against the territory

of the United States both directly and at the direction . . . of the Maduro regime." <u>Id.</u> at 13034,

§ 1. As a result, the Proclamation declares that "all Venezuelan citizens 14 years of age or older

who are members of [Tren de Aragua], are within the United States, and are not actually

naturalized or lawful permanent residents of the United States are liable to be apprehended,

restrained, secured, and removed as Alien Enemies" under the Act. <u>Id.</u>

 In the 5:00 p.m. hearing, the Court began by clarifying the limited basis and scope of the

TRO then in place, <u>see</u> ECF No. 20 (Mar. 15 Hearing Tr.) at 3, and then turned to whether it

should provisionally certify a class — comprising Plaintiffs and those similarly situated — and

issue a second TRO covering that class. <u>See id.</u> at 5–6. The Government began by objecting that

the Court lacked venue because Plaintiffs' claims could be raised only through a petition for

habeas corpus in the federal district in Texas where they were being held, not in the District of

Columbia. <u>See id.</u> at 4–11.

 Noting that it would benefit from further argument on the issue, the Court pivoted to

addressing Plaintiffs' concerns "about imminent deportation." <u>Id.</u> at 11. It asked the

Government whether there were any "removals under this Proclamation planned . . . in the next

24 or 48 hours." <u>Id.</u> Government counsel said that he did not know, but that he could report

back. <u>Id.</u> Plaintiffs' counsel, however, interjected that several "sources" had informed him that

two flights "were scheduled for this afternoon that may have already taken off or [will] during this hearing." Id. at 12.  So, at 5:22 p.m., the Court adjourned the hearing until 6:00 p.m. and directed the Government to find out whether removing people under the Proclamation was then in motion.  Id. at 13–15.

When the hearing resumed shortly after 6:00 p.m., the Government surprisingly represented that it still had no flight details to share.  See id. at 15–18.  The Court thus returned to the venue issue.  Noting that it was a "reasonably close question" if the habeas claims remained, the Court permitted Plaintiffs to dismiss them without prejudice, leaving only claims under the Administrative Procedure Act, for which venue in the District of Columbia was proper. See id. at 22; Compl., ¶¶ 79, 83, 86, 90, 92–95.  The Court next provisionally certified a class of Plaintiffs covering all noncitizens in custody subject to removal under the Proclamation.  See Mar. 15 Hearing Tr. at 23–26, 38.

That left the central question to be resolved: should the Court issue a broader TRO covering the entire class?  At around 6:45 p.m., the Court answered the question in the affirmative.  Whether Plaintiffs could show a likelihood of success on the merits, as required for a TRO, presented novel and nuanced legal issues — issues not easily deciphered in the abbreviated timeframe resulting from the Government's decision to hastily dispatch flights as legal proceedings were ongoing, a move that implied a desire to circumvent judicial review.  The Court nonetheless concluded that Plaintiffs had shown that they had a substantial likelihood of prevailing, and that they would suffer irreparable injury if Act-based removals were not temporarily halted.  See id. at 41–42.  The Court therefore ordered that for 14 days the Government was enjoined from removing any noncitizens in its custody solely on the basis of the Proclamation.  See id. at 42.  The Court then told Government counsel: "[Y]ou shall inform

your clients of [the Order] immediately, and that any plane containing [members of the class] that is going to take off or is in the air needs to be returned to the United States . . . . However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you.  But this is something that you need to make sure is complied with immediately."  Id. at 42.  Not long after, the Court memorialized the Order on the docket, referencing the just-held hearing.  See id. at 47; Minute Order of Mar. 15, 7:25 p.m.

It is important to stress once again that the Order was narrow: it prevented Defendants only from removing the Plaintiff class on the sole basis of the Proclamation.  In other words, the Order did not prevent Defendants from removing anyone — to include members of the class — through other immigration authorities such as the INA.  Indeed, as previously mentioned, those affiliated with Tren de Aragua were all already deportable under that statute as members of an FTO.  See 8 U.S.C. 1182(a)(3)(B).  The Order also did not require Defendants to release a single person held in their custody, even individuals held only on the basis of the Proclamation.  And it did not even prevent Defendants from apprehending noncitizens under the authority of the Proclamation (or any other law, for that matter).

It soon emerged that two planes were indeed likely in the air during the hearing.  In other words, the Government knew as of 10:00 a.m. on March 15 that the Court would hold a hearing later that day, and the most reasonable inference is that it hustled people onto those planes in the hopes of evading an injunction or perhaps preventing them from requesting the habeas hearing to which the Government now acknowledges they are entitled.  See infra p. 13.  According to the Government, prior to this Court's oral ruling at around 6:45 p.m., two planes had departed the United States carrying persons designated as Tren de Aragua members and deported based solely on the Proclamation.  See ECF No. 49 (Cerna Third Decl.), ¶ 5.  A third plane that left some

hours later did not, at least according to the Government, contain persons removed solely pursuant to the Proclamation.  See ECF No. 26-1 (Cerna First Decl.), ¶ 6.  Upon landing in El Salvador, members of the Plaintiff class were apparently transferred into one of that country's detention facilities, known as the Center for Terrorism Confinement (CECOT).  See Secretary Marco Rubio (@SecRubio), X (Mar. 16, 2025, 8:39 a.m.), https://x.com/SecRubio/status/1901252043517432213 (sharing video of the transfer).  As will be discussed, conditions in CECOT are reportedly parlous.  See infra Section III.C.

Plaintiffs emphatically protest that many of the people on the first two flights are not members of Tren de Aragua.  They include in their filings the declarations of lawyers who state that their clients who were removed to El Salvador on those flights have no connection to the gang.  See generally ECF No. 44-5 (Linette Tobin Decl.); Thierry Decl.; Caro-Cruz Decl.; Kim Decl.; see also ECF No. 44 (Opp.) at 7–8.  The Government rejoins that Immigration and Customs Enforcement "personnel carefully vetted each individual alien to ensure they were in fact members of [Tren de Aragua]," although it concedes that not all of them "have criminal records in the United States."  Cerna First Decl., ¶¶ 7, 9.

Because the Court had to act on such an expedited basis, it wished to afford the Government an opportunity to brief the issues involved, and it thus permitted Defendants to move to vacate the TROs, which they have now done.  See ECF No. 26 (Mot. to Vacate).  Plaintiffs responded, and the Court held oral argument on March 21.  See ECF No. 51 (Mar. 21 Hearing Tr.).  The Government also appealed to the D.C. Circuit, seeking a stay of the TROs, see Corrected Emergency Motion for a Stay Pending Appeal, J.G.G. v. Trump, No. 25-5067 (D.C. Cir. Mar. 16, 2025), and also asked the Court of Appeals to reassign this case to a different district judge.  See Letter Pursuant to Rule 28(j) at 2, J.G.G. v. Trump (D.C. Cir. Mar. 17, 2025).

As the Circuit panel is set to hear the case shortly, the Court wishes to set forth its reasoning more fully after briefing and argument.  See Order, J.G.G. v. Trump (D.C. Cir. Mar. 19, 2025).

## II.    Legal Standard

Like preliminary injunctions, TROs "do not conclusively resolve legal disputes."  Lackey v. Stinnie, 145 S. Ct. 659, 667 (2025).  Rather, their purpose is "merely to preserve the relative positions of the parties until a trial on the merits can be held and to balance the equities as the litigation moves forward."  Id. (citations and quotation marks omitted).  Granting such preliminary relief is thus "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017).

Motions for TROs and preliminary injunctions are governed by the same standards. Gomez v. Trump, 485 F. Supp. 3d 145, 168 (D.D.C. 2020).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20).  "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted."  Hospitality Staffing Solutions, LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

III.    **Analysis**

The Court starts by addressing whether it has jurisdiction to hear Plaintiffs' APA claims. Finding that it does, it then addresses the four aforementioned TRO factors, devoting the lion's share of the analysis to the likelihood of success on the merits.

A.    Jurisdiction

Defendants initially contend that, because a noncitizen can contest the applicability of a Proclamation under the Alien Enemies Act through a petition for a writ of habeas corpus, he can do so only through such an action.  See Mot. to Vacate at 8–11.  According to the Government, Plaintiffs consequently should have brought this challenge via habeas claims in the district of their detention, and this Court has no jurisdiction over their APA claims.  Id. at 9.

To be sure, judicial review of Alien Enemies Act claims has generally taken place in the context of a petition for a writ of habeas corpus.  See, e.g., Ludecke v. Watkins, 335 U.S. 160, 163 (1948); United States ex rel. D'Esquiva v. Uhl, 137 F.2d 903, 904 (2d Cir. 1943); United States ex rel. Kessler v. Watkins, 163 F.2d 140, 140 (2d Cir. 1947); Bauer v. Watkins, 171 F.2d 494, 493 (2d Cir. 1948).  But that fact is largely a relic of historical happenstance.  In past invocations of the Act, those subject to removal were also detained solely on that basis.  See, e.g., D'Esquiva, 137 F.2d at 904 ("By habeas corpus the relator sought release from detention by the respondent, who holds him in custody as an alien enemy under an order of the Attorney General purporting to act pursuant to the Alien Enemy Act and the presidential proclamation of December 8, 1941.") (citations omitted).  Habeas was consequently the appropriate avenue for individuals to challenge the Government's application of the Act.

Prior to the 1952 passage of the INA, in fact, "the sole means by which an alien could test the legality of his or her deportation order was by bringing a habeas corpus action in district

court." INS v. St. Cyr, 533 U.S. 289, 306 (2001) (emphasis added). Pre-INA plaintiffs therefore naturally brought challenges under the Alien Enemies Act through habeas actions. Even so, plaintiffs have previously brought civil actions challenging their detention and removal under the Act on non-INA grounds on at least three occasions, and those actions were duly heard and decided by courts. In Clark, for instance, our Circuit considered a consolidated appeal of "three civil actions brought . . . for injunction, mandatory injunction and ancillary relief . . . upon the ground that the Alien Enemy Act is repugnant to the Constitution." 155 F.2d at 291–92 (noting that one group of plaintiffs comprised "individuals who are German nationals and who allege that they are threatened with deportation as alien enemies"). The district court "dismissed the complaints on the merits," id. at 292, and the court of appeals affirmed. Id. at 293. Defendants are wrong to suggest, then, that habeas has historically been the exclusive remedy for individuals contesting the application of the Act.

The Government nevertheless insists that the existence of habeas jurisdiction "preclu[des]" jurisdiction over any other claims, including those brought under the APA. See Mot. to Vacate at 9. The APA, however, has long been available to plaintiffs absent specific preclusion by Congress. See Robbins v. Regan, 780 F.2d 37, 42 (D.C. Cir. 1985) ("[J]urisdiction over APA challenges to federal agency action is vested in district courts unless a preclusion of review statute . . . specifically bars judicial review in the district court."); Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1038 (D.C. Cir. 2002) ("clear and convincing evidence" of congressional intent is needed to "preclude judicial review" under APA) (quoting Abbott Lab'ys. v. Gardner, 387 U.S. 136, 141 (1967)).

The Supreme Court has made clear that the same principle applies even in immigration challenges where habeas is also available. In Brownell v. We Shung, 352 U.S. 180 (1956), a

noncitizen who was "ordered deported" challenged "the legality of an exclusion order" through "an action for declaratory judgment under . . . the Administrative Procedure Act." Id. at 181. The Supreme Court, asked to decide whether such a challenge must be "by habeas corpus," concluded that "either remedy is available in seeking review of such orders." Id.; accord Shaughnessy v. Pedreiro, 349 U.S. 48, 49–52 (1955). As this Court has explained, "[A]lthough Congress has expressly limited APA review over individual deportation and exclusion orders, it has never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA." R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 186 (D.D.C. 2015) (citation omitted). In other words, "APA and habeas review may coexist." Id. at 185.

Because Plaintiffs are "person[s] suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," they are "entitled to judicial review" under the APA. See 5 U.S.C. § 702. And because the Government's orders of removal are "the consummation of the agency's decisionmaking process" and are actions "by which rights or obligations have been determined, or from which legal consequences will flow," Bennett v. Spear, 520 U.S. 154, 178 (1997) (quotation marks omitted), they are "final agency action[s] that are "subject to judicial review." 5 U.S.C. § 704; cf. Nasrallah v. Barr, 590 U.S. 573, 584 (2020) ("A final order of deportation is now defined as a final order concluding that the alien is deportable or ordering deportation.") (quotation marks omitted).

The availability of APA review notwithstanding, Defendants insist that Plaintiffs' contrary-to-law and arbitrary-and-capricious claims are merely "restyl[ed]" habeas claims. See Mot. to Vacate at 10. The Government contends that, "at the end of the day, [Plaintiffs] are challenging and asserting that the Government is entirely without authority under the [Alien

Enemies Act] to exercise custody over their persons."  Mar. 21 Hearing Tr. at 18.  In characterizing Plaintiffs' arguments as "core habeas claim[s]," id., however, Defendants ignore the unusual circumstances that gave rise to this suit.  Plaintiffs represent a class of noncitizens who are both subject to the Proclamation and in Government custody pursuant to authorities independent from the Act.  In other words, Plaintiffs had already been detained when the Proclamation was applied to them.  They bring this action "seek[ing] this Court's intervention to temporarily restrain [the Government's] summary removals."  Compl., ¶ 4; see also id. at 21 (requesting order "to stay [the Government's] removals under the Proclamation").

Plaintiffs' challenge is accordingly centered on the legality of their removal under the Alien Enemies Act.  Nowhere in their Complaint do they suggest that they are being unlawfully detained.  Nor are they contesting the validity of their confinement or seeking to shorten its duration.  Indeed, Plaintiffs have repeatedly emphasized throughout this litigation that they "do not seek release from custody."  Opp. at 20; see also Mar. 15 Hearing Tr. at 19.

The Government, then, is only loosely correct in arguing that Plaintiffs challenge its authority to exercise custody over their persons.  The relevant detail for our purposes is instead that Plaintiffs attack the Government's authority to deport (as opposed to detain) their persons. That is because "[h]abeas is at its core a remedy for unlawful executive detention," and "[t]he typical remedy for such detention is, of course, release."  Munaf v. Geren, 553 U.S. 674, 693 (2008) (emphasis added); accord Preiser v. Rodriguez, 411 U.S. 475, 489 (1973) (purpose of habeas relief is "to provide the means for a . . . prisoner to attack the validity of his confinement."); Heck v. Humphrey, 512 U.S. 477, 481 ("[H]abeas corpus is the exclusive remedy for a . . . prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release.").  The upshot of that axiom is that a plaintiff seeking relief that

16

"would not necessarily spell immediate or speedier release" brings a claim falling outside of "core habeas corpus relief." Wilkinson v. Dotson, 544 U.S. 74, 81 (2005) (emphasis and quotation marks omitted).

Indeed, the Supreme Court has never "recognized habeas as the sole remedy, or even an available one, where the relief sought would neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody." Skinner v. Switzer, 562 U.S. 521, 534 (2011) (cleaned up). On the contrary, it has made clear that when detained persons do not seek "simple release" and instead "request an injunction prohibiting the United States from transferring them to [foreign] custody," they "do not state grounds upon which habeas relief may be granted." Munaf, 553 U.S. at 692–93. Accordingly, "a federal prisoner need bring his claim in habeas only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration.' Otherwise, he may bring his claim through a variety of causes of action." Davis v. U.S. Sent'g Comm'n, 716 F.3d 660, 666 (D.C. Cir. 2013) (quoting Wilkinson, 544 U.S. at 82).

Because the Government disregards that key distinction between challenging one's confinement and one's removal, none of the cases it cites is persuasive. Defendants point to several opinions in which our Circuit set out the principle that plaintiffs cannot mask habeas claims as actions for declaratory judgment in an effort "to give jurisdiction to a district other than that in which the applicant is confined or restrained." Kaminer v. Clark, 177 F.2d 51, 52 (D.C. Cir. 1949); see Mot. to Vacate at 10 (citing Clark v. Memolo, 174 F.2d 978, 981 (D.C. Cir. 1949), and Monk v. Sec'y of Navy, 793 F.2d 364, 366 (D.C. Cir. 1986)). That principle, however, carries little weight when — as here — the plaintiff does not actually seek to challenge his

"detention," <u>Kaminer</u>, 177 F.2d at 52, or "the validity of his confinement." <u>Clark</u>, 174 F.2d at 982.

For similar reasons, <u>LoBue v. Christopher</u>, 82 F.3d 1081 (D.C. Cir. 1996), is inapposite. In that case, the plaintiffs sought to challenge the constitutionality of an extradition statute under which they had been detained. <u>Id.</u> at 1081–82. The court rejected their attempt to distinguish their action from a habeas action, explaining that the relief in both suits would be the same: "a release from custody." <u>Id.</u> at 1083. Here, however, Plaintiffs do not endeavor to "manipulate the preclusive effect of habeas jurisdiction." <u>Id.</u> Unlike the <u>LoBue</u> challengers, they seek different relief in this suit — <i>i.e.</i>, relief from removal — from what they would in a habeas action objecting to their confinement. The <u>LoBue</u> court, moreover, expressly distinguished its <u>extradition</u> holding from precedent permitting "an alien subject to a <u>deportation</u> order to seek relief by way of a declaratory judgment action." <u>Id.</u> (emphasis added). And it did so on the ground that, unlike in the deportation context, "extension of the APA to <u>extradition</u> orders is impossible." <u>Id.</u> If anything, then, the cases cited by the Government confirm the Court's conclusion that this challenge — unlike previous suits — does not pose jurisdictional issues.

Because Plaintiffs do not seek release from confinement — and such release would not be the inevitable result if they succeed on the merits of their claims — they are not limited to habeas relief. Instead, they may challenge the Government's application of the Proclamation to them as arbitrary and capricious and contrary to law under the APA. <u>See</u> Compl., ¶¶ 79, 83, 86, 90, 92–95. There is accordingly no need to address the independent availability of their other claims for relief, such as their <i>ultra vires</i> claims against the facial validity of the Proclamation, <u>see</u> <u>id.</u>, ¶¶ 70–73, 96–99 — although there is reason to believe that such claims can be brought. <u>See</u> <u>Chamber of Com. of U.S. v. Reich</u>, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

B.    Likelihood of Success on Merits

Plaintiffs raise three principal legal challenges.  First, they argue that any action taken pursuant to the Proclamation is unlawful because the Proclamation itself lacks a legal basis.  That is so, they contend, because the actions of Tren de Aragua constitute neither an "invasion" nor a "predatory incursion," and the group, moreover, is not a "foreign nation or government." Second, Plaintiffs protest that even if the Act has been lawfully invoked here, they fall outside the scope of the Proclamation because they are not members of Tren de Aragua, and they must be given an opportunity to contest the Government's assertion that they are.  Third, Plaintiffs assert that even if they are removable under the Act, they cannot be deported to a place like El Salvador where torture likely awaits.  While the Court takes up these questions in order, at this stage, the second position is Plaintiffs' strongest.

1.  *Lawfulness of Proclamation*

Plaintiffs understandably focus their initial fire on the applicability of the Act itself.  The Proclamation cannot invoke the Act, they argue, because Tren de Aragua is not the British in the War of 1812 nor the German state in the two World Wars; it is not a "nation or government" and has not committed an "invasion" or a "predatory incursion."  See TRO Br. at 9–12; Opp. at 24– 31.  Although it contends otherwise, the Government more fundamentally asserts that the Court has no business intruding into these nonjusticiable political questions.  See Mot. to Vacate at 11– 13.  Given the broad powers the Executive possesses in national security and foreign affairs, this issue is a close call, and one the Court need not resolve today.

The political-question doctrine "arises from the constitutional principle of separation of powers."  Al-Tamimi v. Adelson, 916 F.3d 1, 8 (D.C. Cir. 2019).  It "excludes from judicial review those controversies which revolve around policy choices and value determinations

19

constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986). Put differently, it prevents courts from resolving "matters not legal in nature," id. (quotation marks omitted), or deciding an issue that "turn[s] on standards that defy judicial application." Baker v. Carr, 369 U.S. 186, 211 (1962).

Simply because a legal claim implicates foreign affairs or national security, however, does not mean that the political-question doctrine places it "beyond judicial cognizance." Id.; see Al-Tamimi, 916 F.3d at 10–11; El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 841–43 (D.C. Cir. 2010). Indeed, the Supreme Court has cautioned that a court should not unnecessarily flinch from a justiciable controversy that it has "a responsibility to decide" simply because the claim arises in the foreign-affairs context. Zivotofsky ex rel. Zivotofsky v. Clinton (Zivotofsky I), 566 U.S. 189, 194–201 (2012). To the degree that a claim requires the court to interpret a statutory provision or decide a law's constitutionality, the political-question doctrine is not implicated: deciding such questions "is a familiar judicial exercise." Id. at 196. But insofar as the claim would ultimately require the court to "supplant a foreign policy decision of [a] political branch[] with [its] own unmoored determination of what" the "policy . . . should be," id., or to "reconsider[] the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security," El-Shifa, 607 F.3d at 842, the claim is not justiciable. Id. In such cases, the political-question doctrine typically comes into play either because there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or because there are no "judicially discoverable and manageable standards for resolving it." Baker, 369 U.S. at 217. Both of those reasons, the Government contends,

preclude review of Plaintiffs' challenge to the Proclamation's underlying legality.  See Mot. to Vacate at 12–13.

On this issue, the Court is not drawing on a blank slate.  The Supreme Court's decision in Ludecke provides the crucial jumping-off point for determining which, if any, predicates to the Alien Enemy Act's use are justiciable.  That case arose because the United States sought to remove a German national under the Act in 1946 — that is, after the "shooting war" with Germany had ended but before the political branches had formally declared peace with the Nazis' successors.  See Ludecke, 335 U.S. at 162–63, 166.  The German national objected that the President's statutory authority dissolved upon the end of actual hostilities.  Id. at 166–67.  The Court disagreed, holding that the Act's grant of authority remained available to the President until war with Germany was terminated by "treaty," "legislation," or "Presidential proclamation."  Id. at 168.  And the Court found no evidence of any such "political act."  Id. at 169–70.  In fact, it pointed to a recent presidential proclamation indicating that the Executive Branch thought that the war remained ongoing.  See id. at 170.

The Ludecke Court, however, did not say that deciding whether a war had ended was a political question that the judiciary was unempowered to resolve.  Instead, it interpreted "declared war," defined its termination based on that construction, and decided as a factual matter whether such termination had occurred.  See also United States ex rel. Jaegeler v. Carusi, 342 U.S. 347, 348 (1952) (holding that "joint resolution of Congress . . . terminated the state of war" with Germany and thereby extinguished Executive's "statutory power" to remove aliens under Act).  None of those issues presented a political question.  Instead, the Court disclaimed a judicial role only in considering whether there even was a German government "capable of negotiating a treaty of peace" and whether removals of enemy aliens was worthwhile "when the

guns are silent but the peace of Peace has not come." Ludecke, 335 U.S. at 170. Those were "matters of political judgment for which judges have neither technical competence nor official responsibility." Id.

In light of Ludecke and the political-question doctrine's principles thus far explained, this Court is confident that it can — and therefore must, at the appropriate time — construe the terms "nation," "government," "invasion," and "predatory incursion." Cf. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024). While doing so may be no light undertaking, it is a judicial one. A harder question is whether, based on those definitions, this or any court would be empowered to decide if the characteristics of Tren de Aragua qualify it as a "nation" or "government," or if its conduct constitutes a "perpetrated, attempted, or threatened" "invasion" or "predatory incursion." 50 U.S.C. § 21. There may be judicially discoverable and manageable criteria that would allow a court to do so. In such a scenario, the Executive's view would not be dispositive, but it would be important: its "evaluation of the facts" and "informed judgment" would be afforded significant "respect." See Holder v. Humanitarian L. Project, 561 U.S. 1, 33– 34 (2010).

Such a framework is not inconceivable or even unprecedented. The plurality opinion in Hamdi v. Rumsfeld, 542 U.S. 507 (2004), suggests that in order to determine whether a Congressional grant of authority is available to the Executive Branch, courts can assess the record to decide whether something as dynamic and murky as "active combat" is then occurring. See id. at 521; but see id. at 588 (Thomas, J., dissenting) (objecting that courts are "bound by the political branches' determination that the United States is at war" and citing Ludecke as support). The plurality concluded as much even though (or perhaps because) the conflict that served as the predicate for the Executive's detention authority was "unconventional [in] nature" and rested on

"malleable" national-security "underpinnings." See id. at 520 (plurality opinion) (quotation marks omitted) (noting War on Terror "unlikely to end with a formal cease-fire" and Executive Branch might "not consider [the] war won for two generations") (quotation marks omitted). Nor, in the plurality's view, was deciding whether "active hostilities" persisted constitutionally committed to the Executive in that context. Id. at 520–21; but see id. at 516–17 (not reaching whether Article II alone provides Executive detention authority at issue). In other contexts, moreover, courts regularly decide whether certain conduct qualifies as militaristic or warlike. See, e.g., Kaplan v. C. Bank of the Islamic Republic of Iran, 896 F.3d 501, 512, 514 (D.C. Cir. 2018); Pan Am. World Airways, Inc. v. Aetna Casualty & Surety Co., 505 F.2d 989, 1012–13, 1015–17 (2d Cir. 1974).

In any event, these complicated issues bearing on fundamental questions of Judicial, Congressional, and Executive power need not be settled at this early posture. As the Court will next explain, Plaintiffs have established a likelihood of succeeding on a more discrete claim that justifies retaining the TROs even assuming *arguendo* that the Proclamation has a legal basis.

### 2. *Application of Proclamation to Plaintiff Class*

The thorny issues of justiciability just described do not attend the entirely separate determination that an individual detained or removed under the Proclamation is, in fact, an "alien enemy," 50 U.S.C. § 21, as defined by the President's Proclamation — *i.e.*, a Venezuelan citizen 14 years of age or older who is a member of Tren de Aragua and not a naturalized or lawful permanent resident of the United States. See 90 Fed. Reg. at 13034, § 1. As the Government essentially concedes, see Mot. to Vacate at 8; Mar. 21 Hearing Tr. at 13–15, an unbroken line of precedent establishes that federal courts may review under habeas the factual basis for an "alien enemy" determination when it is challenged. Here, even assuming that the Proclamation itself is

lawful, all five named Plaintiffs challenge their designation as members of Tren de Aragua.  See Opp. at 7.  The Court holds that they may do so under the APA, and that they may not be removed from the United States until those challenges have been adjudicated.  It further holds that all class members must be given the opportunity to challenge their classifications as alien enemies, if they wish to do so, before they may be lawfully removed from the United States pursuant to the Proclamation.

In concluding as much, the Court breaks no new ground.  First, it is a familiar exercise for courts to review under the APA whether a person falls within the scope of an executive order without addressing the underlying lawfulness of the order, including in the context of foreign affairs and national security.  See, e.g., Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 159, 162 (D.C. Cir. 2003) (describing review of Treasury Department designations under the International Emergency Economic Powers Act).  Such a circumscribed contest addresses Executive Branch officials' factual determination that a plaintiff falls within the parameters of the executive order; it does not in any way question the President's authority to issue the order in the first instance.

Second, review of alien-enemy status has long been routine under the Alien Enemies Act.  Indeed, Ludecke expressed no reticence over the role of courts in adjudicating "whether the person restrained is in fact an alien enemy fourteen years of age or older."  335 U.S. at 171 n.17.  Indeed, the Court readily admitted that such determinations "may . . . be reviewed."  Id.  In Clark, our Circuit likewise acknowledged that "whether the individual involved is or is not an alien enemy . . . [is] open to judicial determination."  155 F.2d at 294.  To be sure, neither case squarely presented that question, see Ludecke, 335 U.S. at 171 n.17; Clark, 155 F.2d at 294, making those pronouncements dicta.  See In re Grand Jury Investigation, 916 F.3d 1047, 1053

(D.C. Cir. 2019).  But that is of little help to Defendants.  *Dicta* from the Supreme Court

"generally must be treated as authoritative," United States v. Oakar, 111 F.3d 146, 153 (D.C. Cir.

1997) (quotation marks omitted), and the Government has not contested that courts may review

Plaintiffs' challenges to their factual designations as members of Tren de Aragua.  See Mot. to

Vacate at 8.

      The Court in Ludecke, moreover, was drawing on a rich tradition of such review in the

lower courts.  Faced with repeated claims from detained individuals challenging their

designation as alien enemies, courts time and again examined the factual basis for the

designation and, where necessary, ordered release if the facts did not show that the detainee was

an alien enemy.  That body of caselaw serves as exceedingly persuasive authority for exercising

such review power here.

      Take, for example, *Ex parte* Gilroy, 257 F. 110 (S.D.N.Y. 1919) — a case on which

Defendants themselves rely.  See Mot. to Vacate at 7.  There, a certain Walter Alexander filed a

petition for a writ of habeas corpus to contest the determination that he was detainable as a

"German alien enemy."  See Gilroy, 257 F. at 110–11.  The Government argued that the court

was without jurisdiction to review its factual finding because, "even though it can be shown

beyond question that an error has been made, . . . the decision of the executive is final."  Id. at

112.  The court, in one of the earliest discussions of this issue on record, rejected that assertion.

While acknowledging that it was "[v]ital" in "time of war not to hamper acts of the executive in

the defense of the nation and in the prosecution of the war," the court thought it "of equal and

perhaps greater importance" to "preserv[e] . . . constitutional rights."  Id. at 114.  It thus held a

hearing on Alexander's challenge at which "each side was permitted to adduce testimony with a

good deal of liberality," id., and it proceeded to undertake an involved examination of the facts

— evaluating the credibility of witnesses, the reliability of evidence, and the probative value of the testimony offered. See id. at 114–24. At the end of this thorough inquiry, the court overturned the Government's factual finding, declaring that Alexander was in fact a U.S. citizen. Id. at 128.

Subsequent cases during the Second World War largely followed that approach. In Zdunic, the court addressed whether a detainee fell "within the class of aliens whose restraint is authorized under the statute and presidential proclamation pursuant to which he is held in custody." 137 F.2d at 860. As it noted, the "ultimate issue" presented was whether he was a "'native, citizen, denizen, or subject' of Germany." Id. (quoting 50 U.S.C. § 21). "The meaning of those words as used in the statute," the court held, was a "question of law." Id. Likewise, whether the individual detained fell within "the statutory definition of alien enemies" correspondingly involved "questions of fact" as to which he was also "entitled to a judicial inquiry." Id. at 860–61. Because the lower court had held that there was "no substantial issue of fact" to warrant a hearing or to release the detainee, the appellate tribunal reversed. Id. at 860. United States ex rel. Schwarzkopf v. Uhl, 137 F.2d 898 (2d Cir. 1943), affirmed an essentially identical approach. The court there held that a detainee who "allege[d] that he [was] neither a citizen nor subject of Germany" and who raised "issues of fact" was "entitled to . . . a hearing of testimony before the court." Id. at 900. It noted that the "only ground" that could justify detention under the Act was one's alien-enemy status — and not because one was "dangerous to public safety" or even simply an "alien." Id. at 903. Because, on "conceded facts," the detainee was "not a German citizen," he was ordered "discharged from custody." Id.

The Court could go on. Other cases just within the Second Circuit sing from the same songbook. See, e.g., D'Esquiva, 137 F.2d at 904, 907 (reversing denial of writ to Austrian Jew

who contested that he was "native" of Germany simply because it had annexed Austria); Bauer, 171 F.2d at 494 (holding "record as it now stands" did not show conclusively that detainee was German native or citizen).  Courts throughout the country — from Georgia, see Banning v. Penrose, 255 F. 159, 160 (N.D. Ga. 1919), to Illinois, see United States ex rel. Hack v. Clark, 159 F.2d 552, 554 (7th Cir. 1947); Minotto v. Bradley, 252 F. 600, 602 (N.D. Ill. 1918), to Mississippi, see Ex parte Franklin, 253 F. 984, 984 (N.D. Miss. 1918) — charted the same course.  To be sure, the fact that a detained person might in fact be a U.S. citizen was front and center for some courts.  See, e.g., Banning, 255 F. at 160; Gilroy, 257 F. at 119–24.  But others applied equally rigorous review when detainees claimed only that they were not citizens or natives of an enemy nation.  See, e.g., Zdunic, 137 F.2d at 859–60 (Yugoslavia); D'Esquiva, 137 F.2d at 903 (Austria); see also Schwarzkopf, 137 F.2d at 903 ("aliens owing allegiance to some friendly nation" outside purview of Act).  These cases establish conclusively that courts can determine an individual's alien-enemy status — and are obligated to do so when asked.

The Government's only answer to this substantial body of caselaw is to rest on its assertion that such judicial inquiry can take place only in a habeas court.  See Mot. to Vacate at 8–11.  As previously explained, that is incorrect.  See supra Section III.A.  For reasons both historical and circumstantial, habeas was indeed the traditional route to test the legality of the Act's application to alleged alien enemies.  Where, as here, individuals do not seek release from confinement, a cause of action under the APA is appropriate (and indeed, may be the only way) to determine whether Executive Branch officials have operated in accordance with law.  The availability of judicial review — under either habeas or the APA — to evaluate whether an alien falls within the terms of the Act is therefore well established.

It is admittedly less clear, however, where lie the precise contours of that review.  When presented with such questions, habeas courts have appeared to sanction a searching inquiry, including convening hearings in which evidence could be introduced and testimony heard.  See, e.g., Gilroy, 257 F. at 114–24; Schwarzkopf, 137 F.2d at 900; Zdunic, 137 F.2d at 860; Bauer, 171 F.2d at 493–94.  But they have split on whether the Government would bear the burden of proof in such proceedings.  Compare, e.g., Gilroy, 257 F. at 114 (burden is plaintiff's), and Ex parte Risse, 257 F. 102, 103 (S.D.N.Y. 1919) (same), with Bauer, 171 F.2d at 493 (burden is Government's).  Plaintiffs' decision to bring their claims under the APA rather than habeas also raises the question of whether the standard of review is the same under each avenue of relief.  The APA, for instance, subjects agency factfinding to the lenient "substantial evidence" standard of review, but only where a court evaluates the "record of an agency hearing."  5 U.S.C. § 706(2)(E); see Reiner v. United States, 686 F.2d 1017, 1022 n.4 (D.C. Cir. 1982) ("The substantial evidence test applies to agency adjudication only after a trial-type hearing required by statute to be on the record.").  To date, there is no indication that the Government has provided, or intends to provide, hearings to determine whether those subject to the Proclamation are indeed members of Tren de Aragua.  See Mar. 21 Hearing Tr. at 51.  That leaves the Court nothing to evaluate except the affidavits that have been filed.  See, e.g., Cerna First Decl.

Even were agency adjudication to be provided, hard questions would nonetheless remain concerning what deference, if any, the agency's factual determinations should receive from the reviewing court — especially when those determinations themselves would decide the lawful scope of the agency's authority and may implicate constitutional rights.  See Crowell v. Benson, 285 U.S. 22, 58–61 (1932); N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 82 n.34 (1982) (plurality opinion).  The answer to such questions may depend on the nature of the

challenge articulated (*e.g.*, whether the alien asserts that he is an American citizen, a lawful permanent resident, or not a member of Tren de Aragua), as well as the character of the administrative procedures in place.  Cf. Hamdi, 542 U.S. at 533 (plurality opinion) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."); Boumediene v. Bush, 553 U.S. 723, 771, 781 (2008) (holding that aliens designated enemy combatants and detained by United States may challenge their designation, but "the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings"); Al-Adahi v. Obama, 613 F.3d 1102, 1103–05 (D.C. Cir. 2010) (discussing whether preponderance-of-evidence standard is necessary in reviewing factual determinations made by Executive tribunals adjudicating whether detainees were members of Taliban).

The Court need not resolve such quandaries today, even though they loom on the horizon. Indeed, when asked at argument on the Motion to delineate what procedures would be appropriate, neither side offered a clear protocol.  See Mar. 21 Hearing Tr. at 19–22, 35–38.  At this juncture, however, that does not hamstring Plaintiffs' effort to obtain a TRO.  The named Plaintiffs, on behalf of themselves and their class, contest their designations as members of Tren de Aragua and argue that they must be given an opportunity to challenge Defendants' position that they fall within the Proclamation.  See Opp. at 7–8, 13.  Because the caselaw is clear that such questions are reviewable, and because those outside the bounds of the Proclamation's definition of "alien enemies" are not removable under the Act, Plaintiffs are likely to succeed on the merits of their claim.

The Alien Enemies Act itself, moreover, arguably envisions that those caught up in its web must be given the opportunity to seek such review. That is because the Act places limits on when the President may "provide for the removal of" alien enemies: he may do so only when those so identified "refuse or neglect to depart" from the United States. See 50 U.S.C. § 21. Notably, no such qualification is placed on the President's authority to detain alien enemies. See id. (authorizing the President to "direct . . . the manner and degree of the restraint to which [alien enemies] shall be subject and in what cases"). By its plain terms, then, the Act withholds from the President or his officers the authority to remove an alien enemy until that person has been given time to decide whether to depart on his own. See United States ex rel. Von Heymann v. Watkins, 159 F.2d 650, 653 (2d Cir. 1947) (directing district court to release detainee unless government showed, "within a reasonable time to be fixed by that court, that the [detainee] has refused or neglected to leave the country, after having been given a reasonable time so to do unhampered by his present restraint"). It follows that summary deportation following close on the heels of the Government's informing an alien that he is subject to the Proclamation — without giving him the opportunity to consider whether to voluntarily self-deport or challenge the basis for the order — is unlawful.

Members of the Plaintiff class therefore must be given the opportunity, if they so choose, to contest that they are "Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States." 90 Fed. Reg. at 13034, § 1. The form that challenge must take, and the standards used in adjudicating it, must await answers at a future date. In the meantime, the Plaintiff class may not be removed under the Proclamation.

3. *Separate Statutory Restrictions on Removal*

There may well also be independent restrictions on the Government's ability to deport class members — at least to Salvadoran prisons — even if they do fall within the Proclamation's terms. Plaintiffs additionally contend that Defendants violated the Foreign Affairs Reform and Restructuring Act (FARRA) in removing them without regard to legally binding humanitarian protections. See Compl., ¶¶ 88–91; 8 U.S.C. § 1231 notes. The Government counters that this contrary-to-law claim cannot be reviewed, and, even if it could, it is unmeritorious because "alien enemies are not entitled to seek any relief or protection." Mot. to Vacate at 19–20 (citing Clark, 155 F.2d at 294); id. at 1. Plaintiffs disagree, retorting that "humanitarian protections . . . remain available regardless of a noncitizen's status or circumstances." Opp. at 34. To prevail, Plaintiffs must show first that the Court has jurisdiction to hear their claim, and second that they are eligible for — and have been denied the opportunity to apply for — those protections.

FARRA, which codifies the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT), states: "It shall be the policy of the United States not to expel . . . any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 notes; see also 8 C.F.R. §§ 208.16 to 208.18 (FARRA procedure). While FARRA contains a limiting clause that it shall not provide "any court jurisdiction to consider . . . claims raised under the Convention . . . except as part of the review of a final order of removal pursuant to [the INA]," 8 U.S.C. § 1231 notes, that jurisdiction-stripping mandate pertains only to the review of the substance of CAT claims. Here, Plaintiffs do not contest any potential outcome of their CAT claims; rather, they assert that the Administration violated the APA by denying them any

31

opportunity to <u>raise</u> CAT claims before their deportation.  <u>See</u> Compl., ¶ 90.  Because Plaintiffs'

cause of action is rooted in the APA rather than CAT, the Court has jurisdiction over this issue.

On the merits, Plaintiffs must first show that CAT protections apply to their deportations

under the Proclamation.  In <u>Huisha-Huisha v. Mayorkas</u>, 27 F.4th 718 (D.C. Cir. 2022), our

Circuit addressed a strikingly similar claim.  To be sure, the Court of Appeals cautioned that

because it was reviewing a preliminary injunction, its treatment of the issue was not binding

precedent.  <u>See</u> <u>id.</u> at 733.  This Court, however, finds its reasoning persuasive.

The <u>Huisha-Huisha</u> panel concluded that while the Executive could deport migrants

pursuant to a public-health authority, <u>see</u> 42 U.S.C. § 265, it was likely required to provide them

FARRA protections before doing so, meaning that it could not remove them to any "place[]

where they [would] be persecuted or tortured."  27 F.4th at 722.  The Circuit observed that while

§ 265 authorized the Executive to expel aliens, the law was silent about "<u>where</u> to expel" them.

<u>Id.</u> at 721; <u>see</u> <u>id.</u> at 732.  While FARRA, conversely, does not speak to "<u>whether</u> the Executive

can expel aliens," it plainly puts a "limit" on "<u>where</u> aliens can be expelled [to]."  <u>Id.</u> at 731–32.

Because the statutes governed distinct issues and did not conflict, the court reasoned, it likely

could "give effect to both."  <u>Id.</u> at 732 (citing <u>Epic Sys. Corp. v. Lewis</u>, 584 U.S. 497, 510 (2018)

("When confronted with two Acts of Congress allegedly touching on the same topic," a court

"must . . . strive to give effect to both.") (cleaned up)).

This case is on all fours.  Here, even assuming *arguendo* that the Alien Enemies Act

provides the President with the power to remove Plaintiffs, it says nothing about the limits on

countries to which they can or should be removed.  As the <u>Huisha-Huisha</u> court observed,

FARRA does: it dictates the process that must occur before individuals may be removed to

places where they fear torture.  <u>See</u> Mot. to Vacate at 18 ("[T]here is no conflict between the

AEA and the INA."). Since both statutes can be given meaning, the Court must do so, and FARRA protections are likely available to those removed under the Act.

Plaintiffs claim that they never received the opportunity to request protection under CAT from being deported to El Salvador. Instead, they aver that when the Government loaded them on to planes on the morning of March 15, they were not only prevented from claiming CAT protection, but also not informed where they were being taken. See Shealy Decl., ¶ 10 ("On the plane, . . . detainees asked the officers where they were being taken. The officers would only say that they didn't know and then laughed."); Carney Decl., ¶ 12. Without such information, even if they had been given an opportunity to raise a torture claim, they would not have been able to meaningfully do so. As discussed in Section III.C, *infra*, the evidence at this point shows a likelihood of potential torture should Plaintiffs be removed to El Salvador and incarcerated there. To the extent that Defendants seek to remove Plaintiffs to that destination, CAT could stand as an independent obstacle.

C. Irreparable Harm

Convinced that Plaintiffs are likely to succeed, the Court now turns to the other factors governing preliminary relief. Irreparable harm is undoubtedly "a high standard." Chaplaincy of Full Gospel Churches, 454 F.3d at 297. The harm "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a clear and present need for equitable relief." Id. (cleaned up). It must also be "beyond remediation," meaning that "the possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." Id. at 297–98 (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs readily meet these criteria, even though the Court acknowledges that removal
alone does not necessarily do the trick.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  In
Salvadoran prisons, deportees are reportedly "highly likely to face immediate and intentional
life-threatening harm at the hands of state actors."  ECF No. 44-4 (Sarah Bishop Decl.), ¶ 63.
The country's government has boasted that inmates in CECOT "never leave"; indeed, one expert
declarant alleges that she does not know of any CECOT inmate who has been released.  See ECF
No. 44-3 (Juanita Goebertus Decl.), ¶ 3; see also Bishop Decl., ¶ 23 ("[W]e will throw them in
prison and they will never get out.") (quoting Nayib Bukele (@nayibbukele), X (May 16, 2023,
7:02 p.m.), https://x.com/nayibbukele/status/1658608915683201030?s=20).  Once inmates enter
the prisons, moreover, their families are often left in the dark.  See Bishop Decl., ¶ 25 ("In a
sample of 131 cases, [it was] found that 115 family members of detainees have not received any
information about the whereabouts or wellbeing of their detained family members since the day
of their capture.").

Plaintiffs offer declarations that inmates are rarely allowed to leave their cells, have no
regular access to drinking water or adequate food, sleep standing up because of overcrowding,
and are held in cells where they do not see sunlight for days.  See Goebertus Decl., ¶¶ 3, 11;
Bishop Decl., ¶ 31.  At CECOT specifically, one declarant states that "if the prison were to reach
full supposed capacity . . . , each prisoner would have less than two feet of space in shared
cells . . . [which] is less than half the space required for transporting midsized cattle under EU
law."  Bishop Decl., ¶ 30.  Given poor sanitary conditions, Goebertus points out, "tuberculosis,
fungal infections, scabies, severe malnutrition[,] and chronic digestive issues [a]re common."
Goebertus Decl., ¶ 12.

Beyond poor living conditions, Salvadoran inmates are, according to evidence presented, often disciplined through beatings and humiliation. One inmate claimed that "police beat prison newcomers with batons . . . . [W]hen he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that [he] broke a rib." Id., ¶ 8. Three prior deportees from the United States reported being kicked in the face, neck, abdomen, and testicles, with one requiring "an operation for a ruptured pancreas and spleen." Id., ¶ 17. One inmate reported being forced to "kneel on the ground naked looking downwards for four hours in front of the prison's gate." Id., ¶ 10. That same prisoner also said that he was made to sit in a barrel of ice water as guards questioned him and then forced his head under water so he could not breathe. Id.

One scholar avers that, since March 2022, an estimated 375 detainees have died in Salvadoran prisons. See Bishop Decl., ¶¶ 15, 43. Although the Salvadoran government maintains that all deaths have been natural, others respond that 75% of them "were violent, probably violent, or with suspicions of criminality on account of a common pattern of hematomas caused by beatings, sharp object wounds, and signs of strangulation on the cadavers examined." Id., ¶¶ 44–45. When an inmate is killed, there are also reports that guards "bring the body back into the cells and leave it there until the body start[s] stinking." Id., ¶ 39. Needless to say, the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm. See, e.g., United States v. Iowa, 126 F.4th 1334, 1352 (8th Cir. 2025) (torture); Leiva-Perez v. Holder, 640 F.3d 962, 970 (9th Cir. 2011) (physical abuse).

D.  Balance of Equities and Public Interest

The last factors, which the Court considers together where the Government is a party, examine "the balance of equities" and "the public interest."  Sherley, 644 F.3d at 392 (quoting Winter, 555 U.S. at 20); see also Nken, 566 U.S. at 435.

While the Government surely suffers harm whenever its removal orders are stymied, here such harms do not outweigh Plaintiffs' need for preliminary relief.  The Government, recall, is required only to abstain from removing the Plaintiff class from the United States solely on the basis of the Proclamation; in other words, removal under other statutes is permitted.  Defendants point to no concrete problems that could attend that narrow restriction, instead alluding to vague foreign-policy and national-security concerns.  See Mot. to Vacate at 23–24.  That is insufficient. As examples of potential harm, Defendants cite only the importance of "prevent[ing] the entry of illegal aliens" and the potential "danger[]" of the individuals involved.  See id. at 23 (quotation marks omitted).  Neither is at issue here: the TROs impose no restriction on the Government's apprehending alleged members of Tren de Aragua under the contested authority of the Proclamation, not does it require that any individual — dangerous or otherwise — be released from custody.  To be sure, there is generally "a public interest in prompt execution of removal orders," but that interest is diminished when, among other things, the public is not in particular danger.  See Nken, 556 U.S. at 436.  The noncitizens comprising the class are already in United States custody, and any actual Tren de Aragua member is already subject to deportation as a member of an FTO, so there is little additional harm to the public by temporarily preventing their removal.

By contrast, Plaintiffs — as just explained — have shown that they have a high likelihood of suffering significant harm if the Proclamation is allowed to apply to them.  There

is, moreover, a strong public interest in preventing the mistaken deportation of people based on categories they have no right to challenge.  See id. ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").  The public also has a significant stake in the Government's compliance with the law.  See, e.g., League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (quotation marks and citations omitted).

As the Government's asserted harms do not outweigh those Plaintiffs face, the Court finds that the balance of equities tips in Plaintiffs' favor, and that preliminary relief is in the public interest.

## IV.   Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion to Vacate the TRO. A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  March 24, 2025

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**J.G.G.**, *et al.*,

      **Plaintiffs,**

        v.

**DONALD J. TRUMP**, *et al.*,

      **Defendants.**

Civil Action No. 25-766 (JEB)

## <u>ORDER</u>

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1. Defendants' [26] Motion to Vacate is DENIED; and

2. If Plaintiffs wish to convert the Temporary Restraining Order into a preliminary

injunction, they shall so inform the Court by March 26, 2025.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: <u>March 24, 2025</u>

1

EXHIBIT B

## DECLARATION OF ██████████

I, ██████████████████████ , declare:

1. My name is ████████████████ . I was born in Nicaragua. I am 26 years old and currently detained at El Valle Detention Center in Raymondville, Texas.

2. I was previously held in ICE custody in Aurora, Colorado, transferred to East Hidalgo Detention Center, and placed on a removal flight but then returned by the U.S. government.

3. On Friday, March 14, 2025, I and other detained noncitizens were told to get ready to be deported to our home country. We got ready and lined up but were told that there were issues with the flight and that we would be deported the next day.

4. On the morning of Saturday, March 15, guards told us we would be deported to our home country. Later, I asked a female guard for the time, and she told me it was almost 2:30 PM. Around this time, we were transferred to large buses and driven to what appeared to be a military air base. The buses included other detained immigrants from Venezuela and El Salvador. I was the only Nicaraguan.

5. From what I could see, there were a total of four planes on the tarmac. Three were used to transport the immigrants. I was aboard one of the planes, with officers standing along the walkway. I could see the time on their watches and heard the first flight take off at around 6:30 PM. A little later, at around 7:15 PM, I heard the second plane take off. The plane I was on included immigrants from El Salvador and Venezuela. I believe it took off at around 7:50-8:00 PM.

6. The flight that I was on first landed in another country. I raised the window blind slightly and saw officers in uniforms with a blue flag. The plane remained in that country for approximately an hour and a half to two hours.

7. The plane then departed, and we were in the air for approximately 30-45 minutes until we landed in El Salvador. U.S. and Salvadoran officers started disembarking people from the plane and placing them in buses. A Salvadoran official was wearing a hat with the country's flag and called for Salvadoran's first. Everyone was scared and some people had to forcibly be removed from the plane. I was removed from the plane, questioned about my citizenship, and shortly after, told to sit on the floor next to the stairs of one of the planes. Eight other detained women were also separated and were seated next to me. I was able to speak to them and hear their accent. One of them told me they were Venezuelan.

8. I overheard a Salvadoran official tell an ICE officer that the Salvadoran government would not detain someone from another Central American country because of the conflict it would cause. I also heard him say that they would not receive the females because the prison was not for females and females were not mentioned in the agreement. I then saw the ICE officer call someone, and after the call, I overheard him saying we had to be sent back.

9. Except for what appeared to be executives in suits, everyone returned on one flight, including the eight Venezuelan women and U.S. officials who were on the other planes. We arrived at the same airport in South Texas on Sunday, March 16 at around 6:45 AM. The executives flew separately in a jet for about 15-20 people.

The following declaration has been read to me in Spanish, and I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Executed this 21st day of March 2025,


 /s/ ███████████████████ _____

████████████████████

I, Katiana Gonzalez, am fluent in English and Spanish, and I certify that I verbally translated this declaration to ███████████████████ from English to Spanish truthfully and accurately to the best of my abilities. ███████████████ confirmed that it accurately reflected his statements.

Executed this 21st day of March 2025,


 /s/ *Katiana Gonzalez*_____

Katiana Gonzalez

EXHIBIT A

Declaration of S.Z.F.R.

1. I am a woman from Venezuela and I am in detention at Webb County Detention Center in Laredo Texas. My initials are S.Z.F.R.
2. On March 9 at 7 a.m. I was in my dorm in El Paso and was told to get my things together and I was being transferred to another facility. There was one other woman and 14 men who were also transferred with me.
3. I was supposed to have a merits hearing for my asylum claims on March 10th.
4. They took me to the airport in El Paso and I was put on a plane. Already on the plane were many Venezuelan men and three other Venezuelan women. We flew to Laredo.
5. When we got to Laredo we met up with another group of Venezuelan men.
6. There were at least 10 Venezuelan women on the plane. We arrived March 9 in Laredo and were taken to Webb County Detention Center.
7. Thursday of last week, March13th, we were told to gather our belongings and we were driven toward the airport for about an hour. We were told we were being deported to Venezuela. We never made it to the airport. We were sent back to Webb and told it was because of a plane malfunction.
8. On Friday again we were told to gather our belongings and put on the bus at Webb and sat on the bus for about 15 minutes and then were taken back to Webb.
9. Saturday morning we were again told to gather our belongings and get on the bus. We went to the airport and 8 women were put on the plane with me.
10. When we got on the plane there were already over 50 men on the plane. I could see other migrants walking to the plane but we took off before any additional people boarded.
11. Within a couple of minutes of take off I heard two US government officials talking and they said "there is an order saying we can't take off but we already have."
12. I asked where we were going and we were told that we were going to Venezuela.
13. Several other people on the plane told me they were in immigration proceedings and awaiting court hearings in immigration court.
14. We were not allowed to open our window shades.
15. We landed somewhere for refueling. We were there for many hours. We were arm and leg shackled the whole time.
16. We took off again and landed fairly quickly. I was then told we were in El Salvador.
17. While on the plane the government officials were asking the men to sign a document and they didn't want to. The government officials were pushing them to sign the documents and threatening them. I heard them discussing the documents and they were about the men admitting they were members of TdA.
18. After we landed but were still on the plane a woman opened the shade. An officer rushed to shut the shade and pushed her down by her shoulders to try and stop her from looking out. The person that pushed her down had HOU-02 on his sleeve.
19. I saw out the window for a minute and I saw men in military uniforms and another plane. I saw men being led off the plane. Since I've been back in the U.S. I have seen news coverage and the plane I saw looks like the one I've seen on TV with migrants from the U.S. being delivered to El Salvador.

20. All the men got off the plane. The remaining women asked what happens to us? I was told that the President of El Salvador would not accept women. I was also told that we were going back to detention in the U.S.

21. We left in the middle of the night and landed in the early morning in Laredo. The 8 women who were on the plane were all returned back to the U.S.

*/s/ S.Z.F.R.*
S.Z.F.R.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*, | |
| *Plaintiffs–Petitioners*, | |
| v. | No: 1:25-cv-00766-JEB |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants–Respondents*. | |

**PLAINTIFFS' NOTICE REGARDING THE COURT'S MARCH 19 ORDER
REQUIRING DEFENDANTS TO PROVIDE INFORMATION**

In response to this Court's factual inquiries about whether its March 15 oral and written Temporary Restraining Orders were violated, Plaintiffs make a few brief points, and request the opportunity to respond further on March 31 should the government invoke the state secrets privilege. *See* Order (ECF No. 47).

*First*, there are already sufficient undisputed facts in the record and in the public domain for this Court to find that its Orders were violated. Plaintiffs recognize that the Court understandably wishes ultimately to gather all of the facts and to create a complete record. Nonetheless, the consequences of Defendants' violations—that the individuals sent to El Salvador are being held incommunicado in a prison known for horrible conditions, where they face immediate and grave harm—militate in favor of further immediate relief, in light of facts already known.

Those facts include two new declarations submitted with this Notice and referenced by undersigned counsel at the March 21 hearing. The first is from a Venezuelan woman who states

1

(1) that the government sought to remove her on Thursday, March 13 and Friday, March 14

(before the Proclamation was published on Saturday March 15); (2) that on Saturday March 15

she was on one of the planes that landed in El Salvador along with Venezuelan men, but she was

ultimately brought back to the United States and detained because Salvadoran officials informed

United States officials that their President would not take women, (3) that there were seven other

Venezuelan woman who were returned with her; and (4) that shortly after takeoff she overheard

discussions by government officials showing awareness of the Court's Order.  Ex. A.  The second

declaration is from a Nicaraguan man who was also returned from El Salvador when officials

realized that he was not Venezuelan.  Ex. B.  These declarations are submitted to refute the

government's contention that it was not "feasibl[e]" for the planes to bring anyone back, and that

this Court did not account for practical considerations like whether the planes "had enough fuel"

to turn around.  Defs. Mot. to Stay Mar. 18 Order at 2 (ECF No. 37). [1]

In addition, public information shows that two planes were still in the air when the Court

issued both its oral and written Orders.  Most significantly, based on information publicized by

U.S. government officials and publicly available flight data, at least two flights took off during

the hearing on March 15—one at 5:26pm EDT and the other at 5:45pm EDT—and landed well

after this Court's written Order had been filed.  *See* Pls. Resp. to Defs. Notice (ECF No. 21); *see

also* Joyce Sohyun Lee and Kevin Schaul, *Deportation Flights Landed after Judge Said Planes

Should Turn Around*, Wash. Post (Mar. 16, 2025).[2]  And the video released by President Bukele

that shows Plaintiff class members being hauled off the planes in El Salvador includes each

---

[1] In *Grace v. Barr*, No. 1:18-cv-1853, the plane landed in El Salvador and, upon order of Judge
Sullivan, returned to the United States.  *Grace v. Sessions*, No. 1:18-cv-1853, ECF No. 29 ¶¶ 12-
14.
[2] https://www.washingtonpost.com/immigration/2025/03/16/deportation-flights-trump-el-
salvador [https://perma.cc/Q6NH-ATY8].

plane's tail number.[3]  That video was then reposted by both President Trump[4] and Secretary of State Rubio.[5]

Whether the planes were in U.S. airspace at the time the Orders were issued is not relevant.  The Court's Orders unequivocally covered situations where Plaintiff class members were still in U.S. custody, whether or not in U.S. airspace.  Indeed, that was the point of the Court's discussion at the hearing regarding the need for Defendants to move quickly to avoid immediate harm and the government's potential arguments that the Court would lose jurisdiction if individuals were turned over to El Salvador.  *See* Hearing Tr. at 5, 43, 44 (Mar. 15, 2025).

If the Court does determine that class members were unlawfully removed in violation of the TRO, Plaintiffs respectfully request that the Court order that class members be returned promptly to the United States.  Plaintiffs note that both the United States and El Salvador have represented that El Salvador is acting at the behest of the United States government, and the detention is directly paid for by the United States government.  *See* Matthew Lee & Regina Garcia Cano, *US Prepares to Deport about 300 Alleged Gang Members to El Salvador*, Assoc. Press (Mar. 15, 2025) (describing agreement in which the United States will pay El Salvador to imprison Venezuelans transferred from the U.S.).[6]

And as the Court has already found, Salvadoran prisons are notoriously dangerous and life-threatening.  Pls. Opp. at 37–38 (ECF No. 44); Order on Motion to Vacate TRO at 33-35 (ECF No. 53).  Plaintiffs' expert reports detail conditions that amount to torture—including

---

[3] https://x.com/nayibbukele/status/1901245427216978290 [https://perma.cc/BM73-547H].
[4] https://truthsocial.com/@realDonaldTrump/posts/114173862724361939 [https://perma.cc/67LY-FREW].
[5] https://x.com/SecRubio/status/1901252043517432213 [https://perma.cc/RXH4-XH4R].
[6] https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7 [https://perma.cc/2RWA-XLBB].

suffocation, burning, mock executions, electric shocks, and public beatings. Bishop Decl. ¶¶ 35, 37, 40. Such torture is a "habitual practice" rather than "isolated incidents," and death is a real possibility. *Id.* ¶¶ 32 43–50. Any doubt about how these men will be treated is dispelled by the video released by Salvadoran officials (and applauded by President Trump and Secretary Rubio), which showed the men chained and transported into a maximum-security prison.

*Finally*, in light of the Court's inquiries at the March 21 hearing about the significant gap in time between the Proclamation's signing and publication, Plaintiffs note that there is now confusion as to when the Proclamation was issued—and whether the President signed it at all. *See* Jeff Zeleny & Kit Maher, *Trump Says He Didn't Sign Proclamation Invoking Alien Enemies Act*, CNN (Mar. 22, 2025) (Trump: "I don't know when it was signed, because I didn't sign it. Other people handled it, but (Secretary of State) Marco Rubio has done a great job and he wanted them out and we go along with that.");[7] Kelsey Walsh, *White House Backtracks on Trump Statement that He Didn't Sign Alien Enemies Act Order*, ABC News (Mar. 20, 2025) (White House press office's statement that "President Trump was obviously referring to the original Alien Enemies Act that was signed back in 1798," quoting White House spokesman Steven Cheung).[8]

Dated: March 24, 2025                    Respectfully submitted,

Noelle Smith                             /s/ *Lee Gelernt*
Oscar Sarabia Roman                      Lee Gelernt (D.D.C. Bar No. NY0408)
My Khanh Ngo                             Daniel Galindo (D.D.C. Bar No. NY035)

---

[7] https://www.cnn.com/2025/03/21/politics/trump-signature-alien-enemies-act-proclamation/index.html [https://perma.cc/Y9MV-4YTQ]. Video of the President making that statement is available at https://www.cnn.com/2025/03/21/politics/trump-signature-alien-enemies-act-proclamation/index.html (at 1:29) [https://perma.cc/P8WX-S4BV].
[8] https://abcnews.go.com/Politics/live-updates/donald-trump-second-term/?id=119864095&entryId=120061457 [https://perma.cc/EV9A-FYVB].

4

Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (DC Bar No. 482877)
Christine L. Coogle (DC Bar No. 1738913)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org

*Attorneys for Plaintiffs-Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 24, 2025                    Respectfully Submitted,

*/s/ Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org

*Attorney for Plaintiffs–Petitioners*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

Petitioner,

v.

DONALD J. TRUMP, *et al.*,

Respondents.

No. 1:25-cv-766 (JEB)

<u>Declaration Of Kristi Noem</u>

## DECLARATION OF SECRETARY OF HOMELAND SECURITY KRISTI NOEM

I, Kristi Noem, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

     1.     I am the United States Secretary of Homeland Security and the head of the United States Department of Homeland Security, an Executive Department of the United States. *See* 6 U.S.C. §§ 111(a), 112(a). As Secretary of Homeland Security, I am the President's chief advisor on public security.

     2.     The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, Department of Homeland Security employees, and information portals maintained and relied upon by the Department of Homeland Security in the regular course of business, and on my evaluation of that information.

     3.     The purpose of this Declaration is to assert, in my capacity as United States Secretary of Homeland Security and head of the Department of Homeland Security, a formal claim of the state secrets privilege over information requested by this Court in its Minute Order of March

18, 2025, in order to protect the national security interests of the United States. Disclosure of the information covered by my privilege assertion reasonably could be expected to cause significant harm to the national security interests of the United States. I have discussed with knowledgeable employees of the Department of Homeland Security the details of the information over which I am asserting privilege to ensure that the bases for the assertions set forth in this Declaration are appropriate.

4.    In the course of my official duties, I am aware that President Trump created a process by which Tren de Aragua (TdA) and other transnational organizations and cartels may be "designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended." *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists* (Jan. 20, 2025). As President Trump recognized in doing so, TdA has engaged in "campaigns of violence and terror in the United States and internationally," such that it presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.*

5.    In the course of my official duties, I am aware that the Department of State has designated TdA as a Foreign Terrorist Organization and its members as Specially Designated Global Terrorists. *Specially Designated Global Terrorist Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana*, 90 Fed. Reg. 10030 (Feb. 20, 2025); *Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel*

*de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana*, 90 Fed. Reg. 10030 (Feb. 20, 2025)

6.     In the course of my official duties, I am aware that President Trump has, pursuant to the Alien Enemies Act (50 U.S.C. § 21), "proclaimed that all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Proclamation 10903 of March 14, 2025, Invocation of the Alien Enemies Act Regarding the Invasion of the United States be Tren de Aragua*, 90 Fed. Reg. 13033, 13034 (Mar. 20, 2025N). President Trump directed "the apprehension, detention, and removal of all members of TdA who otherwise qualify as Alien Enemies under" his proclamation. *Id.*

7.     In the course of my official duties, I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of TdA pursuant to the Alien Enemies Act.

8.     In the course of my official duties, I have been informed that this Court has ordered the Defendants in this action to disclose "the following details regarding each of the two flights leaving U.S. airspace before 7:25 p.m. on March 15, 2025: 1) What time did the plane take off from U.S. Soil and from where? 2) What time did it leave U.S. airspace? 3) What time did it land in which foreign country (including if it made more than one stop)? 4) What time were individuals subject solely to the Proclamation transferred out of U.S. custody? And 5) How many people were aboard solely on the basis of the Proclamation?" Minute Order of 3/18/2025.

9.     After careful and actual personal consideration of this matter, I have concluded that the disclosure of this information could reasonably be expected to cause significant harm to the national security of the United States, in at least two ways.

10.    *First*, disclosure of information about removal flights—including confirmation or denial of speculation, assumptions, or informal reports about removal flight plans—directly compromises the safety of American officers, contractors, aliens, and the American public.

A. Removal flight plans—including locations from which flights depart, the planes utilized, the paths they travel, where they land, and how long they take to accomplish any of those things—reflect critical means and methods of law enforcement operations.

B. Even where discussing a past operation, disclosing, denying, or confirming alleged operational details would cause significant harm to the national security of the United States by exposing the means and methods of ICE operations. Specific information about past governmental operations, such as the details regarding locations, paths, and timing of flights, would allow others to draw inferences and insight into how future, similar governmental operations will be conducted, and to use that information in a manner adverse to U.S. national security.

C. In addition to flight operations, the number of TdA members on a given removal flight is also information that, if disclosed, would expose ICE's means and methods, thus threatening significant harm to the national security of the United States. Revealing and/or confirming the number of TdA members involved would reveal key details about how the United States conducts these sorts of operations and would allow other aliens (members of TdA and otherwise) to draw inferences about how the Government prioritizes and uses its resources in immigration enforcement and counterterrorism operations. It may even lend TdA and other such organizations the ability to predict operational details to their benefit and to the risk of the ICE officers and contractors involved. That insight would inhibit future enforcement activity. Revealing or

confirming this information—i.e., identifying how many enemy aliens were removed on the basis of the Proclamation, versus under other authorities—also would likely allow our Nation's enemies to determine how the Government is utilizing these distinct sources of authority, which (combined with other information) could likely impair national security.

D. Removal operations involving TdA and similar groups are counterterrorism operations. Disclosing, confirming, or denying details of those operations would inform TdA and similar groups about the means and methods by which the United States plans and carries out operations against them. This would directly help such groups avoid capture. And it would directly undermine the efficacy of American counterterrorism operations.

E. Disclosure of the information sought in this Court's Minute Order would cause significant harm to the United States' national security even assuming some of that information has already entered public sources as a result of assumptions, speculation, public investigation, or informal statements. It is both true and well known that official acknowledgement of a fact may be damaging to national interests in a way that informal suggestions or speculation about that information is not. If the Government were to confirm or deny the information sought by this Court's Minute Order, there would arise a danger that enemies of our national security would be able to stitch together an understanding of the means and methods used to thwart their unlawful and sometimes violent conduct. Again, the result would be a risk of significant harm to the United States' national security interests, particularly in this case involving a gang and terrorist organization that has been determined to be a danger to the public peace and safety of the United States.

11. *Second*, disclosure of the information sought by this Court's March 18 Minute Order would also threaten significant harm to the United States' national security interests by making it less likely that foreign nations will work productively with the United States on sensitive matters relating to the United States' national security.

A. Protecting the national security of the United States often involves cooperation with foreign States, which can and do share information and otherwise assist and cooperate in matters beneficial to and protective of the United States' national security.

B. When the United seeks to remove individuals to a foreign country, the United States must negotiate the details of that removal with the foreign country. This requires nonpublic, sensitive, and high stakes negotiation with the foreign State, particularly where, as here, the aliens being removed have been deemed enemy aliens and members of a foreign terrorist organization. Those negotiations cover sensitive issues, including representations regarding the bases on which the individuals are being removed from the United States, which can impact the foreign State's willingness to accept the removed aliens and the procedures it will employ in doing so. The negotiations also cover the logistical details of that removal—including the destination of the deportation flight, as well as the time of departure and arrival at the destination, and the form and timing of the transfer of custody. All of these issues are sensitive matters that are negotiated with the receiving foreign State outside the public view. The mere fact of compelled disclosure of this information—to anyone—would likely be seen by the foreign State as a breach of trust, making it less likely that the foreign State and other foreign States will cooperate with the United States in the future on sensitive matters impacting its national security.

C. Similarly, if sensitive information covered by a compelled disclosure—for example, the number and nature of aliens removed to the foreign State—were to come to light—the receiving foreign State's government could face internal or international pressure making that foreign State and other foreign States less likely to work cooperatively in the future with the United States on matters affecting its national security.

D. Moreover, if a disclosure were to in any way undercut or, in the eyes of a foreign State (fairly or not) cast doubt on representations made by the United States during sensitive negotiations, that could likewise make that foreign State and other foreign States less likely to work cooperatively with the United States on matters affecting its national security.

E. Likewise, compelled disclosure of information that could reveal whether an alleged deportation flight touched down in a third country—neither the United States nor the foreign State to which removal is being made—would threaten significant harm to the national security of the United States. Whether a particular flight, carried out for a specific purpose, may land in a third country can itself be a matter of sensitive diplomatic discussions and negotiations with the United States' partners and allies. Compelled disclosure of that sensitive information would likely be seen as a breach of trust, threatening the willingness of foreign States to negotiate and cooperate with the United States on confidential and sensitive matters affecting its national security. Moreover, if a flight stopped-over in a foreign State that was unaware of the nature or purpose of the flight, the compelled disclosure of that information—or of other information that could effectively reveal that information—would, if it reached the public, threaten to directly damage the United States' relationship with that foreign

State and would make that State and other foreign States less likely to work cooperatively with the United States in the future on matters affecting the United States' national security.

F.   It is critical to bear in mind that removal operations can be (as they are here) counterterrorism operations. If foreign partners believed that any relevant details could be revealed to third parties, those foreign partners would be less likely to work with the United States on counterterrorism operations in the future.

G.   As discussed in Paragraph 10.E, *supra*, the compelled disclosure of the sensitive information sought by this Court's March 18 Minute Order would cause significant harm to the United States' national security interests even if some of the alleged details have made it into public sources through unofficial means. There is a difference between official acknowledgement and informal reports: Official disclosures or acknowledgements threaten the United States' national security interests in a way that informal reports or statements do not, because informal statements leave an important element of doubt that provides an essential layer of protection and confidentiality. That protection would be lost if the United States were forced to confirm or deny the accuracy of unofficial disclosures or speculation. Thus, even if the public or the press believes certain information to be true, providing an official acknowledgement by confirming or denying specific details threatens the national security harms discussed above.

12.   Finally, for at least two reasons, the compelled disclosure of the information sought in this Court's Minute Order threatens significant harm to the national security of the United States even if that information is provided ex parte and in camera. First, as noted above, the mere act of

providing the information to the Court will itself likely be seen as a breach of trust—the sharing of sensitive, nonpublic information with a third party outside of the process of negotiating and executing the agreement between the two nations. Second, as a practical matter, the more widely information is shared, the greater the risk that the information will reach the public (even if unintentionally), directly or indirectly. Indeed, any order based on the sensitive information at issue here would unavoidably lead to public dissection and speculation as to the bases for the order, even if the underlying information is held under seal. And that increased public dissection and speculation threatens the significant national security harms already discussed: (1) direct threats to the United States' law enforcement operations (here, in the context of a counterterrorism operation); and (2) damage to the United States' ability to obtain cooperation from foreign States on matters affecting its national security.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 24th day of March 2025.

Kristi Noem
Secretary of Homeland Security

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

J.G.G., *et al.*,

Petitioner,

v.

DONALD J. TRUMP, *et al.*,

Respondents.

No. 1:25-cv-766 (JEB)

Declaration Of Marco Rubio

### DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2.      The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.      The purpose of this Declaration is to assert, in my capacity as Secretary of State and head of the Department of State, a formal claim of the state secrets privilege over

information requested by this Court in its Minute Order of March 18, 2025, in order to protect the foreign relations and national security interests of the United States.   As explained in this declaration, disclosure of the information covered by my privilege assertion reasonably could be expected to cause significant harm to the foreign relation and national security interests of the United States.  I have discussed with knowledgeable State Department employees the details of the information over which I am asserting privilege to ensure that the bases for the privilege assertions set forth in this Declaration are appropriate.

4.      In the course of my official duties, I am aware that President Trump issued Executive Order 14157 regarding a process by which Tren de Aragua (TdA) and other transnational organizations and cartels may be "designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended." *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists* (Jan. 20, 2025).  As President Trump recognized in doing so, TdA has engaged in "campaigns of violence and terror in the United States and internationally," such that it presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.*

5.      In the course of my official duties, I designated TdA as a Foreign Terrorist Organization and its members as Specially Designated Global Terrorists. *Specially Designated Global Terrorist Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana,* 90 Fed. Reg. 10030 (Feb. 20, 2025); *Foreign Terrorist Organization*

*Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva*

*Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia*

*Michoacana*, 90 Fed. Reg. 10030 (Feb. 20, 2025)

      6.     In the course of my official duties, I am aware that President Trump has, pursuant

to the Alien Enemies Act (50 U.S.C. § 21), "proclaimed that all Venezuelan citizens 14 years of

age or older who are members of TdA, are within the United States, and are not actually

naturalized or lawful permanent residents of the United States are liable to be apprehended,

restrained, secured, and removed as Alien Enemies." *Invocation of the Alien Enemies Act*

*Regarding the Invasion of the United States be Tren de Aragua* (Mar. 14, 2025). President

Trump directed "the apprehension, detention, and removal of all members of TdA who otherwise

qualify as Alien Enemies under" his proclamation. *Id.*

      7.     In the course of my official duties, I am aware that the instant lawsuit has been

filed regarding the removal of Venezuelan members of TdA pursuant to the Alien Enemies Act.

      8.     In the course of my official duties, I have been informed that this Court has

ordered the Defendants in this action to disclose "the following details regarding each of the two

flights leaving U.S. airspace before 7:25 p.m. on March 15, 2025: 1) What time did the plane

take off from U.S. Soil and from where? 2) What time did it leave U.S. airspace? 3) What time

did it land in which foreign country (including if it made more than one stop)? 4) What time

were individuals subject solely to the Proclamation transferred out of U.S. custody? And 5) How

many people were aboard solely on the basis of the Proclamation?" Minute Order of 3/18/2025.

      9.     After careful and actual personal consideration of this matter, I have concluded

that the disclosure of this information could reasonably be expected to cause significant harm to

the foreign relations interests of the United States and, relatedly, the national security interests of the United States.

10.    When the United seeks to remove individuals to a foreign country, the United States must negotiate the details of that removal with the foreign country. This requires nonpublic, sensitive, and high stakes negotiation with the foreign State, particularly where, as here, the aliens being removed have been deemed enemy aliens and members of a foreign terrorist organization. Those negotiations cover sensitive issues, including representations regarding the bases on which the individuals are being removed from the United States, which can impact the foreign State's willingness to accept the removed aliens and the procedures it will employ in doing so. Compelled disclosure of the number of aliens aboard any deportation flight—including the alleged deportation flights addressed in this Court's Minute Order—and the reasons any of those aliens were placed aboard the deportation flight, threatens significant harm to the United States' foreign affairs and national security interests. For example, if compelled disclosure of that information came to light, it could cause the foreign State's government to face internal or international pressure, making that foreign State and other foreign States less likely to work cooperatively with the United States in the future, both within and without the removal context. Disclosure of that information—to anyone—likewise is likely to be viewed as a breach of the trust on which our foreign relationships are based, leading to a less robust relationship in the future. And if a disclosure were to in any way undercut or, in the eyes of a foreign State (fairly or not) cast doubt on representations made in sensitive negotiations with the United States, that could likewise make that foreign State less likely to work cooperatively with the United States, both within and outside the removal context.

11.     When the United States seeks to remove individuals to a foreign State, it likewise must negotiate the logistical details of that removal—a sensitive issue that can impact the willingness of that foreign State to accept removed aliens at all.  Those sensitive details, which are negotiated outside of public view, include the destination of the deportation flight, as well as the time of departure and arrival at the destination, and the form and timing of the transfer of custody.  Compelled disclosures of that information, or of information that would allow any third party to determine that information in whole or in part, would allow the national and international public to confirm that a particular flight was indeed a deportation flight—a fact which threatens the willingness of foreign States to accept removed aliens but only if done secretly, and which will more broadly threaten the willingness of foreign States to work with the United States on sensitive and confidential matters, both within and without the removal context.  Again, the compelled disclosure—to anyone—of sensitive matters such as this is likely to be seen by foreign nations as a breach of trust that will damage our relationships with allies, negatively affecting the United States' foreign relations and national security.  For these reasons, compelled disclosure of the following information would threaten significant harm to the United States' foreign affairs and national security interests:  1) the time that an alleged deportation flight took off from U.S. soil and from where; 2) the time an alleged deportation flight left U.S. airspace, 3) the time the alleged deportation flight landed in a foreign country; and 4) the location in which the alleged deportation flight landed.

12.     Likewise, compelled disclosure of information that could reveal whether an alleged deportation flight touched down in a third country—neither the United States nor the foreign State to which removal is being made—would threaten significant harm to the United States' foreign affairs and national security interests.  Whether a particular flight, carried out for

a specific purpose, may land in a third country can itself be a matter of sensitive diplomatic discussions and negotiations with the United States' partners and allies. Compelled disclosure of that sensitive information would likely be seen as a breach of trust, threatening the willingness of foreign States to negotiate and cooperate with the United States on confidential and sensitive matters, both within and without the removal context. Moreover, if a flight stopped-over in a foreign State that was unaware of the nature or purpose of the flight, the compelled disclosure of that information—or of other information that could effectively reveal that information—would, if it reached the public, threaten to directly damage the United States' relationship with that foreign State and would make that State and other foreign States less likely to work cooperatively with the United States in the future, both within and outside the removal context.

13.     It is critical to bear in mind that removal operations can be (as they are here) counterterrorism operations. If foreign partners believed that any relevant details could be revealed to third parties, those foreign partners would be less likely to work with the United States in the future. That impairs the foreign relations and diplomatic capabilities of the United States and threatens significant harm to the national security of the United States.

14.     If foreign States believed that the information sought in this Court's Minute Order—or similar information—could be revealed to third parties, simply because a lawsuit has been filed or a judge has asked for the information, it would erode the credibility of the United States' assurances that information will be maintained in confidence and thus impede the ability of the United States to secure the cooperation of foreign authorities in critical operations. Again, this threat to the United States' foreign affairs interests extends beyond the removal context that is the subject of this case.

15.     Importantly, the compelled disclosure of this sensitive information would cause significant harm to the United States' foreign affairs interests even if some of the alleged details have made it into public sources through unofficial means.  The disclosure of foreign affairs information only through official acknowledgment or confirmation is vital to the protection of the United States' ability to conduct foreign affairs.   There is a difference between official acknowledgement and informal reports:  Official disclosures or acknowledgements threaten the United States' national interests in a way that informal reports or statements do not, because informal statements leave an important element of doubt that provides an essential layer of protection and confidentiality.  That protection would be lost if the United States were forced to confirm or deny the accuracy of unofficial disclosures or speculation.  Thus, even if the public or the press believes certain information to be true, providing an official acknowledgement by confirming or denying specific details threatens the significant diplomatic and foreign relation harms discussed above.

16.     Finally, for at least two reasons, the compelled disclosure of the information sought in this Court's Minute Order threatens the foreign relations and national security interests of the United States even if that information is provided ex parte and in camera.  First, as noted above, the mere act of providing the information to the Court will itself likely be seen as a breach of trust—the sharing of sensitive, nonpublic information with a third party outside of the process of negotiating and executing the agreement between the two nations.  Second, as a practical matter, the more widely information is shared, the greater the risk that the information will reach the public (even if unintentionally)—either directly or indirectly.  Indeed, any order based on the sensitive information at issue here would unavoidably lead to public dissection and speculation as to the bases for the order, even if the underlying information is held under seal. And that increased public

dissection and speculation threatens the significant harm already discussed—reduced cooperation from the United States' international partners, both within and without the removal context.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 24th day of March 2025.

Marco Rubio
Secretary of State

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| J.G.G., *et al.*,<br><br>        Petitioner,<br><br>     v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        Respondents. | Declaration Of Attorney General<br>Pamela J. Bondi<br><br>No. 1:25-cv-766 (JEB) |

**DECLARATION OF ATTORNEY GENERAL PAMELA J. BONDI**

I, Pamela J. Bondi, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.    I am the United States Attorney General and the head of the United States Department of Justice, an Executive Department of the United States. *See* 28 U.S.C. §§ 501, 503. As Attorney General, I advise the heads of other executive departments on questions of law. *See* 28 U.S.C. § 512.

2.    The purpose of this Declaration is to protect the national security and foreign affairs interests of the United States by joining, in my official capacity, the formal assertions of the state secrets privilege over information requested by this Court in its Minute Order of March 18, 2025, made by the Secretary of State and the Secretary of Homeland Security.

3.    The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, including declarations made by the Secretary of State and the Secretary of Homeland Security, on reasonable inquiry, and on information obtained from Department of Justice employees.

4.    Following the public issuance of the Presidential Proclamation, *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua*, on March 15, 2025, the Department of Homeland Security successfully removed by aircraft a number of aliens subject to that Proclamation. Those removals were facilitated by Department of State negotiations with foreign countries.

5.    In a March 18, 2025 Minute Order, this Court requested the following information regarding those removals: (1) what time the planes took off and from where; (2) what time the planes left U.S. airspace; (3) what time the planes landed, where they landed, and whether they made more than one stop; (4) what time aliens subject to the Proclamation were transferred out of U.S. custody; and (5) how many aliens were aboard the flights based on the Proclamation.

6.    The Secretary of State and the Secretary of Homeland Security have each submitted a declaration asserting a formal claim of the state secrets privilege regarding disclosure of the information sought in the March 18, 2025 Minute Order. Those declarations reflect the studied and well-supported conclusion of each Secretary that disclosure of the information, even *ex parte* and *in camera*, would cause significant harm to the foreign relations and national security interests of the United States.

7.    After considering all relevant information, including the declarations of the
Secretary of State and the Secretary of Homeland Security, and following an independent legal
review by Department of Justice personnel, I am satisfied that the assertions of the state secrets
privilege by the Secretary of State and the Secretary of Homeland Security regarding information
requested in the Court's March 18, 2025 Minute Order are adequately supported and warranted,
and I join their assertion of the privilege.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and
correct.

Executed this 24th day of March 2025.

Pamela J. Bondi
Attorney General

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| J.G.G., *et al.*, | ) | Civil Action No. 1:25-cv-00766 |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants-Respondents. | ) | |
| | ) | |

## <u>NOTICE INVOKING STATE SECRETS PRIVILEGE</u>

The Executive Branch hereby notifies the Court that no further information will be provided in response to the Court's March 18, 2025 Minute Order based on the state secrets privilege and the concurrently filed declarations of the Secretary of State and the Secretary of Homeland Security.

This is a case about the President's plenary authority, derived from Article II and the mandate of the electorate, and reinforced by longstanding statute, to remove from the homeland designated terrorists participating in a state-sponsored invasion of, and predatory incursion into, the United States. The Court has all of the facts it needs to address the compliance issues before it. Further intrusions on the Executive Branch would present dangerous and wholly unwarranted separation-of-powers harms with respect to diplomatic and national security concerns that the Court lacks competence to address. Accordingly, the states secrets privilege forecloses further demands for details that have no place in this matter, and the government will address the Court's order to show cause tomorrow by demonstrating that there is no basis for the suggestion of non-compliance with any binding order.

## I. Applicable Law

The President of the United States is a party to this lawsuit.  President Trump is "the only person who alone composes a branch of government." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020).[1]  Consequently, this Court owes President Trump "high respect." *Clinton v. Jones*, 520 U.S. 681, 707 (1997).  That binding command on this Court ought to—but to this point has not—"inform the conduct of the entire proceeding, including the timing and scope of discovery." *Id.*

"[C]onstitutional confrontation between the two branches should be avoided whenever possible." *Cheney v. U. S. District Court for D.C.*, 542 U.S. 367, 389–90 (2004).  "[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996).  "[J]udicial deference and restraint" are required to avoid undue interference with the Executive Branch.  *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982).  This is necessary to avoid the current "collision course," in which a single district judge has unnecessarily put himself in an "awkward position" that includes "the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Cheney*, 542 U.S. at 389.

In this case, invocation of the "absolute" state secrets privilege prevents the Court from colliding with the Executive.  *In re Sealed Case*, 494 F.3d 139, 144 (D.C. Cir. 2007); *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982) ("[T]he critical feature of the inquiry in evaluating the claim of privilege is not a balancing of ultimate interests at stake in the litigation.").  "The state secrets privilege is a common law evidentiary rule that protects information from discovery when

---

[1] Unless otherwise noted, all quotation marks, citations, and alterations are omitted from case citations.

disclosure would be inimical to the national security." *In re United States*, 872 F.2d 472, 474 (D.C. Cir. 1989). The privilege may be formally invoked "by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953). The government need only establish that the requested information "poses a reasonable danger to secrets of state." *Halkin*, 690 F.2d at 990. The issue is whether the challenged disclosures "may harm" national security. *United States v. Zubaydah*, 595 U.S. 195, 205 (2022).

Judicial review of the invocation is limited, and the "degree of judicial scrutiny varies according to the importance of the information sought." *Burks v. Islamic Republic of Iran*, 2020 WL 13303322, at *8 (D.D.C. 2020). The Court "must" afford "great deference" to the Executive Branch. *Id.* at *9. This includes being "careful not to force a disclosure of the very thing the privilege is designed to protect." *Id.* "[T]he district court need not have complete knowledge of how disclosure would cause a specific security breach." *In re Sealed Case*, 494 F.3d at 144. Where there is only a "trivial showing of need" for the disclosures, and "the circumstances of the case point to a significant risk of serious harm if the information is disclosed, the trial judge should evaluate (and uphold) the privilege claim solely on the basis of the government's public representations, without an in camera examination of the documents." *Ellsberg v. Mitchell*, 709 F.2d 51, 59 n.38 (D.C. Cir. 1983).

## II. Discussion

The information sought by the Court is subject to the state secrets privilege because disclosure would pose reasonable danger to national security and foreign affairs. Because there is no need for the requested disclosures, the Court must resolve the application based on the Cabinet-level declarations submitted with this motion.

**A. The Court's Requested Disclosures Would Cause Unacceptable Danger**

The state secrets privilege reflects the reality that it is the responsibility of the Executive Branch, "not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising" the Nation's safety. *CIA v. Sims*, 471 U.S. 159, 180 (1985). President Trump's execution of his Article II authorities—which "are of unrivaled gravity and breadth" and include "managing matters related to terrorism . . . and immigration"—requires the "utmost discretion and sensitivity." *Trump v. United States*, 603 U.S. 593, 607, 610–11 (2024). As such, when the government invokes the state secrets privilege, "[n]o competing public or private interest can be advanced to compel disclosure." *Ellsberg*, 709 F.2d at 57.

The Secretary of State's declaration confirms that the removal of the Alien Enemies at issue, namely alien members of the designated foreign terrorist organization Tren de Aragua ("TdA"), were the product of "nonpublic, sensitive, and high stakes negotiation" with one or more foreign countries. Rubio Decl. ¶ 10. Disclosure of the information requested by the Court "could cause the foreign State's government to face internal or international pressure, making that foreign State and other foreign States less likely to work cooperatively with the United States in the future, both within and without the removal context." *Id.* Such disclosure would be viewed as a "breach of the trust on which our foreign relationships are based," and would "impair[] the foreign relations and diplomatic capabilities of the United States." *Id.* ¶¶ 10, 13. The end result would be to "erode the credibility of the United States' assurances that information will be maintained in confidence" and thereby "impede the ability of the United States to secure the cooperation of foreign authorities in critical operations." *Id.* ¶ 14. *See Zubaydah*, 595 U.S. at 208 (applying privilege to disclosures that "can diminish the extent to which the intelligence services of Countries A, B, C, D, etc., will

prove willing to cooperate with our own intelligence services in the future"); *Halkin*, 690 F.2d at 990 n.53 ("[T]he privilege extends to matters affecting diplomatic relations between nations."); *Ellsberg*, 709 F.2d at 59 (upholding privilege where disclosure "would disrupt diplomatic relations with foreign governments"); *In re United States*, 872 F.2d at 475 (recognizing that privilege protects "diplomatic security").

Moreover, the Secretary of Homeland Security has established that responding to the Court's inquiries would "directly compromise[] the safety of American officers, contractors, aliens, and the American public" by, for example, divulging "critical means and methods of law enforcement operations," "confirming alleged operational details [that] would cause significant harm to the national security of the United States," and "undermin[ing] the efficacy of American counterterrorism operations." Noem Decl. ¶ 10. Disclosure "would allow others to draw inferences and insight into how future, similar governmental operations will be conducted, and to use that information in a manner adverse to U.S. national security," thereby enabling "enemies of our national security … to stitch together an understanding of the means and methods used to thwart their unlawful and sometimes violent conduct." *Id. See, e.g.*, *Kareem v. Haspel*, 412 F. Supp. 3d 52 (D.D.C. 2019) ("Detailed statements underscore that disclosure of [the privileged] information . . . and the means, sources and methods of intelligence gathering in the context of this case would undermine the government's intelligence capabilities and compromise national security."), *vacated on other grounds*, 986 F.3d 859 (D.C. Cir. 2021); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (reasoning that courts must be particularly "reluctant to intrude upon the authority of the Executive in military and national security affairs").

"Courts are in no position to gauge what constitutes an acceptable margin of error for determinations that bear on national security," and that is "particularly true where the decisions

involve sensitive and inherently discretionary judgment calls." *Oryszak v. Sullivan*, 565 F. Supp. 2d 14, 19–20 (D.D.C. 2008), *aff'd*, 576 F.3d 522 (D.C. Cir. 2009). Similarly, the Court lacks competence to evaluate risks associated with the "mosaic effect," whereby "bits and pieces of data . . . may aid in piecing together bits of other information, even when the individual piece is not of obvious importance in itself." *Shapiro v. United States Dep't of Justice*, 2014 WL 12912625, at *1 (D.D.C. 2014); *see also Citizens United v. United States Dep't of State*, 460 F. Supp. 3d 12, 19 (D.D.C. 2020) ("[E]ven apparently innocuous information, such as non-sensitive information from ordinary private citizen may be withheld."). For example, confirming the exact time the flights departed, or their particular locations at some other time, would facilitate efforts to track those flights and future flights. *See* Noem Decl. ¶ 10. In turn, disclosing any information that assists in the tracking of the flights would both endanger the government personnel operating those flights and aid efforts by our adversaries to draw inferences about diplomatic negotiations and coordination relating to operations by the Executive Branch to remove terrorists and other criminal aliens from the country. *See id.* Simply put, the Court has no cause to compel disclosure of information that would undermine or impede future counterterrorism operations by the United States.

Finally, the fact that there are allegations and claims in the public domain regarding issues implicated by the Court's questions is not a basis for vitiating the privilege. *Accord* Rubio Decl. ¶ 15; Noem Decl. ¶ 10. Official confirmation of any of those allegations would pose a distinct threat to foreign relations and national security. *See Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("[T]he fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations."). Specifically, "[c]onfirmation" of public claims by "an insider is different in kind

6

from speculation in the press." *Zubaydah*, 595 U.S. at 208. Thus, "information that has entered the public domain may nonetheless fall within the scope of the state secrets privilege." *Id.* at 207; *see also Halkin*, 690 F.2d at 994 ("We reject, as we have previously, the theory that because some information about the project ostensibly is now in the public domain, nothing about the project in which the appellants have expressed an interest can properly remain classified or otherwise privileged from disclosure."); *Edmonds v. U.S. Dep't of Justice*, 323 F. Supp. 2d 65, 76 (D.D.C. 2004) ("That privileged information has already been released to the press . . . does not alter the Court's conclusion")*.* Accordingly, the declarations submitted with this Notice establish a valid basis for invocation of the state secrets privilege—and also a dispositive one for ceasing any further inquiry.

### B. There Is No Need For The Requested Disclosures

The "need" for the information at issue is only relevant to "help the court determine how deeply to probe the details of, and basis for, the Government's privilege claim." *Zubaydah*, 595 U.S. at 209–10; *see also Reynolds*, 345 U.S. at 11 ("[E]ven the most compelling necessity cannot overcome the claim of privilege."). Here, because "necessity is dubious," at most, "a formal claim of privilege . . . will have to prevail." *Id.*

The information sought by the Court is irrelevant to plaintiffs' claims and to the Executive Branch's compliance with the Court's operative order. The Court has already devoted more time to these inquiries than it did to evidence and argument on the issue of whether a class should be certified. In any event, the government has already confirmed that "two flights carrying aliens being removed under the AEA departed U.S. airspace before the Court's minute order of 7:25 PM EDT." Doc. 49-1. Further, the Government has not contested for purposes of these proceedings that the planes landed abroad, and that the aliens on board were deplaned, after the issuance of the

Court's minute order. To have proceeded otherwise and turned planes around mid-air without regard to important logistical constraints such as fuel availability or foreign airspace restrictions, especially on the legally infirm basis that the Court retained authority over aircraft operating outside the United States, would have implicated grave safety risks.

No more information is needed to resolve any legal issue in this case. Whether the planes carried one TdA terrorist or a thousand or whether the planes made one stop or ten simply has no bearing on any relevant legal issue. The need for additional information here is not merely "dubious," *Reynolds*, 345 U.S. at 11, or "trivial," *Ellsberg*, 709 F.2d at 59 n.38, it is non-existent. The Executive Branch violated no valid order through its actions, and the Court has all it needs to evaluate compliance. Accordingly, the Court's factual inquiry should end.

### C.  There Is No Need For *In Camera* Review

In light of the utter lack of "need" for the information the Court seeks, the Court must address the invocation of the state secrets privilege on the basis of the declarations and without *in camera* review of the information at issue.

*In camera* review is "not required as a matter of course in a claim of the state secrets privilege." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 401 (D.C. Cir. 1984); *see also In re Agent Orange Product Liability Litigation*, 97 F.R.D. 427, 431 (E.D.N.Y. 1983) ("[I]n camera inspection is not routine in cases where the state secrets privilege is invoked."). The *Zubaydah* Court, as well as "*Reynolds* itself contemplated that . . . a claim of privilege could prevail without further examination by the court of the ostensibly privileged evidence." *Zubaydah*, 595 U.S. at 209; *see also Reynolds*, 345 U.S. at 10 ("[T]he court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers.").

When the privilege involved is based on "concern" regarding "diplomatic secrets," "courts should not insist upon an examination of the evidence." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, 575 F. Supp. 3d 53, 73 (D.D.C. 2021). "Courts are not required to play with fire and chance further disclosure—inadvertent, mistaken, or even intentional—that would defeat the very purpose for which the privilege exists." *Sterling v. Tenet*, 416 F.3d 338, 344 (4th Cir. 2005). The Supreme Court has "provide[d] that when a judge has satisfied himself that the dangers asserted by the government are substantial and real, he need not—*indeed, should not*—probe further." *Id.* at 345 (emphasis added). That is the appropriate course in this instance.

## III.    Conclusion

For the foregoing reasons, the government invokes the state secrets privilege and declines to further respond to the Court's March 18, 2025 Minute Order.

Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

PATRICK GLEN
Senior Litigation Counsel