

**MEL JONES JR** <jonesjrmel@gmail.com>

# 3. 29. 2025 To: Flint Water Crisis Special Master Deborah Greenspan; RE: You see Ms. Greenspan --- as I said to you in an earlier email.... God is Good [and] HE/ God is good all the time....

1 message

**MEL JONES JR** <jonesjrmel@gmail.com>                                       Sat, Mar 29, 2025 at 12:48 AM
To: Deborah Greenspan <deborah.greenspan@blankrome.com>, Zeldin.Lee@epa.gov, "Cormack, Hayley"
<Cormack.Hayley@epa.gov>, yuri.s.fuchs@usdoj.gov, SupremeCtBriefs@usdoj.gov, derek.l.weiss@usdoj.gov,
mobrien@irli.org, chajec@irli.org, gcanaan@irli.org, gwv@dcglaw.com, tmccotter@boydengray.com,
daniel.epstein@aflegal.org, "jon@publicrightsproject.org" <jon@publicrightsproject.org>, serviceS3@michigan.gov,
giovanatiN@michigan.gov, Stacey.Metro@ag.ny.gov, Annabelle.Wilmott@doj.ca.gov, Lorraine.Lopez@doj.ca.gov,
Delbert.Tran@doj.ca.gov, zoe.levine@ag.ny.gov, Irina.Trasovan@doj.ca.gov, "denise.levey@doj.ca.gov"
<denise.levey@doj.ca.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>, "robert.c.merritt@usdoj.gov"
<robert.c.merritt@usdoj.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>, "brad.rosenberg@usdoj.gov"
<brad.rosenberg@usdoj.gov>, jgrayson@nmdoj.gov, molly.alarcon@sfcityatty.org, "david.louk@sfcityatty.org"
<david.louk@sfcityatty.org>, shannon.stevenson@coag.gov, ksadeck@riag.ri.gov, jared.b.cohen@mass.gov,
john.keller@ag.state.mn.us, johnsonkarpg@doj.state.wi.us, julio.thompson@vermont.gov, dmosteller@ncdoj.gov,
"jeremy.feigenbaum@njoag.gov" <Jeremy.feigenbaum@njoag.gov>, shankar.duraiswamy@njoag.gov,
Viviana.hanley@njoag.gov, shefali.saxena@law.njoag.gov, Elizabeth.walsh@law.njoag.gov, HStern@ag.nv.gov,
akirschner@oag.state.md.us, Janelle.Medeiros@ct.gov, PolicyOffice@epa.gov, EIS-Filing@epa.gov, education@epa.gov,
NEPAssisthelp@epa.gov, NEPA@epa.gov, eric.wessan@ag.iowa.gov, matt.rice@ag.tn.gov, nlindzen@corpfraudlaw.com,
sara.eisenberg@sfcityatty.org
Cc: Colleen Connors <CMColleen4@gmail.com>, "Marissa.Malouff@doj.ca.gov" <Marissa.Malouff@doj.ca.gov>,
"vanessa.kassab@delaware.gov" <vanessa.kassab@delaware.gov>, "kaliko.d.fernandes_hawaii_gov"
<kaliko.d.fernandes@hawaii.gov>, "jeremy.feigenbaum@njoag.gov" <jeremy.feigenbaum@njoag.gov>,
"harrist19@michigan.gov" <harrist19@michigan.gov>, "eng.connie@epa.gov" <eng.connie@epa.gov>, "egle-
nondiscriminationCC@michigan.gov" <egle-nondiscriminationCC@michigan.gov>, "Cormack, Hayley"
<Cormack.Hayley@epa.gov>, "EGLE-Accessibility@michigan.gov" <EGLE-Accessibility@michigan.gov>, "Faltin, Todd
(he/they)" <Faltin.Todd@epa.gov>, "Oviedo, Luis" <oviedo.luis@epa.gov>, "MacMillan-Sanchez, Ariel (she/her/hers)"
<MacmillanSanchez.Ariel@epa.gov>, "Johnson, Johahna (she/her/hers)" <Johnson.Johahna@epa.gov>, "Mason, Trinita"
<Mason.Trinita@epa.gov>, "Moore, Tammy" <moore.tammy@epa.gov>, "Walts, Alan (he/him/his)" <walts.alan@epa.gov>,
Deborah Greenspan <deborah.greenspan@blankrome.com>, "Risley, David" <Risley.David@epa.gov>,
"tmlewis@cityofflint.com" <tmlewis@cityofflint.com>, "cmcgehee@pittlawpc.com" <cmcgehee@pittlawpc.com>,
"eric.a.rey@usdoj.gov" <eric.a.rey@usdoj.gov>, "Jason.T.Cohen@usdoj.gov" <Jason.T.Cohen@usdoj.gov>,
"OIG_Hotline@epa.gov" <OIG_Hotline@epa.gov>, Corey <cstern@levylaw.com>, Patrick Lanciotti
<PLanciotti@napolilaw.com>, "dpettway@cityofflint.com" <dpettway@cityofflint.com>, "saneeley@cityofflint.com"
<saneeley@cityofflint.com>, "mbard@cityofflint.com" <mbard@cityofflint.com>, "michelle.t.domingue.II@usdoj.gov"
<michelle.t.domingue.II@usdoj.gov>, "Kaplan, Robert (he/him/his)" <kaplan.robert@epa.gov>, Mel jones jr
<meljonesjr@gmail.com>, "marianne.f.kies@usdoj.gov" <marianne.f.kies@usdoj.gov>, "daniel.c.eagles@usdoj.gov"
<daniel.c.eagles@usdoj.gov>, "kuhlr@michigan.gov" <kuhlr@michigan.gov>, "gambilln@michigan.gov"
<gambilln@michigan.gov>, "MitosinkaA@michigan.gov" <MitosinkaA@michigan.gov>, "gaiello@mayerbrown.com"
<gaiello@mayerbrown.com>, "jkuptz@cityofflint.com" <jkuptz@cityofflint.com>, "dfaraci@campbell-trial-lawyers.com"
<dfaraci@campbell-trial-lawyers.com>, "alin@eisnerlaw.com" <alin@eisnerlaw.com>, "ccmushatt@cityofflint.com"
<ccmushatt@cityofflint.com>, "heidy.gonzalez@usdoj.gov" <heidy.gonzalez@usdoj.gov>, AG attorney as to MI COC civil
case #23-000115-MZ <bettenhausenm@michigan.gov>, robinsonr11 <robinsonr11@michigan.gov>, Justus Brown
<jubrown@cityofflint.com>, Kameshia Ar-Rahmaan <kar-rahmaan@cityofflint.com>, Davina Donahue
<ddonahue@cityofflint.com>, City of Flint Clerk's Office <cityclerk@cityofflint.com>, Davina Donahue
<CouncilPublicComment@cityofflint.com>, "trachelleyoung@gmail.com" <trachelleyoung@gmail.com>, Ladel Lewis
<llewis@cityofflint.com>, Judy Priestley <jpriestley@cityofflint.com>, Tonya Burns <tburns@cityofflint.com>, Mark Cuker
<mark@cukerlaw.com>, "michael.l.williams@usdoj.gov" <michael.l.williams@usdoj.gov>, "molsen@mayerbrown.com"
<molsen@mayerbrown.com>, "jcampbell@campbell-trial-lawyers.com" <jcampbell@campbell-trial-lawyers.com>, "mnguyen-
dang@mayerbrown.com" <mnguyen-dang@mayerbrown.com>, "pnapoli_napolilaw.com" <pnapoli@napolilaw.com>, Renee
Auten <rauten@thelandbank.org>, Jennifer Riggs <jriggs@thelandbank.org>, Jeremy Maltz <jeremy@lehotskykeller.com>,
"hammoudf1@michigan.gov" <HammoudF1@michigan.gov>, Michigan Attorney General <miag@michigan.gov>,

"dweyre@mcalpinepc.com" <dweyre@mcalpinepc.com>, "g@mayerbrown.com" <g@mayerbrown.com>,
"ljiang@susmangodfrey.com" <ljiang@susmangodfrey.com>, mpitt <mpitt@pittlawpc.com>, Hunter Shkolnik
<hunter@napolilaw.com>, "arosenman@mayerbrown.com" <arosenman@mayerbrown.com>, Theodore Leopold
<tleopold@cohenmilstein.com>, Emmy Levens <elevens@cohenmilstein.com>, Flint Mayor <mayor@cityofflint.com>,
"frank.bednarz@hlli.org" <frank.bednarz@hlli.org>, "ted.frank@hlli.org" <ted.frank@hlli.org>, Diane
<russell.diane@epa.gov>, Amanda Trujillo <atrujillo@cityofflint.com>, "King-Piepenbrok, Pier (AG)"
<KingP1@michigan.gov>, "jonhoma@sinasdramis.com" <jonhoma@sinasdramis.com>, "val@vlwlegal.com"
<val@vlwlegal.com>, "sdg@miller.law" <sdg@miller.law>, "sparadise@eisnerlaw.com" <sparadise@eisnerlaw.com>,
"echeverria.marietta@epa.gov" <echeverria.marietta@epa.gov>, "thompkins.anita@epa.gov" <thompkins.anita@epa.gov>,
"burneson.eric@epa.gov" <burneson.eric@epa.gov>, "travers.david@epa.gov" <travers.david@epa.gov>,
"waters.tom@epa.gov" <waters.tom@epa.gov>, "davis.angela@epa.gov" <davis.angela@epa.gov>,
"robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>,
"denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>,
"nicole.hill@dc.gov" <nicole.hill@dc.gov>, "david.louk@sfcityatty.org" <david.louk@sfcityatty.org>,
nlindzen@corpfraudlaw.com, franklmcnamara@gmail.com, mriordan@publicinterestlegal.org, eric.hamilton@usdoj.gov,
"ryan@mclanelaw.com" <ryan@mclanelaw.com>, Zeldin.Lee@epa.gov, zoe.levine@ag.ny.gov,
Sedalia.JonesKennelly@blankrome.com, rick.brooks@blankrome.com, MEL JONES JR <jonesjrmel@gmail.com>
Bcc: UrbanForestNewYork@gmail.com, Mel jones jr <meljonesjr@gmail.com>

*3. 29. 2025*

*To: Flint Water Crisis Special Master Deborah Greenspan;*

*RE: You see Ms. Greenspan --- as I said to you in an earlier email.... God is Good [and] HE/ God is good all the time....*

*Good evening....*
   *Please LOOK very carefully at the October 9th, 2024 deposition excerpt which is [and I say this out of transparency] ...the EXACT reason how it is... that I was so against "lead" FTCA plaintiff Melissa Mays critizing the US EPA for filing a motion to dismiss/ motion for*

summary judgment. Which is to say... many, many years ago ---- my late beloved mom, who passed away on December 23rd, 2020 and went to be with the LORD... would watch OHPRA WINFREY SHOW... and when there was a RACIST or member of the KKK... Ms. Winfrey would say ---- no, no --- LET THEM SPEAK.

Here... the US EPA's hired DECEPTIVE BULL SHIT ARTIST and "HIRED MOUTHPIECE" to the tune of $400,000.xx per year [e.g. yeah - I bet that DOGE/ ELON MUSK will NOT "fire her"].... anyway, this POS is hiding the FACT that it is the US EPA's mandated duty to KNOW and DISCLOSURE/ WARN THE GENERAL FLINT PUBLIC {e.g. which they have failed to do since 2016 and on an ongoing basis up to October 9th, 2024 and as of TODAY for that matter} with respect to their LATE and purposely DELAYED and FAILURES TO ISSUE ADDITIONAL enforcement orders against the MI DEQ/MI EGLE and City of Flint with respect to ALL, repeat ALL of the

3/29/25, 12:45 AM Gmail - 3.29.2025 to: Flint Water Crisis Special Master Deborah Greenspan, RE: You See Ms. Greenspan - yas I said (o) you is a...

Case: 25-1158 Document: 00118265970 Page: 4 Date Filed: 03/29/2025 Entry ID: 6710152

*known chemicals/ compounds/ toxins/ and pollutants IN THE FLINT RIVER and WHICH COULD HAVE BECOME AIRBORNE during the WARM/ HOT summer months pertaining to EVAPORATION thereto said Flint River:*



3/29/25, 12:45 AM 158 Gmail - 3/28/2025 to Flint Water Crisis Special Master Deborah Greenspan, RE: You see, Ms. Greenspan - as I said to you in a…

Case 4:17-cv-11218-LVP-CI ECF No. 334-4, PageID.12666 Filed 02/21/25 Page 1 of 19

## Exhibit 4

# The US EPA's evasive $ 400k peR YeAR Deception

_..... **and YES – this is YET ANOTHER intervening event as to the US EPA...**_

**which Colleen and [I] have just discovered on or about March 29th, 2025 --- and gives further RISE to me... NOW being [a] and/ or me.... REMAINING A CLAIMANT AS TO THE FLINT WATER CRISIS.... whereby NOW [I] believe that the US EPA is directly liable to [me] and Colleen... in AT LEAST THE AMOUNT of MO' MONIES as to my Flint Water Crisis Claims[s].... because fo' sho' me havin' to be done gots up to go PEE PEE approx. 4 times in the last 3 hours... results in SOME IQ points loss for me... and makes me be ignant and Black African American - disabled Teddy Bear fo' sho'.  No kidding.... I believe that my NEW prescribed caridiac medication NO MATTER how I titrate it along with my other cardiac medications ....makes me MUCH more tired... and causes me to go PEE PEE much more during the DAY and NIGHT TIME [e.g. notwithstanding that "recently" I have noticed that my IBS**

3/29/25, 2:45 AM    Gmail - 25-1158 State of New Jersey, et al v. Jones, et al _To Flint Water Crisis Special Master Deborah Greenspan, RE: You See Ms. Greenspan… as I said (of you) I a…

Case: 25-1158    Document: 00118265970    Page: 7    Date Filed: 03/29/2025    Entry ID: 6710152

## *is so bad that sometimes...I literally POOP my pants/ underwear]... which could be my worsened Flint Water Crisis IBS and my history of STROKE and CVA.*

*Thank you.*
*And, have a very Blessed weekend.*
*Best,*
*~Melvin Jones Jr. - disabled Flint Water Crisis Claimant*
*email: jonesjrmel@gmail.com*

---

**3 attachments**

**the golden egg of utter bull shit and direct admission that the US EPA failed to ALERT the PUBLIC ongoing to ALL known toxins in the FLINT RIVVER.....pdf**
122K

**Gmail - 25-1158 State of New Jersey, et al v. Jones, et al _Letter (general)_ (1).pdf**
83K

**LETTER TO US EPA LEE ZELDIN and US EPA Title VI HAYLEY CORMACK and  FLINT WATER CRISIS SPECIAL MASTER DEBORAH GREENSPAN (1).pdf**
730K

https://mail.google.com/mail/u/0/?ik=3cd34cf00e&view=pt&search=all&permthid=thread-a:r8458090368006916744&simpl=msg-a:r8459742851223600…    7/7

## **Exhibit 4**

The us EPA's

evasive

$400K per

Year Deception

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4         _____

 5    IN RE:               |

 6    FLINT WATER CASES   | No: 4:17-cv-11218

 7                         | (consolidated)

 8                         | HON. LINDA V. PARKER |

 9    _____| United States District Judge

10    Pages 1 - 175.

11

12    Volume 2 of the videotaped deposition of

13    JULIE E. GOODMAN, Ph.D.

14    taken via Golkow Virtual Remote,

15    commencing at 10:01 a.m.

16    Wednesday, October 9, 2024

17    before Ann L. Bacon CSR-1297.

18

19    VIDEOGRAPHER:  MS. DEVYN MULHOLLAND

20

21

22                    HIGHLY CONFIDENTIAL

23

24

25
```

```
                                              Page 2

  1        APPEARANCES:

  2

  3        MS. CARY S. McGEHEE (P42318)

  4        Pitt McGehee Palmer Bonanni & Rivers, P.C.

  5        117 W. Fourth Street, Suite 200

  6        Royal Oak, Michigan 48067

  7        (248) 398-9800

  8        cmcgehee@pittlawpc.com

  9        Appearing on behalf of the Plaintiffs.

 10

 11        MS. DEBORAH A. LABELLE (P31595)

 12        Deborah La Belle Law Offices

 13        221 N. Main Street, Suite 300

 14        Ann Arbor, Michigan 48104

 15        (734) 996-5620

 16        deblabelle@aol.com

 17        Appearing on behalf of the Plaintiffs.

 18

 19

 20

 21

 22

 23

 24

 25
```

Page 3

1          APPEARANCES, Continued:

2

3          MR. TIMOTHY B. WALTHALL

4          United States Department of Justice

5          Civil Division, Torts Branch

6          Environmental Tort Litigation

7          1100 L St. NW

8          Washington, DC 20005

9          (202) 305-0692

10          timothy.walthall@usdoj.gov

11          Appearing on behalf of the United States.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

1    A.    No, I wouldn't say required.

2    Q.    Okay.  Is there any type of quota that you have

3          or expectation on billable hours?

4    A.    We have goals for billable hours, yes.

5    Q.    And what are those goals?

6    A.    I believe it's 70 percent of our time.

7    Q.    Okay.  Seventy percent of the time that you

8          work, you should be billing for, correct?

9    A.    Yes.

10   Q.    Okay.  And does that compute to a certain number

11         of hours per year that you should be billing?

12   A.    Well, I believe it's, I mean 70 percent of a

13         40-hour week times 50 weeks or however many

14         weeks without taking away vacation and holidays.

15   Q.    Okay.  So do you know what that number is?

16   A.    Not off the top of my head, no.

17   Q.    So you're saying 70 percent of 40 hours times 52

18         weeks, so 1,456 hours?

19   A.    Well, there's holidays and vacation days, so it

20         would be less than that.

21   Q.    Okay.  And is there a certain amount of revenue

22         that you're supposed to generate as a principal

23         of Gradient per year?

24   A.    I set a revenue goal, but I don't know that

25         there's a requirement.  There's not a requirement.

Page 11

1    Q.    What's your revenue goal?

2    A.    I do not know if that's -- I believe that's

3          business confidential information.

4    Q.    Well, I don't think that that's -- first of all,

5          your attorney will, you know, offer objections

6          to the extent that they're appropriate, so I

7          think it's fair game for us to know what your

8          revenue goals are.

9    A.    I would have to go back to my company and find

10         out if that is confidential or not.  I'm not --

11         I believe that is confidential information.

12               MS. McGEHEE:  Well, Tim, are you going

13         to instruct her not to answer that?  Because I

14         think we get an answer for that.

15               MR. WALTHALL:  I'm not going to

16         instruct her not to answer, but I am going to

17         request that this deposition be placed, at least

18         this portion of that deposition be placed as

19         confidential and privileged -- strike that --

20         confidential, and so that, Julie, you can answer

21         that question because this portion of the

22         deposition will be deemed confidential so that

23         it does not go out to the public.  Is that

24         satisfactory to you or --

25               THE WITNESS:  I don't know, honestly I

Page 12

```
 1        don't know how it works in terms of if we have
 2        things that are company confidential, I don't
 3        know that even if it's a confidential deposition,
 4        that it's allowed.  I would have to find out.
 5   Q.   (Continuing, by Ms. McGehee) Well, all we're
 6        trying to find out is what your revenue goals
 7        are for your company.  I don't think that that
 8        is something that would be considered proprietary
 9        or confidential, so why don't we do this?  When
10        we take a break, you can ask whoever needs to be
11        consulted as to whether you can provide that
12        information and we will agree that it's provided
13        confidentially under seal in relation to this
14        deposition so you can tell whoever you would
15        have to ask permission from that that will be
16        the case.
17                 MR. WALTHALL:  All right.  That works
18        for us.
19   Q.   (Continuing, by Ms. McGehee) Okay.  Dr. Goodman,
20        your reports and opinions are strictly based on
21        lead exposure, correct?
22   A.   Yes.
23   Q.   They're not based on any other kind of
24        contaminant that was present in the Flint River
25        during the Flint Water Crisis, correct?
```

Page 23

```
 1          individual, are you talking about observable
 2          change by a clinician?
 3    A.    Yes.
 4    Q.    Okay.  But you're aware of the fact that even
 5          one I.Q. drop can have an impact -- sorry.
 6    A.    I disagree with that.
 7    Q.    Well, I haven't even finished my question.
 8                   MR. WALTHALL:  I was going to say there
 9          is no question pending there.
10    Q.    (Continuing, by Ms. McGehee) Okay.  My question
11          is you testified that an I.Q. drop might not be
12          observable by a clinician and my question is
13          isn't it true that while a clinician might not
14          observe an I.Q. drop of one or two points, that
15          a drop of one or two points in I.Q. can have an
16          impact on the earning capacity of an individual?
17                   MR. WALTHALL:  Objection, form.
18    A.    No, I disagree with that statement.
19    Q.    (Continuing, by Ms. McGehee) Have you read any
20          studies in that regard?
21    A.    I have.
22    Q.    And what studies have you read?
23    A.    I can't name them as I sit here.
24    Q.    Isn't it true that health economists in 2009
25          estimated that each I.Q. post -- I'm sorry.
```

Page 24

1          Each I.Q. point loss to elevated blood lead levels
2          represents a loss of $17,815 in discounted value
3          of lifetime earnings?  Are you aware of that?
4                    MR. WALTHALL:  Objection, form.
5     A.   I would have to look at whatever document you're
6          referring to.
7     Q.   (Continuing, by Ms. McGehee) Have you read a
8          report by Sheppard and Burnett regarding
9          confounding exposure measurement errors in air
10         pollution epidemiology?
11    A.   It's possible.  I would have to see it.
12    Q.   Okay.  What articles have you published on lead
13         exposure in cognitive development?
14                    MR. WALTHALL:  Objection, asked and
15         answered.
16    A.   I do not believe I have published any on lead
17         and cognitive development.
18    Q.   (Continuing, by Ms. McGehee) Have you reviewed
19         any academic papers for publication on either
20         the impact of lead exposure on cognitive
21         development or behavioral development?
22    A.   Yes.
23    Q.   What papers have you reviewed?
24    A.   I have reviewed many papers.  Many of them are
25         cited in the reference list of my report.

Page 25

1  Q.  Have you taught any classes in any school or at

2      university or graduate study on the impact of

3      lead exposure on cognitive development?

4  A.  I'm sorry.  You cut out at the beginning of the

5      question.

6  Q.  Sure.  Have you taught any classes in any school

7      or university or graduate study on the impact of

8      lead exposure on cognitive development?

9  A.  I've taught epidemiology and toxicology and risk

10     assessment classes where the focus of the class

11     was certainly not on lead, but it may have been

12     brought up in some of the lessons.

13 Q.  Okay.  Other than that?

14 A.  No.

15 Q.  Okay.  What about the impact of exposure on

16     behavioral development?

17 A.  It would be the same answer.

18 Q.  Same answer.  Have you participated in any

19     studies or designed any studies with regard to

20     looking at the impact of lead exposure on

21     cognitive development?

22 A.  I have not.

23 Q.  Have you given any presentations or papers in

24     any situation, any conference symposium, any

25     meeting on the impact of lead exposure on

1          MR. WALTHALL:  Fair enough.  All right.

2     So shall we come back at say --

3          MS. LABELLE:  Cary, is that because the

4     game starts at three?

5          MS. McGEHEE:  No, I've got it recorded.

6     I record all the games.  I don't even watch them

7     in realtime.

8          MR. WALTHALL:  Shall we come back at

9     like 1:15?

10         MS. McGEHEE:  Yeah, that's fine.

11         MR. WALTHALL:  All right.  Eastern time.

12         VIDEOGRAPHER:  Off the record at 12:40 p.m.

13         (Recess 12:40 p.m. to 1:17 p.m.)

14         VIDEOGRAPHER:  Back on the record at

15     1:17 p.m.

16         MS. McGEHEE:  Okay.  We're back again,

17     Dr. Goodman.  So I hate to beat a dead horse

18     here, but really I'm having a little bit of a

19     problem with your unwillingness to provide us

20     with your salary, which is a pretty basic

21     question asked of an expert, goes to issues of

22     influence and bias and there's just really no

23     justification for you not to answer that

24     question and I think your attorney knows that,

25     and so I'm going to ask you again, and if we

1     can't get an answer, Tim, I'm going to ask you

2     to consult with your client and tell her that

3     she needs to answer that and, if not, I guess we

4     can get Judge Parker on the line to get us

5     through this issue.

6             MR. WALTHALL:  Let me ask you this.

7     What you want is a salary number from her?  Is

8     that what you're interested in?

9             MS. McGEHEE:  Yeah, I want to know what

10    her salary is.

11            MR. WALTHALL:  So I can narrow the

12    issue, and let's take a break and I'll go

13    off-line and let's chat and see if she can't get

14    some consent from her folks to do that in the

15    knowledge that it will be in strict confidence,

16    this portion of the deposition will be in strict

17    confidence.

18            MS. McGEHEE:  Yeah, that's fine.  I

19    have no problem with that.  I prefer not to

20    bother Judge Parker.

21            MR. WALTHALL:  I prefer that, too.

22    Let's go off the record and let me talk to my

23    client and I'll be right back.

24            MS. McGEHEE:  Okay.  No problem, Tim.

25            MR. WALTHALL:  Or talk to my expert.

Page 109

1          VIDEOGRAPHER:  Going off the record at

2     1:19 p.m.

3          (Recess 1:19 p.m. to 1:36 p.m.)

4          VIDEOGRAPHER:  Back on the record at

5     1:36 p.m.

6          MS. McGEHEE:  Okay.  So Dr. Goodman,

7     I understand we have a disagreement on your

8     ability to refuse to answer a question regarding

9     your salary and your employer has indicated that

10    it is not giving you permission to do so even

11    though we think that it's a question that's

12    valid and should be answered, so we're going to

13    mark the record, address it with the court and

14    come back if necessary.

15         MR. WALTHALL:  And just while we're on

16    it, I'll just point out that Dr. Goodman has

17    already turned over what's required under the

18    rule and that the salary is not as relevant as

19    what's already been turned over.  All right.

20    Thank you.

21 Q.   (Continuing, by Ms. McGehee) So we do have your

22    billing that you've submitted and the billing

23    reflects that Gradient has billed the USA for

24    your services in an amount over $400,000.  In

25    fact, the bill I'm looking at which is Bates

1        stamped Goodman 000046 states that the current

2        bill at the time of this particular invoice,

3        which I believe was January 23, 2022 to

4        October 31, I guess that's just the performance

5        period, because that goes into 2025.  At any

6        rate, it shows a bill of $541,175, and as I

7        understand, you were retained by the USA in

8        November of 2022.  Is that accurate?

9  A.    I think I was retained in 2020, but I'm not

10       positive.

11             MR. WALTHALL:  Would it help if you

12       showed her that invoice?  Because I'm not

13       familiar with it either.  It's up to you.

14  Q.    (Continuing, by Ms. McGehee) Yeah, I've got an

15       award effective date of November 23, 2022 on a

16       solicitation contract order, so that's where I

17       get that date and I have a period of performance

18       of November 23, 2022 through October 31, 2023 on

19       that particular document Bates stamped Goodman 1.

20  A.    I don't -- I think that's a continuation of a

21       prior contract and I also think it includes work

22       that somebody else did on a project that didn't

23       involve me possibly.  I'm pretty sure.  I have

24       to look to see.

25             MR. WALTHALL:  And was that all work

1    for the Flint case?

2         MS. McGEHEE:  Are you asking Dr. Goodman?

3         THE WITNESS:  I would have to see it.

4    I can't say.

5         MR. WALTHALL:  Yeah, okay.  All right.

6         THE WITNESS:  I can't answer.

7    Q.  (Continuing, by Ms. McGehee) The invoices that

8        have been submitted to us for the work that you

9        performed indicate at least as of the date of

10       this invoice, which is Goodman 22, was a current

11       bill of -- and, I'm sorry, it's Goodman 46, of

12       541,175.  And so can you tell us of the billing

13       that you have submitted to the EPA, I'm sorry,

14       the USA, what percentage of that would you say

15       is your salary?

16   A.  Okay.  Well, I don't actually think that's a

17       bill.  I don't think there's ever been a bill

18       that high, so I really would need to see what

19       you're looking at, but I work on many different

20       projects at Gradient.  I've been working on this

21       over the past four years, but I've worked on

22       many others, so I don't think I could -- it's

23       not like a one-to-one in terms of project billings

24       and my salary.  My salary is just a salary.

25   Q.  Okay.  On one of the bills that I'm looking at

Page 112

```
 1          that was produced in association with this case,
 2          it indicates that there was quite a bit of work
 3          done on this by a senior project manager named
 4          Anna Engle or Ingle?
 5   A.     Yes.
 6   Q.     Who is she?
 7   A.     She's my project manager.
 8   Q.     And what type of work was she performing in
 9          relation to this retention?
10   A.     When I -- for any of my projects, litigation or
11          non-litigation, whatever it is, I generally work
12          very closely with the project manager, so
13          everything is, I determine the scope and the
14          direction of the project, but we work closely
15          together.  She helps me staff the project and
16          oversees the staff and so we figure out who to
17          delegate to and then she receives it before it
18          comes back to me.  She keeps track of the budget
19          and the deadlines, oversees, for example, we
20          have what we call copy editors that will help
21          with references, so she oversees that, so really
22          kind of keeping the project moving day-to-day.
23   Q.     Okay.  But she's not a toxicologist or
24          epidemiologist?
25   A.     She is not.
```

Page 123

1  A.    Oh, I don't know, ten years ago maybe.

2  Q.    Okay.  And what about the USA retentions, are

3        you working on those currently?

4  A.    One of them, yes.  One of them, no.

5  Q.    Okay.  What percentage of the work that you

6        performed in the last five years for your

7        employer Gradient would you estimate is coming

8        from work that has been contracted with the USA?

9              MR. WALTHALL:  This one I will object

10       to because Patrick Haynes did get into that.

11       Asked and answered, but you can go ahead and

12       answer.

13             MS. McGEHEE:  All right.  Thanks.

14 A.    I don't know in the last five years.  I'm really

15       not sure about the percentage.  I would say less

16       than a quarter, but I'm not positive.

17 Q.    (Continuing, by Ms. McGehee) Okay.  And of the

18       work that you're currently performing, let's

19       just say for this year, 2024, what percentage of

20       the time, of your time is dedicated to this case?

21 A.    Oh, this year?  Probably less than five percent,

22       but I'm not sure.

23 Q.    Okay.  What about in 2023?

24 A.    Probably five percent.  I don't -- I'm not

25       exactly sure.  I'd have to look to be sure, but

Page 124

1          it's on the low side.

2     Q.   Okay.  Assuming that you were retained in 2020,

3          in what year did you perform most of the work

4          that you've been retained to perform in this case?

5     A.   Oh, I'm not sure.  It would all be on the invoices.

6     Q.   Are you working on any lead cases currently

7          other than this one?

8     A.   I am not right now, but I had been, you know,

9          over the course of the last four years.

10    Q.   Okay.  Let's move on to your report.  Okay.  So

11         starting at page 77 of your report, you provide

12         your analysis of the Plaintiffs' claimed health

13         effects caused by lead, correct?

14    A.   Sorry.  I want to make sure.  The question is

15         from page 77 is where I discussed the claimed

16         health effects of lead?

17    Q.   For the Plaintiffs, right?

18    A.   Yes, that's correct.

19    Q.   Okay.  And in relation to your analysis of the

20         claimed medical effects by the Plaintiffs'

21         health conditions, your analysis was strictly

22         based on the adverse health effects of lead, not

23         any other contaminant, right?

24    A.   Correct.

25    Q.   Okay.  And you didn't do any type of analysis in

```
1       STATE OF MICHIGAN)
                         )
2       COUNTY OF MACOMB )
3            I, Ann L. Bacon, a Notary Public in and for
4       the above county and state, do hereby certify
5       that the witness, whose attached deposition was
6       taken before me in the entitled cause on the
7       date, time and place hereinbefore set forth, was
8       first duly sworn to testify to the truth, and
9       nothing but the truth; that the testimony
10      contained in said deposition was reduced to
11      writing in the presence of said witness by means
12      of stenography; that said testimony was
13      thereafter reduced to written form by mechanical
14      means; and that the deposition is, to the best
15      of my knowledge and belief, a true and correct
16      transcript of my stenographic notes so taken.
17           I further certify that the signature to and
18      the reading of the deposition by the witness was
19      waived by counsel for the respective parties
20      hereto; also, that I am not of counsel to either
21      party or interested in the event of this case.
22
        _____
23      Ann L. Bacon, Notary Public, Macomb County
24      Acting in Macomb County
25      My commission expires:  6/29/29
```