

# OFFICE OF THE GOVERNOR

SEP **2 7** 2022

To the Members of the California State Senate:

I am returning Senate Bill 1084 without my signature.

This bill prohibits foreign governments from purchasing, acquiring, leasing, or holding an interest in California agricultural land, and requires the California Department of Food and Agriculture (CDFA) to compile an annual report on foreign ownership of agricultural land, water rights, desalination facilities, energy production, energy storage, and energy distribution in the state.

Federal law requires foreign governments to report interests in agricultural land to the United States Department of Agriculture (USDA), and USDA compiles this information annually into a public report. The additional data reporting required by this bill is beyond CDFA's purview and would create new and arduous responsibilities for the department.

For these reasons, I cannot sign this bill.

Sincerely,

Gavin Newsom

Case 25-1158 Document: 00118265993 Page: 2 Date Filed: 03/29/2025 Entry ID: 6710162

3/29/25, 6:24 PM                                    Bill Text - SB-224 Agricultural land: foreign ownership and interests: foreign governments.




| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

**SB-224 Agricultural land: foreign ownership and interests: foreign governments.** (2023-2024)

SHARE THIS:                                                         **Date Published: 04/13/2023 09:00 PM**

AMENDED  IN  SENATE  APRIL 13, 2023

AMENDED  IN  SENATE  MARCH 20, 2023

CALIFORNIA LEGISLATURE— 2023–2024 REGULAR SESSION

# SENATE BILL                                                              NO. 224

### Introduced by Senator Hurtado
### (Coauthors: Senators Cortese, Grove, Nguyen, and Ochoa Bogh)
### (Coauthors: Assembly Members Alanis, Bauer-Kahan, Flora, Hoover, Weber, and Wilson)

### January 19, 2023

An act to add Chapter 5 (commencing with Section 745) to Title 2 of Part 1 of Division 2 of the Civil Code, relating to property, and declaring the urgency thereof, to take effect immediately.

## LEGISLATIVE COUNSEL'S DIGEST

SB 224, as amended, Hurtado. Agricultural land: foreign ownership and interests: foreign governments.

Existing law provides that all property has an owner, whether that owner is the state, and the property is public, or the owner is an individual, and the property is private.

Existing law, the California Emergency Services Act, establishes the Office of Emergency Services, which is responsible for the state's emergency and disaster response services for natural, technological, or man-made disasters and emergencies, among other duties.

This bill would prohibit a foreign government from purchasing, acquiring, leasing, or holding a controlling interest, as defined, in agricultural land within the State of California. The bill would exempt land held by foreign governments before January 1, 2024, from that prohibition. *The bill would provide that land transferred in violation of these provisions would be subject to divestiture, as specified.*

Existing federal law requires any foreign person, defined to include foreign governments, who acquires or transfers any interest, other than a security interest, in agricultural land to submit to the United States Secretary of Agriculture a report containing specified information relating to, among other things, the type of interest the foreign person acquired or transferred and their legal name, address, and citizenship or country in which they

are created or organized. Existing federal law requires the secretary every 6 months to transmit to each state department of agriculture a copy of each report that was submitted to the secretary in the most recent 6-month period and that involved agricultural land located in that state.

This bill would require the Office of Emergency Services, in consultation with the appropriate boards or departments and based on the above-described reports from the United States Secretary of Agriculture, and other information the office deems appropriate, to compile an annual report containing, among other information, the total amount of agricultural land that is under foreign ownership, how that land is currently being put to use, and any legislative, regulatory, or administrative policy recommendations in light of the information from the annual report. The bill would require the office to publish the inaugural annual report on its website by December 31, 2024, and by March 31 every year thereafter. The bill would require the office to deliver copies of any recommendations for legislative policy changes contained in the report to the Governor and the Assembly and Senate Committees on Agriculture. The bill would require the office to be reimbursed for costs incurred for compiling data, printing, and mailing the report, as specified. The bill would make its provisions operative upon appropriation by the Legislature.

This bill would declare that it is to take effect immediately as an urgency statute.

Vote: 2/3   Appropriation: no   Fiscal Committee: yes   Local Program: no

## THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

**SECTION 1.** Chapter 5 (commencing with Section 745) is added to Title 2 of Part 1 of Division 2 of the Civil Code, to read:

**CHAPTER 5. Foreign Entities and Property Ownership**

**745.** For purposes of this chapter, the following definitions apply:

(a) "Agricultural land" has the same meaning as defined in Section 3508 of Title 7 of the United States Code.

(b) "Controlling interest" means either of the following:

  (1) Possession of 51 percent or more of the ownership interests in an entity.

  (2) A percentage ownership interest in an entity of less than 51 percent, if the foreign government actually directs the business and affairs of the entity without the requirement or consent of any other party.

(c) "Foreign government" means a government or the state controlled-enterprise of a foreign government, except "foreign government" does not include the government of the United States, its states, territories, or possessions, or federally recognized tribes or their government units and enterprises.

(d) "Interest" means any estate, remainder, or reversion enumerated in Chapter 1 (commencing with Section 761) of Title 2 of Part 2, or portion of the estate, remainder, or reversion, or an option pursuant to which one party has a right to cause legal or equitable title to agricultural land to be transferred.

(e) "State-controlled enterprise" means a business enterprise, however denominated, in which the government has a controlling interest.

**746.** (a) Notwithstanding any other law, on and after January 1, 2024, a foreign government shall not purchase, acquire, lease, or hold any controlling interest in agricultural land in the State of California.

(b) This section does not apply to any controlling interest in agricultural land held by a foreign government before January 1, 2024.

(c) A transfer of an interest in land in violation of this section ~~is void.~~ *shall be subject to divestiture, as set forth in Section 746.5.*

(d) This section shall not be applied in a manner inconsistent with any provision of any treaty between the United States and another country.

**746.5.** *(a) The Attorney General, upon the request of any person or upon receipt of any information which leads the Attorney General to believe that a violation of Section 746 may have occurred, may issue subpoenas requiring the appearance of witnesses, the production of relevant records, and the giving of relevant testimony.*

(b) (1) If, after examining the evidence, the Attorney General concludes that a violation of Section 746 has occurred, the Attorney General shall order the prohibited foreign government to divest itself of all interests in the land within 90 days after service of the order upon the foreign government.

(2) The order of divestiture, described in paragraph (1), shall be served personally or by mail.

(c) (1) If the holder of the interest that is ordered to be divested disputes the determination of the Attorney General that a violation of Section 746 has occurred, the holder may submit a written request for a judicial determination to the Attorney General.

(2) The written request, described in paragraph (1), shall be delivered to the Attorney General within 60 days after service of the order of divestiture. If no written request is received within this time, the determination of the Attorney General shall become final.

(d) (1) If the foreign government fails to divest itself of all interests pursuant to subdivision (b), or if a holder of the interest submits a written request pursuant to subdivision (c), the Attorney General shall bring an action in superior court to divest the interest.

(2) Venue for the action described in paragraph (1) shall either be the County of Sacramento or a county in which a portion of the subject land is located, as determined by the Attorney General.

(3) The Attorney General shall promptly record with the county recorder of each county in which any portion of the land is located a notice of pendency of the action pursuant to Title 4.5 (commencing with Section 405) of Part 2 of the Code of Civil Procedure.

(e) If the holder of the interest has submitted a written request pursuant to subdivision (c), the court shall conduct an evidentiary hearing to determine, by a preponderance of the evidence, if a violation of Section 746 has occurred, prior to taking any other action. If the court determines that there has been no violation, the court shall dismiss the action and expunge the notice of pending action.

(f) (1) If the court determines that a violation of Section 746 occurred, the court shall order that the land be sold. Unless the court determines for good cause that another procedure for conducting the sale is appropriate, the court shall appoint a referee pursuant to Article 1 (commencing with Section 873.010) of Chapter 4 of Title 10.5 of Part 2 of the Code of Civil Procedure.

(2) The referee shall make a sale of the property and convey the interest to the purchaser.

(3) The proceeds from the sale shall be distributed in the following order:

(A) The payment of authorized costs of the sale, including all approved fees and expenses of the referee and any taxes and assessments due.

(B) The payment, in an amount approved by the court, to the Attorney General for reimbursement of investigation and litigation costs and expenses.

(C) The payment to lienholders who did not have actual knowledge of a violation of Section 746 in their order of priority, except for liens which under the terms of the sale are to remain on the property.

(D) The payment of a penalty, in an amount determined by the court, not to exceed 10 percent of the sales price of the property, to be paid to the fund designated by the Attorney General for enforcement of this chapter.

(E) The payment to any lienholders not included in subparagraph (C) in their order of priority.

(F) All remaining proceeds to the prohibited foreign government, in an amount that shall not exceed the original amount paid by the foreign government for the property, payable to the person or entity that held the interest.

**747.** (a) Based on the reports submitted to it pursuant to Section 3505 of Title 7 of the United States Code, and other information the Office of Emergency Services, at its discretion, deems appropriate, the office shall compile an annual report in consultation with the appropriate boards or departments for each calendar year containing all of the following:

(1) The total amount of agricultural land that is under foreign ownership.

(2) The percentage change in foreign ownership of agricultural land in California, by year, over the past 10 years.

(3) The purpose to which foreign-owned agricultural land in California is being put to use currently. The office shall also include any significant recent changes or trends in the use to which foreign-owned agricultural land in California is being put to use.

(4) Information regarding the extent of, and any recent changes in, foreign ownership of water rights in California.

(5) Information regarding the extent of, and any recent changes in, foreign ownership of water desalination facilities in California.

(6) Information regarding the extent of, and any recent changes in, foreign ownership of energy production, storage, or distribution facilities in California.

(7) The Office of Emergency Services' assessment of the impact of any recent changes in foreign ownership of agricultural land in California, water rights, or water desalination facilities on Californians' food security.

(8) Any legislative, regulatory, or administrative policy changes the Office of Emergency Services recommends in light of the information in the report.

(b) The report required by subdivision (a) shall also include information on agricultural land that is leased by a foreign government for each of the categories set forth in paragraphs (1) to (8), inclusive, of subdivision (a), as applicable.

(c) (1) The Office of Emergency Services shall publish the inaugural report described in subdivision (a) on its website by December 31, 2024, and by March 31 of each following year thereafter.

(2) The Office of Emergency Services shall publish each subsequent report described in subdivision (a) on its website by March 31 of each following year.

(3) If the report contains recommendations for legislative policy changes pursuant to paragraph (8) of subdivision (a), the Office of Emergency Services shall also deliver copies of those recommendations to the Governor and the Assembly and Senate Committees on Agriculture pursuant to Section 9795 of the Government Code.

(d) The Office of Emergency Services shall be reimbursed from the funds appropriated pursuant to Section 747.5 in an amount to cover the costs incurred for compiling data, printing, and mailing the report.

**747.5.** This chapter shall become operative upon appropriation by the Legislature for the purpose of implementing the provisions of this chapter.
**SEC. 2.** This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the California Constitution and shall go into immediate effect. The facts constituting the necessity are:

In order to secure the integrity of California's agricultural land due to the effects it has on global food security, and in order to address the potential of foreign government control of California's agricultural land and natural resources, it is necessary for this act to take effect immediately.

Case: 25-1158    Document: 00118265993    Page: 6    Date Filed: 03/29/2025    Entry ID: 6710162

# California bill could ban foreign investors from buying state farmland

 Steve Milne

Wednesday, April 26, 2023 | Sacramento, CA

f    🐦    ✉    🔗



In this May 18, 2015 file photo, a tractor tills the dry land on the acreage farmed by Gino Celli near Stockton, Calif.

*AP Photo / Rich Pedroncelli, file*

A bipartisan bill in the state Legislature would prohibit foreign governments from buying California agricultural land.

Senate Bill 224 would also require the state to annually track — and publish — a report on foreign ownership of California resources. Foreign investors own 2.8% of California farmland, according to a 2021 U.S. Department of Agriculture report, though they would be allowed to keep that land if the measure passes.

The bill's author is Senator Melissa Hurtado, a Democrat representing the Bakersfield area. She says the intent is to put California in control of its food supply chain.

"The agricultural land in California that produces one-third of our country's vegetables and two-thirds of its fruits and nuts is invaluable to our state's GDP," Hurtado said in a prepared release. "This bill is a central part of how we get the data needed to have a better understanding of the role foreign owned governments may play in our energy and water facilities and agricultural land."

Dennis Albiani is with the California Seed Association, which opposes the bill. He says the measure could have unintended consequences.

"One of the concerns is, if we stop allowing those investments into California, will it just stop with investments or will it spread to the actual commodities won't be able to be sold, or there'll be retaliatory trade efforts," Albiani said.

This isn't the first time an iteration of this measure has made its way through California's Legislature. In 2022, the Food and Farm Security Act — also authored by Hurtado — passed in both the Assembly and Senate, but was vetoed by Governor Gavin Newsom.

In a veto letter, Newsom said that data reporting would "create new and arduous responsibilities" for the state agency initially identified in the measure, the California Department of Food and Agriculture. A different state agency, the Office of Emergency Services, was identified for the task in the new version of the bill.

The bill has passed the Senate Agriculture Committee and next heads to the Senate Appropriations Committee.

Follow us for more stories like this

**CapRadio provides a trusted source of news because of you.**  As a nonprofit organization, donations from people like you sustain the journalism that allows us to discover stories that are important to our audience. If you believe in what we do and

support our mission, **please donate today**.

**Donate Today** ›

State Government



**Steve Milne**

Morning Edition Anchor & Reporter

We Get Support From:

# With New "Alien Land Laws" Asian Immigrants Are Once Again Targeted by Real Estate Bans

by Edgar Chen

*May 26, 2023*

In Congress and in statehouses throughout the United States, lawmakers continue to introduce legislation designed to bar citizens of foreign adversaries from being able to purchase real property. Ostensibly aimed at preventing a short list of enemy governments from controlling the American food supply or spying on military facilities, these laws' most cited rationale is fear of Chinese Communist Party (CCP) influence on American soil. Sponsors argue that such legislation would safeguard agricultural land, defense, and critical infrastructure from malign foreign influence. However, much of the legislation introduced so far extends well beyond this ambit, restricting even those with no discernable ties to the CCP or other organs of Chinese state power.

These bills – which are opposed by groups including the National Asian Pacific American Bar Association, where I previously served as Policy Director and continue to advise – raise significant concerns regarding the balancing of national security equities against civil liberties, federal preemption grounds, and present a host of unintended consequences with the potential to harm the economies of affected states. Opponents of these bills have described such legislation as a revival of unconstitutional anti-Asian land laws — a class of law once called "alien land laws" — and an ongoing threat to the civil rights of all Asian Americans, regardless of ethnic background.

## Did You Say "Asians" or "Agents"?

On May 8, 2023, Florida Governor Ron DeSantis signed into law SB 264, which bars "foreign principals" — defined as government officials, members of political parties, and anyone domiciled in certain countries of concern (China, Russia, Iran, North Korea, Syria, Venezuela, and Cuba) from purchasing any agricultural land or any property within 10 miles of a military installation or critical infrastructure. The law also specifically bars any

Chinese foreign principals from purchasing any real estate whatsoever in the state, with limited exceptions for residential property by those lawfully present in the United States. Upon enactment, DeSantis proclaimed, "I'm proud to sign this legislation to stop the purchase of our farmland and land near our military bases and critical infrastructure by Chinese agents."

The legislation, however, far exceeds the purchase of strategically important land by "Chinese agents."  With few exceptions, anyone domiciled in China – regardless of non-affiliation with the CCP – is barred from purchasing real estate in Florida. Unlike Russians or Syrians, Chinese citizens are singled out and prohibited from purchasing non-residential property, even land nowhere near a military base. There are carveouts for dual U.S. citizens and green card holders, but other lawfully present Chinese nationals face further restrictions.  Violations could result in forfeiture and criminal penalties.

If part of the intent of the Florida legislation is to thwart the viability of adversarial authoritarian regimes, the law's blanket prohibition on real estate acquisition by any member of any political party from the named countries works against this. While potentially deterring single party regimes such as China and North Korea from investing in Florida, SB 264's terms would also place restrictions on Venezuelan opposition leader Juan Guiado (who was recently spotted in Miami) and Russian dissident Alexei Navalny.

Florida is not alone in ramping up legislation to ban Chinese residents and others from purchasing real estate.  Sponsors from both parties, including in California and New York have introduced drafts, and bills have advanced quickly in Texas, Louisiana, South Carolina, and Alabama presenting many of the same scoping problems. For example, SB 91 in Louisiana prohibits the *leasing* of immovable property to any citizen of China within 50 miles of a military facility, unless they hold a green card. Thus, lawfully admitted Chinese citizens present on student or employment visas studying or working at Louisiana State University would not be able to even *rent* an apartment in Baton Rouge, which houses an armed forces reserve center. Louisiana's House companion bill, HB 537 now contains exceptions for residential property, but would still restrict sales or leases of commercial property to foreign investors. While the latest version also does not apply to "lawfully present" immigrants, a prior draft only excepted valid visa holders, which would have barred most refugees, asylees, and asylum seekers, all of whom are

authorized to live and work in the United States, from renting business space. (Refugees often enter the country using State Department issued transportation letters or boarding foils, which are not technically visas, and asylees are authorized to live and work in the United States by immigration judges or the Department of Homeland Security, not generally through visas). Legislation may prevent many of these vulnerable persons, like the [63 Chinese Christians who fled religious persecution in China](#) or others escaping political oppression in Russia, Iran, Cuba, and Venezuela, from establishing roots.

## Unintended Economic Pitfalls

When first introduced, HB 537 banned any person or entity "subject to the jurisdiction of a foreign adversary" from purchasing or leasing real estate. This would have potentially swept up anyone who does business in, resides in, has assets in, or even visits one of the named countries. For example, foreign-based energy companies operating in Louisiana, who may have subsidiaries, stakes in joint ventures, or other interests in countries such as Russia or Venezuela, could technically be "subject to the[ir] jurisdiction" and would not be allowed to purchase or lease office space in the state under the introduced version.

In an amended draft, the language was changed to "connected with a foreign adversary." However, the definition of "connected with a foreign adversary" included persons "*contracted by*" foreign states. While U.S. and other energy companies have largely [exited Russia](#) due to its attack on Ukraine, others remain in the [Caspian pipeline consortium with Russia](#). Furthermore, U.S.-based and foreign oil and gas companies like Chevron still maintain [significant operations](#) in places such as Venezuela.  While this provision was later amended, it illustrates the risk for business actors.

The Florida law bars entities, whether state owned or not, that are headquartered or incorporated under the laws of foreign adversaries from purchasing farmland or land near critical infrastructure. This calls into question whether Miami's billion dollar [Brickell City Centre project](#), led by Hong Kong based Swire, would violate the new law. Smithfield Foods, the [world's largest pork producer](#), and the AMC Theatres, the [world's largest theatre chain](#), are also both owned by Chinese investors.

## Origin Story One: Concerns Over Large Scale Land Transactions in Texas and North Dakota

While the downing of a Chinese spy balloon in March 2023 underscored the ongoing espionage threat posed by China, two erstwhile land transactions in Texas and North Dakota have been widely cited as the impetus for the raft of anti-Chinese land laws.

In 2016, Chinese billionaire entrepreneur Sun Guangxin began purchasing nearly 140,000 acres of land in southern Texas to build a wind farm that would feed directly into the state's electrical grid. The transaction raised eyebrows due to Sun's ties to the CCP and his former military service with the People's Liberation Army (PLA). In 2020, the proposal was vetted by the federal interagency Committee on Foreign Investment in the United States (CFIUS), which is comprised of representatives from 16 U.S. departments and agencies, including Treasury, Justice, Commerce, Defense, Energy, and Homeland Security. CFIUS is tasked with reviewing, and if appropriate, blocking certain covered commercial transactions that could jeopardize national security. (CFIUS jurisdiction was expanded by the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA) to include real estate transactions located in proximity to sensitive governmental facilities.)

The Trump Administration, through CFIUS, ultimately declined to block the transaction even though the project was located within 50 miles of Laughlin Air Force Base, the largest training facility for Air Force pilots in the country. In response, in June 2021, Texas Governor Greg Abbott signed the Lonestar Infrastructure Protection Act (LSIPA) which barred Chinese, North Korean, and Russian companies from entering into agreements affecting infrastructure, effectively killing the project.

Similarly, in North Dakota, Chinese investment in a corn mill, originally welcomed as an economic boon, was scuttled after concerns were raised that the 370 acre farm, located near the Grand Forks Air Force Base, could be a staging ground for espionage, and a threat to the American food supply. Plans by the Chinese Fufeng Group to build the mill were also reviewed by CFIUS, which in December 2022 declined to exercise jurisdiction after determining that "greenfield" investments were not covered transactions, which generally require a foreign entity to take over control of a U.S. business, and that the nearby base was not on a designated list of particularly sensitive facilities. The decision

was [criticized](#) by the North Dakota's senators, who requested an [opinion by the Air Force](#) which later claimed that the Fufeng project "presents a significant threat to national security." Senator Marco Rubio, Vice Chair of the Senate Select Committee on Intelligence, [blasted CFIUS](#), calling the transaction "dangerous and dumb." The fate of the project was sealed when the Grand Forks City Council [voted to terminate the deal](#) in the wake of the Air Force letter.

On May 5, 2023, the Treasury Department, seemingly in response to the outcry over the Fufeng and Texas windfarm controversies, issued a [notice of proposed rulemaking](#) to add the Grand Forks and Laughlin Air Force Bases and six other military installations to the list of facilities that would be covered under the real estate provisions of CFIUS.

**Proposed Legislation Is Disproportionate to the Perceived Threat**

When SB 264 passed in Florida, the state's agriculture commissioner hailed its enactment, stating "[food security is national security.](#)" Similarly, HB 379 was introduced in Alabama in order to "[protect our agricultural interests and military facilities](#)." Despite legislators' focus on protecting the American farmland, the [U.S. Department of Agriculture (USDA) reported](#) that, as of December 2020, Chinese investors held slightly less than one percent of *foreign-held* agricultural acreage, well behind Canada which held the largest amount at 32% or 12.4 million acres and investors from the Netherlands, Italy, United Kingdom, and Germany, who collectively held 12 million acres or 31 percent of foreign-owned land. In total, foreign investors reported holding interests in nearly 37.6 million acres (2.9 percent) of all privately held farmland and 1.7 percent of all land in the United States. *Chinese owners held only 352,140 acres.*

According to the [National Agricultural Law Center](#), at least 21 states have already enacted legislation to limit foreign ownership of farmland, with states such as [Iowa](#) having near absolute restrictions on the books since the 1970s. Since 1978, the USDA has required that foreign ownership of agricultural land be registered with the agency pursuant to the Agricultural Foreign Investment Disclosure Act.

Much of the current legislation goes far beyond farmland. The Florida law prevents any Chinese citizen domiciled in China (except for U.S. citizens or green card holders) from purchasing any real estate, anywhere in the state, irrespective of whether the property

has any agricultural or strategic value. For certain Chinese visa holders and asylees already in the United States, there are exceptions to purchase a single residence, but the property is limited to two acres and cannot be within five miles of any military installation, potentially ruling out much of Tampa Bay, home to US CENTCOM, and MacDill AFB; and preventing many lawfully admitted Chinese residents from buying a condo in downtown Miami, given the two Coast Guard stations located there.

In Alabama, before a last minute Senate amendment re-focused HB 379 on governments and government officials, the bill restricted those domiciled in China from buying within a 10-mile radius of a military base or any "critical infrastructure," which is defined to include any airport, refinery, electric plant, or wastewater treatment facility. So, for example, a Chinese citizen enrolled at the University of Alabama on a student visa would not have been able to buy a condo in Tuscaloosa, which has two water treatment plants within five miles of the campus, and those on employment-based visas couldn't have purchased a home in Birmingham, Huntsville (home to the state's largest Asian American population), or in Montgomery, home to Maxwell Air Force Base.

## Constitutional Challenges and the Potential for Discriminatory Enforcement

If the legislation is an excessive response to legitimate policy concerns, what are its real goals? Critics of anti-Chinese real estate legislation have argued that such laws violate the Constitution's Equal Protection clause of the 14th amendment as they single out persons for adverse treatment based on national origin and would not survive strict scrutiny, and that provisions of these laws would violate the Fair Housing Act, which bars discrimination in any transactions related to residential housing. Indeed, just this week, a group of Chinese citizens who lawfully reside in Florida, sued the state alleging violations of both.

Lawmakers around the country have defended against allegations that their bills are unconstitutional, discriminatory, or promote anti-Asian racism, in part, by pointing to federal determinations of adversarial nations. For example, Alabama's HB 379 originally targeted only Chinese citizens, but a Senate amendment changed the bill to instead blacklist officials from a list of "foreign countries of concern" (China, Russia, North Korea, and Iran), and others on the Treasury Department's OFAC sanctions list. Legislation introduced in South Carolina and Louisiana is tethered to 15 C.F.R. §7.4,

which lists foreign governments or foreign non-government persons that have "engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States" as determined by the Secretary of Commerce.

While the "People's Republic of China" is not explicitly listed in the text of either the Louisiana Senate or South Carolina bills, lead sponsors have specifically cited to stopping China as the primary motivation. New Jersey's Doug Steinhardt introduced a bill that would bar *any* foreign government or person from buying agricultural land in the Garden State, without naming names, but declared his legislative intent to "stop the Chinese Communist Party from establishing strategic control over sprawling tract of our farmland." When DeSantis signed SB 264, he made no mention of Russian oligarchs purchasing condos in Miami, but instead issued a press released headlined, "Stop CCP Influence."

By contrast, Utah's HB 186, signed into law in March 2023, also does not explicitly mention "China," but appears more narrowly tailored to barring real estate purchases by "restricted foreign entities" rather than individuals. A "restricted foreign entity" is defined as "a company that the United States Secretary of Defense is required to identify and report as a military company" under section 1260H of the National Defense Authorization Act of 2021. This list is limited to companies known to be operating in the United States, and that are owned or controlled by the PLA, are Chinese defense contractors, or are tech companies that receive funding through the Chinese military apparatus.

What remains to be seen, even with facially neutral legislation, is how such laws will be enforced, including whether Asian Americans of any heritage may face additional unwarranted scrutiny in real estate transactions by sellers, realtors, lenders, or others seeking to comply with the laws, based on impermissible factors such as names or appearance. At a Louisiana house committee hearing, the sponsor of HB 537 explained that if there was "reasonable suspicion" that a buyer could be connected to a foreign adversary, that should trigger additional scrutiny and "investigation" – but would that suspicion be precipitated merely by a purchaser being Chinese-American? Or even Asian American? The potential for untoward, unjustified scrutiny based on perceived race or

national origin would have devastating consequences for innocent Asian Americans seeking the American dream.

## An Ounce of Preemption

As discussed above, the federal CFIUS process already scrutinizes transactions, including of real estate, that could jeopardize national security. The CFIUS regime raises questions as to whether state laws purporting to protect military facilities and combat the influence of foreign adversaries named by the federal government may be preempted by federal equities under the [Constitution's Supremacy clause](). The Supreme Court has already ruled that federal power supersedes state attempts to legislate in traditional areas of federal domain: foreign relations and immigration.

A state law may be preempted by a federal statute that contains an express preemption provision, or when states attempt to exercise jurisdiction in areas where the federal authority is exclusive, such as foreign relations, or when state laws conflict with, or stand as an [obstacle]() to federal interests. In *[Arizona v. United States](),* the Supreme Court struck down several provisions of Arizona's SB 1070, which among other things, made it a state crime for non-citizens to fail to register with the federal government and to work without authorization – both of which the Court found to be matters within the exclusive jurisdiction of the federal government. When Massachusetts attempted to impose its own sanctions regime against Burma by barring state entities from buying goods or services from companies doing business with Burma, the Supreme Court [struck down that law]() on federal preemption grounds, as an obstacle to the president's authority both to conduct diplomacy as the commander-in-chief saw fit, and to deploy the federal sanctions regime with discretion in furtherance of the administration's foreign policy preferences. Furthermore, the Court noted that the Massachusetts law conflicted with the federal regime as its scope differed from federal sanctions, and "penalized individuals and conduct that Congress excluded."

Professor Kristen Eichensehr [has argued]() that CFIUS would preempt state laws such as the LSIPA, used to undo the Texas windfarm project. Eichensehr noted that the Texas infrastructure law could be preempted as it imposes restrictions in the name of national security that differ from federal law, which, under CFIUS, allows a review of individual

transactions, not a blanket ban, and that CFIUS allows parties to negotiate and mitigate risk whereas the LSIPA does not provide any flexibilities.

From a policy standpoint, a patchwork of state laws purporting to protect federal facilities and enjoin foreign governments may undermine the federal executive's ability to conduct foreign policy with one voice. Additionally, how would states (or realtors or lenders wary about facilitating barred transactions) identify specific national security risks or individuals who may be actual agents of foreign adversaries? While CFIUS relies on the investigative and analytical power of multiple federal agencies, including the Department of Defense and the intelligence community, states do not possess such tools. Notably the LSIPA's list of barred countries that pose a threat to infrastructure is not based on a federal source, but is determined by the governor of Texas.

## Federal Responses

In response to this torrent of state bills, Congressional Asian Pacific American Caucus (CAPAC) Chair Representative Judy Chu and CAPAC Housing Task Force Chair Representative Al Green yesterday introduced the Preemption of Real Property Discrimination Act to preempt discriminatory state laws, which Chu previously noted "harken back to nativist anti-Asian alien land laws in the 19th and 20th centuries after Chinese immigrants first arrived here, and later, a xenophobic suspicion of Japanese Americans during World War II that also led to their blanket incarceration."

It is not just states, however, but her congressional colleagues who are attempting to legislate in this area: several bills in Congress would also bar foreign governments and citizens from purchasing property in the United States. On the Senate side, S. 1136, the "Not One More Inch or Acre Act" introduced by Senators Tom Cotton and Katie Britt, would bar any citizen of China, or any entity subject to Chinese jurisdiction, from purchasing real property in the United States, with the notable exception of refugees or those granted asylum, who have typically been barred under various state legislation. Representative Chip Roy has sponsored H.R. 344, the "Securing America's Land for Foreign Interference Act," which would direct the president to take necessary actions to prevent the purchase of land by CCP members or entities under the control or influence of the CCP.

## Origin Story Two: Restrictions on Asians Owning Land Have Been Part and Parcel of American History

Unfortunately, the United States has seen this movie before. Authors on *Just Security* wrote last year about the pattern of anti-Asian discrimination and purported facial neutrality under the pretext of national security legislation on the 80th anniversary of Executive Order 9066, which targeted Japanese-Americans and Japanese nationals in the United States during World War II. While that may be the most famous example of anti-Asian discrimination in the United States, it is only one of many.

Florida's newly-enacted ban on Chinese purchasers of real estate is an ironic twist to a saga that only five years ago, saw it become the last state in the union to strike discriminatory "alien land laws" from its books. In 2018, Florida voters finally removed language that had been enshrined in the constitution since 1926 which read, "all natural persons … are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, … and to acquire, possess and protect property e*xcept that the ownership, inheritance, disposition and possession of real property by aliens ineligible for citizenship may be regulated or prohibited by law*" (emphasis added).

The term "aliens ineligible for citizenship" was, as late property law Professor Keith Aoki wrote, "a disingenuous euphemism to disguise the fact that the targets of such laws were first-generation Japanese immigrants." Indeed, in 1922, the Supreme Court ruled in *Ozawa v. U.S.* that naturalization was "limited to free white persons and aliens of African nativity," leaving immigrants of Asian descent unable to gain citizenship. Historically, American immigration statutes had predominantly targeted Asians for exclusion – from the enactment of the earliest laws such as the Page Act of 1875 (barring Chinese women from entry) and Chinese Exclusion Act of 1882.

California enacted its first alien land law in 1913, and then in 1920 added further limitations on lease-holding. Similar laws were passed in Washington, Oregon, Idaho, Montana, Arizona, New Mexico, Texas, Kansas, Louisiana, Missouri, and Minnesota, Wyoming, and Florida. The rationale for these laws, in addition to suppressing economic competition, was, according to Aoki, the perceived threat of Japan's growing industrial strength, its imperial military aspirations, and the projection onto Japanese immigrants

of an image of disloyalty as a "fifth column … waiting to be activated at the emperor's command."

California's alien land law was overturned in 1952 by its state Supreme Court, which held in *Sei Fuji v. State of California* that it violated the 14th amendment and was:

> obviously designed and administered as an instrument for effectuating racial discrimination, and the most searching examination discloses no circumstances justifying classification on that basis. There is nothing to indicate that those alien residents who are racially ineligible for citizenship possess characteristics which are dangerous to the legitimate interests of the state, or that they, as a class, might use the land for purposes injurious to public morals, safety or welfare.

This ruling followed on the heels of the U.S. Supreme Court's 1948 decision in *Oyama v. California* which held that California's alien land laws abridged the 14th amendment rights of U.S. citizens of Japanese descent.

## Prognosis

Conventional wisdom holds that it is the CCP that is in the business of taking away people's property rights. As the nation heads into a presidential election year, fear mongering by state legislators may continue and more anti-China messaging bills may be introduced and passed barring Chinese and others from buying homes. With the Asian American community having just experienced a rise in hate crimes and bias-motivated incidents in the wake of false scapegoating over COVID, the deluge of anti-China legislation exacerbates long held perceptions of Asian Americans as perpetual foreigners, who hold loyalty to their ancestral homelands rather than the United States.

These laws on their face may make superficial efforts to distinguish between persons of Chinese ancestry and the CCP, but they also equate all Chinese denizens with foreign agents, and imply they pose national security threats regardless of lack of party or state affiliation. In a country where a Chinese American like Vincent Chin was murdered by disgruntled autoworkers who believed he was Japanese, or Sikh Americans were targeted after 9/11, technical distinctions will not allay concerns of racial profiling. Still, grassroots efforts to mitigate harms and narrow scoping do appear to be working in some

places. In the United States, unlike in China, the people can – and should – actually do something about problematic laws by apprising legislators of the economic, reputational, and constitutional perils of these bills.

*IMAGE: Florida Gov. Ron DeSantis speaks during a press conference held at the Florida National Guard Robert A. Ballard Armory on June 07, 2021 in Miami, Florida, announcing the signing of two bills including SB 264. (Photo by Joe Raedle/Getty Images)*

## About the Author(s)

### Edgar Chen

Edgar Chen served for a decade at the U.S. Department of Justice, including as Counsel to the Assistant Attorney General for the Criminal Division, in the Office of Legislative Affairs, and as senior trial attorney leading investigations and civil and criminal cases against suspected human rights violators. Among his previous work, he was Policy Director for the National Asian Pacific American Bar Association and continues to advise the organization on combating anti-Asian hate crimes and discrimination.

# The Trump Administration's 14th Amendment Retcon: 'Wong Kim Ark' Does Not Limit Birthright Citizenship

by Edgar Chen and Chris M. Kwok
*March 28, 2025*

It was no coincidence that President Donald Trump announced on the campaign trail that he would seek to end birthright citizenship via executive order on the heels of the 125th anniversary of the Supreme Court's decision in *United States v. Wong Kim Ark*. For well over a century, Congress, the courts, the executive branch, and the American public have understood and adhered to the principle set forth by the Court in 1898 that U.S. citizenship is automatically conferred to anyone born in the United States (except the children of diplomats and occupying foreign powers). Trump's Executive Order No. 14160, however, distorts the *Wong Kim Ark* decision, apparently in the belief that the Court's language provides a blueprint to limit birthright citizenship only to the children of U.S. citizens and lawful permanent residents ("LPRs" or green card holders). Not so.

Despite the fact that the 14th Amendment's citizenship clause does not include the words "permanent," "domicile," or "residence," the government has argued that the Supreme Court in *Wong Kim Ark* was "careful to cabin its actual holding to the children of those with a 'permanent domicile and residence in the United States,'" because that is how the Court described Wong Kim Ark's parents' legal status. Therefore, it stands to reason, says the government, that only children of U.S. citizens or lawful permanent residents are eligible for birthright citizenship.

By doing so, the government attempts to draw a fraught analogy between lawful permanent residents of today and Wong Kim Ark's parents. While some of the words sound the same ("permanent domicile and residence" and "lawful permanent resident"), they have completely different legal meanings. To retcon Wong Kim Ark's parents as the equivalent of current day green card holders is both legally and historically mistaken.

Wong Kim Ark's parents did have a fixed address in the United States (751 Sacramento St. San Francisco, CA), which the Court in 1898 described as their "permanent domicil and residence." But that is where the similarities end; as we discuss below, that address was far from permanent.

**Chinese migrants like Wong's parents did not have anywhere near the same rights or responsibilities as modern-day green card holders.**

First and foremost, today's green card holders have a [pathway to U.S. citizenship](#). Although [Congress in 1868's Expatriation Act stated,](#) "this Government has freely received emigrants from all nations, and invested them with the rights of citizenship," this was not true for *any immigrant* from Asia, including Wong Kim Ark's parents. Chinese migrants were implicitly or explicitly prohibited from citizenship by the [Naturalization Act of 1790](#) (which limited naturalization to free white persons), by [treaty](#), by the [Chinese Restriction (often better known as "Exclusion") Act of 1882,](#) and later Supreme Court [precedent.](#)

Second, today's green card holders are [free to travel](#) outside the United States and return, something that Chinese migrants, beginning in the 1880s could not easily do. Todays' LPRs may travel internationally [on the condition](#) that they return to the United States or abandon their green cards. For Chinese migrants in Wong Kim Ark's time, however, the United States made it extraordinarily onerous to leave and return. They were required under the 1882 Exclusion Act to obtain "Certificates of Reentry" in order to leave the United States and return. To obtain such certificates, Chinese people had to have White persons bear witness to their status. The Supreme Court in *[Fong Yue Ting v United States](#)* upheld this requirement even against a Chinese man placed in deportation proceedings because he did not know any White people who could attest and was unable to obtain the necessary signatures.

In another case, a longtime California resident, Chae Chan Ping, left for a visit to China with a valid certificate of re-entry in 1887, and, and while he was on a ship returning to San Francisco a year later, a new statute passed invalidating all reentry certificates, his included. The Supreme Court in 1889 [upheld Chae Chan Ping's exclusion](#), writing of Chinese migrants, "they remained strangers in the land, residing apart by themselves and

adhering to the customs and usages of their own country. It seemed impossible for them to assimilate with our people or to make any change in their habits or modes of living."

In 1895, the Court affirmed the exclusion of [Lem Moon Sing,](#) who, like Wong Kim Ark's parents, was a Chinese merchant described by the Court as having "permanent domicile" in San Francisco, but who was refused entry back to the United States after a visit to China. Upholding a border officer's decision, the Court stated that Lem "cannot, by reason merely of his domicile in the United States for purposes of business, demand that his claim to reenter this country" be decided by the courts. It is clear that many Chinese people who purportedly had "permanent domicile and residence" during this period, lost that right as soon as they left the United States, distinguishing them from today's lawful permanent residents.

Third, green card holders [may petition](#) for their children and spouses residing overseas to join them permanently in the United States, conferring upon those relatives their own pathway to citizenship. For Chinese migrants in the United States at the turn of the century, however, the inability to reunite with family members compelled circumvention of discriminatory laws and created a whole generation of "[paper sons](#)" – aspiring immigrants who paid U.S. born Chinese Americans to pretend to be their birth fathers in order to claim derivative U.S. citizenship. Indeed, these discriminatory anti-Chinese laws transformed today's so-called "model minorities" into our nation's first "illegal aliens."

Meanwhile, today's LPRs must all [demonstrate admissibility,](#) which means they are carefully scrutinized on a variety of criteria including health-, national security-, and public safety- related grounds. LPRs are required to pay federal income taxes, and men 18 to 26 must register for selective service. [Green card holders are entitled](#) to live permanently in the United States, work at any legal work of their choosing (with the exception for certain national security jobs), and be protected by all the laws of the United States and state and local jurisdictions. As we outline below, many of these privileges were largely to denied to Chinese migrants.

**Chinese Migrants like Wong's parents faced draconian legal restrictions and ethnic cleansing and did not have the protections of law afforded to immigrants today.**

Wong Kim Ark's parents lived in the United States at a time when Chinese migrants faced xenophobic sentiment, accompanied by widespread violent attacks, expulsions, lynchings, and systematic legal restrictions. Chinese migrants first arrived in the United States in large numbers beginning in 1849, lured by the prospect of riches from the California Gold rush and, through grueling and often deadly labor, built the most dangerous portion of the transcontinental railway at a cost of over a thousand dead. When this project was completed, America was united from west to east for the first time, and travel time dropped from seven months to seven days. This set the stage for the United States to emerge as a worldwide economic and political powerhouse.

But these contributions did not mean acceptance. California, in particular, enacted an increasingly restrictive series of prohibitions specifically targeting Chinese migrants and generated contentious litigation resulting in watershed civil rights decisions. These included: a ban on Chinese children attending public school (*Tape v. Hurley*); a ban on Chinese people testifying in court against White people (*People v. Hall*) (effectively making it impossible to convict a white person on charges of assaulting or killing Chinese people); and a ban on Chinese people working for any California company or in any public sector job, both of which were enshrined in the 1879 California Constitution in a section simply captioned, "Article XIX. Chinese." Additional restrictions included bans targeting Chinese Laundries (resulting in the landmark *Yick Wo v. Hopkins*, which held a facially neutral law could be discriminatory), and even the shearing of braided hair worn by Chinese in queues (*Ho Ah Kow v. Nunan*, the so-called "Pigtail Ordinance").

The same vitriol aimed at immigrants today (in particular, use of the term "invasion" by the president) was directed at Chinese who were accused of arriving in overwhelming numbers to steal jobs from Americans and threaten our way of life. The Supreme Court in the *Chae Chan Ping* case acknowledged the outcry from California politicians who described Chinese immigration then, much as the president does about other immigrant communities today, as "approaching the character of an Oriental invasion."

In October 1871, nativist anger erupted into mob violence as approximately 19 Chinese people were killed in Los Angeles in one of the largest lynchings in American history. Elsewhere throughout the American west, nearly 30 Chinese people were murdered in the 1885 Rock Springs massacre in Wyoming, and the same year in Tacoma, Washington,

anywhere between 150 to 200 Chinese people were expelled at gunpoint and their dwellings burned to the ground. These were not one-off race riots. According to historian Beth Lew Williams, between 1885-1886, at least 168 communities across the U.S. west drove out their Chinese residents. This was nothing short of ethnic cleansing, but far less known than the violent removal of Native Americans from their lands and later Japanese incarceration.

Indeed, in stark contrast to the government's current day description of Wong's parents as having "permanent residence," they returned to China shortly after his birth, and as historians have suggested, in the aftermath of an anti-Chinese pogrom in July of 1877. A mob of hundreds attacked San Francisco's Chinatown, and in the words of the *New York Times*, they had "resolved to exterminate every Mongolian and wipe out the hated race." Businesses were looted and torched and four Chinese were killed. Historians recite a systematic wave of anti-Chinese violence and expulsions across the west coast that could fairly be described as a campaign of ethnic cleansing. According to Professor Amanda Frost, Wong Kim Ark's parents "likely never considered America to be their permanent home, however, and for good reason. 'The Chinese must go,' became the populist slogan of the California's Workingmen's Party."

At the time of Wong Kim Ark's parents' arrival in San Francisco, there was no federal immigration law as we know it today and the U.S. essentially had open immigration. There was no such thing as visas or green cards; no such thing as ICE or INS, no border controls, no Ellis Island, and no concept of "illegal immigration" (notwithstanding 1803 and 1807 bans on importation of enslaved persons: which as Professors Jack Chin and Paul Finkelman argue, gave rise to illegally trafficked persons whose children were later granted citizenship under the 14th Amendment). While the presence of Wong's parents was federally permitted under the 1868 Burlingame Treaty (designed to allow U.S. business interests to have access to markets in China), Congress soon enacted the nation's first restrictive immigration law – the Page Act of 1875 which forbade Chinese women from entering the United States. The law, ostensibly designed to curtail alleged prostitution from Asia, had the effect of preventing Chinese men already in the United States from being able to marry and have children, and in fact necessitated their return to China if they wished to marry and start a family. It was under these circumstances that

Wong Kim Ark himself returned to China to marry and visit his family, and was stopped on his return, leading to the Supreme Court case that bears his name.

This history is important to understand as it continues to be repeated. While laws like the Chinese Exclusion Act were believed to be a relic of the late 19th Century, in 2025 a bill in Congress has been introduced that would bar visas from being issued to any Chinese student.  Together with resurgent alien land laws (also reminiscent of early 20th century property bans on Asians) the United States appears to be ushering in a new era of Chinese Exclusion 2.0.

## The Administration will not find support from Wong Kim Ark to justify disparate treatment based on differing immigration status.

Other authors on *Just Security* have tracked arguments regarding the merits of arguments about what the 14th Amendment's "subject to the jurisdiction of the United States" provision means. While that is not our focus, understanding the historical context in which the case of Wong Kim Ark's parents was decided can be instructive here too in analyzing EO 14160's harsher treatment of those who are undocumented or lawfully present in the United States but not LPRs. For example, while some supporting the administration's views have urged that only those who pledge full political allegiance to the United States are covered by the 14th Amendment, remember that the Supreme Court also described Wong's parents as "subjects of the Emperor of China." Moreover, because there was no distinction between legal and undocumented immigration at the time of his birth, the administration can draw no support from the *Wong Kim Ark* case to deprive current day undocumented persons from access to birthright citizenship. The 1868 Burlingame Treaty also provided that "Chinese subjects *visiting or residing* in the United States, shall enjoy the same privileges, immunities…" (emphasis added) – in other words, Chinese tourists in the 1870s had the same rights as those wishing to remain longer. Thus, EO 14160's treatment of lawfully present non-citizens (including those here on student, work, or tourist visas) finds no solace in *Wong Kim Ark*.

## EO 14160 would have a devastating and disproportionate effect on today's Asian American population.

If EO 14160 is upheld, the impact on today's Asian American community would be devastating. 68 percent of Asian American adults in the United States are immigrants.

Asian immigrants of all legal statuses account for a substantial percentage of the United States' overall immigrant population: they make up an estimated 17 percent of undocumented immigrants, and more than 88 percent of individuals holding H1-B visas for specialized occupations especially in the STEM fields were born in Asia. A majority of international students in the U.S. hail from Asia.  Children of immigrants from any of these categories are excluded from birthright citizenship under EO 14160. With over 108,000 young persons born in Asia eligible for DACA protections, their children would be barred under the Order. These Asian Americans know no other country of allegiance and have been educated and raised by immediate family in the United States. Shockingly, the government cites to policy positions that mischaracterize undocumented persons as "individuals who lack any meaningful ties to the United States." Ask that of Tereza Lee, the Korean American who was born in Brazil, and brought to the United States at two years old. She is the original "Dreamer" and an inspiration for the popular and bipartisan DREAM Act.

Finally, a note about refugees and asylees. In addition to abolishing birthright citizenship, Trump has also suspended refugee admissions. After the influx of European refugees fleeing post-World War II Europe, a majority of refugees arriving later in the United States have been from Asia. For example, following the Vietnam War, nearly three million persons from Southeast Asia fled war and persecution in their homelands to seek refuge in the United States, including many who fought alongside the U.S. military. Today, China is among the top three leading countries of nationality for persons granted asylum in the United States. Asylum seekers, regardless of the mode of entry, have fled persecution abroad and affirmatively sought the full physical and political protections of the United States. In other words, they are pleading for the right to give obedience and allegiance to the United States. By law, asylum seekers cannot travel to their home countries, or even renew their old passports, without risking their asylum claims or status, lest they avail themselves of any of the privileges of their origin country's citizenship. For asylees, once they are in the United States, they are here to stay and to become Americans. When granted asylum, they too, have a pathway to U.S. citizenship, and asylees (together with refugees) have some of the highest rates of naturalization of any class of immigrants, demonstrating that overwhelmingly, their allegiance all along has been to the United States and not their prior countries, where they experienced persecution.

The origin story of U.S. immigration *law* is one that firmly has its roots in the exclusion of Chinese migrants and the literally thousands of cases filed by them to vindicate their rights. These cases laid the foundation for today's immigration legal regime, including the border control and enforcement mechanisms we know today. It was not until the Immigration Act of 1891 that the federal government assumed direct control over the inspection and admission of immigrants. The 1891 Act was designed to expand upon the Chinese Restriction (Exclusion) Act of 1882 to bar those *other* than Chinese including: "all idiots, insane persons, paupers, or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony …polygamists," among others. It is telling that the first Supreme Court case upholding the 1891 Act and the federal government's sweeping new immigration powers was *Nishimura Ekiu v. United States,* involving a Japanese woman who was denied entry under the law.

The 20th century brought the 1924 Immigration Act and a permanent bar on migration from Asia along with widespread policies in states with Asian immigrant populations prohibiting them from purchasing real property (so called "alien land laws") – another sign that the United States never intended Asians migrants to have an enduring or permanent presence in this country.

The 14th Amendment was a crown jewel of Reconstruction, through which America refashioned itself out of the ashes of the Civil War. Central to this was the question of citizenship status of the 4.5 million formerly enslaved African Americans and their children. Because of *Dred Scott,* it was critical that the answer be contained in the Constitution. And so, the straightforward language that proclaimed all those born in the United States as citizens became the highest law in the land. When the Supreme Court deliberated for more than a year on Wong Kim Ark's fate, one of the overhanging questions was of the status of the children of non-naturalized white immigrants.   If Wong Kim Ark was denied citizenship, chaos would ensue, as Professor Frost argued, and hundreds of thousands of children of European migrants who had not renounced their loyalties to Britain, Germany or France or other nations, would not be citizens.  The Court's answer was to craft a straightforward rule that would lay the foundation of the new America that was to emerge – a nation which included those born on its soil – Black, White and, yes, even Chinese. For the court to rule otherwise would return America to

the exclusionary legal architecture of Dred Scott The 14th Amendment and the Supreme Court now sent a  new message: While African Americans had previously never been imagined as being part of the American polity and Chinese migrants could not even naturalize – now their children would be American citizens by birth.  A new nation had emerged.

*Editor's note: This piece is part of the* [Collection: Just Security's Coverage of the Trump Administration's Executive Actions](#)

*IMAGE: Departure Statement, Wong Kim Ark Record Group 21. USDC No. District Court of CA, SF Admiralty Case File #11198, Departure Statement of Wong Kim Ark, 1894. National Archives Identifier: 2641490. (Via National Archives)*

## About the Author(s)

### Edgar Chen

Edgar Chen served for a decade at the U.S. Department of Justice, including as Counsel to the Assistant Attorney General for the Criminal Division, in the Office of Legislative Affairs, and as senior trial attorney leading investigations and civil and criminal cases against suspected human rights violators. Among his previous work, he was Policy Director for the National Asian Pacific American Bar Association and continues to advise the organization on combating anti-Asian hate crimes and discrimination.

### Chris M. Kwok

Chris M. Kwok is an Adjunct Assistant Professor in Asian American studies at Hunter College.