NOTICE :



Colleen Connors <cmcolleen4@gmail.com>

---

## Your recent correspondence regarding EPA Complaint No. 07D-24-R5

**Colleen Connors** <cmcolleen4@gmail.com>                                    Tue, Apr 1, 2025 at 4:16 PM
To: "Cormack, Hayley" <Cormack.Hayley@epa.gov>, yuri.s.fuchs@usdoj.gov, SupremeCtBriefs@usdoj.gov, Deborah Greenspan <deborah.greenspan@blankrome.com>, derek.l.weiss@usdoj.gov, Zeldin.Lee@epa.gov, mobrien@irli.org, chajec@irli.org, gcanaan@irli.org, gwv@dcglaw.com, tmccotter@boydengray.com, daniel.epstein@aflegal.org, "jon@publicrightsproject.org" <jon@publicrightsproject.org>, serviceS3@michigan.gov, giovanatiN@michigan.gov, Stacey.Metro@ag.ny.gov, Annabelle.Wilmott@doj.ca.gov, Lorraine.Lopez@doj.ca.gov, Delbert.Tran@doj.ca.gov, zoe.levine@ag.ny.gov, Irina.Trasovan@doj.ca.gov, "denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>, "robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>, "brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>, jgrayson@nmdoj.gov, molly.alarcon@sfcityatty.org, "david.louk@sfcityatty.org" <david.louk@sfcityatty.org>, shannon.stevenson@coag.gov, ksadeck@riag.ri.gov, jared.b.cohen@mass.gov, john.keller@ag.state.mn.us, johnsonkarpg@doj.state.wi.us, julio.thompson@vermont.gov, dmosteller@ncdoj.gov, "jeremy.feigenbaum@njoag.gov" <Jeremy.feigenbaum@njoag.gov>, shankar.duraiswamy@njoag.gov, Viviana.hanley@njoag.gov, shefali.saxena@law.njoag.gov, Elizabeth.walsh@law.njoag.gov, HStern@ag.nv.gov, akirschner@oag.state.md.us, Janelle.Medeiros@ct.gov, PolicyOffice@epa.gov, EIS-Filing@epa.gov, education@epa.gov, NEPAssisthelp@epa.gov, NEPA@epa.gov, eric.wessan@ag.iowa.gov, matt.rice@ag.tn.gov, nlindzen@corpfraudlaw.com, sara.eisenberg@sfcityatty.org, MEL JONES JR <jonesjrmel@gmail.com>
Cc: Colleen Connors <cmcolleen4@gmail.com>, "Acosta-Fox, Ashley" <AcostaFox.Ashley@epa.gov>, "Marissa.Malouff@doj.ca.gov" <Marissa.Malouff@doj.ca.gov>, "vanessa.kassab@delaware.gov" <vanessa.kassab@delaware.gov>, "kaliko.d.fernandes_hawaii_gov" <kaliko.d.fernandes@hawaii.gov>, "harrist19@michigan.gov" <harrist19@michigan.gov>, "eng.connie@epa.gov" <eng.connie@epa.gov>, "egle-nondiscriminationCC@michigan.gov" <egle-nondiscriminationCC@michigan.gov>, "EGLE-Accessibility@michigan.gov" <EGLE-Accessibility@michigan.gov>, "Faltin, Todd (he/they)" <Faltin.Todd@epa.gov>, "Oviedo, Luis" <oviedo.luis@epa.gov>, "MacMillan-Sanchez, Ariel (she/her/hers)" <MacMillanSanchez.Ariel@epa.gov>, "Johnson, Johahna (she/her/hers)" <Johnson.Johahna@epa.gov>, "Mason, Trinita" <Mason.Trinita@epa.gov>, "Moore, Tammy" <moore.tammy@epa.gov>, "Walts, Alan (he/him/his)" <walts.alan@epa.gov>, "Risley, David" <Risley.David@epa.gov>, "tmlewis@cityofflint.com" <tmlewis@cityofflint.com>, "cmcgehee@pittlawpc.com" <cmcgehee@pittlawpc.com>, "eric.a.rey@usdoj.gov" <eric.a.rey@usdoj.gov>, "Jason.T.Cohen@usdoj.gov" <Jason.T.Cohen@usdoj.gov>, "OIG_Hotline@epa.gov" <OIG_Hotline@epa.gov>, Corey <cstern@levylaw.com>, Patrick Lanciotti <PLanciotti@napolilaw.com>, "dpettway@cityofflint.com" <dpettway@cityofflint.com>, "saneeley@cityofflint.com" <saneeley@cityofflint.com>, "mbard@cityofflint.com" <mbard@cityofflint.com>, "michelle.t.domingue.II@usdoj.gov" <michelle.t.domingue.II@usdoj.gov>, "Kaplan, Robert (he/him/his)" <kaplan.robert@epa.gov>, Mel jones jr <meljonesjr@gmail.com>, "marianne.f.kies@usdoj.gov" <marianne.f.kies@usdoj.gov>, "daniel.c.eagles@usdoj.gov" <daniel.c.eagles@usdoj.gov>, "kuhlr@michigan.gov" <kuhlr@michigan.gov>, "gambilln@michigan.gov" <gambilln@michigan.gov>, "MitosinkaA@michigan.gov" <MitosinkaA@michigan.gov>, "gaiello@mayerbrown.com" <gaiello@mayerbrown.com>, "jkuptz@cityofflint.com" <jkuptz@cityofflint.com>, "dfaraci@campbell-trial-lawyers.com" <dfaraci@campbell-trial-lawyers.com>, "alin@eisnerlaw.com" <alin@eisnerlaw.com>, "ccmushatt@cityofflint.com" <ccmushatt@cityofflint.com>, "heidy.gonzalez@usdoj.gov" <heidy.gonzalez@usdoj.gov>, AG attorney as to MI COC civil case #23-000115-MZ <bettenhausenm@michigan.gov>, robinsonr11 <robinsonr11@michigan.gov>, Justus Brown <jubrown@cityofflint.com>, Kameshia Ar-Rahmaan <kar-rahmaan@cityofflint.com>, Davina Rahmaan <ddonahue@cityofflint.com>, City of Flint Clerk's Office <cityclerk@cityofflint.com>, Davina Donahue <CouncilPublicComment@cityofflint.com>, "trachelleyoung@gmail.com" <trachelleyoung@gmail.com>, Ladel Lewis <llewis@cityofflint.com>, Judy Priestley <jpriestley@cityofflint.com>, Tonya Burns <tburns@cityofflint.com>, Mark Cuker <mark@cukerlaw.com>, "michael.l.williams@usdoj.gov" <michael.l.williams@usdoj.gov>, "molsen@mayerbrown.com" <molsen@mayerbrown.com>, "jcampbell@campbell-trial-lawyers.com" <jcampbell@campbell-trial-lawyers.com>, "mnguyen-dang@mayerbrown.com" <mnguyen-dang@mayerbrown.com>, "pnapoli_napolilaw.com" <pnapoli@napolilaw.com>, Renee Auten <rauten@thelandbank.org>, Jennifer Riggs <jriggs@thelandbank.org>, Jeremy Maltz <jeremy@lehotskykeller.com>, "hammoudf1@michigan.gov" <HammoudF1@michigan.gov>, Michigan Attorney General <miag@michigan.gov>, "dweyre@mcalpinepc.com" <dweyre@mcalpinepc.com>, "g@mayerbrown.com"

<g@mayerbrown.com>, "ljiang@susmangodfrey.com" <ljiang@susmangodfrey.com>, mpitt <mpitt@pittlawpc.com>, Hunter Shkolnik <hunter@napolilaw.com>, "arosenman@mayerbrown.com" <arosenman@mayerbrown.com>, Theodore Leopold <tleopold@cohenmilstein.com>, Emmy Levens <elevens@cohenmilstein.com>, Flint Mayor <mayor@cityofflint.com>, "frank.bednarz@hlli.org" <frank.bednarz@hlli.org>, "ted.frank@hlli.org" <ted.frank@hlli.org>, Diane <russell.diane@epa.gov>, Amanda Trujillo <atrujillo@cityofflint.com>, "King-Piepenbrok, Pier (AG)" <KingP1@michigan.gov>, "jonhoma@sinasdramis.com" <jonhoma@sinasdramis.com>, "val@vlwlegal.com" <val@vlwlegal.com>, "sdg@miller.law" <sdg@miller.law>, "sparadise@eisnerlaw.com" <sparadise@eisnerlaw.com>, "echeverria.marietta@epa.gov" <echeverria.marietta@epa.gov>, "thompkins.anita@epa.gov" <thompkins.anita@epa.gov>, "burneson.eric@epa.gov" <burneson.eric@epa.gov>, "travers.david@epa.gov" <travers.david@epa.gov>, "waters.tom@epa.gov" <waters.tom@epa.gov>, "davis.angela@epa.gov" <davis.angela@epa.gov>, franklmcnamara@gmail.com, mriordan@publicinterestlegal.org, eric.hamilton@usdoj.gov, "ryan@mclanelaw.com" <ryan@mclanelaw.com>, Sedalia.JonesKennelly@blankrome.com, rick.brooks@blankrome.com

DATE: April 1, 2025

Good afternoon Hayley Cormack,

Melvin Jones Jr. wants me to relay the following to you:

- A lot has changed in the United States, and the world, since Joe Biden left office. If you want some good reading, take a look at Project 2025, which is a plan and protocol that includes getting rid of the US EPA Title VI department, which doesn't do anything anyway.
- Your time would be better spent polishing your resume than on emailing him [and me] regarding EPA Complaint No. 07D-24-R5, because President Trump, EPA Administrator Lee Zeldin, and Elon Musk are not through slashing jobs at the EPA.
- Mr. Jones believes and prays every day that the EPA will pay "through the nose" as to the Flint Water settlement for their role in the Flint Water Crisis.

Mr. Jones and I are both Claimants in the Flint Water settlement. We believe that the US EPA is an unmitigated joke and has been rendered so by Trump, Zeldin, and Musk. We also believe that the US EPA is self-aggrandizing in that it will go after the Michigan EGLE for a website but blatantly ignored/continue to ignore its responsibilities to the City of Flint and the State of Michigan regarding the Flint Water Crisis .

Flint Water Crisis aside, here's an example of how the US EPA Title VI department doesn't do anything: In 1992 in Flint, Michigan, the St. Francis Prayer Center filed a civil rights complaint with the US EPA Title VI department, but it wasn't until 2017—25 years later—that the US EPA Title VI department rendered a decision in the case—then proceeded to close the case without requiring any remedy.

Mr. Jones is in pain, which he has informed you of, and I am busy. We couldn't care less what you do regarding EPA Complaint No. 07D-24-R5; withdraw it for all we

care. However, please **do not** email either of us again regarding Complaint No. 07D-24-R5, or for any other reason.

Thank you,

Colleen Connors

_____

[Quoted text hidden]

 EPA Accessibility Statement Webpage.pdf
1162K





## ENVIRONMENTAL JUSTICE, DENIED

# Rare discrimination finding by EPA civil-rights office

 by **Talia Buford**
January 25, 2017

---

**Reading Time: 3 minutes**

The U.S. Environmental Protection Agency's civil-rights office has made a rare finding of discrimination, saying the Michigan Department of Environmental Quality treated African American residents of Flint unfairly during the permitting of a power plant more than two decades ago.

In a **letter** dated Jan. 19, the last full day of the Obama administration, the EPA's External Civil Rights Compliance Office said the evidence showed that "African Americans were treated less favorably than non-African Americans" during permit hearings for the **Genesee Power Station** – which burns wood waste and other debris – from 1992 through 1994. A "preponderance of the evidence in EPA's record would lead a reasonable person to conclude that race discrimination was more likely than not the reason …," office director Lilian Dorka wrote to the complainant, Father Phil Schmitter of the St. Francis Prayer Center in Flint.

In a statement, Schmitter said, "Communities of color and schoolchildren have had to grow up near this horrible power plant and be subjected to its harmful emissions. It's unbelievable that it took EPA decades to make this finding, but it's important to send a clear message to MDEQ, even now, that it needs to change the way it does business."

A Center for Public Integrity **investigation** in 2015 detailed the EPA's anemic enforcement of **Title VI** of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, religion, sex or national origin by recipients of federal funding. The analysis showed that the civil-rights office hadn't made a finding of discrimination in 22 years – apart from a **preliminary one** in 2011 – despite having received hundreds of complaints. Last year, the U.S. Commission on Civil Rights **cited the Center's work** in a performance review that found the EPA was failing to meet its obligations under the act.

In last week's letter to Schmitter, the EPA found that MDEQ officials "deviated from … standard operating procedures [at public hearings] on more than one occasion to the detriment of African Americans." For example, it said the department used armed guards to intimidate speakers and closed hearings before all who wanted to speak had done so. The letter recommends, among other things, that the MDEQ improve its public-participation policies and add information about non-discrimination laws to its website. The department has failed to operate a "foundational nondiscriminatory program" for almost 30 years, the letter said.



The Genesee Power Station in Flint, Mich., a poor, largely African-American city.

In a statement, the department said it "disagrees with the EPA assertion that MDEQ has not taken sufficient action to address public participation, especially in minority communities… Above all, our purpose is to respect Michigan residents and to protect public health and the environment."

The EPA's finding on the Genesee plant is separate from "additional and current serious concerns" the agency has expressed about the MDEQ's handling of the **drinking-water crisis** in Flint. There is no public record of any civil-rights cases having been filed, but the EPA **told BNA** it received at least two emailed complaints alleging discrimination by state, county and city officials after Flint's water supply was tainted with brain-damaging lead in 2014.

In **another letter** on Jan. 19, the EPA announced that the New Mexico Environment Department had agreed to take steps to improve the public-participation process for a proposed **hazardous-waste disposal site** in the southeastern part of the state. A group called Citizens for Alternatives to Radioactive Dumping had filed a civil-rights complaint against the department in 2002, alleging it had shown a pattern of discrimination against Spanish-speaking residents. Under the agreement, the department said it would "develop, publish and implement written procedures to ensure meaningful access to all of NMED's programs and activities by all persons, including access by limited English-proficient individuals…"

Deborah Reade, who filed the complaint on behalf of the citizens' group, said in a statement, "It took far too long to get to this point. But finally there's an agreement in place that should lead to more equitable public participation so communities' voices are heard when permits to pollute are being considered. We'll be watching to make sure that New Mexico implements the agreement."

4/1/25, 3:38 PM                    Rare discrimination finding by EPA civil-rights office - Center for Public Integrity

The EPA's findings in the Michigan and New Mexico cases represent an uptick in activity by a civil-rights office – recently moved into the agency's Office of General Counsel – long criticized for failing to act on complaints alleging Title VI violations.

"Credit for the EPA's movement on civil rights complaints goes to the communities and groups that pushed hard for discriminatory practices to be addressed," said Marianne Engelman Lado, a visiting professor at Yale Law School and a former attorney with the public-interest law firm Earthjustice, which has lodged several complaints with the office on behalf of minority communities.

The EPA did not respond to requests for comment.

Pingback:
'Treated like a backyard': pipeline violates civil rights, say Brooklynites | New York – Ghana Editor

Pingback:
'Treated like a backyard': pipeline violates civil rights, say Brooklynites | New York – Our All News

Pingback:
'Treated Like A Backyard': Pipeline Violates Civil Rights, Say Brooklynites

Pingback:
'Treated like a backyard': pipeline violates civil rights, say Brooklynites - Pehal News

Pingback:
Pipeline Violates Civil Rights, say New Yorkers - Legal Regulation Review

Pingback:
'A slap in the face': pipeline violates civil rights, say New Yorkers - The Guardian - Loans Online

# Comments are closed.

© 2025 Center for Public Integrity

Powered by Newspack



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## WASHINGTON, D.C. 20460

EXTERNAL CIVIL RIGHT COMPLIANCE OFFICE
OFFICE OF GENERAL COUNSEL

January 19, 2017

**Return Receipt Requested**
Certified Mail# 7015301000112675188

**In Reply Refer to:**
EPA File No. 01R-94-R5

Father Phil Schmitter
1832 Seymour Avenue
Flint, Michigan 48503

Dear Father Schmitter:

This letter is to advise you that the US Environmental Protection Agency's (EPA) External Civil Rights Compliance Office[1] (ECRCO) has completed its investigation of the above-referenced Complaint (Genesee Complaint) and is resolving and closing[2] this case as of the date of this letter. The Genesee Complaint was dated December 15, 1992, and filed by you on behalf of the St. Francis Prayer Center (Complainants).[3] The Genesee Complaint was filed under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d et seq., (Title VI) and EPA's nondiscrimination regulations found at 40 C.F.R. Part 7.

EPA's investigation focused on allegations of discrimination by the Michigan Department of Natural Resources (MDNR) (later becoming the Michigan Department of Environmental Quality's (MDEQ))[4] and the Michigan Air Pollution Control Commission (MAPCC)[5] based on

---

[1] Formerly the Office of Civil Rights. To eliminate confusion, except where quoting another document, this letter will use the Office's current name, rather than its name at the time of any particular action or correspondence.

[2] The preliminary finding is made pursuant to 40 C.F.R. §115(c)(1)(i). Given the age of the facts relied upon to make this preliminary finding, EPA is not making recommendations pursuant to 40 C.F.R. §115(c)(1)(ii) which triggers notification of the recipient of its right to engage in voluntary compliance negotiations under 40 C.F.R. §115(c)(1)(iii). However, as explained in this letter, EPA will consider issues related to MDEQ's current public participation process within the context of the pending Flint Complaint (EPA File No. 17RD-16-R5) which raises similar issues regarding public participation in the current day context. Therefore, this case, 01R-94-R5, is closed as of the date of this letter and requires no further action.

[3] Letter from Father Phil Schmitter and Sister Joanne Chiaverini, St. Francis Prayer Center, to Mr. Valdas Adamkus, Regional Administrator, Region 5, US EPA (Dec. 15, 1992) enclosing letters dated Dec. 15, 1992, to Mr. Herb Tate, Environmental Equity, US EPA and Mr. William Rosenberg, US EPA.

[4] To eliminate confusion, except where quoting another document, this letter will use the MDEQ's current name, rather than its name at the time of any particular action or correspondence.

[5] In 1992, the MAPCC was made up of eight commissioners appointed by the Governor representing different state agencies and public interests *See* MCL § 336.13 (1992). The MAPCC reviewed both MDEQ Air Quality Division staff recommendations and public comment before approving or disapproving applications for all air permits with significant public interest, including the GPS permit. MCL § 336.15 (1992).

Father Phil Schmitter

race related to granting of a permit to the Genesee Power Station (GPS) in Flint, Michigan under the Clean Air Act (CAA).[6] The MAPCC and MDNR, were recipients of EPA financial assistance at the time of the alleged discriminatory acts. The MDEQ has received, and continues to receive, federal grants from EPA to run the Michigan Air Pollution Control Program, which carries out the functions formerly delegated to the MAPCC and the MDNR. The CAA permit function currently resides in the Air Quality Division of the MDEQ.

With this letter, EPA makes findings with respect to the original issues raised in this complaint and closes EPA File No. 01R-94-R5. However, EPA also has additional and current serious concerns, set forth below, that are being examined in the context of another ongoing EPA investigation involving MDEQ. That investigation is focused on alleged discrimination by MDEQ based on race, national origin, and disability[7] in its administration of the Safe Drinking Water Act of 1974 during the Flint drinking water crisis (EPA File No. 17RD-16-R5) (Flint Complaint).

In this letter, EPA provides next steps regarding actions that EPA will expect MDEQ to take in its resolution of the Flint Complaint, and which were previously conveyed to MDEQ, which focus on: (1) improving MDEQ's public participation program to reduce the risk of future disparate treatment; (2) improving MDEQ's development and implementation of a foundational non-discrimination program that establishes appropriate procedural safeguards while addressing civil rights complaints as well as policies and procedures for ensuring access for persons with disabilities and limited-English proficiency to MDEQ programs and activities; and (3) ensuring that MDEQ has an appropriate process in place for addressing environmental complaints. In addition, in this letter EPA makes specific recommendations to MDEQ regarding the GPS facility.

**Issues Investigated in EPA Case No. 01R-94-R5**

EPA investigated the original issues raised in this complaint: whether the MDEQ and the MAPCC discriminated against African Americans on the basis of race during the public participation process related to the issuance of a Prevention of Significant Deterioration (PSD) operating permit for GPS and the subsequent approval of the facility's Wood Waste Procurement and Management Plan; and whether the permitting of GPS had discriminatory health impacts on African Americans.

In addition, as is EPA's current practice, EPA reviewed MDEQ's compliance with its longstanding obligation to establish a foundational nondiscrimination program through procedural safeguards required by EPA's regulations implementing the federal non-discrimination statutes,[8] as well as to ensure meaningful access to MDEQ programs and activities for persons with disabilities and limited-English proficiency.

---

[6] 42 U.S.C. §7401 et seq.
[7] Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C §794 (Section 504), and EPA's regulations at 40 C.F.R. Part 7 prohibit discrimination on the basis of disability in any programs or activities receiving federal financial assistance.
[8] Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Section 13 of Federal Water Pollution Control Act of 1972, and Title IX of the Education Amendments of 1972 (hereinafter referred to collectively as the federal non-discrimination statutes).

Father Phil Schmitter

**Summary of Findings**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. As implemented by EPA's regulation, these prohibitions include intentional discrimination as well as practices that have a discriminatory effect on the bases of race, color, or national origin. *See* 40 C.F.R. §§7.35(a), 7.35(b).

As will be discussed in more detail below, EPA finds that the preponderance of evidence[9] supports a finding of discriminatory treatment of African Americans by MDEQ in the public participation process for the GPS permit considered and issued from 1992 to 1994. In addition, EPA has concerns that MDEQ's current policies are insufficient to address the potential for discrimination given the deficiencies in MDEQ's public participation program and procedures.

With respect to the allegations of adverse disparate health effects raised in the original complaint, EPA conducted four analyses to assess risk of health effects and did not find sufficient evidence to establish adversity/harm with respect to health effects. Therefore, there is insufficient evidence to support a prima facie case of adverse disparate impact.

In addition, during the course of its investigation, EPA determined that MDEQ had not been in compliance with its longstanding obligation to establish procedural safeguards required by EPA's regulations implementing the federal non-discrimination statutes. For almost 30 years, MDEQ failed to provide the foundational nondiscriminatory program as required by non-discrimination regulations to: provide a continuing notice of non-discrimination;[10] adopt grievance procedures that assure the prompt and fair resolution of complaints alleging violations of the non-discrimination statutes and EPA's implementing regulations[11]; and designate at least one person to coordinate its efforts to comply with its obligations under the federal non-discrimination statutes and EPA's implementing regulations.[12] The purpose of these regulatory requirements is to ensure that recipients have established a program that will allow it to meet its responsibilities under the Federal non-discrimination statutes. MDEQ also failed to have in place policies and procedures to ensure that persons with disabilities and limited-English proficiency have meaningful access to MDEQ programs and activities.

In its investigation, EPA reviewed materials provided by the Complainants and by MDEQ, as well as other relevant material that was submitted to EPA or that EPA found through its investigation. This information included: environmental impact reports, facility permits and permit applications, monitoring reports, risk assessments, health studies, and materials from litigation related to the GPS permit.

---

[9] A finding by EPA that a recipient of EPA financial assistance has violated Title VI and EPA's implementing regulations must be supported by a preponderance of the evidence which means that the version of facts alleged is more likely than not the correct version.
[10] 40 C.F.R. § 7.95 (a).
[11] 40 C.F.R. § 7.90.
[12] 40 C.F.R. § 7.85(g).

Father Phil Schmitter

EPA's investigation also included site visits, witness interviews with former MAPCC Commissioners, community residents, and MDEQ employees, and public participation records. Moreover, EPA reviewed current public participation policies, guidance, and procedures provided by MDEQ, as well as MDEQ's policies for addressing discrimination and MDEQ's public website.

## Background

GPS is a 35 megawatt power plant located in Genesee Township, Michigan. It is permitted to burn high quality wood-waste, natural gas, animal bedding, and tire derived fuel. Genesee Township is a primarily rural township in north Genesee County that borders the City of Flint to the south. The community closest to the GPS facility within the city of Flint was and continues to be predominantly African American.[13]

On June 8, 1992, Genesee Power Station Limited Partnership (GPSLP) applied to the Air Quality Division of MDEQ for an Air Use Permit under the CAA to operate GPS.[14] The first GPS hearing was held at a Michigan Public Health Department building in Lansing on October 27, 1992.[15] MDEQ reported that it received significant comments and suggested the hearing be postponed until the next meeting to allow staff time to review all the comments.[16]

The MAPCC continued the GPS hearing on December 1, 1992.[17] During that time, MDEQ was to resolve concerns MAPCC Commissioners raised during the October hearing; prepare a revised air toxics analysis; and respond to public comment.[18] The MAPCC also extended the public comment period for an additional three weeks to allow the company time to work with the community and the MDEQ to resolve concerns that had been raised.[19]

MDEQ completed a revised draft permit on November 30, 1992.[20] The second GPS hearing was held in Lansing during an MAPCC meeting that started at 9 am. At 12:40 a.m. on December 2, 1992, the MAPCC approved the permit authorizing the construction of GPS, but required a Wood Waste Procurement and Monitoring Plan, and an Ash Testing Plan be submitted and approved before trial operation of the facility.[21]

In October 1993, EPA's Environmental Appeals Board (EAB)[22] upheld the validity of the GPS permit, but asked the MDEQ to consider whether fuel cleaning ("the removal of wood painted or treated with lead-bearing substances") for the wood that would be burned in the facility

---

[13] Brown Longitudinal Tract Database (LTDB) based on decennial census data, 2000 & 1990 as presented in the U.S. Department of Housing and Urban Development's AFFH Data and Mapping Tool.
[14] Permit Application No. 579-92, MDNR AQD, June 8, 1992.
[15] MAPCC Meeting Minutes, Lansing, Mich. (Oct. 27, 1992) at 1.
[16] Id., at 5.
[17] Id., at 5. See also, Transcript of MAPCC Meeting, October 27, 1992, Lansing, Michigan, at 174.
[18] Transcript of MAPCC Meeting, October 27, 1992, Lansing, Michigan, at 174-79.
[19] MAPCC Meeting Minutes, Lansing, Mich. (Oct. 27, 1992) at 7. The extended comment period closed on November 17, 1992, providing a total written comment period of 42 days.
[20] Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 12-13.
[21] MAPCC Meeting Minutes, Lansing, Mich. (Dec. 1, 1992) at 11.
[22] Audio Tape Recording of MDNR Meeting, December 21, 1993, Tape 1 Side A, at 3:10-3:18.

constituted the Best Available Control Technology (BACT) for lead emissions.[23]  On December 21, 1993, the MDEQ held a hearing to discuss fuel cleaning for the GPS facility.[24]

MDEQ determined that fuel cleaning was considered the BACT for lead emission[25] and on December 29, 1993, issued a modified permit to GPS.[26]  The modified permit required that GPS ensure that lead-bearing substances would not be burned at the facility.[27]

On October 20, 1994, MDEQ held a hearing to receive public comment on the proposed Wood Waste Plan.[28]  This hearing was closed before all those signed up to provide comment were able to provide their comments.[29]  On December 22, 1994, MDEQ held a special hearing in order to allow one of the commenters to make a presentation.[30]

On January 12, 1995, MDEQ issued a supplement to the permit requiring revisions, clarifications, and modifications in the Wood Waste Plan.[31]

### Issue 1: Public Participation

The Complaint alleged that African Americans were treated in a discriminatory manner during the public participation process for the GPS permit from 1992 to 1994.  The Complainants described a series of instances during the GPS hearings where African Americans were treated less favorably than non-African Americans who were participating in MDEQ's public participation processes.

### 1. Legal Standard

EPA's investigation was conducted under the authority of Title VI of the Civil Act of 1964, and EPA's nondiscrimination regulations (40 C.F.R. Part 7), consistent with EPA's Case Resolution Manual, and prior standard operating procedures addressing complaint investigation and resolution. Title VI prohibits intentional discrimination on the basis of race, color, or national origin.[32]  EPA's Title VI implementing regulations at 40 C.F.R. §7.35(a) state that a recipient shall not on the basis of race, color, national origin provide a person any service, aid, or other benefit that is different, or is provided differently from that provided to others under the program or activity.

---

[23] *Id.,* at 3:18-3:40.  See also *In the Matter of Genesee Power Station*, E.A.B., PSD Appeal Nos. 93-1 through 93-7 (Oct. 22, 1993) at 43.

[24] Audio Tape Recording of MDNR Meeting. December 21, 1993, Tape 1 Side A, at 0:20-3:10.

[25] Letter from Russell Harding, Deputy Director, MDNR to "Interested Party", Dec. 29, 1993 at 1-2.

[26] *Id.,* at 1.

[27] *Id.,* at 1-2; *See also* Permit No. 579-92 for Genesee Power Station Ltd. Partnership, Dec. 29, 1993 at 6-7.

[28] Transcript of Meeting, MDNR, AQD, October 20, 1994, Flint, Michigan, at 2-3. *See* Interview with MDNR/AQD, in Lansing, Mich. at 35 (Mar. 26, 1999).

[29] Audio Tape Recording of MDNR Meeting. December 22, 1994, Tape 1 Side A, at 1:50-2:20.

[30] *Id.,* at 2:25-2:53.

[31] Letter from Russell Harding, Deputy Director, MDNR to A. Sarkar, Jan. 12, 1995 at 1-2.

[32] *See Alexander v. Choate*, 469 U.S. 287, 293 (1985); *Guardians Ass'n. v. Civil Serv. Comm'n*, 463 U.S. 582 (1983).

Father Phil Schmitter

A claim of intentional discrimination under Title VI alleges that a recipient intentionally treated individuals differently or otherwise knowingly cause them harm because of their race, color, or national origin. Intentional discrimination requires a showing that a "challenged action was motivated by an intent to discriminate."[33] Evidence of "bad faith, ill will or any evil motive on the part of the [recipient] is not necessary.[34] Evidence in a disparate treatment case will generally show that the recipient was not only aware of the complainant's protected status, but that the recipient acted, at least in part, because of the complainant's protected status.[35] Disparate treatment cases can involve either "individual" or "class" discrimination (or both).

EPA will evaluate the "totality of the relevant facts" including direct, circumstantial, and statistical evidence to determine whether intentional discrimination has occurred.[36] For example, evidence to be considered may include:

- statements by decision makers,
- the historical background of the events in issue,
- the sequence of events leading to the decision in issue,
- a departure from standard procedure (*e.g.*, failure to consider factors normally considered),
- legislative or administrative history (*e.g.*, minutes of meetings),
- the foreseeability of the consequences of the action,
- a history of discriminatory or segregated conduct.[37]

If a prima facie case of disparate treatment is established, the recipient then has the burden of producing a legitimate, non-discriminatory reason for the challenged policy or decision and the different treatment.[38] If the recipient articulates such a reason, EPA must then determine if there is evidence that the proffered reason is false, *i.e.*, that the nondiscriminatory reason or reasons or the defendant gives for its actions are not the true reasons and are actually a pretext for discriminatory intent.[39]

### 2. Analysis

EPA's investigation of the public participation issue focused in part on the GPS public involvement processes between 1992 and 1994. At the time of the GPS permit hearings, Michigan was implementing the public participation requirements established under the Clean

---

[33] *Elston*, 997 F.2d at 1406.

[34] *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984).

[35] Congress has prohibited acts of intentional discrimination based on the protected bases identified in Section I. These protections are statutory, not constitutional, and the analysis under the civil rights statutes at issue here may differ from the different levels of protections the Equal Protection Clause provides to classifications based on sex; disability; and race, color, and national origin.

[36] *See Washington v. Davis*, 426 U.S. 229, 242 (1976).

[37] *See Arlington Heights v. Metro. Hous. Redevelopment Corp.*, 429 U.S. 252 at 266-68 (1977) (evaluation of intentional discrimination claim under the Fourteenth Amendment).

[38] The recipient's explanation of its legitimate reason(s) must be clear and reasonably specific. Not every proffered reason will be legally sufficient to rebut a prima facie case. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55, 258 (1981).

[39] *See Burdine*, 450 U.S. at 255-56; *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162-63 (11th Cir. 2006).

Father Phil Schmitter

Air Act with regard to notice and comment. These requirements leave significant room for discretion as to how the hearing process and other elements of public involvement are implemented.

The MAPCC,[40] which ran the October and December 1992 GPS public hearings and issued the initial GPS operating permit, had no written or formalized operating procedures for conducting its meetings, but instead exercised discretion in conducting meetings in accordance with a set of practices established over time.[41] MDEQ,[42] which took over the function of running permit hearings when the MAPCC was disbanded, did not have any formal policies and procedures governing public hearings in place during 1993 and 1994 when the final GPS hearings were held.[43]

EPA also reviewed a variety of documents related to facility permits, permit hearings, and permit decisions. EPA was told that the MAPCC had developed a series of unwritten standard operating procedures that it used to manage hearings.[44] To assist in its understanding of any unwritten hearing procedures, EPA also reviewed recordings of MDEQ and MAPCC meetings and permit hearings and it interviewed MAPCC Commissioners, MDEQ staff, the Complainants, and others who were present at various meetings and hearings during the 1992-1994-time period.

As described below, decisions were made by both the MAPCC and MDEQ officials that resulted in African Americans being treated differently and less favorably than Whites.

### a. December 1, 1992 Hearing

On June 8, 1992, Genesee Power Station Limited Partnership (GPSLP) applied to the Air Quality Division for an Air Use Permit under the CAA to operate GPS.[45] GPS was also required to submit a Wood Waste Procurement and Monitoring Plan (Wood Waste Plan) before starting trial operation of the facility to ensure that GPS only used wood waste fuel that complied with the

---

[40] The MAPCC set an agenda for each meeting, including consideration of Administrative Rules packages, draft permits (*i.e.*, permit hearings), and consent orders, and had a regularly scheduled agenda item to give individuals and organizations an opportunity to discuss items with the MAPCC that were not on the agenda. Letter from John Fordell Leone, Assistant Attorney General, Environment, Natural Resources, and Agriculture Division, Michigan Department of Attorney General, to Velveta Golightly-Howell, Director, Office of Civil Rights, US EPA (Nov. 6, 2015).

[41] *See* Interview with Former MAPCC Chairman at 2-4 (Mar. 26, 1999). *See also* Interview with Former MAPCC Commissioner B (Mar. 30, 1999) (recalling no specific process for establishing the order of speakers).

[42] In 1992, the Air Quality Division was located within the Michigan Department of Natural Resources (MDNR). When the MAPCC was disbanded in 1993, the Air Quality Division took over the MAPCC functions.[42] In 1995, the MDNR was split into two new departments, the DNR and the Michigan Department of Environmental Quality (MDEQ), which became responsible for environmental permitting and enforcement. MDEQ's current authority includes: "(b) Issue permits for the construction and operation of sources, processes, and process equipment, subject to enforceable emission limitations and standards and other conditions reasonably necessary to assure compliance with all applicable requirements of this part, rules promulgated under this part, and the clean air act." MCLS § 324.5503.

[43] Letter from Todd B. Adams, Assistant Attorney General, Natural Resources Division, Department of Attorney General, to Ann Goode, Director, Office of Civil Rights, US EPA, Response to Question 3 (July 28, 1999).

[44] *See* Interview with Former MAPCC Chairman (Mar. 26, 1999). *See also* Interview with Former MAPCC Commissioner B (Mar. 30, 1999) (recalling no specific process for establishing the order of speakers).

[45] Permit Application No. 579-92, MDNR AQD, June 8, 1992.

Father Phil Schmitter

requirements of the permit. The Wood Waste Plan was to go through a public comment process before it could be approved.

On October 5, 1992, the draft GPS permit was made available to the public and a public comment period was announced.[46] The first GPS permit hearing was held on October 27, 1992 in Lansing. At the hearing, MDEQ reported that it had received significant comments and suggested the hearing be postponed until the next meeting to allow staff time to review all the comments.[47] MDEQ staff recommended a revision to several permit conditions.[48] The MAPCC decided to continue the GPS hearing on December 1, 1992, their next scheduled meeting.[49] In the intervening time, MDEQ was to resolve concerns MAPCC Commissioners raised during the October 27th hearing; prepare a revised air toxics analysis; and respond to public comment.[50] The MAPCC also extended the public comment period for an additional three weeks.[51]

EPA has found no evidence that notice was given to the public in advance of the meeting stating that the GPS permit hearing, as opposed to the general MAPCC meeting or any other permit hearings on the schedule, would begin at 9:00 a.m. The agenda handed out at the December 1, 1992 MAPCC meeting agenda lists 8 items in what appears to be the time between 9 a.m. and 1 p.m.[52]

### i. Requests to speak either in advance of or out of order at hearings

According to MAPCC Commissioners, the MAPCC regularly accommodated elected representatives at MAPCC meetings based upon their schedules.[53] Commissioners stated that they would allow elected representatives to offer their comments on a particular permit before the scheduled hearing if their schedules dictated that they be elsewhere when that permit hearing was to take place.[54] The MAPCC also accommodated other attendees with scheduling conflicts.[55] One MAPCC Commissioners stated that the MAPCC was "in the business of listening to the public," and that it "typically went out of [its] way to try to listen to people who had taken the time to appear before the Commission."[56]

During the December 1, 1992 meeting in Lansing, the MAPCC considered three permits in addition to other five agenda items. In addition to GPS, there were permit hearings scheduled related to two proposed facilities in Marquette County, one in Sands Township and one in

---

[46] Letter from Lynn Fiedler, Permit Section Supervisor, MDNR/MDEQ to "Interested Party", Dec. 7, 1992 at 1.
[47] MAPCC Meeting Minutes, Lansing, Mich. (Oct. 27, 1992) at 5.
[48] Id.
[49] Id. See also, Transcript of MAPCC Meeting, October 27, 1992, Lansing, Michigan, at 174.
[50] Transcript of MAPCC Meeting, October 27, 1992, Lansing, Michigan, at 174-79.
[51] MAPCC Meeting Minutes, Lansing, Mich. (Oct. 27, 1992) at 7. The extended comment period closed on November 17, 1992, providing a total written comment period of 42 days.
[52] Meeting Agenda, Michigan Air Pollution Control Commission, December 1, 1992.
[53] Interview of former MAPCC Commissioner A (Mar. 26, 1999); Interview of MDNR/AQD Employee A at 20 (Mar. 26, 1999).
[54] Interview of former Chairman of the MAPCC (Mar. 25, 1999).
[55] Interview of former MAPCC Commissioner B at 11 (Aug. 14, 1997) (accommodations were regularly made for persons with scheduling conflicts).
[56] Interview of former MAPCC Commissioner A at 6 (Mar. 26, 1999).

Father Phil Schmitter

Skandia.[57]  The GPS permit hearing was the 7th item on the agenda.  The MAPCC began its meeting around 9:00 am.  At 9:30 a.m. the MAPCC started the first scheduled public hearing for the Marquette County Solid Waste Management Authority.  By 11:45 a.m., only 3 people had commented on this permit application.[58]  The Chairman of the MAPCC indicated that the MAPCC would break for lunch, but that before it did so, Dr. Robert Soderstrom would speak on the GPS permit application because he had a scheduling conflict and had to leave.[59]  Dr. Robert Soderstrom, from the Genesee Medical Society, who is White, then spoke.[60]

State Representative Floyd Clack and Ms. Janice O'Neal, both of whom are African American, each asked to address the MAPCC in advance of the GPS hearing because of scheduling conflicts created by the delay of the hearing.[61]  Neither request was granted.  Ms. O'Neal provided her oral comments at the GPS hearing later that evening after traveling 120 miles to Flint and back.[62]  Ms. Bogardus, who is White, interrupted the MAPCC as they deliberated about whether to postpone the GPS hearing.[63]  She did not ask permission to speak in advance of the GPS hearing.  She interrupted the Commissioners and was allowed to proceed with her remarks.[64]

The MAPCC deviated from what was described as its standard operating procedures for handling requests to speak in advance of the public comment period resulting in African Americans' requests being denied while requests by Whites to speak in advance were granted.

MDEQ has subsequently implemented policy and guidance that may reduce the likelihood that a hearing would run late into the night (*e.g.,* limiting the agenda to only one permit, time limits on speakers).  However, no information was provided on how MDEQ would evaluate requests to speak in advance or other requests for special accommodations.  EPA reviewed current public involvement policy, guidance, and procedures provided by MDEQ on November 7, 2016 to determine whether they provide sufficient safeguards to ensure similar incidents would not occur today.

### ii.  Limiting time to review permit materials and provide comments.

---

[57] MAPCC Meeting Minutes, Lansing, Mich. (Dec. 1, 1992) at 4, 7-8.

[58] *Id.,* at 5.

[59] *See* MAPCC Meeting Minutes, Lansing, Mich. (Dec. 1, 1992) at 5, and Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 2.  Chairman stated: "At this point, I would like to deviate from the agenda for just a moment.  We have had a request prior to this time from the Genesee County Medical Society that we permit Dr. Soderstrom to speak on Item 7 on the agenda, as he has to leave at noon.  So would Dr. Soderstrom please come up?"

[60] MAPCC Meeting Minutes, Lansing, Mich. (Dec. 1, 1992) at 5; Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 2-8; Audio Tape Recording of MAPCC Meeting, December 1, 1992, Tape 2, Side B at 2:38 – 10:38.

[61] Interview of Witness A. (Sept. 29, 1998).

[62] Interview of Witness B (Apr. 6, 1999).

[63] MAPCC Meeting Minutes, Lansing, Mich. (Dec. 1, 1992) at 8; Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 14-15.  *See also* Audio Tape Recording of MAPCC Meeting, December 1, 1992, Tape 5, Side A.

[64] Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 15.  *See also* Audio Tape Recording of MAPCC Meeting, December 1, 1992, Tape 5, Side A.

At about 2:10 p.m., MDEQ staff provided the public a limited number of copies of the revised GPS Draft Permit and accompanying Staff Activity Report Addendum (SAR Addendum) and their attachments.[65]  The 26 page SAR Addendum stated that in response to the comments and additional information, MDEQ summarized the results of technical studies analyzing wood waste emissions from other wood waste boilers;[66] included a revised BACT analysis for air toxics; "performed an additional analysis of the worst case emissions from the proposed facility;" and "made numerous changes" to permit conditions in the October 5, 1992 Draft Permit.[67] An MDEQ employee acknowledged its lateness, but explained MDEQ "felt it needed to be done as best as possible in order to lay out the facts."[68]

Some people were given the full report, while others were given only a handout summarizing the major changes to the original permit.[69]  Hearing attendees had less than 5 hours to review the changes to the proposed permit conditions and to develop meaningful questions and comments for the Commissioners and MDEQ staff before the GPS hearing began.  At the beginning of the GPS hearing that evening, an MDEQ employee announced additional copies of the SAR were available for those who did not receive them earlier.[70]  While it appears more SARS were made available at the beginning of the GPS hearing, it is unclear whether all those present were provided their own copy.

The GPS hearing began at about 6:40 p.m. with public comment commencing at about 8:40 p.m.[71]  Community members interested in providing comments to the MAPCC were given their opportunity more than 11 hours after they had arrived from Flint and the MAPCC meeting had begun.  The length of time before the GPS hearing began was irregular for the MAPCC, as most MAPCC meetings had concluded or were wrapping up in the early evening.[72]  At no other hearing held in 1992 were community members required to wait 9 hours before their hearing started and 11 hours before they were allowed to provide comment.  The GPS public hearing lasted almost 6 hours.[73]

---

[65] Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 11, 22. MDEQ staff acknowledged that the initial amount of copies provided was limited when they offered copies to those who "did not get a copy of the staff report early this afternoon."

[66] MDEQ AQD Staff Activity Report, December 1, 1992, at 5-9.

[67] MDNR, Staff Activity Report Addendum at 9 (Dec. 1, 1992) (Conclusion). The Renewable Operating Permit for GPS (Permit # 199600357) cites the new air toxics rules, but does not include an additional analysis of air toxics or a change in emissions limits. MDEQ, Staff Report Addendum (Aug. 16, 2000).

[68] Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 21.

[69] Id.

[70] Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 22.

[71] See EPA Chronology of Events for Dec. 1, 1992 MAPCC Meeting.

[72] According to a former a MAPCC Commissioner public hearings typically began and ended during "normal business hours." See Interview with former MAPCC Commissioner A at 7 (Mar. 26, 1999); Interview with former MAPCC Commissioner B at 7 (Mar. 30, 1999) (stating that an MAPCC meeting that continued beyond 9:00 p.m. was "fairly unusual"). However, according to an MDEQ official, there was really no "normal time" for a hearing to begin or end because meeting agendas varied so much from month to month. "Sometimes the agenda was relatively short, so the meeting was over in a few hours. Other times there would be many items on the agenda, and the hearings went well into the night." See Interview of MDNR/AQD Employee A at 21 (Mar. 26, 1999).

[73] See EPA Chronology of Events for Dec. 1, 1992 MAPCC Meeting.

Father Phil Schmitter

The MAPCC considered a proposal to postpone the GPS permit hearing.[74] One Commissioner suggested having a meeting in Flint and recognized that Flint residents had to come to Lansing twice, stating the MAPCC has "been so rude to those people, prolonging the meeting, dragging them out, . . . it's going to be late at night, they have to get home to their children . . ."[75] Another Commissioner agreed a meeting in Flint might be a good alternative to going "way beyond 5 o'clock" and the Commissioner did not think knowing some of the residents that they could do that.[76]

MDEQ stated that it provided 10 hours of public hearings and 42 days of public comment for this permit.[77] While the number of days for written comments exceeds regulatory requirements, it is not relevant when the issue is the amount of time to read, analyze, and develop comments on the considerable new information presented on December 1, 1992. Because the hearing was not postponed, the oral comment period at the December 1 hearing was the only opportunity the Flint community had to provide comment on the new items introduced that afternoon. No additional written comment period was given because the GPS permit was approved immediately after the oral comment period ended that night. If any members of the public needed more time to read and digest the new materials to prepare comments or were not available to provide oral comment to the MAPCC that evening, there was no other opportunity to provide comment on the new information.

MDEQ also stated that there were various informal opportunities for the public to learn about the project, including articles in the local newspaper published before the start of the comment period, meetings sponsored by Genesee Township, a Genesee County Health Department meeting, a neighborhood coalition meeting, and a GPSLP-sponsored tour of a similar facility in Grayling, Michigan.[78] While all of these types of meetings may be a good source of information for the residents, they are not relevant to the issues raised by the complainants about their ability to comment on the revised permit conditions presented on December 1st or the analysis supporting those conditions.

The MAPCC had the discretion to postpone the December 1992 hearing and/or extend the comment period. The decision to continue the hearing into the night and to issue the permit without allowing time for those at the hearing to review and prepare comments on new permit conditions, new analyses, and other information resulted in the commenters from the predominantly African American community being treated less favorably than people at other permit hearings for facilities in predominantly non-African American communities.

MDEQ has implemented procedures and guidance designed to prevent hearings that would require commenters to wait over 10 hours to provide their comments (*e.g.,* generally scheduling only one permit hearing; initially limiting commenters to 5 minutes with an opportunity to

---

[74] MAPCC Meeting Minutes, Lansing, Mich. (Dec. 1, 1992) at 8; Transcript of MAPCC Meeting, December 1, 1992, Part 1, Lansing, Michigan, at 8-9.

[75] Audio Tape Recording of MAPCC Meeting, December 1, 1992, Tape 4, Side A at 15:45-17:25.

[76] Audio Tape Recording of MAPCC Meeting, December 1, 1992, Tape 4, Side A at 15:45-17:25.

[77] Letter from Leslie K. Bender, Legislative Liaison, MDNR to Mike Mattheisen, *OCR, US EPA 2 (June 29, 1995)* at 2, 4, 6. MDEQ noted that the October 27, 1992 GPS hearing lasted approximately 4.5 hours, and that the December 1, 1992 GPS hearing lasted approximately 5.5 hours. *Id.* at 4.

[78] *Id.,* at 2-3.

Father Phil Schmitter

provide additional comments after everyone has had their turn). Also, MDEQ continues to provide a process for extending a public comment period upon written request.[79]

These changes may address some of the causes that contributed to the residents of the African American community having to stay at the hearing in Lansing well after midnight. However, no information was provided on how MDEQ would evaluate requests to postpone hearings or extend the public comment period.

> ### iii. *Consideration of Community Siting Concerns and Opposition*

At the December 1, 1992 meeting, in addition to the GPS permit, the MAPCC also considered the permit application for the Contaminated Soil Recycling facility proposed in Skandia. Skandia is a predominantly White community in Marquette County, Michigan.[80] Residents of both the Flint[81] and Skandia[82] communities expressed significant community opposition to the permits.

The transcript of the December 1-2, 1992 hearing contain discussions that indicate that at least one MAPCC Commissioner considered community opposition during his deliberations over issuance of the Skandia permit.[83]

In response to the allegation, MDEQ stated that the MAPCC followed proper procedures in the GPS permit hearing.[84] Regarding the role of community opposition in the Contaminated Soil Recycling decision, MDEQ stated that the MAPCC had a legal obligation to approve any permit application meeting applicable state and federal air pollution regulations.[85] MDEQ stated that these air pollution regulations were not met in the Contaminated Soil Recycling decision.[86]

---

[79] *A Citizen's Guide to Participation in Michigan's Air Pollution Control Program*, (April 2007) at 12.

[80] 1990 Census of Population and Data Public Law 41-171 Data.

[81] At the October 27, 1992 hearing, eight people representing different community groups or themselves, spoke in opposition to the proposed GPS permit. The commenters "expressed concerns regarding: no guarantee that clean wood would be burned; contamination to the Flint River; existing odors from junkyards burning tires, asphalt plants, cement plants, and Buick; children and senior citizens with respiratory problems; high cancer rate and infant mortality; and environmental racism and economic discrimination." MAPCC Meeting Minutes, Lansing, Mich. (Oct. 27, 1992) at 5. A petition was submitted with 350 signatures opposed to the GPS permit being issued.

[82] MDEQ staff reported that "the proposed facility will likely comply with all applicable state and federal air quality regulations; however, there is an unresolved local construction permit issue and significant public controversy." *Id.*, at 7. Thirteen individuals spoke opposing the Contaminated Soil Recycling, Inc. facility and "a petition with 560 signatures of opposed to the site location was submitted. . . Some commenters expressed health concerns which may be exacerbated by the proposed incinerator." *Id.* at 8.

[83] Transcript of MAPCC Meeting, December 1, 1992, Part 2, Lansing, Michigan, pp. 1-3. One Commissioner stated he would take into account the people who were most impacted and if the public tells him they would rather the MAPCC not approve it, it affects his decision. He further stated that he intended "to take the public into my consideration, and because of its poor siting, and because I think the citizens do feel that there's going to be an impact, I'm not going to approve it." Transcript of MAPCC Meeting, December 1, 1992, Part 2, Lansing, Michigan, at 3.

[84] Letter from Leslie K. Bender, Legislative Liaison, MDNR to Mike Mattheisen, OCR, US EPA (June 29, 1995) at 4.

[85] *Id.*, at 3.

[86] MAPCC Meeting Minutes, Lansing, Mich. (Dec. 1, 1992) at 9.

Father Phil Schmitter

If considering community opposition was proper procedures, then it appears the MAPCC followed them for Contaminated Soil Recycling, but not for GPS. If MDEQ is saying that the MAPCC followed proper procedures by denying the Contaminated Soil Recycling permit because it did not meet regulatory requirements, the transcript of the hearing indicates that the MAPCC was trying to determine what they would consider in making their decision. The fact that the result of the hearing was the correct result under the environmental regulations, does not change the concerns with regard to the process that was used in one instance and not the other.

MDEQ's 2014 Public Involvement Handbook contains a very short discussion of public involvement in permitting decisions states: "The fact that a community or individual simply does not want a proposed facility in their community is generally not a factor that can be considered by the DEQ in reaching a decision on a proposed permit. Local governmental officials may have authority to consider local preferences when making zoning decisions."[87] So it appears MDEQ has implemented guidance that ensures that when it comes to community opposition, all communities will be treated equally, in that their oppositions will not be considered in the decision-making process.

### b. October 20, 1994 Hearing

In October 1993, EPA's Environmental Appeals Board (EAB)[88] had upheld the validity of the GPS permit, but asked the MDEQ to consider whether fuel cleaning ("the removal of wood painted or treated with lead-bearing substances") for the wood that would be burned in the facility constituted the Best Available Control Technology (BACT) for lead emissions.[89] On November 18, 1993, MDEQ announced a public comment period and scheduled a hearing for the reconsideration of BACT for lead. On December 21, 1993, the MDEQ held a hearing to discuss fuel cleaning for the GPS facility[90] in Genesee Township, Michigan. Kearsley High School is approximately five miles from the proposed GPS facility in predominantly White Genesee Township, Michigan.[91]

#### i. Armed and uniformed officers at hearing.

On October 20, 1994, MDEQ held a hearing at the Carpenter Road School, in a predominantly African American neighborhood bordering the GPS facility[92] in Flint, to receive public comment on the proposed Wood Waste Plan.[93] This was the last hearing before GPS would begin normal operation. This was the second GPS public hearing held outside of Lansing and the first to take place in the predominantly African American neighborhood. Two uniformed and

---

[87] MDEQ's *Public Involvement Handbook, A Citizen's Guide* (January 2014) p. 16.
[88] Audio Tape Recording of MDNR Meeting. December 21, 1993, Tape 1 Side A, at 3:10-3:18.
[89] *Id.*, at 3:18-3:40. See also *In the Matter of Genesee Power Station*, E.A.B., PSD Appeal Nos. 93-1 through 93-7 (Oct. 22, 1993) at 43.
[90] *Id.*, at 0:20-3:10.
[91] Brown Longitudinal Tract Database (LTDB) based on decennial census data, 2000 & 1990 as presented in the U.S. Department of Housing and Urban Development's AFFH Data and Mapping Tool.
[92] Brown Longitudinal Tract Database (LTDB) based on decennial census data, 2000 & 1990 as presented in the U.S. Department of Housing and Urban Development's AFFH Data and Mapping Tool.
[93] Transcript of Meeting, MDNR, AQD, October 20, 1994, Flint, Michigan, at 2-3. *See* Interview with MDNR/AQD Staff A at 35 (Mar. 26, 1999).

Father Phil Schmitter

armed MDEQ Conservation Officers attended the hearing at the request of the MDEQ.[94] The first two GPS public hearings had been held in Lansing without armed uniformed officers present at the doors of the hearing.[95]

The Law Enforcement Division, for whom the conservation officers work, did not have any written policy on the use of armed and uniformed officers at hearings. In response to the question of why the armed and uniformed officers were present at the Carpenter Road hearing, Michigan state agencies gave a variety of answers. The Law Enforcement Division stated that upon request, conservation officers were typically assigned to state government real estate sales (strong box security) and other public meetings where it was anticipated that personnel safety may be a concern due to the controversial nature of an issue.[96] Both of the officers at the Carpenter Road hearing stated they had been assigned to guard hearings before, but according to both the officers and other MDEQ staff having guards at MDEQ meetings was not a frequent occurrence and only occurred when the MDEQ anticipated popular disapproval of MDEQ actions.[97]

There was no strong box to guard at the GPS hearing. There is no persuasive evidence in the record that personnel safety may have been a concern due to the controversial nature of an issue. The state office for whom the conservation officers worked had no record of a request for the presence of armed uniformed officers that might contain an explanation for their presence. Neither of the two Conservation Officers who were present at that GPS hearing recalled being briefed regarding the reason that their presence was required.[98]

In 1999, MDEQ stated that no complaints had been filed regarding the presence of conservation officers at public hearings or meetings since 1994.[99] MDEQ stated that it has held public hearings and meetings in the local affected communities without incident, and that many of these meetings were conducted in inner-city communities.[100] MDEQ's recent response[101] describes a number of reasons, including some not mentioned in 1999, why armed and uniformed officers might be present at hearings and indicates that depending on the circumstances, there are several different types of officers that might be present.

---

[94] Interview with MDNR/MDEQ Employee B at 38 (Mar. 26, 1999) (statement confirming that there were 2 MDEQ Conservation Officers present at the October 20, 1994 hearing).

[95] Group Interview of Complainants (Sept. 29, 1998).

[96] Letter from Todd B. Adams, Assistant Attorney General, Natural Resources Division, Department of Attorney General, Michigan, to Ann Goode, Director, Office of Civil Rights, US EPA, Response to Question 2 (July 28, 1999).

[97] See Interview of MDNR/MDEQ Conservation Officer A (May. 17, 1999); Interview of MDNR/MDEQ Conservation Officer B (May. 17, 1999); See also Interview with MDNR/AQD Staff A, (Mar. 26, 1999) at 29-32

[98] Interview of MDNR/MDEQ Conservation Officer A, (May. 17, 1999); Interview of MDNR/MDEQ Conservation Officer B (May. 17, 1999);

[99] Letter from Todd B. Adams, Assistant Attorney General, Natural Resources Division, Department of Attorney General, Michigan, to Ann Goode, Director, Office of Civil Rights, US EPA, Response to Question 2 (July 28, 1999).

[100] Id.

[101] Letter from John Fordell Leone, Assistant Attorney General, Environment, Natural Resources, and Agriculture Division, Michigan Department of Attorney General, to Velveta Golightly-Howell, Director, Office of Civil Rights, US EPA (Nov. 6, 2015) at page 7.

Father Phil Schmitter

At the time, the use of armed and uniformed officers was uncommon and appears to have only happened at the hearing held in the African American community. In evaluating the use of armed and uniformed officers in this situation, EPA considered the intimidation factor through threat of police force as historically used against African Americans when attempting to exercise their rights.

Without any credible explanation, MDEQ deviated from its stated policy at the time by placing the armed and uniformed guards at the GPS hearing in Flint. MDEQ has not provided a copy of any current policies that apply to the use of armed and uniformed officers at hearings or the criteria used to evaluate whether and when certain types of officers should be used (*e.g.*, plain clothes, armed and uniformed police, conservation officers).

### ii. Close of hearing during testimony

MDEQ adjourned the October 20, 1994 hearing during the testimony of an African American speaker and before everyone had been given a chance to testify.

The decision to adjourn the hearing surprised MDEQ staff.[102] MDEQ staff stated that, before its adjournment, the October 20, 1994 hearing was not atypically controversial or heated, nor was the audience disorderly. MDEQ staff members stated that the audience at Carpenter Road Elementary was no more emotional than audiences at other hearings that had not been adjourned.[103] One MDEQ employee stated that she had never seen any hearing adjourned before all of the commenters were allowed to speak.[104]

In addition, another witness who attended most of the air permit hearings held in Michigan from 1990 to 1996 stated that he had never seen the MDEQ adjourn a hearing as it did at the October 20, 1994 GPS hearing. The witness stated that commenters at other hearings had made comments similar to Ms. O'Neal's, but the MDEQ had never adjourned a hearing because of it.[105]

The evidence shows that Ms. O'Neal, an African American, was treated less favorably than all other commenters at any MDEQ hearing in anyone's memory. In addition, the witnesses say that to their knowledge the first time, and for some who attended many hearings afterward the only time, a hearing was closed before all commenters could speak was when it was held in the African American community in Flint.

MDEQ did not provide any current information or decision criteria to address whether and when a current hearing might be closed before all those wishing to speak were able to provide comments.

---

[102] Interview with MDNR/MDEQ Employee B at 38 (Mar. 26, 1999). Interview with MDNR/AQD Employee A. at 34 (Mar. 26, 1999).
[103] Interview with MDNR/MDEQ Employee B at 38 (Mar. 26, 1999). Interview with MDNR/AQD Employee A. at 34 (Mar. 26, 1999).
[104] Interview with MDNR/MDEQ Employee B at 43-45 (Mar. 26, 1999).
[105] Interview with Witness C (Mar. 19, 1999).

The remaining people signed up to present comments who had not yet been called were unable to provide their testimony to the MDEQ at that hearing.[106] Unidentified persons in the audience then began calling out comments such as: "We want to hear what she has to . . ."; and "That's not fair."[107] MDEQ contacted the three people who had been prevented from testifying at that hearing and asked them to submit their written comments to MDEQ.[108] However, one of those commenters stated that written testimony would have been inadequate because she had visual aids for her presentation. On December 22, 1994, MDEQ held a special hearing in order to allow the commenter to make her presentation.[109] On January 12, 1995, MDEQ issued a supplement to the permit requiring revisions, clarifications, and modifications in the Wood Waste Plan.[110]

### 3. Conclusion

Flint, the community that borders that GPS facility, was and continues to be predominantly African American. Both individually and as a community, African Americans were subjected to adverse actions by the MAPCC or MDEQ, while similarly situated, non-African Americans and non-African American communities were not subjected to the same adverse actions.

During that time period, the MAPCC and MDEQ had written no formalized operating procedures for conducting its meetings or hearings. However, there were a series of unwritten standard operating procedures that EPA was told existed or that could be discerned from hearing records. The MAPCC deviated from those standard operating procedures on more than one occasion to the detriment of African Americans. For example, the MAPCC stated it had a standard operating procedure for handling requests to speak in advance of a hearing. The MAPCC's deviation from the stated standard operating procedure resulted in one African American commenter not being able to provide his comments while another African American commenter was forced to drive back to Flint only to return to the hearing later that night to provide her comments.

Regardless of whether it was appropriate for the MAPCC Commissioners to consider community opposition in their votes, the record supports a finding that one Commissioner did consider it in casting his vote for one permit before the MAPCC on December 1, 1992. Both the White community of Skandia and the African American community of Flint expressed significant opposition to the MAPCC granting a permit to operate the proposed facilities. MAPCC decisions that day granted the White community's request, while that of the African American community was denied. In addition, it appears from MDEQ's response that community opposition was not one of the factors the MAPCC was to consider in its decision. If that is the case, then in addition to weighing consideration of community opposition differently, this Commissioner deviated from that policy of not considering community opposition.

---

[106] Transcript of Meeting, MDNR, AQD, October 20, 1994, Flint, Michigan, at 129-130, *See also* Audio Tape Recording of MDNR Meeting. December 22, 1994, Tape 1 Side A, at 1:50-2:20.
[107] Audio Tape Recording of MDNR Meeting. October 20, 1994, Tape 3, Side A.
[108] Audio Tape Recording of MDNR Meeting. December 22, 1994, Tape 1 Side A, at 1:50-2:20.
[109] *Id.*, at 0:00 –3:00.
[110] Letter from Russell Harding, Deputy Director, MDNR to A. Sarkar, Jan. 12, 1995 at 1-2.

Father Phil Schmitter

Moreover, MDEQ deviated from the stated policy for the assignment of armed and uniformed guards and assigned them to the GPS hearing in Flint. In light of the rarity at the time of the use of the armed and uniformed officers; no apparent or articulated need for their presence; and the commonly known historical use of threat of police force to intimidate African Americans who attempt to exercise their civil rights, this use of the officers is yet another example of how the African American community was treated less favorably than White communities who sought to exercise their rights at permit hearings.

The closing of the final GPS hearing held in Flint during the comments of an African American commenter and before all the commenters who signed up could speak was a deviation from the standard operating procedures that all of the witnesses there had experienced.

The totality of the circumstances described above supported by a preponderance of the evidence in EPA's record would lead a reasonable person to conclude that race discrimination was more likely than not the reason why African Americans were treated less favorably than non-African Americans during the 1992-1994 public participation for the GPS permit.

In addition, as will be discussed later in this letter, EPA has significant concerns about MDEQ's current public participation program and whether MDEQ can ensure that these instances of discriminatory treatment would not occur today. In particular, EPA notes that there is no guidance or neutral criteria for MDEQ staff to follow should they encounter the same or similar decisional processes related to the disparate treatment at issue in this case.

**Issue 2: Health Impacts**

In response to allegations raised by the Complainants, EPA investigated whether African Americans would be subjected to adverse disparate health impacts from air pollution emissions from (1) GPS and similar statewide sources; (2) GPS added to the existing cumulative air pollution in Genesee County; and (3) GPS by itself.

### 1. Legal Standard

This issue is being analyzed under a *disparate impact* or *discriminatory effects* standard.[111] As noted previously, EPA and other federal agencies are authorized to enact regulations to achieve the law's objectives in prohibiting discrimination. For example, EPA regulations state:

---

[111] *Guardians,* 463 U.S. at 582; *Alexander v. Choate,* 469 U.S. at 293. Many subsequent cases have also recognized the validity of Title VI disparate impact claims. *See Villanueva v. Carere,* 85 F.3d 481 (10th Cir. 1996); *New York Urban League v. New York,* 71 F.3d 1031, 1036 (2d Cir. 1995); *Chicago v. Lindley,* 66 F.3d 819 (7th Cir. 1995); *David K. v. Lane,* 839 F.2d 1265 (7th Cir. 1988); *Gomez v. Illinois State Bd. Of Educ.,* 811 F.2d 1030 (7th Cir. 1987); *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403 (11th Cir. 1985); *Larry P. v. Riles,* 793 F.2d 969 (9th Cir. 1984). United States v. Maricopa Cty, 915 F. Supp. 2d 1073, 1081 (D. Ariz. 2012) (plaintiff properly stated a disparate impact claim where limited-English proficient Latino inmates had diminished access to jail services such as sanitary needs, food, clothing, legal information, and religious services). In addition, by memorandum dated July 14, 1994, the Attorney General directed the Heads of Departments and Agencies to "ensure that the disparate impact provisions in your regulations are fully utilized so that all persons may enjoy equally the benefits of [f]ederally financed programs." Attorney General Memorandum on the use of the Disparate Impact Standard in Administrative Regulations under Title VI of the Civil Rights Act of 1964 (July 14, 1994)

Father Phil Schmitter

> A recipient shall not use criteria or methods of administering its program or activity
> which have the effect of subjecting individuals to discrimination. ... [112]

In a disparate impact case, EPA must determine whether the recipient uses a facially neutral policy or practice that has a sufficiently adverse (harmful) and disproportionate effect based on race, color, or national origin: This is referred to as the prima facie case. To establish an adverse disparate impact, EPA must:

> (1) identify the specific policy or practice at issue;
> (2) establish adversity/harm;[113]
> (3) establish disparity;[114] and
> (4) establish causation.[115]

The focus here is on the consequences of the recipient's policies or decisions, rather than the recipient's intent.[116] The neutral policy or decision at issue need not be limited to one that a recipient formalizes in writing, but also could be one that is understood as "standard operating procedure" by recipient's employees.[117] Similarly, the neutral practice need not be affirmatively undertaken, but in some instances could be the failure to take action, or to adopt an important policy.[118]

If the evidence establishes a prima facie case of adverse disparate impact, as discussed above, EPA must then determine whether the recipient has articulated a "substantial legitimate justification" for the challenged policy or practice.[119] "Substantial legitimate justification" in a

---

(http://www.justice.gov/ag/attorney-general-july-14-1994-memorandum-use-disparate-impact-standard-administrative-regulations).

[112] 40 C.F.R. § 7.35(b).

[113] Adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm.

[114] In analyzing disparity, EPA analyzes whether a disproportionate share of the adversity/harm is borne by individuals based on their race, color, national origin, age, disability or sex. A general measure of disparity compares the proportion of persons in the protected class who are adversely affected by the challenged policy or decision and the proportion of persons not in the protected class who are adversely affected. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576-77 (2d Cir. 2003). When demonstrating disparity using statistics, the disparity must be statistically significant.

[115] *See N.Y.C. Envtl. Justice All. v. Giuliani*, 214 F.3d 65, 69 (2d Cir. 2000) (plaintiffs must "allege a causal connection between a facially neutral policy and a disproportionate and adverse impact on minorities").

[116] *Lau v. Nichols*, 414 U.S. 563, at 568 (1974).

[117] If as part of a recipient's permitting of a facility, a recipient makes a decision with respect to the siting of a facility; such decision may not intentionally discriminate or have a discriminatory effect on a protected population. The regulation states:
> A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program or activity to which this part applies on the grounds of race, color, or national origin or sex; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart. 40 C.F.R. § 7.35(c).

[118] *See, e.g., Maricopa Cty.*, 915 F. Supp. 2d at 1079 (disparate impact violation based on national origin properly alleged where recipient "failed to develop and implement policies and practices to ensure [limited English proficient] Latino inmates have equal access to jail services" and discriminatory conduct of detention officers was facilitated by "broad, unfettered discretion and lack of training and oversight" resulting in denial of access to important services).

[119] *Georgia State Conf. v. Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985).

Father Phil Schmitter

disparate impact case, is similar to the Title VII employment concept of "business necessity," which in that context requires a showing that the policy or practice in question is demonstrably related to a significant, legitimate employment goal.[120] The analysis requires balancing recipients' interests in implementing their policies with the substantial public interest in preventing discrimination.

If a recipient shows a "substantial legitimate justification" for its policy or decision, EPA must also determine whether there are any comparably effective alternative practices that would result in less adverse impact. In other words, are there "less discriminatory alternatives?"[121] Thus, even if a recipient demonstrates a "substantial legitimate justification," the challenged policy or decision will nevertheless violate federal civil rights laws if the evidence shows that "less discriminatory alternatives" exist.

## 2. Analysis

After reviewing relevant information in the record, EPA determined that in order to answer the question of whether there would be adverse health effects from the site-related pollutants of air toxics and lead, more information was necessary. Therefore, in the early 2000s, EPA conducted its own modeling and analyses[122] of health impacts from air emissions assuming a 30-year exposure period that included:

- Lead emissions from GPS[123]
- Cumulative countywide direct inhalation air toxics from point sources county-wide including GPS emissions (*County-wide Air Toxics Study*)[124]
- Air toxics emissions from GPS and similar facilities statewide (*Statewide Risk Assessment*)[125]
- Air toxics emissions from the GPS facility alone.

EPA used the best available emissions inventory information and best available risk assessment tools. EPA's assessments sought to represent assessments that could have been conducted by MDEQ at the time the permit was issued.

---

[120] *Wards Cove Packing Inc. v. Antonio*, 490 U.S. 642, 659 (1989); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-36 (1971). Notably, the concept of "business necessity" does not transfer exactly to the Title VI context because "business necessity" does not cover the full scope of recipient practices that Title VI covers, which applies far more broadly to many types of public and non-profit entities. *See Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507, 2522-24 (2015) (recognizing the limitations on extension of the business necessity concept to Fair Housing Act complaints).
[121] *Elston*, 997 F.2d at 1407.
[122] No independent data collection such as air or soil sampling was conducted for any of the assessments – instead, the analyses were based on modeling of available facility data.
[123] *Assessment of Lead Exposures and Human Health Impacts Related to Emissions of the Genesee Power Station*, EPA Region 5, (February, 2003).
[124] *Genesee Power Station Point Source Impact Assessment*, Office of Research and Development, National Center for Exposure Assessment, (May, 2005).
[125] *Risk Assessment of Selected Municipal Waste Combustors and Wood Waste Boilers in the State of Michigan*, U.S. EPA Region 5 (January, 2001).

Father Phil Schmitter

When assessing residual risk from air toxics under the CAA for source categories that are subject to technology-based requirements,[126] EPA generally seeks to prevent cancer risks in excess of $10^{-4}$, may address cancer risk in excess of $10^{-6}$, and generally seeks to prevent noncarcinogenic impacts that exceed a hazard quotient or hazard index of 1.[127] When conducting the *Update*, EPA used the two step residual risk assessment process which culminates with an "ample margin of safety" determination to determine adversity/harm under the Title VI adverse disparate impact analysis.

Where a cancer risk was found above $10^{-6}$ or a hazard index above 1.0 in the *County-wide Air Toxics Study* and the *Statewide Risk Assessment*, EPA completed an update to include additional information about key assumptions available at the time of the permit issuance and about more current conditions *(e.g., facility closures, regulatory changes, reviewing emissions data concerns) (2014 Update Analysis).*[128]

The basis for EPA's determination is that with one exception *(i.e.,* locally-caught fish consumption exposure scenario for air toxics), the risk of health effects created in whole or in part by GPS emissions either at the time of the permitting or under current conditions are not above adversity benchmarks generally warranting remedial action *(i.e.,* $10^{-4}$ or HI of 1.0). EPA's update found the risk of health effects for fish consumption to be below these adversity benchmarks.

### a. Criteria Air Pollutants

EPA considered the information provided by Complainants, including the information pertinent to whether the air quality in the area in question attained the National Ambient Air Quality Standards (NAAQS). EPA also examined whether site-specific information demonstrates the presence of adverse health effects from the NAAQS pollutants, even though the area is

---

[126] Under CAA section 112(d), EPA establishes technology-based requirements for certain source categories of air toxics. EPA subsequently reviews these standards to focus on reducing any remaining risk that the source category may pose, a process called residual risk assessment. This process is followed to determine if a source category meets acceptable levels of cancer risk and noncancer hazard. This may include evaluation of pathways and exposure routes including inhalation and ingestion *(e.g.,* fish consumption).

[127] As explained in EPA's Residual Risk Report to Congress (1999, at http://www.epa.gov/airtoxics/rrisk/risk_rep.pdf) on page ES-10:

"For public health risk management decision-making in the residual risk program, EPA considers the two-step process culminating with an "ample margin of safety" determination, as established in the 1989 benzene NESHAP and endorsed by Congress in the 1990 CAA Amendments as a reasonable approach. In the first step, a "safe" or "acceptable risk" level is established considering all health information including risk estimation uncertainty. As stated in the preamble to the rule for benzene, which is a linear carcinogen (i.e., a carcinogen for which cancer risk is believed or assumed to vary linearly with exposure), "an MIR (maximum individual risk) of approximately 1 in 10 thousand should ordinarily be the upper-end of the range of acceptability." In the second step, an emission standard is set that provides an "ample margin of safety" to protect public health, considering all health information including the number of persons at risk levels higher than approximately 1 in 1 million, as well as other relevant factors including costs, economic impacts, technological feasibility, and any other relevant factors."

[128] *Genesee Power Station Technical Assessment Update*, US EPA Region 5, (August 2014). EPA completed an update in 2014; the review, including the update, did not identify adverse impacts from pollutants, and EPA terminated its review of impacts at this time.

Father Phil Schmitter

designated attainment for all such pollutants and the facility recently obtained a construction and operating permit that ostensibly meets applicable requirements.

At the time of GPS permit issuance and currently, Genesee County was in attainment status for the National Ambient Air Quality Standard (NAAQS) for ozone and remains so.[129] EPA's investigation did not find any other readily available, site specific information demonstrating the presence of an adverse health effect from ozone.

### i. Lead Emissions

At the time of GPS permit issuance, Genesee County was monitoring attainment of the NAAQS for lead, and is currently in attainment with the NAAQS for lead.[130] The Complainants provided information that indicated presence of an adverse impact from lead despite the designation of attainment. Therefore, EPA performed a lead health risk assessment which found:

1) no significant increases in the estimated hypothetical children's blood lead levels;
2) no increase in blood lead levels for children whose pre-existing blood lead levels may be elevated from exposure to higher existing soil or dust lead concentrations; and
3) predicted incremental increases to soil and dust lead levels from GPS lead emissions were sufficiently low that they would be undetectable using conventional sampling and analytical procedures.

### b. Air Toxics

EPA completed two risk assessment that evaluated the potential cancer risk and non-cancer hazard from various point sources of air toxics. In 2001, EPA completed a risk assessment of nine wood waste boilers (WWBs) and municipal waste combustors (MWCs) that were comparable to GPS and operating in Michigan at the time of the permitting of GPS.[131] This *Statewide Risk Assessment* looked at both the direct inhalation pathway and the indirect exposure pathways of: (1) garden soil and produce ingestion and (2) high end fish consumption (higher than average, but not subsistence-level consumption).

In 2005, EPA completed the *County-wide Air Toxics Study*,[132] a risk assessment that estimated potential health impacts from direct inhalation of emissions of both airborne carcinogens and non-carcinogens for four different exposure scenarios: (1) impacts of GPS emissions on an area

---

[129] Genesee County is currently in attainment for all NAAQS. See http://www.epa.gov/airquality/greenbook/anayo_mi.html. On October 1, 2015, EPA established a new NAAQS for ozone. While designations of attainment and non-attainment for the new standard have not yet occurred, Genesee County is meeting the new standard based on quality assured and certified ozone monitoring data for the 2013-2015 time period. In addition, preliminary quality assured data for 2016 continue to show attainment of the ozone NAAQS.
[130] Genesee County is currently in attainment for all NAAQS. See http://www.epa.gov/airquality/greenbook/anayo_mi.html.
[131] *Risk Assessment of Selected Municipal Waste Combustors and Wood Waste Boilers in the State of Michigan,* U.S. EPA Region 5 (January, 2001) [*2001 Statewide Risk Assessment*]
[132] *Genesee Power Station Point Source Impact Assessment*, Office of Research and Development, National Center for Exposure Assessment, (May, 2005) [*2005 County-wide Air Toxics Study*].

Father Phil Schmitter

within a 3 mile radius[133] of the facility; (2) impacts of GPS emissions within Genesee County; (3) impacts of emissions from multiple point sources, including GPS, within a 3 mile radius of GPS; and (4) impacts of emissions from multiple point sources, including GPS, within Genesee County.

The time horizon for the risk estimates assumed a 30-year exposure period. The analyses to determine the human health impacts of estimated exposure used the best available facility data and the best available risk assessment tools. EPA sought to represent assessments that could have been conducted by MDEQ at the time the permit was issued.[134]

Since those analyses were conducted, EPA has identified several types of additional emissions data including stack test information and inventory data. EPA updated the *Statewide Risk Assessment* and the *County-wide Air Toxics Assessment* to include additional information about key assumptions available at the time of the permit issuance and about more current conditions.[135] The *Update* describes the current operating status of the nine facilities evaluated in the *2001 Statewide Risk Assessment*.

### i.  Direct Exposure

In the analyses conducted, EPA found no risk above $10^{-6}$ or HI of 1.0 statewide, within Genesee County, or from GPS alone from emissions of air toxics.

### ii.  Indirect Exposure

#### 1.  Facilities Similar to GPS in Michigan

The *2001 Statewide Risk Assessment* examined potential cancer risk and non-cancer hazards from air toxics emissions from GPS and similar facilities statewide for the following exposure pathways: (1) Direct Exposure: Inhalation, (2) Indirect Exposure: Residential Ingestion Scenario (*i.e.*, garden produce and soil ingestion), and (3) Indirect Exposure: Locally-Caught Fish Consumption Scenario (*i.e.*, combined exposure pathways of inhalation, soil ingestion, water ingestion, home garden produce ingestion, and fish ingestion).

Where a cancer risk was found above $10^{-6}$ or a hazard index of 1.0 in the *2001 Statewide Risk Assessment*, EPA completed an update in 2014 to include additional information about key assumptions available at the time of the permit issuance and about current conditions (*e.g., facility closures, regulatory changes, reviewing emissions data concerns*).

---

[133] The 3-mile radius study area reflects an area of alleged impacts identified in the Title VI complaint. *2005 County-wide Air Toxics Study*, p. 6.

[134] An exception in terms of risk assessment tool availability is the Human Health Risk Assessment Protocol (HHRAP) used in the 2001 statewide assessment. The draft HHRAP was issued in 1998, and the final in 2005. HHRAP drew from earlier guidance: 1994 *Hazardous Waste Minimization and Combustion Strategy;* 1994 *Guidance for Performing Screening Level Risk Analysis at Combustion Facilities Burning Hazardous Wastes; and* 1990 *Methodology for Assessing Health Risks Associated with Indirect Exposure to Combustor Emissions, Interim Final.*

[135] Draft *Genesee Power Station Technical Assessment Update*, U.S. EPA Region 5 (October 2014) [*Update*].

Father Phil Schmitter

The *Update* looked at the three facilities in the *2001 Statewide Risk Assessment* that were estimated to have a current cancer risk in the $10^{-4}$ to $10^{-6}$ range, including GPS. However, there is no current stack test data for those three facilities that can be used to update their emissions rates in the *Statewide Assessment*. Where updated stack tests were available for other facilities they showed emissions rates significantly (93% - 99%) lower than those used in the 2001 *Statewide Assessment*. Given the magnitude of the remaining risk values relative to $1 \times 10^{-6}$ and the conservative nature of the analysis, EPA does not believe that further analysis of these facilities is warranted.

2. Facilities Similar to GPS in Michigan

Where a cancer risk was found above $10^{-6}$ or a hazard index of 1.0 in the *2005 County-wide Air Toxics Study*, EPA completed an update in 2014 to include additional information about key assumptions available at the time of the permit issuance and about current conditions. The *Update* discusses the operating status of sources of air toxics in Genesee County based on emissions of pollutants that led to the highest risk in the *2005 County-wide Air Toxics Assessment*. In addition, it discusses information on controls, permit limits, and emissions test results for selected facilities, including how emissions of pollutants of interest in the 2005 assessment may have changed since the time of the permitting decision for GPS. The goal of the *Update* was to help EPA assess whether such changes affect the conclusions of the earlier analyses.

The *Update* found that the GPS emissions do not contribute to the risk of adverse health effects from the one air point source in county that had a cancer risk in the $10^{-4}$ to $10^{-6}$ range (*i.e.*, maximum risk of $2 \times 10^{-6}$). The risk is only very marginally above $10^{-6}$ and given the conservative assumptions of the assessment, the actual risk is likely below $10^{-6}$.

### 3. Conclusion

None of the four analyses conducted by EPA provided sufficient evidence to establish adversity/harm with respect to health effects. Therefore, there is insufficient evidence to establish a prima facie case of adverse disparate impact.

However, Complainants have recently indicated that they are concerned about potential impacts from the GPS facility as it is currently being operated, including potential impacts regarding odor, fugitive dust, and lead; and are concerned about MDEQ's responsiveness to such complaints. Therefore, EPA makes recommendations to address this issue below.

**Issue 3: MDEQ's Non-Discrimination Program**

EPA reviewed MDEQ's compliance with its longstanding obligation to establish procedural safeguards required by EPA's regulations implementing the federal non-discrimination statutes, and to ensure meaningful access for persons with disabilities and limited-English proficiency to MDEQ programs and activities.

### 1. Legal Authority

23

Father Phil Schmitter

EPA's nondiscrimination regulations at 40 C.F.R. Part 7, Subpart D contain the elements
identified as being necessary parts of a recipient's nondiscrimination program: a grievance
procedure under 40 C.F.R. §7.90;[136] a statement of nondiscrimination under 40 C.F.R. §7.95;[137]
and under 40 C.F.R. §7.85(g);[138]and recipients with more than fifteen (15) full-time employees
must designate a person to coordinate its efforts to comply with its non-discrimination
obligations.

On June 25, 2004, EPA issued *Guidance to Environmental Protection Agency Financial
Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination
Affecting Limited English Proficient Persons* (LEP Guidance).[139]  The LEP guidance clarifies
recipient's existing legal obligations to provide meaningful access by limited English proficient
persons in all programs and activities that receive federal financial assistance from EPA.  The
LEP guidance also provides a description of the factors recipients should consider in fulfilling
their responsibilities to limited English proficient persons to ensure meaningful access to
recipients' programs and activities and the criteria EPA uses to evaluate whether recipients are in
compliance with Title VI and Title VI implementing regulations.

On March 21, 2006, EPA published its *Title VI Public Involvement Guidance for EPA Assistance
Recipients Administering Environmental Permitting Programs* which was developed for
recipients of EPA assistance implementing environmental permitting programs.  It discusses
various approaches, and suggests tools that recipients may use to enhance the public involvement
aspects of their current permitting programs.  It also addresses potential issues related to Title VI
and EPA's regulations implementing Title VI.[140]

## 2. Analysis

In July 2014, EPA informed MDEQ that it was in not in compliance with EPA's regulation
found at 40 C.F.R. Part 7, Subpart D which list the requirements for a recipient's
nondiscrimination program.  During a phone call on August 20, 2015, to discuss informal
resolution of the Complaint, EPA informed MDEQ again that it was not in compliance with
EPA's nondiscrimination regulation.  EPA also clarified to MDEQ that in order to come into
compliance and remedy the almost 30 years of noncompliance, MDEQ would need to implement
procedural safeguards that EPA identified for MDEQ in July 2015.

On November 6, 2015, MDEQ provided EPA a copy of MDEQ's October 28, 2015 "Policy and
Procedure Number: 09-024, Subject: Nondiscrimination in Programs Receiving Federal
Assistance from the U.S. Environmental Protection Agency" (Nondiscrimination Policy) and
links to a number of other documents related to MDEQ's public participation process.  EPA
reviewed those materials and on December 3, 2015, informed MDEQ that while MDEQ had
belatedly taken a step forward, MDEQ's Nondiscrimination Policy was insufficient to resolve

---

[136] 40 C.F.R. § 7.90.
[137] 40 C.F.R. § 7.95.
[138] 40 C.F.R. § 7.85.
[139] https://www.federalregister.gov/documents/2004/06/25/04-14464/guidance-to-environmental-protection-agency-financial-assistance-recipients-regarding-title-vi
[140] https://www.epa.gov/sites/production/files/2013-09/documents/title6_public_involvement_guidance.3.13.13.pdf

Father Phil Schmitter

the issues found during the investigation, including its failure to have such a policy in place for nearly 30 years, and to prevent the same issues from happening again.

MDEQ's Nondiscrimination Policy does not mention or implement many of the foundational elements for a standard nondiscrimination program that EPA identified. Furthermore, EPA has not been able to find this information on MDEQ's website; nor has MDEQ provided EPA with any supplemental information to support its compliance with federal nondiscrimination law and EPA's nondiscrimination regulation. For example, EPA has been unable to determine how MDEQ ensures that all persons have equal access to MDEQ's public participation process, including persons with disabilities or who have limited- English proficiency. Given the paucity of documented information available, EPA is concerned that MDEQ does not have a non-discrimination program – on paper or in practice.

As recently as January 12, 2017, EPA reviewed MDEQ's website to determine whether there was any evidence that MDEQ had corrected any of the deficiencies identified in its non-discrimination program. The results of EPA's review follow:

### a. Notice of Non-Discrimination

According to EPA's regulation at 40 C.F.R. § 7.95,

> A recipient shall provide initial and continuing notice that it does not discriminate on the basis of race, color, national origin, age, or handicap in a program or activity receiving EPA assistance or, in programs or activities covered by section 13, on the basis of sex. Methods of notice must accommodate those with impaired vision or hearing. At a minimum, this notice must be posted in a prominent place in the recipient's offices or facilities. Methods of notice may also include publishing in newspapers and magazines, and placing notices in recipient's internal publications or on recipient's printed letterhead. Where appropriate, such notice must be in a language or languages other than English." The notice must identify the employee responsible for coordinating the recipient's compliance with the Federal nondiscrimination statute and EPA's implementing regulations.

MDEQ's notice is deficient in a number of respects. The notice does not list the Federal nondiscrimination statutes to inform people about the statutes that protect them and on what bases complaints may be filed through MDEQ's grievance procedure. Instead, MDEQ refers people to other sources. Clear and complete notice to the public and employees of conduct prohibited by the Federal nondiscrimination laws is required.

MDEQ's notice is not prominently displayed on MDEQ's home page.[141] Searching MDEQ's website using common sense search terms such as "race," "Title VI," "discrimination," and "disability," does not lead directly to the notice. According to EPA's review, MDEQ's notice

---

[141] MDEQ's Nondiscrimination Policy and Procedure states that the notice will "be posted in a prominent place in the DEQ's offices or facilities" and that it may publish the notice newspapers and magazines and placing notices in DEQ's publications.

Father Phil Schmitter

currently only appears within the Nondiscrimination Policy and Procedure in a location on MDEQ's website that people have difficulty accessing.

Additionally, methods of notice must provide meaningful access to persons who are LEP and accommodate persons with disabilities. MDEQ's notice, however, is English only with a note that those who are LEP can request such notice in a language or languages other than English. Although MDEQ's current notice states that it shall accommodate those with impaired vision or hearing, there is no evidence on MDEQ's website that these services are indeed available or how to access them.

Also, the notice states that the Nondiscrimination Compliance Coordinator is the employee responsible for coordinating MDEQ's compliance with the Federal nondiscrimination statutes and EPA's implementing regulations, but does not specifically identify this person by name.

### b.  Grievance Procedures

Section C of MDEQ's Nondiscrimination Policy contains grievance procedures "in order to assure the prompt and fair resolution of complaints that allege a violation by the DEQ of 40 CFR, Part 7." The grievance procedure provides timeframes for MDEQ will take certain actions and provides for an appeal process.

However, the grievance procedure does not list the types of discrimination prohibited or the applicable Federal nondiscrimination statutes. Instead, MDEQ directs people to EPA's Part 7 regulation to determine the type of discrimination (*e.g.,* race, national origin) that has occurred and is one that is redressed by MDEQ's grievance process.

Providing adequate notice of these procedures and how to file complaints is critical to the proper functioning of MDEQ's Nondiscrimination program. MDEQ has given no indication, either in its written response or during informal resolution discussions with EPA that it intends to do more to inform the public of the existence of the grievance procedure beyond posting in its buildings and in its current, difficult-to-find location on its website.

### c.  Retaliation

MDEQ's Nondiscrimination Policy fails to contain assurances that retaliation is prohibited and that claims of retaliation will be handled promptly. To ensure individuals can invoke these grievance procedures without fear of reprisal, MDEQ's Nondiscrimination Policy and grievance procedures should explicitly prohibit retaliation against any individual "for the purpose of interfering with any right or privilege guaranteed under the Acts or this part" or because that individual "has filed a complaint or has testified, assisted, or participated in any way in an investigation, proceeding or hearing" under this part or has opposed any practice made unlawful by this part."[142] Prohibited retaliatory acts include intimidation, threats, coercion, or discrimination against any such individual or group.

---

[142] 40 CFR §100.

Father Phil Schmitter

MDEQ therefore should take steps to prevent any retaliation against those who file a complaint or who provide information regarding the complaint. At a minimum, MDEQ should ensure that complainants know how to report any potential retaliation.

### d. Other Procedural Safeguards

MDEQ's Nondiscrimination Policy is also deficient in that it does not address the need to:

(1) periodically assess the efficacy of MDEQ's efforts to maintain compliance with federal non-discrimination statutes;
(2) conduct reviews of formal and informal discrimination complaints filed with the MDEQ in order to identify and address any patterns or systemic problems; or
(3) ensure appropriate training for persons involved in informal resolution of discrimination complaints filed with MDEQ under federal non-discrimination statutes.

In addition, MDEQ's Nondiscrimination Policy and its grievance procedures fail to, among other things, discuss available informal resolution process(es) and the options for complainants to engage in those processes.

Moreover, it is unclear whether the other responsibilities of the Chief of the Office of Environmental Assistance would create a conflict of interest with those of the Nondiscrimination Compliance Coordinator, as they are currently envisioned to be the same person.

### e. Training

MDEQ has given no indication, either in its written response or during informal resolution discussions with EPA, whether any training will be provided to the Nondiscrimination Compliance Coordinator or other MDEQ employees to help them understand MDEQ's obligations under the Federal nondiscrimination statutes. In order to implement a properly functioning grievance procedure, the Nondiscrimination Compliance Coordinator must have adequate training on what constitutes discrimination and retaliation prohibited under the Federal nondiscrimination statutes and EPA's implementing regulations; how the grievance procedures operate; how to gather relevant evidence and assess it in the Title VI context; the importance of a fair and impartial process; and the applicable legal standards.

### f. Public Participation

The MDEQ website shows no evidence of a public participation plan, including processes and procedures for assessing communities (including demographics, community concerns, history, and background), performing public outreach, determining locations where public meetings should take place, providing language assistance services, providing access services for disabled persons, and providing notification of the location of the information repository.

### g. Limited-English Proficiency

27

Father Phil Schmitter

While reviewing the current public participation policies, guidance, and procedures for environmental programs provided by MDEQ, EPA could not find any information about how MDEQ will ensure that LEP persons will have meaningful access to MDEQ's public participation process.

Although EPA has brought this issue to MDEQ's attention and has been providing technical assistance to MDEQ for some time about ensuring access for LEP persons MDEQ has not submitted any documentation suggesting that it has performed any analysis to assess the needs of the LEP population it serves on a statewide basis consistent with EPA's 2004 Guidance. MDEQ has not provided any information suggesting that it has conducted any assessment of the number of eligible LEP persons in its communities; the frequency with which LEP persons come in contact with MDEQ programs; the importance of MDEQ programs and activities to LEP persons; and the resources available to MDEQ and the associated costs. There is no indication of a language access plan, or a clearly defined program to make communities aware that foreign language services are available, to translate standardized documents, or to provide for simultaneous oral interpretation of live proceedings such as town hall meetings. Moreover, EPA determined that MDEQ does not have any information on its website about its public participation process in languages other than English. After much searching, EPA found isolated links to two documents related to a particular facility that were translated into Spanish and Arabic. Also, there is no evidence that MDEQ adequately notifies LEP individuals of their right to an interpreter or the translation of all vital documents.

### h. Disability

There appears to be no well-defined process for ensuring that MDEQ's facilities and non-Agency facilities are physically accessible for persons with disabilities; or to provide, at no cost, auxiliary aids and services such as qualified interpreters for those who are deaf or hard of hearing. Notifications for access for persons with disabilities are not routinely inserted on public notice documents. The only disability notice that can be readily found by the public is an ADA link at the bottom of the MDEQ website. This links to a State of Michigan site for employment and hiring.

### 3. Conclusion

On December 3, 2015, EPA informed MDEQ that while MDEQ's Nondiscrimination Policy and Procedure policy is a step forward, it alone is not sufficient to assure EPA that MDEQ will be able to meet its nondiscrimination obligations. Nor did the public participation guidance and procedures MDEQ provided address concerns found during the investigation.

Given the aforementioned 30 years of history, EPA is deeply concerned that MDEQ will not fulfill its responsibility to implement a fully functioning and meaningful non-discrimination program as required under EPA regulations.

**Recipient' Response**

Father Phil Schmitter

In addition to responses to specific allegations discussed above, MDEQ also proffered a series of general arguments supporting its position that the Genesee Complaint should be dismissed. MDEQ asserted that EPA's consideration of the Title VI complaint should be procedurally barred under the doctrines of *res judicata* and collateral estoppel by the EAB ruling, the United States District Court's dismissal of Plaintiffs' Title VI claims with prejudice, and the rulings by the Genesee County Circuit Court and the Michigan Court of Appeals.[143]  MDEQ further stated that the complaint was moot.[144]  In 1999, MDEQ stated that the administrative complaint was six years old, concerned a 1992 permit, and raised issues that have not been raised since.  MDEQ stated "[t]here is no actual ongoing controversy."[145]

Res judicata is available as an affirmative defense once a law suit has been filed in court[146] and was prematurely raised here.  Furthermore, federal courts, including the Sixth Circuit, have recognized that the government has an interest in enforcing federal law that is separate from private interests and renders *res judicata* inapplicable in this context.[147]  Even if *res judicata* did apply, EPA was not a party to, nor was it in privity with any of the parties to the prior proceedings and so would not be bound by those prior rulings.[148]

**Attempts to Achieve Informal Resolution**

On July 16, 2014, EPA pointed out the non-discrimination regulatory requirements to MDEQ. Prior to completing the investigation, consistent with EPA regulations and the EPA's Case Resolution Manual (https://www.epa.gov/ocr/case-resolution-manual), EPA attempted to informally resolve the Genesee Complaint.  In July 2015, as part of informal resolution discussions, EPA provided MDEQ more specific recommendations to resolve issues related to the permitting of GPS and MDEQ's failure to comply with EPA's regulatory requirements and to establish the foundational elements of a properly functioning nondiscrimination program.  After admitting in August 2015 to its failure to have a non-discrimination program in place and to comply with EPA's regulatory requirements, MDEQ adopted its Nondiscrimination Policy and Procedure in October 2015.[149]

---

[143] Letter from Paul F. Novak, Assistant Attorney General, Natural Resources Division to Mike Mattheisen & Carlton Waterhouse, EPA, US EPA 1-2 (Dec. 23, 1997).

[144] Letter from Todd B. Adams, Assistant Attorney General, Natural Resources Division, Michigan Department of Attorney General to Ann Goode, Director, EPA, US EPA 3 (July 28, 1999).

[145] *Id.*

[146] Fed. R. Civ. P. 8(c).

[147] *See, EEOC v. McLean Trucking Co.*, 525 F.2d 1007, 1010 (6th Cir. 1976), *following, EEOC v. Kimberly-Clark Corp.*, 511 F.2d 1352, 1361 (6th Cir. 1975), *cert. denied*, 423 U.S. 994 (1975)(examining res judicata in the context of EEOC cases). *See also, Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984)(rejecting res judicata claim in an ERISA suit); *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 692 (7th Cir. 1986) (*en banc*)(considering Voting Rights Act and Title VII actions and comparing with ERISA suit in concluding that statutes that implicate underlying constitutional concerns protect the public interest, which is broader than the interest of private parties who bring suit).

[148] *See, e.g., Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation.*, 402 U.S. 313, 329 (1971) (stating that, "Due process prohibits estopping [litigants who never appeared in a prior action and did not have a chance to present their evidence and argument on the claim] despite one or more existing adjudications of the identical issue which stand squarely against their position.").

[149] October 28, 2015, "Policy and Procedure Number: 09-024, Subject: Nondiscrimination in Programs Receiving Federal Assistance from the U.S. Environmental Protection Agency" (Nondiscrimination Policy and Procedure).

Father Phil Schmitter

On March 21, 2016, the Governor's Flint Water Advisory Task Force recognized the Flint drinking water crisis as a "case of environmental injustice." The Task Force stated "Flint residents, who are majority Black or African American and among the most impoverished of any metropolitan area in the United States, did not enjoy the same degree of protection from environmental and health hazards as that provided to other communities. Moreover, by virtue of their being subject to emergency management, Flint residents were not provided equal access to, and meaningful involvement in, the government decision-making process."[150]

By March 2016, six months had passed since EPA had identified a set of common sense measures focused on ensuring that residents of Flint, and all of Michigan, had equal access to, and meaningful involvement in, the government decision-making process. It is now 18 months since MDEQ was provided those procedural safeguards. MDEQ has both argued that these procedural safeguard issues should be dealt with through a process separate from that of the Genesee Complaint and that it needed more time to consider EPA's recommendations. EPA has determined that continuing our attempts to informally resolve issues raised in the Genesee Complaint investigation are likely to continue to be unproductive.

**Continuing Concerns**

Based on the investigation of the circumstances surrounding the issuance of the Genesee permit and reviewing public participation materials provided by MDEQ, EPA has significant concerns about MDEQ's current public participation program and whether MDEQ can ensure that discriminatory treatment would not occur today. Similarly, EPA for the reasons discussed above is deeply concerned that MDEQ does not take seriously its responsibility to implement a properly functioning non-discrimination program as required under EPA regulations.

In the context of the Flint Complaint, EPA has already informed MDEQ that it will conduct an investigation into MDEQ's procedures for public notification and involvement as wells as compliance with its non-discrimination requirements. In that investigation, EPA will investigate further whether MDEQ's public participation program has sufficient safeguards to ensure it is operated in a nondiscriminatory manner; and whether MDEQ's non-discrimination program is easily accessible and designed and staffed to function properly.

In recent conversations, the Complainants raised the public's current inability to track the status and resolution of both environmental and civil rights complaints filed with MDEQ and inability to access accurate information about facility emissions. Access to such information is a critical component of meaningful public participation in government processes. Therefore, EPA will review these concerns in its investigation of the Flint Complaint.

In correspondence submitted after operation of GPS began and in recent conversations, the Complainants also raised related to the operation of GPS including the impacts of odors, fugitive dust, and lead emissions.

**Next Steps**

---

[150] Flint Water Advisory Task Force, *Flint Water Advisory Task Force Final Report* (March 2016), page 54.

Father Phil Schmitter

In order ensure the problems found in MDEQ's public participation process will not occur in the future, EPA recommends MDEQ:

1. Develop and implement a policy that will require MDEQ to create and/or carry out each step listed below each time that MDEQ engages in a public participation or public involvement process:

   a. An overview of MDEQ's plan of action for addressing the community's needs and concerns;
   b. A description of the community (including demographics, history, and background);
   c. A contact list of agency officials with phone numbers and email addresses to allow the public to communicate via phone or internet;
   d. A detailed plan of action (outreach activities) Recipient will take to address concerns;
   e. A contingency plan for unexpected events;
   f. Location(s) where public meetings will be held (consider the availability and schedules of public transportation);
   g. Contact names for obtaining language assistance services for limited-English proficient persons, including, translation of documents and/or interpreters for meetings;
   h. Appropriate local media contacts (based on the culture and linguistic needs of the community); and
   i. Location of the information repository.

2. Develop factors to assist MDEQ employees in making decisions regarding the appropriate time, location, duration, and security at public meetings and guidance to ensure they are applied in a non-discriminatory manner.

3. Establish and maintain an environmental complaint receiving and response system that clearly enables those complainants to submit environmental complaints, determine how the complaints are responded to by MDEQ, and review documents associated with the results of any MDEQ investigations regarding their complaints.

In order to ensure that MDEQ's non-discrimination program is easily accessible and designed and staffed to function properly, EPA recommends MDEQ:

4. Adopt a notice of nondiscrimination that contains at a minimum, the following statements:

   a. MDEQ does not discriminate on the basis of race, color, national origin, disability, age, or sex in the administration of its programs or activities, as required by applicable laws and regulations.

   b. MDEQ is responsible for coordination of compliance efforts and receipt of inquiries concerning non-discrimination requirements implemented by 40 C.F.R. Part 7 (Non-discrimination in Programs or Activities Receiving Federal Assistance from the Environmental Protection Agency), including Title VI of the Civil Rights Act of 1964, as amended; Section 504 of the Rehabilitation Act of 1973; the Age Discrimination Act of 1975, Title IX of the Education Amendments of 1972, and Section 13 of the Federal Water Pollution Control Act Amendments of 1972.

   c. If you have any questions about this notice or any of MDEQ's non-discrimination programs, policies or procedures, you may contact:
      DEQ Nondiscrimination Compliance Coordinator
      Office of Environmental Assistance
      Michigan Department of Environmental Quality
      525 West Allegan Street
      P.O. Box 30457
      Lansing, MI  48909-7957
      Email: [XXXXXXXXXX]@michigan.gov
      Phone Number: [XXX-XXX-XXXX]

   d. If you believe that you have been discriminated against with respect to a MDEQ program or activity, you may contact the DEQ Nondiscrimination Compliance Coordinator identified above or visit our website at http://www.michigan.gov/deq/ and click the link for Nondiscrimination Policy and Procedure to obtain a copy of the DEQ's procedures to file a complaint of discrimination.

5. Prominently post the notice of non-discrimination on the MDEQ website, in general publications that are distributed to the public, and in MDEQ's offices or facilities.  In order to ensure effective communication with the public, MDEQ will have its notice of non-discrimination made accessible to limited-English proficient individuals and individuals with disabilities.

6. Adopt grievance procedures that will at a minimum address the following:
   a. Who may file a complaint under the procedures;
   b. Which informal process(es) are available, and the options for complainants to bypass an informal process for a formal process at any point;
   c. That an appropriate, prompt and impartial investigation of any allegations filed under federal non-discrimination statutes will be conducted;
   d. That the preponderance of the evidence standards will be applied during the analysis of the complaint;
   e. Contain assurances that retaliation is prohibited and that claims of retaliation will be handled promptly if they occur;
   f. That complaints will be investigated in a prompt and appropriate manner;
   g. That written notice will be promptly provided about the outcome of the investigation, including whether discrimination is found, and a description of the investigation process. (Whether complaint investigations and resolutions to be

Father Phil Schmitter

"prompt" will vary depending on the complexity of the investigation and the severity and extent of the alleged discrimination.  For example, the investigation and resolution of a complaint involving multiple allegations and multiple complainants likely would take longer than one involving a single allegation of discrimination and a single complainant.)

7.  Widely publish in print and on-line its grievance procedures to process discrimination complaints filed under federal non-discrimination statutes, and do so on a continual basis, to allow for prompt and appropriate handling of those discrimination complaints.

8.  Ensure that it has designated at least one Non-Discrimination Coordinator to ensure MDEQ's compliance with Title VI, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Section 13 of Federal Water Pollution Control Act of 1972, and Title IX of the Education Amendments of 1972 (hereinafter referred to collectively as the federal non-discrimination statutes).

9.  Ensure that it has widely published in print and on-line, and will do so on a continual basis, the title of the Non-Discrimination Coordinator, email address, telephone contact information, and duties of the Non-Discrimination Coordinator.

10. Ensure that the Non-Discrimination Coordinator's responsibilities include the following:

   a.  Provide information to individuals regarding their right to services, aids, benefits, and participation in any MDEQ program or activity without regard to their race, national origin, color, sex, disability, age or prior opposition to discrimination, as well as notice of MDEQ's formal and informal grievance processes and the ability to file a discrimination complaint with MDEQ.
   b.  Establish grievance policies and procedures or mechanisms (*e.g.,* an investigation manual) to ensure that all discrimination complaints filed with MDEQ under federal non-discrimination statutes are processed promptly and appropriately. One element of any policy and procedure or mechanism must include MDEQ providing meaningful access for limited-English proficient individuals and individuals with disabilities to MDEQ programs and activities.
   c.  Ensure the tracking of all discrimination complaints filed with MDEQ under federal non-discrimination statutes including any patterns or systemic problems.
   d.  Conduct a semiannual review of all formal and informal discrimination complaints filed with the MDEQ Non-Discrimination Coordinator under federal non-discrimination statutes and/or any other complaints independently investigated by MDEQ in order to identify and address any patterns or systemic problems.
   e.  Inform and advise MDEQ staff regarding the MDEQ's obligations to comply with federal non-discrimination statutes and serve as a resource on such issues.
   f.  Ensure that complainants are updated on the progress of their discrimination complaints filed with MDEQ under federal non-discrimination statutes and are promptly informed as to any determinations made.

Father Phil Schmitter

      g.  Annually assess the efficacy of MDEQ's efforts to maintain compliance with federal non-discrimination statutes.

      h.  Ensure appropriate training in Alternative Dispute Resolution for persons involved in informal resolution of discrimination complaints filed under federal non-discrimination statutes.

      i.  Provide or procure appropriate services to ensure MDEQ employees are appropriately trained on MDEQ non-discrimination policies and procedures, as well as the nature of the federal non-discrimination obligations.

11. Ensure that the Non-Discrimination Coordinator will not have other responsibilities that create a conflict of interest (*e.g.*, serving as the Non-Discrimination Coordinator as well MDEQ legal advisor or representative on civil rights issues).

12. Ensure its public involvement process is available to all persons regardless of race, color, national origin (including limited-English proficiency), age, disability, and sex.

13. Conduct the appropriate analysis described in EPA's LEP Guidance found at 69 FR 35602 (June 25, 2004) and http://www.lep.gov to determine what language services it may need to provide to ensure that limited-English proficient individuals can meaningfully participate in the process. MDEQ should develop a language access plan consistent with the details found in EPA's training module for LEP. http://www.epa.gov/civilrights/lepaccess.htm

14. Develop, publish, and implement written procedures to ensure meaningful access to all MDEQ programs and activities by all persons, including access by limited-English proficient individuals and individuals with disabilities.

15. Provide at no cost appropriate auxiliary aids and services including, for example, qualified interpreters to individuals who are deaf or hard of hearing, and to other individuals as necessary to ensure effective communication or an equal opportunity to participate fully in the benefits, activities, programs and services provided by MDEQ in a timely manner and in such a way as to protect the privacy and independence of the individual.

16. Ensure that all appropriate MDEQ staff have been trained on its internal non-discrimination policies and procedures and on federal non-discrimination obligations.

17. Have a plan in place to ensure that such training is a routine part of the on-boarding process for new employees.

In addition, in order to address continuing community concerns related to the operation of the GPS facility, EPA urges MDEQ to:

1. Continue any current investigations and investigate any community concerns (including those concerns brought to MDEQ's attention by EPA) or complaints hereafter expressed regarding odor, fugitive dust, lead, or other impacts from the GPS facility.

Father Phil Schmitter

2.  Consider its Title VI obligations, the findings of the investigations conducted pursuant the recommendation immediately above, and the concerns expressed by the communities near the GPS facility during any future permit renewal or permit modifications for the facility and document such consideration.

3.  Ensure that it has in place an environmental complaint receiving and response system that clearly enables those complainants wishing to raise environmental concerns regarding the GPS Facility to submit environmental complaints, determine how the complaints are responded to by MDEQ, and review documents associated with the results of any MDEQ investigations regarding their complaints.

This letter sets forth OCR's disposition of the Genesee Complaint (EPA File No. 01R-94-R5). This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. This letter and any findings herein do not affect MDEQ's continuing responsibility to comply with Title VI or other federal non-discrimination laws and EPA's regulations at 40 CFR Part 7, including § 7.85, nor do they affect EPA's investigation of any Title VI or other federal civil rights complaints or address any other matter not addressed in this letter. If you have any questions, please feel free to contact me at (202) 564-9649, by e-mail at dorka.lilian@epa.gov, or U.S. mail at U.S. EPA, Office of General Counsel, External Civil Rights Compliance Office (Mail Code 2310A), 1200 Pennsylvania Avenue, N.W., Washington, D.C., 20460.

Sincerely,

Lilian S. Dorka
Director
External Civil Rights Compliance Office
Office of General Counsel

Cc:

Elise B. Packard
Associate General Counsel for Civil Rights and Finance
U.S. EPA Office of General Counsel

Cheryl Newton
Acting Deputy Civil Rights Official, U.S. EPA Region 5