IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.



ELON MUSK, LEE ZELDIN,
Donald J. Trump in their official
Capacity as Federal Employees
and Mr. Trump, in his official
capacity as President of the
United States, et al. - APPELLEES

*NOTICE of concurrence with the Appellees (MUSK, TRUMP, et al) MOTION TO DISMISS pro se appeal #25-1158*

*Date: April 2nd, 2025*

*On or about April 2nd… [both] appellants pro se …(Colleen Connors) and [Melvin Jones Jr.] became aware of FURTHER NEW and VERY IMPORTANT FILINGS in "companion immigration case" #25-cv-00766 (the Honorable Chief U.S. Judge Boasberg presiding)…. SEE THE*

*ATTACHED SMALL PRINT EXHIBITS AFFIXED HERETO… which disabled pro se appellant Melvin Jones Jr. HAS NOT READ fully due to such being VERY blurry and [his]/ pro se appellants' Melvin Jones Jr. 's serious vision impairments.*

*Nonetheless, as to our instant pro se appeal #25-1158 [and] the defendants'/ appellees*

*motion to dismiss the instant appeal....*

*Here, [we] the pro se appellants NOW give NOTICE to the honorable appeals court, and BOTH [sets] of appellees (e.g. the Donald Trump administration, et al) and the Democratic[] AG appellees State of New Jersey and MI DANA NESSEL, et al.... Of our CONCURRENCE with the president Donald Trump, et*

*al. motion to dismiss the instant appeal #25-1158 WITHOUT PREUDICE.... But NOT for the entirety of the attached declarations affixed hereto.*
*More so.... The appellants pro se... BELIEVE NOW that due to what appears to be [a] SIGNIFICANT continued worsening of Melvin Jones Jr.'s serious and disabling medical conditions [e.g. we believe worsened by and as*

*a result of the Flint Water Crisis].... SEE THE VARIOUS NOTICES AND LETTERS FILED IN THE INSTANT APPEAL #25-1158.... that [he]/ Mr. Jones can NO LONGER participate effectively in the instant appeal nor instant district court case #25-cv-10139 which gave rise to our pro se appeal #25-1158 in the first place.*

*Additionally - [we]/ pro se appellants also believe that Colleen Connors' "IBS" and kidney/ bladder issues which manifest as frequent urination ...which interferes with her/ Colleen's sleep and circadian rhythm... has/ is become MUCH worse on account and due to the Flint Water Crisis.... Which is YET another reason... that the pro se appellants here.... feel/ believe that we NOW must*

*concur to DISMISSAL of our pro se appeal WITHOUT PREJUDICE.*

*More to the point.... there are NUMEROUS other challenges to the ELON MUSK/ DONALD TRUMP birth-right citizenship Executive Order anyway....*

*Thank you.*
*Respectfully Submitted.*
*Best,*

_____

Colleen Connors PRO SE
appellant (interested party)
1935 Hosler St.
Flint, Michigan 48503
Email:
cmcolleen4@gmail.com


Google voice to text ph#
(use email)

_____

*/Melvin Jones Jr./ disabled PRO SE appellant (interested party)*

*1935 Hosler St.*

*Flint, Michigan 48503*

*Email: jonesjrmel@gmail.com*

*Google voice to text ph# 415-562-5074*

*{see the exhibit on the next page[s]}*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| J.G.G., *et al.*, | ) | Civil Action No. 1:25-cv-00766 |
| | ) | |
| Plaintiffs-Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants-Respondents. | ) | |

_____

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    I.    Tren de Aragua's Designation as a Foreign Terrorist Organization and
Under the Alien Enemies Act ............................................................... 2

    II.    This Suit ................................................................................................ 6

ARGUMENT ......................................................................................................... 10

    I.    This Court Lacks Jurisdiction over Plaintiffs' Claims .......................... 10

        A.    There is no jurisdiction to review the President's Proclamation ............. 10

        B.    AEA Claims Must Exclusively Be Brought Through Habeas .................. 13

    II.    Plaintiffs Cannot Succeed on the Merits of Their Claims ..................... 17

        A.    The Proclamation comports with the requirements of the statute ............ 17

            1.    TdA's actions constitute an invasion or a predatory
incursion into the territory of the United States ........................... 17

            2.    Given its intimate connection to Venezuela, TdA is a
"foreign nation or government" for purposes of Section 21 ........ 19

        B.    The Proclamation is supported by the President's inherent
authority to conduct foreign affairs and address national security
risks ........................................................................................................ 22

        C.    Plaintiffs' remaining arguments lack merit .............................................. 23

    III.    The Remaining Equitable Factors Weigh Strongly in the Government's
Favor ..................................................................................................... 27

        A.    Plaintiffs have not established irreparable harm ..................................... 27

        B.    The balance of equities favors denial of preliminary injunctive
relief ....................................................................................................... 28

    IV.    The Court Should Not Enter a Nationwide Injunction Based on a
Defective Provisional Class Certification. ............................................ 29

    V.    Plaintiffs Must Provide Security ........................................................... 32

CONCLUSION ...................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abramski v. United States,*
    134 S. Ct. 2259 (2014) ............................................................................. 20

*Adams v. Vance,*
    570 F.2d 950 (D.C. Cir. 1978) .................................................................. 28

*Amaya v. Stanolind Oil & Gas Co.,*
    62 F. Supp. 181 (S.D. Tex. 1945) ............................................................. 18

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................................................ 30, 31

*Ameziane v. Obama,*
    699 F.3d 488 (D.C. Cir. 2012) .................................................................. 21

*Armstrong v. Bush,*
    924 F.2d 282 (D.C. Cir. 1991) .................................................................. 16

*Baker v. Carr,*
    369 U.S. 186 (1962) .................................................................................. 11

*Bas v. Tingy,*
    4 US 37 (1800) .......................................................................................... 18

*Biden v. Texas,*
    142 S. Ct. 2528 (2022) ............................................................................. 29

*Boudin v. Thomas,*
    732 F.2d 1107 (2d Cir. 1984) ................................................................... 13

*Boumediene v. Bush,*
    553 U.S. 723 (2008) .................................................................................. 15

*Brownell v. Tom We Shung,*
    352 U.S. 180 (1956) .................................................................................. 15

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ............................................................ 11, 12

*Citizens Protective League v. Clark,*
    155 F.2d 290 (D.C. Cir. 1946) ......................................................... 11, 13, 25

ii

*Clinton v. Goldsmith,*
  526 U.S. 529 (1999) .................................................................................... 15

*Davis v. U.S. Sent'g Comm'n,*
  716 F.3d 660 (D.C. Cir. 2013) ................................................................... 14

*Davrod Corp. v. Coates,*
  971 F.2d 778 (1st Cir. 1992) ...................................................................... 18

*Dep't of State v. AIDS Vaccine Advoc. Coal.,*
  No. 24A831, slip op. 7 (2025) .................................................................... 29

*Department of State v. AIDS Vaccine Advocacy Coalition,*
  145 S. Ct. 753 (2025) ................................................................................... 32

*DHS v. Thuraissigiam,*
  591 U.S. 103 (2020) ..................................................................................... 14

*El-Shifa Pharm. Indus. Co. v. United States,*
  607 F.3d 836 (D.C. Cir. 2010) .............................................................. 12, 20

*Epic Systems Corp. v. Lewis,*
  584 U.S. 497 (2018) ..................................................................................... 27

*Ex parte Gilroy,*
  257 F. 110 (S.D.N.Y. 1919) ......................................................................... 11

*Fletcher v. Reilly,*
  433 F.3d 867 (D.C. Cir. 2006) ................................................................... 13

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ..................................................................................... 16

*General Tel. Co. v. Falcon,*
  457 U.S. 147 (1982) ..................................................................................... 31

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) .............................................................................. 12, 22

*Harris v. Med. Transp. Mgmt., Inc.,*
  77 F.4th 746 (D.C. Cir. 2023) .................................................................... 13

*Heck v. Humphrey,*
  512 U.S. 477 (1994) ..................................................................................... 14

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ..................................................................................... 3, 29

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) .......................................................... 25, 26

*In re Nat'l Nurses United*,
    47 F.4th 746 (D.C. Cir. 2022) .......................................................... 15

*J.G.G. v. Trump*,
    No. 25-5067 (D.C. Cir. filed Mar. 15, 2025) ................................... 6

*J.G.G. v. Trump*,
    No. 25-5068 (D.C. Cir. filed Mar. 15, 2025) ................................... 7

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) ........................................................................ 29

*Kiyemba v. Obama*,
    561 F.3d 509 (D.C. Cir. 2009) ........................................................ 24

*LoBue v. Christopher*,
    82 F.3d 1081 (D.C. Cir. 1996) ................................................... 1, 14

*Lockington v. Smith*,
    15 F. Cas. 758 (C.C.D. Pa. 1817) .................................................. 4

*Ludecke v. Watkins*,
    335 U.S. 160 (1948) .................................................................. passim

*Makekau v. Hawaii*,
    943 F.3d 1200 (9th Cir. 2019) ........................................................ 15

*Martin v. Mott*,
    25 U.S. 18 (1827) ............................................................................ 12

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ........................................................................ 30

*Mathews v. Diaz*,
    426 U.S. 67 (1976) .......................................................................... 12

*Matos v. Venegas*, No. 25-cv-00057 (S.D. Tex.) ................................... 16

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) .......................................................... 10

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) .................................................................. 27, 28

iv

*Morton v. Mancari,*
    417 U.S. 535 (1974) .................................................................................................. 27

*Munaf v. Geren,*
    553 U.S. 674 (2008) .................................................................................................. 24

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ................................................................................ 10

*Nishimura Ekiu v. United States,*
    142 U.S. 651 (1892) .................................................................................................. 23

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................ 28, 29

*O'Banion v. Matevousian,*
    835 F. App'x 347 (10th Cir. 2020) ........................................................................... 15

*Rumsfled v. Padilla,*
    542 U.S. 426 (2004) .................................................................................................. 13

*Sale v. Haitian Ctrs. Council, Inc.,*
    509 U.S. 155 (1993) .................................................................................................. 25

*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005) .................................................................................. 11

*Smith v. Bayer Corp.,*
    564 U.S. 299 (2011) .................................................................................................. 32

*Syngenta Crop Prot., Inc. v. Henson,*
    537 U.S. 28 (2002) .................................................................................................... 15

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .................................................................................................. 30

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ............................................................................................ 30, 32

*Trump v. United States,*
    603 U.S. 593 (2024) .................................................................................................. 10

*Tulare Cnty. v. Bush,*
    185 F. Supp. 2d 18 (D.D.C. 2001) ............................................................................ 16

*U.S. ex rel. Schlueter v. Watkins,*
    67 F. Supp. 556 (S.D.N.Y.) ................................................................................ 13, 16

*U.S. ex rel. Schwarzkopf v. Uhl*,
    137 F.2d 898 (2d Cir. 1943) ................................................................ 13

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ........................................................................... 23

*United States ex rel. Schlueter v. Watkins*,
    158 F.2d 853 (2d Cir. 1946) ............................................................... 23

*United States ex rel. Von Kleczkowski v. Watkins*,
    71 F. Supp. 429 (S.D.N.Y. 1947) .................................................. 26, 27

*United States v. Cortez*,
    449 U.S. 411 (1981) ........................................................................... 28

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ...................................................................... 21, 22

*United States v. Texas*,
    719 F. Supp. 3d 640 (W.D. Tex. 2024) .............................................. 17

*Vetcher v. Sessions*,
    316 F. Supp. 3d 70 (D.D.C. 2018) ...................................................... 16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................... 30, 31

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ........................................................................... 22

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ........................................................................... 29

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ............................................................................... 21

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ............................................................................... 22

**Statutes**

28 U.S.C. § 1651(a) .............................................................................. 15

5 U.S.C. § 704 ...................................................................................... 15

50 U.S.C. § 21 ............................................................................... passim

50 U.S.C. § 22 ............................................................................... 21, 24

50 U.S.C. § 23 ................................................................................................ 4

50 U.S.C. § 24 ................................................................................................ 4

8 U.S.C. § 1158(b)(1)(A) ................................................................................ 25

8 U.S.C. § 1182(b)(3)(B) ................................................................................ 6

8 U.S.C. § 1229a(a)(3) .................................................................................... 26

8 U.S.C. § 1231(b)(3) ...................................................................................... 25

8 U.S.C. § 1231(b)(3)(A) ................................................................................ 26

8 U.S.C. § 1231(b)(3)(B)(iv) .......................................................................... 26

Exec. Order No. 14,157 .................................................................................. 2

**Rules**

Fed. R. Civ. P. 23(c)(1)(B), (2) ...................................................................... 30

Fed. R. Civ. P. 65(c) ....................................................................................... 32

**Regulations**

8 C.F.R. 1208.16 .............................................................................................. 25

8 C.F.R. 1208.16(a), 1208.18(b) ..................................................................... 26

90 Fed. Reg. 10,030 (Feb. 20, 2025) ............................................................. 2

90 Fed. Reg. 13,033 (Mar. 20, 2025) ............................................................. 3

**Other Authorities**

Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*,
118 Harv. L. Rev. 2047, 2066 (2005) ..................................................... 19

*Habeas Corpus, Executive Detention, and the Removal of Aliens*,
98 Colum L. Rev. 961 (1998) .................................................................. 13

*See* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/ ..................................... 4, 5

## INTRODUCTION

Plaintiffs' request for a preliminary injunction should be denied because this case is fundamentally miscast and procedurally barred. They style their claims as exclusively arising under the Administrative Procedure Act (APA). But that is inconsistent with binding Supreme Court precedent. The Court has held that detentions and removals under the Alien Enemies Act (AEA) are so bound up with critical national-security judgments that they are barely amenable to judicial review at all, let alone amendable to the sort of searching review that the APA usually provides. *See, e.g., Ludecke v. Watkins*, 335 U.S. 160 (1948). Instead, aliens subject to the AEA can only obtain judicial review of their individualized AEA determinations through habeas, and habeas alone. *See LoBue v. Christopher*, 82 F.3d 1081, 1082-83 (D.C. Cir. 1996) ("[T]he key to plaintiffs' inability to pursue a suit here is jurisdictional, and it rests merely on the availability— not the actual seeking—of habeas relief elsewhere."). Here, however, Plaintiffs abandoned their claims for habeas relief and filed this suit outside of their district of their confinement (the Southern District of Texas). The Court therefore lacks authority to grant relief.

But even if not procedurally barred, Plaintiffs' motion fails on the merits. The President made two findings to enable designated enemy aliens to be summarily removable under the AEA: that TdA members are involved in, threatening, or attempting an "invasion" or "predatory incursion," and that TdA has "infiltrated," and "acts at the direction" of the Maduro regime in Venezuela. The President made both findings based on specific descriptions of TdA's hostile activities and entwinement with the Maduro regime in Venezuela. Those findings fully comport with the exercise of authority under the AEA. And the attendant removals are not inconsistent with immigration laws, including the Immigration and Nationality Act ("INA"), and the Due Process

1

Clause. So even if this Court had the power to review Plaintiffs' claims, Plaintiffs are unable to show that they are likely to succeed on them.

The balance of the equities also supports denial of Plaintiffs' motion. The Plaintiffs, all individuals identified as member of a group designated by the Secretary of State as a Foreign Terrorist Organization (FTO), cannot credibly claim injury from the President's decision to expel them from the United States. Meanwhile the President has an overwhelming interest in securing the United States and in ensuring that the executive's significant outlay of diplomatic capital for this mission is not wasted.

Finally, and in any event, the Court should decline to grant classwide injunctive relief because Plaintiffs have not met the rigorous standards under Federal Rule Civil Procedure 23. If the Court awards injunctive relief, it should require Plaintiffs to provide security.

## BACKGROUND

I.    **Tren de Aragua's Designation as a Foreign Terrorist Organization and Under the Alien Enemies Act**

Tren de Aragua (TdA) is a transnational criminal organization that originated in Venezuela and has "conducted kidnappings, extorted businesses, bribed public officials, authorized its members to attack and kill U.S. law enforcement, and assassinated a Venezuelan opposition figure." Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025); *see also* Declaration of Selweyn Smith at ¶¶ 6-7; Declaration of Marcos D. Charles. The President has found that TdA operates "both within and outside the United States," and that its "extraordinarily violent" campaign of terror presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 14,157, 90 Fed. Reg. 8439, 8439 (Jan. 29, 2025). On the first day of his term, the President declared a national emergency to respond to that threat. *Id.*

2

The threat is so acute that on February 20, 2025, the Secretary of State, in consultation with other Cabinet officers, designated TdA a "foreign terrorist organization." 90 Fed. Reg. 10,030 (Feb. 20, 2025). The immigration laws authorize such a designation upon the Secretary's finding that an organization is foreign, engages in "terrorist activity" or "terrorism" or "retains the capability and intent" to do so, and thereby "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1), (d)(4); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 9 (2010). Given that TdA poses a significant threat to national security, government officials at the White House and the Department of State have expended significant efforts engaging in delicate negotiations with foreign governments and representatives in order to remove TdA members from the United States as swiftly as possible. As the Senior Bureau Official within the State Department's Bureau of Western Hemisphere Affairs has explained, high-level government officials—including the Secretary himself—spent weeks "negotiat[ing] at the highest levels with the Government of El Salvador and with Nicolas Maduro and his representatives in Venezuela" with a view to securing consent to the removal to Venezuela and El Salvador of Venezuelan nationals detained in the United States who are members of TdA. Declaration of Michael Kozak (Kozak Decl.), ECF No. 26-2 at ¶ 2. Following those "intensive and delicate negotiations," the United States reached arrangements "with these foreign interlocutors to accept the removal of some number of Venezuelan members of TdA." *Id.*

On March 14, 2025, the President signed a proclamation, which was published on the White House website on March 15, invoking his authorities under the Alien Enemies Act (AEA), 50 U.S.C. § 21 et seq., against members of TdA. See Proclamation No. 10,903 § 1 (Mar. 14, 2025), 90 Fed. Reg. 13,033 (Mar. 20, 2025) (Proclamation). Originally enacted in 1798, the AEA grants

the Executive broad power to remove enemy aliens from the United States. For instance, the first

sentence of Section 21 provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

50 U.S.C. § 21. Section 21's second sentence elaborates on related powers:

> The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

The Act's remaining provisions outline procedures for implementing the President's broad

authority. Section 22 provides that "an alien who becomes liable as an enemy" but who "is not

chargeable with actual hostility, or other crime against the public safety," may be afforded some

time to settle his affairs before departing from the United States. 50 U.S.C. § 22. Section 23

provides an optional process by which an alien enemy can be ordered removed by a federal court

following a complaint, rather than directly by the President. 50 U.S.C. § 23; *see Lockington v.*

*Smith*, 15 F. Cas. 758, 761 (C.C.D. Pa. 1817) (Washington, J.) (the President can remove alien

enemies under the Act without resorting to the Section 23 process). And Section 24 prescribes a

role for marshals in implementing removal orders under the Act. 50 U.S.C. § 24.

The President's March 14 Proclamation outlines his findings that TdA members meet the

statutory criteria for removal under the Alien Enemies Act. The President found that TdA, which

4

"commits brutal crimes" including murder and kidnapping, is "conducting irregular warfare and undertaking hostile actions against the United States." *See* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/. The President further found that TdA has "engaged in and continues to engage in mass illegal migration to the United States" as a means of supporting Maduro's goal of "harming United States citizens, undermining public safety," and "destabilizing" the United States. *Id*. And the President found that TdA works with the Maduro-sponsored Cartel de los Soles to use "illegal narcotics as a weapon to 'flood' the United States." *Id*.

The President additionally found that TdA and other criminal organizations have taken control over Venezuelan territory, resulting in a "hybrid criminal state." *Id*. Moreover, TdA is "closely aligned with" Maduro's regime in Venezuela, and indeed has "infiltrated" the regime's "military and law enforcement apparatus." *Id*. The resulting hybrid state, the President determined, "is perpetrating an invasion of and predatory incursion into the United States," posing "a substantial danger" to the Nation. *Id*.

Based on those findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" pursuant to 50 U.S.C. § 21. *Id*. Further, "all such members of TdA are" "chargeable with actual hostility against the United States" and "are a danger to the public peace or safety of the United States." *Id*.

The Proclamation adds that all such TdA members "are subject to immediate apprehension, detention, and removal." *Id*. To that end, the President directed the Attorney General

5

and the Secretary of Homeland Security to "apprehend, restrain, secure, and remove every Alien Enemy described" above. *Id*. Any such TdA member found within the United States is "subject to summary apprehension." *Id*. Aliens apprehended under the Proclamation may be detained until their removal, then may be removed to "any such location as may be directed" by the enforcing officers. *Id*. TdA members remain deportable under other authorities, including pursuant to a final order of removal issued under Title 8 as members of a foreign terrorist organization or otherwise. 8 U.S.C. §§ 1182(b)(3)(B), 1227(a)(4)(B). But the Proclamation lets the President use a particularly expeditious, statutorily authorized removal method for individuals found to present serious national-security threats under specified circumstances.

## II.    This Suit

On March 15, 2025, Plaintiffs, five nationals of Venezuela who claim to fear removal under the Proclamation, filed this putative class-action complaint along with a motion for a temporary restraining order. Plaintiffs moved to certify a class of "[a]ll noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation and/or its implementation." Compl., ECF No. 1, a p. 12. Plaintiffs asserted that implementing the Proclamation would violate "their right to habeas corpus" and asked for "a writ of habeas corpus." Compl. at 21. Plaintiffs also sought relief under the APA, asking for an injunction barring enforcement of the Proclamation as contrary to the AEA, the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., and other authorities. Compl. at 15-21. Plaintiffs, finally, moved for a TRO "barring their summary removal under the AEA." ECF No. 3-2, at 2.

Hours later, the Court granted Plaintiffs' motion and ordered that "Defendants shall not remove any of the individual Plaintiffs from the United States for 14 days absent further Order of the Court."  Second Minute Order (Mar. 15, 2025). The Government appealed the district court's

first order and filed an emergency motion to stay it. *See J.G.G. v. Trump*, No. 25-5067 (D.C. Cir. filed Mar. 15, 2025). Later that day, the Court then held a hearing on March 15, 2025, at 5:00 p.m. Third Minute Order (Mar. 15, 2025). At that hearing, Plaintiffs dismissed their habeas claims at this Court's suggestion. Afterward, the Court issued an order (1) provisionally certifying a class of individuals determined by the Executive to be members of a designated FTO, defined as "All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation . . . and its implementation," (2) enjoining the Government "from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court," and (3) setting a briefing schedule for a motion to vacate the TRO. Fourth Minute Order (Mar. 15, 2025). The Government filed a second emergency appeal, this time of the nationwide order and sought a stay on an emergency basis. *See J.G.G. v. Trump*, No. 25-5068 (D.C. Cir. filed Mar. 15, 2025).

On March 17, the government moved in the district court to vacate the nationwide TRO, ECF No. 26, on March 24, the Court denied the government's motion, ECF No. 52. The Court explained that Plaintiffs "are not limited to habeas relief," because they challenge only their removal and "do not seek release from confinement." *Id*. Turning to the merits, the Court found that Plaintiffs are likely to prevail on their claim that "summary deportation following close on the heels of the Government's informing an alien that he is subject to the Proclamation—without giving him the opportunity to consider whether to voluntarily self deport or challenge the basis for the order—is unlawful." *Id*. The Court held that "all class members must be given the opportunity to challenge their classifications as alien enemies, if they wish to do so, before they may be lawfully removed from the United States pursuant to the proclamation." *Id*. The court rejected the government's argument that "such judicial inquiry can take place only in a habeas court." *Id*. The

7

Court opined that there "may well also be independent restrictions on the Government's ability to deport class members—at least to Salvadoran prisons," *id*., under the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, § 2242(b), 112 Stat. 2681-822, which effectuates implementation of Article 3 of the Convention Against Torture. Finally, the Court concluded that Plaintiffs are likely to suffer irreparable harm in the Salvadoran detention facilities to which they anticipated being removed. ECF No. 52. By contrast, the Court dismissed the government's harms from the TRO as "vague foreign-policy and national-security concerns." *Id*. The court thus declined to vacate the initial TRO. *Id*.

On March 26, the D.C. Circuit issued a 2-1 ruling denying a stay, with each judge writing separately. *J.G.G. v. Trump*, 25-5067 (D.C. Cir.), Per Curiam Order dated Mar. 26, 2025 ("D.C. Cir. Order"). A majority (Judges Henderson and Walker) agreed that the TRO orders are appealable. *Id*. at 7-8 (Henderson, J., concurring); *id*. at 73-76 (Walker, J., dissenting). A majority further agreed that the government "risks irretrievable injury" because the district court's orders enjoining further removals "risk 'scuttling delicate international negotiations'" during a critical juncture. *Id*. at 8 (Henderson, J., concurring); *see id*. at 75-76 (Walker, J., dissenting). A different majority nonetheless voted to deny relief. *Id*. at 17-23 (Henderson, J., concurring); *id*. at 56-68 (Millett, J., concurring).

Judge Henderson voted to deny the stay. *See id*. at 29-30. She explained that the district court's orders are appealable because they risk upending international negotiations and they run against the President. *Id*. at 7-8. But she determined that the government had not shown a likelihood of success on the merits. *See id*. at 17-23. She "assume[d]" that Plaintiffs could properly bring their claims under the APA rather than through habeas, *id*. at 10 (emphasis omitted); rejected the government's reliance on the unreviewability of AEA questions, *see id*. at 11-12; and rejected

parts of the government's interpretations of the statutory terms "invasion" and "predatory incursion," *see id*. at 13-23. Yet she reserved "whether TdA has conducted an 'invasion or predatory incursion' 'against the territory of the United States'"; "whether TDA's conduct is 'perpetrated, attempted, or threatened by a foreign nation or government'"; or whether the INA provides "the 'exclusive procedure' for removal and thus eclipse[s] any contrary authority in the AEA." *Id*. at 24-25 (cleaned up).

Judge Henderson also determined that the equities did not support granting a stay. *Id*. at 25-28. Although she had stated in finding the orders appealable that they "threaten[] truly 'irretrievable' harm" by upending "'delicate international negotiations,'" *id*. at 7 (citation omitted), she concluded in analyzing the equities that the government does not face irreparable harm, *see id*. at 28. Finally, she stated that "what the district court did here was not a universal injunction" and that the court instead "followed the Rules of Civil Procedure and certified a class," but she refused to "pass on the class action 'fit' of the plaintiffs' claims." *Id*. at 29 n.9.

Judge Millett, too, voted to deny a stay. *See id*. at 71. In her view, the district court's orders constitute unappealable TROs. *See id*. at 46-53. She rejected the government's argument that most AEA questions are judicially unreviewable under Supreme Court precedent, *see id*. at 55-62, and reasoned that this suit could proceed through the APA, not habeas corpus, *see id*. at 62-68. Although she did not resolve the merits of Plaintiffs' underlying claims, she stated that the Fifth Amendment's Due Process Clause entitles aliens to notice and the opportunity for a hearing before their removal. *See id*. at 60-65. She also determined that the equities do not support granting a stay, *see id*. at 68-69, and opined that "[o]nly a swift class action[] could preserve Plaintiffs' legal rights." *Id*. at 68.

Judge Walker dissented. *Id*. at 72. He concluded that the district court's orders are appealable because they "affirmatively interfered with an ongoing, partially overseas, national-security operation." *Id*. at 75. He determined that the government is likely to succeed on the merits because the suit could properly be brought only through a habeas action in Texas, not through an APA action in the District of Columbia. *See id*. at 86-89. He viewed the equities as favoring a stay because the court's orders jeopardize "the status of 'intensive and delicate' negotiations with El Salvador and the Maduro regime in Venezuela." *Id*. at 90.

On March 28, the Court extended the TRO until April 12. ECF No. 66. The Court found good cause for the extension because the "grounds for originally granting the TRO continue to exist," and additional time is needed fully to consider the parties' briefing on Plaintiffs' motion for a preliminary injunction. *Id*. at 1-2.

## ARGUMENT

### I. This Court Lacks Jurisdiction over Plaintiffs' Claims

#### A. There is no jurisdiction to review the President's Proclamation.

This Court lacks jurisdiction to review the Proclamation or enjoin the President's exercise of authority under Article II and the AEA.

**1.** The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction … to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] … recognizing foreign governments, … overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism, … and immigration"); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir.

2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

Consistent with that general rule, courts have held for over a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny:  "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*."  *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also id.* ("Once the person is an alien enemy, obviously the course to be pursued is essentially an executive function, to be exercised in the discretion of the President.").

Indeed, the D.C. Circuit has described the statute as conferring "[u]nreviewable power in the President," which it characterized as the "essence of the Act."  *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946).  The court explained:

> As a practical matter, it is inconceivable that before an alien enemy could be removed from the territory of this country in time of war, the President should be compelled to spread upon the public record in a judicial proceeding the method by which the Government may detect enemy activity within our borders and the sources of the information upon which it apprehends individual enemies. No constitutional principle is violated by the lodgment in the President of the power to remove alien enemies without resort or recourse to the courts.

*Id.*  That is binding circuit precedent.  Unreviewable means *unreviewable*.  It leaves no room for judicial review, much less sweeping national injunctions.

**2.** The Court lacks power to review the President's Proclamation for another reason as well: Whether the AEA's preconditions are satisfied is a political question committed to the President's discretion, no different from the President's determination to trigger the Constitution's Invasion Clause (Article IV, section 4).  *See California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases).  Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). To guide courts in determining when such a question is raised, the Supreme Court identified six "formulations" that indicate a question has been committed to the political branches. *See, e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). The President's invasion determination under the AEA implicates at least two independently sufficient factors.

*First*, the determination that an "invasion" or "predatory incursion" involving enemy aliens is being perpetrated sits at the intersection of two areas textually committed by the Constitution to the political branches: (1) foreign affairs, *see El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards that would permit a court to assess exactly when hostile entry and criminal and violent acts within the United States by aliens constitute an "invasion" or "predatory incursion" for AEA purposes. *See Martin v. Mott*, 25 U.S. 18, 31-32 (1827) (Story, J.); *see also California*, 104 F.3d at 1091.

The Constitution simply provides no basis for a court to determine when this AEA trigger has been met, and thus there is no basis for second-guessing the policy judgment by the Executive that such an "invasion" or "predatory incursion" is occurring.

12

## B. AEA Claims Must Exclusively Be Brought Through Habeas.

AEA proclamations are thus conclusive and preclusive. As for whether the Act's preconditions are satisfied, that is the President's call alone; the federal courts have no role to play. But that is not to say judicial review is wholly unavailable in the context of the AEA. Rather, plaintiffs may bring individual claims regarding *whether* a proclamation has been properly applied against them. *Ludecke* thus acknowledged that "the question as to whether the person restrained is in fact an alien enemy fourteen years of age or older may" be "reviewed by the courts." *Ludecke*, 335 U.S. at 171 n.17. Such review is limited to questions like "whether the detainee is an alien, and whether the detainee is among the 'natives, citizens, or subjects of the hostile nation' within the meaning of the Act." Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum L. Rev. 961, 994 & n.196 (1998); *see Ludecke*, 335 U.S. at 171.[1]

Such claims, however, are *necessarily* habeas claims. It is the substance of a complaint that dictates whether it sounds in habeas. *See Boudin v. Thomas*, 732 F.2d 1107, 1111 (2d Cir.

---

[1] Because jurisdiction in this context is limited to individual habeas claims challenging whether an alien has been properly included in the category of alien enemies—necessarily an individual determination—there is also no basis to certify a class to resolve those claims. *See Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 753 (D.C. Cir. 2023) (class certification not appropriate where "questions of law or fact … affecting only individual members" predominate); Compl. ¶¶ 9–13 (setting out separate factual circumstances of each Plaintiff); *see, e.g.*, *Ludecke,* 335 U.S. at 163–64 (reasoning, on appeal from "[d]enial of a writ of habeas corpus," that "some statutes 'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute," as demonstrated by the clear text and "controlling contemporary construction"); *id.* at 164–65 (noting that "every judge before whom the question has since come has held that the statute barred judicial review"); *see also U.S. ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y.), *aff'd*, 158 F.2d 853 (2d Cir. 1946) (reviewing habeas petition challenging detention as an alien enemy and explaining "courts are without power to review the action of the executive in ordering removal of an alien enemy in time of war except with respect to the question whether the relator is an enemy alien"); *U.S. ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 900 (2d Cir. 1943) (similar); *Citizens Protective League*, 155 F.2d at 296 (affirming dismissal, for failure to state a claim, of non-habeas cases raising constitutional challenges to application of Alien Enemies Act and seeking injunction).

1984).  And the substance of Plaintiffs' complaint is a challenge to the Executive's legal authority to issue the Proclamation under which they are currently being held.  *See* Compl. 15–20.[2]  Such a challenge to the lawfulness of detention authority is a classic habeas claim—the "core" of habeas is as "a remedy for unlawful detention."  *DHS v. Thuraissigiam*, 591 U.S. 103, 127 (2020) (citation omitted).  And the line between detention and removal in the AEA context is a distinction without a difference.  Under the Proclamation, detention is the immediate precursor to removal.  50 U.S.C. § 21; Proclamation §§ 4–6. And both involve exercise of custodial authority under the AEA, which Plaintiffs' claims here argument is unlawful—a quintessential *habeas* claim.

In other words, Plaintiffs' claims are core habeas claims because prevailing would defeat the basis of their detention under the AEA; they cannot claim otherwise by purporting to attack only the collateral consequence of removal.  A state prisoner cannot evade the procedural requirements of habeas by bringing claims for other forms of relief, such as damages, that would "necessarily imply the invalidity of his conviction or sentence."  *Heck v. Humphrey*, 512 U.S. 477, 483 (1994).  Likewise, a fugitive cannot prevent extradition through a suit for declaratory relief rather than in habeas.  *LoBue v. Christopher*, 82 F.3d 1081, 1083 (D.C. Cir. 1996) (explaining that habeas was the correct remedy even though the plaintiffs there had "not formally sought a release from custody" because prevailing on their claims would immediately entitle them "to release or a new trial because of the issue preclusion effect of the judgment").

---

[2] Indeed, Plaintiffs' complaint contains a habeas claim, which they withdrew less than a day after they filed the complaint.  *See* Mot. Hr'g Tr. at 22:23–25 (Mar. 15, 2025).  They had little choice but to do so.  Plaintiffs, by their own admission, were not detained in this district, and habeas is available only in the district of detention.  *See Padilla*, 542 U.S. at 435; *Fletcher v. Reilly*, 433 F.3d 867, 875 (D.C. Cir. 2006).

14

Indeed, Plaintiffs concede that this principle distinguishing core and noncore habeas claims applies here. Mem. Supp. PI Mot. 10 (citing *Davis v. U.S. Sent'g Comm'n*, 716 F.3d 660, 664 (D.C. Cir. 2013), for the proposition that a claim need not be heard in the district of confinement where "victory would not secure his immediate release" or reduction in sentence)); *id.* at 11 (citing *LoBue*, 82 F.3d at 1083–84, for the proposition that a claim must be brought in habeas if success "would have 'preclusive effect' on [a] pending habeas petition [and] would secure release from confinement"). Plaintiffs have not argued—nor can they—that success on their claims would not result in their release. That means their claims are core habeas claims that must be brought in the district of their confinement, not this district.

The existence and availability of a habeas remedy to challenge the alien-enemy determinations at issue here is fatal to Plaintiffs' APA challenge. By the APA's terms, it is available only for final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. But habeas is an "adequate remedy" through which a Plaintiff can challenge the applicability of the Proclamation to himself, and, thus, whether he may be detained and removed under the Proclamation.[3] Because habeas is adequate to obtain the relief Plaintiffs seek, it displaces any review under the APA. *See O'Banion v. Matevousian*, 835 F. App'x 347, 350 (10th Cir. 2020).[4]

---

[3] Habeas relief is also available to challenge alleged procedural due process violations in Executive detention, contrary to Plaintiffs' unsupported assertion otherwise. Mem. Supp. PI Mot. 12 n.6; *but see, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 781–82 (2008) (discussing procedural protections available in habeas as depending, in part, on those provided in process leading to detention).

[4] *Brownell v. Tom We Shung*, 352 U.S. 180 (1956), upon which this Court relied in its order denying Defendants' motion to vacate the TRO, ECF No. 53, at 14–15, does not aid Plaintiffs, who do not even cite it in support of their PI motion. First, *Brownell* did not involve a claim under the AEA, which broadly "preclude[s] judicial review" other than in habeas. *Ludecke*, 335 U.S. at

15

More fundamental, Plaintiffs' attempt to challenge the President's Proclamation via the APA fails out of the gate. Compl. 18 (Claim 6). The President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). But the AEA vests authority in the President, and the President issued the Proclamation. There is therefore no avenue under the APA for Plaintiffs to enjoin the Proclamation. *See Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) (holding that APA review does not extend to agency action "merely carrying out directives of the President" for the same reasons "APA does not apply to presidential action," since "the action in question is an extension of the President's action"); *see also Vetcher v. Sessions*, 316 F. Supp. 3d 70, 78 (D.D.C. 2018) (recognizing that APA review is not available when relief is available in habeas).

In short, outside of limited habeas review, which Plaintiffs have expressly disclaimed here, "[t]he control of alien enemies has been held to be a political matter in which the executive and

---

164 (citation omitted). And second, Congress overruled *Brownell* shortly after its decision by specifying that aliens "may obtain judicial review" of exclusion orders "by habeas corpus proceedings *and not otherwise*." Pub. L. No. 87-301, § 5, 75 Stat. 653 (1961) (emphasis added).

Nor does the All Writs Act, 28 U.S.C. § 1651(a), provide freestanding jurisdiction. Although § 1651(a) allows courts to issue "writs necessary or appropriate in aid of their respective jurisdictions," *id.*, it "does not erase separate legal requirements for a given type of claim." *Makekau v. Hawaii*, 943 F.3d 1200, 1204 (9th Cir. 2019). Section 1651(a) thus "does not confer jurisdiction on the federal courts"; rather, it lets a court protect jurisdiction already properly invoked. *See Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32–33 (2002); *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999). Thus, if a "court does not and would not have jurisdiction to review the agency action sought by petitioners, it cannot bootstrap jurisdiction" through § 1651(a). *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022).

the legislature may exercise an unhampered discretion," and an "alien enemy" otherwise "is not, under the Constitution and the Statute, entitled to any hearing." *Schlueter*, 67 F. Supp. at 565.[5]

## II.    Plaintiffs Cannot Succeed on the Merits of Their Claims.

### A.    The Proclamation comports with the requirements of the statute.

In all events, the Proclamation and its implementation are perfectly lawful.  The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are found by the President to be met.  *First*, there must be "a declared war," *or* "an[] invasion" *or* a "predatory incursion" that is "perpetrated," *or* "attempted," *or* "threatened against the territory of the United States[.]"  50 U.S.C. § 21.  *Second*, that hostile action must be by a "foreign nation" *or* "government."  *Id.*  The Proclamation signed by the President satisfies both conditions.

#### 1.    *TdA's actions constitute an invasion or a predatory incursion into the territory of the United States.*

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States.  Although the word "invasion" of course includes a military entry and occupation of a country, the accepted definition of that term is far broader, as definitions cotemporaneous with the passage of the AEA make clear. "Invasion" was defined to include "an hostile entrance," *see*, *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or an "hostile encroachment" on another's territory, *see* Thomas

---

[5] Plaintiffs' objection that they will not have the opportunity to file habeas petitions in the absence of preliminary relief is nonsense.  First, it does not change the fact that the great writ is the only avenue through which the law provides them the relief they seek.  Second, they can file habeas petitions in the correct district *now*, as has already been done.  *Matos v. Venegas*, No. 25-cv-00057 (S.D. Tex.).  If a Plaintiff chooses not to seek habeas relief now, while he is in United States custody, he will have no one to blame but himself if the Executive exercises its authority to remove him immediately upon the dissolution of preliminary relief in this Court.

Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789). Nor is there any requirement that the purposes of the incursion are to possess or hold territory. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of what constitutes an invasion. TdA's illegal entry into and continued unlawful presence in the United States is an encroachment on the territory of the U.S. that entails hostile acts contrary to the rights of U.S. citizens to be free from criminality and violence. *See* Smith Decl. at ¶¶ 8-18.

At minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States (2) for purposes contrary to the interests or laws of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids in Texas during hostilities with Mexico in the 1840s that fell well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully entering and fishing in U.S. territorial waters); *Bas v. Tingy*, 4 US 37 (1800) (broadly defining "enemy" and "war"). Here, there is no question that TdA and its members have effected entries into the United States, and similarly no question that the purposes of that entry are contrary to both the interests and laws of this country: trafficking in substances and people, committing violent crimes, and conducting its business with interests antithetical to those of `the United States. *See* Proclamation, Sect. 1.

Plaintiffs' main contention is that "invasion" and "predatory incursion" both *necessarily* entail military actions by foreign governments or the opening salvo of war meant to displace a government or conquer territory. *See generally* Mot. at 22-26. There is no question that definitions of both terms include military actions, but both just as unquestionably have broader meanings that

18

are not foreclosed by any source cited by Plaintiffs. In fact, many of the sources relied on by Plaintiffs contain definitions supportive of the government's argument. *See* Webster's Dictionary, "Invasion" (1828) ("[a] hostile entrance into the possessions of another); *id.*, "Incursion" ("entering into a territory with hostile intention"). In short, both definitions *include* military action, but neither is *limited to* such action.

2.    ***Given its intimate connection to Venezuela, TdA is a "foreign nation or government" for purposes of Section 21.***

The Proclamation makes clear that TdA qualifies as a "foreign nation or government" for at least two independent reasons. To start, TdA's infiltration of key elements of the Venezuelan state, make it indistinguishable from Venezuela. *See* Proclamation. TdA's growth itself can be attributed to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. *Id.* And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id.* The Cártel de los Soles "coordinates with and relies on TdA [] to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *See id.*

Given how significantly TdA has become intertwined in the fabric of the Venezuela's structures, it functions as a governing entity in Venezuela. Through those ties, TdA has become indistinguishable from the Venezuelan state, and the two may be folded together for purposes of invoking Section 21.

Although Plaintiffs try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the United States has authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents

19

who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously "sent more than seven thousand U.S. troops into Mexico to pursue Pancho Villa, the leader of a band of rebels opposed to the recognized Mexican government," *id.* at 2067, while, more recently, President Clinton authorized missile strikes on al Qaeda targets in Africa and elsewhere, *see generally El-Shifa*, 607 F.3d 836.

This history is important because statutes must be read in context. *See, e.g.*, *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) ("Courts 'must . . . interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'") (citation omitted). The AEA is a war powers statute and thus must be read in light of the United States' robust history of employing its war powers against non-state actors.

In all events, TdA also acts as a governing authority in the areas where it operates. As the Proclamation recognizes, "Venezuela national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." Proclamation Preamble. In those areas where it operates, TdA is in fact acting as a criminal governing entity, independent or in place of the normal civil society and government. Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela in which it operates with impunity as an effective governing authority unto itself, it is well within the discretion of the President to determine it constitutes a foreign "government" for purposes of invoking Section 21.

Plaintiffs' contrary arguments lack merit. They again point to cherry-picked dictionary definitions (Mot. at 26-27), but miss the point: the government has never argued that TdA is itself a "nation," and the control and authority exercised by TdA within territory it controls in Venezuela is consistent with founding-era definitions of "government," *see* Thomas Dyche & William

20

Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another, or many"). Additionally, although the AEA references the possibility that a covered entity *may* be able to enter into a treaty governing certain aspects of relations between it and the United States, the statute does not in any way establish treaty-making authority as a prerequisite to inclusion. *See* 50 U.S.C. § 22 (allowing departure consistent with "any treaty then in force between the United States and the hostile nation or government" and further contemplating circumstances "where no such treaty exists"). Nor is there any reason that specific terminology used in the Proclamation should weigh against the President's determination (Mot. at 27-28); members of TdA are clearly "subject" to the authority of that criminal organization and the governance it wields. *See* Dyche & Pardon, *supra* ("under the command, or at the disposal of another").

Plaintiffs' fundamental argument seems to be that other individuals do not agree with the President's determination that TdA and the state of Venezuela are sufficiently intertwined to justify invocation of the AEA. *See* Mot. at 28-29. Yet the President is entitled to examine the available evidence and intelligence estimates and make a final determination based on his *own* assessment of what those documents show. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting "the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature"); *cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) ("the President alone has the power to speak or listen as a representative of the nation"). It is not the proper role of this Court to second-guess those determinations based on nothing more than a handful of declarations by individuals not remotely involved with the assessment of evidence or decision-making that culminated in the instant Proclamation. *See Ameziane v. Obama*,

699 F.3d 488, 494 (D.C. Cir. 2012) ("consistent with our rule of deference, it is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.") (citation omitted).

### B. The Proclamation is supported by the President's inherent authority to conduct foreign affairs and address national security risks.

The President's inherent Article II authority bolsters the Proclamation. Under his authority to protect the nation, the President determined that TdA represents a significant risk to the United States, that it is intertwined and advancing the interests of the Venezuelan state in a manner antithetical to the interests of the United States, and that its members should be summarily removed from this country as part of that threat. The exercise of authority in this case is firmly supported by longstanding Supreme Court precedent. Article II confers on the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). And where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.*, 50 U.S.C. § 21, coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (similar); *see also Ludecke*, 335 U.S. at 164.

If anything, this authority is heightened here. The Supreme Court has consistently noted that "[i]t is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see

fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Thus, laws involving aliens are "implementing an *inherent executive power*." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added). The confluence of statutory and constitutional authority puts the President's actions on the strongest possible turf.

### C.    Plaintiffs' remaining arguments lack merit.

Plaintiffs' additional arguments against the legality of the Proclamation all lack merit.

*First*, Plaintiffs argue (Mot. at 32-34) that individuals may not be removed without due process or allowance of a period of voluntary departure. The statute permits absolute discretion to establish the conditions and processes the Executive will use to implement a Presidential Proclamation, *see* 50 U.S.C. § 21, and whatever those procedures are effectively constitute due process for purposes of the AEA. *See United States ex rel. Schlueter v. Watkins*, 158 F.2d 853, 853 (2d Cir. 1946) (the AEA authorizes "the making of an order of removal of an alien enemy without a court order and without a hearing of any kind"); *see also Ludecke*, 335 U.S. at 162-63 (noting the entirely administrative process established for determining whether an individual was an alien-enemy). Moreover, although aliens who are deemed to fall within the scope of the Proclamation may file a petition for habeas challenging that designation, providing an added layer of procedural safeguards, nothing requires the government to delay removal to permit access to habeas on the alien's preferred timeline.

Plaintiffs' contention that a period of voluntary departure is *required* is not a defensible reading of the statute, especially in context. To be sure, Section 21 permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom," 50 U.S.C. § 21, but it also broadly provides that alien enemies within the purview of a Proclamation "*shall be* liable to be . . . removed as alien enemies."

23

In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating removal, and the AEA's entire purpose would be undercut if active participants in hostilities had to be politely asked to depart on their own terms.

For that reason, the Proclamation explains that TdA engaged in "mass illegal migration to the United States to further its objectives of harming United States citizens," and that this activity undermines public safety, while also enhancing the "Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." Proclamation Preamble. That finding negates Plaintiffs' assertion that a period of voluntary departure is statutorily required in this case, since section 22 makes clear that voluntary departure is only available when an alien "not chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. Here, all members of TdA are chargeable under the Proclamation and their designation as members of a foreign terrorist organization (a designation that has not been judicially challenged).

*Second*, Plaintiffs contend that the Proclamation impermissibly prohibits aliens from seeking relief and protection under federal law, including the provision of the Foreign Affairs Reform and Restructuring Act ("FARRA") which codifies the obligations of the United States under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment ("CAT"). *See* Mot. at 34-36. As a threshold matter, there is no direct conflict between the United States' obligations under CAT as codified by the FARRA, and removals pursuant to the AEA. The United States continues to abide by its policy not to remove aliens to counties in which they are likely to be tortured. *See Munaf v. Geren*, 553 U.S. 674, 702 (2008). "Under *Munaf* … the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009).

24

Nor is there a colorable argument that enemy aliens *must* be permitted to seek relief or protection prior to removal. Such relief is generally permitted only in the exercise of the President's discretion. *See Citizens Protective League*, 155 F.2d at 294 (noting common law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). Plaintiffs' argument is, fundamentally, one of conflict between the INA and the AEA, yet this conflict is illusory. The INA provides a system for determining removability and any relief or protection from removal for aliens under the authority of Title 8, whereas the AEA provides its own mechanisms permitting the President or his delegates to implement procedures and regulations governing removal, detention, and any other issue related to invocation of the AEA, *see* 50 U.S.C. § 21.

With respect to asylum and statutory withholding of removal related to persecution claims, none of the cited provisions constraint the *President's* actions under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. §§ 1208.16, 1208.18 (Immigration Judges, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172-73 (1993) (recognizing distinct grants of authority under the INA to, *inter alia*, the President and Attorney General). Nor are such constraints implicated just because the President has delegated certain authorities, including implementation of the Proclamation, to the Attorney General. *See id.* At 172 n.28 (in implementing the Proclamation, the Attorney General would be "carrying out an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by provisions of the INA).

In any event, individuals subject to removal under Title 50 would likely be barred from eligibility for asylum or statutory withholding of removal related to persecution under the INA. Asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a

categorical basis, as the D.C. Circuit has previously held in the context of Title 42. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730-31 (D.C. Cir. 2022). Here, the AEA disallows relief for covered enemy aliens, and that represents the Executive's categorical conclusion that such aliens are not entitled to relief in the exercise of discretion. Likewise, aliens subject to removal under the AEA would not be eligible for statutory withholding of removal because the President's invocation of the AEA suggests that "there are reasonable grounds to believe that [such aliens are] a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv).

*Finally*, Plaintiffs argue (Mot. at 36-38) that the INA provides the sole mechanism through which an alien may be removed from the United States. Yet the determination required under the AEA does not relate to the "admissibility" or "deportability" of any alien, so there is no reason to believe that Title 8 and its "sole and exclusive" means for addressing *those* questions is implicated in this case. *See* 8 U.S.C. § 1229a(a)(3) (removal proceedings are "exclusive" only to the extent the government is determining admissibility or removability, as those terms are defined under Title 8). Rather, the INA and AEA are distinct mechanisms for effectuating the removal of certain aliens from the United States, just as Title 42 and the INA constitute different bases for *excluding* aliens from the United States. *See generally Huisha-Huisha*, 27 F.4th 718.

In fact, the immigration laws and AEA have been read harmoniously for over 75 years. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status in the United States. Likewise, not all aliens subject to Title 8 will be subject to removal under the AEA—as removal under the AEA is premised on discrete findings, such as nationality and age, beyond admissibility or removability as defined by the INA. And for aliens subject to both Title 8 and Title 50, the Executive has discretion in deciding how

26

and whether to proceed under either or both statutes. *See id.* (recognizing this discretion under pre-INA immigration law). Thus, the AEA, INA, and FARRA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See*, *e.g.*, *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court . . . must . . . strive to give effect to both." (cleaned up)).

Even if there *were* a conflict between the AEA and the INA, it is the AEA that would control in this circumstance. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here, the AEA provides specific rules for the removal of a subset of aliens—those designated as alien enemies through a discrete mechanism providing authority to the President—against the more general provisions relating to removability provided by the INA. Thus, to the extent there may be conflict, the AEA provides an exception to the more general applicability of the INA's removal provisions, and this is true regardless of the later enactment of the INA. *See*, *e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment").

## III.    The Remaining Equitable Factors Weigh Strongly in the Government's Favor.

### A.    Plaintiffs have not established irreparable harm.

Plaintiffs' claims of irreparable harm are premised on "summary remov[al] to places, such as El Salvador, where they face life-threatening conditions, persecution and torture." Mot. 38-39; *see also id.* at 18–21. Plaintiffs, while conceding that "removal does not by itself ordinarily constitute irreparable harm," Mot. 38 (citing *Nken*, 556 U.S. at 435), nevertheless complain that "these are hardly run-of-the-mill removals," emphasizing the "harsh and life threatening" conditions that may face Plaintiffs if removed. Mot. 38. But, *Nken* involved a claim of past

persecution and changed circumstances that would "ma[k]e his persecution more likely." *Id.* at 422–23 ("*Nken* claimed he had been persecuted in the past . . . would be subject to further persecution if he returns" and that changed circumstances since he left his home country "made his persecution more likely"). "It is accordingly plain that the burden of removal alone cannot constitute the requisite irreparable injury." *Id*. at 435. Plaintiffs further allege that the harm they will face if removed is compounded by failure to receive due process. Mot. 39-40. But, as discussed, AEA jurisprudence limits Plaintiffs to habeas review which Plaintiffs have expressly disclaimed. As such, Plaintiffs cannot claim harms for lack of process which they have disavowed in availing themselves to this Court's jurisdiction.

### B. The balance of equities favors denial of preliminary injunctive relief.

The balance of harms and the equities strongly favor the government here as an injunction irreparably harms the United States' conduct of foreign policy. An injunction effectively usurps the President's statutory and constitutional authority to address what he has identified as an invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. An injunction "deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive Branch's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" that are implicated when the Executive is combating terrorist groups, warrants the utmost deference. *Humanitarian Law Project*, 561 U.S. at 33–35.

The Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) ("Nothing in the relevant

immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations"). An injunction does just that, threatening to undermine weeks of delicate international negotiations to remove dangerous alien enemies, where even a short delay in removal can frustrate removal entirely. *See Zadvydas v. Davis*, 533 U.S. 678, 696 (2001); Kozak Decl. An injunction also risks compromising the ability of the United States to negotiate in the future on key foreign-affairs and national-security issues, as foreign actors may "change their minds regarding their willingness to accept" alien enemies or might otherwise seek to "leverage [any delay] as an ongoing issue." Kozak Decl. at ¶¶ 3, 4.

These equities outweigh the equities Plaintiffs have raised. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 436 (2009) (noting there "is always a public interest in prompt execution of removal orders" even in cases where an alien asserts a risk of harm, and that interest "may be heightened" in circumstances where "the alien is particularly dangerous"). The nation's security is of paramount importance.

## IV. The Court Should Not Enter a Nationwide Injunction Based on a Defective Provisional Class Certification.

The Court should not enter a preliminary injunction premised on its provisional certification of a nationwide class. The highly truncated class procedures here—in which a nationwide class was certified before the government could even file a brief in opposition—are incompatible with "'foundational' limits on equitable jurisdiction." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, No. 24A831, slip op. 7 (2025) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, J.J., dissenting) (citation omitted). Here, the provision class is non-ascertainable and consists of anyone in U.S. custody who might be subject to the Proclamation—based on allegations by putative class members who claim they do not belong to TdA and thus cannot possibly represent

29

a class whose defining characteristic is being subject to a Proclamation directed at TdA members. The injunction undermines longstanding deference to the Executive Branch's national security judgments, including the President's responsibility to identify and respond to threats posed by the TdA. Moreover, Article III does not empower federal courts to "exercise general legal oversight of the Legislative and Executive Branches," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021), much less empower them to assume a position of authority over the governmental acts of another coequal department, "an authority which plainly [courts] do not possess." *Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923). By awarding relief to an amorphous nationwide class, the court effectively circumvented equitable limitations on universal relief in a sensitive national-security context.

Before moving forward with a preliminary injunction, the Court must conduct the "rigorous analysis" that Federal Rule of Civil Procedure 23 demands. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). As an initial matter, the Court must define "the class claims, issues, or defenses," and satisfy the requirement to "appoint class counsel under Rule 23(g)," or the requirement to "direct appropriate notice to the class." Fed. R. Civ. P. 23(c)(1)(B), (2). Those requirements are indispensable: The modern class action already represents an "'adventuresome'" "innovat[ion]" on traditional "equity practice." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 617 (1997) (citation omitted); *see Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring). They impose an impose an important protection against overbroad classwide relief orders.

The Court must also consider Rule 23(a)'s interrelated requirements of commonality, typicality, and adequacy. These requirements serve to "effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Wal-Mart*, 564 U.S. at 349. In particular, "a

class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 348-349 (citation omitted). But here, Plaintiffs disclaim their association with TdA, which makes them adequate representatives; "'a class representative must be part of the class.'" *General Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982) (citation omitted); *see also Amchem*, 521 U.S. at 625-626. It also makes their claims materially different from those brought by individuals who acknowledge their ties to TdA.

Nor can Plaintiffs satisfy Rule 23(b)(2), which states that an injunctive class may be certified if injunctive relief "is appropriate respecting the class as a whole." But whether an alien is a member of TdA; whether he has been given sufficient process; whether he is removable under a different provision of law; and other such questions necessarily are individualized determinations unsuitable for class treatment. *Cf.* D.C. Cir. Order at 80 n.34 (Walker, J., dissenting) (explaining that this "type of challenge is unique to each plaintiff, so it would seem that a class action is a poor vehicle"). As this Court has explained, Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360.

More generally, a preliminary injunction here would block the Executive from implementing the Proclamation against anyone currently in U.S. custody, throughout the entire Nation, *see, e.g.*, Appl. for Partial Stay at 15-28, 32-35, *Trump v. CASA, Inc*. (No. 24A884), universal injunctions that extend to non-parties exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753, 756 (2025) (Alito, J., dissenting). Although as a formal matter Plaintiffs are seeking relief only to parties—namely, class members, *cf. Smith v.*

31

*Bayer Corp.*, 564 U.S. 299, 313 (2011)—proceedings without a proper class-certification analysis would make this a universal injunction by another name. As Justice Gorsuch observed in a related context, universal relief has the effect of making "class-action procedures . . . essentially irrelevant in administrative litigation. Thus, the Court should limit any injunction to the five individual Plaintiffs.

In addition, to the extent that the Court were to determine that the APA, AEA, or due process requires an opportunity to challenge individual determinations under the AEA, the availability of habeas proceedings provides the requisite process. Relief should therefore be limited to providing an opportunity for aliens to seek habeas relief, rather than creating entirely new alternative procedures. Any relief should further account for the fact that aliens being confined under the AEA, but not removed, already have the ability to seek relief in habeas—as many have already started to do.

## V.    **Plaintiffs Must Provide Security.**

Federal Rule of Civil Procedure 65(c) provides that the "court may issue a preliminary injunction or a temporary restraining order *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). To the extent the Court grants relief to Plaintiffs, Defendants respectfully request that the Court require Plaintiffs to post security for taxpayer funds expended during the pendency of the Court's Order in the event it is later determined that Defendants were wrongfully enjoined. The risk of harm here is not insubstantial and may include the cost of continued detention during the pendency of the injunction of individuals who would otherwise have been removed.

# CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction

April 1, 2025                                      Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN

*/s/ August E. Flentje*
AUGUST E. FLENTJE
*Acting Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-3309
Email: August.Flentje@usdoj.gov

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

PATRICK GLEN
Senior Litigation Counsel

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2025, I electronically filed this response with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ August E. Flentje*
*Acting Director*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-3309
Email: August.Flentje@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

J.G.G.*, et al.*,

Petitioner,

v.                                                    No. 1:25-cv-766 (JEB)

DONALD J. TRUMP, *et al.*,

                                                      <u>Declaration Of Acting Assistant Director</u>
                                                      <u>Marcos D. Charles</u>

Respondents.

**DECLARATION OF MARCOS D. CHARLES**

I, Marcos D. Charles, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Assistant Director for Field Operations at Enforcement and

Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the

U.S. Department of Homeland Security ("DHS").

2.      As the (A) Assistant Director, I am responsible for providing guidance and

counsel to the twenty-five ERO Field Office Directors, ensuring all field operations are working

to efficiently execute the agency mission.  I began my career with the U.S. Government as a

border patrol agent for the former Immigration and Naturalization Service in Hebbronville, TX.

Over time I was promoted to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and

Field Operations Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I

was promoted to Supervisory Detention and Deportation Officer, Assistant Field Office Director,

Chief of Staff, Deputy Field Office Director, and Field Office Director before becoming the Acting Assistant Director.

3.      I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6.      Gangs remain one of the more formidable issues that corrections officials face in the management of prisons and civil detention facilities. Gangs are responsible for a disproportionate amount of prison misconduct and violence. Their continued presence challenges ongoing efforts to maintain control, order, and safety in the facilities. While all gangs disrupt the

orderly administration of detention facilities, TdA represents a heightened challenge beyond what prisons in the United States face, given TdA's formation and history in penal institutions.

7.      TdA is not just a normal gang. Open-source information documents the gang's history and growth over the last decade. As reported in National Public Radio's article titled, *Tren de Aragua, a criminal organization with roots in Venezuela, has roots in Venezuela, has rapidly expanded across Latin America*, TdA was founded in 2014 in the Tocorón prison, in the central Venezuelan state of Aragua, led by Héctor Rusthenford Guerrero Flores, alias "Niño Guerrero." The gang largely controlled the Tocorón prison and eventually branched out overseas. The gang's leaders fled the prison in 2023 when it was taken over by security forces. While leadership splintered after fleeing the prison, TdA recruited new gang members from among the eight million Venezuelans who had fled the country's economic crisis. Initially, it established criminal cells in neighboring Colombia, Peru, and Chile, where it smuggled drugs and people and operated extortion rackets and prostitution rings. TdA's most notorious alleged crime was the 2024 killing of Ronald Ojeda, a former Venezuelan army officer who conspired against Nicolás Maduro, the country's authoritarian leader, then fled to Chile. Suspected gang members dressed as Chilean police officers abducted Ojeda from his apartment. Days later, his body was found stuffed in a suitcase and buried in cement. The history reflects over a decade of savage criminal activity, vicious disregard for authority, and violent crimes which threaten the stability of order. TdA poses the same terrorizations in the United States as the origin countries from which they started – Venezuela, and now also to include Colombia, Peru and Chile.

8.      While in confinement in Venezuela, TdA was able to grow its numbers exponentially. Multiple examples of their savagery can be found in open-source news articles highlighting the numerous abhorrent activities they have conducted while in the United States

including but not limited to murder, rape, kidnapping, sex trafficking, drug trafficking, robbery, and assault. Further, TdA has been designated a Foreign Terrorist Organization. Their continued presence in ICE custody poses significant risks such as the ability to recruit new TdA members. Detention of hundreds of members of a designated Foreign Terrorist Organization, among other populations of aliens is an unnecessary danger to other detainees and facility staff.

9.      The designation of TdA as a terrorist organization has introduced new budgetary challenges for ICE/ERO. This classification necessitates a shift in resource allocation, directing limited funds and human capital towards the identification, arrest, detention, and removal of individuals within this newly prioritized organization. ICE is bound by statutory requirements to not release certain aliens from immigration detention based on criminal or threat designations. This shift in priorities hampers ICE's ability to properly detain those aliens who are not statutorily eligible for release or for whom an ICE officer determines is a public safety or flight risk during the custody determination process. Detaining this dangerous population of aliens detracts from our already limited bedspace capacities and diminishes our resources and obstructs ICE's ability to detain other criminal aliens, and make difficult decisions on which aliens are the most egregious, dangerous and/or removable all while also being bound by statutory requirements in the Immigration and Nationality Act (INA), which imposes limitations on release, such as aliens subject to expedited removal, or for whom there is a prohibition of release under the mandatory detention provision of INA § 236(c). ICE currently has roughly 41,500 beds available for detention. These beds cost the American public roughly $152 a bed daily. Because members of TdA pose a significant threat of danger at ICE detention facilities, their swift removal from the United States after entering ICE custody ensures the preservation of security and order for both detainees and facility personnel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April, 2025.

MARCOS D CHARLES

Digitally signed by
MARCOS D CHARLES
Date: 2025.04.01
22:48:40 -04'00'

Marcos D. Charles
Acting Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| J.G.G., *et al.*, |   |
|   |   |
| Petitioner, |   |
|   | No. 1:25-cv-766 (JEB) |
| v. |   |
| DONALD J. TRUMP, *et al.*, |   |
|   | <u>Declaration Of Deputy Assistant Director</u> |
|   | <u>Selwyn Smith</u> |
| Respondents. |   |

**DECLARATION OF SELWYN SMITH**

I, Selwyn Smith, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a Deputy Assistant Director ("DAD") for Homeland Security Investigations ("HSI") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the DAD of Countering Transnational Organized Crime, Public Safety and Border Security division ("PSBS"), I oversee a wide variety of investigative and special operations programs targeting Transnational Criminal Organizations involved in human smuggling, narcotics trafficking, racketeering and violent gang activity as well as other crimes enforced by HSI. These programmatic areas support the targeting of cross border criminal organizations that exploit America's legitimate trade, travel, and financial systems for illicit purposes.

3.      I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* stating that, "Evidence irrefutably demonstrates that TdA has invaded the United States and continues to invade, attempt to invade, and threaten to invade the country; perpetrated irregular warfare within the country; and used drug trafficking as a weapon against our citizens" (the Proclamation) (https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/). In the same Proclamation, President Trump announced that, pursuant to 50 U.S.C. § 21, "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

6.      Members of TdA pose an extraordinary threat to the American public. TdA members are involved in illicit activity to invoke fear and supremacy in neighborhoods and with the general population. This has been evident from investigations throughout the nation where TdA members coalesce to conduct their criminal acts. For example, TdA's takeover of Denver apartment buildings stoked fear in the tenants when TdA committed burglaries, narcotics, and weapons violations. Other inquiries into the actions of member of TdA have resulted in criminal investigations and prosecution of cases of human trafficking, to include trafficking of women

from Venezuela; bank fraud; federal narcotics violations; extortion of human smuggling victims; and homicide, to name a few. This, along with the myriad state violations and investigations of groups of TdA members committing crimes throughout the nation are evidence of their criminal enterprise.

7.      TdA is a violent transnational criminal organization (TCO) which originated in the mid-to-late 2000's as a prison gang founded by inmates of the Tocorón prison in the Venezuelan state of Aragua. TdA has since evolved from Venezuela's most powerful homegrown prison gang into a TCO which by 2018, had expanded throughout South America and grew to have an estimated 3,000 to 5,000 members. As TdA continues its expansion throughout South America it is currently proliferating into North America.

8.      Much like MS-13, as TdA's influence and power expanded to other prisons throughout Venezuela and then across the southern hemisphere, the global leadership of the organization exploited the prison system to develop a base of operations for the gang to coordinate logistics, revenue streams, and recruitment. TdA was also able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. The founding members, senior leaders, and a vast number of TdA members escaped the Tocorón prison in September 2023. The subsequent destruction of the prison resulted in the displacement of the senior leaders and the decentralization of the global command-and-control structure for the organization.

9.      Over the course of the past three years, TdA has expanded throughout North America and are now known to be present and committing criminal activity in at least 40 states in the continental United States and Canada. TdA has proven to leverage many of the same expansion tactics and strategies in the United States that they previously employed throughout

South America. Due to the migration patterns of the Venezuelan diaspora and the vast expansion of the organization throughout the United States, TdA has become a loosely affiliated collection of independent cells committing disorganized and opportunistic crimes of violence against the Venezuelan population and rival gangs, terrorizing local communities. Detention of TdA leaders and members would potentially result in the unintended consequence of consolidating and centralizing their command-and-control structure and thereby providing an opportunity for TdA to organize and prolong the violent activities of their criminal enterprise within the United States.

10.     Historically, TdA has been found to be either, or both, strategic and opportunistic in their evolution and expansion. Within the Venezuelan penitentiary system, TdA methodically pursued geographic expansion by taking control of selected prisons in Aragua and surrounding states. Throughout the gang's expansion across international borders, the establishment and disbursement became more random and responsive to the environment and driven by profitability. As TdA continues its geographical expansion it has shown to operate as a loosely organized criminal syndicate serving as an umbrella organization for franchise networks under the TdA banner.

11.     TdA establishes their presence in a three-phase expansion methodology through force and dominance in an urban population within a geographical region. This pattern of behavior has been documented in TdA's expansion throughout South America, including into Colombia, Perú, and Chile. The three known phases of expansion are the Exploration, Penetration, and Consolidation phase.

12.     Exploration - In this step, TdA has been known to infiltrate and control groups of Venezuelan refugees traveling along migratory routes. By mixing with these migrants TdA

members can keep a low profile and pass into new regions. They have been known to exploit these migrants for the gang's profit through extortion and sexual exploitation.

13.     Penetration - In this step, TdA members begin to establish themselves within their new territory. This is often accompanied by a corresponding increase in crime and violence as they begin to set up their criminal activities and confront existing gangs previously established in the area. In general, TdA has historically targeted opportunistic areas with a relatively low volume of rival organizations present and with elevated profitability. During this phase TdA will typically engage in extortion, low-level drug distribution, human trafficking and sexual exploitation, kidnapping, and other violent crimes of intimidation.

14.     Consolidation - Once TdA members have firmly established themselves within an area and overcome and/or absorbed competing gangs through domination they move to consolidate their power and position within the territory into an enterprise.

15.     Reporting reveals TdA is attempting to expand its presence and criminal activity throughout the Western Hemisphere by exploiting the record mass migration resulting from Venezuela's recent political, economic, and humanitarian crises. According to key assessments, if left unchecked, TdA is likely to establish increasingly sophisticated human smuggling and sex trafficking networks into the United States leading to an increase in criminal activity and likely adding further strain to law enforcement resources as seen in Chicago, New York, Denver, and along our southern border.

16.     As of September 2024, ICE HSI reporting indicates that TdA members have been identified in at least 40 states across the United States. ICE HSI has opened approximately 472 investigations targeting members and/or TdA criminal networks across domestic and international offices. The violations in these investigations include, but are not limited to,

murder, robbery, human smuggling, human trafficking, sex trafficking, hostage taking, narcotics trafficking, and firearms violations.

17.     In January 2024, the New York Police Department ("NYPD") recorded a surge in moped robberies that are attributed by police as likely orchestrated by TdA recruits. NYPD CompStat reporting indicates that moped-based armed robbery patterns during this period were 158% higher than the same period the previous year. NYPD attributes this surge to be a result of TdA recruitment of Venezuelans in New York City migrant centers. Accused leaders have admitted to a complex network connected to Florida and Texas with profits shipped back to South America. Associated crews of this TdA network are allegedly involved in extortion and ransom schemes connected to human smuggling and human trafficking networks.

18.     In June 2024, multiple suspected TdA members participated in a nationally publicized series of robberies including the armed robbery of $2 million in merchandise from a high-end jewelry store in Denver, Colorado. In total, 13 subjects were apprehended by ICE HSI in a multi-agency, coordinated enforcement operation as the group attempted to flee to Venezuela.

19.     In January 2025, as a result of a joint ICE HSI investigation, nine TdA members were criminally charged in Colorado state court for their participation in the December 17, 2024, armed home invasion, kidnapping, and torture of two Venezuelan nationals at the Edge of Lowry Apartments in Aurora, Colorado. In total, 12 subjects were charged, with three Venezuelan nationals remaining at large. The court granted the City of Aurora an emergency order to temporarily close the Edge of Lowery Complex due to "an imminent threat to public safety and welfare."

20.    In February 2025, a joint multi-jurisdictional ICE HSI investigation with the Federal Bureau of Investigation and Tennessee Bureau of Investigation, dismantled a transnational commercial sex trafficking enterprise charging eight subjects with ties to TdA. The defendants operated an illegal commercial sex and sex trafficking enterprise out of Nashville motels from July 2022 through March 2024. The defendants facilitated the victims' arrival into the United States and used online commercial sex websites to post advertisements and internet or cellular communications to conduct illicit criminal activities.

21.    It is critical to use all available law enforcement tools to disrupt TdA activities quickly. These individuals are designated as foreign terrorists. Within Venezuela, TdA was able to grow its numbers from the steady prison population and build its criminal enterprise through the extortion of inmates. Keeping them in ICE custody where they could potentially continue to recruit new TdA members poses a grave risk to ICE personnel; other, nonviolent detainees; and the United States as a whole.

22.    Though many TdA members subject to the AEA do not have criminal records in the United States, due to their origin as a prison gang, it is safe to assume these subjects have criminal histories in their home countries, which U.S, law enforcement cannot verify due to the lack of diplomatic relations that currently exist with the country of Venezuela. The lack of a criminal record in the United States does not indicate they pose a limited threat. In fact, based upon their association with TdA, the lack of specific information about each individual actually highlights the risk they pose. It demonstrates that they are potential terrorists for whom we lack a complete profile.

23.    However, even though many of these TdA members have been in the United States only a short time, some have still managed to commit extremely serious crimes. A review

of ICE databases reveals that numerous individuals subject to the AEA have arrests and convictions in the United States for dangerous offenses.

24.     Additionally, a review of ICE databases reveals that numerous individuals removed have arrests, pending charges, and convictions outside of the United States, including an individual who is under investigation by Venezuelan authorities for the crimes of aggravated homicide, qualified kidnapping, and illegal carrying of weapons of war and short arms with ammunition for organized gang in concealment and trafficking; an individual who is the subject of an active INTERPOL Blue Notice issued on or about January 2, 2025, and a Red Notice issued February 5, 2025, for the crime of kidnapping and rape in Chile; an individual who is the subject of an INTERPOL Red Notice issued by Chile for kidnapping for ransom and criminal conspiracy involving TdA; an individual who admitted he sold marijuana and crystal methamphetamine for the Colombian gang Las Paisas, assaulted someone with a knife for a cellphone while living in Venezuela, and has twice robbed people for money while living in Colombia; an individual who is the subject of an INTERPOL Red Notice for child abduction; an individual identified as a "high-ranking" member of the TdA by the Mobile Tactical Interdiction Unit in Guatemala City, Guatemala; an individual who is the subject of an INTERPOL Red Notice based on obstruction of justice, criminal conspiracy, and aggravated corruption based on the individual's role as a police officer in modifying evidence to cover up a murder; an individual who, according to Peruvian Newspapers, is associated with high-ranking TdA members and who fled Peru while under investigation for illegal possession of firearm and distributing narcotics; and an individual who is the subject of an INTERPOL Blue Notice stating that he is under investigation in Venezuela for murder with aggravating circumstances against a victim whose corpse was found inside a suitcase on a dirt road.

25.     According to a review of ICE databases, numerous individuals removed were arrested together as part of federal gang operations, including two individuals who were in a vehicle during a Federal Bureau of Investigations gun bust with known TdA members; four individuals who were arrested during the execution of an HSI New York City operation; and four individuals who were encountered during the execution of an arrest warrant targeting a TdA gang member, all of whom were in a residence with a firearm and attempted to flee out the back of the residence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2025.

SELWYN J
SMITH

Digitally signed by SELWYN J
SMITH
Date: 2025.04.01 21:51:03
-04'00'

Selwyn Smith
Deputy Assistant Director
Homeland Security Investigations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security