- o

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.

**ELON MUSK, LEE ZELDIN,**
**Donald J. Trump in their official**
**Capacity as Federal Employees**
**and Mr. Trump, in his official**
**capacity as President of the**
**United States, et al. - APPELLEES**



NOTICE:  *an APPEAL BRIEF WILL NOT BE FILED IN pro se*
*appeal #25–1158*

***NOTICE that the APPELLANTS withdraw their TENDERED BRIEFS and an APPEAL BRIEF WILL NOT BE FILED IN pro se appeal #25-1158***

*Date: April 3rd, 2025*

*Please take notice that in light of our [e.g. the pro se appellants'] ASSENT/ CONCURRENCE "motion" to dismiss the instant appeal*

*without prejudice… pertaining to the defendants/ appellees President Donald Trump, et al.'s MOTION TO DISMISS/ motion for summary affirmance…. Which we the appellants have filed on April 2nd, 2025 [we] NOW respectfully give NOTICE that an appellant's brief will NOT BE FILED {e.g. and for reasons stated in the AFFIXED EXHIBIT*

HERETO}... we ALSO withdraw our previously TENDERED PRO SE APPELLANTS appeal briefs.

Thank you.
Respectfully Submitted.
Best,

_____
Colleen Connors PRO SE appellant (interested party)
1935 Hosler St.
Flint, Michigan 48503

Email:
*cmcolleen4@gmail.com*

*Google voice to text ph#
(use email)*

_____
*/Melvin Jones Jr./ disabled
PRO SE appellant (interested
party)
1935 Hosler St.
Flint, Michigan 48503
Email: jonesjrmel@gmail.com*

*Google voice to text ph#*
*415-562-5074*

==*{see the exhibit on the next page[s]}*==

Nos. 24A884, 24A885, 24A886

# In the Supreme Court of the United States

————————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*v.*

CASA, INC., ET AL.,

————————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*v.*

WASHINGTON, ET AL.,

————————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*v.*

NEW JERSEY, ET AL.

————————————

## AMICUS BRIEF OF THE STATE OF TENNESSEE IN SUPPORT OF APPLICANTS

————————————

Jonathan Skrmetti
  *Attorney General & Reporter*
J. Matthew Rice
  *Solicitor General*
Whitney D. Hermandorfer
  *Director of Strategic Litigation*
  *Counsel of Record*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
whitney.hermandorfer@ag.tn.gov

**TABLE OF CONTENTS**

INTERESTS OF AMICUS CURIAE.................................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................... 2

ARGUMENT .......................................................................................... 3

I.    Plaintiffs' Mere-Presence Position Has Serious Merits Flaws. ........................ 3

    A.    The Text Weighs Against Plaintiffs. ........................................... 6

    B.    Contemporaneous History and Practice Weigh Against Plaintiffs. ............ 8

    C.    Supreme Court Precedent Weighs Against Plaintiffs.............................. 11

    D.    Plaintiffs' Reliance on Post-Ratification Practice Is Not Dispositive. ....... 15

II.   Plaintiffs Are Not Entitled to Universal Relief. ................................. 20

CONCLUSION....................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) ............................................................................. 22-23

*Benny v. O'Brien*,
32 A. 696 (N.J. 1895) ............................................................................. 13

*Bowsher v. Synar*,
478 U.S. 714 (1986) ............................................................................. 17

*Brooks v. Martin*,
69 U.S. 70 (1864) ............................................................................. 5

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................. 20

*California v. Texas*,
593 U.S. 659 (2021) ............................................................................. 21

*Connection Distrib. Co. v. Holder*,
557 F.3d 321 (6th Cir. 2009) ............................................................................. 22

*Dep't of Homeland Sec. v. Thuraissigiam*,
591 U.S. 103 (2020) ............................................................................. 15

*Dep't of Homeland Sec. v. New York*,
140 S. Ct. 599 (2020) ............................................................................. 21

*Does #1-9 v. Lee*,
659 F. Supp. 3d 865 (M.D. Tenn. 2023) ............................................................................. 23

*Dos Reis ex rel. Camara v. Nicolls*,
161 F.2d 860 (1st Cir. 1947) ............................................................................. 17

*Doran v. Salem Inn*,
422 U.S. 922 (1975) ............................................................................. 21

*Dred Scott v. Sandford*,
60 U.S. (19 How.) 393 (1857) ............................................................................. 4

*Elk v. Wilkins*,
112 U.S. 94 (1884) ............................................................................. 12

*Free Speech Coal., Inc. v. Skrmetti,*
  2024 WL 5248104 (W.D. Tenn. Dec. 30, 2024) .................................................. 24

*Friends of George's, Inc. v. Mulroy,*
  675 F. Supp. 3d 831 (W.D. Tenn. 2023) ............................................. 24

*Gill v. Whitford,*
  585 U.S. 48 (2018).................................................................... 20

*INS v. Rios-Pineda,*
  471 U.S. 444 (1985)................................................................... 17

*Kaplan v. Tod,*
  267 U.S. 228 (1925)............................................................... 14-15

*Kentucky v. Biden,*
  57 F.4th 545 (6th Cir. 2023) .......................................................... 22

*L.W. ex rel. Williams v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023).................................................... 20-22

*L.W. ex rel. Williams v. Skrmetti,*
  679 F. Supp. 3d 668 (M.D. Tenn. 2023) ........................................... 23

*Labrador v. Poe ex rel. Poe,*
  144 S. Ct. 921 (2024) .................................................................. 24

*Leng May Ma v. Barber,*
  357 U.S. 185 (1958)................................................................... 15

*Lopez-Sorto v. Garland,*
  103 F.4th 242 (4th Cir. 2024) ........................................................ 15

*Maryland v. King,*
  567 U.S. 1301 (2012) ................................................................. 24

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010)............................................................. 19-20

*Morrison v. California,*
  291 U.S. 82 (1934) .................................................................... 17

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
  526 U.S. 172 (1999)................................................................... 22

*Minor v. Happersett,*
  88 U.S. 162 (1874)..................................................................... 12

iii

*Nat'l Treasury Emps. Union v. Bush,*
    891 F.2d 99 (5th Cir. 1989) ................................................................ 23

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) ........................................................................... 16

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ............................................................................. 19

*Peter Pan Bus Lines v. Fed. Motor Carrier Safety Admin.,*
    471 F.3d 1350 (D.C. Cir. 2006) .......................................................... 18

*Plyler v. Doe,*
    457 U.S. 202 (1982) ........................................................................... 17

*Samia v. United States,*
    599 U.S. 635 (2023) ........................................................................... 16

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ........................................................................... 16

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953) ........................................................................... 15

*Slaughter-House Cases,*
    83 U.S. 36 (1873) ............................................................................... 11

*Somerville v. Somerville,*
    31 Eng. Rep. 839 (1801) ...................................................................... 8

*Tenn. Conf. of the NAACP v. Lee,*
    730 F. Supp. 3d 705 (M.D. Tenn. 2024) ............................................ 24

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ........................................................................... 22

*United States ex rel. Hintopoulous v. Shaughnessy,*
    353 U.S. 72 (1957) ............................................................................. 17

*United States v. Ju Toy,*
    198 U.S. 253 (1905) ...................................................................... 14-15

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995) ........................................................................... 21

*United States v. Rahimi,*
    602 U.S. 680 (2024) ........................................................ 8, 16, 18-19

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................. 23

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) ................................................................. 13

*Van Buren v. United States,*
    593 U.S. 374 (2021) ................................................................... 6

*Vidal v. Elster,*
    602 U.S. 286 (2024) ................................................................. 18

*Washington v. Trump,*
    858 F.3d 1168 (9th Cir. 2017) ................................................ 22

*Welty v. Dunaway,*
    749 F. Supp. 3d 882 (M.D. Tenn. 2024) ................................. 24

*Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021) ................................................................... 21

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ................................................................. 14

## Constitutional Provisions

U.S. Const. Amend. XIV, § 1 ................................................... 6, 7

U.S. Const. art. III ............................................................ 2, 20-22

U.S. Const. art. VI .................................................................. 19

## Statutes & Legislative Materials

8 U.S.C. § 1401(b) ..................................................................... 4

Civil Rights Act of 1866,14 Stat. 27 ...................................... 4, 7

Cong. Globe, 39th Cong., 1st Sess. (1866) ............................. 3, 9

## Other Authorities

2 *A Dictionary of Words and Phrases Used in Ancient and Modern Law* (1899) ........ 7

3 John Bassett Moore, LL.D., *A Digest of International Law* § 373 (1906) .............. 10

Alexander Porter Morse, *A Treatise on Citizenship* (1881) ........................ 10

Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135 (2019) .......................................................... 4, 6-10, 15, 18

Brandon L. Garrett, *Misplaced Constitutional Rights*, 100 B.U. L. Rev. 2085 (2020) .................................................................. 18

Hannis Taylor, A *Treatise on International Public Law* (1901) ................................ 11

Henry Campbell Black, *Handbook of American Constitutional Law* (3d ed. 1910) ...................................... 11

James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006) ............................................................................ 5

Joseph Story, *Commentaries on the Conflict of Laws* (1834) .................................... 10

Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) ............................ 7-10, 13

K. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013) .......................................................... 19

Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340 (1995) ...................................................................... 16

Letter from F.A. Reeve, Acting Solicitor of the Treasury, (in XI Documents of the Assembly of the State of New York, 113th Sess.) .......... 10

Letter from Sen. Lyman Trumbull to President Andrew Johnson, (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress) ....... 9

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ............................................. 8

S. Rapalje & R. Lawrence, *A Dictionary of American and English Law* (1888) .................................................. 7

Samuel Freeman Miller, *Lectures on the Constitution of the United States United States* (J. C. Bancroft Davis ed., 1893) ....................................................... 10

William Edward Hall, *A Treatise on International Law* (5th ed. 1904) .................... 11

## INTERESTS OF AMICUS CURIAE

Tennessee has an interest in ensuring that courts appropriately exercise their judicial power within the bounds of the law and separation-of-powers principles. That interest is heightened here, where a series of overlapping injunctions granting universal relief has thwarted the President's effort to address one aspect of a national immigration crisis that has harmed the States. Recent years have seen an influx of illegal aliens—over 9 million—overwhelming the national infrastructure. U.S. Customs and Border Protection, *Nationwide Encounters* (Feb. 5, 2024), https://perma.cc/EDU3-98CP. And "many noncitizens proceed to interior States" after crossing the border illegally. *See* DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* 26 (Oct. 29, 2021), https://perma.cc/5DNE-B9AE. Tennessee thus faces significant economic, health, and public-safety issues from policies "holding out a nationwide incentive for illegal immigration," Stay Appl. 36-37, beyond what the Citizenship Clause requires. More generally, as a frequent federal-court litigant, the State and its citizens suffer when courts depart from traditional limits on their equitable authority to broadly block duly enacted state laws.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The "judicial Power of the United States" requires sound legal analysis that settles parties' rights, not abstract proclamations of indiscriminate scope. U.S. Const. art. III, § 1. And the more politically salient the question, the higher the institutional stakes of life-tenured judges' abiding Article III's limits. Yet in a series of rulings blocking the President's day-one Executive Order on citizenship, courts have opted against remedial restraint. A position contradicting plaintiffs' maximalist reading of the Citizenship Clause, the reasoning seems to go, is too "untenable," App. 14a (or "resoundingly" wrong, App. 25a, or "verg[ing] on frivolous," App. 97a) to warrant a tailored remedy. Never mind that plaintiffs' mere-presence-at-birth rule cannot be right all the time, as all agree. Or that it is contrary to the expressed view of many contemporaneous court cases and commentators. Or that it rewards illegal behavior in a manner no drafter or ratifier of the Citizenship Clause endorsed. Courts have viewed plaintiffs' correctness as largely foregone, then folded that view into remedial rulings running against the President facially and nationwide.

The Solicitor General's Office persuasively explains why the January-onset "epidemic" of universal orders warrants this Court's swift treatment. Stay Appl. 3. Tennessee writes to emphasize two points. One, since some lower courts saw the merits and scope-of-relief questions as linked, *e.g.*, App. 69a, it's worth pausing to point out that the first-principles case for plaintiffs' mere-presence position is not only not obvious—it has serious problems under the Citizenship Clause's text and ratification-era history. Contemporaneous sources instead support what common sense suggests: Conferring United States citizenship requires a more meaningful

2

connection than mere presence by happenstance or illegality. That connection, originalist evidence repeatedly instructs, was parental domicile. This Court's immigration precedents likewise cut against a mere-presence rule. Nor can plaintiffs' reliance on political-branch practice long post-dating ratification override the original public meaning of the Clause. So even if the rulings' merits and scope interact, plaintiffs oversell by casting their constitutional position as an open-and-shut case.

Two, whatever the ultimate merits outcome, the trifecta of overlapping, universal orders entered below goes beyond the judicial power. Injunctive relief must be no more burdensome than necessary to address a plaintiff's injury. And here, that principle dictates that any relief be limited in two ways: first, it must extend only to the identified plaintiffs; and second, it must prohibit only the unconstitutional applications of the challenged Executive Order, if there are any. Declining to discipline remedial overreach harms Tennessee and other States who must continually bear the brunt of overbroad injunctions by federal courts.

## ARGUMENT

## I.    Plaintiffs' Mere-Presence Position Has Serious Merits Flaws.

It is dubious to link merits questions with "the government's likelihood of success" on narrowing an injunction's remedial scope. App. 71a (Niemeyer, J., dissenting). But if merits questions indeed bear here and now, this Court should have a more balanced picture of the problems plaguing plaintiffs' interpretive case.

It's helpful to start with a few broader points that most accept. *First*, the Fourteenth Amendment aimed to constitutionally "ingraft" the protections of the Civil Rights Act of 1866. Cong. Globe, 39th Cong., 1st Sess. App. 82 (1867) (statement of

Rep. Miller).  Relevant here, the 1866 Act directed that "all persons born in the United States *and not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States," no matter their "race and color" and "without regard to any previous condition of slavery or involuntary servitude."  Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 (emphasis added).  Given their close relationship, the Act's history and ordinary public meaning have long been understood to bear on interpretation of the Citizenship Clause.

*Second*, there is "near-universal consensus" that both the Citizenship Clause and the Civil Rights Act of 1866 sought to overturn the Supreme Court's odious holding in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which treated U.S.-born descendants of African slaves as property rather than persons entitled to U.S. citizenship.  Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135, 145 (2019).  The provisions also sought to redress the "systematic denial of civil rights to freed slaves" by prohibiting race-based discrimination in the conferral of citizenship or provision of civil rights.  *Id*. at 146.  But parental race or alienage is *not* parental residency—a distinction the district courts have failed to grasp.  *See, e.g.*, App. 92a.

*Third*, while plaintiffs advocate for a mere-presence rule, they must at the same time agree that their pure *jus soli* approach does not hold in all cases.  Specifically, plaintiffs and their supporters stipulate that presence is not enough for children of (i) Indian tribal members (who obtain citizenship only through statute, *see* 8 U.S.C. § 1401(b)), (ii) foreign diplomats, and (iii) at least some others, like enemy

combatants, who are immune from U.S. law. *E.g.*, James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 369 (2006). This means that the core question is not, as many commentators cast it, whether all persons born within U.S. borders obtain citizenship—even plaintiffs agree that's not right. It's whether "born ... in the United States, and subject to the jurisdiction thereof" excludes only some unstated set of limited exceptions based on then-prevailing understandings of immunity (plaintiffs' view), or provides a generally applicable rule that bars all those without meaningful residence-based ties to the United States (applicants' view).

*Fourth*, immigration restrictions as we know them did not arise until the early 1880s, after the Citizenship Clause's ratification. There is thus no contemporaneous discussion supporting plaintiffs' maximalist position applying the Clause to children whose parents are present in the United States only unlawfully and after evading detection. And if rewarding parental illegality had come up, it would have run afoul of the "deep and firm" legal rule *Ex turpi causâ non oritur actio*, which prohibited enforcing illegal contracts or rewarding illegal acts. *E.g.*, *Brooks v. Martin*, 69 U.S. 70, 75-76 (1864).

To sum up, then, plaintiffs' first-principles position is that a provision that (i) aimed to confer citizenship on freed slaves and thus (ii) does not address non-residents or those unlawfully present, nonetheless (iii) binds the Executive Branch to automatically confer citizenship in most (but not all) cases (iv) in a manner rewarding those who illegally enter the country. That counterintuitive "fallout" should raise red

flags about the "implausibility" of plaintiffs' interpretation. *Van Buren v. United States*, 593 U.S. 374, 394 (2021). And as it turns out, plaintiffs' mere-presence position is textually, historically, and precedentially challenged.

## A.    The Text Weighs Against Plaintiffs.

There are two apparent textual problems with plaintiffs' mere-presence position. At the outset, the Clause directs that covered persons not only must be "born … in the United States"; they also must be "subject to the jurisdiction thereof"—a limitation that was added later to the originally proposed text. U.S. Const. Amend. XIV, § 1; *see* Swearer, *supra*, at 143. So the text, as revised, must do something different than adopt England's common-law rule of pure *jus soli*, which turns only on the location of a child's birth. Plaintiffs do not dispute as much.

The parties instead debate precisely *how* the Clause departs from a pure *jus soli* approach. Plaintiffs contend that "jurisdiction" is a low bar, referring only to the bare sense of being subject to *some* U.S. control. But as the application explains, that narrow meaning doesn't work—after all, tribal members and foreign diplomats are "in some way subject to the basic level of sovereign authority the United States government exerts over its geographical territory," even though their "exclusion from birthright citizenship is uncontested." Swearer, *supra*, at 149 & n.35 (collecting examples of U.S. legal authority over diplomats); Stay Appl. 6-7 (same for diplomats and Indians). Equating "subject to the jurisdiction of" with being within the United States' territory collapses two distinct prongs of the Clause's text.

Plaintiffs' contrary reading further places the Citizenship Clause in collision with the 1866 Act, which allows citizenship only to those "not subject to any foreign

6

power." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27. That phrasing "specifically intended to withhold birthright citizenship from those who did not owe a complete, permanent allegiance to the United States and who were not part of the 'American people.'" Swearer, *supra*, at 157-59 (collecting sources). Historical evidence indicates that the metric for measuring the requisite connection to U.S. jurisdiction was domicile or lawful permanent residence. *Infra* pp. 8-11. Temporary presence by a parent who legally resided in a foreign country was not enough.

A second textual feature of the Citizenship Clause points to a domicile-based approach: The provision's premise is that it applies only to persons who also have a "State *wherein they reside*." U.S. Const. Amend. XIV, § 1 (emphasis added). The term "reside," in context, connotes a person's legal residence or domicile. *See, e.g.*, "Residence," S. Rapalje & R. Lawrence, 2 *A Dictionary of American and English Law* 1114 (1888) (collecting cases treating "residence" as "synonymous with 'domicile'"); "Residence, Legal," 2 *A Dictionary of Words and Phrases Used in Ancient and Modern Law* 692 (1899) ("[t]he place where a man has his fixed place of abode, where he can exercise his political rights and is subject to personal taxation"). That's particularly so when viewed against then-prevailing concepts of complete jurisdiction and political allegiance, with which domicile's meaning was closely aligned. *See* Stay Appl. 6-8; *see also* Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 488-90 (2015) (colleting authorities); *accord* "Domicile," 1 *Dictionary of American and English Law*, *supra*, at 410 ("The question where a

person is domiciled may be important, because it is by the law of that place that his civil status … is regulated.").

The general rule of "domicile of origin" or "natural domicile," moreover, is that a child inherits his parent's domicile at birth and that domicile prevails until "clearly abandoned and another taken" via "fixed and settled habitation." *Somerville v. Somerville* (1801) 31 Eng. Rep. 839, 840, 842; 5 Ves. Jun. 750, 750, 755. "Thus," as an 1888 American and English law dictionary instructed, "if a husband and wife domiciled in England take a voyage to India, and a child is born to them on the voyage, or in India before they acquire a domicile there, its domicile is English." "Domicile of origin," *Dictionary of American and English Law*, *supra*, at 410. The Citizenship Clause's reference to "reside" thus appears to align with a domicile-based approach to the Citizenship Clause and exclude persons whose parents lack permanent or lawful residence in the United States.

## B.    Contemporaneous History and Practice Weigh Against Plaintiffs.

When assessing the Citizenship Clause's meaning, the "history that matters most is the history surrounding the ratification of the text." *United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring). Tennessee does not purport to fully survey the complex historical record here. Others have, though. *See* Swearer, *supra*; Lollman, *supra*; Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010). Suffice it to

say, a range of contemporaneous sources[1] cast significant doubt on plaintiffs' mere-presence position.  *See* Stay Appl. 6-9.

These include debates and commentary surrounding the passage and ratification of the 1866 Act and the Fourteenth Amendment, which pervasively linked eligibility to legal residency:

- Senator Trumbull, the primary drafter of the 1866 Act's citizenship provision, explained that the Act excluded "persons *temporarily resident* in [the United States] whom we would have no right to make citizens."  Even though "a sort of allegiance was due to the country from" such persons, they were not those "who owe allegiance to the United States" in the sense the citizenship clause was understood to require.  Cong. Globe, 39th Cong., 1st Sess. 572 (1866) (emphasis added).

- Senator George Henry Williams, a member of the Joint Committee on Reconstruction, wrote similarly: "In one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States, *but they are not subject to the jurisdiction of the United States in every sense*."  Cong. Globe, 39th Cong., 1st Sess. 2897 (1866) (emphasis added).

- Summarizing the Civil Rights Act for President Johnson, Senator Trumbull explained that the Act "declares 'all persons' born of *parents domiciled in the United States* … to be citizens of the United States."  Swearer, *supra*, at 158-59 (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson, *in* Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress, Washington, D.C., Doc. No. 28152) (emphasis added).

- In explaining how the Citizenship Clause tracked the Civil Rights Act, Senator Howard emphasized that the Clause "will not, of course, include persons born in the United States *who are foreigners, aliens*, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States."  Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (emphasis added).

Early Executive Branch practice was in accord:

- In the 1880s, two different Secretaries of State denied citizenship to persons born in the United States.  The reason?  Their parents had "remained

---

[1] The historical sources quoted throughout this section are collected in Swearer, *supra*, and Lollman, *supra*.

domiciled" overseas. Swearer, *supra*, at 170. Letters setting out their reasoning confirmed that "[t]he fact of birth" in the United States, "under circumstances implying alien subjection, establishes of itself no right of citizenship." Letter from Mr. Frelinghuysen, Sec'y of State, to Mr. Kasson, Minister to Ger. (Jan. 15, 1885), *in* 3 John Bassett Moore, LL.D., *A Digest of International Law* § 373, at 279 (1906); Letter from Mr. Bayard, Sec'y of State, to Mr. Winchester, Minister to Switz. (Nov. 28, 1885), *in* 3 John Bassett Moore, LL.D., *A Digest of International Law* § 373, at 280 (1906); *see* Lolling, *supra*, at 479-80.

- The Secretary of the Treasury applied similar reasoning in an 1890 opinion letter, which denied "citizenship of a child born to a would-be immigrant who had not 'landed' but was awaiting immigration approval." Swearer, *supra*, at 171. The Secretary explained: "I am, therefore, of the opinion that the child in controversy born during the temporary removal of the mother from the importing vessel to a lying-in hospital for her own comfort, pending further examination as to whether she belongs to the prohibited class of immigrants, did not become, by reason of its birth, under such circumstances, an American citizen." Letter from F.A. Reeve, Acting Solicitor of the Treasury (Mar. 4, 1890), *in* XI Documents of the Assembly of the State of New York, 113th Sess., No. 74, 6, 47.

Likewise, 1800s and early 1900s commentary recognized parental domicile as a distinguishing feature between the British and U.S. rules on citizenship:

- Justice Joseph Story, writing in his *Commentaries on the Conflict of Laws*, urged in 1834 that "[a] reasonable qualification o[n] the rule" of *jus soli* "would seem to be, that it should not apply to the children of parents … who were abiding there for temporary purposes." Joseph Story, *Commentaries on the Conflict of Laws* § 48 (Boston, Little, Brown & Co. 6th ed. 1865) (quoted in Lollman, *supra*).

- Alexander Porter Morse asserted in 1881 that "[t]he words 'subject to the jurisdiction thereof' exclude[d] the children of foreigners transiently within the United States … as … subjects of a foreign nation." Alexander Porter Morse, *A Treatise on Citizenship* 248 (Boston, Little, Brown & Co. 1881).

- In an 1891 law review article, former Supreme Court Justice Samuel Miller observed: "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction." Samuel Freeman Miller, LL.D., *Naturalization and Citizenship*, *in* LECTURES ON THE CONSTITUTION OF THE UNITED STATES 275, 279 (J. C. Bancroft Davis ed., 1893).

- An 1898 comment in *Yale Law Journal* wrote: "[I]n this country, the alien *must be permanently domiciled*, while in Great Britain birth during a mere temporary sojourn is sufficient to render the child a British subject." Comment, 7 Yale L.J. 365, 367 (1898) (emphasis added).

- Constitutional scholar Henry Campbell Black distinguished between U.S.-born children of "a stranger or traveler passing through the country, or temporarily residing here," who are not entitled to citizenship, and "children, born within the United States, *of permanently resident aliens*, who are not diplomatic agents or otherwise within the excepted classes," who are entitled to citizenship no matter their race. *Handbook of American Constitutional Law* 634 (3d ed. 1910) (emphasis added).

- International law treatises reached the same conclusion. *See, e.g.*, William Edward Hall, M.A., *A Treatise on International Law* 224-25, 227 (5th ed. 1904) ("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Hannis Taylor, LL.D., *A Treatise on International Public Law* 220 (1901) ("It appears, therefore, that children born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'").

If nothing else, the excerpts above and sources collected by scholars show that plaintiffs' mere-presence position was not the uniform historical consensus.

## C.    Supreme Court Precedent Weighs Against Plaintiffs.

Nor does this Court's precedent mandate plaintiffs' maximalist reading of the Citizenship Clause. Quite the contrary: Caselaw emphasizes the importance of parental domicile to birthright citizenship and shuns mere-physical-presence rules in the immigration context.

1.    The earliest cases interpreting the Fourteenth Amendment point towards a domicile-based approach. In 1872, the Court's decision in the *Slaughter-House Cases* stated that the Citizenship Clause "was intended to *exclude* from its operation children of ministers, consuls, and *citizens or subjects of foreign States born*

11

*within the United States.*" 83 U.S. 36, 73 (emphasis added). Two years later, the Court observed that "common-law" principles informed "who shall be natural-born citizens" and noted "doubts" as to whether children of "aliens or foreigners" born in the United States constituted "natural-born citizens." *Minor v. Happersett*, 88 U.S. 162, 167-68 (1874). The Court recognized that "it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also." *Id.* at 167. After observing that "[s]ome authorities go further and include as citizens children born within the jurisdiction without reference to the citizenship of their parents," the Court noted that "[a]s to this class there have been doubts." *Id.* at 168.

*Elk v. Wilkins*, 112 U.S. 94 (1884), also counsels against a mere-presence approach. There, the Court assessed how the Citizenship Clause applied to an Indian born into a tribe who then severed tribal relations. *Id.* at 99. The Court held that "Indians born within the territorial limits of the United States, … although in a geographical sense born in the United States" were not "'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment." *Id.* at 102. The Indian must have been "completely subject to [the United States'] political jurisdiction, and owing them direct and immediate allegiance." *Id.* But he was not, just as "the children of subjects of any foreign government born within the domain of that government" would not receive citizenship. *Id.*

*Wong Kim Ark*—on which plaintiffs principally rely—cuts against them too. The Court there decided how the Citizenship Clause applied to a U.S.-born child of

Chinese aliens lawfully present and permanently domiciled in the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898). So unlawful presence was not at play. Still, the Court emphasized throughout that the alien parents were "resident[s]" and "domiciled within the United States." *Id.* at 652, 653, 693, 696, 705. It reasoned that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States" for purposes of the Clause. *Id.* at 693 (emphasis added). And it held that "Chinese persons … *so long as they are permitted by the United States to reside here*" enjoy the same birthright protections "as all other aliens residing in the United States." *Id.* at 694 (emphasis added). In so doing, the Court expressly drew from *Benny v. O'Brien*, 32 A. 696 (N.J. 1895) (cited at Stay Appl. 9), which interpreted the Citizenship Clause to require that parents be "domiciled here," and thus to exclude "those born in this country of foreign parents who are temporarily traveling here." *Id.* at 698.

*Wong Kim Ark*'s emphasis on parental domicile was no accident. It responded directly to the parties' briefing and to the dissent's concern about covering persons "born of aliens whose residence was merely temporary, either in fact or in point of law." *Id.* at 729 (Fuller, C.J., dissenting). Not surprisingly, "[i]n the years immediately following *Wong Kim Ark*, several commentators read the Court's reference to domicile as actually doing work in the opinion." Lollman, *supra*, at 462, 471. So did the Court and the Department of Justice. *See* U.S. Br. 38-39.

13

2.    Additional precedent clashes with plaintiffs' treatment of mere physical presence in the United States as determinative.

In the immigration context, this Court has long recognized that not every alien physically present within U.S. soil, water, or airspace "has *effected an entry* into the United States" for "constitutional purposes." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see United States v. Ju Toy*, 198 U.S. 253, 263 (1905). *Kaplan v. Tod*, 267 U.S. 228 (1925), is instructive. There, the Court rejected a mere-presence rule when considering whether children obtain citizenship through their parents' naturalization. A mother brought her daughter to Ellis Island to join her father, who legally resided in the country. *Id.* at 229. The daughter was denied admission, but the outbreak of the First World War prevented her deportation. *Id.* After detaining the girl for nearly a year, the government paroled her. *Id.* She then lived with her father in the United States for the better part of a decade. *Id.* During this time, the girl's father naturalized. *Id.* at 230. And when the government later sought to deport the girl, she argued that she had obtained citizenship because she was "dwelling in the United States" when her father naturalized. *Id.*

The Court disagreed. It held that the girl never "lawfully … landed in the United States," and "until she legally landed," she "could not have dwelt within the United States." *Id.* (quotations omitted). Legally, she remained "at the boundary line and had gained no foothold in the United States." *Id.* Absent a permissible "entry," the Court concluded, "an alien can neither 'dwell' nor 'reside' within the United

States, as those words are understood in the immigration context." *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024) (quoting *Kaplan*, 267 U.S. at 229-30).

This Court has invoked the at-the-border legal fiction time and again. *E.g.*, *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958). Under it, an alien may be "physically within our boundaries," but treated under the law "as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate." *Ju Toy*, 198 U.S. at 263. And that rule applies to aliens who "arrive at ports of entry" or are detained "after unlawful entry," for example, even if later "paroled elsewhere in the country" pending removal. *Thuraissigiam*, 591 U.S. at 139.

The at-the-border legal fiction in the Court's precedents aligns with the historical domicile-based approach to the Citizenship Clause. It makes no sense to recognize the "legal fiction of extraterritoriality, wherein ambassadors and diplomats, though literally present on United States soil, were considered to be still living in the sending state," Swearer, *supra*, at 143, yet ignore the similarly well-established legal fiction when it comes to aliens paroled into the country. The clash between plaintiffs' Citizenship Clause reading and settled immigration-law principles further weighs against their mere-presence position.

### D. Plaintiffs' Reliance on Post-Ratification Practice Is Not Dispositive.

Plaintiffs and the district courts have sought to support their merits position with congressional and Executive Branch practice, which they say has applied a

mere-presence approach for over a century. *E.g.*, App. 68a. To be sure, "the longstanding practice of the government can inform our determination of what the law is." *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (citation and quotations omitted). And if this Court's precedent aligns with practice in a holding about the meaning of a constitutional provision, "*stare decisis*" might "control the outcome." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring). But for a few reasons here, plaintiffs' historical-practice points prove little about the interpretive question.

To begin, much of plaintiffs' cited evidence comprises sources—including a 1995 Office of Legal Counsel memo—stemming from the late 1900s. *E.g.*, Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340 (1995). Plaintiffs' thus have a "timing problem": Evidence arising over a century after the Fourteenth Amendment's adoption is "far too late to inform the meaning" of the Citizenship Clause "at the time of" its ratification. *Samia v. United States*, 599 U.S. 635, 655 (2023) (Barrett, J., concurring in part and concurring in the judgment); *cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 221 (2020) (dismissing cited historical-practice examples as too "recent").

Nor is closer-in-time practice evidence merely "inconclusive." *Samia*, 599 U.S. at 656 (Barrett, J., concurring in part and concurring in the judgment). As discussed, *see supra* pp. 9-10, administrative actions "surrounding the ratification" weigh against plaintiffs by highlighting that Executive Branch officials viewed parental domicile as relevant to the Citizenship Clause's application, *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring). As far as practice goes, those incidents are rather on point:

As here, they involve executive officials asserting that citizenship does not automatically attach based on a child's place of birth alone, but instead turns on assessing parental connection to the United States. *See supra* pp. 12-13. Neither plaintiffs nor the courts below have offered any counters to that "contemporaneous and weighty evidence of the Constitution's meaning." *Bowsher v. Synar*, 478 U.S. 714, 723 (1986).

Plaintiffs' limited body of earlier 20th-century "practice" is not persuasive on its own terms, either. Congress's 1940 choice to codify the Clause's language only begs this case's dispute over what phrases like "subject to the jurisdiction of" and "in the United States" are best read to mean. Nor do cases making passing references to broader conceptions of birthright citizenship move the needle. *Cf.* 19 Op. O.L.C. at 346 n.15 (1995) (collecting such cases). Many arise only well into the 1900s, so likewise suffer timing flaws.[2] Others either overread *Wong Kim Ark* to conflate alienage and "race" with lawful residency,[3] assume without deciding that presence at birth suffices under the Clause,[4] or mention birthright citizenship only in describing the factual background or in other dicta.[5] No case "directly" addresses the interpretive question here: Whether the Citizenship Clause requires conferral of citizenship based on a child's mere presence at birth, no matter the temporary, accidental, or

---

[2] *See, e.g., Plyler v. Doe*, 457 U.S. 202, 211 n.10 (1982).

[3] *See, e.g., Morrison v. California*, 291 U.S. 82, 85 (1934) (discussing race); *Dos Reis ex rel. Camara v. Nicolls*, 161 F.2d 860, 861-62 (1st Cir. 1947) (discussing nationality).

[4] *See United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957).

[5] *See, e.g., INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (cited at 19 Op. O.L.C. at 346 n.15 (1995); App. 92a).

unlawful nature of parental presence. *See* Swearer, *supra*, at 197-201 (discussing more recent Supreme Court cases).

That leaves later Executive Branch practice from the mid-1900s to now, which plaintiffs assert has generally adopted a mere-presence view. But in a case about the location of a constitutional floor on Fourteenth-Amendment citizenship, it is not determinative that the Executive Branch has been willing to raise the ceiling. *Cf.* Brandon L. Garrett, *Misplaced Constitutional Rights*, 100 B.U. L. Rev. 2085, 2087 (2020) ("[I]n many areas, government actors can choose to provide greater protection than the Constitution demands."). Outside of the mandatory constitutional limits on the President's power over foreign affairs, the political branches maintain discretion to craft citizenship and naturalization rules in a manner consistent with foreign-policy objectives and exigencies. *See* Stay Appl. 4-5, 35-37.

And to the extent the Executive Branch has read *Wong Kim Ark* as governing beyond its holding about parental domicile, *see, e.g.*, 19 Op. O.L.C. at 344-46, its practice is minimally probative, *cf. Peter Pan Bus Lines v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) ("[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled…." (citation and quotations omitted)). Carrying forward a plainly flawed reading of a case is not the type of historical practice that should govern. After all, "evidence of 'tradition' unmoored from original meaning is not binding law." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (quoting *Vidal v. Elster*, 602 U.S. 286, 322-25 (2024) (Barrett, J., concurring in part)).

18

Along the same lines, even if plaintiffs are right that some recent federal-government tradition supports their reading, that could not override or alter the meaning of the Clause as ratified. "The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood." *Rahimi*, 602 U.S. at 715 (Kavanaugh, J., concurring). That fixation principle is plank one of originalism; the second rule speaks to interpretive constraint—that "the discoverable historical meaning … has legal significance and is authoritative in most circumstances." *Id.* at 737 (Barrett, J., concurring) (quoting K. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013)). Tethering meaning to the ratified text reflects that "[t]he text of the Constitution is the 'Law of the Land'" that controls "unless and until it is amended." *Id.* at 715 (Kavanaugh, J., concurring) (quoting U.S. Const., art. VI).

Asked to select among historical sources supporting original public meaning and practice of more recent vintage, this Court should favor the former. To be sure, the "[h]istorical analysis" an original-meaning methodology requires "can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult." *McDonald v. City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J., concurring). But such constraints serve a vital purpose in a system governed by a written Constitution with judges empowered to exercise "neither FORCE nor WILL but merely judgment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 120 (2015) (Thomas, J., concurring in the judgment) (quoting The Federalist No. 78,

at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).  Among other things, an original-meaning approach helps ensure that courts' constitutional analysis reflects "a body of evidence susceptible of reasoned analysis"—not "vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald*, 561 U.S. at 804 (Scalia, J., concurring).

## II.   Plaintiffs Are Not Entitled to Universal Relief.

Even if some injunctive relief were proper, this Court should reject plaintiffs' invitation to employ an across-the-board override of an Executive policy throughout the country.  Cabining courts' growing penchant for universally blocking presidential policies not only will help forestall further branch-on-branch conflict at the federal level.  A rule requiring tailored relief also would help protect States from federal-court interference into important policies implicating core sovereignty concerns.

As a baseline, this Court should clarify that any injunctive relief must be limited to the parties.  As a rule, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added).  To that end, an injunction "must … be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 68 (2018).  This limitation follows from "the nature of federal judicial power," as enshrined in Article III itself. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024) (Mem.).  Article III "confines the 'judicial power' to 'Cases' and 'Controversies.'" *Id.* (quoting U.S. Const. art. III, § 2). It does not permit federal courts to "issue advisory opinions" or address legal issues

"'in the abstract.'" *Id.* (quoting *California v. Texas*, 593 U.S. 659, 672 (2021)).  Courts cannot "lawfully enjoin the world at large or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (cleaned up).  They "must operate in a party-specific and injury-focused manner." *L.W.*, 83 F.4th at 490.

So to the extent that the threatened application of the Executive Order to plaintiffs gives rise to an Article III injury, an injunction preventing application of the order *to plaintiffs* would fully redress that injury.  Setting aside distinct review schemes like the Administrative Procedure Act's, it is improper to enter relief that also governs "everyone in the nation similarly situated by categorially enjoining the defendants" from any enforcement.  App. 72a (Niemeyer, J., dissenting).  Injunctions as "to those who are strangers to the suit" exceed "the judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).  That is why, in cases involving in personam injunctions of enforcement, "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran v. Salem Inn*, 422 U.S. 922, 931 (1975); *see United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995).  And it is also why the government generally remains "free to" enforce challenged provisions—even if enjoined as to specific plaintiffs—against "others" not party to the suit. *See Doran*, 422 U.S. at 931.

That plaintiffs have raised a facial challenge to the Executive Order changes nothing.  Nor does the Executive Order's cited "categorical" effect. *See* Stay Appl. 12-13, 21.  Limits on the scope of "judicial power" apply with full force whether the

challenge is facial or as applied, or to a targeted order or a nationwide policy. *L.W.*, 83 F.4th at 490. No matter the substantive merits theory, "[d]istrict courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.'" *Id.* (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). Relief that goes further and applies to unnamed nonparties across the country necessarily exceeds "the power of Article III courts" and flouts "longstanding limits on equitable relief." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see L.W.*, 83 F.4th at 490. It also "implicates unnecessarily potentially conflicting orders or reasoning, claims preclusion, res judicata, and other similar principles that order the work of different courts." App. 73a (Niemeyer, J., dissenting).

Moreover, any injunctive relief must be limited to the allegedly unconstitutional applications of the challenged Executive Order. That is, even if this Court concludes that some applications of the Executive Order are unconstitutional, it does not follow that *all* applications should be enjoined. Rather, the constitutionality of Executive Orders, like statutes, should be assessed provision by provision, and courts have an "obligation" to use severance "to maintain as much of the order as is legal." *Washington v. Trump*, 858 F.3d 1168, 1172 (9th Cir. 2017) (Kozinski, J., dissenting); *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (assuming "the severability standard for statutes also applies to executive orders"). Applied here, that rule restricts any remedy to "enjoin[ing] the unconstitutional *applications* of the [Order] while preserving the other valid applications." *Connection*

*Distrib. Co. v. Holder*, 557 F.3d 321, 342 (6th Cir. 2009); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006).

As discussed, evidence supports reading the Citizenship Clause to turn on parental domicile or lawful residency. At a minimum, this Court's immigration precedents strongly suggest that persons encountered at illegal border crossings have not effectuated legal entry "in the United States," no matter if later paroled. *See supra* pp. 14-15. If that is right, then there are a host of situations in which the Executive Order can be applied with no constitutional problems. That at a minimum means plaintiffs' *facial* challenge to the Executive Order must fail along with their claim for facial relief. *See Nat'l Treasury Emps. Union v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989) (applying "difficult" facial standard from *United States v. Salerno*, 481 U.S. 739 (1987), to an Executive Order). To the extent that there remain situations outside the bounds of constitutional application, injunctive relief should be narrowly crafted to "enjoin only the unconstitutional applications … while leaving other applications in force." *Ayotte*, 546 U.S. at 329.

States are past due for a binding opinion that clarifies the checks on district courts' remedial authority. All too often, Tennessee receives and must seek reversal of statewide district-court injunctions on scope-of-relief grounds. *See, e.g.*, *L.W. ex rel. Williams v. Skrmetti*, 679 F. Supp. 3d 668, 716-18 (M.D. Tenn. 2023), *rev'd* 83 F.4th at 489-91, *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (mem.); *Does #1-9 v. Lee*, 659 F. Supp. 3d 865, 894 (M.D. Tenn. 2023), *rev'd* 102 F.4th 330, 341-42 (6th Cir. 2024). That enact-enjoin-reverse cycle inflicts grave federalism

harms in our dual-sovereign system. After all, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted) (cited at Stay Appl. 36).

Worse, many injunctions arise in the facial, pre-enforcement posture. So federal courts are blocking new state laws, statewide, based on guesses about how they might later be read—thus preempting the traditional interpretive and enforcement role of state courts and state officials. *See, e.g., Friends of George's, Inc. v. Mulroy*, 675 F. Supp. 3d 831 (W.D. Tenn. 2023), *rev'd* 108 F.4th 431 (6th Cir. 2024); *Welty v. Dunaway*, 749 F. Supp. 3d 882 (M.D. Tenn. 2024), *appeal docketed*, No. 24-5968 (6th Cir. Oct. 24, 2024). Further hampering proper percolation, broad statewide relief often forces Tennessee to resort to early, emergency appellate proceedings to vindicate its rights. *See, e.g., Free Speech Coal., Inc. v. Skrmetti*, 2024 WL 5248104, at *17 (W.D. Tenn. Dec. 30, 2024) (granting "statewide" preliminary injunction), *stayed*, 2025 WL 512049 (6th Cir. Jan. 13, 2025); *Tenn. Conf. of the NAACP v. Lee*, 730 F. Supp. 3d 705, 711, 740 (M.D. Tenn. 2024) (granting permanent injunction as to nonparties), *stayed*, 105 F.4th 888 (6th Cir. 2024). "That scenario is not always optimal for orderly judicial decisionmaking," *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 930 (2024) (Kavanaugh, J., concurring), or for strained state and judicial resources.

In short, clarifying the proper scope of equitable relief is an independently certworthy endeavor. Such instruction would benefit the rule of law by better aligning courts' practices with limits on their powers. It also would address well-placed

24

separation-of-powers concerns over judicial interference with core Executive Branch functions. And it would promote federalism and comity values in cases carrying great importance for States like Tennessee, their lawmakers, and their citizens.

## CONCLUSION

If the constitutional merits inform the proper scope of judicial remedies, a wide range of sources close in time to the Citizenship Clause's ratification casts doubt on plaintiffs' mere-presence position. At a minimum, this Court should clarify that any injunction must be appropriately tailored, not universal.

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

*/s/ Whitney D. Hermandorfer*
Whitney D. Hermandorfer
  *Director of Strategic Litigation*
  *Counsel of Record*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
whitney.hermandorfer@ag.tn.gov
(615) 741-3491

*Counsel for the State of Tennessee*