- o

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW JERSEY, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants.

No. 25-1158

MELVIN JONES JR.; COLLEEN CONNORS,

Interested Parties–Appellants.

ELON MUSK, LEE ZELDIN,
Donald J. Trump in their official
Capacity as Federal Employees
and Mr. Trump, in his official
capacity as President of the
United States, et al. - APPELLEES

INFORMATIONAL BRIEFS in support of pro se appellants
ASSENT motion to dismiss the instant appeal #25-1158

*Date: April 4th, 2025*

*"INFORMATIONAL BRIEF[s]" in support of pro se appellants ASSENT motion to dismiss the instant appeal #25-1158.*

*To the honorable appeals court [and] to the defendant/ appellee President Donald Trump, et al. [and] appellees Michigan*

*AG - DANA NESSEL and the State of New Jersey, et al {e.g. Democratic states' AG's}....*

*Please take notice of the attached VARIOUS INFORMATIONAL BRIEFS {e.g. which although SMALL PRINT....here, pro se appellant Colleen Connors is able to read such} HOWEVER, due to disabled pro se appellant Melvin*

*Jones Jr.,'s serious vision impairments... which includes EYE-STRAIN MIGRAINE HEADACHES.... HE/ appellant Mr. Jones Jr., [is NOT able to read said small print documents affixed hereto fully]..... However, said "INFORMATIONAL BRIEFS FURTHER" ....which GIVE relevant context of PART of how it is that BOTH {Colleen Connors' and my/ disabled Melvin Jones Jr.} give*

*additional - notice that in light of our [e.g. the pro se appellants'] ASSENT/ CONCURRENCE "motion" to dismiss the instant appeal without prejudice... pertaining to the defendants/ appellees President Donald Trump, et al.'s MOTION TO DISMISS/ motion for summary affirmance.... Which we the appellants have filed on April 2nd, 2025 [we] NOW*

respectfully give NOTICE that an appellant's brief will NOT BE FILED {e.g. IN PART for reasons stated in the AFFIXED EXHIBITS HERETO}... we ALSO withdraw our previously TENDERED PRO SE APPELLANTS appeal briefs.

Thank you.
Respectfully Submitted.

*Best,*

*Colleen Connors*

*——————————————*

*Colleen Connors PRO SE appellant (interested party)*

*1935 Hosler St.*

*Flint, Michigan 48503*

*Email:*

*cmcolleen4@gmail.com*

*Google voice to text ph# (use email)*

_____

/Melvin Jones Jr./ disabled

PRO SE appellant (interested party)

1935 Hosler St.

Flint, Michigan 48503

Email: jonesjrmel@gmail.com

Google voice to text ph# 415-562-5074

*{see the exhibit on the next page[s]}*

No. 24A884, 24A885, 24A886

# In the Supreme Court of the United States

_____

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., APPLICANTS

*v.*

CASA, INC., ET AL.

_____

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., APPLICANTS

*v.*

STATE OF WASHINGTON, ET AL.

_____

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., APPLICANTS

*v.*

STATE OF NEW JERSEY, ET AL.

_____

**On Applications for Partial Stays of the Injunctions Issued by the
United States District Courts for the District of Maryland, the
Western District of Washington, and the District of Massachusetts**

_____

**BRIEF OF *AMICUS CURIAE* DAVID BOYLE IN SUPPORT OF
NO PARTY RE APPLICATIONS FOR PARTIAL STAYS OF THE
INJUNCTIONS ISSUED BY THE UNITED STATES DISTRICT COURTS
FOR THE DISTRICT OF MARYLAND, THE WESTERN DISTRICT
OF WASHINGTON, AND THE DISTRICT OF MASSACHUSETTS**

_____

David Boyle
   *Counsel of Record*
P.O. Box 15143
Long Beach, CA 90815
(734) 904-6132
dbo@boyleslaw.org

## *AMICUS CURIAE* STATEMENT OF INTEREST

The present *amicus curiae*, David Boyle (hereinafter, "Amicus"),[1] thinks children should be treated well. "Jesus said, 'Let the little children come to me, and do not hinder them, for the kingdom of heaven belongs to such as these.'" *Matthew* 19:14 (NIV). Therefore, stripping them of long-established citizenship rights may not be kind, prudent, or in touch with our laws and traditions. So, Amicus writes this brief, although it is for no party, since this writer is cognizant of additional factors, e.g., whether the Court has some passionate urge to make a "big statement" against nationwide injunctions, regardless of the welfare of innocent children.

## SUMMARY OF ARGUMENT

The famed poem "The New Colossus" offers insights on how immigrants, including children, should be treated in the U.S.A. Children's best interests, lauded by case law and the Bible, are not served by deprivation of citizenship (nor perhaps by the "universal extinction of the universal injunction" that some desire). Children might even be injured or killed by such loss. Stripping youths of citizenship due to an accident of birth, may be wrong, even abusive, though more measured reform of immigration is possible. Finally, some recent holidays or anniversaries remind us that violence either against politicians, or by politicians against innocents such as children, is detestable, and, one hopes, avoidable, by the grace of God.

## ARGUMENT

## I. EMMA LAZARUS' "THE NEW COLOSSUS" REMINDS US OF

---

[1] No party or its counsel wrote or helped write this brief, or gave money for the brief, *see* S. Ct. R. 37.

## HOW IMMIGRANTS SHOULD BE TREATED IN AMERICA



(1889 engraving of Emma Lazarus, *available at* https://en.wikipedia.org/wiki/

File:Emmalazarusengraving.jpg (last checked Mar. 17, 2025, as with all links

here))

American poetess Emma Lazarus' 1883 poem "The New Colossus", especially

since it has the dignity of being engraved on a bronze plaque inside the Statue of

Liberty, is well worth reading or re-reading as an embodiment of national intent

and aspiration towards the humane treatment of immigrants:

> *Not like the brazen giant of Greek fame,*
> *With conquering limbs astride from land to land;*
> *Here at our sea-washed, sunset gates shall stand*
> *A mighty woman with a torch, whose flame*
> *Is the imprisoned lightning, and her name*
> *Mother of Exiles. From her beacon-hand*
> *Glows world-wide welcome; her mild eyes command*
> *The air-bridged harbor that twin cities frame.*
>
> *"Keep, ancient lands, your storied pomp!" cries she*
> *With silent lips. "Give me your tired, your poor,*
> *Your huddled masses yearning to breathe free,*
> *The wretched refuse of your teeming shore.*
> *Send these, the homeless, tempest-tost to me,*
> *I lift my lamp beside the golden door!"*

*Id.* If not a legal document *per se*, the poem, being honored by its presence inside the Statue of Liberty, is no "small potatoes" either, so to say. (*See* Percy Bysshe Shelley, *A Defence of Poetry* (1821): "Poets are the unacknowledged legislators of the world." *Id.*) One could even call Lazarus' masterwork "America's Sonnet", due to its quality and prominence.

In line with this current brief's being for no party, Amicus shall leave it up to the reader whether "The New Colossus" would support stripping Fourteenth Amendment-protected citizenship from "masses", Poem, *supra*, of innocent children (very few of whom are children of diplomats or of invading armies) who are born here, through no fault of their own, in America, the greatest country on Earth,

## II. THE "BEST INTERESTS OF THE CHILD" PROBABLY DO NOT INCLUDE BEING EXCLUDED FROM CITIZENSHIP

In our country, the best interests of children are highly important. *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158 (1944), noting "the general interest in youth's wellbeing", *id.* at 166 (Rutledge, J.); *Parham v. J.R.*, 442 U.S. 584 (1979), recognizing "the child's best interests", *id.* at 602-03 (Burger, J.) (citation omitted). Amicus is at a loss to see how an infant or child gains anything from losing her or his U.S. citizenship. Ending birthright citizenship can even be seen as systematic governmental child abuse, creating loss for little or no gain.

And the consequences of such loss could be deadly, even more than some forms of gender-transition techniques/therapy for children allegedly are. *Cf., e.g.*, Gustaf Kilander, *Texas child being treated for cancer — and who is a US citizen — is deported to Mexico with undocumented parents*, Mar. 13, 2025, 1:10 p.m., The

Independent, https://www.the-independent.com/news/world/americas/us-politics/texas-mexico-child-cancer-deportation-b2714565.html, "So far, the cancer-stricken 10-year-old and her 15-year-old brother, who has a heart condition, haven't been receiving the care they need in Mexico, their mother said. 'The authorities have my children's lives in their hands,' she tearfully told NBC." *Id.* —But what if the 10-year-old weren't even a citizen? How much more difficult, or deadly, might it be for her then? The mind reels at the potential abortion of children's rights or lives by elimination of birthright citizenship.

*Cf. Prince*, *supra*, on the danger of "expos[ing] the community or the child to communicable disease or the latter to ill health or death", 321 U.S. at 166-67 (Rutledge, J.). Also, *cf. Jeremiah* 31:15, "A voice is heard in Ramah, mourning and great weeping, Rachel weeping for her children and refusing to be comforted, because they are no more", *id.* (internal quotation marks omitted) (NIV); *Matthew* 2:16-18, *see id.* (story of Herod, which largely reiterates previous quote) (NIV). The young are not to be treated like "wretched refuse", "The New Colossus", *supra* at 2.

\* \* \*

The recently-passed Ides of March, the 15th, is a date which reminds us of the evil of political violence, whether stabbing Julius Caesar to death in the Roman Senate, or attempting to hang former President-of-the-American-Senate Mike Pence, or shooting any President or presidential candidate. "Blessed are the peacemakers, for they will be called children of God." *Matthew* 5:9 (NIV). But the State should not be violent or oppressive to citizens, including little children, either.

There is plenty of room for sensible bipartisan immigration reform, e.g., deportation of violent criminals in a fair way that abides by due process. However, destroying birthright citizenship may be a step too far: throwing out the babies with the bathwater, so to speak. But no one should put babies in a corner.

Two days after the Ides, we have a happier day of note, St. Patrick's Day, today; so, for any believers, may blessed St. Patrick and all the saints preserve us, and the rights of all American children. (Indeed, *cf.* Deepti Hajela, *Here's what you need to know about St. Patrick's Day*, AP, updated Mar. 15, 2025, 4:11 p.m., https://apnews. com/article/st-patricks-day-34e5e7278243258bee3c2f7005e7b208, "The spread of St. Patrick's Day celebrations in the U.S. was a way for Irish immigrant communities, who in the 19th century faced discrimination and opposition, to stake that ground [i.e., put down roots in American culture], [Professor Leigh Schmidt] says: 'It's a kind of immigrant Irish way of combating nativist antagonism against them.'" *Id.*)

## CONCLUSION

Amicus sees little reason to grant stays, but if, say, there is some unmasterable craving to make this the moment for a huge "demonstration" against national injunctions, no matter how much damage is caused to helpless infants, the Court may choose to do whatever the Court may do. It could be prudent, though, to weigh carefully whether such a "demonstration" needs to be made at this particular moment (or ever); does the Court's reputation need to "die on that hill", one is tempted to ask? Amicus humbly thanks the Court for its time and consideration.

March 17, 2025                    Respectfully submitted,

David Boyle
  *Counsel of Record*
P.O. Box 15143
Long Beach, CA 90815
dbo@boyleslaw.org
(734) 904-6132

**IN THE**
**SUPREME COURT OF THE UNITED STATES**

———————

Nos. 24A884, 24A885, 24A886

———————

DONALD J. TRUMP, President of the United States, *et al.*,
Applicants,
v.
CASA, Inc., *et al.*,
Respondents

———————

DONALD J. TRUMP, President of the United States, *et al.*,
Applicants,
v.
WASHINGTON, *et al.*,
Respondents

———————

DONALD J. TRUMP, President of the United States, *et al.*,
Applicants,
v.
NEW JERSEY, *et al.*,
Respondents

———————

**On Applications for Stays Pending Appeal**

———————

**BRIEF *AMICUS CURIAE* OF AMERICA'S FUTURE, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, GUN OWNERS OF CALIFORNIA, CITIZENS UNITED, LEADERSHIP INSTITUTE, U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND, THE CLAREMONT INSTITUTE CENTER FOR CONSTITUTIONAL JURISPRUDENCE, AND CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND IN SUPPORT OF APPLICATIONS FOR STAYS OF INJUNCTION**

———————

John C. Eastman
  Long Beach, CA  90802
Michael Boos
  Washington, D.C.  20003
Jeffrey C. Tuomala
  Winchester, VA  22602
Patrick M. McSweeney
  Powhatan, VA  23139

March 28, 2025

William J. Olson*
Jeremiah L. Morgan
Robert J. Olson
  William J. Olson, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  Fax (703) 356-5085
  wjo@mindspring.com
*Counsel of Record

*Additional Counsel on next page*

i

J. Mark Brewer
  Johnson City, TX  78636

James N. Clymer
  Lancaster, PA  17603

Joseph W. Miller
  Fairbanks, AK  99708

Phillip L. Jauregui
  Washington, DC  20005

Rick Boyer
  Lynchburg, VA  24506

John I. Harris III
  Nashville, TN 37203

Kerry L. Morgan
  Wyandotte, MI  48192

Alicia Kutzer
  Wilkes-Barre, PA  18701

Phillip E. Marbury
  Wolfeboro, NH  03894

Mark J. Fitzgibbons
  Manassas, VA  20110

ii

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

INTEREST OF THE *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

ARGUMENT

I.      THE APPLICATIONS FOR PARTIAL STAY SHOULD BE TREATED AS A
        PETITION FOR CERTIORARI AND GRANTED, ALLOWING THE CASE TO BE
        DECIDED ON THE MERITS WITHOUT DELAY. . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.     THE NATIONWIDE INJUNCTIONS BELOW EXCEED THE JUDICIAL POWER OF
        THE UNITED STATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

III.    THE DECISIONS BELOW WERE PREDICATED ON ERRORS OF LAW . . . . . . . . . . .  8

IV.     "BIRTHRIGHT CITIZENSHIP" VIOLATES THE TEXT AND THE ORIGINAL
        INTENT OF THE FOURTEENTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . .  16

V.      THE VIEW THAT "BIRTHRIGHT CITIZENSHIP" SHOULD BE HANDED OUT
        IRRESPECTIVE OF ALLEGIANCE HAS BIZARRE RESULTS . . . . . . . . . . . . . . . . . .  20

VI.     THE CASES AGAINST PRESIDENT TRUMP SHOULD BE DISMISSED. . . . . . . . . . .  23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

iii

# TABLE OF AUTHORITIES

**CONSTITUTION**

Article III, Section 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Article III, Section 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Article IV, Section 2, clause 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 10, 11, 13, 16-19

**STATUTES**

8 U.S.C. § 1401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Administrative Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Civil Rights Act of 1866, 14 *Stat.* 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Indian Citizenship Act of 1924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Reconstruction Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**CASES**

*Carlisle v. United States*, 83 U.S. 147 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) . . . . . . . . . . . . . . . . . . . . . . . . 7
*Dred Scott v. Sandford,* 60 U.S. 383 (1857) . . . . . . . . . . . . . . . . . . . . . 9, 16, 18
*Elk v. Wilkins*, 112 U.S. 94 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*Franklin v. Massachusetts*, 505 U.S. 788 (1992) . . . . . . . . . . . . . . . . . . . . . . . 3, 24
*Kendall v. United States*, 37 U.S. 524 (1838) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
*Korematsu v. United States*, 323 U.S. 214 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) . . . . . . . . . . . . . . . . . . 7
*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 25
*Minor v. Happersett*, 88 U.S. 162 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Mississippi v. Johnson*, 71 U.S. 475 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
*Muskrat v. United States*, 219 U.S. 346 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
*Roe v. Wade*, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Slaughter-House Cases*, 83 U.S. 36 (1873) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) . . . . . . . . . . . . . . . 2, 10-14, 22
*Van Ness v. Pacard*, 27 U.S. 137 (1829) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**MISCELLANEOUS**

R. Berger, <u>Government by the Judiciary: The Transformation of the
    Fourteenth Amendment</u> at 48 (Liberty Fund: 1997) . . . . . . . . . . . . . . . . . . . 16
W. Blackstone, *Commentaries on the Laws of England* (1765) . . . . . . . . . . . . . . . 8
Congressional Globe, 39th Cong., 1st Sess., 2890-97 . . . . . . . . . . . . . . . . . . . 19, 20
The Declaration of Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17
J. Eastman, "The Significance of 'Domicile' in *Wong Kim Ark*,"
    22 CHAP. L. REV. 301 (Spring 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents,"
    *Hurriyet Daily News* (Mar. 12, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
E. J. Erler, <u>The Founders on Citizenship and Immigration</u>
    (Claremont Inst: 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
J. Feere, "Birthright Citizenship in the United States: A Global Comparison,"
    *Center for Immigration Studies* (Aug. 31, 2010) . . . . . . . . . . . . . . . . . . . . . 23
A. Hamilton, Federalist 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
D. Iriekpen, "Citizenship Rights: American Agitations Threaten a
    Nigerian Practice," *This Day* (Aug. 16, 2010) . . . . . . . . . . . . . . . . . . . . . . . 23
J. Madison, The Debates in the Federal Convention of 1787, Aug. 27, 1787 . . . . . . 6
N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick, say
    Trump's action illegal," *Vanguard* (Jan. 23, 2025) . . . . . . . . . . . . . . . . . . . . 23
W. Olson & J. Tuomala, "Citizens By Accident of Birth: the Bogus
    Theory of Birthright Citizenship," *America's Future* (Mar. 2025) . . . . . . . . 14
K. Richburg, "For many pregnant Chinese, a U.S. passport for baby
    remains a powerful lure," *Washington Post* (July 18, 2010) . . . . . . . . . . . . 23
U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror
    Suspects in the U.S. Criminal Justice System," (June 9, 2009) . . . . . . . . . . 23
U.S. Department of Justice Office of the Inspector General, "A Review of
    the FBI's Handling of Intelligence Information Prior to the
    September 11 Attacks," ch. 5 (Nov. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
U.S. Department of Justice, "Two sent to prison for roles in cartel-linked
    human smuggling scheme," (Oct. 30, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . 23
U.S. Department of State, "State Sponsors of Terrorism" . . . . . . . . . . . . . . . . . . . 10

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici curiae* America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Citizens United, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, The Claremont Institute Center for Constitutional Jurisprudence, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal income taxation under Section 501(c)(3) or Section 501(c)(4) of the Internal Revenue Code, which have filed numerous *amicus curiae* briefs in federal and state courts.  These *amici* filed *amicus* briefs in support of stays in each of the three cases from which these applications for stay arise.  *See* Brief *Amicus Curiae* of America's Future, *et al.*, *Washington v. Trump*, Ninth Circuit No. 25-807 (Feb. 17, 2025), Brief *Amicus Curiae* of America's Future, *et al*, *CASA v. Trump*, Fourth Circuit No. 25-1153 (Feb. 21, 2025), and Brief *Amicus Curiae* of America's Future, *et al.*, *New Jersey v. Trump*, First Circuit No. 25-1170 (Mar. 4, 2025).[2]

## STATEMENT OF THE CASE

On January 20, 2025, President Donald Trump issued an Executive Order noting that being born on American soil has never by itself automatically conferred

---

[1] It is hereby certified that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

[2] These *amici* also filed *amicus* briefs opposing the granting of injunctive relief in two of these cases when before the district courts.  *See* Brief *Amicus Curiae* of America's Future, *et al*, *State of Washington v. Trump*, W.D. of Wash. No. 2:25-CV-00127 (Jan. 31, 2025) and Brief *Amici Curiae* of America's Future, *et al*, *New Hampshire Indonesian Community Support v. Trump*, D. N.H. No. 1:25-cv-00038 (Jan. 31, 2025)

2

American citizenship.  The Order stated that "[t]he Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof.'"  *Id.*  Accordingly, the Order contained a narrowly defined directive that federal agencies are not to consider a person born on U.S. soil a citizen when, "at the time of said person's birth," the father "was not a United States citizen or lawful permanent resident..." and:

> "when that person's **mother**" was:
> (1) "**unlawfully present** in the United States" ... or
> (2) ... when [the mother's presence] ... was **lawful but temporary**
> (such as, but not limited to, visiting the United States under the
> auspices of the Visa Waiver Program or visiting on a student, work, or
> tourist visa)....  [*Id.* (emphasis added).]

## SUMMARY OF ARGUMENT

The Government's Applications for Partial Stays seek only to undo the universal nature of the district court injunctions, but there are compelling reasons for this Court to move directly to address the merits of this case and end the unlawful practice of birth tourism.  These *amici* urge the Court to treat the Applications as Petitions for Certiorari, grant it, and order briefing on the merits. In the alternative, the Applications should be granted, as no district court should have the power to bind persons not party to the litigation below on such a matter.

Birthright citizenship may have been long taught in law school, but it is profoundly wrong.  Respondents seek to render the language "subject to the jurisdiction thereof" in the Fourteenth Amendment a nullity, and badly misread this Court's decision in *Wong Kim Ark*.  The circuit courts erred in ignoring the true

3

nature of citizenship, which requires reciprocal duties of government protection in exchange for the allegiance of the citizen.  The framers of the Fourteenth Amendment were clear that citizenship would not be extended to foreigners and aliens who simply happened to be in the United States at the time of their birth.

Lastly, two of the injunctions below run against the President of the United States, in direct conflict with this court's decision in *Franklin v. Massachusetts*.  No judge can enjoin the President in such a matter, and no such injunction can be allowed to stand by this Court.

## ARGUMENT

I.  **THE APPLICATIONS FOR PARTIAL STAY SHOULD BE TREATED AS A PETITION FOR CERTIORARI AND GRANTED, ALLOWING THE CASE TO BE DECIDED ON THE MERITS WITHOUT DELAY.**

The United States has filed three Applications for a Partial Stay of the Injunctions issued by the district courts for the Western District of Washington, the District of Maryland, and the District of Massachusetts pending the consideration and disposition of the government's appeal to the United States Courts of Appeals for the First, Fourth, and Ninth Circuits,[3] "and pending any further review in this Court." *Trump v. Washington*, Application at 1.  The government explains its request as follows:

_____

[3] All three circuit courts of appeals denied the Government's motions for stay pending appeal.  *See New Jersey v. Trump*, 2025 U.S. App. LEXIS 5580 (1st Cir. 2025); *CASA, Inc. v. Trump*, 2025 U.S. App. LEXIS 4856 (4th Cir. 2025); *Washington v. Trump*, 2025 U.S. App. LEXIS 3983 (9th Cir. 2025).

4

> These cases — which involve challenges to the President's January 20,
> 2025 Executive Order concerning birthright citizenship — raise
> **important constitutional questions with major ramifications**
> **for securing the border**.  But at this stage, the government comes to
> this Court with a **"modest" request:** while the parties litigate
> weighty merits questions, the Court should "restrict the scope" of
> multiple preliminary injunctions that "purpor[t] to cover every person
> * * * in the country," limiting those injunctions to parties actually
> within the courts' power.  [*Id.* at 1-2 (citation omitted) (emphasis
> added).]

These *amici* fully agree that this Court should not allow district court judges to issue universal injunctions in cases such as this.  A universal injunction transforms the act of a district judge from deciding a case and controversy before him to rendering a sweeping decree that is more akin to legislating.  Nevertheless, these *amici* believe that it would be unwise to allow **any** injunctions to stay in effect for months, if not years, while these cases are litigated on the merits.  Therefore, these *amici* respectfully request this Court treat the Government's Application for a Partial Stay as a Petition for Certiorari, grant the Petition, and then order briefing on the merits.

This case has already been extensively briefed in several district courts and courts of appeals.  There are no factual issues in dispute.  These *amici* have already filed five briefs, two in district court and three in courts of appeals, on these issues.  Numerous other parties and *amici* also have filed briefs on the legal issues.  The issue of birthright citizenship is before this Court now, and there is no reason to delay in resolving the merits, which it ultimately will be required to do.

5

It is unlikely that further percolation in these particular circuits will result in different views being presented, as these circuits were clearly chosen to achieve a particular result. Was it an accident that the challenge brought by the State of New Jersey was filed in Massachusetts, where its appeal would be decided by the First, rather than the Third, Circuit? Was it an accident that the challenge brought in the District of Columbia was dropped as soon as it was assigned to a judge who had been appointed by President Trump? *See OCA-Asian Pacific American Advocates v. Rubio*, No. 1:25-cv-00287.

As the Acting Solicitor General has stated, these challenges to President Trump's executive order raise "important constitutional questions with major ramifications for securing the border." If this Court delays, the magnet of birthright citizenship will continue to draw foreigners with no allegiance to our country, who engage in "birth tourism" to deliver an "anchor baby" who then could help the parents and other family members gain legal residency and avoid deportation.

Treatment of an Application for Stay as a petition for certiorari may not be routine, but it certainly is not unusual. In the last two years, there have been three cases in which these *amici* filed *amicus* briefs where this Court did just that. On December 1, 2022, in *Biden v. Nebraska*, No. 22-506, this Court treated an application for stay filed by the United States as a petition for certiorari before judgment and granted it. On January 5, 2024, in *Moyle v. United States*, No. 23-726, this Court treated an application for a stay filed by Speaker of the Idaho House Mike Moyle as a petition for a writ of certiorari before judgment and granted it. On

6

February 28, 2024, in *Trump v. United States*, No. 23-939, this Court granted the Special Counsel's request to treat a stay application filed on behalf of now-President Trump as a petition for a writ of certiorari and granted it.

## II. THE NATIONWIDE INJUNCTIONS BELOW EXCEED THE JUDICIAL POWER OF THE UNITED STATES.

The Fourth Circuit never analyzed the scope of the Maryland District Court injunction, but allowed it to stand over the dissent of Judge Niemeyer. *See CASA v. Trump*, 2025 U.S. App. LEXIS 4856, at *6, *13. The Ninth Circuit allowed the universal injunction to stand without analysis, only concluding that the Government had not demonstrated a likelihood of success on the merits. *See Washington v. Trump*, 2025 U.S. App. LEXIS 3982, at *5. The First Circuit applied each of the *Nken* factors as to the universal scope of the injunction, and found that the Government failed to demonstrate a strong showing on the merits. *See New Jersey v. Trump*, 2025 U.S. App. LEXIS 5580, at *30-31. What makes these decisions curious is that the Government had not addressed the merits in its motions for stay, focusing only on the universal nature of the injunction.

Article III, Section 2 provides that "[t]he judicial Power shall extend to all Cases, in Law and Equity [and] to Controversies to which the United States shall be a Party..." Madison's Notes indicate that the convention believed that Article III power of the judiciary is "limited to cases of a Judiciary Nature,"[4] not a political nature. *See Marbury v. Madison*, 5 U.S. 137, 163-67 (1803). Judicial power is "'the

---

[4] J. Madison, The Debates in the Federal Convention of 1787, Aug. 27, 1787.

7

power of a court to decide and pronounce a judgment and carry it into effect

**between persons and parties who bring a case** before it for decision.'" *Muskrat*

*v. United States*, 219 U.S. 346, 356 (1911) (emphasis added).  "[N]o principle is more

fundamental to the judiciary's proper role in our system of government than the

constitutional limitation of federal-court jurisdiction to actual cases or

controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).  Cases

and controversies are disputes between litigants, and it is the very nature of the

judicial power to resolve disputes between parties rather than to make laws of

general applicability.

The injunctions approved by the circuit courts were not limited to the

Plaintiffs as they should have been.  Under Rule 65 of the Federal Rules of Civil

Procedure, injunctions affect "the parties; the parties' officers, agents, servants,

employees, and attorneys; and other persons who are in active concert or

participation" with them if they have received "actual notice" of the injunction.  The

injunctions below exceeded the scope of Rule 65, granting relief to nonparties who

had no involvement whatsoever in the litigation.  And, they impaired the ability of

the President to carry out the important responsibilities entrusted to him by the

Constitution and the laws of the land.  As this Court has stated:  "'injunctive relief

should be no more burdensome to the defendant than necessary to provide complete

relief to the plaintiffs.'"  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765

(1994).  Injunctions which compel government action with respect to nonparties

violate this principle.

8

To be sure, nationwide injunctions are issued in class action litigation to give relief to nonparties, but at least that relief is subject to protections afforded by federal law and the Federal Rules of Civil Procedure.  Also, the act of  striking down a regulation under the Administrative Procedure Act ("APA") has a similar effect to a nationwide injunction, but in that situation, Courts act pursuant to the APA grant of authority to "set aside" the regulation.

Allowing the lower federal courts to enjoy such free-wheeling authority to trump the political decisions of the President provides a compelling incentive for plaintiffs to forum shop and find that one (or three) friendly district court judge(s), situated in a friendly circuit.

During the Founding Era, and well into the history of our country, "[t]he decisions ... of courts [were] held in the highest regard," but as Blackstone warned, they were not "law" themselves, but only "evidence" of law, "[s]o that *the law*, and the *opinion of the judge* are not always convertible terms, or one and the same thing; since it sometimes may happen that the judge may mistake the law."  I Blackstone's *Commentaries* at 71 (emphasis original).  In Federalist 78, Alexander Hamilton, cautioned that the judiciary has "neither force nor will, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments."  The public confidence in the judiciary is harmed when the judiciary exceeds its authority.

## III.   THE DECISIONS BELOW WERE PREDICATED ON ERRORS OF LAW.

9

The decisions of the courts below were consistent with the view taught in law school attended by lawyers and judges.  However, that view is fundamentally wrong on the law as to virtually every point.  There was a time that *Dred Scott v. Sandford*[5] was considered good law, and so also was *Korematsu v. United States*,[6] and more recently *Roe v. Wade*.[7]  This is a time not to reflect on what was once the prevailing teaching by law professors, but for this Court to engage the issues and seriously re-examine what is assumed to be true.  This *amicus* brief seeks to present a comprehensive opposing view which demonstrates the errors of the lower courts.

First, some of the courts below assumed that the **text** resolves the legal issue without any more analysis.  For example, the Massachusetts District Court stated:

> Each of the defendants' theories focuses on the parents, rather than the child whose citizenship is at stake.  In so doing, these interpretations **stray from the text** of the Citizenship Clause.  [*Doe v. Trump*, 2025 U.S. Dist. LEXIS 27523, at *11 (D. Mass. 2025) (emphasis added).[8]]

The relevant text states:  "All persons born or naturalized in the United States, **and subject to the jurisdiction thereof**, are citizens of the United States and of the State wherein they reside."  Fourteenth Amendment, Sec. 1 (emphasis added).  None of the district courts actually dealt with the text, but simply adopted

---

[5]  60 U.S. 383 (1857).

[6]  323 U.S. 214 (1944).

[7]  410 U.S. 113 (1973).

[8]  *See also CASA v. Trump*, 2025 U.S. Dist. LEXIS 20921, at *16 (D. Md. 2025), and *Washington v. Trump*, 2025 U.S. Dist. LEXIS 24892, at *8 (W.D. Wash. 2025).

10

what they thought was this Court's view in *United States v. Wong Kim Ark*, 169

U.S. 649 (1898), which one court characterized as:

> the Supreme Court concluded that "subject to the jurisdiction thereof"
> was meant "to exclude, by the fewest and fittest words," the following
> categories of persons: "children of members of the Indian tribes,"
> "children born of alien enemies in hostile occupation, and children of
> diplomatic representatives of a foreign state." [*Doe* at *26.]

The district courts never addressed why such persons would not be U.S.

Citizens according to the text. Does it matter that the persons covered by the

Executive Order are also citizens of other countries as well as the United States,

under the law of other nations? Does a person become "subject to the jurisdiction

thereof" simply by being subject to arrest for the commission of a crime? Such an

interpretation renders the phrase a nullity. According to plaintiffs' rule, children

born to those working in foreign embassies who do not have diplomatic immunity,

are U.S. Citizens. What about those born to a woman who is from and a citizen of a

nation on our State Department's list of State Sponsors of Terrorism[9] (Cuba, North

Korean, Iran, and Syria) or others like Russia or China, which are not here "in

hostile occupation"? As of this date, could there be any children born who would not

be citizens under the district court's "hostile occupation" test? With all these

unanswered questions, what is the validity of the contention that the text resolves

the issue for the Plaintiffs?

Second, the Massachusetts District Court stated:

---

[9] *See* https://www.state.gov/state-sponsors-of-terrorism/.

11

In a lengthy 1898 decision, the **Supreme Court** examined the Citizenship Clause, **adopting** the interpretation the plaintiffs advance and rejecting the interpretation expressed in the EO. [*Doe* at *9-10 (emphasis added).[10]]

However, the *Wong Kim Ark* decision did not in any way decide the issue presented here, and on the issues it addressed, it was fundamentally flawed. Consider the several cases decided during that time frame. In 1873, just five years after ratification of the Fourteenth Amendment, this Court interpreted the Citizenship Clause:

> That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase, "**subject to its jurisdiction**" was intended to **exclude** from its operation children of ministers, consuls, and **citizens or subjects of foreign States born within the United States**. [*Slaughter-House Cases*, 83 U.S. 36, 73 (1873) (emphasis added).]

Two years later, the Court again questioned acquiring citizenship, focusing on British citizenship:

> At **common-law**, ... it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also. These were natives, or natural-born citizens, as distinguished from aliens or foreigners. **Some authorities go further** and include as citizens children born within the jurisdiction without reference to the citizenship of their parents. **As to this class there have been doubts**.... [*Minor v. Happersett*, 88 U.S. 162, 167-68 (1875) (emphasis added).]

Just 14 years before *Wong Kim Ark*, writing for the Court, Justice Gray had highlighted the critical difference between the children of citizens and the children of aliens owing allegiance to foreign powers. This Court declared:

---

[10]  *See also CASA* at *17; *Washington* at *12.

12

> [t]he main object of the opening sentence of the Fourteenth
> Amendment was to settle the question ... as to the citizenship of free
> negroes ... and to put it beyond doubt that all persons, white or black,
> and whether formerly slaves or not, born or naturalized in the United
> States, and **owing no allegiance to any alien power**, should be
> citizens of the United States.... [*Elk v. Wilkins*, 112 U.S. 94, 101 (1884)
> (emphasis added).]

Because the Plaintiff in *Elk v. Wilkins* was a member of a Native American tribe to
which he owed allegiance, and had never been naturalized, the Court found that he
was **not a citizen** despite being born on U.S. soil.  Should *Wong Kim Ark* be read to
overrule these cases?

Despite some unduly broad dicta, *Wong Kim Ark* did not even address those
specific children covered by the Executive Order — those born to a mother either
**illegally or temporarily present** in the United States.  The question addressed
in *Wong Kim Ark* was:

> whether a child born in the United States, of parents of [foreign]
> descent, who, at the time of his birth, are subjects of [a foreign
> government], but have a **permanent domicil** and residence in the
> United States, and are there carrying on business, and are not
> employed in any diplomatic or official capacity under the [foreign
> government], becomes at the time of his birth a citizen of the United
> States.  [*Wong Kim Ark* at 653 (emphasis added).]

However, if *Wong Kim Ark* viewed that "subject to the jurisdiction" of the
United States simply meant to be present "within the jurisdiction" thereof, equating
(i) children born to aliens who owe allegiance to foreign governments to (ii) children
of citizens, then that decision was in error, an outlier, inconsistent with this Court's
decisions in the *Slaughter-House Cases, Minor,* and *Elk.*

13

Third, the Massachusetts District Court assumed that *Wong Kim Ark* was later validated by the courts and Congress, stating:

> The rule and reasoning from that decision were reiterated and applied in later decisions, adopted by Congress as a matter of federal statutory law in 1940.... [*Doe* at *10.*]

There is no reason to believe that, when Congress enacted a law which used the same words as the Fourteenth Amendment, it was ratifying a decision of this Court which did not resolve the issue, and certainly did not equate the Citizenship Clause's commandment with a mistaken reading of *Wong Kim Ark*, rather than the Clause itself. As the First Circuit noted, "the parties both agree that 8 U.S.C. § 1401 and the Citizenship Clause of the Fourteenth Amendment are 'coterminous.'" *New Jersey* at *7 n.5. Thus, the INA simply incorporates that Amendment, but not Respondents' mistaken reading of *Wong Kim Ark*.

Fourth, the courts below demonstrated a fundamental misunderstanding of citizenship in finding that allegiance and parentage are irrelevant: "First, allegiance in the United States arises from the fact of birth. It does not depend on the status of a child's parents...." *Doe* at *10.[11] The Massachusetts District Court's position is identical to the common-law principle of *jus soli*, but that common law is completely inapplicable, as it was developed under the British view of "subjectship," not the American view of citizenship. In *Wong Kim Ark*, Justice Gray accurately described the English common law's presumption that everyone born on English

---

[11] *See also CASA* at *37; *Washington* at *14.

soil was a subject of the King for life, whether he wished to be or not. "By the common law of England, every person born within the dominions of the Crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject." *Wong Kim Ark* at 657.

Justice Gray incorrectly assumed the British rule of citizenship that he described also applied in America when it does not. As Justice Story explained in 1829, "The common law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright. But they brought with them, and adopted only that portion which was applicable to their situation." *Van Ness v. Pacard*, 27 U.S. 137, 145 (1829).

This distinction between British and American citizenship was addressed in an article originally published in January 2001, now updated and published by America's Future. It explained the legal principle of *jus soli* was based on the idea that the king owned the land, and thus anyone born on the land, whether to a citizen or an alien, became by birth a subject of the king, to whom that person now owed allegiance for life, being permanently a subject by birth on the king's land.[12]

The shift to the American notion of citizenship occurred when our forefathers declared their land and persons "Absolved from all Allegiance to the British Crown" in 1776, the Framers expressly rejected the notion of being unalterably subjects by

---

[12] W. Olson & J. Tuomala, "Citizenship by Accident of Birth: the Bogus Theory of Birthright Citizenship," *America's Future* (Mar. 2025).

15

birth: "The Declaration of Independence is not just a thorough repudiation of that old feudal idea of 'permanent allegiance' [to the king by accident of birth], but perhaps the most eloquent repudiation of it ever written.... The notion that the English common law of *jus soli* therefore continued unabated after the Declaration of Independence could not be more mistaken."[13]

Actually, citizenship is a reciprocal duty of protection. Only those persons who can be expected to have a "**permanent allegiance**" to our country can become citizens, because only on that permanent allegiance does the country's reciprocal duty of protection arise. No such relationship exists with the two classes of persons addressed by the Executive Order:

> By **allegiance** is meant the obligation of **fidelity and obedience** which the individual owes to the government under which he lives, or to his sovereign in return for the protection he receives. It may be an absolute and permanent obligation, or it may be a qualified and temporary one. The citizen or subject owes an **absolute and permanent allegiance** to his government or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. The alien, whilst domiciled in the country, owes a **local and temporary allegiance**, which continues during the period of his residence. [*Carlisle v. United States*, 83 U.S. 147, 154 (1872) (emphasis added).]

These and other flaws with the extreme theory advanced by respondents and adopted by courts below that everyone born on U.S. soil — but for two tiny exceptions which might cover an infinitesimal fraction of 1 percent of births covered by the Executive Order — are U.S. citizens are discussed in the following sections.

---

[13] J. Eastman, "The Significance of 'Domicile' in *Wong Kim Ark*," 22 CHAP. L. REV. 301, 308-09 (Spring 2019).

16

## IV. "BIRTHRIGHT CITIZENSHIP" VIOLATES THE TEXT AND THE ORIGINAL INTENT OF THE FOURTEENTH AMENDMENT.

The courts below gave little consideration to the views of the Framers of the Fourteenth Amendment but rather cited to case law. Following the Civil War, Congress took action to overrule *Dred Scott*, which held that slaves and their descendants, even as freedmen, were excluded from U.S. citizenship. Congress first moved to override *Dred Scott* by enacting the **Civil Rights Act of 1866**, which provided that "all persons born in the United States and **not subject to any foreign power**, excluding Indians not taxed, are hereby declared to be **citizens** of the United States." 14 *Stat*. 27 (emphasis added).

Due to concerns that this Court might rule the Civil Rights Act unconstitutional or that a subsequent Congress might repeal the Act, Congress initiated the process required to amend the Constitution. *See* Raoul Berger, Government by the Judiciary: The Transformation of the Fourteenth Amendment at 48 (Liberty Fund: 1997). The resulting Fourteenth Amendment included this language:

> Section 1. All persons born or naturalized in the United States, and **subject to the jurisdiction thereof**, are citizens of the United States and of the State wherein they reside.... No State shall ... deny to any person **within its jurisdiction** the equal protection of the law. [Emphasis added.]

The language "**subject to the jurisdiction thereof**" in the Fourteenth Amendment was understood as conveying the same meaning as the language "**and not subject to any foreign power**" as used in the Civil Rights Act of 1866. Most

17

countries claim as citizens those children born to parents who are their citizens. Consequently, even if born on American soil, those children are **subjects of a foreign power** and thus **not subject to the jurisdiction of the United States**. That being the case, children born in the United States of parents who are not U.S. citizens have no lawful claim of citizenship simply because they are born in U.S. territory.

The Declaration of Independence not only freed the new country from the notion that persons born in America were British citizens with allegiance to England, it also demonstrated the solemn, binding, and covenantal action undertaken on behalf of the people, which was later confirmed by the People's ratification of the Constitution which begins "We the People."

> We, therefore, the Representatives of the united States of America, in General Congress, Assembled, **appealing to the Supreme Judge of the world for the rectitude of our intentions**, do, in the Name, and by Authority of the good People of these Colonies, solemnly publish and declare, That these United Colonies are, and of Right ought to be **Free and Independent States**; that they are **Absolved from all Allegiance to the British Crown**, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved.... [Declaration of Independence (emphasis added).]

The Declaration of Independence declared that Americans were shifting from their previous "**allegiance to the British Crown**" to allegiance to the new nation formed of "**Free and Independent States**." Likewise, the ratification history of the Fourteenth Amendment, discussed *infra*, demonstrates that "**subject to the jurisdiction**" entails an obligation of allegiance to the United States and not

18

simply an obligation of obedience to the laws of the United States.  The **obligation of allegiance** signified in the Citizenship Clause is different in kind from the obligation of every person in the territory of the United States to obey the laws of the land.

Citizens subject to the jurisdiction of the United States are entitled to corresponding privileges and immunities of citizenship.  Constitution, Article IV, Sec. 2, cl. 1.  On the other hand, all persons who "come within its jurisdiction" have a duty to obey the law, together with a corresponding right to the equal protection of the law.  The meaning of the phrase "subject to the jurisdiction" as used in the Fourteenth Amendment context is very different from the meaning of "within its jurisdiction."

Congress's deliberations on the Fourteenth Amendment reveals the limited objective for which the Citizenship Clause was adopted — to reverse *Dred Scott* and to ensure that the citizenship of freedmen was recognized on the same basis as other Americans born in the United States.  The purpose was not to change the law regarding citizenship, but rather to affirm its proper understanding.  The deliberations addressed the issue of children born in the United States to non-citizens and assumed that they did not qualify as natural born citizens.  It was understood by the Framers that the best evidence that a person will bear true faith and allegiance to America is birth in the United States to American parents.

Senator Jacob Howard of Michigan, who authored the Citizenship Clause, explained its meaning:

19

> This … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States. **This will not, of course, include persons born in the United States who are foreigners, aliens**, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons. [Congressional Globe, 39th Cong., 1st Sess., 2890 (emphasis added).]

Senator Howard also explained what he meant by use of the term "jurisdiction":

> "jurisdiction" as here employed, ought to be construed so as to imply a **full and complete jurisdiction** on the part of the United States … that is to say, the **same jurisdiction in extent and quality** as applies to every citizen of the United States now. [*Id.* at 2895 (emphasis added).]

Senator Lyman Trumbull of Illinois, Chairman of the Senate Judiciary Committee,

concurred with Senator Howard regarding his characterization of the meaning of

"jurisdiction":

> That means "subject to the complete jurisdiction thereof".... **Not owing allegiance to anybody else**. That is what it means.... It cannot be said of any [person] who owes allegiance, partial allegiance if you please, to some other Government that he is "subject to the jurisdiction of the United States…."
> It is only those persons who are completely within our jurisdiction, who are subject to our laws, that we think of making citizens; and there can be no objection to the proposition that such persons should be citizens. [*Id.* at 2893 (emphasis added).]

Senator George Williams of Oregon concurred:

> In one sense, all persons born within the geographical limits of the United States, are subject to the jurisdiction of the United States, but they are not subject to the jurisdiction of the United States in every sense.... I understand the words here, "subject to the jurisdiction of the United States," to mean fully and completely subject to the jurisdiction of the United States. [*Id.* at 2897 (emphasis added).]

20

Senator Edgar Cowan of Pennsylvania specifically expressed concern that the amendment should not be interpreted to grant citizenship to Chinese immigrant workers in California and went on to discuss the rights of travelers in the United States from foreign nations:

> If a **traveler** comes here from Ethiopia, from Australia, or from Great Britain, he is entitled to a certain extent, to the protection of the laws. You cannot murder him with impunity.  It is murder to kill him, the same as it is to kill another man.  You cannot commit an assault and battery on him, I apprehend.  He has a right to the protection of the laws; but he is **not a citizen** in the ordinary acceptation of the word. [*Id.* at 2890 (emphasis added).]

Before the debate on Senator Howard's proposal to add the qualifying phrase "subject to the jurisdiction thereof," Senator Saulsbury concisely stated the Senate's object with regard to this amendment, and in so doing, removed all doubt as to the limited purpose of the amendment as drafted:

> I do not presume that any one will pretend to disguise the fact that the object of this first section is simply to declare that negroes shall be citizens of the United States.  [*Id.* at 2897.]

## V.　THE VIEW THAT "BIRTHRIGHT CITIZENSHIP" SHOULD BE HANDED OUT IRRESPECTIVE OF ALLEGIANCE HAS BIZARRE RESULTS.

The preliminary injunctions issued in these cases omitted discussion of one of the most important aspects of Citizenship — the **allegiance** that a person owes to his own country, sometimes described as loyalty or fidelity to the nation.  Most countries recognize citizenship based on the principle of *jus sanguinis* — that a child acquires the citizenship of the child's natural parents.  *See* Edward J. Erler, The Founders on Citizenship and Immigration (Claremont Inst: 2007) at 28-29.

21

Thus, children born anywhere in the world to citizens of most other countries acquire the citizenship of their parents at birth. Under Respondents' notion of "birthright citizenship" — a term of recent origin that cannot be sourced to the Declaration, Constitution, or statute — almost all such children automatically would be citizens of multiple countries. To which country do these children owe their allegiance?

The United States has long required naturalized citizens to disavow allegiance to all foreign sovereigns, but not so with those benefitting from "birthright citizenship." Most children born in the United States to parents with foreign citizenship are recognized as foreign nationals under international law, and not any more "subject to the jurisdiction" of the United States than are the children of diplomats, Native Americans (before the Indian Citizenship Act of 1924), or foreign invaders, who Respondents concede are not citizens.

The importance of allegiance is most acutely felt during time of war when the obligations of citizenship are most consequential. An American citizen is "subject to the jurisdiction" of the United States and may be drafted into the military even if outside the country. Citizens who take up arms against the United States may be prosecuted for treason. *See* U.S. Constitution Article III, Sec. 3. Non-citizens who take up arms against the United States are prisoners of war if captured, and they are not subject to prosecution simply for waging war against the United States. A person who is a citizen of two different countries that are at war will be placed in an untenable position. The problems that arise with dual citizenship were acutely felt

22

by U.S. citizens who were impressed into service with the British navy leading up to the War of 1812.

Neither of the two categories of children born to aliens in the United States that are addressed by the Executive Order can be expected to demonstrate allegiance to our nation. First, those children born of parents who are not legally in the United States cannot be expected to be nurtured in the values of American citizenship by parents who entered the country illegally — being here not "subject to" but rather "in defiance of" our nation's laws. Second are those children of birth tourists, who travel to the United States for the purpose of giving birth and thereby obtaining cheap and easy citizenship for their children. They too are unlikely to have any allegiance to nurture their children in values of American citizenship.

Indeed, as explained *supra*, only those persons who can be expected to have a "**permanent allegiance**" to our country can become citizens, because based on that permanent allegiance, the country then owes to its citizens a reciprocal duty of protection. But no such relationship can be said to be established with the two classes of persons covered by the Executive Order.

If *Wong Kim Ark* is read to support the preliminary injunctions, it contravenes common sense and our sense of justice. According to the lower courts' theory, under *Wong Kim Ark*, a person born in the United States of alien parents is constitutionally entitled to American citizenship, whereas a person born outside the United States to American citizens is entitled to such citizenship only by statute.

23

Why should there be an irrebuttable legal presumption of allegiance in the former case, but not in the latter?

Under the Respondents' theory of the case and the district courts' preliminary injunctions, children of the 9/11 hijackers, human traffickers, and enemy combatants captured overseas and held in the United States who are born on U.S. territory would be entitled to citizenship.[14]  Birth tourism from Turkey, China, Nigeria, and Mexico has received considerable attention.[15]  The problems associated with the theory of birthright citizenship are exacerbated by statutes that facilitate immigration of family members of lawfully naturalized citizens, known as "chain migration."

## VI.    THE CASE AGAINST PRESIDENT TRUMP SHOULD BE DISMISSED.

All Respondents named President Trump as a defendant in his official capacity and the Washington and Maryland district courts actually enjoined the

---

[14]  *See, e.g.*, DOJ Office of the Inspector General, "A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks," ch. 5 (Nov. 2004); U.S. Department of Justice, "Two sent to prison for roles in cartel-linked human smuggling scheme" (Oct. 30, 2024); U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror Suspects in the U.S. Criminal Justice System" (June 9, 2009).

[15]  *See, e.g.*, J. Feere, "Birthright Citizenship in the United States: A Global Comparison," *Center for Immigration Studies* (Aug. 31, 2010); I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents," *Hurriyet Daily News* (Mar. 12, 2010); K. Richburg, "For many pregnant Chinese, a U.S. passport for baby remains a powerful lure," *Washington Post* (July 18, 2010); D. Iriekpen, "Citizenship Rights: American Agitations Threaten a Nigerian Practice," *This Day* (Aug. 16, 2010); N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick, say Trump's action illegal," *Vanguard* (Jan. 23, 2025).

24

President.  Only the Massachusetts District Court understood it had no authority to enjoin the President, but it left the issue unresolved.  *See Doe* at *48.

In *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), this Court explained that, while a district court could enjoin an executive branch official, it could not enjoin the President himself.  In striking down an injunction against a President, the Court bluntly stated that "the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows." *Id*. at 802.  Concurring in *Franklin*, Justice Scalia went even further, asserting that "[i]t is a commentary upon the level to which judicial understanding — indeed, even judicial awareness — of the doctrine of separation of powers has fallen, that the District Court entered this order against the President without blinking an eye." *Id*. at 826.  Justice Scalia noted that, up until at least 1984, "'[n]o court has ever issued an injunction against the president himself or held him in contempt of court.'"  *Id*. at 827.

In 1838, the High Court observed that "[t]he executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power."  *Kendall v. United States*, 37 U.S. 524, 610 (1838).  An injunction against the President was considered by this Court in *Mississippi v. Johnson*, 71 U.S. 475 (1866), involving Mississippi's suit to enjoin President Andrew Johnson from enforcing the Reconstruction Acts.  Although leaving open the question of whether the President could be ordered to perform

25

mere ministerial acts, the Court made clear that "this court has no jurisdiction ... to enjoin the President in the performance of his official duties...." *Id.* at 501.

The President's Executive Order constituted an act in the performance of his official duties. *See Marbury v. Madison*, 5 U.S. 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). *See also Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). For official acts, the President is not subject to the jurisdiction of the judiciary — a coequal, not superior, branch of government.

## CONCLUSION

For the foregoing reasons, the Applications for Stays should be treated as Petitioners for Certiorari Before Judgment and granted. In the alternative, the Applications for Stays should be granted.

Respectfully submitted,

John C. Eastman
Alexander Haberbush
  Constitutional Counsel Group
  444 W Ocean Blvd., Suite 1403
  Long Beach, CA 90802

Michael Boos
  Citizens United
  1006 Pennsylvania Ave. SE
  Washington, DC 20003

William J. Olson*
Jeremiah L. Morgan
Robert J. Olson
  William J. Olson, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  Fax (703) 356-5085
  wjo@mindspring.com
*Counsel of Record
March 28, 2025

26

Jeffrey C. Tuomala
  114 Creekside Ln.
  Winchester, VA 22602

Patrick M. McSweeney
  McSweeney, Cynkar
  & Kachouroff, PLLC
  3358 John Tree Hill Rd.
  Powhatan, VA 23139

J. Mark Brewer
  209 N. Nugent Ave.
  Johnson City, TX 78636

James N. Clymer
  Clymer Musser & Sarno, P.C.
  408 West Chestnut Street
  Lancaster, PA 17603

Joseph W. Miller
  Law Offices of Joseph
  Miller, LLC
  P.O. Box 83440
  Fairbanks, AK  99708

Phillip L. Jauregui
  Judicial Action Group
  1300 I Street, NW #400E
  Washington, DC 20005

Rick Boyer
  Integrity Law Firm
  P.O. Box 10953
  Lynchburg, VA 24506

Richard B. Sanders
  Land Use and Property Law, PLLC
  6659 Kimball Dr., Ste. B-201
  Gig Harbor, WA 98335

Kerry L. Morgan
  Pentiuk, Couvreur &
  Kobiljak, P.C.
  2915 Biddle Ave., Ste. 200
  Wyandotte, MI  48192

John I. Harris III
  Schulman, Leroy &
  Bennett, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN 37203

Alicia Kutzer
  Kutzer Law Firm, LLC
  120 South Franklin Street
  Wilkes-Barre, PA 18701

Phillip E. Marbury
  Law Offices of Marbury & Marbury
  29 Mill Street, Unit C4
  Wolfeboro, NH  03894

Mark J. Fitzgibbons
  9625 Surveyor Court, Ste. 400
  Manassas, VA  20110

No. 24A884, 24A885, 24A886

IN THE

# Supreme Court of the United States

DONALD J. TRUMP, ET AL., *Applicants,*

v.

CASA, INC., ET AL., *Respondents.*

_____

DONALD J. TRUMP, ET AL., *Applicants,*

v.

WASHINGTON, ET AL., *Respondents.*

_____

DONALD J. TRUMP, ET AL., *Applicants,*

v.

NEW JERSEY, ET AL., *Respondents.*

_____

**On Applications for Partial Stays of the Injunctions Issued by the United States District Courts for the District of Maryland, the Western District of Washington and the District of Massachusetts**

_____

**Brief of Former United States Attorney General Edwin Meese III as *Amicus Curiae* in Support of Applications for Stay**

_____

J. CHRISTIAN ADAMS
    *Counsel of Record*
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Suite 700
Alexandria, VA 22314
(703) 745-5870
adams@publicinterestlegal.org

# Table of Contents

Table of Contents ............................................................................................ i

Table of Authorities ........................................................................................ ii

Interests of *Amicus Curiae* ........................................................................... 1

Summary of the Argument ............................................................................. 2

Argument ........................................................................................................ 2

I.    The Executive Order More Closely Adheres to the Original Meaning of the
      Citizenship Clause of the Fourteenth Amendment ........................... 2

      A.    The Civil Rights Act of 1866 Clarifies the Intent of the Citizenship
            Clause ...................................................................................... 3

      B.    Legislative Debates Demonstrate That Birthright Citizenship Was
            Not Universal ........................................................................... 5

II.   Birthright Citizenship Requires Full Political Jurisdiction .............. 7

      A.    Territorial vs. Political Jurisdiction ........................................ 7

      B.    Historical Exclusion from Birthright Citizenship .................. 9

III.  Supreme Court Precedent Does Not Support Universal Birthright
      Citizenship ........................................................................................ 11

      A.    The *Slaughter-house Cases* and *Elk v. Wilkins* .................. 11

      B.    Longstanding Misinterpretation of *Wong Kim Ark* ............ 12

      C.    Historical and Legal Consensus Post-*Wong Kim Ark* ......... 14

IV.   The Executive Order Preserves the Integrity of American Citizenship ........ 15

Conclusion .................................................................................................... 16

# Table of Authorities

## Cases

*United States v. Wong Kim Ark,* 169 U.S. 649 (1898) ........................... 11,13,14, 15

*Elk v. Wilkins*, 112 U.S. 94 (1884) ............................................................... 9,10, 12

*The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872) .............................. 11, 17

## United States Constitution

U.S. CONST. amend. XIV, § 1 ............................................................................. 2, 17

## Statutes

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227. ....... 9

Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (1866) ..................................... 3,4,8, 17

## Other Authorities

Congressional Globe, 39th Cong., 1st Sess., 2890 (May 30, 1866) .............. 3,4,5, 8

Exec. Order No. 14160, Protecting the Meaning and Value of American Citizenship
(Jan. 20, 2025) ........................................................................................... 1,2, 15

Richard W. Flournoy, Jr., Dual Nationality and Election, 30 Yale L. J. 545
(1921) ................................................................................................................ 6

Jon Freer, *Birthright Citizenship in the United States: A Global Comparison*,
CENTER FOR IMMIGRATION STUDIES, https://cis.org/Report/Birthright-
Citizenship-United-States .......................................................................... 16, 17

Amy Swearer, The Citizenship Clause's Original Meaning and What It Means
Today, https://www.heritage.org/immigration/ report/the-citizenship-clauses-
original-meaning-and-what-it-means-today. ............................... 3, 4,6,8,10, 14

Amy Swearer, The Political Case for Confining Birthright Citizenship to Its
Original Meaning, https://www.heritage.org/the-constitution/ report/the-political-
case-confining-birthright-citizenship-its-original-meaning ............................ 16

Hans von Spakovsky, Birthright Citizenship, A Fundamental Misunderstanding of the 14th Amendment, https://www.foxnews.com/opinion/birthright- citizenship-a-fundamental-misunderstanding-of-the-14th-amendment............... 8,9,14, 15

Charles J. Patrick, Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law, 51 Washburn Law J. 211 (2011) ............................................................................7

## INTERESTS OF *AMICUS CURIAE*[1]

The Honorable Edwin Meese III, former Attorney General of the United States, submits this amicus curiae brief in support of Executive Order 14160, "Protecting the Meaning and Value of American Citizenship." His experience in shaping and interpreting federal law as the 75th Attorney General of the United States provides him with a unique perspective on the legal and historical foundations of American citizenship.

His extensive work in the Department of Justice and his contributions to constitutional discourse underscore his commitment to ensuring that laws are faithfully applied in accordance with their historical meaning.

Attorney General Meese has been actively involved in legal and policy discussions concerning immigration, national security, and the constitutional structure of government. His scholarship and public service have emphasized the importance of maintaining the constitutional balance of powers, ensuring that executive authority is exercised within its proper scope, and upholding the nation's sovereignty. In submitting this amicus brief, Attorney General Meese aims to provide the Court with a perspective grounded in legal history, constitutional originalism, and the principles of self-governance.

---

[1] No counsel for a party authored this brief in whole or in part, nor did any person or entity, other than *amicus curiae* and its counsel, make a monetary contribution intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

Executive Order 14160 correctly implements the original meaning of the Fourteenth Amendment's Citizenship Clause. Longstanding and mistaken assumptions about birthright citizenship that conflict with the jurisprudence of this Court do not absolve themselves of error through the passage of time. The text and legislative history of the Fourteenth Amendment demonstrate that birthright citizenship was intended to apply only to individuals who are fully subject to the political jurisdiction of the United States. The government's prior policies reflecting a different interpretation of birthright citizenship, even if longstanding and commonly accepted, are inconsistent with the Constitution's text and original meaning. Upholding the Executive Order would reinforce the value of American citizenship and prevent further erosion of the political and legal principles enshrined in the Fourteenth Amendment

## ARGUMENT

### I.    The Executive Order Adheres to the Original Meaning of the Citizenship Clause of the Fourteenth Amendment.

The Citizenship Clause of the Fourteenth Amendment states: "All persons born…in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. CONST. amend. XIV, § 1. This language guarantees citizenship only to individuals "subject to the jurisdiction" of the United States—those who owe political allegiance to the United States of America. This Court has never held

2

squarely otherwise. The framers of the Fourteenth Amendment intentionally included the qualifying phrase "subject to the jurisdiction thereof" to limit the scope of birthright citizenship. This careful wording reflects the framers' intention to distinguish between individuals who merely reside in the United States and those who are fully integrated into the nation's political and legal framework.

### A. The Civil Rights Act of 1866 Clarifies the Intent of the Citizenship Clause.

The Citizenship Clause was drafted to constitutionalize the Civil Rights Act of 1866, which provided that "all persons born in the United States, and not subject to any foreign power," are citizens. Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (1866). The Act explicitly excluded individuals who owed allegiance to a foreign power, such as children of diplomats or tribally affiliated Native Americans. By incorporating this language into the Constitution, Congress sought to ensure that citizenship would be reserved for those who had a meaningful and permanent connection to the United States. Congress specifically considered (and outright rejected) the idea that it could or should make citizens of the U.S.-born children of "persons temporarily resident in it" who only owe a qualified or minimal allegiance. Congressional Globe, 39th Cong., 1st Sess. 572 (1866) (statement of Sen. Trumbull).

The framers of the Fourteenth Amendment understood that the Civil Rights Act's definition of citizenship was not universally applicable and intentionally preserved these limitations in the constitutional text. *See* Swearer, *The Citizenship*

3

*Clause's Original Meaning and What It Means Today*, HERITAGE FOUNDATION, https://www.heritage.org/immigration/report/the-citizenship-clauses-original-meaning-and-what-it-means-today.

The Civil Rights Act of 1866 was drafted to address the status of newly freed slaves and ensure that they received the full rights of American citizenship. *Id.* at ¶ 10. In addition to acting as an enforcement mechanism for the Thirteenth Amendment, "the act served as Congress's first effort to undo Dred Scott." *Id.*

Senator Lyman Trumbull, also a sponsor of the Civil Rights Act of 1866, emphasized that the phrase in the Fourteenth Amendment legislation "not subject to any foreign power" was crucial in defining who was entitled to birthright citizenship. This phrase was meant to exclude individuals who, in contrast to the U.S.-born descendants of African slaves, retained meaningful political allegiance to another sovereign entity. Trumbull explained that "subject to the jurisdiction" meant "not owing allegiance to anyone else." Congressional Globe, 39th Cong., 1st Sess., 2893 (May 30, 1866).

Trumbull was not alone in this view among the authors of the Fourteenth Amendment. Senator Jacob Howard who introduced the very language of the jurisdiction clause of the Fourteenth Amendment on the Senate floor said it should be construed to mean "a full and complete jurisdiction," "the same jurisdiction that in extent and quality as applies to every citizen of the United States now." Congressional Globe, 39th Cong., 1st Sess., 2890 (May 30, 1866).

4

This limiting approach was consistent with existing legal principles governing nationality and allegiance. *Id*. The framers understood that political jurisdiction—not mere territorial presence—was the determining factor in conferring citizenship. *Id* at ¶ 6. This Court has never held otherwise.

## B.   Legislative Debates Demonstrate That Birthright Citizenship Was Not Universal.

The legislative debates and express position of sponsors of the Fourteenth Amendment demonstrate that Congress did not intend to grant citizenship to anyone simply because they were born on American soil. Lawmakers emphasized the importance of ensuring that citizenship would be conferred only on individuals who, irrespective of their race, were fully subject to the political jurisdiction of the United States. Senator Jacob Howard, a proponent of the Fourteenth Amendments stated that the clause would exclude "persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (statement of Sen. Howard). Additionally, prominent member of the Joint Committee on Reconstruction Senator George Henry Williams noted, "[i]n one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States, but they are not subject to the jurisdiction of the United States in every sense." *Id.* at 2897 (Statement of Sen. Williams). He also added that the phrase "subject to the Jurisdiction of the

United States" must mean "fully and completely subject to the jurisdiction of the United States. *Id.*

Without question, the authors of the Fourteenth Amendment, believed the grant of citizenship at birth had limits. The question before this Court is not whether limits exist to birthright citizenship, but rather how far the limits extend.

The debates in Congress surrounding the Fourteenth Amendment also reveal a broad consensus that the jurisdiction requirement was not meant to reach transient populations and individuals whose legal ties to the United States were tenuous. These limits not only included children of foreign diplomats, members of Native American tribes (who at the time were considered to be under the jurisdiction of their sovereign tribal governments), but also, children of foreign nationals who were present in the United States without lawful status. As one scholar writing two decades after *Wong Kim Ark* conceded, the Court had not decided the issue of citizenship for U.S.-born children of "sojourners or transients in this country" and such a grant of citizenship would be at odds with the conclusions of renowned scholars. Swearer, *supra,* at ¶ 72 (citing Richard W. Flournoy, Jr., Dual Nationality and Election, 30 Yale L. J. 545, 552 (1921)).

Congress's deliberate exclusion of certain groups from birthright citizenship reflected their understanding of jurisdiction. The framers recognized that "territorial" jurisdiction—the obligation to obey American laws while present in the United States —was insufficient to confer citizenship. Instead, they focused on "political"

6

jurisdiction, which requires a complete and enduring allegiance to the United States. *Id.* at ¶ 45. This distinction between territorial jurisdiction and political jurisdiction is critical to understanding the original meaning of the Citizenship Clause and its application to modern questions of birthright citizenship.

The principle of allegiance as a prerequisite for citizenship was a well-established concept in 19th-century legal thought. See Charles J. Patrick, *Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law*, 51 Washburn Law J. 211 (2011). The framers of the Fourteenth Amendment were well aware of these legal traditions and crafted the Citizenship Clause to reflect this fundamental principle. Their intent was to prevent the automatic grant of citizenship to individuals who lacked the requisite allegiance to the United States.

This historical context supports the Executive Order. The framers' intent was clear: citizenship should be granted only to individuals who are fully and exclusively subject to the political jurisdiction of the United States.

## II.    Birthright Citizenship Requires Full Political Jurisdiction.

### A.  Territorial vs. Political Jurisdiction

Proponents of universal birthright citizenship conflate territorial jurisdiction with political jurisdiction. Territorial jurisdiction refers to the authority of a government to enforce its laws within its borders, which applies to all individuals present in the country, including foreign nationals. Political jurisdiction, on the other

hand, requires a deeper connection to the nation—an allegiance that signifies full membership in the political community. The framers of the Fourteenth Amendment understood this distinction and intentionally limited the Citizenship Clause to individuals who were fully subject to the United States' political jurisdiction. *See* Swearer, *supra*.

The distinction between territorial and political jurisdiction is deeply rooted in American legal history. As Senator Lyman Trumbull explained during the debates on the Fourteenth Amendment, the term "subject to the jurisdiction thereof" was intended to exclude individuals who owed allegiance to another sovereign power. Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (statement of Sen. Howard). This principle was reflected in the Civil Rights Act of 1866, which granted citizenship only to individuals "not subject to any foreign power." Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (1866). This legislative history supports the reading of the Fourteenth Amendment that mere presence in the United States does not automatically confer citizenship; rather, full political allegiance is required.

Children born to foreign nationals who are in the United States temporarily or unlawfully are not fully subject to the political jurisdiction of the United States. These individuals remain under the jurisdiction of their parents' home countries and owe allegiance to foreign powers. Eventually, they are supposed to depart the United States. As such, they do not meet the constitutional requirements for birthright citizenship. *See* Hans von Spakovsky, Birthright Citizenship, A Fundamental

8

Misunderstanding ofthe14thAmendment. This interpretation aligns with the original understanding of the Citizenship Clause and ensures that citizenship remains a meaningful and exclusive status.

The Supreme Court has historically recognized the importance of political jurisdiction in determining citizenship. In *Elk v. Wilkins*, the Court ruled that Native Americans born within U.S. territory but owing allegiance to their tribal governments were not automatically granted citizenship under the Fourteenth Amendment. *Elk v. Wilkins*, 112 U.S. 94, 122-23 (1884). This decision reaffirmed that territorial presence alone was insufficient. Full subjection to United States political jurisdiction was necessary to enjoy American citizenship based solely on birth inside the United States. *Id.*

### B. Historical Exclusion from Birthright Citizenship

The historical exclusions from birthright citizenship illustrate the importance of political jurisdiction. For example, children of foreign diplomats born in the United States have never been considered United States citizens because they remain subject to the jurisdiction of their home countries. This principle is in both domestic law and international legal norms. For example, under the Vienna Convention on Diplomatic Relations, diplomatic personnel are considered agents of their home countries and are not legally subject to the full jurisdiction of their host nations. Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227.

9

Similarly, tribally affiliated Native Americans were excluded from birthright citizenship until the passage of the Indian Citizenship Act in 1924. Before this legislation, Native Americans were recognized as members of sovereign tribal nations and not fully subject to United States political jurisdiction. The Supreme Court's ruling in *Elk v. Wilkins* confirmed this principle, holding that Native Americans who maintained tribal ties were not automatically entitled to citizenship. *Elk v. Wilkins*, 112 U.S. at 102. The eventual extension of citizenship through legislative action, rather than constitutional mandate, supports that the Citizenship Clause was not understood to provide absolute birthright citizenship, but instead had limits.

The exclusion of children born to unauthorized aliens is consistent with this historical understanding. Like foreign diplomats and temporary visitors, unauthorized aliens remain subject to the political jurisdiction of their home countries. Their presence in the United States does not signify a complete severance of allegiance to their countries of origin. In fact, allegiance was often by some sovereigns seen as perpetual, meaning that "it could not be discharged without the consent of the sovereign, regardless of whether a person swore allegiance to another sovereign or left the kingdom permanently." Swearer, *supra*, at ¶ 57. As such, their children do not qualify for birthright citizenship under the original meaning of the Fourteenth Amendment.

The historical exclusions from birthright citizenship demonstrate that political jurisdiction is a prerequisite before birthright citizenship may automatically attach.

10

III.    **Supreme Court Precedent Does Not Support Universal Birthright Citizenship.**

The Supreme Court has never actually interpreted the Citizenship Clause of the Fourteenth Amendment in a manner that supports the notion of universal birthright citizenship for aliens in the United States without a legal presence. This is commonly misunderstood. Early Court decisions emphasize the importance of political jurisdiction and allegiance, underscoring that mere birth on United States soil does not automatically confer citizenship. While some decisions, particularly *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), are thought by some to support a broader interpretation, *Wong Kim Ark* does not. A careful examination reveals the question of whether or not to extend citizenship to the children of individuals who are unlawfully present remains decidedly undecided by the Court. The Executive Order more closely aligns with the original meaning of the Citizenship Clause and is consistent with Supreme Court precedent that recognizes the limitations of birthright citizenship.

A.    **The *Slaughter-house Cases* and *Elk v. Wilkins***

The Supreme Court's earliest interpretations of the Citizenship Clause support that birthright citizenship has limits and was never intended to be universal. In *The Slaughter-House Cases*, 83 U.S. 36 (1872), the Court acknowledged that the phrase "subject to the jurisdiction thereof" was a limiting qualifier designed to exclude certain individuals from automatic citizenship. The Court specifically noted that

11

birthright citizenship did not apply to "children of ministers, consuls, and citizens or subjects of foreign States born within the United States." *Id.* at 73.

This textual limit was further explored in *Elk v. Wilkins*. At issue was the question of whether a Native American born within United States territory was a citizen under the Fourteenth Amendment. *Elk v. Wilkins*, 112 U.S. at 98 The Court ruled that Native Americans who maintained allegiance to their tribal nations were not "subject to the jurisdiction" of the United States in the manner required for birthright citizenship. *Id.* at 102. The Court held that a Native American still holding allegiance to the tribe is not automatically a United States citizen. *Id.* at 109. The Court emphasized that mere territorial presence was insufficient. Rather, full political jurisdiction and allegiance to the United States were necessary prerequisites for citizenship. *Id.* at 101–02.

The reasoning in *Elk v. Wilkins* makes clear that the Citizenship Clause has limits, even for those born on American soil. If one retains allegiance to a sovereign other that the United States, birthright citizenship will not attach.

### B. Longstanding Misinterpretation of *Wong Kim Ark*

The conventional wisdom, accepted over decades, is that *Wong Kim Ark* supports absolute birthright citizenship to everyone born in the United States. The holding in this case does not go as far as the conventional wisdom would have you believe. And no matter how long a mistaken interpretation of a Supreme Court case has been around, its longevity does not make it any less mistaken. This case

12

addressed a specific and narrow legal question: whether a child born in the United States to lawful permanent residents of Chinese descent was entitled to citizenship under the Fourteenth Amendment. It did not, despite the conventional wisdom over decades, reach the question whether children born to parents illegally present in the United States were entitled to citizenship under the Fourteenth Amendment. Put another way, it did not reach the question of whether those not subject to the political jurisdiction were entitled to birthright citizenship. The Court ruled in favor of Wong Kim Ark, concluding that the children of *lawful permanent residents* who are "domiciled" in the United States are entitled to birthright citizenship. *Id.* at 693. The case does not stand for the proposition the plaintiffs wish it did.

That is no surprise because the Court's actual decision in *Wong Kim Ark* is consistent with the common understanding of international law and English common law, namely that citizenship to individuals born within the sovereign's territory was limited in scope and not absolute. *Id.* at 655–56.

Critically, *Wong Kim Ark* did not address the question of whether children born to individuals who are unlawfully present in the United States qualify for birthright citizenship, no matter how many newspapers or television reporters say otherwise. The parents of Wong Kim Ark were *lawful* permanent residents, meaning they had a recognized and legitimate presence within the country. *See Wong Kim Ark*, 169 U.S. at 653. The Court's holding was limited to the specific facts of the case and should not be read as extending citizenship to the children of foreign nationals who have no legal

status in the United States. Swearer, *supra,* at ¶ 61-66. A mistaken interpretation of a 127-year-old case is still a mistaken interpretation.

### C.  Historical and Legal Consensus Post-*Wong Kim Ark.*

So where did the mistaken interpretation of the Fourteenth Amendment come from? For decades after *Wong Kim Ark*, the prevailing legal and academic consensus had it correct, that the Citizenship Clause applied only to the children of individuals who were lawfully present and permanently domiciled in the United States. *See* Swearer, *supra*, at ¶ 66. The federal government long recognized that birthright citizenship was not a blanket entitlement for all individuals born on American soil.

This view remained largely unchallenged until the latter half of the twentieth century, when administrative policy, rather than judicial precedent or constitutional amendment, expanded the practice of granting citizenship to virtually all U.S.-born children. Swearer, *supra,* at 66. It is the executive branch that has misinterpreted the scope of the Fourteenth Amendment and effectuating statutes. The State Department "erroneously interpreted that statute to provide passports to anyone born in the United States, regardless of whether their parents are here illegally and regardless of whether the applicant meets the requirement of being 'subject to the jurisdiction of the United States." *See* Hans von Spakovsky, *supra,* at ¶12. And thus the conventional wisdom that anyone born in the United States is a citizen was born. "Accordingly, birthright citizenship has been implemented by executive fiat, not because it is required by federal law or the Constitution." *Id.*

14

Legal scholars and jurists have continued to challenge this mistaken and overbroad interpretation of *Wong Kim Ark*, arguing that it represents a departure from the original meaning of the Fourteenth Amendment. *See* Hans von Spakovsky, *supra*. The current practice of granting automatic citizenship to the children of individuals who are unlawfully present in the United States is inconsistent with both the historical understanding of the Citizenship Clause and the Supreme Court's jurisprudence.

### IV.    The Executive Order Preserves the Integrity of American Citizenship

Executive Order 14160 represents a constitutionally grounded step toward restoring the original understanding of the Fourteenth Amendment's Citizenship Clause. By clarifying that birthright citizenship applies only to children born to American citizens and lawful permanent residents, the Executive Order more closely aligns with the original intent of the framers and ensures that citizenship remains a meaningful and exclusive status.

American citizenship is one of the most significant legal and political statuses that the nation confers, entailing not only fundamental rights and privileges but also profound responsibilities and allegiance. The Constitution's careful limitations on birthright citizenship reflect an understanding that citizenship should be reserved for those who have a genuine, enduring, and exclusive connection to the United States that comports with the Constitution. Extending citizenship to individuals who lack

this meaningful connection undermines the principles of sovereignty, national identity, and self-governance.

Unrestricted birthright citizenship has significant consequences for national sovereignty, particularly in the context of immigration policy. An overly broad and mistaken interpretation of the Citizenship Clause has created significant intrusions into American sovereignty. For example, the mistaken interpretation has given rise to "birth tourism," wherein foreign nationals deliberately travel to the United States to give birth so their children can obtain citizenship, despite lacking any genuine connection to the country. *See*, Swearer, The Political Case for Confining Birthright Citizenship to Its Original Meaning, HERITAGE FOUNDATION, https://www.heritage.org/the-constitution/report/the-political-case-confining-birthright-citizenship-its-original-meaning. Reports indicate that thousands of birth tourists enter the United States annually for this sole purpose. *See* Jon Freer, *Birthright Citizenship in the United States: A Global Comparison*, CENTER FOR IMMIGRATION STUDIES, https://cis.org/Report/Birthright-Citizenship-United-States.

## CONCLUSION

The Constitution's text, structure, and history provide guidance on the scope of birthright citizenship. The Executive Order is more consistent with a correct understanding of the Fourteenth Amendment and affiliated jurisprudence. The Fourteenth Amendment's Citizenship Clause states that "all persons born or

naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States." U.S. CONST. amend. XIV, § 1. The phrase "subject to the jurisdiction thereof" must be understood to mean complete political jurisdiction—that is, exclusive allegiance to the United States. This interpretation is consistent with the language of the Civil Rights Act of 1866, which conferred citizenship only upon those "not subject to any foreign power." 14 Stat. 27.

The Supreme Court's early decisions affirm this understanding. In *The Slaughter-House Cases*, the Court stated that "subject to the jurisdiction thereof" excludes "children of ministers, consuls, and citizens or subjects of foreign states born within the United States." *The Slaughter-House Cases,* 83 U.S. at 73.

Beyond its constitutional basis, the Executive Order serves an essential function in preserving the significance of American citizenship. Citizenship entails not only legal rights but also civic duties, such as allegiance to the nation, participation in democratic governance, and adherence to U.S. laws. The automatic granting of citizenship to individuals with no meaningful connection to the country dilutes these responsibilities and weakens the social contract between citizens and their government.

America's grant of citizenship should align more with other nations such as France, Germany, and Japan, that do not grant automatic birthright citizenship. *See* Jon Freer, *Birthright Citizenship in the United States: A Global Comparison*. The current practice of conferring citizenship based solely on birth location is an anomaly

17

that is inconsistent with both historical and global norms. Birthright citizenship to aliens present illegally in the United States has no support in the jurisprudence of this Court. The Executive Order corrects mistakes and reinforces the integrity of American citizenship.

Respectfully submitted,

J. CHRISTIAN ADAMS
    *Counsel of Record*
PUBLIC INTEREST LEGAL FOUNDATION
107 S. West Street
Suite 700
Alexandria, VA 22314
(703) 745-5870
adams@publicinterestlegal.org

Dated: March 24, 2025

Nos. 24A884, 24A885, 24A886

# In the Supreme Court of the United States

————————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*v.*

CASA, INC., ET AL.,

————————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*v.*

WASHINGTON, ET AL.,

————————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

*v.*

NEW JERSEY, ET AL.

————————————

## AMICUS BRIEF OF THE STATE OF TENNESSEE IN SUPPORT OF APPLICANTS

————————————

Jonathan Skrmetti
  *Attorney General & Reporter*
J. Matthew Rice
  *Solicitor General*
Whitney D. Hermandorfer
  *Director of Strategic Litigation*
  *Counsel of Record*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
whitney.hermandorfer@ag.tn.gov

# TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE.................................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................... 2

ARGUMENT ...................................................................................................... 3

I.    Plaintiffs' Mere-Presence Position Has Serious Merits Flaws. ........................ 3

    A.    The Text Weighs Against Plaintiffs. ........................................................ 6

    B.    Contemporaneous History and Practice Weigh Against Plaintiffs. ............ 8

    C.    Supreme Court Precedent Weighs Against Plaintiffs. .............................. 11

    D.    Plaintiffs' Reliance on Post-Ratification Practice Is Not Dispositive. ....... 15

II.   Plaintiffs Are Not Entitled to Universal Relief. ............................................ 20

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ayotte v. Planned Parenthood of N. New England,*
546 U.S. 320 (2006) ................................................................ 22-23

*Benny v. O'Brien,*
32 A. 696 (N.J. 1895) ............................................................ 13

*Bowsher v. Synar,*
478 U.S. 714 (1986) .............................................................. 17

*Brooks v. Martin,*
69 U.S. 70 (1864) .................................................................... 5

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .............................................................. 20

*California v. Texas,*
593 U.S. 659 (2021) .............................................................. 21

*Connection Distrib. Co. v. Holder,*
557 F.3d 321 (6th Cir. 2009) ............................................... 22

*Dep't of Homeland Sec. v. Thuraissigiam,*
591 U.S. 103 (2020) .............................................................. 15

*Dep't of Homeland Sec. v. New York,*
140 S. Ct. 599 (2020) ........................................................... 21

*Does #1-9 v. Lee,*
659 F. Supp. 3d 865 (M.D. Tenn. 2023) ............................... 23

*Dos Reis ex rel. Camara v. Nicolls,*
161 F.2d 860 (1st Cir. 1947) ................................................ 17

*Doran v. Salem Inn,*
422 U.S. 922 (1975) .............................................................. 21

*Dred Scott v. Sandford,*
60 U.S. (19 How.) 393 (1857) ................................................ 4

*Elk v. Wilkins,*
112 U.S. 94 (1884) ................................................................ 12

*Free Speech Coal., Inc. v. Skrmetti,*
2024 WL 5248104 (W.D. Tenn. Dec. 30, 2024) ..................................... 24

*Friends of George's, Inc. v. Mulroy,*
675 F. Supp. 3d 831 (W.D. Tenn. 2023) ................................................ 24

*Gill v. Whitford,*
585 U.S. 48 (2018) .................................................................................. 20

*INS v. Rios-Pineda,*
471 U.S. 444 (1985) ................................................................................ 17

*Kaplan v. Tod,*
267 U.S. 228 (1925) ........................................................................... 14-15

*Kentucky v. Biden,*
57 F.4th 545 (6th Cir. 2023) .................................................................. 22

*L.W. ex rel. Williams v. Skrmetti,*
83 F.4th 460 (6th Cir. 2023) .............................................................. 20-22

*L.W. ex rel. Williams v. Skrmetti,*
679 F. Supp. 3d 668 (M.D. Tenn. 2023) ............................................... 23

*Labrador v. Poe ex rel. Poe,*
144 S. Ct. 921 (2024) ............................................................................. 24

*Leng May Ma v. Barber,*
357 U.S. 185 (1958) ................................................................................ 15

*Lopez-Sorto v. Garland,*
103 F.4th 242 (4th Cir. 2024) ............................................................... 15

*Maryland v. King,*
567 U.S. 1301 (2012) .............................................................................. 24

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ........................................................................... 19-20

*Morrison v. California,*
291 U.S. 82 (1934) .................................................................................. 17

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
526 U.S. 172 (1999) ................................................................................ 22

*Minor v. Happersett,*
88 U.S. 162 (1874) .................................................................................. 12

*Nat'l Treasury Emps. Union v. Bush*,
   891 F.2d 99 (5th Cir. 1989) ................................................... 23

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ............................................................... 16

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ................................................................. 19

*Peter Pan Bus Lines v. Fed. Motor Carrier Safety Admin.*,
   471 F.3d 1350 (D.C. Cir. 2006) ............................................ 18

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................... 17

*Samia v. United States*,
   599 U.S. 635 (2023) ............................................................... 16

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ............................................................... 16

*Shaughnessy v. United States ex rel. Mezei*,
   345 U.S. 206 (1953) ............................................................... 15

*Slaughter-House Cases*,
   83 U.S. 36 (1873) ................................................................... 11

*Somerville v. Somerville*,
   31 Eng. Rep. 839 (1801) .......................................................... 8

*Tenn. Conf. of the NAACP v. Lee*,
   730 F. Supp. 3d 705 (M.D. Tenn. 2024) .............................. 24

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ............................................................... 22

*United States ex rel. Hintopoulous v. Shaughnessy*,
   353 U.S. 72 (1957) ................................................................. 17

*United States v. Ju Toy*,
   198 U.S. 253 (1905) ........................................................14-15

*United States v. Nat'l Treasury Emps. Union*,
   513 U.S. 454 (1995) ............................................................... 21

*United States v. Rahimi*,
   602 U.S. 680 (2024) ............................................. 8, 16, 18-19

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................. 23

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) ................................................................. 13

*Van Buren v. United States,*
    593 U.S. 374 (2021) ................................................................... 6

*Vidal v. Elster,*
    602 U.S. 286 (2024) ................................................................. 18

*Washington v. Trump,*
    858 F.3d 1168 (9th Cir. 2017) ................................................. 22

*Welty v. Dunaway,*
    749 F. Supp. 3d 882 (M.D. Tenn. 2024) ................................. 24

*Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021) ................................................................... 21

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ................................................................. 14

## Constitutional Provisions

U.S. Const. Amend. XIV, § 1 ................................................... 6, 7

U.S. Const. art. III ............................................................. 2, 20-22

U.S. Const. art. VI ..................................................................... 19

## Statutes & Legislative Materials

8 U.S.C. § 1401(b) ........................................................................ 4

Civil Rights Act of 1866,14 Stat. 27 ........................................ 4, 7

Cong. Globe, 39th Cong., 1st Sess. (1866) ............................... 3, 9

## Other Authorities

2 *A Dictionary of Words and Phrases Used in Ancient and Modern Law* (1899) ........ 7

3 John Bassett Moore, LL.D., *A Digest of International Law* § 373 (1906) .............. 10

Alexander Porter Morse, *A Treatise on Citizenship* (1881) ........................ 10

Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135 (2019) ........................................................ 4, 6-10, 15, 18

Brandon L. Garrett, *Misplaced Constitutional Rights*, 100 B.U. L. Rev. 2085 (2020) ..................................................................... 18

Hannis Taylor, A *Treatise on International Public Law* (1901) ................................ 11

Henry Campbell Black, *Handbook of American Constitutional Law* (3d ed. 1910) .................................... 11

James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367 (2006) ..................................................................... 5

Joseph Story, *Commentaries on the Conflict of Laws* (1834) .................................... 10

Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) .......................... 7-10, 13

K. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013) .......................................................... 19

Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340 (1995) ..................................................................... 16

Letter from F.A. Reeve, Acting Solicitor of the Treasury, (in XI Documents of the Assembly of the State of New York, 113th Sess.) .......... 10

Letter from Sen. Lyman Trumbull to President Andrew Johnson, (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress) ....... 9

Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ............................................ 8

S. Rapalje & R. Lawrence, *A Dictionary of American and English Law* (1888) ................................................. 7

Samuel Freeman Miller, *Lectures on the Constitution of the United States United States* (J. C. Bancroft Davis ed., 1893) ....................................... 10

William Edward Hall, *A Treatise on International Law* (5th ed. 1904) .................... 11

## INTERESTS OF AMICUS CURIAE

Tennessee has an interest in ensuring that courts appropriately exercise their judicial power within the bounds of the law and separation-of-powers principles.  That interest is heightened here, where a series of overlapping injunctions granting universal relief has thwarted the President's effort to address one aspect of a national immigration crisis that has harmed the States.  Recent years have seen an influx of illegal aliens—over 9 million—overwhelming the national infrastructure.  U.S. Customs and Border Protection, *Nationwide Encounters* (Feb. 5, 2024), https://perma.cc/EDU3-98CP.  And "many noncitizens proceed to interior States" after crossing the border illegally.  *See* DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* 26 (Oct. 29, 2021), https://perma.cc/5DNE-B9AE.  Tennessee thus faces significant economic, health, and public-safety issues from policies "holding out a nationwide incentive for illegal immigration," Stay Appl. 36-37, beyond what the Citizenship Clause requires.  More generally, as a frequent federal-court litigant, the State and its citizens suffer when courts depart from traditional limits on their equitable authority to broadly block duly enacted state laws.

1

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The "judicial Power of the United States" requires sound legal analysis that settles parties' rights, not abstract proclamations of indiscriminate scope. U.S. Const. art. III, § 1. And the more politically salient the question, the higher the institutional stakes of life-tenured judges' abiding Article III's limits. Yet in a series of rulings blocking the President's day-one Executive Order on citizenship, courts have opted against remedial restraint. A position contradicting plaintiffs' maximalist reading of the Citizenship Clause, the reasoning seems to go, is too "untenable," App. 14a (or "resoundingly" wrong, App. 25a, or "verg[ing] on frivolous," App. 97a) to warrant a tailored remedy. Never mind that plaintiffs' mere-presence-at-birth rule cannot be right all the time, as all agree. Or that it is contrary to the expressed view of many contemporaneous court cases and commentators. Or that it rewards illegal behavior in a manner no drafter or ratifier of the Citizenship Clause endorsed. Courts have viewed plaintiffs' correctness as largely foregone, then folded that view into remedial rulings running against the President facially and nationwide.

The Solicitor General's Office persuasively explains why the January-onset "epidemic" of universal orders warrants this Court's swift treatment. Stay Appl. 3. Tennessee writes to emphasize two points. One, since some lower courts saw the merits and scope-of-relief questions as linked, *e.g.*, App. 69a, it's worth pausing to point out that the first-principles case for plaintiffs' mere-presence position is not only not obvious—it has serious problems under the Citizenship Clause's text and ratification-era history. Contemporaneous sources instead support what common sense suggests: Conferring United States citizenship requires a more meaningful

connection than mere presence by happenstance or illegality. That connection, originalist evidence repeatedly instructs, was parental domicile. This Court's immigration precedents likewise cut against a mere-presence rule. Nor can plaintiffs' reliance on political-branch practice long post-dating ratification override the original public meaning of the Clause. So even if the rulings' merits and scope interact, plaintiffs oversell by casting their constitutional position as an open-and-shut case.

Two, whatever the ultimate merits outcome, the trifecta of overlapping, universal orders entered below goes beyond the judicial power. Injunctive relief must be no more burdensome than necessary to address a plaintiff's injury. And here, that principle dictates that any relief be limited in two ways: first, it must extend only to the identified plaintiffs; and second, it must prohibit only the unconstitutional applications of the challenged Executive Order, if there are any. Declining to discipline remedial overreach harms Tennessee and other States who must continually bear the brunt of overbroad injunctions by federal courts.

## ARGUMENT

### I. Plaintiffs' Mere-Presence Position Has Serious Merits Flaws.

It is dubious to link merits questions with "the government's likelihood of success" on narrowing an injunction's remedial scope. App. 71a (Niemeyer, J., dissenting). But if merits questions indeed bear here and now, this Court should have a more balanced picture of the problems plaguing plaintiffs' interpretive case.

It's helpful to start with a few broader points that most accept. *First*, the Fourteenth Amendment aimed to constitutionally "ingraft" the protections of the Civil Rights Act of 1866. Cong. Globe, 39th Cong., 1st Sess. App. 82 (1867) (statement of

Rep. Miller).  Relevant here, the 1866 Act directed that "all persons born in the United States *and not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States," no matter their "race and color" and "without regard to any previous condition of slavery or involuntary servitude."  Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 (emphasis added).  Given their close relationship, the Act's history and ordinary public meaning have long been understood to bear on interpretation of the Citizenship Clause.

*Second*, there is "near-universal consensus" that both the Citizenship Clause and the Civil Rights Act of 1866 sought to overturn the Supreme Court's odious holding in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which treated U.S.-born descendants of African slaves as property rather than persons entitled to U.S. citizenship.  Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135, 145 (2019).  The provisions also sought to redress the "systematic denial of civil rights to freed slaves" by prohibiting race-based discrimination in the conferral of citizenship or provision of civil rights.  *Id.* at 146.  But parental race or alienage is *not* parental residency—a distinction the district courts have failed to grasp.  *See, e.g.*, App. 92a.

*Third*, while plaintiffs advocate for a mere-presence rule, they must at the same time agree that their pure *jus soli* approach does not hold in all cases.  Specifically, plaintiffs and their supporters stipulate that presence is not enough for children of (i) Indian tribal members (who obtain citizenship only through statute, *see* 8 U.S.C. § 1401(b)), (ii) foreign diplomats, and (iii) at least some others, like enemy

combatants, who are immune from U.S. law. *E.g.*, James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 367, 369 (2006). This means that the core question is not, as many commentators cast it, whether all persons born within U.S. borders obtain citizenship—even plaintiffs agree that's not right. It's whether "born ... in the United States, and subject to the jurisdiction thereof" excludes only some unstated set of limited exceptions based on then-prevailing understandings of immunity (plaintiffs' view), or provides a generally applicable rule that bars all those without meaningful residence-based ties to the United States (applicants' view).

*Fourth*, immigration restrictions as we know them did not arise until the early 1880s, after the Citizenship Clause's ratification. There is thus no contemporaneous discussion supporting plaintiffs' maximalist position applying the Clause to children whose parents are present in the United States only unlawfully and after evading detection. And if rewarding parental illegality had come up, it would have run afoul of the "deep and firm" legal rule *Ex turpi causâ non oritur actio*, which prohibited enforcing illegal contracts or rewarding illegal acts. *E.g.*, *Brooks v. Martin*, 69 U.S. 70, 75-76 (1864).

To sum up, then, plaintiffs' first-principles position is that a provision that (i) aimed to confer citizenship on freed slaves and thus (ii) does not address non-residents or those unlawfully present, nonetheless (iii) binds the Executive Branch to automatically confer citizenship in most (but not all) cases (iv) in a manner rewarding those who illegally enter the country. That counterintuitive "fallout" should raise red

flags about the "implausibility" of plaintiffs' interpretation. *Van Buren v. United States*, 593 U.S. 374, 394 (2021). And as it turns out, plaintiffs' mere-presence position is textually, historically, and precedentially challenged.

### A.   The Text Weighs Against Plaintiffs.

There are two apparent textual problems with plaintiffs' mere-presence position. At the outset, the Clause directs that covered persons not only must be "born … in the United States"; they also must be "subject to the jurisdiction thereof"—a limitation that was added later to the originally proposed text. U.S. Const. Amend. XIV, § 1; *see* Swearer, *supra*, at 143. So the text, as revised, must do something different than adopt England's common-law rule of pure *jus soli*, which turns only on the location of a child's birth. Plaintiffs do not dispute as much.

The parties instead debate precisely *how* the Clause departs from a pure *jus soli* approach. Plaintiffs contend that "jurisdiction" is a low bar, referring only to the bare sense of being subject to *some* U.S. control. But as the application explains, that narrow meaning doesn't work—after all, tribal members and foreign diplomats are "in some way subject to the basic level of sovereign authority the United States government exerts over its geographical territory," even though their "exclusion from birthright citizenship is uncontested." Swearer, *supra*, at 149 & n.35 (collecting examples of U.S. legal authority over diplomats); Stay Appl. 6-7 (same for diplomats and Indians). Equating "subject to the jurisdiction of" with being within the United States' territory collapses two distinct prongs of the Clause's text.

Plaintiffs' contrary reading further places the Citizenship Clause in collision with the 1866 Act, which allows citizenship only to those "not subject to any foreign

6

power." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27. That phrasing "specifically intended to withhold birthright citizenship from those who did not owe a complete, permanent allegiance to the United States and who were not part of the 'American people.'" Swearer, *supra*, at 157-59 (collecting sources). Historical evidence indicates that the metric for measuring the requisite connection to U.S. jurisdiction was domicile or lawful permanent residence. *Infra* pp. 8-11. Temporary presence by a parent who legally resided in a foreign country was not enough.

A second textual feature of the Citizenship Clause points to a domicile-based approach: The provision's premise is that it applies only to persons who also have a "State *wherein they reside*." U.S. Const. Amend. XIV, § 1 (emphasis added). The term "reside," in context, connotes a person's legal residence or domicile. *See, e.g.*, "Residence," S. Rapalje & R. Lawrence, 2 *A Dictionary of American and English Law* 1114 (1888) (collecting cases treating "residence" as "synonymous with 'domicile'"); "Residence, Legal," 2 *A Dictionary of Words and Phrases Used in Ancient and Modern Law* 692 (1899) ("[t]he place where a man has his fixed place of abode, where he can exercise his political rights and is subject to personal taxation"). That's particularly so when viewed against then-prevailing concepts of complete jurisdiction and political allegiance, with which domicile's meaning was closely aligned. *See* Stay Appl. 6-8; *see also* Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 488-90 (2015) (colleting authorities); *accord* "Domicile," 1 *Dictionary of American and English Law*, *supra*, at 410 ("The question where a

7

person is domiciled may be important, because it is by the law of that place that his civil status … is regulated.").

The general rule of "domicile of origin" or "natural domicile," moreover, is that a child inherits his parent's domicile at birth and that domicile prevails until "clearly abandoned and another taken" via "fixed and settled habitation." *Somerville v. Somerville* (1801) 31 Eng. Rep. 839, 840, 842; 5 Ves. Jun. 750, 750, 755. "Thus," as an 1888 American and English law dictionary instructed, "if a husband and wife domiciled in England take a voyage to India, and a child is born to them on the voyage, or in India before they acquire a domicile there, its domicile is English." "Domicile of origin," *Dictionary of American and English Law*, *supra*, at 410. The Citizenship Clause's reference to "reside" thus appears to align with a domicile-based approach to the Citizenship Clause and exclude persons whose parents lack permanent or lawful residence in the United States.

## B.   Contemporaneous History and Practice Weigh Against Plaintiffs.

When assessing the Citizenship Clause's meaning, the "history that matters most is the history surrounding the ratification of the text." *United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring). Tennessee does not purport to fully survey the complex historical record here. Others have, though. *See* Swearer, *supra*; Lollman, *supra*; Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010). Suffice it to

say, a range of contemporaneous sources[1] cast significant doubt on plaintiffs' mere-presence position.  *See* Stay Appl. 6-9.

These include debates and commentary surrounding the passage and ratification of the 1866 Act and the Fourteenth Amendment, which pervasively linked eligibility to legal residency:

- Senator Trumbull, the primary drafter of the 1866 Act's citizenship provision, explained that the Act excluded "persons *temporarily resident* in [the United States] whom we would have no right to make citizens."  Even though "a sort of allegiance was due to the country from" such persons, they were not those "who owe allegiance to the United States" in the sense the citizenship clause was understood to require.  Cong. Globe, 39th Cong., 1st Sess. 572 (1866) (emphasis added).

- Senator George Henry Williams, a member of the Joint Committee on Reconstruction, wrote similarly: "In one sense, all persons born within the geographical limits of the United States are subject to the jurisdiction of the United States, *but they are not subject to the jurisdiction of the United States in every sense.*"  Cong. Globe, 39th Cong., 1st Sess. 2897 (1866) (emphasis added).

- Summarizing the Civil Rights Act for President Johnson, Senator Trumbull explained that the Act "declares 'all persons' born of *parents domiciled in the United States* … to be citizens of the United States."  Swearer, *supra*, at 158-59 (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson, *in* Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress, Washington, D.C., Doc. No. 28152) (emphasis added).

- In explaining how the Citizenship Clause tracked the Civil Rights Act, Senator Howard emphasized that the Clause "will not, of course, include persons born in the United States *who are foreigners, aliens*, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States."  Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (emphasis added).

Early Executive Branch practice was in accord:

- In the 1880s, two different Secretaries of State denied citizenship to persons born in the United States.  The reason?  Their parents had "remained

---

[1] The historical sources quoted throughout this section are collected in Swearer, *supra*, and Lollman, *supra*.

domiciled" overseas. Swearer, *supra*, at 170. Letters setting out their reasoning confirmed that "[t]he fact of birth" in the United States, "under circumstances implying alien subjection, establishes of itself no right of citizenship." Letter from Mr. Frelinghuysen, Sec'y of State, to Mr. Kasson, Minister to Ger. (Jan. 15, 1885), *in* 3 John Bassett Moore, LL.D., *A Digest of International Law* § 373, at 279 (1906); Letter from Mr. Bayard, Sec'y of State, to Mr. Winchester, Minister to Switz. (Nov. 28, 1885), *in* 3 John Bassett Moore, LL.D., *A Digest of International Law* § 373, at 280 (1906); *see* Lolling, *supra*, at 479-80.

- The Secretary of the Treasury applied similar reasoning in an 1890 opinion letter, which denied "citizenship of a child born to a would-be immigrant who had not 'landed' but was awaiting immigration approval." Swearer, *supra*, at 171. The Secretary explained: "I am, therefore, of the opinion that the child in controversy born during the temporary removal of the mother from the importing vessel to a lying-in hospital for her own comfort, pending further examination as to whether she belongs to the prohibited class of immigrants, did not become, by reason of its birth, under such circumstances, an American citizen." Letter from F.A. Reeve, Acting Solicitor of the Treasury (Mar. 4, 1890), *in* XI Documents of the Assembly of the State of New York, 113th Sess., No. 74, 6, 47.

Likewise, 1800s and early 1900s commentary recognized parental domicile as a distinguishing feature between the British and U.S. rules on citizenship:

- Justice Joseph Story, writing in his *Commentaries on the Conflict of Laws*, urged in 1834 that "[a] reasonable qualification o[n] the rule" of *jus soli* "would seem to be, that it should not apply to the children of parents … who were abiding there for temporary purposes." Joseph Story, *Commentaries on the Conflict of Laws* § 48 (Boston, Little, Brown & Co. 6th ed. 1865) (quoted in Lollman, *supra*).

- Alexander Porter Morse asserted in 1881 that "[t]he words 'subject to the jurisdiction thereof' exclude[d] the children of foreigners transiently within the United States … as … subjects of a foreign nation." Alexander Porter Morse, *A Treatise on Citizenship* 248 (Boston, Little, Brown & Co. 1881).

- In an 1891 law review article, former Supreme Court Justice Samuel Miller observed: "If a stranger or traveller passing through, or temporarily residing in this country, who has not himself been naturalized, and who claims to owe no allegiance to our Government, has a child born here which goes out of the country with its father, such child is not a citizen of the United States, because it was not subject to its jurisdiction." Samuel Freeman Miller, LL.D., *Naturalization and Citizenship*, *in* Lectures on the Constitution of the United States 275, 279 (J. C. Bancroft Davis ed., 1893).

- An 1898 comment in *Yale Law Journal* wrote: "[I]n this country, the alien *must be permanently domiciled*, while in Great Britain birth during a mere temporary sojourn is sufficient to render the child a British subject." Comment, 7 Yale L.J. 365, 367 (1898) (emphasis added).

- Constitutional scholar Henry Campbell Black distinguished between U.S.-born children of "a stranger or traveler passing through the country, or temporarily residing here," who are not entitled to citizenship, and "children, born within the United States, *of permanently resident aliens*, who are not diplomatic agents or otherwise within the excepted classes," who are entitled to citizenship no matter their race. *Handbook of American Constitutional Law* 634 (3d ed. 1910) (emphasis added).

- International law treatises reached the same conclusion. *See, e.g.*, William Edward Hall, M.A., *A Treatise on International Law* 224-25, 227 (5th ed. 1904) ("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Hannis Taylor, LL.D., *A Treatise on International Public Law* 220 (1901) ("It appears, therefore, that children born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'").

If nothing else, the excerpts above and sources collected by scholars show that plaintiffs' mere-presence position was not the uniform historical consensus.

## C.   Supreme Court Precedent Weighs Against Plaintiffs.

Nor does this Court's precedent mandate plaintiffs' maximalist reading of the Citizenship Clause. Quite the contrary: Caselaw emphasizes the importance of parental domicile to birthright citizenship and shuns mere-physical-presence rules in the immigration context.

1.   The earliest cases interpreting the Fourteenth Amendment point towards a domicile-based approach. In 1872, the Court's decision in the *Slaughter-House Cases* stated that the Citizenship Clause "was intended to *exclude* from its operation children of ministers, consuls, and *citizens or subjects of foreign States born*

*within the United States.*" 83 U.S. 36, 73 (emphasis added). Two years later, the Court observed that "common-law" principles informed "who shall be natural-born citizens" and noted "doubts" as to whether children of "aliens or foreigners" born in the United States constituted "natural-born citizens." *Minor v. Happersett*, 88 U.S. 162, 167-68 (1874). The Court recognized that "it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also." *Id.* at 167. After observing that "[s]ome authorities go further and include as citizens children born within the jurisdiction without reference to the citizenship of their parents," the Court noted that "[a]s to this class there have been doubts." *Id.* at 168.

*Elk v. Wilkins*, 112 U.S. 94 (1884), also counsels against a mere-presence approach. There, the Court assessed how the Citizenship Clause applied to an Indian born into a tribe who then severed tribal relations. *Id.* at 99. The Court held that "Indians born within the territorial limits of the United States, … although in a geographical sense born in the United States" were not "'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment." *Id.* at 102. The Indian must have been "completely subject to [the United States'] political jurisdiction, and owing them direct and immediate allegiance." *Id.* But he was not, just as "the children of subjects of any foreign government born within the domain of that government" would not receive citizenship. *Id.*

*Wong Kim Ark*—on which plaintiffs principally rely—cuts against them too. The Court there decided how the Citizenship Clause applied to a U.S.-born child of

Chinese aliens lawfully present and permanently domiciled in the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898). So unlawful presence was not at play. Still, the Court emphasized throughout that the alien parents were "resident[s]" and "domiciled within the United States." *Id.* at 652, 653, 693, 696, 705. It reasoned that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States" for purposes of the Clause. *Id.* at 693 (emphasis added). And it held that "Chinese persons … *so long as they are permitted by the United States to reside here*" enjoy the same birthright protections "as all other aliens residing in the United States." *Id.* at 694 (emphasis added). In so doing, the Court expressly drew from *Benny v. O'Brien*, 32 A. 696 (N.J. 1895) (cited at Stay Appl. 9), which interpreted the Citizenship Clause to require that parents be "domiciled here," and thus to exclude "those born in this country of foreign parents who are temporarily traveling here." *Id.* at 698.

*Wong Kim Ark*'s emphasis on parental domicile was no accident. It responded directly to the parties' briefing and to the dissent's concern about covering persons "born of aliens whose residence was merely temporary, either in fact or in point of law." *Id.* at 729 (Fuller, C.J., dissenting). Not surprisingly, "[i]n the years immediately following *Wong Kim Ark*, several commentators read the Court's reference to domicile as actually doing work in the opinion." Lollman, *supra*, at 462, 471. So did the Court and the Department of Justice. *See* U.S. Br. 38-39.

13

2.      Additional precedent clashes with plaintiffs' treatment of mere physical presence in the United States as determinative.

In the immigration context, this Court has long recognized that not every alien physically present within U.S. soil, water, or airspace "has *effected an entry* into the United States" for "constitutional purposes." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see United States v. Ju Toy*, 198 U.S. 253, 263 (1905). *Kaplan v. Tod*, 267 U.S. 228 (1925), is instructive. There, the Court rejected a mere-presence rule when considering whether children obtain citizenship through their parents' naturalization. A mother brought her daughter to Ellis Island to join her father, who legally resided in the country. *Id.* at 229. The daughter was denied admission, but the outbreak of the First World War prevented her deportation. *Id.* After detaining the girl for nearly a year, the government paroled her. *Id.* She then lived with her father in the United States for the better part of a decade. *Id.* During this time, the girl's father naturalized. *Id.* at 230. And when the government later sought to deport the girl, she argued that she had obtained citizenship because she was "dwelling in the United States" when her father naturalized. *Id.*

The Court disagreed. It held that the girl never "lawfully … landed in the United States," and "until she legally landed," she "could not have dwelt within the United States." *Id.* (quotations omitted). Legally, she remained "at the boundary line and had gained no foothold in the United States." *Id.* Absent a permissible "entry," the Court concluded, "an alien can neither 'dwell' nor 'reside' within the United

14

States, as those words are understood in the immigration context." *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024) (quoting *Kaplan*, 267 U.S. at 229-30).

This Court has invoked the at-the-border legal fiction time and again. *E.g.*, *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958). Under it, an alien may be "physically within our boundaries," but treated under the law "as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate." *Ju Toy*, 198 U.S. at 263. And that rule applies to aliens who "arrive at ports of entry" or are detained "after unlawful entry," for example, even if later "paroled elsewhere in the country" pending removal. *Thuraissigiam*, 591 U.S. at 139.

The at-the-border legal fiction in the Court's precedents aligns with the historical domicile-based approach to the Citizenship Clause. It makes no sense to recognize the "legal fiction of extraterritoriality, wherein ambassadors and diplomats, though literally present on United States soil, were considered to be still living in the sending state," Swearer, *supra*, at 143, yet ignore the similarly well-established legal fiction when it comes to aliens paroled into the country. The clash between plaintiffs' Citizenship Clause reading and settled immigration-law principles further weighs against their mere-presence position.

### D.   Plaintiffs' Reliance on Post-Ratification Practice Is Not Dispositive.

Plaintiffs and the district courts have sought to support their merits position with congressional and Executive Branch practice, which they say has applied a

mere-presence approach for over a century. *E.g.*, App. 68a. To be sure, "the longstanding practice of the government can inform our determination of what the law is." *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (citation and quotations omitted). And if this Court's precedent aligns with practice in a holding about the meaning of a constitutional provision, "*stare decisis*" might "control the outcome." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring). But for a few reasons here, plaintiffs' historical-practice points prove little about the interpretive question.

To begin, much of plaintiffs' cited evidence comprises sources—including a 1995 Office of Legal Counsel memo—stemming from the late 1900s. *E.g.*, Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S., 19 Op. O.L.C. 340 (1995). Plaintiffs' thus have a "timing problem": Evidence arising over a century after the Fourteenth Amendment's adoption is "far too late to inform the meaning" of the Citizenship Clause "at the time of" its ratification. *Samia v. United States*, 599 U.S. 635, 655 (2023) (Barrett, J., concurring in part and concurring in the judgment); *cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 221 (2020) (dismissing cited historical-practice examples as too "recent").

Nor is closer-in-time practice evidence merely "inconclusive." *Samia*, 599 U.S. at 656 (Barrett, J., concurring in part and concurring in the judgment). As discussed, *see supra* pp. 9-10, administrative actions "surrounding the ratification" weigh against plaintiffs by highlighting that Executive Branch officials viewed parental domicile as relevant to the Citizenship Clause's application, *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring). As far as practice goes, those incidents are rather on point:

As here, they involve executive officials asserting that citizenship does not automatically attach based on a child's place of birth alone, but instead turns on assessing parental connection to the United States.  *See supra* pp. 12-13.  Neither plaintiffs nor the courts below have offered any counters to that "contemporaneous and weighty evidence of the Constitution's meaning."  *Bowsher v. Synar*, 478 U.S. 714, 723 (1986).

Plaintiffs' limited body of earlier 20th-century "practice" is not persuasive on its own terms, either.  Congress's 1940 choice to codify the Clause's language only begs this case's dispute over what phrases like "subject to the jurisdiction of" and "in the United States" are best read to mean.  Nor do cases making passing references to broader conceptions of birthright citizenship move the needle.  *Cf.* 19 Op. O.L.C. at 346 n.15 (1995) (collecting such cases).  Many arise only well into the 1900s, so likewise suffer timing flaws.[2]  Others either overread *Wong Kim Ark* to conflate alienage and "race" with lawful residency,[3] assume without deciding that presence at birth suffices under the Clause,[4] or mention birthright citizenship only in describing the factual background or in other dicta.[5]  No case "directly" addresses the interpretive question here:  Whether the Citizenship Clause requires conferral of citizenship based on a child's mere presence at birth, no matter the temporary, accidental, or

---

[2] *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 211 n.10 (1982).

[3] *See, e.g.*, *Morrison v. California*, 291 U.S. 82, 85 (1934) (discussing race); *Dos Reis ex rel. Camara v. Nicolls*, 161 F.2d 860, 861-62 (1st Cir. 1947) (discussing nationality).

[4] *See United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957).

[5] *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (cited at 19 Op. O.L.C. at 346 n.15 (1995); App. 92a).

unlawful nature of parental presence.  *See* Swearer, *supra*, at 197-201 (discussing more recent Supreme Court cases).

That leaves later Executive Branch practice from the mid-1900s to now, which plaintiffs assert has generally adopted a mere-presence view.  But in a case about the location of a constitutional floor on Fourteenth-Amendment citizenship, it is not determinative that the Executive Branch has been willing to raise the ceiling.  *Cf.* Brandon L. Garrett, *Misplaced Constitutional Rights*, 100 B.U. L. Rev. 2085, 2087 (2020) ("[I]n many areas, government actors can choose to provide greater protection than the Constitution demands.").  Outside of the mandatory constitutional limits on the President's power over foreign affairs, the political branches maintain discretion to craft citizenship and naturalization rules in a manner consistent with foreign-policy objectives and exigencies.  *See* Stay Appl. 4-5, 35-37.

And to the extent the Executive Branch has read *Wong Kim Ark* as governing beyond its holding about parental domicile, *see, e.g.*, 19 Op. O.L.C. at 344-46, its practice is minimally probative, *cf. Peter Pan Bus Lines v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) ("[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that interpretation is compelled…." (citation and quotations omitted)).  Carrying forward a plainly flawed reading of a case is not the type of historical practice that should govern.  After all, "evidence of 'tradition' unmoored from original meaning is not binding law." *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (quoting *Vidal v. Elster*, 602 U.S. 286, 322-25 (2024) (Barrett, J., concurring in part)).

Along the same lines, even if plaintiffs are right that some recent federal-government tradition supports their reading, that could not override or alter the meaning of the Clause as ratified. "The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood." *Rahimi*, 602 U.S. at 715 (Kavanaugh, J., concurring). That fixation principle is plank one of originalism; the second rule speaks to interpretive constraint—that "the discoverable historical meaning … has legal significance and is authoritative in most circumstances." *Id.* at 737 (Barrett, J., concurring) (quoting K. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013)). Tethering meaning to the ratified text reflects that "[t]he text of the Constitution is the 'Law of the Land'" that controls "unless and until it is amended." *Id.* at 715 (Kavanaugh, J., concurring) (quoting U.S. Const., art. VI).

Asked to select among historical sources supporting original public meaning and practice of more recent vintage, this Court should favor the former. To be sure, the "[h]istorical analysis" an original-meaning methodology requires "can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult." *McDonald v. City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J., concurring). But such constraints serve a vital purpose in a system governed by a written Constitution with judges empowered to exercise "neither FORCE nor WILL but merely judgment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 120 (2015) (Thomas, J., concurring in the judgment) (quoting The Federalist No. 78,

at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).  Among other things, an original-meaning approach helps ensure that courts' constitutional analysis reflects "a body of evidence susceptible of reasoned analysis"—not "vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald*, 561 U.S. at 804 (Scalia, J., concurring).

## II.    Plaintiffs Are Not Entitled to Universal Relief.

Even if some injunctive relief were proper, this Court should reject plaintiffs' invitation to employ an across-the-board override of an Executive policy throughout the country.  Cabining courts' growing penchant for universally blocking presidential policies not only will help forestall further branch-on-branch conflict at the federal level.  A rule requiring tailored relief also would help protect States from federal-court interference into important policies implicating core sovereignty concerns.

As a baseline, this Court should clarify that any injunctive relief must be limited to the parties.  As a rule, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added).  To that end, an injunction "must … be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 68 (2018).  This limitation follows from "the nature of federal judicial power," as enshrined in Article III itself.  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 490 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024) (Mem.).  Article III "confines the 'judicial power' to 'Cases' and 'Controversies.'" *Id.* (quoting U.S. Const. art. III, § 2).  It does not permit federal courts to "issue advisory opinions" or address legal issues

"'in the abstract.'" *Id.* (quoting *California v. Texas*, 593 U.S. 659, 672 (2021)). Courts cannot "lawfully enjoin the world at large or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (cleaned up). They "must operate in a party-specific and injury-focused manner." *L.W.*, 83 F.4th at 490.

So to the extent that the threatened application of the Executive Order to plaintiffs gives rise to an Article III injury, an injunction preventing application of the order *to plaintiffs* would fully redress that injury. Setting aside distinct review schemes like the Administrative Procedure Act's, it is improper to enter relief that also governs "everyone in the nation similarly situated by categorially enjoining the defendants" from any enforcement. App. 72a (Niemeyer, J., dissenting). Injunctions as "to those who are strangers to the suit" exceed "the judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). That is why, in cases involving in personam injunctions of enforcement, "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran v. Salem Inn*, 422 U.S. 922, 931 (1975); *see United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995). And it is also why the government generally remains "free to" enforce challenged provisions—even if enjoined as to specific plaintiffs—against "others" not party to the suit. *See Doran*, 422 U.S. at 931.

That plaintiffs have raised a facial challenge to the Executive Order changes nothing. Nor does the Executive Order's cited "categorical" effect. *See* Stay Appl. 12-13, 21. Limits on the scope of "judicial power" apply with full force whether the

challenge is facial or as applied, or to a targeted order or a nationwide policy. *L.W.*, 83 F.4th at 490. No matter the substantive merits theory, "[d]istrict courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury.'" *Id.* (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). Relief that goes further and applies to unnamed nonparties across the country necessarily exceeds "the power of Article III courts" and flouts "longstanding limits on equitable relief." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see L.W.*, 83 F.4th at 490. It also "implicates unnecessarily potentially conflicting orders or reasoning, claims preclusion, res judicata, and other similar principles that order the work of different courts." App. 73a (Niemeyer, J., dissenting).

Moreover, any injunctive relief must be limited to the allegedly unconstitutional applications of the challenged Executive Order. That is, even if this Court concludes that some applications of the Executive Order are unconstitutional, it does not follow that *all* applications should be enjoined. Rather, the constitutionality of Executive Orders, like statutes, should be assessed provision by provision, and courts have an "obligation" to use severance "to maintain as much of the order as is legal." *Washington v. Trump*, 858 F.3d 1168, 1172 (9th Cir. 2017) (Kozinski, J., dissenting); *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (assuming "the severability standard for statutes also applies to executive orders"). Applied here, that rule restricts any remedy to "enjoin[ing] the unconstitutional *applications* of the [Order] while preserving the other valid applications." *Connection*

*Distrib. Co. v. Holder*, 557 F.3d 321, 342 (6th Cir. 2009); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006).

As discussed, evidence supports reading the Citizenship Clause to turn on parental domicile or lawful residency.  At a minimum, this Court's immigration precedents strongly suggest that persons encountered at illegal border crossings have not effectuated legal entry "in the United States," no matter if later paroled.  *See supra* pp. 14-15.  If that is right, then there are a host of situations in which the Executive Order can be applied with no constitutional problems.  That at a minimum means plaintiffs' *facial* challenge to the Executive Order must fail along with their claim for facial relief.  *See Nat'l Treasury Emps. Union v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989) (applying "difficult" facial standard from *United States v. Salerno*, 481 U.S. 739 (1987), to an Executive Order).  To the extent that there remain situations outside the bounds of constitutional application, injunctive relief should be narrowly crafted to "enjoin only the unconstitutional applications … while leaving other applications in force."  *Ayotte*, 546 U.S. at 329.

States are past due for a binding opinion that clarifies the checks on district courts' remedial authority.  All too often, Tennessee receives and must seek reversal of statewide district-court injunctions on scope-of-relief grounds.  *See, e.g.*, *L.W. ex rel. Williams v. Skrmetti*, 679 F. Supp. 3d 668, 716-18 (M.D. Tenn. 2023), *rev'd* 83 F.4th at 489-91, *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (mem.); *Does #1-9 v. Lee*, 659 F. Supp. 3d 865, 894 (M.D. Tenn. 2023), *rev'd* 102 F.4th 330, 341-42 (6th Cir. 2024).  That enact-enjoin-reverse cycle inflicts grave federalism

harms in our dual-sovereign system. After all, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted) (cited at Stay Appl. 36).

Worse, many injunctions arise in the facial, pre-enforcement posture. So federal courts are blocking new state laws, statewide, based on guesses about how they might later be read—thus preempting the traditional interpretive and enforcement role of state courts and state officials. *See, e.g., Friends of George's, Inc. v. Mulroy*, 675 F. Supp. 3d 831 (W.D. Tenn. 2023), *rev'd* 108 F.4th 431 (6th Cir. 2024); *Welty v. Dunaway*, 749 F. Supp. 3d 882 (M.D. Tenn. 2024), *appeal docketed*, No. 24-5968 (6th Cir. Oct. 24, 2024). Further hampering proper percolation, broad statewide relief often forces Tennessee to resort to early, emergency appellate proceedings to vindicate its rights. *See, e.g., Free Speech Coal., Inc. v. Skrmetti*, 2024 WL 5248104, at *17 (W.D. Tenn. Dec. 30, 2024) (granting "statewide" preliminary injunction), *stayed*, 2025 WL 512049 (6th Cir. Jan. 13, 2025); *Tenn. Conf. of the NAACP v. Lee*, 730 F. Supp. 3d 705, 711, 740 (M.D. Tenn. 2024) (granting permanent injunction as to non-parties), *stayed*, 105 F.4th 888 (6th Cir. 2024). "That scenario is not always optimal for orderly judicial decisionmaking," *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 930 (2024) (Kavanaugh, J., concurring), or for strained state and judicial resources.

In short, clarifying the proper scope of equitable relief is an independently certworthy endeavor. Such instruction would benefit the rule of law by better aligning courts' practices with limits on their powers. It also would address well-placed

separation-of-powers concerns over judicial interference with core Executive Branch functions.  And it would promote federalism and comity values in cases carrying great importance for States like Tennessee, their lawmakers, and their citizens.

## CONCLUSION

If the constitutional merits inform the proper scope of judicial remedies, a wide range of sources close in time to the Citizenship Clause's ratification casts doubt on plaintiffs' mere-presence position.  At a minimum, this Court should clarify that any injunction must be appropriately tailored, not universal.

Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

*/s/ Whitney D. Hermandorfer*
Whitney D. Hermandorfer
  *Director of Strategic Litigation*
  *Counsel of Record*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
whitney.hermandorfer@ag.tn.gov
(615) 741-3491

*Counsel for the State of Tennessee*

Nos. 24A884, 24A885, 24A886

_____

**IN THE SUPREME COURT OF THE UNITED STATES**
_____

**DONALD J. TRUMP, et al.,** *Applicants,*
**v.**
**CASA, INC., et al.,** *Respondents.*

_____

**DONALD J. TRUMP, et al.,** *Applicants,*
**v.**
**WASHINGTON, et al.,** *Respondents.*

_____

**DONALD J. TRUMP, et al.,** *Applicants,*
**v.**
**NEW JERSEY, et al.,** *Respondents.*

_____

**BRIEF OF IMMIGRATION REFORM LAW INSTITUTE
AS *AMICUS CURIAE* IN SUPPORT OF APPLICATIONS FOR STAY**
_____

CHRISTOPHER J. HAJEC
  *Counsel of Record*
GABRIEL R. CANAAN
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
chajec@irli.org
(202) 232-5590

*Counsel for Amicus Curiae
Immigration Reform Law Institute*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .........................................1

INTRODUCTION ........................................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ...........................................................................3

    I.    To be "subject to the jurisdiction" of the United States under the Citizenship Clause, one must have permission to reside in the United States ........................................................................4

        A.    To be within the allegiance and protection of the United States, one must have permission to reside here ...........................................4

        B.    To be subject to the jurisdiction of the United States, one must be within the allegiance and protection of the United States ..............9

        C.    *Wong Kim Ark*'s permission requirement was a holding of the Court ....................................................................... 10

    II.    Respondents have no likelihood of success in their facial challenge 12

CONCLUSION....................................................................... 13

i

# TABLE OF AUTHORITIES

## Cases

*AFSCME Council 79 v. Scott*,
717 F.3d 851 (11th Cir. 2013).......................................................... 13

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)............................................................3

*Ariz. Dream Act Coalition v. Brewer*,
855 F.3d 957 (9th Cir. 2017)..............................................................1

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017)..............................................................3

*Elk v. Wilkins*,
112 U.S. 94 (1884)............................................................................9

*Fong Yue Ting v. United States*,
149 U.S. 698 (1893)............................................................ 5, 6, 7, 10

*Franchise Tax Bd. of Cal. v. Hyatt*,
587 U.S. 230 (2019)...........................................................................7

*Jackson v. Virginia*,
443 U.S. 307 (1979)....................................................................... 11

*Minor v. Happersett*,
88 U.S. 162 (1874)............................................................................8

*New York State Liquor Authority v. Bellanca*,
452 U.S. 714 (1981)...........................................................................3

*Plyler v. Doe*,
457 U.S. 202 (1982)....................................................................... 12

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U.S. 477 (1989)....................................................................... 12

*Matter of Silva-Trevino*,
26 I. & N. Dec. 826 (B.I.A. 2016)....................................................1

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ..................................................................1

*United States v. Salerno*,
  481 U.S. 739 (1987) ................................................................ 13

*United States v. Texas*,
  599 U.S. 670 (2023) ..................................................................1

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898) ............................................... 4, 5, 7, 9, 12

*Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*,
  50 F.4th 164 (D.C. Cir. 2022) ...................................................1

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ......................................................................3

## Other Authorities

U.S. National Archives & Records Administration, *Chinese Exclusion Act* ......8

*The Concise Oxford Dictionary of Current English* (7th ed. 1919) ....................5

*Exec. Order No. 13989*, 85 Fed. Reg. 512 (2025) .................................2

Amanda Frost, *"By Accident of Birth": The Battle over Birthright Citizenship After United States v. Wong Kim Ark*,
  32 Yale J.L. & Human. 38 (2021) ..............................................8

## Treatises

Emer de Vattel, *The Law of Nations* bk. 1, ch. 19, § 213
  (Joseph Chitty trans., 6th Am. ed. 1844) ...................................7

## Constitutional Provisions

U.S. CONST. amend. XIV, § 1 ............................................................4

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).[1]

## INTRODUCTION

On January 20, 2025, President Donald J. Trump signed an executive order titled "Protecting the Value of United States Citizenship" ("EO"). This order provides that:

> United States citizenship does not automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a

---

[1] No counsel for any party authored this brief in whole or in part and no person or entity, other than *amicus curiae*, its members, or its counsel, has contributed money that was intended to fund preparing or submitting the brief.

1

student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*Exec. Order No. 13989*, 85 Fed. Reg. 512 (2025). It then directs the relevant federal agencies to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." *Id.*

## SUMMARY OF ARGUMENT

The lower courts' preliminary injunctions rest on a glaring legal error. This Court has held that only children born in the United States to parents who, at the time, were permitted to reside in the United States are citizens at birth by virtue of the Citizenship Clause of the Fourteenth Amendment. Also, because Respondents make only a facial challenge to the EO, they can succeed only if no set of circumstances exists under which the EO would be valid. Under this Court's controlling precedent, the EO is valid as applied in innumerable situations, such as to children of illegal aliens.

The lower courts wrongly concluded that the phrase "subject to the jurisdiction" as used in the Citizenship Clause means merely being subject to the country's territorial sovereignty. In fact, to be "subject to the jurisdiction" of the United States for purposes of this clause means to be within the nation's

2

allegiance and protection, not merely subject to its laws or territorial sovereignty. This Court has held that for a person to be born within the nation's allegiance and protection, and thus subject to its jurisdiction, that person must be born in the United States to a parent who, at that time, had permission to reside in the United States. Because the lower courts applied the incorrect legal standard in determining that Respondents were likely to succeed on the merits, this court should narrow the lower courts' injunctions, which, as the Applications demonstrate, also suffer from jurisdictional and scope-of-relief issues.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The standard of review for a preliminary injunction is abuse of discretion, *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 716 (1981), and a district court abuses its discretion if it applies an incorrect legal standard, makes clearly erroneous factual findings, or misapplies the relevant legal principles. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

Here, the lower courts applied an incorrect legal standard. The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof,

are citizens of the United States." U.S. CONST. amend. XIV, § 1. Contrary to the lower courts' views, in the central case on birthright citizenship, *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), this Court held that, to have citizenship at birth under the Citizenship Clause, one must be born in the geographic confines of the United States to parents who, at the time of one's birth, had permission to reside in the United States.

I.    **To be "subject to the jurisdiction" of the United States under the Citizenship Clause, one must have permission to reside in the United States.**

A.    ***To be within the allegiance and protection of the United States, one must have permission to reside here.***

At issue in *Wong Kim Ark* was whether a son born to Chinese subjects lawfully residing in the United States was a citizen at birth under the Citizenship Clause. This Court found that he was, explaining:

> The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The Amendment, in clear words and in manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is *within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.* His allegiance to the United States is direct and immediate, and although but local

4

and temporary, continuing only so long as he remains within our territory, is yet, in the words of Lord Coke, in Calvin's Case, 7 Rep. 6a, "strong enough to make a natural subject, for if he hath issue here, that issue is a natural-born subject;" and his child, as said by Mr. Binney in his essay before quoted, "if born in the country, is as much a citizen as the natural-born child of a citizen, and by operation of the same principle."  It can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides—seeing that, as said by Mr. Webster, when Secretary of State, in his Report to the President on Thrasher's Case in 1851, and since repeated by this court, "independently of a residence with intention to continue such residence; independently of any domiciliation; independently of the taking of any oath of allegiance or of renouncing any former allegiance, it is well known that, by the public law, an alien, or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may be punished for treason, or other crimes, as a native-born subject might be, unless his case is varied by some treaty stipulations." Ex. Doc. H.R. No. 10, 1st sess. 32d Congress, p. 4; 6 Webster's Works, 526; United States v. Carlisle, 16 Wall. 147, 155; Calvin's Case, 7 Rep. 6a; Ellesmere on Postnati, 63; 1 Hale P.C. 62; 4 Bl. Com. 74, 92.

*Id.* at 693-94 (emphasis added). The Court then added an important proviso, applicable to the particular facts of the case:

Chinese persons, born out of the United States, remaining subjects of the Emperor of China, and not having become citizens of the United States, are entitled to the *protection of and owe allegiance* to the United States, *so long as they are permitted by the United States to reside here*; and are "subject to the jurisdiction thereof," in the same sense as all other aliens [lawfully] residing in the United States.

*Id.* at 694 (emphasis added) (citing, *inter alia, Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893)). *See, e.g., The Concise Oxford Dictionary of Current English* 825 (7th ed. 1919) (defining "so long as" as "with the proviso, on the

condition, that"). Here, then, the Court held that persons such as Wong Kim Ark's parents—and thus children born to them in the United States—were within the allegiance and protection of the United States "so long as they are permitted by the United States to reside here"—meaning, provided that they were permitted to reside here.

One reason the *Wong Kim Ark* Court added this proviso is that, at the time, other Chinese persons—laborers who had overstayed their permission to be in the country—were subject to deportation under the Exclusion Acts, and thus, for the Court, were not within the allegiance and protection of the United States. As the Court had put it in a case it cited in the above passage:

> Chinese laborers, [] like all other aliens residing in the United States for a shorter or longer time, are entitled, *so long as they are permitted by the government of the United States to remain in the country*, to the safeguards of the Constitution, and to the protection of the laws, in regard to their rights of person or property, and to their civil and criminal responsibility.

*Fong Yue Ting*, 149 U.S. at 724 (emphasis added). Thus, for the Court, Chinese laborers and other resident aliens who were *not* permitted by law to reside in the United States were not "entitled . . . to the safeguards of the Constitution, and to the protection of the laws, in regard to their rights of person or property, and to their civil and criminal responsibility." And, thus, unlike Chinese persons such as Wong Kim Ark's parents, whose permission to reside here was

undisputed, such aliens were not within the allegiance and protection of the

United States. *Wong Kim Ark*, 169 U.S. at 694.

> As the Court in *Fong Yue Ting* further explained:

> By the law of nations, doubtless, aliens residing in a country, with
> the intention of making it a permanent place of abode, acquire, in
> one sense, a domicil there; and, *while they are permitted by the*
> *nation to retain such a residence and domicil, are subject to its*
> *laws, and may invoke its protection against other nations.* This is
> recognized by those publicists who, as has been seen, maintain in
> the strongest terms the right of the nation to expel any or all aliens
> at its pleasure. Vattel, lib. 1, c. 19, § 213; 1 Phillimore, c. 18, § 321;
> Mr. Marcy, in *Koszta's case,* Wharton's International Law Digest,
> § 198. See also *Lau Ow Bew* v. *United States,* 144 U.S. 47, 62;
> Merlin, Repertoire de Jurisprudence, Domicile, § 13, quoted in the
> case, above cited, of *In re Adam,* 1 Moore P.C. 460, 472,
> 473.(emphasis added).

*Fong Yue Ting*, 149 U.S. at 724 (emphasis added). The cited-to selection of

Emmer de Vattel's treatise *The Law of Nations,* which was highly influential

on American jurisprudence, *Franchise Tax Bd. of Cal. v. Hyatt,* 587 U.S. 230,

239 (2019), describes these reciprocal duties:

> The inhabitants, as distinguished from citizens, are foreigners who
> are *permitted to settle and stay in the country*. Bound to the society
> by the residence, they are subject to the laws of the state while
> they reside in it; and they are obliged to defend it, because it grants
> them protection, though they do not participate in all the rights of
> citizens. They enjoy only the advantages which the law or custom
> gives them. (emphasis added.)

Emer de Vattel, *The Law of Nations* bk. 1, ch. 19, § 213 (Joseph Chitty trans.,

6th Am. ed. 1844) (emphasis added). Indeed, the Court's holding in *Wong Kim*

*Ark* continues to comport with common sense, since an illegal alien, subject to

7

apprehension, detention, and removal at all times, can hardly be said to be within the "protection" of the United States, as the phrase "allegiance and protection" has always been understood. *See, e.g., Minor v. Happersett*, 88 U.S. 162, 165-66 (1874) ("The very idea of a political community, such as a nation is, implies an association of persons for *the promotion of their general welfare*. Each one of the persons associated becomes a member of the nation formed by the association. He owes it allegiance and is entitled to its protection.") (emphasis added).

When the Court issued its ruling in *Wong Kim Ark*, no law prohibited aliens of any nationality other than Chinese from residing here. *See* Amanda Frost, *"By Accident of Birth": The Battle over Birthright Citizenship After United States v. Wong Kim Ark*, 32 Yale J.L. & Human. 38, 47 (Summer 2021); U.S. National Archives & Records Administration, *Chinese Exclusion Act*, https://www.archives.gov/milestone-documents/chinese-exclusion-act (last visited Mar. 13, 2025). But, of course, even apart from *Fong Yue Ting*'s above generalization of the permission requirement to all resident aliens, it is wholly against the tenor of *Wong Kim Ark* to imagine that the requirement was only applicable to the Chinese—that only *Chinese* persons, if excluded, would be outside the allegiance and protection of the United States, while those of other nationalities who might be excluded, if Congress had passed a law excluding them, would somehow remain within the nation's allegiance and protection.

Needless to say, the Court was far from observing any such distinction of race or nationality.

> **B.**   ***To be subject to the jurisdiction of the United States, one must be within the allegiance and protection of the United States.***

Being "subject to the jurisdiction" of the United States under the Citizenship Clause means not merely being subject to the laws of the United States, but being subject to the nation's political jurisdiction and "owing it direct and immediate allegiance." *Wong Kim Ark,* 169 U.S. at 680 (citing *Elk v. Wilkins*, 112 U.S. 94, 101-102 (1884)):

> The only adjudication that has been made by this court upon the meaning of the clause, "and subject to the jurisdiction thereof," in the leading provision of the Fourteenth Amendment, is *Elk* v. *Wilkins,* 112 U.S. 94, in which it was decided that an Indian born a member of one of the Indian tribes within the United States, which still existed and was recognized as an Indian tribe by the United States, who had voluntarily separated himself from his tribe, and taken up his residence among the white citizens of a State, but who did not appear to have been naturalized, or taxed, or in any way recognized or treated as a citizen, either by the United States or by the State, was not a citizen of the United States, as a person born in the United States, "and subject to the jurisdiction thereof," within the meaning of the clause in question.
>
> That decision was placed upon the grounds, that the meaning of those words was, "not merely subject in some respect or degree to the jurisdiction of the United States, *but completely subject to their political jurisdiction, and owing them direct and immediate allegiance.*"

*Id.* at 680 (emphasis added). Thus, for this Court, being subject to the jurisdiction of the United States required "owing" the United States "direct and

immediate allegiance." Quite obviously, those outside the allegiance and protection of the United States altogether—such as excluded Chinese laborers then, or illegal aliens today—cannot be said to meet the requirement of owing the United States "direct and immediate allegiance." Therefore, they cannot be "subject to the jurisdiction" of the United States under the Citizenship Clause.

### C.    *Wong Kim Ark's permission requirement was a holding of the Court.*

Not to regard this Court as holding permission to reside in the country to be a prerequisite for being subject to the jurisdiction of the United States for Citizenship Clause purposes would be to truncate the reasoning the Court gave for its judgment, ignore the precedents it cited, and make nonsense of its opinion.  For example, this Court would then have left open the possibility (which it explicitly foreclosed, and had earlier foreclosed, *Fong Yue Ting*, 149 U.S at 724)) that those residing in the country while being prohibited from doing so were within the allegiance and protection of the United States, or the possibility that one could be outside of the nation's allegiance and protection but still owe it "direct and immediate allegiance," as required for being subject to its jurisdiction.

The Court's proviso requiring permission to reside also is clearly part of its holding, not dicta, because that proviso was part of the rule of law the Court stated and applied when considering the particular facts of the case. These

were that Wong Kim Ark's parents were not merely resident aliens, but Chinese subjects residing in the United States at a time when some Chinese, uniquely among nationalities, were excluded from the country. It was when considering these particular facts that the Court had the need to articulate its proviso about permission to reside, and that proviso is thus part of the rule of law it announced and applied to reach its judgment concerning those particular facts.

And, of course, this Court may set forth a standard as part of its holding in a case even when the Court finds that the standard has been met in that case. For example, in *Jackson v. Virginia*, 443 U.S. 307 (1979), the Court held that a federal court hearing habeas corpus must consider whether there was legally sufficient evidence to support a conviction, not just whether there was some evidence, even though it found that the prosecution had met the former, higher standard. Likewise, *Wong Kim Ark* did not leave open the question of whether those born in this country to persons who did *not* lawfully reside in the country were birthright citizens merely because it was undisputed that Wong Kim Ark's parents lawfully resided here. Rather, the standard the Court announced and applied was part of its holding, even though Wong Kim Ark met that standard. Any view of "holding" that is more restrictive, at least if applied to this Court, would rob the Court of its ability to set forth general

principles of law to guide lower courts in any case where the general principle it discerned, and relied on to reach its judgment, happened to be met.

It is true that the Court in *Wong Kim Ark* stated, in dicta, that "jurisdiction" had a unitary meaning in the Fourteenth Amendment. 169 U.S. at 687. It is also true that "jurisdiction" for purposes of the Equal Protection Clause of that amendment was later held to be merely geographical. *Plyler v. Doe*, 457 U.S. 202, 215 (1982). But that is not enough to conclude that the *Plyler* holding alters *Wong Kim Ark*'s holding—with which it is fully consistent— about the meaning of "jurisdiction" in the Citizenship Clause. This insufficiency goes double for lower courts. *A fortiori, Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## II.    Respondents have no likelihood of success in their facial challenges.

It follows from *Wong Kim Ark* that the EO has innumerable valid applications, including to children born to illegal aliens, tourists, and others who do not have permission to reside in the United States. Therefore, the lower courts erred in concluding that Respondents were likely to succeed on the

merits of their facial challenge. *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *see also AFSCME Council 79 v. Scott*, 717 F.3d 851, 857-858 (11th Cir. 2013) (applying the rule of *Salerno* to a facial challenge to an executive order). In light of *Wong Kim Ark*'s holding that, to have birthright citizenship under the Fourteenth Amendment, one's parents must have been permitted to reside in the United States at one's birth, the EO is far from invalid on its face.

## CONCLUSION

For the foregoing reasons, the Court should grant the Applications.

Dated: March 19, 2025                 Respectfully submitted,

CHRISTOPHER J. HAJEC
  *Counsel of Record*
GABRIEL R. CANAAN
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
chajec@irli.org
(202) 232-5590

*Counsel for Amicus Curiae*
*Immigration Reform Law Institute*

Nos. 24A884, 24A885, 24A886

Iɴ ᴛʜᴇ

# Supreme Court of the United States

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*,
*Applicants,*

*v.*

CASA, INC., *et al.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*,
*Applicants,*

*v.*

WASHINGTON, *et al.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*,
*Applicants,*

*v.*

NEW JERSEY, *et al.*

Oɴ Aᴘᴘʟɪᴄᴀᴛɪᴏɴs ғᴏʀ Pᴀʀᴛɪᴀʟ Sᴛᴀʏs ᴏғ ᴛʜᴇ Iɴᴊᴜɴᴄᴛɪᴏɴs Issᴜᴇᴅ ʙʏ ᴛʜᴇ
Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Dɪsᴛʀɪᴄᴛ Cᴏᴜʀᴛs ғᴏʀ ᴛʜᴇ Dɪsᴛʀɪᴄᴛ ᴏғ Mᴀʀʏʟᴀɴᴅ, ᴛʜᴇ
Wᴇsᴛᴇʀɴ Dɪsᴛʀɪᴄᴛ ᴏғ Wᴀsʜɪɴɢᴛᴏɴ ᴀɴᴅ ᴛʜᴇ Dɪsᴛʀɪᴄᴛ ᴏғ Mᴀssᴀᴄʜᴜsᴇᴛᴛs

## BRIEF *AMICUS CURIAE* OF FORMER
## NATIONAL SECURITY OFFICIAL JOSHUA STEINMAN
## IN SUPPORT OF APPLICANTS' MOTIONS TO STAY

Dᴀɴɪᴇʟ Z. Eᴘsᴛᴇɪɴ
Aᴍᴇʀɪᴄᴀ Fɪʀsᴛ
  Lᴇɢᴀʟ Fᴏᴜɴᴅᴀᴛɪᴏɴ
611 Pennsylvania Avenue SE
  #231
Washington, DC 20003

Jᴜᴅᴅ E. Sᴛᴏɴᴇ II
  *Counsel of Record*
Cʜʀɪsᴛᴏᴘʜᴇʀ D. Hɪʟᴛᴏɴ
Aʀɪ Cᴜᴇɴɪɴ
Sᴛᴏɴᴇ Hɪʟᴛᴏɴ PLLC
600 Congress Avenue,
  Suite 2350
Austin, TX 78701
judd@stonehilton.com
(737) 465-7248

*Counsel for Amicus Curiae*

## QUESTION PRESENTED

Whether the Court should stay the injunctions prohibiting enforcement of President Donald Trump's executive order entitled "Protecting the Meaning and Value of American Citizenship" ("the EO"). Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025).

## TABLE OF CONTENTS

Question Presented ............................................................................. I

Table of Contents ............................................................................. II

Table of Authorities ......................................................................... III

Interest of *Amicus Curiae* ................................................................ 1

Summary of Argument ...................................................................... 2

Argument .......................................................................................... 3

I.  The EO Is Faithful to the Constitution and Serves the Interests of National Security. .................................................................. 5

II. National-Security Concerns Also Support the Executive in the Irreparable-Harm Analysis. ................................................. 13

Conclusion ....................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*Beame v. Friends of the Earth,*
    434 U.S. 1310 (1977) ........................................................................14

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ......................................................................3, 16

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) .........................................................................16

*Dep't of State v. Munoz,*
    602 U.S. 899 (2024) ...........................................................................9

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) .........................................................................16

*Henderson v. Shinseki,*
    562 U.S. 428 (2011) .........................................................................17

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) .........................................................................9, 10

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010) ...........................................................................3

*INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor,*
    510 U.S. 1301 (1993) .......................................................................14

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ...........................................................................10

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................4, 14

*Reno v. Flores,*
    507 U.S. 292 (1993) .........................................................................15

*Rogers v. Bellei,*
    401 U.S. 815 (1971) ...........................................................................8

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ..........................................................9, 10, 13-15

*Trump v. Int'l Refugee Assistance Project,*
    582 U.S. 571 (2017) ...........................................................................3

*U.S. Dep't of Labor v. Triplett,*
    494 U.S. 715 (1990) .........................................................................14

*United States v. Texas,*
    599 U.S. 670 (2023) ...........................................................................3

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) .................................................................. 6

*Williams v. Zbaraz*,
    442 U.S. 1309 (1979) ............................................................ 14

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................. 14

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) .......................................................... 16, 17

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ......................................................... 5

U.S. Const. art. II, § 3 ................................................................... 3

U.S. Const. art. IV, § 4 ............................................................ 7, 11

**Statutes, Rules and Regulations**

Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443 (Jan. 20, 2025) .................. 8, 10, 13

Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ................................ I, 2

Exec. Order No. 14,160, § 1 ........................................................... 5

Exec. Order No. 14,160, § 2 ........................................................... 6

Exec. Order No. 14,160, § 3 ........................................................... 6

Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 20, 2025) ................................. 10

Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 20, 2025) ................................ 10

Proclamation No. 10,888, 90 Fed. Reg. 8333 (Jan. 20, 2025) ............................ 10-11

Supreme Court Rule 37.4 ................................................................ 4

Supreme Court Rule 37.6 ................................................................ 1

8 U.S.C. § 1401(a) ................................................................... 5, 6

**Other Authorities**

ABC News, *How the FBI Busted Anna Chapman and the Russian Spy Ring* (Nov. 1, 2011), https://abcnews.go.com/blogs/politics/2011/11/how-the-fbi-busted-anna-chapman-and-the-russian-spy-ring ................. 11-12

Attorney General Prepared Remarks on the National-Security Entry-Exit Registration System (June 6, 2002), https://www.justice.gov/archive/ag/speeches/2002/060502agpreparedremarks.htm ............................... 9

ALEX COCKBURN, NATIONALITY OR THE LAW RELATING TO SUBJECTS AND ALIENS (1869) ........................................................................ 8

Kevin J. Fandl, *Immigration Posses: U.S. Immigration Law and Local Enforcement Practices*, 34 J. LEGIS. 16 (2008) .................................................. 9

2 FARRAND'S RECORDS ............................................................................ 7

THE FEDERALIST NO. 68 (Alexander Hamilton) (Clinton Rossiter, ed. 1961) ...................................................................................................... 7

Alexander Hamilton, *Speech at the Constitutional Convention*, *in* JAMES MADISON'S NOTES OF DEBATES IN THE FEDERAL CONVENTION (June 8, 1787) ...................................................................................... 7

James T. Kimer, *Landmarks in US Immigration Policy*, NACLA.org (Sept. 25, 2007), https://nacla.org/article/landmarks-us-immigration-policy ............................................................................................... 8-9

Timothy Meyer & Ganesh Sitaraman, *The National Security Consequences of the Major Questions Doctrine*, 122 MICH. L. REV. 55 2023) ...................................................................................................... 16

Kevin P. Riehle, *Russia's Intelligence Illegals Program: An Enduring Asset*, 35 INTELLIGENCE & NAT'L SEC. 385 (2020) .......................... 12, 13

Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 Tex. Rev. L. & Pol. 135 (2019) .................................................................. 6

*Trump v. New Jersey* Stay App. .............................................. 6, 8, 11, 14

Kristin A. Vara, *Espionage: A Comparative Analysis*, 22 ILSA J. Int'l & Comp. L. 61 (2015) .............................................................. 12

Shaun Walker, *"I Thought I Was Smarter Than Almost Everybody": My Double Life as a KGB Agent*, THE GUARDIAN (Feb. 11, 2017), https://www.theguardian.com/world/2017/feb/11/thought-smarter-everybody-kgb-spy-jack-barsky ...................................................... 12, 13

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Joshua Steinman is a former national security official and the Co-founder and CEO of Galvanick, a cybersecurity firm specializing in securing industrial facilities. Prior to that role, Mr. Steinman served on the White House National Security Council Staff from 2017 to 2021 as Deputy Assistant to the President and Senior Director for Cyber. In that role, his duties included oversight of all cyber and telecommunications policy for the federal government. Mr. Steinman has also served as a naval officer, serving in the United States and abroad, and in the private sector as a senior executive in Silicon Valley. While assigned to an emerging technologies task force answering to the Chief of Naval Operations, he successfully advocated for the creation of the Defense Innovation Unit, an entity formed to help the Department of Defense integrate emerging technology and national security.

*Amicus* has worked at the most senior levels of the federal government and with the highest-level security clearance. He has devoted his career to combating complex security threats to the United States. These threats are perhaps no more complex and consequential than those involving the United States's assessment of and response to foreign intelligence assets in an increasingly globalized,

---

[1] Under Rule 37.6, no counsel for any party authored this brief, in whole or in part, nor did counsel for any party or either party make a monetary contribution intended to fund this brief in whole or part. No person or entity other than *amicus* and counsel for *amicus* contributed monetarily to this brief's preparation or submission.

interconnected geopolitical landscape. Such threats include the exploitation of vulnerabilities in United States citizenship requirements on the part of foreign adversaries.

*Amicus* respectfully submits this brief to offer the Court a perspective on the national-security contours of this case. In particular, *amicus* writes to describe the implications of place-of-birth and citizenship derived therefrom for national security, and why interference with the President's Executive Order (the "EO") giving effect to the Constitution's citizenship provisions may leave the United States vulnerable to harm from its enemies abroad. *See* Exec. Order No. 14,160.

## SUMMARY OF ARGUMENT

I.     The Fourteenth Amendment of the Constitution provides, in relevant part, that a person attains U.S. citizenship if he is both "born or naturalized in the United States" and "subject to the jurisdiction thereof." U.S. CONST. amend. XIV. As the Executive has argued, the EO rightly recognizes that the automatic grant of birthright citizenship to a child born on U.S. soil regardless of whether his parents are lawfully and permanently in the United States is not required by the Fourteenth Amendment. The district courts' rulings were not in keeping with the text of the Constitution and the national-security interests it serves.

II.     The foregoing principles also support the Executive's argument that it will be irreparably harmed absent a stay. Enjoining the EO harms the Executive by interfering in the President's management of foreign affairs and national security. And because of the unique challenges posed by U.S.-born foreign-intelligence assets,

courts are ill-suited to redress threats to national security from potential U.S.-born foreign intelligence assets that would have been stymied by the EO.

## ARGUMENT

The Court should grant a stay of the orders enjoining the EO, which fore-closed the EO's treatment of birthright citizenship on Fourteenth Amendment grounds. This Court has recognized that constitutional liberties must coexist with longstanding national-security interests. "Established legal doctrine must be consulted for its teaching. Remote in time it may be; irrelevant to the present it is not. . . . Security subsists, too, in fidelity to freedom's first principles." *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) (cleaned up). *Amicus* agrees that enjoining the EO was not in keeping with those principles. The orders enjoining the EO misunderstand the Fourteenth Amendment, raising needless conflict with the United States's national-security interests and the President's obligation to see the Constitution faithfully executed. *See* U.S. CONST. art. II, § 3.

To obtain a stay from this Court, the Executive must show (1) a reasonable probability that this Court will grant certiorari, (2) a likelihood of success on the merits, and (3) a likelihood of irreparable harm absent a stay. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). The Court routinely grants review on matters of Executive authority that bear on national security, even when the Government initially presents those issues for this Court's review in a stay posture. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 675 (2023) (granting certiorari before judgment after the Fifth Circuit denied a stay pending appeal); *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 572 (2017) (granting the petitions for certiorari and the

4

Executive stay applications in part in challenge to Executive Order). *Amicus* thus focuses on two factors that also support an injunction pending appeal: likelihood of success on the merits and irreparable harm. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).[2]

*First*, the Executive and others have elsewhere highlighted flaws in the constitutional analysis of Fourteenth Amendment challenges to the EO. *Amicus*, being well-versed in the complex national-security challenges facing the United States, is uniquely situated to shed further light on the conflict between unbounded birthright citizenship and our constitutional system. As a former national security official, *amicus* has diligently worked to uphold constitutional values like those embraced in the Fourteenth Amendment while also balancing the national-security interests vital to the continued safety and security of the United States.

*Second*, regarding irreparable harm, the EO's national-security implications warrant a stay. Because the Constitution does not confer citizenship in the manner claimed by plaintiffs, this case poses important questions about the separation of powers. A stay permits the President to exercise his lawful authority to faithfully execute the law without undue interference from the courts, which are particularly ill-suited to second-guess the political branches on national security.

---

[2] In view of this Court's admonition that *amicus* supporting a stay application should brief only relevant matters not already presented by the parties, *see* S. Ct. R. 37.4, this brief does not address the specific scope or terms of an appropriate stay in each case in which the Executive has sought relief from this Court.

I.   **The EO Is Faithful to the Constitution and Serves the Interests of National Security.**

The district courts' preliminary injunctions are unlikely to stand on appeal, and the EO is unlikely to be enjoined permanently, because respondents err as to the scope of citizenship guaranteed by the Fourteenth Amendment. Moreover, the EO's interpretation of the Constitution aligns with important national-security aims.

**A.** Under the text of the Fourteenth Amendment's Citizenship Clause, citizenship is not automatically conferred to all persons born in the United States. The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. CONST. amend. XIV, § 1.

The EO addresses what it means to be "subject to the jurisdiction" of the United States. Exec. Order No. 14,160, § 1. The EO examines the Citizenship Clause in reference to the applicable statutory text accompanying it, which extends U.S. citizenship to "a person born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). The EO recognizes that the Constitution and Congress do not automatically extend citizenship to a person born in the United States whose: (1) mother was unlawfully present and father was not a citizen or lawful permanent resident or (2) mother was present lawfully but only temporarily and father was not a citizen or lawful permanent resident. Exec. Order No. 14,160, § 1. The EO

instructs relevant federal authorities with respect to documentation policies and regulations consistent with those narrow limitations. *Id.* §§ 2-3.

There is no dispute that there are limitations on deriving U.S. citizenship solely from the geographic place of one's birth. *See generally* Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 TEX. REV. L. & POL. 135, 143 (2019). Moreover, no one challenges other well-established exceptions for geographically derived birthright citizenship, such as for children of foreign diplomats, whose "exclusion from birthright citizenship is uncontested." *Id.* at 149 & n.35. Even this Court in *United States v. Wong Kim Ark*, 169 U.S. 649, 652-53 (1898), spoke in limited terms when it examined how the Citizenship Clause applied to a child born in the United States to parents who were lawfully present Chinese aliens permanently domiciled in the United States. The Court reasoned that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States" for purposes of the Citizenship Clause. *Id.* at 693. At this stage, however, *amicus* agrees that those questions need not be definitively addressed until "courts fully examine the merits" below. *See Trump v. New Jersey* Stay App. 1.[3]

---

[3] Because the EO addresses citizenship under 8 U.S.C. § 1401(a), this brief does not address the other avenues to U.S. citizenship that Congress has or could have provided elsewhere. *Amicus* takes no position on U.S. citizenship in this brief beyond the narrow issue of geographically derived birthright U.S. citizenship under Section 1401(a) as it relates to the EO.

*Amicus* respectfully submits, however, that national-security implications should be considered when interpreting the Constitution, especially when such concerns were known to its Framers. For instance, Alexander Hamilton warned, "foreign powers" would "not be idle spectators" in American affairs: "They will interpose, the confusion will increase, and a dissolution of the Union ensue." Alexander Hamilton, *Speech at the Constitutional Convention*, *in* JAMES MADISON'S NOTES OF DEBATES IN THE FEDERAL CONVENTION (June 8, 1787). Hamilton elsewhere insisted that the Constitution must give "provident and judicious attention" to addressing "the desire in foreign powers to gain an improper ascendant in our councils." THE FEDERALIST NO. 68, at 412-13 (Alexander Hamilton) (Clinton Rossiter, ed. 1961).

Indeed, concerns about foreign influence provided powerful motivation to enshrine other constitutional protections. For instance, foreign influence motivated the express inclusion of an impeachment mechanism in the Constitution:

> [The Executive] may be bribed by a greater interest to betray his trust; and no one would say that we ought to expose ourselves to the danger of seeing the first Magistrate in foreign pay without being able to guard against by displacing him. One would think the King of England well secured against bribery. Yet Charles II was bribed by Louis XIV.

2 FARRAND'S RECORDS 68-69 (Gouverneur Morris). And the addition of the Foreign Emoluments Clause followed after Charles Pinckney had "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence." *Id.* at 389. The Constitution elsewhere provides that, in "guarantee[ing] to every State in this Union a Republican Form of Government," the United States would "protect each of them against Invasion." U.S. CONST. art. IV, § 4.

And as this Court has recognized, concerns about conflicting claims of allegiances have created real-world "problems for the governments involved." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971). The Citizenship Clause itself arose from a time when Congress and the Executive were focused on problems of dual nationality. For instance, the War of 1812 had been sparked by disputes between the United States and the United Kingdom over naval impressment of citizens that each sovereign claimed as its own. *See* ALEX COCKBURN, NATIONALITY OR THE LAW RELATING TO SUBJECTS AND ALIENS 70-79 (1869). Given this context, it is especially appropriate for requirements for U.S. citizenship in the Constitution to be read in harmony with concerns about national security

**B.** The EO's faithful reading of the Fourteenth Amendment's text is confirmed by the important national-security interests it serves. *See Trump v. New Jersey* Stay App. 5 (citing Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443 (Jan. 20, 2025)). Specifically, the EO tracks the reality that some illegal aliens enter the United States to engage in "hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and that such aliens "present significant threats to national security and public safety." Exec. Order No. 14,159, § 1. Concerns about illegal immigration and national security have long shaped federal policy. For instance, Congress passed the Immigration Reform and Control Act of 1986 a year after President Ronald Reagan described illegal immigration as a "threat to national security." James T. Kimer, *Landmarks in US Immigration Policy*, NACLA.org (Sept. 25, 2007), https://nacla.org/article/landmarks-us-

immigration-policy. Former Attorney General John Ashcroft likewise announced national-security reforms after the 9/11 hijackers were "easily able to avoid contact with immigration authorities and violate the terms of their visas with impunity." Attorney General Prepared Remarks on the National-Security Entry-Exit Registration System (June 6, 2002), https://www.justice.gov/archive/ag/speeches/2002/060502agpreparedremarks.htm. Other scholarship has explained that modern anti-illegal-alien enforcement policy is grounded in national security concerns. *See, e.g.*, Kevin J. Fandl, *Immigration Posses: U.S. Immigration Law and Local Enforcement Practices*, 34 J. Legis. 16, 18-20 (2008). The Constitution leaves room for Congress and the Executive Branch to respond to such threats with respect to geographically derived birthright U.S. citizenship. As explained below, the EO's national-security aims are consistent with the Constitution.

This Court has recognized national security as a governmental interest of the highest order. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010). And it has consistently ruled that national-security interests and constitutional rights form an interconnected framework of carefully balanced policy considerations regarding issues of immigration. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 702 (2018). By necessary implication, the EO affects such decisions because a child born to parents covered by the EO who then returns from abroad will have to seek admission as a non-citizen if and when he chooses to return to the United States. *See, e.g.*, *Dep't of State v. Munoz*, 602 U.S. 899, 907 (2024) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a

fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (cleaned up)). "Because decisions in these matters may implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive." *Hawaii*, 585 U.S. at 702 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).

Of course, an executive official invoking national security alone does not suffice; courts do not "abdicat[e] the judicial role" in the face of the executive asserting such an interest. *Humanitarian L. Project*, 561 U.S. at 34. Rather, the Court gives "respect" to the Government's conclusions regarding national security while maintaining the "obligation to secure the protection that the Constitution grants." *Id*. Importantly, the Court does not "substitute [its] own evaluation" of "serious threats to our Nation and its people." *Id*.

Here, the Executive has explained why the EO forms an integral part of President Trump's efforts to repair the American immigration system and respond to the urgent national-security crisis of unchecked migration at the Southern Border. *See* Exec. Order No. 14,159, § 1 (explaining that President Trump's immigration policy is designed to fight the threat to "national security and public safety" from unlawful immigration); *see also* Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 20, 2025); Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 20, 2025) (declaring a national emergency at the southern border); Proclamation No. 10,888, 90 Fed. Reg.

8333 (Jan. 20, 2025) (explaining the President's actions to protect the border under Article IV, Section 4 of the Constitution). Executing federal policy consistent with the correct reading of the Citizenship Clause is a key component of the President's national-security efforts because it removes incentives for unlawful immigration and closes loopholes that can be exploited by foreign adversaries. *See, e.g.*, *Trump v. New Jersey* Stay App. 36.

Notably, the EO addresses a vulnerability in citizenship derivation that is well-known to the intelligence community. *See generally Trump v. New Jersey* Stay App. 36. Birthright citizenship creates opportunities for dual loyalty that can be exploited by malign foreign actors to cultivate intelligence assets. Conferring U.S. citizenship at birth begins a long timeline that is difficult to track on an individual level, let alone counteract or prosecute if it materializes into criminal espionage activity.

From the standpoint of a foreign adversary, an individual who appears to be a citizen of the target country is an ideal intelligence asset. In the intelligence community, these assets known as "illegals" masquerade as American citizens when in fact they are not. Foreign actors deploy significant resources to create such assets, often by stealing or assuming another's identity. But that approach is costly and time-consuming for the foreign adversary, with attendant risks for detection and traceability. Well-publicized examples have come to light in recent years. For example, a network of 10 Russian sleeper agents, including Anna Chapman, was exposed in 2010 after a decade-long FBI investigation. *How the FBI Busted Anna Chapman*

*and the Russian Spy Ring*, ABC NEWS (Nov. 1, 2011), https://abcnews.go.com/blogs/politics/2011/11/how-the-fbi-busted-anna-chapman-and-the-russian-spy-ring. The program, known as the "Illegals Program," involved individuals living in the U.S. under deep cover for many years, using stolen identities to pose as ordinary citizens while gathering intelligence. *See* Kristin A. Vara, *Espionage: A Comparative Analysis*, 22 ILSA J. INT'L & COMP. L. 61, 68-70 (2015); *see also, e.g.*, Shaun Walker, *"I Thought I Was Smarter Than Almost Everybody": My Double Life as a KGB Agent*, THE GUARDIAN (Feb. 11, 2017), https://www.theguardian.com/world/2017/feb/11/thought-smarter-everybody-kgb-spy-jack-barsky (interviewing Jack Barsky, an ex-KGB spy who lived a double life in the U.S. under an assumed identity).

But birthright U.S. citizenship lets foreign adversaries avoid many of those pitfalls. With a round-trip plane ticket, a malign actor can send an expecting mother to the United States, receive mother and baby on return, indoctrinate and train the child, and then send the individual back to the United States to engage in espionage activity. That mechanism, for instance, stymies major advances in digital surveillance and biometric technologies that make it harder for undercover agents to remain anonymous and operate in the target country under a false identity. *See* Kevin P. Riehle, *Russia's Intelligence Illegals Program: An Enduring Asset*, 35 INTELLIGENCE & NAT'L SEC. 385, 386 (2020). Thus, with an extremely modest financial investment and the passage of time, a foreign adversary can use geographically derived birthright citizenship to create a nearly undetectable human intelligence asset

with no bonds of affection for his country of birth and carte blanche access to the United States. And as the example of Russia's "Illegals Program" shows, malign foreign actors are perfectly willing to make such long-term plays. *See, e.g.*, Riehle, *supra*, 386 ("Russian intelligence services remain proud of their intelligence illegals program, claiming it is an object of envy for Western intelligence services.").

The EO thus forms an important part of President Trump's efforts to improve national security. For example, many high-value foreign officials cannot travel without advance permission, and law enforcement at the U.S. border increases risks of apprehension for foreign adversaries seeking to infiltrate the country. *See, e.g.*, Walker, *supra* (describing the "complex passport switches and documents left via dead drop" necessary for a deep-cover Soviet spy to travel between the U.S. and Europe). The Executive has taken significant steps to secure the border and deter threats from unlawful immigration. *See, e.g.*, Exec. Order No. 14,159, § 1. And as noted in Part II, *infra*, the EO provides additional avenues for screening potential malign actors from entering the United States as non-citizens. *Cf. Hawaii*, 585 U.S. at 689 (describing the system for "vetting" aliens seeking admission to the United States). The EO not only removes an incentive for illegal immigration, it removes birthright citizenship as an attractive alternative for American adversaries seeking to easily cultivate intelligence assets.

## II.    National-Security Concerns Also Support the Executive in the Irreparable-Harm Analysis.

A stay is warranted lest national security and the separation of powers be jeopardized. When, as here, a stay has been denied by the lower courts, the burden

falls on the applicant to show that the equities favor a stay. *Beame v. Friends of the Earth*, 434 U.S. 1310, 1012 (1977) (Marshall, J., in chambers). The irreparable harm inquiry balances the injuries the respective sides might suffer, and the Circuit Court's conclusion regarding that balance "is entitled to weight and should not lightly be disturbed." *Williams v. Zbaraz*, 442 U.S. 1309, 1312 (1979) (Stevens, J., in chambers).

Denying a stay pending appeal threatens irreparable injury to the Executive and the public, whose interests "merge." *Nken*, 556 U.S. at 435. As the Executive argues, an injunction that prevents the President from carrying out his broad authority over and responsibility for immigration matters is an "improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Trump v. New Jersey* Stay App. 36 (quoting *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers)). The decisions below not to grant a stay are thus demonstrably incorrect.

Preserving Executive authority to function properly within the national-security and foreign-affairs realm is of the highest importance. *See Hawaii*, 585 U.S. at 704. "Judicial inquiry into the national-security realm raises concerns for the separation of powers by intruding on the President's constitutional responsibilities in the area of foreign affairs." *Id.* (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017)) (cleaned up). And there is a "heavy presumption of constitutionality to which a carefully considered decision of a coequal and representative branch of our Government is entitled." *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990) (cleaned up);

*see also Hawaii*, 585 U.S. at 704 ("Any rule of constitutional law that would inhibit the flexibility of the President to respond to changing world conditions should be adopted only with the greatest caution, and our inquiry into matters of entry and national security is highly constrained." (cleaned up)).

Granting citizenship to an individual is a profoundly consequential action of sovereignty—after all, "in the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens." *Reno v. Flores*, 507 U.S. 292, 305-06 (1993) (cleaned up). That distinction is perhaps no clearer than in cases touching on aliens and immigration. As this Court recognized in upholding other national-security Executive actions, "Congress designed an individualized vetting system that places the burden on the alien to prove his admissibility." *Hawaii*, 585 U.S. at 689. Rules governing the conferral of citizenship thus implicate the "vetting" of individuals who are or may become intelligence assets of a foreign adversary by virtue of advantageously derived U.S. citizenship. A stay helps alleviate the irreparable harm in interfering with such Executive functions.

Moreover, enjoining the EO can have serious foreign-affairs consequences regardless of the raw number of births involved or U.S. citizenships conferred while this case is litigated on the merits. The EO expresses President Trump's position on a matter of domestic policy with foreign-relations implications. It is beyond serious dispute that judicial action can have profound effects on foreign policy and the range of options available to the Executive in responding to national-security threats. *Cf.,*

*e.g.*, Timothy Meyer & Ganesh Sitaraman, *The National Security Consequences of the Major Questions Doctrine*, 122 MICH. L. REV. 55, 61, 80 (2023) ("Judicial action [in restraint of domestic Executive action] can thereby weaken the executive branch's hand on the international plane").

Courts are ill-suited to interfere with such matters of national security and foreign affairs, let alone remedy them. After all, "[u]nlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene*, 553 U.S. at 797. The Court has emphasized that "[i]t is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Matters like these, which involve complex national-security and foreign-affairs considerations, "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."

The United States should "speak with one voice" on matters affecting the nation's foreign affairs. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000). The President has "a unique role in communicating with foreign governments," as "only the Executive has the characteristic of unity at all times" that is necessary for diplomacy. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14, 21 (2015). While this Court has declined to recognize an unbounded Executive power

over foreign affairs in the face of contrary Congressional action, *see id.* at 20, the President here has chosen to exercise his authority in furtherance of the Constitution of the United States. A stay preserves the crucial "one voice" of the United States in matters of sovereignty and foreign affairs. Had Congress intended otherwise, it would be expected to "speak clearly" and indicate as much. *Cf., e.g.*, *Henderson v. Shinseki*, 562 U.S. 428, 436-38 (2011) (explaining that Congress would have cast a deadline in different language if it had intended the provision to be jurisdictional). Congress has not done so here.

## CONCLUSION

The Court should stay the district courts' orders enjoining the EO.

Respectfully submitted.

<table>
<tr>
<td>

Daniel Epstein
AMERICA FIRST
  LEGAL FOUNDATION
611 Pennsylvania Ave. SE
  #231
Washington, DC 20003

</td>
<td>

/s/ Judd E. Stone II
JUDD E. STONE II
  *Counsel of Record*
CHRISTOPHER D. HILTON
ARI CUENIN
STONE HILTON PLLC
600 Congress Ave., Ste. 2350
Austin, Texas 78701
judd@stonehilton.com
(737) 465-7248

*Counsel for Amicus Curiae*

</td>
</tr>
</table>

MARCH 2025