



**MEL JONES JR <jonesjrmel@gmail.com>**

---

## To: my VATO - California FELLOW native Californians {e.g. although I was NOT born in California ...but Colleen was}... PLEASE see the attached documents which GIVE RISE to [Gavin Newsom] respectfully being FULL OF CRAP with his "embellished and CUT FROM WHOLE CLOTH civil lawsuit against President Donald Trump...

1 message

---

**MEL JONES JR <jonesjrmel@gmail.com>**                                    Tue, Jun 10, 2025 at 2:19 PM
To: "mwolock@wolocklaw.com" <mwolock@wolocklaw.com>, Deborah Greenspan <deborah.greenspan@blankrome.com>,
"pnapoli_napolilaw.com" <pnapoli@napolilaw.com>, uri.s.fuchs@usdoj.gov, SupremeCtBriefs@usdoj.gov,
derek.l.weiss@usdoj.gov, Zeldin.Lee@epa.gov, mobrien@irli.org, chajec@irli.org, gcanaan@irli.org, gwv@dcglaw.com,
tmccotter@boydengray.com, daniel.epstein@aflegal.org, "jon@publicrightsproject.org" <jon@publicrightsproject.org>,
serviceS3@michigan.gov, giovanatiN@michigan.gov, Stacey.Metro@ag.ny.gov, Annabelle.Wilmott@doj.ca.gov,
Lorraine.Lopez@doj.ca.gov, Delbert.Tran@doj.ca.gov, zoe.levine@ag.ny.gov, Irina.Trasovan@doj.ca.gov,
"denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>,
"robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>,
"brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>, jgrayson@nmdoj.gov, molly.alarcon@sfcityatty.org,
"david.louk@sfcityatty.org" <david.louk@sfcityatty.org>, shannon.stevenson@coag.gov, ksadeck@riag.ri.gov,
jared.b.cohen@mass.gov, john.keller@ag.state.mn.us, johnsonkarpg@doj.state.wi.us, julio.thompson@vermont.gov,
dmosteller@ncdoj.gov, "jeremy.feigenbaum@njoag.gov" <Jeremy.feigenbaum@njoag.gov>, shankar.duraiswamy@njoag.gov,
Viviana.hanley@njoag.gov, shefali.saxena@law.njoag.gov, Elizabeth.walsh@law.njoag.gov, HStern@ag.nv.gov,
akirschner@oag.state.md.us, Janelle.Medeiros@ct.gov, PolicyOffice@epa.gov, EIS-Filing@epa.gov, education@epa.gov,
NEPAssisthelp@epa.gov, NEPA@epa.gov, eric.wessan@ag.iowa.gov, matt.rice@ag.tn.gov, nlindzen@corpfraudlaw.com,
sara.eisenberg@sfcityatty.org, MEL JONES JR <jonesjrmel@gmail.com>, Colleen Connors <CMColleen4@gmail.com>,
osedwick@lawyerscommittee.org, ecaspar@lawyerscommittee.org, csdubov@debevoise.com, ntsang@debevoise.com,
sdthomas@debevoise.com, jjpastore@debevoise.com, Laura.Faer@doj.ca.gov
Cc: Colleen Connors <CMColleen4@gmail.com>, "Acosta-Fox, Ashley" <AcostaFox.Ashley@epa.gov>,
"Marissa.Malouff@doj.ca.gov" <Marissa.Malouff@doj.ca.gov>, "vanessa.kassab@delaware.gov"
<vanessa.kassab@delaware.gov>, "kaliko.d.fernandes_hawaii_gov" <kaliko.d.fernandes@hawaii.gov>,
"jeremy.feigenbaum@njoag.gov" <jeremy.feigenbaum@njoag.gov>, "harris19@michigan.gov" <harris19@michigan.gov>,
"eng.connie@epa.gov" <eng.connie@epa.gov>, "egle-nondiscriminationCC@michigan.gov" <egle-
nondiscriminationCC@michigan.gov>, "Cormack, Hayley" <Cormack.Hayley@epa.gov>, "EGLE-Accessibility@michigan.gov"
<EGLE-Accessibility@michigan.gov>, "Faltin, Todd (he/they)" <Faltin.Todd@epa.gov>, "Oviedo, Luis"
<oviedo.luis@epa.gov>, "MacMillan-Sanchez, Ariel (she/her/hers)" <MacmillanSanchez.Ariel@epa.gov>, "Johnson, Johahna
(she/her/hers)" <Johnson.Johahna@epa.gov>, "Mason, Trinita" <Mason.Trinita@epa.gov>, "Moore, Tammy"
<moore.tammy@epa.gov>, "Walts, Alan (he/him/his)" <walts.alan@epa.gov>, Deborah Greenspan
<deborah.greenspan@blankrome.com>, "Risley, David" <Risley.David@epa.gov>, "tmlewis@cityofflint.com"
<tmlewis@cityofflint.com>, "cmcgehee@pittlawpc.com" <cmcgehee@pittlawpc.com>, "eric.a.rey@usdoj.gov"
<eric.a.rey@usdoj.gov>, "Jason.T.Cohen@usdoj.gov" <Jason.T.Cohen@usdoj.gov>, "OIG_Hotline@epa.gov"
<OIG_Hotline@epa.gov>, Corey <cstern@levylaw.com>, Patrick Lanciotti <PLanciotti@napolilaw.com>,
"dpettway@cityofflint.com" <dpettway@cityofflint.com>, "saneeley@cityofflint.com" <saneeley@cityofflint.com>,
"mbard@cityofflint.com" <mbard@cityofflint.com>, "michelle.t.domingue.II@usdoj.gov" <michelle.t.domingue.II@usdoj.gov>,
"Kaplan, Robert (he/him/his)" <kaplan.robert@epa.gov>, Mel jones jr <meljonesjr@gmail.com>, "marianne.f.kies@usdoj.gov"
<marianne.f.kies@usdoj.gov>, "daniel.c.eagles@usdoj.gov" <daniel.c.eagles@usdoj.gov>, "kuhlr@michigan.gov"
<kuhlr@michigan.gov>, "gambilln@michigan.gov" <gambilln@michigan.gov>, "MitosinkaA@michigan.gov"
<MitosinkaA@michigan.gov>, gaiello@mayerbrown.com" <gaiello@mayerbrown.com>, "jkuptz@cityofflint.com"
<jkuptz@cityofflint.com>, "dfaraci@campbell-trial-lawyers.com" <dfaraci@campbell-trial-lawyers.com>, "alin@eisnerlaw.com"
<alin@eisnerlaw.com>, "ccmushatt@cityofflint.com" <ccmushatt@cityofflint.com>, "heidy.gonzalez@usdoj.gov"
<heidy.gonzalez@usdoj.gov>, AG attorney as to MI COC civil case #23-000115-MZ <bettenhausenm@michigan.gov>,
robinsonr11 <robinsonr11@michigan.gov>, Justus Brown <jubrown@cityofflint.com>, Kameshia Ar-Rahmaan <kar-
rahmaan@cityofflint.com>, Davina Donahue <ddonahue@cityofflint.com>, City of Flint Clerk's Office
<cityclerk@cityofflint.com>, Davina Donahue <CouncilPublicComment@cityofflint.com>, "trachelleyoung@gmail.com"
<trachelleyoung@gmail.com>, Ladel Lewis <llewis@cityofflint.com>, Judy Priestley <jpriestley@cityofflint.com>, Tonya
Burns <tburns@cityofflint.com>, Mark Cuker <mark@cukerlaw.com>, "michael.l.williams@usdoj.gov"
<michael.l.williams@usdoj.gov>, "molsen@mayerbrown.com" <molsen@mayerbrown.com>, "jcampbell@campbell-trial-

lawyers.com" <jcampbell@campbell-trial-lawyers.com>, "mnguyen-dang@mayerbrown.com" <mnguyen-dang@mayerbrown.com>, "pnapoli_napolilaw.com" <pnapoli@napolilaw.com>, Renee Auten <rauten@thelandbank.org>, Jennifer Riggs <jriggs@thelandbank.org>, Jeremy Maltz <jeremy@lehotskykeller.com>, "hammoudf1@michigan.gov" <HammoudF1@michigan.gov>, Michigan Attorney General <miag@michigan.gov>, "dweyre@mcalpinepc.com" <dweyre@mcalpinepc.com>, "g@mayerbrown.com" <g@mayerbrown.com>, "ljiang@susmangodfrey.com" <ljiang@susmangodfrey.com>, mpitt <mpitt@pittlawpc.com>, Hunter Shkolnik <hunter@napolilaw.com>, "arosenman@mayerbrown.com" <arosenman@mayerbrown.com>, Theodore Leopold <tleopold@cohenmilstein.com>, Emmy Levens <elevens@cohenmilstein.com>, Flint Mayor <mayor@cityofflint.com>, "frank.bednarz@hlli.org" <frank.bednarz@hlli.org>, "ted.frank@hlli.org" <ted.frank@hlli.org>, Diane <russell.diane@epa.gov>, Amanda Trujillo <atrujillo@cityofflint.com>, "King-Piepenbrok, Pier (AG)" <KingP1@michigan.gov>, "jonhoma@sinasdramis.com" <jonhoma@sinasdramis.com>, "val@vlwlegal.com" <val@vlwlegal.com>, "sdg@miller.law" <sdg@miller.law>, "sparadise@eisnerlaw.com" <sparadise@eisnerlaw.com>, "echeverria.marietta@epa.gov" <echeverria.marietta@epa.gov>, "thompkins.anita@epa.gov" <thompkins.anita@epa.gov>, "burneson.eric@epa.gov" <burneson.eric@epa.gov>, "travers.david@epa.gov" <travers.david@epa.gov>, "waters.tom@epa.gov" <waters.tom@epa.gov>, "davis.angela@epa.gov" <davis.angela@epa.gov>, "robert.c.merritt@usdoj.gov" <robert.c.merritt@usdoj.gov>, "brad.rosenberg@usdoj.gov" <brad.rosenberg@usdoj.gov>, "denise.levey@doj.ca.gov" <denise.levey@doj.ca.gov>, "gerard.cedrone@mass.gov" <gerard.cedrone@mass.gov>, "nicole.hill@dc.gov" <nicole.hill@dc.gov>, "david.louk@sfcityatty.org" <david.louk@sfcityatty.org>, nlindzen@corpfraudlaw.com, franklmcnamara@gmail.com, mriordan@publicinterestlegal.org, eric.hamilton@usdoj.gov, "ryan@mclanelaw.com" <ryan@mclanelaw.com>, Zeldin.Lee@epa.gov, zoe.levine@ag.ny.gov, Sedalia.JonesKennelly@blankrome.com, rick.brooks@blankrome.com, steven.ury@seiu.org, MEL JONES JR <jonesjrmel@gmail.com>
Bcc: UrbanForestNewYork@gmail.com, Mel jones jr <meljonesjr@gmail.com>

# June 10th, 2025

## To: California AG (Rob Bonta)

RE: *{....and FYI with the current riotous insurrection/ LA Mexican illegal immigrant RIOTS - uprising in the State of California... which the civilian authorities have INVITED due to the state of California's [UNLAWFUL] SANCTUARY - STATE and sanctuary - city/ Los Angeles which violates Federal Law and the 14th amendment and OTHER federal laws and is discriminatory and [a]n uprising/ act of "war" against BOTH (pro se appellants in #25-1158 {i.e. Colleen Connors and [me] disabled teddy bear -Melvin Jones Jr. ... how can we return to California to have FUN IN THE SUN at the BEACH ???})*:

*Good afternoon,*
*Ok... ok, from [one] Californian to another ....*
*[we] get it; California Governor Gavin Newsom*
*IS NO PUNK BITCH.*

6/10/25, 2:20 PM Gmail - County VATO 00 California 9 FELLOW native Californians {e.g. although I was NOT born in California...but Colleen was}...PLE…

Case 25-1158 Document 061-8299014 Page: 3 Date Filed: 06/10/2025 Entry ID: 6737691

*But "bro"... come on ---* <u>To: my VATO {e.g. the current AG of California [Rob Bonta] who has a cool "hair-style"}</u>...

<u>Oh come on ---- "get your client CA. Gov. Gavin Newsome under control... [he] is spewing A LOT of media spin... which CANNOT [and] WILL NOT help your client's RECENTLY filed civil {obstructionist} lawsuit.... so to - California FELLOW native VATO Californians {e.g. although I was NOT born in California ...but Colleen was}... PLEASE see the attached documents which GIVE RISE to [Gavin Newsom] respectfully being FULL OF CRAP with his "embellished and CUT FROM WHOLE CLOTH civil lawsuit against President Donald Trump</u>:

6/10/25, 2:22 PM    Gmail - County of California - FOLLOW native Californians {e.g., although it was "not found in California..." only Colleen was)...FILE...

Case 3:25-cv-04870    Document 1    Filed 06/09/25    Page 1 of 22

1    **ROB BONTA**
     Attorney General of California
2    MARISSA MALOUFF
     JAMES E. STANLEY
3    Supervising Deputy Attorneys General
     NICHOLAS ESPÍRITU
4    LUKE FREEDMAN
     ROBIN GOLDFADEN
5    BRENDAN M. HAMME
     LORRAINE LOPEZ
6    KENDAL MICKLETHWAITE
     MEGAN RICHARDS
7    Deputy Attorneys General
     LAURA L. FAER
8    Acting Senior Assistant Attorney General
       1515 Clay St.
9    Oakland, CA 94612
     Telephone: (510) 879-3304
10   E-mail: Laura.Faer@doj.ca.gov
     *Attorneys for Plaintiffs*

11

12            IN THE UNITED STATES DISTRICT COURT

13           FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16

17   **GAVIN NEWSOM**, IN HIS OFFICIAL
     **CAPACITY AS GOVERNOR OF THE STATE OF**
     **CALIFORNIA; STATE OF CALIFORNIA,**      NO.

18

                           Plaintiffs,    **COMPLAINT FOR DECLARATORY**
19                                     **AND INJUNCTIVE RELIEF**

20          v.                       Date:
                                       Time:
21   **DONALD TRUMP**, IN HIS OFFICIAL      Courtroom:
     **CAPACITY AS PRESIDENT OF THE UNITED**   Judge:
22   **STATES; PETE HEGSETH**, IN HIS OFFICIAL   Trial Date:

//





**PRESS RELEASE**

# Operation Guardian Angel Launched to Neutralize California's Sanctuary State Policies that Protect Criminal Illegal Aliens

Monday, May 19, 2025

**For Immediate Release**

U.S. Attorney's Office, Central District of California

*LOS ANGELES* – The United States Attorney's Office along with its federal law enforcement partners today announced the launch of Operation Guardian Angel, a program that seeks to neutralize California's sanctuary state policy and protect Americans from criminal illegal aliens incarcerated in county jails by issuing federal arrest warrants for them.

The Central District of California – comprised of the counties of Los Angeles, Orange, Riverside,

….which is to say  ---- being CALIFORNIA CUTE is NOT the answer here.   Plus, even in my disabled - Flint Water Crisis affected condition…. [I/ disabled Teddy Bear Melvin Jones Jr.] am MORE cute than BOTH - California AG ROB BONTA and

6/10/25, 2:25 PM    Gmail - Could my GATO U California's BELOW native Californians {e.g. although I was not born in California...} my Colleen was y...GRE...

Case 25-1158   Document 06-18298014   Page 6   Date Filed 06/10/2025   Entry ID 6737691

CA Governor Gavin Newsom.      .

and --- here is a song for it *{....and FYI with the current riotous insurrection/ LA Mexican illegal immigrant RIOTS - uprising in the State of California... which the civilian authorities have INVITED due to the state of California's [UNLAWFUL] SANCTUARY - STATE and sanctuary - city/ Los Angeles which violates Federal Law and the 14th amendment and OTHER federal laws and is discriminatory and [a]n uprising/ act of "war" against BOTH (pro se appellants in #25-1158 {i.e. Colleen Connors and [me] disabled teddy bear - Melvin Jones Jr. ... how can we return to California to have FUN IN THE SUN at the BEACH ???})}*:

6/10/25, 2:22 PM Gmail - County of CATO to California's FELLOW native Californians {e.g. although I was not I buried in California. Daily Colleen was}...



**Tierra - Together**



**Soulman70**
40.7K subscribers

Subscribe

👍 16K | 👎 | ➦ Share | •••

https://youtu.be/BD2WrG5723c?feature=shared

*Thank you.*
*Best,*

*/s/*

*Disabled teddy bear/* **Melvin Jones**

**Jr***./ - Flint Water Crisis Claimant* 

*email:* *jonesjrmel@gmail.com*

**1935 Hosler St.**

**Flint, Michigan 48503**

**2 attachments**

6/10/25, 2:22 PM  Gmail - County of California - FELLOW native Californians {e.g. although I was born Raised in California...Daily Colleen was... FLE...



**ECF 1 - Complaint NG.pdf**
372K

**Central District of California _ Operation Guardian Angel Launched to Neutralize California's Sanctuary State Policies that Protect Criminal Illegal Aliens _ United States Department of Justice.pdf**
339K

6 . 10 . 2025

Colleen Connops

Melvin Jones Jr.

See the Next page



**PRESS RELEASE**

# Operation Guardian Angel Launched to Neutralize California's Sanctuary State Policies that Protect Criminal Illegal Aliens

Monday, May 19, 2025

**For Immediate Release**

U.S. Attorney's Office, Central District of California

*LOS ANGELES* – The United States Attorney's Office along with its federal law enforcement partners today announced the launch of Operation Guardian Angel, a program that seeks to neutralize California's sanctuary state policy and protect Americans from criminal illegal aliens incarcerated in county jails by issuing federal arrest warrants for them.

The Central District of California – comprised of the counties of Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, and Ventura – is home to an estimated 1.5 million illegal aliens. Among this population are gang members and other dangerous felons.

The operation will file complaints and arrest warrants to allow federal law enforcement to take as many defendants as possible into custody from state jails. The program, which began May 10, has resulted in the arrest of 13 defendants as of May 15. Those numbers are expected to grow.

"Even the worst criminal aliens in state custody are frequently released into the community because California's sanctuary state policies block cooperation with federal law enforcement," said United States Attorney Bill Essayli. "These laws effectively render federal immigration

detainers meaningless. The days of giving criminal illegal aliens a free pass are over. While California may be presently disregarding detainers, it cannot ignore federal arrest warrants."

The danger to the community of state protection of criminal illegal aliens could not be starker. In February 2025, José Cristian Saravia-Sánchez, 30, of Mexico, shot and killed an Inglewood man who tried to stop him from stealing a catalytic converter. Despite the fact he was an illegal alien who had been convicted of vehicle theft, was removed from the United States in 2013, and had been arrested 11 times between June 2022 and August 2024, local law enforcement was prevented by state law from complying with an immigration detainer request.

The goal of Operation Guardian Angel is to neutralize – as far as possible – California's sanctuary state policy and make our community safer.

## Contact

Ciaran McEvoy
Public Information Officer
[ciaran.mcevoy@usdoj.gov](mailto:ciaran.mcevoy@usdoj.gov)
(213) 894-4465

*Updated May 19, 2025*

## Topic

**IMMIGRATION**

## Component

[USAO - California, Central](#)

Press Release Number: 25-146

# Related Content

**PRESS RELEASE**

## Federal Prosecutors Charge 34 Defendants This Week with Being Illegal Aliens Found in the United States Following Removal

Working alongside law enforcement partners at United States Immigration and Customs Enforcement, federal prosecutors filed criminal charges against 34 defendants this week who allegedly were found in the U.S. following...

May 9, 2025

**PRESS RELEASE**

## Prosecutors in CDCA Charge 45 Defendants with Being Illegal Aliens in U.S. Following Removal – a 3,755% Increase from Previous Year

Federal prosecutors in the Central District of California this week criminally charged 45 defendants who allegedly illegally re-entered the United States following removal, bringing the total number of defendants charged...

May 1, 2025

**PRESS RELEASE**

## CDCA Federal Prosecutors This Week Charge 32 Defendants with Being Illegal Aliens Reentering the United States Following Removal

Working alongside law enforcement partners at United States Immigration and Customs Enforcement, federal prosecutors in the Central District of California this week filed criminal charges against 32 defendants who allegedly...

April 25, 2025

## Central District of California

312 N. Spring St. Suite 1200

Los Angeles, CA 90012

Phone: (213) 894-2400

Fax: (213) 894-0141

**ROB BONTA**
Attorney General of California
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
Deputy Attorneys General
LAURA L. FAER
Acting Senior Assistant Attorney General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3304
  E-mail:  Laura.Faer@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | NO.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge:<br>Trial Date:<br>Action Filed: |

1

**INTRODUCTION**

1.    The Governor of the State of California and the State of California bring this action to protect the State against the illegal actions of the President, Secretary of Defense, and Department of Defense to deploy members of the California National Guard, without lawful authority, and in violation of the Constitution.

2.    One of the cornerstones of our Nation and our democracy is that our people are governed by civil, not military, rule. The Founders enshrined these principles in our Constitution— that a government should be accountable to its people, guided by the rule of law, and one of civil authority, not military rule.

3.    President Trump has repeatedly invoked emergency powers to exceed the bounds of lawful executive authority. On Saturday, June 7, he used a protest that local authorities had under control to make another unprecedented power grab, this time at the cost of the sovereignty of the State of California and in disregard of the authority and role of the Governor as commander-in-chief of the State's National Guard.

4.    The vehicle the President has sought to invoke for this unprecedented usurpation of state authority and resources is a statute, 10 U.S.C. § 12406, that has been invoked on its own only once before and for highly unusual circumstances not presented here. Invoking this statute, the President issued a Memorandum on June 7, 2025 (Trump Memo), "call[ing] into Federal service members and units of the National Guard." Secretary of Defense Hegseth, in turn, issued a Memorandum (DOD Order) that same day to the Adjutant General of California, ordering 2,000 California National Guard members into federal service. And on June 9, 2025, Secretary Hegseth issued another Memorandum (June 9 DOD Order) ordering an additional 2,000 California National Guard members into federal service.

5.    These orders were issued despite the text of section 12406, which, among other things, requires that when the President calls members of a State National Guard into federal service pursuant to that statute, those orders "shall be issued through the governors of the States." 10 U.S.C. § 12406. Instead, Secretary Hegseth unlawfully bypassed the Governor of California, issuing an order that by statute must go through him.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

6.    As a result, the National Guard has been deployed to Los Angeles. And now, on top of the National Guard, Defendants are reportedly also deploying Marines to the area.

7.    The President's federalization and deployment of the National Guard for reasons not authorized by law and without input from or consent of the Governor contravenes core statutory and constitutional restrictions. Use of the regular armed forces is similarly unlawful here.

8.    The Constitution reserves to the States power over their respective state militias— now the National Guard— unless the State requests or consents to federal control. Only under the most exigent of circumstances can the President, over the objections of a State, call the National Guard into federal service. The balance the Framers struck between the State's power to control its own militia and the very narrow circumstances in which the federal government may take command and control of the militia serves as a vital check against federal overreach. Section 12406 does not provide the authority Defendants have claimed and cannot be the vehicle for their actions.

9.    The Constitution grants the States—not the federal Executive—the authority to conduct ordinary law enforcement activities and to determine how their own state laws should be enforced.

10.    Reflecting the Founders' distrust of military rule, the U.S. Constitution and the laws of our Nation strictly limit the domestic use of the military, including the federalized National Guard. The Posse Comitatus Act codifies these strict rules, prohibiting the military from engaging in civil law enforcement unless explicitly authorized by law. The authority to use the military domestically for civil law enforcement is reserved for dire, narrow circumstances, none of which is present here. Defendants have overstepped the bounds of law and are intent on going as far as they can to use the military in unprecedented, unlawful ways.

11.    It appears that the Trump Administration intends to treat section 12406 as a mechanism to evade these time-honored constitutional limits. But the statute provides no such authority. This Court should reject the unlawful attempt by Defendants to wrest away the State's control of its own National Guard for improper and unjustified ends.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**JURISDICTION AND VENUE**

12. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the California Attorney General and the State of California have offices at 455 Golden Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore reside in this district, and no real property is involved in this action. This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

14. Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiffs maintain offices in the District of San Francisco.

**PARTIES**

15. Plaintiff Gavin Newsom is the Governor of the State of California. In his capacity as Governor, Governor Newsom is the Commander-in-Chief of the California National Guard. Cal. Const., art. V, § 7.

16. Attorney General Rob Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11, 12600-12; see *Pierce v. Superior Court*, 1 Cal. 2d 759, 761-62 (1934) (The Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").

17. Defendant Donald Trump is the President of the United States. In his official capacity as such, he issued a Memorandum on June 7, 2025, directing the federalization of the National Guard. He is the Commander-in-Chief of the United States' armed forces, including the National Guard when under federal control. He is sued in his official capacity.

18. Defendant Peter Hegseth is the Secretary of Defense and head of the Department of Defense. On June 7 and June 9, 2025, Secretary Hegseth issued Memoranda ordering California National Guard members into federal service. He is sued in his official capacity.

19.  Defendant U.S. Department of Defense (DOD) is a department of the executive branch of the United States government, responsible for coordinating the activities of the United States' armed forces, including the National Guard when under federal control.

20.  Defendant U.S. Department of Defense and Defendant Hegseth shall collectively be referred to as the "DOD Defendants."

## FACTS

**A.    Immigration Raids Give Rise to Protests**

21.  On Friday, June 6, 2025, Immigration and Customs Enforcement (ICE) officers carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles. According to news reports that rely on statements from the Department of Homeland Security, ICE officers were executing search warrants at various locations, including outside Ambiance Apparel, a clothing wholesaler. ICE reportedly also carried out enforcement activities that included detentions and arrests at a doughnut shop in the Fashion District of downtown Los Angeles and two Home Depot stores in the Westlake District in Los Angeles.

22.  Prior to the ICE operations, federal officials did not provide the leadership of the Los Angeles Sheriff's Department (LASD) or Los Angeles Police Department (LAPD) with any notice as to the planned operations or otherwise attempt to coordinate activities to protect the safety of the public.

23.  During the course of these operations, ICE and its agents reportedly took actions that inflamed tensions and provoked protest. On information and belief, agents engaged in military-style operations while conducting these detentions and arrests that sparked panic in the community. For example, in some instances, ICE agents were reportedly observed sealing off entire streets around targeted buildings and using unmarked armored vehicles equipped with paramilitary gear.

24.  In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and 70-80 people detained in total.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25.  That same day, members of the public gathered in protest at the Edward R. Roybal Federal Building and U.S. Courthouse. This building, located at 255 E. Temple St., Los Angeles, CA 90012, includes a detention facility known as "B-18." On information and belief, protestors gathered at this location based on reports that individuals who were detained during the ICE operations were being held there. Protesters also gathered at other locations where ICE operations were reportedly happening, including in the City of Paramount, a city in Los Angeles County.

26.  While not unified in their views or tactics, most protesters seem to have gathered to express their opposition to the manner in which the Trump Administration has executed its immigration agenda and to express solidarity with and concern for the individuals and families most directly impacted by the enforcement actions taking place in their community.

27.  During the protests, Service Employees International Union California leader David Huerta was injured in the midst of interactions with federal agents. He was arrested, treated at a nearby hospital, and then detained. Federal authorities have alleged that Mr. Huerta was obstructing federal agents' access to a worksite where they were executing a warrant, while in contrast, Union representatives have reported that Mr. Huerta was detained while exercising his First Amendment right to observe and document law enforcement activity. The arrest of Mr. Huerta, who remains detained as of the date of filing, led to further upset in the community.

28.  Protests continued on June 7, and June 8, 2025.

29.  Most of those involved in protesting have been exercising their rights under the First Amendment in a peaceful, non-violent, and legally compliant manner. There have no doubt been exceptions. News reports have shown some individuals in the midst of these protests breaking the law and acting violently, for example by throwing objects at law enforcement officers and damaging property, including by setting fires. State and local law enforcement agencies have responded to such actions, and Governor Newsom and other state and local officials have unequivocally condemned such conduct and called for the prosecution of such law breaking.

30.  At no point in the past three days has there been a rebellion or an insurrection. Nor have these protests risen to the level of protests or riots that Los Angeles and other major cities

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

have seen at points in the past, including in recent years. The protests and unrest of the past three

days pale in comparison to a host of examples, including the time when the National Guard was

last federalized for riot control – in 1992, at the then-Governor's request, during the "Rodney

King riots." That unrest involved thousands of people across Los Angeles County, resulting in

multiple shootouts, over sixty deaths, thousands of people injured, and more than 12,000 arrests.

**B.    Local Authorities Quickly Respond and Are Able to Control and Manage Conditions**

31.  Both the Los Angeles Police Department (LAPD) and Los Angeles Sheriff

Department (LASD) have substantial training and experience responding to protests and large-

scale riots. The last instance in which it was determined there was need or want for the

intervention of federal authorities occurred in 1992, in the above-described circumstances that

stand in sharp contrast to the events that commenced on June 6.

32.  LAPD and LASD have been responding promptly, professionally, and effectively to

the events unfolding in the City and County. Officers from both Departments have been on the

ground, actively enforcing the law, issuing and enforcing orders to disperse, and protecting public

safety and property as well as federal personnel.

33.  In the afternoon of June 6, 2025, some time after protesters had gathered near the

Roybal Federal Building and its "B-18" detention facility, federal agents sent a request to LAPD

for assistance. Within an hour, assistance from LAPD arrived on the scene and began

coordinating their officers to address the situation with the protesters.

34.  LAPD would have responded sooner had federal officials coordinated with LAPD

prior to engaging in the enforcement actions. Federal officials did not, and as a result LAPD was

unable to proactively plan for the potential incidents, for example by pre-positioning resources,

and it was not positioned to immediately deploy appropriate staffing and equipment.

35.  Around 7:50 p.m., LAPD declared an unlawful assembly in the area of the protest

site, at the intersection of Alameda and Temple Streets, and it issued an order for the protesters to

disperse or be arrested.

36.  By approximately 8:00 p.m., the crowd started to disperse, with LAPD officers

blocking their path back to the B-18 detention center.

37.  A few hours later, LAPD received a report that another crowd had gathered outside of a parking lot in Chinatown. The group dispersed as federal agents established a perimeter.

38.  ICE immigration enforcement activity continued the next day, Saturday, June 7.

39.  Protests continued in the City of Los Angeles that were by all accounts peaceful.

40.  The LAPD issued a statement that night that "demonstrations across the City of Los Angeles remained peaceful," and commended those who exercised their First Amendment rights responsibly.

41.  Earlier in the day, outside the City, but within the County of Los Angeles, there were other protests. At approximately 10:15 a.m., personnel from LASD responded to the 6400 Block of Paramount Boulevard in Paramount, CA, following reports of a large crowd gathering in the area and obstructing traffic.

42.  Upon arrival, LASD deputies observed the presence of federal law enforcement officers and a significant number of individuals gathering to protest. Federal officials did not give LASD any forewarning of any of the planned operations in that area, or otherwise attempt to coordinate activities.

43.  LASD positioned its officers around the intersection of Alondra Boulevard and Atlantic Avenue, and deployed less-lethal weapons.

44.  At approximately 4:00 p.m., LASD declared an unlawful assembly and instructed individuals to leave the area or be arrested. Officers shot tear gas canisters into the crowd and protesters retreated.

45.  By 7:00 p.m., approximately 100 protesters had gathered on the other side of the 710 Freeway near Atlantic Avenue and Alondra Boulevard.

46.  At about 9:30 p.m. a line of LASD deputies and vehicles began moving toward the crowd, forcing them back, and by midnight, most of demonstrators began to leave.

47.  LASD's standard practice is to call in assistance from other local agencies, such as sheriff's departments from neighboring counties, and then for direct aid from state agencies when LASD determines that it cannot handle a situation. These two steps would be done before a

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

request for federal assistance would be made. But LASD did not need and did not request the assistance of other agencies to gain control of the protests.

48.  Governor Newsom has also taken steps to ensure that the State itself is actively providing support, in close coordination with the City and County, and there are no unmet needs from local law enforcement. Local law enforcement agencies have not requested any assistance, but if they were to do so, the State is more than prepared to meet any needs that may arise. As an example, on June 6 and June 7, the State deployed additional California Highway Patrol personnel to maintain safety and order on Los Angeles highways.

49.  ICE continues to carry out immigration enforcement, including in Los Angeles County.

## C.   Without Consent or Even Official Notice to the Governor, the President Federalizes the National Guard

50.  Early on Saturday, June 7, Border Czar Tom Homan stated "Mayor [Karen] Bass should be thanking us. She says they are going to mobilize—guess what? We are already mobilizing. We are going to bring the National Guard in tonight."

51.  Over the course of the day, the Department of Defense (DOD) did not communicate directly with the Governor's Office regarding any planned activation and deployment of California National Guard members.

52.  At no time prior to issuing the memorandum to federalize the California National Guard troops did the DOD seek approval from Governor Newsom to utilize California's National Guard to protect federal agents and federal property, or otherwise notify or seek concurrence from the Governor or his office regarding the planned mobilization of the National Guard.

///

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

53.  At 5:13 p.m. on June 7, the Governor communicated unequivocally and publicly on social media that he disapproved of the federal government's plans, which were unnecessary because "there is currently no unmet need," and which would be counterproductive because it would "only escalate tensions" and "erode public trust":

**Governor Gavin Newsom** ✔
@CAgovernor

The federal government is moving to take over the California National Guard and deploy 2,000 soldiers. That move is purposefully inflammatory and will only escalate tensions.

LA authorities are able to access law enforcement assistance at a moment's notice. We are in close coordination with the city and county, and there is currently no unmet need.

The Guard has been admirably serving LA throughout recovery.

This is the wrong mission and will erode public trust.

5:13 PM · Jun 7, 2025 · **7.4M** Views

54.  On the evening of June 7, President Trump issued a memorandum entitled "Department of Defense Security for the Protection of Department of Homeland Security Functions" (the Trump Memo). The Trump Memo does not identify the Los Angeles protests, the State, or any specific geographic region by name, but instead refers to "[n]umerous incidents of violence and disorder" that "have recently occurred and threaten to continue in response" to ICE enforcement of federal immigration laws and to threats to the security of federal immigration detention facilities and other federal property. The Trump Memo also states that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."

55.  The Trump Memo states: "In light of these incidents and credible threats of continued violence, by the authority vested in me as President by the Constitution and the laws of the United

States of America, I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations."

56. The Trump Memo further directs the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority." The Trump Memo specifies that the members and units called into federal services "shall be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense." Finally, the Trump Memo authorizes personnel to "perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property."

57. The provision cited by President Trump for his authority to take this step—section 12406—states that:

Whenever—

(1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

(3) the President is unable with the regular forces to execute the laws of the United States;

The President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1 | 10 U.S.C. § 12406.

2 | 58. This is only the second time in our nation's history that a President has relied on the

3 | exclusive authority of this provision to federalize the National Guard. The first was President

4 | Richard Nixon when he called upon the National Guard to deliver the mail during the 1970 Postal

5 | Service Strike. This is also the first time since 1965—when President Johnson sent troops to

6 | Alabama to protect civil rights demonstrators, under different federal authority—that a president

7 | has activated a State's National Guard without a request from the State's Governor.

8 | 59. Later in evening of June 7, Secretary Hegseth sent a memorandum (the "DOD

9 | Order") to the Adjutant General of California, who leads the California National Guard but also

10 | holds a federal commission as a reserve of the United States Army. Secretary Hegseth attached

11 | the Trump Memo and called into federal service 2,000 members of the California National Guard

12 | for a period of 60 days.

13 | 60. The Adjutant General subsequently shared the DOD Order with the Governor's

14 | Office; however, at no time did the Governor or his Office provide consent to the mobilization or

15 | issue orders through the Governor mobilizing the Guard members.

16 | 61. Shortly thereafter on the same evening, the Adjutant General relinquished command

17 | of the 79th Infantry Brigade Combat Team to General Gregory M. Guillot, commander of U.S.

18 | Northern Command (USNORTHCOM). Since that time, all orders issued to this unit have come

19 | from USNORTHCOM.

20 | 62. The service members of the 79th Infantry Brigade Combat Team come from across

21 | California. Many members are based in San Diego, but other members have individual residences

22 | throughout the State, and the 79th has subordinate units based in various parts of the state,

23 | including Richmond, California.

24 | 63. When the 300 deployed California National Guard troops and armored vehicles began

25 | arriving in Los Angeles on Sunday morning, the city was quiet. The local police and sheriff's

26 | departments had addressed any disturbances up to that point.

27 | 64. On June 8, the Governor's Office sent a letter to Secretary Hegseth objecting to the

28 | federalization and deployment of California National Guard troops to Los Angeles and requesting

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

that DOD rescind its order. The letter also reiterated that local law enforcement is more than capable of responding to the situation in Los Angeles and had taken robust action to protect federal facilities and maintain order.

65.  On June 9, 2025, Secretary Hegseth issued a second memorandum (June 9 DOD Order) ordering the federalization of 2,000 additional California National Guard members. Once again, this order was not issued through the Governor and did not provide any opportunity for the Governor to review or consent.

66.  While the face of the Defendants' orders purport to direct the deployment of the federalized National Guard members to protect federal property and federal personnel carrying out their functions, these directives are phrased in an ambiguous manner and suggest potential misuse of the federalized National Guard. It is unclear what actions Secretary Hegseth will deem as "reasonably necessary to ensure the protection and safety of Federal personnel and property." Among other concerns, the lengthy duration of the deployment (60 days) and location (not just where protests are occurring, but where they are "likely" to occur) indicate that the National Guard may be compelled to accompany immigration enforcement on its missions in any location with potentially dissenting residents.

67.  Defendants have already made clear their intention to expand the use of these National Guard members to effectuate interior civil immigration enforcement activities normally conducted by civil immigration law enforcement officers. For example, on the evening of June 8, President Trump issued a statement on social media purporting to direct DOD and other federal agencies to "take all action necessary to liberate Los Angeles from the Migrant Invasion[.]" And he informed the media: "We're going to have troops everywhere."

68.  Already, fear and terror are spreading in communities across California as a result of Defendants' actions. And, as predicted by Governor Newsom and other state and local leaders, the deployment of the National Guard seems to have only heightened tensions with protesters and residents in Los Angeles.

**D.    Defendants' Mobilization of California's National Guard Members Usurps the Authority of the Governor and Harms the State of California**

69.  Defendants' actions unlawfully activating 4,000 California National Guard members into federal service directly infringes on Governor Newsom's proper role of Commander-in-Chief of the California National Guard. Cal. Const. art. V, § 7; U.S. Const. art. I, §§ 8, cls. 15-16; amend. X.  Except when the State's militia has been lawfully called into federal service, the Governor maintains command and control of the militia.

70.  As Commander-in-Chief, the Governor of California calls members of the California National Guard into active duty to serve the needs of California. The California National Guard is vital for various State functions including emergency and natural disaster response and drug interdiction. The California National Guard acts to protect people and property in many ways, and the State relies on the National Guard to be ready to intervene in emergent situations to help protect Californians. As a general matter, it is the Governor, in conjunction with local law enforcement, who is best situated to determine the resources needed in times of emergency.

71.  By unlawfully diverting 4,000 service members from their state responsibilities for at least 60 days, Defendants' action impairs the Governor's ability as Commander-in-Chief of the California National Guard to call upon the State's National Guard for emergencies and to carry out other critical functions.

72.  The California National Guard, composed of the California Army National Guard and the California Air National Guard, has approximately 18,733 service members, with 12,212 available for deployment. Most of the California National Guard members serve as reserve forces, meaning that their role in the California National Guard is part-time, and they are generally employed in civilian roles separate from their work as service members. Many of these service members receive specialized training to perform specific duties, and all play a critical role in protecting the State.

73.  As a recent example of the National Guard's important work, in January 2025, the Guard was called upon to assist in fighting one of the most destructive fires in the State's history in Los Angeles County. Between January 7, 2025, when the fires started, and January 11, 2025,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   Governor Newsom activated 2,500 service members to support firefighting efforts. Many of the

2   National Guard members were dispatched the same day as the fire began. In addition to

3   firefighting support, the National Guard's provision of resources was critical to assisting local

4   authorities and ensuring the safety of the surrounding community, firefighting brigades, and

5   pilots.

6        74.  This deployment comes when California is in the midst of peak wildfire season for

7   both Northern and Southern California and may need to rely on their crucial support, as the State

8   did during the Los Angeles fires earlier this year.

9        75.  When the State faces simultaneous emergencies, the National Guard's resources can

10  be stretched thin. For example, in 2020, the California National Guard was required to respond to

11  COVID-19, multiple wildfires at once, and civil unrest, significantly burdening the National

12  Guard's military policing resources and making it difficult to fulfill emergent needs across the

13  State. Such overlapping emergencies cannot be predicted.

14       76.  All 4,000 of the federally deployed National Guard members are now unavailable if a

15  natural disaster or other state-emergency erupts. These National Guard members, coming from

16  the 79th Infantry Brigade Combat Team, include a large number of guard members who serve in

17  Taskforce Rattlesnake, the State's specialized fire combat unit. These service members have

18  specialized training in wildland fire mitigation and prevention and direct fire suppression, and

19  would be highly difficult for the State to replace.

20       77.  The 79th Infantry Brigade also contains Counterdrug Taskforce members that

21  specialize in providing support to stop the trafficking of fentanyl at the U.S.-Mexico Border.

22       78.  Because these National Guard members have been federalized for 60 days—

23  unlawfully, as detailed below—the State of California is deprived of resources to protect itself

24  and its citizens, and of critical responders in the event of a State emergency.

25

26

27

28

15

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1              **CLAIMS**

2

3              **FIRST CAUSE OF ACTION**
                      **Ultra Vires**
4                   **(All Defendants)**

5       79.   Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set

6    forth herein.

7       80.   Neither the President nor an agency can take any action that exceeds the scope of

8    their constitutional or statutory authority.

9       81.   Federal courts possess the power in equity to grant injunctive relief "with respect to

10   violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S.

11   320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against

12   federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v.*

13   *Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

14      82.   Section 12406 requires that orders pursuant to that section be "issued through the

15   governors of the States or, in the case of the District of Columbia, through the commanding

16   general of the National Guard of the District of Columbia." 10 U.S.C. § 12406.

17      83.   Section 12406 originated as part of the Militia Act of 1903. Publ. L. No. 57-33, 32

18   Stat. 775 (1903). The original section did not include this provision, but the statute was

19   subsequently amended to include the requirement that orders be issued through the governor.

20   Militia Act of 1908, ch. 204, 35 Stat. 399 (1908).

21      84.   "'A statute should be construed so that effect is given to all its provisions, so that no

22   part will be inoperative or superfluous, void or insignificant.'" *Hibbs v. Winn*, 542 U.S. 88, 101

23   (2004) (quoting Singer, Statutes and Statutory Construction § 46.06, pp. 181–186 (rev. 6th ed.

24   2000)). "'[A] significant change in language is presumed to entail a change in meaning' even

25   when legislative history is silent as to Congress's intent." *In re Saldana*, 122 F.4th 333, 341 (9th

26   Cir. 2024) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal

27   Texts 256–60 (2012)).

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

85.  As discussed *supra*, Defendants did not notify Governor Newsom of the orders or attempt to obtain his consent. Nor did they issue their orders through the Governor as the statute directs. This circumvention deprived the Governor of the opportunity that compliance with the terms of the statute would have afforded him—at a minimum, consultation with the President or other federal officials not only as to whether the California National Guard should be called into federal service at all, but if so, which service members and in what number should be called, and for what purposes and what period of time.

86.  President Trump's Memo purporting to call into federal service members of the California National Guard under 10 U.S.C. § 12406 without issuing this order through Governor Newsom is contrary to law and outside of the authority granted to the President under that statute.

87.  Secretary Hegseth's orders purporting to federalize 4,000 members of the California National Guard without issuing these orders through Governor Newsom are contrary to law and outside of Secretary Hegseth's authority.

88.  Defendants' actions are *ultra vires* for reasons beyond their failure to follow the procedural requirements of section 12406. Conditions in California did not fall under any of the situations set forth in section 12406 that would allow its invocation at the time it was invoked, nor do they now, nor is it reasonable to expect them to for the next 60 days. The statute authorizes the federalization of the National Guard to (1) repel invasion of the United States by a foreign nation, (2) suppress a rebellion or danger of rebellion against the authority of the Government of the United States; or (3) execute federal laws when the President is unable to do so with the regular forces. 10 U.S.C. § 12406(1)-(3).

89.  The Trump Memo does not (and cannot) assert that California is being invaded or is in danger of invasion by a foreign power. Nor has the Trump Administration identified a "rebellion," which is generally understood to connote "an organized attempt to change the government or leader of a country, [usually] through violence," something much beyond mere protest or sporadic acts of disobedience and violence. *Rebellion, Black's Law Dictionary* (12th ed. 2024). The Trump Memo asserts that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the

17

1    Government of the United States," but primarily peaceful protests with some acts of violence or

2    civil disobedience do not rise to the level of a rebellion. Indeed, nothing about the scale of the

3    protests or acts of violence set these events apart from other recent periods of significant social

4    unrest.

5    90.  Defendants have also not shown that any of the protests have rendered the President

6    "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3).

7    Indeed, Governor Newsom and Mayor Karen Bass both reported on June 7, 2025, that they had

8    sufficient resources to respond to any potential unrest or threats to safety or property. A June 8

9    letter from the Office of Governor Newsom to Secretary Hegseth notes that as "demonstrated by

10    the robust law enforcement response yesterday evening to protect federal facilities, local law

11    enforcement resources are sufficient to maintain order." And on both June 6 and 7, ICE officials

12    were able to act on warrants and make arrests.

13    91.  Violation of the Posse Comitatus Act is imminent, if not already underway.

14    92.  Accordingly, Plaintiffs are entitled to a declaration that any action taken pursuant to

15    the June 7, 2025 Presidential Memorandum is invalid, and an injunction prohibiting DOD

16    Defendants from implementing the Memorandum.

17                    **SECOND CAUSE OF ACTION**
18    **Tenth Amendment of the U.S. Constitution; Article I, § 8, cls. 15-16; Title 32**
                            **(All Defendants)**
19

20    93.  Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set

21    forth herein.

22    94.  The Tenth Amendment provides that "[t]he powers not delegated to the United States

23    by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to

24    the people."

25    95.  The President's unlawful order calling up "at least 2,000 National Guard personnel"

26    infringes on Governor Newsom's role as Commander-in-Chief of the California National Guard

27    and violates the State's sovereign right to control and have available its National Guard in the

28    absence of a lawful invocation of federal power.

96.   Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government." *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878).

97.   Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

98.   Deploying over 4,000 federalized military forces to quell a protest or prevent future protests despite the lack of evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State Power that is at the heart of the Tenth Amendment. State officials in conjunction with local officials, such as the Los Angeles Police Department and the Los Angeles Sheriff's Department are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

99.   Further, here the federal government is not merely intruding on the province of the State, but doing so by taking command of the State's own resources, the California National Guard, which remains under State control unless properly federalized. Proper federalization has not happened here.

100. Because the January 7, 2025 Presidential Memoranda and resulting DOD Order and June 9 DOD Order purport to federalize the National Guard for an unconstitutional and illegal

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    purpose, Plaintiffs respectfully ask the Court to find that the Orders are void, and that the

2    National Guard should be transferred back to the rightful command and control of the State of

3    California through Governor Newsom.

4        101. Plaintiffs are also entitled to a declaration that any action taken pursuant to the June 7,

5    2025 Presidential Memorandum is invalid, and an injunction prohibiting DOD Defendants from

6    implementing the Memorandum.

7

8                        **THIRD CAUSE OF ACTION**
                     **Violation of the Administrative Procedure Act**
                            **(Against DOD Defendants)**

9

10       102. Plaintiffs reallege and incorporate by reference the foregoing allegations as fully set

11   forth herein.

12       103. Under the Administrative Procedure Act, a court must "hold unlawful and set aside

13   agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

14   accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess

15   of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.

16   § 706(2)(A)-(C).

17       104. An agency may not take any action that exceeds the scope of its constitutional or

18   statutory authority.

19       105. The DOD Defendants lack authority to federalize members of the California National

20   Guard without issuing such orders through Governor Newsom, who has not consented to their

21   actions or been afforded the opportunity to consult on any deployment. Such agency actions are

22   unauthorized, unprecedented, and not entitled to deference by this Court.

23       106. Accordingly, Plaintiffs are entitled to a declaration that Secretary Hegseth's June 7

24   and June 9 Orders are invalid, and an injunction prohibiting DOD Defendants from implementing

25   the June 7, 2025 Presidential Memorandum.

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**PRAYER FOR RELIEF**

107. Wherefore, Plaintiffs request that the Court enter a judgment against Defendants and award the following relief:

    a.  A declaration that the June 7, 2025 Presidential Memorandum calling into Federal service members and units of the National Guard under 10 U.S.C. § 12406 and Secretary Hegseth's June 7 and June 9 Orders (and any future orders) calling the California National Guard into service under the stated authority of the President's use of 10 U.S.C. § 12406 are unauthorized by and contrary to the laws of the United States;

    b.  Injunctive relief prohibiting the DOD Defendants from federalizing and deploying the California National Guard and military without meeting the requirements of 10 U.S.C. § 12406, which include that issuance shall be "through the Governor" and only for the reasons set forth in 10 U.S.C. § 12406 (1-3) and not to conduct domestic law enforcement activities;

    c.  Award the State of California its costs and reasonable attorneys' fees; and

    d.  Such additional relief as the court deems proper and the interests of justice may require.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

| | |
|---|---|
| Dated:  June 9, 2025 | Respectfully submitted, |
| | **ROB BONTA** |
| | Attorney General of California |
| | MARISSA MALOUFF |
| | JAMES E. STANLEY* |
| | Supervising Deputy Attorneys General |
| | NICHOLAS ESPÍRITU |
| | LUKE FREEDMAN |
| | ROBIN GOLDFADEN |
| | BRENDAN M. HAMME |
| | LORRAINE LOPEZ* |
| | KENDAL MICKLETHWAITE |
| | MEGAN RICHARDS |
| | Deputy Attorneys General |
| | /s/ Laura L. Faer |
| | LAURA L. FAER |
| | Acting Senior Assistant Attorney General |
| | 1515 Clay St. |
| | Oakland, CA  94612 |
| | Telephone: (510) 879-3304 |
| | E-mail:  Laura.Faer@doj.ca.gov |
| | *Attorneys for Plaintiffs* |
| | * Admission Pending |

22